**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STRIKE, LLC, *et al.*[1] | ) Case No. 21-90054 (DRJ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF SEAN GORE IN SUPPORT OF DEBTORS' PETITIONS AND
REQUESTS FOR FIRST DAY RELIEF**

I, Sean Gore, Executive Vice President and Chief Financial Officer of Strike, LLC, declare

pursuant to 28 U.S.C. § 1746 as follows:

## I.     **INTRODUCTION**

1.      The Debtors provide pipeline, facilities, and infrastructure solutions to the energy

sector.  Partnering closely with clients in all major basins in the United States, the Debtors

deliver a full range of integrated engineering, construction, maintenance, integrity, and specialty

services to oil and gas companies.

2.      Beginning in late summer 2021, the Debtors foresaw that they would experience a

precipitous liquidity shortfall in the third quarter of this year.  The Debtors' liquidity issues were

the result of lower than predicted activity levels by certain key customers, margin pressures

driven by low at-bid margin jobs, and large money-losing projects.  In addition to its declining

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: Strike, LLC (2120); Strike HoldCo, LLC (0607); Delta Directional Drilling, LLC (9896); Strike Global Holdings, LLC (4661); Capstone Infrastructure Services, LLC (0161); and Crossfire, LLC (7582).  The location of Debtor Strike, LLC's principal place of business and the Debtors' service address is: 1800 Hughes Landing Boulevard, Suite 500, The Woodlands, Texas 77380.  Additional information regarding this case may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/StrikeLLC.

liquidity position, the Debtors' asset-backed loan facility was set to mature on November 30, 2021, the Debtors' refinancing efforts with respect to that facility had stalled, and the existing lenders under that facility at that time had no interest in remaining in the Debtors' capital structure. Efforts to raise additional capital from its equity holders had also failed. Left with no other options, the Debtors sought rescue financing to avoid a free-fall into bankruptcy.

3.      Although the Debtors reached out to various potential financing sources, including various lenders under the Debtors' prepetition term loan facility, American Industrial Partners, Ltd. ("**AIP**") and certain of its affiliates (together with AIP, the "**AIP Parties**"), who at the time owned more than two-thirds of the loans under the Debtors' term loan facility, were the only parties that expressed a willingness to provide additional liquidity to the Debtors. The AIP Parties subsequently acquired all of the loans, and became the administrative agent, under the Debtors' asset-backed loan facility.

4.      The Debtors engaged in extensive good-faith negotiations with the AIP Parties to obtain the funding needed to preserve their businesses as a going-concern on the best possible terms. These negotiations were extended on September 30, 2021, when the Debtors and the AIP Parties entered into a forbearance agreement with respect to certain defaults under its term loan and asset-backed loan facilities. Thereafter, on October 18, 2021, the Debtors and the AIP Parties entered into a series of agreements, including an additional forbearance agreement and amendment to its term loan facility and a forbearance and amendment to its asset-backed loan facility whereby the Debtors obtained commitments from the AIP Parties to make up to $40 million of additional loans to fund the Debtors' operations while the parties negotiated a comprehensive restructuring.

AMERICAS 108903890

5.      On November 22, 2021, the Debtors and the AIP Parties entered into a restructuring support agreement (the "**RSA**")[2] with the common goal of maximizing the value of the Debtors' assets through the sale of substantially all of the Debtors' assets and winding down their estates in a responsible and efficient manner.  The RSA contemplates that the Debtors will engage in a pre and post-petition marketing process, collect bids and conduct an auction during these chapter 11 cases in order to obtain the highest and best price for their assets.  The AIP Parties agreed to provide the stalking horse bid with respect to that competitive sale process and debtor-in-possession financing in an amount believed to be sufficient to fund the administration of the chapter 11 cases, including the sale and wind-down processes.  Through these chapter 11 cases, the Debtors intend to run a competitive sale process to market-test the stalking horse bid, preserve the ability to sell the Debtors' businesses as a going concern, save thousands of jobs and vendor and customer relationships, and maximize the value of their estates for the benefit of all of their stakeholders.  Thereafter, the Debtors intend to distribute the proceeds of the sale, if any, and wind down their estate in an efficient and responsible manner through the proposal of a chapter 11 plan of liquidation.

6.      Critically, the going-concern value of the Debtors' business is dependent on the continued support of its employees, customers and vendors.  Most of the Debtors' customer contracts are limited in duration and there is no guarantee that key customers will continue to accept the Debtors' bids and award them work during the pendency of the chapter 11 cases.  In addition, because the Debtors' work force is highly mobile, there is a high risk of attrition.  I believe a fast process is necessary to mitigate the risk of customer and employee flight.  To that end, the Debtors have committed to complete the sale process within 60 days.  The AIP Parties'

---

[2]      A copy of the RSA is attached as **Exhibit A**.

AMERICAS 108903890

commitment to fund this case and submit a stalking horse bid is contingent on consummating a sale by that deadline.  If the Debtors' sale process is delayed there is a strong likelihood that attrition among their key customers and employees will cause their businesses to deteriorate significantly and value will be lost.  It is therefore essential for the Debtors to complete their restructuring on the contemplated 60 day time table to protect the businesses from any further erosion or deterioration that could endanger the enterprise.

## II.  BACKGROUND OF DECLARANT

7.      I am the Executive Vice President and Chief Financial Officer of Strike, LLC.  I was appointed to the board of managers of Strike Investment, LLC (the indirect corporate parent of Strike, LLC) ("**Strike Investment**") in February 2021.  In July 2021, I resigned from that position and was appointed to my current position as the Executive Vice President and Chief Financial Officer of Strike, LLC.

8.      I have extensive experience as a corporate executive in the energy sector.  I am currently the President and Chief Executive Officer of Global Geophysical Services Inc. ("**GGS**"), a seismic services company specializing in the acquisition of seismic data for the oil and gas industry.  I have held that position since April 2016.  From January 2014 to April 2016, I was the Senior Vice President and Chief Financial Officer of GGS.  Prior to my tenure at GGS, I served as the Chief Financial Officer at Aperio Energy Partners, LLC, an oil and gas exploration and production company.  I have also held various executive roles at U.S. Concrete, a publicly-traded company specializing in concrete and heavy construction aggregates and Petroleum Geo-Services ASA, a publicly-traded Norwegian company specializing in marine seismic data acquisition and processing worldwide.

4

AMERICAS 108903890

9.     On December 6, 2021 (the "**Petition Date**"), Strike, LLC and certain of its affiliates (collectively, the "**Debtors**") each filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), commencing the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**").  A chart depicting the Debtors' organization structure as of the Petition Date is attached to this declaration as **<u>Exhibit B</u>**.

10.     To ease their transition into operating as debtors-in-possession, the Debtors filed motions seeking various types of "first day" relief (the "**First Day Motions**").  I submit this declaration to (i) offer the Court and parties in interest a background of the Debtors and the circumstances leading to the commencement of the Chapter 11 Cases; and (ii) provide an evidentiary basis for the relief requested in the First Day Motions.

11.     I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.  Unless stated otherwise, all facts in this declaration are based on my personal knowledge, my discussions with members of the Debtors' management team and outside advisors to the Company, my review of documents and information concerning the Debtors and their operations, financial affairs, and restructuring efforts, or my experience and general knowledge about the Company.

12.     I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called to testify, I would testify to the matters set forth in this declaration.

### III.   <u>DISCUSSION</u>

#### A.   **Business Overview**

13.     Headquartered in The Woodlands, Texas, the Debtors provide pipeline, facilities, and infrastructure solutions to the energy sector.  The Debtors' business is generally divided into

two segments, (1) infrastructure and integrity services ("**IIS**") and (2) facilities and specialty services ("**FSS**").  The Debtors' IIS and FSS customers include some of the largest companies in the oil and gas industry.  Further, the Debtors are well-positioned to expand their business in the growing green energy sector.

14.    The Debtors' IIS segment provides oil and gas companies with services that assist them in constructing and maintaining the condition of their pipeline and related facility assets. Those services include predictive maintenance and inspection to identify any anomalies in the assets.  The Debtors also provide their clients with repair and remediation services when such services are required.  The Debtors' IIS segment is comprised of 5 regional business units.

15.    The Debtors' FFS segment performs major capital projects and provides facilities, EPC, fabrication, directional drilling, industrial instrumentation and electrical services.  The major capital projects division of the Debtors FFS segment focuses on the construction of pipeline, pump and compressor stations, and other facilities used primarily in connection with the transportation of hydrocarbons (*i.e.* oil and natural gas).[3]   The Debtors specialize in congested corridor installation and complex installation techniques.  They have significant experience working along the Texas gulf coast and all other major basins across the United States.  The Company has performed some of the largest pipeline and facilities projects in the industry, including installing the largest diameter natural gas pipeline constructed in the last 50 years.

16.    The services division of the FSS segment includes 3 specialty brands under the Bolt, Delta Directional, and Pickett brands.  Bolt specializes in industrial instrumentation and electrical contractor services.  Delta Directional is a leader in horizontal drilling, boring, and

---

[3]      Given the current market, I expect the major capital project division to be a much smaller part of the Debtors' business than it has been historically.

AMERICAS 108903890

fiber installation services for the pipeline and telecom industries.  Finally, Pickett is a premium measurement and fabrication services company that specializes in the manufacturing of skid-mounted measurement equipment.

17.    The Debtors also have leveraged the expertise of their IIS and FFS segments to perform work in the green energy and clean technology industries, including solar, wind and geothermal projects.  For instance, the Debtors have constructed a 100-megawatt solar farm facility from the ground up, prepared wind power collection sites for wind turbine installations, and provided geothermal energy pipeline solutions.  The Debtors intend to expand their renewable energy service offerings to service the growing green energy sector.

18.    The Debtors have approximately 2,500 employees and locations in all of the major oil and gas basins across the United States.  The Debtors' operating revenue for the twelve-month period that ended 2020 was approximately $1 billion, and, as of the Petition Date, the Debtors have over $308,000,000 in aggregate original principal amount of prepetition funded debt obligations.

### B.    The Debtors' Prepetition Secured Indebtedness

19.    The Debtors' prepetition capital structure consists of (i) a revolving asset-backed loan facility (the "**Prepetition ABL Facility**"), which was subsequently amended to provide incremental delayed draw term loans provided by the AIP Parties (the "**Prepetition Bridge Facility**," and together with the Prepetition ABL Facility, the "**Prepetition Senior Loan Facility**") governed by the Prepetition Senior Loan Agreement (as defined below), (ii) a term loan facility (the "**Prepetition Junior Loan Facility**") governed by the Prepetition Junior Loan Agreement (as defined below), and (iii) certain capital lease obligations.  In addition, the

7

Company has one cash-collateralized undrawn letter of credit in an aggregate face amount of $2,000,000 (the "**Prepetition LC**").

### i. Prepetition Senior Loan Facility

20.     Strike, LLC, Delta Directional Drilling, LLC ("**Delta Drilling**"), and Strike Global Holdings, LLC ("**Strike Global Holdings**"), as borrowers, Strike Holdco, LLC ("**Strike Holdco**"),[4] as Holdings, subsidiaries of Strike, LLC, as subsidiary guarantors (the "**Senior Loan Subsidiary Guarantors**"), certain financial institutions, as Lenders (the "**Senior Lenders**"), and Lightship Capital II LLC (as successor in interest to Bank of America, N.A.), as administrative agent and collateral agent (in such capacities, the "**Senior Loan Agent**," and together with the Senior Lenders and the other Secured Parties (as defined therein), the "**Senior Secured Parties**"), are parties to an *ABL Loan and Security Agreement*, dated as of November 30, 2016 (as amended, amended and restated, supplemented or otherwise modified, the "**Prepetition Senior Loan Agreement**," and together with the other Loan Documents (as defined in the Prepetition Senior Loan Agreement), the "**Prepetition Senior Loan Documents**"), which provided for (i) the Prepetition ABL Facility and (ii) the Prepetition Bridge Facility.[5]

21.     Pursuant to the Prepetition Senior Loan Documents, the Debtors granted the Senior Secured Parties liens on, and security interests in, Collateral (as defined in the Prepetition

---

[4]      In connection with Amendment No. 4 to the Prepetition Senior Loan Agreement entered into on February 12, 2021 (the "**ABL Amendment No. 4**"), the Prepetition Senior Loan Documents were amended, among other things, to release Strike Capital from its obligations under the Prepetition Senior Loan Documents and to substitute, in place of Strike Capital (including in place of each reference to Strike Capital in the Prepetition Senior Loan Agreement and its exhibits), Strike Holdco, in each case, as a party to such Prepetition Senior Loan Document. At such time Strike Holdco (i) became a party to the Prepetition Senior Credit Agreement, the Senior Loan Guaranty (as defined below), and the other Prepetition Senior Loan Documents, including the Intercreditor Agreement (as defined below) and, in the case of each applicable Prepetition Senior Loan Document, assumed the obligations of "Holdings" and as a Guarantor (in each case, as defined therein) thereunder, and (ii) pledged and granted to the Senior Loan Agent for the benefit of the Senior Secured Parties a security interest in and lien on all of its Prepetition Collateral.

[5]      In connection with ABL Amendment No. 5 (as defined below), on October 18, 2021, the Prepetition Senior Loan Documents were amended, among other things, to add the Prepetition Bridge Facility, pursuant to which the Senior Lenders agreed to advance the Initial Bridge Loans (as defined below), and in connection with ABL Amendment No. 6 (as defined below), on November 12, 2021, the Senior Lenders agreed to advance the Additional Bridge Loans (as defined below).

AMERICAS 108903890

Senior Loan Agreement), consisting of substantially all assets of the Debtors, but excluding certain Excluded Assets (as defined in the Prepetition Senior Loan Agreement) (the "**Prepetition Senior Loan Collateral**," and the liens and security interests granted on the Prepetition Senior Loan Collateral under the Prepetition Senior Loan Documents, the "**Prepetition Senior Liens**") to secure all obligations under the Prepetition Senior Loan Documents (collectively, the "**Senior Loan Secured Obligations**").

22.     Under the Prepetition Senior Loan Documents, Strike Holdco, Strike, LLC (except as to its own obligations) and the other Guarantors (as defined in the Prepetition Senior Loan Agreement and, collectively, the "**Prepetition Senior Loan Guarantors**") provided to the Senior Secured Parties an unconditional joint and several guaranty of the Senior Secured Obligations (the "**Senior Loan Guaranty**"), which guaranty is secured by the Prepetition Senior Loan Collateral.

23.     As of the Petition Date, the aggregate amount of revolving loans outstanding under the Prepetition ABL Facility was approximately $51,000,000 and the aggregate principal amount of Bridge Loans outstanding under the Prepetition Bridge Facility was approximately $30,000,000.

**ii.     Prepetition Junior Loan Facility**

24.     Strike, LLC, as borrower, Strike Holdco, as guarantor, subsidiaries of Strike, LLC, as subsidiary guarantors (the "**Junior Loan Subsidiary Guarantors**"), certain financial institutions, as lenders (the "**Junior Lenders**"), and Wilmington Trust, National Association, as administrative agent and collateral agent (in such capacities, the "**Junior Loan Agent**," and together with the Junior Lenders and the other Secured Parties (as defined therein), the "**Junior Secured Parties**;" the Junior Secured Parties and the Senior Secured Parties, together, the

9

"**Prepetition Secured Parties**") are parties to a *Term Loan and LC Loan and Security Agreement*, dated as of November 30, 2016 (as amended, amended and restated, supplemented or otherwise modified, the "**Prepetition Junior Loan Agreement**," and together with the other Loan Documents (as defined in the Prepetition Junior Loan Agreement), the "**Prepetition Junior Loan Documents**").

25.     Pursuant to the Prepetition Junior Loan Documents, the Debtors granted the Junior Secured Parties liens on, and security interests in, Collateral (as defined in the Prepetition Junior Loan Agreement), consisting of substantially all assets of the Debtors, other than certain Excluded Assets (as defined in the Prepetition Junior Loan Agreement) (the "**Prepetition Junior Loan Collateral**," and the liens and security interests granted on the Prepetition Junior Loan Collateral under the Prepetition Junior Loan Documents, the "**Prepetition Junior Liens**;" the Prepetition Junior Loan Collateral together with the Prepetition Senior Loan Collateral, the "**Prepetition Collateral**," and the Prepetition Junior Liens together with the Prepetition Senior Liens, the "**Prepetition Liens**"), to secure all obligations under the Prepetition Junior Loan Documents (collectively, the "**Junior Loan Secured Obligations**," and together with the Senior Secured Obligations, the "**Prepetition Secured Obligations**").

26.     As required by the Prepetition Junior Loan Documents, Strike HoldCo, Strike, LLC (except as to its own obligations), and the Junior Loan Subsidiary Guarantors (collectively, the "**Prepetition Junior Loan Guarantors**") provided the Junior Secured Parties an unconditional joint and several guaranty of the Junior Secured Obligations (the "**Junior Loan Guaranty**," and together with the Senior Guaranty, the "**Prepetition Guaranties**"), which guaranty is secured by the Prepetition Junior Loan Collateral.

AMERICAS 108903890

27.    As of the Petition Date, the aggregate principal amount of term loans outstanding under the Prepetition Term Loan Agreement was approximately $215,000,000.

