IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE: ) | CHAPTER 11 |
| ) | |
| STRIKE, LLC, *et al.*,[1] ) | CASE NO. 21-90054 (DRJ) |
| ) | |
| DEBTORS. ) | JOINTLY ADMINISTERED |
| ) | |

**ASPEN AMERICAN INSURANCE COMPANY'S LIMITED OBJECTION AND RESERVATION OF RIGHTS WITH REGARD TO DEBTORS' EMERGENCY MOTION FOR ENTRY OF ORDERS: (I) (A) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS' ENTRY INTO A STALKING HORSE AGREEMENT AND APPROVING THE REIMBURSABLE EXPENSES (C) ESTABLISHING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) APPROVING THE FORM AND MANNER OF RELATED NOTICES, AND (E) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE; (II) (A) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Aspen American Insurance Company, for itself and on behalf of its affiliated sureties (collectively, "Aspen"), by and through counsel, hereby submits this limited objection and reservation of rights (the "Limited Objection") regarding *Debtors' Emergency Motion For Entry Of Orders: (I) (A) Establishing Bidding Procedures For The Sale Of Substantially All Of The Debtors' Assets, (B) Authorizing The Debtors' Entry Into A Stalking Horse Agreement And Approving The Reimbursable Expenses (C) Establishing Procedures For The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases, (D) Approving The Form And*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Strike, LLC (2120); Strike HoldCo, LLC (0607); Delta Directional Drilling, LLC (9896); Strike Global Holdings, LLC (4661); Capstone Infrastructure Services, LLC (0161); and Crossfire, LLC (7582). The location of Debtor Strike, LLC's principal place of business and the Debtors' service address is: 1800 Hughes Landing Boulevard., Suite 500, The Woodlands, Texas 77380. Additional information regarding this case may be obtained at https://dm.epiq11.com/StrikeLLC.

1

*Manner Of Related Notices, And (E) Scheduling A Hearing To Consider The Proposed Sale; (II) (A) Authorizing And Approving The Sale Of Substantially All Of The Debtors' Assets Free And Clear Of All Liens, Claims, Encumbrances, And Interests, (B) Authorizing The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases; And (III) Granting Related Relief* [Docket No. 60] (the "Motion"), and in support of its Limited Objection, states as follows:

## I.  JURISDICTION AND VENUE

1. This Court has jurisdiction over the Motion and this Objection pursuant to 28 U.S.C. § 1334. The Motion and the Objection are core proceedings pursuant to 28 U.S.C. § 157. Venue for the Motion and the Objection is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  BACKGROUND

2. On December 6, 2021, Strike, LLC ("Strike"), along with certain of its subsidiaries and affiliates (collectively, the Debtors[2]) filed petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3. The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

4. On December 15, 2021, the Office of the United States Trustee for the Southern District of Texas appointed an Official Committee of Unsecured Creditors. To date, no trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.

5. The Debtors provide pipeline, facilities, and infrastructure solutions to the energy sector. Partnering closely with clients across North America, the Debtors deliver a full range of integrated engineering, construction, maintenance, integrity, and specialty services that span the

---

[2] The Debtors in these chapter 11 cases are: Strike, LLC; Strike HoldCo, LLC; Delta Directional Drilling, LLC; Strike Global Holdings, LLC; Capstone Infrastructure Services, LLC; and Crossfire, LLC.

entire oil and gas lifecycle. In order for the Debtors to operate their businesses, they are required to provide payment and performance assurances to their contract counterparties and other state and federal regulatory authorities. These payment and performance assurances are often provided in the form of surety bonds.

### A. The Motion

6. The Motion seeks approval of, *inter alia*, sale procedures, bid procedures, and approval of the Stalking Horse Agreement between the Debtors and American Industrial Partners, Ltd. (the "Stalking Horse Bidder") for a sale of substantially all of the assets of the Debtors. In addition to the sale of assets, the Stalking Horse Agreement contemplates the assumption by the Debtors and assignment to the Stalking Horse Bidder of certain executory contracts, including contracts that may be bonded by Aspen. In the event there are no competing bids, or the Stalking Horse Bidder wins any such auction, the Stalking Horse Agreement will govern the sale of such assets. The bidding procedures also require any competing bids to include a proposed asset purchase agreement that is based on the Stalking Horse Agreement.

