**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **STRIKE, LLC, *et al.*,**[1] | **Case No. 21-90054 (DRJ)** |
| **Debtors.** | **(Jointly Administered)** |

**MEARS GROUP, INC.'S MOTION FOR RELIEF**
**FROM THE AUTOMATIC STAY TO CONTINUE ARBITRATION PROCEEDING**

**THIS IS A MOTION FOR RELIEF FROM THE AUTOMATIC STAY. IF IT IS GRANTED, THE MOVANT MAY ACT OUTSIDE OF THE BANKRUPTCY PROCESS. IF YOU DO NOT WANT THE STAY LIFTED, IMMEDIATELY CONTACT THE MOVING PARTY TO SETTLE. IF YOU CANNOT SETTLE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY AT LEAST 7 DAYS BEFORE THE HEARING. IF YOU CANNOT SETTLE, YOU MUST ATTEND THE HEARING. EVIDENCE MAY BE OFFERED AT THE HEARING AND THE COURT MAY RULE.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

**A THERE WILL BE A HEARING WILL ON THIS MATTER ON JANUARY 14, 2022, AT 1:30 PM (prevailing Central Time), IN COURTROOM 400, 4th Floor, 515 RUSK STREET, HOUSTON, TX 77002. PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT (832) 917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE JONES'S CONFERENCE ROOM NUMBER IS 205691. VIDEO COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE JONES'S HOME PAGE. THE MEETING CODE IS "JUDGEJONES". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Strike, LLC (2120); Strike HoldCo, LLC (0607); Delta Directional Drilling, LLC (9896); Strike Global Holdings, LLC (4661); Capstone Infrastructure Services, LLC (0161); and Crossfire, LLC (7582). The location of Debtor Strike, LLC's principal place of business and the Debtors' service address is: 1800 Hughes Landing Boulevard., Suite 500, The Woodlands, Texas 77380. Additional information regarding this case may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/StrikeLLC.

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND INPERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JONES'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Mears Group, Inc. ("Mears") files this *Motion for Relief from Automatic Stay to Continue Arbitration Proceeding* (the "Motion"), which is currently pending against Debtor Strike, LLC ("Strike") before the American Arbitration Association ("AAA"). In support of the Motion, Mears respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Strike and certain affiliates entered into that certain Project Service Agreement dated August 1, 2020 with Mears (the "Agreement"), pursuant to which Mears agreed to construct a 36-inch steel pipe under the Colorado River as part of a large construction project for Kinder Morgan ("KM"). After Mears performed under the Agreement, Strike refused to pay Mears the principal amount of $4.28 million for work that was performed on the construction project. Mears commenced an arbitration proceeding in the Houston Division of AAA styled, *Mears Group, Inc. v. Strike, LLC*; Case No. 01-21-0001-1668 in February 2021 (the "Arbitration Proceeding"), seeking payment of all amounts due under the Agreement. Mears is now listed as the largest unsecured creditor in this bankruptcy proceeding.

2. Mears' claims in the Arbitration Proceeding are governed exclusively by Texas state law and do not conflict with the purposes of the Bankruptcy Code. Mears seeks to recover funds currently held in trust by Strike pursuant to the Texas Construction Trust Fund Act ("CTFA"). As discussed more fully below, after conflicting case law, the Texas legislature amended the CTFA to expressly provide that funds held thereunder are *neither* property of the bankruptcy estate *nor* property in which a debtor has an interest. Accordingly, Mears requests

that the Court modify the automatic stay to allow the Arbitration Proceeding to pursue its *in rem* remedy against such trust funds and to liquidate its claims against Strike.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

### A. General Background of the Chapter 11 Case

4. On December 6, 2021 (the "Petition Date"), Strike and certain of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), commencing the above-captioned chapter 11 cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

### B. Strike's Operations and the KM-Hungerford Project

5. Strike is engaged in the business of pipeline facilities and energy infrastructure services. KM hired Strike to construct a 52-mile, 36-inch-diameter pipeline connector between two of KM's intrastate gas pipeline systems (the "Project"). As part of the Project, Strike was required to install a pipeline under the Colorado River. Strike's wholly-owned subcontractor, Delta Directional Drilling ("Delta"), attempted to cross the Colorado River using horizontal directional drilling ("HDD") on several occasions. Each attempt failed.

