**<u>Exhibit 2</u>**

**Draft DIP Loan Agreement**

Exhibit 2-1-

**EXHIBIT 2**

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

Dated as of December [●], 2021,

among

**STRIKE, LLC,
DELTA DIRECTIONAL DRILLING, LLC,**
and
**STRIKE GLOBAL HOLDINGS, LLC**,
as Borrowers, and as Debtors and Debtors-in-Possession
under Chapter 11 of the Bankruptcy Code,

**STRIKE HOLDCO, LLC**,
as Holdings, as a Guarantor, and as a Debtor and Debtor-in-Possession
under Chapter 11 of the Bankruptcy Code,

**THE SUBSIDIARY GUARANTORS PARTY HERETO**,

**CERTAIN FINANCIAL INSTITUTIONS**,
as Lenders,

and

**LIGHTSHIP CAPITAL II LLC**,
as Administrative Agent

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

## <u>TABLE OF CONTENTS</u>

**Page**

**SECTION 1.**      DEFINITIONS; RULES OF CONSTRUCTION.................................................3

    **1.1.**    **Definitions**.........................................................................................3
    **1.2.**    **Accounting Terms**.........................................................................58
    **1.3.**    **Uniform Commercial Code**.........................................................58
    **1.4.**    **Certain Matters of Construction**................................................58

**SECTION 2.**      CREDIT FACILITIES .................................................................59

**SECTION 3.**      INTEREST, FEES AND CHARGES............................................64

    **3.1.**    **Interest**............................................................................................64
    **3.2.**    **Fees and Commitment Payments**.................................................66
    **3.3.**    **Computation of Interest, Fees, Yield Protection**.......................67
    **3.4.**    **Reimbursement Obligations**........................................................67
    **3.5.**    **Illegality**.........................................................................................68
    **3.6.**    **Inability to Determine Rates**.......................................................68
    **3.7.**    **Increased Costs; Capital Adequacy**............................................68
    **3.8.**    **Mitigation**......................................................................................70
    **3.9.**    **Funding Losses**.............................................................................70
    **3.10.**   **Maximum Interest**.......................................................................70

**SECTION 4.**      LOAN ADMINISTRATION ........................................................71

    **4.1.**    **Manner of Borrowing and Funding Loans**................................71
    **4.2.**    **Defaulting Lender**.........................................................................72
    **4.3.**    **Number and Amount of LIBOR Loans; Determination of Rate**...................74
    **4.4.**    **Borrower Agent**...........................................................................74
    **4.5.**    **One Obligation**.............................................................................74
    **4.6.**    **Effect of Termination**..................................................................74

**SECTION 5.**      PAYMENTS..................................................................................75

    **5.1.**    **General Payment Provisions**.......................................................75
    **5.2.**    **Voluntary Prepayments**..............................................................75
    **5.3.**    **Mandatory Prepayments**............................................................75
    **5.4.**    **Payment of Other Obligations**....................................................77
    **5.5.**    **Marshaling; Payments Set Aside**................................................77
    **5.6.**    **Application and Allocation of Payments**.....................................77
    **5.7.**    **Dominion Account**.......................................................................78

-i-

AMERICAS 110819944

**EXHIBIT 2**

|  | 5.8. | Account Stated. | 78 |
|  | 5.9. | Taxes | 79 |
|  | 5.10. | Lender Tax Information | 80 |
|  | 5.11. | Nature and Extent of Each Borrower's Liability | 83 |
|  | 5.12. | Termination Payment | 86 |

**SECTION 6.** CONDITIONS PRECEDENT ... 87

|  | 6.1. | Conditions Precedent to Closing Date and Initial Borrowing. | 87 |
|  | 6.2. | Conditions Precedent to All Borrowings. | 91 |

**SECTION 7.** COLLATERAL ... 93

|  | 7.1. | Grant of Security Interest. | 93 |
|  | 7.2. | Lien on Deposit Accounts; Cash Collateral | 94 |
|  | 7.3. | Pledged Collateral. | 95 |
|  | 7.4. | Intellectual Property Matters. | 99 |
|  | 7.5. | Other Collateral. | 101 |
|  | 7.6. | No Assumption of Liability. | 101 |
|  | 7.7. | Further Assurances | 101 |
|  | 7.8. | Further Exceptions. | 102 |

**SECTION 8.** COLLATERAL ADMINISTRATION ... 102

|  | 8.1. | [Reserved]. | 102 |
|  | 8.2. | Administration of Accounts. | 102 |
|  | 8.3. | [Reserved]. | 103 |
|  | 8.4. | [Reserved]. | 103 |
|  | 8.5. | Administration of Deposit Accounts. | 103 |
|  | 8.6. | General Provisions. | 104 |
|  | 8.7. | Power of Attorney. | 105 |

**SECTION 9.** REPRESENTATIONS AND WARRANTIES ... 105

|  | 9.1. | General Representations and Warranties. | 105 |
|  | 9.2. | Disclosure. | 111 |

**SECTION 10.** COVENANTS AND CONTINUING AGREEMENTS ... 112

|  | 10.1. | Affirmative Covenants | 112 |
|  | 10.2. | Negative Covenants | 122 |
|  | 10.3. | Financial Covenant. | 134 |
|  | 10.4. | Chapter 11 Cases | 135 |

**SECTION 11.** EVENTS OF DEFAULT; REMEDIES ON DEFAULT ... 136

-ii-

**EXHIBIT 2**

| | | |
|---|---|---|
| 11.1. | Events of Default. | 136 |
| 11.2. | Remedies upon Default | 142 |
| 11.3. | Setoff | 147 |
| 11.4. | Remedies Cumulative; No Waiver | 148 |

**SECTION 12.    ADMINISTRATIVE AGENT** ..................................................148

| | | |
|---|---|---|
| 12.1. | Appointment, Authority and Duties of Administrative Agent. | 148 |
| 12.2. | Agreements Regarding Collateral and Borrower Materials. | 150 |
| 12.3. | Reliance By Administrative Agent. | 152 |
| 12.4. | Action Upon Default. | 152 |
| 12.5. | Ratable Sharing | 152 |
| 12.6. | Indemnification. | 153 |
| 12.7. | Limitation on Responsibilities of Administrative Agent. | 153 |
| 12.8. | Successor Agent and Co-Agents. | 154 |
| 12.9. | Non-Reliance on the Administrative Agent and the Other Lenders | 155 |
| 12.10. | Remittance of Payments and Collections | 156 |
| 12.11. | Individual Capacities | 156 |
| 12.12. | [Reserved]. | 157 |
| 12.13. | [Reserved]. | 157 |
| 12.14. | No Third Party Beneficiaries. | 157 |
| 12.15. | Withholding Tax. | 157 |
| 12.16. | Administrative Agent May File Proofs of Claim; Credit Bidding. | 158 |
| 12.17. | Certain ERISA Matters | 161 |
| 12.18. | Successors By Merger, Etc. | 162 |

**SECTION 13.    BENEFIT OF AGREEMENT; ASSIGNMENTS** ..........................162

| | | |
|---|---|---|
| 13.1. | Successors and Assigns. | 162 |
| 13.2. | Participations. | 163 |
| 13.3. | Assignments. | 164 |
| 13.4. | Replacement of Certain Lenders. | 165 |

**SECTION 14.    MISCELLANEOUS** ..................................................166

| | | |
|---|---|---|
| 14.1. | Consents, Amendments and Waivers | 166 |
| 14.2. | Indemnity. | 167 |
| 14.3. | Notices and Communications. | 168 |
| 14.4. | Performance of Borrowers' Obligations | 170 |
| 14.5. | Credit Inquiries. | 170 |
| 14.6. | Severability. | 170 |
| 14.7. | Cumulative Effect; Conflict of Terms. | 170 |
| 14.8. | Counterparts; Execution. | 171 |

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

| | | |
|---|---|---|
| 14.9. | Entire Agreement | 171 |
| 14.10. | Relationship with Lenders | 171 |
| 14.11. | No Advisory or Fiduciary Responsibility | 171 |
| 14.12. | Confidentiality | 172 |
| 14.13. | Governing Law | 173 |
| 14.14. | Consent to Forum | 173 |
| 14.15. | Waivers by Borrowers | 173 |
| 14.16. | Patriot Act Notice | 174 |
| 14.17. | No Oral Agreement | 174 |
| 14.18. | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 174 |
| 14.19. | DIP Orders | 175 |
| 14.20. | Acknowledgment Regarding any Supported QFCs | 175 |

-iv-

AMERICAS 110819944

**EXHIBIT 2**

## <u>LIST OF EXHIBITS AND SCHEDULES</u>

| | |
|---|---|
| Exhibit A | Assignment and Acceptance |
| Exhibit B | Assignment Notice |
| Exhibit C-1 | Form of Notice of Borrowing |
| Exhibit C-2 | Form of Notice of Conversion/Continuation |
| Exhibit D | Form of Guaranty |
| Exhibit E | Form of Compliance Certificate |
| Exhibit F | Form of U.S. Tax Compliance Certificate |
| Exhibit G | Form of Joinder |
| Exhibit H | Initial Budget |
| | |
| Schedule 1.1 | Commitments of Lenders |
| Schedule 7.1(c) | Commercial Tort Claims |
| Schedule 7.3(a) | Equity Interests and Debt Securities |
| Schedule 8.5 | Deposit Accounts |
| Schedule 9.1.4 | Names and Capital Structure |
| Schedule 9.1.10 | Patents, Trademarks, Copyrights and Licenses |
| Schedule 9.1.15 | Litigation |
| Schedule 9.1.18 | Labor Relations |
| Schedule 10.1.13 | Milestones |
| Schedule 10.2.1 | Existing Debt |
| Schedule 10.2.2 | Existing Liens |

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

## SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT

**THIS SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** is dated as of December [●], 2021 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), among (a) **STRIKE HOLDCO, LLC**, a Delaware limited liability company and a debtor and debtor-in-possession in the Chapter 11 Cases ("Holdings"), as a Guarantor (such term, and each other capitalized term used but not defined in this introductory statement or in the Recitals having the meaning assigned thereto in Section 1), (b) each of (i) **STRIKE, LLC**, a Texas limited liability company and a debtor and debtor-in-possession in the Chapter 11 Cases ("Strike"), (ii) **DELTA DIRECTIONAL DRILLING, LLC**, a Texas limited liability company and a debtor and debtor-in-possession in the Chapter 11 Cases, and (iii) **STRIKE GLOBAL HOLDINGS, LLC**, a Texas limited liability company and a debtor and debtor-in-possession in the Chapter 11 Cases, in each case, as a borrower of the Loans hereunder (each of the foregoing, in such capacity, a "Borrower", and, collectively, the "Borrowers"), (c) each Person party hereto as a Subsidiary Guarantor, (d) each Person party hereto from time to time as a Lender, and (e) **LIGHTSHIP CAPITAL II LLC**, as Administrative Agent.

### R E C I T A L S :

WHEREAS, on December 6, 2021 (the "Petition Date"), each of the Borrowers, Holdings and each direct and indirect Subsidiary of the Borrowers (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") initiating their respective jointly administered cases under Chapter 11 of the Bankruptcy Code (Case No. 21-90054) (collectively, the "Chapter 11 Cases"), and each Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, pursuant to the Prepetition Loan Agreements, the Persons who are party hereto as Lenders on the Closing Date extended (directly or indirectly) certain loans and provided certain other accommodations to the Debtors prior to the Petition Date, and the Debtors' obligations with respect thereto constitute Prepetition Debt for purposes hereof;

WHEREAS, the Debtors and the Persons who are party hereto as Lenders on the Closing Date are engaging (directly or indirectly) in certain discussions and good-faith negotiations with respect to one or more restructuring, reorganization, sale and other transactions, and have entered into the Restructuring Support Agreement in connection therewith;

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

WHEREAS, the Borrowers have requested that the Lenders provide the Debtors with liquidity to pursue the Restructuring (as defined in the Restructuring Support Agreement), and the Lenders have agreed to provide such liquidity in the form and on the terms of the senior secured super-priority debtor-in-possession term loan credit facility documented pursuant to this Agreement (the "DIP Facility"), pursuant to which the Lenders shall extend (or be deemed to extend, as the case may be) term loans to the Borrowers pursuant to the terms hereof and the DIP Orders in an aggregate principal amount not to exceed the DIP Facility Amount, consisting of (i) New Money Loans funded by the Lenders at such times as provided herein and (ii) Roll-Up Loans deemed incurred on the Final DIP Order Date;[1]

WHEREAS, this Agreement constitutes the "DIP Credit Agreement", and the DIP Facility and the Loans constitute "DIP Financing", in each case, referred to in the Restructuring Support Agreement, and, upon entry by the Lenders into this Agreement, all obligations and agreements of the AIP Parties and the Consenting Lenders (each, as defined in the Restructuring Support Agreement) with respect to the DIP Financing set forth in the Restructuring Support Agreement (including Section 6(b)(i) thereof) shall be deemed satisfied and discharged to the fullest extent required by the Restructuring Support Agreement;

WHEREAS, to provide security for the repayment of the Loans and the satisfaction of all other Obligations owing to the Lenders, the Obligors have agreed to grant in favor of the Administrative Agent (for the benefit of the Secured Parties) first-priority Liens on the Collateral, in each case, as further set forth in, and subject to, the DIP Orders; and

WHEREAS, subject to the terms and conditions set forth herein and in the DIP Orders, (i) the Lenders are willing to make available (or be deemed to make available) the Loans to the Borrowers and (ii) the Administrative Agent is willing to serve as Administrative Agent for the Lenders.

**NOW, THEREFORE**, for valuable consideration hereby acknowledged, the parties agree as follows:

---

[1] NTD: Debtors and Lenders to negotiate in good faith to include an additional DIP L/C Facility in an amount and timing to be mutually agreed (but no later than entry into the Final DIP Order).

-2-

**EXHIBIT 2**

# SECTION 1.  DEFINITIONS; RULES OF CONSTRUCTION

**1.1.**   __Definitions__.[2]   As used herein, the following terms have the meanings set forth below:

"__Account__":  as defined in the UCC, including all rights to payment for goods sold or leased, or for services rendered.

"__Account Debtor__":  a Person obligated under an Account, Chattel Paper or General Intangible.

"__Acquired EBITDA__":  with respect to any Acquired Entity or Business for any period, the amount for such period of EBITDA of such Acquired Entity or Business (determined or estimated in good faith by the Borrower Agent using such definitions as if references to the Borrowers and their Subsidiaries therein were to such Acquired Entity or Business and its Subsidiaries), all as determined on a consolidated basis for such Acquired Entity or Business.

"__Acquired Entity or Business__":  as defined in the term "EBITDA".

"__Acquisition__":  a transaction or series of transactions resulting in (a) acquisition of a business, division, or all or substantially all assets of a Person; (b) record or beneficial ownership of more than 50% of the Equity Interests of a Person; or (c) merger, consolidation or combination of Holdings or a Subsidiary with another Person.

"__Additional Specified Vehicle Dispositions__":  as defined in the definition of Permitted Asset Dispositions.

"__Adequate Protection Provisions__":  the provisions in the Interim DIP Order or, once entered, in the Final DIP Order, granting adequate protection to the Prepetition Secured Parties.

"__Administrative Agent__":  as of any time of determination, the Person appointed in accordance with this Agreement (including pursuant to the successor agency provisions of **Section 12.8**) to act as administrative agent for the Lenders and as collateral agent for the Secured Parties.

---

[2] NTD:  Defined terms relating to the Chapter 11 Cases to be reviewed prior to closing and conformed to the extent necessary to ensure consistency with corresponding terminology used in the RSA and DIP Order (as applicable).

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

"<u>Affected Financial Institution</u>": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>":  with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  For the avoidance of doubt, the Sponsor shall be an Affiliate of the Obligor and their Subsidiaries.

"<u>Agent Fee Letter</u>":  that certain DIP Agent Fee Letter, dated as of the Closing Date, by and among the Administrative Agent and the Borrowers, as the same may be supplemented, amended or otherwise modified from time to time.

"<u>Agent Fees</u>":  as defined in **Section 3.2.1**.

"<u>Agent Indemnitees</u>":  Administrative Agent and its officers, directors, employees, Affiliates, agents and attorneys.

"<u>Agent Professionals</u>":  attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by Administrative Agent.

"<u>Agreement</u>":  as defined in the preamble hereto.

"<u>Allocable Amount</u>":  as defined in **Section 5.11.3**.

"<u>Alternative Asset Purchase Agreement</u>" means an asset purchase agreement (other than the Stalking Horse Agreement) selected by the Obligors in accordance with the Sale Procedures as representing the highest and otherwise best offer for the purchase and sale of all or substantially all of the Obligor's assets, provided that the terms of any such asset purchase agreement shall require the Payment in Full of all DIP Obligations immediately upon the consummation of such Sale Transaction.

"<u>Anti-Corruption Law</u>":  the Foreign Corrupt Practices Act of 1977, as amended, or any similar Applicable Law.

"<u>Anti-Terrorism Law</u>":  any law primarily relating to terrorism or money laundering, including the Patriot Act.

"<u>Applicable Law</u>":  with respect to any Person, conduct, transaction, agreement or matter, as the case may be, all laws, rules, regulations and governmental guidelines applicable to such Person, conduct, transaction, agreement or matter in question, including all applicable statutory

-4-

AMERICAS 110819944

**EXHIBIT 2**

law, common law and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities (including, with reference to the Debtors, any order of the Bankruptcy Court, pursuant to the Bankruptcy Code or otherwise in connection with the Chapter 11 Cases).

"Applicable Margin":  10%.

"Approved Budget":  (a) the Initial Budget, at all times, until superseded by an Updated Budget in accordance with (and subject to receipt of all approvals required pursuant to) **Section 10.1.12** and (b) as of any time of determination thereafter, the most recent Budget Supplement (if any) that constitutes the Updated Budget in effect as of such time in accordance with (and subject to) receipt of all approvals required pursuant to **Section 10.1.12**; provided, that, no Budget Supplement or other cash flow forecast shall in any event constitute an Approved Budget unless, in addition to being in accordance with the terms hereof, the same is also sufficient to constitute the "Approved Budget" for purposes of (and as such term is defined in) the DIP Orders.

"Approved Fund":  any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in its ordinary course of activities, and is administered or managed by a Lender, an entity that administers or manages a Lender, or an Affiliate of either.

"Asset Disposition":  a sale, lease (as lessor), license, consignment, transfer or other disposition of property (including any Equity Interests) of an Obligor, unwinding of any Hedging Agreement, any discounting or selling of (with or without recourse) any notes receivable or accounts receivable, a disposition of property in connection with a sale-leaseback transaction or synthetic lease, and including any disposition of property pursuant to a Division.

"Assignment and Acceptance":  an assignment agreement between a Lender and Eligible Assignee, in the form of **Exhibit A** or otherwise reasonably acceptable to the Administrative Agent.

"Bail-In Action":  the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation":  (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution

-5-

AMERICAS 110819944

**EXHIBIT 2**

of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bank of America</u>":  Bank of America, N.A., a national banking association, and its successors and assigns.

"<u>Bankruptcy Code</u>":  Title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"<u>Bankruptcy Court</u>":  as defined in the recitals to this Agreement.

"<u>Base Rate</u>":  for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1% (b) the Prime Rate in effect for such day, and (c) LIBOR for a one month Interest Period plus 1.00%.  Any change in any such rate shall take effect at the opening of business on the day specified in the announcement of such change.

"<u>Base Rate Loan</u>":  any Loan that bears interest based on the Base Rate.

"<u>Beneficial Ownership Certification</u>":  a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>":  31 C.F.R. § 1010.230.

"<u>Benefit Plan</u>":  any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"<u>Board of Governors</u>":  the Board of Governors of the Federal Reserve System.

"<u>Borrowed Money</u>":  with respect to any Obligor or Subsidiary, without duplication, its (a) Debt that (i) arises from the lending of money by any Person to such Obligor, (ii) is evidenced by notes, drafts, bonds, debentures, credit documents or similar instruments, (iii) accrues interest or is a type upon which interest charges are customarily paid (excluding trade payables owing in the Ordinary Course of Business), or (iv) was issued or assumed as full or partial payment for property; (b) Capital Leases; (c) reimbursement obligations with respect to drawn amounts under letters of credit; and (d) Guarantee Obligations with respect to any Debt of the foregoing types owing by another Person.

"<u>Borrower Agent</u>":  as defined in **Section 4.4**.

-6-

**EXHIBIT 2**

"Borrower Materials":  reports, financial statements and other materials delivered by Borrowers hereunder, as well as other Reports and information provided by Administrative Agent to Lenders.

"Borrowers":  as defined in the preamble hereto.

"Borrowing":  a group of Loans of one Type that are made (or deemed made) on the same day or are converted into Loans of one Type on the same day.

"Borrowing Date":  as defined in **Section 4.1.1**.

"Budget Supplement":  as defined in **Section 10.1.12**.

"Business Day":  any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of Texas, New York, or Delaware, and, if such day relates to a LIBOR Loan, any such day on which dealings in Dollar deposits are conducted between banks in the London interbank Eurodollar market.

"Business Unit Consolidation":  the transactions or series of related transactions relating to the consolidation of the regional/specialty business units of Holdings and its Subsidiaries from 12 regional/specialty business units to five or fewer business units.

"Capital Expenditures":  all liabilities incurred or expenditures made by Holdings or a Subsidiary for the acquisition of fixed assets, or any improvements, replacements, substitutions or additions thereto with a useful life of more than one year.

"Capital Lease":  any lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Capital Lease Obligations":  as applied to any Person, all obligations under Capital Leases of such Person or any of its Subsidiaries, in each case taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"Capstone":  Capstone, LLC.

"Capstone JV Transaction":  the acquisition by Holdings or a Subsidiary of 50% or less of the Equity Interests in Capstone.

"Carve-Out":  has the meaning assigned to such term in the Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) or the Final DIP Order (from and after the date on which the Final DIP Order is entered).

-7-

**EXHIBIT 2**

"<u>Cash Collateral</u>":  cash, Cash Equivalents, and any interest or other income earned thereon, that collateralizes, or is security for the payment of, any Obligations.

"<u>Cash Dominion Period</u>":  (x) the period (a) commencing, at the election of the Administrative Agent or the Required Lenders, on the day that (i) any Event of Default occurs or arises hereunder; and (b) continuing until, such Event of Default is cured or shall cease to exist, so long as no other Default or Event of Default exists or is continuing at such time, and (y) any other period during which the Administrative Agent shall, pursuant to the applicable DIP Order, have the right to sweep cash, exercise cash dominion and other rights with respect to Deposit Accounts or any funds therein, and/or take any other actions relating to account control and cash management matters, as the case may be.

"<u>Cash Equivalents</u>":  (a) marketable obligations issued or unconditionally guaranteed by, and backed by the full faith and credit of, the United States government, maturing within 12 months of the date of acquisition; (b) certificates of deposit, time deposits and bankers' acceptances maturing within 12 months of the date of acquisition, and overnight bank deposits, in each case which are issued by a Lender or a commercial bank organized under the laws of the United States or any state or district thereof, rated A-1 (or better) by S&P or P-1 (or better) by Moody's at the time of acquisition, and (unless issued by a Lender) not subject to offset rights; (c) repurchase obligations with a term of not more than 30 days for underlying investments of the types described in clauses (a) and (b) entered into with any bank described in clause (b); (d) commercial paper issued by any financial institution or other Person acceptable to the Administrative Agent or rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and maturing within nine months of the date of acquisition; (e) shares of any money market fund that has substantially all of its assets invested continuously in the types of investments referred to above, has net assets of at least $500,000,000 and has the highest rating obtainable from either Moody's or S&P; and (f) any money market fund of which the assets are comprised of not less than 90% of the items specified in clauses (a) through (e) above.

"<u>Cash Management Services</u>":  any services provided from time to time by the Administrative Agent, any Lender or any of their Affiliates to Holdings or any Subsidiary in connection with operating, collections, payroll, trust, or other depository or disbursement accounts, including automated clearinghouse, e-payable, electronic funds transfer, wire transfer, controlled disbursement, overdraft, depository, information reporting, lockbox, stop payment and similar services.

"<u>CERCLA</u>":  the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 <u>et</u> <u>seq</u>.).

"<u>Change in Law</u>":  the occurrence, after the date hereof, of (a) the adoption, taking effect or phasing in of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or

-8-

AMERICAS 110819944

**EXHIBIT 2**

treaty or in the administration, interpretation or application thereof; or (c) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; *provided*, *however*, that "Change in Law" shall include, regardless of the date enacted, adopted or issued, all requests, guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any similar authority) or any other Governmental Authority.

"Change of Control":  any of the following:

(a)    Holdings ceases to own and control, beneficially and of record, directly or indirectly, all Equity Interests in the Borrowers;

(b)    Sponsor and the Pate Group collectively cease to own and control, beneficially and of record, directly or indirectly, Equity Interests of Holdings representing more than 50% of the voting power of the then outstanding Voting Equity Interests of Holdings;

(c)    at any time, and for any reason whatsoever, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), excluding the Permitted Holders, shall become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of Equity Interests of Holdings representing more than the greater of (x) thirty-five percent (35%) of the voting power of the then outstanding Voting Equity Interests of Holdings, and (y) the percentage of the voting power of the then outstanding Voting Equity Interests of Holdings owned, directly or indirectly, beneficially by the Permitted Holders (in the aggregate);

(d)    the sale or transfer of all or substantially all of the Borrowers' assets on a consolidated basis (including pursuant to any Sale Transaction); or

(e)    a "change of control" or any comparable term under, and as defined in, any agreement governing Debt for Borrowed Money in an aggregate principal amount exceeding $1,000,000.

"Chapter 5 Claims and Causes of Action":  the Obligors' claims and causes of action arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code or similar state law.

"Chapter 11 Approvals":  as defined in **Section 10.2.21**.

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

"Chapter 11 Cases": as defined in the recitals to this Agreement.

"Chapter 11 Liquidating Plan": a Liquidating Plan (as defined in the Restructuring Support Agreement).

"Chapter 11 Order": any order of the Bankruptcy Court in the Chapter 11 Cases in form and substance, and on terms and conditions, satisfactory to the Required Lenders (including, as applicable, the Interim DIP Order and the Final DIP Order).

"Chapter 11 Plan": any plan of reorganization or liquidation (as the case may be) (including any Chapter 11 Liquidating Plan).

"Chapter 11 Plan Effective Date": (a) with respect to the Chapter 11 Liquidating Plan, the date upon which all of the conditions to the effectiveness of the Chapter 11 Liquidating Plan set forth therein have been satisfied (or waived) in accordance with its terms and in accordance with the terms of the Restructuring Support Agreement, and (b) with respect to any Chapter 11 Plan that is not the Chapter 11 Liquidating Plan, the date of "substantial consummation" (as such term is defined in Section 1101 of the Bankruptcy Code) of any Chapter 11 Plan; *provided*, that, for purposes of this Agreement, "substantial consummation" shall in any event be deemed to occur no later than the effective date of such Chapter 11 Plan.

"Chapter 11 Unsecured Creditors Committee": the official committee of unsecured creditors appointed in the Chapter 11 Cases, pursuant to Section 1102 of the Bankruptcy Code, if any.

"Claims": all claims, liabilities, obligations, losses, damages, penalties, judgments, proceedings, interest, costs and expenses of any kind (including remedial response costs, reasonable attorneys' fees (which shall be limited to the fees, disbursements and other charges of one primary counsel and one local counsel in each relevant jurisdiction for the Indemnitees (unless there is an actual or perceived conflict of interest in which case each such Indemnitee may retain its own counsel)), and Extraordinary Expenses) at any time (including after Full Payment of the Obligations or replacement of Administrative Agent or any Lender) incurred by any Indemnitee or asserted against any Indemnitee by any Obligor or other Person, to the extent relating to (a) any Loans, Letters of Credit, Loan Documents, Borrower Materials, or the use thereof or transactions relating thereto, (b) any action taken or omitted in connection with any Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise of any rights or remedies under any Loan Documents or Applicable Law, or (e) failure by any Obligor to perform or observe any terms of any Loan Document, in each case including all costs and expenses relating to any investigation, litigation, arbitration, settlement or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Indemnitee is a party thereto.

-10-

**EXHIBIT 2**

"Closing Date": the date upon which all conditions precedent to the effectiveness of this Agreement set forth in **Section 6.1** are satisfied or waived in accordance with the terms hereof. For the avoidance of doubt, December [●], 2021 constitutes the Closing Date.[3]

"Code": the Internal Revenue Code of 1986, as amended.

"Collateral": collectively, (a) all property described in **Section 7.1**, (b) all property (including Real Estate, personal property, mixed, owned, leased or operated by an Obligor) that is described in any DIP Order or any Security Document as security for any Obligations, and (c) all other property of an Obligor that now or hereafter secures (or is intended to secure) any Obligations; but, in all cases, excluding Excluded Assets (unless a Lien thereon is granted pursuant to the DIP Order or any other Chapter 11 Order).

"Commitment Agreement": any written agreement (which may be contained in any supplement or amendment hereto, or in any other instrument, in each case, as determined by the Administrative Agent), duly executed and delivered by the Obligors, the Administrative Agent and any Lender (or any group of Lenders, as applicable), pursuant to which such Lender agrees to increase, extend and/or otherwise modify any of its Commitments, and/or to provide any new or additional Commitment hereunder, as the case may be, in each case, in accordance with the terms and conditions thereof and hereof (including pursuant to **Section 2.1.7** hereof); *provided*, that the form and substance of such written agreement shall be acceptable to the parties thereto.

"Commitments": the New Money Loan Commitments.

"Commodity Exchange Act": the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.).

"Company Advisors": the respective counsel and other professional advisors to any of the Obligors (including the Company FA).

"Company FA": any Person providing any structuring, financial or transactional advisory, investment banking, consulting or other similar services to any of the Obligors in connection with any Potential Transaction (but, for the avoidance of doubt, excluding any counsel); *provided*, that no such Person shall be engaged or appointed by or on behalf of any Obligor at any time as of the Closing Date unless a copy of any fee or engagement letter or other agreement entered into by any

---

[3] NTD: To be no later than 2 BDs after the date on which Interim DIP Order is entered (corresponding with termination date under DIP Facility Commitment Letter).

-11-

AMERICAS 110819944

**EXHIBIT 2**

Obligor in connection therewith shall have been delivered to the Administrative Agent prior to effectiveness thereof.  As of the Closing Date, Opportune LLP constitutes a Company FA.

"Company Parties":  (a) the Obligors, Strike Investments and their respective Subsidiaries and (b) the Company Advisors.

"Compliance Certificate":  a certificate substantially in the form of **Exhibit E** hereto or otherwise reasonably acceptable to the Administrative Agent, by which Borrower Agent certifies compliance with **Section 10.3** and certifies as to other matters described in **Section 10.1.2(c)**.

"Consenting Lender Advisors":  collectively, the Lenders' counsel (including Stroock & Stroock & Lavan LLP), financial advisors, and other professional advisors and consultants (including Houlihan Lokey Capital, Inc. and Riveron RTS, LLC, and their respective Affiliates) (and, each such Person individually, a "Consenting Lender Advisor").

"Consenting Lender Side Persons":  collectively, the Lenders and the Consenting Lender Advisors (and, each individually, a "Consenting Lender Side Person").

"Contingent Obligation":  any obligation of a Person arising from any guaranty (including all Guarantee Obligations), indemnity or other assurance of payment or performance of any Debt, lease, dividend or other obligation ("primary obligations") of another obligor ("primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person under any (a) guaranty, endorsement, co-making or sale with recourse of an obligation of a primary obligor; (b) obligation to make take-or-pay or similar payments regardless of nonperformance by any other party to an agreement; and (c) arrangement (i) to purchase any primary obligation or security therefor, (ii) to supply funds for the purchase or payment of any primary obligation, (iii) to maintain or assure working capital, equity capital, net worth or solvency of the primary obligor, (iv) to purchase property or services for the purpose of assuring the ability of the primary obligor to perform a primary obligation, or (v) otherwise to assure or hold harmless the holder of any primary obligation against loss in respect thereof.  The amount of any Contingent Obligation shall be deemed to be the stated or determinable amount of the primary obligation (or, if less, the maximum amount for which such Person may be liable under the instrument evidencing the Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto as determined by such Person in good faith.

"Control":  the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

-12-

AMERICAS 110819944

**EXHIBIT 2**

"<u>Copyrights</u>":  all copyrights (whether statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications, together with any and all (i) rights and privileges arising under applicable law with respect to the foregoing, (ii) renewals, supplements and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"<u>Covered Party</u>":  as defined in **Section 14.20**.

"<u>Creditor Distribution</u>":  any Distribution (as defined in the Intercreditor Agreement).

"<u>Crossfire</u>":  Crossfire, LLC, a Colorado limited liability company.

"<u>Crossfire Acquisition Effective Date</u>":  the date on which all conditions precedent to the effectiveness of the Crossfire Acquisition Transaction have been satisfied and the transactions described in the definitive agreement in respect of the Crossfire Acquisition Transaction have been consummated.

"<u>Crossfire Acquisition Transaction</u>":  the acquisition of all of the Equity Interests of Crossfire (by merger or otherwise).

"<u>CWA</u>":  the Clean Water Act (33 U.S.C. §§ 1251 <u>et</u> <u>seq</u>.).

"<u>Debt</u>":  as applied to any Person, without duplication, (a) all indebtedness and obligations of such Person for Borrowed Money; (b) the deferred purchase price of assets or services that in accordance with GAAP would be included as liabilities on the balance sheet of such Person; (c) all obligations of such Person arising with respect to non-contingent earnout or similar non-contingent obligations incurred in connection with an Acquisition; (d) all Disqualified Equity Interests; (e) all reimbursement obligations in respect of letters of credit issued for the account of such Person; (f) all Debt of a second Person secured by any Lien on any property owned by such first Person, whether or not such Debt has been assumed; (g) all Capital Lease Obligations of such Person; (h) all obligations of such Person under Hedging Agreements (but taking into account only the mark-to-market value or, if any actual amount is due as a result of the termination or close-out of such transaction, that amount) and (i) without duplication, all Contingent Obligations of such Person with respect to Debt described in (a) through (h) above; *provided*, that Debt shall not include (i) trade payables and accrued expenses, in each case arising in the Ordinary Course of Business, (ii) deferred or prepaid revenue, or (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the

-13-

AMERICAS 110819944

**EXHIBIT 2**

respective seller.  The Debt of a Person shall include any recourse Debt of any partnership in which such Person is a general partner or joint venturer.  The amount of Debt of any Person for purposes of clause (iii) shall be deemed to be equal to the lesser of (1) the aggregate unpaid amount of such Debt and (2) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Debt Issuance":  the incurrence by any Obligor or any Subsidiary of any Debt, other than Debt permitted under **Section 10.2.1**.

"Debtor":  as defined in the preamble to this Agreement.

"Default":  an event or condition that, with the lapse of time or giving of notice, would constitute an Event of Default.

"Default Rate":  with respect to (a) overdue principal of any Loan, the interest rate applicable to such Loan, *plus* 2.00% per annum, and (b) any other overdue Obligation or amount, including overdue interest, fees, premiums, expenses (to the extent permitted by Applicable Law), the interest rate applicable to Base Rate Loans, *plus* 2.00% per annum.

"Defaulting Lender":  subject to **Section 4.2.2**, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower Agent in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit) within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided*, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of an Insolvency Proceeding, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit

-14-

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; *provided*, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to **Section 4.2.2**) upon delivery of written notice of such determination to the Borrower and each Lender.

"Deposit Account Control Agreement":  an agreement with respect to any Deposit Account entered into by and among the Obligor in whose name such Deposit Account is maintained, the institution(s) maintaining such Deposit Account, and Administrative Agent, which agreement shall be in form and substance reasonably acceptable to the Administrative Agent and effective to establish "control" (within the meaning set forth in Sections 9-104 and 9-106 of the Uniform Commercial Code) of such Deposit Account in favor of the Administrative Agent to the extent required to perfect the Administrative Agent's Lien on such Deposit Account.

"Designated Jurisdiction":  a country or territory that is the subject of a Sanction.

"DIP Facility":  as defined in the recitals to this Agreement.

"DIP Facility Amount":  \$[●][4].

"DIP Facility Commitment Letter":  that certain letter agreement (including all schedules, exhibits and attachments thereto), dated as of December 6, 2021, by and among the DIP Facility Commitment Party and the Debtors.

"DIP Facility Commitment Party": Lightship Capital II LLC.

"DIP Motion" means the motion and proposed form of Interim DIP Order filed by the Obligors with the Bankruptcy Court on the Petition Date seeking approval, on an interim and final basis, of (among other things) the DIP Facility, and authorization for the use of cash collateral

---

[4] NTD:  Final amounts to be confirmed.

-15-

AMERICAS 110819944

**EXHIBIT 2**

(including such terms and conditions relating to adequate protection in connection therewith), in each case, in form and substance acceptable to the Administrative Agent.

"<u>DIP Orders</u>":  collectively, the Interim DIP Order and the Final DIP Order and separately, the Interim DIP Order or the Final DIP Order, as the context requires.

"<u>DIP Superpriority Claims</u>":  as defined in the DIP Orders.

"<u>Disposed EBITDA</u>":  with respect to any Sold Entity or Business for any period, the amount for such period of EBITDA of such Sold Entity or Business (determined or estimated in good faith by the Borrower Agent as if references to Holdings and its Subsidiaries in the definition of EBITDA were references to such Sold Entity or Business and its Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"<u>Disqualified Equity Interests</u>":  any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Equity Interest), or upon the happening of any event, matures or is mandatorily redeemable (other than (i) solely for Equity Interests that are not Disqualified Equity Interests and cash in lieu of fractional shares or (ii) solely at the discretion of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, initial public offering, asset sale or similar event shall be subject to Full Payment of the Obligations), or redeemable at the option of the holder of the Equity Interest, in whole or in part, on or prior to the date that is 91 days after the Termination Date.  Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Equity Interests solely because the holders of the Equity Interests have the right to require Holdings or any Subsidiary to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale will not constitute Disqualified Equity Interests if the terms of such Equity Interests provide that Holdings or such Subsidiary, as applicable, may not repurchase or redeem any such Equity Interests pursuant to such provisions unless such repurchase or redemption complies with **Section 10.2.3**.

"<u>Disqualified Lender</u>":  any Person that constitutes a direct competitor of the Borrowers and is designated by the Borrower Agent as a Disqualified Lender pursuant to a written notice delivered to the Administrative Agent on the Closing Date.

"<u>Distribution</u>":  any declaration or payment of a distribution, interest or dividend on any Equity Interest (other than payment-in-kind); or any purchase, redemption, or other acquisition or retirement for value of any Equity Interest.

"<u>Dividing Person</u>":  has the meaning assigned to it in the definition of "Division."

-16-

**EXHIBIT 2**

"Division":  the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"Dollars":  lawful money of the United States.

"Dominion Account":  each Deposit Account set forth on **Schedule 8.5** and maintained in the name of a Borrower at Bank of America or another bank reasonably acceptable to the Administrative Agent over which Administrative Agent has control and the ability to take actions during any Cash Dominion Period, pursuant to the applicable DIP Order and such other arrangements reasonably acceptable to the Administrative Agent.

"EBITDA":  for any period, the sum of Net Income for such period, plus

(a)     without duplication and, other than with respect to clauses (xvi) and (xix) below, to the extent deducted in determining Net Income for such period, the sum of:

(i)     Interest Expense for such period;

(ii)     provision for taxes for such period, based on income or profits or capital, including state, franchise, excise, property and similar taxes and foreign withholding and similar taxes (net of tax refunds), and Tax Distributions made during such period (if permitted hereunder);

(iii)     all amounts attributable to depreciation and amortization (including amortization of intangibles) expense for such period;

(iv)     non-cash charges related to compensation expense recognized under stock option plans or otherwise accrued or realized from any deferred equity compensation plan or grants of equity appreciation or similar rights, equity options, restricted equity or other similar rights to officers, directors and employees; *provided*, that the calculation of EBITDA for any period as of the Closing Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto;

(v)     non-cash expenses for such period associated with the application of purchase accounting rules;

(vi)     RPO Expenses for such period;

-17-

AMERICAS 110819944

**EXHIBIT 2**

(vii)    with respect to any period ended prior to the Petition Date, the amount of Management Fees that are paid or accrued during such period;

(viii)    board of directors fees and reimbursements in an amount not to exceed $150,000 for such period; *provided*, that the calculation of EBITDA for any period as of the Closing Effective Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto and such payment is in accordance with the Approved Budget;

(ix)    any unusual or non-recurring cash expenses or losses (including, whether or not otherwise includable as separate items in the statement of such consolidated Net Income for such period, losses on sales of assets outside of the Ordinary Course of Business but excluding, for the avoidance of doubt, lease termination costs with respect to the Borrower's vehicle fleet reduction program) and expenses or losses resulting from the Business Unit Consolidation; *provided*, that the calculation of EBITDA for any period as of the Closing Effective Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto;

(x)    severance, relocation costs and restructuring charges or reserves (including restructuring costs related to acquisitions after the date hereof) *provided*, that the calculation of EBITDA for any period as of the Closing Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto;

(xi)    any other non-cash charges for such period, including non-cash charges with respect to litigation settlement accruals (but excluding any non-cash charge in respect of an item that was included in Net Income in a prior period and any non-cash charge that relates to the write-down or write-off of Accounts or Inventory); *provided*, that the calculation of EBITDA for any period as of the Closing Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto;

(xii)    [reserved];

(xiii)    transaction fees, costs and expenses incurred during such period in connection with (A) in the case of any period ending prior to the Closing Date, the execution and delivery of the Mill Point Capital Raise Agreement and related documents and the preparation for the transactions thereunder, (B) Investments permitted hereunder, (C) incurrence of, and waivers and amendments regarding, Debt permitted hereunder (including, for the avoidance of doubt, (x) all fees and expense reimbursements paid to the Administrative Agent, any Lender and/or any counsel or advisor thereto, and (y) to the

-18-

**EXHIBIT 2**

extent permitted by this Agreement to be paid, fees and expense reimbursements paid to any agent and/or lender (and/or any counsel or advisor thereto) under any other Debt), and (D) issuance of Equity Interests permitted hereunder, in each case, whether or not consummated;

(xiv)   debt issuance costs and commissions, discounts and other fees associated with Borrowed Money permitted to be incurred under the Loan Documents (whether or not such Borrowed Money has been incurred);

(xv)   unrealized, non-cash market-to-market hedging losses;

(xvi)   cash Distributions received by Holdings or its Subsidiaries from Persons not consolidated with Holdings;

(xvii)   costs, expenses, and losses related to Permitted Asset Dispositions (other than the disposition of Inventory in the Ordinary Course of Business);

(xviii)   any net loss from disposed or discontinued operations; *provided*, that the calculation of EBITDA for any period as of the Closing Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto;

(xix)   any Pro Forma Adjustments;

(xx)   (A) non-cash lease termination costs with respect to any Borrower's vehicle fleet reduction program paid through deferred payment options and/or capital leases to the extent the Required Lenders consent to the inclusion of such lease termination costs in EBITDA; and (B) lease termination costs (net of any proceeds received by any Borrower and included in such Borrower's Net Income in connection with such lease termination) with respect to such Borrower's vehicle fleet reduction program paid in cash in accordance with the Approved Budget during the relevant period; minus

(b)   without duplication and to the extent included in Net Income,

(i)   non-cash income for such period associated with the application of purchase accounting rules;

(ii)   any extraordinary, unusual or non-recurring income for such period;

(iii)   any non-cash items of income for such period;

-19-

AMERICAS 110819944

**EXHIBIT 2**

(iv)     any cash payments made during such period in respect of non-cash charges described in clause (a)(xi) taken in a prior period;

(v)     unrealized, non-cash market-to-market hedging gains;

(vi)     gains related to Permitted Asset Dispositions (other than the disposition of Inventory in the Ordinary Course of Business); and

(vii)     any net income from disposed or discontinued operations;

*provided*, that in no event shall the sum of the amounts under sub-clauses (ix), (x) and (xix) of clause (a) exceed 10% of EBITDA for such period (without giving effect to such limit). Notwithstanding anything to the contrary herein, in no event shall any net cash proceeds of the Mill Point Capital Raise Transaction or any net cash proceeds of the New Money Loans received by Holdings, a Borrower or any Subsidiary be included in determining EBITDA for any purpose under this Agreement.

There shall be included in determining EBITDA for any period, without duplication, (1) the Acquired EBITDA of any Person, property, business or asset acquired by Holdings or any Subsidiary since the beginning of such period to the extent not subsequently sold, transferred, abandoned or otherwise disposed of by Holdings or such Subsidiary (each such Person, property, business or asset acquired and not subsequently so disposed of, an "Acquired Entity or Business"), (2) an adjustment in respect of each Acquired Entity or Business equal to the amount of the Pro Forma Adjustment (limited in amount as specified above) with respect to such Acquired Entity or Business acquired since the beginning of such period (including the portion thereof occurring prior to such acquisition) as specified in a Pro Forma Adjustment Certificate and delivered to the Administrative Agent, and (3) there shall be excluded in determining EBITDA for any period the Disposed EBITDA of any Person, property, business, line of business or asset sold, transferred, abandoned or otherwise disposed of, closed or classified as discontinued operations by Holdings or any Subsidiary since the beginning of such period, including, for the avoidance of doubt, any Disposed EBITDA in connection with the contribution of property and assets to Capstone in connection with the Capstone JV Transaction (each such Person, property, business, line of business or asset so sold, transferred, abandoned or otherwise disposed of, a "Sold Entity or Business").

"EEA Financial Institution":  (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

-20-

**EXHIBIT 2**

"EEA Member Country":  any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority":  any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee":  (a) each Lender, (b) each Affiliate of a Lender, (c) each Approved Fund, and (d) each other Person (except (i) any natural person, or (ii) the Borrower or any of the Borrower's Affiliates or Subsidiaries) approved by the Administrative Agent; *provided, however*, that each assignment to an Eligible Assignee shall be made in accordance with **Section 13.3**.

"Enforcement Action":  any action to enforce any Obligations or Loan Documents or to exercise any rights or remedies relating to any Collateral (whether by judicial action, self-help, notification of Account Debtors, exercise of setoff or recoupment, exercise of any right to act in an Obligor's Insolvency Proceeding or to credit bid Obligations, or otherwise, including in the Chapter 11 Cases, pursuant to any order of the Bankruptcy Court, or otherwise).

"Environment":  ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and subsurface strata, and natural resources such as wetland, flora and fauna.

"Environmental Laws":  all Applicable Laws (including all programs, permits and guidance promulgated by regulatory agencies), relating to public health (but excluding occupational safety and health, to the extent regulated by OSHA) or the protection or pollution of the environment, including CERCLA, RCRA and CWA.

"Environmental Liability":  any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, directly or indirectly relating to (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Notice":  a notice (whether written or oral) from any Governmental Authority or other Person of any possible noncompliance with, investigation of a possible violation of, litigation relating to, or potential fine or liability under any Environmental Law, or with respect to any Environmental Release, environmental pollution or hazardous materials, including any complaint, summons, citation, order, claim, demand or request for correction, remediation or otherwise.

-21-

AMERICAS 110819944

**EXHIBIT 2**

"Environmental Release":  a release as defined in CERCLA or under any other Environmental Law.

"Environmental Restoration":  with respect to any project, any and all related clean-up, disposal of extraneous materials on site, restoration of disturbed pre-existing landscaping or necessary regrading of land, re-paving or restoration of ground coverings, ancillary repairs to adjacent or relevant structures, and removal of all construction equipment from the applicable project site or sites, in each case, to the extent required to be undertaken or performed pursuant to the requirements of the contract governing such project.

"Equity Interest":  the interest of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or joint venture); (c) member in a limited liability company; or (d) Person having any other form of equity security or ownership interest in another Person, including common stock and preferred stock, and including all of the warrants, options or other rights for the purchase or acquisition from such Person of such Equity Interests in such Person.

"ERISA":  the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate":  any trade or business (whether or not incorporated) under common control with an Obligor within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event":  (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Obligor or ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Obligor or ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the determination that any Pension Plan or Multiemployer Plan is considered an at risk plan or a plan in critical or endangered status under the Code, ERISA or the Pension Protection Act of 2006; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Obligor or ERISA Affiliate; or (h) with respect to any Pension Plan, a failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived, or a failure to make a required contribution to a Multiemployer Plan.

-22-

AMERICAS 110819944

**EXHIBIT 2**

"EU Bail-In Legislation Schedule":  the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default":  as defined in **Section 11**.

"Excess Cash Amount":  as defined in **Section 5.3.1**.

"Excess Cash Prepayment":  as defined in **Section 5.3.1**.

"Exchange Act":  Securities Exchange Act of 1934.

"Excluded Account":  any Deposit Account in the name of any Borrower (a) that is used exclusively for payroll, payroll taxes and other employee wage and benefit payments in the Ordinary Course of Business; or (b) that is a trust, fiduciary, or withholding tax payment account; *provided*, that, no other Deposit Accounts shall constitute an Excluded Account.

"Excluded Assets":

(a)      any lease, license, contract, or agreement (including, with respect to any Purchase Money Debt or similar arrangement, in each case, permitted hereunder, the assets subject thereto) to which any Obligor is a party or any of its rights or interests thereunder if and only for so long as the grant of a security interest or Lien under this Agreement (i) is prohibited by Applicable Law during the Chapter 11 Cases, or would constitute or result in the abandonment, invalidation or unenforceability of any right, title or interest of such Obligor therein pursuant to Applicable Law during the Chapter 11 Cases, (ii) would require the consent of third parties (and such consent requirement is enforceable during the Chapter 11 Cases), and such consent shall have not been obtained notwithstanding the Obligors' commercially reasonable efforts to obtain the same, or (iii) would constitute or result in a breach, termination or default under any such lease, license, contract or agreement (in each case other than to the extent that any such prohibition, limitation, consent requirement or other term thereof would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC of any relevant jurisdiction, the Bankruptcy Code or any other Applicable Law or any principles of equity); *provided*, that such lease, license, contract or agreement (including, with respect to any Purchase Money Debt or similar arrangement, in each case, permitted hereunder, the assets subject thereto) will be an Excluded Asset only to the extent and for so long as the consequences specified above will result and will cease to be an Excluded Asset, and will become Collateral, immediately and automatically, at such time as such consequences will no longer result;

(b)      Excluded Accounts;

-23-

**EXHIBIT 2**

(c)     [reserved];

(d)     any United States intent-to-use trademark applications to the extent the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law notwithstanding the DIP Orders; and

(e)     Margin Stock;

*provided*, that "Excluded Assets" shall not include (i)  any proceeds, products, substitutions or replacements of Excluded Assets (unless such proceeds, products, substitutions or replacements would otherwise constitute Excluded Assets); *provided*, *further*, that upon the occurrence of an event that renders property to no longer constitute Excluded Assets, a security interest in such property shall be automatically and simultaneously granted under the Security Documents and such property shall be automatically included as Collateral hereunder.

"Excluded Swap Obligation":  with respect to an Obligor, each Swap Obligation as to which, and only to the extent that, such Obligor's guaranty of or grant of a Lien as security for such Swap Obligation is or becomes illegal under the Commodity Exchange Act because the Obligor does not constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to any keepwell, support or other agreement for the benefit of such Obligor and all guarantees of Swap Obligations by other Obligors) when such guaranty or grant of Lien becomes effective with respect to the Swap Obligation.  If a Hedging Agreement governs more than one Swap Obligation, only the Swap Obligation(s) or portions thereof described in the foregoing sentence shall be Excluded Swap Obligation(s) for the applicable Obligor.

"Excluded Taxes":  with respect to the Administrative Agent, any Lender or any other recipient of a payment to be made by or on account of any Obligation, (a) Taxes imposed on or measured by its net income (however denominated), branch profits Taxes and franchise Taxes imposed on it by a taxing jurisdiction, in each case, as a result of (i) such recipient being organized or having its principal office, or, in the case of any Lender, having its applicable Lending Office located, in such jurisdiction, or (ii) a present or former connection between such recipient and the taxing jurisdiction (other than connections arising from the Administrative Agent, such Lender or such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document); (b)  any Tax imposed on a Lender as a result of such Lender's failure to comply with **Section 5.10**; (c) in the case of a Lender, any U.S. federal withholding tax imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to laws in force at the time such Lender becomes a Lender (or designates a new

-24-

AMERICAS 110819944

**EXHIBIT 2**

Lending Office) hereunder (other than pursuant to an assignment requested by the Borrower under **Section 3.8**), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, immediately prior to designation of a new Lending Office (or assignment), to receive additional amounts from any Obligor with respect to such U.S. federal withholding tax and (d) withholding Taxes imposed by FATCA.

"Extraordinary Expenses": all costs or expenses that Administrative Agent in accordance with the terms hereof incurs during an Event of Default, or during the pendency of an Insolvency Proceeding of an Obligor, relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against Administrative Agent, any Lender, any Obligor, any representative of creditors of an Obligor or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of Administrative Agent's Liens with respect to any Collateral), Loan Documents, Letters of Credit or Obligations, including any lender liability or other Claims; (c) the exercise, protection or enforcement of any rights or remedies of Administrative Agent in, or the monitoring of, any Insolvency Proceeding; (d) settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral; (e) any Enforcement Action; (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan Documents or Obligations; and (g) Protective Advances. Such costs, expenses and advances include transfer fees, Other Taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, reasonable, documented, and out-of-pocket legal fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any Obligor or independent contractors in liquidating any Collateral, and travel expenses.

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations of any of the foregoing, any intergovernmental agreements entered into in connection therewith and any agreements entered into pursuant to Section 1471(b)(1) of the Code as of the date of this Agreement (or any amended or successor version described above).

"Federal Funds Rate":  for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided*, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary,

-25-

AMERICAS 110819944

**EXHIBIT 2**

to a whole multiple of 1/100 of 1%) on such day on such transactions as determined by the Administrative Agent.

"<u>Final Completion</u>":  the date on which all services related to a project and contracted to be performed under all applicable work orders and any relevant service contract with respect to such project have been completed, including any and all Environmental Restoration, and such services have been accepted by the applicable Account Debtor as complete.

"<u>Final DIP Order</u>":  an order of the Bankruptcy Court in the Chapter 11 Cases, which order (a) shall be in form and substance, and on terms and conditions, satisfactory to the Required Lenders, (b) shall, subject to the foregoing, authorize and approve, on a final basis, among other things, the DIP Facility and the transactions related thereto (including the making of the Loans, the Roll-Up, and the incurrence of the Obligations), the Debtors' use of cash collateral, and the grant of adequate protection, (c) shall be in full force and effect, and (d) (i) shall not have been reversed, vacated, or stayed and (ii) shall not have been amended, supplemented or otherwise modified since entry thereof by the Bankruptcy Court.

"<u>Final DIP Order Date</u>":  the date on which the Final DIP Order is approved and entered by the Bankruptcy Court.

"<u>First Day Motions</u>" means any "first day" or "second day" motions and pleadings to be filed by the Obligors with the Bankruptcy Court on the Petition Date in connection with the Chapter 11 Cases, including, without limitation, the DIP Motion, and the Sale Procedures Motion, each of which shall be in form and substance acceptable to the Administrative Agent.

"<u>Fiscal Quarter</u>":  each period of three months, commencing on the first day of a Fiscal Year.

"<u>Fiscal Year</u>":  the fiscal year of Holdings and its Subsidiaries for accounting and tax purposes, ending on December 31 of each year.

"<u>FLSA</u>":  the Fair Labor Standards Act of 1938.

"<u>Foreign Lender</u>":  any Lender that is not a U.S. Person.

"<u>Foreign Plan</u>":  any employee benefit plan or arrangement (a) maintained or contributed to by any Obligor or Subsidiary that is not subject to the laws of the United States; or (b) mandated by a government other than the United States for employees of any Obligor or Subsidiary.

"<u>Full Payment</u>":  with respect to the Loans and all other Obligations (other than Remaining Obligations), (a) the indefeasible payment thereof in full in Cash in accordance with the Loan

-26-

AMERICAS 110819944

**EXHIBIT 2**

Documents or as otherwise consented to in writing by the Lenders (including in connection with the consummation of any Sale Transaction or any other transaction pursuant to which all or substantially all of the Debtors' property and assets are sold, transferred or otherwise disposed of (including pursuant to Section 363 of the Bankruptcy Code)), including with respect to the Termination Payments, and all interest, fees and other amounts (including Post-Petition Interest); *provided*, that, notwithstanding the foregoing, Full Payment shall not be deemed to occur, and no Loans shall be deemed to have been paid in full, unless and until such time as all Commitments shall have irrevocably, permanently and finally expired, or shall have been so terminated, cancelled and discharged.

"GAAP":  generally accepted accounting principles in effect in the United States from time to time.

"Governmental Approvals":  all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and required reports to, all Governmental Authorities.

"Governmental Authority":  any federal, state, local, foreign or other agency, authority, body, commission, court, instrumentality, political subdivision, or other entity or officer exercising executive, legislative, judicial, regulatory or administrative functions for any governmental, judicial, investigative, regulatory or self-regulatory authority.

"Guarantee Obligation":  as to any Person (the "guaranteeing person") any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided*, *however*, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to

-27-

AMERICAS 110819944

**EXHIBIT 2**

the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof, as determined by the Borrowers in good faith.

"Guarantor":  each Person that is, or at any time becomes, a party to (or otherwise agrees to be bound by) any Guaranty, or that otherwise guarantees payment or performance of any Obligations or owes any Guarantee Obligations to the Secured Parties.  As of the Closing Date, each of Holdings and each Subsidiary Guarantor is a Guarantor.

"Guarantor Payment":  as defined in **Section 5.11.3**.

"Guaranty":  each guaranty agreement executed by a Guarantor in favor of Administrative Agent, substantially in the form of **Exhibit D** or otherwise in form reasonably acceptable to the Administrative Agent.

"Hazardous Materials":  all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants including petroleum or petroleum distillates, natural gas, natural gas liquids, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, toxic mold, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants or compounds of any nature in any form regulated pursuant to any Environmental Law.

"Hedging Agreement":  any "swap agreement" as defined in Section 101(53B)(A) of the Bankruptcy Code.

"Holdings":  Strike HoldCo, LLC, a Delaware limited liability company.

"Indemnified Taxes":  (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Obligor under any Loan Document, and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitees":  Agent Indemnitees and Lender Indemnitees.

"Initial Budget":  a [9][5]-week cash flow forecast that (a) sets forth, on a line-item, cumulative and aggregate basis, the Obligors' projections for all weekly receipts and

---

[5] NTD:  To conform to final position under corresponding requirements in Interim DIP Order.

-28-

AMERICAS 110819944

**EXHIBIT 2**

disbursements/expenditures (including debt service costs) expected to be collected, incurred or made (as the case may be) by the Obligors and their Subsidiaries, in each case, during the period beginning with the calendar week ending on Friday of the week in which the Petition Date occurs, and ending on (and including) the week ended as of the Friday of the week after the Maturity Date, and (b) is in all respects in form and substance satisfactory to the Administrative Agent.  For the avoidance of doubt, <u>Exhibit 1</u> to the Interim DIP Order shall constitute the Initial Budget (and a copy thereof is attached as <u>Exhibit H</u> hereto).

"<u>Initial Loan</u>":  as defined in **Section 2.1.2(a)(i)**.

"<u>Insolvency Proceeding</u>":  any case or proceeding commenced by or against a Person under any state, federal or foreign law, rule or regulation for, or any agreement of such Person to any or a combination of the following (each, a "<u>Bankruptcy Law</u>"): (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment or reorganization law (including any moratorium or any other marshalling of the assets and liabilities of any Person and any similar laws, rules or regulations relating to or affecting the enforcement of creditors' rights generally); (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its property; or (c) an assignment or trust mortgage for the benefit of creditors.

"<u>Intellectual Property</u>":  all intellectual and similar property of a Person, including: Patents, Trademarks, Copyrights and Technology; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

"<u>Intellectual Property Claim</u>":  any claim or assertion (whether in writing, by suit or otherwise) that Holding's or a Subsidiary's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other property or methods, processes or services violates, infringes, dilutes or misappropriates another Person's Intellectual Property.

"<u>Intellectual Property Collateral</u>":  all Intellectual Property and Licenses of each Obligor, whether now or hereafter owned, licensed or acquired.

"<u>Intercreditor Agreement</u>":  the Intercreditor Agreement, dated as of November 30, 2016, by and among the Prepetition Senior Loan Agent and the Prepetition Junior Loan Agent, as acknowledged and agreed to by the Obligors, as amended or otherwise modified from time to time in accordance with its terms and as in effect on the Petition Date.

"<u>Interest Expense</u>":  for any period, total interest expense (including that attributable to Capital Leases) of Holdings and its Subsidiaries for such period with respect to all outstanding Debt of Holdings and its Subsidiaries (including all commissions, discounts and other fees and

-29-

AMERICAS 110819944

**EXHIBIT 2**

charges owed with respect to letters of credit and bankers' acceptances and net costs under Hedging Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP), calculated on a consolidated basis for Holdings and its Subsidiaries for such period in accordance with GAAP, but excluding, however, (a) amortization of deferred financing costs and any other amounts of non-cash interest, (b) the accretion or accrual of discounted liabilities during such period, and (c) all non-recurring cash interest expense consisting of liquidated damages for failure to comply in a timely manner with registration rights obligations and financing fees, all as calculated on a consolidated basis in accordance with GAAP.

"Interest Period":  as defined in **Section 3.1.3**.

"Interim DIP Order":  an order of the Bankruptcy Court in the Chapter 11 Cases in connection with the DIP Motion, which order shall (a) be in form and substance, and on terms and conditions, satisfactory to the Required Lenders, (b) subject to the foregoing, authorize and approve, on an interim basis, among other things, the DIP Facility and all other matters set forth in, and transactions contemplated by, the DIP Motion, (including, without limitation, the DIP Facility, the making of the Loans, the Roll-Up, the New Money Loan Commitment Payment, the Termination Payment, and the incurrence of all other Obligations, the Debtors' use of cash collateral, and the grant of adequate protection), (c) be in full force and effect, and (d) not have been reversed, vacated, stayed or amended, supplemented or otherwise modified (unless the Required Lenders shall have previously consented thereto in writing).

"Interim Hearing":  has the meaning specified therefor in the Interim DIP Order.

"Inventory":  as defined in the UCC, including all goods intended for sale, lease, display or demonstration; all work in process; and all raw materials, and other materials and supplies of any kind that are or could be used in connection with the manufacture, printing, packing, shipping, advertising, sale, lease or furnishing of such goods, or otherwise used or consumed in a Person's business (but excluding Equipment).

"Investment":  an Acquisition; an acquisition of record or beneficial ownership of any Equity Interests of a Person; or a loan advance or capital contribution to or other debt or equity investment in a Person.

"IRS":  the United States Internal Revenue Service.

"Lender":  as of any time of determination, each Person that has a Commitment and/or holds any Loan at such time (including any Person that has become a Lender pursuant to an Assignment and Acceptance) (the foregoing Persons, collectively, the "Lenders").  As of the Closing Date, the Lenders shall be the Persons whose name is set forth on **Schedule 1.1** hereto under the heading "Lenders".

-30-

AMERICAS 110819944

**EXHIBIT 2**

"Lender Indemnitees":  Lenders and their officers, directors, employees, Affiliates, agents and attorneys.

"Lending Office":  the office designated as such by the applicable Lender at the time it becomes party to this Agreement or thereafter by notice to Administrative Agent and Borrower Agent.

"LIBOR":

(a)     for any Interest Period with respect to a LIBOR Loan, the rate per annum equal to the London Interbank Offered Rate ("LIBOR") or a comparable or successor rate, which rate is approved by the Administrative Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; and

(b)     for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two Business Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day; and

(c)     at no time shall LIBOR be less than 1.00% per annum for purposes of this Agreement;

*provided*, that to the extent a comparable or successor rate is approved by the Administrative Agent in connection herewith, the approved rate shall be applied in a manner consistent with market practice and acceptable to the Administrative Agent; *provided*, *further*, that to the extent such market practice is not administratively feasible for the Administrative Agent at any time or from time to time, such approved rate shall be applied in a manner as otherwise determined by the Administrative Agent.

"LIBOR Loan":  a Loan that bears interest based on LIBOR.

"License":  all license and distribution agreements with, and covenants not to sue, any other party with respect to any Intellectual Property or Intellectual Property Collateral, whether such Obligor is a licensor or licensee, distributor or distributee under any such license or distribution agreement, together with any and all (i) renewals, extensions, supplements, amendments and continuations thereof, (ii) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including damages and payments

-31-

AMERICAS 110819944

**EXHIBIT 2**

for past, present or future infringements, breaches or violations thereof, (iii) rights to sue for past, present and future infringements, breaches or violations thereof and (iv) other rights to use, exploit or practice any or all of the Intellectual Property or Intellectual Property Collateral.

"<u>Lien</u>":  any Person's interest in real or personal property securing an obligation owed to, or a claim by, such Person, including any mortgage, lien, security interest, pledge, hypothecation, trust, reservation, encroachment, easement, right-of-way, or other title exception or encumbrance.

"<u>Lightship</u>":  Lightship Capital II LLC.

"<u>Liquidity</u>":  as of any date of determination, the sum of unrestricted cash and Cash Equivalents (based on the book balance thereof) of the Borrowers and its Subsidiaries held in a Deposit Account subject to a Deposit Account Control Agreement in favor of the Administrative Agent.

"<u>Loan</u>":  each and any New Money Loan, Roll-Up Loan and any other loan made (or deemed made) hereunder or pursuant hereto from time to time.

"<u>Loan Documents</u>":  this Agreement, the Other Agreements and the Security Documents.

"<u>Loan Year</u>":  each 12 month period commencing on the Closing Date and on each anniversary of the Closing Date.

"<u>Management Agreement</u>":  that certain Management Services Agreement dated as of February 12, 2021, among Mill Point, Strike Investment and the Borrower, as the same may be amended, restated and/or modified from time to time.

"<u>Management Fees</u>":  any management fee payable pursuant to the Management Agreement in connection with management, monitoring, consulting and advisory services provided by Mill Point to Holdings or its Subsidiaries; *provided*, that, no such fee or other amount pursuant to the Management Agreement shall be paid at any time on or after the Petition Date.

"<u>Margin Stock</u>":  as defined in Regulation U of the Board of Governors.

"<u>Material Adverse Effect</u>":  the effect of any event or circumstance that, taken alone or in conjunction with other events or circumstances (other than as a result of the events and conditions related and/or leading up to the commencement of the Chapter 11 Cases, or any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Chapter 11 Cases), (a) has had or could be reasonably expected to have a material adverse effect (i) on the business, operations, properties, or financial condition of Holdings and its Subsidiaries, taken as a

-32-

AMERICAS 110819944

**EXHIBIT 2**

whole, (ii) on the value of Collateral, taken as a whole, (iii) on the enforceability of any Loan Documents, or (iv) on the validity or priority of Administrative Agent's Liens on a material portion of the Collateral; (b) materially impairs or has a material adverse effect on the ability of the Obligors, taken as a whole, to perform their obligations under the Loan Documents, including repayment of any Obligations; or (c) otherwise impairs or has a material adverse effect on the ability of Administrative Agent to enforce or collect any Obligations or to realize upon a material portion of the Collateral.

"<u>Material Contract</u>":  any written agreement or arrangement to which Holdings or a Subsidiary is party (other than the Loan Documents or Prepetition Loan Agreements) for which breach, termination, nonperformance or failure to renew could reasonably be expected to have a Material Adverse Effect.

"<u>Maturity Date</u>":  the date that is 75 days after the Petition Date.

"<u>Milestones</u>":  the milestones set forth on **Schedule 10.1.13** hereto.

"<u>Mill Point</u>":  Mill Point Capital, LLC, a Delaware limited liability company.

"<u>Mill Point Capital Raise Agreement</u>":  that certain Securities Purchase Agreement, dated as of February 12, 2021, by and between Strike Capital, Strike Investment and Mill Point Splitter.

"<u>Mill Point Capital Raise Instruments</u>":  the instruments issued and/or sold to Mill Point Splitter prior to the Closing Date in the form of Equity Interests (other than Disqualified Equity Interests) of Strike Investment.

"<u>Mill Point Capital Raise Transaction</u>":  the transactions contemplated by the Mill Point Capital Raise Agreement, including the issuance of the Mill Point Capital Raise Instruments prior to the Closing Date.

"<u>Mill Point Splitter</u>":  Mill Point Strike Splitter LP, a Delaware limited partnership.

"<u>Moody's</u>":  Moody's Investors Service, Inc., and its successors.

"<u>Multiemployer Plan</u>":  any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Obligor or ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"<u>Net Cash Proceeds</u>":  as defined in the Prepetition Term Loan Credit Agreement.

-33-

AMERICAS 110819944

**EXHIBIT 2**

"Net Income":  for any period, the consolidated net income (or loss) of Holdings and its Subsidiaries, determined on a consolidated basis in accordance with GAAP; *provided*, that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with Holdings or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary) in which Holdings or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by Holdings or such Subsidiary in the form of dividends or similar distributions, (c) the undistributed earnings of any Subsidiary that is not an Obligor to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation (other than under any Loan Document) or Applicable Law applicable to such Subsidiary, (d) the cumulative effect of a change in accounting principles during such period to the extent included in Net Income, and (e) any income (loss) for such period attributable to the early extinguishment of Debt.  There shall be excluded from Net Income for any period the purchase accounting effects of adjustments to inventory, property and equipment, software and other intangible assets and deferred revenue in component amounts required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to Holdings and its Subsidiaries) as a result of any acquisition whether consummated before or after the Closing Date, any Investment, or the amortization or write-off of any amounts hereof.

"New Money Loan Cap":  $26,000,000.

"New Money Loan Commitment":  the New Money Loan Tranche A Commitment and/or the New Money Loan Tranche B Commitment (collectively and/or individually, as the context may require; provided, that the aggregate amount of the New Money Loan Commitment shall not exceed the New Money Loan Cap).

"New Money Loan Commitment Payment": a payment (for the account of Lenders holding New Money Loan Commitments) required to be made by the Borrowers on the Closing Date pursuant to the DIP Facility Commitment Letter and otherwise in accordance with **Sections 3.2.4 and 2.1.2** hereof, in an aggregate amount equal to 7.5% of the New Money Loan Cap.

"New Money Loan Commitment Termination Date":  the earliest to occur of (a) the Termination Date, (b) the Stalking Horse Sale Closing Date (unless a Notice of Borrowing for a Borrowing of New Money Loans on the Stalking Horse Sale Closing Date shall have been duly delivered prior to the Stalking Horse Sale Closing Date in accordance herewith, in which case the New Money Loan Commitment Termination Date shall not be deemed to occur pursuant to this clause (b) in respect of the New Money Loan Commitment relating to such Borrowing), and (c) the date on which the New Money Loan Commitments are reduced to zero, or otherwise terminate or

-34-

AMERICAS 110819944

**EXHIBIT 2**

expire, or are cancelled, in each case, in accordance with the terms hereof (whether pursuant to **Section 2.1.2**, **Section 2.1.4** or otherwise).

"New Money Loan Tranche A Cap":  $22,000,000.

"New Money Loan Tranche A Commitment":  the commitment and obligation of the Lenders to fund their Pro Rata shares of New Money Loans pursuant to **Section 2.1.2** in an aggregate principal amount outstanding at any time not to exceed the amount determined at such time to be equal to (a) the New Money Loan Tranche A Cap, *minus* (b) the aggregate principal amount of New Money Loans made through to such time, *plus* (c) the aggregate principal amount of New Money Loans prepaid or repaid prior to such time pursuant to an Excess Cash Prepayment in accordance with Section 5.3.1.  For the avoidance of doubt, if applicable from time to time, the New Money Loan Tranche A Commitment shall be adjusted to reflect any increase or reduction resulting from the operation of the provisions hereof (including pursuant to Sections 2.1.7 and/or 2.1.4).

"New Money Loan Tranche B Commitment":  the commitment and obligation of the Lenders to fund their Pro Rata shares of New Money Loans on the Stalking Horse Sale Closing Date pursuant to **Section 2.1.2** in an aggregate principal amount not to exceed the Wind Down Statutory Expense Amount, to the extent that the Wind Down Budget contained in the Approved Budget then in effect shows a need therefor in to facilitate payment of Wind Down Statutory Expenses due on or after the Stalking Horse Sale Closing Date.  Each Lender's New Money Loan Tranche B Commitment shall be automatically and permanently reduced, on a dollar-for-dollar basis, by the principal amount of New Money Loans made by it pursuant to Section 2.1.2(a)(ii).

"New Money Loans":  Loans made hereunder pursuant to a funding of cash by Lenders having New Money Loan Commitments.

"Notice of Borrowing":  a Notice of Borrowing to be provided by Borrower Agent to request a Borrowing of Loans, substantially in the form of **Exhibit C-1** hereto or such other form as may be approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Senior Officer of the Borrower.

"Notice of Conversion/Continuation":  a Notice of Conversion/Continuation to be provided by Borrower Agent to request a conversion or continuation of any Loans as LIBOR Loans, substantially in the form of **Exhibit C-2** hereto or otherwise reasonably acceptable to the Administrative Agent.

"Obligations":  all (a) principal of, and premium, if any, on the Loans (including all Roll-Up Loans, all New Money Loans, and Loans resulting from, and deemed made in connection with

-35-

AMERICAS 110819944

**EXHIBIT 2**

payment of, PIK Interest, the New Money Loan Commitment Payment and the Termination Payments), and, without limiting the foregoing, all obligations and indebtedness with respect to the New Money Loan Commitment Payment and the Termination Payments, (b) interest (including interest accruing after the Termination Date or other maturity of the Loans, and Post-Petition Interest), expenses, fees, indemnification obligations, Extraordinary Expenses and other amounts payable by Obligors under Loan Documents (including, without limitation, all amounts pursuant to **Sections SECTION 3**, **SECTION 5**, **SECTION 10**, and **14.2**), and all charges accruing during the Chapter 11 Cases, and (c) other Debts, obligations and liabilities of any kind owing by Obligors pursuant to the Loan Documents, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in any Insolvency Proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several; *provided*, that Obligations of an Obligor shall not include Excluded Swap Obligations.

"<u>Obligor</u>":  each Borrower, Guarantor, or other Person that has granted a Lien in favor of Administrative Agent on its assets to secure any Obligations.

"<u>Ordinary Course of Business</u>":  in respect of any obligation of, transaction involving, action taken by, or agreement or arrangement entered into by, any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice or otherwise undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in, or any requirement of, any Loan Document, any Restructuring Transaction Document or Applicable Law; *provided*, that, (i) any of the foregoing that occurs on or at any time after the Petition Date shall only be deemed to be in the Ordinary Course of Business if and to the extent that the same constitutes "ordinary course of business" pursuant to section 363 of the Bankruptcy Code, and (ii) any payment, disbursement or liability made or arising as of the Petition Date shall only be deemed to be in the Ordinary Course of Business if, in addition to satisfying the foregoing requirements, the same shall be in accordance with the Approved Budget.

"<u>Organic Documents</u>":  with respect to any Person, its charter, certificate or articles of incorporation, bylaws, articles of organization, limited liability agreement, operating agreement, members agreement, shareholders agreement, partnership agreement, certificate of partnership, certificate of formation, voting trust agreement, or similar agreement or instrument governing the formation or operation of such Person.

"<u>OSHA</u>":  the Occupational Safety and Hazard Act of 1970.

"<u>Other Agreement</u>":  the Agent Fee Letter and each other fee letter, Compliance Certificate, or other note, document, instrument or agreement (other than this Agreement or a Security

-36-

AMERICAS 110819944

**EXHIBIT 2**

Document) now or hereafter delivered by an Obligor to Administrative Agent or a Lender in connection with this Agreement.

"Other Connection Taxes":  with respect to the Administrative Agent, any Lender or any other recipient, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes":  all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, except any such Taxes, charges or levies imposed with respect to an assignment (other than any assignment pursuant to **Section 3.8**) that are Other Connection Taxes.

"Paid in Kind":  as used with respect to payment of any accrued interest or any fee or other amount hereunder (including the New Money Loan Commitment Payment), shall mean that such interest or fee or other amount hereunder shall (automatically, by operation of the terms hereof, without the requirement for any Person to take any action or cause anything to be done in order to effectuate such payment) be deemed paid at 12:01 a.m. (New York City time) on due date therefor by deeming the Dollar amount of such interest payment or fee or other amount hereunder (calculated in accordance with **Section 3**) to be automatically capitalized as an equivalent principal amount of the Loans (and such amount shall be compounded onto, and added to the aggregate principal amount of such Loan outstanding immediately prior to such payment date or fee date), such that, immediately after giving effect to the payment thereof as described herein, the aggregate outstanding principal amount of such Loans shall include the amount of such interest, fee or other amount paid as provided herein.  For the avoidance of doubt, once paid in accordance with the foregoing, PIK Interest shall cease to constitute accrued interest and shall instead constitute Loan principal, which shall be deemed incurred at such time, and shall thereupon accrue interest in accordance with **Section 3**.

"Participant":  as defined in **Section 13.2**.

"Participant Register":  as defined in **Section 13.2.4**.

"Pate Group":  all or any of (a) Stephen V. Pate, Richmond Pate, Kevin Pate, and Aaron Cole Pate, any of their parents, spouses, lineal descendants of any of their parents, any spouse of a lineal descendant of any of their parents, or any estate or heir of any of the foregoing, and (b) any trust, limited partnership, limited liability company, corporation or other entity, the

-37-

AMERICAS 110819944

**EXHIBIT 2**

beneficiaries, partners, members, shareholders or other equity holders of which consist of, or are Controlled by, one or more Persons referenced in clause (a) of this definition.

"Patents":  all patents and all patent applications (whether issued, applied for or allowed in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable law with respect to the foregoing, (ii) inventions, discoveries, designs and improvements described or claimed therein, (iii) reissues, divisions, continuations, reexaminations, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"Patriot Act":  the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

"Payment Item":  each check, draft or other item of payment payable to Holdings or any Subsidiary, including those constituting proceeds of any Collateral.

"PBGC":  the Pension Benefit Guaranty Corporation.

"Pension Plan":  any employee pension benefit plan (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Obligor or ERISA Affiliate or to which the Obligor or ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the preceding five plan years.

"Permitted Asset Disposition":  an Asset Disposition that is any one or more of the following, but, in each case, only if, and so long as, no Default shall exist or arise at the time of, or after giving effect to, such Asset Disposition (including under the Budget Covenant:

> (a)    a sale of Inventory or Equipment in the Ordinary Course of Business;

> (b)    dispositions of property (other than Accounts or Inventory); *provided*, that the fair market or book value (whichever is more) of all dispositions made in reliance on this clause (b) (taken as a whole and determined in the aggregate) at any time on or after the Closing Date shall not exceed $1,000,000;

-38-

**EXHIBIT 2**

(c)      a disposition of property that is obsolete, surplus, unmerchantable or otherwise unsalable, including the abandonment or other disposition of immaterial Intellectual Property, in the Ordinary Course of Business;

(d)      termination of a lease of real or personal property the result of which could not reasonably be expected to have a Material Adverse Effect; *provided*, that prior written consent of the Administrative Agent shall in any event be required in connection with any such termination with respect to a lease involving payments to or by any Obligor or any of its Subsidiaries in excess of $1,000,000 in any Fiscal Year;

(e)      the sale or discount (or forgiveness), in each case without recourse and in the ordinary course of business, of accounts receivable or notes receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof or in connection with the bankruptcy or reorganization of the applicable account debtors and dispositions of any securities received in any such bankruptcy or reorganization;

(f)      dispositions resulting from any casualty or other insured damage to, or any taking under any power of eminent domain or by condemnation or similar proceeding of, any real or personal property of any Obligor;

(g)      any transactions permitted by **Sections 10.2.2**, **10.2.3**, **10.2.4** or **10.2.8**;

(h)      non-exclusive licensing agreements for any intellectual property, leases or subleases, in each case in the Ordinary Course of Business;

(i)      approved in writing by the Administrative Agent (with the Required Lenders' consent);

(j)      replacement of Equipment that is worn, damaged or obsolete with Equipment of like function and value, if the replacement Equipment is acquired substantially contemporaneously with such disposition and is free of Liens (other than Permitted Liens);

(k)      a disposition of property to the extent that (i) such property is immediately exchanged for credit against the purchase price of similar replacement property (and such purchase is consummated promptly thereafter) or (ii) the proceeds of such disposition are applied to the purchase price of such replacement property (which replacement property is actually promptly purchased); *provided*, that, if any property acquired hereunder constitutes Collateral, the Administrative Agent shall be granted a fully perfected Lien

-39-

**EXHIBIT 2**

thereon in accordance with the requirements hereof and having the same priority as all other Liens granted to secure the Obligations;

(l)      a lease, sublease, license or sublicense of any real or personal property which is entered into in good faith and does not materially interfere with the business of the Obligors, taken as a whole; *provided*, that any payments by any Obligor with respect thereto shall be set forth in the Approved Budget and shall be in accordance with the Budget Covenant and the DIP Orders;

(m)      the unwinding of Hedging Agreements; *provided*, that, the Net Cash Proceeds thereof shall be applied to repay the Loans in accordance with **Section 5.3**;

(n)      dispositions of personal property to an Obligor in the Ordinary Course of Business;

(o)      the liquidation or other disposition of cash and Cash Equivalents in the Ordinary Course of Business;

(p)      the surrender or waiver of contractual rights and the settlement or waiver of contractual or litigation claims in the Ordinary Course of Business or in the commercially reasonable judgment of the Obligors, and, in each case, solely if and to the extent permitted in the Chapter 11 Cases and not in violation of any Restructuring Transaction Document;

(q)      any Asset Disposition previously approved by the Administrative Agent in writing; and

(r)      as long as no Default or Event of Default exists, the Asset Dispositions identified in writing to the Administrative Agent prior to the Closing Date, so long as the same shall be consummated in accordance with the Approved Budget and that any receipts and disbursements in respect thereof are in accordance with the Approved Budget; *provided*, that all proceeds thereof shall be applied to repay the Obligations in accordance with **Section 5.2** (the "Additional Specified Vehicle Dispositions"),

*provided*, that, notwithstanding anything to the contrary, neither Holdings nor any Subsidiary shall make any Asset Disposition in connection with a sale-leaseback transaction without the prior written consent of the Administrative Agent.

"Permitted Contingent Obligations":   Contingent Obligations (a) arising from endorsements of Payment Items for collection or deposit in the Ordinary Course of Business; (b) arising from Hedging Agreements entered into prior to the Petition Date in accordance with the Prepetition Loan Agreements and not prohibited hereunder, or any Hedging Agreements entered

-40-

**EXHIBIT 2**

into after the Petition Date in accordance herewith; (c) incurred or arising in the Ordinary Course of Business prior to the Petition Date (to the extent then permitted by the Prepetition Loan Agreements), and existing on the Closing Date, and any extension or renewal thereof that does not increase the amount of such Contingent Obligation when extended or renewed; (d) incurred in the Ordinary Course of Business with respect to surety, appeal or performance bonds, or other similar obligations; (e) arising from customary indemnification obligations in favor of purchasers in connection with Asset Dispositions not prohibited hereunder; (f) arising under the Loan Documents or the DIP Order or otherwise in favor of the Secured Parties and/or their Related Parties (including the Guarantee Obligations of the Guarantors); (g) in an aggregate amount of $100,000 or less at any time incurred or arising by operation of law, or in the Ordinary Course of Business pursuant to a transaction not otherwise prohibited hereunder; (h) in respect of Debt (other than the Obligations) permitted pursuant to **Section 10.2.1** (but not exceeding the amount thereof, and only insofar as such Contingent Obligations are subordinated to the Obligations to the extent required hereby or as otherwise acceptable to the Administrative Agent); or (i) arising from endorsements of payment items for collection or deposit in the Ordinary Course of Business; *provided*, that, notwithstanding the foregoing, any Contingent Obligation incurred or arising (or extended or renewed) at any time after the Petition Date shall only constitute a Permitted Contingent Obligation if and to the extent that the same is permitted during the Chapter 11 Cases and is not in breach of, or inconsistent with, any Chapter 11 Order.

"Permitted Discretion": a determination made in the exercise, in good faith, of reasonable credit judgment (from the perspective of a secured lender, or any administrative or collateral agent in connection with any secured financing transaction).

"Permitted Holders": (i) Sponsor and (ii) Pate Group.

"Permitted Lien": as defined in **Section 10.2.2**.

"Permitted Restrictions": prohibitions, restrictions, or conditions under or with respect to any of the following: (a) the Loan Documents or the DIP Orders, (b) any agreement entered into prior to the Petition Date and in effect on the Closing Date, (c) any Purchase Money Debt or Purchase Money Lien permitted by **Section 10.2.1** or **10.2.2** solely to the extent that the agreement or instrument governing such Debt prohibits a Lien on the property subject thereto, (d) by reason of customary provisions restricting pledges, assignments, subletting or other transfers contained in leases, licenses, contracts and similar agreements entered into in the Ordinary Course of Business (*provided*, that such restrictions are limited to the property or assets subject to such leases, licenses, contracts or similar agreements, as the case may be), (e) any prohibition or limitation that consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under this Agreement, (f) under any Debt or Lien permitted to be outstanding on the date any Person first becomes a Subsidiary (so long as such agreement was not entered into

-41-

AMERICAS 110819944

**EXHIBIT 2**

solely in contemplation of such Person becoming a Subsidiary, and such Person is permitted hereunder to become a Subsidiary), (g) Liens that are negative pledges and restrictions on Liens in favor of any holder of Debt permitted under **Section 10.2.1** but solely to the extent any negative pledge relates to (A) the property financed by such Debt and the proceeds, accessions and products thereof or (B) the property secured by such Debt and the proceeds, accessions and products thereof so long as the agreements governing such Debt permit the Liens on Collateral securing the Obligations; (h) Liens that are restrictions on cash or other deposits imposed by customers under contracts entered into in the Ordinary Course of Business and permitted during the Chapter 11 Cases; (i) Liens that arise with respect to cash or other deposits permitted under **Sections 10.2.1** or **10.2.2** and limited to such cash or deposit; (j) Liens that are restrictions regarding licensing or sublicensing by Holdings and its Subsidiaries of Intellectual Property in the Ordinary Course of Business, if permitted during the Chapter 11 Cases; (k) Liens that are restrictions on cash earnest money deposits in favor of sellers in connection with acquisitions not prohibited hereunder; and (l) Applicable Law during the Chapter 11 Cases.

"Permitted Variance":  as defined in **Section 10.3.1**.

"Person":  any individual, corporation, limited liability company, partnership, joint venture, association, trust, unincorporated organization, Governmental Authority or other entity.

"Petition Date":  as defined in the recitals to this Agreement.

"PIK Interest":  interest Paid in Kind.

"Plan":  any employee benefit plan (as defined in Section 3(3) of ERISA) established or maintained by an Obligor or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, an ERISA Affiliate.

"Platform":  as defined in **Section 14.3.3**.

"Pledged Collateral":  as defined in **Section 7.3.1**.

"Pledged Debt Securities":  as defined in **Section 7.3.1**.

"Pledged Equity Interests":  as defined in **Section 7.3.1**.

"Post-Petition Interest":  with respect to any Loans or other Obligations hereunder, all interest, fees, expenses and other charges accruing after the filing of any petition under the Bankruptcy Law, or the commencement of any Insolvency Proceeding relating to any Obligor and/or any of its Subsidiaries (including, as applicable, the Chapter 11 Cases), whether or not a

-42-

AMERICAS 110819944

**EXHIBIT 2**

claim for post-filing or post-petition interest is allowed or allowable under the Bankruptcy Law or in any such Insolvency Proceeding.

"<u>Potential Transaction</u>":  one or more potential financing, restructuring, recapitalization, merger, consolidation, sale, reorganization, amendment and/or similar or related transactions relating to the Obligors, the Loans, the Obligations, any Prepetition Debt, and/or related matters, as the case may be (including any Sale Transaction, any other transaction contemplated by any Restructuring Transaction Documents, and any transaction pursuant to any modification to any Loan Document or any Prepetition Loan Document, as the case may be).

"<u>Prepetition Credit Facility Debt</u>":  the Prepetition Senior Loan Debt and the Prepetition Junior Loan Debt.

"<u>Prepetition Debt</u>":  (a) all Prepetition Credit Facility Debt and (b) to extent permitted pursuant to **Section 10.2.1**, all other Debt incurred prior to, and outstanding as of, the Petition Date.

"<u>Prepetition Junior Lenders</u>":  the lenders under the Prepetition Junior Loan Agreement and their respective successors and assigns.

"<u>Prepetition Junior Loan Agent</u>":  Lightship, as administrative agent and as collateral agent under the Prepetition Junior Loan Agreement, and each of its successors and permitted assigns.

"<u>Prepetition Junior Loan Agreement</u>":  the Term Loan and LC Loan and Security Agreement, dated as of November 30, 2016 (as amended or otherwise modified from time to time prior to, and as in effect on, the Petition Date), among the Borrower, the lenders party thereto from time to time and the Prepetition Junior Loan Agent.

"<u>Prepetition Junior Loan Debt</u>":  all Debt, obligations, liabilities and indebtedness of every kind, nature and description owing by the Obligors to the Prepetition Junior Loan Agent and Prepetition Junior Loan lenders, including principal, interest, charges, fees, premiums, indemnities, letter of credit obligations, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise arising under the Prepetition Junior Loan Documents (including all "Obligations" and all "Secured Obligations" as defined thereunder).

"<u>Prepetition Junior Loan Documents</u>":  collectively, the following (as the same now exist or may hereunder be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Prepetition Junior Loan Agreement; and (b) all other agreements, documents and instruments at any time executed and/or delivered by any of the Obligors with, to or in favor of the Prepetition Junior Loan Agent or any Prepetition Junior Lender in connection therewith or

-43-

**EXHIBIT 2**

related thereto; sometimes being referred to herein individually as a "Prepetition Junior Loan Document".

"Prepetition Junior Loan Secured Parties":  collectively, the Prepetition Junior Lenders, the Prepetition Junior Loan Agent and the other Secured Parties (as such term is defined under the Prepetition Junior Loan Documents).

"Prepetition Loan Agreements":  the Prepetition Senior Loan Agreement and the Prepetition Junior Loan Agreement, collectively, and each of them individually, as the context may require.

"Prepetition Loan Documents":  the Prepetition Senior Loan Documents and the Prepetition Junior Loan Documents, collectively, and each of them individually, as the context may require.

"Prepetition Secured Parties":  collectively, the Prepetition Senior Loan Secured Parties and the Prepetition Junior Obligors (and each of them individually, a "Prepetition Secured Party").

"Prepetition Senior Lenders":  the lenders under the Prepetition Senior Loan Agreement and their respective successors and assigns.

"Prepetition Senior Loan Agent":  Lightship Capital II LLC (in its capacity as a successor to Bank of America, N.A.), as administrative agent and as collateral agent under the Prepetition Senior Loan Agreement, and each of its successors and permitted assigns.

"Prepetition Senior Loan Agreement":  the ABL Loan and Security Agreement, dated as of November 30, 2016 (as amended or otherwise modified from time to time prior to, and as in effect on, the Petition Date), among the Borrower, the lenders party thereto from time to time and the Prepetition Senior Loan Agent.

"Prepetition Senior Loan Debt":  all Debt, obligations, liabilities and indebtedness of every kind, nature and description owing by the Obligors to the Prepetition Senior Loan Agent and Prepetition Senior Loan lenders, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise arising under the Prepetition Senior Loan Documents (including all "Obligations" and all "Secured Obligations" as defined thereunder).

"Prepetition Senior Loan Documents":  collectively, the following (as the same now exist or may hereunder be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Prepetition Senior Loan Agreement; and (b) all other agreements, documents and instruments at any time executed and/or delivered by any of the Obligors with, to or in favor of

-44-

AMERICAS 110819944

**EXHIBIT 2**

the Prepetition Senior Loan Agent or any Prepetition Senior Lender in connection therewith or related thereto; sometimes being referred to herein individually as a "Prepetition Senior Loan Document".

"Prepetition Senior Loan Secured Parties":  collectively, the Prepetition Senior Lenders, the Prepetition Senior Loan Agent and the other Secured Parties (as such term is defined under the Prepetition Senior Loan Documents).

"Primary Operating Account":  a Deposit Account of the Borrowers designated by the Borrower Agent in writing to the Administrative Agent from time to time as the Borrowers' Primary Operating Account.

"Prime Rate":  the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent).  Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Pro Forma Adjustment":  for any period that includes all or any part of a fiscal quarter ending prior to the end of any Post-Acquisition Period, with respect to the Acquired EBITDA of the applicable Acquired Entity or Business or the EBITDA of Holdings and its Subsidiaries, the pro forma increase or decrease in such Acquired EBITDA or such EBITDA, as the case may be, projected by the Borrowers in good faith to be realized during such Post-Acquisition Period as a result of (a) actions taken during such Post-Acquisition Period for the purposes of realizing reasonably identifiable and factually supportable "run rate" cost savings, operating expense reductions, other operating improvements and or synergies (in each case, including, but not limited to, (i) reductions in personnel expenses, (ii) reductions of costs related to administrative functions, (iii) reductions of costs related to leased or owned properties and (iv) reductions from the consolidation of operations and streamlining of corporate overhead) or (b) any additional costs incurred during such Post-Acquisition Period, in each case, in connection with the combination of the operations of such Acquired Entity or Business with the operations of Holdings and its Subsidiaries; *provided*, that such actions are taken during such Post-Acquisition Period, or such costs are incurred during such Post-Acquisition Period, as applicable; *provided*, *further*, that any such pro forma increase or decrease to such Acquired EBITDA or such EBITDA, as the case may be, shall be without duplication for cost savings or additional costs already included in such Acquired EBITDA or such EBITDA, as the case may be, for such period; *provided*, *further* that in no event shall the sum of the amounts under sub-clauses (ix) and (x) of clause (a) of the definition

-45-

AMERICAS 110819944

**EXHIBIT 2**

of EBITDA for any period, plus the amount of any Pro Forma Adjustments, exceed 10% of EBITDA for such period (determined on the basis of EBITDA as calculated without giving effect to any increase attributable to a Pro Forma Adjustment addback).

"Pro Forma Adjustment Certificate":  any certificate of a Senior Officer of the Borrower Agent delivered pursuant to **Section 10.1.2(c)**.

"Pro Rata":  with respect to any Lender, such Lender's share of the New Money Loan Commitments, expressed as a percentage and set forth on **Schedule 1.1** hereto opposite such Lender's name under the heading "New Money Loan Commitment" (or in any Commitment Agreement entered into by such Lender, the Administrative Agent and the Obligors pursuant to **Section 2.1.7**).

"Properly Contested":  with respect to any obligation of an Obligor, (a) the obligation is subject to a bona fide dispute regarding amount or the Obligor's liability to pay; (b) the obligation is being properly contested in good faith by appropriate proceedings promptly (or to be promptly) instituted and diligently pursued; (c) appropriate reserves have been established in accordance with GAAP; (d) non-payment could not reasonably be expected to have a Material Adverse Effect; (e) no Lien other than a Permitted Lien is imposed on assets of the Obligor, unless bonded and stayed to the reasonable satisfaction of Administrative Agent; and (f) if the obligation results from entry of a judgment or other order, such judgment or order is stayed pending appeal or other judicial review.

"Protective Advances":  as defined in **Section 2.1.6**.

"PTE":  a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Purchase Money Debt":  (a) Debt (other than the Obligations) for payment of any of the purchase price of fixed assets; (b) Debt (other than the Obligations) incurred within 270 days before or after acquisition of any fixed assets, for the purpose of financing any of the purchase price thereof; and (c) any renewals, extensions or refinancings (but not increases) thereof, in each case, solely to the extent effectuated prior to the Petition Date in accordance with the Prepetition Loan Agreements.

"Purchase Money Lien":  a Lien that secures Purchase Money Debt, encumbering only the fixed assets acquired with such Debt and constituting a Capital Lease or a purchase money security interest under the UCC.

"QFC Credit Support":  as defined in **Section 14.20**.

-46-

**EXHIBIT 2**

"Qualified ECP":  an Obligor with total assets exceeding $10,000,000, or that constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"RCRA":  the Resource Conservation and Recovery Act (42 U.S.C. §§ 6991-6991i).

"Real Estate":  an Obligor's interest in all leases and all land, tenements, hereditaments and any estate or interest therein, together with the buildings, structures, parking areas and other improvements thereon (including all fixtures), now or hereafter owned or leased by any Obligor, together with all easements, rights of way, and similar rights relating thereto and all leases, licenses, tenancies and occupancies thereof.

"Register":  as defined in **Section 13.3.4**.

"Related Parties":  with respect to any Person, (a) such Person's Affiliates and (b) the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, consultants, service providers and representatives of such Person and of such Person's Affiliates.

"Release":  any release, spill, emission, discharge, deposit, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment, or into, from or through any building, structure or facility.

"Remaining Obligations":  as of any date of determination, Obligations that as of such date of determination are inchoate or contingent indemnification and reimbursement obligations under the Loan Documents that survive termination of the Loan Documents, but as of such date of determination are not due and payable and for which no claims have been made.

"Report":  as defined in **Section 12.2.3**.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Required Lenders":  at any time, one or more Lenders (subject to **Section 4.2**) having at such time (on an aggregate basis) Total Credit Exposures in excess of 50% of the Total Credit Exposures of all Lenders at such time; *provided*, *however*, that the Commitments and Loans of any Defaulting Lender shall be excluded from such calculation.

"Resolution Authority":  an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

-47-

AMERICAS 110819944

**EXHIBIT 2**

"Restricted Investment":  any Investment by an Obligor or Subsidiary, other than the following (but, in each case, only if, and so long as, no Default or Event of Default shall exist or arise at the time of, or after giving effect to, such Investment (including under the Budget Covenant):

(a)    Investments in Subsidiaries of Holdings to the extent existing on the Closing Date and permitted under the Prepetition Credit Agreements;

(b)    Investments in cash and Cash Equivalents (and assets that were Cash Equivalents when such Investment was made); *provided*, that the cash and Cash Equivalents subject to such Investment shall be held in a Deposit Account that constitutes Collateral and is either subject to a Deposit Account Control Agreement in favor of the Administrative Agent, in an Excluded Account or a perfected Lien pursuant to the DIP Order;

(c)    advances to a director, officer, or employee for salary, travel expenses, relocation, commissions and other business-related expenses in the Ordinary Course of Business and in accordance with the Approved Budget;

(d)    prepaid expenses and extensions of trade credit made in the Ordinary Course of Business;

(e)    deposits with financial institutions permitted hereunder;

(f)    Investments in any Obligor;

(g)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the Ordinary Course of Business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the Ordinary Course of Business;

(h)    promissory notes, securities and other non-cash consideration received in connection with Permitted Asset Dispositions, so long as the same shall constitute Collateral and be subject to the Administrative Agent's Lien hereunder in accordance with the requirements hereof;

(i)    Investments in Hedging Agreements permitted under **Section 10.2.14**;

-48-

AMERICAS 110819944

**EXHIBIT 2**

(j)      Contingent Obligations in respect of leases (other than Capital Leases) or other obligations that do not constitute Debt, in each case entered into in the Ordinary Course of Business and constituting Permitted Contingent Obligations; and

(k)      other Investments made in the Ordinary Course of Business, so long as the aggregate amount of such Investments shall not exceed $1,000,000 at any time outstanding and such Investments shall be in accordance with the Approved Budget.

"Restrictive Agreement": an agreement that conditions or restricts the right of any Obligor to grant Liens on any assets to secure the Obligations, to declare or make Distributions, or to repay any intercompany Debt.

"Restructuring": as defined in the Restructuring Support Agreement.

"Restructuring Committee": the "Restructuring Committee" established by the Strike Investment Board.

"Restructuring Support Agreement": that certain Restructuring Support Agreement (including the term sheet attached thereto as Exhibit 1, and all other exhibits, schedules, annexes and other attachments thereto), dated as of November 22, 2021, by and among the Debtors, the Prepetition Secured Parties party thereto and the Lenders, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Restructuring Transaction Documents": any one or more of the following: (a) the Restructuring Support Agreement, (b) the Definitive Documents and the Asset Purchase Agreement (each, as defined in the Restructuring Support Agreement), and (c) such other agreements, documents and instruments (if any) designated as such by the Administrative Agent.

"Roll-Up": as defined in **Section** Error! Reference source not found..

"Roll-Up Amount":   All Prepetition Senior Loan Debt outstanding as of the Final DIP Order Closing Date.

"Roll-Up Loans": as defined in **Section** Error! Reference source not found..

"Royalties":   all royalties, fees, expense reimbursement and other amounts payable by a Borrower under a License.

"RPO Expense": with respect to any fiscal period and for Holdings and its Subsidiaries on a consolidated basis, all rent paid in cash by Holdings and its Subsidiaries during such period on

-49-

**EXHIBIT 2**

account of equipment subject to a rental purchase option, which rental purchase option has been exercised.

"S&P":  Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and its successors.

"Sale Approval Order": a final non-appealable order of the Bankruptcy Court authorizing the Sale Transaction pursuant to section 363 of the Bankruptcy Code and approving (a) the Stalking Horse Agreement, or (b) an Alternative Asset Purchase Agreement, in each case, in form and substance acceptable to the Administrative Agent and the Lenders.

"Sale Auction": to the extent competing qualified bids are timely submitted in accordance with the Sale Procedures, an auction to be conducted by the Obligors and their advisors in connection with the Sale Process.

"Sale Process":  the marketing process to be conducted by the Obligors for the purposes of soliciting bids for the purchase of all or substantially all of the Obligor's assets and consummating a Sale Transaction, in each case, in accordance with the Sale Procedures.

"Sale Procedures": the marketing process and procedures, in form and substance acceptable to the Administrative Agent and the Lenders, which shall be filed with the Bankruptcy Court in connection with the Sale Procedures Motion.

"Sale Procedures Motion": the motion (together with all exhibits thereto), in form and substance acceptable to the Administrative Agent and the Lenders, to be filed by the Obligors with the Bankruptcy Court, (i) authorizing the Obligors' entry into the Stalking Horse Agreement, (ii) approving the Sale Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, (iii) approving and authorizing the payment of certain bidding protections, if any (each as shall be described in the Stalking Horse Agreement), (iv) scheduling a hearing with respect to the sale, and (v) granting other related relief.

"Sale Procedures Order": an order of the Bankruptcy Court approving the Sale Procedures Motion, in form and substance acceptable to the Administrative Agent and the Lenders.

"Sale Transaction": the Stalking Horse Sale, or the sale of all or substantially all of the Obligor's assets pursuant to the Alternative Asset Purchase Agreement.

 "Sanction":  any sanction administered or enforced by the U.S. Government (including OFAC), United Nations Security Council, European Union, Her Majesty's Treasury or other sanctions authority.

-50-

**EXHIBIT 2**

"Secured Parties":  collectively, the Administrative Agent and Lenders.

"Securities Act":  the Securities Act of 1933.

"Security Documents":  the Guaranties, Deposit Account Control Agreements, the DIP Orders and all other documents, instruments and agreements now or hereafter securing (or given with the intent to secure) any Obligations.

"Senior Officer":  the chairman of the board, president, chief executive officer, chief financial officer or treasurer of Holdings or the Borrower Agent or, if the context requires, another Obligor (or any other officer or employee of the applicable Obligor designated in or pursuant to an agreement between the applicable Obligor and the Administrative Agent).

"Sold Entity or Business":  as defined in the definition of the term "EBITDA".

"Special Resolution" means that certain Written Consent of the Board of Managers of Strike Investment, dated September 19, 2021, as in effect on the Closing Date.

"Specified Event of Default":  any Event of Default arising under **Section 11.1(a)** and **11.1(b)**, **11.1(d)** (solely relating to a failure to comply with **Sections 8.1, 8.2.4, and 8.2.5**), or **11.1(j)**.

"Specified Obligor":  an Obligor that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to **Section 5.11**).

"Spectra Agreement":  that certain Construction Agreement dated as of September 27, 2016, by and between Valley Crossing Pipeline, LLC (an affiliate of Spectra Energy Partners, LP) and Borrower.

"Sponsor":  any of (a) OEP Secondary Fund GP Ltd. (the "OEP Affiliate"), (b) Mill Point and Mill Point Splitter or (c) any investment vehicle that is Controlled or managed by the OEP Affiliate or Mill Point or Mill Point Splitter (whether through the ownership of the majority of the aggregate issued and outstanding voting Equity Interests of such investment vehicle or through the management of investments of such investment vehicle by the OEP Affiliate or Mill Point or Mill Point Splitter, as applicable, or otherwise); for the avoidance of doubt, this clause (b) shall not include any other portfolio company of the OEP Affiliate or Mill Point, as applicable.

"Stalking Horse Agreement":  as defined in the Restructuring Support Agreement.

"Stalking Horse Sale": the sale of all or substantially all of the Obligor's assets pursuant to the Stalking Horse Agreement.

-51-

**EXHIBIT 2**

"<u>Stalking Horse Sale Closing Date</u>":  the date on which the Stalking Horse Sale is consummated in accordance with the Stalking Horse Agreement (which shall be the same date as the Closing Date under (and as defined in) the Stalking Horse Agreement).

"<u>Strike</u>":  as defined in the preamble hereto.

"<u>Strike Capital</u>":  Strike Capital, LLC, a Texas limited liability company.

"<u>Strike Investment</u>":  Strike Investment, LLC, a Delaware limited liability company.

"<u>Strike Investment Board</u>":  the board of managers of Strike Investment.

"<u>Subordinated Debt</u>":  Debt incurred by Holdings or its Subsidiaries that is expressly contractually subordinate and junior in right of payment to Full Payment of all Obligations (other than Remaining Obligations) on terms in accordance with **Section 10.2.1(b)** and **Section 10.2.7**.

"<u>Subsidiary</u>":  with respect to any Person, any entity more than 50% of whose voting securities or Equity Interests is owned by such Person (including indirect ownership by such Person through other entities in which such Person directly or indirectly owns more than 50% of the voting securities or Equity Interests).  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings.

"<u>Subsidiary Guarantor</u>":  each Subsidiary of Holdings; *provided*, that, for the avoidance of doubt, any Subsidiary that is also a Borrower shall only be a Subsidiary Guarantor with respect to Obligations of the other Obligors, and shall be a primary obligor (as defined in the definition of Guarantee Obligations) with respect to its Obligations in its capacity as a Borrower.

"<u>Supported QFC</u>":  as defined in **Section 14.20**.

"<u>Swap Obligations</u>":  with respect to an Obligor, its obligations under a Hedging Agreement that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"<u>Tax Distribution</u>":  the following (if and to the extent in accordance with the Budget Covenant):  (a) (i) for any taxable period ending after the Closing Date for which Holdings is treated as a partnership or disregarded entity for U.S. federal, state and/or local income tax purposes, Distributions by Holdings to permit its direct and indirect equity owners to pay the U.S. federal, state and/or local income taxes attributable to their respective direct or indirect distributable shares of Holdings' taxable income for such taxable period, in an aggregate amount for each such taxable period not to exceed the product of (x) (1) the aggregate amount of net taxable income of Holdings allocated to such direct or indirect equity owners (excluding any

-52-

AMERICAS 110819944

**EXHIBIT 2**

taxable income allocable to such direct or indirect equity owners under Section 704(c) of the Code) for such taxable period, minus (2) any cumulative net taxable losses allocated to such direct or indirect equity owners for any prior taxable period and such taxable period, in each case, ending after the Closing Date, and in each case, to the extent such cumulative net taxable loss has not previously been taken into account to reduce the amount determined under this clause (a)(i)(x) after the Closing Date, and (y) the highest marginal effective rate of federal, state and local income tax applicable to an individual or corporation (whichever is higher) resident in New York, New York, Los Angeles, California or Houston, Texas (whichever is higher) (taking account of any difference in rates applicable to ordinary income, capital gains and dividends and any allowable deductions in respect of state and local taxes in computing the member's liability for federal income taxes); *provided*, that Distributions shall be permitted under this clause (a)(i) with respect to any taxable period on a quarterly basis to allow such direct and indirect equity owners to pay estimated taxes during the course of such taxable period using reasonable estimates of the anticipated aggregate amount of Distributions permitted for such taxable period at the time of such payment, with any excess of aggregate quarterly installments with respect to any such taxable period over the actual amount determined under clause (a)(i) for such taxable period reducing the amount determined under clause (a)(i) for the immediately subsequent taxable period (and, to the extent such excess is not fully absorbed in the immediately subsequent taxable period, the following period(s)); and (ii) any Distributions made by Holdings to its equity owners for a taxable period in an aggregate amount equal to the amount imposed by an applicable taxing authority as a result of a "push out" election under Section 6226 of the Code for such taxable period; and (b) without any duplication of any Distribution described in clause (a) above, with respect to any taxable period for which Holdings is a member of a consolidated, combined, unitary or similar income tax group (including a Texas franchise tax group) for U.S. federal and/or applicable state or local income tax purposes of which a direct or indirect equity owner of Holdings is the common parent or other entity responsible for paying the taxes of such tax group (a "Tax Group"), any Distribution made by Holdings to pay the portion of any U.S. federal, state or local income taxes (as applicable) of such Tax Group for such taxable period that is attributable to the income of Holdings and/or the applicable Subsidiaries, as determined by Holdings in its good faith discretion and evidenced by documentation reasonably acceptable to the Administrative Agent; *provided*, that any Distributions made pursuant to this clause (b) shall not exceed the tax liability that Holdings and/or the applicable Subsidiaries (as applicable) would have paid were such taxes determined as if such entity(ies) were a stand-alone taxpayer or a stand-alone group, reduced by any actual taxes described in clause (b) directly paid by Holdings and/or any of the Subsidiaries; provided, further, that, to the extent requested by the Administrative Agent, the Obligors shall deliver to the Administrative Agent such information and supporting materials as is reasonably required by the Administrative Agent to determine the type, scope and extent of any Tax Distribution (including as a condition to any payment in respect thereof being deemed permitted hereunder).

-53-

**EXHIBIT 2**

"Tax Group":  as defined in the definition of Tax Distribution.

"Taxes":  all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Technology":  all trade secrets, know how, technology (whether patented or not), rights in Software (including source code and object code), rights in data and databases, rights in Internet web sites, customer and supplier lists, proprietary information, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclosure thereof by any person, pricing and cost information, business and marketing plans and proposals, together with any and all (i) rights and privileges arising under applicable law with respect to the foregoing, (ii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future misappropriations or violations thereof, (iii) rights corresponding thereto throughout the world and (iv) rights to sue for past, present and future misappropriations or violations thereof.

"Termination Date":  the earliest of the following: (a) the date that is thirty-five (35) days after the Petition Date (or such later date as may be agreed in writing by the Required Lenders) unless the Final DIP Order Date has occurred on or prior to such date, (b) the Stalking Horse Sale Closing Date, or the date of consummation of any other Sale Transaction, or any other transaction pursuant to which all or substantially all of the Debtors' property and assets are sold, transferred or otherwise disposed of (including pursuant to Section 363 of the Bankruptcy Code), (c) the Chapter 11 Plan Effective Date, (d) the Maturity Date, and (e) the date on which the Loans are accelerated or otherwise declared (or become) due and payable in accordance with the terms of this Agreement (whether automatically, or upon any Event of Default or as otherwise provided hereunder).

"Termination Payment":  each payment required to be made by the Borrowers (for the account of the applicable Lenders) with respect to any Termination Payment Triggering Event, pursuant to **Section 5.12** and the other applicable provisions hereof, which payment shall be in a Dollar amount equal to (a) in the case of any Termination Payment Triggering Event described in clause (a) of the definition thereof, 3.00% of the aggregate principal amount of the New Money Loans being prepaid, repaid, paid or redeemed (as applicable) at such time, and (b) in the case of any other Termination Payment Triggering Event, 3.00% of the aggregate principal amount of then-outstanding New Money Loans.  Notwithstanding anything to the contrary, and for the avoidance of doubt, there shall be no Termination Payment due and payable in respect of the Roll-Up Loans.

-54-

**EXHIBIT 2**

"Termination Payment Triggering Event":  the occurrence of any of the following (without duplication): (a) the making of any prepayment, repayment, payment or redemption (as applicable) of all or any portion of the Loans, whether before or after the occurrence of any Default or Event of Default or the Termination Date (but excluding any mandatory prepayment pursuant to **Section 5.3.1** prior to the occurrence of any Default); (b) the Termination Date; (c) the acceleration of all or any portion of the Loans or other Obligations for any reason, or the occurrence of any other event or circumstance that causes any Loan or other Obligation to become (or to be declared) due and payable for any reason (including upon an Event of Default, pursuant to **Section SECTION 11** hereof, by operation of law, or otherwise); (d) the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any Loan or other Obligation for any reason, including in any Insolvency Proceeding, any foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure, or the making of a distribution of any kind in any Insolvency Proceeding to the Lenders (whether directly or indirectly, including through the Administrative Agent or any other distribution agent), in full or partial satisfaction of any Loan or other Obligation; and (e) the termination of this Agreement for any reason.

"Total Credit Exposure":  as to any Lender at any time, the unused Commitments and outstanding amount of all Loans of such Lender at such time.

"Trademarks":  all trademarks (including service marks), slogans, logos, certification marks, trade dress, uniform resource locators (URL's), domain names, corporate names, brand names, and trade names and other identifiers of source or goodwill, whether registered or unregistered, and all registrations and applications for the foregoing (whether statutory or common law and whether established or registered or applied for in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable law with respect to any of the foregoing, (ii) extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements, dilutions or violations thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements, dilutions or violations thereof.

"Transactions":  (a) the execution and delivery by the Obligors of this Agreement and the other Loan Documents to which they are a party on the Closing Date, and the performance of the obligations and transactions hereunder, (b) the other transactions related to or entered into in connection with any of the foregoing or otherwise in connection with the Restructuring, and (c) the payment of fees, premiums, charges, costs and expenses in connection with any of the foregoing.

-55-

**EXHIBIT 2**

"<u>Transferee</u>":  any actual or potential Eligible Assignee, Participant or other Person acquiring an interest in any Obligations.

"<u>Type</u>":  any type of a Loan (<u>i.e.</u>, Base Rate Loan or LIBOR Loan) that has the same interest option and, in the case of LIBOR Loans, the same Interest Period.

"<u>UCC</u>":  the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection, priority or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

"<u>UK Financial Institution</u>":  any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"<u>UK Resolution Authority</u>":  the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"<u>Unfunded Pension Liability</u>":  the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to the Code, ERISA or the Pension Protection Act of 2006 for the applicable plan year.

"<u>Updated Budget</u>":  as defined in **Section 10.1.12(a)**.

"<u>Upstream Payment</u>":  a Distribution by a Subsidiary of Holdings to Holdings or to another Subsidiary of Holdings that holds Equity Interests in such Subsidiary so long as each Obligor that holds Equity Interests in such Subsidiary received at least its pro rata share of such Distribution based on its relative ownership of such Subsidiary.

"<u>U.S. Person</u>":  "United States person" as defined in Section 7701(a)(30) of the Code.

"<u>U.S. Special Resolution Regimes</u>":  as defined in **Section 14.20**.

"<u>U.S. Tax Compliance Certificate</u>":  as defined in **Section 5.10.2(b)(iii)**.

"<u>Voting Equity Interests</u>":  with respect to any Person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

circumstances to elect at least a majority of the board of directors (or equivalent governing body) of such Person.

"Wind Down": the orderly wind down of the Obligors (including their respective assets and operations) following the consummation of the Stalking Horse Sale in accordance with the Wind Down Budget and otherwise in a manner reasonably acceptable to the Lenders.

"Wind Down Statutory Expense Amount": to the extent not paid prior to or assumed in connection with the consummation of the Stalking Horse Sale, the aggregate amount determined in good faith by the Borrowers (and reasonably acceptable to the Lenders) to be necessary to discharge the Obligors' liabilities in connection with (a) allowed priority tax claims pursuant to section 507(a)(8) of the Bankruptcy Code (except to the extent that any payment with respect thereto was sought pursuant to any First Day Motion), as identified to the Administrative Agent in writing and set forth in the Wind Down Budget (the "Wind Down Tax Claims"), and (b) allowed claims pursuant to Section 503(b)(9) of the Bankruptcy Code, as identified to the Administrative Agent in writing and set forth in the Wind Down Budget (the "Administrative Expense Claims", and, together with the Wind Down Tax Claims, the "Wind Down Statutory Expenses"); provided, that the Wind Down Statutory Expense Amount shall in no event exceed $4,000,000 (and the aggregate amount of Administrative Expense Claims permitted to be included in such amount shall not exceed $2,000,000).

"Wind Down Budget": the itemized cash flow forecast included in the Initial Budget (or, in any other Approved Budget) and reflecting, on a line item, cumulative and aggregate basis, the Obligor's projected disbursements necessary to implement the Wind Down, including (without duplication) (a) Administrative Expense Claims and Wind Down Tax Claims up to the Wind Down Statutory Expense Amount, (b) other allowed priority claims, (c) necessary employee wages and benefits, (d) professional and/or advisory fees in the Chapter 11 Cases projected to be incurred during the period (i) from and after the Stalking Horse Sale Closing Date through to the Chapter 11 Plan Effective Date, and (ii) from and after the Chapter 11 Plan Effective Date, and (e) office rent, insurance, records retention and destruction, and other general and administrative costs and expenses necessary for the Wind Down, which cash flow forecast shall be in amount, form and substance acceptable to the Lenders.

"Write-Down and Conversion Powers": (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of

-57-

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

**1.2.** **Accounting Terms**.  Under the Loan Documents (except as otherwise specified herein), all accounting terms shall be interpreted, all accounting determinations shall be made, and all financial statements shall be prepared, in accordance with GAAP applied on a basis consistent with the most recent audited financial statements of Holdings and its Subsidiaries delivered to Administrative Agent before the Closing Date and using the same inventory valuation method as used in such financial statements, except for any change required or permitted by GAAP if Borrowers' certified public accountants concur in such change, the change is disclosed to Administrative Agent, and **Section 10.3** is amended in a manner satisfactory to Required Lenders to take into account the effects of the change.  Any change in GAAP occurring after the date hereof that would require operating leases to be treated as capital leases shall be disregarded for the purposes of determining Debt and any financial ratio or compliance requirement contained in any Loan Document.

**1.3.** **Uniform Commercial Code**.  As used herein, the following terms are defined in accordance with the UCC in effect in the State of New York from time to time:  "Chattel Paper," "Commercial Tort Claim," "Deposit Account," "Document," "Equipment," "General Intangibles," "Goods," "Instrument," "Investment Property," "Letter-of-Credit Right" and "Supporting Obligation."

**1.4.** **Certain Matters of Construction**.  The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  In the computation of periods of time from a specified date to a later specified date, "from" means "from and including," and "to" and "until" each mean "to but excluding."  The terms "including" and "include" shall mean "including, without limitation" and, for purposes of each Loan Document, the parties agree that the rule of *ejusdem generis* shall not be applicable to limit any provision.  Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document.   All references to (a) laws or statutes include all related rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any section mean, unless the context otherwise requires, a section of this Agreement; (d) any exhibits or schedules mean, unless the context otherwise requires, exhibits and schedules attached hereto, which are hereby incorporated by reference; (e) any Person include successors and assigns; (f) time of day mean time of day at Administrative Agent's notice address under **Section 14.3.1**; or (g) discretion of Administrative Agent or any

-58-

AMERICAS 110819944

**EXHIBIT 2**

Lender means the sole and absolute (unless otherwise qualified) discretion of such Person exercised in a manner consistent with its duties of good faith and fair dealing.  All references to Loans, Obligations and other amounts herein shall be denominated in Dollars, unless expressly provided otherwise, and all determinations (including calculations of financial covenants) made from time to time under the Loan Documents shall be made in light of the circumstances existing at such time.  No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision.  A reference to a Borrower's "knowledge" or similar concept means actual knowledge of a Senior Officer, or knowledge that a Senior Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter.  Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person.  Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

## SECTION 2.  CREDIT FACILITIES

2.1.1   Roll-Up Loans.  Subject to the terms and conditions of the Final DIP Order and this Agreement, and relying upon the representations and warranties set forth herein, immediately and automatically upon the occurrence of the Final DIP Order Date, the Lenders shall hereby be deemed to have made a term loan to the Borrowers pursuant to this **Section 2.1.1** in an aggregate principal amount equal to the Roll-Up Amount (the "Roll-Up Loan").  The Roll-Up Loan shall be deemed to refinance, on a cashless basis, all Prepetition Senior Loan Debt outstanding as of such time, pursuant to the Final DIP Order (the foregoing, including the incurrence of the Roll-Up Loan, the "Roll-Up").  For the avoidance of doubt, it shall be understood that the Roll-Up Loans shall be deemed incurred on the Final DIP Order Date.

2.1.2   New Money Loans.

(a)       Subject to the Approved Budget, and the satisfaction of the conditions precedent set forth in **Section SECTION 6**, and subject further the other terms and conditions hereof, and relying upon the representations and warranties set forth herein, the Lenders agree to make the following New Money Loans to the Borrowers (unless the Termination Date shall have occurred):

-59-

EXHIBIT 2

(i)       New Money Loans funded pursuant to the New Money Loan Tranche A Commitment, as follows: (A) on the Closing Date, a New Money Loan in an aggregate principal amount equal to the amount set forth in the Initial Budget as the "DIP – New Money Balance" for such date[6] (or, if less, the aggregate principal amount of New Money Loans authorized in the Interim DIP Order to be borrowed on the Closing Date); (B) on one or more Borrowing Dates occurring after the Closing Date but prior to the Final DIP Order Date, in an aggregate principal amount not to exceed the amount required to fund Permitted Disbursements in accordance with the Approved Budget (as further set forth below) (or, if less, the aggregate principal amount authorized in the Interim DIP Order), and (C) on one or more Borrowing Dates occurring after the Final DIP Order Date, but prior to or on the New Money Loan Commitment Termination Date, in each case, in an aggregate principal amount not to exceed the amount required to fund Permitted Disbursements in accordance with the Approved Budget; provided, that, the Lenders shall not be required to fund any amount of any New Money Loan on any Borrowing Date pursuant to this Section 2.1.2(a)(i) if the amount of New Money Loans funded on such applicable Borrowing Date would exceed the New Money Loan Tranche A Commitment then in effect (or, if less, the New Money Loan Tranche A Commitment then in effect as authorized pursuant to the Final DIP Order); provided, further, that, notwithstanding any amount of New Money Loans that may be determined to be available to be borrowed on the basis of the foregoing, such available amount of New Money Loans shall in any event not be permitted to be borrowed in reliance hereon in connection with (x) any Wind Down Statutory Expenses, or (y) any other amount relating to the Wind Down (except solely an amount not to exceed an amount equal to (I) $5,000,000 *minus* (II) the amount of Liquidity as of such time; provided, that, the Borrowers shall apply cash on hand to finance such Wind Down amounts prior to applying any proceeds of New Money Loans obtained hereunder, and such New Money Loans shall in any event not be made until the Stalking Horse Sale Closing Date); and

(ii)      Subject to occurrence of the Final DIP Order Date, New Money Loans funded pursuant to the New Money Loan Tranche B Commitment on a single Borrowing Date occurring on the Stalking Horse Sale Closing Date (and, in any event, solely if the Borrowers reasonably and in good faith believe that the Stalking Horse Sale Closing Date shall occur as scheduled) in an aggregate principal amount not to exceed the Money Loan Tranche B Commitment then in effect; provided, that such New Money Loan shall only be required to be funded if and to the extent that the Borrowers demonstrate that the proceeds thereof shall be required to finance Wind Down Statutory Expenses in an amount not exceeding the Wind Down Statutory Expense Amount payable on or after the Stalking Horse Sale Closing Date in accordance

---

[6] NTD:  Currently expected not to be any Closing Date borrowings of New Money Loans and subject to final Initial Budget.

-60-

**EXHIBIT 2**

with the Wind Down Budget contained in the Approved Budget then in-effect, and such payment shall occur at a time when the Borrowers shall not have sufficient Liquidity to fund such amount without borrowing the New Money Loan hereunder (as evidenced by the Approved Budget then in effect); provided, that, the Borrowers shall apply cash on hand to finance such Wind Down amounts prior to applying any proceeds of New Money Loans obtained hereunder.

Notwithstanding the foregoing or anything else in this Agreement or in any other Loan Document to the contrary, (A) no Lender shall be required to fund New Money Loans on more than two (2) Borrowing Dates in any calendar week (unless consented to in writing by such Lender), (B) no Lender shall be required to make any New Money Loan on any Borrowing Date that has not been previously specified in the Approved Budget in effect at the time a request for such New Money Loan is delivered in accordance herewith; provided, that, New Money Loans requested in accordance herewith in connection with the Wind Down shall not be required to be funded if the Lenders determine that a need therefor has not been demonstrated in the Wind Down Budget portion of the Approved Budget then in-effect, and (C) the Borrowers shall not be permitted to request (and the Lenders shall not be required to make) any New Money Loan except if and to the extent (and in the amount) required to fund any disbursement identified for purposes hereof in the Approved Budget in effect at the time a request for such New Money Loan is delivered in accordance herewith (such disbursement, a "Permitted Disbursement"); provided, further, that each New Money Loan shall be in a minimum amount equal to (I) at least $100,000 and in integral multiples of $10,000 thereafter (or such other amounts as agreed to by the applicable Lender), or (II) if lower that the foregoing, the lesser of (x) the remaining, unfunded amount of such Lender's applicable New Money Loan Commitment, as determined as of such time (after giving effect to the aggregate amount of New Money Loans previously made by such Lender), and (y) the amount authorized pursuant to the Interim DIP Order (in the case of New Money Loans made prior to the Final DIP Order Date) or the Final DIP Order (in the case of New Money Loans made as of the Final DIP Order Date).

(b)     Each Lender's New Money Loan Commitment shall, concurrently with the funding of the above New Money Loans by it to the Administrative Agent, be automatically reduced, on a dollar-for-dollar basis, by the principal amount of New Money Loans made by it at such time; provided, that, an Excess Cash Prepayment in accordance with Section 5.3.1 shall cause the New Money Loan Commitment to be replenished by an amount equal to the amount of such Excess Cash Prepayment; provided, that, notwithstanding anything else herein, each Lender's New Money Loan Commitment shall in any event terminate, and shall be deemed permanently discharged, extinguished and cancelled in full, and shall cease to be binding on, or enforceable against, such Lender, in each case, automatically on, and immediately upon the occurrence of, the Termination Date.  For the avoidance of doubt, in no event shall the Lenders be required to fund any Loans if such funding would cause the aggregate principal amount of Loans outstanding hereunder to exceed the aggregate amount authorized pursuant to the Interim DIP Order (in the

-61-

**EXHIBIT 2**

case of New Money Loans made prior to the Final DIP Order Date) or the Final DIP Order (in the case of New Money Loans made as of the Final DIP Order Date).

(c)     Concurrently with the making of New Money Loans on the Closing Date, the Borrowers shall be required to pay the New Money Loan Commitment Payment, which payment shall be effectuated pursuant to a deemed making by the Lenders of additional Loans in an aggregate principal amount equal to the amount of the New Money Loan Commitment Payment (which shall have the same pricing and other terms as all New Money Loans made on the Closing Date, but which shall be made automatically and immediately upon and concurrently with the occurrence of the Closing Date, without requirement for any cash to be advanced by any Lender), and all such Loans shall be deemed to be, and shall be treated as (and shall accordingly have the same rights, privileges and terms as otherwise attach to), New Money Loans for purposes hereof, and the Borrowers shall be deemed to have incurred such Loans on the same date as such New Money Loans are incurred on (but automatically, by operation of the provisions hereof, without any further action by any Person), and all such Loans shall be outstanding as of such time, and interest shall accrue thereon in the same manner as the interest that accrues on such New Money Loans.

(d)     Once repaid, no Loan (or portion thereof) may be reborrowed; provided, that, notwithstanding the foregoing, to the extent that any New Money Loans made pursuant to the New Money Loan Tranche A Commitment are repaid or prepaid pursuant to **Section 5.3.1** prior to the Stalking Horse Sale Closing Date, the Borrowers shall be permitted to request to re-borrow, prior to [the Stalking Horse Sale Closing Date] a corresponding amount of New Money Loans, subject to satisfaction of the applicable conditions precedent in **Section 6**.

2.1.3   Use of Proceeds.  The proceeds of Loans, and cash and Cash Equivalents of the Obligors, shall, in each case, only be permitted to be used by the Obligors or their Subsidiaries to finance Permitted Disbursements in accordance with the Approved Budget, this Agreement and the DIP Orders.

2.1.4   Termination of Commitments; Voluntary Reduction of Commitments.

(a)     Commitments shall automatically terminate on the Termination Date.  Upon at least 10 Business Days (or such shorter period as Administrative Agent may agree) prior written notice to Administrative Agent at any time, Borrowers may, at their option, terminate any New Money Loan Commitments; provided, that such termination shall not become effective unless and until Borrowers shall have paid the Termination Payment calculated on the amount of Commitments so terminated, and Full Payment of all Obligations with respect thereto (but no Lender shall be required to fund any Loan or provide any credit extension or other accommodation pursuant to any such Commitment

-62-

AMERICAS 110819944

**EXHIBIT 2**

as of the time that notice of such termination is delivered to the Administrative Agent hereunder).  Any notice of termination given by Borrowers shall be irrevocable.

(b)      Borrowers may permanently reduce any Commitments, on a Pro Rata basis for each Lender, upon at least 10 Business Days (or such shorter period as Administrative Agent may agree) prior written notice to Administrative Agent, which notice shall specify the amount of the reduction and shall be irrevocable once given.  Each reduction shall be in a minimum amount of $5,000,000, or an increment of $1,000,000 in excess thereof.  No reduction of any Commitments hereunder shall become effective unless and until Borrowers shall have paid the Termination Payment calculated on the amount of Commitments so reduced, and Full Payment of all Obligations with respect thereto (but no Lender shall be required to fund any Loan or provide any credit extension or other accommodation pursuant to any Commitment amount sought to be so reduced pending any payment owing hereunder).

2.1.5    [Reserved].

2.1.6    Protective Advances.  Administrative Agent shall be authorized, in its discretion, at any time that any conditions in **Section 6** are not satisfied to make Base Rate Loans ("Protective Advances") (a) up to an aggregate amount outstanding at any time of up to ten percent (10%) of the aggregate Commitments, if Administrative Agent deems such Loans necessary or desirable to preserve or protect Collateral, or to enhance the collectability or repayment of Obligations, as long as such Loans do not cause the outstanding Loans to exceed the aggregate Commitments; or (b) to pay any other amounts chargeable to Obligors under any Loan Documents, including interest, costs, fees and expenses.  Each Lender shall participate in each Protective Advance on a Pro Rata basis.  Required Lenders may at any time revoke Administrative Agent's authority to make further Protective Advances under clause (a) by written notice to Administrative Agent.  Absent such revocation, Administrative Agent's determination that funding of a Protective Advance is appropriate shall be conclusive.

2.1.7    Increase in Commitments; Additional Commitments.  Borrowers may, from time to time, upon notice to Administrative Agent, request an increase in, or other modification to, any New Money Loan Commitments, and/or the establishment of more of more additional or new Commitments, as the case may be; *provided*, that, such increase, modification or new Commitment, as applicable, shall not become effective unless and until (a) the Administrative Agent (at the Required Lenders' direction) shall have agreed thereto pursuant to a Commitment Agreement delivered in connection therewith, (b) Borrower Agent shall have obtained such Commitments from one or more Lenders or other Eligible Assignees (or, in the case of any modification to any Lender's existing Commitment, the Borrower Agent shall have obtained agreement thereto from such Lender) pursuant to a Commitment Agreement entered into by the

-63-

AMERICAS 110819944

**EXHIBIT 2**

applicable Lenders(s) and/or Eligible Assignee(s), as the case may be, and (c) the conditions precedent thereto, as set forth in the applicable Commitment Agreement, shall have been satisfied or waived in accordance with the terms thereof.  Administrative Agent, Borrowers, and new and existing Lenders shall execute and deliver such documents and agreements (including an amendment of this Agreement if necessary) as Administrative Agent reasonably deems appropriate (without the consent of any other Lender) to evidence the increase in, or other modification to, any Commitments, and/or the establishment of any new or additional Commitment(s), as the case may be, and the allocations of any such applicable Commitments.  On the effective date of any increase, modification or establishment of any new or additional Commitment pursuant to any Commitment Agreement, as the case may be, all applicable outstanding Loans and/or other exposures under the applicable Commitments shall be allocated (or reallocated) among the Lenders party to such Commitment Agreement in accordance with the terms thereof, and settled by Administrative Agent if necessary, in accordance with Lenders' adjusted shares of such Commitments.

## SECTION 3.  INTEREST, FEES AND CHARGES

### 3.1.  Interest.

#### 3.1.1  Rates and Payment of Interest.

(a)  The Obligations shall bear interest at the following rates, subject to **Section 3.1.1(b)** (and, in each case, applicable and accruing until Full Payment): (i) in the case of any Base Rate Loan, at the Base Rate in effect from time to time, plus the Applicable Margin; (ii) the case of any LIBOR Loan, at LIBOR for the applicable Interest Period, plus the Applicable Margin; and (iii) the case of any other Obligation, to the extent that the same is overdue (including, to the extent permitted by law, overdue interest, fees, expenses and other amounts not paid when due), at the Base Rate in effect at the applicable time of determination, plus the Applicable Margin.

(b)  As of the occurrence of, and at all times during the continuance of, any Insolvency Proceeding with respect to any Obligor, or any other Event of Default (including if any Loans or other Obligations (or portion thereof) shall remain unpaid as of the Termination Date), all outstanding Loans and overdue Obligations shall automatically accrue interest at the Default Rate (whether before or after any judgment), until Full Payment thereof, and such interest shall be payable in cash on each Regular Interest Payment Date (unless a demand therefor is made on the Borrower Agent sooner or on a more frequent basis, as determined by the Administrative Agent).  Each Borrower acknowledges that the cost and expense to Administrative Agent and Lenders due to an Event of Default are difficult to ascertain and that the Default Rate is fair and reasonable compensation for this.

-64-

**EXHIBIT 2**

(c)    Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable on demand.  Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable on demand.

3.1.2    <u>Application of LIBOR to Outstanding Loans</u>.

(a)    Borrowers may on any Business Day, subject to delivery of a Notice of Conversion/Continuation, elect to convert any portion of the Base Rate Loans to, or to continue any LIBOR Loan at the end of its Interest Period as, a LIBOR Loan.  During any Event of Default, Administrative Agent may (and shall at the direction of Required Lenders) declare that no Loan may be made, converted or continued as a LIBOR Loan.

(b)    Whenever Borrowers desire to convert or continue Loans as LIBOR Loans, Borrower Agent shall give Administrative Agent a Notice of Conversion/Continuation, no later than 11:00 a.m. at least three Business Days before the requested conversion or continuation date.  Promptly after receiving any such notice, Administrative Agent shall notify each Lender thereof.  Each Notice of Conversion/Continuation shall be irrevocable, and shall specify the amount of Loans to be converted or continued, the conversion or continuation date (which shall be a Business Day), and the duration of the Interest Period (which shall be deemed to be one month if not specified).  If, upon the expiration of any Interest Period in respect of any LIBOR Loans, Borrowers shall have failed to deliver a Notice of Conversion/Continuation, they shall be deemed to have elected to convert such Loans into Base Rate Loans.  Agent does not warrant or accept responsibility for, nor shall it have any liability with respect to, administration, submission or any other matter related to any rate described in the definition of LIBOR or with respect to any rate that is an alternative or replacement for or successor to any of such rate or the effect of any of the foregoing.

3.1.3    <u>Interest Periods</u>.  In connection with the making, conversion or continuation of any LIBOR Loans, Borrowers shall select an interest period ("<u>Interest Period</u>") to apply, which interest period shall be 1, 2, 3 or 6 months (or, if agreed by the Administrative Agent, 12 months or any other period); *provided*, *however*, that:

(a)    the Interest Period shall begin on the date the Loan is made or continued as, or converted into, a LIBOR Loan, and shall expire on the numerically corresponding day in the calendar month at its end;

(b)    if any Interest Period begins on a day for which there is no corresponding day in the calendar month at its end or if such corresponding day falls after the last Business Day of such month, then the Interest Period shall expire on the last

-65-

AMERICAS 110819944

**EXHIBIT 2**

Business Day of such month; and if any Interest Period would otherwise expire on a day that is not a Business Day, the period shall expire on the next Business Day; and

      (c)     no Interest Period shall extend beyond the Termination Date, and all Loans outstanding as of such time shall automatically be converted into Base Rate Loans.

      3.1.4   <u>Interest Rate Not Ascertainable</u>.  If Administrative Agent shall reasonably determine that on any date for determining LIBOR, due to any circumstance affecting the London interbank market, adequate and fair means do not exist for ascertaining such rate on the basis provided herein, then Administrative Agent shall immediately notify Borrowers of such determination.  Until Administrative Agent notifies Borrowers that such circumstance no longer exists (which it will use commercially reasonable efforts to promptly do when it becomes aware that such circumstances no longer exist), the obligation of Lenders to make LIBOR Loans shall be suspended, and no further Loans may be converted into or continued as LIBOR Loans.

**3.2.**    <u>**Fees and Commitment Payments**</u>.

      3.2.1   <u>Agent Fees</u>.  The Borrowers agree to pay to the Administrative, for its own account, the administrative and collateral agency fees and other amounts set forth in the Agent Fee Letter, in each case, at the times and in the amounts specified therein (the "<u>Agent Fees</u>").  For the avoidance of doubt, the Agent Fees shall be payable in addition to, and nothing herein shall be construed as limiting the Obligors' obligations with respect to payment of, any other fees, expenses, indemnities and other amounts payable to the Administrative Agent pursuant to the Loan Documents (including Extraordinary Expenses, and amounts payable pursuant to **Section 3.4** and **Section 14.2**) or otherwise.

      3.2.2   <u>Fees</u>.  Without limiting anything else herein, the Borrowers shall pay all fees set forth in all engagement letters, fee letters and other similar agreements executed in connection with the Loan Documents with the Consenting Lender Side Persons or any other Person (if permitted by the Required Lenders).

      3.2.3   <u>No Refunds</u>.  No fees or other amounts payable hereunder (including the New Money Loan Commitment Payment, Termination Payment, and Agent Fees) shall be refundable under any circumstances.

      3.2.4   <u>New Money Loan Commitment Payment</u>.  As consideration for delivery of the DIP Facility Commitment Letter to the Obligors and the agreements of the DIP Facility Commitment Party thereunder, and as additional consideration for structuring and arranging the DIP Facility, for providing the New Money Loan Commitments, and, as applicable, for permitting the Borrowers to re-borrow Initial Loans pursuant to Section 2.1.2(d), and such other accommodations that have been or may be made available to the Borrowers by the Lenders

-66-

AMERICAS 110819944

**EXHIBIT 2**

hereunder, and otherwise in connection with the transactions occurring on or about the Closing Date, Borrowers shall pay to each Lender the New Money Loan Commitment Payment, which New Money Loan Commitment Payment shall be paid pursuant to, and as further set forth in, **Section 2.1.2**.

3.3.    **Computation of Interest, Fees, Yield Protection**.  All interest, as well as fees and other charges calculated on a per annum basis, shall be computed for the actual days elapsed, based on a year of 360 days, except that interest on Base Rate Loans accruing at the "prime rate" shall be computed based on a year of 365 or 366 days (as applicable).  Each determination by Administrative Agent of any interest, fees or interest rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error.  All fees shall be fully earned when due and shall not be subject to rebate, refund or proration.  A certificate as to amounts payable by Borrowers under **Section 3.4**, **3.7**, **3.9** or **5.9**, submitted to Borrower Agent by Administrative Agent or the affected Lender, as applicable, and setting forth in reasonable detail the basis for such payment and the calculation thereof, shall be final, conclusive and binding for all purposes, absent manifest error, and Borrowers shall pay such amounts to the appropriate party within 10 Business Days following receipt of the certificate.

3.4.    **Reimbursement Obligations**.  Borrowers shall reimburse Administrative Agent for all Extraordinary Expenses.  Borrowers shall also reimburse Administrative Agent for all reasonable and documented legal, accounting, examination, consulting, and other reasonable and documented fees, costs and expenses incurred by it in connection with (a) negotiation and preparation of any Loan Documents, including any amendment or other modification thereof; (b) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of Administrative Agent's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; and (c) subject to the limits of **Section 10.1.1(b)**, each inspection, audit or examination with respect to any Obligor or Collateral, whether prepared by Administrative Agent's personnel or a third party (in the case of legal fees and expenses, subject to the immediate following sentence).  All legal and accounting fees incurred by Agent Professionals shall be charged to Borrowers at the actual rate charged by such Agent Professionals; *provided*, that Borrowers' obligation to reimburse Administrative Agent for legal fees and expenses shall be limited to the reasonable and documented legal fees and expenses of one primary counsel, and one local counsel in each relevant jurisdiction.  In addition to the Extraordinary Expenses of Administrative Agent, upon the occurrence and during the continuance of an Event of Default, Borrowers shall reimburse each Lender for any reasonable out-of-pocket fees, charges and disbursements (including without limitation, the reasonable, documented, and out-of-pocket fees, charges and disbursement of one primary outside legal counsel for all of the Lenders) incurred by it in connection with the enforcement, collection or protection of its rights under the Loan Documents, including all such

-67-

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

expenses incurred during any workout, restructuring or Insolvency Proceeding. All amounts payable by Borrowers under this Section shall be due on demand.

**3.5.** **Illegality**. If any Lender in good faith reasonably determines that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund LIBOR Loans, or to determine or charge interest rates based upon LIBOR, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to Administrative Agent, any obligation of such Lender to make or continue LIBOR Loans or to convert Base Rate Loans to LIBOR Loans shall be suspended until such Lender notifies Administrative Agent that the circumstances giving rise to such determination no longer exist (which Administrative Agent will promptly do when it becomes aware that such circumstances no longer exist). Upon delivery of such notice, Borrowers shall prepay or, if applicable, convert all LIBOR Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Loans. Upon any such prepayment or conversion, Borrowers shall also pay accrued interest on the amount so prepaid or converted.

**3.6.** **Inability to Determine Rates**. If Required Lenders notify Administrative Agent for any reason in connection with a request for a Borrowing of, or conversion to or continuation of, a LIBOR Loan that (a) Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and Interest Period of such Loan, (b) adequate and reasonable means do not exist for determining LIBOR for the requested Interest Period, or (c) LIBOR for the requested Interest Period does not adequately and fairly reflect the cost to such Lenders of funding such Loan, then Administrative Agent will promptly so notify Borrower Agent and each Lender. Thereafter, the obligation of Lenders to make or maintain LIBOR Loans shall be suspended until Administrative Agent (upon instruction by Required Lenders) revokes such notice. Upon receipt of such notice (which the Required Lenders shall promptly do when they become aware that the circumstances giving rise to such suspension no longer exist), Borrower Agent may revoke any pending request for a Borrowing of, conversion to or continuation of a LIBOR Loan or, failing that, will be deemed to have submitted a request for a Base Rate Loan.

**3.7.** **Increased Costs; Capital Adequacy**.

3.7.1 <u>Increased Costs Generally</u>. If any Change in Law shall:

(a) impose, modify or deem applicable any reserve, liquidity, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in calculating LIBOR);

-68-

AMERICAS 110819944

**EXHIBIT 2**

(b)      subject any recipient to Taxes (other than (i) Indemnified Taxes or (ii) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes) with respect to any Loan, Commitment or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(c)      impose on any Lender or interbank market any other condition, cost or expense affecting any Loan, Commitment or Loan Document;

and the result thereof shall be to increase the cost to a Lender of making or maintaining any Loan or Commitment, or converting to or continuing any interest option for a Loan, or to reduce the amount of any sum received or receivable by a Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, Borrowers will pay to it such additional amount(s) as will compensate it for the additional costs incurred or reduction suffered; *provided*, that such additional amounts are also being assessed by such Lender generally against similarly situated borrowers under similar credit facilities.

3.7.2   <u>Capital Requirements</u>.   If a Lender determines that a Change in Law affecting such Lender or its holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or holding company's capital as a consequence of this Agreement, or such Lender's Commitments, Loans, or participations in Loans, to a level below that which such Lender or holding company could have achieved but for such Change in Law (taking into consideration its policies with respect to capital adequacy), then from time to time Borrowers will pay to such Lender, as the case may be, such additional amounts as will compensate it or its holding company for the reduction suffered; *provided*, that such additional amounts are also being assessed by such Lender against similarly situated borrowers under similar credit facilities.

3.7.3   <u>Libor Loan Reserves</u>.   If any Lender is required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits beyond those required of it on the Closing Date or, if later, the date it became a Lender, Borrowers shall pay additional interest to such Lender on each LIBOR Loan equal to the costs of such additional reserves allocated to the Loan by the Lender (as reasonably determined by it in good faith, which determination shall be conclusive).   The additional interest shall be due and payable on each interest payment date for the Loan; *provided*, *however*, that if the Lender notifies Borrowers (with a copy to Agent) of the additional interest less than 10 Business Days prior to the interest payment date, then such interest shall be payable 10 Business Days after Borrowers' receipt of the notice.

3.7.4   <u>Compensation</u>.   Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of its right to demand such compensation, but Borrowers shall not be required to compensate a Lender for any increased costs incurred or reductions suffered more than nine months prior to the date that the Lender notifies

-69-

**EXHIBIT 2**

Borrower Agent of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

     **3.8.**   <u>**Mitigation**</u>.   If any Lender requests compensation under **Section 3.7**, or if Borrowers are required to pay additional amounts with respect to a Lender under **Section 5.9**, then such Lender shall (at the request of the Borrowers) use reasonable efforts to designate a different Lending Office or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) reduce amounts payable in the future; and (b) would not subject the Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to it or unlawful. Borrowers shall pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

     **3.9.**   <u>**Funding Losses**</u>.   If for any reason (other than default by a Lender) (a) any Borrowing of, or conversion to or continuation of, a LIBOR Loan does not occur on the date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn), (b) any repayment or conversion of a LIBOR Loan occurs on a day other than the end of its Interest Period, (c) Borrowers fail to repay a LIBOR Loan when required hereunder, or (d) a Lender (other than a Defaulting Lender) is required to assign a LIBOR Loan prior to the end of its Interest Period pursuant to **Section 13.4**, then Borrowers shall pay to Administrative Agent its customary administrative charge and to each Lender all resulting losses and expenses (excluding loss of anticipated profits), including any loss or expense arising from liquidation or redeployment of funds or from fees payable to terminate deposits of matching funds. Lenders shall not be required to purchase Dollar deposits in any interbank or offshore Dollar market to fund any LIBOR Loan, but this Section shall apply as if each Lender had purchased such deposits.

     **3.10.**   <u>**Maximum Interest**</u>.   Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Applicable Law ("maximum rate"). If Administrative Agent or any Lender shall receive interest in an amount that exceeds the maximum rate, the excess interest shall be applied to the principal of the Obligations or, if it exceeds such unpaid principal, refunded to Borrowers. In determining whether the interest contracted for, charged or received by Administrative Agent or a Lender exceeds the maximum rate, such Person may, to the extent permitted by Applicable Law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

-70-

**EXHIBIT 2**

## SECTION 4.  LOAN ADMINISTRATION

**4.1.**   **Manner of Borrowing and Funding Loans**.

4.1.1   Notice of Borrowing.

(a)      Whenever Borrowers desire funding of a Borrowing of Loans, Borrower Agent shall give notice to the Administrative Agent in the form of a Notice of Borrowing.  Each such Notice of Borrowing must be received by Administrative Agent no later than 11:00 a.m. at least (i) one (1) Business Day prior to the requested Borrowing Date in the case of a Base Rate Loan, and (ii) three (3) Business Days prior to the requested Borrowing Date in the case of a LIBOR Loan (unless the Administrative Agent consents to any shorter time period).  Notices received after 11:00 a.m. shall be deemed received on the next Business Day.  Each Notice of Borrowing shall be irrevocable and shall specify (A) the amount of the Borrowing, which shall demonstrate a need for the amount requested to be borrowed on the applicable Borrowing Date, by reference to the Approved Budget then in effect (and, in the case of a Borrowing under Section 2.1.2(a)(ii) or otherwise in connection with the Wind Down, by reference to the Wind Down Budget portion of such Approved Budget), and shall identify the Permitted Disbursements thereunder with respect to which such funding is being requested, (B) the requested funding date (which must be a Business Day) (each, a "Borrowing Date"), (C) whether the Borrowing is to be made as Base Rate Loans or LIBOR Loans (*provided*, that each Borrowing in respect of which a Notice of Borrowing is delivered less than three (3) Business Days prior to the requested Borrowing Date shall be Base Rate Loans unless the Lenders agree in writing to permit such Loans to be made as LIBOR Loans), and (D) in the case of LIBOR Loans, the duration of the applicable Interest Period (which shall be deemed to be one (1) month if a different duration is not specified).

(b)      Unless payment is otherwise timely made by Borrowers, the becoming due of any Obligations (whether principal, interest, fees or other charges, including Extraordinary Expenses) shall be deemed to be a request for Base Rate Loans on the due date, in the amount of such Obligations.  The proceeds of such Loans shall be disbursed as direct payment of the relevant Obligation.  In addition, Administrative Agent may, at its option, during any Cash Dominion Period charge such Obligations against any operating, investment or other account of a Borrower maintained with Administrative Agent or any of its Affiliates (and in any such case will give Borrower Agent prompt notice thereof).

4.1.2   Funding by Lenders.  Each Lender shall timely honor its Commitment by funding its Pro Rata share of each Borrowing of Loans that is properly requested hereunder.  Administrative Agent shall notify Lenders of each Notice of Borrowing (or deemed request for a

-71-

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

Borrowing). Each Lender shall fund to Administrative Agent or to the Borrowers such Lender's Pro Rata share of the Borrowing to the account specified by Administrative Agent in immediately available funds not later than 5:00 p.m. on the requested funding date. Subject to its receipt of such amounts from Lenders, Administrative Agent shall disburse the proceeds of the Loans as directed by Borrower Agent in the applicable Notice of Borrowing. Unless Administrative Agent shall have received (in sufficient time to act) written notice from a Lender that it does not intend to fund its Pro Rata share of a Borrowing, Administrative Agent may assume that such Lender has deposited or promptly will deposit its share with Administrative Agent, and Administrative Agent may disburse a corresponding amount to Borrowers. If a Lender's share of any Borrowing or of any settlement pursuant to **Section 4.1.2** is not received by Administrative Agent, then Borrowers agree to repay to Administrative Agent **on demand** the amount of such share, together with interest thereon from the date disbursed until repaid, at the rate applicable to the Borrowing.

4.1.3   Notices.   Neither Administrative Agent nor any Lender shall have any liability for any loss suffered by a Borrower as a result of Administrative Agent or any Lender acting upon its understanding of telephonic or e-mailed instructions from a person believed in good faith by Administrative Agent or any Lender to be a person authorized to give such instructions on a Borrower's behalf.

**4.2.   Defaulting Lender**.

4.2.1   Defaulting Lender Adjustments.   Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)   Waivers and Amendments.   Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definitions of Required Lenders.

(b)   Defaulting Lender Waterfall.   Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to **Section 11** or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to **Section 11.3** shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, as the Borrower Agent may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower Agent, to be held in a Deposit Account and released pro rata in order to satisfy such Defaulting Lender's potential future funding

-72-

AMERICAS 110819944

**EXHIBIT 2**

obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided*, that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in **Section 6.2** were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with their Commitments without giving effect to clause (d) below.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this **Section 4.2.1(b)** shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

4.2.2   <u>Cure</u>.  If the Borrowers and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held pro rata by the Lenders in accordance with their Commitments (without giving effect to **Section 4.2.14.2.1(b)**), whereupon such Lender will cease to be a Defaulting Lender; *provided*, that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

4.2.3   <u>Loans</u>.  So long as any Lender is a Defaulting Lender, (i) the Administrative Agent shall not be required to fund any Loans unless it will have no Fronting Exposure after giving effect to such Loan.

-73-

AMERICAS 110819944

**EXHIBIT 2**

**4.3.** __Number and Amount of LIBOR Loans; Determination of Rate__.   Each Borrowing of LIBOR Loans when requested shall be in a minimum amount of $100,000 and in integral multiples of $10,000 (or such other amounts as agreed to by the Administrative Agent) (or, if lower, the lesser of (x) the remaining, unfunded amount of such Lender's New Money Loan Commitment, determined as of such time after giving effect to the aggregate amount of New Money Loans previously made by such Lender and (y) the amount authorized pursuant to the Final DIP Order).   No more than six (6) Borrowings of LIBOR Loans may be outstanding at any time, and all LIBOR Loans having the same length and beginning date of their Interest Periods shall be aggregated together and considered one Borrowing for this purpose.   Upon determining LIBOR for any Interest Period requested by Borrowers, Administrative Agent shall promptly notify Borrowers thereof by telephone or electronically and, if requested by Borrowers, shall confirm any telephonic notice in writing.

**4.4.** __Borrower Agent__.   Each Obligor hereby designates Strike ("__Borrower Agent__") as its representative and agent for all purposes under the Loan Documents, including requests for Loans and Letters of Credit, designation of interest rates, delivery or receipt of communications, preparation and delivery of financial reports, receipt and payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Loan Documents (including in respect of compliance with covenants), and all other dealings with Administrative Agent or any Lender.   Borrower Agent hereby accepts such appointment.   Administrative Agent and Lenders shall be entitled to rely upon, and shall be fully protected in relying upon, any notice or communication (including any notice of borrowing) delivered by Borrower Agent on behalf of any Obligor.   Administrative Agent and Lenders may give any notice or communication with an Obligor hereunder to Borrower Agent on behalf of such Obligor.   Each of Administrative Agent and Lenders shall have the right, in its discretion, to deal exclusively with Borrower Agent for any or all purposes under the Loan Documents.   Each Obligor agrees that any notice, election, communication, representation, agreement or undertaking made on its behalf by Borrower Agent shall be binding upon and enforceable against it.

**4.5.** __One Obligation__.   The Loans and other Obligations constitute one general obligation of Borrowers and are secured by Administrative Agent's Lien on all Collateral; *provided*, *however*, that Administrative Agent and each Lender shall be deemed to be a creditor of, and the holder of a separate claim against, each Borrower to the extent of any Obligations jointly or severally owed by such Borrower.

**4.6.** __Effect of Termination__.   On the effective date of the termination of all Commitments, the Obligations (other than Remaining Obligations) shall be immediately due and payable.   Until Full Payment of the Obligations, all undertakings of Borrowers contained in the Loan Documents shall continue, and Administrative Agent shall retain its Liens in the Collateral and all of its rights and remedies under the Loan Documents.   **Sections 3.7, 5.5, 5.9, 5.10, 12, 14.2,**

-74-

**EXHIBIT 2**

this Section, and each indemnity or waiver given by an Obligor or Lender in any Loan Document, shall survive Full Payment of the Obligations.

## SECTION 5.  PAYMENTS

**5.1.   General Payment Provisions**.   Except in the case of any amounts that are expressly permitted to be Paid in Kind hereunder (including as set forth in **Section 3.1.1**), all payments of Obligations shall be made in Dollars, without offset, counterclaim or defense of any kind, free of (and without deduction for) any Taxes (except as otherwise provided herein), and in immediately available funds, not later than 12:00 noon on the due date.  Any payment after such time may be deemed by the Administrative Agent made on the next Business Day.  Any payment of a LIBOR Loan prior to the end of its Interest Period shall be accompanied by all amounts due under **Section 3.9** to the extent then known to the Borrowers, or the Borrowers shall thereafter promptly pay such amounts when ascertained by the Lenders.  Borrowers agree that, during the continuation of an Event of Default, Administrative Agent shall have the continuing, exclusive right to apply and reapply payments and proceeds of Collateral against the Obligations, in such manner as Administrative Agent deems advisable, but whenever possible, any prepayment of Loans shall be applied first to Base Rate Loans and then to LIBOR Loans.

**5.2.   Voluntary Prepayments**.   Loans may be prepaid from time to time, without penalty or premium, subject to the requirements with respect to the Termination Payment, and **Section 3.9** and **Section 5.12**.  The Administrative Agent shall elect whether any prepayment shall be applied first to Base Rate Loans or to LIBOR Loans.

**5.3.   Mandatory Prepayments**.

5.3.1   Anti-hoarding.  On and after the earlier of (i) the Final DIP Order Date and (ii) the first Borrowing Date of New Money Loans occurring on or after the Closing Date, if, for any reason, Liquidity exceeds $10,000,000 for any two (2) consecutive Business Day period (the amount of such excess, the "Excess Cash Amount"), the Borrowers shall promptly (and, in any event, by 5 p.m. (New York City time) on the second (2nd) Business Day immediately after the second (2nd) Business Day in such period prepay the Loans in an aggregate principal amount equal to the Excess Cash Amount (each payment hereunder, an "Excess Cash Prepayment").  Notwithstanding anything to contrary contained herein, in no event shall any prepayment pursuant to this Section 5.3.1 reduce the then outstanding New Money Loan Commitment; provided, that, notwithstanding any Excess Cash Prepayment, the Lenders shall not be required to make any Loans unless and until all conditions precedent shall have been satisfied or waived in accordance with Section 6.2.

-75-

AMERICAS 110819944

**EXHIBIT 2**

5.3.2   <u>Termination Date</u>.  On the Termination Date, Borrowers shall repay all outstanding Loans and other Obligations in full in cash to the extent required to constitute Full Payment hereunder.

5.3.3   <u>Change of Control</u>.   Immediately upon any Change of Control, the Borrowers shall (i) prepay, or cause to be prepaid, the Loans (together with the Termination Payment) and other Obligations, and (ii) terminate, or cause to be terminated, the Commitments, in each case, in an amount that would cause the Full Payment thereof; *provided*, that, pending prepayment of the Loans in accordance herewith, and at all times until Full Payment, all cash, Cash Equivalents and other funds and proceeds thereof shall be held in a Deposit Account subject to a Deposit Account Control Agreement in favor of the Administrative Agent, and no payments, withdrawals, transfers or disbursements shall be made or permitted to be made therefrom at any time (whether or not such payment, withdrawal, transfer or disbursement is otherwise in accordance with the Approved Budget or otherwise permitted hereunder).

5.3.4   [Reserved].

5.3.5   <u>Asset Dispositions</u>.  The Borrowers shall prepay the Loans (together with the Termination Payment thereon) as hereinafter provided in an aggregate amount equal to 100% of the Net Cash Proceeds received by any Obligor or any Subsidiary from all Asset Dispositions and Involuntary Dispositions within 3 calendar days of the date of such Asset Disposition or Involuntary Disposition; *provided*, that, pending application of such amounts towards prepayment of the Loans in accordance herewith, all cash, Cash Equivalents and other funds and proceeds thereof shall be held in a Deposit Account subject to a Deposit Account Control Agreement in favor of the Administrative Agent; *provided*, *further*, that, the foregoing shall not be construed as permitting, and shall not operate as a consent or waiver with respect to, any Asset Disposition that would not otherwise be permitted hereunder, or any Default or Event of Default resulting from the same, or any consequence thereof.  For the avoidance of doubt, a prepayment of Loans shall be deemed to be required pursuant to this Section 5.3.5 in connection with proceeds of any Asset Disposition (including any Additional Specified Vehicle Disposition) or Involuntary Disposition, whether or not the receipt of any such proceeds shall (directly or indirectly) cause Liquidity to exceed $10,000,000 (and, even in such event, Loan prepayments shall be governed by, and made in accordance with, this Section 5.3.5, and not in accordance with Section 5.3.1).

5.3.6   <u>Debt Issuance</u>.  Immediately upon the receipt by any Obligor or Subsidiary thereof of the Net Cash Proceeds of any Debt Issuance, the Borrower shall prepay the Loans (together with the Termination Payment thereon) as hereinafter provided in an aggregate amount equal to 100% of such Net Cash Proceeds; *provided*, that, pending application of such amounts towards prepayment of the Loans in accordance herewith, all funds shall be held in a Deposit Account subject to a Deposit Account Control Agreement in favor of the Administrative Agent.

-76-

AMERICAS 110819944

**EXHIBIT 2**

5.3.7   <u>Effect of Prepayments</u>.   Notwithstanding limiting anything else herein, except prepayments made pursuant to Section 5.3.1, no other prepayments or repayments of any Loans (including pursuant to this Section 5.3) shall (or shall be deemed to), cause or result in any increase to, or replenish or give rise to any increase to, any Commitment, and the Borrowers shall not be permitted to request to borrow additional Loans as a result of any such prepayment or repayment.

5.4.   **Payment of Other Obligations**.   Extraordinary Expenses and other Obligations (except the Loans (including interest thereon) and other Obligations payable pursuant to **Section 5.3.1** or as otherwise required hereby (including pursuant to **Section 5.12**)) shall be paid in cash by Borrowers as provided in the Loan Documents or, if no payment date is specified, within three (3) Business Days after written demand from the Administrative Agent (which may be via e-mail).

5.5.   **Marshaling; Payments Set Aside**.   None of Administrative Agent or Lenders shall be under any obligation to marshal any assets in favor of any Obligor or against any Obligations. If any payment by or on behalf of Borrowers is made to Administrative Agent or any Lender, or Administrative Agent or any Lender exercises a right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other Person, then to the extent of such recovery, the Obligation originally intended to be satisfied, and all Liens, rights and remedies relating thereto, shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

5.6.   **Application and Allocation of Payments**.

5.6.1   <u>Application</u>.   Payments made by Borrowers hereunder shall be applied (a) first, as specifically required hereby; (b) second, to Obligations then due and owing; (c) third, to other Obligations specified by Borrowers; and (d) fourth, as determined by Administrative Agent in its good faith reasonable discretion.

5.6.2   <u>Post-Default Allocation</u>.   Notwithstanding anything in any Loan Document to the contrary, during an Event of Default, monies to be applied to the Obligations, whether arising from payments by Obligors, realization on Collateral, setoff or otherwise, shall be allocated as follows:

(a)   <u>first</u>, to all fees, indemnification, costs and expenses, including Extraordinary Expenses, owing to Administrative Agent;

-77-

AMERICAS 110819944

**EXHIBIT 2**

(b)    second, to all amounts owing to Administrative Agent on any Loans fronted by it for the benefit of a Lender, Protective Advances, and Loans and participations that a Defaulting Lender has failed to settle or fund;

(c)    third, to all Obligations constituting fees, indemnification, costs or expenses owing to Lenders;

(d)    fourth, to all Obligations constituting interest; and

(e)    last, to all remaining Obligations.

Amounts shall be applied to payment of each category of Obligations only after full payment of all preceding categories. If amounts are insufficient to satisfy a category, Obligations in the category shall be paid on a pro rata basis. Monies and proceeds obtained from an Obligor shall not be applied to its Excluded Swap Obligations, but appropriate adjustments shall be made with respect to amounts obtained from other Obligors to preserve the allocations in any applicable category. If the provider fails to deliver the calculation within five days following request, Administrative Agent may assume the amount is zero. The allocations set forth in this Section are solely to determine the rights and priorities among Secured Parties, and may be changed by agreement among them without the consent of any Obligor. This Section is not for the benefit of or enforceable by any Obligor, and each Borrower irrevocably waives the right to direct the application of any payments or Collateral proceeds subject to this Section.

5.6.3    Erroneous Application. Administrative Agent shall not be liable for any application of amounts made by it in good faith and, if any such application is subsequently determined to have been made in error, the sole recourse of any Lender or other Person to which such amount should have been made shall be to recover the amount from the Person that actually received it (and, if such amount was received by any Lender, such Lender hereby agrees to return it).

5.7.    **Dominion Account**. Subject to the DIP Order, the ledger balance in the main Dominion Account as of the end of a Business Day shall (a) during a Cash Dominion Period, be applied to the Obligations at the beginning of the next Business Day and (b) at all other times, be immediately transferred to the Primary Operating Account. If, as a result of such application, a credit balance exists, the balance shall not accrue interest in favor of Borrowers and shall be made available to Borrowers as long as no Event of Default exists.

5.8.    **Account Stated**. Administrative Agent shall maintain in accordance with its usual and customary practices account(s) evidencing the Debt of Borrowers hereunder. Any failure of Administrative Agent to record anything in a loan account, or any error in doing so, shall not limit or otherwise affect the obligation of Borrowers to pay any amount owing hereunder. Entries made

-78-

EXHIBIT 2

in a loan account shall constitute presumptive evidence, absent manifest error, of the information contained therein.

**5.9.    Taxes**.

5.9.1    Payments Free of Taxes.

(a)     All payments by any Obligor under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If Applicable Law (as determined by the applicable withholding agent in its good faith discretion) requires the deduction or withholding of any Tax from any such payment, then the applicable withholding agent shall be entitled to make such deduction or withholding based on information and documentation provided pursuant to **Section 5.10**.

(b)     If the applicable withholding agent is required by any Applicable Law to withhold or deduct Taxes, including backup withholding and withholding taxes, from any payment (including amounts payable under this **Section 5.9**), then (i) the applicable withholding agent shall pay the full amount that it determines must be withheld or deducted to the relevant Governmental Authority pursuant to the Applicable Law, and (ii) to the extent the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Obligor (including amounts payable under this **Section 5.9**) shall be increased as necessary so that the Lender (or the Administrative Agent in the case where the Administrative Agent receives the payment for its own account) receives an amount equal to the sum it would have received had no such withholding or deduction been made.

5.9.2    Payment of Other Taxes.  Without limiting the foregoing, Borrowers shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at Administrative Agent's option, timely reimburse Administrative Agent for payment of, any Other Taxes.

5.9.3    Tax Indemnification.  Each Borrower shall indemnify and hold harmless, on a joint and several basis, the Administrative Agent or any Lender against any Indemnified Taxes (including those imposed or asserted on or attributable to amounts payable under this Section) payable or paid by a recipient or required to be withheld or deducted from a payment to a recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  Each Borrower shall make payment within 10 days after demand for any amount or liability payable under this Section.  A certificate as to the amount of such payment or liability delivered to Borrowers by a Lender (with a copy to Administrative

-79-

AMERICAS 110819944

**EXHIBIT 2**

Agent), or by Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

5.9.4   Evidence of Payments.  If Administrative Agent or an Obligor pays any Taxes pursuant to this Section, then upon request, Administrative Agent shall deliver to Borrower Agent or Borrower Agent shall deliver to Administrative Agent, respectively, a copy of a receipt issued by the appropriate Governmental Authority evidencing the payment, a copy of any return required by Applicable Law to report the payment, or other evidence of payment reasonably satisfactory to Administrative Agent or Borrower Agent, as applicable.

5.9.5   Treatment of Certain Refunds.  Unless required by Applicable Law, at no time shall Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, nor have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of a Lender.  If a Lender or other recipient of the payments from an Obligor under any Loan Document determines in its discretion that it has received a refund of any Taxes as to which it has been indemnified by Borrowers or with respect to which a Borrower has paid additional amounts pursuant to this Section, it shall pay Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrowers with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided*, that Borrowers agree, upon request by the recipient, to repay the amount paid over to Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the recipient if the recipient is required to repay such refund to the Governmental Authority.  Notwithstanding anything herein to the contrary, no recipient shall be required to pay any amount to Borrowers if such payment would place the recipient in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  In no event shall Administrative Agent or any recipient be required to make its tax returns (or any other information relating to its taxes that it deems confidential) available to any Obligor or other Person.

5.9.6   Survival.  Each party's obligations under **Sections 5.9** and **5.10** shall survive the resignation or replacement of Administrative Agent or any assignment of rights by or replacement of a Lender, the termination of the Commitments, and the repayment, satisfaction, discharge or Full Payment of any Obligations.

### 5.10.   **Lender Tax Information**.

5.10.1 Status of Lenders.  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments of Obligations shall deliver to Borrowers

-80-

**EXHIBIT 2**

and Administrative Agent, at the time or times reasonably requested by Borrowers or Administrative Agent, such properly completed and executed documentation reasonably requested by Borrowers or Administrative Agent or prescribed by Applicable Law as will permit such payments to be made without or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Borrowers or Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrowers or Administrative Agent to enable them to determine whether such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding the foregoing, such documentation (other than documentation described in **Sections 5.10.2(a)**, **(b)** and **5.10.2(d)**) shall not be required if a Lender reasonably believes delivery of the documentation would subject it to any material unreimbursed cost or expense or would materially prejudice its legal or commercial position.

       5.10.2   <u>Documentation</u>.  Without limiting the foregoing, if any Borrower is a U.S. Person,

       (a)     Any Lender that is a U.S. Person shall deliver to Borrowers and Administrative Agent on or prior to the date on which such Lender becomes a Lender hereunder (and from time to time thereafter upon reasonable request of Borrowers or Administrative Agent), executed copies of IRS Form W-9, certifying that such Lender is exempt from U.S. federal backup withholding Tax;

       (b)     Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender hereunder (and from time to time thereafter upon reasonable request of Borrowers or Administrative Agent), whichever of the following is applicable:

       (i)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E or W-8BEN (as applicable) establishing an exemption from or reduction of U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty, and (y) with respect to other payments under the Loan Documents, IRS Form W-8BEN-E or IRS Form W-8BEN (as applicable) establishing an exemption from or reduction of U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

       (ii)     executed copies of IRS Form W-8ECI;

       (iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate

-81-

**EXHIBIT 2**

substantially in the form of **Exhibit F** hereto, to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10-percent shareholder" of a Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to a Borrower, as described in Section 881(c)(3)(C) of the Code ("U.S. Tax Compliance Certificate"), and (y) executed copies of IRS Form W-8BEN-E or W-8BEN (as applicable); or

(iv)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E or W8-BEN, a U.S. Tax Compliance Certificate substantially in the form of **Exhibit F** hereto, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided*, that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in form of **Exhibit F** hereto, on behalf of each such direct and indirect partner;

(c)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender hereunder (and from time to time thereafter upon the reasonable request of Borrowers or Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit Borrowers or Administrative Agent to determine the withholding or deduction required to be made; and

(d)     if payment of an Obligation to a Lender would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code), such Lender shall deliver to Borrowers and Administrative Agent at the time(s) prescribed by law and otherwise as reasonably requested by Borrowers or Administrative Agent such documentation prescribed by Applicable Law (including Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrowers or Administrative Agent as may be necessary for them to comply with their obligations under FATCA and to determine whether such Lender has complied with its obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (d), "FATCA" shall include any amendments made to FATCA after the date hereof.

-82-

**EXHIBIT 2**

5.10.3 <u>Redelivery of Documentation</u>.  If any form or certification previously delivered by a Lender pursuant to this Section expires or becomes obsolete or inaccurate in any respect, such Lender shall promptly update the form or certification or notify Borrowers and Administrative Agent in writing of its inability to do so.

5.10.4 <u>Lenders' Authorization</u>.  Each Lender hereby authorizes the Administrative Agent to deliver to the Obligors and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to **Section 5.10**.

### 5.11.  **<u>Nature and Extent of Each Borrower's Liability</u>**.

5.11.1 <u>Joint and Several Liability</u>.  Each Borrower agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to Administrative Agent and Lenders the prompt payment and performance of, all Obligations and all agreements under the Loan Documents, except its Excluded Swap Obligations.  Each Borrower agrees that its guaranty obligations hereunder constitute a continuing guaranty of payment and not of collection, that such obligations shall not be discharged until Full Payment of the Obligations, and that such obligations are absolute and unconditional, irrespective of (a) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Obligor is or may become a party or be bound; (b) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by Administrative Agent or any Lender with respect thereto; (c) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any security or guaranty for the Obligations or any action, or the absence of any action, by Administrative Agent or any Lender in respect thereof (including the release of any security or guaranty); (d) the insolvency of any Obligor; (e) any election by Administrative Agent or any Lender in an Insolvency Proceeding for the application of Section 1111(b)(2) of the Bankruptcy Code; (f) any borrowing or grant of a Lien by any other Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (g) the disallowance of any claims of Administrative Agent or any Lender against any Obligor for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (h) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except a defense of partial payment and Full Payment of all Obligations.

5.11.2 <u>Waivers</u>.

(a)     Each Borrower expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel Administrative Agent or Lenders to marshal assets or to proceed against any Obligor, other Person or security for the payment or performance of any Obligations before, or as a

-83-

EXHIBIT 2

condition to, proceeding against such Borrower. Each Borrower waives all defenses available to a surety, guarantor or accommodation co-obligor other than Full Payment of all Obligations and waives, to the maximum extent permitted by law, any right to revoke any guaranty of any Obligations as long as it is a Borrower. It is agreed among each Borrower, Administrative Agent and Lenders that the provisions of this **Section 5.11** are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Administrative Agent and Lenders would decline to make Loans and issue Letters of Credit. Each Borrower acknowledges that its guaranty pursuant to this Section is necessary to the conduct and promotion of its business, and can be expected to benefit such business.

(b)       Administrative Agent and Lenders may, in their discretion, during the continuation of an Event of Default, pursue such rights and remedies as they deem appropriate, including realization upon Collateral or any Real Estate by judicial foreclosure or nonjudicial sale or enforcement, to the extent permitted under Applicable Law and this Agreement, without affecting any rights and remedies under this **Section 5.11**. If, in taking any action in connection with the exercise of any rights or remedies, Administrative Agent or any Lender shall forfeit any other rights or remedies, including the right to enter a deficiency judgment against any Borrower or other Person, whether because of any Applicable Laws pertaining to "election of remedies" or otherwise, each Borrower consents to such action and, to the extent permitted under Applicable Law, waives any claim based upon it, even if the action may result in loss of any rights of subrogation that any Borrower might otherwise have had. To the extent permitted under Applicable Law, any election of remedies that results in denial or impairment of the right of Administrative Agent or any Lender to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Obligations. To the extent permitted under Applicable Law, each Borrower waives all rights and defenses arising out of an election of remedies, such as nonjudicial foreclosure with respect to any security for the Obligations, even though that election of remedies destroys such Borrower's rights of subrogation against any other Person. To the extent permitted under Applicable Law, Administrative Agent may bid all or a portion of the Obligations at any foreclosure, trustee or other sale, including any private sale, and the amount of such bid need not be paid by Administrative Agent but shall be credited against the Obligations. To the extent permitted under Applicable Law, the amount of the successful bid at any such sale, whether Administrative Agent or any other Person is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral, and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this **Section 5.11**, notwithstanding that any present or future law or court decision may have the effect of reducing the amount of any

-84-

AMERICAS 110819944

**EXHIBIT 2**

deficiency claim to which Administrative Agent or any Lender might otherwise be entitled but for such bidding at any such sale.

5.11.3 <u>Extent of Liability; Contribution</u>.

(a)     Notwithstanding anything herein to the contrary, each Borrower's liability under this **Section 5.11** shall be limited to the greater of (i) all amounts for which such Borrower is primarily liable, as described below, and (ii) such Borrower's Allocable Amount.

(b)     If any Borrower makes a payment under this **Section 5.11** of any Obligations (other than amounts for which such Borrower is primarily liable) (a "<u>Guarantor Payment</u>") that, taking into account all other Guarantor Payments previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Guarantor Payments in the same proportion that such Borrower's Allocable Amount bore to the total Allocable Amounts of all Borrowers, then such Borrower shall be entitled to receive contribution and indemnification payments from, and to be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.   The "<u>Allocable Amount</u>" for any Borrower shall be the maximum amount that could then be recovered from such Borrower under this **Section 5.11** without rendering such payment voidable under Section 548 of the Bankruptcy Code or under any applicable state fraudulent transfer or conveyance act, or similar statute or common law.

(c)     Nothing contained in this **Section 5.11** shall limit the liability of any Borrower to pay Loans made directly or indirectly to that Borrower (including Loans advanced to any other Borrower and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower), and all accrued interest, fees, expenses and other related Obligations with respect thereto, for which such Borrower shall be primarily liable for all purposes hereunder.   Administrative Agent shall have the right, at any time that a Default exists, to condition Loans upon a separate calculation of borrowing availability for each Borrower and to restrict the disbursement and use of such Loans to such Borrower.

(d)     Each Obligor that is a Qualified ECP when its guaranty of or grant of Lien as security for a Swap Obligation becomes effective hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide funds or other support to each Specified Obligor with respect to such Swap Obligation as may be needed by such Specified Obligor from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified

-85-

ECP's obligations and undertakings under this **Section 5.11** voidable under any applicable fraudulent transfer or conveyance act).  The obligations and undertakings of each Qualified ECP under this Section shall remain in full force and effect until Full Payment of all Obligations.  Each Obligor intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support or other agreement" for the benefit of, each Obligor for all purposes of the Commodity Exchange Act.

5.11.4   <u>Joint Enterprise</u>.  Each Borrower has requested that Administrative Agent and Lenders make this credit facility available to Borrowers on a combined basis, in order to finance Borrowers' business most efficiently and economically.  Borrowers' business is a mutual and collective enterprise, and the successful operation of each Borrower is dependent upon the successful performance of the integrated group.  Borrowers believe that consolidation of their credit facility will enhance the borrowing power of each Borrower and ease administration of the DIP Facility, all to their mutual advantage.  Borrowers acknowledge that Administrative Agent's and Lenders' willingness to extend credit and to administer the Collateral on a combined basis hereunder is done solely as an accommodation to Borrowers and at Borrowers' request.

5.11.5   <u>Subordination</u>.  Each Borrower hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Obligor, howsoever arising, to the Full Payment of all Obligations, *provided*, that, for the avoidance of doubt, so long as no Event of Default has occurred and is continuing, nothing in this **Section 5.11.5** shall prohibit any Obligor from making or accepting payments on any such claims.

**5.12.**   **Termination Payment**.

(a)   As additional consideration for structuring and arranging the DIP Facility, committing to the New Money Loan Commitments, and on account of such other accommodations provided to the Borrowers by the Lenders, and otherwise in connection with the transactions occurring pursuant hereto, Borrowers shall be liable to the Lenders to pay the Termination Payment (as set forth below) in connection with any Termination Payment Triggering Event.  Each Termination Payment shall be deemed earned in full immediately and automatically upon such Lender executing this Agreement, and shall be Paid in Kind  immediately upon the occurrence of any Termination Payment Triggering Event.

(b)   If any Termination Payment becomes due and payable as set forth in this **Section 5.12**, then the Termination Payment, as applicable, shall immediately and without further action constitute part of the Obligations payable by the Borrower (and guaranteed by the Guarantors) in respect of the Loans, which Obligations are guaranteed by the Guarantors and secured by the Collateral, and constitutes liquidated damages, not unmatured interest or a penalty,

-86-

AMERICAS 110819944

**EXHIBIT 2**

as the actual amount of damages to the Lenders as a result of the relevant event set forth in clause (a) of this **Section 5.12** would be impracticable and extremely difficult to ascertain. Without limiting the generality of the foregoing, it is further understood and agreed that (i) upon the occurrence of any event set forth in this **Section 5.12**, the Termination Payment shall be automatically and immediately due and payable as of the earliest such date, and shall constitute part of the Obligations payable by the Borrower (and guaranteed by the Guarantors) in respect of the Loans, which Obligations are secured by the Collateral, (ii) the Termination Payment shall also be automatically and immediately due and payable if, and upon such time as, any Loans or Obligations are satisfied, released or discharged by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by any other means at a time when any Termination Payment would otherwise have been due and payable in accordance with this paragraph, and the Termination Payment shall constitute a part of the Obligations at the time. THE BORROWER AND EACH GUARANTOR EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING TERMINATION PAYMENT IN CONNECTION WITH ANY PREPAYMENT, ACCELERATION OR MATURITY OF THE LOANS OR THE COMMENCEMENT OF ANY INSOLVENCY PROCEEDING. The Borrower and each Guarantor expressly agrees (to the fullest extent that it may lawfully do so) that: (A) the Termination Payment are reasonable and are the product of an arm's-length transaction between sophisticated business people, ably represented by counsel; (B) the Termination Payment shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower and Guarantors giving specific consideration in this transaction for such agreement to pay the Termination Payment; and (D) the Borrower and each Guarantor shall each be estopped hereafter from claiming differently than as agreed to in this paragraph. The Obligors expressly acknowledge that their agreement to pay the Termination Payment hereunder is a material inducement to the Lenders to provide the DIP Facility and the Commitments, and to make the Loans and enter into this Agreement.

(c)    The parties hereto agree (x) to treat any Termination Payment for U.S. federal income tax purposes as an increase to the yield of the applicable Loans, taxable as original issue discount (i.e., interest) over the remaining term of such Loans in accordance with the applicable rules under the Code and the U.S. Treasury Regulations thereunder and (y) that no U.S. federal, state or local withholding tax should be withheld or deducted on account of any Termination Payment.

## SECTION 6.  <u>CONDITIONS PRECEDENT</u>

**6.1.    <u>Conditions Precedent to Closing Date and Initial Borrowing</u>**.  The occurrence of the Closing Date, and the effectiveness of this Agreement and of the Lenders' obligations to

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

make Initial Loans hereunder on the Closing Date, are subject to the satisfaction (or waiver by the Administrative Agent and the Required Lenders) of the following conditions precedent, in addition to the conditions precedent set forth in **Section 6.2**:

6.1.1   Restructuring Transaction Related Deliverables:

(a)   (i) the Obligors and the other parties thereto shall have entered into the Stalking Horse Agreement in accordance with the requirements of Restructuring Support Agreement, and a fully executed copy of the Stalking Horse Agreement shall have been delivered to the Administrative Agent, and (ii) on and as of the Closing Date, the Stalking Horse Agreement shall be in full force and effect, and no breach or default thereunder shall have occurred or be continuing;

(b)   the Obligors shall have commenced the Chapter 11 Cases in the Bankruptcy Court in accordance with the requirements of Restructuring Support Agreement no later than (and Petition Date shall have occurred on) December 6, 2021;

(c)   each Obligor shall be a debtor and debtor-in-possession in the Chapter 11 Cases, in each case, in accordance with the requirements of Restructuring Support Agreement and as otherwise satisfactory to the Required Lenders;

(d)   not later than the date that is one (1) Business Day after the Petition Date, the Obligors shall have filed with the Bankruptcy Court (i) the First Day Motions, the DIP Motion and the Sale Procedures Motion, in each case, no later than the Petition Date, and (ii) all other motions and other documents required to be filed with or submitted to the Bankruptcy Court in connection with the Chapter 11 Cases, by such time as required pursuant to the Bankruptcy Code (or as requested by the Bankruptcy Court), in a form and in substance reasonably satisfactory to the Required Lenders;

(e)   not later than the date that is three (3) calendar days following the Petition Date, all orders relating to the First Day Motions, the DIP Motion (including the Interim DIP Order) and the Sale Procedures Motion shall have been entered by the Bankruptcy Court;

(f)   the Obligors shall have established a cash management system subject to the entry of the DIP Orders satisfactory to the Obligors and the Required Lenders;

(g)   the Obligors shall have made no payments after the Petition Date on account of any Debt or other obligations arising prior to the Petition Date unless such payment is made pursuant to a Chapter 11 Order and subject to Permitted Variances, in accordance with the Approved Budget;

-88-

**EXHIBIT 2**

(h)       the Interim DIP Order (i) shall have been entered by the Bankruptcy Court in the Chapter 11 Cases not later than 3 calendar days after the Petition Date, (ii) shall be in full force and effect on the Closing Date, (iii) shall not have been vacated or reversed, (iv) shall not be subject to a stay, and (v) shall not have been modified or amended in any respect without the prior written consent of the Required Lenders;

(i)       the Interim DIP Order shall be effective to create, in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid, binding, enforceable and fully and automatically perfected Lien on the Collateral, on the basis and with the priority set forth therein;

(j)       the Restructuring Support Agreement shall be in full force and effect on and as of the Closing Date, and no Termination Event (as defined in the Restructuring Support Agreement) or notice delivered by any party thereto in respect thereof shall have occurred;

(k)       each Milestone required to be satisfied prior to the Closing Date shall have been satisfied (or waived) in accordance with the terms hereof; and

(l)       the Final DIP Order shall not have become the subject of any appeal or challenge.

6.1.2    Administrative Agent shall have received a copy of this Agreement and each other Loan Document, in each case, duly executed and delivered to Administrative Agent by each of the signatories thereto, and each of the foregoing shall be in full force and effect on the Closing Date.

6.1.3    Administrative Agent shall have received the Wind Down Budget.

6.1.4    Administrative Agent and the Lenders shall have received from the Obligors the Initial Budget.

6.1.5    Administrative Agent shall have received certificates, in form and substance satisfactory to it, from a Senior Officer of the Borrowers certifying that, immediately after giving effect to the incurrence of the Initial Loans and the consummation of the transactions hereunder on the Closing Date, (i) no Default or Event of Default exists; (ii) the representations and warranties set forth in **Section SECTION 9** are true and correct in all material respects (or with respect to representations qualified by materiality, in all respects) on and as of the Closing Date (or if such representation or warranty is as of an earlier date, as of such earlier date) and (iii) the conditions set forth in **Section 6.2** are satisfied.

-89-

**EXHIBIT 2**

6.1.6   Administrative Agent shall have received a certificate of a duly authorized officer of the Borrowers, certifying (i) that the copies of each Obligor's Organic Documents attached thereto are true and complete, and are in full force and effect, without amendment except as shown; (ii) that an attached copy of resolutions authorizing execution and delivery of the Loan Documents is true and complete, and that such resolutions are in full and effect, were duly adopted, have not been amended, modified or revoked, and constitute all resolutions adopted with respect to this credit facility; and (iii) to the title, name and signature of each officer of each Obligor authorized to sign the Loan Documents.   Administrative Agent may conclusively rely on this certificate until it is otherwise notified by the applicable Obligor or the Borrower in writing.

6.1.7   Administrative Agent shall have received a written opinion of White & Case LLP, in form and substance reasonably satisfactory to Administrative Agent.

6.1.8   Administrative Agent shall have received (a) copies of the charter documents of each Obligor, certified by the Secretary of State or other appropriate official of such Obligor's jurisdiction of organization as of a date no earlier than 30 days prior to the Petition Date by the Secretary of State of the state of the applicable Obligor's organization, and (b) good standing certificates for each Obligor, issued by the Secretary of State or other appropriate official of (i) such Obligor's jurisdiction of organization and each jurisdiction where such Obligor's conduct of business or ownership of property necessitates qualification where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect.

6.1.9   Administrative Agent shall have received certificates of insurance for the insurance policies carried by the Obligors, all in compliance with the Loan Documents, each of which shall have been endorsed or otherwise amended to include a customary lender's loss payable endorsement and to name the Administrative Agent as additional insured, in form and substance reasonably satisfactory to the Required Lenders.

6.1.10   Borrowers shall have paid (a) all fees, costs, expenses and other amounts required to be paid to Administrative Agent and Lenders on the Closing Date, and (b) all accrued and unpaid out-of-pocket fees and costs of the Prepetition Secured Parties (including their counsel and other advisors) payable pursuant to the Prepetition Credit Facilities shall have been paid (or shall be paid from the proceeds of the Initial Loans).

6.1.11   All governmental and third party approvals necessary in connection with the Transactions and the DIP Facility and financing contemplated hereby (including shareholder approvals, if any) shall have been obtained on reasonably satisfactory terms and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the Transactions or the financing thereof or any of the transactions contemplated hereby.

-90-

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

6.1.12  The Obligors and their Subsidiaries shall have (A) no outstanding Debt except as permitted pursuant to **Section 10.2.1**, and (B) no outstanding preferred stock except as set forth on **Schedule 9.1.4**.

6.1.13  All legal (including tax implications) and regulatory matters shall be reasonably satisfactory to Administrative Agent and Lenders, including but not limited to compliance with all applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve System.

6.1.14  The absence of any injunction or temporary restraining order which, in the judgment of Administrative Agent exercising Permitted Discretion, would prohibit the making of the Loans or the consummation of the Transactions; and the absence of any litigation which would reasonably be expected to result in a Material Adverse Effect.

6.1.15  Satisfactory results of due diligence investigation of Holdings and its subsidiaries (including without limitation insurance coverage and contingent liabilities (e.g., environmental, retiree medical benefits, ERISA, etc. and contractual obligations)).

6.1.16  Administrative Agent and the Lenders shall have received, at least five (5) Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

**6.2.**  **Conditions Precedent to All Borrowings**.  No Loans shall be made (or deemed made) at any time, and the Lenders shall not be required to fund any Loan requested by the Borrowers, unless, in each case, the following conditions are satisfied (or waived by the Administrative Agent and the Required Lenders) prior to (or concurrently with) the making (or deemed making) of such Loan on the Borrowing Date relating thereto:

6.2.1  The Closing Date shall have occurred.  No Default or Event of Default shall exist at the time of, or immediately result from, the making of such Loan.

6.2.2  The representations and warranties of each Obligor in the Loan Documents shall be true and correct in all material respects (or, with respect to representations and warranties qualified by materiality, in all respects) on the date of, and upon giving effect to, the making of such Loan (except for representations and warranties that expressly relate to an earlier date).

6.2.3  There shall be an Approved Budget in full force and effect on and as of each of (a) the Borrowing Date for such Loan and (b) the time that such Loan is funded; provided, that, if such Borrowing comprises New Money Loans intended to fund any amounts in connection with the Wind Down, the Approved Budget required hereunder shall contain the Wind Down Budget.

-91-

**EXHIBIT 2**

6.2.4    The Interim DIP Order (in the case of Loans made prior to the entry of the Final DIP Order) or the Final DIP Order (in the case of Loans made after the entry of the Final DIP Order) shall be in full force and effect, and shall not have been reversed, vacated or stayed, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

6.2.5    The Restructuring Support Agreement shall be in full force and effect, and no Termination Event (as defined in the Restructuring Support Agreement) or notice delivered by any party thereto in respect thereof shall have occurred or be continuing.

6.2.6    The making of such Loan shall not violate any Applicable Laws and shall not be enjoined, temporarily, preliminarily or permanently.

6.2.7    There shall not have occurred since the Petition Date any development or event which, individually or in the aggregate with other such circumstances, has had or could reasonably be expected to have, a Material Adverse Effect (except to the extent relating to the Chapter 11 Cases).

6.2.8    In the case of a Borrowing of any New Money Loans, in addition to the above, the following shall be satisfied (or waived as provided herein):

(a)    the aggregate principal amount of all New Money Loans requested by the Borrowers on such Borrowing Date shall not exceed the amount identified in the Approved Budget as being required by the Obligors and their Subsidiaries to finance Permitted Disbursements during the period specified in the Approved Budget (unless such Lender consents thereto); provided, however, that any amount prepaid pursuant to Section 5.3.1 during such period shall increase such amount requested by an equivalent amount;

(b)    the making of such New Money Loans, and the use of proceeds therefrom, shall comply with the Approved Budget (and, if such New Money Loans are borrowed in connection with the Wind Down, the Wind Down Budget), and with this Agreement in all respects;

(c)    the applicable Lender shall not have advanced New Money Loans on more than one other occasion during the calendar week in which the Borrowing Date for such New Money Loans shall occur (unless such Lender consents thereto);

(d)    the Administrative Agent shall have received a Notice of Borrowing in connection with the applicable New Money Loans in accordance with the requirements of this Agreement; and

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

(e)     the Administrative Agent shall have received evidence (which may be included in the applicable Notice of Borrowing, or delivered separately in writing) demonstrating that (i) on and as of the time of delivery of the Notice of Borrowing for the applicable New Money Loan, and immediately prior to the incurrence thereof, the aggregate amount of Liquidity, *plus* the amount of New Money Loans then-available to be borrowed hereunder, shall not be less than $2,500,000 following the end of the immediately preceding day, and (ii) pro forma for the making of such New Money Loan (after giving effect to the receipt of proceeds thereof), Liquidity shall not exceed $10,000,000 (in each case, unless such Lender consents thereto).

Each Notice of Borrowing (or, in the case of the Borrowing of Loans not constituting New Money Loans, each deemed request by Borrowers for a Loan) shall constitute a representation by Borrowers that the foregoing conditions are satisfied on and as of each of (i) the date of such Notice of Borrowing (or the date of such deemed request), (ii) the requested Borrowing Date, and (iii) the date on which such Loan is funded or made (or deemed funded or made, as applicable).

## SECTION 7.  **COLLATERAL**

   **7.1.     Grant of Security Interest**.  To secure the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of all Obligations to the full extent required hereunder, each Obligor hereby grants to Administrative Agent, for the benefit of the Secured Parties, a continuing security interest in, and Lien upon, all property and assets of such Obligor, whether tangible or intangible, real or personal, wherever located, and whether now owned by or owing to such Obligor, or at any time hereafter coming into existence, whether prior to or after the Petition Date, whether acquired or obtained by, or arising in favor of, such Obligor, or in which such Obligor now has or at any time in the future may acquire any right, title or interest, and, including, without limitation, all of the following:

   (a)     all Accounts;

   (b)     all Chattel Paper, including electronic chattel paper;

   (c)     all claims and causes of action, including all Commercial Tort Claims (including those shown on **Schedule 7.1(c)** or described in any notice or other instrument delivered to the Administrative Agent at any time), and subject to the entry of a Final DIP Order, all proceeds of Chapter 5 Claims and Causes of Action;

   (d)     all Deposit Accounts;

   (e)     all Documents;

-93-

AMERICAS 110819944

**EXHIBIT 2**

(f)     all General Intangibles, including Intellectual Property Collateral and Payment Intangibles;

(g)     all Goods, including Inventory, Equipment and fixtures;

(h)     all Real Estate and interests therein (including all leasehold interests);

(i)     all Instruments;

(j)     all Investment Property and Financial Assets;

(k)     all Letter-of-Credit Rights;

(l)     all Supporting Obligations;

(m)     all cash, Cash Equivalents, monies and other funds (whether or not in the possession or under the control of Administrative Agent, a Lender, or a bailee or Affiliate of Administrative Agent or a Lender, and including any Cash Collateral);

(n)     all other assets and properties of the Grantors, whether tangible, intangible, real, personal or mixed;

(o)     all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral; and

(p)     all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing.

Notwithstanding anything in this Agreement or any other Loan Document to the contrary, no security interest or Lien is granted in any Excluded Assets.

**7.2.**     **Lien on Deposit Accounts; Cash Collateral**.

7.2.1     <u>Deposit Accounts</u>.  To further secure the prompt payment and performance of all Obligations, each Obligor hereby grants to Administrative Agent for the benefit of Secured Parties a continuing security interest in and Lien upon all amounts credited to any Deposit Account of such Obligor (other than any Excluded Accounts), including any sums in any blocked or lockbox accounts or in any accounts into which such sums are swept.  Each Obligor hereby authorizes and directs each bank or other depository to deliver to Administrative Agent, upon request, all

-94-

**EXHIBIT 2**

statements of balances in any Deposit Account maintained by such Obligor, without inquiry into the authority or right of Administrative Agent to make such request.

7.2.2   Cash Collateral.   Cash Collateral may be invested, at Administrative Agent's discretion (and subject to the prior written consent of Borrower Agent, as long as no Event of Default exists), but Administrative Agent shall have no duty to do so, regardless of any agreement or course of dealing with any Borrower, and shall have no responsibility for any investment or loss.   Each Borrower hereby grants to Administrative Agent, as security for the Obligations, a security interest in all Cash Collateral held from time to time and all proceeds thereof, whether held in a Cash Collateral Account or otherwise.   Administrative Agent may apply Cash Collateral to the payment of Obligations as they become due, in such order as Administrative Agent may elect.   Each Cash Collateral Account and all Cash Collateral shall be under the sole dominion and control of Administrative Agent, and no Borrower or other Person shall have any right to any Cash Collateral, until Full Payment of all Obligations.

**7.3.    Pledged Collateral**.

7.3.1   Pledged Equity Interests and Debt Securities.   As security for the payment or performance, as the case may be, in full of the Obligations, each Obligor hereby assigns and pledges to Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to Administrative Agent, its successors and assigns, for the benefit of Secured Parties, a security interest in, all of such Obligor's right, title and interest in, to and under (a) the Equity Interests now owned or at any time hereafter acquired by such Obligor, including the Equity Interests set forth opposite the name of such Obligor on **Schedule 7.3(a)**, and all certificates and other instruments representing such Equity Interests (collectively, the "Pledged Equity Interests"); (b) the debt securities now owned or at any time hereafter acquired by such Obligor, including the debt securities set forth opposite the name of such Obligor on **Schedule 7.3(a)**, and all promissory notes and other instruments (collectively, the "Pledged Debt Securities"); (c) all other property that may be delivered to and held by Administrative Agent pursuant to the terms of this Section; (d) subject to **Section 7.3.6**, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of, the Equity Interests, securities and instruments referred to in clauses (a) and (b) above; (e) subject to **Section 7.3.6**, all rights and privileges of such Obligor with respect to the securities, instruments and other property referred to in clauses (a), (b), (c) and (d) above; and (f) all proceeds of any and all of the foregoing (the items referred to in clauses (a) through (f) above being collectively referred to as the "Pledged Collateral").

7.3.2   Delivery of the Pledged Collateral.

-95-

**EXHIBIT 2**

(a)     Subject to the terms of the Intercreditor Agreement, each Obligor agrees to deliver or cause to be delivered to Administrative Agent any and all certificates representing the Pledged Equity Interests of Subsidiaries and all other certificated Pledged Collateral at any time owned by such Obligor with a value in excess of $2,000,000 promptly (and in any event, within 45 days (or such longer period as the Administrative Agent may agree)) following the acquisition thereof by such Obligor, together with instruments of transfer executed in blank by a duly authorized officer of such Obligor.

(b)     Upon delivery to Administrative Agent, (i) any Pledged Equity Interests shall be accompanied by undated stock powers duly executed by the applicable Obligor in blank or other instruments of transfer reasonably satisfactory to Administrative Agent and by such other instruments and documents as Administrative Agent may reasonably request and (ii) the certificated Pledged Collateral shall be accompanied by undated proper instruments of assignment duly executed by the applicable Obligor in blank and by such other instruments and documents as Administrative Agent may reasonably request.  In connection with any delivery of possessory Pledged Collateral after the date hereof to Administrative Agent, Borrower Agent shall deliver a schedule to Administrative Agent describing the possessory Pledged Collateral so delivered, which schedule shall be attached to **Schedule 7.3(a)** and made a part hereof; *provided*, that failure to deliver any such schedule hereto or any error in a schedule so attached shall not affect the validity of the pledge of any Pledged Collateral.

7.3.3     Pledge Related Representatives, Warranties and Covenants.  Each Obligor hereby represents, warrants and covenants to Administrative Agent and the Secured Parties that:

(a)     **Schedule 7.3(a)** sets forth a true and complete list, as of the Closing Date, with respect to such Obligor, of (i) all the Equity Interests owned by such Obligor and the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity Interests owned by such Obligor and (ii) all debt securities owned by such Obligor, and all promissory notes and other instruments evidencing such debt securities.  **Schedule 7.3(a)** sets forth, as of the Closing Date, all Equity Interests, debt securities and promissory notes required to be pledged hereunder.

(b)     The Pledged Equity Interests and Pledged Debt Securities have (to the knowledge of the Obligors in the case of any of the foregoing that are not issued by an Obligor or Subsidiary) been duly and validly authorized and issued by the issuers thereof and (i) in the case of Pledged Equity Interests, are fully paid and nonassessable and (ii) in the case of Pledged Debt Securities, are legal, valid and binding obligations of the issuers thereof (subject to applicable bankruptcy, reorganization, insolvency, moratorium or

-96-

EXHIBIT 2

similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(c)     Except for the security interests granted hereunder, such Obligor (i) is and, subject to any transfers or dispositions not prohibited by this Agreement, will continue to be the direct owner, beneficially and of record, of the Pledged Collateral indicated on **Schedule 7.3(a)** as owned by such Obligor, (ii) holds the same free and clear of all Liens (other than Permitted Liens), (iii) will make no assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral (other than Permitted Liens and transfers or dispositions not prohibited by this Agreement) and (iv) will defend its title or interest thereto or therein against any and all Liens (other than Permitted Liens), however arising, of all persons whomsoever.

(d)     Such Obligor has the corporate or company power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated.

(e)     No Governmental Approval or any other action by any Governmental Authority and no consent or approval of any securities exchange or any other person (including stockholders, partners, members or creditors of such Obligor) is or will be required for the validity of the pledge effected hereby (other than such as have been obtained and are in full force and effect).

(f)     By virtue of the execution and delivery by such Obligor of this Agreement, when any Pledged Collateral are delivered to Administrative Agent in accordance with this Agreement, Administrative Agent will obtain a legal, valid and perfected lien upon and security interest in such Pledged Collateral as security for the payment and performance of the Obligations.

7.3.4     Certification of Limited Liability Company and Limited Partnership Interests.  If reasonably requested by Administrative Agent at a time when an Event of Default has occurred and is continuing, each Obligor shall use commercially reasonable efforts to cause each interest in any limited liability company or limited partnership controlled by such Obligor and pledged hereunder to be a "security" within the meaning of Article 8 of the New York UCC.

7.3.5     Registration in Nominee Name; Denominations.  At any time when an Event of Default has occurred and is continuing, Administrative Agent shall have the right (in its sole and absolute discretion) to hold the Pledged Collateral in its own name as pledgee, in the name of its nominee (as pledgee or as sub-agent) or in the name of the applicable Obligor, endorsed or

-97-

**EXHIBIT 2**

assigned in blank or in favor of Administrative Agent. Administrative Agent shall at a time when an Event of Default has occurred and is continuing have the right to exchange the certificates representing Pledged Equity Interests for certificates of smaller or larger denominations for any purpose consistent with this Agreement.

7.3.6    Voting Rights; Dividends and Interest.

(a)    Unless and until an Event of Default shall have occurred and be continuing and Administrative Agent shall have provided at least one Business Days' prior written notice to the Borrower Agent that the Obligors' rights under this Section are being suspended:

(i)    Each Obligor shall be entitled to exercise any and all voting and other consensual rights and powers inuring to an owner of Pledged Collateral or any part thereof for any purpose consistent with the terms of this Agreement and the other Loan Documents; *provided*, that such rights and powers shall not be exercised in any manner that could reasonably be expected to materially and adversely affect the rights inuring to a holder of any Pledged Collateral or the rights and remedies of Administrative Agent or any other Secured Party under this Agreement or any other Loan Document or the ability of the Secured Parties to exercise the same.

(ii)    Administrative Agent shall execute and deliver to Obligors, or cause to be executed and delivered to Obligors, all such proxies, powers of attorney and other instruments as Obligors may reasonably request for the purpose of enabling Obligors to exercise the voting and other consensual rights and powers they are entitled to exercise pursuant to paragraph (i) above.

(iii)    Each Obligor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral to the extent and only to the extent that such dividends, interest, principal and other distributions are not prohibited by, the terms and conditions of this Agreement, the other Loan Documents and applicable laws; *provided*, that any noncash dividends, interest, principal or other distributions that would constitute Pledged Equity Interests or Pledged Debt Securities, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Collateral or received in exchange for Pledged Collateral or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral and, if received by any Obligor, shall be held in trust for the benefit of Administrative Agent, shall be segregated from other property or funds of such Obligor and shall be

-98-

**EXHIBIT 2**

forthwith delivered to Administrative Agent upon demand in the same form as so received (with any necessary endorsement).

(b)     Upon the occurrence and during the continuance of an Event of Default, after Administrative Agent shall have notified Obligors of the suspension of their rights under paragraph (a)(iii) of this Section, all rights of Obligors to dividends, interest, principal or other distributions that such Obligor is authorized to receive pursuant to paragraph (a)(iii) of this Section shall cease, and all such rights shall thereupon become vested in Administrative Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions.     All dividends, interest, principal or other distributions received by any Obligor contrary to the provisions of this Section shall be held in trust for the benefit of Administrative Agent, shall be segregated from other property or funds of such Obligor and shall be forthwith delivered to Administrative Agent upon demand in the same form as so received (with any necessary endorsement).     Any and all money and other property paid over to or received by Administrative Agent pursuant to the provisions of this paragraph shall be retained by Administrative Agent in an account to be established by Administrative Agent upon receipt of such money or other property, shall be held as security for the Obligations and shall be applied in accordance with the provisions of **Section 5.6**.  After all Events of Default have been cured or waived and Administrative Agent shall have received a certificate from a Senior Officer of Borrower Agent to that effect, Administrative Agent shall promptly repay to Obligors (without interest) all dividends, interest, principal or other distributions that Obligors would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) of this Section and that remain in such account.

(c)     Upon the occurrence and during the continuance of an Event of Default, after Administrative Agent shall have notified Obligors of the suspension of their rights under and in accordance with paragraph (a)(i) of this Section, all rights of any Obligor to exercise the voting and other consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section, and the obligations of Administrative Agent under paragraph (a)(ii) of this Section, shall cease, and all such rights shall thereupon become vested in Administrative Agent, which shall have the sole and exclusive right and authority to exercise such voting and other consensual rights and powers; *provided*, that, unless otherwise directed by the Required Lenders, Administrative Agent shall have the right from time to, in its sole discretion, notwithstanding the continuance of an Event of Default, to permit any Obligor to exercise such rights and powers.

**7.4.**    **Intellectual Property Matters**.

-99-

**EXHIBIT 2**

7.4.1  For the purpose of enabling the Administrative Agent, during the continuance of an Event of Default, to exercise rights and remedies hereunder at such time as the Administrative Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Obligor hereby grants to the Administrative Agent, an irrevocable, non-exclusive, worldwide, royalty-free (and free of any other obligation of payment) license to use, assign, license or sublicense any of the Intellectual Property Collateral now owned, licensed or hereafter acquired by such Obligor, wherever the same may be located.  Such license shall include access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof.

7.4.2  On a continuing basis, each Obligor shall, at its sole cost and expense, (i) promptly following its becoming aware thereof, notify the Administrative Agent of any adverse determination in any proceeding or the institution of any proceeding in any federal, state or local court or administrative body or in the United States Patent and Trademark Office or the United States Copyright Office regarding any material Intellectual Property Collateral, such Obligor's right to register such material Intellectual Property Collateral or its right to keep and maintain such registration and prosecute applications in full force and effect, (ii) maintain, protect and enforce all material Intellectual Property Collateral as presently used and operated, (iii) not permit to lapse or become abandoned any material Intellectual Property Collateral, and not settle or compromise any pending or future litigation or administrative proceeding with respect to any such material Intellectual Property Collateral, in either case except as shall be consistent with commercially reasonable business judgment, (iv) upon such Obligor obtaining knowledge thereof, promptly notify the Administrative Agent in writing of any event which may be reasonably expected to materially and adversely affect the value or utility of any material Intellectual Property Collateral or the rights and remedies of the Administrative Agent in relation thereto including a levy or threat of levy or any legal process against any material Intellectual Property Collateral, (v) not license any Intellectual Property Collateral, or otherwise disclose any confidential Technology or source code other than licenses entered into by such Obligor in, or incidental to, the ordinary course of business, or amend or permit the amendment of any of the licenses in a manner that materially and adversely affects the right to receive payments thereunder, or in any manner that would materially impair the value of any Intellectual Property Collateral or the Lien on and security interest in the Intellectual Property Collateral created therein hereby, without the consent of the Administrative Agent, (vi) diligently keep adequate records respecting all Intellectual Property Collateral and (vii) furnish to the Administrative Agent from time to time upon the Administrative Agent's request therefor reasonably detailed statements and amended schedules further identifying and describing the Intellectual Property Collateral and such other materials evidencing or reports pertaining to any Intellectual Property Collateral as the Administrative Agent may from time to time reasonably request.

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

7.4.3    If any Obligor shall at any time after the date hereof (i) obtain any rights to any additional Intellectual Property Collateral or (ii) become entitled to the benefit of any additional Intellectual Property Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property Collateral, or any improvement on any Intellectual Property Collateral, or if any intent-to use trademark application is no longer subject to clause (h) of the definition of Excluded Assets, the provisions hereof shall automatically apply thereto and any such item enumerated in the preceding clause (i) or (ii) shall automatically constitute Intellectual Property Collateral as if such would have constituted Intellectual Property Collateral at the time of execution hereof and be subject to the Lien and security interest created by this Agreement without further action by any party.

**7.5.    Other Collateral**.

7.5.1    Commercial Tort Claims.  Obligors shall promptly take such actions as Administrative Agent reasonably requests from time to time to subject any Commercial Tort Claim with a claim value in excess of $100,000 to a duly perfected, first priority Lien in favor of Administrative Agent, subject to Permitted Liens.

7.5.2    Certain After-Acquired Collateral.  Obligors shall notify Administrative Agent in the next Compliance Certificate delivered pursuant to this Agreement in accordance with **Section 10.1.2(c)** (or with respect to clause (a), within 30 days thereof) if, after the Closing Date, any Obligor obtains any interest in any Collateral consisting of (a) Deposit Accounts (other than Excluded Accounts), (b) Chattel Paper and Instruments, in each case with a face amount in excess of $100,000, (c) Investment Property with a value in excess of $100,000 or consisting of Equity Interests in a Subsidiary, or (d) Letter-of-Credit Rights with a value in excess of $100,000 and, upon Administrative Agent's request, shall promptly take such actions as Administrative Agent may reasonably request to effect Administrative Agent's duly perfected, first priority Lien (subject to Permitted Liens) upon such Collateral, including obtaining any appropriate possession or Deposit Account Control Agreement.

**7.6.    No Assumption of Liability**.  The Lien on Collateral granted hereunder is given as security only and shall not subject Administrative Agent or any Lender to, or in any way modify, any obligation or liability of Obligors relating to any Collateral.

**7.7.    Further Assurances**.  All Liens granted to Administrative Agent under the Loan Documents are for the benefit of Secured Parties.  Promptly upon request, Obligors shall deliver such instruments and agreements, and shall take such actions, as Administrative Agent shall reasonably request under Applicable Law to evidence or perfect its Lien on any Collateral.  Each Obligor authorizes Administrative Agent to file any financing statement that describes the Collateral as "all assets" or "all personal property" of such Obligor, or words to similar effect, and

-101-

AMERICAS 110819944

**EXHIBIT 2**

ratifies any action taken by Administrative Agent before the Closing Date to effect or perfect its Lien on any Collateral.

**7.8.**   **Further Exceptions**.  Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, no Obligor will be required to perfect any lien on any property subject to a certificate of title.

# SECTION 8.   COLLATERAL ADMINISTRATION

**8.1.**   **[Reserved]**.

**8.2.**   **Administration of Accounts**.

8.2.1   Records and Schedules of Accounts.  Each Obligor shall keep materially accurate and complete records of its Accounts, including all payments and collections thereon, and shall submit to Administrative Agent sales, collection, reconciliation and other reports in form reasonably satisfactory to Administrative Agent, on such periodic basis as Administrative Agent may reasonably request.  Each Obligor shall also provide to Administrative Agent, on or before the 25th day of each month, a detailed aged trial balance of all Accounts as of the end of the preceding month, specifying each Account's Account Debtor name and address, amount, invoice date and due date, and net of any discount, allowance, credit, authorized return or dispute, and such other information as Administrative Agent may reasonably request.

8.2.2   Taxes.  If an Account of any Borrower includes a charge for any Other Taxes, Administrative Agent is authorized, in its Permitted Discretion, to pay the amount thereof to the proper taxing authority for the account of such Borrower and to charge Borrowers therefor; *provided*, however, neither Administrative Agent nor Lenders shall be liable for any Other Taxes (including any that may be due from Obligors, or any Other Taxes with respect to any Collateral).

8.2.3   Account Verification.  At any time when an Event of Default has occurred and is continuing, Administrative Agent shall have the right, in the name of Administrative Agent, any designee of Administrative Agent or any Borrower, to verify the validity, amount or any other matter relating to any Accounts of Borrowers by mail, telephone or otherwise, *provided*, that, except during the existence of a Specified Event of Default, the Administrative Agent agrees to conduct such activities only through the Borrower Agent and with the assistance of the Borrower Agent, Borrowers shall cooperate fully with Administrative Agent in an effort to facilitate and promptly conclude any such verification process.

8.2.4   Maintenance of Dominion Account.  Borrowers shall ensure that the Administrative Agent has, at all times, pursuant to the DIP Order and such other arrangements acceptable to the Administrative Agent, rights to the Dominion Accounts and control thereof to

-102-

AMERICAS 110819944

**EXHIBIT 2**

the extent necessary to enable the Administrative Agent to establish dominion over the Dominion Accounts, and exercise all rights associated therewith during any Cash Dominion Period (including the right to sweep cash, and require immediate deposit of all remittances received in the lockbox to a Dominion Account). If requested by the Administrative Agent, Borrowers shall use commercially reasonable efforts to obtain a Deposit Account Control Agreement (or other agreement in form and substance reasonably satisfactory to Administrative Agent) from each lockbox servicer and Dominion Account bank, establishing Administrative Agent's control over and Lien in the lockbox or Dominion Account, which may be exercised by Administrative Agent during any Cash Dominion Period. Administrative Agent and Lenders assume no responsibility to Borrowers for any lockbox arrangement or Dominion Account, including any claim of accord and satisfaction or release with respect to any Payment Items accepted by any bank.

8.2.5    Proceeds of Collateral.  Subject to the applicable DIP Order [(or other Chapter 11 Order)], Obligors shall ensure that all payments on Accounts or otherwise relating to Collateral are at all times made directly to a Dominion Account (or a lockbox relating to a Dominion Account).  If Holdings or any Subsidiary receives cash or Payment Items with respect to any Collateral, it shall hold same in trust for Administrative Agent and promptly (not later than the second Business Day (or if such cash or Payment Item is with respect to a material amount, the next Business Day) or such later date as is acceptable to Administrative Agent) deposit same into a Dominion Account.

**8.3.**    **[Reserved]**.

**8.4.**    **[Reserved]**.

**8.5.**    **Administration of Deposit Accounts**.  **Schedule 8.5** sets forth all Deposit Accounts maintained by Obligors, including all Dominion Accounts, as of the Closing Date. Obligors shall use commercially reasonable efforts to ensure that the Administrative Agent has a fully perfected first-priority Lien on each Deposit Account (other than Excluded Accounts) at all times until Full Payment, and shall use commercially reasonable efforts necessary to maintain such Lien in effect.  Each Obligor shall be the sole account holder of each Deposit Account, and shall not allow any other Person (other than Administrative Agent or, solely by operation of applicable law, the depositary bank at which such account is held, or pursuant to the DIP Order) to have control over a Deposit Account or any property deposited therein.  Each Obligor shall promptly notify Administrative Agent in writing of any intention to (or notice in connection with any other Person's intention to) open or close any Deposit Account (including an Excluded Account), and shall enter into a Deposit Account Control Agreement or other arrangements reasonably satisfactory to the Administrative Agent, and use commercially reasonable efforts to obtain such Chapter 11 Approvals as required by the Administrative Agent in connection with the same, in

-103-

AMERICAS 110819944

**EXHIBIT 2**

each case, prior to any funds being transferred to any such newly opened Deposit Account, and, with the consent of Administrative Agent, will amend **Schedule 8.5** to reflect same.

      8.6.    **General Provisions**.

      8.6.1   _Insurance of Collateral; Condemnation Proceeds_.  Each Obligor shall maintain insurance with respect to the Collateral (subject to exceptions to be agreed upon by Administrative Agent in its Permitted Discretion), covering casualty, hazard, theft, malicious mischief, flood and other risks, in amounts, with endorsements and with insurers (with a Best's Financial Strength Rating of at least A-VII, unless otherwise approved by Administrative Agent) consistent with industry practice for similarly situated companies or otherwise reasonably satisfactory to Administrative Agent.  All proceeds under each property policy shall be payable to Administrative Agent as loss payee.  From time to time upon reasonable request of the Administrative Agent, Obligors shall deliver to Administrative Agent copies of its insurance policies.  Unless Administrative Agent shall agree otherwise, each property policy and general liability policy shall include customary endorsements (i) showing Administrative Agent as loss payee or additional insured, as applicable; (ii) requiring 10 days prior written notice to Administrative Agent in the event of cancellation of the policy for any reason whatsoever; and (iii) with respect to property policies, specifying that the interest of Administrative Agent shall not be impaired or invalidated by any act or neglect of any Obligor or the owner of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by the policy. If any Obligor fails to provide and pay for any insurance, Administrative Agent may, at its option, but shall not be required to, procure the insurance and charge Obligors therefor.  While no Event of Default exists, Obligors may settle, adjust or compromise any insurance claim, as long as the proceeds are delivered to Administrative Agent.  If an Event of Default exists, only Administrative Agent shall be authorized to settle, adjust and compromise such claims.

      8.6.2   _Protection of Collateral_.  All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes payable with respect to any Collateral (including any sale thereof), and all other payments required to be made by Administrative Agent to any Person to realize upon any Collateral, shall be borne and paid by Borrowers.  Administrative Agent shall not be liable or responsible in any way for the safekeeping of any Collateral, for any loss or damage thereto (except for reasonable care in its custody while Collateral is in Administrative Agent's actual possession), for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other Person whatsoever, but the same shall be at Borrowers' sole risk.

      8.6.3   _Defense of Title_.  Each Obligor shall defend its title to Collateral and Administrative Agent's Liens therein against all Persons, claims and demands, except Permitted Liens.

-104-

**EXHIBIT 2**

8.7. **Power of Attorney**. Each Obligor hereby irrevocably constitutes and appoints Administrative Agent (and all Persons designated by Administrative Agent) as such Obligor's true and lawful attorney (and agent-in-fact) for the purposes provided in this Section. Administrative Agent, or Administrative Agent's designee, may, without notice and in either its or any Obligor's name, but at the cost and expense of Borrowers:

(a) Endorse any Obligor's name on any Payment Item or other proceeds of Collateral (including proceeds of insurance) that come into Administrative Agent's possession or control; and

(b) During the continuation of an Event of Default, (i) notify any Account Debtors of the assignment of their Accounts, demand and enforce payment of Accounts by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to Accounts; (ii) settle, adjust, modify, compromise, discharge or release any Accounts or other Collateral, or any legal proceedings brought to collect Accounts or Collateral; (iii) sell or assign any Accounts and other Collateral upon such terms, for such amounts and at such times as Administrative Agent deems advisable in its Permitted Discretion; (iv) collect, liquidate and receive balances in Deposit Accounts or investment accounts, and take control, in any manner, of proceeds of Collateral; (v) prepare, file and sign Obligor's name to a proof of claim or other document in a bankruptcy of an Account Debtor, or to any notice, assignment or satisfaction of Lien or similar document; (vi) receive, open and dispose of mail addressed to any Obligor, and notify postal authorities to deliver any such mail to an address designated by Administrative Agent; (vii) endorse any Chattel Paper, Document, Instrument, bill of lading, or other document or agreement relating to any Accounts, Inventory or other Collateral; (viii) use any Obligor's stationery and sign its name to verifications of Accounts and notices to Account Debtors; (ix) use information contained in any data processing, electronic or information systems relating to Collateral; (x) make and adjust claims under insurance policies; (xi) take any action as may be necessary or appropriate to obtain payment under any letter of credit, banker's acceptance or other instrument for which any Obligor is a beneficiary; and (xii) take all other actions as Administrative Agent deems, in its Permitted Discretion, appropriate to fulfill any Obligor's obligations under the Loan Documents.

## SECTION 9. REPRESENTATIONS AND WARRANTIES

9.1. **General Representations and Warranties**. To induce Administrative Agent and Lenders to enter into this Agreement and to make available the Commitments and Loans, each Obligor represents and warrants that, on and as of the Closing Date and each Borrowing Date:

9.1.1 *Organization and Qualification*. Holdings and each of its Subsidiaries is duly organized, validly existing and in good standing (to the extent such concepts are applicable) under the laws of the jurisdiction of its organization. Each Obligor is duly qualified, authorized to do business and in good standing (to the extent such concepts are applicable) as a foreign

-105-

AMERICAS 110819944

**EXHIBIT 2**

corporation in each jurisdiction where failure to be so qualified could reasonably be expected to have a Material Adverse Effect.

9.1.2 <u>Power and Authority</u>.  Holdings and each of its Subsidiaries is duly authorized to execute, deliver and perform its Loan Documents (subject to the DIP Orders).  The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary corporate or company, as applicable, action, and do not (a) require any consent or approval of any holders of Equity Interests of any Obligor, except those already obtained; (b) contravene the Organic Documents of any Obligor; (c) violate or cause a default under any Applicable Law or Material Contract; or (d) result in or require the imposition of any Lien (other than Permitted Liens) on any Obligor's real or personal property.

9.1.3 <u>Enforceability</u>.  Subject to the entry of the applicable DIP Order and the terms thereof, each Loan Document is a legal, valid and binding obligation of each Obligor party thereto, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

9.1.4 <u>Capital Structure</u>.  Each direct or indirect Subsidiary of Holdings is an Obligor, and **Schedule 9.1.4** shows for each Obligor and each direct Subsidiary thereof, its name, jurisdiction of organization, authorized and issued Equity Interests, holders of its Equity Interests, and agreements binding on such holders with respect to such Equity Interests.  Except as disclosed on **Schedule 9.1.4**, in the five years preceding the Closing Date, no Obligor has acquired any substantial assets from any other Person nor been the surviving entity in a merger or combination.  Each Obligor has good title to its Equity Interests in its Subsidiaries, subject only to Permitted Liens, and all such Equity Interests are duly issued, fully paid and non-assessable (in each case to the extent such concepts are applicable).  Other than as set forth on **Schedule 9.1.4**, there are no outstanding purchase options, warrants, subscription rights, agreements to issue or sell, convertible interests, phantom rights or powers of attorney relating to Equity Interests of any Obligor (other than Holdings) or Subsidiary.

9.1.5 <u>Title to Properties</u>.  Each Obligor has good title to (or valid leasehold interests in) all material Real Estate, and good title to all of its material personal property, including all property reflected in any financial statements delivered to Administrative Agent or Lenders, in each case free of Liens except Permitted Liens.

9.1.6 [Reserved].

9.1.7 <u>Financial Statements</u>.  The historical balance sheets, and related statements of income, cash flow and shareholder's equity, of Strike and its Subsidiaries that have been delivered to Administrative Agent on or prior to the Closing Date, and, following the Closing Date, the consolidated financial statements that have been delivered in accordance with **Section 10.1.2**,

-106-

**EXHIBIT 2**

are prepared in accordance with GAAP, except as otherwise expressly noted therein, and fairly present in all material respects the financial positions and results of operations of Holdings and its Subsidiaries at the dates and for the periods indicated, and, for unaudited financial statements, subject to normal year-end and audit adjustments and the absence of footnotes. All projections delivered from time to time to Administrative Agent and Lenders have been prepared in good faith, based on assumptions believed by the Borrowers to be reasonable in light of the circumstances at such time; *provided*, that projections, estimates, and forward-looking statements are not to be viewed as facts or a guaranty of performance or achievement of a certain result, and the actual results during the period or periods covered may differ from such projections, estimates, and forward-looking statements, and such differences may be material. Since December 31, 2015, there has been no change in the condition, financial or otherwise, of Holdings and its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

9.1.8   Taxes. Each Obligor and Subsidiary has filed all Tax returns and other reports that it is required by Applicable Law to file, and has paid all Taxes (including in a capacity as a withholding agent) that are due and payable, whether or not shown on a Tax return or report, except in each case (i) to the extent being Properly Contested or (ii) to the extent failure to file such Tax return or report or pay such Taxes could not reasonably be expected to have a Material Adverse Effect or to the extent that failure to file or pay the same could not reasonably be expected to have a Material Adverse Effect. Each of the Obligors is, as of October 1, 2021, and has continued to be through the Closing Date, classified as a disregarded entity for U.S federal income tax purposes, and no action has been taken during the 75 day period prior to the Closing Date that would result in a change of such classification thereafter.

9.1.9   Brokers. There are no brokerage commissions, finder's fees or investment banking fees payable in connection with any transactions contemplated by the Loan Documents, exclusive of any fee payable to the Sponsor upon closing of the Transactions.

9.1.10   Intellectual Property. Each Obligor and Subsidiary owns or has the lawful right to use all Intellectual Property used or held for use in or otherwise necessary for the conduct of its business, without conflict with any rights of others except to the extent the failure of the foregoing to be true could not reasonably be expected to have a Material Adverse Effect. There is no pending or, to any Borrower's knowledge, threatened Intellectual Property Claim with respect to any Borrower, any Subsidiary or any of their property (including any Intellectual Property except to the extent the failure of the foregoing to be true could not reasonably be expected to have a Material Adverse Effect). Except as disclosed on **Schedule 9.1.10**, as of the Closing Date no Borrower or Subsidiary pays or owes any Royalty or other compensation to any Person with respect to any material Intellectual Property. As of the Closing Date, all registered and applied for Intellectual Property and Licenses owned, used or licensed by, or otherwise subject to any interests

-107-

**EXHIBIT 2**

of, any Borrower or Subsidiary is set forth on **Schedule 9.1.10**, other than standard off-the-shelf products.

9.1.11   Governmental Approvals.  Subject to the DIP Orders, as applicable, each Obligor and Subsidiary has, is in compliance with, and is in good standing with respect to, all Governmental Approvals necessary to conduct its business and to own, lease and operate its properties except to the extent failure to be in compliance and good standing could not reasonably be expected to have a Material Adverse Effect.  All necessary import, export or other licenses, permits or certificates for the import or handling of any goods or other Collateral have been procured and are in effect, and each Obligor and Subsidiary has complied with all foreign and domestic laws with respect to the shipment and importation of any goods or Collateral, except where the failure to procure, maintain in effect or noncompliance could not reasonably be expected to have a Material Adverse Effect.

9.1.12   Compliance with Laws.  Each Obligor and Subsidiary has duly complied, and its properties and business operations are in compliance, in all material respects with all Applicable Law, except where noncompliance could not reasonably be expected to have a Material Adverse Effect.  There have been no citations, notices or orders of noncompliance issued to any Borrower or Subsidiary under any Applicable Law except where noncompliance could not reasonably be expected to have a Material Adverse Effect.  No Inventory has been produced in violation of the FLSA.

9.1.13   Compliance with Environmental Laws.  No Obligor or Subsidiary's past or present operations, Real Estate or other properties are subject to any federal, state or local investigation to determine whether any remedial action is needed to address any environmental pollution, hazardous material or environmental clean-up that could reasonably be expected to have a Material Adverse Effect.  No Obligor or Subsidiary has received any Environmental Notice that could reasonably be expected to have a Material Adverse Effect.  No Borrower or Subsidiary has any contingent liability with respect to any Environmental Release, environmental pollution or hazardous material on any Real Estate now or previously owned, leased or operated by it that could reasonably be expected to have a Material Adverse Effect.

9.1.14   Burdensome Contracts.  No Restrictive Agreement to which any Obligor is a party prohibits the execution, delivery or performance of any Loan Document by an Obligor.

9.1.15   Litigation.  Other than the commencement of the Chapter 11 Cases and except as shown on **Schedule 9.1.15**, there are no proceedings or investigations pending or, to any Borrower's knowledge, threatened against any Obligor or Subsidiary, or any of its operations or properties, that (a) as of the Closing Date, relate to any Loan Documents or transactions contemplated thereby; or (b) could reasonably be expected to have a Material Adverse Effect.  No Obligor or Subsidiary is in default with respect to any order, injunction or judgment of any

-108-

AMERICAS 110819944

**EXHIBIT 2**

Governmental Authority to the extent such default could reasonably be expected to have a Material Adverse Effect.

        9.1.16  <u>No Defaults</u>.  No event or circumstance has occurred or exists that constitutes a Default or Event of Default.

        9.1.17  <u>ERISA</u>.  Except to the extent the failure of the following to be true could not reasonably be expected to have a Material Adverse Effect:

        (a)    Each Plan is in compliance with the applicable provisions of ERISA, the Code, and other federal and state laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of Borrowers, nothing has occurred which would prevent, or cause the loss of, such qualification.  Each Obligor and ERISA Affiliate has met all applicable requirements under the Code, ERISA and the Pension Protection Act of 2006, and no application for a waiver of the minimum funding standards or an extension of any amortization period has been made with respect to any Plan.

        (b)    There are no pending or, to the knowledge of Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan.

        (c)    (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) no Obligor or ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) no Obligor or ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; (v) no Obligor or ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA; and (vi) as of the most recent valuation date for any Pension Plan or Multiemployer Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is at least 60%, and no Obligor or ERISA Affiliate knows of any fact or circumstance that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of such date.

        (d)    With respect to any Foreign Plan, (i) all employer and employee contributions required by law or by the terms of the Foreign Plan have been made, or, if

-109-

<b>EXHIBIT 2</b>

applicable, accrued, in accordance with normal accounting practices; (ii) the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance, or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles; and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

      9.1.18  <u>Labor Relations</u>.  Except as described on **Schedule 9.1.18**, as of the Closing Date, no Borrower or Subsidiary is party to or bound by any collective bargaining agreement, material management agreement or material consulting agreement.  There are no grievances, disputes or controversies with any union or other organization of any Borrower's or Subsidiary's employees, or, to any Borrower's knowledge, any asserted or threatened strikes, work stoppages or demands for collective bargaining, in each case, the effect of which could reasonably be expected to have a Material Adverse Effect.

      9.1.19  <u>Not a Regulated Entity</u>.  No Obligor is an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940.

      9.1.20  <u>Margin Stock</u>.  No Obligor is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No Loan proceeds or Letters of Credit will be used by Borrowers to purchase or carry, or to reduce or refinance any Debt incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.

      9.1.21  <u>OFAC</u>.  No Obligor, Subsidiary, director, officer, employee, or, to the knowledge of the Borrowers, agent, affiliate or representative thereof, is or is owned or controlled by any individual or entity that is currently the subject or target of any Sanction, or is located, organized or resident in a Designated Jurisdiction.

      9.1.22  <u>Anti-Corruption Laws</u>.  Each Obligor and Subsidiary has conducted its business in accordance with applicable anti-corruption laws in all material respects and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

      9.1.23  <u>Affected Financial Institution</u>.  None of the Obligors is an Affected Financial Institution.

-110-

**EXHIBIT 2**

9.1.24 <u>Security Interests</u>.  This Agreement and the DIP Orders are effective to create, in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding, enforceable first-priority Lien on and security interest in all right, title and interest of the Obligors in the Collateral, in each case, subject to the Carve Out and junior only to any Permitted Liens (other than as expressly provided in the DIP Orders).  Pursuant to the terms of the DIP Orders, no filings or other action (including the taking of possession or control) are or shall at any time be necessary to perfect, preserve or protect such Liens and security interests; *provided*, that, notwithstanding the foregoing, the Obligors shall have executed and delivered the Guaranty and Collateral Agreement and all other Security Documents, and made (or authorized the making by any Agent of) all filings, in each case, to the extent deemed reasonably necessary and/or appropriate, and requested, by any Agent or the Required Lenders.

9.1.25 <u>Beneficial Ownership Certificate</u>.  The information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

9.1.26 <u>Covered Entities</u>.  No Obligor is a Covered Entity.

9.1.27 <u>Budget</u>.  Each of the Initial Budget attached as <u>Exhibit H</u>, each Approved Budget, each Budget Supplement and each Updated Budget is based upon good faith estimates and assumptions believed by management of the Borrowers to be reasonable at the time made, in light of the circumstances under which they were made.

9.1.28 <u>DIP Budget</u>.  The Initial Budget, which was delivered to Administrative Agent and the Lenders on or prior to, and which shall be in effect as of, the Closing Date, was prepared in good faith based upon assumptions the Borrower believes to be reasonable assumptions on the date of delivery thereof.

**9.2.** **Disclosure**.  As of the Closing Date, there are no agreements, instruments and corporate or other restrictions to which any Obligor is subject, or other matters known to the Borrowers that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the written reports, financial statements, certificates or other written information furnished by or on behalf of any Obligor to Administrative Agent in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect; *provided*, that, with respect to projected financial information, the Borrowers represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Closing Date, as of the Closing Date.

-111-

<b>EXHIBIT 2</b>

## SECTION 10.      COVENANTS AND CONTINUING AGREEMENTS

**10.1.    Affirmative Covenants**. Until Full Payment, each Obligor shall, and shall cause each Subsidiary thereof to:

    10.1.1 Inspections.

        (a)      Permit Administrative Agent from time to time, subject (except when an Event of Default exists) to reasonable notice and normal business hours, to visit and inspect the properties of Holdings or any Subsidiary, inspect, audit and make extracts from Holding's or Subsidiary's books and records, and discuss with its officers, employees, agents, advisors and independent accountants Holding's or Subsidiary's business, financial condition, assets and results of operations, subject to any express limits in clause (b) below. Lenders may participate in any such visit or inspection, at their own expense. Neither Administrative Agent nor any Lender shall have any duty to any Obligor to make any inspection, nor to share any results of any inspection, examination or report with any Obligor. Obligors acknowledge that all inspections, examinations and reports are prepared by Administrative Agent and Lenders for their purposes, and Obligors shall not be entitled to rely upon them.

        (b)      Reimburse Administrative Agent for all reasonable charges, costs and expenses of Administrative Agent in connection with examinations of any Obligor's books and records or any other financial or Collateral matters (including for the avoidance of doubt, field examinations) as Administrative Agent deems appropriate, up to two times per Loan Year (but no more than once in any six month period); *provided*, *however*, that a second examination during any six month period will be permitted at the Obligors' expense during a Cash Dominion Period; *provided*, *further* that if an examination is initiated during an Event of Default, all charges, costs and expenses therefor shall be reimbursed by Borrowers without regard to such limits; and *provided further* that a third examination may be performed by Administrative Agent at Lenders' expense in the absence of any Default. Borrowers agree to pay Administrative Agent's then standard charges for examination activities (which shall not be less than $1,100 per man day), including the standard charges of Administrative Agent's internal examination groups, as well as the reasonable charges of any third party used for such purposes.

    10.1.2 Financial and Other Information. Keep adequate records and books of account with respect to its business activities, in which proper entries are made in accordance with GAAP reflecting all financial transactions; and furnish to Administrative Agent and Lenders:

        (a)      within 100 days after the close of each Fiscal Year, balance sheets as of the end of such Fiscal Year and the related statements of income, cash flow and shareholders' equity for such Fiscal Year, on consolidated basis for Holdings and Subsidiaries, which consolidated statements shall be audited and certified (without a

-112-

**EXHIBIT 2**

"going concern" or like qualification or exception (except for qualifications or exceptions resulting solely from the Chapter 11 Cases)) by a firm of independent certified public accountants of recognized standing selected by Borrowers and reasonably acceptable to Administrative Agent (it being acknowledged that Ernst & Young is acceptable), and shall set forth in comparative form corresponding figures for the preceding Fiscal Year;

(b)     within 45 days after the end of each Fiscal Quarter other than the last Fiscal Quarter in a Fiscal Year, unaudited balance sheets as of the end of such Fiscal Quarter and the related statements of income and cash flow for such Fiscal Quarter and for the portion of the Fiscal Year then elapsed, on consolidated basis for Holdings and Subsidiaries, setting forth in comparative form corresponding figures for the preceding Fiscal Year and certified by a Senior Officer of Borrower Agent as prepared in accordance with GAAP and fairly presenting the financial position and results of operations for such Fiscal Quarter and period, subject to normal year-end and audit adjustments and the absence of footnotes;

(c)     concurrently with delivery of financial statements under clauses (a) and (b) above, a Compliance Certificate executed by a Senior Officer of Borrower Agent, which compliance certificate will include (i) [reserved], (ii) a calculation of the amount of any Pro Forma Adjustment not previously set forth in a Pro Forma Adjustment Certificate or any material change in the amount of a Pro Forma Adjustment set forth in any Pro Forma Adjustment Certificate previously provided and, in reasonable detail, the calculations and basis for such Pro Forma Adjustment or such change, (iii) notice of any event described in **Section 7.4.3** and confirmation of the attachment of the Lien and security interest created by this Agreement to any rights described in clauses (i) and (ii) of **Section 7.4.3** by execution of an instrument in form reasonably acceptable to the Administrative Agent (which shall be promptly filed and recorded with the United States Patent and Trademark Office or United States Copyright Office or any other applicable registry, as applicable) such instruments as shall be reasonably necessary to create, preserve, protect or perfect the Administrative Agent's security interest in such Intellectual Property Collateral and (iv) notice of any Obligor obtaining a Commercial Tort Claim (with the Borrower Agent promptly amending **Schedule 7.1(c)** to include such claim);

(d)     concurrently with delivery of financial statements under clause (a) above, copies of all management letters and other material reports submitted to Borrowers by their accountants in connection with such financial statements;

(e)     not later than 60 days after the end of each Fiscal Year, projections of Holding's and its Subsidiaries' consolidated balance sheets, results of operations, cash flow for the next Fiscal Year, prepared on a month by month basis;

-113-

**EXHIBIT 2**

(f)     reasonably promptly upon Administrative Agent's request, a listing of each Obligor's trade payables, specifying the trade creditor and balance due, and a detailed trade payable aging, all in form reasonably satisfactory to Administrative Agent, *provided*, that, unless an Event of Default exists, such request shall not be made more than once per month;

(g)     promptly after the sending or filing thereof, copies of any regular, periodic and special reports or registration statements or prospectuses that any Obligor files with the Securities and Exchange Commission or any other Governmental Authority, or any securities exchange; and copies of any press releases or other statements made available by any Obligor to the public concerning material changes to or developments in the business of such Obligor;

(h)     promptly after request, such other reports and information (financial or otherwise) as Administrative Agent may reasonably request from time to time in connection with any Collateral or any Obligor's or its Subsidiary's financial condition or business; and

(i)     promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent or any Lender (through the Administrative Agent) for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act and the Beneficial Ownership Regulation.

10.1.3  <u>Notices</u>.  Notify Administrative Agent in writing, promptly after any Obligor's obtaining knowledge thereof, of any of the following in respect of an Obligor (without limiting any requirements of **Section 10.1.12**):  (a) except with respect to the Chapter 11 Cases, the written threat or commencement of any proceeding or investigation, whether or not covered by insurance, which could reasonably be expected to have a Material Adverse Effect; (b) any pending or threatened in writing labor dispute, strike or walkout, or the expiration of any labor contract, which could reasonably be expected to have a Material Adverse Effect; (c) any uncured default by an Obligor under a Material Contract; (d) the existence of any Default or Event of Default; (e) any judgment not covered by insurance in an amount exceeding $500,000; (f) the assertion of any Intellectual Property Claim, which could reasonably be expected to have a Material Adverse Effect; (g) any violation or asserted violation of any Applicable Law (including ERISA, OSHA, FLSA, or any Environmental Laws) which could reasonably be expected to have a Material Adverse Effect; (h) any Environmental Release by an Obligor or on any real property owned, leased or occupied by an Obligor, or receipt of any Environmental Notice; (i) the occurrence of any ERISA Event; or (j) the discharge of or any withdrawal or resignation by

-114-

**EXHIBIT 2**

Borrowers' independent accountants which could reasonably be expected to have a Material Adverse Effect.

10.1.4 <u>Compliance with Laws</u>.  Comply with all Applicable Laws, including ERISA, Environmental Laws, FLSA, OSHA, Anti-Terrorism Laws, Anti-Corruption Laws and laws regarding collection and payment of Taxes (solely to the extent specifically provided by **Section 10.1.5**), and maintain all Governmental Approvals necessary to the ownership of its properties or conduct of its business unless failure to comply (other than a failure to comply with Anti-Terrorism Laws) or maintain could not reasonably be expected to have a Material Adverse Effect.  Without limiting the generality of the foregoing, if any Environmental Release occurs at or on any properties of any Obligor or of a Subsidiary thereof, it shall act promptly and diligently to investigate and report to Administrative Agent and all appropriate Governmental Authorities the extent of, and to make appropriate remedial action to eliminate, such Environmental Release to the extent required by Environmental Laws, whether or not directed to do so by any Governmental Authority.

10.1.5 <u>Taxes</u>.  Pay and discharge all Taxes prior to the date on which they become delinquent or penalties attach, unless such Taxes are being Properly Contested or the failure to pay or discharge such Taxes could not reasonably be expected to have a Material Adverse Effect.

10.1.6 <u>Insurance</u>.  In addition to the insurance required hereunder with respect to Collateral, maintain insurance with insurers (with a Best Rating of at least A-VII, unless otherwise approved by Administrative Agent) satisfactory to Administrative Agent, with respect to the properties and business of Borrowers and Subsidiaries of such type (including workers' compensation, larceny, embezzlement, or other criminal misappropriation insurance), in such amounts, and with such coverages and deductibles as are customary for companies similarly situated.

10.1.7 <u>Licenses</u>.  Keep each License affecting any Collateral (including the manufacture, distribution or disposition of Inventory) or any other material real or personal property of Obligors and Subsidiaries in full force and effect except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect; promptly notify Administrative Agent of any proposed modification to any such License, or entry into any new material License, in each case at least 15 days prior to its effective date; pay all material Royalties when due; and notify Administrative Agent of any default or breach asserted by any Person to have occurred under any material License.

10.1.8 <u>Further Assurances; etc.</u>

(a)     Subject to clause (b) below, each Obligor will, and will cause each of the other Obligors to, grant to the Administrative Agent, for the benefit of the Secured

-115-

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

Parties, security interests in such assets (other than Excluded Assets) of such Obligor and such other Obligors as are not covered by the grant and perfection requirements of **Section 7** hereto or any other Security Document as of the Closing Date (other than Excluded Assets), and as may be reasonably requested from time to time by the Administrative Agent or the Required Lenders.

Subject to the limitations set forth herein or any other Loan Document, promptly upon the reasonable request by the Administrative Agent the Obligors shall (i) assist in correcting any jointly identified material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Security Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances, and other instruments as the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of **Section 7** and the Security Documents.

(b)    With respect to any Person that is or becomes a Subsidiary after the Petition Date, promptly (and in any event, by the time required by the Administrative Agent) (i) deliver to the Administrative Agent or its bailee the certificates, if any, representing all (or such lesser amount as is required) of the Equity Interests of any such Subsidiary that is a direct Subsidiary of an Obligor, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all intercompany notes owing from such Subsidiary to any Obligor together with instruments of transfer executed in blank by a duly authorized officer of such Obligor, (ii) cause such new Subsidiary  (A) to execute a joinder agreement, substantially in the form of **Exhibit G** hereto, and (B) subject to the limitation in **Section 7**, to take all actions reasonably necessary or advisable in the reasonable opinion of the Administrative Agent to cause the Lien on the Collateral of such Subsidiary created by **Section 7** hereof or the applicable Security Document to be duly perfected in accordance with all Applicable Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent, and (iii) at the request of the Administrative Agent, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Lenders, of counsel to the Obligors reasonably acceptable to the Administrative Agent as to such matters set forth in this **Section 10.1.8(b)** as the Administrative Agent may reasonably request.

(c)    Each Obligor agrees that each action required by clause (a) of this **Section 10.1.8** shall be completed no event later than 10 calendar days after such action is required to be taken pursuant to such clauses or requested to be taken by the Administrative Agent or the Required Lenders (or such longer period as the Administrative Agent shall

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

otherwise agree), as the case may be; *provided,* that in no event will a Borrower or any of its Subsidiaries be required to take any action, other than using its commercially reasonable efforts (which shall in any event include filing any applicable petition, motion, request or similar with the Bankruptcy Court), to obtain consents from third parties with respect to compliance with clause (a) of this **Section 10.1.8**.

10.1.9  <u>Designation of Subsidiaries</u>.  Each Person that is a Subsidiary of Holdings at any time shall be required to be an Obligor and shall be subject to all terms and conditions hereof applicable to Obligors.  For the avoidance of doubt, no Investment shall be made by Holdings or any Subsidiary thereof in any Person other than an Obligor.

10.1.10    [Reserved].

10.1.11    <u>Lender Calls</u>.  To the extent that any Obligor (or any representative thereof) holds for the benefit of all or a subset of the Prepetition Junior Loan Secured Parties, any meeting (including by conference call) (the costs of such call to be paid by the Borrowers) (including relating to any to review of any financial results, the financial condition of Holdings and its Subsidiaries and/or any budgets), the Borrowers shall invite the Lenders and the Administrative Agent to attend the same at the same time, and on the same terms as, such invitation is made to the applicable Prepetition Junior Loan Secured Parties.  Any information provided for the benefit of all or a subset of the Prepetition Junior Loan Secured Parties shall be delivered to the Administrative Agent concurrently therewith.

10.1.12    <u>Other Reporting</u>.

(a)    Not later than 5:00 p.m. New York City time every Tuesday (commencing with Tuesday of the calendar week immediately after the Closing Date, i.e., December 14, 2021) (the "<u>Budget Reporting Deadline</u>"), the Obligors shall deliver to the Administrative Agent (for the benefit of it and the Lenders) a nine (9) week supplement to the Approved Budget then in effect (each, a "<u>Budget Supplement</u>"), covering the period that commences with the Monday of the week in which such Budget Supplement is required to be delivered and ending on February 4, 2022, the form, scope and level of detail of which Budget Supplement shall be consistent with the Initial Budget, and which Budget Supplement shall be otherwise in form and substance satisfactory to the Required Lenders in their sole discretion (as confirmed and approved in writing by the Administrative Agent) (each Budget Supplement, if, but solely if and upon, approved in accordance with the foregoing, an "<u>Updated Budget</u>").  For the avoidance of doubt, no Updated Budget shall become the Approved Budget unless and until Borrower Agent (or its counsel) shall have received written notice thereof from the Administrative Agent (acting at the direction and with the consent of the Required Lenders); *provided*, *however*, that neither the Administrative Agent nor any of the Lenders shall have any obligation to approve any

-117-

AMERICAS 110819944

**EXHIBIT 2**

Budget Supplement or any Updated Budget, and, no modification to any Updated Budget or any Approved Budget, or any reforecasting of any information relating to any period covered by any other Updated Budget or any Approved Budget, as the case may be, shall in any event be effective without the Administrative Agent's prior written consent (acting at the direction of the Required Lenders) ; *provided, further, however,* that notwithstanding anything in this **Section 10.1.12(a)** to the contrary, in the event that changes in the Budget Supplement are made (i) in order to reconcile the Obligors' actual business performance during the prior week or (ii) to change any line item by no more than ten percent (10%), the consent or approval of the Required Lenders or Administrative Agent thereto shall not be unreasonably withheld or delayed.

(b)   Not later than 5:00 p.m. New York City time every Tuesday (commencing with Tuesday of the calendar week immediately after the Closing Date, i.e., December 14, 2021) (each, a "Variance Reporting Deadline"), the Obligors shall deliver to the Administrative Agent (for the benefit of it and the Lenders) (i) a variance report in form, scope and detail satisfactory to the Required Lenders (each, a "Variance Report"), which Variance Report shall set forth, with respect to (I) the calendar week ending as of (and including) the Friday of the week immediately preceding the applicable Variance Reporting Deadline (each, a "Weekly Performance Period") and (II) the rolling two-week period ending as of (and including) the Friday of the week immediately preceding the applicable Variance Reporting Deadline, if both such calendar weeks are covered by the Approved Budget then in effect, (each, a "Bi-Weekly Performance Period", and, together with each Weekly Performance Period, each, a "Performance Period"), the variance (i.e. the difference, expressed as a percentage (each, a "Budget Variance")) between (x) the amounts actually realized, achieved or incurred (as applicable) in each applicable Performance Period, and (y) the amounts projected in the Approved Budget to be realized, achieved or incurred (as applicable) in each applicable Performance Period, in each case, calculated with respect to the line-items designated in the Approved Budget as "Customer Receipts", "Other Receipts", "Total Receipts", "Vendor Payables", "Professional Fees" (*provided*, that the Approved Budget and Variance Report shall distinguish between, and separately report on, fees and expenses relating to Company Advisors and other professionals (which shall be designated as "Company and Other Professionals Fees"), and those of the Chapter 11 Unsecured Creditors Committee (which shall be designated as "UCC Professionals Fees")), and "Total Disbursements", and (ii) a certificate of a Senior Officer of Borrower Agent prepared in respect of each Variance Report and (A) explaining, in detail reasonably satisfactory to the Required Lenders, all Budget Variances identified in such Variance Report for each applicable Performance Period, and (B) (x) certifying compliance by Holdings and its Subsidiaries with the Budget Covenant and **Section 10.3.1**, and with each other provision hereof that requires any payment, receipt, distribution or other matter to be in accordance with, or as set forth in, the Approved Budget, or in

-118-

**EXHIBIT 2**

compliance with the Budget Covenant (or that is conditioned on no Default arising thereunder), or (y) if or to the extent that such certification cannot be made with respect to any item, specifically identifying and describing any non-compliance (including the extent and amount thereof), and explaining, in detail reasonably satisfactory to the Required Lenders, the reason for, and facts and circumstances causing or contributing to any such non-compliance; *provided*, that, compliance with this **Section 10.1.12(b)** (including delivery of any Variance Report or such certificate, and any information, description or explanation therein) shall not cure (or be deemed to cure) any Default or Event of Default resulting from any non-compliance identified hereunder, or under the Budget Covenant or any other provision requiring compliance herewith or therewith. Variances, if any, from the applicable Approved Budget, and any proposed changes to the applicable Approved Budget, shall be subject to the prior written consent of the Required Lenders. For the avoidance of doubt, any incurrence of any obligation, or any payment or distribution or disbursement, as applicable, by any of Holdings and its Subsidiaries (x) other than as set forth in the Approved Budget and (y) in excess of the Permitted Variances permitted by the Budget Covenant shall, in each case, constitute a Default under **Section 10.3.1**, and an immediate Event of Default under **Section 11.1(d)**.

(c)        The Obligors shall arrange for a teleconference with Lenders to take place at 10:00 a.m. (New York City time) (or at such other time as is reasonably satisfactory to the Administrative Agent) every Wednesday (commencing with Wednesday, December 15, 2021) (or such other day as is reasonably satisfactory to the Administrative Agent) until Full Payment occurs, which teleconference shall (i) require, at the election of the Required Lenders, participation by at least one Senior Officer of Borrower Agent's management team and/or professional advisors to the Borrower Agent, and (ii) be intended for purposes of discussing Holdings and its Subsidiaries' financials (including any budget proposed to be the Approved Budget, Variance Reports and any projections), the Potential Transaction, and such other information and matters reasonably related thereto (including any matter contemplated pursuant to any Restructuring Transaction Documents) or requested by any Lender; *provided*, that such teleconference shall not be required in any week if and to the extent that the Administrative Agent shall have previously waived or postponed the same by written notice to the Borrower Agent.

(d)        Furnish to Administrative Agent and Lenders:

(i)        promptly following the end of each day, a statement of available cash;

(ii)        on at least a weekly basis, (w) a report of work-in-progress under major project divisions (including support for all "estimates at completion"), (x)

-119-

**EXHIBIT 2**

copies of latest project reviews, (y) reports of any material discussion with contract counterparties, and (z) reports of any litigation, claims, actions and similar events (whether new, ongoing, pending, threatened or anticipated); and

(iii)    promptly following any written request thereof, such other reporting reasonably requested by the Required Lenders from time to time including notice of, and disclosure of all information regarding, all (1) formal and informal arrangements (binding or non-binding) among any and any Obligors or any of its affiliates or Related Parties, (2) side letters or agreements with respect to any Potential Transaction, and any other transaction similar to any transaction described in the definition thereof (irrespective of the Persons involved therein), and (3) formal or informal (binding or non-binding) proposals or communications with respect to any Potential Transaction or any such other transaction (including term sheets, letters of intent, indications of interest and similar items).

10.1.13    <u>Milestones, Restructuring Support Agreement and Related Covenants</u>.

(a)    Satisfy the requirements with respect to each Milestone (including by the time, to the extent, and in the manner required thereby), or as otherwise agreed to by the Administrative Agent in writing.

(b)    (i) Actively and in good faith engage in (and shall procure the same by Company Advisors, and their respective Subsidiaries), and shall not discontinue discussions and negotiations with the Consenting Lender-Side Persons regarding the Potential Transactions, (ii) actively and fully cooperate in good faith with the Consenting Lender-Side Persons in connection with the Potential Transactions (including by actively and promptly providing due diligence and access to books and records, negotiating the terms thereof and all definitive documents), and (iii) promptly deliver to the Person requesting the same all information, documentation, instruments and other materials reasonably requested by any Consenting Lender-Side Person in connection herewith or any Potential Transaction; <u>provided</u>, that the foregoing obligation shall not require Obligors to furnish any information that the Obligors reasonably and in good faith and upon advice of outside counsel believe (x) would cause the Obligors to violate any Chapter 11 Order, or (y) to be privileged, unless such information is requested and furnished pursuant to a joint defense and/or common interest agreement entered into on mutually agreeable terms with such Consenting Lender-Side Person.

(c)    In addition to any notices or information required to be given under this Agreement (including, without limitation, pursuant to **Sections 10.1.2**, **10.1.3** and **10.1.11**) and the other Loan Documents, each Obligor will use commercially reasonable efforts to provide the Consenting Lender Advisors (for the benefit of the Lenders) with (i) prompt written notice of, in

-120-

**EXHIBIT 2**

any event no later than one (1) Business Day of the occurrence of any Obligor or any of its Subsidiaries (or any of their respective directors or officers) having actual knowledge of any breach or violation of this Agreement or any other Loan Document, or any Restructuring Transaction Document, by any Obligor or any Affiliate thereof (including Sponsor) that is a party thereto or restricted pursuant to the terms thereof, (ii) reasonably prompt written notice of a default or breach under, or any required redemption (or notice with respect to any required redemption) or other mandatory redemption or purchase relating to any Debt of any Obligor (including, without limitation, the Prepetition Debt) and (iii) reasonably prompt written notice of the occurrence of any default or event of default under, or the pursuit of any remedies against any Obligor in connection with, any material operating contract (including any termination thereof).

(d)     Procure that no disbursements are made with respect to any Wind Down amount, except in accordance with the Wind Down Budget.  In addition to all other obligations hereunder, each Obligor shall (and shall cause its Senior Officers and management teams, and each Company FA (and such other Company Advisors as may be requested by the Administrative Agent) to), in each case, (A) provide the Administrative Agent (for its and the Lenders' and Consenting Lender Advisors' benefit) with all information reasonably requested by the Administrative Agent or any of the Consenting Lender Advisors in connection with evaluating, analyzing or making any other determination with respect to the Wind Down Budget or any matters relating thereto (including to the extent required to assess or determine whether any payment or disbursement is made in accordance with the Wind Down Budget and the Approved Budget), and (B) actively cooperate and work in good faith with (and simultaneously meet and confer with) the Administrative Agent and the Consenting Lender Advisors to provide information with respect to the Wind Down Budget.

10.1.14     <u>Bankruptcy Related Matters</u>.

(a)     Cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Obligations and/or the Loan Documents, the Prepetition Debt and applicable loan documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course or adequate protection, (iv) any Chapter 11 Liquidating Plan and/or any disclosure statement related thereto, (v) orders concerning the financial condition of the Debtors, or other Debt of the Debtors and (vi) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors, to be in accordance with the terms of this Agreement, to the extent applicable.

(b)     Comply in all respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases.

-121-

**EXHIBIT 2**

(c)     Deliver to the Administrative Agent and the Lender Advisors not less than three (3) Business Days (or, if and solely to the extent that, as a result of exigent circumstances, there is a need to file on an expedited basis, not less than two (2) Business Days) prior to any filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Obligors with the Bankruptcy Court in the Chapter 11 Cases that affect or may affect any of the Secured Parties, or distributed by or on behalf of the Obligors to the Chapter 11 Unsecured Creditors Committee (or any other official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest), and shall consult in good faith with the Lender Advisors and the Required Lenders regarding the form and substance of any such document.

(d)     If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent and to the Lender Advisors promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Obligors to the Chapter 11 Unsecured Creditors Committee (or any other official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest).

(e)     Provide written notice to the Lenders (via the Administrative Agent) and the Lender Advisors not less than five (5) Business Days (or such shorter period as may be consented to in writing by the Required Lenders or by the Administrative Agent, acting at the Required Lenders' direction) prior to any assumption or rejection of any Debtor's or any Subsidiary's Material Contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected if the Administrative Agent (acting at the direction of the Required Lenders) informs the Borrower Agent in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption or rejection, as applicable.

10.1.15     <u>Priority of Liens and Claims</u>.  Cause the Obligations to, upon and at all times as of entry of the Interim DIP Order (including upon and at all times as of entry of the Final DIP Order) (i) constitute Superpriority DIP Claims having the priority and rights set forth in the DIP Orders and (ii) be secured by a valid, binding, continuing, enforceable and perfected first priority (subject only to the Carve-Out and any other liens expressly permitted by the DIP Orders) security interest in, and Lien, on all Collateral.

**10.2.   <u>Negative Covenants</u>**.  Until Full Payment and as long as any Commitments or Obligations are outstanding, each Obligor shall not, and shall cause each Subsidiary not to:

-122-

**EXHIBIT 2**

10.2.1  <u>Permitted Debt</u>.  Create, incur, guarantee or suffer to exist any Debt, except:

(a)  the Obligations;

(b)  the Prepetition Credit Facility Debt;

(c)  any (i) Debt incurred to finance the acquisition, construction, or improvement of any fixed or capital assets (if consummated prior to the Petition Date, solely if and to the extent such acquisition, construction, or improvement was permitted under the Prepetition Loan Agreements, and, if consummated on or at any time after the Petition Date, solely if and to the extent such acquisition, construction, or improvement is permitted hereunder during the Chapter 11 Cases) (whether or not constituting Purchase Money Debt), including Capital Lease Obligations, <u>provided</u>, that no Debt shall be incurred pursuant hereto at any time as of the Petition Date unless permitted pursuant to the applicable Chapter 11 Approvals, and no payments in respect thereof shall be made except to the extent in accordance with the Budget Covenant, and (ii) Debt assumed in connection with the acquisition of any of the foregoing assets or secured by a Lien on any such assets prior to the acquisition thereof (so long as such acquisition was permitted under the Prepetition Loan Agreements); *provided*, that the aggregate principal amount of Debt incurred in reliance on this clause (c) after the Closing Date shall not exceed $500,000 at any time outstanding;

(d)  Debt incurred prior to the Petition Date and expressly permitted under the Prepetition Credit Agreements and outstanding as of the Closing Date (other than Prepetition Credit Facility Debt or any debt incurred prior to the Petition Date and permitted pursuant to any other clause of this **Section 10.2.1**); provided, that if any such Debt exceeds an aggregate principal amount of $100,000, a description set forth on **Schedule 10.2.1** hereof;

(e)  Debt with respect to Debt in respect of netting services, automatic clearinghouse arrangements, overdraft protections, treasury, depository, corporate purchasing cards and other credit cards, cash management, and similar arrangements, in each case incurred in the Ordinary Course of Business;

(f)  Debt that was in existence when a Person became a Subsidiary prior to the Petition Date, or that is secured by an asset when acquired by Holdings or Subsidiary prior to the Petition Date, as long as such Debt was not incurred in contemplation of such Person becoming a Subsidiary or such acquisition; *provided*, that the aggregate amount under this clause (f) does not exceed $1,000,000 outstanding at any time;

(g)  Permitted Contingent Obligations;

-123-

**EXHIBIT 2**

(h)  intercompany Debt among the Obligors; *provided*, that any such Debt shall be subordinated on terms reasonably satisfactory to the Administrative Agent to the Obligations hereunder;

(i)  Debt incurred in connection with the financing of insurance premiums in the Ordinary Course of Business;

(j)  Debt owed to any Person providing workers' compensation, unemployment insurance, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the Ordinary Course of Business;

(k)  Debt in respect of performance bonds, completion guarantees, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the Ordinary Course of Business, including, without limitation, pursuant to that certain General Agreement of Indemnity with Chubb Surety and Agreement of Indemnity with Westchester Fire Insurance Company substantially in the forms delivered to the Administrative Agent prior to the Closing Date;

(l)  [reserved];

(m)  Guarantee Obligations by any Obligor with respect to Debt otherwise permitted by this **Section 10.2.1**; *provided*, that if the Debt being guaranteed is subordinated or pari passu with the Obligations, then the guarantee shall be subordinated or pari passu, as applicable, to the same extent as the Debt being guaranteed;

(n)  the Intercreditor Agreement shall, in whole or in part, cease to be effective (or cease to be legally valid, binding and enforceable against any party thereto, or against any person on whose behalf any such party makes covenants or agreements therein), or shall otherwise not be fully effective to create the rights and obligations purported to be created thereunder;

(o)  preferred stock of Holdings issued prior to the Petition Date and that does not constitute Disqualified Equity Interests, as set forth on **Schedule 9.1.4**;

(p)  Debt consisting of take or pay obligations contained in supply arrangements entered into in the Ordinary Course of Business; <u>provided,</u> that the aggregate amount thereof incurred or arising or outstanding at any time shall not exceed $500,000; <u>provided, further,</u> that, no such obligations shall be incurred at any time as of the Petition Date unless permitted by the DIP Orders or other Chapter 11 Order (in each case, in accordance with the Approved Budget);

-124-

**EXHIBIT 2**

(q)     guarantees required by Governmental Authorities in the Ordinary Course of Business;

(r)     [reserved];

(s)     Debt constituting obligations of the Obligors with respect to deferred compensation payable to employees of the Obligors in the Ordinary Course of Business, but only if, and solely to the extent that, such obligations arise pursuant to arrangements in effect as of the Closing Date (so long as the same shall have been approved in writing by the Administrative Agent); _provided_, no payments or disbursements shall be made in connection therewith except to the extent that a line-item with respect thereto is set forth in the Approved Budget, and the payment thereof shall be in accordance with the Approved Budget;

(t)     endorsements for collection, deposit, or negotiation and warranties of products or services, in each case incurred in the Ordinary Course of Business;

(u)     rental obligations incurred in the Ordinary Course of Business;

(v)     obligations under operating leases incurred in the Ordinary Course of Business; _provided_, that the aggregate amount thereof incurred or arising at any time as of the Petition Date shall not exceed $500,000;

(w)     trade payables and other current liabilities incurred in the Ordinary Course of Business; and

(x)     all interest accruing on, and all reasonable and documented fees and expenses payable in connection with, the obligations described in the foregoing clauses (in the case of (1) clause (a), without limiting the amounts otherwise included pursuant to the definition of Obligations or as provided elsewhere in this Agreement, and (2) clause (b), without limiting the amounts otherwise included pursuant to the definition of Prepetition Senior Loan Debt or Prepetition Junior Loan Debt).

For purposes of determining compliance with this **Section 10.2.1**, if an item of Debt meets the criteria of more than one of the categories of Debt described above, the Borrower Agent shall, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item of Debt (or any portion thereof) and will only be required to include the amount and type of such Debt in one or more of the above clauses; _provided_, that all Debt outstanding under the Loan Documents will be deemed to have been incurred in reliance only on the exception in clause (a) of this **Section 10.2.1**.  Notwithstanding anything to the contrary, no payment shall be made in respect of any

-125-

**EXHIBIT 2**

Debt (whether or not such Debt is permitted hereunder) at any time as of the Closing Date except in accordance with the Approved Budget.

      10.2.2  <u>Permitted Liens</u>.  Create or suffer to exist any Lien upon any of its property or assets, except the following (collectively, "<u>Permitted Liens</u>"):

      (a)    Liens in favor of Administrative Agent (for the benefit of the Secured Parties) granted pursuant to the Loan Documents to secure the Obligations;

      (b)    [reserved];

      (c)    Liens for Taxes not yet due or being Properly Contested;

      (d)    statutory or common law Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens (other than Liens for Taxes or imposed under ERISA) arising in the Ordinary Course of Business, but only if (i) payment of the obligations secured thereby is not yet due or is being Properly Contested, and (ii) such Liens do not materially impair the value or use of the real or personal property or materially impair operation of the business of any Borrower or Subsidiary;

      (e)    customary Liens incurred or deposits made in the Ordinary Course of Business to secure the performance of tenders, bids, leases, contracts (except those relating to Borrowed Money), statutory obligations, surety, stay, customs, and appeal bonds, performance bonds, and other similar obligations, or arising as a result of progress payments under government contracts including, without limitation, pursuant to that certain General Agreement of Indemnity with Chubb Surety and Agreement of Indemnity with Westchester Fire Insurance Company substantially in the forms delivered to the Administrative Agent prior to the Closing Date;

      (f)    pledges, deposits, or Liens in the Ordinary Course of Business in connection with (i) workers' compensation, payroll taxes, unemployment insurance, and other social security legislation and (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Holdings, the Borrowers, the Obligors, or any of the Subsidiaries;

      (g)    Liens arising by virtue of a judgment or judicial order against any Obligor, or any real or personal property of an Obligor, as long as such judgment does not otherwise result in an Event of Default under **Section 11.1(h)**;

-126-

**EXHIBIT 2**

(h)      easements, rights-of-way, restrictions, covenants, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions, or other agreements of record, and other similar charges or encumbrances on Real Estate, that do not secure any monetary obligation and do not interfere with the business of the Obligors in any material respect;

(i)      normal and customary rights of setoff upon deposits in favor of depository institutions, and Liens of a collecting bank on Payment Items in the course of collection;

(j)      Liens granted or arising prior to the Petition Date and existing as of the Closing Date; *provided*, that, if any such Lien secures any Debt exceeding $100,000, a description thereof shall be set forth on **Schedule 10.2.2**;

(k)      leases, licenses, subleases or sublicenses granted to others that do not (i) interfere in any material respect with the business of Holdings or the Subsidiaries or (ii) secure any Debt;

(l)      Liens arising from UCC financing statements filed regarding (i) operating leases entered into by an Obligor and (ii) goods consigned or entrusted to or bailed to a Person in the Ordinary Course of Business;

(m)      Liens in favor of customs or revenue authorities to secure payment of customs duties in connection with the importation of goods;

(n)      Liens solely on any cash earnest money deposits made by any Obligor or any Subsidiary in connection with any letter of intent or purchase agreement not prohibited by this Agreement;

(o)      Liens on Collateral securing the "Obligations" under the Prepetition Credit Facility Debt, *provided*, that the liens thereon must be junior in priority to the liens securing Obligations hereunder pursuant to the DIP Order;

(p)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by any Obligor in the Ordinary Course of Business permitted by this Agreement;

(q)      Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the Ordinary Course of Business and not for speculative purposes;

-127-

**EXHIBIT 2**

(r)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted hereunder to be applied against the purchase price for such Investment and (ii) consisting of an agreement to dispose of any property in an Asset Disposition permitted hereunder, to the extent that such Asset Disposition would have been permitted on the date of the creation of such Lien;

(s)     ground leases in respect of real property on which facilities owned or leased by any of the Obligors are located;

(t)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto not to exceed the amount of such premiums;

(u)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(v)     deposits of cash with the owner or lessor of premises leased and operated by any Obligor to secure the performance of such Obligor's obligations under the terms of the lease for such premises;

(w)     [reserved];

(x)     Liens on property subject to any sale-leaseback transaction not prohibited hereunder and general intangibles related thereto;

(y)     Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(z)     Liens existing on property at the time of its acquisition by an Obligor in accordance herewith, or existing on the property of any Person at the time such Person becomes an Obligor in accordance herewith, but excluding Liens on the Equity Interests of any Person that becomes a Subsidiary;

(aa)     [reserved];

(bb)     Liens upon real or personal property leased under operating leases in the Ordinary Course of Business by Holdings or any of its Subsidiaries in favor of the lessor created at the inception of the lease transaction, securing obligations of Holdings or any of its Subsidiaries under or in respect of such lease and extending to or covering only the property subject to such lease and improvements thereon;

-128-

**EXHIBIT 2**

(cc)     Liens that are contractual rights of set-off or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Debt, (ii) relating to pooled deposit or sweep accounts of Holdings or any of the Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings or any of the Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of any Subsidiary in the Ordinary Course Of Business; and

(dd)     Liens on cash and Cash Equivalents securing reimbursement obligations under letters of credit permitted hereunder.

10.2.3   <u>Distributions; Upstream Payments</u>.  Declare or make any Distributions, except for Upstream Payments, and as follows:

(a)     [reserved];

(b)     [reserved];

(c)     Holdings may declare and make Tax Distributions that are specifically identified in, and made in accordance with, the Approved Budget; and

(d)     Holdings and its Subsidiaries may make Distributions to any direct or indirect holder of its Equity Interests, but solely if, and to the extent that, (i) such Distributions are set forth in, and made in accordance with, the Approved Budget, and (ii) the proceeds of such Distributions shall be promptly used to pay franchise and excise taxes attributable to Holdings and its Subsidiaries, and reasonable and customary operating or overhead costs required to maintain Holdings' corporate existence during the Chapter 11 Cases; provided, that the aggregate amount of Distributions made under this clause (d) shall not to exceed $100,000 in any Fiscal Year.

No Borrower shall create or permit to exist any encumbrance or restriction on the ability of a Subsidiary to make any Upstream Payment, except for Permitted Restrictions.  Notwithstanding anything to the contrary, no Distribution or other payment shall be made (whether or not permitted hereunder) at any time as of the Closing Date except in accordance with the Approved Budget.

10.2.4   <u>Restricted Investments</u>.  Make any Restricted Investment.

10.2.5   <u>Disposition of Assets</u>.  Make any Asset Disposition, except a Permitted Asset Disposition.

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

10.2.6 <u>Capital Expenditures</u>. (a) Permit the aggregate amount of Capital Expenditures made by the Obligors to exceed the amount set forth therefor in the Approved Budget, or (b) make any payment on account of, or incur any obligation with respect to, any Capital Expenditure, except if (i) no Default shall exist or be continuing at the time of, or after giving effect to, the same, and (ii) the type and amount of such Capital Expenditure is set forth in the Approved Budget, and such payment is made in accordance with the Approved Budget.

10.2.7 <u>Restrictions on Creditor Distributions and Payment of Certain Debt</u>. Make any payment or any Creditor Distribution (whether in cash, kind or consisting of any assets or interests or otherwise, including on account of or in respect of any principal payments, and whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition), in each case, with respect to (a) any Prepetition Debt, or (b) any other Borrowed Money (other than Borrowed Money described in **Sections 10.2.1(h)** or **10.2.1(p)**)) or Debt that is contractually subordinated, or is secured by liens that are contractually subordinated to the Liens securing the Obligations, except (i) in accordance with the express provisions of the Intercreditor Agreement, or such other intercreditor agreement acceptable to the Administrative Agent, (ii) payments of regularly scheduled principal and interest under the Prepetition Senior Loan Agreement, solely to the extent permitted and made in accordance with the Approved Budget, (iii) in the case of such other Borrowed Money, payments on their respective due dates under the agreements evidencing such Debt, to the extent that the same is made in accordance with the Approved Budget, and (iv) payments in kind permitted under the Prepetition Senior Loan Agreement (as in effect on the date hereof).

10.2.8 <u>Fundamental Changes</u>. Change its legal name; change its tax, charter or other organizational identification number; change its form or state of organization; liquidate, wind up its affairs or dissolve itself; or effect a Division, merge, combine or consolidate with any Person, whether in a single transaction or in a series of related transactions.

10.2.9 <u>Subsidiaries</u>. Form or acquire any Subsidiary after the Petition Date; or permit any existing Subsidiary to issue any Equity Interests.

10.2.10 <u>Organic Documents and Material Contracts</u>. Amend, modify or otherwise change any of its Organic Documents or any Material Contract.

10.2.11 <u>Spectra Agreement</u>. Amend, modify or otherwise change the terms of Borrower's contractual requirement in the Spectra Agreement.

10.2.12 <u>Accounting Changes</u>. Make any material change in accounting treatment or reporting practices, except as required by GAAP and in accordance with **Section 1.2**; or change its Fiscal Year.

-130-

**EXHIBIT 2**

10.2.13     <u>Restrictive Agreements</u>. Become a party to any Restrictive Agreement other than agreements containing solely Permitted Restrictions.

10.2.14     <u>Hedging Agreements</u>. Enter into, amend or modify any Hedging Agreement (including, directly or indirectly, with respect to any notional amount, or any Swap Obligation or other obligation or exposure thereunder) at any time without the prior written consent of the Administrative Agent, or make any payment pursuant to, or in connection with, any Hedging Agreement (or any Swap Obligation or other obligation thereunder) except to the extent set forth in, and made in accordance with, the Approved Budget.

10.2.15     <u>Conduct of Business</u>. Engage in any line of business materially different than the lines of business conducted by it on the Closing Date and any activities related, similar or incidental thereto or synergistic therewith.

10.2.16     <u>Affiliate Transactions</u>. Enter into or be party to, or consummate or permit to exist, any transaction with an Affiliate except (a) transactions expressly permitted by the Loan Documents, (b) payment of reasonable compensation to officers and employees for services actually rendered, and payment of customary directors' fees and indemnities (solely to the extent that payment thereof is in accordance with the Approved Budget and approved by the Administrative Agent prior to the Closing Date), (c) the payment of reasonable fees to independent directors of Holdings or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of Holdings or their Subsidiaries in the Ordinary Course of Business, subject to the Approved Budget, (d) transactions solely among Obligors, (e) transactions with Affiliates that were consummated prior to the Closing Date and permitted pursuant to the Prepetition Loan Agreements, (f) transactions with Affiliates consummated in good faith upon approval thereof by such Obligor's board of directors (*provided*, that a copy of the resolution adopted by the majority of such board of directors approving such transaction and a certificate of a Senior Officer thereof certifying that such transaction complies with this <u>sub-clause (f)</u>), and on terms and pricing no less favorable than would be obtained in a comparable arm's-length transaction with a non-Affiliate; *provided*, that, without the Administrative Agent's prior written consent, the aggregate amount of payments or other obligation made pursuant to this clause (f) by any Obligor shall not exceed $500,000 per Fiscal Year, (g) shared services agreements with Crossfire and Capstone (as in effect prior to the Closing Date, or as amended thereafter with the Required Lenders' consent), and (h) transactions between or among Holdings and its Subsidiaries; *provided*, that such transactions are intercompany transactions entered into in the Ordinary Course of Business as part of tax, accounting, pension, cash management and other administrative activities and not for the purpose of circumventing any covenant hereunder; *provided*, that, if such any transaction that shall otherwise be permitted hereunder gives rise to any payment or other obligation of the Obligors or any of their Subsidiaries

-131-

**EXHIBIT 2**

in excess of $500,000 per Fiscal Year, the Administrative Agent's prior written approval shall be required notwithstanding that such transaction shall otherwise comply with the terms hereof.

        10.2.17    <u>Plans</u>.  Become party to any Multiemployer Plan or Foreign Plan, other than any in existence on the Closing Date.

        10.2.18    <u>Amendments to Subordinated Debt</u>.  Amend, supplement or otherwise modify any document, instrument or agreement relating to any Subordinated Debt.

        10.2.19    <u>Holding Company</u>.  Holdings shall not directly or indirectly, conduct, transact or otherwise engage in any material business or operations, or own any material properties or assets, other than the following (to the extent in accordance with an applicable Chapter 11 Order):

        (a)    its ownership of the Equity Interests of the Borrowers and its Subsidiaries;

        (b)    the maintenance of its legal existence (including the ability to incur fees, costs and expenses related to such maintenance);

        (c)    the performance of its obligations under the Loan Documents;

        (d)    participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and its Subsidiaries;

        (e)    the granting of (i) nonconsensual Liens and obligations arising by operation of law and (ii) Liens to secure the Obligations and the Prepetition Credit Facility Debt;

        (f)    Investments in any Obligor;

        (g)    the making of Distributions permitted under **Section 10.2.3**;

        (h)    establishing and maintaining bank accounts in good faith and for legitimate business purposes not in violation of any provision hereof;

        (i)    performing the activities contemplated pursuant to any of the employment agreements and other customary arrangements with officers, consultants, employees and directors, in each case, entered into in good faith and for legitimate business purposes not in violation of any provision hereof prior to the Petition Date and in effect as

-132-

**EXHIBIT 2**

of the Closing Date; *provided*, that any payment thereunder shall be in accordance with the Approved Budget;

(j)     Guarantee Obligations with respect to Debt of any of its Subsidiaries not otherwise prohibited under this Agreement;

(k)     the providing of customary indemnification to officers, consultants, managers and directors pursuant to arrangements entered into prior to the Petition Date and in effect as of the Closing Date; and

(l)     activities incidental to the business or activities described in the foregoing subclauses (a) through (k).

10.2.20     <u>Classification</u>.  Take or omit to take any action (or permit any parent entity or other Person Controlling any of the Obligors to take or omit to take any action at any time (including, but not limited to, the making of an election under Treasury Regulations Section 301.7701-3), in each case, to the extent that the same could result in any of the Obligors ceasing to be classified as, or being deemed not to be, a disregarded entity for U.S. federal income tax purposes.

10.2.21     <u>Restricted Actions</u>.  Notwithstanding anything else herein, the Obligors shall not (and shall not permit any of their respective Subsidiaries to) (i) incur any Debt, grant or permit to arise any Lien, make any Investment, Distribution or Upstream Payment, or (ii) undertake any Asset Disposition, Affiliate transaction or any other transaction, enter into or modify any Hedging Agreement, or take any other action or exercise any right or power, in each case, that is subject to the covenants contained in **Sections 10.2.1** through **10.2.20** (each, an "<u>Applicable Transaction</u>") except, in each case, solely if and to the extent that, no Default or Event of Default shall exist or be continuing prior to (or after giving effect to) such Applicable Transaction, and such Applicable Transaction (and any action in connection therewith) (x) does not violate any Applicable Law, and is in accordance with any applicable Chapter 11 Order (and, if any approval, authorization or consent, or any notice, motion, filing or other action, as the case may be, is required to cause such Applicable Transaction to be permitted during the pendency of the Chapter 11 Cases (each of the foregoing, a "<u>Chapter 11 Approval</u>"), the Debtors shall have obtained all such Chapter 11 Approvals prior to consummating such Applicable Transaction and shall consummate the same in accordance with the requirements thereof), (y) is undertaken by the applicable Obligor (or by the Subsidiaries of the Obligors involved therein) acting in good faith, and (z) is effectuated or consummated in the Ordinary Course of Business and in accordance with prudent business practices of the Obligors; *provided*, that, notwithstanding the foregoing, A) no cash or Cash Equivalents of the Obligors (including resulting from any borrowing of Loans) shall be used to fund any disbursement or payment in connection with any Wind Down (including any Wind Down Statutory Expenses) except to the extent that the same shall be in accordance with the

-133-

**EXHIBIT 2**

Wind Down Budget and the DIP Orders, and (B) without limiting anything in foregoing clause (A), any Applicable Transaction (or related series of Applicable Transactions) in excess of $250,000 individually or $500,000 in the aggregate (since the Petition Date) shall in any event require the prior written consent of the Administrative Agent unless the same is in accordance with the DIP Orders and Approved Budget, and does not result in a breach of the Budget Covenant; *provided*, *further*, <u>however</u>, that, except in connection with making a payment not in violation of the foregoing, the Obligors shall not (and shall not permit any of their respective Subsidiaries to) transfer any funds (other than such funds to pay payroll) from any account that is (or is required to be) subject to a Deposit Account Control Agreement in favor of the Administrative Agent into any account that is not subject to a Deposit Account Control Agreement in favor of the Administrative Agent (other than a transfer that is made in accordance with customary cash management practices into a deposit account maintained by an Obligor at Bank of America that is subject to a zero balance cash sweep into a deposit account maintained by such Obligor at Bank of America that is not an Excluded Account and that is subject to a Deposit Account Control Agreement in favor of the Administrative Agent).

**10.3.** <u>**Financial Covenant**</u>.

10.3.1 <u>Permitted Variances</u>. Obligors shall not (a) permit (i) actual "Total Receipts", "Customer Receipts" or "Other Receipts" (which shall exclude proceeds of the Additional Specified Vehicle Dispositions that are actually received by the Borrowers) for the Performance Period covered in each Variance Report to be less than 87.5% of each respective projected line-item for such Performance Period in the Approved Budget, for the first Weekly Performance Period of each Approved Budget and on a rolling two week basis for each Bi-Weekly Performance Period thereafter for each Approved Budget, (ii) the actual "Total Disbursements" (which shall exclude "<u>Professional Fees</u>") for the most recently ended Performance Period covered in each Variance Report to exceed 112.5% of the projected "Total Disbursements" for such Performance Period in the Approved Budget, for the first Weekly Performance Period of each Approved Budget and on a rolling two week basis for each Bi-Weekly Performance Period thereafter for each Approved Budget, and (iii) the actual "Vendor Payables" for the most recently ended Performance Period covered in each Variance Report to exceed 115% of each respective projected line-item for such Performance Period in the Approved Budget, for the first Weekly Performance Period of each Approved Budget and on a rolling two week basis for each Bi-Weekly Performance Period thereafter for each Approved Budget, and (b) make any payment (whether on account of any disbursement, Investment, Distribution or otherwise) unless, both at the time thereof, and on a pro forma basis (after giving effect to the making of such payment and any other circumstances resulting therefrom), the Obligors shall be in compliance with clause (a) (the requirements set forth in this **Section 10.3.1**, the "<u>Budget Covenant</u>").

-134-

**EXHIBIT 2**

10.3.2 <u>Minimum Liquidity</u>. Obligors shall not permit the aggregate amount of Liquidity, *plus* the amount of New Money Loans then-available to be borrowed hereunder, to be less than $2,500,000 at the end of each day.

**10.4.  <u>Chapter 11 Cases</u>**.

Obligors shall not:

(a)     Other than the claims and Liens of the Administrative Agent arising from this Agreement, and other than the adequate protection claims of permitted in the DIP Orders, as applicable, and except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other Superpriority DIP Claim which is pari passu with, or senior to the claims and Liens of, the Administrative Agent and Lenders.

(b)     Make or permit to be made any amendment or change to the DIP Orders, as applicable, without the consent of the Required Lenders.

(c)     Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against any Agent, any Lender or any Prepetition Secured Party with respect to any Loan Document or any Prepetition Loan Document, or any of the liens, claims, rights, benefits or protections granted hereunder or thereunder, or any of the transactions contemplated hereby or thereby.

(d)     Make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claim, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by Chapter 11 Order after notice and a hearing, and (b) are expressly permitted by, and in compliance with, the terms of the Loan Documents (including the Budget Covenant and the Approved Budget, subject to any Permitted Variance), or otherwise with the prior written consent of the Required Lenders.

(e)     File any material motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Debtors without consulting with the Lenders and providing the Lenders prior (in any case, not less than two (2) Business Days' (or as soon as reasonably practicable if two (2) Business Days in advance is not reasonably practicable)) notice and the opportunity to review and comment on each such motion.

(f)     Subject to the applicable DIP Order, object to, contest, delay, prevent, or interfere in any manner with, the exercise of any rights and remedies by the Administrative Agent

-135-

**EXHIBIT 2**

or the Lenders with respect to the Collateral following the occurrence and during the continuance of an Event of Default.

## SECTION 11.     EVENTS OF DEFAULT; REMEDIES ON DEFAULT

**11.1.     <u>Events of Default</u>**.  Each and any one or more of the following shall be an "Event of Default" if it occurs for any reason whatsoever, whether voluntary or involuntary, by operation of law or otherwise:

(a)     any Borrower shall fail to pay any principal of any Loan, or any Termination Payment (or portion thereof) when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     any Borrower shall fail to pay any interest on any Loan or any fee or any other Obligation (other than an amount referred to in clause (a) above) payable under any Loan Document, within three (3) Business Days after the same shall become due and payable;

(c)     any representation or warranty of an Obligor made in any Loan Document is false or misleading in any material respect when given;

(d)     any Obligor or Subsidiary breaches or fail to perform any covenant applicable to it contained in **Section 7.2**, **7.3**, **8.1**, **8.2.4**, **8.2.5**, **8.5**, **10.1.1**, **10.1.12**, **10.1.13**, Error! Reference source not found., **10.1.14, 10.1.15, 10.2** or **10.3**;

(e)     any Obligor or Subsidiary breaches or fails to perform any other covenant contained in any Loan Documents, and such breach or failure is not cured within 30 days (or 10 days in the case of a breach of **Section 10.1.2**) after a Senior Officer of such Obligor or Subsidiary has knowledge thereof or receives notice thereof from Administrative Agent, whichever is sooner; *provided, however*, that such notice and opportunity to cure shall not apply if the breach or failure to perform is not capable of being cured within such period;

(f)     any Guarantor repudiates, revokes or attempts to revoke its Guaranty; an Obligor denies or contests the validity or enforceability of any Loan Documents or Obligations, or the perfection or priority of any Lien granted to Administrative Agent; any Loan Document ceases to be in full force or effect for any reason (other than a waiver or release by Administrative Agent and Lenders and other than in accordance with the terms of this Agreement); any lien created hereunder or under the Security Documents ceases to be a valid and perfected lien (other than as a result of any

-136-

**EXHIBIT 2**

action or inaction by the Administrative Agent and other than by reason of a release of Collateral in accordance with the terms hereof or thereof or Full Payment) or the Obligations cease to be Superpriority DIP Claims;

(g)     other than any "Event of Default" (in each case, as defined in the Prepetition Loan Agreements) that occurs under either Prepetition Loan Agreement, any breach or default of an Obligor or Subsidiary occurs under any Hedging Agreement, or under any instrument or agreement to which it is a party or by which it or any of its properties is bound, in each case, relating to any Debt (other than the Obligations) in excess of $500,000 (in the case of any Hedging Agreement, determined on a net basis), if the maturity of or any payment with respect to such Debt may be accelerated or demanded due to such breach;

(h)     any judgment or order for the payment of money is entered against an Obligor or Subsidiary in an amount that exceeds, individually or cumulatively with all unsatisfied judgments or orders against all Obligors and Subsidiaries, $500,000 (excluding amounts of insurance coverage therefor that has not been denied by the insurer, or subject to another contractual indemnity arrangement reasonably acceptable to the Administrative Agent, and available to the Obligors for payment of such liabilities), and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty consecutive days;

(i)     an Obligor or Subsidiary is enjoined, restrained or in any way prevented by any Governmental Authority from conducting any part of its business which could reasonably be expected to have a Material Adverse Effect; there is a cessation of any part of an Obligor's or Subsidiary's business which could reasonably be expected to have a Material Adverse Effect; a material portion of the Collateral or real or personal property of an Obligor or Subsidiary is taken or impaired through condemnation the effect of which could reasonably be expected to have a Material Adverse Effect;

(j)     an Insolvency Proceeding is commenced by an Obligor or Subsidiary; an Obligor or Subsidiary makes an offer of settlement, extension or composition to its unsecured creditors generally; a trustee is appointed to take possession of any substantial real or personal property of or to operate any of the business of an Obligor or Subsidiary; or an Insolvency Proceeding is commenced against an Obligor or Subsidiary, and the Obligor or Subsidiary consents to institution of the proceeding, the petition commencing the proceeding is not timely contested by the Obligor or Subsidiary, the petition is not dismissed within 60 days after filing, or an order for relief approving such Insolvency Proceeding is entered in the proceeding; *provided*, *however*, that the Chapter 11 Cases shall not constitute an Event of Default pursuant to this clause (j);

-137-

AMERICAS 110819944

**EXHIBIT 2**

(k)     an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of an Obligor to a Pension Plan, Multiemployer Plan or PBGC, or that constitutes grounds for appointment of a trustee for or termination by the PBGC of any Pension Plan or Multiemployer Plan to the extent the foregoing could reasonably be expected to have a Material Adverse Effect; an Obligor or ERISA Affiliate fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan to the extent the foregoing could reasonably be expected to have a Material Adverse Effect; or any event similar to the foregoing occurs or exists with respect to a Foreign Plan to the extent the foregoing could reasonably be expected to have a Material Adverse Effect;

(l)     any Obligor or Subsidiary is criminally convicted for (i) a felony committed in the conduct of the Obligor's or Subsidiary's business, or (ii) violating any state or federal law (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act) that could reasonably be expected to have a Material Adverse Effect;

(m)     the Borrowers do not immediately (i) prepay, or cause to be prepaid, the Loans and (ii) terminate, or cause to be terminated, the Commitments upon the occurrence of a Change of Control pursuant to **Section 5.3.3** hereof or in any amount less than as set forth thereunder;

(n)     the Strike Investment Board, any committee of the Strike Investment Board (including the Restructuring Committee) or any of the members of Strike Investment does any of the following (whether by amendment to the limited liability company agreement of Strike Investment, resolution, written consent or otherwise): (i) dissolves, terminates or disbands the Restructuring Committee, (ii) limits, reduces, or modifies the powers, responsibilities, rights or authority of the Restructuring Committee, (iii) changes the members of the Restructuring Committee (including by adding additional members to the Restructuring Committee or by removing and/or replacing any members of the Restructuring Committee), (iv) restores or reinstates to the Strike Investment Board any powers or authority of the Strike Investment Board that were limited or restricted by the Special Resolution, or (v) takes any action to impede, delay or frustrate the purpose of any action taken by the Restructuring Committee in accordance with the powers granted to it by the Special Resolution;

(o)     (i) any Restructuring Transaction Documents shall, in whole or in part, cease to be effective and legally valid, binding and enforceable against any Obligor or Affiliate thereof, or shall otherwise cease or fail be effective to create the rights and

-138-

AMERICAS 110819944

**EXHIBIT 2**

obligations purported to be created thereunder in favor of any Consenting Lender-Side Person, or (ii) any Obligor thereof shall repudiate or revoke (or attempt or purport to repudiate or revoke) any of its obligations or covenants under any Restructuring Transaction Document, or (y) breach or default by any Obligor under (and, in each case, subject to any applicable cure periods thereunder), or any termination of, any other Restructuring Transaction Document (unless such termination results from any breach of default by the Administrative Agent or any other Consenting Lender-side Person);

(p)     there shall have occurred any of the following in the Chapter 11 Cases:

(i)     the bringing of a motion by any Obligor in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (A) obtaining additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under this Agreement in full in cash; (B) granting any Lien other than Liens expressly permitted under this Agreement upon or affecting any Collateral; (C) except as provided in this Agreement, the Interim DIP Order or the Final DIP Order, as the case may be, authorizing use of cash collateral of the Administrative Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent and the Required Lenders; or (D) that (in the case of any Obligor) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Obligor) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Administrative Agent and the Lenders hereunder or their interest in the Collateral;

(ii)     the filing by any Obligor of (A) any disclosure statement or other document or instrument relating to any Chapter 11 Plan that is not a Chapter 11 Liquidating Plan, or (B) any direct or indirect amendment to any disclosure statement or other document or instrument relating to any Chapter 11 Liquidating that would cause the same to cease to constitute a Chapter 11 Liquidating Plan;

(iii)     the modification, expiry or termination of any Obligor's exclusive right to file and solicit acceptances of a Chapter 11 Plan;

(iv)     the entry of an order in any of the Chapter 11 Cases confirming a Plan that does not constitute a Chapter 11 Liquidating Plan;

(v)     the entry of an order in the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document or the DIP Orders or impairing the rights, privileges, benefits or protections of the Administrative Agent and the Lenders under the DIP Orders or the Loan Documents, in each case, without the prior written consent of the Required Lenders;

-139-

AMERICAS 110819944

**EXHIBIT 2**

(vi)    the payment of, or application by any Obligor for authority to pay, any Prepetition Debt or other prepetition claim without the Required Lenders' prior written consent other than (A) as provided in any "first day order" in form and substance acceptable to the Required Lenders, or (B) to the extent such payment is expressly permitted pursuant to this Agreement or consented to by the Required Lenders;

(vii)   the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Obligor, for an order seeking the appointment of, in either case, without the prior written consent of the Required Lenders, an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (including any powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery from) any of the Secured Parties or against any of the Prepetition Secured Parties; or the sale without the Required Lenders' consent, of any Obligor's assets (including through a sale under section 363 of the Bankruptcy Code), except to the extent expressly permitted hereunder and the DIP Orders;

(viii)  the dismissal of the Chapter 11 Cases which does not contain a provision for Full Payment, or if any Obligor shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases that does not contain a provision for Full Payment;

(ix)    the conversion of any Chapter 11 Case from a case under chapter 11 of the Bankruptcy Code to a case under chapter 7 of the Bankruptcy Code, or into any other bankruptcy proceeding under any Bankruptcy Law, as applicable, or any Obligor shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(x)     the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Administrative Agent and the Prepetition Senior Loan Agent, in each case, subject to any Permitted Liens;

(xi)    the entry of an order in the Chapter 11 Cases, avoiding, recharacterizing, subordinating, disgorging or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

-140-

AMERICAS 110819944

**EXHIBIT 2**

(xii)    the failure of any Obligor to perform any of its obligations under the Interim DIP Order or the Final DIP Order or any violation of any of the terms of the Interim DIP Order or the Final DIP Order, subject to any applicable grace or cure periods;

(xiii)    the challenge (or support) in writing by any Obligor to (and the entry of an order of the Court impairing or modifying in any manner) the validity, enforceability, extent, perfection or priority of any liens or claims granted under the Prepetition Loan Documents, the DIP Orders or the Loan Documents;

(xiv)    [reserved];

(xv)    the entry of an order in any of the Chapter 11 Cases granting any super priority administrative claim or Lien equal or superior to that granted to the Agent, on behalf of itself and the Lenders without the consent in writing of the Required Lenders, except (A) in respect of the Carve-Out in accordance with the DIP Orders and (B) as expressly provided in the Adequate Protection Provisions;

(xvi)    the filing of a motion by any Obligor requesting, or the entry of any order granting, any super-priority administrative expense claim which is senior to or pari passu with the Lenders' claims or with the claims of the Prepetition Secured Parties without the consent in writing of the Required Lenders, except (A) in respect of the Carve-Out and (B) as expressly provided in the Adequate Protection Provisions;

(xvii)    the entry of an order precluding any Agent or the applicable agent under any Prepetition Credit Facility Debt from having the right to or being permitted to "credit bid" with respect to the assets of the Obligors;

(xviii) any attempt by any Obligor to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing such Obligations to any other debt;

(xix)    the reversal, vacatur, or stay of the effectiveness of either the Interim DIP Order or the Final DIP Order or any provision thereof without the consent of the Required Lenders;

(xx)    the payment of, or granting adequate protection (except pursuant to the Adequate Protection Provisions) with respect to, any Prepetition Credit Facility Debt;

(xxi)    an application for any of the orders described in this Section 11.1(p) shall be (a) made, joined in or supported by any of the Obligors or (b) made by any other Person (other than any Agent or the Lenders) and such application is not, to the extent requested by the

-141-

**EXHIBIT 2**

Administrative Agent or the Lenders, contested by the Obligors in good faith, and the relief requested is granted in an order that is not stayed pending appeal;

(xxii)   cessation of Liens or super-priority claims granted with respect to this Agreement to be valid, perfected (in the case of any Liens) and enforceable in all respects

(xxiii)  the Restructuring Support Agreement is terminated by any party thereto, or otherwise terminates in accordance with the terms thereof except with respect to any termination resulting from a breach by the Lenders;

(xxiv)  the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Security Documents and the Collateral;

(xxv)   [the Stalking Horse Agreement is terminated by any party thereto, or otherwise terminates in accordance with the terms thereof, other than as a result of either (A) a breach of the Stalking Horse Agreement by the purchaser under the Stalking Horse Agreement or (B) the Obligors entry into an Alternative Asset Purchase Agreement in accordance with the Sale Procedures;

(xxvi)  an Alternative Asset Purchase Agreement is terminated by the Obligors other than as a result of a breach of the Alternative Asset Purchase Agreement by the purchaser thereunder; or

(xxvii) (A) the "Sellers" (as defined in the Stalking Horse Agreement) shall have failed to deliver to the "Purchaser" (as defined in the Stalking Horse Agreement) true, accurate and complete copies of all of the "Seller Disclosure Schedules" (as defined in the Stalking Horse Agreement) on or before the date that is seven (7) days after the "Execution Date" (as defined in the Stalking Horse Agreement), or (B) any of the "Seller Disclosure Schedules" (as defined in the Stalking Horse Agreement), or any matter, fact, item of information, circumstance, event, liability or other disclosure set forth on, or described or referred to in, any of the "Seller Disclosure Schedules" (as defined in the Stalking Horse Agreement), shall not be acceptable to the "Purchaser" (as defined in the Stalking Horse Agreement).]

**11.2.   Remedies upon Default**.

11.2.1  Remedies Generally.  If an Event of Default described in **Section 11.1(j)** occurs with respect to any Obligor, then to the extent permitted by Applicable Law, all Obligations (including the Termination Payment) shall become automatically due and payable, and all Commitments shall terminate, without any action by Administrative Agent or notice of any kind. In addition, or if any other Event of Default exists, Administrative Agent may in its discretion (and

-142-

AMERICAS 110819944

**EXHIBIT 2**

shall upon written direction of Required Lenders) do any one or more of the following from time to time (in addition to any and all other things as provided elsewhere in **Section 11.2**):

(a)    declare any Obligations (including the Termination Payment and all other premiums thereon) to be immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrowers to the fullest extent permitted by law;

(b)    terminate, reduce or condition any Commitment;

(c)    require the Obligors to cash collateralize then Obligations; and

(d)    exercise any other rights, remedies, powers and privileges afforded under the Loan Documents or any other agreement, pursuant to the DIP Order and any other Chapter 11 Order, by law (including under the Bankruptcy Code and other Applicable Law), at equity and otherwise, including the rights and remedies of a secured party under the UCC.

11.2.2    <u>Disposition of Collateral</u>.  Without limiting the generality of the foregoing, the Administrative Agent may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by the Interim DIP Order, or, the Final DIP Order) to or upon any Obligor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived (except as required by the Interim DIP Order or the Final DIP Order)), during the continuance of any Event of Default (personally or through its agents or attorneys), to the maximum extent permitted under the Bankruptcy Code and other Applicable Law (including the DIP Orders):  (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self- help, without judicial process, without first obtaining a final judgment or giving any Obligor or any other Person notice or opportunity for a hearing on the Administrative Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral, (iii) Sell, grant any option to purchase, and/or deliver any Collateral (in its then condition, or after any further manufacturing or processing thereof) (and enter into contractual obligations to do any of the foregoing), in lots or in bulk, in one or more parcels, at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere, upon such terms and conditions, and at such prices, as it may deem necessary, prudent or advisable, for cash or on credit or for future delivery (or any combination thereof), or without charge, and/or without assumption of any credit risk, and any of the foregoing may be adjourned from time to time in accordance with Applicable Law, and Administrative Agent shall have the right to purchase all or any portion of the Collateral free of any right or equity of redemption of any Obligor, which right or equity is hereby waived and released, at any public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may credit bid and set off the amount of such price against the Obligations, (iv) withdraw all cash and Cash Equivalents in any Deposit Account or Securities Account of a Obligor

-143-

AMERICAS 110819944

**EXHIBIT 2**

and apply such cash and Cash Equivalents and other cash, if any, then held by it as Collateral in satisfaction of the Obligations, and (v) give notice and take sole possession and control of all amounts on deposit in or credited to any Deposit Account or Securities Account pursuant to the related Deposit Account Control Agreement.

11.2.3   Management of Collateral.  Each Obligor further agrees, that, during the continuance of any Event of Default, (i) at the Administrative Agent's request, it shall assemble the Collateral and make it available to the Administrative Agent at places that the Administrative Agent shall reasonably select, whether at such Obligor's premises or elsewhere, (ii) without limiting the foregoing, the Administrative Agent also has the right to require that each Obligor store and keep any Collateral pending further action by the Administrative Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Administrative Agent is able to sell any Collateral, the Administrative Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Administrative Agent, and (iv) the Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Lender Parties), with respect to such appointment without prior notice or hearing as to such appointment.  The Administrative Agent shall not have any obligation to any Obligor to maintain or preserve the rights of any Obligor as against third parties with respect to any Collateral while such Collateral is in the possession of the Administrative Agent.

11.2.4   Direct Obligation.  Neither the Administrative Agent nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, any Obligor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof.  All of the rights and remedies of the Administrative Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Applicable Law. To the extent it may lawfully do so, each Obligor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any Lender or other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 calendar days before such Sale or other disposition.

-144-

**EXHIBIT 2**

11.2.5 <u>Commercially Reasonable</u>.  To the extent that any Applicable Law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Obligor acknowledges and agrees that the Administrative Agent shall be deemed to have complied with such duties even if it shall:

(i)  fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Administrative Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)  fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Applicable Law, fail to obtain permits or other consents for the collection or disposition of any Collateral;

(iii)  fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)  advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Obligor, for expressions of interest in acquiring any such Collateral;

(v)  exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Administrative Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi)  dispose of assets in wholesale rather than retail markets;

(vii)  disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii)  purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of any Collateral or to provide

-145-

**EXHIBIT 2**

to the Administrative Agent a guaranteed return from the collection or disposition of any Collateral.

### 11.2.6 <u>Accounts and Payments in Respect of General Intangibles</u>.

(a)     In addition to, and not in substitution for, any other provision in this Agreement, if required by the Administrative Agent at any time during the continuance of an Event of Default, on and after the date on which at least one deposit account or securities account has been established, any payment of accounts or payment in respect of general intangibles, when collected by any Obligor, shall be promptly (and, in any event, within two (2) Business Days) deposited by such Obligor in the exact form received, duly indorsed by such Obligor to the Administrative Agent, in the Dominion Account or such other account, subject to withdrawal by the Administrative Agent as provided herein.  Until so turned over, such payment shall be held by such Obligor in trust for the Administrative Agent, segregated from other funds of such Obligor.  Each such deposit of proceeds of accounts and payments in respect of general intangibles shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(b)     At any time during the continuance of an Event of Default:

(A)     each Obligor shall, upon the Administrative Agent's written request, deliver to the Administrative Agent all original and other documents evidencing, and relating to, the contractual obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all original orders, invokes and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to the Administrative Agent and that payments in respect thereof shall be made directly to the Administrative Agent;

(B)     the Administrative Agent may, without notice, at any time during the continuance of an Event of Default, limit or terminate the authority of an Obligor to collect its accounts or amounts due under general intangibles or any thereof and, in its own name or in the name of others, communicate with account debtors to verify with them to the Administrative Agent's reasonable satisfaction the existence, amount and terms of any account or amounts due under any general intangible.  In addition, the Administrative Agent may at any lime enforce such Obligor's rights against such account debtors and obligors of general intangibles; and

(C)     each Obligor shall take all actions, deliver all documents and provide all information necessary or reasonably requested by the Administrative Agent to ensure any Internet domain name is registered.

-146-

**EXHIBIT 2**

(c)     Anything herein to the contrary notwithstanding, each Obligor shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  No Secured Party shall have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any Loan Document or the receipt by any Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any obligation of any Obligor under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

11.2.7  <u>Proceeds to be Turned over to and Held by Administrative Agent</u>.  Unless otherwise expressly provided in this Agreement, upon the occurrence and during the continuance of an Event of Default, all proceeds of any Collateral received by any Obligor hereunder in cash or Cash Equivalents shall be held by such Obligor in trust for the Administrative Agent and the other Lender Parties, segregated from other funds of such Obligor, and shall, promptly upon receipt by any Obligor, be turned over to the Administrative Agent in the exact form received (with any necessary endorsement).

11.2.8  <u>Deficiency</u>.  Each Obligor shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Obligations and the fees and disbursements of any attorney employed by the Administrative Agent or any other Lender Party to collect such deficiency.

**11.3.**  <u>Setoff</u>.  At any time during an Event of Default, Administrative Agent, Lenders, and any of their Affiliates are authorized, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Administrative Agent, such Lender or such Affiliate to or for the credit or the account of an Obligor against any Obligations, irrespective of whether or not Administrative Agent, such Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of Administrative Agent, such Lender or such Affiliate different from the branch or office holding such deposit or obligated on such indebtedness, *provided*, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of **Section 4.2.2** and, pending such payment, shall be segregated by such Defaulting Lender from

-147-

**EXHIBIT 2**

its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of Administrative Agent, each Lender and each such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) that such Person may have. NOTWITHSTANDING THE FOREGOING, NO LENDER AND NO PARTICIPANT SHALL EXERCISE ANY RIGHT OF SETOFF, BANKER'S LIEN, OR THE LIKE AGAINST ANY DEPOSIT ACCOUNT OR PROPERTY OF ANY OBLIGOR HELD OR MAINTAINED BY SUCH PERSON WITHOUT THE WRITTEN CONSENT OF THE ADMINISTRATIVE AGENT.

**11.4.** **Remedies Cumulative; No Waiver**.

11.4.1 Cumulative Rights and Remedies. All agreements, warranties, guaranties, indemnities and other undertakings of the Obligors under the Loan Documents are cumulative and not in derogation of each other. The rights and remedies of Administrative Agent and Lenders are cumulative, may be exercised at any time and from time to time, concurrently or in any order, and are not exclusive of any other rights or remedies available by agreement, by law, at equity or otherwise. All such rights and remedies shall continue in full force and effect until Full Payment of all Obligations. Each Obligor acknowledges that the purpose of **Section 11.2** is, among other things, to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Secured Parties shall not be deemed commercially unreasonable solely on account of not being indicated in such clauses.

11.4.2 Waivers. No waiver or course of dealing shall be established by (a) the failure or delay of Administrative Agent or any Lender to require strict performance by Borrowers with any terms of the Loan Documents, or to exercise any rights or remedies with respect to Collateral or otherwise; (b) the making of any Loan during a Default, Event of Default or other failure to satisfy any conditions precedent; or (c) acceptance by Administrative Agent or any Lender of any payment or performance by an Obligor under any Loan Documents in a manner other than that specified therein. It is expressly acknowledged by Borrowers that any failure to satisfy a financial covenant on a measurement date shall not be cured or remedied by satisfaction of such covenant on a subsequent date.

## SECTION 12.   ADMINISTRATIVE AGENT

**12.1.** **Appointment, Authority and Duties of Administrative Agent**.

12.1.1 Appointment and Authority. Each Secured Party appoints and designates Lightship Capital II LLC as Administrative Agent under all Loan Documents. Administrative

-148-

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

Agent may, and each Secured Party authorizes Administrative Agent to, enter into all Loan Documents to which Administrative Agent is intended to be a party and accept all Security Documents, for the benefit of Secured Parties. Any action taken by Administrative Agent in accordance with the provisions of the Loan Documents, and the exercise by Administrative Agent of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized by and binding upon all Secured Parties. Without limiting the generality of the foregoing, Administrative Agent shall have the sole and exclusive authority to (a) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents; (b) execute and deliver as Administrative Agent each Loan Document, including any intercreditor or subordination agreement, and accept delivery of each Loan Document; (c) to execute, deliver and perform any intercreditor agreement in respect of this Facility or the Liens granted pursuant to the Security Documents or the DIP Orders, in each case under this clause (ii) to the extent such agreement, amendment or restatement has been approved by the Required Lenders; (d) act as collateral agent for Secured Parties for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (e) manage, supervise or otherwise deal with Collateral; and (f) take any Enforcement Action or otherwise exercise any rights or remedies with respect to any Collateral or under any Loan Documents, Applicable Law or otherwise. The duties of Administrative Agent are ministerial and administrative in nature only, and Administrative Agent shall not have a fiduciary relationship with any Secured Party, Participant or other Person, by reason of any Loan Document or any transaction relating thereto.

12.1.2 <u>Duties</u>. Administrative Agent shall not have any duties except those expressly set forth in the Loan Documents. The conferral upon Administrative Agent of any right shall not imply a duty to exercise such right, unless instructed to do so by Lenders in accordance with this Agreement.

12.1.3 <u>Agent Professionals</u>. Administrative Agent may perform its duties through agents and employees. Administrative Agent may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional. Administrative Agent shall not be responsible for the negligence or misconduct of any agents, employees or Agent Professionals selected by it with reasonable care.

12.1.4 <u>Instructions of Required Lenders</u>. The rights and remedies conferred upon Administrative Agent under the Loan Documents may be exercised without the necessity of joinder of any other party, unless required by Applicable Law. In determining compliance with a condition for any action hereunder, including satisfaction of any condition in **Section 6**, Administrative Agent may presume that the condition is satisfactory to a Secured Party unless Administrative Agent has received notice to the contrary from such Secured Party before

-149-

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

Administrative Agent takes the action. Administrative Agent may request instructions from Required Lenders or other Secured Parties with respect to any act (including the failure to act) in connection with any Loan Documents or Collateral, and may seek assurances to its satisfaction from Secured Parties of their indemnification obligations against Claims that could be incurred by Administrative Agent. Administrative Agent may refrain from any act until it has received such instructions or assurances, and shall not incur liability to any Person by reason of so refraining. Instructions of Required Lenders shall be binding upon all Secured Parties, and no Secured Party shall have any right of action whatsoever against Administrative Agent as a result of Administrative Agent acting or refraining from acting pursuant to instructions of Required Lenders. Notwithstanding the foregoing, instructions by and consent of specific parties shall be required to the extent provided in **Section 14.1.1**. In no event shall Administrative Agent be required to take any action that, in its opinion, is contrary to Applicable Law or any Loan Documents or could subject any Agent Indemnitee to personal liability or violate or conflict with the terms of the Intercreditor Agreement (as the terms thereof may be modified by the DIP Orders). In any case, where the consent of the Administrative Agent is expressly required under this Agreement, the other Loan Documents or the DIP Orders, the withholding or giving of such consent may be conditioned by the Administrative Agent upon the receipt of the approval of the Required Lenders, and the Administrative Agent shall be fully protected and not liable to the Lenders or any other Person in relying upon such approval or failing to act in the absence of such approval.

### 12.2. <u>Agreements Regarding Collateral and Borrower Materials</u>.

12.2.1 <u>Lien Releases; Care of Collateral</u>. Secured Parties authorize Administrative Agent to, and Administrative Agent shall, (1) release any Lien with respect to any Collateral (a) upon Full Payment of the Obligations; (b) that is the subject of a Permitted Asset Disposition to a Person that is not an Obligor (and Administrative Agent may request that the Obligors certify that such disposition is a Permitted Asset Disposition and may rely conclusively on any such certificate without further inquiry); (c) subject to **Section 14.1**, with the consent of Required Lenders; and (d) if the Collateral subject to such Lien is owned by an Obligor, upon release of such Obligor from its obligations under the Loan Documents pursuant to the following clause (2) and (2) upon request of an Obligor, release any Obligor from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents. Secured Parties authorize Administrative Agent to subordinate its Liens to any Purchase Money Lien or other Permitted Lien expressly entitled to priority hereunder or the Liens securing the Prepetition Senior Loan Agreement to the extent contemplated in the Intercreditor Agreement. Administrative Agent shall have no obligation to assure that any Collateral exists or is owned by an Obligor, or is cared for, protected or insured, nor to assure that Administrative Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral. Upon request by the

-150-

**EXHIBIT 2**

Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this **Section 12.2.1**. If any Collateral is disposed pursuant to a Permitted Asset Disposition to any Person other than an Obligor, such Collateral shall be sold free and clear of the Liens created by the Loan Documents and the Administrative Agent shall, at the expense of the Obligors, take any and all actions reasonably requested by the Obligors to effect the foregoing (*provided*, that if requested by the Administrative Agent the Obligors shall provide a certification that such disposition is permitted by this Agreement).

      12.2.2  <u>Possession of Collateral</u>.  Administrative Agent and Secured Parties appoint each Lender as agent (for the benefit of Secured Parties) for the purpose of perfecting Liens in any Collateral held or controlled by such Lender, to the extent such Liens are perfected by possession or control.  If any Lender obtains possession or control of any Collateral, it shall notify Administrative Agent thereof and, promptly upon Administrative Agent's request, deliver such Collateral to Administrative Agent or otherwise deal with it in accordance with Administrative Agent's instructions.

      12.2.3  <u>Reports</u>.  Administrative Agent shall promptly provide to Lenders, when complete, any field audit or examination report prepared for Administrative Agent with respect to any Obligor or Collateral ("<u>Report</u>").  Reports and other Borrower Materials may be made available to Lenders by providing access to them on the Platform, but Administrative Agent shall not be responsible for system failures or access issues that may occur from time to time.  Each Lender agrees (a) that Reports are not intended to be comprehensive audits or examinations, and that Administrative Agent or any other Person performing an audit or examination will inspect only specific information regarding the Obligations or Collateral and will rely significantly upon Borrowers' books, records and representations; (b) that Administrative Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials and shall not be liable for any information contained in or omitted from any Borrower Materials, including any Report; and (c) to keep all Borrower Materials confidential and strictly for such Lender's internal use, not to distribute any Report or other Borrower Materials (or the contents thereof) to any Person (except to such Lender's Participants, attorneys and accountants provided such Persons are informed of the confidential nature of such Reports and Borrower Materials and instructed to keep them confidential and strictly for such Lender's use), and to use all Borrower Materials solely for administration of the Obligations.  Each Lender shall indemnify and hold harmless Administrative Agent and any other Person preparing a Report from any action such Lender may take as a result of or any conclusion it may draw from any Borrower Materials, as well as from any Claims arising as a direct or indirect result of Administrative Agent furnishing same to such Lender, via the Platform or otherwise.

-151-

**EXHIBIT 2**

**12.3.**   **Reliance By Administrative Agent**.   Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any certification, notice or other communication (including those by telephone, telex, telegram, telecopy or e-mail) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person except to the extent such reliance is the result of the gross negligence or willful misconduct of the Administrative Agent. Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon except to the extent such reliance is the result of the gross negligence or willful misconduct of the Administrative Agent.   In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.   Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.   Administrative Agent shall have a reasonable and practicable amount of time to act upon any instruction, notice or other communication under any Loan Document, and shall not be liable for any delay in acting.

**12.4.**   **Action Upon Default**.   Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default, or of any failure to satisfy any conditions in **Section 6**, unless it has received written notice from a Borrower or Required Lenders specifying the occurrence and nature thereof.   If any Lender acquires knowledge of a Default, Event of Default or failure of such conditions, it shall promptly notify Administrative Agent and the other Lenders thereof in writing.   Each Secured Party agrees that, except as otherwise expressly provided in any Loan Documents or with the written consent of Administrative Agent and Required Lenders, it will not take any Enforcement Action, accelerate Obligations, or exercise any right that it might otherwise have under Applicable Law to credit bid at foreclosure sales, UCC sales or other dispositions of Collateral, or to assert any rights relating to any Collateral.

**12.5.**   **Ratable Sharing**.   If any Lender obtains any payment or reduction of any Obligation, whether through set-off or otherwise, in excess of its share of such Obligation, determined on a Pro Rata basis or in accordance with **Section 5.6.2**, as applicable, such Lender shall forthwith purchase from Administrative Agent and the other Lenders such participations in the affected Obligation as are necessary to share the excess payment or reduction on a Pro Rata basis or in accordance with Section 5.6.2, as applicable.   If any of such payment or reduction is thereafter recovered from the purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.   Notwithstanding the foregoing, if a Defaulting Lender obtains a payment or reduction of any Obligation, it shall immediately turn over the amount thereof to Administrative Agent for application under **Section 4.2.2** and it shall

-152-

**EXHIBIT 2**

provide a written statement to Administrative Agent describing the Obligation affected by such payment or reduction.  No Lender shall set off against any Dominion Account without Administrative Agent's prior consent.

**12.6.**  **Indemnification**.  EACH LENDER SHALL INDEMNIFY AND HOLD HARMLESS AGENT INDEMNITEES, TO THE EXTENT NOT REIMBURSED BY OBLIGORS, ON A PRO RATA BASIS, AGAINST ALL CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH AGENT INDEMNITEE, PROVIDED, THAT ANY CLAIM AGAINST AN AGENT INDEMNITEE RELATES TO OR ARISES FROM ITS ACTING AS OR FOR ADMINISTRATIVE AGENT (IN THE CAPACITY OF AGENT).  In no event shall any Lender have any obligation hereunder to indemnify or hold harmless an Agent Indemnitee with respect to a Claim that is determined in a final, non-appealable judgment by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Agent Indemnitee.  In Administrative Agent's discretion, it may reserve for any Claims made against an Agent Indemnitee, and may satisfy any judgment, order or settlement relating thereto, from proceeds of Collateral prior to making any distribution of Collateral proceeds to Secured Parties.  If Administrative Agent is sued by any receiver, trustee or other Person for any alleged preference or fraudulent transfer, then any monies paid by Administrative Agent in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to Administrative Agent by each Lender to the extent of its Pro Rata share.

**12.7.**  **Limitation on Responsibilities of Administrative Agent**.  Administrative Agent shall not be liable to any Secured Party for any action taken or omitted to be taken under the Loan Documents, except for losses to the extent caused by Administrative Agent's gross negligence or willful misconduct.  Administrative Agent does not assume any responsibility for any failure or delay in performance or any breach by any Obligor, Lender or other Secured Party of any obligations under the Loan Documents.  Administrative Agent does not make any express or implied representation, warranty or guarantee to Secured Parties with respect to any Obligations, Collateral, Loan Documents or Obligor.  No Agent Indemnitee shall be responsible to Secured Parties for any recitals, statements, information, representations or warranties contained in any Loan Documents or Borrower Materials; the execution, validity, genuineness, effectiveness or enforceability of any Loan Documents; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Obligor or Account Debtor.  No Agent Indemnitee shall have any obligation to any Secured Party to ascertain or inquire into the existence of any Default or Event of Default, the observance by any Obligor of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Documents.

-153-

**EXHIBIT 2**

**12.8.** **Successor Agent and Co-Agents**.

12.8.1 <u>Resignation; Successor Agent</u>. The Administrative Agent may (x) resign at any time by giving at least 5 days written notice thereof to Lenders and Borrowers (or such shorter time period as agreed to by the Required Lenders) and/or (y) be removed by the Required Lenders on not less than 30 days' prior written notice. Upon receipt of such notice, Required Lenders shall have the right to appoint a successor Administrative Agent which shall be (a) a Lender or an Affiliate of a Lender; or (b) a financial institution reasonably acceptable to Required Lenders. If no successor agent is appointed prior to the effective date of Administrative Agent's resignation, then Administrative Agent may (but shall not be obligated to) appoint a successor agent that is a financial institution acceptable to it, which shall be a Lender unless no Lender accepts the role. Whether or not a successor has been appointed, such resignation shall become effective. Upon acceptance by a successor Administrative Agent of its appointment hereunder, such successor Administrative Agent shall thereupon succeed to and become vested with all the powers and duties of the retiring Administrative Agent without further act, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder but shall continue to have the benefits of the indemnification set forth in **Sections 12.6** and **14.2**. Notwithstanding any Administrative Agent's resignation, the provisions of this **Section 12** shall continue in effect for its benefit with respect to any actions taken or omitted to be taken by it while Administrative Agent. The resigning Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Secured Parties under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and except for any indemnity payments or other amounts then owed to the resigning Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Any successor to Lightship Capital II LLC by merger or acquisition of stock or this loan shall continue to be Administrative Agent hereunder without further act on the part of any Secured Party or Obligor.

12.8.2 <u>Co-Collateral Agent</u>. If necessary or appropriate under Applicable Law, Administrative Agent may appoint a Person to serve as a co-collateral agent or separate collateral agent under any Loan Document. Each right and remedy intended to be available to Administrative Agent under the Loan Document shall also be vested in such agent. Secured Parties shall execute and deliver any instrument or agreement that Administrative Agent may request to effect such appointment. If the agent shall die, dissolve, become incapable of acting, resign or be removed, then all the rights and remedies of such agent, to the extent permitted by Applicable Law, shall vest in and be exercised by Administrative Agent until appointment of a new agent.

-154-

**EXHIBIT 2**

12.8.3  <u>Delegation of Duties</u>.  Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of this **Section 12** shall apply to any such sub-agent and to the Affiliates of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**12.9.  <u>Non-Reliance on the Administrative Agent and the Other Lenders</u>**.  Each Lender expressly acknowledges that neither the Administrative Agent nor the Arranger has made any representation or warranty to it, and that no act by the Administrative Agent hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of any Obligor of any Affiliate thereof, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender as to any matter, including whether the Administrative Agent has disclosed material information in its (or its Related Parties') possession.  Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent, the Arranger, any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis of, appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors and their Subsidiaries, and all applicable bank or other regulatory laws relating to the transactions contemplated hereby, and made its own decision to enter into, or consent to, this Agreement and the other Loan Documents and to extend credit to the Borrower hereunder.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Arranger any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors.  Each Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility and (ii) it is engaged in making, acquiring or holding commercial loans in the ordinary course and is entering into this Agreement as a Lender for the purpose of making, acquiring or holding commercial loans and providing other facilities set forth herein as may be applicable to such Lender, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender agrees not to assert a claim in contravention of the foregoing.  Each Lender represents and

-155-

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

warrants that it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.

**12.10.  Remittance of Payments and Collections**.

12.10.1  <u>Remittances Generally</u>.  All payments by any Lender to Administrative Agent shall be made by the time and on the day set forth in this Agreement, in immediately available funds.  If no time for payment is specified or if payment is due on demand by Administrative Agent and request for payment is made by Administrative Agent by 11:00 a.m. on a Business Day, payment shall be made by Lender not later than 2:00 p.m. on such day, and if request is made after 11:00 a.m., then payment shall be made by 11:00 a.m. on the next Business Day.  Payment by Administrative Agent to any Secured Party shall be made by wire transfer, in the type of funds received by Administrative Agent.  Any such payment shall be subject to Administrative Agent's right of offset for any amounts due from such payee under the Loan Documents.

12.10.2  <u>Failure to Pay</u>.  If any Secured Party fails to pay any amount when due by it to Administrative Agent pursuant to the terms hereof, such amount shall bear interest, from the due date until paid in full, at the rate determined by Administrative Agent as customary for interbank compensation for two Business Days and thereafter at the Default Rate for Base Rate Loans.  In no event shall Borrowers be entitled to receive credit for any interest paid by a Secured Party to Administrative Agent, nor shall any Defaulting Lender be entitled to interest on any amounts held by Administrative Agent pursuant to **Section 4.2**.

12.10.3  <u>Recovery of Payments</u>.  If Administrative Agent pays an amount to a Secured Party in the expectation that a related payment will be received by Administrative Agent from an Obligor and such related payment is not received, then Administrative Agent may recover such amount from the Secured Party.  If Administrative Agent determines that an amount received by it must be returned or paid to an Obligor or other Person pursuant to Applicable Law or otherwise, then, notwithstanding any other term of any Loan Document, Administrative Agent shall not be required to distribute such amount to any Secured Party.  If any amounts received and applied by Administrative Agent to any Obligations are later required to be returned by Administrative Agent pursuant to Applicable Law, each Lender shall pay to Administrative Agent, **on demand**, such Lender's Pro Rata share of the amounts required to be returned.

**12.11.  Individual Capacities**.  As a Lender, Lightship Capital II LLC shall have the same rights and remedies under the Loan Documents as any other Lender, and the terms "Lenders," "Required Lenders" or any similar term shall include Lightship Capital II LLC in its capacity as a

-156-

**EXHIBIT 2**

Lender. Administrative Agent, Lenders and their Affiliates may accept deposits from, lend money to, provide bank products to, act as financial or other advisor to, and generally engage in any kind of business with, Obligors and their Affiliates, as if they were not Administrative Agent or Lenders hereunder, without any duty to account therefor to any Secured Party. In their individual capacities, Administrative Agent, Lenders and their Affiliates may receive information regarding Obligors, their Affiliates and their Account Debtors (including information subject to confidentiality obligations), and shall have no obligation to provide such information to any Secured Party.

    **12.12.** **[Reserved]**.

    **12.13.** **[Reserved]**.

    **12.14.** **No Third Party Beneficiaries**. This **Section 12** is an agreement solely among Secured Parties and Administrative Agent, and shall survive Full Payment of the Obligations. This **Section 12** does not confer any rights or benefits upon Borrowers or any other Person. As between Borrowers and Administrative Agent, any action that Administrative Agent may take under any Loan Documents or with respect to any Obligations shall be conclusively presumed to have been authorized and directed by Secured Parties.

    **12.15.** **Withholding Tax**. To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the IRS or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Section. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the commitments and the repayment, satisfaction or discharge of all other Obligations.

-157-

**EXHIBIT 2**

**12.16.  Administrative Agent May File Proofs of Claim; Credit Bidding**.

          12.16.1         <u>Proofs of Claim</u>.  In case of the pendency of any Insolvency Proceeding or any other judicial proceeding relative to any Obligor, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

                  (a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent) allowed in such judicial proceeding; and

                  (b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent.

          Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

          12.16.2         <u>Credit Bidding</u>.  The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to take all actions and exercise all rights described in **Section 11.2**, including to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any

-158-

**EXHIBIT 2**

similar Laws in any other jurisdictions to which an Obligor is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided*, that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a) through (f) of **Section 14.1.1** of this Agreement), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

12.16.3    Exculpatory Provisions.  Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

-159-

AMERICAS 110819944

**EXHIBIT 2**

(b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), *provided*, that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Bankruptcy Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Bankruptcy Law;

(c)      shall not have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, to any Lender, any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Obligors or any of their Affiliates, that is communicated to, obtained or in the possession of, the Administrative Agent or any of their Related Parties in any capacity, except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein;

(d)      shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Sections 11.2** and **14.1**) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction by a final and nonappealable judgment.  The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower Agent, a Lender;

(e)      shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in **Section 6** or elsewhere

-160-

**EXHIBIT 2**

herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, but, in each case, subject at all times to the DIP Order, in the event that any controversy arises between or among any of the Secured Parties or any other Person in respect of any Collateral or proceeds thereof in the possession or control of the Administrative Agent, the Administrative Agent shall, to the extent directed by the Required Lenders, have the right to initiate proceedings in the Bankruptcy Court (or to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction over such matter, to any other court of competent jurisdiction permitted under **Section 14.14**) for a declaratory judgment to determine the rights of such Secured Parties or other Persons with respect to such Collateral or any proceeds thereof.  The provisions of this paragraph are in addition to and not in limitation of any right of resignation or other rights or protections afforded to the Administrative Agent pursuant to the terms of this Agreement.

### 12.17.  **Certain ERISA Matters**.

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower Agent or any other Obligor, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into,

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

        (iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

        (b)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower Agent or any other Obligor, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

        **12.18.** **Successors By Merger, Etc**.  Any corporation or association into which the Administrative Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Administrative Agent is a party, will be and become the successor the Administrative Agent a under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

**SECTION 13.**        **BENEFIT OF AGREEMENT; ASSIGNMENTS**

        **13.1.**  **Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of Borrowers, Administrative Agent, Lenders, Secured Parties, and their respective successors and assigns, except that (a) no Borrower shall have the right to assign its rights or delegate its obligations under any Loan Documents; (b) any assignment by a Lender must be made in compliance with **Section 13.3**; and (c) any assignment by the Administrative Agent of its role as such must be made in compliance with **Section 12.8**.  Administrative Agent may treat the Person

-162-

**EXHIBIT 2**

which made any Loan as the owner thereof for all purposes until such Person makes an assignment in accordance with **Section 13.3**. Any authorization or consent of a Lender shall be conclusive and binding on any subsequent transferee or assignee of such Lender.

**13.2.** **Participations**.

13.2.1 <u>Permitted Participants; Effect</u>. Subject to **Section 13.3.3**, any Lender may sell to a financial institution ("<u>Participant</u>") a participating interest in the rights and obligations of such Lender under any Loan Documents. Despite any sale by a Lender of participating interests to a Participant, such Lender's obligations under the Loan Documents shall remain unchanged, it shall remain solely responsible to the other parties hereto for performance of such obligations, it shall remain the holder of its Loans and Commitments for all purposes, all amounts payable by Borrowers shall be determined as if it had not sold such participating interests, and Borrowers and Administrative Agent shall continue to deal solely and directly with such Lender in connection with the Loan Documents. Each Lender shall be solely responsible for notifying its Participants of any matters under the Loan Documents, and Administrative Agent and the other Lenders shall not have any obligation or liability to any such Participant. The Borrower agrees that each Participant shall be entitled to the benefits of **Sections 3.7** and **5.9** (subject to the requirements and limitations of such Sections and **Section 5.10**; *provided*, that any documentation required under **Section 5.10** shall be delivered solely to the applicable participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to **Section 13.1**. A Participant shall not be entitled to receive any greater payment under **Section 3.7** or **5.9** than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to a greater payment results from a Change in Law occurring after the sale of the participation.

13.2.2 <u>Voting Rights</u>. Each Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, waiver or other modification of a Loan Document other than that which forgives principal, interest or fees, reduces the stated interest rate or fees payable with respect to any Loan or Commitment in which such Participant has an interest, postpones the Termination Date or any date fixed for any regularly scheduled payment of principal, interest or fees on such Loan or Commitment, or releases any Borrower, Guarantor or substantially all Collateral.

13.2.3 <u>Benefit of Set-Off</u>. Borrowers agree that each Participant shall have a right of set-off in respect of its participating interest to the same extent as if such interest were owing directly to a Lender, and each Lender shall also retain the right of set-off with respect to any participating interests sold by it. By exercising any right of set-off, a Participant agrees to share with Lenders all amounts received through its set-off, in accordance with **Section 12.5** as if such Participant were a Lender.

-163-

AMERICAS 110819944

**EXHIBIT 2**

13.2.4 <u>Participant Register</u>.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); *provided*, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as the Administrative Agent) shall have no responsibility for maintaining a Participant Register.

**13.3.  <u>Assignments</u>.**

13.3.1 <u>Permitted Assignments</u>.  A Lender may assign to an Eligible Assignee any of its rights and obligations under the Loan Documents, as long as (a) each assignment is of a constant, and not a varying, percentage of the transferor Lender's rights and obligations under the Loan Documents and, in the case of a partial assignment, is in a minimum principal amount of $5,000,000 (unless otherwise agreed by Administrative Agent in its discretion) and integral multiples of $1,000,000 in excess of that amount; (b) except in the case of an assignment in whole of a Lender's rights and obligations, the aggregate amount of the Commitments retained by the transferor Lender is at least $5,000,000 (unless otherwise agreed by Administrative Agent in its discretion); and (c) the parties to each such assignment shall execute and deliver to Administrative Agent, for its acceptance and recording, an Assignment and Acceptance.  Nothing herein shall limit the right of a Lender to pledge or assign any rights under the Loan Documents to secure obligations of such Lender, including a pledge or assignment to a Federal Reserve Bank; *provided*, *however*, that no such pledge or assignment shall release the Lender from its obligations hereunder nor substitute the pledge or assignee for such Lender as a party hereto.

13.3.2 <u>Effect; Effective Date</u>.  Upon delivery to Administrative Agent of an assignment notice in the form of **Exhibit B** and a processing fee of $3,500 (unless otherwise agreed by Administrative Agent in its discretion), the assignment shall become effective as specified in the notice, if it complies with this **Section 13.3**.  From such effective date, the Eligible Assignee shall for all purposes be a Lender under the Loan Documents, and shall have all rights and obligations of a Lender thereunder.  Upon consummation of an assignment, the transferor Lender, Administrative Agent and Borrowers shall make appropriate arrangements for issuance of

-164-

**EXHIBIT 2**

replacement and/or new notes, if applicable.  The transferee Lender shall comply with **Section 5.10** and deliver, upon request, an administrative questionnaire satisfactory to Administrative Agent.

13.3.3  <u>Certain Assignees</u>.  Without the Administrative Agent's consent, no assignment or participation may be made to a Borrower, Affiliate of a Borrower, Defaulting Lender or natural person.  Any assignment by a Defaulting Lender shall be effective only upon payment by the Eligible Assignee or Defaulting Lender to Administrative Agent of an aggregate amount sufficient, upon distribution (through direct payment, purchases of participations or other compensating actions as Administrative Agent deems appropriate), to satisfy all funding and payment liabilities then owing by the Defaulting Lender hereunder.  If an assignment by a Defaulting Lender shall become effective under Applicable Law for any reason without compliance with the foregoing sentence, then the assignee shall be deemed a Defaulting Lender for all purposes until such compliance occurs.

13.3.4  <u>Register</u>.  Administrative Agent, acting as a non-fiduciary agent of Borrowers, shall maintain (a) a copy of each Assignment and Acceptance delivered to it, and (b) a register for recordation of the names, addresses and Commitments of, and the Loans and stated interest owing to, each Lender (the "<u>Register</u>").  Entries in the Register shall be conclusive, absent manifest error, and Borrowers, Administrative Agent and Lenders shall treat each lender recorded in such Register as a Lender for all purposes under the Loan Documents, notwithstanding any notice to the contrary.  The Register shall be available for inspection by Borrowers and any Lender (but, in the case of any Lender, only with respect to its holdings (unless consented to otherwise in writing by the Administrative Agent)), from time to time upon reasonable notice.

**13.4.**  **Replacement of Certain Lenders**.  If (a) a Lender (i) fails to give its consent to any amendment, waiver or action for which consent of all Lenders was required and Required Lenders consented, (ii) is a Defaulting Lender, or (iii)  requests compensation under **Section 3.7**, or (b) any Borrower is required to pay additional amounts or indemnity payments with respect to a Lender under **Section 5.9**, then, in addition to any other rights and remedies that any Person may have, Administrative Agent or Borrower Agent may, by notice to such Lender within 120 days after such event, require such Lender to assign all of its rights and obligations under the Loan Documents to Eligible Assignee(s), pursuant to appropriate Assignment and Acceptance(s), within 20 days after the notice, *provided*, that (i) in the case of any such assignment resulting from a claim for compensation under Section 3.7 or payments required to be made pursuant to Section 5.9, such assignment will result in a reduction in such compensation or payments thereafter and (ii) a Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.  Administrative Agent is irrevocably appointed as attorney-in-fact to execute any such Assignment and Acceptance if the Lender fails to execute it.

-165-

AMERICAS 110819944

**EXHIBIT 2**

Such Lender shall be entitled to receive, in cash, concurrently with such assignment, all amounts owed to it under the Loan Documents through the date of assignment.

## SECTION 14.    MISCELLANEOUS

### 14.1.  <u>Consents, Amendments and Waivers</u>.

14.1.1 <u>Amendment</u>.  No modification of any Loan Document, including any extension or amendment of a Loan Document or any waiver of a Default or Event of Default, shall be effective without the prior written agreement of Administrative Agent (with the consent of Required Lenders) and each Obligor party to such Loan Document; *provided*, *however*, that

(a)    without the prior written consent of Administrative Agent, no modification shall be effective with respect to any provision in a Loan Document that relates to any rights, duties or discretion of Administrative Agent;

(b)    [reserved];

(c)    without the prior written consent of each affected Lender, including a Defaulting Lender, no modification shall be effective that would (i) increase the Commitment of such Lender (except as provided in **Section 4.2**); (ii) reduce the amount of, or waive or delay payment of, any principal, reimbursement obligation, interest fees or other amounts payable to such Lender (except as provided in **Section 4.2** and any waiver of interest accruing at the Default Rate); (iii) extend the Commitment Termination Date, the Termination Date or the New Money Loan Commitment Termination Date; or (iv) amend this clause (c);

(d)    without the prior written consent of all Lenders (except any Defaulting Lender), no modification shall be effective that would (i) alter **Section 5.6.2**, **7.1** (except to add Collateral) or **14.1.1**; (ii) amend the definition of Pro Rata or Required Lenders, (iii) release all or substantially all Collateral; or (iv) except in connection with a merger, disposition or similar transaction expressly permitted hereby, release any Obligor from liability for any Obligations (as measured by value not number);

(e)    [reserved];

(f)    [reserved]; and

(g)    without the prior written consent of each affected Lender, including a Defaulting Lender, no modification shall be effective that would alter **Section 12.5** or **14.3.1**.

-166-

**EXHIBIT 2**

14.1.2 <u>Limitations</u>. Only the consent of the parties to any agreement relating to fees shall be required for modification of such agreement. Any waiver or consent granted by Administrative Agent or Lenders hereunder shall be effective only if in writing and only for the matter specified. Further, notwithstanding anything to the contrary contained in this **Section 14.1**, if following the Closing Date, the Administrative Agent and any Obligor shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Obligors shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

**14.2.** **Indemnity**. Each Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Lender Related Person") against, and hold each Lender Related Person harmless from, any and all losses, claims, damages, liabilities and related expenses (limited, in the case of legal fees and expenses, to the fees, charges and disbursements of one primary counsel and one local counsel in each relevant jurisdiction for all Lender Related Persons and, in the case of an actual or reasonably perceived conflict of interest, one additional primary counsel (and one additional local counsel in each relevant jurisdiction) per group of similarly situated affected parties), to the extent incurred by any Lender Related Person or asserted against any Lender Related Person by any Person (including each Borrower or any other Obligor) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in **Section 5.9**), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by Holdings or any of its Subsidiaries, or any Environmental Liability related in any way to Holdings or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, in all cases, whether based on contract, tort or any other theory, whether brought by a third party or by a Borrower or any other Obligor, and regardless of whether any Lender Related Person is a party thereto, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE LENDER RELATED PERSON; *provided*, that such indemnity shall not, as to any Lender Related Person, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad

-167-

AMERICAS 110819944

**EXHIBIT 2**

faith or willful misconduct of such Lender Related Person or (y) other than in the case of the Administrative Agent or any of its Related Parties, result from a claim brought by a Borrower or any other Obligor against a Lender Related Person for a material breach of such Lender Related Person's obligations hereunder or under any other Loan Document, if such Borrower or such Obligor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. Without limiting the provisions of **Section 5.9.2**, this **Section 14.2** shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**14.3.** **Notices and Communications**.

14.3.1 <u>Notice Address</u>. Subject to **Section 4.1.3**, all notices and other communications by or to a party hereto shall be in writing and shall be given to any Borrower, at Borrower Agent's address shown on the signature pages hereof, and to any other Person at its address shown on the signature pages hereof (or, in the case of a Person who becomes a Lender after the Closing Date, at the address shown on its Assignment and Acceptance), or at such other address as a party may hereafter specify by notice in accordance with this **Section 14.3**. Each communication shall be effective only (a) if given by facsimile transmission, when transmitted to the applicable facsimile number, if confirmation of receipt is received; (b) if given by mail, three Business Days after deposit in the U.S. mail, with first-class postage pre-paid, addressed to the applicable address; or (c) if given by personal delivery, when duly delivered to the notice address with receipt acknowledged. Notwithstanding the foregoing, no notice to Administrative Agent pursuant to **Sections 2.1.4, 3.1.2**, or **4.1.1** shall be effective until actually received by the individual to whose attention at Administrative Agent such notice is required to be sent. Any written communication that is not sent in conformity with the foregoing provisions shall nevertheless be effective on the date actually received by the noticed party. Any notice received by Borrower Agent shall be deemed received by all Borrowers.

14.3.2 <u>Communications</u>. Electronic communications (including e-mail, messaging and websites) may be used only in a manner acceptable to Administrative Agent and only for routine communications, such as delivery of Borrower Materials, administrative matters, distribution of Loan Documents and matters permitted under **Section 4.1.3**. Secured Parties make no assurance as to the privacy or security of electronic communications. E-mail and voice mail shall not be effective notices under the Loan Documents.

14.3.3 <u>Platform</u>. Borrower Materials shall be delivered pursuant to procedures approved by Administrative Agent, including via e-mail and other electronic delivery (if possible) upon request by Administrative Agent to an electronic system maintained by Administrative Agent ("<u>Platform</u>"). Borrowers shall notify Administrative Agent of each posting of Borrower Materials on the Platform and the materials shall be deemed received by Administrative Agent only upon its

-168-

**EXHIBIT 2**

receipt of such notice. Borrower Materials and other information relating to this credit facility may be made available to Lenders on the Platform. The Platform is provided "as is" and "as available." Administrative Agent does not warrant the accuracy or completeness of any information on the Platform nor the adequacy or functioning of the Platform, and expressly disclaims liability for any errors or omissions in the Borrower Materials or any issues involving the Platform. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ADMINISTRATIVE AGENT WITH RESPECT TO BORROWER MATERIALS OR THE PLATFORM. Lenders acknowledge that Borrower Materials may include material non-public information of Obligors and should not be made available to any personnel who do not wish to receive such information or who may be engaged in investment or other market-related activities with respect to any Obligor's securities. No Agent Indemnitee shall have any liability to Borrowers, Lenders or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the Platform or delivery of Borrower Materials, notices and other information through the Platform, any other electronic platform or electronic messaging service, or through the Internet.

       14.3.4  <u>Public Information</u>.  Obligors and Secured Parties acknowledge that "public" information may not be segregated from material non-public information on the Platform. Secured Parties acknowledge that Borrower Materials may include Obligors' material non-public information, and should not be made available to personnel who do not wish to receive such information or may be engaged in investment or other market-related activities with respect to an Obligor's securities.

       14.3.5  <u>Non-Conforming Communications</u>.  Administrative Agent and Lenders may rely upon any communications purportedly given by or on behalf of any Borrower even if they were not made in a manner specified herein, were incomplete or were not confirmed, or if the terms thereof, as understood by the recipient, varied from a later confirmation. Each Borrower shall indemnify and hold harmless each Indemnitee from any liabilities, losses, costs and expenses arising from any electronic or telephonic communication purportedly given by or on behalf of a Borrower.

       14.3.6  <u>Electronic Mail</u>.  Notwithstanding the foregoing, the parties hereto agree that (i) if an Agent requires or seeks consent and/or direction of any Lender in connection with exercising any of its rights or powers, or otherwise taking any action, under this Agreement or any other Loan Document (including in connection with providing any consent or waiver that this Agreement or such other Loan Document expressly permits such Agent to provide), such Agent shall be entitled to rely on any such consent and/or direction delivered to it by electronic mail ("e-

-169-

AMERICAS 110819944

**EXHIBIT 2**

mail") by or on behalf of the applicable Lender (including by any investment advisor, manager or similar Person holding itself out as authorized to act on behalf of such Lender or by any counsel thereto or to such Lender) and (ii) with respect to any provision of this Agreement or any other Loan Document that permits any date by which any Obligor is required to comply with any obligation hereunder (including any date set forth on **Schedule 10.1.13**) or under such other Loan Document to be extended with the consent and/or at the direction of one or more of the Lenders, each Lender shall be permitted to provide its consent and/or direction via its counsel and, in such case, such consent and/or direction shall be deemed to have been validly provided to the extent that such counsel confirms the same by electronic mail ("e-mail") to the Borrower's counsel (it being agreed that, in connection with delivering such e-mail, such counsel shall be permitted to rely on any corresponding consent or direction delivered to such counsel by or on behalf of the applicable Lender (including by any investment advisor, manager or similar entity holding itself out as authorized to act on behalf of such Lender)).

 **14.4.**  **Performance of Borrowers' Obligations**.  Administrative Agent may, in its discretion at any time and from time to time, at Borrowers' expense, pay any amount or do any act required of a Borrower under any Loan Documents or otherwise lawfully requested by Administrative Agent to (a) enforce any Loan Documents or collect any Obligations; (b) protect, insure, maintain or realize upon any Collateral; or (c) defend or maintain the validity or priority of Administrative Agent's Liens in any Collateral, including any payment of a judgment, insurance premium, warehouse charge, finishing or processing charge, or landlord claim, or any discharge of a Lien. All payments, costs and expenses (including Extraordinary Expenses) of Administrative Agent under this Section shall be reimbursed to Administrative Agent by Borrowers, within 10 Business Days after demand, with interest from the date incurred until paid in full, at the Default Rate applicable to Base Rate Loans. Any payment made or action taken by Administrative Agent under this Section shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Loan Documents.

 **14.5.**  **Credit Inquiries**.  Administrative Agent and Lenders may (but shall have no obligation) to respond to usual and customary credit inquiries from third parties concerning any Obligor or Subsidiary.

 **14.6.**  **Severability**.  Wherever possible, each provision of the Loan Documents shall be interpreted in such manner as to be valid under Applicable Law. If any provision is found to be invalid under Applicable Law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of the Loan Documents shall remain in full force and effect.

 **14.7.**  **Cumulative Effect; Conflict of Terms**.  The provisions of the Loan Documents are cumulative. The parties acknowledge that the Loan Documents may use several limitations or measurements to regulate similar matters, and they agree that these are cumulative and that each

-170-

**EXHIBIT 2**

must be performed as provided.  Except as otherwise provided in another Loan Document (by specific reference to the applicable provision of this Agreement), if any provision contained herein is in direct conflict with any provision in another Loan Document, the provision herein shall govern and control.

**14.8.   Counterparts; Execution**.  Any Loan Document may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement shall become effective when Administrative Agent has received counterparts bearing the signatures of all parties hereto.  The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Acceptances, amendments or other modifications, Notices of Borrowing, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided*, that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

**14.9.   Entire Agreement**.  Time is of the essence with respect to all Loan Documents and Obligations.  The Loan Documents constitute the entire agreement, and supersede all prior understandings and agreements, among the parties relating to the subject matter thereof.

**14.10.   Relationship with Lenders**.  The obligations of each Lender hereunder are several, and no Lender shall be responsible for the obligations or Commitments of any other Lender. Amounts payable hereunder to each Lender shall be a separate and independent debt.  It shall not be necessary for Administrative Agent or any other Lender to be joined as an additional party in any proceeding for such purposes.  Nothing in this Agreement and no action of Administrative Agent, Lenders or any other Secured Party pursuant to the Loan Documents or otherwise shall be deemed to constitute Administrative Agent and any Secured Party to be a partnership, joint venture or similar arrangement, nor to constitute control of any Obligor.

**14.11.   No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated by any Loan Document, Borrowers acknowledge and agree that (a)(i) this credit facility and any related arranging or other services by Administrative Agent, any

-171-

AMERICAS 110819944

**EXHIBIT 2**

Lender, any of their Affiliates or any arranger are arm's-length commercial transactions between Borrowers and such Person; (ii) Borrowers have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate; and (iii) Borrowers are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated by the Loan Documents; (b) each of Administrative Agent, Lenders, their Affiliates and any arranger is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Borrowers, any of their Affiliates or any other Person, and has no obligation with respect to the transactions contemplated by the Loan Documents except as expressly set forth therein; and (c) Administrative Agent, Lenders, their Affiliates and any arranger may be engaged in a broad range of transactions that involve interests that differ from those of Borrowers and their Affiliates, and have no obligation to disclose any of such interests to Borrowers or their Affiliates. To the fullest extent permitted by Applicable Law, each Borrower hereby waives and releases any claims that it may have against Administrative Agent, Lenders, their Affiliates and any arranger with respect to any breach of agency or fiduciary duty in connection with any transaction contemplated by a Loan Document.

**14.12. <u>Confidentiality</u>.** Each of Administrative Agent and Lenders shall maintain the confidentiality of all Information (as defined below), except that Information may be disclosed (a) to its Affiliates, and to its and their partners, directors, officers, employees, agents, advisors and representatives (*provided* such Persons are informed of the confidential nature of the Information and instructed to keep it confidential); (b) to the extent requested by any governmental, regulatory or self-regulatory authority purporting to have jurisdiction over it or its Affiliates; (c) to the extent required by Applicable Law or by any subpoena or other legal process; (d) to any other party hereto; (e) in connection with any action or proceeding relating to any Loan Documents or Obligations; (f) subject to an agreement containing provisions substantially the same as this Section, to any Transferee or any actual or prospective party (or its advisors) to any bank product; (g) with the consent of Borrower Agent; or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) is available to Administrative Agent, any Lender or any of their Affiliates on a nonconfidential basis from a source other than Borrowers. Notwithstanding the foregoing, Administrative Agent and Lenders may publish or disseminate general information concerning this credit facility for league table, tombstone and advertising purposes, and may use Borrowers' logos, trademarks or product photographs in advertising materials. As used herein, "Information" means all information received from an Obligor or Subsidiary relating to it or its business. Any Person required to maintain the confidentiality of Information pursuant to this Section shall be deemed to have complied if it exercises a degree of care similar to that which it accords its own confidential information. Each of Administrative Agent and Lenders acknowledges that (i) Information may include material non-public information; (ii) it has developed compliance procedures regarding

-172-

**EXHIBIT 2**

the use of material non-public information; and (iii) it will handle such material non-public information in accordance with Applicable Law.

**14.13.  GOVERNING LAW.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, UNLESS OTHERWISE SPECIFIED, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES TO THE EXTENT SUCH PRINCIPLES WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

**14.14.  Consent to Forum.  EACH BORROWER HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, SOLELY TO THE EXTENT THAT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION OVER ANY MATTER, ANY STATE COURT SITTING IN THE CITY OF NEW YORK IN THE BOROUGH OF MANHATTAN OR THE UNITED STATES DISTRICT COURT IN THE SOUTHERN DISTRICT OF NEW YORK IN THE BOROUGH OF MANHATTAN, IN ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING RELATING IN ANY WAY TO ANY LOAN DOCUMENTS, AND AGREES THAT ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING SHALL BE BROUGHT BY IT SOLELY IN ANY SUCH COURT. EACH BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL CLAIMS, OBJECTIONS AND DEFENSES THAT IT MAY HAVE REGARDING ANY SUCH COURT'S PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE OR INCONVENIENT FORUM.   EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 14.3.1.  A final judgment in any proceeding of any such court shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or any other manner provided by Applicable Law.**

**14.15.  Waivers by Borrowers**.  To the fullest extent permitted by Applicable Law, each Borrower waives (a) the right to trial by jury (which Administrative Agent and each Lender hereby also waives) in any proceeding or dispute of any kind relating in any way to any Loan Documents, Obligations or Collateral; (b) presentment, demand, protest, notice of presentment, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any commercial paper, accounts, documents, instruments, chattel paper and guaranties at any time held by Administrative Agent on which a Borrower may in any way be liable, and hereby ratifies anything Administrative Agent may do in this regard; (c) notice prior to taking possession or control of any Collateral; (d) any bond or security that might be required by a court prior to allowing Administrative Agent to exercise any rights or remedies; (e) the benefit of all valuation,

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

appraisement and exemption laws; (f) any claim against Administrative Agent or any Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in any way relating to any Enforcement Action, Obligations, Loan Documents or transactions relating thereto; and (g) notice of acceptance hereof. Each Borrower acknowledges that the foregoing waivers are a material inducement to Administrative Agent and Lenders entering into this Agreement and that they are relying upon the foregoing in their dealings with Borrowers. Each Borrower has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial and other rights following consultation with legal counsel. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

**14.16.** **Patriot Act Notice**. Administrative Agent and Lenders hereby notify Borrowers that pursuant to the Patriot Act, Administrative Agent and Lenders are required to obtain, verify and record information that identifies each Borrower, including its legal name, address, tax ID number and other information that will allow Administrative Agent and Lenders to identify it in accordance with the Patriot Act. Administrative Agent and Lenders will also require information regarding each guarantor, if any, and may require information regarding Borrowers' management and owners, such as legal name, address, social security number and date of birth. Borrowers shall, promptly upon request, provide all documentation and other information as Administrative Agent or any Lender may request from time to time in order to comply with any obligations under any "know your customer," anti-money laundering or other requirements of Applicable Law.

**14.17.** **NO ORAL AGREEMENT.** **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES**.

**14.18.** **Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

        (a)     the application of any Write-Down and Conversion Powers by an Affected Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

-174-

NY 78807585v8

AMERICAS 110819944

**EXHIBIT 2**

<blockquote>
<blockquote>
(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

<blockquote>
(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any Affected Resolution Authority.
</blockquote>
</blockquote>
</blockquote>

**14.19.   DIP Orders**.  The Obligors, the Administrative Agent and the Lenders hereby expressly agree that, in the event of any conflict or inconsistency between this Agreement (or any other Loan Document), on the one hand, and any DIP Order, on the other hand, the DIP Order then in effect shall control.  Notwithstanding anything to the contrary herein, the provisions of this Agreement are subject to the terms, covenants, conditions and provisions of, the DIP Orders, as applicable. This Agreement is subject in all respects (including with respect to all obligations and agreements of the Obligors provided for hereunder) to the terms of the Interim DIP Order (and, when applicable, the Final DIP Order) and, notwithstanding anything in the foregoing, the Obligors shall not be required to undertake any obligation, make any agreement or take any action that is prohibited by the terms of the Interim DIP Order (and, when applicable, the Final DIP Order.

**14.20.   <u>Acknowledgment Regarding any Supported QFCs</u>**.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States).

<blockquote>
(a)      In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the
</blockquote>

-175-

**EXHIBIT 2**

transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this **Section 14.20**, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:

i.    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

ii.    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

iii.    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

[*Remainder of page intentionally left blank*]

-176-

AMERICAS 110819944

**EXHIBIT 2**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**STRIKE, LLC**

By: _____

  Name:

  Title:

**STRIKE HOLDCO, LLC**

By: _____

  Name:

  Title:

**DELTA DIRECTIONAL DRILLING, LLC**

By: _____

  Name:

  Title:

**STRIKE GLOBAL HOLDINGS, LLC**

By: _____

  Name:

  Title:

**CROSSFIRE, LLC**

By: _____

  Name:

  Title:

[DIP Loan and Security Agreement]

**EXHIBIT 2**

**CAPSTONE INFRASTRUCTURE SERVICES, LLC**

By: _____

  Name:

  Title:

[DIP Loan and Security Agreement]

AMERICAS 110819944

**EXHIBIT 2**

**LIGHTSHIP CAPITAL II LLC, as
Administrative Agent**

By:_____

Name:

Title:

[DIP Loan and Security Agreement]

AMERICAS 110819944

**EXHIBIT 2**

**LIGHTSHIP CAPITAL II LLC, as Lender**

By:_____

Name:

Title:

[DIP Loan and Security Agreement]

AMERICAS 110819944

**EXHIBIT 2**

## Schedule 10.1.13

### Milestones

(a)     On or before the date that is twenty-one (21) calendar days following the Petition Date, the Sale Procedures Order shall have been entered by the Bankruptcy Court;

(b)     On or before the date that is thirty-five (35) calendar days following the Petition Date, the Final DIP Order shall have been entered by the Bankruptcy Court;

(c)     On or before the date that is forty (40) calendar days following the Petition Date, the deadline for the submission of final qualified bids in connection with the Sale Process shall have occurred;

(d)     On or before the date that is forty-two (42) calendar days following the Petition Date, the Sale Auction (if required in accordance with the Sale Procedures) shall have occurred;

(e)     On or before the date that is forty-five (45) calendar days following the Petition Date, the Sale Approval Order shall have been entered by the Bankruptcy Court; and

(f)     On or before the date that is sixty (60) calendar days following the Petition Date, the Sale Transaction shall have been consummated.

[DIP Loan and Security Agreement]

**EXHIBIT 2**