# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STRIKE, LLC, *et al.*[1] | ) Case No. 21-90054 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## DECLARATION OF RYAN BOULEY
## IN SUPPORT OF THE DEBTORS' DIP MOTION AND SALE MOTION

I, Ryan Bouley, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, hereby declare as follows:

1. I am a partner of Opportune LLP, which is an independent, privately held partnership and the parent company of Opportune Partners LLC ("**Opportune Partners**," and together with Opportune LLP, "**Opportune**"). Opportune Partners is serving as investment banker and Opportune LLP is serving as financial advisor for the debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**").

2. I submit this declaration (the "**Declaration**") in support of the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 79] (the "**DIP**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtors' federal tax identification number, are: Strike, LLC (2120); Strike HoldCo, LLC (0607); Delta Directional Drilling, LLC (9896); Strike Global Holdings, LLC (4661); Capstone Infrastructure Services, LLC (0161); and Crossfire, LLC (7582). The location of Debtor Strike, LLC's principal place of business and the Debtors' service address is: 1800 Hughes Landing Boulevard, Suite 500, The Woodlands, Texas 77380. Additional information regarding this case may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/StrikeLLC.

1

**EXHIBIT 3**

**Motion**"), and the *Debtors' Motion for Entry of Orders: (I) (A) Establishing Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors' Entry into Stalking Horse Agreement and Approving the Expense Reimbursement, (C) Establishing Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Related Notices, and (E) Scheduling a Hearing to Consider the Proposed Sale; (II) (A) Authorizing and Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 60] (the "**Sale Motion**," and together with the DIP Motion, the "**Motions**").

3. In forming the views set forth herein, I have relied upon and considered, among other things, the following: (a) my experience as an investment banker and financial advisor advising on debtor-in-possession financing facilities and overseeing and engaging in sales, mergers, and acquisitions; (b) the Motions and the exhibits thereto; (c) the *Declaration of Sean Gore in Support of Debtors' Petitions and Requests for First Day Relief* [Docket No. 18] (the "**First Day Declaration**")[2] filed concurrently with this Declaration; (d) documents related to the bidding procedures (the "**Bidding Procedures**") and proposed sale (the "**Sale**") of substantially all of the Debtors' assets (the "**Assets**") proposed in the Sale Motion; (e) documents related to the debtor-in-possession financing facility (the "**DIP Facility**") proposed in the DIP Motion; (f) discussions with the Debtors' management concerning the Debtors' business and finances; (g) my general familiarity with the terms of the Debtors' funded debt obligations, including the

---

[2] Where context requires, capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the First Day Declaration.

2

**EXHIBIT 3**

Prepetition Senior Loan Facility (as defined below) and Prepetition Junior Facility (as defined below); (h) discussions with prospective purchasers and sources of debtor-in-possession financing; and (i) discussions with certain other professionals at Opportune and other advisors to the Debtors.

4. I am not being specifically compensated for this testimony other than indirectly through payments received by Opportune through its retention prior to the petition date and proposed retention in these Chapter 11 Cases. I am authorized to submit this Declaration. If called to testify, I would testify to each of the facts set forth herein based on my personal knowledge, discussions, review of documents, and/or opinion.

I. **Background and Qualifications**

5. Opportune Partners is an investment banking firm with its principal office at 711 Louisiana Street, Suite 3100, Houston, Texas 77002. Opportune, its affiliates, and employees provide an array of financial, operational, and investment banking advisory services to distressed companies and their boards of directors, senior lenders, creditors, and other constituencies in connection with in- and out-of-court complex reorganizations.

6. I joined Opportune in March 2014 and have been a partner of the firm since 2017. Prior to joining Opportune, I was employed by J.P. Morgan Securities, Inc., Chanin Capital Partners (d/b/a Duff & Phelps Securities), and Panagos Katz Situational Investing, an investment fund focused on investing in the debt and equity of distressed companies. I have a Bachelor of Arts degree from Tufts University and a juris doctor degree from Wake Forest University School of Law. I have presented and spoken on a number of energy-related and restructuring-related topics.