### iii.    Intercreditor Agreement

28.    The rights and remedies of the Senior Secured Parties and the Junior Secured Parties, and the relative priorities of the Prepetition Liens on the Prepetition Collateral granted to the Senior Loan Agent, on behalf of itself and the Senior Secured Parties, and to the Junior Loan Agent, on behalf of itself and the Junior Secured Parties, respectively, are set forth in an ABL Intercreditor Agreement, dated as of November 30, 2016 (as amended, restated, supplemented, or otherwise modified, the "**Intercreditor Agreement**") by and between the Senior Loan Agent, as Senior Lien Representative, and the Junior Loan Agent, as Junior Lien Representative, and Strike Holdco and Strike, LLC, as Grantors, and the other grantors.[6]    The Intercreditor Agreement contains provisions governing the relationship between the Senior Loan Agent and the other Senior Secured Parties and the Junior Loan Agent and the other Junior Secured Parties, including with respect to the relative lien and payment priority of their respective interests in the Prepetition Collateral and to set forth the parties' rights with regard to post-petition financing and other bankruptcy related rights.    The Intercreditor Agreement provides that the Prepetition Senior Liens are senior in all respects to the Prepetition Junior Liens on all Prepetition Collateral, and the Junior Loan Secured Obligations are subordinated to the Senior Loan Secured Obligations.

### iv.    Capital Leases

29.    Debtor Strike, LLC also is a party to certain capital lease agreements with respect to certain of its fleet and IT equipment (collectively, the "**Capital Leases**").    The lessors and

---

[6]    The Senior Loan Agent, the Junior Loan Agent, and certain of the Debtors entered into an amended and restated Intercreditor Agreement on October 18, 2021 in connection with the October 18, 2021 amendment to the Prepetition Senior Loan Agreement and Prepetition Junior Loan Agreement (as defined below).    The amended and restated Intercreditor Agreement, among other things, modified the respective lien and payment priorities of the Prepetition Secured Obligations.

AMERICAS 108903890

total outstanding amount with respect to each such capital lease, as of October 31, 2021, are listed in the table below.

| Counterparty | Outstanding Amount (October 31, 2021) |
|---|---|
| Merchants Automotive Group, Inc. | $14,024,360 |
| VFS Leasing Co. | $854,058 |
| Caterpillar Financial Services Corporation | $414,686 |
| Wells Fargo Financial Services | $77,572 |
| FlexTG Financial Services – MN | $71,586 |
| Canon Financial Services Inc. | $31,089 |

### C.     Circumstances Leading to the Commencement of the Chapter 11 Cases

30.     The Debtors were founded in 2003 by Stephen Pate, Kevin Pate, Richmond Pate, Kacey Smart, and Jarvis Arnold.  Until about 2014, the Debtors were largely run as a closely-held, family-owned business.  The Debtors' business and revenue grew exponentially in the early 2000's and they quickly began to compete for, and win, some of the largest projects in the oil and gas industry.  During that period of rapid expansion, the Debtors experienced some growing pains due to the volatile nature of their major projects division, challenges with certain of their major projects, and the competitive and cyclical nature of the oil and gas industry.

31.     In 2018, the Debtors encountered operational issues related to delays and cost overruns with respect to three significant projects undertaken by their major projects division. Those issues were compounded in late 2019, when a confluence of factors caused the Debtors to experience a liquidity crunch.  First, one of the Debtors' projects with a major liquefied natural gas company became delayed due to, among other things, regulatory oversight from the Federal Energy Regulatory Commission and abnormally heavy rainfall in the Oklahoma area.  Those

12

delays significantly affected the Debtors' cash flows from the end of 2019 through beginning of 2020.  Second, in March 2020, competition between Saudi Arabia and Russia caused the price of crude oil to drop precipitously resulting in reduced pipeline volumes.  As a result, many of the Debtors' customers opted to defer the non-critical capital and maintenance projects that drive the Debtors' business until volume rebounded.  Third, administrative delays with respect to the permitting of new pipeline construction reduced the anticipated demand for major capital projects work.  Finally, like most other businesses, the Debtors' projects were affected by the lock-down orders, work stoppages, and economic contraction in response to the COVID-19 pandemic that continues through today.

32.     The Debtors' responded swiftly to those challenges, and the resulting drop in revenue, by eliminating structural costs and reducing their head count.  The Debtors also developed, and began to implement, a plan to reduce their fleet and other overhead to adjust to the lower volume of business.  Ultimately, those cost saving measures were not adequate and the Debtors' financial issues placed in doubt their ability to comply with certain financial covenants under their Prepetition Junior Loan Agreement.

33.     The Debtors entered into arm's-length negotiations with their lenders and in September 2020, entered into an amendment to the Prepetition Junior Loan Agreement which, increased the maximum leverage the Debtors could incur through the end of 2021 and provided the Debtors with the breathing room needed to attempt to stabilize their business.  That amendment was contingent on the Debtors raising additional equity or subordinated debt to reduce the principal amount of the Prepetition Junior Loan Obligations and provide the Debtors with liquidity to fund their operational restructuring initiatives and working capital needs.

AMERICAS 108903890

34.     In the winter of 2020-2021, the Debtors ran a competitive process to raise the required additional capital.  On February 12, 2021, Mill Point Capital, LLC ("**Mill Point**") purchased $65,000,000 of preferred equity units (the "**Preferred Units**") in Strike Investment (a newly-formed parent company of the Debtors) pursuant to a Securities Purchase Agreement.

35.     On February 12, 2021, concurrent with the issuance of the Preferred Units, the Prepetition Senior Loan Documents and the Prepetition Junior Loan Documents were each amended again (the "**February 2021 Amendments**") to, among other things, release Strike Capital, LLC ("**Strike Capital**") from its obligations under the Prepetition Senior Loan Documents and the Prepetition Junior Loan Documents, respectively, and to substitute, in place of Strike Capital, Strike HoldCo, in each case, as a party to the Prepetition Senior Loan Documents and Prepetition Junior Loan Documents.  In addition, the Prepetition Senior Loan Agreement was amended to reduce the existing revolver commitments from the original maximum amount of $100,000,000 to $85,000,000.

36.     Of the $65,000,000 raised by the sale of the Preferred Units, $40,000,000 was used to pay down the outstanding principal amount of the Term Loan Obligations, approximately $10,000,000 was used to pay costs and expenses associated with the Mill Point investment, and the remaining approximately $15,000,000 was used to fund the Debtors' working capital needs and restructuring initiatives.

37.     The Debtors' performance continued to lag behind expectations during the first three quarters of 2021 and in the second and third quarters of 2021, in particular, revenue targets were missed by approximately 35% and 40%, respectively.  Given this top line deterioration, the additional capital from Mill Point proved insufficient to solve the Debtors' financial issues.  In late June 2021, the board of managers of Strike Investment determined it was prudent to replace

14

the Debtors' existing management.  On July 1, 2021, Strike, LLC announced the appointment of Chuck Davison as Chief Executive Officer and myself, Sean Gore, as Chief Financial Officer. We quickly got up to speed, formulated a turn-around plan, and expeditiously began to execute a number of new initiatives to improve the Debtors' culture, operations and balance sheet.  Those initiatives included (1) holding regular town hall meetings with our employees, (2) implementing improved forecasting processes, (3) identifying and addressing issues with key customers, (4) defining and executing a reduction in the Debtors' fixed costs, (5) removing redundancies between business units (and in certain cases completely eliminating business units to streamline operations), and (6) implementing a number of leadership changes at certain of the Debtors' key business units.

38.     Notwithstanding the Mill Point capital infusion and operational changes implemented by Mr. Davison and me, later in the summer of 2021, the Debtors recognized that they would face a true liquidity cliff before the start of the fourth quarter of 2021.  In anticipation of that shortfall, the Debtors and their advisors entered into discussions with Mill Point regarding an additional capital infusion.  Ultimately, Mill Point determined that it would not provide additional capital to the Debtors.

39.     To direct the Debtors' evaluation of potential transactions and rescue financing, on September 19, 2021, Anthony Horton and Patrick Bartels were appointed as independent managers (the "**Independent Managers**") to the Board of Managers (the "**Board of Managers**") of Strike Investment, the sole member of Strike Holdco.  The Board of Managers established a restructuring committee consisting of the Independent Managers and delegated the sole authority to investigate, evaluate, negotiate, and enter into potential restructuring

15

transactions on behalf of the Debtors to the Independent Managers.  The Independent Managers have worked closely with the Debtors in all aspects of the restructuring negotiations.

40.    In addition to Mill Point, the Debtors and their advisors contacted additional financing sources regarding potential rescue financing.  The AIP Parties, who at the time held more than two-thirds in amount of the outstanding obligations under the Prepetition Junior Loan Agreement, were the only party that offered to provide that financing.  The AIP Parties subsequently purchased all of the outstanding obligations and became administrative agent under the Prepetition Senior Loan Agreement in order to resolve certain impending defaults that the incumbent asset-backed lenders were unwilling to waive.

41.    Throughout the fall of 2021, the Debtors continued to engage in good-faith negotiations with the AIP Parties to obtain the funding needed to preserve their businesses as a going-concern on the best possible terms and agree on the terms of a comprehensive restructuring.  Those negotiations were extended on September 30, 2021, when the Debtors and the AIP Parties entered into forbearance agreements with respect to certain defaults under the Prepetition Senior Loan Agreement and the Prepetition Junior Loan Agreement, which allowed the Debtors to avoid potential cash dominion under the Prepetition Senior Loan Agreement.

42.    On October 18, 2021, a series of agreements were executed to provide the Debtors with additional liquidity necessary to keep our operations going, including (1) a forbearance and amendment to the Prepetition Junior Loan Agreement, (2) a forbearance and amendment to the Prepetition Senior Loan Agreement that, among other things, provided the Company with the initial Bridge Loan in the aggregate amount of $20,000,000 to fund our working capital needs, and (3) an amendment to the Intercreditor Agreement subordinating the Prepetition Junior Loan to the Prepetition Senior Loan.

16

43.     On November 12, 2021, the Debtors and certain of the AIP Parties agreed to further amend the Prepetition Senior Loan Agreement to provide for an additional bridge loan necessary to fund our businesses in an incremental principal amount not to exceed $20,000,000. Immediately thereafter, the Debtors' investment banker, Opportune Partners, LLC commenced a marketing process for the sale of substantially all of the Debtors' assets.

44.     On November 22, 2021, the Debtors and the AIP Parties entered into the RSA. The RSA is an agreement by the Debtors and the AIP Parties that will allow the Debtors to work towards the goal of maximizing the value of the Debtors' assets and winding down their estates in a responsible and efficient manner pursuant to a chapter 11 plan of liquidation.  Thereafter, the Debtors and the AIP Parties negotiated and, on December 6, 2021, entered into the stalking horse asset purchase agreement (the "**Stalking Horse Agreement**") and debtor-in-possession loan documents (the "**DIP Loan Documents**").

### D.  Objectives of the Chapter 11 Cases

45.     The Debtors are requesting authorization to run a competitive sale process under which any interested party may submit a qualified bid for the Debtors' assets.  The Stalking Horse Agreement will set a floor for the contemplated competitive bidding process that will allow the Debtors to identify any higher and better offers that might exist and maximize value for all of its stakeholders.  If no higher and better offers are identified through this process, the stalking horse bidder has agreed to purchase substantially all of the Debtors' assets, which will preserve the Debtors' businesses as a going concern, save thousands of jobs and vendor and customer relationships, and provide enough resources to the estates to wind-down in an orderly fashion pursuant to a chapter 11 plan.

AMERICAS 108903890

## IV.   THE FIRST DAY MOTIONS

46.   The Debtors filed the First Day Motions seeking relief related to the administration of the cases; the Debtors' vendors, employees, and customers; their operations; and their cash management.  A list of the First Day Motions is set forth below.

### A.   Administrative Motions

- *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Cases and (II) Waiving Requirements of Bankruptcy Code Section 345(c)(1) and Bankruptcy Rules 1005 and 2002(n)*

- *Debtors' Emergency Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix, (II) Authorizing the Debtors to File a Consolidated List of the Thirty (30) Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Certain Personal Identification Information, (IV) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (V) Granting Related Relief*

### B.   Substantive Motions

- *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claim, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Existing Cash Management System, (B) Maintain Their Existing Bank Accounts and Business Forms,  (C) Pay Related Prepetition Obligations, and (D) Continue to Perform Intercompany Transactions, and (III) Granting Related Relief*

- *Debtors' Emergency Motion for Entry of an  Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*

18

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Critical Vendor Claims, Lien Claims, and 503(b)(9) Claims, (II) Confirming Administrative Expense Priority of Outstanding Purchase Orders, and (III) Granting Related Relief*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I)Authorizing the Debtors to (A) Continue Insurance Programs and Surety Bond Program and (B) Pay All Obligations with Respect Thereto, and (II) Granting Related Relief*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief*

- *Debtors' Emergency Motion for Entry of an Order (I) Determining Adequate Assurance of Payment to for Future Utility Services, (II) Prohibiting Utilities from Discontinuing Service, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief*

47.    The Debtors have also filed the following motions, which are set to be heard on

regular notice:

- *Debtors' Motion for Entry of Orders: (I) (A) Establishing Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Authorizing the Debtors' Entry Into a Stalking Horse Agreement and Approving the Reimbursable Expenses, (C) Establishing Procedures for the Assumption and Assignment of Certain Executory Contract and Unexpired Leases, (D) Approving the Form and Manner of Related Notices, and (E) Scheduling a Hearing to Consider the Proposed Sale; (II) (A) Authorizing and Approving the Sale of Substantially All of the Debtors Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief*

- *Debtors' First Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts Effective* Nunc Pro Tunc *as of the Petition Date*

- *Debtors' Second Omnibus Motion for Entry of an Order Authorizing the Rejection of Certain Unexpired Leases and Executory Contracts*

- *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates*

19

48.     The Debtors have narrowly tailored the relief requested in the First Day Motions to meet their goals of: (a) continuing their current operations in chapter 11 with as little disruption as possible, (b) maintaining the confidence and support of their vendor, customer, employee, and other key constituencies, (c) providing the framework for, and ability to pursue, a sale process to sell substantially all of their assets, and (d) establishing procedures for the efficient administration and wind-down of these Chapter 11 Cases.

49.     I have reviewed each of the First Day Motions (including their exhibits) and the facts stated in them are true and correct to the best of my knowledge.  I incorporate by reference the factual statements in each of the First Day Motions as though set forth here.

50.     The relief sought in each of the First Day Motions is necessary to the successful implementation of the Debtors' efforts to maximize the value of their estates.  With respect to those First Day Motions that request the authority to pay specific prepetition claims or continue selected prepetition programs, the request is essential to the maintenance of the Debtors' operations and necessary to avoid immediate and irreparable harm to the Debtors' estates and creditors.

51.     The success of these Chapter 11 Cases depends on the Debtors' ability to preserve their operations while they complete a sale.  The relief requested in the First Day Motions is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

52.     I respectfully request that all of the relief requested in the First Day Motions, and such other and further relief as may be just and proper, be granted.