### B. Aspen Bonds

7. Prior to the Petition Date, Aspen issued certain payment and performance bonds in connection with construction contracts/projects in various states on behalf of the Debtors. Aspen also issued certain commercial bonds on behalf of the Debtors supporting permits and licenses critical to the Debtors' business operations. The aggregate gross penal amount of active bonds issued by Aspen on behalf of the Debtors (collectively, the "Bonds") is approximately $29,300,000.

8. Aspen issued the Bonds in consideration of and conditioned upon, among other things, execution by Strike, LLC and certain of its affiliates of various agreements of indemnity, including that certain General Agreement of Indemnity dated April 29, 2020 (collectively, the

"Indemnity Agreements"). Under the Indemnity Agreements, Strike and certain other indemnitors are jointly and severally obligated to "indemnify the Surety and save it harmless from and against any and all liabilities, claims, demands, payments, losses, damages, expenses, and costs to investigate and/or resolve claims which Surety may at any time incur or pay by reason of or arising out of its execution or non-execution of any Bonds." Therefore, the Indemnity Agreements create contractual rights of indemnification and rights of exoneration for Aspen. These rights are in addition to Aspen's common law equitable subrogation rights.

## OBJECTION

9. While the proposed sale is structured as an asset sale, it is functionally a going concern sale, as it purports to sell all or substantially all of the operating assets of the Debtors. Aspen generally supports a going concern sale of the Debtors to an entity capable of curing existing defaults, assuring timely completion of the existing construction projects, and financing the continued employment of the Debtors' employees and the efficient deployment of the Debtors' capital assets. Further, Aspen acknowledges that establishing bid procedures and obtaining a stalking horse bid for such a going concern sale is a prudent approach to the sale process. However, as presently postured, the Stalking Horse Agreement has gaps in detail that make it impossible for Aspen and other creditors of this estate to evaluate whether it is a bid that should be accepted in any event. Furthermore, the Stalking Horse Agreement appears to contemplate the Stalking Horse Bidder taking assignment of the benefits of executory contracts without taking the burdens associated with the same in violation of Section 365 of the Bankruptcy Code. For these reasons, Aspen objects specifically to the entry of any order that approves the Stalking Horse Agreement unless these deficiencies are resolved and the creditors have had an opportunity to re-evaluate the Stalking Horse Agreement and object, if appropriate, to the same prior to its approval.

10. The Stalking Horse Agreement lacks sufficient information regarding the extent of the consideration to be provided by the Stalking Horse Bidder.  The Stalking Horse Agreement is structured as a credit bid with no cash consideration for not only the physical assets of the Debtors, but also the intangible assets, including avoidance actions.  From the standpoint of an unsecured creditor, the primary benefit from a sale to this Stalking Horse Bidder would be the contemplated assumption of liabilities.  However, while the Stalking Horse Agreement mentions the possible assumption of liabilities, it does not designate any specific liabilities that are to be assumed or the value of such liabilities to the Estate.  Indeed, the Stalking Horse Bidder is not required to disclose the liabilities and contracts to be assumed until three days prior to the Sale Hearing and **after the auction has occurred**. The competing bidders at the auction will have no ability assess the actual value of the Stalking Horse Bid, which will inhibit the bidding process.  Furthermore, understanding the extent of liabilities to be assumed by the Stalking Horse Bidder in comparison to the competing bidders will undoubtedly be critical to a determination of which bid is the highest and best for the estate.  Consequently, Aspen objects to approval of the Stalking Horse Agreement as the stalking horse bid unless the Stalking Horse Bidder provides identification of the specific liabilities to be assumed and aggregate dollar amount of such liabilities.