**C. The Project Service Agreement with Mears**

6. Following the failed attempts by Delta, KM approached Mears and asked that it get involved because Mears' team has more experience with Direct Pipe® crossings than any other outfit in the country.

7. Under the Direct Pipe® method, a micro tunnel boring machine ("MTBM") is attached to the lead section of the product pipeline and progresses through the bore path using a pipe thruster on the surface. Unlike the HDD method, which requires multiple passes through the bore hole prior to the installation of the pipeline, the Direct Pipe® method excavates the material in the pathway of the MTBM and pumps it to the surface, while installing the pipeline to complete the crossing upon exiting. Although the Direct Pipe® method is state of the art, it is generally four to five times more expensive than the HDD method.

8. Under the Agreement, Mears agreed to provide "all labor, materials, consumables, and equipment to perform installation of 36-inch steel pipe utilizing Direct Pipe® method" under the Colorado River. Because of the crossing permit issued by the U.S. Army Corps of Engineers (the "Corps"), Strike insisted that Mears follow the exact same bore path as the prior failed attempts that had used HDD. Mears informed Strike that such a crossing — one going through a failed HDD bore path — had never been attempted before, and potentially could be very difficult.

9. Given the unprecedented nature of the crossing, Mears insisted that the work be performed on a time and materials basis; Mears would not bear all the risk associated with an unsuccessful crossing. The Purchase Order attached to the Agreement does not contain a specific completion date. Instead, it requires Mears to perform the work "as soon as reasonably practicable consistent with industry practice and prior practices between the Contractor and Subcontractor."

Likewise, the Exhibit to the Agreement makes clear that the schedule proposed by Mears was simply an estimate: "Completion dates are estimates, based on anticipated number of shifts."

**D. The Execution Plan**

10. The Agreement required Mears to provide an installation plan and furnish "As-Drilled" drawings for the crossing. Under the Execution Plan, Mears and its subcontractor, Trenchless Crossings Support ("TCS"), specifically outlined the potential risks associated with the crossing, including that its tunneling operations would go off course and that the pipeline would buckle.

**E. Mears Performs Work on the Project**

11. After creating the Execution Plan, Mears commenced the tunneling operation under the Colorado River using the Direct Pipe® method. Mears performed work on the Project from August 8, 2020 to August 26, 2020, without any incidents or complaints from Strike.

12. On the afternoon of August 26, 2020, Mears was forced to stop working because Hurricane Laura threatened the Texas Gulf Coast. After Hurricane Laura no longer threatened the area, Mears resumed its work on the Project and continued the tunneling operation until September 5, 2020.

**F. The Pipe Drifts off the Intended Bore Path and the Pipe Bends**

13. On September 6, 2020, Mears discovered that the Direct Pipe® diverted from the intended bore path, which it promptly reported to Strike. Following a meeting between the parties' representatives, the decision was made to pull back the Direct Pipe® and attempt to return it to the original pathway. When Mears pulled back the pipe, it discovered that the pipe had deformed around a welding joint as a result of stress from the diversion. Once again, however, Mears'

Execution Plan expressly contemplated that the pipe would divert off the intended pathway, and that the pipe may be exposed to buckling.

### G. The Corps of Engineers Issues Amended Permit and Strike Terminates Mears for Convenience

14. As it turns out, at the same time that Mears was attempting to correct the diversion of the Direct Pipe®, Strike received an amended permit from the Corps of Engineers that allowed Strike to utilize an alternate bore path to cross the Colorado River. The amended permit meant that Strike could attempt the crossing on an alternate pathway using HDD, rather than requiring the more expensive Direct Pipe® method to which it had agreed under the Agreement. Once again, the Direct Pipe® method is generally four to five times more expensive than the HDD method, so the amended permit provided Strike a cheaper option at an easier location.