7. In my career, I have provided investment banking and financial advisory services to numerous distressed companies and their stakeholders, including in, among numerous others, the following recent chapter 11 cases: *In re Lonestar Resources US Inc.*, No. 20-34805 (DRJ)

**EXHIBIT 3**

(Bankr. S.D. Tex. Sept. 30, 2020); *In re Fieldwood Energy LLC*, No. 20-33948 (MI) (Bankr. S.D. Tex. Aug. 3, 2020); *In re Bruin E&P Partners, LLC*, No. 2033605 (MI) (Bankr. S.D. Tex. July 17, 2020); *In re California Resources Corp.*, No. 20-33568 (DRJ) (Bankr. S.D. Tex. July 15, 2020); *In re Chesapeake Energy Corp.*, No. 20-33233 (DRJ) (Bankr. S.D. Tex. June 28, 2020); *In re Extraction Oil & Gas, Inc.*, No. 20-11548 (CSS) (Bankr. D. Del. June 14, 2020); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Oct. 3, 2019); and *In re Whiting Petroleum*, No. 20-32021 (DRJ), (Bankr. S.D. Tex. Apr. 1, 2020).

8. I lead the Opportune Partners team advising and assisting the Debtors in connection with the Sale and the DIP Facility.

**II. Retention of Opportune Partners**

9. The Debtors retained Opportune in September 2021 as their proposed financial advisor with respect to these cases. In November 2021, the Debtors retained Opportune Partners as their proposed investment banker. Since our engagement, members of my team and I have become familiar with the Debtors' capital structure, liquidity needs, and business operations and have worked closely with the Debtors' management and other advisors to analyze the Debtors' business affairs, assets and liabilities, financial position, contractual arrangements, and various proposed strategic transactions.

**III. General Background**

10. The Debtors' prepetition capital structure consists of (i) a revolving asset-backed loan facility (the "**Prepetition ABL Facility**"), which was subsequently amended to provide an incremental delayed draw term loan facility (the "**Prepetition Bridge Facility**," and the loans thereunder, the "**Bridge Loans**;" the Prepetition Bridge Facility together with the Prepetition ABL Facility, the "**Prepetition Senior Loan Facility**") governed by the Prepetition Senior Loan Agreement, (ii) a term loan facility (the "**Prepetition Junior Loan Facility**," and together with

4

**EXHIBIT 3**

the Prepetition Senior Loan Facility, the "**Prepetition Facilities**") governed by the Prepetition Junior Loan Agreement, and (iii) certain capital lease obligations.

11. Beginning in late summer 2021, the Debtors foresaw that they would experience a liquidity shortfall in the third quarter of this year and sought rescue financing. Although the Debtors reached out to various funding sources, including the Debtors' equity holders and various lenders under the Debtors' term loan facility. American Industrial Partners, Ltd. ("**AIP**") and certain of its affiliates (together with AIP, the "**AIP Parties**"), the Debtors' largest existing lenders, were the only parties at the time that were willing to even sign a confidentiality agreement to discuss the possibility of providing additional liquidity to the Debtors.

12. The Debtors and their advisors subsequently engaged in good-faith negotiations with the AIP Parties to obtain funding needed to preserve the Debtors as a going-concern on the best possible terms and provide the Debtors' with a bridge to a comprehensive restructuring. The AIP Parties subsequently acquired all of the loans under the Debtors' Prepetition ABL Facility, and negotiations were extended when the Debtors and the AIP Parties entered into forbearance agreements dated September 30, 2021 in respect of certain events of default under the Prepetition Senior Loan Facility and the Prepetition Junior Loan Facility.

13. Thereafter, on October 18, 2021, the Debtors and the AIP Parties entered into a series of agreements, including a further forbearance and an amendment to the Prepetition Junior Loan Facility, as well as a forbearance agreement and an amendment to the Prepetition Senior Loan Facility, under which certain of the AIP Parties agreed to provide the Company with an initial Bridge Loan in the aggregate amount of $20,000,000 to fund the Debtors' working capital needs while the parties discussed and negotiated a comprehensive restructuring.