*[Remainder of Page Intentionally Left Blank]*

20

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:   December 6, 2021
               The Woodlands, Texas

SEAN GORE
Executive Vice President and Chief Financial Officer of
Strike, LLC

22

## **EXHIBIT A**

Restructuring Support Agreement

AMERICAS 108903890

## RESTRUCTURING SUPPORT AGREEMENT

**This Agreement is not an offer with respect to any securities, or a solicitation with respect to any securities, of the Company or a solicitation of votes with respect to a chapter 11 plan within the meaning of sections 1125 or 1126 of the Bankruptcy Code.  Nothing herein shall be deemed to be the solicitation of an acceptance or rejection of a chapter 11 plan.  Any such offer or solicitation will comply with all applicable securities laws and provisions of the Bankruptcy Code.  Nothing contained in this Agreement shall be an admission of fact or liability or, until the occurrence of the Agreement Effective Date on the terms described herein, be deemed binding on the Parties hereto.**

This Restructuring Support Agreement, dated as of November 22, 2021 (together with all exhibits, schedules, annexes and attachments hereto, and as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**"), is entered into by and among: (i)  Strike HoldCo LLC, a Delaware limited liability company, and each of its direct and indirect subsidiaries (each a "**Debtor**" and collectively, the "**Debtors**" or the "**Company**"); (ii) AIPCF VII LLC ("**AIP**") and certain funds and entities managed by or affiliated with AIP identified on the signature pages hereto that are the beneficial owners (or nominees, investment managers, advisors or subadvisors for the beneficial owners) of ABL Claims and Term Loan Claims (collectively with AIP, the "**AIP Parties**"); (iii)  each of the beneficial owners (or nominees, investment managers, advisors or subadvisors for the beneficial owners) of ABL Claims, including the AIP Parties and such other owners identified on the signature pages hereto (if any) or that becomes party to this Agreement after the Agreement Effective Date in accordance with the terms hereof (collectively, together with any Permitted Transferees of such Persons, a "**Consenting ABL Lender**"); (iv) each of the beneficial owners (or nominees, investment managers, advisors or subadvisors for the beneficial owners) of Term Loan Claims, including the AIP Parties and such other owners identified on the signature pages hereto (if any) or that becomes party to this Agreement after the Agreement Effective Date in accordance with the terms hereof (collectively, together with any Permitted Transferees of such Persons, the "**Consenting Term Loan Lenders**," and together with the Consenting ABL Lenders and the AIP Parties, the "**Consenting Lenders**").  The Company, the AIP Parties, each of the Consenting Lenders, and any other Person that is or becomes a party to this Agreement after the Agreement Effective Date in accordance with the terms hereof are each referred to herein as a "**Party**" and, collectively, the "**Parties.**"

## RECITALS

**WHEREAS**, the Consenting Lenders are beneficial owners (or nominees, investment managers, advisors or subadvisors for the beneficial owners) of the Company's obligations under the ABL Credit Agreement and the Term Loan Credit Agreement;

**WHEREAS**, on September 30, 2021, certain of the Debtors and certain of the AIP Parties entered into that certain *Forbearance Agreement to Term Loan and LC Loan and Security Agreement* and that certain *Forbearance Agreement to ABL Loan and Security Agreement*;

**WHEREAS**, on October 18, 2021, certain of the Debtors, certain of the AIP Parties, and Wilmington Trust, National Association, as administrative and collateral agent under the Term Loan Documents, entered into that certain *Forbearance Agreement and Amendment No. 7 to Term Loan and LC Loan and Security Agreement* (the "**Term Loan Amendment No. 7**");

**WHEREAS**, on October 18, 2021, certain of the Debtors, certain of the AIP Parties, and the ABL Agent entered into that certain *Amendment No. 5 and Forbearance Under ABL Loan and Security Agreement* (the "**ABL Amendment No. 5**") under which certain of the AIP Parties agreed to, among other things, extend delayed draw term loans under the ABL Credit Agreement in a principal amount not to exceed $20 million;

WHEREAS, on November 12, 2021, certain of the Debtors, certain of the AIP Parties, and the ABL Agent entered into that certain *Amendment No. 6 and Forbearance Under ABL Loan and Security Agreement* (the "**ABL Amendment No. 6**," and together with the ABL Amendment No. 5 and the Term Loan Amendment No. 7, the "**Bridge Loan and Forbearance Agreements**") under which certain of the AIP Parties agreed to, among other things, extend additional delayed draw term loans under the ABL Credit Agreement in an incremental principal amount not to exceed $20 million;

WHEREAS, following arm's-length, good-faith negotiations among the Parties and their Representatives, the Parties have agreed that the Debtors shall (i) conduct the Sale Process, enter into the Stalking Horse Agreement and implement a Sale Transaction, and (ii) facilitate the Sale Transaction by commencing voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") and obtaining DIP Financing to provide the Company with liquidity to pursue the Sale Transaction, administer the Chapter 11 Cases, and pursue confirmation and consummation of the Liquidating Plan (collectively, the "**Restructuring**"), in each case, upon the terms and conditions set forth in this Agreement, including the term sheet attached hereto as **Exhibit 1** (including any exhibits, schedules and annexes attached thereto, each as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the "**Restructuring Term Sheet**"); and

WHEREAS, the Parties desire to express to each other their mutual support and commitments in respect of the Restructuring, including with respect to the execution, delivery and/or performance of the Definitive Documents, in each case, in accordance with and subject to the terms hereof.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## AGREEMENT

**Section 1.**      **Definitions and Interpretative Provisions.**

(a)      Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in **Annex A** hereto.

(b)      Unless otherwise specified, references in this Agreement to any Section, clause or subclause refer to such Section, clause or subclause as contained in this Agreement. The words "herein," "hereof" and "hereunder" and other words of similar import in this Agreement refer to this Agreement as a whole, and not to any particular Section, clause or subclause contained in this Agreement. Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation."  The term "or" is not necessarily exclusive.

(c)      For purposes of this Agreement, to the extent the Company has any right to consent, acceptance, approval, amendment or waiver of any provision herein, in any of the Definitive Documents or in any other documents or agreements to be executed or delivered in connection with the Restructuring, such right shall be exercised exclusively by the written consent, acceptance, approval, amendment or waiver of or by the Restructuring Committee.

**Section 2.**      **Exhibits Incorporated by Reference**.      Each exhibit (including, without limitation, the Restructuring Term Sheet) attached hereto is expressly incorporated herein and made a part of this Agreement as if fully set forth herein, and all references to this Agreement shall include the exhibit(s)

(including, without limitation, the Restructuring Term Sheet).  In the event of any inconsistency between this Agreement (without reference to the exhibit(s)) and the Restructuring Term Sheet, the Restructuring Term Sheet shall govern.

**Section 3.     Effectiveness of this Agreement**.  This Agreement shall become effective and binding on each of the undersigned Parties on the date and time (the "**Agreement Effective Date**") upon which (a) (1) the Company, and (2) the AIP Parties, as owners of, in the aggregate, at least (i) 100% of the aggregate outstanding principal amount of ABL Claims, and (ii) 66.67% of the aggregate outstanding principal amount of the Term Loan Claims, in each case, shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company and AIP (in each case, at the email addresses for such law firms set forth in Section 21 hereof); and (b) counsel to the Company shall have given notice to the counsel to the Consenting Lenders in the manner set forth in Section 21 hereof (which may be by electronic mail) that the conditions to the occurrence of the Agreement Effective Date have occurred.  In addition to (and without limiting) the terms of Section 7(a), a Person that beneficially owns or controls ABL Claims or Term Loan Claims may become a party hereto as a Consenting Lender hereunder by executing a Joinder Agreement and delivering an executed copy thereof to counsel to the Company and counsel to AIP (in each case, at the email addresses for such law firms set forth in Section 21 hereof), in which event such Person shall be deemed to be a Consenting Lender hereunder to the extent of the Claims owned and controlled by such Person.  With respect to any Consenting Lender that becomes a party to this Agreement by executing and delivering a Joinder Agreement, this Agreement shall become effective as to such Consenting Lender at the time such Joinder Agreement or this Agreement is executed and a copy thereof has been delivered to counsel to the Company and counsel to AIP (in each case, at the email addresses for such law firms set forth in Section 21).

**Section 4.     Milestones**.

(a)     On and after the Agreement Effective Date, the Restructuring shall be implemented in accordance with the following milestones (the "**Milestones**"), each of which may be extended or waived only with the prior written consent of the Company and the Requisite Consenting Lenders (which may be by electronic mail):

(i)     On December 3, 2021, (i) the Company and the Lender Purchase Vehicle shall have entered into the Stalking Horse Agreement, (ii) one or more of the AIP Parties shall have provided a binding commitment with respect to the DIP Financing, (iii) the Company and the AIP Parties shall have negotiated and reached agreement upon substantially final drafts of the DIP Credit Agreement, the Interim DIP Order, and the DIP Motion, and (iv) a fully executed copy of the Stalking Horse Agreement shall have been delivered to the AIP Parties and the Consenting Lenders (in each case, at the email addresses for such law firms set forth in Section 21 hereof);

(ii)     No later than December 6, 2021 (the "**Petition Date**") at 8:00 am Eastern Time, the Company shall have commenced the Chapter 11 Cases in the Bankruptcy Court;

(iii)     No later than the Petition Date, the Company shall have filed the First Day Motions, the DIP Motion and the Sale Procedures Motion with the Bankruptcy Court;

(iv)     On or before 3 calendar days following the Petition Date, the Interim DIP Order shall have been entered by the Bankruptcy Court;

(v)     On or before 21 calendar days following the Petition Date, the Sale Procedures Order shall have been entered by the Bankruptcy Court;

(vi)     On or before 35 calendar days following the Petition Date, the Final DIP Order shall have been entered by the Bankruptcy Court;

(vii)    On or before 40 calendar days following the Petition Date, the deadline for the submission of final qualified bids in connection with the Sale Process shall have occurred;

(viii)    On or before 42 calendar days following the Petition Date, the Auction (if required in accordance with the Sale Procedures) shall have occurred;

(ix)    On or before 45 calendar days following the Petition Date, the Sale Approval Order shall have been entered by the Bankruptcy Court; and

(x)    On or before 60 calendar days following the Petition Date, the Sale Transaction shall have been consummated (the "**Outside Sale Date**");

(xi)    On or before 70 calendar days following the Petition Date, the Company shall have filed the Liquidating Plan, the Disclosure Statement and the motion seeking entry of the Disclosure Statement Order with the Bankruptcy Court;

(xii)    On or before 30 calendar days following the filing of the motion seeking entry of the Disclosure Statement Order with the Bankruptcy Court, the Disclosure Statement Order shall have been entered by the Bankruptcy Court;

(xiii)    As soon as reasonably practicable following, and in no event later than 20 calendar days from the entry of the Disclosure Statement Order by the Bankruptcy Court, the Company shall have filed the Plan Supplement with the Bankruptcy Court;

(xiv)    On or before 35 calendar days following the entry of the Disclosure Statement Order, the Confirmation Order shall have been entered by the Bankruptcy Court; and

(xv)    The effective date of the Liquidating Plan shall have occurred as soon as reasonably practicable following entry of the Confirmation Order, and in no event later than 15 calendar days after entry of the Confirmation Order (the "**Outside Plan Date**").

**Section 5.    Definitive Documents.**    Each of the Definitive Documents that has not been executed as of the Agreement Effective Date and that remains subject to negotiation and completion shall, upon completion, contain terms, conditions, representations, warranties, and covenants that are consistent in all material respects with this Agreement and the Restructuring Term Sheet and, with the exception of any Asset Purchase Agreement, otherwise shall be in form and substance reasonably acceptable to the AIP Parties and the Company; <u>provided</u> that the Stalking Horse Agreement, the Sale Procedures, the Sale Procedures Order, the Sale Approval Order, the DIP Facility Documents, and any agreement that the AIP Parties are a signatory to shall be acceptable to the AIP Parties and the Company.

**Section 6.    Commitments of the Parties**.

(a)    <u>Commitments of the Company</u>.    During the Agreement Effective Period, the Company agrees to:

(i)    act in good faith and use commercially reasonable efforts to take (and cause its controlled Affiliates and their respective Representatives to take) all actions reasonably necessary or appropriate to obtain the DIP Financing and support, implement, and achieve consummation of each aspect of the Restructuring in accordance with the terms and conditions set forth in this Agreement;

(ii)    comply with the Milestones and consummate the Sale Transaction by the Outside Sale Date and consummate the Liquidating Plan by the Outside Plan Date;

(iii)    conduct the Sale Process in a commercially reasonable manner, in accordance with and subject to the Sale Procedures, provide AIP with regular updates as to the status of such process, undertake commercially reasonable efforts to complete the preparation, as soon as reasonably practicable after the date hereof, of all of the Sale Process Documents, and take all actions reasonably necessary or desirable to implement and achieve consummation of the Sale Transaction;

(iv)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, take all steps reasonably necessary or desirable to address any such impediment (in each case, as determined by the Company and the Requisite Consenting Lenders), including negotiating in good faith appropriate additional or alternative provisions to address any such impediment;

(v)    in connection with the Chapter 11 Cases,

(A)    timely file a formal objection to any motion filed with the Bankruptcy Court by any Person seeking the entry of an order (1) directing the appointment of an examiner with expanded powers or a trustee, (2) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (3) dismissing any of the Chapter 11 Cases, (4) approving an Alternative Transaction Proposal (other than in accordance with the Sale Procedures and this Agreement), (5) for relief that (x) is inconsistent with this Agreement in any material respect, or (y) would, or would reasonably be expected to (as determined by the Company or the Requisite Consenting Lenders in their reasonable discretion), delay or prevent the consummation of the Sale Transaction by the Outside Sale Date, or (6) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a chapter 11 plan;

(B)    timely file a formal objection to any motion, application or proceeding filed with the Bankruptcy Court by any Person (1) challenging (a) the validity, allowance, character, enforceability, priority or amount of any Claims held by any of the Consenting Lenders arising under or related to the Existing Loan Documents or the DIP Facility Documents, (b) the validity, enforceability or perfection of any lien or other encumbrance securing any Claims held by any of the Consenting Lenders arising under or related to the Existing Loan Documents or the DIP Facility Documents, or (c) any of the transactions contemplated by this Agreement; or (2) seeking standing to pursue any Claims or causes of action of the Debtors or their estates against any Consenting Lender or any director, manager, officer or employee of, or any consultant or advisor that is retained or engaged by, any of the Consenting Lenders; and

(C)    timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any Person with respect to the Definitive Documents (or motion filed by such Person that seeks to interfere with the Definitive Documents);

(vi)    use commercially reasonable efforts to negotiate and execute in good faith the Definitive Documents to which it is (or will be) a party;

(vii)    use commercially reasonable efforts to obtain any and all required governmental, regulatory, or any other third-party approvals necessary to consummate the Sale Transaction by the Outside Sale Date and to consummate the Liquidating Plan by the Outside Plan Date;

(viii)    use commercially reasonable efforts to seek additional support for the Restructuring from its other material stakeholders to the extent reasonably prudent, as determined by the Company and the Requisite Consenting Lenders;

(ix)    not, directly or indirectly, through any Person (or cause its Representatives, subsidiaries, and Affiliates to), take any action that is inconsistent with, or that would reasonably be expected to interfere with, impede, prevent, or materially delay the Sale Transaction, the Liquidating Plan or the Restructuring; provided, that actions taken by the Company with respect to the Sale Process in accordance with the Sale Procedures shall not be deemed to be inconsistent with the Restructuring;

(x)    provide, and direct its Representatives to provide, to AIP and the AIP Advisors (A) reasonable access to the Company's books and records during normal business hours on reasonable advance notice to the Company's Representatives and without disruption to the operation of the Company's business, (B) information, documentation, instruments, and other materials that are reasonably requested in connection with the Sale Transaction, the Liquidating Plan or the Restructuring, (C) information, documents, instruments and other materials required under the Bridge Loan and Forbearance Agreements, and (D) reasonable access to the management and advisors of the Company on reasonable advance notice to such Persons and without disruption to the operation of the Company's business; provided that nothing herein shall require the Company to furnish any information that the Company reasonably and in good faith and upon advice of outside counsel believes to be (1) privileged, unless such information is requested and furnished pursuant to a joint defense and/or common interest agreement entered into on mutually agreeable terms, or (2) MNPI, unless provided pursuant to Section 27 hereof;

(xi)    except as otherwise contemplated under this Agreement, not, directly or indirectly, redeem, purchase, acquire or offer to acquire, declare any distribution on or make any distribution on any Interests, incur any Debt, grant any Lien, make any Investment or make any Distributions or Upstream Payments, undertake any Asset Disposition or affiliate transaction or undertake any other transaction (collectively, the "**Applicable Transactions**"), except, in each case, solely if and to the extent (x) not prohibited under Section 10.2 of the ABL Credit Agreement, (y) such Applicable Transaction is undertaken by the Company acting in good faith, and (z) such Applicable Transaction (and any action in connection therewith) is effectuated or consummated in the ordinary course of business and in accordance with prudent and historical business practices of the Company; provided that, without limiting the foregoing, any Applicable Transaction (or series of related Applicable Transactions) in excess of $1 million, shall in any event require the prior written consent of the ABL Agent unless the same is in accordance with the Approved Budget and does not result in a breach of the Budget Covenant; provided, further, however, that the Company shall not (and shall not permit any of its respective controlled Affiliates or subsidiaries to) transfer any funds (other than such funds to pay payroll) from any account that is (or is required to be) subject to a Deposit Account Control Agreement in favor of the ABL Agent into any account that is not subject to a Deposit Account Control Agreement in favor of the ABL Agent (other than a transfer that is made in accordance with customary cash management practices into a deposit account maintained by a Debtor at Bank of America that is subject to a zero balance cash sweep into a deposit account maintained by such Debtor at Bank of America that is not an Excluded Account and that is subject to a Deposit Account Control Agreement in favor of the ABL Agent);

(xii)    comply, during the period from and after the Agreement Effective Date to the Petition Date, with all obligations and covenants of the Company set forth in the Bridge Loan and Forbearance Agreements (except the notice provisions contained in sections 10.1.13(d)(iii)(2) and (3) and 10.1.14(c) of ABL Amendment No. 6) and the Term Loan Credit Agreement, and, upon

6

entry into the DIP Credit Agreement, subject to the terms and conditions thereof, comply with all obligations and covenants of the Company set forth in the DIP Facility Documents;

(xiii)    promptly notify each other Party hereto within three (3) Business Days after obtaining actual knowledge thereof of (A) any Governmental Authority or other third party complaints, litigations, investigations or hearings (or communications indicating that the same may be contemplated or threatened) challenging the validity of the transactions contemplated by this Agreement or any other Definitive Document or seeking to enjoin, restrain or prohibit this Agreement or any other Definitive Document or the consummation of the transactions contemplated hereby or thereby, (B) any breach by the Company in any material respect of any of its obligations, representations, warranties or covenants set forth in this Agreement, (C) any Material Adverse Effect, (D) the happening or existence of any Event that shall have made any of the conditions precedent set forth in the Asset Purchase Agreement incapable of being satisfied prior to the Outside Sale Date or any conditions precedent to the effectiveness of the Liquidating Plan incapable of being satisfied prior to the Outside Plan Date, and (E) the receipt of notice from any Governmental Authority or other third party alleging that the consent of such Person is or may be required in connection with the consummation of any part of the Restructuring;

(xiv)    not, nor encourage any other Person to, directly or indirectly, seek, initiate, solicit, encourage, propose, consent to, vote for, or enter or participate in any agreements or other arrangements with or proposal from any Person regarding any Alternative Transaction Proposal (other than in accordance with the Sale Procedures and this Agreement);