11. Additionally, although Section 4.24 of the Stalking Horse Agreement provides certain representations by the Debtors regarding surety bonds, the Stalking Horse Agreement does not identify the specific surety bonds that will be replaced in conjunction with the proposed sale. The surety bonds are financial accommodations that may not be assumed and assigned pursuant to Section 365(c)(2) of the Bankruptcy Code. *See In re Falcon V, LLC*, 620 B.R. 256, 266 (Bankr. M.D. La. 2020).  Furthermore, any substitution of the principal on a bond without the surety's consent effectively discharges the bond and relieves that surety of any obligation thereunder. See

Restatement (Third) of Suretyship & Guaranty, §§ 37, 41. Accordingly, to the extent that an executory contract requires the posting of a bond, the Stalking Horse Bidder, or any successful purchaser at the Auction, will have to provide a replacement bond or post acceptable alternative security to such contract counterparty. The Stalking Horse Bidder, or any other successful purchaser at the Auction, will be required to acquire replacement bonds for any bonded licenses and permits necessary to the operation of the business, as the Debtor's posted bonds will not transfer to such purchaser. Since the replacement of the bonds that are necessary to the assumption of the key contracts and issuance of necessary permits and licenses is key to establishing that the bidder will be able to effectively operate the business post-acquisition, the Stalking Horse Agreement should identify not only the contracts to be assumed, but also the bonds that are to be replaced by the buyer in conjunction with the Sale.

12. Aspen also objects to the language of the Stalking Horse Agreement providing that, with respect to executory contracts that are assumed and assigned, the Stalking Horse Bidder will be responsible only for the liabilities under assumed and assigned contracts that arise after the Closing Date. Specifically, Section 1.3 of the Stalking Horse Agreement provides as follows:

> Section 1.3. Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement and the Sale Approval Order, effective as of the Closing, the Purchaser shall assume from each Seller, and each Seller shall assign to the Purchaser, only the following Liabilities of each Seller (collectively, the "Assumed Liabilities"):
>
> (a) all Liabilities of such Seller under each Assigned Contract arising after the Closing Date and which relate solely to events occurring after the Closing Date (except for Liabilities arising out of any breach or default of any Assigned Contract on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or after giving notice, or both, would constitute or give rise to such a breach or default); . . . .

Section 365 of the Bankruptcy Code generally provides that a debtor in possession may not assume a defaulted executory contract unless the defaults are cured and the debtor provides adequate assurance of future performance under the contract. More specifically, executory contracts that a debtor wishes to assume and assign must be assumed and assigned *cum onere*, with the assignee assuming all the liabilities, along with the benefits, of such contract. *In re Dan Hixson Chevrolet Co.*, 12 B.R. 917, 923 n.9 (Bankr. N.D. Tex. 1981). With respect to standard construction contracts, Section 365 would compel the debtor to ensure that that all work on the contract that has been performed and is to be performed is free of defects and that all subcontractors and suppliers on the contracts are fully paid. The provision of the Stalking Horse Agreement that purports to allow the Stalking Horse Bidder to take the benefits of the assigned contracts without taking responsibility for the burdens of those contracts violates Section 365(b)(1) of the Bankruptcy Code. Accordingly, the Stalking Horse Agreement should not be approved unless this provision is modified to provide for the assumption and assignment in full of contracts without reservation and in accordance with Section 365 of the Bankruptcy Code.

## **RESERVATION OF RIGHTS**

13.     Aspen may have other substantive objections to the proposed sale and expressly reserves its right to raise such objections in conjunction with this and further hearings regarding the proposed sale, including the Sale Hearing.

**WHEREFORE**, Aspen respectfully requests that the Motion be denied unless the Stalking Horse Agreement is supplemented and modified as requested herein.

Dated:  December 20, 2021

Respectfully submitted,

MANIER & HEROD, P.C.

/s/ Michael E. Collins
Michael E. Collins (TX Bar 24029006)
1201 Demonbreun St., Suite 900
Nashville, TN 37203
Telephone: (615) 742-9350
Fax: (615) 242-4203
mcollins@manierherod.com

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served upon all parties receiving notice pursuant to the CM/ECF system on December 20, 2021.

/s/ Michael E. Collins
Michael E. Collins

1116782.1
4887-1689-6007, v. 1