15. Electing to pursue the now-available and less expensive option, Strike sent Mears a Notice of Default on September 11, 2020. At the time of the Notice of Default, Strike owed Mears $4.1 million under the Agreement for time and material as agreed, in addition to mobilization/demobilization costs in the amount of $180,000.00.

### H. The Arbitration Proceeding

16. On February 9, 2021, Mears commenced the Arbitration Proceeding based upon the following arbitration provision contained in the Agreement:

> If the parties are unable to resolve the Dispute pursuant to the terms herein above, Contractor, at its sole discretion, may require that the Dispute be submitted to binding arbitration conducted by and in accordance with the commercial arbitration rules of the American Arbitration Association. Such arbitration shall be conducted exclusively in Harris County, Texas. Each party shall pay its own costs and attorneys' fees unless otherwise provided herein.

17. In the Arbitration Proceeding, Mears asserts claims against Strike for breach of contract, quantum meruit, violations of the Texas Prompt Pay Act, and violations of the CTFA.

Strike, in turn, has asserted a counterclaim against Mears for the damage that it caused to the pipeline. Mears and Strike have engaged in written discovery and designated expert witnesses, but have not taken any depositions. The final arbitration hearing is scheduled for February 16, 2022.

18. Strike recently filed a *Notice of Suggestion of Bankruptcy and Automatic Stay of Proceedings* in the Arbitration Proceeding on December 9, 2021.

**REQUESTED RELIEF**

19. Pursuant to section 362(d)(1) of the Bankruptcy Code and Bankruptcy Rule 4001, Mears requests entry of an order, substantially in the form attached hereto (the "Proposed Order"): (i) modifying the automatic stay to permit the Arbitration Proceeding to proceed to final award before AAA; (ii) finding that the automatic stay does not apply to continuation of the Arbitration Proceeding; and (iii) granting related relief.

**BASIS FOR RELIEF**

**A. Cause Exists to Lift the Automatic Stay and Allow the Arbitration Proceeding to Continue**

20. The Court should lift the automatic stay for cause because the Arbitration Proceeding derives from Texas state law, and it does not conflict with the purposes of the Bankruptcy Code.

21. The Bankruptcy Code provides that a bankruptcy petition operates to stay "the commencement or continuation . . . of a … proceeding against the debtor that was or could have been commenced before the commencement" of the bankruptcy. 11 U.S.C. § 362(a)(1). A party may be granted relief from an automatic stay under section 362(d) of the Bankruptcy Code, which states, in pertinent part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay–
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; [. . . .]

11 U.S.C § 362(d)(1)

22. The Fifth Circuit has recognized that relief from an automatic stay is warranted in cases involving pending arbitration proceedings. In *National Gypsum*, the Court explained:

> In the most common type of creditor-initiated core proceeding—a motion for relief from the automatic stay—bankruptcy courts regularly have permitted arbitration to continue (or commence) in spite of the presence of core bankruptcy jurisdiction. In those cases permitting arbitration, courts have typically found little difficulty with arbitration of disputes where resolution would not involve matters of federal bankruptcy law.

118 F.3d 1056, 1067-68 (5th Cir 1997). The Court adopted a two-part test for determining when a bankruptcy court has discretion to decline enforcement of an otherwise applicable arbitration agreement. First, the bankruptcy court must determine whether the proceeding adjudicates rights created *exclusively* by the Bankruptcy Code. *See In re Henry*, 944 F.3d 587, 590-91 (5th Cir. 2019). If so, the court may proceed to the second inquiry: whether "arbitration would conflict with the purposes of the Bankruptcy Code." *Id*. at 591. "Both parts of the test are necessary, and the failure of the first is fatal." *See In re Martinez*, No. 06-34385, 2007 Bankr. LEXIS 1260, at *13 (Bankr. S.D. Tex. April 19, 2007) (Bohm, J.).

***1. The Arbitration Proceeding Derives from Texas State Law – Not the Bankruptcy Code***

23. The Court should allow the Arbitration Proceeding to continue because the substance of the proceeding does not derive exclusively from the Bankruptcy Code.