**EXHIBIT 3**

14. On November 12, 2021, the Debtors and certain of the AIP Parties agreed to further amend the Prepetition Senior Loan Agreement to provide for an additional Bridge Loan in an incremental principal amount of up to $20,000,000 to address the Company's incremental liquidity needs while negotiating regarding a comprehensive restructuring. In return, among other things, the Debtors commenced the prepetition marketing process with respect to the Debtors' assets.

15. Immediately thereafter, my team commenced a marketing process for the sale of substantially all of the Debtors' assets. On November 22, 2021, the Debtors and certain of the AIP Parties entered into a restructuring support agreement (the "**RSA**").[3] Under the RSA, (a) the AIP Parties agreed to provide a senior secured superpriority priming debtor-in-possession financing facility in an amount to fund the competitive sale process and the Chapter 11 Cases, including the orderly wind-down of the Debtors' estates pursuant to a chapter 11 plan of liquidation, on terms to be agreed upon by the Debtors and the AIP Parties; and (b) an affiliate of the AIP Parties agreed to enter into a stalking horse asset purchase agreement that would be subject to higher and better offers solicited through a court-approved bidding and auction process. My team and I reviewed, provided feedback on, and engaged in the negotiations with respect to the proposed sale process and milestones agreed to in the RSA and helped negotiate the terms of the proposed DIP Facility. Among other things, obtaining the DIP Facility would provide the Debtors with necessary liquidity to fund their working capital needs, the administration of the Chapter 11 Cases, and the orderly wind-down of their estates. The DIP Facility would also avoid potential costly litigation over, among other things, adequate protection of the secured claims of the Prepetition Secured Parties and any resulting delays in the Debtors' ability to access the financing needed to sustain their operations.

---

[3] The RSA is attached to the First Day Declaration as Exhibit A.

**EXHIBIT 3**

## IV. The DIP Motion[4]

### A. The Debtors' Liquidity Requirements

16. Prior to the Petition Date, the Debtors, with the assistance of Opportune, analyzed their projected liquidity needs and developed an estimated budget for a prospective chapter 11 process. Based on that analysis, the Debtors determined that they will require access to Cash Collateral and additional liquidity of up to approximately $26 million during the Chapter 11 Cases. The budget attached to the DIP Order as <u>Exhibit 1</u>, which was negotiated in good faith and at arm's-length with the DIP Agent and DIP Lenders, reflects the Debtors' projected cash need under the circumstances.

17. The proceeds of the DIP Facility and Cash Collateral are necessary for the Debtors to continue to operate during the Chapter 11 Cases and will be used to fund the Debtors' obligations to vendors, suppliers, contractors, and customers, make necessary capital expenditures, satisfy working capital and operational needs, and fund the administrative costs of the Chapter 11 Cases, including the contemplated value-maximizing sale process and orderly wind-down of the Debtors' estates through a chapter 11 plan of liquidation.

18. I believe that, without access to the DIP Facility and the ability to use Cash Collateral, the Debtors would be administratively insolvent and would be forced to cease operations and convert these cases to a chapter 7 liquidation. Those actions would destroy the value of the Debtors' businesses, lead to the loss of thousands of jobs, and diminish recoveries for all of their stakeholders.

---

[4] Capitalized terms used in this Section IV but not defined in this Declaration have the meanings ascribed to them in the DIP Motion.

**EXHIBIT 3**

**B.    Efforts to Obtain Postpetition Financing and Use of Cash Collateral**

19. My team and I have reached out to potential financing sources to gauge their interest in providing the Debtors with debtor-in-possession financing. Those efforts commenced prior to the execution of the RSA and have continued following the execution of the RSA and the receipt of a preliminary term sheet with respect to the AIP Parties' proposed DIP Facility. In total, my team contacted 25 potential sources of financing—including certain other lenders under the Prepetition Junior Loan Facility—with respect to providing debtor-in-possession financing in an amount sufficient to fund the Debtors' liquidity needs during the Chapter 11 Cases. The potential sources of DIP financing also include certain of the potential purchasers we contacted in connection with the pre-petition sale marketing process, described in more detail below. Ultimately, however, no one has expressed interest in providing debtor-in-possession financing.