(xv)    (A) provide drafts of each of the Definitive Documents to, and afford reasonable opportunity for comment and review of such documents by, the AIP Advisors upon no less than three (3) Business Days in advance of any filing, execution, distribution or use (as applicable) thereof (or as soon as reasonably practicable if three (3) Business Days in advance is not reasonably practicable) and (B) consult in good faith with the AIP Advisors regarding the substance of each of the Definitive Documents in advance of the filing, execution, distribution or use (as applicable) thereof; provided, however, that the obligations under this Section 6(a)(xv) shall in no way alter or diminish any right expressly provided to the AIP and its respective counsel under this Agreement to review, comment on, and/or consent to the form and/or substance of any Definitive Document;

(xvi)    (A) provide the AIP Advisors with such information as is reasonably necessary to evaluate the Company's contracts and leases, and, to the extent applicable, any material information relating to ongoing discussions and negotiations related thereto and (B) not move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of any contract or lease prior to or in connection with the entry of the Sale Order without the prior written consent of AIP; provided, however that this Section 6(a)(xvi) shall not apply following the consummation of the Sale Transaction, and the Company may move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of any contract or lease that is not an Assumed Contract or that is not otherwise assumed or rejected in connection with the Sale Transaction following such date;

(xvii)    not announce in writing its intention to withdraw its support for the Sale Process, the Sale Transaction, the Liquidating Plan or the Restructuring or take any other action that would, or would reasonably be expected to prevent, interfere with, delay or impede the implementation, solicitation, confirmation, approval or consummation of the Sale Transaction, the Liquidating Plan or the Restructuring (including Bankruptcy Court approval of any applicable Definitive Documents), including, but not limited to, (A) initiating any proceeding or taking any other action to oppose the execution or delivery of any of the Definitive Documents, the

performance of any obligations of any party to any of the Definitive Documents or the consummation of the transactions contemplated by any of the Definitive Documents, (B) initiating any proceeding or taking any other action to amend, supplement or otherwise modify any of the Definitive Documents, which amendment, modification or supplement is not materially consistent with this Agreement, or otherwise acceptable to AIP (as to any documents to which AIP benefits from a similar consent standard) and reasonably acceptable to the Requisite Consenting Lenders, or (C) initiating any proceeding or taking any other action that is prohibited by or is otherwise inconsistent in any material respect with this Agreement or any of the Definitive Documents;

(xviii)   not take or omit to take any action (or permit any parent entity or other Affiliate to take or omit to take any action) at any time (including, but not limited to, the making of an election under Treasury Regulations Section 301. 7701-3), in each case, to the extent that the same could result in any of the Debtors ceasing to be classified as, or being deemed not to be, a disregarded entity for U.S. federal income tax purposes;

(xix)   not execute or file any Definitive Document (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement;

(xx)   not assert, or support any assertion by any third party, that, in order to act on the provisions of Section 9, the Requisite Consenting Lenders shall be required to obtain relief from the automatic stay from the Bankruptcy Court (and, except with respect to any termination arising from a breach by one or more Consenting Lenders, the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of any notice of termination in accordance with Section 9);

(xxi)   not enter into any agreement with respect to debtor-in-possession financing, cash collateral usage and/or other financing arrangements, other than the DIP Financing, without the prior written consent of AIP (which may be by electronic mail);

(xxii)   (A) conduct its business and operations in compliance with all applicable Laws and in the ordinary course of business in a manner that is consistent with past practices, (B) maintain good standing and legal existence under applicable Laws, and (B) not authorize, create or issue any additional Interests in the Company; and

(xxiii)   (A) not amend, modify or supplement any of the Organizational Documents of any of the Debtors, (B) except with respect to the KEIP Program and Retention Agreements, enter into, adopt or amend any existing employment agreements or any management compensation or incentive plans, or increase in any manner the compensation or benefits (including severance) of any director, officer or management level employee of any of the Debtors; or (C) except with respect to a key employee retention plan entered into with respect to the Company's field employees in connection with the Chapter 11 Cases, enter into or amend any other existing employee agreements or any benefit or compensation plans except in the ordinary course of business consistent with past practices.

Notwithstanding anything to the contrary herein or the Bridge Loan and Forbearance Agreements (including, without limitation, in this Section 6(a)), but subject to the immediately following two paragraphs, nothing in this Agreement shall require the Company or any directors, officers or managers of the Company (in such Person's capacity as a director, officer or manager) to take any action, or refrain from taking any action, that, the Restructuring Committee determines, after receiving advice from outside counsel, is inconsistent with the Company's or the Restructuring Committee's fiduciary obligations, if any, under applicable law; provided, however, that if the Restructuring Committee determines to take any material action or refrain from taking any material action with respect to the Sale Transaction, the Liquidating Plan or the Restructuring in reliance on this paragraph, the Company shall promptly (in any

event within one (1) Business Day of such determination) provide written notice (which may be by electronic mail) of such determination, together with a reasonably detailed basis for such determination, to the Consenting Lenders; provided, further, that the foregoing shall not limit any Party's right to terminate this Agreement under, and pursuant to Section 9.

Notwithstanding anything to the contrary in this Agreement, but subject to the following paragraph, the Company and its respective directors, officers, managers, members, investment bankers, attorneys, accountants, consultants, and other advisors or Representatives shall have the rights to: (i) explore, evaluate and consider unsolicited Alternative Transaction Proposals, (ii) provide access to non-public information concerning the Company to any Person that is subject to any executed confidentiality agreement or nondisclosure agreement with the Company ("**Confidentiality Agreement**") or enter into any Confidentiality Agreements; (iii) discuss or negotiate any unsolicited Alternative Transaction Proposal, (iv) otherwise cooperate with assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of unsolicited Alternative Transaction Proposals; and (v) enter into or continue discussions or negotiations with holders of Claims against or Interests in the Company or any of its subsidiaries, any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Person regarding the Restructuring or unsolicited Alternative Transaction Proposals; provided that the Company, acting directly or through its Representatives, shall (x) provide notice to AIP and a copy of any Alternative Transaction Proposal and all materials provided in connection therewith (or a summary thereof if such proposal is made orally) to AIP promptly after the receipt of such proposal, but in any event within one (1) calendar day of receipt of same, and (y) respond to the reasonable requests of AIP (or any advisor of AIP) regarding, and keep AIP promptly apprised of, the status of the Company's review of such Alternative Transaction Proposal; provided, further, that the foregoing shall not limit any Party's right to terminate this Agreement under, and pursuant to, Section 9. Nothing in this paragraph shall require the Company to disclose to the AIP Parties the substantive terms of the bids (or other communications related thereto) received in connection with the Sale Process except as otherwise set forth in the Sale Procedures. The Company shall continue to negotiate in good faith with the Consenting Lenders with respect to the Restructuring notwithstanding the existence of an Alternative Transaction Proposal.

Notwithstanding the immediately preceding paragraph, the Company shall not be permitted to evaluate, consider, or engage in any discussions, negotiations or communications with (i) a Restricted Person (as such term is defined in the Term Loan Amendment No. 7) with respect to an Alternative Transaction or Alternative Transaction Proposal (other than in accordance with the Sale Procedures and this Agreement) or (ii) any other Person (excluding any of the Consenting Lenders or any of their Affiliates) relating to a Transaction or an Alternative Transaction Proposal or potential bid in connection with the Sale Process that contemplates participation by any Restricted Person in the proposed transaction contemplated thereby, unless (A) such Restricted Person (or such other Person) provides a written proposal to the Company that will result in the payment in full in cash of all outstanding ABL Claims and Term Loan Claims at the closing of such proposed transaction (a "**Full Debt Repayment**" and the proposal in which such repayment is provided, a "**Restricted Party Proposal**"), and (B) the Company requires that the Person making such Restricted Party Proposal provide evidence acceptable to the Company that it will be capable of funding (or procuring the funding of) the Full Debt Repayment, in the form of (x) an executed commitment letter from a nationally recognized bank or other institution acceptable to the Company for a financing, or (y) the existence of immediately available and unrestricted funds in an account or accounts to which it has unrestricted access and which are not subject to any claim or interest of any other Person (and provides written proof of such access) (the "**Proof of Financing**"); provided, that the Company shall provide AIP with copies of all Restricted Party Proposals and all Proof of Financing within one (1) day of their receipt by the Company and shall keep AIP promptly apprised of the status of all discussions regarding all Restricted Party Proposals; *provided further*, that the Company shall continue to negotiate in good faith with the Consenting Lenders with respect to the Restructuring notwithstanding the existence of a Restricted Party Proposal.  For purposes of this paragraph, the term "Company" shall include Strike Investment;

provided, further, that the AIP Parties reserve all rights and remedies with respect to any other Alternative Transaction Proposals and Alternative Transactions.

(b)    Commitments of the AIP Parties and the Consenting Lenders.    During the Agreement Effective Period, the AIP Parties, the Consenting Lenders (severally and not jointly), in respect of all of their Claims agree, to:

(i)    provide the DIP Financing in accordance with and subject to the terms and conditions set forth in this Agreement;

(ii)    act in good faith and use commercially reasonable efforts to take (and cause their respective Representatives to take), all actions reasonably necessary or appropriate to support, implement, and achieve consummation of the Restructuring, including, without limitation, consummation of the Sale Transaction and the Liquidating Plan, in accordance with the terms and conditions set forth in this Agreement;

(iii)    not, directly or indirectly, through any Person (or cause its Representatives to), or encourage any other Person to, take any action that is inconsistent with, or that would reasonably be expected to interfere with, impede, prevent, or delay the Restructuring, including the Company's ability to achieve the Milestones;

(iv)    negotiate in good faith and use commercially reasonable efforts to execute, deliver, perform its obligations under, and consummate the transactions contemplated by, the Definitive Documents to which it is (or will be) a party;

(v)    not direct the ABL Agent or the Term Loan Agent (as applicable) to take any action inconsistent with the Consenting Lender's obligations under this Agreement, or support any such action or direction, and if such agent takes any action inconsistent with the Consenting Lender's obligations under this Agreement, the Consenting Lenders shall use commercially reasonable efforts to instruct or direct such agent in writing to cease and refrain from taking any such action, provided, however, that nothing in this Agreement shall require the Consenting Lenders to commence litigation against such agent or provide such Agent with any indemnity or incur any expense or reimbursement obligation;

(vi)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring  subject to the limitations set forth in the last sentence of the last paragraph of this Section 6(b), take all steps reasonably necessary or desirable to address any such impediment (in each case, as determined by the Company and the Requisite Consenting Lenders), including negotiating in good faith appropriate additional or alternative provisions to address any such impediment, provided, however, that the Consenting Lenders shall not be required to commence any litigation or other proceeding in respect of the foregoing;

(vii)    subject to receipt by such Consenting Lender of Solicitation Materials, (A) timely vote, or cause to be timely voted, all Claims held by such Consenting Lender as of the voting record date to accept the Liquidating Plan by delivering its duly executed and completed ballot accepting such plan following the commencement of the solicitation; (B) not change or withdraw (or cause to be changed or withdrawn) such vote(s); and (C) consent to all of the releases contained in such plan and not make an election to opt-out of any such releases (provided that the granting of such release does not diminish or impair the ability of AIP to recover on its Claims under the Liquidating Plan on the same basis as any other non-administrative and non-priority claimant thereunder); provided, however, that such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Consenting Lender at any time following the

termination of the Agreement Effective Period with respect to such Consenting Lender (other than termination resulting from such Consenting Lender's breach of this Agreement) (it being understood that any termination of the Agreement Effective Period with respect to a Consenting Lender (other than termination resulting from such Consenting Lender's breach of this Agreement) shall entitle such Consenting Lender to change its vote in accordance with section 1127(d) of the Bankruptcy Code, and the Solicitation Materials shall be consistent with this provision);

(viii)    comply, during the period from and after the Agreement Effective Date to the Petition Date, with all obligations of the Consenting Lenders set forth in the Bridge Loan and Forbearance Agreements and the Term Loan Credit Agreement, and, upon entry into the DIP Credit Agreement, comply with all obligations and covenants of the Company set forth in the DIP Facility Documents, in all cases subject to the terms and conditions thereof;

(ix)    not, nor encourage any other Person to, directly or indirectly, (A) object to, delay, impede or take any other action to interfere with (1) approval, acceptance, implementation or consummation of the DIP Financing, the Sale Transaction or any other aspect of the Restructuring, (B) propose, file, support, consent to or vote for any Alternative Transaction Proposal, or (C) file any motion, pleading, or other document with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement or the Restructuring; and

(x)    (1) extend the termination date with respect to the loans under the  ABL Credit Agreement through 11:59 p.m. Eastern Time on December 5, 2021, (2) extend the existing forbearance agreements with respect to the "Specified Defaults" under the Term Loan Credit Agreement and ABL Credit Agreement enumerated in the Bridge Loan and Forbearance Agreements through 11:59 p.m. Eastern Time on December 5, 2021, and (3) update the list of "Specified Defaults" enumerated in the Bridge Loan and Forbearance Agreements to include the potential default under the Term Loan Credit Agreement resulting from the Borrower's (as defined in the Term Loan Credit Agreement) failure to maintain minimum Liquidity (as defined in the Term Loan Credit Agreement) as of November 30, 2021.

Except as expressly provided in this Agreement (and solely to the extent that the following is not inconsistent with this Agreement, the Stalking Horse Agreement, the Liquidating Plan, the Restructuring and the Definitive Documents, and is not for the purpose of, and would not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Sale Transaction, the Liquidation Plan or the Restructuring, or would not reasonably be expected to have a material adverse effect on a Consenting Lender's ability to perform its obligations under this Agreement or the other Definitive Documents, or to consummate the Stalking Horse Agreement, the Liquidating Plan or the Restructuring), nothing contained herein shall (i) limit (A) the right of a Consenting Lender under any applicable bankruptcy, insolvency, foreclosure or similar proceeding concerning the Company or any of its properties, assets or interests, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in any case under the Bankruptcy Code; (B) subject to the Bridge Loan and Forbearance Agreements, any right or remedy of a Consenting Lender under the ABL Credit Agreement, the Term Loan Credit Agreement or any of the other Existing Loan Documents, or any right or remedy with respect to the Collateral, and any other applicable agreement, instrument or document that gives rise to a Consenting Lender's Claims; (C) the ability of a Consenting Lender to consult with any of the other Parties regarding the Restructuring, subject to any applicable confidentiality or non-disclosure agreements to which such Consenting Lender is a party; (D) the rights of the Consenting Lenders to engage in any discussions, enter into any agreements or take any other action regarding matters to be effectuated after the expiration or termination of the Agreement Effective Period not otherwise in violation of this Agreement; or (E) the ability of the Consenting Lenders to enforce any right, remedy, condition, consent or approval requirement under this Agreement or any of the other

Definitive Documents, or to contest whether any matter, fact or thing is a breach of, or is inconsistent with, this Agreement or any of the other Definitive Documents, (ii) constitute a waiver or amendment of any term or provision of the ABL Credit Agreement, Term Loan Credit Agreement or any of the other Existing Loan Documents, any Default (as defined in the ABL Credit Agreement or Term Loan Credit Agreement) or Event of Default (as defined in the ABL Credit Agreement or Term Loan Credit Agreement), or any term or provision of any other agreement, instrument or document that gives rise to the Consenting Lenders' Claims, or (iii) release any Lien (as defined in the ABL Credit Agreement or the Term Loan Credit Agreement) on any of the Collateral created (or purported to be created) under any of the Existing Loan Documents.  Other than as expressly set forth in the Restructuring Term Sheet or this Agreement, no Consenting Lender shall be required to incur, assume, become liable in respect of, or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to any Party or its Affiliates.

Notwithstanding anything contained herein to the contrary, nothing in this Agreement shall preclude, prejudice or waive the right of any of the AIP Parties to participate in the Sale Process in any respect, submit overbids, participate in the Sale Auction, participate in the hearing to approve the Sale Transaction, take any position with respect to an Asset Purchase Agreement, enforce the Sale Procedures, and otherwise exercise all rights and remedies afforded to creditors generally with respect to the Sale Process.

**Section 7.**     **Transfers of Claims**.

(a)     <u>Restrictions on Transfers</u>.  During the Agreement Effective Period, each Consenting Lender agrees that such Consenting Lender shall not Transfer any of its Claims or any option thereon or any right therein (including granting any proxies, depositing any Claims into a voting trust, or entering into a voting agreement with respect to any such Claims), unless the transferee thereof either (i) is a Consenting Lender that is not in material breach of this Agreement, or (ii) prior to, or contemporaneous with, such Transfer, executes and delivers a Joinder Agreement, agreeing to be bound by all of the terms of this Agreement with respect to any Claims acquired prior to, in connection with, or after the Transfer, to counsel to the Company and the other Consenting Lenders no more than five (5) Business Days after such execution (in each case, such transferee, a "**Permitted Transferee**"), in which event (A) the Permitted Transferee shall be deemed to be a Consenting Lender hereunder and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.  Any transfer made while this Agreement remains in effect in violation of this provision shall be *void ab initio* and each other Party shall have the right to enforce the voiding of such Transfer.