24. For the arbitration proceeding to derive "exclusively from the provisions of the [Bankruptcy] Code", the "underlying nature of the proceeding" must pertain to a right provided to

the parties by the Bankruptcy Code itself. *See In re EXCO Servs.*, No. 18-30167, 2020 Bankr. LEXIS 1110, at *8-9 (Bankr. S.D. Tex. Apr. 22, 2020) (Isgur, J.). If the bankruptcy court "determines that a proceeding does not derive exclusively from the Code, the court has no choice but to abstain and allow the parties to arbitrate the matter." *In re Daisytek*, 323 B.R. 180, 186-87 (N.D. Tex. 2005) (quoting *In re Mirant Corp.*, 316 B.R. 234, 238 (Bankr. N.D. Tex. 2004).

25. In this case, Mears' claims in the Arbitration Proceeding do not derive exclusively from the Bankruptcy Code. Instead, Mears has asserted claims for breach of contract, quantum meruit, violations of the Texas Prompt Pay Act, and violations of the CTFA, which arise solely under Texas state law. Accordingly, given that Mears is seeking to pursue state law claims against Strike that do not derive under the Bankruptcy Code, the Court should allow the Arbitration Proceeding to continue.[2]

### *2. The Arbitration Proceeding Does Not Conflict with the Purposes of the Bankruptcy Code*

26. Even if the Court were to find that Mears' state law claims derive exclusively from the Bankruptcy Code, it should still allow the Arbitration Proceeding to continue because it does not conflict with the Bankruptcy Code's purposes.

27. When determining whether a conflict exists, the Fifth Circuit identified the following purposes served by the Bankruptcy Code: (1) centralized resolution of purely bankruptcy issues; (2) need to protect creditors and reorganizing debtors from piecemeal litigation; (3) and the undisputed power of a bankruptcy court to enforce its own orders. *See In re Nat'l*

[2] *See, e.g., In re Trevino*, 599 B.R. 526, 541 – 42 (Bankr. S.D. Tex. 2019) (Rodriguez, J.) (finding that the creditor's claims for breach of contract and Texas statutory violations were "not derived exclusively from the provisions of the Bankruptcy Code, but rather derive from debtors' prepetition legal or equitable rights"); *Elite Precision Fabricators, Inc. v. Gen. Dynamics Land Sys.*, No. H-14-2086, 2015 U.S. Dist. LEXIS 169257 (S.D. Tex. Dec. 18, 2015) (Lake, J.) (finding that the creditor's claim derived from "pre-petition legal rights rather than entirely from federal rights conferred by the Bankruptcy Code.").

*Gypsum Co.*, 118 F.3d 1056, 1069 (5th Cir 1997). "A conflict exists 'where arbitration is inadequate to protect the substantive rights at issue.'" *See In re Trevino*, 599 B.R. 526, 545 (Bankr. S.D. Tex. 2019) (Rodriguez, J.). "While courts have been reticent in compelling arbitration of claims that would 'necessarily jeopardize' the objectives of the Bankruptcy Code," a party contesting arbitration "bears a *heavy* burden of showing a *clear* and *manifest* expression of congressional intent that the Bankruptcy Code displaces" the Federal Arbitration Act. *Id.* at 546.

28. The District Court for the Southern District of Texas addressed this issue in *Trefny v. Bear Stearns*. There, the District Court found that an arbitration proceeding did not conflict with the purposes of the Bankruptcy Code because the creditor was not seeking to assert claims against the debtor's estate. In its opinion, the District Court explained:

> Trefny's claims do not involve important bankruptcy policies. Trefny does not assert claims against the debtor's estate in this adversary proceeding. The resolution of the claims against Bear Stearns do not require allocating property of the debtor's estate among creditors. The resolution of the claim against Bear Stearns do not require interpreting whether an order discharging the debtor has been violated. Trefny's claims against Bear Stearns arose prepetition and could have been asserted prepetition. None of Trefny's claims require the interpretation of the SIPA or any technical provision of the Bankruptcy Code. The basis of Trefny's claims is that Bear Stearns committed fraud or actionable negligence. Arbitration of this issue does not implicate or conflict with the bankruptcy law or policies.