20. Ultimately, given the lack of any alternative offers and the Debtors' need for financing, the Debtors, in their business judgment, determined that obtaining the DIP Facility from the AIP Parties on the recently improved terms is their best and only means to enter Chapter 11 with access to sufficient liquidity and the ability to use Cash Collateral to, among other things, fund working capital expenditures, pay employees, customers, vendors, contractors and suppliers, and pay the necessary costs to administer the Chapter 11 Cases and preserve the value of the Debtors' business.

21. Prior to the Petition Date, the Debtors and the DIP Lenders engaged in good-faith, arms'-length negotiations regarding the terms of the DIP Facility. The Debtors and the DIP Lenders have agreed on the terms of a $112.6 million senior secured, priming, superpriority DIP Facility, consisting of (i) a fully committed new-money multiple-draw term loan facility in an aggregate principal amount of $26 million (the "**DIP Term Loan Facility**"), of which $8 million will be made available during the interim period, with the balance available from and after entry

of the Final Order, and (ii) a $86.6 million roll-up facility (the "**DIP Roll-Up Facility**," and together with the DIP Term Loan Facility, the "**DIP Facility**"), pursuant to which, subject to entry of the Final Order, all amounts outstanding under the Prepetition Senior Loan Facility will be rolled into the DIP Facility. Additionally, in exchange for the Adequate Protection set forth in the DIP Order, the Debtors have obtained consents from the requisite lenders under the Prepetition Facilities to use Cash Collateral and grant priming liens to secure the DIP Facility.

22. Based on my and my team's participation in marketing and negotiating the DIP Facility and our ongoing marketing efforts in connection with the Sale, I believe that the Debtors are unable to obtain financing on more favorable terms than the DIP Facility, and the terms have improved significantly over the last two days, when the Debtors' receipt of several large unanticipated payments reduced the immediate borrowing need and compelled the AIP Parties to renegotiate certain of the terms. The AIP Parties agreed to significantly reduce fees and eliminate several terms permitted only under extraordinary circumstances. The unanticipated cash receipt did not completely solve the Debtors' financing needs—they will still need postpetition financing during the interim period—but did reduce the needed amount of expensive financing and give the Debtors the opportunity to improve the terms of that financing significantly.

23. The DIP Facility is also tied to the AIP Parties' commitment to provide a stalking horse bid, which sets the floor for a competitive bidding process in respect of the Sale of substantially all of the Debtors' Assets. Under the circumstances, including the lack of any interest in providing alternative debtor-in-possession financing and the Debtors' near term need for liquidity to continue as a going concern, the terms of the proposed DIP Facility are the best terms currently available to the Debtors. It is my opinion that entering into the DIP Facility is reasonable, necessary, and in the best interests of the Debtors' estates.

C. **The DIP Facility Is Necessary for the Debtors' Continued Operations, Including During the Interim Period**

24. The proposed DIP Facility provides the best, and likely only, means for the Debtors to sustain their operations and administer the Chapter 11 Cases. Without access to the DIP Facility, the Debtors would likely be forced to cease operations and convert to a chapter 7 liquidation. Moreover, failure to obtain timely approval of the DIP Facility will give rise to a termination event under the RSA and the Stalking Horse Agreement, leaving the Debtors without a clear path to preserve their business as a going concern and fund an orderly wind-down of their estates. Failure to obtain access to the DIP Facility would irreparably harm the Debtors' estates.