(b)     Notwithstanding anything to the contrary herein, (i) a Qualified Marketmaker that acquires any of the Claims from a Consenting Lender with the purpose and intent of acting as a Qualified Marketmaker for such Claims shall not be required to execute and deliver a Joinder Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement if such Qualified Marketmaker Transfers such Claims (by purchase, sale, assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a Permitted Transferee; and (ii) to the extent any Party is acting solely in its capacity as a Qualified Marketmaker, it may Transfer any ownership interests in the Claims that it acquires from a holder of such Claims that is not a Consenting Lender at the time of such acquisition without the requirement that the transferee be a Permitted Transferee.

(c)     <u>Additional Claims</u>.  This Agreement shall in no way be construed to preclude any Consenting Lender from acquiring additional Claims.   To the extent any Consenting Lender acquires additional Claims, whether directly or indirectly, then, in each case, each such Consenting Lender shall promptly notify (in no event later than five (5) Business Days thereafter) the entities listed in <u>Section 21</u>

hereof that are Parties to this Agreement, and each such Consenting Lender agrees that such Claims shall be subject to this Agreement.

(d)     This <u>Section 7</u> shall be subject in all respects to the (i) Company's right to seek relief from the Bankruptcy Court restricting the Transfer of Claims or Interests with respect to the preservation of net operating losses (with the prior written consent of AIP) and (ii) the transfer restrictions set forth in the Existing Loan Documents. Each Party agrees that any Transfer of any Claims made while this Agreement remains in effect that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

**Section 8.      Representations and Warranties**.

(a)     <u>Mutual Representations and Warranties</u>.  Each Party, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date a Consenting Lender becomes a Party hereto):

(i)     <u>Power and Authority</u>.  Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, or other similar action on its part;

(ii)     <u>No Conflict</u>.  The execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries, or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party;

(iii)     <u>No Consent or Approval</u>.  The execution, delivery, and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state, or Governmental Authority or regulatory body, except such filings as may be required by the United States Securities and Exchange Commission; and

(iv)     <u>Enforceability</u>.  This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b)     <u>Additional Representations of Consenting Lenders</u>.  Each Consenting Lender, severally and not jointly, represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date a Consenting Lender becomes a Party hereto):

(i)     <u>Consenting Lender Ownership</u>.  Such Consenting Lender (A) is the beneficial owner of not less than the aggregate principal amount of Claims set forth below its name on its signature page to this Agreement (or Joinder Agreement, as applicable) with the power to vote and consent to matters concerning such Claims (or, with respect to Claims subject to an agreement to purchase which has not closed as of the date hereof, will have such power upon closing), and/or (B) has (or, with respect to Claims subject to an agreement to purchase which has not closed as of the date hereof, will have), with respect to the beneficial owners of such Claims,

13

(1) sole investment or voting discretion with respect to such Claims, (2) full power and authority to vote and consent to matters concerning such Claims or to exchange, assign, and transfer such Claims, and (3) full power and authority to bind or act on the behalf of such beneficial owners; and (C) does not beneficially own or control any other Claims other than those Claims set forth below its name on its signature page to this Agreement (or Joinder Agreement, as applicable); and

(ii)     Accredited Eligible Participants.  Such Consenting Lender (A) is either (1) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (2) not a U.S. person (as defined in Regulation S of the Securities Act), or (3) an "accredited investor" (as defined in Rule 501 of the Exchange Act), and (B) any securities acquired by the Consenting Lender in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 9.     Termination of Agreement**.

(a)     Consenting Lender Termination Events.  This Agreement may be terminated as to all Parties by delivery to the other Parties of a written notice in accordance with Section 21 hereof by the Requisite Consenting Lenders, upon the occurrence and during the continuation of any of the following events:

(i)     the breach by the Company of any material representations, warranties, obligations, or covenants of the Company set forth in this Agreement; provided, however, that the Requisite Consenting Lenders shall include in such notice a reasonable description of any such breach, and if such breach is capable of being cured, the breaching Party shall have five (5) calendar days after receiving such notice to cure any such breach;

(ii)     the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Restructuring, and such ruling, judgment, or order is final and non-appealable; provided, however, that the Parties shall have 10 Business Days after issuance of such final ruling, judgment, or order to obtain relief that would allow consummation of the Restructuring in accordance with this Agreement;

(iii)     the Company has (A) voluntarily commenced any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership, or similar law now or hereafter in effect, except as contemplated by this Agreement, (B) consented to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the foregoing clause (A), (C) applied for or consented to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator, or similar official with respect to the Company or for a substantial part of the Company's assets, (D) made a general assignment or arrangement for the benefit of creditors, or (E) taken any corporate action for the purpose of authorizing any of the foregoing, in each case, without the prior written consent of the Requisite Consenting Lenders (which may be by electronic mail);

(iv)     a court of competent jurisdiction enters a ruling, judgment or order that appoints, or that authorizes, or permits the taking of possession by, a receiver, liquidator, assignee, custodian, trustee or sequestrator (or similar official) of the Company, any Interests held by the Company, or a material portion of the property or assets of the Company, in each case, on an individual basis;

14

(v)      any of the Milestones is not achieved, except where (A) such Milestone has been waived or extended by the Requisite Consenting Lenders in writing (which may be by electronic mail), or (B) failure to achieve such Milestone is the direct result of any act, omission, or material delay on the part of the Requisite Consenting Lenders in violation of this Agreement;

(vi)     following the commencement of the Chapter 11 Cases, the Bankruptcy Court grants relief that (A) is inconsistent with this Agreement in any material respect or (B) would, or would reasonably be expected to, prevent or delay the consummation of the Sale Transaction, the Liquidating Plan or the Restructuring;

(vii)    following the commencement of the Chapter 11 Cases, the entry of an order by the Bankruptcy Court, or the filing of a motion or application by the Company seeking entry of an order (without the prior written consent of the Requisite Consenting Lenders (which may be by electronic mail)), (A) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (B) dismissing one or more of the Chapter 11 Cases, (C) appointing an examiner with expanded powers or a chapter 11 trustee in any of the Chapter 11 Cases, (D) terminating or modifying the Company's exclusivity periods under section 1121 of the Bankruptcy Code, (E) granting authority, other than in connection with a Sale Transaction in accordance with the Sale Procedures, to sell any asset of the Company outside of the ordinary course of business with an aggregate fair market value in excess of $750,000; or (F) rejecting this Agreement;

(viii)   the occurrence of an event of default, termination event, or similar event under the Stalking Horse Agreement, other than an event of default or termination event as a direct result of a breach thereunder by the AIP Parties or Lender Purchase Vehicle or the selection of an alternative bid in accordance with the Sale Procedures Order;

(ix)     any of the DIP Orders, the Sale Procedures Order, the Sale Approval Order, the DIP Facility Documents, the Sale Process Documents, this Agreement are reversed, dismissed, vacated, modified or amended (as applicable), in each case, without the prior written consent of the Requisite Consenting Lenders (which may be by electronic mail);

(x)      following the commencement of the Chapter 11 Cases, the Company obtains debtor-in-possession financing or cash collateral usage, other than the DIP Financing, that is in an amount, on terms and conditions, or otherwise in substance, that (in any such case) is/are not acceptable to the Requisite Consenting Lenders;

(xi)     following the commencement of the Chapter 11 Cases, the Company seeks relief from the Bankruptcy Court or supports another Person seeking relief from the Bankruptcy Court to enter an order invalidating, disallowing, subordinating, recharacterizing or limiting, as applicable, any of the Claims arising under or related to the Existing Loan Documents or any of the liens or encumbrances that secure (or purport to secure) the Claims arising under or related to the Existing Loan Documents, (or the entry by the Bankruptcy Court or any order or judgment granting such relief);

(xii)    the Company (A) executes or files any agreement, instrument, pleading, order, form and other document that is utilized to implement or effectuate, or that otherwise relates to, this Agreement and/or the Sale Transaction that, in any such case, is not consistent in any material respect with this Agreement or otherwise reasonably acceptable to the Requisite Consenting Lenders, or (B) waives, amends or modifies, or files any pleading seeking to waive, amend or modify any term or condition of, (x) any of the Definitive Documents that have been executed prior to or contemporaneously herewith, or (y) any of the other Definitive Documents, upon completion thereof in accordance with this Agreement, which waiver, amendment,

modification or filing is not consistent in any material respect with this Agreement or otherwise reasonably acceptable to the Requisite Consenting Lenders;

(xiii)    any Material Contract of the Company is (A) terminated by, or as a result of a default or material breach by, the Company, or (B) amended, modified or supplemented in a material respect with the consent of the Company, in either case under the foregoing clause (A) or clause (B), without the prior written consent of the Requisite Consenting Lenders (which may be by electronic mail); provided, that this Section 9(a)(xiii) shall not apply to the Debtors' assumption or rejection of a Material Contract in connection with an Asset Purchase Agreement approved by the Bankruptcy Court or in connection with the Liquidating Plan (to the extent not assumed by the buyer pursuant to the Asset Purchase Agreement);

(xiv)    following the commencement of the Chapter 11 Cases, the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) to permit the recovery of any assets with an aggregate fair market value in excess of $750,000 of the Company;

(xv)    following the commencement of the Chapter 11 Cases, the occurrence of an event of default or termination event under any of the DIP Facility Documents, or the termination of or the exercise of any remedies upon a default under the DIP Orders or any other cash collateral order or order approving debtor-in-possession financing, in each case, in accordance with the terms thereof;

(xvi)    the taking of any action by the Company to invalidate, disallow, subordinate, or recharacterize, as applicable, the Claims of the Consenting Lenders arising under the DIP Facility Documents or the Existing Loan Documents or any lien or encumbrance that secures (or purports to secure) the Claims of the Consenting Lenders arising under the DIP Facility Documents or the Existing Loan Documents (or the entry by the Bankruptcy Court or any order or judgment granting such relief);

(xvii)    if the Company (A) selects, files, or publicly announces that it will support any Alternative Transaction, (B) withdraws the Sale Procedures Motion or publicly announces its intention not to support this Agreement, or (C) withdraws or publicly announces that it will withdraw from or otherwise not consummate the Sale Process, a Sale Transaction, the Liquidating Plan or the Restructuring;

(xviii)    the happening or existence of any Event that shall have made any of the conditions precedent to the conditions to effectiveness in the Sale Purchase Agreement or the consummation of the Sale Transaction incapable of being satisfied by the Outside Sale Date;

(xix)    the Restructuring Committee (A) determines, after consulting with outside counsel, that proceeding with the Restructuring would be inconsistent with the exercise of its or the Company's fiduciary duties, if any, under applicable Law or (B) provides notice to AIP in accordance with the last paragraphs of Section 6(a) that it is exercising its rights under the last paragraphs of Section 6(a);

(xx)    after the Agreement Effective Date, there shall have occurred any Event that, individually, or collectively, has had or would reasonably be expected to have a Material Adverse Effect;

(xxi)    during the period from and after the Agreement Effective Date to the Petition Date, the occurrence of an event of default under the ABL Credit Agreement or the Term

16

Loan Credit Agreement (other than as a result of a violation of the notice requirements under sections 10.1.13(d)(iii)(2) and (3) and 10.1.14(c) of ABL Amendment No. 6); or

(b)      Company Termination Events. This Agreement may be terminated as to all Parties by delivery to the other Parties of a written notice in accordance with Section 21 hereof by the Company, upon the occurrence and during the continuation of any of the following events:

(i)      the breach by one or more of the Consenting Lenders of any of the material representations, warranties, obligations, or covenants of such Consenting Lenders, as applicable, set forth in this Agreement; provided, however, that the Company shall include in such notice a reasonable description of any such breach, and if such breach is capable of being cured, the breaching Parties shall have five (5) calendar days after receiving such notice to cure any such breach; provided, further, that the Company may not terminate this Agreement pursuant to this Section 9(b)(i) based on such breach if the non-breaching Consenting Lenders hold in the aggregate at least 66.7% in aggregate outstanding principal amount of the ABL Claims and Term Loan Claims, respectively;

(ii)      the failure to meet the Milestone set forth in Section 4(a)(i), except where (A) such Milestone has been waived or extended by the Company and the Requisite Consenting Lenders in writing (which may be by electronic mail), or (B) failure to achieve such Milestone is the direct result of any act, omission, or material delay on the part of the Company in violation of this Agreement;

(iii)      the issuance by any Governmental Authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Restructuring, and such ruling, judgment, or order is final and non-appealable; provided, however, that the Parties shall have 10 Business Days after issuance of such final ruling, judgment, or order to obtain relief that would allow consummation of the Restructuring in accordance with this Agreement;

(iv)      the Sale Transaction has not been consummated by the Outside Sale Date, except where such failure is the direct result of any act, omission, or material delay on the part of the Company or caused by Company's breach of this Agreement;

(v)      if one or more of the Chapter 11 Cases is converted to a case under chapter 7 of the Bankruptcy Code;

(vi)      if a chapter 11 trustee or an examiner with expanded powers is appointed in any of the Chapter 11 Cases, if any;

(vii)      if one or more Consenting Lenders (A) files or publicly announces that it will (or joins in) support any Alternative Transaction Proposal, (B) announces its intention not to support the Restructuring, or (C) publicly announces that it will withdraw from or otherwise not consummate the Restructuring; provided further, that the Company may not terminate this Agreement pursuant to this Section 9(c)(vi) based on such breach if the non-breaching Consenting Lenders hold in the aggregate at least 66.7% in aggregate outstanding principal amount of the ABL Claims and Term Loan Claims, respectively; or

(viii)      the Restructuring Committee (A) determines, after consulting with outside counsel, that proceeding with the Restructuring would be inconsistent with the exercise of its or the Company's fiduciary duties, if any, under applicable Law or (B) provides notice to the Consenting Lenders in accordance with the last paragraphs of Section 6(a) that it is exercising its rights under the last paragraphs of Section 6(a).

(c)      Mutual Termination.  This Agreement may be terminated as to all Parties by written agreement among the Company and the Requisite Consenting Lenders.

(d)      Automatic Termination.  This Agreement shall terminate automatically without further required action or notice upon the earlier of (i) the effective date of the Liquidating Plan and (ii) the Outside Plan Date.

(e)      Effect of Termination.  Upon the termination of this Agreement in accordance with this Section 9(e), and except as provided in Section 14 hereof, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement; provided, however, that in no event shall any such termination relieve a Party from liability for its breach or nonperformance of its obligations under this Agreement prior to the date of such termination.  No Party may terminate this Agreement, and no Consenting Lender may be counted among the Requisite Consenting Lenders for purposes of terminating this Agreement, if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, and such failure to perform or comply caused, resulted in, or contributed to the occurrence of one or more termination events specified herein.  Upon the termination of this Agreement, any and all ballots tendered by the Parties before such termination shall be deemed, for all purposes, to be null and void and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring, this Agreement or otherwise.  If this Agreement is terminated in accordance with its terms by the Requisite Consenting Lenders pursuant to this Section 9, each Consenting Lender (other than a Consenting Lender whose breach of this Agreement resulted in such termination) shall have an opportunity to change or revoke (or cause to change or revoke) its vote to accept the Liquidating Plan (and, upon any revocation, such vote shall be deemed void *ab initio*), regardless of whether any deadline for votes, or for revocation thereof, set forth in the Disclosure Statement has passed, and the Company shall not oppose any attempt by such Consenting Lender to change or revoke (or cause to change or revoke) such vote at such time.

**Section 10.      Amendments and Waivers**.

(a)      This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 10.

(b)      This Agreement may only be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, only in a writing signed by the Company, AIP and the Requisite Consenting Lenders; provided, however, that any written consent, acceptance, approval, or waiver that may be required pursuant to or contemplated by this Agreement, including any written approval of or by the Company, the Consenting Lenders, the Requisite Consenting Lenders and/or the AIP Parties, as applicable, shall be deemed to have occurred if (i) counsel to the applicable Parties expressly agree in writing (including electronic mail) that such specific consent, acceptance, approval, or waiver may be provided by counsel on behalf of the applicable Parties, and (ii) such consent, acceptance, approval, or waiver is conveyed in a writing (including electronic mail) between each such counsel that includes an express representation that such counsel's client Party agrees to such consent, acceptance, approval, or waiver.

(c)      Any proposed modification, amendment, waiver or supplement that does not comply with this Section 10 shall be ineffective and void *ab initio*.

18

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.

**Section 11.     Governing Law; Jurisdiction; Waiver of Jury Trial**.

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflicts of law principles thereof.

(b)     Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in New York or, in the event that the Company is a debtor in a case filed under title 11 of the United States Code, the bankruptcy court in which such case is pending. Each of the Parties hereby irrevocably submits to the jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim, or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, that (i) the proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such proceeding is improper, or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 11.

**Section 12.     Specific Performance; Remedies Cumulative**.

(a)     It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

(b)     All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative or exhaustive, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

19

**Section 13.**     **Further Assurances**.  Subject to the other terms of this Agreement, the Parties shall execute and deliver such other instruments and perform such other acts, in addition to the matters herein specified, as may be reasonably necessary, from time to time, to effectuate the Restructuring.

**Section 14.**     **Survival**.  Notwithstanding the termination of this Agreement pursuant to Section 9, the agreements and obligations of the Parties in Sections 9(e) and 10 through 28 (other than section 13) hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms herein; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

**Section 15.**     **Headings**.  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

**Section 16.**     **Successors and Assigns; No Third-Party Beneficiaries**.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives; provided, however, that nothing contained in this Section 16 shall be deemed to permit Transfers of the Claims other than in accordance with the express terms of this Agreement.  There are no third party beneficiaries under this Agreement.