243 B.R. 300, 316 (S.D. Tex. 1999) (Rosenthal, J.).

29. Similarly, in this case, Mears has asserted state law claims against Strike in the Arbitration Proceeding and is seeking to liquidate trust funds under the CTFA, which are not property of the bankruptcy estate. Hence, there is no conflict between the Arbitration Proceeding and the purposes of the Bankruptcy Code.

### B. Mears Is Seeking to Liquidate Trust Funds, which the Texas Legislature Clarified through Amendment are Neither Property of the Estate nor Property in which the Debtors have an Interest

30. The Court should allow the Arbitration Proceeding to continue because Mears is seeking to liquidate funds that are currently held in trust by Strike under the CTFA, which are neither property of the bankruptcy estate nor property in which the Debtors have an interest.

31. The Bankruptcy Code provides that the automatic stay applies to actions that affect the property of the debtor or the property of the estate. 11 U.S.C. § 362(a)(3)-(6). "Understanding what is and what is not property of the estate is essential to the determination of the scope of the automatic stay." *In re Stone Creek Vill. Prop. Owners Ass'n*, 2011 Bankr. LEXIS 2944 (Bankr. W.D. Tex. July 27, 2011). "Section 362(a)(3) bars any act to obtain possession of property of the estate and, by negative implication, allows 'any act to obtain possession' of property that is not 'property of the estate.'" *See In re Chesnut*, 422 F.3d 298, 302 (5th Cir. 2005).

32. While federal law determines the scope of a debtor's bankruptcy estate, "in the absence of controlling federal bankruptcy law, the substantive nature of the property rights held by a bankrupt and its creditors is defined by state law." *In re Harbor Oil Co.*, 12 F.3d 426, 435 (5th Cir. 1994); *In re Segerstrom*, 247 F.3d 218, 223-224 (5th Cir. 2001) ("A debtor's pre-petition rights in property . . . are determined according to state law"); *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (1979) (explaining that "property interests are created and defined by state law").[3]

### *1. General Standards Governing the CTFA*

33. The CTFA is a "remedial statute" that was enacted to protect subcontractors, laborers, and materialmen. *See Dealers Elec. Supply Co. v. Scoggins Constr. Co.*, 292 S.W.3d 650,

[3] *See, e.g., In re T.S.C. Seiber Servs., L.C.*, 771 F.3d 246, 250 (5th Cir. 2014) (finding that funds trapped under the Texas mineral lien statute were not property of the bankruptcy estate); *In re Stone Creek Vill. Prop. Owners Ass'n*, Case No. 10-54343, 2011 Bankr. LEXIS 2944, at *10-11 (Bankr. W.D. Tex. July 27, 2011) ("Because the Common Area does not constitute property of the debtor's estate, the automatic stay will not prevent the state court plaintiffs from seeking to enforce their state court injunction with respect to the Common Area against the non-debtor defendants.").

658 (Tex. 2009). The CTFA provides that construction payments are "trust funds" if the "payments are made to a contractor or subcontractor or to an officer, director, or agent of a contractor or subcontractor, under a construction contract for the improvement of specific real property." TEX. PROP. CODE § 162.001(a); *Vulcan Materials Co. v. Jack Raus, Inc*., 157 B.R. 592, 597 (Bankr. W.D. Tex. 1993) (finding that "once the owner makes a payment to either the general contractor or to a subcontractor, that payment gives rise to a trust for all parties in the subcontract chain"). Any contractor, officer, agent, or direct who receives or controls the funds are considered trustees. TEX. PROP. CODE § 162.002. The beneficiaries of the trust funds are persons who provide labor or materials for the project. *Id.* § 162.003. Under the CTFA, trust funds may only be distributed for purposes unrelated to the construction project after all current or past due obligations to the supplier beneficiaries have been paid. *Id*. § 162.031.