25. The Debtors forecast that, fairly soon after the Petition Date, they will be unable to generate sufficient levels of operating cash flows in the ordinary course of business to sustain operations and the administrative costs of the Chapter 11 Cases. Thus, absent interim approval of the DIP Facility and quick access to proceeds of the DIP Facility and the Cash Collateral, the Debtors will likely have to significantly limit or even cease business operations to the material detriment of creditors and other parties in interest. Moreover, approval of the DIP Facility and use of Cash Collateral is necessary for the Debtors to pursue the Sale and to demonstrate to their customers, suppliers, contractors, and vendors that they have sufficient capital to ensure the continuation of their operations without interruption.

D. **The Terms of the DIP Facility Are Adequate Under the Circumstances**

26. The DIP Facility is the best debtor-in-possession financing package available to the Debtors.

(a) **The Roll-Up of the Obligations Under the Prepetition Senior Loan Facility Is Appropriate Under the Circumstances**

27. The DIP Roll-Up Facility contemplates a "roll up" of all outstanding obligations under the Prepetition Senior Loan Facility on a cashless dollar for dollar basis, subject to entry of

**EXHIBIT 3**

the Final Order. The DIP Roll-Up Facility on the terms proposed in the DIP Loan Agreement and the DIP Order is a material and inextricable component of the DIP Facility and a condition to the DIP Lenders' commitment to provide postpetition financing and the consensual use of Cash Collateral. The Debtors and the DIP Lenders engaged in extensive good-faith, arms'-length negotiations regarding the terms of the DIP Roll-Up Facility, and the Debtors agreed to the DIP Roll-Up Facility as consideration for, among other things, the DIP Lenders having funded the Bridge Loans, consenting to the use of Cash Collateral, and making available $26 million in new money under the DIP Facility to fund the Chapter 11 Cases. It is my understanding that without the DIP Roll-Up Facility, the DIP Lenders would not have agreed to provide the DIP Facility.

28. Finally, I understand that the obligations under the Prepetition Senior Loan Facility that are being "rolled-up" are currently secured by first-priority liens on substantially all assets of the Debtors. Following the roll-up, such obligations will be secured by DIP Liens on substantially the same assets.

29. Given these circumstances, especially the Debtors' need for the liquidity provided by the DIP Facility, it is my belief that the DIP Roll-Up Facility is appropriate under the circumstances and should be approved.

    **(b)**   **Inability to Obtain Unsecured or Non-Priming Financing**

30. I believe that the Debtors reasonably concluded that postpetition financing was not available on an unsecured basis based on my efforts to obtain alternative funding prior to the Petition Date. Given the efforts my team and I made reaching out to potential financing sources to determine any interest, I believe the Debtors have a good understanding of the current availability of postpetition financing. No party has come forward to offer the Debtors financing on an unsecured basis, or even on a junior secured basis.

**EXHIBIT 3**

31. I believe that the Debtors also reasonably determined that postpetition credit was only available to them on a secured superpriority priming basis. A condition of the AIP Parties in offering the DIP Facility was that it be secured by a senior superpriority priming loan and, as stated in this Declaration, the Debtors and their advisors determined that the best course of action was to enter Chapter 11 with a negotiated DIP Facility in place. The AIP Parties would not offer the DIP Facility without assurances that the loans under the DIP Facility would be made on a secured superpriority priming basis.

### (c) Payment of Fees and Interest Required by the DIP Lenders Is Reasonable and Necessary Under the Circumstances

32. I understand that, under the proposed DIP Facility, the Debtors have agreed to pay the DIP Lenders (i) a commitment fee of 7.5% of the new money commitment, which amount is proposed to be payable in-kind upon the Closing Date, and (ii) a termination fee of 3% of the aggregate principal amount of the drawn amounts of the new money commitment, which is proposed to be payable in-kind upon certain triggering events, including any payment, prepayment or repayment of the DIP Obligations (including mandatory prepayments required by the DIP Loan Agreement other than with respect to any Excess Cash Amount). I also understand that, under the proposed DIP Facility, the Debtors have agreed to pay interest on the DIP Loans at the Base Rate or LIBOR, as applicable, plus an applicable margin of 10%, in each case payable in-kind, with an additional 2% accruing automatically upon the occurrence of an Event of Default under the DIP Loan Agreement. Importantly, the interest rate charged under the DIP Facility is the same as the interest rate charged under the Prepetition Senior Loan Facility, and such interest will not be required to be paid in cash during the Chapter 11 Cases. Therefore, the DIP Facility and the roll-up of the Prepetition Senior Loan Facility proposed thereunder will not result in an increase of