**Section 17.**     **Severability**.  If any provision of this Agreement, or the application of any such provision to any Person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party, and upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**Section 18.**     **Several, Not Joint, Claims**. The agreements, representations, warranties, and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

**Section 19.**     **Prior Negotiations; Entire Agreement**.  This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements (if any) and the Bridge Loan and Forbearance Agreements shall continue in full force and effect pursuant to their terms.

**Section 20.**     **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by email in portable document format (.pdf), which shall be deemed to be an original for the purposes of this paragraph.

**Section 21.**     **Notices**.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses or electronic mail addresses:

(a)     If to the Company, to:

Strike, LLC
1800 Hughes Landing Blvd., Suite 500
The Woodlands, TX 77380
Attention:     Sean Gore – CFO

Bryan Dempsey – CCO and GC

Email:        Sean.Gore@strikeusa.com
              Bryan.Dempsey@strikeusa.com

with copies to (which shall not constitute notice):

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Attention:     Binoy Dharia
               Andrew O'Neill
Email:         bdharia@whitecase.com
               aoneill@whitecase.com

(b)        AIP, to the address or electronic mail address indicated on such AIP's signature page to this Agreement, with a copy to:

Strook & Strook & Lavan LLP
180 Maiden Lane
New York, NY 10038
Attention:     Kristopher Hansen
               Erez Gilad
Email:         khansen@stroock.com
               egilad@stroock.com

(c)        If to a Consenting Lender, to the address or electronic mail address indicated on such Consenting Lender's signature page to this Agreement (or on the signature page to a Joinder Agreement in the case of any Consenting Lender that becomes a party hereto after the Agreement Effective Date).

Any notice given by delivery, mail, or courier shall be effective when received.  Any notice given by electronic mail shall be effective upon confirmation of transmission.

**Section 22.      Reservation of Rights; No Admission.**

(a)        Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, including without limitation, its claims against any of the other Parties (or their respective Affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its Affiliates and subsidiaries.

(b)        This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, this Agreement, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.  This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

**Section 23.      Relationship Among Parties.**  It is understood and agreed that no Consenting Lender has any duty of trust or confidence of any kind or form to any other Party, and, except as expressly

provided in this Agreement, there are no commitments among or between the Consenting Lenders. In this regard, it is understood and agreed that any Consenting Lender may trade in the Claims without the consent of the Company or any other Party, subject to the terms of this Agreement, the terms of the ABL Credit Agreement, the terms of the Term Loan Credit Agreement and any confidentiality or other agreement entered into with the Company. The decision to commit to enter into the transactions contemplated by this Agreement has been made independently by each Party hereto, without reliance on any statement of any Party or Person (or such other Party's or Person's Representatives) other than the Parties' respective representations and warranties expressly set forth in this Agreement or any Definitive Document.

Section 24.    **No Solicitation**. This Agreement is not and shall not be deemed to be a solicitation to tender or exchange any of the Claims.

Section 25.    **Representation by Counsel; Rules of Construction.** Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with the negotiation, drafting, and execution of this Agreement and the transactions contemplated hereby. This Agreement is the product of negotiations among the Company, the AIP Parties and the Consenting Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

Section 26.    **Transaction Expenses.**

(a)    Whether or not the transactions contemplated by this Agreement are consummated, the Company hereby agrees to pay in cash the Transaction Expenses as follows: (i) all accrued and unpaid Transaction Expenses, incurred up to (and including) the Agreement Effective Date, shall be paid in full in cash one (1) Business Day following the receipt of a summary invoice, (ii) prior to the Petition Date, and after the Agreement Effective Date, all accrued and unpaid Transaction Expenses shall be paid in full in cash by the Company on a regular and continuing basis promptly (but in any event within five (5) Business Days) and no later than one (1) Business Day prior to the Petition Date, if any, against receipt of summary invoices, (iii) on and after the Petition Date, and subject to approval of the Bankruptcy Court (if necessary), all Transaction Expenses shall be paid in full in cash by the Company on a regular, monthly and continuing basis promptly (but in any event within five (5) Business Days) against receipt of summary invoices, (iv) upon termination of this Agreement with respect to any Party, all accrued and unpaid Transaction Expenses incurred up to (and including) the date of such termination shall be paid in full in cash promptly (but in any event within five (5) Business Days) in full in cash, against receipt of summary invoices, and (v) on the Sale Effective Date, if any, all accrued and unpaid Transaction Expenses incurred up to (and including) the Sale Effective Date shall be paid in full in cash on the Sale Effective Date against receipt of summary invoices, in each case, to the extent applicable, if permitted by Bankruptcy Court order which may include the Sale Procedures Order or the Sale Approval Order. The terms set forth in this Section 26 shall survive termination of this Agreement and shall remain in full force and effect regardless of whether the transactions contemplated by this Agreement are consummated; provided, however, that the Company shall have no obligation to pay Transaction Expenses incurred after the termination of this Agreement unless otherwise required by a separate agreement.

(b)    The Company hereby acknowledges and agrees that, in connection with the Restructuring, the Consenting Lenders have expended, and will continue to expend, considerable time, effort and expense in connection with this Agreement and the negotiation of the Restructuring, and that this Agreement provides substantial value to, is beneficial to, and is necessary to preserve, the Company, and that the Consenting Lenders have made a substantial contribution to the Company and the Restructuring. To the extent applicable, if and to the extent not previously reimbursed or paid in connection with the foregoing, in the event the Restructuring is implemented through the commencement of Chapter 11 Cases,

subject to the approval of the Bankruptcy Court, the Company shall reimburse or pay (as the case may be) all Transaction Expenses pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise. In the event the Restructuring is implemented through the commencement of Chapter 11 Cases, the Company hereby acknowledges and agrees that the Transaction Expenses are of the type that should be entitled to treatment as, and, to the extent applicable, the Company shall seek treatment of such Transaction Expenses as, administrative expense claims pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

   **Section 27.   Confidential Information**.  Notwithstanding anything in this Agreement to the contrary, if the Company reasonably determines that any information (whether written or oral) required to be delivered under this Agreement constitutes material non-public information ("**MNPI**") under United States federal or state securities laws, the Company shall not be obligated to deliver any such MNPI to any Party (but shall instead deliver such information to such Party's advisors only on an advisors' eyes only basis) unless and until such Party has executed a confidentiality agreement, in a form reasonably satisfactory to such Party and the Company under which such recipient has agreed to hold such information as confidential, subject to customary exceptions, and further agreed not disclose, subject to customary exceptions, any such MNPI for a reasonable period.

   **Section 28.   Disclosure; Nondisclosure of Consenting Lender Information**.  Subject to this Section 28, the Company may publicly disclose the existence and the material terms of this Agreement upon its effectiveness; provided, however, that the Company shall submit drafts to the Consenting Lenders of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement, the Stalking Horse Agreement or the Restructuring Term Sheet, or any amendment to the terms of this Agreement, the Stalking Horse Agreement or the Restructuring Term Sheet, at least two (2) business days prior to making any such disclosure, which such press releases and public documents shall be subject to the prior approval of AIP and the Requisite Consenting Lenders.  Notwithstanding anything in this Agreement to the contrary, unless required by applicable law or regulation, the Parties agree to keep confidential and not disclose to any Person the identity and the principal amount or percentage of all Claims held (beneficially or otherwise) by any Consenting Lender absent the prior written consent of such Consenting Lender; provided, however, that and if such announcement or disclosure is so required by law or regulation, the disclosing Party shall provide each Consenting Lender with advance notice of the intent to disclose same and shall afford each of the Consenting Lenders a reasonable opportunity to review and comment upon any such announcement or disclosure prior to the Company's making such announcement or disclosure and shall take all reasonable measures to limit such disclosure.  If the Company determines that it is required to attach a copy of this Agreement to any document in connection with the Restructuring, it will redact any reference to the amount or percentage of a specific Consenting Lender's Claims and such Consenting Lender's notice information (as may be included on its signature page).  The foregoing shall not prohibit any Party from disclosing the aggregate Claims of all Consenting Lenders.

   IN WITNESS WHEREOF, the Parties have executed this Agreement on the date first written above.

[*Signature Pages Follow.*]

23

**COMPANY SIGNATURE PAGE**

STRIKE HOLDCO LLC

By: _____
Name:  Sean Gore
Title:    Chief Financial Officer


STRIKE, LLC

By: _____
Name:  Sean Gore
Title:    Chief Financial Officer


STRIKE GLOBAL HOLDINGS, LLC

By: _____
Name:  Sean Gore
Title:    Chief Financial Officer


CAPSTONE INFRASTRUCTURE SERVICES, LLC

By: _____
Name:  Sean Gore
Title:    Chief Financial Officer


DELTA DIRECTIONAL DRILLING, LLC

By: _____
Name:  Sean Gore
Title:    Chief Financial Officer


CROSSFIRE, LLC

By: _____
Name:  Sean Gore
Title:    Chief Financial Officer

**AIPCF VII, LLC**

As general partner of the managing member on behalf of
**LIGHTSHIP CAPITAL II LLC**


By: _____
Name: Louis Tedesco
Title: Managing Member

Notice Address:

███████████████████████████████

Aggregate Amount Owned of:

ABL Loans
(principal amount): ███████████████

Term Loans
(principal amount): ███████████████

Other Claims
(please specify): ███████████████

**AIPCF VII, LLC**

As general partner of the managing member on behalf of
**ICP ORIGINATION I LLC**



By: _____
Name: Louis Tedesco
Title: Managing Member

Notice Address:

██████████████████████████████
██████████████████████████████
██████████████████████████████

Aggregate Amount Owned of:

ABL Loans
(principal amount): ██████████████

Term Loans
(principal amount): ██████████████

Other Claims
(please specify): ██████████████

**AIPCF VII, LLC**

As general partner on behalf of
**AIPCF VII CREDIT OPPORTUNITY HOLDING
LP**

By: _____

Name: Louis Tedesco

Title: Managing Member

Notice Address:

██████████████████████████

Aggregate Amount Owned of:

ABL Loans
(principal amount): ██████████████

Term Loans
(principal amount): ████████████

Other Claims
(please specify): ____ ██████████

## ANNEX A

### Defined Terms

"*ABL Agent*" means Lightship Capital II LLC, in its capacity as successor administrative agent and collateral agent under the ABL Credit Agreement and the other ABL Loan Documents, including any successor thereto.

"*ABL Amendment No. 5*" has the meaning ascribed to such term in the recitals to the Agreement.

"*ABL Claims*" means any and all Claims against any Debtor arising from or based upon the ABL Credit Agreement or any other ABL Loan Document, including, without limitation, all accrued but unpaid principal, interest, premiums, costs, fees, expenses and indemnities.

"*ABL Credit Agreement*" means that certain ABL Loan and Security Agreement, dated as of November 30, 2016, by and among Strike, LLC, Delta Directional Drilling, LLC, and Strike Global Holdings, LLC, as borrowers, Strike HoldCo, LLC, as holdings, the lenders party thereto from time to time, and the ABL Agent, as amended, modified, supplemented, or amended and restated from time to time.

"*ABL Lenders*" means the "Lenders," as such term is defined in the ABL Credit Agreement.

"*ABL Loan Documents*" means the "Loan Documents," as such term is defined in the ABL Credit Agreement, and all related agreements and documents executed by any Debtor in connection therewith, in each case, as amended, modified, supplemented, or amended and restated from time to time.

"*Affiliate*" means, with respect to any Person, any other Person controlled by, controlling or under common control with such Person; *provided that*, for purposes of this Agreement, the Company shall not be deemed to be an Affiliate of any Consenting Lender. As used in this definition, "control" (including, with its correlative meanings, "controlling," "controlled by," and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by contract or otherwise). A Related Fund of any Person shall be deemed to be the Affiliate of such Person.

"*Agreement Effective Date*" has the meaning ascribed to such term in Section 3 of the Agreement.

"*Agreement Effective Period*" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Consenting Lender that becomes a Party to the Agreement after the Agreement Effective Date, as of the date and time such Consenting Lender becomes a Party to the Agreement in accordance with the terms thereof) to the date and time on which termination of the Agreement is effective in accordance with Section 9 thereof.

"*AIP Additional Advisors*" means such other attorneys, consultants and advisors, other than the AIP Advisors, that may be retained by any of the AIP Parties.

"*AIP Advisors*" means (a) Stroock & Stroock & Lavan LLP, as bankruptcy counsel, (b) Texas local counsel, (c) Houlihan Lokey Capital, Inc., as financial advisor, (d) Riveron RTS, LLC (f/k/a Conway MacKenzie, LLC), as financial advisors, and (e) the AIP Additional Advisors.

"*Alternative Transaction*" means any restructuring, reorganization, recapitalization, merger, transaction, consolidation, tender offer, exchange offer, business combination, joint venture partnership, financing (debt or equity), assignment for the benefit of creditors, dissolution, winding up, liquidation, workout, sale, plan of arrangement, plan of reorganization, or plan of liquidation involving the Company,

its equity or its assets, in each case, other than the Stalking Horse Agreement and the Liquidating Plan; provided, that a sale in accordance with the Sale Procedures and this Agreement shall not be considered to be an Alternative Transaction.

"*Alternative Transaction Proposal*" means any inquiries, expressions of interest, term sheets, offers or proposals, in each case, whether formal or informal, binding or non-binding, oral or written, regarding any transactions or series of transactions in respect of an Alternative Transaction; provided, however, that any inquiries, expressions of interest, term sheets, offers or proposals, in each case, whether formal or informal, binding or non-binding, oral or written, regarding any transactions or series of transactions submitted in connection with the Sale Process in accordance with the Sale Procedures and this Agreement shall not be considered to be an Alternative Transaction Proposal.

"*Applicable Transactions*" has the meaning ascribed to such term in Section 6(a)(ix) of the Agreement.

"*Approved Budget*" has the meaning ascribed to such term in the ABL Credit Agreement (except to the extent superseded by the DIP Credit Agreement, in which case "Approved Budget" shall refer to the budget approved in connection with the DIP Credit Agreement).

"*Asset Disposition*" has the meaning ascribed to such term in the ABL Credit Agreement.

"*Asset Purchase Agreement*" means the asset purchase agreement(s) selected by the Company in accordance with the Sale Procedures as representing the highest or otherwise best offer for all or substantially all of the Company's assets, other than the Stalking Horse Agreement.

"*Assumed Contracts*" shall mean the contracts to be assumed by the Lender Purchase Vehicle and set forth in the Stalking Horse Agreement, as determined by the AIP Parties, which contracts shall include the KEIP Program, the Retention Agreements, and the Employment Agreements.

"*Bankruptcy Code*" has the meaning ascribed to such term in the recitals to the Agreement.

"*Bankruptcy Court*" has the meaning ascribed to such term in the recitals to the Agreement.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated by the United States Supreme Court pursuant to 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

"*Bridge Loan and Forbearance Agreements*" has the meaning ascribed to such term in the recitals to the Agreement.

"*Budget Covenant*" has the meaning ascribed to such term in the ABL Credit Agreement (except to the extent superseded by the DIP Credit Agreement).

"*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or day on which commercial banks in New York, New York are required or authorized by law to remain closed.

"*Chapter 11 Cases*" has the meaning ascribed to such term in the recitals to the Agreement.

"*Claim*" means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"*Collateral*" has the meaning ascribed to such term in the Bridge Loan and Forbearance Agreements.

"*Company*" has the meaning ascribed to such term in the preamble to the Agreement.

"*Confidentiality Agreement*" has the meaning ascribed to such term in Section 6(a) of the Agreement.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Liquidating Plan.

"*Consenting ABL Lenders*" has the meaning ascribed to such term in the preamble to the Agreement.

"*Consenting Lenders*" has the meaning ascribed to such term in the preamble to the Agreement.

"*Consenting Term Loan Lenders*" has the meaning ascribed to such term in the preamble to the Agreement.

"*Debt*" has the meaning ascribed to such term in the ABL Credit Agreement.

"*Debtors*" has the meaning ascribed to such term in the preamble to the Agreement.

"*Definitive Documents*" means all definitive documents, agreements, instruments, forms, questionnaires, pleadings and orders (including all exhibits, schedules, supplements, appendices, annexes, instructions and attachments thereto) that are utilized to implement or effectuate, or that otherwise relate to, the Restructuring, including, without limitation, each of the following:

(a)     this Agreement;

(b)     all motions and proposed court orders that the Company files on or after the Petition Date and seeks to have heard on an expedited basis at the "first day hearing";

(c)     the DIP Facility Documents;

(d)     the Sale Process Documents;

(e)     the Liquidating Plan;

(f)     the Disclosure Statement and Solicitation Materials;

(g)     the Disclosure Statement Order;

(h)     the Confirmation Order;

(i)     the Plan Supplement;

(j)     any other substantive pleadings, motions, orders or other documents to be filed by the Company with the Bankruptcy Court in connection with the Chapter 11 Cases; and

(k)     such other definitive documentation contemplated by this Agreement or as is necessary or desirable to consummate the Restructuring as reasonably determined by the Company and the Requisite Consenting Lenders.

Notwithstanding the foregoing, any Asset Purchase Agreement and related document (other than the Sale Approval Order) with respect to a third party bid submitted in connection with the Sale Procedures shall not, by the terms of this Agreement, be subject to the consent of the AIP Parties.

"*Deposit Account Control Agreement*" has the meaning ascribed to such term in the ABL Credit Agreement.