34. In 2009, Texas Legislature made several significant amendments to the CTFA to clarify prior uncertainty in the law as to whether trust funds were considered property of the debtor and the estate in the context of a bankruptcy proceeding.

***2. Pre-Amendment Decisions Regarding the CTFA***

35. Prior to 2009, bankruptcy courts in Texas reached different conclusions regarding whether trust funds were property of a debtor's estate.

36. In *Sommers v. Katy Steel Co*., a bankruptcy trustee brought adversary proceedings against defendant subcontractors of a bankruptcy debtor, seeking turnover of alleged post-petition payments that were made to subcontractors pursuant to the CTFA where the subcontractors were issued checks pre-petition by the debtor but the checks were cashed post-petition. 343 B.R. 573 (Bankr. S.D. Tex. 2006). The trustee and the subcontractors filed cross-motions for summary judgment.

37. In analyzing the motions for summary judgment, Judge Marvin Isgur focused on whether the payments to the subcontractors were transfers of estate property. *Id.* at 579. Judge Isgur noted that some bankruptcy courts had interpreted Section 547 of the Bankruptcy Code and held "that a transfer of a trust fund during the preferential transfer period is not a recoverable transfer" because the funds did not constitute an "interest of the debtor in property." *Id.* Judge Isgur distinguished these decisions by noting the differences in the definitions contained in Section 547 and Section 549. *Id*. at 580-81 ("The statutes differ and the policies to be vindicated differ. Section 549 does not refer to 'an interest of the debtor in property' – the phrase that is the linchpin of all trust fund cases under § 547. Instead, § 549 refers to 'a transfer of property of the estate.' The bankruptcy estate is not created until a case is commenced.").

38. Judge Isgur went on to explain that since the debtor retained a legal interest in the trust funds at the commencement of the bankruptcy case, they were considered "property of the estate," and the payments could therefore be avoided as a preference. *Id*. at 581-85. After Judge Isgur granted summary judgment in favor of the trustee, the subcontractor appealed to the District Court for the Southern District of Texas, and Judge Nancy Atlas affirmed. *See Varela v. Sommers*, No. H-05-3212, 2006 U.S. Dist. LEXIS 80109 (S.D. Tex. Nov. 2, 2006). Subsequently, the Fifth Circuit affirmed the rulings of the Bankruptcy Court and the District Court in an unpublished decision, but expressly recognized that the appellants could establish that the payments were trust funds under the CTFA and "therefore excludable as property of the estate." *See Varela v. Sommers (In re Contractor Tech., Ltd.),* 229 Fed. App'x 294, 295 (5th Cir. 2007) (per curiam).

39. Less than two years later, in *In re N.A. Flash Found. Inc.*, the Fifth Circuit Court of Appeals refused to avoid a preferential transfer made by a general contractor to a material supplier of trust funds under the CTFA. 298 F. App'x 355, 356-357 (5th Cir. 2008). Both the

Bankruptcy Court and the District Court used the construction fund concept to conclude that the material supplier "would have received the same amount in a hypothetical Chapter 7 proceeding that it did from the allegedly preferential transfers." *Id.* at 360. The trustee subsequently appealed the decision to the Fifth Circuit, which affirmed. In its opinion, the Fifth Circuit explained its reasoning as follows:

> In a hypothetical case, NA Flash would be required to hold the amounts received from property owners in trust for its subcontractors on those projects, including Palmetco, or face criminal liability for misuse of trust funds. Therefore, in the hypothetical bankruptcy proceeding, where the court is to presume everyone will act reasonably, NA Flash would have held any payments it received on Palmetco projects between October 2003 (when the transfers hypothetically never took place) and December 29, 2003 (the date of the bankruptcy), in trust for Palmetco; otherwise, NA Flash would have faced criminal liability. **The trust funds would have given Palmetco a priority claim to the funds in the subsequent bankruptcy proceeding. Consequently, in a hypothetical proceeding, Palmetco would have received 100% of the money it was owed, and NA Flash's estate would not be depleted of any money that would have otherwise been available to the unsecured creditors.**

*Id*. (emphasis added).[4]

### *3. 2009 Legislative Amendments to the CTFA*

40. In the 2009 Session, the Texas Legislature amended Chapter 162 of the CTFA to address conflicting case law concerning the treatment of trust funds in bankruptcy cases.