**EXHIBIT 3**

interest expense when compared with the terms of the Prepetition Senior Loan Facility and will help preserve cash during the Chapter 11 Cases by providing that interest be payable in-kind.

33. The fees owed under the DIP Facility are the product of extensive negotiations between the Debtors and the DIP Lenders, are integral components of the overall terms of the DIP Facility, and were required by the DIP Agent and DIP Lenders as consideration for the extension of postpetition financing and consensual use of Cash Collateral. Accordingly, I believe that paying these fees is necessary under the circumstances.

### (d) The Milestones Are Appropriate Under the Circumstances

34. An important feature of the DIP Facility are the chapter 11 milestones set forth in the RSA, which I understand are incorporated into the Interim DIP Order and the DIP Loan Agreement. These milestones were heavily negotiated and required by the DIP Lenders as a condition to providing the DIP Facility and to provide for the efficient administration of the Chapter 11 Cases given the Debtors' strained liquidity position. In my experience, milestones are a common feature of DIP Facilities in Chapter 11 cases of similar size and complexity, and I believe that the proposed milestones offer sufficient time for the Debtors to effectively market their assets and complete the transactions currently contemplated in the Chapter 11 Cases, including the Sale.

### E. The DIP Facility Should be Approved

35. In light of the foregoing, and based on my experience in general and my direct involvement in the marketing and negotiation of the DIP Facility, I believe that entering into the DIP Facility is a sound exercise of the Debtors' business judgment following a well-informed and negotiated process and a reasonable and well-informed evaluation of potential alternatives. The DIP Facility is the most favorable option available to the Debtors under the circumstances,

providing continued access to liquidity to fund the Debtors' business during the Chapter 11 Cases and the administration of the Chapter 11 Cases, including a competitive sale process.

## V. The Sale Motion[5]

### A. The Debtors' Prepetition Marketing Efforts

36. On or about November 12, 2021, the Debtors launched a marketing process for the sale of the Debtors' Assets. Opportune Partners, with input from the Debtors, compiled a list of potential financial and strategic purchasers. Opportune Partners then contacted 180 entities identified as potential purchasers prior to the Petition Date. Opportune Partners also distributed an opportunity summary (commonly known as a "teaser") to 155 of those potential purchasers. Thereafter, the Debtors provided interested parties that had executed non-disclosure agreements with access to a confidential information memorandum (the "**CIM**") that included a summary of the Debtors' operations, a description of its services and products, and historical and projected financial information. The CIM also included illustrative descriptions of the Debtors' Assets. To allow potential purchasers to conduct due diligence and prepare bids, the Debtors established a virtual data room consisting of hundreds of documents, including the necessary information a potential purchaser would need to make a proposal. Access to the virtual data room has been promptly granted to each potential purchaser who has requested and executed a non-disclosure agreement.

37. Currently, 22 potential buyers have NDAs in process and 10 have signed a non-disclosure agreement and have been granted access to diligence materials. Although the Debtors have not received any binding or non-binding indications of interest with respect to the Debtors' Assets, I believe that the pre-petition marketing process has provided interested parties a

---

[5] Capitalized terms used in this Section V but not defined in this Declaration have the meanings ascribed to them in the Sale Motion.

**EXHIBIT 3**

meaningful opportunity to review and diligence the Debtors' Assets, and to position them to bid during the post-petition marketing process.