"*DIP Credit Agreement*" means the credit agreement with respect to the debtor-in-possession financing provided by the AIP Parties (or their designee) in connection with the DIP Financing.

"*DIP Financing*" means the senior secured super-priority postpetition financing for the Company, to be provided in accordance with the Restructuring Term Sheet by one or more of the AIP Parties including in an amount sufficient to fund the Wind-Down Budget and on terms and conditions mutually acceptable to the Debtors and AIP.

"*DIP Facility Documents*" means the DIP Motion, the DIP Orders, the DIP Credit Agreement and all other agreements, instruments, pleadings, orders and other related documents necessary or advisable to consummate the DIP Financing or other debtor-in-possession financing, each of which shall be in form and substance acceptable to AIP and the Company.

"*DIP Motion*" means the motion and proposed form of order to be filed by the Debtors with the Bankruptcy Court on the Petition Date seeking approval, on an interim and final basis, of the DIP Orders and authorization for the use of cash collateral (including such terms and conditions relating to adequate protection in connection therewith).

"*DIP Orders*" means the Interim DIP Order and the Final DIP Order.

"*Disclosure Statement*" means the disclosure statement with respect to the Liquidating Plan, that is prepared and distributed, in accordance with, among other things, sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Rule 3018 of the Bankruptcy Rules and other applicable Law, and all exhibits, schedules, supplements, modifications and amendments thereto.

"*Disclosure Statement Order*" means the order of the Bankruptcy Court approving the Disclosure Statement as a disclosure statement meeting the applicable requirements of the Bankruptcy Code, approving the Solicitation Materials and authorizing solicitation of the Liquidating Plan.

"*Distribution*" has the meaning ascribed to such term in the ABL Credit Agreement.

"*Employment Agreements*" means certain employment agreements between Strike, LLC and its key employees in form and substance and upon terms acceptable to AIP.

"*Event*" means any event, change, effect, occurrence, development, circumstance, condition, result, state of fact or change of fact, or the worsening of any of the foregoing.

"*Excluded Account*" has the meaning ascribed to such term in the ABL Credit Agreement.

"*Existing Loan Documents*" means the ABL Loan Documents and the Term Loan Documents.

"*Final DIP Order*" means an order of the Bankruptcy Court approving, on a final basis, the DIP Financing, authorizing the Company's use of cash collateral and the grant of adequate protection, and granting the Company related relief.

"*First Day Motions*" means any "first day" or "second day" motions and pleadings to be filed by the Debtors with the Bankruptcy Court on the Petition Date in connection with the Chapter 11 Cases, including, without limitation, the DIP Motion, and the Sale Procedures Motion, each of which shall be in form and substance acceptable to the Debtors, AIP and the Requisite Consenting Lenders.

"*Full Debt Repayment*" has the meaning ascribed to such term in Section 6(a) of the Agreement.

"*Governmental Authority*" means any applicable federal, state, local, or foreign government or any agency, bureau, board, commission, court, or arbitral body, department, political subdivision, regulatory or administrative authority, tribunal, or other instrumentality thereof, or any self-regulatory organization.

"*Interim DIP Order*" means " means an order of the Bankruptcy Court approving, on an interim basis, the DIP Financing, authorizing the Company's use of cash collateral and the grant of adequate protection, and granting the Company related relief.

"*Interests*" means, with respect to any Person, (i) any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests, or other equity, ownership, beneficial, or profits interests of such Person, and (ii) any options, warrants, securities, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights, or other agreements, arrangements, or rights of any kind that are convertible into, exercisable, or exchangeable for, or otherwise permit any Person to acquire, any capital stock (including common stock and preferred stock), limited liability company interests, partnership interests, or other equity, ownership, beneficial, or profits interests of such Person

"*Investment*" has the meaning ascribed to such term in the ABL Credit Agreement.

"*Joinder Agreement*" means a joinder agreement in the form attached to the Agreement as <u>Exhibit 2</u>.

"*KEIP Program*" means the key employee incentive program to be approved with respect to certain officers and managers of Strike, LLC in an amount and upon terms and conditions acceptable to AIP.

"*Law*" means, in any applicable jurisdiction, any applicable statute or law (including common law), ordinance, rule, treaty, code or regulation and any decree, injunction, judgment, order, ruling, assessment, writ or other legal requirement, in any such case, of any applicable Governmental Authority.

"*Lender Purchase Vehicle*" has the meaning ascribed to such term in the Restructuring Term Sheet.

"*Lien*" has the meaning ascribed to such term in the ABL Credit Agreement.

"*Liquidating Plan*" means a chapter 11 plan of liquidation; <u>provided</u> that such plan shall provide for, among other things, (1) the payment of all allowed administrative and priority claims as and to the extent necessary to satisfy the confirmation requirements of section 1129 of the Bankruptcy Code; (2) a mutual release by the Debtors and their estates and the AIP Parties, and (3) the treatment of any and all Claims held by the AIP Parties in form and substance acceptable to AIP in its discretion and such plan shall otherwise be acceptable to the Company and reasonably acceptable to AIP.

"*Material Adverse Effect*" means any Event occurring after the Agreement Effective Date, that, individually or together with all other Events, has had, or would reasonably be expected to have, a material adverse effect on either (i) the business, operations, finances, properties, interests, reserves, condition (financial or otherwise), assets, or liabilities of the Company, taken as a whole, or (ii) the ability of the Company, taken as a whole, to consummate the Restructuring; <u>provided</u>, <u>however</u>, that none of the following Events shall be deemed to constitute a "Material Adverse Effect" and shall not be taken into account, individually or in the aggregate, in determining whether a Material Adverse Effect has occurred: (A) the execution, announcement or pendency of the Agreement and compliance with the express provisions of the Agreement or the consummation of the transactions contemplated thereby (including the

impact on the relationships, contractual or otherwise, of the Company with its suppliers or partners or other business relationships as a result of the execution, announcement or pendency of the Agreement), including the filing of the Chapter 11 Cases as contemplated by the Agreement, (B) actions or omissions taken or not taken by or on behalf of the Company with the prior written consent of the Requisite Consenting Lenders, (C) changes or prospective changes in applicable law or generally accepted accounting principles or other applicable accounting principles or standards in the United States or elsewhere, or changes or prospective changes in the interpretation or enforcement of any of the foregoing, or any changes or prospective changes in general legal, regulatory or political conditions; (D) volcanoes, tsunamis, effects of climate change, earthquakes, floods, storms, hurricanes, tornadoes, fires, epidemics, pandemics, disease, outbreak, public health crises or acts of god or natural disasters or man-made disasters, in each case, including any direct or indirect consequence or condition thereof, including outbreaks or additional waves of outbreaks of any contagious diseases (including influenza, COVID-19 or any variation thereof) or any Law, regulation, statute, directive, pronouncement or guideline issued by a governmental unit (as defined in section 101(27) of the Bankruptcy Code), the Centers for Disease Control and Prevention, the World Health Organization or industry group providing for business closures, sheltering-in-place or other restrictions that relate to, or arise out of, an epidemic, pandemic or disease outbreak (including the COVID-19 pandemic) or any change in such Law, regulation, statute, directive, pronouncement or guideline or interpretation thereof following the Agreement Effective Date, (E) any action required to be taken under any Law to which the Company is bound, to the extent such action is not in contravention of any express term, and does not otherwise frustrate the purpose, of the Agreement; (F) general trends, Events or conditions generally affecting the industry, markets or geographic areas in which the Company operates, including changes in supplier behavior, (G) local, regional, national or international political or social conditions or any national or international hostilities, acts of terror, cyberterrorism, police action, civil unrest, sabotage, war (whether or not declared) or any escalation or worsening of any such conditions, hostilities or acts, except, in the case of subclauses (C), (D), (F), and (G), to the extent such Events have a materially disproportionate adverse effect on the Company, taken as a whole, as compared to other businesses in the same industry, market, or geographic area in which the Company operates.

"*Material Contract*" means any contract or agreement to which the Company is a party or pursuant to which the Company or any of its assets or properties are bound, the termination of which would reasonably be expected to result in a Material Adverse Effect.

"*Milestones*" has the meaning ascribed to such term in Section 4 of the Agreement.

"*MNPI*" has the meaning ascribed to such term in Section 27 of this Agreement.

"*Organizational Documents*" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including, without limitation, any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement).

"*Outside Plan Date*" has the meaning ascribed to such term in Section 4 of this Agreement.

"*Outside Sale Date*" has the meaning ascribed to such term in Section 4 of the Agreement.

"*Party*" has the meaning ascribed to such term in the preamble to the Agreement.

"*Person*" has the meaning ascribed to such term in 101(41) of the Bankruptcy Code.

"*Permitted Transferee*" has the meaning ascribed to such term in <u>Section 7</u> of the Agreement.

"*Petition Date*" means the date of commencement of the Chapter 11 Cases set forth in <u>Section 4(a)(ii) of the Agreement</u>.

"*Plan Supplement*" mean the supplement or supplements to the Liquidating Plan containing a compendium of documents, including certain schedules, documents, forms of documents, and/or term sheets, relevant to the implementation of the Liquidating Plan, to be filed by the Debtors with the Bankruptcy Court.

"*Proof of Financing*" has the meaning ascribed to such term in <u>Section 6(a)</u> of the Agreement.

"*Qualified Marketmaker*" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims (or enter with customers into long and short positions in Company Claims), in its capacity as a dealer or market maker in Company Claims and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"*Related Fund*" means, with respect to any Person, any fund, account, or investment vehicle that is controlled or managed by (i) such Person, (ii) an Affiliate of such Person, or (iii) the same investment manager, advisor or subadvisor as such Person or an Affiliate of such investment manager, advisor or subadvisor.

"*Restructuring Committee*" means the Restructuring Committee of Strike Investment, which is comprised of (1) Patrick Bartels and (2) Anthony Horton.

"*Representative*" means, with respect to any Person, any employee, officer, director, agent, attorney, investment banker, financial advisor, accountant or other advisor retained by such Person.

"*Requisite Consenting ABL Lenders*" means, collectively, the Consenting ABL Lenders holding in excess of 66.67% of the outstanding aggregate principal amount of ABL Claims held by all Consenting ABL Lenders in the aggregate.

"*Requisite Consenting Lenders*" means the Requisite Consenting ABL Lenders and the Requisite Consenting Term Loan Lenders.

"*Requisite Consenting Term Loan Lenders*" means, collectively, the Consenting Term Loan Lenders holding in excess of 66.67% of the outstanding aggregate principal amount of the Term Loan Claims held by all Consenting Term Loan Lenders in the aggregate.

"*Restricted Party Proposal*" has the meaning ascribed to such term in Section 6(a) of the Agreement.

"*Retention Agreements*" means certain retention agreements by and between Strike, LLC and certain of its non-insider employees that remain with the Company through the Effective Date of the Sale Transaction in amounts and upon terms and conditions acceptable to AIP.

"*Sale Approval Order*" means a final non-appealable order of the Bankruptcy Court authorizing the Sale Transaction and approving the Stalking Horse Agreement or Asset Purchase Agreement pursuant to section 363 of the Bankruptcy Code; <u>provided</u>, that the Sale Approval Order shall not be required to be a final non-appealable order for purposes of satisfying the Milestone set forth in <u>Section 4(ix)</u>.

"*Sale Auction*" means, to the extent competing qualified bids are timely submitted in accordance with the Sale Procedures, an auction to be conducted by the Debtors and their advisors in connection with the Sale Process.

"*Sale Effective Date*" means the date and time on which a Sale Transaction has been consummated.

"*Sale Process*" means the pre- and post-petition marketing process to be conducted by the Company for the purposes of soliciting bids for the purchase of all or substantially all of the Company's assets and consummating a Sale Transaction, in each case, in accordance with the Sale Procedures.

"*Sale Procedures*" means, as applicable, (a) the prepetition marketing process and procedures contemplated by the milestones set forth in the ABL Amendment No. 6, and (b) the post-petition marketing process and procedures, in form and substance acceptable to the AIP Parties, which shall be filed with the Bankruptcy Court in connection with the Sale Procedures Motion. ·

"*Sale Procedures Motion*" means the motion (together with all exhibits thereto) to be filed by the Debtors with the Bankruptcy Court in accordance with the Milestones, (i) authorizing the Debtors' entry into the Stalking Horse Agreement, (ii) approving the post-petition Sale Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, (iii) approving and authorizing the payment of certain bidding protections, if any (each as shall be described in the Stalking Horse Agreement), (iv) scheduling a hearing with respect to the sale, and (v) granting other related relief.

"*Sale Procedures Order*" means an order of the Bankruptcy Court approving the Sale Procedures Motion.

"*Sale Process Documents*" means all agreements, instruments, pleadings, orders or other related documents necessary or advisable to implement the Sale Process and the Sale Transaction (other than the Asset Purchase Agreement), including, but not limited to, the Stalking Horse Agreement,  the Sale Procedures, the Sale Procedures Motion, and the Sale Procedures Order, each of which shall contain terms and conditions consistent with this Agreement.

"*Sale Transaction*" means the sale of all or substantially all of the Company's assets in accordance with the Stalking Horse Agreement or Asset Purchase Agreement.

"*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder.

"*Solicitation Materials*" shall mean the Disclosure Statement, ballots, notices and other materials to be distributed in connection with the solicitation of the Liquidating Plan.

"*Stalking Horse Agreement*" means the asset purchase agreement entered into between the Company and the Lender Purchase Vehicle providing for the purchase and sale of all or substantially all of the assets of the Company, subject to higher and better bids in accordance with the Sale Procedures, in accordance with the Restructuring Term Sheet.

"*Strike Investment*" means Strike Investment, LLC.

"*Term Loan Agent*" means Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent under the Term Loan Credit Agreement and the other Term Loan Documents, including any successor thereto.

"*Term Loan Amendment No. 7*" has the meaning ascribed to such term in the recitals to the Agreement.

"*Term Loan Claims*" means any and all Claims against any Debtor arising from or based upon the Term Loan Credit Agreement or any other Term Loan Document, including, without limitation, all accrued but unpaid principal, interest, premiums, costs, fees, expenses and indemnities.

"*Term Loan Credit Agreement*" means that certain Term Loan and LC Loan and Security Agreement, dated as of November 30, 2016, by and among Strike, LLC, as borrower, Strike HoldCo, LLC, as holdings, the subsidiary guarantors party thereto, the lenders party thereto from time to time, and the Term Loan Agent, as amended, modified, supplemented, or amended and restated from time to time.

"*Term Loan Documents*" means the "Loan Documents," as such term is defined in the Term Loan Credit Agreement, and all related agreements and documents executed by any of the Debtors in connection therewith, in each case, as amended, modified, supplemented, or amended and restated from time to time.

"*Term Loan Lenders*" means the "Lenders," as such term is defined in the Term Loan Credit Agreement.

"*Transaction*" has the meaning ascribed to such term in the recitals to the Agreement.

"*Transaction Expenses*" means all reasonable and documented fees, and all documented costs and expenses incurred by the Requisite Consenting Lenders (including, without limitation, all reasonable and documented fees and the documented costs, expenses and disbursements of the AIP Advisors (other than AIP Additional Advisors)), in each case, incurred in connection with the Chapter 11 Case and the formulation, negotiation, preparation, documentation, execution, implementation and consummation of this Agreement, the Restructuring Term Sheet, the Sale Transaction, the DIP Financing, the Definitive Documents and the transactions contemplated thereunder and hereunder; provided that "Transaction Expenses" shall exclude, and the Company shall be under no obligation to pay, any fees, costs, or expenses with respect to any AIP Additional Advisor unless the payment of such expenses is consented to by the Company in writing (email sufficient) (such consent not to be unreasonably withheld or delayed)..

"*Restructuring Term Sheet*" means that certain Restructuring Term Sheet attached as **Exhibit 1** to this Agreement.

"*Transfer*" means to sell, resell, transfer, loan, issue, pledge, hypothecate, assign, reallocate, donate, grant or otherwise encumber or dispose of, directly or indirectly; provided, however, that, notwithstanding anything to the contrary in Section 7 of the Agreement, the restrictions on Transfers set forth in Section 7 of the Agreement shall not apply to the grant of any liens or encumbrances on any Claims in favor of a bank or broker-dealer holding custody of such Claims in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such Claims.

"*Upstream Payments*" has the meaning ascribed to such term in the ABL Credit Agreement.

"*Wind-Down Budget*" shall mean the budget for the wind-down of the Company and their assets and operations in accordance with the Liquidating Plan, which shall include, without limitation, the payment of operating expenses, allowed administrative and priority claims (that are not otherwise assumed or paid in connection with the Sale Transaction), and fees and expenses of the Sellers (including, without limitation, fees and expenses of the Sellers' professionals allowed by the Bankruptcy Court) in connection with the Chapter 11 Cases, and other amounts necessary to effectuate such orderly wind-down of the

Debtors' estates in accordance with the Liquidating Plan, in each case, up to an aggregate amount and otherwise in form and substance acceptable to AIP Parties and the Company.