41. As amended, Section 161.001(d) of the CFTA expressly states: "Trust funds paid to a creditor under this chapter **are not property or an interest in property of a debtor** who is a trustee described by Section 162.002." TEX. PROP. CODE § 162.001(d) (emphasis added). Adding

[4] "There have been other recent cases about whether, when a contractor files for bankruptcy relief, trust funds in the contractor's hands are 'property' of the bankruptcy estate of the contractor in any way for purposes of 11 U.S.C. § 541, notwithstanding that under the Trust Fund Statute, the subcontractors are supposed to be beneficiaries of such funds. Most of these cases have tended to hold that the funds are not property of the estate of the bankrupt contractor, or are not otherwise recoverable by the bankruptcy trustee as preferential transfers or otherwise, although the reasoning of such cases has varied and been somewhat unpredictable." *See* 1 MECHANIC'S & MATERIALMAN'S LIEN LAWS OF TEXAS § 8.03 (citing *In re Railworks,* 387 B.R. 156 (Bankr. D. Md. 2008) (applying Texas law); *In re Diamond K Corp*., 2007 Bankr. LEXIS 2608 (Bankr. E.D. Tex. Aug. 2, 2007)).

additional clarity, the amendment also expressly provides that commingling of trust funds with other debtor funds does not defeat the trust. *Id.* § 162.031(d) ("A trustee who commingles trust funds with other funds in the trustee's possession does not defeat a trust created by this chapter").

42. The Texas House Committee Report from the Business and Industry Committee described the purpose of the amendments as follows:

> HB 1513 revises the Texas Construction Trust Fund Act to deal with the effects of the preferential transfer statute and to clarify remedies intended to be provided by the act. **Specifically, the bill states that trust funds in the hands of a construction trustee are expressly removed from the debtor's bankruptcy estate**, states that the commingling of funds by a construction trustee with other funds of the construction trustee does not destroy the trust nature of the funds, and clarifies that the act applies to both public and private projects in Texas whether bonded or not.

HOUSE COMM. ON BUS. & INDUS., BILL ANALYSIS, TEX. H.B. 1513, 81st Leg., R.S. (2009) (emphasis added).[5]

***4. Post-Amendment Decisions Regarding the CTFA***

43. After the Legislature's clarifying amendments in 2009, several bankruptcy courts have addressed claims to trust funds under the CTFA.[6]

44. In *Margolis v. Hensley (In re Hensley),* a residential contractor sued a homeowner in state court when issues arose on a construction project. Adv. No. 12-4180, 2014 Bankr. LEXIS 4213, at *3-4 (Bankr. E.D. Tex. Oct. 1, 2014), *aff'd*, 2015 U.S. Dist. LEXIS 126359 (E.D. Tex., Sept. 22, 2015). In the bankruptcy case, the contractor successfully obtained stay relief from the

[5] According to commentators, the purpose of the amendment was to "make it absolutely clear that the contractor/trustee of such trust funds has no assertable interest in them sufficient to defeat the beneficiaries' interests." *See* 1 MECHANIC'S & MATERIALMAN'S LIEN LAWS OF TEXAS § 8.03.

[6] Texas state courts have also analyzed trust fund claims under the CTFA. In *Constructors & Assocs. v. First Nat'l Bank of Cameron*, the Austin Court of Appeals explained that when "two competing claims exist, one under the construction trust fund act and the other as an assignee money lender, the trust fund claim takes priority. This priority does not disappear in bankruptcy, as trust funds are not part of the bankruptcy estate." No. 03-10-00357-CV, 2011 Tex. App. LEXIS 5413, at *10-11 (Tex. App.—Austin, July 14, 2011, no pet.) (emphasis added).

bankruptcy court to allow it to continue the arbitration and seek to recover amounts owed under the CFTA. *Id*.