### B. The Stalking Horse Agreement

38. The Stalking Horse Agreement is the product of good-faith, arms'-length negotiations. Approval of the Stalking Horse Agreement is in the best interest of Debtors' estates. The Stalking Horse Agreement sets the floor for a competitive bidding process that will allow the Debtors to obtain the highest or otherwise best value for the Assets. Moreover, the Stalking Horse Agreement includes no provisions for a break-up or termination fee—as commonly required by stalking horse bidders. As described in greater detail below, the Stalking Horse Agreement does provide for the purchaser to receive the Expense Reimbursement if it is terminated under certain circumstances.

39. In addition to promoting a competitive bidding process, the Stalking Horse Agreement contemplates that, as a condition to Closing, the Debtors will retain or receive cash in an amount sufficient to wind-down the Debtors' estates pursuant to a chapter 11 plan of liquidation that will include, among other things, the payment in full of the Debtors' anticipated allowed administrative and priority claims.

### C. Reasonableness of the Expense Reimbursement

40. I understand that the Stalking Horse Agreement commits the Debtors to reimburse the Stalking Horse Bidder for certain fees and expenses (the "**Expense Amount**"), in an amount not to exceed $1,500,000 (the "**Expense Reimbursement Cap**"), in the event that the Stalking Horse Agreement is validly terminated (other than as a result of a breach by the Stalking Horse Bidder). Moreover, I understand that, in the event the Expense Reimbursement is not timely paid when due, the Stalking Horse Bidder will also be entitled to a reimbursement of costs incurred in

collecting the unpaid portion and interest thereon at the prime rate (the "**Collection Costs**," and together with the Expense Amount, the "**Expense Reimbursement**").

41. The Expense Reimbursement is a material inducement for the Stalking Horse Bidder's entry into the Stalking Horse Agreement, which the Stalking Horse Bidder may terminate if the Expense Reimbursement is not approved. The Debtors and the Stalking Horse Bidder negotiated the Expense Reimbursement at arms'-length and in good faith. In my experience, stalking horse agreements, including those contemplating a credit bid, customarily include similar expense reimbursement obligations. I am generally aware that the Expense Reimbursement Cap is competitive relative to the financial bid protections of similar stalking horse agreements that I have observed were approved in other cases. Accordingly, I believe that the Debtors' decision to agree to the Expense Reimbursement is appropriate and reasonable in light of the circumstances.

D.  **Reasonableness of the Bidding Procedures**

42. The Bidding Procedures are the product of arms'-length and good faith negotiations between the Debtors and the Stalking Horse Bidder. The Bidding Procedures are designed to foster a competitive bidding and auction process that increases the likelihood of obtaining the highest or otherwise best value for the Assets. Completion of the sale process in accordance with the timeline under the Bidding Procedures is in the best interest of the Debtors' estates and their stakeholders.

43. The Bidding Procedures contemplate an approximate six-week post-petition marketing and bidding process, which will be in addition to the three-week prepetition marketing efforts undertaken by the Debtors and Opportune Partners prior to the commencement of the chapter 11 cases. In formulating the Bidding Procedures, the Debtors sought to balance the need to provide an adequate diligence period to interested parties with the Debtors' limited resources and need to maintain sufficient liquidity to fund their operations and the Chapter 11 Cases. The Bidding Procedures also take into consideration the milestones under the DIP Facility. If those

milestones are not met, the Debtors could lose the funding needed to maintain the Debtors' operations and preserve the value of the Assets during the sale process.

44.     Accordingly, I believe that the Bidding Procedures, particularly given that the marketing process commenced prior to the Petition Date, coupled with the Debtors' significant liquidity constraints, are reasonable and will provide parties with sufficient time to conduct due diligence and formulate and submit informed bids for the Debtors' Assets, maximize the value of the Debtors' Assets, and allow the Debtors to preserve value for their stakeholders.

*[Remainder of Page Intentionally Left Blank]*

Case 21-90054 Document 82-3 Filed in TXSB on 12/30/21 Page 17 of 18

**EXHIBIT 3**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 8, 2021

_____
Ryan Bouley
Partner
Opportune LLP

**EXHIBIT 3**