## **EXHIBIT 1**

**Restructuring Term Sheet**

**EXECUTION VERSION**

## RESTRUCTURING TERM SHEET

THIS RESTRUCTURING TERM SHEET (AS MAY BE AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS OF THE RSA (AS DEFINED BELOW), THIS "TERM SHEET"), WHICH IS EXHIBIT 1 TO THE RESTRUCTURING SUPPORT AGREEMENT, DATED AS OF NOVEMBER 22, 2021 (AS MAY BE AMENDED, SUPPLEMENTED, AMENDED AND RESTATED OR OTHERWISE MODIFIED FROM TIME TO TIME IN ACCORDANCE WITH THE TERMS THEREOF, THE "RSA"), PRESENTS THE PRINCIPAL TERMS OF THE RESTRUCTURING (AS DEFINED IN THE RSA). CAPITALIZED TERMS USED IN THIS TERM SHEET WITHOUT DEFINITIONS SHALL HAVE THE MEANINGS GIVEN TO SUCH TERMS IN THE RSA.

THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES, BANKRUPTCY AND/OR OTHER LAWS.

THIS TERM SHEET DOES NOT INCLUDE A DESCRIPTION OF ALL OF THE TERMS, CONDITIONS AND OTHER PROVISIONS THAT ARE TO BE CONTAINED IN THE DEFINITIVE DOCUMENTS, ALL OF WHICH REMAIN SUBJECT TO DISCUSSION AND NEGOTIATION AMONG THE PARTIES (AS DEFINED IN THE RSA); PROVIDED, HOWEVER, THAT ALL SUCH TERMS, CONDITIONS AND OTHER PROVISIONS SHALL NOT, DIRECTLY OR INDIRECTLY, CONTRADICT OR BE INCONSISTENT IN ANY MATERIAL RESPECT WITH ANY OF THE TERMS, CONDITIONS OR PROVISIONS HEREIN.

THIS TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE TRANSACTION. NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ANY RIGHTS, REMEDIES OR DEFENSES OF THE PARTIES.

| | |
|---|---|
| **Summary of Transaction:** | The Sellers (as defined below) shall pursue a sale of all or substantially all of the assets of the Sellers, taken as a whole, free and clear of any and all liens, rights, claims, interests and encumbrances.  The Sale Transaction shall be consummated through the commencement of Chapter 11 Cases and pursuant to the Sale Procedures.<br><br>Prior to the commencement of the Chapter 11 Cases, the Sellers shall commence a formal marketing process with respect to the Sale Transaction.  The AIP Parties shall, through the Lender Purchase Vehicle (as defined below) or the administrative agent under the DIP Financing (the "DIP Agent"), the ABL Agent and/or the Term Loan Agent on behalf of the Lender Purchase Vehicle, submit a stalking horse bid consistent with the terms set forth in this Term Sheet in accordance with the deadlines set forth in the RSA (the "Stalking Horse Bid"). In connection with the Stalking Horse Bid, in accordance with the deadlines set forth in the RSA, the AIP Parties will provide the Sellers with a commitment to provide DIP Financing pursuant to the DIP Budget (as defined below) (the "DIP Financing Commitment") to facilitate and consummate the Sale Process and Liquidating Plan in accordance with and subject to the terms and conditions set forth in the RSA. |
| **Sellers:** | The sellers in the Sale Transaction shall be the following entities (each, a "Seller" and, collectively, the "Sellers"):<br><br>(a)  Strike HoldCo LLC, a Delaware limited liability company<br><br>(b)  Strike, LLC, a Texas limited liability company<br><br>(c)  Strike Global Holdings, LLC, a Texas limited liability company<br><br>(d)  Capstone Infrastructure Services, LLC, a Texas limited liability company<br><br>(e)  Delta Directional Drilling, LLC, a Texas limited liability company<br><br>(f)  Crossfire, LLC, a Colorado limited liability company |
| **Lender Purchase Vehicle:** | A newly formed entity organized and controlled by the AIP Parties (the "Lender Purchase Vehicle"). |
| **Purchased Assets and Assumed Liabilities** | The assets to be sold by the Sellers and purchased by the Lender Purchase Vehicle in the Sale Transaction (such assets, the "Purchased Assets") shall be acceptable to the AIP Parties in their sole discretion and expressly described in the Stalking Horse Agreement.<br><br>The Lender Purchase Vehicle will not assume any liabilities of the Sellers in connection with the Sale Transaction, except for those liabilities that are acceptable to the AIP Parties in their sole discretion and expressly described in the Stalking Horse Agreement, which shall include the Assumed Contracts (such assumed liabilities, the "Assumed Liabilities"). |
| **Purchase Price:** | The aggregate consideration (the "Purchase Price") to be provided under the Stalking Horse Agreement shall consist of:<br><br>(a)  Credit bid and/or assumption of DIP Claims (as defined below), ABL |

<table>
<tr><td></td><td>

Claims, and/or Term Loan Claims in an amount to be determined by the AIP Parties;

(b) Assumption of the Assumed Liabilities and payment of any cure costs in connection therewith in an amount determined by order of the Bankruptcy Court; and

(c) Cash in an amount equal to the Wind-Down Amount (as defined below).

The determination of how any cash retained by the Sellers shall be treated in connection with the Purchase Price shall be subject to and in accordance with the Sale Procedures Order and the Stalking Horse Agreement.

</td></tr>
</table>

| **Sale Procedures and Bid Protections:** | In accordance with the Milestones set forth in the RSA, the Sellers shall file the Sale Procedures Motion with the Bankruptcy Court seeking entry of the Sale Procedures Order. The Sale Procedures Order shall, among other things, (1) approve the Sellers' execution of the Stalking Horse Agreement as the Stalking Horse Agreement (subject to higher and better offers received pursuant to the Sale Procedures), (2) approve the post-petition component of the Sale Procedures, (3) approve bid protections for the Lender Purchase Vehicle, (certain of which protections are set forth below) and (4) schedule the Sale Auction to determine the highest and best bid for the Purchased Assets and a hearing to approve the Sale Transaction in accordance with the Milestones set forth in the RSA. |
|---|---|
| | Each of the Sale Procedures Motion and the Sale Procedures Order shall be consistent with the following (and shall contain such other terms that are acceptable to the AIP Parties): |
| | (a) *Qualified Bids*: A third party shall only be permitted to participate in the Sale Auction, and the bid for the Purchased Assets submitted by such third party shall only be a qualified bid, if such third party satisfies certain conditions to be mutually agreed upon between the Sellers and the AIP Parties, but, in any event, such conditions shall require that the bid for the Purchased Assets submitted by such third party shall (i) be for only cash consideration (other than assumed liabilities) to be paid at the closing of the Sale Transaction contemplated by such bid in an amount equal to at least the sum of (A) the Purchase Price set forth in the Stalking Horse Agreement (excluding the Assumed Liabilities (other than any Assumed Liabilities that consist of DIP Claims, ABL Claims and Term Loan Claims)), (B) the Reimbursable Expenses Cap (as defined below), and (C) an overbid amount to be agreed in the Sale Procedures; (ii) be accompanied by a good faith cash deposit in the amount of 10% of the cash purchase price proposed by such bid; (iii) be accompanied by written evidence that demonstrates that such third party has committed financing or unconditional access to funds that will allow such third party to consummate the Sale Transaction contemplated by such bid in a timely manner, (iv) not contain conditions or contingencies of any kind (including, without limitation, any financing or diligence conditions or contingencies) more onerous than those included in the Stalking Horse Agreement, and (v) be binding and irrevocable on such third party until the conclusion of the Sale Auction and the Sellers have selected the winning bidder. Bids for the Purchased Assets that satisfy the conditions referred to (generally and specifically) in the immediately preceding sentence and as otherwise agreed to in the Sale Procedures shall be referred to herein as "Qualified Bids." The Stalking Horse Bid shall be deemed to be a Qualified |

3

Bid, the AIP Parties, the Lender Purchase Vehicle and the DIP Agent, ABL Agent and/or Term Loan Agent on behalf of the Lender Purchase Vehicle shall be deemed to be qualified bidders entitled to participate in the Auction, and the Lender Purchase Vehicle shall not be required to provide a good faith deposit or any evidence of committed financing or unconditional access to funds.   The Qualified Bid that the Sellers determine at their discretion is the second highest or otherwise best Qualified Bid at the Auction will be designated as the back-up bidder and such bid shall remain irrevocable until the Sellers and the winning bidder have consummated the Sale Transaction, provided, that the Stalking Horse Bid (or any subsequent overbid) shall not be deemed to be a backup bidder unless the Lender Purchase Vehicle agrees in writing to serve as a backup bidder.

(b) *Credit Bidding*:  The AIP Parties, the Lender Purchase Vehicle and the DIP Agent, ABL Agent and/or Term Loan Agent shall be entitled to participate in the Sale Auction and shall be permitted, pursuant to section 363(k) of the Bankruptcy Code, to credit bid all or any portion of the DIP Claims, the ABL Claims and/or the Term Loan Claims (pursuant to the terms of the Term Loan Documents) to acquire the Purchased Assets (each dollar of such Claims that is so credit bid shall be treated the same as a dollar of cash).  The Sellers shall not seek (or support any other party in seeking) to limit the AIP Parties', the Lender Purchase Vehicle's or the DIP Agent, ABL Agent and/or Term Loan Agent's ability to make such credit bid "for cause" under section 363(k) of the Bankruptcy Code.

(c) *Reimbursement of Expenses*:  The Sellers shall reimburse the AIP Parties and the Lender Purchase Vehicle for all reasonable, documented out-of-pocket fees, costs and expenses incurred by the Lender Purchase Vehicle and/or any of its affiliates (including the AIP Parties) prior to any valid termination of the Stalking Horse Agreement in connection with the Sale Transaction, the Stalking Horse Agreement, the other Definitive Documents, the Sale Procedures Motion, the Sale Procedures, the Sale Procedures Order, the Sale Auction, the Sale Approval Order, the RSA (including this Term Sheet), and any of the transactions contemplated by any of the foregoing, including, without limitation, the reasonable fees, costs and expenses of legal counsel, financial advisors, consultants and any other advisors that the Lender Purchase Vehicle or any of its affiliates (including the AIP Parties) engages (all such fees, costs and expenses, the "Reimbursable Expenses"), subject to a cap of $1,500,000 (the "Reimbursable Expenses Cap").  Nothing in the Sale Procedures Order, the Stalking Horse Agreement or any of the other Definitive Documents shall affect the AIP Parties' rights to receive reimbursement for expenses or other adequate protection pursuant to any other order of the Bankruptcy Court, including any order approving the DIP Financing or the Sellers' use of cash collateral.   Notwithstanding the foregoing, if the Stalking Horse Agreement or the RSA is terminated due to a material breach thereof by the Lender Purchase Vehicle or the AIP Parties, as applicable, then the Sellers shall not be required to reimburse the Lender Purchase Vehicle for any Reimbursable Expenses incurred after the date of such termination.

The Reimbursable Expenses (up to the Reimbursable Expenses Cap) shall constitute allowed superpriority administrative claims against the Sellers' estates under sections

|  | 503(b) and 507(a)(1) of the Bankruptcy Code. |
|---|---|
| **Milestones:** | The Stalking Horse Agreement and DIP Facility Documents shall include the Milestones set forth in <u>Section 4</u> to the RSA, as applicable. |
| **DIP Financing:** | In connection with the submission of the Stalking Horse Bid, the AIP Parties will provide the DIP Financing Commitment in accordance with and subject to the terms and conditions set forth in the RSA.<br><br>The amount, terms, and provisions of the DIP Financing (including the definitions, conditions, prepayment requirements, representations, warranties, covenants, collateral and security provisions, events of default, indemnities and reimbursements) shall be mutually agreed upon between the Sellers and the AIP Parties.<br><br>The proceeds of the DIP Financing shall be used by the Sellers to finance the ongoing working capital needs of the Sellers and all amounts necessary to administer the Chapter 11 Cases, including to pay fees and expenses incurred by the Sellers (including reasonable and documented allowed professional fees and expenses) in connection with the Chapter 11 Cases, to facilitate and consummate the Sale Process, and to fund the Wind-Down Budget of the estates pursuant to a Liquidating Plan as provided herein, in each case in an amount and pursuant to a budget that is acceptable to the AIP Parties and to the Sellers (such budget, the "<u>DIP Budget</u>") and in accordance with the order(s) approving such DIP Financing.<br><br>All Claims against any of the Sellers arising from or based upon amounts drawn or accrued and outstanding under the DIP Financing, including all accrued but unpaid principal, interest, premiums, costs, fees, expenses and indemnities, shall be referred to herein as "<u>DIP Claims</u>". |
| **Chapter 11 Plan of Liquidation** | The Sellers and the AIP Parties agree that promptly following the consummation of the Sale Transaction, the Sellers' remaining business and assets shall be wound-down pursuant to the Liquidating Plan. |
| **Wind-Down Amount:** | After the closing of a Sale Transaction with the Lender Purchase Vehicle, the Sellers shall be left with and shall use cash (including proceeds of the Sale Transaction and/or proceeds of the DIP Financing) to effectuate the wind-down of the Debtors' estates pursuant to the Liquidating Plan. Such amount of cash shall, in all cases, be in an aggregate amount acceptable to the AIP Parties and the Sellers and shall include (unless otherwise assumed by the Lender Purchase Vehicle as part of the Sale Transaction) amounts necessary to effectuate such orderly wind-down of the Debtors' estates pursuant to the Liquidating Plan (such amount of cash to be excluded from the Purchased Assets, the "<u>Wind-Down Amount</u>").<br><br>The Wind-Down Amount shall be used by the Sellers in accordance with the DIP Budget to effectuate the Liquidating Plan. Other than any obligation to fund the Wind-Down Amount, the Lender Purchase Vehicle shall not be responsible or liable for any expenses associated with, relating to, or incurred in connection with the Liquidating Plan. Any portion of the Wind-Down Amount that remains after the |

|  | wind-down of the Debtors' estates and consummation of the Liquidating Plan shall be paid to the Lender Purchase Vehicle. |
|---|---|
| **Release:** | The Sale Order shall contain customary mutual releases of (a) the Lender Purchase Vehicle, the AIP Parties and the ABL Agent, (b) each of the affiliates, managed accounts and related funds of the Lender Purchase Vehicle, the AIP Parties and the ABL Agent, (c) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the persons or entities described in <u>clause (a)</u> or <u>clause (b)</u>, (d) the Sellers, and (e) each of the current officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of the Sellers from any and all claims, causes of action, and liabilities whatsoever  (other than claims of the AIP Parties, the ABL Agent, the DIP Agent, and the Term Loan Agent not credit bid or assumed in connection with the Sale Transaction or any rights to enforce the Stalking Horse Agreement or any of the other Definitive Documents), including any derivative claims asserted on behalf of the Sellers, based on or relating to the Sellers, the Chapter 11 Cases, the Sale Transaction, the DIP Financing, the ABL Loan Documents, the Term Loan Documents, or any of the transactions contemplated by any of the foregoing arising on or before the consummation of the Sale Transaction. |
| **Tax Structure:** | The parties shall negotiate in good faith to structure the Sale Transaction pursuant to the Stalking Horse Bid in the most tax-efficient manner for the Sellers, the Lender Purchase Vehicle, and the AIP Parties, as determined by the Sellers and the AIP Parties. |
| **Definitive Documents:** | Any Sale Transaction with the Lender Purchase Vehicle shall be subject to, and governed by, the Stalking Horse Agreement and such other Definitive Documents mutually agreed upon between the Sellers and the AIP Parties.  The Stalking Horse Agreement and such other Definitive Documents shall be in form and substance consistent with this Term Sheet and the RSA, and otherwise acceptable to the Sellers and the AIP Parties, and shall include, in any event, representations, warranties, affirmative and negative covenants, termination rights, conditions to closing (including, without limitation, the entry by the Bankruptcy Court of a Sale Approval Order authorizing and approving the Sale Transaction with the Lender Purchase Vehicle and approving the Sale Transaction free and clear of any and all liens, rights, claims, interests or encumbrances (including any of the foregoing arising under or relating to any of the Term Loan Claims), and which Sale Approval Order shall be in form and substance acceptable to the AIP Parties and the Lender Purchase Vehicle in all respects and shall be a final order) and other provisions customary for transactions of this type. |

## EXHIBIT 2

## FORM OF JOINDER AGREEMENT

This Joinder Agreement to the Restructuring Support Agreement, dated as of November __, 2021 (together with all exhibits, schedules, annexes and attachments hereto, as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**Agreement**"), by and among the Parties is executed and delivered by _____ (the "**Joining Party**") as of _____, 2021. Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to such term in the Agreement.

1.     Agreement To Be Bound.  The Joining Party hereby agrees to be bound by (a) all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof), and (b) the agreements and obligations of the transferor of the Claims to be acquired in connection with the execution of this Joinder Agreement.  The Joining Party shall hereafter be deemed to be a "Consenting Lender" under the Agreement with respect to any and all Claims held by such Joining Party, regardless of when acquired.

2.     Representations and Warranties.  The Joining Party hereby makes the representations and warranties of the Consenting Lenders set forth in the Agreement to each other Party to the Agreement.

3.     Governing Law.  This Joinder Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*      *      *

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date first written above.

[JOINING PARTY]

By: _____

Name _____

Title: _____

<u>Notice Address</u>:

_____

_____

_____

Email: _____

Attention: _____

<u>Aggregate Amount Owned of</u>:

ABL Loans
(principal amount): _____

Term Loans
(principal amount): _____

Other Claims
(please specify): _____

**<u>EXHIBIT B</u>**

Organizational Structure

23

AMERICAS 108903890

# ORG CHART



**Legend**

Debtor

Non-Debtor