45. In *Munoz v. Cedar Park Constr., LLC (In re RTX Custom Homes, Inc.)*, the bankruptcy court relied on the 2009 amendments to the CFTA and held that the payments were not avoidable as preferences because "Texas state law expressly provides that 'construction trust funds' are not an interest in property of a debtor." Adv. No. 15-01110-HCM, 2017 Bankr. LEXIS 1669, *110 (Bankr. W.D. Tex. June 8, 2017). The bankruptcy court reasoned that the payments were not property of the estate pursuant to Section 541(d) of the Bankruptcy Code:

> Buttressing the Court's conclusion is another provision of the Bankruptcy Code and Supreme Court precedent regarding payment of trust funds held by a debtor. **Section 541(d) of the Bankruptcy Code provides that property in which the debtor holds only legal title and not an equitable interest, is not property of the bankruptcy estate**. 11 U.S.C. § 541(d). The Supreme Court has recognized that "property of the estate" under § 541(d) should be read as the post-petition analog to what constitutes "property of a debtor" under § 547(b) (the preference statute) . . . RTX (the debtor) held the "construction trust funds" in a statutory trust created by Chapter 162 of the Texas Property Code. As a result, the payment of the construction trust funds by RTX to Cedar Park cannot be recovered as a preference under § 547(b) of the Bankruptcy Code.

*Id.* at *113 (emphasis added).

46. Here too, the trust funds held by Strike are not property of the estate, and the Court should grant Mears relief from the stay to liquidate its claim in the Arbitration Proceeding and pursue its in rem remedy against non-property of the estate.

**NOTICE**

47. Notice of this Motion will be given to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the Prepetition Senior Loan Agent; (d) the Prepetition Junior

Loan Agent; (e) AIP and the DIP Secured Parties,[7] and their counsel, Stroock & Stroock & Lavan LLP; (f) the Official Committee of Unsecured Creditors; (g) the Office of the United States Attorney for the Southern District of Texas; (h) the state attorneys general for states in which the Debtors conduct business; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (l) AFCO; and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002. In view of the nature of the relief requested, no other or further notice need be provided.

48. A copy of this Motion is available on (i) the Court's website: www.txs.uscourts.gov, and (ii) the website maintained by the Debtors' claims and noticing agent, Epic, Debtors' noticing agent at https://dm.epiq11.com/StrikeLLC.

## CONCLUSION

WHEREFORE, Mears Group, Inc. respectfully requests that the Court enter the Proposed Order modifying and lifting the automatic stay to permit Mears to continue prosecuting the Arbitration Proceeding to final judgment and granting such other further relief as is just and proper.

[7] The term "DIP Secured Parties" is defined in the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief* [Docket No. 79].

Dated: December 21, 2021

VORYS, SATER, SEYMOUR AND PEASE LLP

*/s/ Steven R. Rech*

Steven R. Rech, Esq. [Texas Bar #16649200; Fed #15801]
John S. Collins, Esq. [Texas Bar #24087327; Fed #318157]
Tiffany Strelow Cobb, Esq. (admitted pro hac vice)
Kari B. Coniglio, Esq. (admitted pro hac vice)
Vorys, Sater, Seymour and Pease LLP
909 Fannin Street, Suite 2700
Houston, TX 77010
Telephone: (713) 588-7017
Facsimile: (713) 588-7090
E-mail: srech@vorys.com

*Counsel for Mears Group, Inc.*

**CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that counsel for the movant has conferred with counsel to the Debtors regarding the relief requested in the Motion, and has been unable to reach an agreement on the requested relief.

*/s/ Tiffany Strelow Cobb*
Tiffany Strelow Cobb

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2021 a true and correct copy of the foregoing *Motion for Relief from Automatic Stay to Continue Arbitration Proceeding* was filed and served electronically via the Court's CM/ECF System upon those who are registered to receive electronic notice.

*/s/ Steven R. Rech*
Steven R. Rech