United States Bankruptcy Court
Southern District of Texas

**ENTERED**

January 28, 2022

Nathan Ochsner, Clerk

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| STRIKE, LLC, *et al.*[1] | ) Case No. 21-90054 (DRJ) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) **Re: Docket No. 60** |

### ORDER (I) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH; (III) AUTHORIZING THE SALE TRANSACTION; AND (IV) GRANTING RELATED RELIEF

Upon the motion [Dkt. No. 60] (the "**Motion**")[2] of the above-captioned debtors and debtors-in-possession (the "**Debtors**") for entry of an order (this "**Order**"), pursuant to sections 105(a), 363, 365, and 503 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") (i) approving the sale of substantially all assets of the Debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") free and clear of all liens, claims, encumbrances and interests in accordance with and subject to the terms and conditions contained in that certain Asset Purchase Agreement, dated as of December 6, 2021 (as amended, supplemented, amended and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Strike, LLC (2120); Strike HoldCo, LLC (0607); Delta Directional Drilling, LLC (9896); Strike Global Holdings, LLC (4661); Capstone Infrastructure Services, LLC (0161); and Crossfire, LLC (7582). The location of Debtor Strike, LLC's principal place of business and the Debtors' service address is: 1800 Hughes Landing Boulevard, Suite 500, The Woodlands, Texas 77380. Additional information regarding these cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/StrikeLLC.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Asset Purchase Agreement (as defined herein).

restated or otherwise modified from time to time, including the amendments thereto, as set forth in the schedules attached to this Order, and including the exhibits and schedules thereto, the "**Asset Purchase Agreement**"),[3] by and among Strike Acquisition LLC and the Debtors; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases set forth on **Schedule 1** attached hereto (the "**Assigned Contracts**") and pursuant to the designation rights set forth in section 1.5 of the Asset Purchase Agreement; (iii) authorizing the consummation of the sale and each of transactions contemplated by the Asset Purchase Agreement and this Order (the "**Sale Transaction**"); and (iv) granting related relief; and upon the *Declaration of Ryan Bouley in Support of the Debtors' DIP Motion and Sale Motion* [Dkt. No. 82]; and the United States Bankruptcy Court for the Southern District of Texas (the "**Court**") having entered an order on December 23, 2021 [Dkt. No. 279] (the "**Bidding Procedures Order**") approving, among other things, the dates, deadlines, and bidding procedures (the "**Bidding Procedures**") with respect to, and notice of, the proposed sale of substantially all the assets of the Debtors (the "**Assets**"); and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and the Court having held a hearing on January 27, 2022 (the "**Sale Hearing**") to approve the Sale Transaction; and the Court having reviewed and considered (a) the Motion, (b) the objections to the Motion or the Sale Transaction, if any, (c) the *Supplemental Declaration of Ryan Bouley in Support of the Motion* [Dkt. No. 573] (the "**Supplemental Bouley Declaration**"); (d) all other pleadings filed in support of the Motion, and (e) the arguments of counsel, and the evidence proffered or adduced at the Sale Hearing and any other hearing related to the Motion; and all parties in interest having been heard, or having

---

[3] A copy of the Asset Purchase Agreement (without schedules or exhibits) that incorporates the amendments to the Asset Purchase Agreement set forth on Schedule 2 is attached hereto as Schedule 3.

AMERICAS 111936533

had the opportunity to be heard, regarding the approval of the Sale Transaction and the other relief requested in the Motion; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors and other parties in interest; and upon the record of the Sale Hearing and the Chapter 11 Cases; and after due deliberation thereon; and good cause appearing therefore, it is hereby,

**FOUND, DETERMINED, AND CONCLUDED THAT:[4]**

A. <u>Jurisdiction and Venue</u>. This Court has jurisdiction to consider the Motion and approve the Sale Transaction under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these Chapter 11 Cases and this Motion is proper in this district and Court under 28 U.S.C. §§ 1408 and 1409.

B. <u>Final Order</u>. This Order constitutes a final order within the meaning of 28 U.S.C. §158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

C. <u>Property of the Estate</u>. The Purchased Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

---

[4] The findings, determinations, and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

AMERICAS 111936533

D.    <u>Legal Predicates</u>.  The predicates for the relief requested by this Motion are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and applicable Bankruptcy Local Rules.

E.    <u>Petition Date</u>.  On December 6, 2021 (the "**Petition Date**"), each of the Debtors commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

F.    <u>Committee</u>.  On December 15, 2021, the United States Trustee for the Southern District of Texas appointed the Official Committee of Unsecured Creditors of Strike, LLC, *et al.* (the "**Committee**").

G.    <u>Bidding Procedures Order</u>.  On December 23, 2021, this Court entered the Bidding Procedures Order (i) approving the Bidding Procedures; (ii) authorizing the Debtors to enter into the Stalking Horse Agreement and approving the Expense Reimbursement; (iii) scheduling the Auction and Sale Hearing; (iv) approving the form and manner of notice of the Bidding Procedures, the Bid Deadline, the Auction, the deadline to object to the sale, and all other relevant procedures, protections, schedules and agreements; (v) establishing the Assumption and Assignment Procedures, including notice of proposed cure amounts (the "**Cure Amounts**") and relevant objection deadlines; and (v) granting related relief.  No appeal, motion to reconsider or similar pleading has been filed with respect to the Bidding Procedures Order, and the Bidding Procedures Order is a final order of the Court.  The Bidding Procedures Order has not been vacated, withdrawn, rescinded or amended and remains in full force and effect.

H.    <u>Compliance with Bidding Procedures Order</u>.  As demonstrated by the testimony and other evidence proffered or adduced at the Sale Hearing and the representations of counsel

made on the record at the Sale Hearing, the Debtors have marketed the Assets and conducted the sale process in compliance with the Bidding Procedures Order. The Debtors and their professionals have afforded potential purchasers a full and fair opportunity to make higher and better offers than the Stalking Horse Bid (as defined in the Bidding Procedures). The Purchaser Parties (as defined below) have acted in good faith and in compliance with the terms of the Bidding Procedures. The Debtors did not receive a Qualified Bid by the Bid Deadline, and therefore, on January 25, 2022, filed and served the *Notice of Cancellation of Auction, Selection of Successful Bidder, and Scheduling of Sale Hearing* [Dkt. No. 533]. In accordance with the Bidding Procedures, the Debtors determined that the bid submitted by the Purchaser and memorialized by the Asset Purchase Agreement is the Successful Bid (as defined in the Bidding Procedures). The Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

I.      <u>Notice</u>. As evidenced by the affidavits of service and publication previously filed with the Court [Dkt. Nos. 122, 364, 416, 418, 486, 501, and 502], and based on the record at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Bidding Procedures, the Auction, the Sale Hearing, the Sale Transaction, the relevant objection deadlines, the Assumption and Assignment Procedures (including the objection deadline with respect to any Cure Amount and the assumption and assignment of the Assigned Contracts), the designation rights set forth in section 1.5 of the Asset Purchase Agreement, and the Cure Amounts has been provided in accordance with sections 102(l), 363 and 365 of the Bankruptcy Code, Bankruptcy

5

Rules 2002, 6004, 6006, 9007 and 9014, and applicable Bankruptcy Local Rules, and in compliance with the Bidding Procedures Order to each party entitled to such notice, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Bidding Procedures, the Auction, the Sale Hearing, the Sale Transaction, the relevant objection deadlines, the Assumption and Assignment Procedures (including the objection deadline with respect to any Cure Amount), the assumption and assignment of the Assigned Contracts (including the designation rights set forth in section 1.5 of the Asset Purchase Agreement), or the Cure Amounts is or shall be required.  With respect to entities whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice in *The Wall Street Journal* (National Edition) and *The Houston Chronicle* on December 31, 2021, was sufficient and reasonably calculated under the circumstances to reach such entities. [Dkt. Nos. 500, 501].

J.      Notice of the Debtors' assumption, assignment, transfer, and/or sale to the Purchaser of the Assigned Contracts has been provided to each non-Debtor party thereto, together with a statement therein from the Debtors with respect to the Cure Amount.  As to each Assigned Contract, the Cure Amount set forth on **Schedule 1** hereto, as applicable, is sufficient for the Debtors to comply fully with the requirements of sections 365(b)(1)(A) and (B) of the Bankruptcy Code, subject, in the case of the Assigned Contracts set forth **Exhibit B to Schedule 1** hereto, to the applicable Assignment Objection Deadline.  Each of the non-Debtor parties to the Assigned Contracts has had a fair and reasonable opportunity to object to the Cure Amounts set forth in the *Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale and Cure Costs* [Dkt. No. 309] and will have a fair and reasonable opportunity to object to the Cure Amounts set forth in the *Supplemental Notice of Assumption and*

*Assignment of Executory Contracts and Unexpired Leases in Connection with Sale and Cure Costs* filed and served on January 26, 2022 [Dkt. No. 571], subject to the applicable objection deadline provided in the Bidding Procedures Order.

K.    <u>Company Authority</u>.  Each Debtor (i) has full limited liability company power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby and hereby, including the Ancillary Agreements (collectively, the "**Transaction Documents**"), and the Sale Transaction has been duly and validly authorized by all necessary limited liability company action of each of the applicable Debtors, (ii) has all of the limited liability company power and authority necessary to consummate the transactions contemplated by this Order and the Transaction Documents, (iii) has taken all limited liability company action and formalities necessary to authorize and approve the Transaction Documents and the Debtors' consummation of the transactions contemplated thereby and hereby, including as required by their respective organizational documents, (iv) has duly executed and delivered the Asset Purchase Agreement, and (v) no government, regulatory or other consents or approvals, other than those expressly provided for in the Transaction Documents, are required for the Debtors to enter into the Transaction Documents, to consummate the Sale Transaction, or to perform their obligations under the Transaction Documents.  The consummation of the Sale Transaction and performance under the Transaction Documents do not violate or conflict with any applicable law.

L.    <u>Opportunity to Object</u>.  A fair and reasonable opportunity to object and to be heard with respect to the Motion and the relief requested therein, has been given to all interested persons and entities, including the following: (i) all counterparties to the Assigned Contracts, (ii) all known parties holding or asserting Interests on, in, or against the Assets, (iii) all parties that have requested

7

notice pursuant to Bankruptcy Rule 2002 as of the time of service, and (iv) all applicable federal, state. and local taxing and regulatory authorities.

M. <u>Sale in Best Interest</u>.  Consummation of the sale of the Purchased Assets pursuant to the Asset Purchase Agreement at this time is in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

N. <u>Business Justification</u>. Sound business reasons exist for the Sale Transaction. Entry into the Transaction Documents, and the consummation of the transactions contemplated thereby, including the Sale Transaction and the assumption and assignment of the Assigned Contracts (including the exercise of the designation rights set forth in section 1.5 of the Asset Purchase Agreement), constitutes an exercise of the Debtors' sound business judgment and such acts are in the best interests of each Debtor, its estate, and all parties in interest.  The Court finds that each Debtor has articulated good and sufficient business reasons justifying the Sale Transaction.  Such business reasons include, but are not limited to, the following: (i) the Asset Purchase Agreement constitutes the highest and best offer for the Purchased Assets; (ii) the Purchaser has agreed to assume the Assumed Liabilities; (iii) the Sale Transaction maximizes the going concern value of the Business and Purchased Assets; and (iv) unless the Sale Transaction and all of the other transactions contemplated by the Transaction Documents are concluded expeditiously, as provided for in the Motion, the Bidding Procedures, and pursuant to the Asset Purchase Agreement, recoveries to creditors may be diminished.

O. The Debtors and their professionals actively marketed the Assets to potential purchasers, as set forth in the Motion and in accordance with the Bidding Procedures Order.  The bidding and auction process set forth in the Bidding Procedures Order and the Bidding Procedures afforded a full and fair opportunity for any entity to make a higher or otherwise better offer to

8

purchase the Purchased Assets than the offer memorialized by the Asset Purchase Agreement. Based upon the record of these proceedings, all creditors and other parties in interest and all prospective bidders have been afforded a reasonable and fair opportunity to bid for the Purchased Assets.

P.       No other person or entity or group of persons or entities has offered to purchase the Purchased Assets for an amount that would give equal or greater economic value to the Debtors and their estates in the aggregate than the value being provided pursuant to the Asset Purchase Agreement.   Among other things, the Sale Transaction is the best alternative available to the Debtors to maximize the return to their estates.   The terms and conditions of the Asset Purchase Agreement, including the consideration to be realized by the Debtors, are fair and reasonable. Given all of the circumstances of the Chapter 11 Cases and the adequacy and fair value of the consideration provided under the Asset Purchase Agreement, approval of the Motion, the Asset Purchase Agreement, and the transactions contemplated thereby and hereby, including the Sale Transaction and the assumption and assignment of the Assigned Contracts, is in the best interest of the Debtors, their estates and creditors, and all other parties in interest.

Q.       <u>Arms-Length Sale</u>.   The Transaction Documents were negotiated, proposed, and entered into by the Debtors and the Purchaser without collusion, in good faith, and at arm's- length. None of the Debtors or any of the Purchaser Parties, or any of their respective representatives has engaged in any conduct that would cause or permit the Transaction Documents, or the consummation of the Sale Transaction, to be avoidable or avoided, or for costs or damages to be imposed, under 11 U.S.C. § 363(n), or has acted in bad faith or in any improper or collusive manner with any entity in connection therewith.   Specifically, the Purchaser Parties have not acted in a

9

collusive manner with any person or entity and the Purchase Price was not controlled by any agreement among bidders.

      R.     <u>Good Faith Purchaser</u>.  The Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under 11 U.S.C. § 363(m) and any other applicable or similar bankruptcy and non-bankruptcy law.  Furthermore, none of the Purchaser Parties is an "insider" (as defined under section 101(31) of the Bankruptcy Code) of any Debtor, and, therefore, each Purchaser Party is entitled to the full protections of section 363(m) of the Bankruptcy Code and has otherwise proceeded in good faith in all respects in connection with these Chapter 11 Cases and the Sale Transaction.  Without limiting the foregoing: (i) all Purchaser Parties recognized that the Debtors were free to deal with any other party interested in purchasing the Purchased Assets; (ii) all Purchaser Parties complied in all respects with the provisions in the Bidding Procedures Order; (iii) the Purchaser agreed to subject its bid to the competitive Bidding Procedures set forth in the Bidding Procedures Order; (iv) all consideration to be provided by the Purchaser and all other agreements or arrangements entered into by the Purchaser Parties in connection with the Sale Transaction have been disclosed; (v) no common identity of directors, officers or controlling stockholders exists among the Purchaser and the Debtors; (vi) the negotiation and execution of the Transaction Documents were at arm's-length and in good faith, and at all times each of the Purchaser Parties and the Debtors were represented by competent counsel of their choosing; and (vii) the Purchaser Parties have not acted in a collusive manner with any person or entity. The Purchaser Parties will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the Asset Purchase Agreement and the other Transaction Documents.

AMERICAS 111936533

S.      Credit Bid.  Pursuant to the Asset Purchase Agreement and sections 363(b) and 363(k) of the Bankruptcy Code, the Purchaser, in addition to the other consideration offered under the Asset Purchase Agreement, agreed to credit bid all DIP Obligations and all Prepetition Senior Loan Obligations (if any) outstanding as of immediately prior to the Closing Date (collectively, the "**Credit Bid**").

T.      The Credit Bid was valid and proper, and was authorized to be made by the Purchaser, pursuant to the DIP Loan Documents, the Prepetition Senior Loan Documents, the Bidding Procedures Order, and the Bidding Procedures.  No cause exists to limit, reduce, modify or impair the amount of the Credit Bid under section 363(k) of the Bankruptcy Code.  In accordance with section 363(k) of the Bankruptcy Code, the Debtors valued each dollar of the Credit Bid as equivalent to one dollar of cash, and such valuation was appropriate and represents a reasonable exercise of the Debtors' business judgment.

U.      Subject to the occurrence of the Closing, (i) the Credit Bid is binding on the Purchaser Parties, the DIP Agent, the DIP Lenders, the Prepetition Senior Loan Agent, and the Prepetition Senior Loan Lenders; and (ii) the Debtors and their estates, and all property of the Debtors' estates, are released from any and all claims, liabilities, liens, and interests related to or arising from the DIP Claims and the Prepetition Senior Loan Claims included in the Credit Bid.

V.      Free and Clear Sale.  The Debtors may sell the Purchased Assets free and clear of all Encumbrances, claims (including any "claims" as defined in section 101(5) of the Bankruptcy Code), rights, obligations, Liabilities, and other interests of any kind or nature whatsoever against the Debtors or the Purchased Assets (other than Permitted Encumbrances and the Assumed Liabilities), including, without limitation, other than Permitted Encumbrances and the Assumed Liabilities, any Liabilities, debts, or obligations arising under or out of, in connection with, or in

11

any way relating to, any acts or omissions, indentures, loan agreements, instruments, leases, agreements, collective bargaining agreements, conditional sale or other title retention agreements, suits, judgments, demands, guaranties, contractual commitments, licenses, restrictions, options, rights of first refusal, offsets, Contracts, recoupment rights, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, breach of warranty, alter-ego, environmental liabilities, labor and employment claims (whether or not under a labor agreement), employee pension or benefit plan claims (including multiemployer benefit plan claims), including any withdrawal or termination liability thereunder, workers' compensation claims, retiree medical benefits claims, liabilities related to the Employee Retirement Income Security Act of 1974, liabilities related to the Worker Adjustment and Retraining Notification Act of 1988, liabilities related to the Internal Revenue Code, or any other liability relating to the Debtors' current and former employees, claims for taxes of or against the Debtors or their assets, any derivative, vicarious, transfer or successor liability claims, and any other rights or causes of action (whether in law or in equity, under any law, statute, rule or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior to or subsequent to the Closing Date, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, asserted or unasserted, material or non-material, disputed or undisputed, matured or unmatured, liquidated or unliquidated, or contingent or non-contingent, and whether imposed by agreement, understanding, law, equity or otherwise, including, without limitation, any and all claims otherwise arising under doctrines of successor liability, in each case, arising under or out of, in connection with, or in any way related to the Debtors (or their predecessors), the Debtors' interests in the Purchased Assets, the operation of the Debtors' businesses before the

AMERICAS 111936533

Closing, or the transfer of the Debtors' interests in the Purchased Assets to the Purchaser, and all Excluded Liabilities (collectively, and excluding any Permitted Encumbrances and Assumed Liabilities, the "**Interests**"), because, with respect to each person or entity asserting an Interest, one or more of the standards set forth in sections 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Each person or entity with an Interest in the Purchased Assets: (i) has, subject to the terms and conditions of this Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest; or (iii) otherwise falls within one or more of the other subsections of section 363(f) of the Bankruptcy Code.  Those holders of Interests who did not object or withdrew objections to the Sale Transaction are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code.

W.      The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby, including the Sale Transaction and the assumption and assignment of the Assigned Contracts, (i) if the transfer of the Purchased Assets was not free and clear of all Interests, including rights or claims based on any successor or transferee liability, of any kind or nature whatsoever (except as expressly set forth in the Asset Purchase Agreement or this Order with respect to Permitted Encumbrances and Assumed Liabilities) or (ii) if the Purchaser, the AIP Parties, or any Affiliates of the Purchaser or any of the AIP Parties, or any past, present or future members, partners, principals, or equityholders (or equivalent), whether direct or indirect, lenders, subsidiaries, parents, divisions, funds, agents, representatives, insurers, attorneys, successors or assigns of the Purchaser, any of the AIP Parties or any Affiliates of the Purchaser or any of the AIP Parties, or any of the directors, managers, officers, employees, agents, representatives, attorneys, contractors, subcontractors, independent

13

contractors, owners, or insurance companies of any of the foregoing (collectively, and each in their capacity as such, "**Purchaser Parties**") would, or in the future could, be liable for any such Interests. The Purchaser will not consummate the transactions contemplated by the Asset Purchase Agreement, including the Sale Transaction and the assumption and assignment of the Assigned Contracts, unless this Court expressly orders that none of the Purchaser, the other Purchaser Parties, or the Purchased Assets will have any Liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Interest.

X.     Not transferring the Purchased Assets to the Purchaser free and clear of all Interests would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Purchased Assets to the Purchaser other than pursuant to a transfer that is free and clear of all Interests would be of substantially less benefit to the Debtors' estates.  The total consideration to be provided under the Asset Purchase Agreement reflects the Purchaser's reliance on this Order to provide the Purchaser, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Interests.

Y.     <u>Assumption of Executory Contracts and Unexpired Leases</u>.  The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assigned Contracts (including the designation rights set forth in section 1.5 of the Asset Purchase Agreement) is in the best interests of the Debtors and their estates.  The Assigned Contracts being assigned to the Purchaser are an integral part of the Asset Purchase Agreement and the Sale Transaction and, accordingly, such assumption and

assignment of the Assigned Contracts is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

Z.      <u>Cure/Adequate Assurance</u>.  The Debtors and the Purchaser have (i) cured, or the Purchaser has provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assigned Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(A) and 365(f)(2)(A), and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B).  The Purchaser has provided adequate assurance of future performance of and under the Assigned Contracts within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).

AA.      <u>Prompt Consummation</u>.  The sale of the Purchased Assets must be approved and consummated promptly to preserve the value of the Purchased Assets. Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Purchaser intend to close the Sale Transaction as soon as reasonably practicable. The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transactions contemplated by the Asset Purchase Agreement, the other Transaction Documents and this Order, including the Sale Transaction. The Purchaser, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the Sale Transaction contemplated by the Asset Purchase Agreement at any time after entry of this Order, subject to the terms and conditions of the Asset Purchase Agreement. There is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006 with regards to the transactions contemplated by this Order.

15

BB.    <u>No Fraudulent Transfer</u>.  The Transaction Documents were not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia, and none of the parties to the Transaction Documents are consummating the Sale Transaction for any other fraudulent or otherwise improper purpose.

CC.    The consideration provided by the Purchaser for the Purchased Assets pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other available alternative, and (iv) constitutes reasonably equivalent value, fair consideration and fair value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the Uniform Voidable Transactions Act), and any other applicable law.

DD.    <u>Purchaser Not an Insider and No Successor Liability</u>.  Prior to the Closing Date, the Purchaser was not an "insider" or "affiliate" of the Debtors, as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors or stockholders existed between the Purchaser and the Debtors. The transfer of the Purchased Assets to the Purchaser, the assumption of the Assumed Liabilities by the Purchaser and the consummation of the Sale Transaction (including any individual elements of the Sale Transaction), except as otherwise set forth in the Asset Purchase Agreement, do not, and will not, subject the Purchaser Parties to any Liability whatsoever, with respect to the operation of the Debtors' businesses prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, in any theory

16

of law or equity including any laws affecting antitrust, successor, transferee or vicarious liability. Pursuant to the Asset Purchase Agreement, the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing any of the Excluded Assets or assuming the Excluded Liabilities, and the Purchaser is not holding itself out to the public as a continuation of the Debtors. The Purchaser, as a result of any action taken in connection with the Sale Transaction (including by consummating the Sale Transaction), is not a successor to or a mere continuation of any of the Debtors or their respective estates and there is no continuity or common identity between the Purchaser and the Debtors. The Sale Transaction does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors' estates. There is not substantial continuity between the Purchaser and the Debtors, and there is no continuity of enterprise between the Debtors and the Purchaser. The Purchaser does not constitute a successor to the Debtors or the Debtors' estates. None of the Purchaser Parties shall assume or in any way be responsible for any obligations or Liability of any Debtor or any Debtor's estate, except as expressly provided in the Asset Purchase Agreement.

EE.   <u>Binding Agreement</u>.  The Transaction Documents are, or upon the execution of thereof by the parties thereto, will be valid and binding contracts between the Debtors and the Purchaser and shall be enforceable pursuant to their terms.  Notwithstanding anything contained herein, the Transaction Documents or any further order of the Court to the contrary, the Transaction Documents and consummation of the Sale Transaction shall be, to the extent provided in the Transaction Documents, specifically enforceable against and binding upon the Debtors and any estate representative, including any chapter 7 trustee or chapter 11 trustee appointed in any of the Debtors' cases, any plan administrator, litigation trustee or liquidation trustee appointed in the

AMERICAS 111936533

Chapter 11 Cases or any successor cases, creditors and all other parties-in-interest, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person or entity.

FF.  <u>Legal, Valid Transfer</u>.  The Debtors have full limited liability company power and authority (i) to perform all of their obligations under the Transaction Documents and (ii) to consummate the Sale Transaction.  The transfer of the Purchased Assets to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the Purchaser with all right, title, and interest of the Debtors in and to the Purchased Assets free and clear of all Interests (except as set forth in the Asset Purchase Agreement).  The Purchased Assets constitute property of the Debtors' estates and good title to the Purchased Assets is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Debtors are the sole and rightful owners of the Purchased Assets, and no other person or entity has any ownership right, title, or interests therein.

GG.  <u>Not a Sub Rosa Plan</u>.  The Sale Transaction does not constitute a *sub rosa* chapter 11 plan or an element of such plan for the Debtors, for which approval has been sought without the protections that a disclosure statement would afford.  The Sale Transaction does not (i) impermissibly restructure the rights of the Debtors' creditors or equity interest holders, (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors, (iii) impermissibly dictate a plan of reorganization for the Debtors; or (iv) classify claims or equity interests, compromise controversies, or extend debt maturities.

HH.  <u>Consummation is Legal, Valid and Binding</u>.  The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m) and 365 of the Bankruptcy Code, and all of the applicable requirements of the Bankruptcy Code have been complied with in

AMERICAS 111936533

respect of the transactions contemplated by the Asset Purchase Agreement and the other Transaction Documents. The transactions contemplated under the Transaction Documents and this Order (including the Sale Transaction) are inextricably linked and collectively constitute a single, integrated transaction.

II.     <u>Global Settlement</u>. The Debtors, the Committee and the AIP Parties, together with their respective representatives, agents and professionals (the "**Settlement Parties**") have agreed to the terms of a global settlement (the "**Global Settlement**"), upon the terms set forth in paragraphs 60-61 of this Order and **<u>Schedule 2</u>** attached hereto, which includes the forms of amendments to the Asset Purchase Agreement and the DIP Credit Agreement to conform those documents to the terms of the Global Settlement (the "**Settlement Term Sheet**"). The terms of the Global Settlement have been negotiated in good faith and at arm's length among the Settlement Parties, are fair and reasonable, and are in the best interests of the Debtors' estates.

JJ.     <u>Amendments to the Asset Purchase Agreement</u>. In order to incorporate and reflect the terms of the Global Settlement and additional amendments agreed upon among the parties thereto, the Asset Purchase Agreement has been amended in accordance with **<u>Schedule 3</u>** attached hereto (the "**APA Amendment**"). The terms of the APA Amendment have been negotiated in good faith and at arm's length among the parties thereto, are fair and reasonable, and are in the best interests of the Debtors' estates.

KK.     <u>New Financing Facilities</u>. The credit facilities contemplated in the term sheet attached to the Commitment Letter dated January 26, 2022, between AIPCF VII Strike Holdings, LP and Purchaser, a copy of which has been filed with this Court as an exhibit to the Supplemental Bouley Declaration (the "**New Financing Facilities**") are supported by adequate consideration and are being extended in good faith and for fair value and, therefore, the obligations thereunder

and the liens granted therein are valid, binding, and enforceable against each of the Purchaser and its subsidiaries, and may not be avoided under the Bankruptcy Code, Uniform Voidable Transactions Act, the Uniform Fraudulent Transaction Act, the Uniform Fraudulent Conveyance Act, similar laws or any other applicable laws.  There is no evidence that any of the Debtors, the Purchaser, or the administrative agent, the collateral agent and the lenders under the New Financing Facilities engaged in any conduct that would cause or permit the Stalking Horse Agreement, the Transaction Documents, or the documents governing the New Financing Facilities, or the consummation of the Sale Transaction (including the advance (or deemed advance) of the New Financing Facilities to the Purchaser and its subsidiaries) to be avoided, or costs or damages to be imposed, under Bankruptcy Code section 363(n) or under any other law of the United States, any state, territory, possession thereof, the District of Columbia, or any other applicable law.  None of the Purchaser, the administrative agent, the collateral agent, or the lenders under the New Financing Facilities has entered into the documents governing the New Financing Facilities, or is consummating the New Financing Facilities for any fraudulent or otherwise improper purpose.

LL.    <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

<u>**General Provisions**</u>

1.    The Sale Transaction contemplated by the Motion and the Asset Purchase Agreement is approved, in each case, as set forth in this Order.

2.    This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated herein by reference.

AMERICAS 111936533

3.      Objections to the Motion or the relief requested therein, the Transaction Documents, the Sale Transaction, the entry of this Order, or the relief granted herein that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, are hereby **DENIED** and **OVERRULED** on the merits with prejudice.  All withdrawn objections are deemed withdrawn with prejudice.  Those parties, including those holders of Interests, who did not object to the Motion or the entry of this Order in accordance with the Bidding Procedures Order, or who withdrew their objections thereto, are deemed to have consented to the relief granted herein for all purposes, including, without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Interests that have an Interest in the Purchased Assets and who did object could be compelled in a legal or equitable proceeding to accept money satisfaction of such Interest pursuant to section 363(f)(5) of the Bankruptcy Code or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and, therefore, are adequately protected by having their Interests that constitute Interests in the Purchased Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the property in which they have an Interest, in the same order of priority and with the same validity, force and effect that such holders had prior the Sale Transaction, subject to any claims, setoffs, deductions, offsets and defenses of the Debtors to such Interests. Any counterparty to an Assigned Contract that has not actually filed with the Court an objection to the assumption or assignment of such Assigned Contract as of the date specified in the Bidding Procedures Order is deemed to have consented to such assumption and assignment.

AMERICAS 111936533

## Approval of the Sale of the Purchased Assets

4.      The Asset Purchase Agreement, including any amendments, supplements and modifications thereto, all other Transaction Documents, and all of the terms and conditions therein, are hereby **APPROVED** in all respects.

5.      Pursuant to 11 U.S.C. §§ 363(b) and (f), the sale of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement free and clear of all Interests is approved in all respects.

## Sale and Transfer of the Purchased Assets

6.      The consideration provided by the Purchaser for the Purchased Assets under the Asset Purchase Agreement is fair and reasonable and shall be deemed for all purposes to constitute reasonably equivalent value, fair value, and fair consideration under the Bankruptcy Code and the laws of the United States, any state, territory, possession, or the District of Columbia, including without limitation the Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform Fraudulent Conveyance Act, and any other applicable law. The Sale Transaction may not be avoided or rejected by any person or entity, nor may any costs or damages be imposed or awarded against the Purchaser Parties, under section 363(n) or any other provision of the Bankruptcy Code.

7.      The Sale Transaction authorized herein shall be of full force and effect, regardless of the Debtors' lack or purported lack of good standing in any jurisdiction in which the Debtors are formed or authorized to transact business.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified to the extent necessary, without further order of this Court, to implement the Sale Transaction and the provisions of this Order, including, without limitation, to allow the Purchaser to: (a) deliver any notice provided for in the Asset Purchase Agreement and

22

any of the other Transaction Documents; (b) take any and all actions permitted under the Asset Purchase Agreement and any of the other Transaction Documents in accordance with the terms and conditions thereof; and (c) take any and all actions necessary or appropriate to implement the Sale Transaction.

8.    Subject to the terms, conditions, and provisions of this Order, all persons and entities are hereby forever prohibited and barred from taking any action that would adversely affect or interfere, or that would be inconsistent (a) with the ability of the Debtors to sell and transfer the Purchased Assets to the Purchaser, and assume and assign the Assigned Contracts, in accordance with the terms of the Transaction Documents and this Order, (b) with the ability of the Purchaser to acquire, take possession of, use and operate the Purchased Assets and the Assigned Contracts and to conduct the Business in accordance with the terms of the Transaction Documents and this Order and (c) with the ability of the Debtors and the Purchaser to consummate the transactions contemplated by the Transaction Documents or to perform their respective obligations under any of the Transaction Documents; provided, however, that the foregoing restriction shall not impair the right of any party in interest with the requisite standing to appeal this Order in accordance with applicable law or opposing any appeal of this Order.

9.    Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors are hereby authorized, empowered and directed to, and shall, take any and all actions necessary or appropriate to (a) sell the Purchased Assets to the Purchaser, (b) consummate the Sale Transaction in accordance with, and subject to the terms and conditions of, this Order and the Transaction Documents, and (c) transfer and assign to the Purchaser all right, title and interest (including common law rights) to all property, licenses and rights to be conveyed in accordance with and subject to the terms and conditions of the Transaction Documents, in each case without further

AMERICAS 111936533

notice to or order of this Court. The Debtors are further authorized and directed to execute and deliver, and are empowered to perform under, consummate and implement, the Transaction Documents, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, including the related documents, exhibits and schedules, and to take all further actions as may be reasonably requested by the Purchaser for the purposes of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Purchased Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Transaction Documents without further notice to or order of this Court.  Neither the Purchaser nor the Debtors shall have any obligation to proceed with consummating the Sale Transaction until all conditions precedent to their obligations to do so under the applicable Transaction Documents have been met, satisfied or waived.

10.     Pursuant to sections 363(b), 363(f) and 365 of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser at Closing free and clear of all Interests.  On and after the Closing Date, any person or entity that has an Interest against or in the Purchased Assets is authorized and directed to execute such documents and take all other actions as may be necessary or reasonably requested by the Purchaser to release its Interests in or against the Purchased Assets, if any, as such Interests may have been recorded or otherwise exist.  If any such person or entity shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions or releases of all Interests that such person or entity has with respect to the Purchased Assets, or otherwise, then the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive

24

evidence of the release of all Interests in the Purchased Assets of any kind or nature; provided that, notwithstanding anything in this Order, the Asset Purchase Agreement or other Transaction Documents to the contrary, the provisions of this Order authorizing and approving the transfer of the Purchased Assets free and clear of all Interests shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Order, the Asset Purchase Agreement or any of the other Transaction Documents.

11.     Following the Closing, the Purchaser may, but shall not be required to, file or record a certified copy of this Order in any filing or recording office in any federal, state, county, or other jurisdiction in which the Debtors are formed or have real or personal property, or with any other appropriate clerk or recorder, and such filing or recording shall be accepted and shall be sufficient to release, discharge, and terminate any of the Interests as set forth in this Order as of the Closing and/or to transfer and assign any of the Purchased Assets to the Purchaser as of the Closing free and clear of any and all Interests. Subject to the occurrence of the Closing, this Order will be construed, and constitute for any and all purposes, a full and complete general assignment, conveyance and transfer to the Purchaser of the Purchased Assets or a bill of sale transferring good and marketable title in the Purchased Assets to the Purchaser.  Subject to the occurrence of the Closing, this Order also shall be construed, and constitute for any and all purposes, a complete and general assignment of all right, title and interest of the Debtors and each of their estates to the Purchaser in the Assigned Contracts.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by this Order, the Asset Purchase Agreement and the other Transaction Documents.

12.     All persons and entities who are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Purchaser on the Closing Date.

13.     Except as expressly permitted by the Asset Purchase Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers, employees, litigation claimants, parties to executory contracts and unexpired leases, customers, licensors, current and former employees and other creditors, and all holders of Interests against or in a Debtor or any of the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Purchased Assets before the Closing, or the transactions contemplated by the Asset Purchase Agreement, including the Sale Transaction, the transfer of the Purchased Assets and the assumption and assignment of the Assigned Contracts, are forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such persons' or entities' Interests, whether by payment, setoff, or otherwise, directly or indirectly (including, without limitation, taking any of the following actions: (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Interest; (d) asserting an Interest as a setoff, right of subrogation or recoupment of any kind against any obligation due; (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Order or the agreements or actions contemplated or taken in respect thereof; or (f) interfering with, preventing, restricting, prohibiting or otherwise enjoining

26

the consummation of the Sale Transaction), in the case of each of the foregoing, against the Purchaser, the other Purchaser Parties, or any of their respective successors or assigns, their respective assets or property and the Purchased Assets. Following the Closing, no party shall interfere with the Purchaser's title to or use, enjoyment and operation of the Purchased Assets based on or related to any such Interest or based on any action or failure to act of the Debtors in the Chapter 11 Cases or any successor cases.

14. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license or similar grant relating to the Business or the operation of the Purchased Assets on account of the filing or pendency of the Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement or any of the other Transaction Documents, including the Sale Transaction, the transfer of the Purchased Assets and the assumption and assignment of the Assigned Contracts. Each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction.

15. The Purchaser shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Business or the Purchased Assets, and, to the extent provided for under the Asset Purchase Agreement, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are directed to be, transferred to the Purchaser as of the Closing Date. Any dispute with respect to any such transfer or the vesting of any such license, permit, registration or government authorization or approval in the Purchaser not raised by the Sale Objection Deadline is hereby waived.

AMERICAS 111936533

16.     Subject to the terms and conditions of this Order, the transfer of the Purchased Assets to the Purchaser pursuant to the Asset Purchase Agreement and the consummation of the Sale Transaction and any related actions contemplated hereby and thereby constitute a legal, valid, and effective transfer of the Purchased Assets, do not require any consents of any Person or entity other than as specifically provided for in the Asset Purchase Agreement, and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Purchased Assets free and clear of all Interests of any kind or nature whatsoever.

## Releases and No Successor Liability

17.     None of the Purchaser Parties is a "successor" to the Debtors or their estates by reason of any theory of law or equity, and, except as otherwise expressly provided in the Asset Purchase Agreement, none of the Purchaser Parties shall assume, or be deemed to assume, or in any way be responsible for any Liability or obligation of any of the Debtors and/or their estates with respect to the Purchased Assets or otherwise (other than, in the case of the Purchaser, the Assumed Liabilities), including, but not limited to, under any bulk sales law, doctrine or theory of successor liability, or similar theory or basis of liability or responsibility for any claim against any Debtor or against an insider of any Debtor, or similar liability.  Except to the extent the Purchaser assumes Assumed Liabilities pursuant to the Asset Purchase Agreement, neither the purchase of the Purchased Assets by the Purchaser nor the fact that the Purchaser is using any assets previously operated by the Debtors will cause any of the Purchaser Parties to be deemed a successor in any respect to the Debtors' businesses or, except for the Assumed Liabilities, incur any Liability derived therefrom of any kind or character, including, but not limited to, an Interest or Liability arising under: (a) any employment or labor agreements or the termination thereof; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs,

including, without limitation, any pension plan of or related to any of the Debtors or any of the Debtors' predecessors or any current or former employees of any of the foregoing, or the termination of any of the foregoing; (c) the Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; (e) any claims of any former employees of any of the Debtors; and (f) any employee, workers' compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to: (i) the Employee Retirement Income Security Act of 1974, as amended; (ii) the Fair Labor Standards Act; (iii) Title VII of the Civil Rights Act of 1964; (iv) the Federal Rehabilitation Act of 1973; (v) the National Labor Relations Act; (vi) the Worker Adjustment and Retraining Notification Act of 1988; (vii) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended; (viii) the Americans with Disabilities Act of 1990; (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985; (x) the Multiemployer Pension Plan Amendments Act of 1980; (xi) state and local discrimination laws; (xii) state and local unemployment compensation laws or any other similar state and local laws; (xiii) state workers' compensation laws; (xiv) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to wages, benefits, employment or termination of employment with any or all of the Debtors or any of the Debtors' predecessors; (xv) any antitrust laws; (xvi) any product liability or similar laws, whether state, federal or otherwise; (xvii) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or similar state statutes; (xviii) any bulk sales or similar laws; (xix) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; or (xx) any common law

29

doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory

or any other theory of or related to successor liability, whether known or unknown as of the Closing

Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, or

liquidated or unliquidated with respect to any of the Debtors or any obligations of any of the

Debtors arising prior to the Closing, including, but not limited to, liabilities on account of any taxes

arising, accruing or payable under, out of, in connection with, or in any way relating to, the

Purchased Assets (except as expressly set forth in the Asset Purchase Agreement with respect to

Assumed Liabilities or Permitted Encumbrances or paragraph 65 of this Order).

18.    The Purchaser and the Purchaser Parties will be providing substantial consideration

under the Asset Purchase Agreement and the Transaction Documents, which consideration shall

constitute valid and valuable consideration for the releases of any potential claims of successor

liability against the Purchaser Parties and which shall be deemed to have been given in favor of

the Purchaser Parties by all holders of Interests in or against the Debtors, or the Purchased Assets.

Upon consummation of the Sale Transaction, none of the Purchaser Parties shall be deemed to (a)

be the successor to any Debtor or any assets of any Debtor, (b) have, *de facto* or otherwise, merged

with or into any Debtor or any Debtor's estate, (c) have a common identity with any Debtor, (d)

have a continuity of enterprise with any Debtor or (e) be a mere continuation, alter ego or

substantial continuation of any Debtor.

19.    Except to the extent the Purchaser has specifically agreed in the Asset Purchase

Agreement, the Purchaser shall not have any liability, responsibility or obligation for any Interests,

claims, Liabilities or other obligations of the Debtors or their estates, including any Interests,

claims, Liabilities or other obligations related to the Purchased Assets prior to Closing.  Under no

circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Interests

AMERICAS 111936533

against, in or to the Debtors or the Purchased Assets.  For the purposes of this paragraph of this Order, all references to the Purchaser shall also include the Purchaser Parties.

20.     Upon entry of this Order, subject to the occurrence of the Closing, to the fullest extent permitted under applicable law, (a) (i) the Purchaser, the AIP Parties, and the Prepetition Senior Loan Agent, (ii) each of the affiliates, managed accounts and related funds of the Purchaser, the AIP Parties and the Prepetition Senior Loan Agent, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the persons or entities described in <u>clause (a)(i)</u> or <u>clause (a)(ii)</u>, (collectively, and each in their capacity as such, the "**AIP Releasing Parties**") shall be deemed to release and discharge the Debtor Releasing Parties (as defined below), and (b) (i) the Debtors, and (ii) each of the current officers, directors, employees, equityholders, partners, members, managers, advisors, predecessors, successors and assigns of the Debtors (collectively, and each in their capacity as such, the "**Debtor Releasing Parties**," and together with the AIP Releasing Parties, the "**Releasing Parties**") shall be deemed to release and discharge the AIP Releasing Parties, in each case, from any and all claims, interests, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative claims that such Releasing Party (or someone on its behalf) would have been legally entitled to assert, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of a holder of any claim against a Releasing Party, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Sale Transaction, the DIP Financing, the Prepetition Senior Loan Documents, the Prepetition Junior Loan Documents, or any of the transactions

31

contemplated by any of the foregoing arising on or before the Closing Date; provided that this paragraph shall not (1) release any Releasing Party from any claims or liabilities arising out of or relating to any act or omission of a Releasing Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a final order of a court of competent jurisdiction, (2) release any Releasing Party from any claims, liabilities or obligations arising under or related to (w) the RSA, (x) this Order (including the Settlement Term Sheet), (y) the Asset Purchase Agreement and the other Transaction Documents; (z) the DIP Financing documents entered into in connection therewith, or any documents related thereto (other than claims, liabilities, or obligations directly related to DIP Claims included in the Credit Bid), including any obligation to fund undrawn amounts thereunder; or (aa) release any Prepetition Junior Loan Claims or other claims against the Debtors held by the AIP Releasing Parties that are not included in the Credit Bid.

**<u>Good Faith</u>**

21.     The transactions contemplated by the Transaction Documents are undertaken by the Purchaser Parties without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Sale Transaction shall not alter, affect, limit, or otherwise impair the validity of the sale of the Purchased Assets to the Purchaser, including the transfer of the Purchased Assets and the assumption, assignment (including pursuant to the designation rights set forth in section 1.5 of the Asset Purchase Agreement), and/or transfer of the Assigned Contracts. The Purchaser is a good faith purchaser of the Purchased Assets within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and is hereby granted, the full rights, benefits, privileges and protections of section 363(m) of the Bankruptcy

AMERICAS 111936533

Code. The Debtors and the Purchaser have acted, and will be acting, in good faith if they proceed to consummate the Sale Transaction at any time after the entry of this Order.

22.      As a good faith purchaser of the Purchased Assets, the Purchaser has not entered into an agreement with any other potential bidders at the Auction, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Purchased Assets, and, therefore, neither the Debtors nor any representative of or successor in interest to the Debtors' estates nor any other party in interest shall be entitled to bring any claim or cause of action against the Purchaser or the other Purchaser Parties, and the Sale Transaction may not be avoided, in each case, pursuant to section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Asset Purchase Agreement, any of the other Transaction Documents or the Sale Transaction.

**Assumption and Assignment of Assigned Contracts**

23.      Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the consummation of the Closing, the Debtors' assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Asset Purchase Agreement (including pursuant to the designation rights set forth in section 1.5 of the Asset Purchase Agreement), of the Assigned Contracts is hereby approved, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

24.      The Purchaser has provided adequate assurance of future performance for the Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

25.      The Debtors are hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the

AMERICAS 111936533

Closing Date (or such later date as provided in the Asset Purchase Agreement), the Assigned Contracts free and clear of all Interests of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Purchaser.

26.     The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by the Purchaser, except as provided in the Asset Purchase Agreement.

27.     Upon the Closing Date or such other date as set forth in the Asset Purchase Agreement, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title, and interest of the Debtors in each Assigned Contract free and clear of Interests of any kind or nature whatsoever.  The Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing, as further provided in the Asset Purchase Agreement.

28.     Upon the Closing, Strike Acquisition LLC or its applicable Affiliate to which it assigns or transfers its rights to a particular Assigned Contract shall be deemed to be substituted for all purposes as a party to all Assigned Contracts in the place of the Debtors, and shall have any and all rights and benefits of the Debtors under all such Assigned Contracts without interruption or termination of any kind, and all terms thereof applicable to the Debtors shall apply to such entity as if such Assigned Contracts were amended to replace the Debtors with such entity and all

34

references in an Assigned Contract to one or more of the Debtors or an affiliate of a Debtor shall

be deemed modified to be a reference to Strike Acquisition LLC or its applicable Affiliate.

29.     All counterparties to the Assigned Contracts shall be deemed to have consented to

such assumption and assignment under section 365(c)(1)(B) of the Bankruptcy Code and any other

applicable law, and the Purchaser shall enjoy all of the Debtors' rights, benefits, and privileges

under each such Assigned Contract as of the applicable date of assumption and assignment without

the necessity to obtain any non-Debtor parties' written consent to the assumption or assignment

thereof.

30.     Upon the Debtors' assumption and assignment of the Assigned Contracts, no

default shall exist under any Assigned Contract and no counterparty to any such Assigned Contract

shall be permitted to declare or enforce a default by the Debtors or the Purchaser thereunder or

otherwise take action against the Purchaser relating to any of the Debtors' financial condition,

change in control, bankruptcy or failure to perform any of its obligations under the relevant

Assigned Contract. Any provision in an Assigned Contract that prohibits or conditions the

assignment or sublease of such Assigned Contract (including the granting of a lien therein) or

allows the counterparty thereto to terminate, recapture, impose any penalty, declare a default,

condition a renewal or extension, or modify any term or condition upon any assignment or sublease

of such Assigned Contract, or upon the consummation or occurrence of any change of control of

any of the Debtors, constitutes an unenforceable anti-assignment provision that is void and of no

force and effect only in connection with the assumption and assignment of such Assigned Contract

to the Purchaser. The failure of the Debtors (prior to Closing) or the Purchaser (subsequent to

Closing) to enforce at any time one or more terms or conditions of any Assigned Contract shall

not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce

AMERICAS 111936533

every term and condition of the Assigned Contract.  Nothing in this Order, the Motion, or in any notice or any other document is or shall be deemed an admission by the Debtors that any Assigned Contract is an executory contract or unexpired lease under section 365 of the Bankruptcy Code or, subject to the terms of the Asset Purchase Agreement, must be assumed and assigned pursuant to the Asset Purchase Agreement in order to consummate the Sale Transaction.

31.     Pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors to the Purchaser of the Assigned Contracts shall not be a default thereunder.  All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Purchaser (as provided in the Asset Purchase Agreement) on the Closing Date or as soon thereafter as reasonably practicable (or as otherwise agreed with the counterparty to such Assigned Contract), and the Purchaser shall have no liability or obligation arising or accruing under the Assigned Contracts prior to the Closing, except as otherwise expressly provided in the Asset Purchase Agreement.

32.     As applicable, the Sale Transaction and assumption and assignment of the Assigned Contracts approved herein (including pursuant to the designation rights set forth in section 1.5 of the Asset Purchase Agreement) includes the conveyance of all beneficial rights, easements, permits, licenses, servitudes, rights-of-way, surface leases and other surface rights, and all contracts, agreements, and instruments by which they are bound, appurtenant to, and used or held for use in connection with the Assigned Contracts.

33.     All counterparties to the Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents, or other documents which may be required

or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale Transaction.

34.     Each non-Debtor party to an Assigned Contract hereby is forever barred, estopped, and permanently enjoined from raising or asserting against (a) the Debtors, the Purchaser, the Purchaser Parties, or the property of such parties, any fee, acceleration, default, loss of rights, increase in obligations, breach or claim of loss, penalty, or condition to assignment, existing, arising under or related to the Assigned Contracts, existing as of the date that such Assigned Contracts are assumed, or arising by reason of the consummation of transactions contemplated by the Asset Purchase Agreement (including the Sale Transaction and the assumption and assignment of the Assigned Contracts or any state of facts, events, circumstances or occurrences resulting therefrom), including, without limitation, any breach related to or arising out of change-in-control provisions in such Assigned Contracts, or any purported written or oral modification to the Assigned Contracts and (b) the Purchaser (or its property, including the Purchased Assets) any claim, counterclaim, defense, breach, condition, or setoff asserted, or assertable against the Debtors existing prior to the Closing or arising by reason of the Closing except for the Assumed Liabilities.  Each non-Debtor party to an Assigned Contract (except Merchants Automotive Group (as to whom such right to assert setoff is preserved)) is forever barred, estopped and permanently enjoined from setting off any amounts owed by them to the Purchaser under an Assigned Contract against amounts owed or asserted to be owed to them by any of the Debtors under any Contract that is not assigned to the Purchaser or any other Claim held by such counterparty against the Debtors.  Any party that may have had the right to consent to the assignment of an Assigned Contract or a change of control with respect to the Debtors, or to assert or claim any default or violation under an Assigned Contract as a result of or related to the assignment of an Assigned

37

Contract or a change of control with respect to the Debtors, is deemed to have consented to such assignment for purposes of section 365 of the Bankruptcy Code or change of control, or is deemed to have irrevocably waived any such default or violation, if such party failed to timely object to the assumption and assignment of such Assigned Contract.

35.     The Purchaser shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any of the Assigned Contracts to the extent not previously provided by the Debtors.

36.     No objections to the Cure Amounts ("**Cure Objections**") were timely filed with respect to the Assigned Contracts listed on **Exhibit A to Schedule 1** attached hereto and the applicable Assignment Objection Deadlines have passed.  The Cure Amounts for the contracts listed on **Exhibit A** are hereby fixed at the amounts set forth in the applicable Assumption and Assignment Notice, and the contract counterparties to such Assigned Contracts are forever bound by such Cure Amounts.  Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, the Purchaser shall pay to the applicable contract counterparty the Cure Amounts relating to any Assigned Contracts on **Exhibit A** on or as soon as reasonably practicable after the Closing Date (or as otherwise agreed between the Purchaser and such contract counterparty).  Upon payment of any such Cure Amount and, in accordance with paragraph 39 below, any Post-Petition Cure Amounts (as defined below) with respect to an Assigned Contract as provided for herein, the contract counterparties to such Assigned Contract are hereby enjoined from taking any action against the Purchaser, the other Purchaser Parties or the Purchased Assets with respect to any claim for breach or default under such Assigned Contract arising or existing prior to the date such Assigned Contract is assumed by the applicable Debtor or any pecuniary loss resulting therefrom.

AMERICAS 111936533

37.     Cure Objections were either timely filed with respect to the Assigned Contracts listed on **Exhibit B to Schedule 1** attached hereto or the applicable Assignment Objection Deadline has not passed.  Such Cure Objections will be resolved in accordance with the Asset Purchase Agreement and Bidding Procedures Order or were previously resolved by this Court or upon agreement of the Debtors and the contract counterparty.  The Cure Amounts for the Assigned Contracts listed on **Exhibit B** are hereby fixed at the amounts set forth on **Exhibit B**, and the contract counterparties to such Assigned Contracts are forever bound by such Cure Amounts; provided, however, that any Cure Amounts applicable to Assigned Contracts set forth on **Exhibit B** that are subject to a pending Assignment Objection Deadline will only be fixed at the later of the expiration of such deadline or resolution of a timely filed Cure Objection.  Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, the Purchaser shall pay to the applicable contract counterparty the Cure Amounts relating to any Assigned Contracts on **Exhibit B** on or as soon as reasonably practicable after the Closing Date or in accordance with any post-closing payment arrangements between the Purchaser and such contract counterparty; provided, however, that any Cure Amounts applicable to Assigned Contracts set forth on **Exhibit B** that are subject to a pending Assignment Objection Deadline will be paid on or as soon as reasonable practicable after the later of the expiration of such deadline or resolution of a timely filed Assignment Objection, or in accordance with any payment arrangements between the Purchaser and such contract counterparty.  Upon payment of any such Cure Amount with respect to an Assigned Contract as provided for herein (including, in accordance with paragraph 40 below, any Post-Petition Cure Amounts), the contract counterparties to such Assigned Contract are hereby enjoined from taking any action against the Purchaser, the other Purchaser Parties or the Purchased Assets with respect to any claim for breach or default under such Assigned Contract arising or existing

39

prior to the date such Assigned Contract is assumed by the applicable Debtor or any pecuniary loss resulting therefrom.

38.     To the extent there is a Cure Objection pending with respect to an Assigned Contract on **Exhibit B**, the Debtors shall be entitled to elect to assume and assign the applicable Assigned Contract prior to the resolution of the Cure Objection provided that in such case the Debtors shall, within ten (10) Business Days after the entry of this Order, establish or cause to be established a cash reserve in an amount sufficient to pay the disputed Cure Amounts in full with such cash reserve to be funded by the Purchaser based on the maximum amounts owed by the Debtors with respect to such disputed Cure Amounts. To the extent the Cure Objection is resolved or determined unfavorably to the applicable Debtor, the Debtors may, subject to the terms of the agreement with the Purchaser, reject the applicable Assigned Contract after such unfavorable resolution or determination.  Notwithstanding the foregoing, the Debtors and the Purchaser may elect to defer the assumption and assignment of an Assigned Contract until the resolution of a Cure Objection.

39.     To the extent a party is to receive a cure payment pursuant to the Order and such party has asserted a lien against the Debtors' or their customer's assets or work such party shall be required to execute a lien release, and provide evidence thereof to both the Debtors and the Purchaser, as a condition to receiving such cure payment.

40.     The Cure Amounts represent the amounts owed that accrued but were unpaid, and any other amounts to cure any defaults existing, under the Assigned Contracts as of the Petition Date.  Any undisputed amounts that accrue, become due and owing under an Assigned Contract in accordance with its terms from the period following the Petition Date to the date the applicable Assigned Contract is assumed and which remain unpaid at the date on which such Assigned

AMERICAS 111936533

Contract is assumed (the "**Post-Petition Cure Amounts**"), shall be satisfied by the Purchaser in accordance with the terms of the Assigned Contract or as otherwise agreed to between the Purchaser and the counterparty to the Assigned Contract.  The payment of the applicable Cure Amounts (if any) and the Post-Petition Cure Amounts shall effect a cure of all defaults existing as of the date that the applicable Assigned Contracts are assumed and shall compensate for any actual pecuniary loss to such contract counterparty resulting from such default, provided that each such contract counterparty's rights to assert and reconcile Post-Petition Cure Amounts against the Purchaser, and any rights and defenses of the Purchaser thereto, are preserved.

41.     The unexpired agreements between the applicable Debtor(s) and (i) any or all of BP America Production Co., BP Exploration & Production, Inc., BP Pipelines (North America) Inc., and/or BPX Midstream LLC, (ii) Buckeye Terminals, LLC, Buckeye Partners, LP, and South Texas Gateway Terminal LLC, (iii) Centurion Pipeline Companies, LLC and certain of its affiliates, (iv) Chevron U.S.A. Inc. and its Affiliates (as defined in the Amended And Restated Master Engineering, Procurement, Construction and Installation Contract No. CW1374076, as amended from time to time, collectively "**Chevron**"), (v) Enbridge Inc. (or its affiliates), (vi) Enterprise Products Operating LLC, Enterprise Texas Pipeline, LLC, Enterprise Pelican Pipeline, L.P., South Texas NGL Pipelines, LLC, and Acadian Gas Pipeline System; (vii) Marathon Oil Company (and its affiliates), (viii) Phillips 66 Company (or its affiliates); and (ix) The Williams Companies, Inc., Williams Ohio Valley Midstream, LLC, and Transcontinental Gas Pipe Line Company, LLC (or its affiliates); listed on **Schedule 1** to this Order, including any amendments to any such agreements and any associated active purchase orders, service orders, or call-outs, including amendments to any such purchase orders, service orders, or call-outs, as applicable (including those under which work is complete but amounts remain due and owing to

41

the Debtors and/or by the Debtors) (collectively, the "**Assigned Customer Contracts**") shall be assumed and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code upon the occurrence of the Closing. Notwithstanding any other provision of this Order or any document or agreement attached to or referenced in this Order, following the assumption and assignment of the Assigned Customer Contracts, each Assigned Customer Contract shall be enforceable by the Purchaser and the applicable counterparty to such Assigned Customer Contracts in accordance with their respective terms and conditions, and the parties' associated rights, claims, and obligations are expressly preserved, including, but not limited to, (i) any audit rights or claims arising from any audit, (ii) indemnification rights and claims, (iii) warranty obligations, (iv) setoff and recoupment rights and claims, (v) obligations to pay third parties, subcontractors, or suppliers and (vi) obligations to keep the work free and clear of liens; if any, in the case of each of clauses (i) – (vi) above, as and to the extent set forth in the Assigned Customer Contracts (with all rights, claims, obligations, and defenses thereto of the Purchaser and the counterparty to such Assigned Customer Contract being fully preserved). Following the assumption and assignment of the Assigned Customer Contracts, (x) Strike Acquisition LLC or its applicable Affiliate shall be deemed to be substituted for all purposes as a party to all Assigned Customer Contracts in the place of the applicable Debtor(s), and the Purchaser shall have any and all rights and benefits of the applicable Debtor(s) under all such Assigned Customer Contracts without interruption or termination of any kind, and all terms thereof applicable to the applicable Debtor(s) shall apply to Strike Acquisition LLC or its applicable Affiliate as if such Assigned Customer Contracts were amended to replace the applicable Debtor(s) with Strike Acquisition LLC or its applicable Affiliate and all references in an Assigned Customer Contract to one or more of the Debtors or an affiliate of a Debtor shall be deemed modified to be a reference to Strike Acquisition LLC or its applicable

AMERICAS 111936533

Affiliate; and (y) no counterparty to any such Assigned Customer Contract shall be permitted to raise, assert, declare or enforce a default by the Debtor or the Purchaser thereunder or otherwise take action against the Purchaser Parties or their assets (including asserting any fee, penalty, breach, acceleration, loss of rights, increase in obligations, breach or claim or condition to assignment), relating to: (a) the substitution of Strike Acquisition LLC or its applicable Affiliate for the applicable Debtor(s) as provided in clause (x) of this Paragraph, (b) any of the Debtors' financial condition, change in control, bankruptcy, or insolvency, or (c) any provision in any Assigned Customer Contract that prohibits or conditions the assignment or sublease of such Assigned Customer Contract (including the granting of a lien therein) or allows the counterparty thereto to terminate, recapture, impose any penalty, declare a default, condition on renewal or extension, or modify any term or condition upon such assignment, sublease, or change of control of any of the Debtors, which provisions constitute unenforceable anti-assignment provisions and are of no force and effect only in connection with the assumption and assignment of such Assigned Customer Contract to the Purchaser. All counterparties to Assigned Customer Contracts (i) have consented to such assumption and assignment or (ii) any required consent to assignment is not enforceable pursuant to under section 365(c)(1) and (f) of the Bankruptcy Code.

42.     The Debtors and Chevron will file a stipulation with the Court on or before February 4, 2022 that identifies the Chevron Assigned Customer Contracts to be assumed and assigned to the Purchaser and such Chevron Assigned Customer Contracts shall be included in and subject to paragraph 41 of this Order in all respects, unless as otherwise set forth in such stipulation.

43.     Following the assumption and assignment of the unexpired agreements between the applicable Debtor(s) and Western Midstream Operating L.P. and WGR Operating, LP, listed on

AMERICAS 111936533

**Schedule 1** to this this Order, including any amendments to such agreements and any associated active purchase orders (including those under which work is complete but amounts remain due and owing to the Debtors and/or by the Debtors), the relevant agreements shall be enforceable by the Purchaser and the applicable counterparty to such agreements in accordance with their respective terms and conditions, including, but not limited to, obligations to pay third parties, subcontractors, or suppliers, as and to the extent set forth in the relevant agreements (with all rights, claims and defenses thereto of the Purchaser and Western Midstream Operating L.P. or WGR Operating, LP being fully preserved).

44.    Notwithstanding anything to the contrary in the Motion, the Stalking Horse Agreement, the Assumption and Assignment Procedures, any Assumption and Assignment Notice (or any list of assumed and assigned contracts or Cure Amounts), this Order, or any documents relating to any of the foregoing, nothing shall alter or modify the terms and conditions of, or permit or otherwise effect a sale, an assignment or any other transfer at this time of (i) any insurance policies that have been issued by ACE American Insurance Company, Indemnity Insurance Company of North America, Westchester Fire Insurance Company, Federal Insurance Company and/or any of their U.S.-based affiliates and successors (collectively, the "**Chubb Companies**") and all agreements, documents or instruments relating thereto (collectively the "**Chubb Insurance Contracts**"), and/or (ii) any rights, proceeds, benefits, claims, rights to payments and/or recoveries under such Chubb Insurance Contracts, without (1) the express written consent of the Chubb Companies in a form acceptable to the Chubb Companies and (2) further order of this Court which may be submitted as an agreed order by agreement of the Debtors, the Chubb Companies and the Successful Bidder.  Such further order, without further notice, may provide, among other things, that: (a) upon any assumption and assignment of any Chubb Insurance Contracts or any rights

thereunder to the Successful Bidder as of a date that is acceptable to the Chubb Companies, the Successful Bidder  shall assume and shall become liable in full for any and all now existing or hereinafter arising obligations and liabilities of any of the Debtors under such Chubb Insurance Contracts, (b) the Debtors are authorized under the Bankruptcy Code to so assume and assign and to execute any agreements or other documents consistent with the foregoing and/or (c) such other and further relief as may be requested by the Chubb Companies, the Debtors and the Successful Bidder.

## Additional Provisions

45.    Commencing on the Closing Date, the Debtors and the Purchaser are authorized to take such actions as may be necessary or appropriate to obtain a release of any and all Interests in, on or against the Purchased Assets, if any, and to the extent contemplated hereby and by the Asset Purchase Agreement.  This Order (a) shall be effective as a determination that, as of the Closing Date, all Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been, and are, unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all persons and entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law or by reason of the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.  Each and every federal, state and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to

AMERICAS 111936533

consummate the transactions contemplated by the Asset Purchase Agreement and the other Transaction Documents. The Purchaser and the Debtors shall take such further steps and execute such further documents, assignments, instruments and papers as shall be reasonably requested by the other to implement and effectuate the transactions contemplated in this paragraph. All Interests of record as of the date of this Order shall be forthwith deemed removed and stricken as against the Purchased Assets. All persons and entities described in this paragraph are authorized and specifically directed to strike all such recorded Interests against the Purchased Assets from their records, official and otherwise.

46.    If any person or entity that has filed statements or other documents or agreements evidencing Interests in, on or against any of the Purchased Assets does not deliver to the Debtors or the Purchaser prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all interests and other interests that the person or entity has or may assert with respect to any of the Purchased Assets in any required jurisdiction, the Debtors and/or the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to any of the Purchased Assets in any required jurisdiction. This Order constitutes authorization under all applicable jurisdictions and versions of the Uniform Commercial Code and other applicable law for the Purchaser to file UCC and other applicable termination statements with respect to all Interests in, on, or against the Purchased Assets.

47.    The Debtors will cooperate with the Purchaser and the Purchaser will cooperate with the Debtors, in each case to ensure that the transactions contemplated in the Asset Purchase Agreement and the other Transaction Documents are consummated, and the Debtors will make

AMERICAS 111936533

such modifications or supplements to any bill of sale or other document executed in connection with the Closing to facilitate such consummation as contemplated by the Transaction Documents.

48.     The terms and provisions of the Transaction Documents and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors and their respective affiliates, successors and assigns, their estates, and their creditors and equityholders, the Purchaser, and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons or entities asserting Interests in, on or against the Purchased Assets (including all counterparties to the Assigned Contracts), notwithstanding any subsequent appointment of any trustee(s) (including without limitation any plan administrators, litigation or liquidation trustees appointed during the pendency of, or upon confirmation of a chapter 11 plan in, these Chapter 11 Cases), examiner(s) or other fiduciary under any chapter of the Bankruptcy Code, as to which trustee(s) (including without limitation any plan administrators, litigation or liquidation trustees appointed during the pendency of, or upon confirmation of a chapter 11 plan in, these Chapter 11 Cases), examiner(s) or other fiduciary such terms and provisions likewise shall be binding.

49.     The failure specifically to include any particular provisions of the Asset Purchase Agreement or any other Transaction Documents in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement and the other Transaction Documents be authorized and approved in their entirety.

50.     Following entry of this Order, the Transaction Documents may be modified, amended or supplemented by the parties thereto, in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.  To the extent that any provision of the

47

Asset Purchase Agreement conflicts with or is, in any way, inconsistent with any provision of this Order, this Order shall govern and control.  To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion, the terms of this Order shall govern.

51.     Neither the Purchaser Parties nor the Debtors shall have an obligation to close the Sale Transaction until all conditions precedent in the Asset Purchase Agreement to each of their respective obligations to close the Sale Transaction have been met, satisfied, or waived in accordance with the terms of the Asset Purchase Agreement.

52.     Nothing in this Order shall modify or waive any closing conditions or termination rights set forth in the Asset Purchase Agreement, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

53.     Nothing contained in any plan of reorganization or liquidation confirmed in these Chapter 11 Cases, any order of this Court confirming such plans, any order dismissing any of these Chapter 11 Cases or any other order in these Chapter 11 Cases, including any order entered after any conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or the terms of this Order.  To the extent of any such conflict or derogation, the terms of this Order, (including the Settlement Term Sheet) and the Asset Purchase Agreement shall govern.  The provisions of this Order, the Asset Purchase Agreement and the other Transaction Documents, and any actions taken pursuant hereto or thereto, shall survive entry of any order which may be entered confirming or consummating any chapter 11 plan of the Debtors, or which may be entered converting these Chapter 11 Cases from chapter 11 to chapter 7 of the Bankruptcy Code or dismissing these Chapter 11 Cases, and the terms and provisions of the Asset Purchase Agreement and the other Transaction Documents, as well as the rights and interests granted pursuant to this Order, the Asset Purchase

48

Agreement and the other Transaction Documents, shall continue in these Chapter 11 Cases or any superseding cases and shall be specifically performable and enforceable against and binding upon the Debtors, their estates, all creditors, all holders of equity interests in the Debtors, all holders of claim(s) (whether known or unknown) against the Debtors, all holders of Interests (whether known or unknown) against, in or on all or any portion of the Purchased Assets, the Purchaser and their respective successors and permitted assigns, and any trustee, responsible officer or other fiduciary hereafter appointed or elected as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, including without limitation plan fiduciaries, plan administrators, litigation or liquidation trustees appointed during the pendency of, or upon confirmation of a chapter 11 plan in, these Chapter 11 Cases.

54.     Any and all valid and perfected Interests in the Purchased Assets arising prior to the Closing Date, other than any such Interests related to the Assumed Liabilities, Permitted Encumbrances, the DIP Claims and the Prepetition Senior Loan Claims included in the Credit Bid, shall attach to any proceeds of the Sale Transaction (except, for the avoidance of doubt, the Professional Fee Escrow) immediately upon receipt of such proceeds by the Debtors in the order of priority, and with the same validity, force and effect which they may have against such Purchased Assets as of immediately prior to the Closing Date, subject to any rights, claims, and defenses of the Debtors, the Debtors' estates or any trustee for any Debtor, as applicable, may possess with respect thereto; provided, however, that setoff rights will be extinguished to the extent there is no longer mutuality after the consummation of the Sale Transaction in addition to any limitations on the use of such proceeds pursuant to any provision of this Order.

55.     The provisions of this Order are nonseverable and mutually dependent.

49

56.    No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale Transaction.

57.    The Debtors and each other person or entity having duties or responsibilities under the Transaction Documents or this Order, and their respective agents, representatives, and attorneys, are authorized and empowered to carry out all of the provisions of the Asset Purchase Agreement and the other Transaction Documents, to issue, execute, deliver, file and record, as appropriate, the Asset Purchase Agreement, the other Transaction Documents and any related agreements, and to take any action contemplated by the Asset Purchase Agreement, the other Transaction Documents or this Order, and to issue, execute, deliver, file and record, as appropriate, such other certificates, documents, contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary, desirable or appropriate to, implement, effectuate and consummate the Transaction Documents and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court.  Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by applicable business corporation, trust and other laws of applicable governmental units with respect to the implementation and consummation of the Asset Purchase Agreement, the other Transaction Documents and this Order and the transactions contemplated thereby and hereby.  The transfer of the Purchased Assets to the Purchaser pursuant to the Transaction Documents do not require any consents other than specifically provided for in the Asset Purchase Agreement or as provided for herein.

58.    Nothing in this Order or the Asset Purchase Agreement

(i)    releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability of an entity to a governmental unit (as defined in section

50

101(27) of the Bankruptcy Code (a "**Governmental Unit**")) under any police or regulatory statutes or regulations that such entity would be subject to as the owner or operator of the Purchased Assets after the Closing; provided, however, for the avoidance of doubt, nothing herein shall subject the Purchaser to any liability to a Governmental Unit for penalties for days of violation prior to the Closing, response costs incurred by a governmental unit prior to the Closing, or other matters not related to conditions existing on or at the Purchased Assets on or after the Closing that require remediation or compliance under applicable non-bankruptcy law by the owner or operator regardless of who is responsible for the condition or when it arose. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law;

(ii)     authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; or

(iii)    divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

59.     Notwithstanding anything to the contrary herein or in the Asset Purchase Agreement or any other prior order of this Court, upon the occurrence of the Closing, the Excluded Cash shall be paid to and/or remain with the Debtors as provided in the Asset Purchase Agreement, in each case free and clear of any and all liens and interests, including of the Purchaser, the DIP Agent, the DIP Lenders, the Prepetition Senior Loan Agent, the Prepetition Senior Lenders, the Prepetition Junior Loan Agent, and the Prepetition Junior Lenders; *provided,* that, notwithstanding the foregoing, effective immediately and automatically as of the Closing, upon consummation of the Sale Transaction in accordance with the Asset Purchase Agreement, and without the necessity of the execution, recordation or filing by the Purchaser of any mortgages, deeds of trust, pledge or security agreements, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other similar documents or instruments, or the possession or control by the Purchaser of, or over, the Professional Fee Amount, the Purchaser is hereby granted a valid,

51

binding, enforceable, non-avoidable, and automatically and properly perfected first priority lien and security interest in any residual Professional Fee Amount that is not distributed from the Escrow Account to an Estate Professional pursuant to an Order of the Bankruptcy Court, as and solely to the extent set forth in the Asset Purchase Agreement; *provided*, *further*, *however*, that $50,000 of the Wind Down Amount shall be allocated for the fees and expenses of the Prepetition Junior Loan Agent (including the fees and expenses of counsel to the Prepetition Junior Loan Agent) that are incurred during the period from and after the Closing Date through and including the effective date of any chapter 11 plan of liquidation for the Debtors.

60.     The Settlement Parties each agree to the terms of the Global Settlement upon the terms set forth herein and in the Settlement Term Sheet attached hereto, which Global Settlement and Settlement Term Sheet are hereby approved and shall be binding and enforceable upon the Settlement Parties; *provided, however,* that to the extent any provisions of the Global Settlement are to be implemented in the Plan (as defined in the Settlement Term Sheet), such provisions shall be incorporated into the Plan and approval thereof shall be subject to confirmation of such Plan. The Settlement Parties are authorized and directed to take all actions necessary and appropriate to implement the Global Settlement and the Settlement Term sheet, and the Settlement Parties shall negotiate in good faith any Definitive Documentation (as defined in the Settlement Term Sheet) required to implement the Global Settlement.

61.     The Asset Purchase Agreement and the DIP Credit Agreement are hereby approved and deemed amended to incorporate and reflect the terms of the Global Settlement as set forth in Schedule 1 and Schedule 2, respectively, to the Settlement Term Sheet. Notwithstanding paragraph 38 of the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate*

*Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Dkt No. 348] (the "**Final DIP Order**"), the Final DIP order shall be deemed amended to the extent necessary to reflect such amendments (as applicable) to the DIP Credit Agreement and Asset Purchase Agreement.

62.     Pursuant to Bankruptcy Code sections 105, 363 and 364, the New Financing Facilities are hereby approved and the Purchaser and its subsidiaries are authorized to enter into and perform under the documents governing the New Financing Facilities. Pursuant to Bankruptcy Code sections 105, 363 and 364, the Purchaser and its subsidiaries are hereby authorized to take any and all actions necessary or appropriate to enter into the New Financing Facilities on and after the Closing Date. By agreement of the parties thereto, on and after the Closing Date, the Purchased Assets shall be subject in all respects to the liens securing the New Financing Facilities, to the extent provided by the documents governing the New Financing Facilities, which liens shall hereby shall hereby be deemed valid, binding and fully perfected. The New Financing Facilities are being extended in good faith and for fair value and, therefore, the obligations thereunder and the liens granted therein are valid, binding and enforceable against the Purchaser and its subsidiaries, and may not be avoided under the Bankruptcy Code, the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, or any other similar federal or state laws, and shall not be subject to disallowance, recharacterization or subordination.

63.     Notwithstanding anything to the contrary in this Order, the term "Purchased Assets" in the Asset Purchase Agreement and related documents specifically includes Debtors' rights, if any, to three pending Franchise Tax Research and Development Refunds (the "**TXFT Refund Requests**") currently in process with the Texas Comptroller of Public Accounts (the

AMERICAS 111936533

"**Texas Comptroller**").  Nothing herein impacts the pending TXFT Refund Requests, and it is expressly understood that Debtors and/or Purchaser may not be entitled to any funds from the TXFT Refund Requests.

64.     Notwithstanding anything to the contrary in this Order, the term "Assumed Liabilities" in the Asset Purchase Agreement and related documents specifically includes the Debtors' liabilities, if any, arising from the current sales and use tax audit of Strike LLC by the Texas Comptroller for the period of June 1, 2016, to December 31, 2018 (the "**Texas Sales Tax Audit**").  The Texas Sales Tax Audit shall continue until completed at which point Purchaser shall pay all undisputed amounts that are due and owing thereunder, if any, as required under applicable law.  Purchaser reserves all rights to exhaust all judicial and administrative remedies related to the Texas Sales Tax Audit.  If any funds are owed to Purchaser for the TXFT Refund Requests, the Texas Comptroller may offset the final amount of undisputed liability to be paid by Purchaser under the Texas Sales Tax Audit by the amount of the funds due and owing pursuant to the TXFT Refund Requests, if any. Debtors and Purchaser shall comply with all steps as reasonably requested by the Texas Comptroller or other state agency to assume and/or be assessed the Debtors' liabilities referenced herein under the Texas Sales Tax Audit.

65.     Notwithstanding anything to the contrary in this Order, the term "Excluded Liabilities" in the Asset Purchase Agreement and related documents includes all pre-Closing liabilities of Debtors to Texas Comptroller or Texas Workforce Commission (the "**TWC**") other than any liabilities arising from the Texas Sales Tax Audit.  All tax claims owed to the Texas Comptroller or TWC that are categorized as "Excluded Liabilities" shall be treated under the Debtors' plan of liquidation in accordance with the priorities as required under the Bankruptcy Code or as otherwise agreed to by the Texas Comptroller or TWC. Texas Comptroller and TWC

54

reserve all rights against the Debtors and their estates regarding treatment of all their claims that fall under Excluded Liabilities.

66.      Notwithstanding anything to the contrary in this Order, the Texas Comptroller and TWC reserve: (1) any statutory or common law setoff rights in accordance with 11 U.S.C. § 553; (2) any and all rights, if any, to pursue any non-debtor third parties for tax debts or claims (other than the Purchaser Parties with respect to Excluded Liabilities); (3) any right to seek payment from the Debtors of interest on administrative expense tax claims, if any, including the right to seek payment of interest at the statutory rate under Texas Tax Code 111.060; and (4) any right to seek payment of post-petition tax claims from the Debtors, when due, without motion or application pursuant to section 503(b)(1)(D) of the Bankruptcy Code; provided, that the Debtors and any other party in interest reserve all rights regarding the amount and priority of such claims.

67.      The Debtors shall pay their pro-rated share of ad valorem tax**es** for the 2022 tax year to the Texas Taxing Authorities[5] for the period from January 1, 2022 through the date falling one day prior to the Closing Date in full as and when due, with funds escrowed for such payment on the Closing Date.  The Debtors will also escrow funds on the Closing Date in connection with unpaid and/or disputed tax claims for tax years prior to 2022 asserted by Nueces County, Val Verde County, Montgomery County, Goliad County and Goliad ISD.  The Texas Taxing Authorities shall have a lien on the escrow account and the proceeds thereof on account of the pre-Closing ad valorem taxes for the 2022 tax year and the pre-2022 ad valorem tax claims asserted

---

[5] The Texas Taxing Authorities are: Dilley Independent School District, Frio Hospital District, Reeves County,  Cypress-Fairbanks Independent School District, Goliad County, Harris County, Hidalgo County, Jefferson County, Jim Wells CAD, Montgomery County, Nueces County, Val Verde County, Zavala CAD, Midland Central Appraisal District, The  County of Wharton, Texas, Reeves County Tax District, Panola County, City of Cleburne, Cleburne Independent School District, Johnson County, Brazoria County Tax Office, Chambers County Tax Office, Barbers Hill Independent School District, The City of Mont Belvieu, Montgomery County Municipal Utility District #67, Karnes County Tax Office, Midland County, and La Pryor Independent School District.

by Nueces County, Val Verde County, Montgomery County, Goliad County and Goliad ISD until such taxes and/or claims are paid in full in their allowed amount. Within ninety (90) days of the Closing Date, the pre-2022 claims of Nueces County, Val Verde County, Montgomery County, Goliad County and Goliad ISD shall be paid in full and to the extent not otherwise paid, an objection to the claim must be filed with the Court. The Purchaser Parties shall pay their pro-rated share of ad valorem tax**es** for the 2022 tax year to the Texas Taxing Authorities for the period of time from the Closing Date through December 31, 2022 in full as and when due. The Texas Taxing Authorities are not required to send separate tax statements on account of any agreed-upon pro-rated share between the Debtors and the Purchaser Parties. Any dispute regarding the proration of the 2022 ad valorem taxes between the Debtors and the Purchaser Parties shall have no effect on the Debtors and the Purchaser Parties' respective responsibility to pay the 2022 ad valorem taxes. Notwithstanding anything to the contrary in this Order, the Texas Taxing Authorities shall retain their liens, if any, on the Purchased Assets on account of the post-closing ad valorem tax**es** for the 2022 tax year until such taxes are paid in full. The Texas Taxing Authorities shall have no recourse to the Debtors on account of the Purchaser Parties' ad valorem tax obligations under this Order and the Texas Taxing Authorities shall have no recourse to the Purchaser Parties on account of the Debtors' ad valorem tax obligations under this Order; *provided* that the Debtors and the Purchaser Parties assume the tax liability for their respective pro-rated shares of 2022 ad valorem taxes. In the event the Purchaser Parties fail to pay their pro-rated share of the 2022 ad valorem taxes, the Texas Taxing Authorities may proceed with non-bankruptcy collections against the Purchaser Parties and/or the Purchased Assets in accordance with applicable law, without leave or approval of the Court.

AMERICAS 111936533

68.     Notwithstanding anything to the contrary contained in this Order or the Asset Purchase Agreement, entry of this Order or into the Asset Purchase Agreement and consummation of the transactions contemplated thereby shall not limit or otherwise prejudice the affirmative defenses to payment and set off rights and recoupment rights of USD Group, Port Arthur Terminal LLC, Midship Pipeline Company, LLC ("**Midship**"), National Fuel Gas Distribution Corporation, NFG Midstream Clermont, LLC, and National Fuel Gas Supply Corporation pursuant to an applicable contract, in equity, or under applicable law, including the Bankruptcy Code.

69.     Nothing in this Order or the Asset Purchase Agreement authorizes the sale, transfer, or assignment to the Purchaser of any "Work Product," as that term is defined in Article 10 of that certain Lump Sum Construction Agreement between Strike, LLC and Midship, dated March 19, 2018.  Such Work Product shall be retained by the Debtors' estates, removed from any computers or servers sold to the Purchaser and either turned over to Midship or destroyed.  The Debtors shall engage in good faith with Midship regarding the handling of such Work Product.

70.     To the extent any contract between the Debtors, on the one hand, and Enterprise Texas Pipeline LLC, Enterprise Products Operating LLC, Enterprise Crude Pipeline LLC, Enterprise Pelican Pipeline, L.P., South Texas NGL Pipelines, LLC, and Acadian Pipeline Systems, (collectively, with their affiliates, "**Enterprise**"), on the other, is neither assumed nor assigned pursuant to this Order, (i) all drawings, reports, designs, sketches, plans or other work product that is deemed sole property of Enterprise under such applicable non-assumed contracts shall be permanently removed, erased, and scrubbed from all computers, servers, hard drives, and other electronic storage spaces of the Debtors such that it cannot be restored using data recovery tools and (ii) the Debtors shall provide counsel to Enterprise evidence of such removal, including by providing a data destruction certificate.

AMERICAS 111936533

71.     Notwithstanding any provision in this Sale Order or the Asset Purchase Agreement to the contrary, the approval of the Asset Purchase Agreement and related transactions contemplated in the Sale Order shall not limit, restrict, prejudice, or otherwise impair (i) rights of any tort or wrongful death claimant to proceed or satisfy any judgment against the Debtors and their affiliates (but not the Purchaser) from the proceeds of the Debtors' liability insurance policies covering such third party claims that expired pursuant to their terms prior to the Petition Date, which policies are not being assigned or transferred to the Purchaser pursuant to the Sale Order and shall remain available to satisfy third party claims to the same extent and in the same amounts as prior to the Petition Date; (ii) any motion seeking relief against the Debtors (but not the Purchaser) from the automatic stay in connection with such claims; or (iii) the Debtors' defenses and objections to such claims and related motions to lift or modify the automatic stay against the Debtors.  For the avoidance of doubt, any claims or judgments of such tort or wrongful death claimants against the Debtors and their affiliates are Excluded Liabilities under the Asset Purchase Agreement.

72.     Nothing in this Order shall permit the transfer of the commercial and contract surety bonds (the "**Aspen Bonds**") issued by Aspen American Insurance Company or its affiliated sureties (collectively, "**Aspen**") without the consent of Aspen.  The Purchaser shall either replace the Aspen Bonds related to the performance of Assigned Contracts or otherwise obtain Aspen's consent for the transfer of such Aspen Bonds prior to the assumption and assignment of the applicable Assigned Contracts.

73.     Notwithstanding the provisions of Bankruptcy Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order shall not be stayed for fourteen (14) days after the entry hereof, but shall be effective and enforceable immediately upon entry,

AMERICAS 111936533

and the fourteen (14) day stay provided in such rules is hereby expressly waived and shall not apply.  Accordingly, the Debtors are authorized and empowered to close the Sale Transaction immediately upon, and following, entry of this Order.  Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing, or risk its appeal will be foreclosed as moot.

74.     This Court shall retain exclusive jurisdiction to enforce and implement the terms and provisions of this Order (including the Settlement Term Sheet), the Asset Purchase Agreement and the other Transaction Documents, and all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connections therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Purchaser free and clear of all Interests, or compel the performance of other obligations owed by the Debtors, (b) compel delivery of the purchase price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset Purchase Agreement, or any of the other Transaction Documents except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Order, and (e) protect the Purchaser and Purchaser Parties against (i) claims made related to any of the Excluded Liabilities, (ii) any claims of successor or vicarious liability related to the Purchased Assets or Assigned Contracts, or (iii) any Interests (other than Assumed Liabilities or Permitted Encumbrances) asserted in, on, or against the Debtors or the Purchased Assets, of any kind or nature whatsoever.

75.     To the extent the Debtors or any trustee(s), receiver(s), responsible officer(s) or other fiduciary appointed or elected, in these Chapter 11 Cases or any successor cases, receive, hold, or otherwise come into possession after the Closing of any payment or asset that constitutes Purchased Assets, such payment or asset shall be held in trust for the benefit of the Purchaser and

59

the Debtors or any such trustee(s), receiver(s), responsible officer(s) or other fiduciary shall promptly deliver or otherwise turn over such payment or asset to the Purchaser.

      76.    The Debtors are authorized to take all actions necessary or appropriate to effectuate the relief granted pursuant to this Order in accordance with the Motion.

      **Signed:  January 28, 2022.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

60

## **Schedule 1**

Assigned Contracts Schedules

**Exhibit A**

(1) Certain cure amounts listed for contracts with the Debtors' customers are on account of payables owed to third party subcontractors, vendors, and/or suppliers associated with the applicable customer contract and may be paid directly to such third party rather than the customer counterparty listed hereon.
(2) All agreements are as amended, if applicable.

| Debtor Counter Party | Counter Party | Title of Contract[2] | Effective Date | Cure Amount[1] |
|---|---|---|---|---|
| Delta Directional Drilling, LLC | 3-GIS, LLC | Master Services Agreement | 01/03/18 | 269,965.10 |
| Strike, LLC | 3W Construction, LLC | Master Services Agreement | 02/27/20 | 78,048.86 |
| Crossfire, LLC | 4 Horse Construction, LLC | Lease Agreement | 05/21/19 | — |
| Crossfire, LLC | 4 Warriors Hydro Excavation, LLC | Master Services Agreement | 02/28/20 | 118,500.00 |
| Crossfire, LLC | Advanced Industrial Services Midcon Region, LLC | Master Services Agreement | 06/05/19 | 9,165.00 |
| Strike, LLC | Ag & Oil 365 Energy LLC | Master Service Agreement | 12/14/18 | 12,983.32 |
| Strike, LLC | Ag-Con LLC | Master Services Agreement | 01/28/20 | 55,242.60 |
| Crossfire, LLC | Ahern Rentals | Rental Contract | 07/15/20 | 48,681.06 |
| Crossfire, LLC | Airgas, Inc and Affiliates | Strategic Accounts Sales Agreement | 01/28/16 | 84,259.81 |
| Strike, LLC | Alamo Crane Service, Inc. | Master Services Agreement | 10/27/20 | 25,307.50 |
| Strike, LLC | ALL Crane Rental of Louisiana, LLC | Blanket Equipment Bare Rental Agreement | 04/22/21 | 39,933.80 |
| Strike, LLC | Allied World Surplus Lines Insurance Company | Insurance Policy #0311-0998 | 12/01/21 | — |
| Delta Directional Drilling, LLC | Altuve's Construction & Drilling, LLC | Master Services Agreement | 11/02/21 | 44,631.49 |
| Crossfire, LLC | American Piping Inspection Inc | Master Service Agreement | 07/03/18 | 45,140.00 |
| Strike, LLC | American Pollution Control Corporation | Master Service Agreement | 07/15/20 | 66,700.00 |
| Strike, LLC | American Waste, Inc dba Norther A-1 Services | Master Service Agreement | 05/23/19 | 23,003.57 |
| Strike, LLC | Amerivax, Inc. | Master Service Agreement | 05/11/21 | 12,130.00 |
| Strike, LLC | Anadarko Petroleum Corporation | Master Services Agreement | 04/12/04 | — |
| Crossfire, LLC | ARB Midstream, LLC | Master Services Agreement | 05/08/19 | 1,849.14 |
| Crossfire, LLC | Arc Inspection Services LLC | Master Services Agreement | 06/18/18 | 11,870.00 |
| Strike, LLC | Ardent Services LLC | Master Services Agreement | 05/04/18 | 1,808,877.03 |
| Strike, LLC | Ardent Services LLC | Master Services Agreement | 09/05/07 | 12,753.15 |
| Strike, LLC | Aries Freight Systems LP | Master Hauling Agreement | 10/29/20 | — |
| Strike, LLC | Arrow Directional Drilling, Inc. | Master Services Agreement | 11/18/20 | 50,760.00 |
| Strike, LLC | ASFI Partners, LP | Master Services Agreement | 02/26/17 | 4,050.00 |
| Crossfire, LLC | Astar, Inc | Master Services Agreement | 10/25/19 | 2,969.64 |
| Crossfire, LLC | August Industries Inc | Master Services Agreement | 11/09/21 | 12,775.52 |
| Crossfire, LLC | AWP, Inc | Master Services Agreement | 10/13/17 | 30,850.34 |
| Crossfire, LLC | B & M Concrete Pumping, LLC | Master Services Agreement | 01/17/19 | 10,413.23 |
| Strike, LLC | B Grant Construction, Inc. | Master Hauling Agreement | 09/28/20 | 155,606.96 |
| Strike, LLC | B&R Trucking Inc. | Master Services Agreement | 05/14/18 | 2,400.00 |
| Strike, LLC | Badger Daylighting Corp | Master Services Agreement | 10/02/17 | 358,068.10 |
| Crossfire, LLC | Badlands Power Fuels, LLC | Master Services Agreement | 09/18/20 | 1,170.00 |
| Strike, LLC | Base Line Data, Inc. | Master Services Agreement | 09/17/20 | 4,756.17 |
| Crossfire, LLC | Basin Disposal, Inc. | Master Services Agreement | 03/07/17 | 35.16 |
| Delta Directional Drilling, LLC | Bay Springs Telephone Co. dba TEC | Construction Agreement | 08/12/21 | 294.25 |
| Delta Directional Drilling, LLC | Bay Springs Telephone Co. dba TEC | Construction Contract | 07/12/21 | — |
| Delta Directional Drilling, LLC | Bay Springs Telephone Company, Inc. dba TEC | Telecommunications System Construction Contract | 08/02/21 | 276,966.19 |
| Delta Directional Drilling, LLC | Bay Springs Telephone Company, Inc. dba TEC | Construction Contract | 02/18/21 | — |
| Delta Directional Drilling, LLC | Bay Springs Telephone Company, Inc. dba TEC | Telecommunications Systems Contract | 10/20/20 | — |
| Strike, LLC | Beck Bros, Inc. | Master Services Agreement | 11/17/20 | 56,281.73 |
| Strike, LLC | Berkley National Insurance Company | Insurance Policy #EGL001949915 | 12/01/21 | — |
| Strike, LLC | Berkley National Insurance Company | Insurance Policy #ECA 3135907-15 | 12/01/21 | — |
| Strike, LLC | Berkley National Insurance Company | Insurance Policy #EUL001949915 | 12/01/21 | — |
| Strike, LLC | Berkley National Insurance Company | Insurance Policy #CEX09604322-01 | 12/01/21 | — |
| Strike, LLC | Big B Crane, LLC | Master Services Agreement | 03/21/19 | 107,149.93 |
| Strike, LLC | Big D's Pumping, Inc. | Master Hauling Agreement | 01/24/19 | 8,092.50 |
| Crossfire, LLC | Bighorn Transport Services LLC | Master Hauling Agreement | 03/11/20 | 380,116.03 |
| Crossfire, LLC | Blackbeard Directional, LLC | Master Services Agreement | 09/17/21 | 90,384.00 |
| Crossfire, LLC | Blue Eagle Oilfield Services | Master Services Agreement | 02/01/18 | 119,334.13 |
| Strike, LLC | Blue Fin Services, LLC | Master Service Agreement | 11/20/12 | — |
| Strike, LLC | Blue Sky Dumpsters, LLC | Master Services Agreement | 11/01/19 | 4,422.13 |
| Crossfire, LLC | Bobcat Electrical & Instrumentation, LLC | Master Services Agreement | 01/31/20 | 365,449.00 |
| Strike, LLC | Bobcat Heavy Civil, LLC | Project Agreement | 01/09/18 | 108,728.78 |
| Crossfire, LLC | Borsheim Crane Service, LLC | Master Services Agreement | 09/29/21 | 29,062.75 |
| Crossfire, LLC | Bottomline Technologies, Inc. | Software License Agreement | 09/27/19 | 32,114.63 |
| Strike, LLC | Brandsafway LLC | Master Service Agreement | 03/11/15 | 12,000.00 |
| Strike, LLC | Braun Intertec Corporation | Master Service Agreement | 11/04/15 | 10,250.70 |
| Crossfire, LLC | Broadleaf IT LLC | Master Agreement | 02/20/19 | 8,865.68 |
| Strike, LLC | Brundage-Bone Concrete Pumping, Inc. | Master Services Agreement | 01/01/12 | 2,383.92 |
| Crossfire, LLC | BTH Services and Rental LLC | Master Services Agreement | 10/09/19 | 66,780.17 |
| Strike, LLC | C & R Preferred Concrete Pumping, LLC | Master Services Agreement | 05/13/21 | 1,523.75 |
| Delta Directional Drilling, LLC | C & W Underground Drilling, LLC | Master Services Agreement | 07/28/21 | 111,386.05 |
| Strike, LLC | Car-Ber Holdings, Inc. dba Car-Ber Testing Services | Master Services Agreement | 11/30/11 | 46,665.30 |
| Strike, LLC | Caterpillar Inc. | Rental National Account Agreement | 04/01/18 | 1,171,212.44 |
| Strike, LLC | Celanese International Corporation | Services Purchase Agreement | 06/22/18 | 16,626.60 |
| Strike, LLC | Centaurus USA LTD | PO The Midland Shop | 11/09/21 | 1,320.94 |
| Strike, LLC | Centurion Pipeline L.P. | Master Service Agreement | 09/09/16 | — |
| Crossfire, LLC | Certarus | Master Services Agreement | 10/08/19 | — |
| Strike, LLC | Charbonneau Industries | PO 737045 | 09/27/21 | 308.85 |
| Strike, LLC | Charbonneau Industries | PO 736775 | 09/15/21 | 450.73 |
| Strike, LLC | Charbonneau Industries | PO 736294 | 08/26/21 | — |
| Strike, LLC | Charbonneau Industries | PO 735481 | 08/03/21 | — |
| Strike, LLC | Charbonneau Industries | PO 734504 | 06/28/21 | — |
| Strike, LLC | Charbonneau Industries | PO 733800 | 06/07/21 | — |
| Strike, LLC | Charbonneau Industries | PO 732753 | 05/04/21 | 49.68 |
| Strike, LLC | Charbonneau Industries | PO 730282 | 02/12/21 | — |
| Strike, LLC | Charbonneau Industries | PO 728866 | 12/17/20 | — |
| Strike, LLC | Charbonneau Industries | PO 725712 | 09/04/20 | — |
| Strike, LLC | Charbonneau Industries | PO 724474 | 07/30/20 | — |
| Strike, LLC | Charbonneau Industries | Master Terms and Conditions | 04/30/20 | 524,808.59 |
| Strike, LLC | Chesapeake Operating, Inc. | Master Services Agreement | 11/16/10 | — |
| Strike, LLC | Chesapeake Operating, Inc. | Master Services Agreement | 12/02/08 | 10,071.38 |
| Crossfire, LLC | Cimarex Energy Co. | Master Construction Services Agreement | 08/17/18 | 12,467.40 |
| Strike, LLC | Cimarex Energy Co. | Master Service Agreement | 03/21/16 | — |
| Crossfire, LLC | Coastal Directional Drilling, Inc | Master Services Agreement | 10/01/19 | 13,320.00 |
| Strike, LLC | Colonial Pipeline Company | Master Services Agreement | 12/29/14 | — |
| Strike, LLC | Columbia Gulf Transmission, LLC | Construction Agreement | 08/15/17 | — |
| Strike, LLC | Columbia Gulf Transmission, LLC | Agreement No. 4600007931 | 08/15/17 | — |
| Strike, LLC | Columbia Gulf Transmission, LLC | Agreement No. 4600007932 | 08/15/17 | — |
| Strike, LLC | Columbia Pipeline Group Services Company | General Services Agreement | 07/15/16 | — |
| Strike, LLC | Comdata Inc. | Corporate Payment Solution Agreement | 09/17/19 | — |
| Strike, LLC | Concur Technologies, Inc. | Order Form | 03/27/19 | 22,628.11 |
| Strike, LLC | Connect Services, LLC | Reference and Terms | 02/27/20 | — |
| Crossfire, LLC | ConocoPhillips Company | Master Agreement No. 305445 | 10/01/15 | — |
| Crossfire, LLC | ConocoPhillips Company | Master Service Agreement | 05/01/15 | — |
| Crossfire, LLC | ConocoPhillips Company | Master Agreement - Well Services | 12/01/14 | — |
| Strike, LLC | Consolidated Fabrication and Constructors, Inc. | Purchase Order | 08/31/21 | — |
| Crossfire, LLC | CORTEC, LLC | Master Services Agreement | 06/02/21 | 9,554.67 |
| Strike, LLC | Crimson Insulation, Inc. | Lease Agreement | 10/14/19 | — |
| Strike, LLC | Crossbridge, LLC | Lease Agreement - 10919 Interstate 10 E Baytown, Texas | 08/30/13 | — |
| Strike, LLC | Crossbridge, LLC | Lease Agreement - 7619 Up River Rd. Corpus Christi, Texas 78409 | 08/30/13 | — |
| Strike, LLC | CTTV, LLC dba Team 3 Rentals and Services | Master Rental Agreement | 03/13/19 | 20,862.54 |
| Strike, LLC | CyrusOne, LLC | Order Form | 04/01/18 | — |
| Strike, LLC | D & C Fence Company, Inc. | Master Services Agreement | 11/01/06 | 7,761.52 |
| Strike, LLC | DAEC Industrial Park, LLC | Lease Agreement | 01/01/20 | 561.77 |
| Strike, LLC | Dakota Line Contractors, Inc | Master Services Agreement | 05/14/21 | — |
| Crossfire, LLC | D-A-M Services, Inc. | Master Services Agreement | 05/14/21 | — |
| Crossfire, LLC | Danco Enterprises Inc. | Master Services Agreement | 04/29/19 | 44,966.83 |
| Strike, LLC | Darby Equipment Company | Rental Contract | 10/21/20 | — |
| Strike, LLC | Darby Equipment Company | Rental Contract | 09/29/20 | — |
| Strike, LLC | Darby Equipment Company | Rental Contract | 08/24/20 | — |
| Strike, LLC | Darby Equipment Company | Rental Contract | 08/12/20 | — |
| Strike, LLC | Darby Equipment Company | Rental Contract | 09/30/19 | — |
| Strike, LLC | Dark Skies, LLC dba Mercury Permits | Master Services Agreement | 09/30/19 | 149,404.33 |
| Crossfire, LLC | Dark Skies, LLC dba Mercury Permits | General Contract for Services | 08/01/19 | 17,564.68 |
| Crossfire, LLC | DCP Midstream, LP | Master Services Agreement | 08/20/10 | — |
| Strike, LLC | DCP Midstream, LP | Master Service Agreement | 05/21/03 | — |
| Strike, LLC | Desert Industrial X-Ray, L.P. | Master Services Agreement | 10/24/08 | 44,992.52 |
| Strike, LLC | Diamond Hydraulics Inc | Master Services Agreement | 08/14/18 | — |
| Strike, LLC | Disa Global Solutions, Inc. | Master Services Agreement | 06/08/17 | — |
| Strike, LLC | DMI International, Inc. | Equipment Rental Agreement | 11/20/20 | 51,260.83 |
| Strike, LLC | Dnow LP | Master Terms and Conditions | 12/18/17 | 82,905.14 |

| Debtor Counter Party | Counter Party | Title of Contract[2] | Effective Date | Cure Amount[3] |
|---|---|---|---|---|
| Strike, LLC | Dutcher Phipps Crane & Rigging | Master Services Agreement | 06/01/08 | 26,013.00 |
| Strike, LLC | Easton Energy, LLC | Master Services Agreement | 11/12/19 | – |
| Capstone Infrastructure Services, LLC | Economic Progress Alliance of Crawford County | Agreement Intent Contract No. 12017-2020-01 | 03/31/21 | 1,147.56 |
| Strike, LLC | Elite Oil Field & Construction Services LLC | Master Services Agreement | 12/04/19 | 49,956.34 |
| Strike, LLC | Elite Supply Partners inc. | Master Terms and Conditions | 01/31/20 | 712,772.78 |
| Strike, LLC | Encorp Engineered Solutions, LLC | Master Services Agreement | 03/05/21 | 63,220.10 |
| Crossfire, LLC | Enduring Resources, LLC | Master Service and Supply Agreement | 08/01/17 | – |
| Strike, LLC | Energy Field Equipment Services LLC | Master Services Agreement | 01/20/20 | 35,330.00 |
| Strike, LLC | Enterprise Products Operating LLC | PS200824 | 03/03/21 | – |
| Strike, LLC | Enterprise Products Operating LLC | PS200788 | 10/21/20 | 73.00 |
| Strike, LLC | Enterprise Products Operating LLC | PS200679 | 08/03/20 | 71.48 |
| Strike, LLC | Enterprise Products Operating LLC | PS200680 | 03/11/20 | – |
| Strike, LLC | Envirocal, Inc. | Master Services Agreement | 01/20/20 | 66,630.00 |
| Strike, LLC | Envirodispose LLC | Master Service Agreement | 12/12/19 | 1,143.50 |
| Strike, LLC | EOG Resources, Inc. | Master Service Contract | 09/23/19 | – |
| Strike, LLC | EOG Resources, Inc. | Master Service Agreement | 09/23/19 | – |
| Crossfire, LLC | EquipmentShare.com, Inc. | Equipment Rental Agreement | 11/10/20 | – |
| Crossfire, LLC | EquipmentShare.com, Inc. | Equipment Rental Agreement | 11/03/20 | – |
| Crossfire, LLC | EquipmentShare.com, Inc. | Equipment Rental Agreement | 10/16/20 | – |
| Crossfire, LLC | EquipmentShare.com, Inc. | Equipment Rental Agreement | 09/14/20 | – |
| Crossfire, LLC | EquipmentShare.com, Inc. | Equipment Rental Agreement | 07/28/20 | – |
| Strike, LLC | Evangeline Construction, LLC | Master Service Agreement | 06/26/18 | 110,306.00 |
| Strike, LLC | Executive AirShare Corporation | Joint Ownership of Aircraft Agreement | 12/23/15 | – |
| Strike, LLC | Executive AirShare Corporation | Aircraft Purchase Agreement | 12/23/15 | – |
| Strike, LLC | Executive Flight Services, Inc | Aircraft Dry Lease Agreement | 12/23/15 | – |
| Strike, LLC | Executive Flight Services, Inc | Management Agreement | 12/23/15 | – |
| Strike, LLC | Executive Flight Services, LLC & Executive Airshare, LLC | Air share Agreement | 12/23/20 | 23,661.88 |
| Strike, LLC | ExxonMobil | Proposal PS21-1122 - Rev 2 | 09/29/21 | 5,922.20 |
| Strike, LLC | Farwest Corrosion Control | Professional Services Agreement | 10/29/14 | 4,639.06 |
| Strike, LLC | First Advantage Tax Consulting Services LLC | Transportation Compliance Service Agreement | 05/31/19 | 9,544.51 |
| Strike, LLC | FlexTG Financial Services | Lease Agreement (500-0628644-000) | 11/30/20 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement (500-0628641-000) | 11/30/20 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement (500-0628643-000) | 11/30/20 | 2,235.50 |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application #2685500 | 10/30/20 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application #2685494 | 09/28/20 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application #2685491 | 09/28/20 | 1,784.97 |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application #2685501 | 09/22/20 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application #2685479 | 09/22/20 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application #2685496 | 09/20/20 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application # LS-3780123 | 09/17/19 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application # LS-3780120 | 09/17/19 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application # LS-3836473 | 06/28/19 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application # LS-3780145 | 06/12/19 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application # LS-3780136 | 06/06/19 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application # LS-3262279276 | 04/23/19 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application # LS-3694600 | 04/05/19 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application # LS-3728878 | 03/26/19 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application # LS-3723351 | 03/09/19 | – |
| Crossfire, LLC | Flow-Zone LLC | Master Services Agreement | 08/13/19 | 298,179.06 |
| Strike, LLC | Foster Fence Ltd | Master Service Agreement | 11/01/06 | 307,649.36 |
| Delta Directional Drilling, LLC | Fred Bennett | Storage Agreement | 10/10/17 | 2,000.00 |
| Crossfire, LLC | Gajeske Inc. | Master Service Agreement | 08/03/17 | 13,688.95 |
| Strike, LLC | General Security National Insurance Company | Insurance Policy #FA008Z195-2021-2 | 12/01/21 | – |
| Strike, LLC | GK Techstar LLC | Master Service Agreement | 01/31/20 | 23,594.26 |
| Strike, LLC | Global Software, LLC d/b/a insightsoftware | Purchase Agreement | 11/26/19 | – |
| Crossfire, LLC | GM Oilfield & Trucking Services LLC | Master Services Agreement | 06/11/20 | 3,562.50 |
| Strike, LLC | Golden Pass Pipeline, LLC | Standard Procurement Agreement for Upstream Services w/ Incidental Goods | 07/11/13 | – |
| Crossfire, LLC | Goodnight Midstream Permian, LLC | Master Service Agreement | 09/13/18 | – |
| Strike, LLC | Grant Thornton LLP | Statement of Work for State/Local Tax Refund Services | 02/10/21 | – |
| Strike, LLC | Graybar Electric Company, Inc. | Master Terms and Conditions | 05/27/20 | 817,933.58 |
| Strike, LLC | Great American Assurance Company | Insurance Policy #EXC4137664 | 12/01/21 | – |
| Strike, LLC | Great American E & S Ins. Co | Insurance Policy #CSE 2628934 13 | 12/01/21 | – |
| Crossfire, LLC | Greenlee and Sons Septic Service LLC | Master Service Agreement | 04/04/19 | 61,716.79 |
| Crossfire, LLC | H-2 Enterprises, LLC | Master Services Agreement | 07/22/20 | 109,954.00 |
| Delta Directional Drilling, LLC | Hall's Towing Services, Inc. | Master Services Agreement | 10/29/18 | 867.00 |
| Delta Directional Drilling, LLC | Harris Electrical & Automation, Inc. | Master Services Agreement | 07/14/21 | 3,600.00 |
| Strike, LLC | HB Properties, LLC | Lease Agreement | 01/29/19 | – |
| Crossfire, LLC | HCJ INVESTMENTS, LLC | Lease Agreement | 11/01/18 | – |
| Strike, LLC | Heavyquip | Reference and Terms | 09/16/20 | – |
| Strike, LLC | Heritage-Crystal Clean LLC | Master Services Agreement | 05/19/15 | 16,977.39 |
| Crossfire, LLC | High Mountain Inspection Service, Inc | Master Services Agreement | 07/25/19 | 1,236.00 |
| Crossfire, LLC | Hilcorp Energy Company | Master Service Agreement | 09/20/17 | – |
| Crossfire, LLC | Hilcorp Energy Company | Master Service Agreement | 08/01/17 | – |
| Strike, LLC | Hilcorp Energy Company | Master Service Contract | 04/14/05 | – |
| Crossfire, LLC | Hobbs Rental, LLC | Master Services Agreement | 06/21/18 | 3,475.00 |
| Strike, LLC | Holloman Corporation | Subcontract Blanket Agreement | 10/09/20 | 1,016.38 |
| Strike, LLC | Holt Texas LTD | Rental Agreement 01613203 S16-DZ109 | 10/23/15 | – |
| Strike, LLC | Holt Texas LTD | Rental Agreement 01614203 S16-DZ112 | 10/23/15 | – |
| Strike, LLC | Holt Texas LTD | Rental Agreement 01614103 S16-DZ108 | 10/23/15 | – |
| Strike, LLC | Holt Texas LTD | Rental Agreement 01606503 S16-DZ110 | 10/23/15 | – |
| Strike, LLC | Holt Texas LTD | Rental Agreement 0160480 S16-DZ111 | 10/23/15 | – |
| Crossfire, LLC | Hoppe's Construction, LLC | Master Services Agreement | 01/10/19 | 956.25 |
| Crossfire, LLC | Hurley Enterprises, Inc. | Master Services Agreement | 06/25/20 | 4,626.00 |
| Strike, LLC | IIA Field Services, LLC | Master Services Agreement | 03/29/19 | – |
| Strike Capital, LLC | Indian Harbor Ins Co (XL) | Insurance Policy # MTP9038631 | 08/30/21 | – |
| Delta Directional Drilling, LLC | Indigo Minerals, LLC | Master Service Agreement | 10/23/12 | – |
| Crossfire, LLC | Industrial Training Services, Inc. | Client Agreement | 04/09/20 | 350.00 |
| Crossfire, LLC | Industrial Training Services, Inc. | Client Agreement | 05/10/19 | 175.00 |
| Strike, LLC | Industrial Training Services, Inc. | Client Agreement | 02/14/19 | 10,600.00 |
| Strike, LLC | Ineight SaaS Products | Order Form | 04/17/20 | – |
| Strike, LLC | Ineight SaaS Products | Service Order | 09/21/18 | – |
| Strike, LLC | Ineight SaaS Products | Service Order | 09/21/18 | – |
| Delta Directional Drilling, LLC | Inrock Drilling Systems, Inc. | Supply of Services Contract | 05/13/21 | 10,350.00 |
| Strike, LLC | Insight Software | Purchase Agreement | 11/26/19 | – |
| Strike, LLC | Integrated Technology And Security, LLC | Master Service Agreement | 01/27/17 | 29,194.39 |
| Strike, LLC | Intellisite, LLC | Master Services Agreement | 10/01/20 | 24,951.39 |
| Strike, LLC | Intergraph Corporation, dba Hexagon PPM | Software Maintenance Support Agreement | 12/05/18 | 16,146.57 |
| Strike, LLC | Intero Integrity Services US L.L.C. | Master Services Agreement | 07/30/21 | 216,690.00 |
| Strike, LLC | Intralinks, Inc. | Work Order 32145889 | 09/08/20 | – |
| Crossfire, LLC | IRISNDT Inc. | Master Services Agreement | 10/08/21 | – |
| Crossfire, LLC | Irrigo, LLC | First Amendment to Lease Agreement | 06/19/13 | – |
| Strike, LLC | Ism Industries, Inc. | Master Service Agreement | 06/13/18 | 47,935.27 |
| Crossfire, LLC | IV Kings Rig Technicians, LLC | Master Service Agreement | 03/24/20 | 151,950.00 |
| Crossfire, LLC | J Custom Electric LLC | Master Services Agreement | 04/13/21 | 5,125.50 |
| Crossfire, LLC | J&J Raymond Construction, LLC | Master Service Agreement | 01/01/19 | 143,752.00 |
| Crossfire, LLC | J&J Raymond Construction, LLC | Project Agreement | 05/07/18 | – |
| Delta Directional Drilling, LLC | Jasper County, Mississippi | Commercial Real Estate Lease Agreement | 12/09/21 | – |
| Strike, LLC | Jimmy R. Cranford & Ann A. Cranford | Lease Agreement | 01/01/21 | – |
| Delta Directional Drilling, LLC | JM Underground, LLC | Master Services Agreement | 07/21/21 | 253,698.60 |
| Crossfire, LLC | Joyce Steel Erection LTD | Master Service Agreement | 03/20/20 | 58,753.39 |
| Crossfire, LLC | JP Holdings, LLC dba JP Services | Equipment Rental | 12/02/20 | – |
| Strike, LLC | JP Hydro LLC | Master Services Agreement | 06/14/12 | – |
| Strike, LLC | JP Hydro, LLC | Letter Agreement | 06/14/12 | – |
| Strike, LLC | Kinetic Energy Services, LLC and its affiliates and subsidiaries | Master Service Agreement | 10/22/18 | – |
| Strike, LLC | Kinetic Leasing, Inc. | Master Lease Agreement | 04/17/18 | – |
| Crossfire, LLC | Kirby Smith Machinery, Inc. | Rental Agreement | 10/14/20 | – |
| Crossfire, LLC | Kirby Smith Machinery, Inc. | Rental Agreement | 10/05/20 | – |
| Strike, LLC | Klaus, Inc. | Master Services Agreement | 08/18/20 | 106,203.01 |
| Delta Directional Drilling, LLC | LA Construction and Drilling, LLC | Master Services Agreement | 09/01/21 | 150,803.50 |
| Strike, LLC | La Puerta Azul Rentals LLC | Commercial Lease | 03/01/20 | – |
| Strike, LLC | Labelleco Fab LLC | Master Service Agreement | 02/16/18 | – |
| Strike, LLC | Lance Rental Company | Rental Contract | 12/02/20 | 76,742.64 |
| Strike, LLC | LeeTranServices, Inc. | General Service Agreement | 06/07/21 | 7,150.35 |
| Strike, LLC | Linequest, LLC | Master Service Agreement | 02/19/18 | 16,450.00 |
| Strike, LLC | Lone Tree Services, LLC | Master Hauling Agreement | 06/12/19 | 6,577.16 |
| Strike, LLC | LRC Energy, LLC | Master Services Agreement | 11/14/17 | – |
| Strike, LLC | Lyondell Chemical Company | Master Field Services Contract | 02/17/10 | 92.01 |

| Debtor Counter Party | Counter Party | Title of Contract[2] | Effective Date | Cure Amount[1] |
|---|---|---|---|---|
| Strike, LLC | LyondellBasell/Equistar Chemical | PO 4403643683 | 06/03/19 | -- |
| Strike, LLC | M S Bendhow and Associates Professional Engineering Corporation | Master Service Agreement | 05/14/19 | 3,600.00 |
| Crossfire, LLC | Marco Inspection Services, LLC | Master Services Agreement | 09/28/18 | 5,367.50 |
| Delta Directional Drilling, LLC | MB Technical Services, Inc | Master Services Agreement | 08/01/18 | 33,993.75 |
| Strike, LLC | MBM Financial Interests LP | Lease Agreement #25522295 | 08/09/18 | -- |
| Strike, LLC | MBM Financial Interests LP | Lease Agreement #25516590 | 08/01/18 | -- |
| Strike, LLC | MBM Financial Interests LP | Lease Agreement #25503939 | 03/28/18 | -- |
| Strike, LLC | MBM Financial Interests LP | Lease Agreement #25504030 | 03/23/18 | -- |
| Strike, LLC | MBM Financial Interests LP | Lease Agreement #50104129 | 03/17/17 | -- |
| Strike, LLC | MBM Financial Interests LP | Lease Agreement #25360192 | 09/29/15 | -- |
| Strike, LLC | McNorton Dewatering, Inc | Master Service Agreement | 09/10/14 | 100,160.00 |
| Strike, LLC | Meister Industries, Inc. dba Longhorn Custom Coating Co. | Master Service Agreement | 12/04/15 | 393,094.52 |
| Strike, LLC | Merchants Automotive Group, Inc. | Master Lease Agreement | 10/07/11 | -- |
| Strike, LLC | Messner Contracting Group, LLC | Master Service Agreement | 01/12/21 | -- |
| Crossfire, LLC | Michaels Fence & Supply, Inc | Master Service Agreement | 12/15/20 | 31,530.00 |
| Strike, LLC | Microsoft | Volume Licensing | 12/18/18 | 10,469.91 |
| Strike, LLC | Milbar Hydro-Test, Inc. | Master Service Agreement | 06/27/17 | 325,341.00 |
| Crossfire, LLC | Mitchell Hopper Infrastructure LLC | Master Service Agreement | 04/04/19 | 28,722.60 |
| Crossfire, LLC | Mobile Mini Solutions | Rental Contract | 09/21/20 | 33,216.42 |
| Strike, LLC | Mo-Vac Environmental | Master Services Agreement | 05/12/15 | 8,384.00 |
| Crossfire, LLC | MPS Enterprises, Inc. dba Milford | Master Service Agreement | 02/18/20 | 638.68 |
| Strike, LLC | MRC Global (US), Inc. | Master Terms and Conditions of Purchase | 06/04/20 | 242,926.61 |
| Crossfire, LLC | Nash Trucking and Construction, Ltd. | Master Hauling Agreement | 07/02/18 | 2,651.43 |
| Strike, LLC | National Inspection Services, LLC | Master Service Agreement | 10/30/09 | 7,211.75 |
| Strike, LLC | National Union Fire Insurance Company of Pittsburg, PA(AIG) | Insurance Policy # SIHL YK066 | 12/01/21 | -- |
| Strike, LLC | Nextgen Security | Master Services Agreement | 08/16/19 | 53,253.31 |
| Strike, LLC | Nitrogen Services LLC | Master Services Agreement | 11/21/17 | 31,236.50 |
| Strike, LLC | Nu Way Real Estate, LLC | Commercial Lease | 07/15/21 | -- |
| Crossfire, LLC | NVI LLC | Master Services Agreement | 02/13/20 | 4,181.31 |
| Crossfire, LLC | Occidental Oil and Gas Corporation | Master Service Agreement | 07/31/11 | -- |
| Strike, LLC | Occidental Oil and Gas Corporation | Master Construction Services Agreement | 07/31/11 | -- |
| Strike, LLC | Occidental Petroleum Corporation | Master Services Agreement | 05/01/14 | -- |
| Strike, LLC | Occidental Petroleum Corporation | Master Services Agreement | 11/16/11 | -- |
| Strike, LLC | Occucare International | Agreement for Medical Services | 10/17/18 | 57,738.75 |
| Strike, LLC | Odessa Pumps and Equipment, Inc | Master Services Agreement | 06/08/21 | 4,404.37 |
| Crossfire, LLC | Omni Compressed Air, Ltd. | Master Services Agreement | 03/23/17 | 23,181.72 |
| Strike, LLC | ONEOK Partners Intermediate Limited Partnership | Master Service Agreement | 04/15/08 | 101.65 |
| Strike, LLC | Optimax Services & Supply, LLC | Master Service Agreement | 02/12/19 | 7,500.00 |
| Strike, LLC | Oracle America, Inc. | Master Agreement | 05/14/19 | 27,952.44 |
| Strike, LLC | Oracle America, Inc. | Ordering Document | 05/09/19 | -- |
| Strike, LLC | Outlaw Testing, LLC | Master Services Agreement | 07/20/18 | 5,375.00 |
| Strike, LLC | Oxy Midstream Strategic Development, LLC | Master Construction Services Agreement | 05/01/14 | -- |
| Strike, LLC | Oxy USA Inc. | Master Services Agreement | 04/27/20 | -- |
| Strike, LLC | Oxy USA Inc. | Master Services Agreement | 04/27/20 | -- |
| Strike, LLC | Oxy USA Inc. | Master Services Agreement | 09/06/16 | -- |
| Strike, LLC | Oxy USA Inc. | Master Services Agreement | 11/16/11 | -- |
| Strike, LLC | Paisano Lease Company, Inc. | Master Services Agreement | 12/13/19 | 14,325.00 |
| Strike, LLC | Pate Trucking Co., LLC | Master Services Agreement | 08/16/19 | 41,948.54 |
| Strike, LLC | Patriot Construction and Industrial LLC | Master Services Agreement | 11/01/19 | 288,097.33 |
| Strike, LLC | Peerless Dynamics LLC | Master Services Agreement | 10/10/19 | 22,000.00 |
| Strike, LLC | PetroCloud, LLC | Master Automated Monitoring Services Agreement | 04/16/19 | 7,697.63 |
| Strike, LLC | Petrolink USA, LLC | Master Services Agreement | 01/04/21 | 259,127.60 |
| Crossfire, LLC | Pinnergy, Ltd. | Master Services Agreement | 04/12/19 | 3,949.79 |
| Strike, LLC | Pioneer Natural Resources Company | Master Services Agreement | 02/19/16 | -- |
| Strike, LLC | Pioneer Natural Resources Pumping Services, LLC | Amended and Restated Master Service/Sales Agreement | 09/17/15 | -- |
| Strike, LLC | Pioneer Natural Resources USA, Inc. | Amended and Restated Master Service/Sales Agreement | 02/19/16 | 5,861.38 |
| Strike, LLC | Pioneer Water Management LLC | Amended and Restated Master Service/Sales Agreement | 09/17/15 | -- |
| Strike, LLC | Pipe Freezing Services, Inc | Master Service Agreement | 09/03/20 | 31,236.50 |
| Strike, LLC | Pipeline Controls & Service, Inc. | Master Services Agreement | 07/30/21 | 47,516.81 |
| Delta Directional Drilling, LLC | Plains All American Pipeline, L.P. | Amite County HDD PO | 05/26/21 | 2,754.00 |
| Delta Directional Drilling, LLC | Plains All American Pipeline, L.P. | 8" Steel HDD Agreement | 10/22/19 | -- |
| Delta Directional Drilling, LLC | Plains All American Pipeline, L.P. | Ferriday Louisiana Project Agreement | 06/26/19 | -- |
| Crossfire, LLC | Plains Marketing, L.P. | Major Service Contract | 06/20/14 | -- |
| Strike, LLC | PMP Directional LLC | Master Services Agreement | 05/13/21 | 373,643.47 |
| Strike, LLC | Port-A-John, Inc. | Master Services Agreement | 12/13/17 | 557.44 |
| Crossfire, LLC | Precision Crane & Transport LLC | Master Services Agreement | 11/08/21 | 20,075.00 |
| Delta Directional Drilling, LLC | Premier Truck Rental, LLC | Rental Contract | 04/01/20 | -- |
| Delta Directional Drilling, LLC | Premier Truck Rental, LLC | Master Rental Agreement | 08/26/19 | 16,700.80 |
| Crossfire, LLC | Principal Environmental, LLC | Master Service Agreement | 03/18/20 | 90,489.36 |
| Strike, LLC | Proactive Safety Solutions, LLC | Master Service Agreement | 07/07/20 | 39,600.00 |
| Strike, LLC | Proconex | PO J10000899 | 06/24/21 | -- |
| Strike, LLC | Proconex | PO J10000891 | 06/21/21 | -- |
| Strike, LLC | Proconex | PO J10000889 | 06/16/21 | -- |
| Strike, LLC | Proconex | PO J10000878 | 06/01/21 | -- |
| Strike, LLC | Proconex | PO J10000872 | 05/19/21 | -- |
| Strike, LLC | Proconex | PO J10000856 | 04/26/21 | -- |
| Strike, LLC | Proconex | PO J10000854 | 04/20/21 | -- |
| Strike, LLC | Proconex | PO J10000828 | 03/17/21 | -- |
| Strike, LLC | Proconex | PO J10000822 | 02/22/21 | -- |
| Strike, LLC | Proconex | PO J10000806 | 02/08/21 | -- |
| Strike, LLC | Proconex | PO J10000798 | 01/12/21 | -- |
| Strike, LLC | Proconex, Inc. | Purchase Order No J10001017 | 11/30/21 | -- |
| Delta Directional Drilling, LLC | Professional Fiber Works, LLC | Master Service Agreement | 06/07/19 | 80,062.50 |
| Strike, LLC | Professional Service Industries, Inc. | Master Services Agreement | 10/09/08 | 4,832.00 |
| Crossfire, LLC | Protégé Energy III LLC | Master Service Contract | 10/01/20 | -- |
| Strike, LLC | Quality Construction and Production LLC | Master Services Agreement | 03/13/20 | 33,368.00 |
| Strike, LLC | Quality Gate & Controls, LLC | Master Service Agreement | 08/01/18 | 15,484.51 |
| Delta Directional Drilling, LLC | R&C Wiring LLC | Master Services Agreement | 06/19/18 | 69,522.29 |
| Strike, LLC | Ram Tool & Supply Co., Inc. | Master Terms and Conditions | 04/17/20 | 1,481.23 |
| Crossfire, LLC | Rangely Trash Service, Inc. | Master Services Agreement | 12/10/18 | 1,856.00 |
| Strike, LLC | RCI Consultants, Inc. dba RCI Energy Group | Master Services Agreement | 01/13/21 | 8,809.85 |
| Crossfire, LLC | Reneck Consulting, LLC | Client Agreement | 11/15/19 | -- |
| Crossfire, LLC | Rental King, LLC | Rental Contract | 12/07/20 | 173,701.21 |
| Crossfire, LLC | Rental King, LLC | Rental Contract | 11/11/20 | -- |
| Crossfire, LLC | Rental King, LLC | Rental Contract | 10/21/20 | -- |
| Crossfire, LLC | Rental King, LLC | Rental Contract | 10/13/20 | -- |
| Crossfire, LLC | Rental King, LLC | Rental Contract | 09/28/20 | -- |
| Crossfire, LLC | Rental King, LLC | Rental Contract | 08/28/20 | -- |
| Crossfire, LLC | Rental King, LLC | Rental Contract | 08/21/20 | -- |
| Crossfire, LLC | Rental King, LLC | Rental Contract | 07/06/20 | -- |
| Strike, LLC | Republic Services National Accounts | Preferred Service Agreement | 03/01/18 | 28,299.72 |
| Strike, LLC | Resolute Compliance, LLC | Master Professional Services Agreement | 05/06/21 | 2,000.00 |
| Delta Directional Drilling, LLC | Riley Industrial Services, Inc. | Master Service Agreement | 02/25/14 | 2,154.75 |
| Delta Directional Drilling, LLC | RLW Construction LLC | Master Service Agreement | 08/20/21 | 45,650.00 |
| Delta Directional Drilling, LLC | Roanoke Telephone Company Inc. dba TEC | OSP Contruction Contract | 09/12/19 | -- |
| Strike, LLC | Robert Wiggins | Lease Agreement | 04/23/21 | -- |
| Strike, LLC | Rock Engineering & Testing | Master Services Agreement | 06/01/08 | 2,707.00 |
| Delta Directional Drilling, LLC | Rockin' B Environmental Services, Inc | Master Hauling Agreement | 04/17/19 | 605.00 |
| Delta Directional Drilling, LLC | Rockin E Construction, LLC | Master Services Agreement | 06/01/21 | 107,544.76 |
| Strike, LLC | Rock'N Seventy Seven Trucking LLC | Master Hauling Agreement | 12/13/18 | 4,500.00 |
| Delta Directional Drilling, LLC | Roderick Lyons dba T&R Directional Drilling | Master Hauling Agreement | 11/24/20 | 33,764.64 |
| Crossfire, LLC | Rooter Sewer Service Inc | Master Services Agreement | 03/19/20 | 138.92 |
| Crossfire, LLC | Rosenbaum Construction Co., Inc. | Master Services Agreement | 12/20/19 | 24,067.50 |
| Crossfire, LLC | Rosenbaum Construction Co., Inc. | Subcontractor Contract | 02/20/17 | -- |
| Crossfire, LLC | Royal Logistics Groups, LLC | Master Hauling Agreement | 10/21/21 | 27,952.95 |
| Strike, LLC | RWDY, Inc. | Subcontractor Agreement | 01/11/17 | 70,220.16 |
| Delta Directional Drilling, LLC | S&H Underground, LLC | Master Service Agreement | 11/20/20 | 50,338.80 |
| Delta Directional Drilling, LLC | S2W Contracting, LLC | Master Service Agreement | 09/05/17 | 168,045.50 |
| Strike, LLC | Sacramento Land Investments, LLC | Lease Agreement | 08/01/19 | -- |
| Strike, LLC | Securadyne Systems Intermediate LLC | Master Services Agreement | 03/16/21 | 19,096.60 |
| Strike, LLC | Select Safety Services LLC | Master Service Agreement | 11/06/20 | 151.47 |
| Strike, LLC | Sentinel Integrity Solutions Inc | Master Service Agreement | 10/27/17 | 8,761.30 |
| Strike, LLC | Sentry On-Site Security Corporation | Master Services Agreement | 09/13/20 | 14,143.95 |
| Crossfire, LLC | Serrano's Inc | Master Services Agreement | 07/17/19 | 2,892.96 |
| Strike, LLC | SiteWatch One | Master Services Agreement | 11/30/20 | 31,347.90 |
| Strike, LLC | Smart Materials Inc | Master Services Agreement | 08/26/15 | 33,531.79 |
| Strike, LLC | Smart Oilfield Services | Master Hauling Agreement | 07/15/15 | 44,875.00 |

| Debtor Counter Party | Counter Party | Title of Contract[2] | Effective Date | Cure Amount[3] |
|---|---|---|---|---|
| Strike, LLC | Smith Energy Services, Inc. | Master Services Agreement | 05/30/17 | 5,586.00 |
| Strike, LLC | Smith Equipment Services, LLC | Master Service Agreement | 09/05/18 | 26,844.80 |
| Delta Directional Drilling, LLC | Sorto Directional Boring, LLC | Master Services Agreement | 06/11/21 | 304,835.20 |
| Strike, LLC | South Texas Electric Cooperative, Inc. | General Terms and Conditions | 04/26/18 | 309.42 |
| Strike, LLC | South Texas Electric Cooperative, Inc. | General Terms and Conditions | 02/26/18 | – |
| Strike, LLC | South Texas Gateway Terminal LLC | Construction Agreement BPLSTR031820 - STGT E&I | 12/15/20 | – |
| Strike, LLC | South Texas Gateway Terminal LLC | Construction Agreement | 03/19/20 | – |
| Delta Directional Drilling, LLC | Southern Diversified Technologies, Inc. | Master Service Agreement | 07/27/18 | 2,566.58 |
| Strike, LLC | Southern Pipe & Supply Co., Inc. dba Southern Trucking | Master Hauling Agreement | 03/07/19 | 10,849.19 |
| Strike, LLC | Spectra Energy Transmission, LLC | Form Construction Agreement No. CW2231361 | 01/11/16 | – |
| Strike, LLC | Speed Field Services, LLC | Master Services Agreement | 09/28/21 | 56,290.33 |
| Strike, LLC | Sprint Waste Services LP | Master Service Agreement | 07/07/11 | 59,646.59 |
| Delta Directional Drilling, LLC | SS Communications and Fiber Optic LLC | Master Services Agreement | 02/19/20 | 115,869.02 |
| Strike, LLC | Starr Indemnity & Liability Company | Insurance Policy #1000031218211 | 12/01/21 | – |
| Strike, LLC | Steel Painters, Inc. | Master Service Agreement | 06/08/11 | 66,898.38 |
| Crossfire, LLC | Summit Midstream Partners, LP | Master Services Agreement | 04/14/14 | – |
| Crossfire, LLC | Summit Midstream Partners, LP | Master Services Agreement | 04/22/12 | – |
| Strike, LLC | Summit Midstream Permian, LLC | Master Service Agreement | 03/17/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12126 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12130 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12143 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12112 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement PO#182691331 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12124 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12123 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12137 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12128 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12142 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12133 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12136 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12129 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12141 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12131 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12138 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12127 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12135 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12122 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12134 | 12/10/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12119 | 12/08/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12116 | 12/03/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12110 | 12/01/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12113 | 12/01/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12111 | 12/01/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12107 | 11/21/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12057 | 10/14/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12058 | 10/13/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12021 | 09/23/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #12015 | 09/23/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #11859 | 07/22/20 | – |
| Strike, LLC | Sunbelt Equipment Marketing, Inc. | Equipment Rental Agreement #11860 | 05/22/20 | 52,667.12 |
| Strike, LLC | Sunbelt Rentals Inc. | Master Terms and Conditions | 04/15/21 | 251,192.32 |
| Strike, LLC | Sunbelt Tractor & Equipment Company | Equipment Rental Agreement | 03/27/20 | 35,753.16 |
| Strike, LLC | Sunland Capital, LLC DBA Delta Daylighting, LLC | Master Service Agreement | 06/16/17 | 37,302.30 |
| Strike, LLC | Superior Hydrovac Solutions, LLC | Master Service Agreement | 09/14/15 | 16,952.82 |
| Strike, LLC | Surveying and Mapping Inc | Master Services Agreement | 01/04/18 | 11,871.25 |
| Strike, LLC | Syncfusion, Inc. | Master Software License Agreement | 06/08/20 | – |
| Strike, LLC | T. Baker Smith, LLC | Master Service Agreement | 09/24/19 | – |
| Strike, LLC | T. Baker Smith, LLC | Professional Services Agreement | 11/13/15 | – |
| Strike, LLC | Talkdesk, Inc. | Master Subscription Agreement | 06/02/20 | 419.94 |
| Strike, LLC | Targa Resources LLC | Master Engineering, Procurement and Construction Agreement | 07/03/19 | – |
| Crossfire, LLC | Team Industrial Services, Inc. | Master Service Agreement | 04/03/18 | – |
| Delta Directional Drilling, LLC | TEC | Master Services Agreement | 05/19/18 | – |
| Strike, LLC | Tech Con Trenching Inc. | Master Service Agreement | 01/13/20 | 275,628.01 |
| Strike, LLC | TechCorr USA, LLC | Master Services Agreement | 07/10/08 | 136,262.15 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP East MSCC Columbus | 12/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Corinth | 12/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Columbus | 12/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of HS Corinth | 12/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Div of Medicaid Columbu | 12/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Div of Medicaid Corinth | 12/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Collinsville | 12/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP NECC Corinth | 12/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP North MS Reg Center | 12/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP City of Richland | 12/08/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP City of Richland | 12/08/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Yazoo | 12/08/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Chawla Ventures Greenville | 12/07/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Jackson State University | 12/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Kemper Co Ext Office Dekal | 12/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Columbus | 12/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of ES Jackson | 12/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Columbus | 12/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Rehab Eupora | 12/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Div of Medicaid Starkvi | 12/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Vet Medicine Board Star | 12/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Wireless Comm Jackson | 12/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Tippah Co Sheriff Ripley | 12/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Lee Co Schools Tupelo | 12/05/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Indianola Hampton Inn | 12/03/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Child PA Mayersville | 12/02/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Issaquena Co BOS Mayersvil | 12/01/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Rolling | 12/01/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Town of Taylorsville | 12/01/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Div of Medicaid Jackson | 11/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI MS Methodist Senior Servic | 11/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Louisville | 11/21/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of RS Louisville | 11/21/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP North MS Reg Center Pontot | 11/21/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Louisville | 11/21/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS  VA Based Kilmichael | 11/20/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Koch Foods Morton 278 Herr | 11/20/21 | 16.80 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Chase Bays Trussville | 11/20/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP East MSCC Scooba | 11/20/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Ripley | 11/20/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Mendenhall | 11/20/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Choctaw Tribal Schools Phi | 11/16/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Probate Office Jasper | 11/15/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Cru Fine WineSpirits Gree | 11/15/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI AllSafe Self Storage Hatti | 11/15/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of HS Pontotoc | 11/14/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI The First Starkville | 11/13/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Eupora | 11/12/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Fiber Relocate Eupora | 11/11/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Yazoo | 11/11/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Child PA New Albany | 11/11/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | MS2178 Cell Site Conehatta | 11/11/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Jackson State University | 11/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of EDU Columbus | 11/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Noxubee Co SD Macon | 11/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Philadel | 11/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MSU Ext Office Columbus | 11/08/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Bovina Elem School | 11/07/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDAH Jackson | 11/07/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Div of Medicaid Philade | 11/07/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Tupelo Public Schools | 11/07/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Southern Company Jasper | 11/07/21 | 470.77 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Winona | 11/06/21 | – |

| Debtor Counter Party | Counter Party | Title of Contract[2] | Effective Date | Cure Amount[1] |
|---|---|---|---|---|
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Quitman | 11/06/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Quitman | 11/06/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Carthage | 11/04/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS0302 Cell Site | 11/04/21 | 208.25 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP City of Pontotoc | 11/04/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Boonville Train Museum | 11/03/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Jackson | 11/03/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Starkville | 11/03/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Dekalb | 11/03/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Booneville Gas and Water | 11/02/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP National Park Service Tupe | 11/02/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Dept Employment Security L | 11/02/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Pearl | 11/02/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Child PA Amory | 11/02/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Child PA Meridian | 11/02/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Okolona | 11/02/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of RS Amory | 11/02/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of ES Forest | 11/01/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Jasper Auto Sales 2708 | 11/01/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Clinton | 11/01/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Ridgelan | 11/01/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Jasper Auto Sales 3910 | 11/01/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP East MS State Hospital Mer | 11/01/21 | 1,600.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Conehatta Elementary Schoo | 10/31/21 | 2,604.15 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Div of Medicaid Vicksbu | 10/31/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Lowndes Co SD Columbus | 10/31/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS D. A. Vicksburg | 10/31/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Port Gib | 10/31/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of HS Meridian | 10/31/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP South Delta SD Anguilla | 10/31/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Booneville Child Protectiv | 10/31/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Booneville PD | 10/31/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of PS Meridian | 10/31/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Meridian | 10/31/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MUW Tupelo | 10/31/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of HS Starkville | 10/31/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Lauderdale Co BOS | 10/29/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Pelham Metro Fiber Lateral Agreement | 10/28/21 | 123.05 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Booneville City Park | 10/28/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Oktibbeha Co Office Starkv | 10/28/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Rev. Meridian | 10/28/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Aberdeen School District | 10/27/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP City of Richland | 10/27/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Jasper Auto Sales 3201 | 10/26/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP PRV Water District Brandon | 10/26/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Vicksburg | 10/26/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP City of Louisville | 10/25/21 | 1,059.42 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Winona | 10/24/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Eupora | 10/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Columbus | 10/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Iuka | 10/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDES Iuka | 10/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Iuka | 10/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MSU for Womens Diversity C | 10/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Iuka | 10/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Columbus Municipal School | 10/20/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Webster MSU Ext Eupora | 10/20/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Hampton Inn Yazoo City | 10/18/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS VA Board Memo | 10/15/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Magnolia Regional Health C | 10/15/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Dept of Health Aberdeen | 10/15/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of AG Starkville | 10/15/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Revenue Madison | 10/15/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Wireless Commission Pea | 10/15/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Prentiss Co School Distric | 10/15/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Pearl | 10/15/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Booneville Human Services | 10/14/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Kosciusk | 10/14/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Carthage | 10/14/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Tishomingo County Schools | 10/14/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Ripley | 10/13/21 | 2,467.76 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP East MSCC West Point | 10/12/21 | 175.11 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Professional Marketing Sta | 10/12/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Dekalb | 10/11/21 | 1,016.50 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP West Amory Elementary Scho | 10/11/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Amory | 10/11/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Philadelphia | 10/11/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Splicing North East | 10/11/21 | 2,122.37 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Carthage Police Dept | 10/11/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP ECCC Louisville | 10/11/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Calhoun City | 10/10/21 | 90.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Forest | 10/10/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Philadelphia | 10/09/21 | 1,729.07 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Greenlee Attendance Center | 10/08/21 | 205.04 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP North MS Reg. Center Kilmi | 10/08/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Carthage | 10/08/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Veterans Affairs Board | 10/08/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Prentiss Co BOS Booneville | 10/07/21 | 108.07 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP City of Booneville | 10/05/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Canton | 10/05/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Mendenhall | 10/04/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDHS Houston | 10/04/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Child PA Houston | 10/04/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Houston | 10/04/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Booneville City Hall | 10/01/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of ITS Hazlehurst | 10/01/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Fayette | 10/01/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of HS Hazlehurst | 10/01/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Hazlehur | 10/01/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Splicing Central | 10/01/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDWFP Philadelphia | 09/30/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Alcorn St Univ Vicksburg | 09/30/21 | 2,130.32 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Boswell Regional Center Pe | 09/30/21 | 1,465.87 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDHS Iuka | 09/30/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT New Albany | 09/30/21 | 1,611.06 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Veterans Affairs Board Kos | 09/30/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Public Safety J | 09/30/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of ITS Jackson | 09/30/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Jackson 60255075 | 09/30/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Child Protective Services | 09/30/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Jackson 62768001 | 09/28/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 4 MS0148 Cell Site | 09/26/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of PS Richland | 09/26/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP ECCC Philadelphia | 09/24/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Jackson | 09/24/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Booneville FD | 09/23/21 | 1,048.60 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Div of Medicaid Meridia | 09/22/21 | 2,265.21 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Booneville | 09/21/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Hazelhurst | 09/20/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Neshoba Co BOS Philadelphi | 09/20/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP City of Starkville | 09/19/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Tupelo | 09/19/21 | 630.84 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Toomsuba | 09/19/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT West Point | 09/18/21 | 252.50 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Philadelphia | 09/18/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Public Safety R | 09/17/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Board of Medical Licensure | 09/17/21 | -- |

| Debtor Counter Party | Counter Party | Title of Contract[2] | Effective Date | Cure Amount[3] |
|---|---|---|---|---|
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Houston | 09/17/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Dept of Employment Securit | 09/17/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Dept of Rehab Philadelphia | 09/16/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP North MS State Hospital Tu | 09/16/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Booneville | 09/16/21 | 697.64 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Macon 62700001 Maste | 09/16/21 | 278.20 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP City of Columbus | 09/16/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Forest | 09/16/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Tupelo | 09/16/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Rehab Services | 09/15/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP City of Forest Police Dept | 09/14/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Public Safety V | 09/13/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Canton | 09/12/21 | 32.10 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC New Albany | 09/11/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Clay County Sheriffs Offic | 09/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Clay County E911 | 09/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC West Point | 09/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Public Safety W | 09/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Lowndes School District | 09/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG West Point | 09/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Vicksburg | 09/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health New Alba | 09/09/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Boswell Regional Center 19 | 09/07/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Pearl | 09/07/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Ridgeland Rec Center | 09/07/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Boswell Regional Center Mo | 09/07/21 | 82.89 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP City of Mendenhall | 09/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Aberdeen | 09/06/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Boswell Regional Center Me | 09/03/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Tippah Career and Technolo | 09/03/21 | 1,070.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Div of Medicaid Brandon | 09/02/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Winona | 09/02/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Lowndes County SD Columbus | 09/02/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Public Safety P | 09/02/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP ERate NE | 09/01/21 | 1,842.12 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MSU West Point | 09/01/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Canton Elementary School | 09/01/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Houston | 08/31/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Morton | 08/31/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDRS Meridian | 08/31/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of EDU Forest | 08/31/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Army NG Morton | 08/31/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Blue Mountain High School | 08/31/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Morton | 08/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Central MS Residential Cen | 08/30/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Yazoo | 08/27/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Public Safety N | 08/27/21 | 1,092.84 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Corrections Vic | 08/26/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Dept of Corrections Canton | 08/25/21 | 64.20 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Public Safety C | 08/23/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Warren Central High School | 08/19/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Jackson | 08/19/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Iuka | 08/16/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Human Services | 08/09/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Pearl | 08/09/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Hattiesburg Clinic Petal | 08/09/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of ITS Magee | 08/05/21 | 80.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Boswell Regional Center Ma | 08/03/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Child Protection Service M | 07/31/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Nettleton School District | 07/31/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP New Albany Connector | 07/30/21 | 1,380.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Warrenton Elem School Vick | 07/29/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Pine Grove School Ripley | 07/28/21 | 2,297.26 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of HS Raymond | 07/28/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Meridian | 07/28/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Wireless Comm New Alban | 07/27/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Monroe County Career Tech | 07/27/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP City of Richland | 07/27/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Nance McNeely Library Myrt | 07/22/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Corinth | 07/21/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Brandon | 07/21/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Amory | 07/20/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Health Raleigh | 07/17/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Long Creek Elementary Scho | 07/16/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Yazoo Co Board of Supervis | 07/16/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Human Services | 07/13/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Newton | 07/05/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Canton School of Arts and | 06/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Talk south Hattiesburg | 06/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Cspire Maintenance Mississippi | 06/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP West Lowndes Elementary Sc | 06/29/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Area 20 Corinth East Connector | 06/29/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Walt Wright Realty Lucedal | 06/29/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Oxford Auto Care | 06/23/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Sacred Heart Mission Camde | 06/23/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP East Amory Elementary Scho | 06/19/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Macon | 06/17/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI 16th Section MB Church Sta | 06/16/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI 28th Ave Baptist Church Ha | 06/16/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Town of Pelahatchie | 06/11/21 | 800.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Hemline Oxford | 06/08/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Port Gibson | 06/03/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Cardiology Associates Mobi | 05/31/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Singing River Electric | 05/24/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Twin Motors Columbus | 05/20/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Pontotoc | 05/14/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Mobile Metro Section 5 | 05/10/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | 2021 Cspire MS Damages | 04/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI MW Industrial Services Inc | 04/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Focus MD Mobile | 04/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Mobile Metro Section 4 | 04/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Mobile Metro Section 3 | 04/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Franklin Telephone Amory | 04/30/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Crane Title Mobile | 04/28/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Hattiesburg Clinic 2313 La | 04/27/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Zeigler Rd Fiber move | 04/23/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Hinds Co Sheriff Office | 04/19/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Engineered Lumber Partners | 04/12/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI D'Iberville Promenade | 04/12/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Clinton Endodontics | 04/12/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Rick Underwood Furniture S | 04/08/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Adranos Inc McHenry | 04/09/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Grit Training LLC Flowood | 04/08/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Sprint Ridgeland | 03/31/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Hinds Community College Ra | 03/31/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Child Protective Agency | 03/31/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Nitel Inc Starkville | 03/27/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Paul Davis Restorations Fl | 03/26/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | B'ham-Meridian Construction | 03/17/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Birmingham to Meridian | 03/17/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Child Protective Agency | 03/17/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Toomsuba(2nd Circuit) | 03/17/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Eupora | 03/15/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Human Services | 03/15/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI John McMurray Starkville | 03/15/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Gregory's on the Bypass Lo | 03/15/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP State Contract Central | 03/11/21 | 5,080.00 |

| Debtor Counter Party | Counter Party | Title of Contract[2] | Effective Date | Cure Amount[1] |
|---|---|---|---|---|
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MSU for Women Columbus | 03/11/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Public Safety G | 03/10/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Hinds Co Sheriff Office | 03/10/21 | 100.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Rolling Fork | 03/10/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Rent All of Laurel | 03/10/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP ERate Central | 03/09/21 | 1,219.28 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI MSTC LLC Laurel | 03/08/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MSU Canton | 03/08/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Walnut Grove | 03/08/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Forest | 03/08/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Hattiesburg Clinic 104 | 03/08/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Laurel Liquor and Wine | 03/08/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Elm Lake Golf Course Colum | 03/05/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Thompsons Welding Hamilton | 03/05/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | FTTH Acadian Village Tupelo | 03/05/21 | 204.69 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Scialdone Law Firm Gulfpor | 03/04/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Communicare SA Outpatient | 03/04/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Hattiesburg Clinic 50 Offi | 03/03/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Starkville Surgery Center | 03/01/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | FTTH Stonehenge Mooreville | 02/27/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Bradford O'Keefe Biloxi | 02/26/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Bolton | 02/25/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI MS Gulf Coast CC Biloxi | 02/24/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Right Track Medical Biloxi | 02/24/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Carr Riggs and Ingram LLC | 02/24/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Mi Casita Laurel | 02/24/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Biloxi Medical Clinic | 02/23/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Keesler FCU Jackson | 02/23/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Madison | 02/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Brunini Grantham Biloxi | 02/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI WDAM Moselle | 02/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Shaggy's Biloxi | 02/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Verizon BNS Meridian | 02/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Hwy 80 Bridge Replacement | 02/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI McFadden Engineering Mobil | 02/20/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI New Process Steel Columbus | 02/16/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Replace HH Sandersville | 02/12/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Alcorn Co E911 Corinth | 02/11/21 | 900.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Child Protective Agency | 02/11/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Laurel Mercantile (Laurel) | 02/11/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | FTTH Autumn Hills Tupelo | 02/10/21 | 192.54 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Bulldog Way MSU | 02/10/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Subway 600 Columbus | 02/09/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Raymonds Auto Sales LLC St | 02/09/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Independent Healthcare Mgm | 02/08/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Community Counseling Servi | 02/05/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | FTTH Tupelo North Ridge | 02/04/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Car Care Clinic Ridgeland | 02/04/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Jackson | 02/02/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Winona | 02/01/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Chas N Clark Ass. LTD Laurel | 02/01/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Starkville Surgery Center | 01/31/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Aberdeen | 01/29/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Shelter Insurance Louisvil | 01/29/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Right Track Medical Columb | 01/28/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Community Bank Amory | 01/28/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI N. MS Medical 373 West Poi | 01/26/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI N. MS Medical 977 West Poi | 01/26/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Franks Franks Wilemon Tupe | 01/26/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Town of Pelahatchie | 01/25/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI MS Eye Consultants Oxford | 01/25/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Kelly Law Office Brandon | 01/25/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Castlewoods Country Club Brand Agreement | 01/22/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | FTTH Meadow Lake Park of Tuple | 01/21/21 | 554.01 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Subway Brandon | 01/21/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Community Bank Sandersvill | 01/21/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Ronnie Harrison D.D.S. Luc | 01/21/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Los Encinos Eupora | 01/12/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Covington County Hospital | 01/12/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Community Bank Raleigh | 01/12/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Adaton Baptist Church Star | 01/11/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Coldwater Pharmacy | 01/08/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI City of Ridgeland Fiber Pr | 01/05/21 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Garan Manufacturing Starkv | 12/21/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Tupelo FTTH Lake Circle | 12/11/20 | 325.62 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | HW Byers Attendance Center Hol | 12/04/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Mid-South Industry Laurel | 12/01/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Tupelo FTTH Lakefield Woodside | 11/18/20 | 401.79 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI The Citizens Bank Philadel | 10/22/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI NW Street Jackson Revised | 10/13/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | FTTH Tupelo Country Wood Cove | 10/13/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | FTTH Charleston Gardens Of Tup | 10/05/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 2 Metro Jackson | 09/30/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 4 Lauderdale | 09/29/20 | 136.12 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | FTTH Southron of Tupelo | 09/29/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Hardy Street Bridge Move | 09/22/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Poplar Springs Baptist Mer | 08/31/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Project RFP5000 SDMS Contract | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 11 Carthage to WG | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 12 Durant to Kosciusk | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 14 Scooba to Dekalb | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 19 Iuka | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 21 Ripley to Ashland | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 17 | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 16 Monroe County | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 18 Prentiss | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 15 Metro Columbus | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 32 | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Hatley Attendance Center A | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Louisville High School | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Carthage High School | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP South Park Elementary | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Dana Rd Elementary School | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Vicksburg Warren Jr. Schoo | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Houston School District Of | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Houston Upper Elementary | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Monroe County Sheriff Dept | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Kosciusko | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Bentonia Gibbs Elementary | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Dept of Public Safety M | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Brooksville Library | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Evon Ford Library Taylorsv | 08/24/20 | 0.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Dixie Library Sherman | 08/24/20 | 1,513.50 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Hazlehurst | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Childhood Learning Center | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Tippah Career and Tech Cen | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Secretary of State Jack | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Kosciusko School District | 08/24/20 | 338.10 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Jackson 60255-078 | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Vicksburg | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Webster County 911 Mathist | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MWFP Louisville | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Army NG Jackson | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS VA Board Jackson | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS North Reg. Center Colum | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Jackson | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOC Dekalb | 08/24/20 | -- |

| Debtor Counter Party | Counter Party | Title of Contract[2] | Effective Date | Cure Amount[3] |
|---|---|---|---|---|
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Town of Taylorsville | 08/24/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Raymond/Utica/Vicksburg | 08/14/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Area 21 DOT Cotton Gin Rd | 08/14/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Lawndale Elementary School | 08/14/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Wren Public Library Aberde | 08/14/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Sebastopol Library | 08/14/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Stonewall Library | 08/14/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS Board of Public Account | 08/14/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Clarke County EMA Quitman | 07/31/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI The Citizens Bank Collinsv | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI FL Crane & Sons Florence | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Best Western Inn Richland | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Tronox Inc Hamilton | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Mobile Community Action In | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI East Central Comm. College | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Hattiesburg Clinic 1527 La | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Cooper Family Medical Pasc | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MS National Guard 144 Mili | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Bank of Commerce Oxford | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Twin Motors West Point | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI McFadden Engineering Mobil | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Telesouth Starkville | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Pinelake Church Starkville | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Tractor Supply Waynesboro | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Bank of Commerce Starkvill | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Tecumseh Meridian | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Kelli's Cakes | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI McLaurin & Co Ridgeland | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI City Home Center Laurel | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Wood and Carlton Tupelo | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Schneider Psychology Merid | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Oxford University Bank | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI North MS Medical Center Tu | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Ideal Truck Service Mobile | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Verizon Business Tupelo | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Monroe Regional Hospital A | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Wheats Building Supply Pop | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI Ichiban McComb | 07/23/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | SBI First Financial Group Mobi | 06/22/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | The Meridian Star Meridian | 05/20/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | DS Cancer Meridian | 03/31/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Columbus FTTH Elm Lake | 03/19/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Columbus FTTH Bent Tree | 03/02/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Ironwood FTTH | 02/13/20 | -- |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. dba C Spire | Construction Agreement | 02/24/21 | -- |
| Crossfire, LLC | Terror Services, Inc. | Master Services Agreement | 07/28/20 | 39,407.50 |
| Strike, LLC | Texas Gamma Ray, Inc. | Master Service Agreement | 07/16/20 | 3,230.00 |
| Crossfire, LLC | Texas Lobo Trucking LLC | Master Service Agreement | 01/10/20 | 1,775.50 |
| Strike, LLC | TGW Industries, Inc. | Master Services Agreement | 02/23/21 | 1,600.00 |
| Strike, LLC | The Trenton Corporation | Master Service Agreement | 03/18/19 | 29,530.19 |
| Crossfire, LLC | Three Star Rentals, LLC | Lease Agreement | 02/15/17 | -- |
| Strike, LLC | Tiger Rentals dba Tiger Safety | Master Service Agreement | 06/05/17 | 61,466.85 |
| Crossfire, LLC | TIP Excise, LLC | Service Agreement | 12/21/20 | 37,752.69 |
| Strike, LLC | TNT Crane & Rigging, Inc | Master Services Agreement | 04/08/20 | 16,198.11 |
| Strike, LLC | Tolunay-Wong Engineers, Inc | Master Service Agreement | 10/14/20 | 18,965.63 |
| Strike, LLC | Torcsill Foundations Inc. | Master Service Agreement | 02/11/20 | 7,919.88 |
| Crossfire, LLC | Toro Complete Services, Inc. | Master Services Agreement | 02/08/19 | 142,094.10 |
| Strike, LLC | TransCanada USA Operations Inc. | Preferred Master Construction Services Agreement | 06/30/16 | -- |
| Strike, LLC | TransCanada USA Operations Inc. | Master Construction and Maintenance Services Agreement | 02/05/13 | -- |
| Crossfire, LLC | Trex Hydro Excavating, Inc. | Master Service Agreement | 08/14/19 | 15,046.25 |
| Strike, LLC | Tridder Industrial, LLC | Master Hauling Agreement | 08/26/21 | 11,886.74 |
| Crossfire, LLC | Triple J Well Service, Inc | Master Service Agreement | 11/12/19 | 690.63 |
| Crossfire, LLC | Triple S Trucking Co., Inc. | Master Hauling Agreement | 06/11/20 | 6,478.23 |
| Crossfire, LLC | Triple T's Linings, LLC | Master Services Agreement | 03/07/17 | 3,537.65 |
| Crossfire, LLC | Tri-State Vacuum and Rental, LLC | Master Services Agreement | 10/30/20 | 26,777.47 |
| Crossfire, LLC | Trotter Construction, Inc. | Subcontractor Contract | 03/08/17 | -- |
| Crossfire, LLC | Trotter Construction, Inc. | Master Services Agreement | 03/07/17 | 65,420.40 |
| Strike, LLC | TS Pipeline Services, LLC | Master Service Agreement | 06/10/19 | 191,994.00 |
| Strike Capital, LLC | U.S. Specialty Insurance Company | Insurance Policy #U720-85764 | 08/30/20 | -- |
| Crossfire, LLC | Ultrasonic Guided Wave, LLC | Master Service Agreement | 03/21/17 | 9,028.14 |
| Crossfire, LLC | United Pipeline Systems, Inc | Project Agreement | 10/20/21 | 81,519.50 |
| Strike, LLC | Universal Ensco, Inc. | Subcontract | 02/13/20 | 11,625.73 |
| Strike, LLC | Universal Land Clearing, LLC | Master Services Agreement | 05/03/21 | 67,379.00 |
| Crossfire, LLC | Utah Gas Corp. | Master Services Agreement | 05/05/17 | -- |
| Strike, LLC | VacuWorx Global, LLC | Rental Contract | 11/11/20 | -- |
| Strike, LLC | VacuWorx Global, LLC | Rental Contract | 11/11/20 | 9,985.99 |
| Strike, LLC | Valero Energy Corporation | Master Services Agreement | 06/15/07 | -- |
| Strike, LLC | Valero Energy Corporation | Master Services Agreement | 01/25/06 | -- |
| Strike, LLC | Valero Logistics Operations, L.P. | Master Work Agreement | 01/25/06 | -- |
| Strike, LLC | Valero Terminalling and Distribution Company | Master Work Agreement | 03/13/08 | -- |
| Strike, LLC | Valero Terminalling and Distribution Company | Master Work Agreement | 06/15/07 | -- |
| Strike, LLC | Value Industrial ER Services, LLC | Master Service Agreement | 10/05/17 | 167,685.11 |
| Delta Directional Drilling, LLC | Velox, LLC | Master Service Agreement | 05/14/20 | 528,632.98 |
| Strike, LLC | Verizon Wireless | Major Account Agreement | 07/16/19 | 83,045.45 |
| Delta Directional Drilling, LLC | Vermeer Midsouth Inc. | Equipment Rental Agreement | 08/12/20 | -- |
| Delta Directional Drilling, LLC | Vermeer Midsouth Inc. | Equipment Rental Agreement | 06/10/20 | -- |
| Delta Directional Drilling, LLC | Vermeer Midsouth Inc. | Equipment Rental Agreement | 05/01/20 | -- |
| Delta Directional Drilling, LLC | Vermeer Midsouth Inc. | Equipment Rental Agreement #A5348/426367 | 04/02/20 | -- |
| Delta Directional Drilling, LLC | Vermeer Midsouth Inc. | Equipment Rental Agreement #A5348/426366 | 04/02/20 | 245,024.15 |
| Delta Directional Drilling, LLC | Vermeer Midsouth Inc. | Equipment Rental Agreement | 04/01/20 | -- |
| Delta Directional Drilling, LLC | Vermeer Midsouth Inc. | Equipment Rental Agreement | 04/01/20 | -- |
| Delta Directional Drilling, LLC | Vermeer Midsouth Inc. | Equipment Rental Agreement #VERMO504 | 04/01/20 | -- |
| Delta Directional Drilling, LLC | Vermeer Midsouth Inc. | Equipment Rental Agreement | 04/01/20 | -- |
| Delta Directional Drilling, LLC | Vermeer Midsouth Inc. | Equipment Rental Agreement | 07/31/19 | -- |
| Strike, LLC | Versa Integrity Group, Inc. | Master Service Agreement | 11/19/20 | 4,055.70 |
| Crossfire, LLC | Warrior Technologies LLC | Master Services Agreement | 05/01/19 | 41,629.46 |
| Strike, LLC | Waste Management National Services, Inc. (NM) | Industrial Waste & Disposal Services Agreement | 05/01/18 | 55.00 |
| Strike, LLC | Westchester Fire Insurance Company | Insurance Policy #G71206038004 | 12/01/21 | -- |
| Strike, LLC | Westchester Fire Insurance Company | Insurance Policy #G7357268A001 | 08/21/21 | -- |
| Strike, LLC | Westchester Fire Insurance Company | Insurance Policy #G73599246001 | 08/15/21 | -- |
| Strike, LLC | Westchester Fire Insurance Company | Insurance Policy #G73562600001 | 07/12/21 | -- |
| Strike, LLC | Westchester Fire Insurance Company | Insurance Policy #G28314279001 | 06/01/21 | -- |
| Strike, LLC | Westchester Fire Insurance Company | Insurance Policy #G28248155001 | 05/05/21 | -- |
| Strike, LLC | Westchester Fire Insurance Company | Insurance Policy #G28248234001 | 04/21/21 | -- |
| Strike, LLC | Westchester Fire Insurance Company | Insurance Policy #G28248076001 | 04/07/21 | -- |
| Strike, LLC | Westchester Fire Insurance Company | Insurance Policy #G28309621001 | 02/12/21 | -- |
| Strike, LLC | Westchester Fire Insurance Company | Insurance Policy #G28316823001 | 12/15/20 | -- |
| Strike, LLC | Western Industrial, Inc | Master Services Agreement | 10/02/14 | 45,684.32 |
| Crossfire, LLC | Western Midstream Operating, LP | Master Service Agreement | 07/23/20 | -- |
| Crossfire, LLC | Williams Scotsman, Inc. | Equipment Rental Agreement | 11/19/20 | 24,859.44 |
| Strike, LLC | Williams Scotsman, Inc. | Equipment Rental Agreement | 08/04/20 | 14,089.60 |
| Strike, LLC | Worldwide Machinery, Inc. | Equipment Rental Agreement | 08/18/20 | -- |
| Crossfire, LLC | Worldwide Rental Services | Equipment Rental Agreement | 08/21/20 | -- |
| Strike, LLC | WTB, LLC dba West Texas Boring Company | Master Service Agreement | 09/11/15 | 227,220.00 |
| Crossfire, LLC | XTO Energy Inc. | Master Service Agreement | 04/22/20 | -- |
| Strike, LLC | Zurich American Ins. Co. | Insurance Policy #GTU 5466466 | 12/01/21 | -- |

**<u>Exhibit B</u>**

(1) In accordance with the Sale Order and Bidding Procedures Order, the Debtors may file supplemental notices to add Assigned Contracts not included on this schedule, remove Assigned Contracts included on this schedule, or revise the Cure Amounts for Assigned Contracts included on this schedule.
(2) Certain cure amounts listed for contracts with the Debtors' customers are on account of payables owed to third party subcontractors, vendors, and/or suppliers associated with the applicable customer contract and may be paid directly to such third party rather than the customer counterparty listed here.
(3) All agreements are as amended, if applicable.

| Debtor Counter Party | Counter Party | Title of Contract[3] | Effective Date | Cure Amount[2] |
|---|---|---|---|---|
| Strike, LLC | Acadian Gas Pipeline System | Engineering, Procurement and Construction Contract | 12/07/20 | 91,357.08 |
| Strike, LLC | Access MLP Operating, LLC (Williams) | Master Service Agreement | 07/08/13 | – |
| Strike, LLC | ARI Fleet LT | Lease Agreement | 08/20/19 | – |
| Strike, LLC | Automotive Rentals, Inc. | Lease Agreement | 08/20/19 | – |
| Strike, LLC | Axis Industrial Services, LLC | Master Service Agreement | 12/10/13 | 400,000.00 |
| Strike, LLC | B.C. Henderson Construction, Inc. | Master Service Agreement | 10/14/20 | 400,000.00 |
| Strike, LLC | Bayou Technical Services, LP | Master Service Agreement | 10/14/20 | – |
| Strike, LLC | Black Gold Energy Services LLC | Master Service Agreement | 03/17/21 | 180,000.00 |
| Delta Directional Drilling, LLC | Blaylock HDD, Inc | Master Service Agreement | 09/30/19 | 224,946.00 |
| Crossfire, LLC | BP America Production Co. | Master Agreement for Provision of Construction Services | 02/05/14 | 5,819.40 |
| Strike, LLC | Buckeye Partners, L.P. | Construction Agreement | 01/14/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-218711 | 06/25/21 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212084 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212088 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212083 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212087 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212077 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212076 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212091 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212093 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212081 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212072 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212082 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212095 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212075 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212097 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212089 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212073 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212074 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212092 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212094 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212078 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-212085 | 11/19/20 | – |
| Strike, LLC | Buckeye Partners, LP | Service/Construction Contract Order C1-211474 | 10/29/20 | – |
| Strike, LLC | Buckeye Terminals, LLC | Notice of Award | 06/30/21 | 95.87 |
| Strike, LLC | Buckeye Terminals, LLC | Notice of Award | 06/22/21 | 2,378.91 |
| Strike, LLC | Buckeye Terminals, LLC | Notice of Award to Pickett Systems - PO Agreement | 06/10/21 | 1,011,185.64 |
| Strike, LLC | Buckeye Terminals, LLC | Notice of Award | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217620 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217589 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217596 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217603 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217619 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217625 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217600 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217623 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217598 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217622 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217621 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217599 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217614 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217601 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217594 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217626 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217602 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217612 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217611 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217595 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217624 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217613 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - N/A | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219261 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217608 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217591 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217259 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217259 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219254 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217590 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217251 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219252 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219258 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219248 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219266 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219250 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217606 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219249 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217607 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217267 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217264 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217592 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217265 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217609 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217593 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217610 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217597 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217263 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219262 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217253 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-217257 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219336 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219269 | 04/21/21 | 2,134.26 |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219255 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219256 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219340 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219255 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219401 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219268 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Construction Agreement - PO C1-219779 | 04/21/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Notice of Award | 03/22/21 | – |
| Strike, LLC | Buckeye Terminals, LLC | Notice of Award | 03/03/21 | – |
| Crossfire, LLC | Catamount Energy Partners LLC | Master Service Agreement | 09/18/18 | 7,910.72 |
| Strike, LLC | Centurion Pipeline Company, LLC | Master Construction Services Agreement | 01/09/20 | 54,082.86 |
| Crossfire, LLC | Chaparral Industries Inc | Master Service Agreement | 01/21/20 | 5,372.21 |
| Strike, LLC | Charbonneau Industries | PO 736104 | 08/20/21 | 201,528.60 |
| Strike, LLC | Charbonneau Industries | PO 735332 | 07/28/21 | 1,494.21 |
| Strike, LLC | Charbonneau Industries | PO 734728 | 07/06/21 | 143,417.09 |
| Strike, LLC | Charbonneau Industries | PO 734413 | 06/24/21 | 188,372.78 |
| Strike, LLC | Charbonneau Industries | PO 734171 | 06/16/21 | 628.48 |
| Strike, LLC | Charbonneau Industries | PO 733921 | 06/09/21 | 96,125.13 |
| Strike, LLC | Charbonneau Industries | PO 733918 | 06/08/21 | 28,957.49 |
| Strike, LLC | Cherwell Software, LLC | Statement of Work | 09/09/16 | 25,177.21 |
| Strike, LLC | Colonial Pipeline Company | Agreement Between Owner and Contractor for Construction Contract | 08/13/21 | 211,993.02 |
| Strike, LLC | Comdata Network, Inc. | Comdata MasterCard Corporate Card Agreement | 06/16/09 | – |
| Strike, LLC | Comdata Network, Inc. | Comdata MasterCard Corporate Card Agreement | 11/25/08 | – |
| Crossfire, LLC | ConocoPhillips Company | Master Agreement - Construction | 05/01/15 | 165,644.64 |
| Strike, LLC | Corrpro Companies, Inc. | Master Service Agreement | 05/30/18 | 40,000.00 |
| Crossfire, LLC | Crestone Peak Resources Midstream, LLC | Master Construction Agreement | 02/04/20 | 265.34 |
| Strike, LLC | Cross Country Infrastructure Services USA, Inc. | Project Agreement | 08/01/19 | 600,000.00 |
| Strike, LLC | CW Operating Company, Inc | Corporate Designee Application and Agreement | 05/07/17 | – |
| Strike, LLC | CW Operating Company, Inc | Corporate Designee Application and Agreement | 01/07/14 | – |

| Debtor Counter Party | Counter Party | Title of Contract[3] | Effective Date | Cure Amount[4] |
|---|---|---|---|---|
| Strike, LLC | CW Operating Company, Inc | Corporate Designee Application and Agreement | 06/24/11 | – |
| Strike, LLC | Cyclone Services LLC | Master Service Agreement | 04/13/12 | 435,000.00 |
| Strike, LLC | CyrusOne, LLC | Master Service Agreement | 08/28/13 | 18,981.79 |
| Strike, LLC | Deere Credit, Inc. | Master Lease Agreement | 05/18/18 | 547,311.12 |
| Strike, LLC | Delta Fuel Company, LLC | Master Terms and Conditions of Purchase | 06/17/20 | – |
| Strike, LLC | Di-Trol Systems, Inc. | Master Service Agreement | 11/14/18 | 120,000.00 |
| Crossfire, LLC | DJR Operating, LLC | Master Service Contract | 06/15/18 | 63,220.81 |
| Crossfire, LLC | DMD Fabrication & Services, Inc. | Master Services Agreement | 03/07/17 | 293,664.50 |
| Strike, LLC | DTE Pipeline Company | Contract | 03/26/18 | 59,400.56 |
| Crossfire, LLC | DTM Louisiana Gathering, LLC | Pipeline Construction Contract | 09/27/21 | 120,712.84 |
| Strike, LLC | E.L. Farmer & Co | Master Hauling Agreement | 04/26/21 | 83,262.00 |
| Capstone Infrastructure Services, LLC | Economic Progress Alliance of Crawford County | Agreement Contract No. 12017-2020-01; Change Order No. 2 | 06/16/21 | 14,117.63 |
| Strike, LLC | Enbridge (U.S.) Inc. | Master Services Agreement | 07/15/21 | – |
| Strike, LLC | Enbridge (U.S.) Inc. | Maintenance and Digs Master Services Agreement | 07/15/21 | 155,155.20 |
| Strike, LLC | Enbridge (U.S.) Inc. | Masters Service Agreement | 04/01/15 | – |
| Strike, LLC | Enbridge (U.S.) Inc. | Revised Master Services Agreement | 04/01/15 | – |
| Strike, LLC | Enbridge Energy Partners, L.P. | Revised Master Services Agreement | 04/01/15 | – |
| Strike, LLC | Enbridge Inc. | Master Service Agreement | 11/04/21 | – |
| Strike, LLC | Enbridge Inc. | Master Service Agreement | 06/06/17 | – |
| Strike, LLC | Enbridge Storage (Cushing) LLC | Contract AFE: 20014042 | 02/21/20 | – |
| Strike, LLC | Enterprise Products Operating LLC | Pipeline Construction Contract No 11438 | 10/27/20 | 1,538,830.48 |
| Strike, LLC | Enterprise Products Partners L.P. | Master Services Agreement | 09/30/04 | – |
| Strike, LLC | Enterprise Texas Pipeline, LLC | Engineering, Procurement and Construction Contract | 02/10/21 | 123,283.01 |
| Crossfire, LLC | EP Energy E&P Company, L.P. | Pipeline Onshore Construction Agreement | 05/06/19 | 63,041.96 |
| Crossfire, LLC | EPCO Holdings, Inc. | Service Agreement | 03/22/11 | 680.00 |
| Strike, LLC | EquipmentShare.com, Inc. | Equipment Rental Agreement | 12/11/20 | 185,000.00 |
| Strike, LLC | Excel Aircraft, LLC dba Excel Mulching | Master Service Agreement | 09/12/11 | 600,000.00 |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application #1681405 | 01/11/21 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application #1681406 | 01/11/21 | – |
| Strike, LLC | FlexTG Financial Services | Lease Agreement Application #1681415 | 12/16/20 | – |
| Strike, LLC | Flores Energy Services LLC | Master Hauling Agreement | 02/19/20 | 410,000.00 |
| Crossfire, LLC | Geocorr LLC | Master Service Agreement | 03/11/19 | 50,000.00 |
| Strike, LLC | Glass Mountain Pipeline, LLC | Master Service Agreement | 06/20/19 | 275,315.36 |
| Strike, LLC | Grant Thornton LLP | Tax Services Agreement | 02/13/19 | 4,155.00 |
| Strike, LLC | Gulfterra Energy Partners, L.P. | Service Agreement | 11/24/04 | 99,698.34 |
| Crossfire, LLC | Harvest Pipeline Company | Master Service Agreement | 09/20/17 | 4,439.90 |
| Strike, LLC | Heavy Equipment Rentals of Texas, LLC | Master Rental Agreement | 07/26/19 | – |
| Strike, LLC | Howard Midstream Energy Partners, LLC | Master Service Agreement | 05/08/13 | 116.21 |
| Strike, LLC | Howdy Enterprises LTD | Master Service Agreement | 01/27/20 | 4,712.40 |
| Strike, LLC | Hydromax, LLC | Master Service Agreement | 02/28/20 | 260,000.00 |
| Strike, LLC | Ignite Energy Services LLC | Master Service Agreement | 04/23/13 | 400,000.00 |
| Strike, LLC | IKAV Energy Inc. | Master Service Agreement | 09/10/20 | 19,709.49 |
| Strike, LLC | Independence TX, LLC | Master Service Agreement | 10/15/21 | 1,333.29 |
| Crossfire, LLC | Indigo Minerals, LLC | Master Service Agreement | 01/09/17 | 12,222.77 |
| Crossfire, LLC | Industrial Electric Service, Inc. | Subcontractor Contract | 03/24/17 | 281,411.36 |
| Crossfire, LLC | Industrial Electric Services, Inc. | Master Service Agreement | 03/24/17 | 281,411.36 |
| Strike, LLC | Ineight SaaS Products | Master Subscription Agreement | 12/22/14 | 20,649.77 |
| Strike, LLC | Intellisite, LLC | Standard Commercial Mobile Surveillance Lease | 12/02/20 | – |
| Crossfire, LLC | Ironwood Midstream Energy Partners, LLC | Master Services Agreement | 11/04/21 | 18,530.26 |
| Strike, LLC | Jones Transport LLC | Master Hauling Agreement | 04/24/20 | 900,000.00 |
| Strike, LLC | JPH Holdings, LLC | Asset Purchase Agreement | 08/27/20 | – |
| Crossfire, LLC | JPH Holdings, LLC dba JP Services | Master Services Agreement | 02/10/20 | 490,000.00 |
| Strike, LLC | Kirby-Smith Machinery, Inc. | Project Agreement | 03/14/17 | 100,000.00 |
| Strike, LLC | Komatsu Financial Limited Partnership | Master Equipment Lease (and all unexpired underlying lease schedules) | 12/04/15 | – |
| Crossfire, LLC | Legacy Construction, LLC | Master Service Agreement | 07/15/19 | 260,000.00 |
| Strike, LLC | Lenox Services | Agreement | 04/11/18 | 19,100.00 |
| Strike, LLC | Lewis Energy Group | Purchase Order | 11/01/21 | 66,260.63 |
| Delta Directional Drilling, LLC | Longview Truck Center | Rental Contract | 07/10/19 | 52,493.31 |
| Strike, LLC | Louisville Gas and Electric Company | General Commercial Agreement | 12/11/19 | 220,902.29 |
| Strike, LLC | Lyondell Chemical Company | Master Field Services Contract | 07/01/20 | 235,435.15 |
| Strike, LLC | Marathon Pipe Line LLC | Master Service Agreement | 07/02/18 | 2,300.71 |
| Crossfire, LLC | MarkWest Energy Partners, LP | Master Service Contracts | 09/21/21 | 18,730.27 |
| Strike, LLC | Marsh USA | Premium Financing Agreement | 12/01/21 | – |
| Strike, LLC | Maxim Crane Works, L.P. | Master Service Agreement | 07/02/13 | 80,122.00 |
| Strike, LLC | MBM Financial Interests LP | Lease Agreement #25532650 | 11/13/18 | – |
| Crossfire, LLC | Mec Services LLC | Master Hauling Agreement | 10/28/20 | 50,000.00 |
| Strike, LLC | Mulholland Energy Services, LLC | Master Service Agreement | 05/13/19 | 190,000.00 |
| Crossfire, LLC | NextEra Energy Constructors, LLC | Enterprise Agreement | 12/15/20 | 3,433.45 |
| Crossfire, LLC | Nickle Rock, LLC | Master Service Agreement | 04/18/17 | 100,000.00 |
| Crossfire, LLC | Northwest Pipeline GP | General Service Agreement | 07/15/11 | 32,956.65 |
| Strike, LLC | NuStar Logistics, L.P. | Master Work Agreement | 06/10/19 | 17,297.44 |
| Pickett Systems | OptiMax Services and Supply, LLC | Purchase Order No. 1708 | | – |
| Strike, LLC | Onyx Delaware Oil Transport LLC | Master Service Agreement | 04/16/18 | 100,961.28 |
| Crossfire, LLC | Petrohawk Energy Corporation, Inc. | Master Service Agreement | 03/01/19 | 2,629.48 |
| Crossfire, LLC | Phillips 66 Company | Compensation Agreement | 04/15/20 | – |
| Strike, LLC | Phillips 66 Company | Compensation Agreement | 10/01/19 | – |
| Strike, LLC | Phillips 66 Company | USA Master Services Agreement | 04/18/19 | 278,226.70 |
| Strike, LLC | Phillips 66 Company | USA Downstream Master Service Agreement | 05/12/14 | – |
| Strike, LLC | Pioneer Natural Resources USA, Inc. | Master Service/Sales Agreement | 09/17/15 | 23,069.00 |
| Strike, LLC | Pipeline Supply & Service, LLC (dba PSS Companies) | Vendor Agreement | 09/16/20 | 400,000.00 |
| Strike, LLC | Plains Marketing, L.P. | Major Service Contract | 03/17/14 | 12,772.50 |
| Strike, LLC | Power Motive Corporation | Terms and Conditions | 04/22/21 | 28,452.95 |
| Strike, LLC | Proconex | PO J10001030 | 12/15/21 | – |
| Strike, LLC | Proconex | PO J10000995 | 10/18/21 | 4,935.08 |
| Strike, LLC | Proconex | PO J10000980 | 10/07/21 | 541.50 |
| Strike, LLC | Proconex | PO J10000956 | 09/15/21 | 4,530.95 |
| Strike, LLC | Proconex | PO J10000950 | 09/07/21 | 2,653.70 |
| Strike, LLC | Proconex | PO J10000926 | 08/04/21 | 6,193.52 |
| Crossfire, LLC | Protégé Energy III LLC | Master Service Contract | 03/06/20 | 6,655.57 |
| Strike, LLC | QP Energy Services, LLC | Master Services Agreement | 02/07/20 | 165,000.00 |
| Delta Directional Drilling, LLC | R&D Land Improvements | Master Service Agreement | 05/12/20 | 40,000.00 |
| Strike, LLC | Redi Services LLC | Master Service Agreement | 09/05/13 | 100,000.00 |
| Strike, LLC | Rock-It Natural Stone | Project Agreement | 02/27/19 | 265,000.00 |
| Strike, LLC | RSK Transport, LLC | Master Hauling Agreement | 10/05/20 | 35,000.00 |
| Crossfire, LLC | S.D. Twomey Trucking | Master Hauling Agreement | 06/14/18 | 40,000.00 |
| Strike, LLC | Satelitte Shelters | Reference and Terms | 09/30/20 | 58,288.12 |
| Crossfire, LLC | SCC Inspection Services Inc | Master Service Agreement | 10/16/19 | 43,535.00 |
| Strike, LLC | Scott-Macon Equipment | PO# 168514 | 11/22/21 | 5,015.45 |
| Strike, LLC | Select Environmental, Inc | Master Service Agreement | 06/19/20 | 19,279.60 |
| Strike, LLC | Signature Financial LLC | Master Lease Agreement | 02/04/19 | – |
| Delta Directional Drilling, LLC | Simpson Fiber, LLC | Master Service Agreement | 04/08/21 | 90,938.34 |
| Strike, LLC | South Texas NGL Pipelines, LLC | Pipeline Construction Contract No 11439 | 10/27/20 | 968.37 |
| Delta Directional Drilling, LLC | Southern Pine Electric | Premiss SS Fiber Removal/Replacement | 12/13/21 | – |
| Strike, LLC | Spectra Energy Transmission II, LLC | Master Construction Agreement | 06/30/16 | 646,118.99 |
| Strike, LLC | Spectra Energy Transmission II, LLC | Standing Agreement | 10/28/15 | 438,387.21 |
| Strike, LLC | Standard Rig Solutions, LLC | Master Services Agreement | 12/21/17 | – |
| Strike, LLC | Sterling Crane, LLC | Master Service Agreement | 10/16/17 | 360,000.00 |
| Strike, LLC | Summit Electric Supply Co. Inc. | Master Services Agreement | 09/16/20 | 1,250,000.00 |
| Crossfire, LLC | Taproot Rockies Midstream LLC | Master Service Agreement | 08/24/18 | 58,119.64 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP SOMS Overhead | 10/29/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP MDOT Raleigh | 09/30/21 | 82,110.79 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP Jumpertown High School | 07/28/21 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | RFP State Contract NE | 03/08/21 | 5,590.00 |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | C Spire Fiber Build | 07/23/20 | – |
| Delta Directional Drilling, LLC | Telepak Networks, Inc. | Standalone PO | 10/01/19 | – |
| Crossfire, LLC | Tesoro Logistics Operations LLC | Major Service Contract | 12/02/19 | 45,124.18 |
| Crossfire, LLC | Tesoro Logistics Operations LLC | Master Service Agreement | 03/06/19 | – |
| Strike, LLC | Texas Brine Company | Preferred Supplier Agreement | 05/06/11 | 2,807.65 |
| Strike, LLC | Texas Eastern Transmission, LP | Lump Sum Construction Agreement | 11/18/20 | 601,534.75 |
| Pickett Systems | Texas Pipeline Webb County Lean System, LLC | EOG-GBM-001 | 01/12/22 | – |
| Pickett Systems | Texas Pipeline Webb County Lean System, LLC | SPOHN-002 | 01/05/22 | – |
| Strike, LLC | Texas Pipeline Webb County Lean System, LLC | PO LUNA-001 | 11/18/21 | 5,467.85 |
| Strike, LLC | Texas Reexcavation, LLC | Master Services Agreement | 07/22/21 | 63,380.00 |
| Strike, LLC | Tongate Farm & Ranch | Master Services Agreement | 09/14/17 | 85,000.00 |
| Crossfire, LLC | Torres Trucking, LLC | Subcontractor Contract | 01/31/17 | 55,000.00 |
| Strike, LLC | TransCanada USA Operations Inc. | Master Pipeline Maintenance and Construction Services Agreement | 05/20/20 | 145,585.77 |
| Strike, LLC | Transcontinental Gas Pipe Line Corporation | General Service Agreement | 04/04/08 | 172,439.89 |

| Debtor Counter Party | Counter Party | Title of Contract[3] | Effective Date | Cure Amount[2] |
|---|---|---|---|---|
| Strike, LLC | United Rentals National Acounts | National Account Agreement | 01/01/09 | 2,000,000.00 |
| Strike, LLC | Universal Ensco, Inc. | PO 16473 | 11/24/20 | 7,775.96 |
| Crossfire, LLC | Utah Gas Corp. | Master Service Agreement | 10/15/18 | 611.78 |
| Strike, LLC | Verdun Oil & Gas, LLC | Master Service Agreement | 11/15/16 | 10,432.92 |
| Strike, LLC | Western Midstream Operating, LP | Master Service Agreement | 08/06/20 | – |
| Crossfire, LLC | Western Refining Inc. | Master Services Agreement | 09/24/12 | – |
| Crossfire, LLC | Western Refining Logistics, LP | Major Service Contract | 12/02/19 | 163,238.79 |
| Crossfire, LLC | Western Refining Logistics, LP | Major Service Contract | 12/02/19 | – |
| Strike, LLC | Western Refining Logistics, LP | Major Service Contract | 11/26/19 | 46,593.48 |
| Crossfire, LLC | Western Refining Logistics, LP | Master Service Agreement | 07/10/19 | – |
| Crossfire, LLC | Western Refining Pipeline, LLC and Western Refining Terminals, LLC | Agreement for Services | 05/16/14 | – |
| Crossfire, LLC | Western Refining Southwest, Inc. | Agreement for Services | 11/03/15 | – |
| Strike, LLC | Western Refining Southwest, Inc. | Agreement for Services | 01/16/15 | – |
| Strike, LLC | Western Refining Terminals, LLC | Agreement for Services | 10/20/14 | – |
| Strike, LLC | WGR Operating, LP | Master Service Contract | 08/06/20 | 294,525.90 |
| Strike, LLC | Whitecap | Reference and Terms | 03/10/21 | 27,414.40 |
| Strike, LLC | WhiteWater Midstream, LLC | Master Construction Services Contract | 02/16/17 | 179,054.85 |
| Crossfire, LLC | Williams Northwest Pipeline GP | General Service Agreement | 07/15/11 | – |
| Strike, LLC | Williams Ohio Valley Midstream, LLC | Onshore Pipeline Construction Contract | 12/14/21 | 655.46 |
| Strike, LLC | Williams Partners L.P. | Master Services Agreement | 07/08/13 | – |
| Crossfire, LLC | Williams Partners L.P. | Master Services Agreement | 07/15/11 | – |
| Strike, LLC | Worldwide Machinery, Inc. | Equipment Rental Agreement | 10/19/20 | – |
| Strike, LLC | Yak Mat, LLC | Master Services Agreement | 03/11/20 | 400,000.00 |
| Strike, LLC | Zters, Inc. | Master Services Agreement | 02/22/18 | 48,000.00 |

## **Schedule 2**

Settlement Term Sheet

**In re Strike, LLC, *et al.***
**Case No. 21-90054 (DRJ)**

**SETTLEMENT TERM SHEET**[1]

This preliminary term sheet (the "Term Sheet") sets forth the principal terms of a proposed settlement (the "Settlement") for a consensual resolution of the chapter 11 cases (the "Chapter 11 Cases") of Strike, LLC and its affiliated debtors and debtors in possession (collectively, the "Debtors") among the Debtors, AIPCF VII LLC and/or one or more of its or its affiliates' managed entities or funds ("AIP")[2] and the Official Committee of Unsecured Creditors (the "Committee" and, together with the Debtors and AIP, the "Parties"). The Settlement and transactions contemplated in this Term Sheet are subject in all respects to the negotiation, execution, and delivery of Definitive Documentation (as defined herein).

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL TRANSACTIONS REFERENCED HEREIN AND THE ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO AIP, THE DEBTORS AND THE COMMITTEE. THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES PROTECTING THE USE OR DISCLOSURE OF INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.

| | SETTLEMENT TERMS |
|---|---|
| **DIP Facility / Wind Down** | 1. The DIP Loan Agreement shall be amended as set forth in Schedule 1 attached hereto.<br><br>2. The Stalking Horse Agreement shall be amended as set forth in Schedule 2 attached hereto.<br><br>3. For the avoidance of doubt, nothing contained herein, the DIP Loan Agreement or the Stalking Horse Agreement shall constitute a |

---

[1] Terms not otherwise defined herein shall have the meanings ascribed to them in the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 348].

[2] Unless otherwise expressly stated herein, references to AIP shall refer to AIP in its capacity as (a) Stalking Horse Purchaser, (b) DIP Secured Party, and/or (c) Prepetition Secured Party, as the context may require.

guarantee, backstop or other commitment on the part of AIP (in any capacity) as to the amount of available cash on hand that the Debtors may have, or the amount of the then-unused New Money Loan Tranche A Commitment, in each case, as of the Stalking Horse Sale Closing Date, and (other than with respect to the Tranche B Wind Down Amount) AIP (in any capacity) shall not have any commitment or other obligation to finance, or to extend any other loans or provide other financial accommodations to facilitate payment of, or have any other liability or obligation, in each case, with respect to, any shortfall or any amount in excess of the New Money Loan Tranche A Commitment; *provided, however*, AIP agrees that it shall not terminate, in whole or in part, the New Money Loan Tranche A Commitment (other than the Tranche A Commitment Reduction, if any) and/or the New Money Loan Tranche B Commitment without also terminating the Stalking Horse Agreement. The Committee and the Debtors waive any right to object to the consummation of the Stalking Horse Sale on the basis that there are insufficient funds as of the Stalking Horse Sale Closing Date to fund the Professional Fee Escrow Excess, the Tranche A Wind Down Amount, the Tranche B Wind Down Amount or any other amounts, whether currently provided in the Approved Budget or otherwise, unless, in each such case, (i) AIP is in breach of its obligations under the DIP Facility (as modified by the Settlement) or (ii) the consummation of the Stalking Horse Sale is unduly delayed as a result of (a) a breach by AIP of its funding obligations under the DIP Facility (as modified by the Settlement) or (b) any act or failure to act by AIP that is taken or not taken, as the case may be, in bad faith.

4. The proceeds of the Tranche A Wind Down Amount and the Tranche B Wind Down Amount may be used to fund (i) the wind down of the Chapter 11 Cases, (ii) distributions under the Plan (as defined below), and (iii) the investigation and potential prosecution of claims and causes of action (except for any Purchased Claims (as defined below)) by the Litigation Trust (as defined below) as set forth herein.

5. The Stalking Horse Purchaser shall not receive a lien on or otherwise have any residual interest in the Tranche A Wind Down Amount and the Tranche B Wind Down Amount; *provided, however,* that the Stalking Horse Purchaser shall receive a first priority lien and residual interest in the Professional Fee Amount deposited into the Escrow Account, as and solely to the extent set forth in the Stalking Horse Agreement.

6. No later than 5:00 p.m. ET on January 28, 2022, each Professional Person and AIP shall deliver to the Debtors, the Committee and AIP a good faith estimate setting forth, with respect to each Professional Person and AIP, the amount of fees and expenses incurred during the period from the Petition Date through and including January 25, 2022, as well as an estimate of the amount of fees and expenses expected to be incurred during the period from and after the date hereof through and

| | |
|---|---|
| | including the currently estimated Stalking Horse Sale Closing Date of February 11, 2022. The estimates provided pursuant to this paragraph shall be solely for informational purposes and shall not be binding in any respect on any Professional Person or AIP. |
| **Liquidating Plan** | The Debtors shall propose, file and prosecute a liquidating chapter 11 plan (the "<u>Plan</u>") in accordance with this Term Sheet, which Plan shall otherwise be in form and substance reasonably acceptable to the Debtors, AIP and the Committee, and which shall include, among others, the following terms:<br><br>• Allowed administrative, priority and other secured claims (except as otherwise permitted under the confirmation requirements of the Bankruptcy Code or as otherwise agreed to by the applicable parties) will be paid in full, in cash, or otherwise be rendered unimpaired.<br><br>• Holders of general unsecured claims (which shall include, for the avoidance of doubt, all claims arising under the Prepetition Junior Loan Facility that are not applied in connection with any credit bid, which claims shall be fully allowed in the amount of $260.73 million plus fees and other obligations outstanding thereunder, less any amounts applied in connection with any credit bid by AIP) will receive their ratable share (except as otherwise provided in this section) of (a) cash available for distribution after payment in full, in cash of all allowed administrative and priority claims and allocation of funding for the Litigation Trust and (b) interests in the Litigation Trust to be established under the Plan.<br><br>• Subject to its receipt of a disclosure statement and solicitation materials approved by the Bankruptcy Court, AIP, will vote all of its claims against the Debtors that are not applied in connection with any credit bid by AIP, in whatever capacity held, to accept the Plan, and exercise commercially reasonable efforts to support the Plan (provided that AIP shall not be required to incur any liability or material expense in connection therewith), in each case, so long as the Plan reflects the Settlement and the Plan has not been amended, waived or modified in a manner that adversely affects AIP or its treatment under the Plan.<br><br>• AIP will agree to forgo its right to any recovery on account of any claims it may hold with respect to the Prepetition Junior Loan Facility that are not applied in connection with any credit bid by AIP until such time as the aggregate recoveries to general unsecured creditors (excluding AIP) equal 7.5% of the aggregate allowed amount of prepetition general unsecured claims (excluding general unsecured claims held by AIP), after which AIP shall share pro rata |

| | |
|---|---|
| | in any such incremental distributions above such 7.5% aggregate recoveries based on the amount of its claims under the Prepetition Junior Loan Facility that are not applied in connection with any credit bid by AIP. |
| | • The Plan shall include usual and customary releases and exculpation of AIP (in any capacity), the Committee and its members (in their capacities as such) and the Debtor entities; *provided, however,* that the Parties shall negotiate in good faith the scope of the additional releases and exculpation provisions to be included in the Plan. |
| | • The Committee agrees to support the Plan and agrees to recommend to general unsecured creditors (through a letter or other communication) that they vote to accept the Plan. |
| **Litigation Trust** | The Debtors' estates shall retain all claims and causes of action, except for Purchased Claims³ (collectively, the Litigation Claims. The Purchased Claims shall be assigned to the Stalking Horse Purchaser in accordance with the Stalking Horse Agreement and the Sale Approval Order, and shall be addressed, as applicable, in accordance with the Stalking Horse Agreement.<br><br>The Plan will provide for the creation of a litigation trust (the "<u>Litigation Trust</u>") on the effective date of the Plan.  The Plan will provide for the distribution of interests in the Litigation Trust to general unsecured creditors (which shall include, for the avoidance of doubt, all claims arising under the Prepetition Junior Loan Facility that are not applied in connection with any credit bid by AIP) and all distributions shall be made on a *pro rata* basis to general unsecured creditors, subject to the limitation on recovery with respect to AIP in the section titled "Liquidating Plan" above in this Term Sheet. |

---

³      "<u>Purchased Claims</u>" (1) means any and all claims and causes of action that may be asserted by any of the Debtors or their respective estates against (a) AIP (in any capacity), (b) the DIP Secured Parties, (c) the Prepetition Secured Parties, (d) any counterparty to any Assigned Contracts (as defined in the Stalking Horse Agreement), (e) all current officers or employees of the Debtors and all Transferred Employees (as defined in the Stalking Horse Agreement), (f) any vendor, supplier, trade creditor or customer doing business with the Debtors within the two year period prior to the Petition Date, and (g) any Affiliates (as defined in the Stalking Horse Agreement), officers, directors, employees, shareholders, agents and representatives of each of the foregoing persons or entities solely in their capacities as such; and (2) any and all rights (including lien rights), claims (including commercial tort claims), settlement proceeds, causes of action, choses in action, rights of recovery, rights of recoupment, rights of set off, equity rights and defenses that may be asserted by any of the Debtors or their respective estates, relating to the Business, any of the Purchased Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to, any of the Assigned Contracts), or any of the Assumed Liabilities, including all rights under vendors', manufacturers' and contractors' representations, warranties, indemnities and guarantees; *provided, however,* and notwithstanding anything in <u>clauses (1)(g) and (2)</u> to the contrary, all claims and causes of action that may exist against any director or officer or equity holder of the Debtors or their related persons (in each case, other than a current officer or employee of the Debtors or a Transferred Employee) shall be retained by the Debtors' estates.

| | |
|---|---|
| | The trustee for the Litigation Trust (the "<u>Litigation Trustee</u>") and the members of the trust advisory board (if any) (the "<u>Trust Advisory Board</u>") shall be selected by the Committee in consultation with AIP and the Debtors.<br><br>Professionals for the Litigation Trust shall be selected by the Litigation Trustee with the consent of the Trust Advisory Board, in consultation with AIP and the Debtors.<br><br>Stalking Horse Purchaser will provide commercially reasonable access to any relevant documents or information or personnel (so long as not disruptive to business operations) reasonably requested by the Litigation Trustee related to the Litigation Claims and the reconciliation of claims against the Debtors' estates.<br><br>The Debtors and the Stalking Horse Purchaser, as applicable, shall preserve, for the benefit of the Litigation Trustee, all records and documents (including all electronic records or documents) related to the Litigation Claims until such time as the Litigation Trustee notifies the Debtors or the Stalking Horse Purchaser, as applicable, in writing, that such records are no longer required to be preserved, or all necessary and available records and documents have been provided to the Litigation Trustee.<br><br>The Definitive Documentation (as defined below) shall provide for the transfer of all documents, information and privileges related to the Litigation Claims and claims reconciliation from the Debtors and their estates to the Litigation Trust; *provided, however,* that the Debtors shall not have to transfer any documents, information or privileges related to any Litigation Claims that are released under the Plan. |
| **Suspension of Committee Investigations** | ▪  Any due diligence or investigation by the Committee or the Debtors (except ordinary course investigation by current employees of the Debtors), and their respective professionals, of AIP, the DIP Secured Parties, the Prepetition Secured Parties, any current employees, any current or former officers, directors, equity holders or affiliates of the Debtors, or any other creditors, counter-parties or other parties-interest, and any due diligence or investigation into potential claims or causes of action that may be brought by the Litigation Trust, and all activities (including formal or informal discovery) related thereto, shall be stayed, and the Committee's Challenge Deadline shall be tolled, until the earlier of (a) the Stalking Horse Sale Closing Date, or (b) three business days after the Stalking Horse Agreement is terminated; *provided, further, however,* for the avoidance of doubt, in the interim, AIP shall be entitled to credit bid the full face amount of the DIP Facility (including any amounts in the DIP Roll-Up Facility) outstanding as of the Stalking Horse Sale Closing Date, and any other Prepetition Secured Obligations |

| | |
|---|---|
| | outstanding as of the Closing Date, pursuant to Section 363(k), that AIP elects to apply in connection with its credit bid. |
| **Implementation** | ▪ The Committee agrees not to oppose or interfere in any manner with the bid of AIP (in any capacity) to purchase the Purchased Assets consistent with the Stalking Horse Agreement (as modified to reflect the terms of this Settlement and the Bidding Procedures Order).<br><br>▪ The Parties agree to support entry of the Sale Approval Order (as modified to reflect the terms of this Settlement), including the release of AIP (in any capacity) and its affiliates pursuant to the Sale Approval Order.<br><br>▪ The Parties shall reasonably cooperate and exercise commercially reasonable efforts to facilitate the Closing.<br><br>▪ The Debtors, AIP and the Committee will cooperate with each other in good faith to draft and finalize the definitive documentation to implement the Settlement, which shall be in all respects consistent with this Term Sheet (the "Definitive Documentation"), including but not limited to the Plan, a litigation trust agreement, the plan supplement, the disclosure statement for the Plan, the order approving the disclosure statement, the solicitation materials for the Plan and the order confirming the Plan (each of which shall be in form and substance reasonably acceptable to the Parties).<br><br>▪ The Settlement is contingent in its entirety upon the Stalking Horse Purchaser's designation as the Successful Bidder (as defined in the Sale Procedures Order) and the sale transaction to Stalking Horse Purchaser is consummated. In the event that Stalking Horse Purchaser is not selected as the Successful Bidder or the sale transaction to the Stalking Horse Purchaser is not consummated, the Settlement shall not be implemented and this Term Sheet shall be deemed null and void. |

**Schedule 1**

<u>Amendments to DIP Loan Agreement</u>

**SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

Dated as of December 10, 2021,

among

**STRIKE, LLC,**
**DELTA DIRECTIONAL DRILLING, LLC**,
and
**STRIKE GLOBAL HOLDINGS, LLC**,
as Borrowers, and as Debtors and Debtors-in-Possession
under Chapter 11 of the Bankruptcy Code,

**STRIKE HOLDCO, LLC**,
as Holdings, as a Guarantor, and as a Debtor and Debtor-in-Possession
under Chapter 11 of the Bankruptcy Code,

**THE SUBSIDIARY GUARANTORS PARTY HERETO**,

**CERTAIN FINANCIAL INSTITUTIONS**,
as Lenders,

and

**LIGHTSHIP CAPITAL II LLC**,
as Administrative Agent

## TABLE OF CONTENTS

**Page**

SECTION 1.     DEFINITIONS; RULES OF CONSTRUCTION ............................ 3
    1.1.     Definitions. ........................................................................................ 3
    1.2.     Accounting Terms. .......................................................................... 61
    1.3.     Uniform Commercial Code. ............................................................ 61
    1.4.     Certain Matters of Construction. .................................................... 61

SECTION 2.     CREDIT FACILITIES ...................................................................... 62

SECTION 3.     INTEREST, FEES AND CHARGES ................................................. 66
    3.1.     Interest. ............................................................................................ 66
    3.2.     Fees and Commitment Payments. .................................................... 68
    3.3.     Computation of Interest, Fees, Yield Protection. ............................ 69
    3.4.     Reimbursement Obligations. ........................................................... 69
    3.5.     Illegality. ......................................................................................... 70
    3.6.     Inability to Determine Rates. ........................................................... 70
    3.7.     Increased Costs; Capital Adequacy. ............................................... 71
    3.8.     Mitigation. ....................................................................................... 72
    3.9.     Funding Losses. ............................................................................... 72
    3.10.   Maximum Interest. ........................................................................... 73

SECTION 4.     LOAN ADMINISTRATION .............................................................. 73
    4.1.     Manner of Borrowing and Funding Loans. ..................................... 73
    4.2.     Defaulting Lender. ........................................................................... 75
    4.3.     Number and Amount of LIBOR Loans; Determination of Rate. ..... 76
    4.4.     Borrower Agent. .............................................................................. 77
    4.5.     One Obligation. ............................................................................... 77
    4.6.     Effect of Termination. ..................................................................... 77

SECTION 5.     PAYMENTS ....................................................................................... 77
    5.1.     General Payment Provisions. .......................................................... 77
    5.2.     Voluntary Prepayments. .................................................................. 78
    5.3.     Mandatory Prepayments. ................................................................. 78
    5.4.     Payment of Other Obligations. ....................................................... 79
    5.5.     Marshaling; Payments Set Aside. .................................................... 79
    5.6.     Application and Allocation of Payments. ........................................ 79
    5.7.     Dominion Account. .......................................................................... 81
    5.8.     Account Stated. ................................................................................ 81
    5.9.     Taxes. ............................................................................................... 81
    5.10.   Lender Tax Information. ................................................................... 83

NY 78904694v1NY 78904694v7

| | | |
|---|---|---|
| **5.11.** | **Nature and Extent of Each Borrower's Liability.** | 85 |
| **5.12.** | **Termination Payment.** | 89 |
| | | |
| **SECTION 6.** | CONDITIONS PRECEDENT | 90 |
| **6.1.** | **Conditions Precedent to Closing Date and Initial Borrowing.** . | 90 |
| **6.2.** | **Conditions Precedent to All Borrowings.**. | 94 |
| | | |
| **SECTION 7.** | COLLATERAL | 96 |
| **7.1.** | **Grant of Security Interest.** | 96 |
| **7.2.** | **Lien on Deposit Accounts; Cash Collateral.** | 97 |
| **7.3.** | **Pledged Collateral.** | 98 |
| **7.4.** | **Intellectual Property Matters.** | 102 |
| **7.5.** | **Other Collateral.** | 104 |
| **7.6.** | **No Assumption of Liability.** | 104 |
| **7.7.** | **Further Assurances.** | 104 |
| **7.8.** | **Further Exceptions.**. | 105 |
| | | |
| **SECTION 8.** | COLLATERAL ADMINISTRATION | 105 |
| **8.1.** | **[Reserved].** | 105 |
| **8.2.** | **Administration of Accounts.** | 105 |
| **8.3.** | **[Reserved].** | 106 |
| **8.4.** | **[Reserved].** | 106 |
| **8.5.** | **Administration of Deposit Accounts.**. | 106 |
| **8.6.** | **General Provisions.** | 107 |
| **8.7.** | **Power of Attorney.** | 108 |
| | | |
| **SECTION 9.** | REPRESENTATIONS AND WARRANTIES | 109 |
| **9.1.** | **General Representations and Warranties.** | 109 |
| **9.2.** | **Disclosure.**. | 115 |
| | | |
| **SECTION 10.** | COVENANTS AND CONTINUING AGREEMENTS | 115 |
| **10.1.** | **Affirmative Covenants.** | 115 |
| **10.2.** | **Negative Covenants.** | 127 |
| **10.3.** | **Financial Covenant.** | 139 |
| **10.4.** | **Chapter 11 Cases.** | 140 |
| | | |
| **SECTION 11.** | EVENTS OF DEFAULT; REMEDIES ON DEFAULT | 141 |
| **11.1.** | **Events of Default.** | 141 |
| **11.2.** | **Remedies upon Default.** | 147 |
| **11.3.** | **Setoff.**. | 152 |
| **11.4.** | **Remedies Cumulative; No Waiver.** | 153 |
| | | |
| **SECTION 12.** | ADMINISTRATIVE AGENT | 154 |

NY 78904694v1NY 78904694v7

**12.1.** **Appointment, Authority and Duties of Administrative Agent.** 154
**12.2.** **Agreements Regarding Collateral and Borrower Materials.** 155
**12.3.** **Reliance By Administrative Agent..** 157
**12.4.** **Action Upon Default..** 157
**12.5.** **Ratable Sharing.** 158
**12.6.** **Indemnification.** 158
**12.7.** **Limitation on Responsibilities of Administrative Agent.** 159
**12.8.** **Successor Agent and Co-Agents.** 159
**12.9.** **Non-Reliance on the Administrative Agent and the Other Lenders..** 160
**12.10.** **Remittance of Payments and Collections.** 161
**12.11.** **Individual Capacities..** 162
**12.12.** **[Reserved].** 162
**12.13.** **[Reserved].** 162
**12.14.** **No Third Party Beneficiaries.** 163
**12.15.** **Withholding Tax..** 163
**12.16.** **Administrative Agent May File Proofs of Claim; Credit Bidding.** 163
**12.17.** **Certain ERISA Matters.** 167
**12.18.** **Successors By Merger, Etc.** 168

**SECTION 13.** BENEFIT OF AGREEMENT; ASSIGNMENTS 168
**13.1.** **Successors and Assigns.** 168
**13.2.** **Participations.** 169
**13.3.** **Assignments.** 170
**13.4.** **Replacement of Certain Lenders.** 171

**SECTION 14.** MISCELLANEOUS 172
**14.1.** **Consents, Amendments and Waivers.** 172
**14.2.** **Indemnity..** 173
**14.3.** **Notices and Communications.** 174
**14.4.** **Performance of Borrowers' Obligations** 176
**14.5.** **Credit Inquiries..** 177
**14.6.** **Severability..** 177
**14.7.** **Cumulative Effect; Conflict of Terms..** 177
**14.8.** **Counterparts; Execution..** 177
**14.9.** **Entire Agreement..** 177
**14.10.** **Relationship with Lenders.** 178
**14.11.** **No Advisory or Fiduciary Responsibility..** 178
**14.12.** **Confidentiality.** 178
**14.13.** **Governing Law** 179
**14.14.** **Consent to Forum** 179
**14.15.** **Waivers by Borrowers..** 180
**14.16.** **Patriot Act Notice.** 180
**14.17.** **No Oral Agreement** 181
**14.18.** **Acknowledgement and Consent to Bail-In of Affected Financial Institutions** 181

**14.19.  DIP Orders**.................................................................................181
**14.20.  Acknowledgment Regarding any Supported QFCs**..................................182

NY 78904694v1NY 78904694v7

## <u>LIST OF EXHIBITS AND SCHEDULES</u>

Exhibit A                              Assignment and Acceptance
Exhibit B                              Assignment Notice
Exhibit C-1                            Form of Notice of Borrowing
Exhibit C-2                            Form of Notice of Conversion/Continuation
Exhibit D                              Form of Guaranty
Exhibit E                              Form of Compliance Certificate
Exhibit F                              Form of U.S. Tax Compliance Certificate
Exhibit G                              Form of Joinder
Exhibit H                              Initial Budget


Schedule 1.1                           Commitments of Lenders
Schedule 7.1(c)                        Commercial Tort Claims
Schedule 7.3(a)                        Equity Interests and Debt Securities
Schedule 8.5                           Deposit Accounts
Schedule 9.1.4                         Names and Capital Structure
Schedule 9.1.10                        Patents, Trademarks, Copyrights and Licenses
Schedule 9.1.15                        Litigation
Schedule 9.1.18                        Labor Relations
Schedule 10.1.13                       Milestones
Schedule 10.2.1                        Existing Debt
Schedule 10.2.2                        Existing Liens

NY 78904694v1NY 78904694v7

### SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
### LOAN AND SECURITY AGREEMENT

**THIS SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** is dated as of December 10, 2021 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), among (a) **STRIKE HOLDCO, LLC**, a Delaware limited liability company and a debtor and debtor-in-possession in the Chapter 11 Cases ("Holdings"), as a Guarantor (such term, and each other capitalized term used but not defined in this introductory statement or in the Recitals having the meaning assigned thereto in Section 1), (b) each of (i) **STRIKE, LLC**, a Texas limited liability company and a debtor and debtor-in-possession in the Chapter 11 Cases ("Strike"), (ii) **DELTA DIRECTIONAL DRILLING, LLC**, a Texas limited liability company and a debtor and debtor-in-possession in the Chapter 11 Cases, and (iii) **STRIKE GLOBAL HOLDINGS, LLC**, a Texas limited liability company and a debtor and debtor-in-possession in the Chapter 11 Cases, in each case, as a borrower of the Loans hereunder (each of the foregoing, in such capacity, a "Borrower", and, collectively, the "Borrowers"), (c) each Person party hereto as a Subsidiary Guarantor, (d) each Person party hereto from time to time as a Lender, and (e) **LIGHTSHIP CAPITAL II LLC**, as Administrative Agent.

### R E C I T A L S:

WHEREAS, on December 6, 2021 (the "Petition Date"), each of the Borrowers, Holdings and each direct and indirect Subsidiary of the Borrowers (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") initiating their respective jointly administered cases under Chapter 11 of the Bankruptcy Code (Case No. 21-90054) (collectively, the "Chapter 11 Cases"), and each Debtor has continued and is continuing in the possession of its assets and management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, pursuant to the Prepetition Loan Agreements, the Persons who are party hereto as Lenders on the Closing Date extended (directly or indirectly) certain loans and provided certain other accommodations to the Debtors prior to the Petition Date, and the Debtors' obligations with respect thereto constitute Prepetition Debt for purposes hereof;

WHEREAS, the Debtors and the Persons who are party hereto as Lenders on the Closing Date are engaging (directly or indirectly) in certain discussions and good-faith negotiations with respect to one or more restructuring, reorganization, sale and other transactions, and have entered into the Restructuring Support Agreement in connection therewith;

WHEREAS, the Borrowers have requested that the Lenders provide the Debtors with liquidity to pursue the Restructuring (as defined in the Restructuring Support Agreement), and the Lenders have agreed to provide such liquidity in the form and on the terms of the senior secured super-priority debtor-in-possession term loan credit facility documented pursuant to this Agreement (the "DIP Facility"), pursuant to which the Lenders shall extend (or be deemed to extend, as the case may be) term loans to the Borrowers pursuant to the terms hereof and the DIP

Orders in an aggregate principal amount not to exceed the DIP Facility Amount, consisting of (i) New Money Loans funded by the Lenders at such times as provided herein and (ii) Roll-Up Loans deemed incurred on the Final DIP Order Date;

WHEREAS, this Agreement constitutes the "DIP Credit Agreement", and the DIP Facility and the Loans constitute "DIP Financing", in each case, referred to in the Restructuring Support Agreement, and, upon entry by the Lenders into this Agreement, all obligations and agreements of the AIP Parties and the Consenting Lenders (each, as defined in the Restructuring Support Agreement) with respect to the DIP Financing set forth in the Restructuring Support Agreement (including Section 6(b)(i) thereof) shall be deemed satisfied and discharged to the fullest extent required by the Restructuring Support Agreement;

WHEREAS, to provide security for the repayment of the Loans and the satisfaction of all other Obligations owing to the Lenders, the Obligors have agreed to grant in favor of the Administrative Agent (for the benefit of the Secured Parties) first-priority Liens on the Collateral, in each case, as further set forth in, and subject to, the DIP Orders; and

WHEREAS, subject to the terms and conditions set forth herein and in the DIP Orders, (i) the Lenders are willing to make available (or be deemed to make available) the Loans to the Borrowers and (ii) the Administrative Agent is willing to serve as Administrative Agent for the Lenders.

**NOW, THEREFORE**, for valuable consideration hereby acknowledged, the parties agree as follows:

## SECTION 1.  DEFINITIONS; RULES OF CONSTRUCTION

**1.1.** **Definitions**.  As used herein, the following terms have the meanings set forth below:

"Account":  as defined in the UCC, including all rights to payment for goods sold or leased, or for services rendered.

"Account Debtor":  a Person obligated under an Account, Chattel Paper or General Intangible.

"Accrued Post-Petition AP": as defined in Section 10.2.21.

"Acquired EBITDA":  with respect to any Acquired Entity or Business for any period, the amount for such period of EBITDA of such Acquired Entity or Business (determined or estimated in good faith by the Borrower Agent using such definitions as if references to the Borrowers and their Subsidiaries therein were to such Acquired Entity or Business and its Subsidiaries), all as determined on a consolidated basis for such Acquired Entity or Business.

"Acquired Entity or Business":  as defined in the term "EBITDA".

"Acquisition":  a transaction or series of transactions resulting in (a) acquisition of a business, division, or all or substantially all assets of a Person; (b) record or beneficial ownership of more than 50% of the Equity Interests of a Person; or (c) merger, consolidation or combination of Holdings or a Subsidiary with another Person.

"Additional Specified Vehicle Dispositions": as defined in the definition of Permitted Asset Dispositions.

"Adequate Protection Provisions":  the provisions in the Interim DIP Order or, once entered, in the Final DIP Order, granting adequate protection to the Prepetition Secured Parties.

"Administrative Agent":  as of any time of determination, the Person appointed in accordance with this Agreement (including pursuant to the successor agency provisions of **Section 12.8**) to act as administrative agent for the Lenders and as collateral agent for the Secured Parties.

"Affected Financial Institution": (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate":  with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  For the avoidance of doubt, the Sponsor shall be an Affiliate of the Obligor and their Subsidiaries.

"Agent Fee Letter":  that certain DIP Agent Fee Letter, dated as of the Closing Date, by and among the Administrative Agent and the Borrowers, as the same may be supplemented, amended or otherwise modified from time to time.

"Agent Fees":  as defined in **Section 3.2.1**.

"Agent Indemnitees":  Administrative Agent and its officers, directors, employees, Affiliates, agents and attorneys.

"Agent Professionals":  attorneys, accountants, appraisers, auditors, business valuation experts, environmental engineers or consultants, turnaround consultants, and other professionals and experts retained by Administrative Agent.

"Agreement":  as defined in the preamble hereto.

"Allocable Amount":  as defined in **Section 5.11.3**.

"Alternative Asset Purchase Agreement" means an asset purchase agreement (other than the Stalking Horse Agreement) selected by the Obligors in accordance with the Sale Procedures as representing the highest and otherwise best offer for the purchase and sale of all or substantially all of the Obligor's assets, provided that the terms of any such asset purchase

- 3-

agreement shall require the Full Payment of all DIP Obligations immediately upon the consummation of such Sale Transaction.

"Anti-Corruption Law":  the Foreign Corrupt Practices Act of 1977, as amended, or any similar Applicable Law.

"Anti-Terrorism Law":  any law primarily relating to terrorism or money laundering, including the Patriot Act.

"AP Trade Balance":  the aggregate amount of the Obligors' trade accounts payable incurred after the Petition Date, which shall (a) include the aggregate amount of invoiced and unvouchered trade accounts payable, but (b) exclude (i) Professional Fees, and (ii) the aggregate amount of any fees, costs and expenses of any professionals (other than any Estate Professionals) involved in the Chapter 11 Cases the payment of whose fees, costs and expenses have been authorized to be paid by the Bankruptcy Court in the Chapter 11 Cases.

"AP Trade Balance Amount": as defined in Section 10.3.3.

"AP Trade Balance Testing Date":  as defined in Section 10.3.3.

"Applicable Law":  with respect to any Person, conduct, transaction, agreement or matter, as the case may be, all laws, rules, regulations and governmental guidelines applicable to such Person, conduct, transaction, agreement or matter in question, including all applicable statutory law, common law and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities (including, with reference to the Debtors, any order of the Bankruptcy Court, pursuant to the Bankruptcy Code or otherwise in connection with the Chapter 11 Cases).

"Applicable Margin":  10%.

"Approved Budget":  (a) the Initial Budget, at all times, until superseded by an Updated Budget in accordance with (and subject to receipt of all approvals required pursuant to **Section 10.1.13** and (b) as of any time of determination thereafter, the most recent Budget Supplement (if any) that constitutes the Updated Budget in effect as of such time in accordance with (and subject to) receipt of all approvals required pursuant to **Section 10.1.13**; provided, that, no Budget Supplement or other cash flow forecast shall in any event constitute an Approved Budget unless, in addition to being in accordance with the terms hereof, the same is also sufficient to constitute the "Approved Budget" for purposes of (and as such term is defined in) the DIP Orders (without taking into account any reference to the "Wind Down Budget" therein.

"Approved Fund":  any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in its ordinary course of activities, and is administered or managed by a Lender, an entity that administers or manages a Lender, or an Affiliate of either.

"Asset Disposition":  a sale, lease (as lessor), license, consignment, transfer or other disposition of property (including any Equity Interests) of an Obligor, unwinding of any Hedging Agreement, any discounting or selling of (with or without recourse) any notes receivable or accounts receivable, a disposition of property in connection with a sale-leaseback transaction or synthetic lease, and including any disposition of property pursuant to a Division.

"Assignment and Acceptance":  an assignment agreement between a Lender and Eligible Assignee, in the form of **Exhibit A** or otherwise reasonably acceptable to the Administrative Agent.

"Available Cash":  as of any time of determination, the amount of cash and Cash Equivalents of the Obligors at such time, determined net of (a) amounts used to finance any costs and expenses (other than Professional Fees) budgeted for pursuant to the Approved Budget (or otherwise approved by the Administrative Agent) and paid as of or on the Stalking Horse Sale Closing Date; provided, that such costs and expenses are set forth in a funds flow memorandum (or similar document) reasonably satisfactory to the Administrative Agent and the Borrowers, and payment thereof is permitted pursuant to a Chapter 11 Order in effect at such time and (b) amounts payable by the Obligors pursuant to any check issued by the Obligors in the Ordinary Course of Business, if such check has been previously identified to the Administrative Agent but has not yet cleared as of the applicable time. For the avoidance of doubt, the amount of the proceeds of New Money Loans that are applied to fund the Professional Fee Amount and the Wind Down Amounts shall be excluded from the calculation of Available Cash.

"Bail-In Action":  the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation":  (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Bank of America":  Bank of America, N.A., a national banking association, and its successors and assigns.

"Bankruptcy Code":  Title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"Bankruptcy Court":  as defined in the recitals to this Agreement.

"Base Rate":  for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1% (b) the Prime Rate in effect for such day, and (c) LIBOR for a

- 5-

one month Interest Period plus 1.00%. Any change in any such rate shall take effect at the opening of business on the day specified in the announcement of such change.

"Base Rate Loan":  any Loan that bears interest based on the Base Rate.

"Beneficial Ownership Certification":  a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation":  31 C.F.R. § 1010.230.

"Benefit Plan":  any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Board of Governors":  the Board of Governors of the Federal Reserve System.

"Borrowed Money":  with respect to any Obligor or Subsidiary, without duplication, its (a) Debt that (i) arises from the lending of money by any Person to such Obligor, (ii) is evidenced by notes, drafts, bonds, debentures, credit documents or similar instruments, (iii) accrues interest or is a type upon which interest charges are customarily paid (excluding trade payables owing in the Ordinary Course of Business), or (iv) was issued or assumed as full or partial payment for property; (b) Capital Leases; (c) reimbursement obligations with respect to drawn amounts under letters of credit; and (d) Guarantee Obligations with respect to any Debt of the foregoing types owing by another Person.

"Borrower Agent":  as defined in **Section 4.4**.

"Borrower Materials":  reports, financial statements and other materials delivered by Borrowers hereunder, as well as other Reports and information provided by Administrative Agent to Lenders.

"Borrowers":  as defined in the preamble hereto.

"Borrowing":  a group of Loans of one Type that are made (or deemed made) on the same day or are converted into Loans of one Type on the same day.

"Borrowing Date":  as defined in **Section 4.1.1**.

"Budget Supplement":  as defined in **Section 10.1.13**.

"Business Day":  any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of Texas, New York, or Delaware, and, if such day relates to a LIBOR Loan, any such day on which

- 6-

dealings in Dollar deposits are conducted between banks in the London interbank Eurodollar market.

"Business Unit Consolidation":  the transactions or series of related transactions relating to the consolidation of the regional/specialty business units of Holdings and its Subsidiaries from 12 regional/specialty business units to five or fewer business units.

"Capital Expenditures":  all liabilities incurred or expenditures made by Holdings or a Subsidiary for the acquisition of fixed assets, or any improvements, replacements, substitutions or additions thereto with a useful life of more than one year.

"Capital Lease":  any lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Capital Lease Obligations":  as applied to any Person, all obligations under Capital Leases of such Person or any of its Subsidiaries, in each case taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"Capstone":  Capstone Infrastructure Services, LLC.

"Capstone JV Transaction":  the acquisition by Holdings or a Subsidiary of 50% or less of the Equity Interests in Capstone.

"Carve-Out":  has the meaning assigned to such term in the Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) or the Final DIP Order (from and after the date on which the Final DIP Order is entered).

"Cash Collateral":  cash, Cash Equivalents, and any interest or other income earned thereon, that collateralizes, or is security for the payment of, any Obligations.

"Cash Dominion Period":  (x) the period (a) commencing, at the election of the Administrative Agent or the Required Lenders, on the day that (i) any Event of Default occurs or arises hereunder; and (b) continuing until, such Event of Default is cured or shall cease to exist, so long as no other Default or Event of Default exists or is continuing at such time, and (y) any other period during which the Administrative Agent shall, pursuant to the applicable DIP Order, have the right to sweep cash, exercise cash dominion and other rights with respect to Deposit Accounts or any funds therein, and/or take any other actions relating to account control and cash management matters, as the case may be.

"Cash Equivalents":  (a) marketable obligations issued or unconditionally guaranteed by, and backed by the full faith and credit of, the United States government, maturing within 12 months of the date of acquisition; (b) certificates of deposit, time deposits and bankers' acceptances maturing within 12 months of the date of acquisition, and overnight bank deposits, in each case which are issued by a Lender or a commercial bank organized under the laws of the United States or any state or district thereof, rated A-1 (or better) by S&P or P-1 (or better) by Moody's at the time of acquisition, and (unless issued by a Lender) not subject to offset rights;

- 7-

(c) repurchase obligations with a term of not more than 30 days for underlying investments of the types described in clauses (a) and (b) entered into with any bank described in clause (b); (d) commercial paper issued by any financial institution or other Person acceptable to the Administrative Agent or rated A-1 (or better) by S&P or P-1 (or better) by Moody's, and maturing within nine months of the date of acquisition; (e) shares of any money market fund that has substantially all of its assets invested continuously in the types of investments referred to above, has net assets of at least $500,000,000 and has the highest rating obtainable from either Moody's or S&P; and (f) any money market fund of which the assets are comprised of not less than 90% of the items specified in clauses (a) through (e) above.

"Cash Management Services":  any services provided from time to time by the Administrative Agent, any Lender or any of their Affiliates to Holdings or any Subsidiary in connection with operating, collections, payroll, trust, or other depository or disbursement accounts, including automated clearinghouse, e-payable, electronic funds transfer, wire transfer, controlled disbursement, overdraft, depository, information reporting, lockbox, stop payment and similar services.

"CERCLA":  the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.).

"Change in Law":  the occurrence, after the date hereof, of (a) the adoption, taking effect or phasing in of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof; or (c) the making, issuance or application of any request, guideline, requirement or directive (whether or not having the force of law) by any Governmental Authority; *provided*, *however*, that "Change in Law" shall include, regardless of the date enacted, adopted or issued, all requests, guidelines, requirements or directives (i) under or relating to the Dodd-Frank Wall Street Reform and Consumer Protection Act, or (ii) promulgated pursuant to Basel III by the Bank of International Settlements, the Basel Committee on Banking Supervision (or any similar authority) or any other Governmental Authority.

"Change of Control":  any of the following:

(a)      Holdings ceases to own and control, beneficially and of record, directly or indirectly, all Equity Interests in the Borrowers;

(b)      Sponsor and the Pate Group collectively cease to own and control, beneficially and of record, directly or indirectly, Equity Interests of Holdings representing more than 50% of the voting power of the then outstanding Voting Equity Interests of Holdings;

(c)      at any time, and for any reason whatsoever, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), excluding the Permitted Holders, shall become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of Equity Interests of Holdings representing more than the greater of (x) thirty-five percent (35%) of the voting power of

- 8-

the then outstanding Voting Equity Interests of Holdings, and (y) the percentage of the voting power of the then outstanding Voting Equity Interests of Holdings owned, directly or indirectly, beneficially by the Permitted Holders (in the aggregate);

(d)     the sale or transfer of all or substantially all of the Borrowers' assets on a consolidated basis (including pursuant to any Sale Transaction); or

(e)     a "change of control" or any comparable term under, and as defined in, any agreement governing Debt for Borrowed Money in an aggregate principal amount exceeding $1,000,000.

"Chapter 5 Claims and Causes of Action":  the Obligors' claims and causes of action arising under chapter 5 of the Bankruptcy Code, including sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code or similar state law.

"Chapter 11 Approvals": as defined in **Section 10.2.21**.

"Chapter 11 Cases": as defined in the recitals to this Agreement.

"Chapter 11 Liquidating Plan":  a Liquidatingthe Plan (as defined in the Restructuring Support AgreementSettlement Term Sheet) (as defined in the Sale Approval Order).

"Chapter 11 Order":  any order of the Bankruptcy Court in the Chapter 11 Cases in form and substance, and on terms and conditions, satisfactory to the Required Lenders (including, as applicable, the Interim DIP Order and the Final DIP Order).

"Chapter 11 Plan":  any plan of reorganization or liquidation (as the case may be) (including any Chapter 11 Liquidating Plan).

"Chapter 11 Plan Effective Date":  (a) with respect to the Chapter 11 Liquidating Plan, the date upon which all of the conditions to the effectiveness of the Chapter 11 Liquidating Plan set forth therein have been satisfied (or waived) in accordance with its terms and in accordance with the terms of the Restructuring Support Agreement, and (b) with respect to any Chapter 11 Plan that is not the Chapter 11 Liquidating Plan, the date of "substantial consummation" (as such term is defined in Section 1101 of the Bankruptcy Code) of any Chapter 11 Plan; *provided*, that, for purposes of this Agreement, "substantial consummation" shall in any event be deemed to occur no later than the effective date of such Chapter 11 Plan.

"Chapter 11 Unsecured Creditors Committee":  the official committee of unsecured creditors appointed in the Chapter 11 Cases, pursuant to Section 1102 of the Bankruptcy Code, if any.

"Chapter 11 Unsecured Creditors Committee Professionals" means the legal and professional advisors to the Chapter 11 Unsecured Creditors Committee, to the extent that the retention and engagement thereof shall have been approved pursuant to an order of the Bankruptcy Court in the Chapter 11 Cases.

"Claims":  all claims, liabilities, obligations, losses, damages, penalties, judgments, proceedings, interest, costs and expenses of any kind (including remedial response costs, reasonable attorneys' fees (which shall be limited to the fees, disbursements and other charges of one primary counsel and one local counsel in each relevant jurisdiction for the Indemnitees (unless there is an actual or perceived conflict of interest in which case each such Indemnitee may retain its own counsel)), and Extraordinary Expenses) at any time (including after Full Payment of the Obligations or replacement of Administrative Agent or any Lender) incurred by any Indemnitee or asserted against any Indemnitee by any Obligor or other Person, to the extent relating to (a) any Loans, Letters of Credit, Loan Documents, Borrower Materials, or the use thereof or transactions relating thereto, (b) any action taken or omitted in connection with any Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise of any rights or remedies under any Loan Documents or Applicable Law, or (e) failure by any Obligor to perform or observe any terms of any Loan Document, in each case including all costs and expenses relating to any investigation, litigation, arbitration, settlement or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Indemnitee is a party thereto.

"Closing Date": the date upon which all conditions precedent to the effectiveness of this Agreement set forth in **Section 6.1** are satisfied or waived in accordance with the terms hereof. For the avoidance of doubt, December 10, 2021 constitutes the Closing Date.

 "Code":  the Internal Revenue Code of 1986, as amended.

"Collateral":  collectively, (a) all property described in **Section 7.1**, (b) all property (including Real Estate, personal property, mixed, owned, leased or operated by an Obligor) that is described in any DIP Order or any Security Document as security for any Obligations, and (c) all other property of an Obligor that now or hereafter secures (or is intended to secure) any Obligations; but, in all cases, excluding Excluded Assets (unless a Lien thereon is granted pursuant to the DIP Order or any other Chapter 11 Order).

"Commitment Agreement":  any written agreement (which may be contained in any supplement or amendment hereto, or in any other instrument, in each case, as determined by the Administrative Agent), duly executed and delivered by the Obligors, the Administrative Agent and any Lender (or any group of Lenders, as applicable), pursuant to which such Lender agrees to increase, extend and/or otherwise modify any of its Commitments, and/or to provide any new or additional Commitment hereunder, as the case may be, in each case, in accordance with the terms and conditions thereof and hereof (including pursuant to **Section 2.1.7** hereof); *provided*, that the form and substance of such written agreement shall be acceptable to the parties thereto.

"Commitments":  the New Money Loan Commitments.

 "Commodity Exchange Act":  the Commodity Exchange Act (7 U.S.C. § 1 *et seq*.).

"Company Advisors":  the respective counsel and any financial or professional advisors to any of the Obligors (including the Company FA) engaged by (or, at their direction, on behalf

- 10-

of) the Obligors in connection with the Chapter 11 Cases, in each case, so long as the retention and engagement thereof shall have been approved pursuant to an order of the Bankruptcy Court in the Chapter 11 Cases.

"<u>Company FA</u>":  any Person providing any structuring, financial or transactional advisory, investment banking, consulting or other similar services to any of the Obligors in connection with any Potential Transaction (but, for the avoidance of doubt, excluding any counsel); *provided*, that no such Person shall be engaged or appointed by or on behalf of any Obligor at any time as of the Closing Date unless a copy of any fee or engagement letter or other agreement entered into by any Obligor in connection therewith shall have been delivered to the Administrative Agent prior to effectiveness thereof.  As of the Closing Date, Opportune LLP constitutes a Company FA.

"<u>Company Parties</u>":  (a) the Obligors, Strike Investments and their respective Subsidiaries and (b) the Company Advisors.

"<u>Compliance Certificate</u>":  a certificate substantially in the form of **Exhibit E** hereto or otherwise reasonably acceptable to the Administrative Agent, by which Borrower Agent certifies compliance with **Section 10.3** and certifies as to other matters described in **Section 10.1.2(c)**.

"<u>Consenting Lender Advisors</u>":  collectively, the Lenders' counsel (including Stroock & Stroock & Lavan LLP), financial advisors, and other professional advisors and consultants (including Houlihan Lokey Capital, Inc. and Riveron RTS, LLC, and their respective Affiliates) (and, each such Person individually, a "<u>Consenting Lender Advisor</u>").

"<u>Consenting Lender Side Persons</u>":  collectively, the Lenders and the Consenting Lender Advisors (and, each individually, a "<u>Consenting Lender Side Person</u>").

"<u>Contingent Obligation</u>":  any obligation of a Person arising from any guaranty (including all Guarantee Obligations), indemnity or other assurance of payment or performance of any Debt, lease, dividend or other obligation ("<u>primary obligations</u>") of another obligor ("<u>primary obligor</u>") in any manner, whether directly or indirectly, including any obligation of such Person under any (a) guaranty, endorsement, co-making or sale with recourse of an obligation of a primary obligor; (b) obligation to make take-or-pay or similar payments regardless of nonperformance by any other party to an agreement; and (c) arrangement (i) to purchase any primary obligation or security therefor, (ii) to supply funds for the purchase or payment of any primary obligation, (iii) to maintain or assure working capital, equity capital, net worth or solvency of the primary obligor, (iv) to purchase property or services for the purpose of assuring the ability of the primary obligor to perform a primary obligation, or (v) otherwise to assure or hold harmless the holder of any primary obligation against loss in respect thereof.  The amount of any Contingent Obligation shall be deemed to be the stated or determinable amount of the primary obligation (or, if less, the maximum amount for which such Person may be liable under the instrument evidencing the Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto as determined by such Person in good faith.

- 11-

"Control":  the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Copyrights":  all copyrights (whether statutory or common law, whether established or registered in the United States or any other country or any political subdivision thereof, whether registered or unregistered and whether published or unpublished) and all copyright registrations and applications, together with any and all (i) rights and privileges arising under applicable law with respect to the foregoing, (ii) renewals, supplements and extensions thereof and amendments thereto, (iii) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable with respect thereto, including damages and payments for past, present or future infringements thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present or future infringements thereof.

"Covered Party":  as defined in **Section 14.20**.

"Creditor Distribution":  any Distribution (as defined in the Intercreditor Agreement).

"Crossfire":  Crossfire, LLC, a Colorado limited liability company.

"Crossfire Acquisition Effective Date":  the date on which all conditions precedent to the effectiveness of the Crossfire Acquisition Transaction have been satisfied and the transactions described in the definitive agreement in respect of the Crossfire Acquisition Transaction have been consummated.

"Crossfire Acquisition Transaction":  the acquisition of all of the Equity Interests of Crossfire (by merger or otherwise).

"CWA":  the Clean Water Act (33 U.S.C. §§ 1251 et seq.).

"Debt":   as applied to any Person, without duplication, (a) all indebtedness and obligations of such Person for Borrowed Money; (b) the deferred purchase price of assets or services that in accordance with GAAP would be included as liabilities on the balance sheet of such Person; (c) all obligations of such Person arising with respect to non-contingent earnout or similar non-contingent obligations incurred in connection with an Acquisition; (d) all Disqualified Equity Interests; (e) all reimbursement obligations in respect of letters of credit issued for the account of such Person; (f) all Debt of a second Person secured by any Lien on any property owned by such first Person, whether or not such Debt has been assumed; (g) all Capital Lease Obligations of such Person; (h) all obligations of such Person under Hedging Agreements (but taking into account only the mark-to-market value or, if any actual amount is due as a result of the termination or close-out of such transaction, that amount) and (i) without duplication, all Contingent Obligations of such Person with respect to Debt described in (a) through (h) above; *provided*, that Debt shall not include (i) [reserved], (ii) deferred or prepaid revenue, or (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller.  The Debt of a Person shall

- 12-

include any recourse Debt of any partnership in which such Person is a general partner or joint venturer.  The amount of Debt of any Person for purposes of clause (iii) shall be deemed to be equal to the lesser of (1) the aggregate unpaid amount of such Debt and (2) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Debt Issuance":  the incurrence by any Obligor or any Subsidiary of any Debt, other than Debt permitted under **Section 10.2.1**.

"Debtor":  as defined in the preamble to this Agreement.

"Default":  an event or condition that, with the lapse of time or giving of notice, would constitute an Event of Default.

"Default Rate":   with respect to (a) overdue principal of any Loan, the interest rate applicable to such Loan, *plus* 2.00% per annum, and (b) any other overdue Obligation or amount, including overdue interest, fees, premiums, expenses (to the extent permitted by Applicable Law), the interest rate applicable to Base Rate Loans, *plus* 2.00% per annum.

"Defaulting Lender":   subject to **Section 4.2.2**, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower Agent in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder (including in respect of its participation in Letters of Credit) within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (*provided*, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of an Insolvency Proceeding, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; *provided*, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with

- 13-

immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to **Section 4.2.2**) upon delivery of written notice of such determination to the Borrower and each Lender.

"Deposit Account Control Agreement":  an agreement with respect to any Deposit Account entered into by and among the Obligor in whose name such Deposit Account is maintained, the institution(s) maintaining such Deposit Account, and Administrative Agent, which agreement shall be in form and substance reasonably acceptable to the Administrative Agent and effective to establish "control" (within the meaning set forth in Sections 9-104 and 9-106 of the Uniform Commercial Code) of such Deposit Account in favor of the Administrative Agent to the extent required to perfect the Administrative Agent's Lien on such Deposit Account.

"Designated Jurisdiction":  a country or territory that is the subject of a Sanction.

"DIP Facility":  as defined in the recitals to this Agreement.

"DIP Facility Amount":  $26,000,000.

"DIP Facility Commitment Letter": that certain letter agreement (including all schedules, exhibits and attachments thereto), dated as of December 6, 2021, by and among the DIP Facility Commitment Party and the Debtors.

"DIP Facility Commitment Loans": as defined in Section 2.1.2(c).

"DIP Facility Commitment Party": Lightship Capital II LLC.

"DIP Motion" means the motion and proposed form of Interim DIP Order filed by the Obligors with the Bankruptcy Court on the Petition Date seeking approval, on an interim and final basis, of (among other things) the DIP Facility, and authorization for the use of cash collateral (including such terms and conditions relating to adequate protection in connection therewith), in each case, in form and substance acceptable to the Administrative Agent.

"DIP Orders":  collectively, the Interim DIP Order and the Final DIP Order and separately, the Interim DIP Order or the Final DIP Order, as the context requires.

"DIP Superpriority Claims":  as defined in the DIP Orders.

"Disposed EBITDA":  with respect to any Sold Entity or Business for any period, the amount for such period of EBITDA of such Sold Entity or Business (determined or estimated in good faith by the Borrower Agent as if references to Holdings and its Subsidiaries in the definition of EBITDA were references to such Sold Entity or Business and its Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

- 14-

"Disqualified Equity Interests":  any Equity Interest that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Equity Interest), or upon the happening of any event, matures or is mandatorily redeemable (other than (i) solely for Equity Interests that are not Disqualified Equity Interests and cash in lieu of fractional shares or (ii) solely at the discretion of the issuer), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, asset sale or similar event so long as any rights of the holders thereof upon the occurrence of a change of control, initial public offering, asset sale or similar event shall be subject to Full Payment of the Obligations), or redeemable at the option of the holder of the Equity Interest, in whole or in part, on or prior to the date that is 91 days after the Termination Date.  Notwithstanding the preceding sentence, any Equity Interest that would constitute Disqualified Equity Interests solely because the holders of the Equity Interests have the right to require Holdings or any Subsidiary to repurchase such Equity Interest upon the occurrence of a change of control or an asset sale will not constitute Disqualified Equity Interests if the terms of such Equity Interests provide that Holdings or such Subsidiary, as applicable, may not repurchase or redeem any such Equity Interests pursuant to such provisions unless such repurchase or redemption complies with **Section 10.2.3**.

"Disqualified Lender":  any Person that constitutes a direct competitor of the Borrowers and is designated by the Borrower Agent as a Disqualified Lender pursuant to a written notice delivered to the Administrative Agent on the Closing Date.

"Distribution":  any declaration or payment of a distribution, interest or dividend on any Equity Interest (other than payment-in-kind); or any purchase, redemption, or other acquisition or retirement for value of any Equity Interest.

"Dividing Person":  has the meaning assigned to it in the definition of "Division."

"Division":  the division of the assets, liabilities and/or obligations of a Person (the "Dividing Person") among two or more Persons (whether pursuant to a "plan of division" or similar arrangement), which may or may not include the Dividing Person and pursuant to which the Dividing Person may or may not survive.

"Dollars":  lawful money of the United States.

"Dominion Account":  each Deposit Account set forth on **Schedule 8.5** and maintained in the name of a Borrower at Bank of America or another bank reasonably acceptable to the Administrative Agent over which Administrative Agent has control and the ability to take actions during any Cash Dominion Period, pursuant to the applicable DIP Order and such other arrangements reasonably acceptable to the Administrative Agent.

"EBITDA":  for any period, the sum of Net Income for such period, plus

(a)     without duplication and, other than with respect to clauses (xvi) and (xix) below, to the extent deducted in determining Net Income for such period, the sum of:

- 15-

(i)     Interest Expense for such period;

(ii)    provision for taxes for such period, based on income or profits or capital, including state, franchise, excise, property and similar taxes and foreign withholding and similar taxes (net of tax refunds), and Tax Distributions made during such period (if permitted hereunder);

(iii)   all amounts attributable to depreciation and amortization (including amortization of intangibles) expense for such period;

(iv)    non-cash charges related to compensation expense recognized under stock option plans or otherwise accrued or realized from any deferred equity compensation plan or grants of equity appreciation or similar rights, equity options, restricted equity or other similar rights to officers, directors and employees; *provided*, that the calculation of EBITDA for any period as of the Closing Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto;

(v)     non-cash expenses for such period associated with the application of purchase accounting rules;

(vi)    RPO Expenses for such period;

(vii)   with respect to any period ended prior to the Petition Date, the amount of Management Fees that are paid or accrued during such period;

(viii)  board of directors fees and reimbursements in an amount not to exceed $150,000 for such period; *provided*, that the calculation of EBITDA for any period as of the Closing Effective Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto and such payment is in accordance with the Approved Budget;

(ix)    any unusual or non-recurring cash expenses or losses (including, whether or not otherwise includable as separate items in the statement of such consolidated Net Income for such period, losses on sales of assets outside of the Ordinary Course of Business but excluding, for the avoidance of doubt, lease termination costs with respect to the Borrower's vehicle fleet reduction program) and expenses or losses resulting from the Business Unit Consolidation; *provided*, that the calculation of EBITDA for any period as of the Closing Effective Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto;

(x)     severance, relocation costs and restructuring charges or reserves (including restructuring costs related to acquisitions after the date hereof) *provided*, that the calculation of EBITDA for any period as of the Closing Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto;

- 16-

(xi)    any other non-cash charges for such period, including non-cash charges with respect to litigation settlement accruals (but excluding any non-cash charge in respect of an item that was included in Net Income in a prior period and any non-cash charge that relates to the write-down or write-off of Accounts or Inventory); *provided*, that the calculation of EBITDA for any period as of the Closing Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto;

(xii)    [reserved];

(xiii)    transaction fees, costs and expenses incurred during such period in connection with (A) in the case of any period ending prior to the Closing Date, the execution and delivery of the Mill Point Capital Raise Agreement and related documents and the preparation for the transactions thereunder, (B) Investments permitted hereunder, (C) incurrence of, and waivers and amendments regarding, Debt permitted hereunder (including, for the avoidance of doubt, (x) all fees and expense reimbursements paid to the Administrative Agent, any Lender and/or any counsel or advisor thereto, and (y) to the extent permitted by this Agreement to be paid, fees and expense reimbursements paid to any agent and/or lender (and/or any counsel or advisor thereto) under any other Debt), and (D) issuance of Equity Interests permitted hereunder, in each case, whether or not consummated;

(xiv)    debt issuance costs and commissions, discounts and other fees associated with Borrowed Money permitted to be incurred under the Loan Documents (whether or not such Borrowed Money has been incurred);

(xv)    unrealized, non-cash market-to-market hedging losses;

(xvi)    cash Distributions received by Holdings or its Subsidiaries from Persons not consolidated with Holdings;

(xvii)    costs, expenses, and losses related to Permitted Asset Dispositions (other than the disposition of Inventory in the Ordinary Course of Business);

(xviii)    any net loss from disposed or discontinued operations; *provided*, that the calculation of EBITDA for any period as of the Closing Date shall not include any amounts hereunder unless the Administrative Agent shall have previously consented thereto;

(xix)    any Pro Forma Adjustments;

(xx)    (A) non-cash lease termination costs with respect to any Borrower's vehicle fleet reduction program paid through deferred payment options and/or capital leases to the extent the Required Lenders consent to the inclusion of such lease termination costs in EBITDA; and (B) lease termination costs (net of any proceeds received by any Borrower and included in such Borrower's Net Income in connection

- 17-

with such lease termination) with respect to such Borrower's vehicle fleet reduction program paid in cash in accordance with the Approved Budget during the relevant period; minus

(b)      without duplication and to the extent included in Net Income,

(i)      non-cash income for such period associated with the application of purchase accounting rules;

(ii)      any extraordinary, unusual or non-recurring income for such period;

(iii)      any non-cash items of income for such period;

(iv)      any cash payments made during such period in respect of non-cash charges described in clause (a)(xi) taken in a prior period;

(v)      unrealized, non-cash market-to-market hedging gains;

(vi)      gains related to Permitted Asset Dispositions (other than the disposition of Inventory in the Ordinary Course of Business); and

(vii)      any net income from disposed or discontinued operations;

*provided*, that in no event shall the sum of the amounts under sub-clauses (ix), (x) and (xix) of clause (a) exceed 10% of EBITDA for such period (without giving effect to such limit). Notwithstanding anything to the contrary herein, in no event shall any net cash proceeds of the Mill Point Capital Raise Transaction or any net cash proceeds of the New Money Loans received by Holdings, a Borrower or any Subsidiary be included in determining EBITDA for any purpose under this Agreement.

There shall be included in determining EBITDA for any period, without duplication, (1) the Acquired EBITDA of any Person, property, business or asset acquired by Holdings or any Subsidiary since the beginning of such period to the extent not subsequently sold, transferred, abandoned or otherwise disposed of by Holdings or such Subsidiary (each such Person, property, business or asset acquired and not subsequently so disposed of, an "Acquired Entity or Business"), (2) an adjustment in respect of each Acquired Entity or Business equal to the amount of the Pro Forma Adjustment (limited in amount as specified above) with respect to such Acquired Entity or Business acquired since the beginning of such period (including the portion thereof occurring prior to such acquisition) as specified in a Pro Forma Adjustment Certificate and delivered to the Administrative Agent, and (3) there shall be excluded in determining EBITDA for any period the Disposed EBITDA of any Person, property, business, line of business or asset sold, transferred, abandoned or otherwise disposed of, closed or classified as discontinued operations by Holdings or any Subsidiary since the beginning of such period, including, for the avoidance of doubt, any Disposed EBITDA in connection with the contribution of property and assets to Capstone in connection with the Capstone JV Transaction (each such

- 18-

Person, property, business, line of business or asset so sold, transferred, abandoned or otherwise disposed of, a "<u>Sold Entity or Business</u>").

"<u>EEA Financial Institution</u>":  (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>":  any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>":  any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Eligible Assignee</u>":  (a) each Lender, (b) each Affiliate of a Lender, (c) each Approved Fund, and (d) each other Person (except (i) any natural person, or (ii) the Borrower or any of the Borrower's Affiliates or Subsidiaries) approved by the Administrative Agent; *provided, however*, that each assignment to an Eligible Assignee shall be made in accordance with **Section 13.3**.

"<u>Enforcement Action</u>":  any action to enforce any Obligations or Loan Documents or to exercise any rights or remedies relating to any Collateral (whether by judicial action, self-help, notification of Account Debtors, exercise of setoff or recoupment, exercise of any right to act in an Obligor's Insolvency Proceeding or to credit bid Obligations, or otherwise, including in the Chapter 11 Cases, pursuant to any order of the Bankruptcy Court, or otherwise).

"<u>Environment</u>":  ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and subsurface strata, and natural resources such as wetland, flora and fauna.

"<u>Environmental Laws</u>":   all Applicable Laws (including all programs, permits and guidance promulgated by regulatory agencies), relating to public health (but excluding occupational safety and health, to the extent regulated by OSHA) or the protection or pollution of the environment, including CERCLA, RCRA and CWA.

"<u>Environmental Liability</u>":  any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities) whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, directly or indirectly relating to (a) any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

- 19-

"Environmental Notice":  a notice (whether written or oral) from any Governmental Authority or other Person of any possible noncompliance with, investigation of a possible violation of, litigation relating to, or potential fine or liability under any Environmental Law, or with respect to any Environmental Release, environmental pollution or hazardous materials, including any complaint, summons, citation, order, claim, demand or request for correction, remediation or otherwise.

"Environmental Release":  a release as defined in CERCLA or under any other Environmental Law.

"Environmental Restoration":  with respect to any project, any and all related clean-up, disposal of extraneous materials on site, restoration of disturbed pre-existing landscaping or necessary regrading of land, re-paving or restoration of ground coverings, ancillary repairs to adjacent or relevant structures, and removal of all construction equipment from the applicable project site or sites, in each case, to the extent required to be undertaken or performed pursuant to the requirements of the contract governing such project.

"Equity Interest":  the interest of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or joint venture); (c) member in a limited liability company; or (d) Person having any other form of equity security or ownership interest in another Person, including common stock and preferred stock, and including all of the warrants, options or other rights for the purchase or acquisition from such Person of such Equity Interests in such Person.

"ERISA":  the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate":  any trade or business (whether or not incorporated) under common control with an Obligor within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event":  (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Obligor or ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Obligor or ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the determination that any Pension Plan or Multiemployer Plan is considered an at risk plan or a plan in critical or endangered status under the Code, ERISA or the Pension Protection Act of 2006; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (g) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Obligor or ERISA Affiliate; or (h) with respect to any Pension Plan, a failure to satisfy the

- 20-

minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived, or a failure to make a required contribution to a Multiemployer Plan.

"Escrow Account": an escrow account established pursuant to the Escrow Agreement.

"Escrow Agreement": has the meaning defined in the Stalking Horse Agreement.

"Estate Professional": any Person that is a Company Advisor or a Chapter 11 Unsecured Creditors Committee Professional as of the time of determination (such Persons, collectively, the "Estate Professionals").

"EU Bail-In Legislation Schedule":  the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default":  as defined in **Section 11**.

"Excess Cash Amount":  as defined in **Section 5.3.1**.

"Excess Cash Prepayment":  as defined in **Section 5.3.1**.

"Exchange Act":  Securities Exchange Act of 1934.

"Excluded Account":  any Deposit Account in the name of any Borrower (a) that is used exclusively for payroll, payroll taxes and other employee wage and benefit payments in the Ordinary Course of Business; or (b) that is a trust, fiduciary, or withholding tax payment account; *provided*, that, no other Deposit Accounts shall constitute an Excluded Account.

"Excluded Assets":

(a)     any lease, license, contract, or agreement (including, with respect to any Purchase Money Debt or similar arrangement, in each case, permitted hereunder, the assets subject thereto) to which any Obligor is a party or any of its rights or interests thereunder if and only for so long as the grant of a security interest or Lien under this Agreement (i) is prohibited by Applicable Law during the Chapter 11 Cases, or would constitute or result in the abandonment, invalidation or unenforceability of any right, title or interest of such Obligor therein pursuant to Applicable Law during the Chapter 11 Cases, (ii) would require the consent of third parties (and such consent requirement is enforceable during the Chapter 11 Cases), and such consent shall have not been obtained notwithstanding the Obligors' commercially reasonable efforts to obtain the same, or (iii) would constitute or result in a breach, termination or default under any such lease, license, contract or agreement (in each case other than to the extent that any such prohibition, limitation, consent requirement or other term thereof would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC of any relevant jurisdiction, the Bankruptcy Code or any other Applicable Law or any principles of equity); *provided*, that such lease, license, contract or agreement (including, with respect to any Purchase Money Debt or similar arrangement, in each case, permitted hereunder,

- 21-

the assets subject thereto) will be an Excluded Asset only to the extent and for so long as the consequences specified above will result and will cease to be an Excluded Asset, and will become Collateral, immediately and automatically, at such time as such consequences will no longer result;

      (b)    Excluded Accounts;

      (c)    [reserved];

      (d)    any United States intent-to-use trademark applications to the extent the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark application under applicable federal law notwithstanding the DIP Orders; and

      (e)    Margin Stock;

*provided*, that "Excluded Assets" shall not include (i) any proceeds, products, substitutions or replacements of Excluded Assets (unless such proceeds, products, substitutions or replacements would otherwise constitute Excluded Assets); *provided*, *further*, that upon the occurrence of an event that renders property to no longer constitute Excluded Assets, a security interest in such property shall be automatically and simultaneously granted under the Security Documents and such property shall be automatically included as Collateral hereunder.

"Excluded Cash": as defined in the Stalking Horse Agreement.

"Excluded Swap Obligation":  with respect to an Obligor, each Swap Obligation as to which, and only to the extent that, such Obligor's guaranty of or grant of a Lien as security for such Swap Obligation is or becomes illegal under the Commodity Exchange Act because the Obligor does not constitute an "eligible contract participant" as defined in the Commodity Exchange Act (determined after giving effect to any keepwell, support or other agreement for the benefit of such Obligor and all guarantees of Swap Obligations by other Obligors) when such guaranty or grant of Lien becomes effective with respect to the Swap Obligation.  If a Hedging Agreement governs more than one Swap Obligation, only the Swap Obligation(s) or portions thereof described in the foregoing sentence shall be Excluded Swap Obligation(s) for the applicable Obligor.

"Excluded Taxes":  with respect to the Administrative Agent, any Lender or any other recipient of a payment to be made by or on account of any Obligation, (a) Taxes imposed on or measured by its net income (however denominated), branch profits Taxes and franchise Taxes imposed on it by a taxing jurisdiction, in each case, as a result of (i) such recipient being organized or having its principal office, or, in the case of any Lender, having its applicable Lending Office located, in such jurisdiction, or (ii) a present or former connection between such recipient and the taxing jurisdiction (other than connections arising from the Administrative Agent, such Lender or such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned

an interest in any Loan or Loan Document); (b) any Tax imposed on a Lender as a result of such Lender's failure to comply with **Section 5.10**; (c) in the case of a Lender, any U.S. federal withholding tax imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to laws in force at the time such Lender becomes a Lender (or designates a new Lending Office) hereunder (other than pursuant to an assignment requested by the Borrower under **Section 3.8**), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, immediately prior to designation of a new Lending Office (or assignment), to receive additional amounts from any Obligor with respect to such U.S. federal withholding tax and (d) withholding Taxes imposed by FATCA.

"Extraordinary Expenses": all costs or expenses that Administrative Agent in accordance with the terms hereof incurs during an Event of Default, or during the pendency of an Insolvency Proceeding of an Obligor, relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against Administrative Agent, any Lender, any Obligor, any representative of creditors of an Obligor or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of Administrative Agent's Liens with respect to any Collateral), Loan Documents, Letters of Credit or Obligations, including any lender liability or other Claims; (c) the exercise, protection or enforcement of any rights or remedies of Administrative Agent in, or the monitoring of, any Insolvency Proceeding; (d) settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral; (e) any Enforcement Action; (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan Documents or Obligations; and (g) Protective Advances.  Such costs, expenses and advances include transfer fees, Other Taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, reasonable, documented, and out-of-pocket legal fees, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any Obligor or independent contractors in liquidating any Collateral, and travel expenses.

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations of any of the foregoing, any intergovernmental agreements entered into in connection therewith and any agreements entered into pursuant to Section 1471(b)(1) of the Code as of the date of this Agreement (or any amended or successor version described above).

"Federal Funds Rate": for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided*, that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded

NY 78904694v1NY 78904694v7

upward, if necessary, to a whole multiple of 1/100 of 1%) on such day on such transactions as determined by the Administrative Agent.

"Final Completion":  the date on which all services related to a project and contracted to be performed under all applicable work orders and any relevant service contract with respect to such project have been completed, including any and all Environmental Restoration, and such services have been accepted by the applicable Account Debtor as complete.

"Final DIP Order":  an order of the Bankruptcy Court in the Chapter 11 Cases, which order (a) shall be in form and substance, and on terms and conditions, satisfactory to the Required Lenders, (b) shall, subject to the foregoing, authorize and approve, on a final basis, among other things, the DIP Facility and the transactions related thereto (including the making of the Loans, the Roll-Up, and the incurrence of the Obligations), the Debtors' use of cash collateral, and the grant of adequate protection, (c) shall be in full force and effect, and (d) (i) shall not have been reversed, vacated, or stayed and (ii) shall not have been amended, supplemented or otherwise modified since entry thereof by the Bankruptcy Court.

"Final DIP Order Date":  the date on which the Final DIP Order is approved and entered by the Bankruptcy Court.

"First Day Motions" means any "first day" or "second day" motions and pleadings to be filed by the Obligors with the Bankruptcy Court on the Petition Date in connection with the Chapter 11 Cases, including, without limitation, the DIP Motion, and the Sale Procedures Motion, each of which shall be in form and substance acceptable to the Administrative Agent.

"Fiscal Quarter":  each period of three months, commencing on the first day of a Fiscal Year.

"Fiscal Year":  the fiscal year of Holdings and its Subsidiaries for accounting and tax purposes, ending on December 31 of each year.

"FLSA":  the Fair Labor Standards Act of 1938.

"Foreign Lender":  any Lender that is not a U.S. Person.

"Foreign Plan":  any employee benefit plan or arrangement (a) maintained or contributed to by any Obligor or Subsidiary that is not subject to the laws of the United States; or (b) mandated by a government other than the United States for employees of any Obligor or Subsidiary.

"Full Payment":   with respect to the Loans and all other Obligations (other than Remaining Obligations), (a) the indefeasible payment thereof in full in cash in accordance with the Loan Documents or as otherwise consented to in writing by the Lenders (including in connection with the consummation of any Sale Transaction or any other transaction pursuant to which all or substantially all of the Debtors' property and assets are sold, transferred or otherwise disposed of (including pursuant to Section 363 of the Bankruptcy Code)), including with respect

- 24-

to the Termination Payments, and all interest, fees and other amounts (including Post-Petition Interest); *provided*, that, notwithstanding the foregoing, Full Payment shall not be deemed to occur, and no Loans shall be deemed to have been paid in full, unless and until such time as all Commitments shall have irrevocably, permanently and finally expired, or shall have been so terminated, cancelled and discharged.

"GAAP":  generally accepted accounting principles in effect in the United States from time to time.

"Governmental Approvals":   all authorizations, consents, approvals, licenses and exemptions of, registrations and filings with, and required reports to, all Governmental Authorities.

"Governmental Authority":  any federal, state, local, foreign or other agency, authority, body, commission, court, instrumentality, political subdivision, or other entity or officer exercising executive, legislative, judicial, regulatory or administrative functions for any governmental, judicial, investigative, regulatory or self-regulatory authority.

"Guarantee Obligation":  as to any Person (the "guaranteeing person") any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; *provided*, *however*, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof, as determined by the Borrowers in good faith.

"Guarantor":  each Person that is, or at any time becomes, a party to (or otherwise agrees to be bound by) any Guaranty, or that otherwise guarantees payment or performance of any

- 25-

Obligations or owes any Guarantee Obligations to the Secured Parties.  As of the Closing Date, each of Holdings and each Subsidiary Guarantor is a Guarantor.

"Guarantor Payment":  as defined in **Section 5.11.3**.

"Guaranty":  each guaranty agreement executed by a Guarantor in favor of Administrative Agent, substantially in the form of **Exhibit D** or otherwise in form reasonably acceptable to the Administrative Agent.

"Hazardous Materials":  all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants including petroleum or petroleum distillates, natural gas, natural gas liquids, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, toxic mold, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants or compounds of any nature in any form regulated pursuant to any Environmental Law.

"Hedging Agreement":  any "swap agreement" as defined in Section 101(53B)(A) of the Bankruptcy Code.

"Holdings":  Strike HoldCo, LLC, a Delaware limited liability company.

"Indemnified Taxes":  (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Obligor under any Loan Document, and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitees":  Agent Indemnitees and Lender Indemnitees.

"Initial Budget":  a 9 -week cash flow forecast that (a) sets forth, on a line-item, cumulative and aggregate basis, the Obligors' projections for all weekly receipts and disbursements/expenditures (including debt service costs) expected to be collected, incurred or made (as the case may be) by the Obligors and their Subsidiaries, in each case, during the period beginning with the calendar week ending on Friday of the week in which the Petition Date occurs, and ending on (and including) the week ended as of the Friday of the week after the Maturity Date, and (b) is in all respects in form and substance satisfactory to the Administrative Agent.  For the avoidance of doubt, Exhibit 1 to the Interim DIP Order shall constitute the Initial Budget (and a copy thereof is attached as Exhibit H hereto).

 "Insolvency Proceeding":  any case or proceeding commenced by or against a Person under any state, federal or foreign law, rule or regulation for, or any agreement of such Person to any or a combination of the following (each, a "Bankruptcy Law"): (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment or reorganization law (including any moratorium or any other marshalling of the assets and liabilities of any Person and any similar laws, rules or regulations relating to or affecting the enforcement of creditors' rights generally); (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its property; or (c) an assignment or trust mortgage for the benefit of creditors.

- 26-

"Intellectual Property":  all intellectual and similar property of a Person, including: Patents, Trademarks, Copyrights and Technology; all embodiments or fixations thereof and all related documentation, applications, registrations and franchises; all licenses or other rights to use any of the foregoing; and all books and records relating to the foregoing.

"Intellectual Property Claim":  any claim or assertion (whether in writing, by suit or otherwise) that Holding's or a Subsidiary's ownership, use, marketing, sale or distribution of any Inventory, Equipment, Intellectual Property or other property or methods, processes or services violates, infringes, dilutes or misappropriates another Person's Intellectual Property.

"Intellectual Property Collateral":  all Intellectual Property and Licenses of each Obligor, whether now or hereafter owned, licensed or acquired.

"Intercreditor Agreement":  the Intercreditor Agreement, dated as of November 30, 2016, by and among the Prepetition Senior Loan Agent and the Prepetition Junior Loan Agent, as acknowledged and agreed to by the Obligors, as amended or otherwise modified from time to time in accordance with its terms and as in effect on the Petition Date.

"Interest Expense":  for any period, total interest expense (including that attributable to Capital Leases) of Holdings and its Subsidiaries for such period with respect to all outstanding Debt of Holdings and its Subsidiaries (including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptances and net costs under Hedging Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP), calculated on a consolidated basis for Holdings and its Subsidiaries for such period in accordance with GAAP, but excluding, however, (a) amortization of deferred financing costs and any other amounts of non-cash interest, (b) the accretion or accrual of discounted liabilities during such period, and (c) all non-recurring cash interest expense consisting of liquidated damages for failure to comply in a timely manner with registration rights obligations and financing fees, all as calculated on a consolidated basis in accordance with GAAP.

"Interest Period":  as defined in **Section 3.1.3**.

"Interim DIP Order":  an order of the Bankruptcy Court in the Chapter 11 Cases in connection with the DIP Motion, which order shall (a) be in form and substance, and on terms and conditions, satisfactory to the Required Lenders, (b) subject to the foregoing, authorize and approve, on an interim basis, among other things, the DIP Facility and all other matters set forth in, and transactions contemplated by, the DIP Motion, (including, without limitation, the DIP Facility, the making of the Loans, the New Money Loan Commitment Payment, the Termination Payment, and the incurrence of all other Obligations in accordance with the terms hereof, the Debtors' use of cash collateral, and the grant of adequate protection), (c) be in full force and effect, and (d) not have been reversed, vacated, stayed or amended, supplemented or otherwise modified (unless the Required Lenders shall have previously consented thereto in writing).

"Interim Hearing":  has the meaning specified therefor in the Interim DIP Order.

NY 78904694v1NY 78904694v7

"<u>Inventory</u>":  as defined in the UCC, including all goods intended for sale, lease, display or demonstration; all work in process; and all raw materials, and other materials and supplies of any kind that are or could be used in connection with the manufacture, printing, packing, shipping, advertising, sale, lease or furnishing of such goods, or otherwise used or consumed in a Person's business (but excluding Equipment).

"<u>Investment</u>":  an Acquisition; an acquisition of record or beneficial ownership of any Equity Interests of a Person; or a loan advance or capital contribution to or other debt or equity investment in a Person.

"<u>IRS</u>":  the United States Internal Revenue Service.

"<u>Lender</u>":  as of any time of determination, each Person that has a Commitment and/or holds any Loan at such time (including any Person that has become a Lender pursuant to an Assignment and Acceptance) (the foregoing Persons, collectively, the "<u>Lenders</u>").  As of the Closing Date, the Lenders shall be the Persons whose name is set forth on **Schedule 1.1** hereto under the heading "Lenders".

"<u>Lender Indemnitees</u>":  Lenders and their officers, directors, employees, Affiliates, agents and attorneys.

"<u>Lending Office</u>":  the office designated as such by the applicable Lender at the time it becomes party to this Agreement or thereafter by notice to Administrative Agent and Borrower Agent.

"<u>LIBOR</u>":

(a)    for any Interest Period with respect to a LIBOR Loan, the rate per annum equal to the London Interbank Offered Rate ("<u>LIBOR</u>") or a comparable or successor rate, which rate is approved by the Administrative Agent, as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period; and

(b)    for any interest calculation with respect to a Base Rate Loan on any date, the rate per annum equal to LIBOR, at or about 11:00 a.m., London time determined two Business Days prior to such date for U.S. Dollar deposits with a term of one month commencing that day; and

(c)    at no time shall LIBOR be less than 1.00% per annum for purposes of this Agreement;

*provided*, that to the extent a comparable or successor rate is approved by the Administrative Agent in connection herewith, the approved rate shall be applied in a manner

- 28-

consistent with market practice and acceptable to the Administrative Agent; *provided*, *further*, that to the extent such market practice is not administratively feasible for the Administrative Agent at any time or from time to time, such approved rate shall be applied in a manner as otherwise determined by the Administrative Agent.

"LIBOR Loan":  a Loan that bears interest based on LIBOR.

"License":  all license and distribution agreements with, and covenants not to sue, any other party with respect to any Intellectual Property or Intellectual Property Collateral, whether such Obligor is a licensor or licensee, distributor or distributee under any such license or distribution agreement, together with any and all (i) renewals, extensions, supplements, amendments and continuations thereof, (ii) income, fees, royalties, damages, claims and payments now and hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements, breaches or violations thereof, (iii) rights to sue for past, present and future infringements, breaches or violations thereof and (iv) other rights to use, exploit or practice any or all of the Intellectual Property or Intellectual Property Collateral.

"Lien":  any Person's interest in real or personal property securing an obligation owed to, or a claim by, such Person, including any mortgage, lien, security interest, pledge, hypothecation, trust, reservation, encroachment, easement, right-of-way, or other title exception or encumbrance.

"Lightship":  Lightship Capital II LLC.

"Liquidity":  as of any date of determination, the sum of unrestricted cash and Cash Equivalents (based on the book balance thereof) of the Borrowers and its Subsidiaries held in a Deposit Account subject to a Deposit Account Control Agreement in favor of the Administrative Agent.

"Loan":  each and any New Money Loan, Roll-Up Loan, DIP Facility Commitment Loan, and any other loan made (or deemed made) hereunder or pursuant hereto from time to time.

"Loan Documents":  this Agreement, the Other Agreements and the Security Documents.

"Loan Year":  each 12 month period commencing on the Closing Date and on each anniversary of the Closing Date.

"Management Agreement":  that certain Management Services Agreement dated as of February 12, 2021, among Mill Point, Strike Investment and the Borrower, as the same may be amended, restated and/or modified from time to time.

"Management Fees":  any management fee payable pursuant to the Management Agreement in connection with management, monitoring, consulting and advisory services provided by Mill Point to Holdings or its Subsidiaries; *provided*, that, no such fee or other amount pursuant to the Management Agreement shall be paid at any time on or after the Petition Date.

- 29-

"<u>Margin Stock</u>":  as defined in Regulation U of the Board of Governors.

"<u>Material Adverse Effect</u>":  the effect of any event or circumstance that, taken alone or in conjunction with other events or circumstances (other than as a result of the events and conditions related and/or leading up to the commencement of the Chapter 11 Cases, or any defaults under agreements that have no effect under the terms of the Bankruptcy Code as a result of the commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Chapter 11 Cases), (a) has had or could be reasonably expected to have a material adverse effect (i) on the business, operations, properties, or financial condition of Holdings and its Subsidiaries, taken as a whole, (ii) on the value of Collateral, taken as a whole, (iii) on the enforceability of any Loan Documents, or (iv) on the validity or priority of Administrative Agent's Liens on a material portion of the Collateral; (b) materially impairs or has a material adverse effect on the ability of the Obligors, taken as a whole, to perform their obligations under the Loan Documents, including repayment of any Obligations; or (c) otherwise impairs or has a material adverse effect on the ability of Administrative Agent to enforce or collect any Obligations or to realize upon a material portion of the Collateral.

"<u>Material Contract</u>":  any written agreement or arrangement to which Holdings or a Subsidiary is party (other than the Loan Documents or Prepetition Loan Agreements) for which breach, termination, nonperformance or failure to renew could reasonably be expected to have a Material Adverse Effect.

"<u>Maturity Date</u>":  the date that is 75 days after the Petition Date.

"<u>Milestones</u>":  the milestones set forth on **Schedule 10.1.13** hereto.

"<u>Mill Point</u>":  Mill Point Capital, LLC, a Delaware limited liability company.

"<u>Mill Point Capital Raise Agreement</u>":  that certain Securities Purchase Agreement, dated as of February 12, 2021, by and between Strike Capital, Strike Investment and Mill Point Splitter.

"<u>Mill Point Capital Raise Instruments</u>":  the instruments issued and/or sold to Mill Point Splitter prior to the Closing Date in the form of Equity Interests (other than Disqualified Equity Interests) of Strike Investment.

"<u>Mill Point Capital Raise Transaction</u>":  the transactions contemplated by the Mill Point Capital Raise Agreement, including the issuance of the Mill Point Capital Raise Instruments prior to the Closing Date.

"<u>Mill Point Splitter</u>":  Mill Point Strike Splitter LP, a Delaware limited partnership.

"<u>Moody's</u>":  Moody's Investors Service, Inc., and its successors.

"<u>Multiemployer Plan</u>":  any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Obligor or ERISA Affiliate makes or is obligated to make

- 30-

contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Proceeds":  as defined in the Prepetition Term Loan Credit Agreement.

"Net Income":  for any period, the consolidated net income (or loss) of Holdings and its Subsidiaries, determined on a consolidated basis in accordance with GAAP; *provided*, that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with Holdings or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary) in which Holdings or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by Holdings or such Subsidiary in the form of dividends or similar distributions, (c) the undistributed earnings of any Subsidiary that is not an Obligor to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any contractual obligation (other than under any Loan Document) or Applicable Law applicable to such Subsidiary, (d) the cumulative effect of a change in accounting principles during such period to the extent included in Net Income, and (e) any income (loss) for such period attributable to the early extinguishment of Debt.  There shall be excluded from Net Income for any period the purchase accounting effects of adjustments to inventory, property and equipment, software and other intangible assets and deferred revenue in component amounts required or permitted by GAAP and related authoritative pronouncements (including the effects of such adjustments pushed down to Holdings and its Subsidiaries) as a result of any acquisition whether consummated before or after the Closing Date, any Investment, or the amortization or write-off of any amounts hereof.

"New Money Loan Cap":  $26,000,000.

 "New Money Loan Commitment":  the New Money Loan Tranche A Commitment and/or the New Money Loan Tranche B Commitment (collectively and/or individually, as the context may require; provided, that the aggregate amount of the New Money Loan Commitment shall not exceed the New Money Loan Cap).

"New Money Loan Commitment Payment": a payment (for the account of Lenders holding New Money Loan Commitments) required to be made by the Borrowers on the Closing Date pursuant to the DIP Facility Commitment Letter and otherwise in accordance with **Sections 3.2.4** and **2.1.2** hereof, in an aggregate amount equal to 7.5% of the New Money Loan Cap.

"New Money Loan Commitment Termination Date":  the earliest to occur of (a) the Termination Date, (b) the Stalking Horse Sale Closing Date (unless a Notice of Borrowing for a Borrowing of New Money Loans on the Stalking Horse Sale Closing Date shall have been duly delivered by the Business Day immediately prior to the Stalking Horse Sale Closing Date in accordance herewith, in which case the New Money Loan Commitment Termination Date shall not be deemed to occur pursuant to this clause (b) in respect of the New Money Loan Commitment relating to such Borrowing), and (c) the date on which the New Money Loan Commitments are reduced to zero, or otherwise terminate or expire, or are cancelled, in each

- 31 -

case, in accordance with the terms hereof (whether pursuant to **Section 2.1.2**, **Section 2.1.4** or otherwise).

"New Money Loan Tranche A Cap":  $22,000,000.

"New Money Loan Tranche A Commitment":  the commitment and obligation of the Lenders to fund their Pro Rata shares of New Money Loans pursuant to **Section 2.1.2** in an aggregate principal amount outstanding at any time not to exceed the amount determined at such time to be equal to (a) the New Money Loan Tranche A Cap, *minus* (b) the aggregate principal amount of New Money Loans made through to such time, *plus* (c) the aggregate principal amount of New Money Loans prepaid or repaid prior to such time pursuant to an Excess Cash Prepayment in accordance with Section ~~5.3.1.~~5.3.1; provided, that, in the event that, on the Stalking Horse Sale Closing Date, the AP Trade Balance exceeds $13.5 million, then, at the Administrative Agent's election (effectuated upon delivery by the Administrative Agent to the Borrower Agent of a written notice thereof, which may include electronic email to counsel to the Borrower), the New Money Loan Tranche A Commitment (determined in accordance with the foregoing) shall immediately and automatically be deemed permanently reduced, on a dollar for dollar basis, by an amount equal to the amount by which the AP Trade Balance exceeds $13.5 million (the foregoing, the "New Money Loan Tranche A Commitment Reduction").  For the avoidance of doubt, in addition to any reduction resulting from the New Money Loan Tranche A Commitment Reduction, if applicable from time to time, the New Money Loan Tranche A Commitment shall also be adjusted to reflect any increase or reduction (as applicable )resulting from the operation of the other provisions hereof (including pursuant to Sections 2.1.7 and/or 2.1.4).

"New Money Loan Tranche A Commitment Reduction": as defined in "New Money Loan Tranche A Commitment".

"New Money Loan Tranche B Commitment":  the commitment and obligation of the Lenders to fund their Pro Rata shares of New Money Loans on the Stalking Horse Sale Closing Date pursuant to **Section 2.1.2** in an aggregate principal amount ~~not~~equal to ~~exceed~~ the Tranche B Wind Down ~~Statutory Expense Amount, to the extent that the Wind Down Budget contained in the Approved Budget then in effect shows a need therefor in to facilitate payment of Wind Down Statutory Expenses due on or after the Stalking Horse Sale Closing Date.~~ Amount  Each Lender's New Money Loan Tranche B Commitment shall be automatically and permanently reduced, on a dollar-for-dollar basis, by the principal amount of New Money Loans made by it pursuant to Section 2.1.2(a)(ii).

"New Money Loans":  Loans made hereunder pursuant to a funding of cash by Lenders having New Money Loan Commitments.

"Notice of Borrowing":  a Notice of Borrowing to be provided by Borrower Agent to request a Borrowing of Loans, substantially in the form of **Exhibit C-1** hereto or such other form as may be approved by the Administrative Agent (including any form on an electronic platform

or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Senior Officer of the Borrower.

"<u>Notice of Conversion/Continuation</u>":   a Notice of Conversion/Continuation to be provided by Borrower Agent to request a conversion or continuation of any Loans as LIBOR Loans, substantially in the form of **Exhibit C-2** hereto or otherwise reasonably acceptable to the Administrative Agent.

"<u>Obligations</u>":   all (a) principal of, and premium, if any, on the Loans (including all Roll-Up Loans, all New Money Loans, all DIP Facility Commitment Loans, and Loans resulting from, and deemed made in connection with payment of, PIK Interest, the New Money Loan Commitment Payment and the Termination Payments), and, without limiting the foregoing, all obligations and indebtedness with respect to the New Money Loan Commitment Payment and the Termination Payments, (b) interest (including interest accruing after the Termination Date or other maturity of the Loans, and Post-Petition Interest), expenses, fees, indemnification obligations, Extraordinary Expenses and other amounts payable by Obligors under Loan Documents (including, without limitation, all amounts pursuant to **Sections 3**, **5**, **10**, and **14.2**), and all charges accruing during the Chapter 11 Cases, and (c) other Debts, obligations and liabilities of any kind owing by Obligors pursuant to the Loan Documents, whether now existing or hereafter arising, whether evidenced by a note or other writing, whether allowed in any Insolvency Proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several; *provided*, that Obligations of an Obligor shall not include Excluded Swap Obligations.

"<u>Obligor</u>":   each Borrower, Guarantor, or other Person that has granted a Lien in favor of Administrative Agent on its assets to secure any Obligations.

"<u>Ordinary Course of Business</u>":   in respect of any obligation of, transaction involving, action taken by, or agreement or arrangement entered into by, any Person, the ordinary course of such Person's business, as conducted by any such Person in accordance with past practice or otherwise undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in, or any requirement of, any Loan Document, any Restructuring Transaction Document or Applicable Law; *provided*, that, (i) any of the foregoing that occurs on or at any time after the Petition Date shall only be deemed to be in the Ordinary Course of Business if and to the extent that the same constitutes "ordinary course of business" pursuant to section 363 of the Bankruptcy Code, and (ii) any payment, disbursement or liability made or arising as of the Petition Date shall only be deemed to be in the Ordinary Course of Business if, in addition to satisfying the foregoing requirements, the same shall be in accordance with the Approved Budget.

"<u>Organic Documents</u>":   with respect to any Person, its charter, certificate or articles of incorporation, bylaws, articles of organization, limited liability agreement, operating agreement, members agreement, shareholders agreement, partnership agreement, certificate of partnership,

- 33-

certificate of formation, voting trust agreement, or similar agreement or instrument governing the formation or operation of such Person.

"OSHA":  the Occupational Safety and Hazard Act of 1970.

"Other Agreement":  the Agent Fee Letter and each other fee letter, Compliance Certificate, or other note, document, instrument or agreement (other than this Agreement or a Security Document) now or hereafter delivered by an Obligor to Administrative Agent or a Lender in connection with this Agreement.

"Other Connection Taxes":  with respect to the Administrative Agent, any Lender or any other recipient, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes":  all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, except any such Taxes, charges or levies imposed with respect to an assignment (other than any assignment pursuant to **Section 3.8**) that are Other Connection Taxes.

"Paid in Kind":  as used with respect to payment of any accrued interest or any fee or other amount hereunder (including the New Money Loan Commitment Payment and the Termination Payment), shall mean that such interest or fee or other amount hereunder shall (automatically, by operation of the terms hereof, without the requirement for any Person to take any action or cause anything to be done in order to effectuate such payment) be deemed paid at 12:01 a.m. (New York City time) on due date therefor by deeming the Dollar amount of such interest payment or fee or other amount hereunder (calculated in accordance with **Section 3**) to be automatically capitalized as an equivalent principal amount of the Loans (and such amount shall be compounded onto, and added to the aggregate principal amount of such Loan outstanding immediately prior to such payment date or fee date), such that, immediately after giving effect to the payment thereof as described herein, the aggregate outstanding principal amount of such Loans shall include the amount of such interest, fee or other amount paid as provided herein.  For the avoidance of doubt, once paid in accordance with the foregoing, PIK Interest shall cease to constitute accrued interest and shall instead constitute Loan principal, which shall be deemed incurred at such time, and shall thereupon accrue interest in accordance with **Section 3**.

"Participant":  as defined in **Section 13.2**.

"Participant Register":  as defined in **Section 13.2.4**.

- 34-

"Pate Group":  all or any of (a) Stephen V. Pate, Richmond Pate, Kevin Pate, and Aaron Cole Pate, any of their parents, spouses, lineal descendants of any of their parents, any spouse of a lineal descendant of any of their parents, or any estate or heir of any of the foregoing, and (b) any trust, limited partnership, limited liability company, corporation or other entity, the beneficiaries, partners, members, shareholders or other equity holders of which consist of, or are Controlled by, one or more Persons referenced in clause (a) of this definition.

"Patents":  all patents and all patent applications (whether issued, applied for or allowed in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable law with respect to the foregoing, (ii) inventions, discoveries, designs and improvements described or claimed therein, (iii) reissues, divisions, continuations, reexaminations, extensions and continuations-in-part thereof and amendments thereto, (iv) income, fees, royalties, damages, claims and payments now or hereafter due and/or payable thereunder and with respect thereto including damages and payments for past, present or future infringements thereof, (v) rights corresponding thereto throughout the world and (vi) rights to sue for past, present or future infringements thereof.

"Patriot Act":  the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

"Payment Item":  each check, draft or other item of payment payable to Holdings or any Subsidiary, including those constituting proceeds of any Collateral.

"PBGC":  the Pension Benefit Guaranty Corporation.

"Pension Plan":  any employee pension benefit plan (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Obligor or ERISA Affiliate or to which the Obligor or ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the preceding five plan years.

"Permitted Asset Disposition":  an Asset Disposition that is any one or more of the following, but, in each case, only if, and so long as, no Default shall exist or arise at the time of, or after giving effect to, such Asset Disposition (including under the Budget Covenant:

(a)      a sale of Inventory or Equipment in the Ordinary Course of Business;

(b)      dispositions of property (other than Accounts or Inventory); *provided*, that the fair market or book value (whichever is more) of all dispositions made in reliance on this clause (b) (taken as a whole and determined in the aggregate) at any time on or after the Closing Date shall not exceed $1,000,000;

- 35-

(c)      a disposition of property that is obsolete, surplus, unmerchantable or otherwise unsalable, including the abandonment or other disposition of immaterial Intellectual Property, in the Ordinary Course of Business;

(d)      termination of a lease of real or personal property the result of which could not reasonably be expected to have a Material Adverse Effect; *provided*, that prior written consent of the Administrative Agent shall in any event be required in connection with any such termination with respect to a lease involving payments to or by any Obligor or any of its Subsidiaries in excess of $1,000,000 in any Fiscal Year;

(e)      the sale or discount (or forgiveness), in each case without recourse and in the ordinary course of business, of accounts receivable or notes receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof or in connection with the bankruptcy or reorganization of the applicable account debtors and dispositions of any securities received in any such bankruptcy or reorganization;

(f)      dispositions resulting from any casualty or other insured damage to, or any taking under any power of eminent domain or by condemnation or similar proceeding of, any real or personal property of any Obligor;

(g)      any transactions permitted by **Sections 10.2.2**, **10.2.3**, **10.2.4** or **10.2.8**;

(h)      non-exclusive licensing agreements for any intellectual property, leases or subleases, in each case in the Ordinary Course of Business;

(i)      approved in writing by the Administrative Agent (with the Required Lenders' consent);

(j)      replacement of Equipment that is worn, damaged or obsolete with Equipment of like function and value, if the replacement Equipment is acquired substantially contemporaneously with such disposition and is free of Liens (other than Permitted Liens);

(k)      a disposition of property to the extent that (i) such property is immediately exchanged for credit against the purchase price of similar replacement property (and such purchase is consummated promptly thereafter) or (ii) the proceeds of such disposition are applied to the purchase price of such replacement property (which replacement property is actually promptly purchased); *provided*, that, if any property acquired hereunder constitutes Collateral, the Administrative Agent shall be granted a fully perfected Lien thereon in accordance with the requirements hereof and having the same priority as all other Liens granted to secure the Obligations;

(l)      a lease, sublease, license or sublicense of any real or personal property which is entered into in good faith and does not materially interfere with the business of the Obligors, taken as a whole; *provided*, that any payments by any Obligor with respect

- 36-

thereto shall be set forth in the Approved Budget and shall be in accordance with the Budget Covenant and the DIP Orders;

(m)     the unwinding of Hedging Agreements; *provided*, that, the Net Cash Proceeds thereof shall be applied to repay the Loans in accordance with **Section 5.3**;

(n)     dispositions of personal property to an Obligor in the Ordinary Course of Business;

(o)     the liquidation or other disposition of cash and Cash Equivalents in the Ordinary Course of Business;

(p)     the surrender or waiver of contractual rights and the settlement or waiver of contractual or litigation claims in the Ordinary Course of Business or in the commercially reasonable judgment of the Obligors, and, in each case, solely if and to the extent permitted in the Chapter 11 Cases and not in violation of any Restructuring Transaction Document;

(q)     any Asset Disposition previously approved by the Administrative Agent in writing; and

(r)     as long as no Default or Event of Default exists, the Asset Dispositions identified in writing to the Administrative Agent prior to the Closing Date, so long as the same shall be consummated in accordance with the Approved Budget and that any receipts and disbursements in respect thereof are in accordance with the Approved Budget; *provided*, that all proceeds thereof shall be applied to repay the Obligations in accordance with **Section 5.2** (the "Additional Specified Vehicle Dispositions"),

*provided*, that, notwithstanding anything to the contrary, neither Holdings nor any Subsidiary shall make any Asset Disposition in connection with a sale-leaseback transaction without the prior written consent of the Administrative Agent.

"Permitted Contingent Obligations":     Contingent Obligations (a) arising from endorsements of Payment Items for collection or deposit in the Ordinary Course of Business; (b) arising from Hedging Agreements entered into prior to the Petition Date in accordance with the Prepetition Loan Agreements and not prohibited hereunder, or any Hedging Agreements entered into after the Petition Date in accordance herewith; (c) incurred or arising in the Ordinary Course of Business prior to the Petition Date (to the extent then permitted by the Prepetition Loan Agreements), and existing on the Closing Date, and any extension or renewal thereof that does not increase the amount of such Contingent Obligation when extended or renewed; (d) incurred in the Ordinary Course of Business with respect to surety, appeal or performance bonds, or other similar obligations; (e) arising from customary indemnification obligations in favor of purchasers in connection with Asset Dispositions not prohibited hereunder; (f) arising under the Loan Documents or the DIP Order or otherwise in favor of the Secured Parties and/or their Related Parties (including the Guarantee Obligations of the Guarantors); (g) in an aggregate amount of $100,000 or less at any time incurred or arising by operation of law, or in the Ordinary Course of

- 37-

Business pursuant to a transaction not otherwise prohibited hereunder; (h) in respect of Debt (other than the Obligations) permitted pursuant to **Section 10.2.1** (but not exceeding the amount thereof, and only insofar as such Contingent Obligations are subordinated to the Obligations to the extent required hereby or as otherwise acceptable to the Administrative Agent); or (i) arising from endorsements of payment items for collection or deposit in the Ordinary Course of Business; *provided*, that, notwithstanding the foregoing, any Contingent Obligation incurred or arising (or extended or renewed) at any time after the Petition Date shall only constitute a Permitted Contingent Obligation if and to the extent that the same is permitted during the Chapter 11 Cases and is not in breach of, or inconsistent with, any Chapter 11 Order.

"Permitted Disbursements": as defined in Section 2.1.2(a).

"Permitted Discretion":  a determination made in the exercise, in good faith, of reasonable credit judgment (from the perspective of a secured lender, or any administrative or collateral agent in connection with any secured financing transaction).

"Permitted Holders":  (i) Sponsor and (ii) Pate Group.

"Permitted Lien":  as defined in **Section 10.2.2**.

"Permitted Restrictions":  prohibitions, restrictions, or conditions under or with respect to any of the following: (a) the Loan Documents or the DIP Orders, (b) any agreement entered into prior to the Petition Date and in effect on the Closing Date, (c) any Purchase Money Debt or Purchase Money Lien permitted by **Section 10.2.1** or **10.2.2** solely to the extent that the agreement or instrument governing such Debt prohibits a Lien on the property subject thereto, (d) by reason of customary provisions restricting pledges, assignments, subletting or other transfers contained in leases, licenses, contracts and similar agreements entered into in the Ordinary Course of Business (*provided*, that such restrictions are limited to the property or assets subject to such leases, licenses, contracts or similar agreements, as the case may be), (e) any prohibition or limitation that consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under this Agreement, (f) under any Debt or Lien permitted to be outstanding on the date any Person first becomes a Subsidiary (so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary, and such Person is permitted hereunder to become a Subsidiary), (g) Liens that are negative pledges and restrictions on Liens in favor of any holder of Debt permitted under **Section 10.2.1** but solely to the extent any negative pledge relates to (A) the property financed by such Debt and the proceeds, accessions and products thereof or (B) the property secured by such Debt and the proceeds, accessions and products thereof so long as the agreements governing such Debt permit the Liens on Collateral securing the Obligations; (h) Liens that are restrictions on cash or other deposits imposed by customers under contracts entered into in the Ordinary Course of Business and permitted during the Chapter 11 Cases; (i) Liens that arise with respect to cash or other deposits permitted under **Sections 10.2.1** or **10.2.2** and limited to such cash or deposit; (j) Liens that are restrictions regarding licensing or sublicensing by Holdings and its Subsidiaries of Intellectual Property in the Ordinary Course of Business, if permitted during the Chapter 11 Cases; (k) Liens that are restrictions on cash earnest money deposits in favor of sellers in

- 38-

connection with acquisitions not prohibited hereunder; and (l) Applicable Law during the Chapter 11 Cases.

"<u>Permitted Variance</u>":  as defined in **Section 10.3.1**.

"<u>Person</u>":   any individual, corporation, limited liability company, partnership, joint venture, association, trust, unincorporated organization, Governmental Authority or other entity.

"<u>Petition Date</u>":  as defined in the recitals to this Agreement.

"<u>PIK Interest</u>":  interest Paid in Kind.

"<u>Plan</u>":  any employee benefit plan (as defined in Section 3(3) of ERISA) established or maintained by an Obligor or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, an ERISA Affiliate.

"<u>Platform</u>":  as defined in **Section 14.3.3**.

"<u>Pledged Collateral</u>":  as defined in **Section 7.3.1**.

"<u>Pledged Debt Securities</u>":  as defined in **Section 7.3.1**.

"<u>Pledged Equity Interests</u>":  as defined in **Section 7.3.1**.

"<u>Post-Petition Interest</u>":   with respect to any Loans or other Obligations hereunder, all interest, fees, expenses and other charges accruing after the filing of any petition under the Bankruptcy Law, or the commencement of any Insolvency Proceeding relating to any Obligor and/or any of its Subsidiaries (including, as applicable, the Chapter 11 Cases), whether or not a claim for post-filing or post-petition interest is allowed or allowable under the Bankruptcy Law or in any such Insolvency Proceeding.

"<u>Potential Transaction</u>":   one or more potential financing, restructuring, recapitalization, merger, consolidation, sale, reorganization, amendment and/or similar or related transactions relating to the Obligors, the Loans, the Obligations, any Prepetition Debt, and/or related matters, as the case may be (including any Sale Transaction, any other transaction contemplated by any Restructuring Transaction Documents, and any transaction pursuant to any modification to any Loan Document or any Prepetition Loan Document, as the case may be).

"<u>Prepetition Credit Facility Debt</u>":  the Prepetition Senior Loan Debt and the Prepetition Junior Loan Debt.

"<u>Prepetition Debt</u>":  (a) all Prepetition Credit Facility Debt and (b) to extent permitted pursuant to **Section 10.2.1**, all other Debt incurred prior to, and outstanding as of, the Petition Date.

- 39-

"<u>Prepetition Junior Lenders</u>":  the lenders under the Prepetition Junior Loan Agreement and their respective successors and assigns.

"<u>Prepetition Junior Loan Agent</u>":  Lightship, as administrative agent and as collateral agent under the Prepetition Junior Loan Agreement, and each of its successors and permitted assigns.

"<u>Prepetition Junior Loan Agreement</u>":  the Term Loan and LC Loan and Security Agreement, dated as of November 30, 2016 (as amended or otherwise modified from time to time prior to, and as in effect on, the Petition Date), among the Borrower, the lenders party thereto from time to time and the Prepetition Junior Loan Agent.

"<u>Prepetition Junior Loan Debt</u>":  all Debt, obligations, liabilities and indebtedness of every kind, nature and description owing by the Obligors to the Prepetition Junior Loan Agent and Prepetition Junior Loan lenders, including principal, interest, charges, fees, premiums, indemnities, letter of credit obligations, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise arising under the Prepetition Junior Loan Documents (including all "Obligations" and all "Secured Obligations" as defined thereunder).

"<u>Prepetition Junior Loan Documents</u>":  collectively, the following (as the same now exist or may hereunder be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Prepetition Junior Loan Agreement; and (b) all other agreements, documents and instruments at any time executed and/or delivered by any of the Obligors with, to or in favor of the Prepetition Junior Loan Agent or any Prepetition Junior Lender in connection therewith or related thereto; sometimes being referred to herein individually as a "Prepetition Junior Loan Document".

"<u>Prepetition Junior Loan Secured Parties</u>":  collectively, the Prepetition Junior Lenders, the Prepetition Junior Loan Agent and the other Secured Parties (as such term is defined under the Prepetition Junior Loan Documents).

"<u>Prepetition Loan Agreements</u>":  the Prepetition Senior Loan Agreement and the Prepetition Junior Loan Agreement, collectively, and each of them individually, as the context may require.

"<u>Prepetition Loan Documents</u>":  the Prepetition Senior Loan Documents and the Prepetition Junior Loan Documents, collectively, and each of them individually, as the context may require.

"<u>Prepetition Secured Parties</u>":  collectively, the Prepetition Senior Loan Secured Parties and the Prepetition Junior Obligors (and each of them individually, a "<u>Prepetition Secured Party</u>").

"<u>Prepetition Senior Lenders</u>":  the lenders under the Prepetition Senior Loan Agreement and their respective successors and assigns.

- 40-

"Prepetition Senior Loan Agent":  Lightship Capital II LLC (in its capacity as a successor to Bank of America, N.A.), as administrative agent and as collateral agent under the Prepetition Senior Loan Agreement, and each of its successors and permitted assigns.

"Prepetition Senior Loan Agreement":  the ABL Loan and Security Agreement, dated as of November 30, 2016 (as amended or otherwise modified from time to time prior to, and as in effect on, the Petition Date), among the Borrower, the lenders party thereto from time to time and the Prepetition Senior Loan Agent.

"Prepetition Senior Loan Debt":  all Debt, obligations, liabilities and indebtedness of every kind, nature and description owing by the Obligors to the Prepetition Senior Loan Agent and Prepetition Senior Loan lenders, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise arising under the Prepetition Senior Loan Documents (including all "Obligations" and all "Secured Obligations" as defined thereunder).

"Prepetition Senior Loan Documents":  collectively, the following (as the same now exist or may hereunder be amended, modified, supplemented, extended, renewed, restated or replaced): (a) the Prepetition Senior Loan Agreement; and (b) all other agreements, documents and instruments at any time executed and/or delivered by any of the Obligors with, to or in favor of the Prepetition Senior Loan Agent or any Prepetition Senior Lender in connection therewith or related thereto; sometimes being referred to herein individually as a "Prepetition Senior Loan Document".

"Prepetition Senior Loan Secured Parties":  collectively, the Prepetition Senior Lenders, the Prepetition Senior Loan Agent and the other Secured Parties (as such term is defined under the Prepetition Senior Loan Documents).

"Primary Operating Account":  a Deposit Account of the Borrowers designated by the Borrower Agent in writing to the Administrative Agent from time to time as the Borrowers' Primary Operating Account.

"Prime Rate":  the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent).  Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"Pro Forma Adjustment":  for any period that includes all or any part of a fiscal quarter ending prior to the end of any Post-Acquisition Period, with respect to the Acquired EBITDA of the applicable Acquired Entity or Business or the EBITDA of Holdings and its Subsidiaries, the pro forma increase or decrease in such Acquired EBITDA or such EBITDA, as the case may be, projected by the Borrowers in good faith to be realized during such Post-Acquisition Period as a

- 41-

result of (a) actions taken during such Post-Acquisition Period for the purposes of realizing reasonably identifiable and factually supportable "run rate" cost savings, operating expense reductions, other operating improvements and or synergies (in each case, including, but not limited to, (i) reductions in personnel expenses, (ii) reductions of costs related to administrative functions, (iii) reductions of costs related to leased or owned properties and (iv) reductions from the consolidation of operations and streamlining of corporate overhead) or (b) any additional costs incurred during such Post-Acquisition Period, in each case, in connection with the combination of the operations of such Acquired Entity or Business with the operations of Holdings and its Subsidiaries; *provided*, that such actions are taken during such Post-Acquisition Period, or such costs are incurred during such Post-Acquisition Period, as applicable; *provided*, *further*, that any such pro forma increase or decrease to such Acquired EBITDA or such EBITDA, as the case may be, shall be without duplication for cost savings or additional costs already included in such Acquired EBITDA or such EBITDA, as the case may be, for such period; *provided*, *further* that in no event shall the sum of the amounts under sub-clauses (ix) and (x) of clause (a) of the definition of EBITDA for any period, plus the amount of any Pro Forma Adjustments, exceed 10% of EBITDA for such period (determined on the basis of EBITDA as calculated without giving effect to any increase attributable to a Pro Forma Adjustment addback).

"Pro Forma Adjustment Certificate":  any certificate of a Senior Officer of the Borrower Agent delivered pursuant to **Section 10.1.2(c)**.

"Pro Rata":  with respect to any Lender, such Lender's share of the New Money Loan Commitments, expressed as a percentage and set forth on **Schedule 1.1** hereto opposite such Lender's name under the heading "New Money Loan Commitment" (or in any Commitment Agreement entered into by such Lender, the Administrative Agent and the Obligors pursuant to **Section 2.1.7**).

"Professional Fee Amount":  the aggregate amount owing by the Obligors to Estate Professionals on the Stalking Horse Sale Closing Date on account of accrued but unpaid Professional Fees incurred at any time prior to or on the Stalking Horse Sale Closing Date; *provided*, that, not later than two (2) Business Days prior to the Stalking Horse Sale Closing Date, each such Estate Professional shall have provided to the Obligors and the Administrative Agent (for its and the Lenders' benefit) the total of its invoiced and reasonably estimated Professional Fees accrued as of the Stalking Horse Sale Closing Date.

"Professional Fee Amount Excess": an amount equal to (a) the Professional Fee Amount, less (b) the aggregate amount of the Obligors' cash on hand as of the Stalking Horse Sale Closing Date, net of amounts required to finance (i) the Wind Down Budget, and (ii) any costs and expenses (other than Professional Fees) required to be paid as of or on the Stalking Horse Sale Closing Date; provided, that such costs and expenses are set forth in a funds flow memorandum (or similar document) reasonably satisfactory to the Administrative Agent and the Borrowers, and payment thereof is permitted pursuant to a Chapter 11 Order in effect at such time. "Professional Fee Amount Excess": as defined in **Section 2.1.2(a)(i)(C)**.

- 42-

"Professional Fees":    professional fees and expenses of any Estate Professionals (including any restructuring, sale, success, or other transaction fee due, accrued and payable to any Company Advisor on the Stalking Horse Sale Closing Date).

"Properly Contested":  with respect to any obligation of an Obligor, (a) the obligation is subject to a bona fide dispute regarding amount or the Obligor's liability to pay; (b) the obligation is being properly contested in good faith by appropriate proceedings promptly (or to be promptly) instituted and diligently pursued; (c) appropriate reserves have been established in accordance with GAAP; (d) non-payment could not reasonably be expected to have a Material Adverse Effect; (e) no Lien other than a Permitted Lien is imposed on assets of the Obligor, unless bonded and stayed to the reasonable satisfaction of Administrative Agent; and (f) if the obligation results from entry of a judgment or other order, such judgment or order is stayed pending appeal or other judicial review.

"Protective Advances":  as defined in **Section 2.1.6**.

"PTE":  a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Purchase Money Debt":  (a) Debt (other than the Obligations) for payment of any of the purchase price of fixed assets; (b) Debt (other than the Obligations) incurred within 270 days before or after acquisition of any fixed assets, for the purpose of financing any of the purchase price thereof; and (c) any renewals, extensions or refinancings (but not increases) thereof, in each case, solely to the extent effectuated prior to the Petition Date in accordance with the Prepetition Loan Agreements.

"Purchase Money Lien":  a Lien that secures Purchase Money Debt, encumbering only the fixed assets acquired with such Debt and constituting a Capital Lease or a purchase money security interest under the UCC.

"Purchased Claims": as defined in the Stalking Horse Agreement.

"QFC Credit Support":  as defined in **Section 14.20**.

"Qualified ECP":  an Obligor with total assets exceeding $10,000,000, or that constitutes an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"RCRA":  the Resource Conservation and Recovery Act (42 U.S.C. §§ 6991-6991i).

"Real Estate":  an Obligor's interest in all leases and all land, tenements, hereditaments and any estate or interest therein, together with the buildings, structures, parking areas and other improvements thereon (including all fixtures), now or hereafter owned or leased by any Obligor, together with all easements, rights of way, and similar rights relating thereto and all leases, licenses, tenancies and occupancies thereof.

- 43-

"<u>Register</u>":  as defined in **Section 13.3.4**.

"<u>Related Parties</u>":  with respect to any Person, (a) such Person's Affiliates and (b) the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, consultants, service providers and representatives of such Person and of such Person's Affiliates.

"<u>Release</u>":  any release, spill, emission, discharge, deposit, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment, or into, from or through any building, structure or facility.

"<u>Remaining Obligations</u>":  as of any date of determination, Obligations that as of such date of determination are inchoate or contingent indemnification and reimbursement obligations under the Loan Documents that survive termination of the Loan Documents, but as of such date of determination are not due and payable and for which no claims have been made.

"<u>Report</u>":  as defined in **Section 12.2.3**.

"<u>Reportable Event</u>":  any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"<u>Required Lenders</u>":  at any time, one or more Lenders (subject to **Section 4.2**) having at such time (on an aggregate basis) Total Credit Exposures in excess of 50% of the Total Credit Exposures of all Lenders at such time; *provided*, *however*, that the Commitments and Loans of any Defaulting Lender shall be excluded from such calculation.

"<u>Resolution Authority</u>":  an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"<u>Restricted Investment</u>":  any Investment by an Obligor or Subsidiary, other than the following (but, in each case, only if, and so long as, no Default or Event of Default shall exist or arise at the time of, or after giving effect to, such Investment (including under the Budget Covenant):

(a)    Investments in Subsidiaries of Holdings to the extent existing on the Closing Date and permitted under the Prepetition Credit Agreements;

(b)    Investments in cash and Cash Equivalents (and assets that were Cash Equivalents when such Investment was made); *provided*, that the cash and Cash Equivalents subject to such Investment shall be held in a Deposit Account that constitutes Collateral and is either subject to a Deposit Account Control Agreement in favor of the Administrative Agent, in an Excluded Account or a perfected Lien pursuant to the DIP Order;

(c)    advances to a director, officer, or employee for salary, travel expenses, relocation, commissions and other business-related expenses in the Ordinary Course of Business and in accordance with the Approved Budget;

- 44-

(d)    prepaid expenses and extensions of trade credit made in the Ordinary Course of Business;

(e)    deposits with financial institutions permitted hereunder;

(f)    Investments in any Obligor;

(g)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the Ordinary Course of Business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the Ordinary Course of Business;

(h)    promissory notes, securities and other non-cash consideration received in connection with Permitted Asset Dispositions, so long as the same shall constitute Collateral and be subject to the Administrative Agent's Lien hereunder in accordance with the requirements hereof;

(i)    Investments in Hedging Agreements permitted under **Section 10.2.14**;

(j)    Contingent Obligations in respect of leases (other than Capital Leases) or other obligations that do not constitute Debt, in each case entered into in the Ordinary Course of Business and constituting Permitted Contingent Obligations; and

(k)    other Investments made in the Ordinary Course of Business, so long as the aggregate amount of such Investments shall not exceed $1,000,000 at any time outstanding and such Investments shall be in accordance with the Approved Budget.

"Restrictive Agreement":  an agreement that conditions or restricts the right of any Obligor to grant Liens on any assets to secure the Obligations, to declare or make Distributions, or to repay any intercompany Debt.

"Restructuring":  as defined in the Restructuring Support Agreement.

"Restructuring Committee":  the "Restructuring Committee" established by the Strike Investment Board.

"Restructuring Support Agreement":  that certain Restructuring Support Agreement (including the term sheet attached thereto as Exhibit 1, and all other exhibits, schedules, annexes and other attachments thereto), dated as of November 22, 2021, by and among the Debtors, the Prepetition Secured Parties party thereto and the Lenders, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Restructuring Transaction Documents":  any one or more of the following: (a) the Restructuring Support Agreement, (b) the Definitive Documents and the Asset Purchase

- 45-

Agreement (each, as defined in the Restructuring Support Agreement), and (c) such other agreements, documents and instruments (if any) designated as such by the Administrative Agent.

"<u>Roll-Up</u>":  as defined in **Section 2.1.1**.

"<u>Roll-Up Amount</u>":   All Prepetition Senior Loan Debt outstanding as of the Final DIP Order Closing  Date.

"<u>Roll-Up Loans</u>":  as defined in **Section 2.1.1**.

"<u>Royalties</u>":  all royalties, fees, expense reimbursement and other amounts payable by a Borrower under a License.

"<u>RPO Expense</u>":  with respect to any fiscal period and for Holdings and its Subsidiaries on a consolidated basis, all rent paid in cash by Holdings and its Subsidiaries during such period on account of equipment subject to a rental purchase option, which rental purchase option has been exercised.

"<u>S&P</u>":   Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business, and its successors.

"<u>Sale Approval Order</u>": a final non-appealable order of the Bankruptcy Court authorizing the Sale Transaction pursuant to section 363 of the Bankruptcy Code and approving (a) the Stalking Horse Agreement, or (b) an Alternative Asset Purchase Agreement, in each case, in form and substance acceptable to the Administrative Agent and the Lenders.

"<u>Sale Auction</u>": to the extent competing qualified bids are timely submitted in accordance with the Sale Procedures, an auction to be conducted by the Obligors and their advisors in connection with the Sale Process.

"<u>Sale Process</u>":  the marketing process to be conducted by the Obligors for the purposes of soliciting bids for the purchase of all or substantially all of the Obligor's assets and consummating a Sale Transaction, in each case, in accordance with the Sale Procedures.

"<u>Sale Procedures</u>": the marketing process and procedures, in form and substance acceptable to the Administrative Agent and the Lenders, which shall be filed with the Bankruptcy Court in connection with the Sale Procedures Motion.

"<u>Sale Procedures Motion</u>": the motion (together with all exhibits thereto), in form and substance acceptable to the Administrative Agent and the Lenders, to be filed by the Obligors with the Bankruptcy Court, (i) authorizing the Obligors' entry into the Stalking Horse Agreement, (ii) approving the Sale Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, (iii) approving and authorizing the payment of certain bidding protections, if any (each as shall be described in the Stalking Horse Agreement), (iv) scheduling a hearing with respect to the sale, and (v) granting other related relief.

- 46-

"Sale Procedures Order": an order of the Bankruptcy Court approving the Sale Procedures Motion, in form and substance acceptable to the Administrative Agent and the Lenders.

"Sale Transaction": the Stalking Horse Sale, or the sale of all or substantially all of the Obligor's assets pursuant to the Alternative Asset Purchase Agreement.

"Sanction":  any sanction administered or enforced by the U.S. Government (including OFAC), United Nations Security Council, European Union, Her Majesty's Treasury or other sanctions authority.

"Secured Parties":  collectively, the Administrative Agent and Lenders.

"Securities Act":  the Securities Act of 1933.

"Security Documents":  the Guaranties, Deposit Account Control Agreements, the DIP Orders and all other documents, instruments and agreements now or hereafter securing (or given with the intent to secure) any Obligations.

"Senior Officer":  the chairman of the board, president, chief executive officer, chief financial officer or treasurer of Holdings or the Borrower Agent or, if the context requires, another Obligor (or any other officer or employee of the applicable Obligor designated in or pursuant to an agreement between the applicable Obligor and the Administrative Agent).

"Sold Entity or Business":  as defined in the definition of the term "EBITDA".

"Special Resolution" means that certain Written Consent of the Board of Managers of Strike Investment, dated September 19, 2021, as in effect on the Closing Date.

"Specified Disbursement":  as defined in Section 10.2.21.

"Specified Event of Default":  any Event of Default arising under **Section 11.1(a)** and **11.1(b)**, **11.1(d)** (solely relating to a failure to comply with **Sections 8.1, 8.2.4**, and **8.2.5**), or **11.1(j)**.

"Specified Obligor":  an Obligor that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to **Section 5.11**).

"Spectra Agreement":  that certain Construction Agreement dated as of September 27, 2016, by and between Valley Crossing Pipeline, LLC (an affiliate of Spectra Energy Partners, LP) and Borrower.

"Sponsor":  any of (a) OEP Secondary Fund GP Ltd. (the "OEP Affiliate"), (b) Mill Point and Mill Point Splitter or (c) any investment vehicle that is Controlled or managed by the OEP Affiliate or Mill Point or Mill Point Splitter (whether through the ownership of the majority of the aggregate issued and outstanding voting Equity Interests of such investment vehicle or

- 47-

through the management of investments of such investment vehicle by the OEP Affiliate or Mill Point or Mill Point Splitter, as applicable, or otherwise); for the avoidance of doubt, this clause (b) shall not include any other portfolio company of the OEP Affiliate or Mill Point, as applicable.

"<u>Stalking Horse Agreement</u>":   that certain Asset Purchase Agreement, dated as of December 6, 2021 (as amended, supplemented or otherwise modified by the parties thereto, and including the disclosure schedules and exhibits attached thereto) by and among (a)(i) Holdings, (ii) Strike, (iii) Strike Global Holdings, LLC, (iv) Capstone, (v) Delta Directional Drilling, LLC, and (vi) Crossfire, and (b) Strike Acquisition LLC, a Delaware limited liability company, a copy of which is filed on the Court's docket at Docket No. 278.

"<u>Stalking Horse Purchaser</u>": the Purchaser, as such term is defined in the Stalking Horse Agreement.

"<u>Stalking Horse Sale</u>": the sale of all or substantially all of the Obligor's assets pursuant to the Stalking Horse Agreement.

"<u>Stalking Horse Sale Closing Date</u>":   the date on which the Stalking Horse Sale is consummated in accordance with the Stalking Horse Agreement (which shall be after the Final DIP Order Date, and shall be the same date as the Closing Date under (and as defined in) the Stalking Horse Agreement).

"<u>Strike</u>":  as defined in the preamble hereto.

"<u>Strike Capital</u>":  Strike Capital, LLC, a Texas limited liability company.

"<u>Strike Investment</u>":  Strike Investment, LLC, a Delaware limited liability company.

"<u>Strike Investment Board</u>":  the board of managers of Strike Investment.

"<u>Subordinated Debt</u>":  Debt incurred by Holdings or its Subsidiaries that is expressly contractually subordinate and junior in right of payment to Full Payment of all Obligations (other than Remaining Obligations) on terms in accordance with **Section 10.2.1(b)** and **Section 10.2.7**.

"<u>Subsidiary</u>":  with respect to any Person, any entity more than 50% of whose voting securities or Equity Interests is owned by such Person (including indirect ownership by such Person through other entities in which such Person directly or indirectly owns more than 50% of the voting securities or Equity Interests).  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings.

"<u>Subsidiary Guarantor</u>":  each Subsidiary of Holdings; *provided*, that, for the avoidance of doubt, any Subsidiary that is also a Borrower shall only be a Subsidiary Guarantor with respect to Obligations of the other Obligors, and shall be a primary obligor (as defined in the definition of Guarantee Obligations) with respect to its Obligations in its capacity as a Borrower.

NY 78904694v1NY 78904694v7

"<u>Supported QFC</u>":  as defined in **Section 14.20**.

"<u>Swap Obligations</u>":  with respect to an Obligor, its obligations under a Hedging Agreement that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"<u>Tax Distribution</u>":  the following (if and to the extent in accordance with the Budget Covenant):  (a) (i) for any taxable period ending after the Closing Date for which Holdings is treated as a partnership or disregarded entity for U.S. federal, state and/or local income tax purposes, Distributions by Holdings to permit its direct and indirect equity owners to pay the U.S. federal, state and/or local income taxes attributable to their respective direct or indirect distributable shares of Holdings' taxable income for such taxable period, in an aggregate amount for each such taxable period not to exceed the product of (x) (1) the aggregate amount of net taxable income of Holdings allocated to such direct or indirect equity owners (excluding any taxable income allocable to such direct or indirect equity owners under Section 704(c) of the Code) for such taxable period, minus (2) any cumulative net taxable losses allocated to such direct or indirect equity owners for any prior taxable period and such taxable period, in each case, ending after the Closing Date, and in each case, to the extent such cumulative net taxable loss has not previously been taken into account to reduce the amount determined under this clause (a)(i)(x) after the Closing Date, and (y) the highest marginal effective rate of federal, state and local income tax applicable to an individual or corporation (whichever is higher) resident in New York, New York, Los Angeles, California or Houston, Texas (whichever is higher) (taking account of any difference in rates applicable to ordinary income, capital gains and dividends and any allowable deductions in respect of state and local taxes in computing the member's liability for federal income taxes); *provided*, that Distributions shall be permitted under this clause (a)(i) with respect to any taxable period on a quarterly basis to allow such direct and indirect equity owners to pay estimated taxes during the course of such taxable period using reasonable estimates of the anticipated aggregate amount of Distributions permitted for such taxable period at the time of such payment, with any excess of aggregate quarterly installments with respect to any such taxable period over the actual amount determined under clause (a)(i) for such taxable period reducing the amount determined under clause (a)(i) for the immediately subsequent taxable period (and, to the extent such excess is not fully absorbed in the immediately subsequent taxable period, the following period(s)); and (ii) any Distributions made by Holdings to its equity owners for a taxable period in an aggregate amount equal to the amount imposed by an applicable taxing authority as a result of a "push out" election under Section 6226 of the Code for such taxable period; and (b) without any duplication of any Distribution described in clause (a) above, with respect to any taxable period for which Holdings is a member of a consolidated, combined, unitary or similar income tax group (including a Texas franchise tax group) for U.S. federal and/or applicable state or local income tax purposes of which a direct or indirect equity owner of Holdings is the common parent or other entity responsible for paying the taxes of such tax group (a "<u>Tax Group</u>"), any Distribution made by Holdings to pay the portion of any U.S. federal, state or local income taxes (as applicable) of such Tax Group for such taxable period that is attributable to the income of Holdings and/or the applicable Subsidiaries, as determined by Holdings in its good faith discretion and evidenced by documentation reasonably acceptable to the Administrative Agent; *provided*, that any Distributions made pursuant to this clause (b) shall

- 49-

not exceed the tax liability that Holdings and/or the applicable Subsidiaries (as applicable) would have paid were such taxes determined as if such entity(ies) were a stand-alone taxpayer or a stand-alone group, reduced by any actual taxes described in clause (b) directly paid by Holdings and/or any of the Subsidiaries; provided, further, that, to the extent requested by the Administrative Agent, the Obligors shall deliver to the Administrative Agent such information and supporting materials as is reasonably required by the Administrative Agent to determine the type, scope and extent of any Tax Distribution (including as a condition to any payment in respect thereof being deemed permitted hereunder).

"Tax Group":  as defined in the definition of Tax Distribution.

"Taxes":  all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Technology":  all trade secrets, know how, technology (whether patented or not), rights in Software (including source code and object code), rights in data and databases, rights in Internet web sites, customer and supplier lists, proprietary information, methods, procedures, formulae, descriptions, compositions, technical data, drawings, specifications, name plates, catalogs, confidential information and the right to limit the use or disclosure thereof by any person, pricing and cost information, business and marketing plans and proposals, together with any and all (i) rights and privileges arising under applicable law with respect to the foregoing, (ii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future misappropriations or violations thereof, (iii) rights corresponding thereto throughout the world and (iv) rights to sue for past, present and future misappropriations or violations thereof.

"Termination Date":  the earliest of the following: (a) the date that is thirty-five (35) days after the Petition Date (or such later date as may be agreed in writing by the Required Lenders) unless the Final DIP Order Date has occurred on or prior to such date, (b) the Stalking Horse Sale Closing Date (after giving effect to all Loans incurred (or required to be funded) on such date pursuant to Section 2.1.2), or the date of consummation of any other Sale Transaction, or any other transaction pursuant to which all or substantially all of the Debtors' property and assets are sold, transferred or otherwise disposed of (including pursuant to Section 363 of the Bankruptcy Code), (c) the Chapter 11 Plan Effective Date, (d) the Maturity Date, and (e) the date on which the Loans are accelerated or otherwise declared (or become) due and payable in accordance with the terms of this Agreement (whether automatically, or upon any Event of Default or as otherwise provided hereunder).

"Termination Payment":  each payment required to be made by the Borrowers (for the account of the applicable Lenders) with respect to any Termination Payment Triggering Event, pursuant to **Section 5.12** and the other applicable provisions hereof, which payment shall be in a Dollar amount equal to (a) in the case of any Termination Payment Triggering Event described in clause (a) of the definition thereof, 3.00% of the aggregate principal amount of the New Money Loans being prepaid, repaid, paid or redeemed (as applicable) at such time, and (b) in the case of

- 50-

any other Termination Payment Triggering Event, 3.00% of the aggregate principal amount of then-outstanding New Money Loans.  Notwithstanding anything to the contrary, and for the avoidance of doubt, there shall be no Termination Payment due and payable in respect of the Roll-Up Loans.

"Termination Payment Triggering Event":  the occurrence of any of the following (without duplication): (a) the making of any prepayment, repayment, payment or redemption (as applicable) of all or any portion of the Loans, whether before or after the occurrence of any Default or Event of Default or the Termination Date (but excluding any mandatory prepayment pursuant to **Section 5.3.1** prior to the occurrence of any Default); (b) the Termination Date; (c) the acceleration of all or any portion of the Loans or other Obligations for any reason, or the occurrence of any other event or circumstance that causes any Loan or other Obligation to become (or to be declared) due and payable for any reason (including upon an Event of Default, pursuant to **Section 11** hereof, by operation of law, or otherwise); (d) the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any Loan or other Obligation for any reason, including in any Insolvency Proceeding, any foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure, or the making of a distribution of any kind in any Insolvency Proceeding to the Lenders (whether directly or indirectly, including through the Administrative Agent or any other distribution agent), in full or partial satisfaction of any Loan or other Obligation; and (e) the termination of this Agreement for any reason.

"Total Credit Exposure":  as to any Lender at any time, the unused Commitments and outstanding amount of all Loans of such Lender at such time.

"Trademarks":  all trademarks (including service marks), slogans, logos, certification marks, trade dress, uniform resource locators (URL's), domain names, corporate names, brand names, and trade names and other identifiers of source or goodwill, whether registered or unregistered, and all registrations and applications for the foregoing (whether statutory or common law and whether established or registered or applied for in the United States or any other country or any political subdivision thereof), together with any and all (i) rights and privileges arising under applicable law with respect to any of the foregoing, (ii) extensions and renewals thereof and amendments thereto, (iii) income, fees, royalties, damages and payments now and hereafter due and/or payable thereunder and with respect thereto, including damages, claims and payments for past, present or future infringements, dilutions or violations thereof, (iv) rights corresponding thereto throughout the world and (v) rights to sue for past, present and future infringements, dilutions or violations thereof.

"Tranche A Wind Down Amount":  as defined in Section 2.1.2(a)(i)(D).

"Tranche A Wind Down Cap":  $7,500,000.

"Tranche B Wind Down Amount": $4,000,000.

- 51-

"Transactions":  (a) the execution and delivery by the Obligors of this Agreement and the other Loan Documents to which they are a party on the Closing Date, and the performance of the obligations and transactions hereunder, (b) the other transactions related to or entered into in connection with any of the foregoing or otherwise in connection with the Restructuring, and (c) the payment of fees, premiums, charges, costs and expenses in connection with any of the foregoing.

"Transferee":  any actual or potential Eligible Assignee, Participant or other Person acquiring an interest in any Obligations.

"Type":  any type of a Loan (i.e., Base Rate Loan or LIBOR Loan) that has the same interest option and, in the case of LIBOR Loans, the same Interest Period.

"UCC":  the Uniform Commercial Code as in effect in the State of New York or, when the laws of any other jurisdiction govern the perfection, priority or enforcement of any Lien, the Uniform Commercial Code of such jurisdiction.

"UK Financial Institution":  any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority":  the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unfunded Pension Liability":  the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to the Code, ERISA or the Pension Protection Act of 2006 for the applicable plan year.

"Updated Budget":  as defined in **Section 10.1.13(a)**.

"Upstream Payment":  a Distribution by a Subsidiary of Holdings to Holdings or to another Subsidiary of Holdings that holds Equity Interests in such Subsidiary so long as each Obligor that holds Equity Interests in such Subsidiary received at least its pro rata share of such Distribution based on its relative ownership of such Subsidiary.

"U.S. Person":  "United States person" as defined in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regimes":  as defined in **Section 14.20**.

"U.S. Tax Compliance Certificate":  as defined in **Section 5.10.2(b)(iii)**.

- 52-

"Voting Equity Interests":  with respect to any Person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors (or equivalent governing body) of such Person.

"Wind Down":  the orderly wind down of the Obligors (including their respective assets and operations) following the consummation of the Stalking Horse Sale ~~in accordance with the Wind Down Budget and otherwise in a manner reasonably acceptable to the Lenders~~.

~~"Wind Down Statutory Expense Amount":  to the extent not paid prior to or assumed in connection with the consummation of the Stalking Horse Sale, the aggregate amount determined in good faith by the Borrowers (and reasonably acceptable to the Lenders) to be necessary to discharge the Obligors' liabilities in connection with (a) allowed priority tax claims pursuant to section 507(a)(8) of the Bankruptcy Code (except to the extent that any payment with respect thereto was sought pursuant to any First Day Motion), as identified to the Administrative Agent in writing and set forth in the Wind Down Budget (the "Wind Down Tax Claims"), and (b) allowed claims pursuant to Section 503(b)(9) of the Bankruptcy Code, as identified to the Administrative Agent in writing and set forth in the Wind Down Budget (the "Administrative Expense Claims", and, together with the Wind Down Tax Claims, the "Wind Down Statutory Expenses"); provided, that the Wind Down Statutory Expense Amount shall in no event exceed $4,000,000 (and the aggregate amount of Administrative Expense Claims permitted to be included in such amount shall not exceed $2,000,000).~~

"Wind Down ~~Budget":  the itemized cash flow forecast included in the Initial Budget (or in such other Approved Budget in effect at the time of determination, as the case may be) and reflecting, on a line item, cumulative and aggregate basis, the Obligor's projected disbursements necessary to implement the Wind Down, including (without duplication) (a) Administrative Expense Claims and Wind Down Tax Claims up to the Wind Down Statutory Expense Amount, (b) other allowed priority claims, (c) necessary employee wages and benefits, (d) professional and/or advisory fees in the Chapter 11 Cases projected to be incurred during the period (i) from and after the Stalking Horse Sale Closing Date through to the Chapter 11 Plan Effective Date, and (ii) from and after the Chapter 11 Plan Effective Date, and (e) office rent, insurance, records retention and destruction, and other general and administrative costs and expenses necessary for the Wind Down, which cash flow forecast shall be in amount, form and substance acceptable to the Lenders.~~Amount": the Tranche A Wind Down Amount and the Tranche B Wind Down Amount, the proceeds of which may only be used to finance (a) the Wind Down (b) distributions under the Chapter 11 Liquidating Plan, and (c) the investigation and potential prosecution of claims and causes of action (except for any Purchased Claims) by any litigation trust established under the Chapter 11 Liquidating Plan (clauses (a) through (c), collectively, the "Wind Down Related Disbursements").

"Wind Down Related Disbursements": as defined in "Wind Down Amount".

"Write-Down and Conversion Powers":  (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time

- 53-

to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.2.    **Accounting Terms**.  Under the Loan Documents (except as otherwise specified herein or in any other provision of this Agreement, or in any other Loan Document, as the case may be), all accounting terms shall be interpreted, all accounting determinations shall be made, and all financial statements shall be prepared, in accordance with GAAP applied on a basis consistent with the most recent audited financial statements of Holdings and its Subsidiaries delivered to Administrative Agent before the Closing Date and using the same inventory valuation method as used in such financial statements, except for any change required or permitted by GAAP if Borrowers' certified public accountants concur in such change, the change is disclosed to Administrative Agent, and **Section 10.3** is amended in a manner satisfactory to Required Lenders to take into account the effects of the change.  Any change in GAAP occurring after the date hereof that would require operating leases to be treated as capital leases shall be disregarded for the purposes of determining Debt and any financial ratio or compliance requirement contained in any Loan Document.  For the avoidance of doubt, notwithstanding this Section 1.2 (including any requirement hereunder for anything to be in accordance with GAAP), to the extent that this Agreement or any other Loan Document requires, contemplates or involves any interpretation, determination and/or calculation of any matter relating to any trade accounts payable (including for purposes of Section 10.3), the same shall be made in a manner, and according to calculations, reasonably satisfactory to the Administrative Agent, whether or not otherwise in accordance with GAAP.

1.3.    **Uniform Commercial Code**.  As used herein, the following terms are defined in accordance with the UCC in effect in the State of New York from time to time:  "Chattel Paper," "Commercial Tort Claim," "Deposit Account," "Document," "Equipment," "General Intangibles," "Goods," "Instrument," "Investment Property," "Letter-of-Credit Right" and "Supporting Obligation."

1.4.    **Certain Matters of Construction**.  The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  In the computation of periods of time from a specified date to a later specified date, "from" means "from and including," and "to" and "until" each mean "to but excluding."  The terms "including" and "include" shall mean "including, without limitation" and, for purposes of each Loan Document, the parties agree that the rule of *ejusdem generis* shall not be applicable to limit any provision.  Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document.  All references to (a) laws or statutes include all related

- 54-

rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any section mean, unless the context otherwise requires, a section of this Agreement; (d) any exhibits or schedules mean, unless the context otherwise requires, exhibits and schedules attached hereto, which are hereby incorporated by reference; (e) any Person include successors and assigns; (f) time of day mean time of day at Administrative Agent's notice address under **Section 14.3.1**; or (g) discretion of Administrative Agent or any Lender means the sole and absolute (unless otherwise qualified) discretion of such Person exercised in a manner consistent with its duties of good faith and fair dealing.  All references to Loans, Obligations and other amounts herein shall be denominated in Dollars, unless expressly provided otherwise, and all determinations (including calculations of financial covenants) made from time to time under the Loan Documents shall be made in light of the circumstances existing at such time.  No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision.  A reference to a Borrower's "knowledge" or similar concept means actual knowledge of a Senior Officer, or knowledge that a Senior Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter.  Any reference herein to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person.  Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

## SECTION 2.  CREDIT FACILITIES

2.1.1   Roll-Up Loans.  Subject to the terms and conditions of the Final DIP Order and this Agreement (including Section 6 hereof), and relying upon the representations and warranties set forth herein, immediately and automatically upon the occurrence of the Final DIP Order Date, the Lenders shall hereby be deemed to have made a term loan to the Borrowers pursuant to this **Section 2.1.1** in an aggregate principal amount equal to the Roll-Up Amount (the "Roll-Up Loan").  The Roll-Up Loan shall be deemed to refinance, on a cashless basis, all Prepetition Senior Loan Debt outstanding as of such time, pursuant to the Final DIP Order (the foregoing, including the incurrence of the Roll-Up Loan, the "Roll-Up").  For the avoidance of doubt, it shall be understood that the Roll-Up Loans shall be deemed incurred on the Final DIP Order Date.

2.1.2   New Money Loans.

(a)      Subject to the Approved Budget (except in the case of Loans borrowed pursuant to Section 2.1.2(a)(i)(C) to pay the Professional Fee Amount Excess, 2.1.2(a)(i)(D) and/or 2.1.2(a)(ii)) and the satisfaction of the applicable conditions precedent set forth in **Section**

NY 78904694v1NY 78904694v7

**6**, and subject further to the other terms hereof, and relying upon the representations and warranties set forth herein, the Lenders agree to make the following New Money Loans to the Borrowers (unless the Termination Date shall have occurred):

(i)     New Money Loans funded pursuant to the New Money Loan Tranche A Commitment, as follows:

(A) on one or more Borrowing Dates occurring after the Closing Date but prior to the Final DIP Order Date, in an aggregate principal amount not to exceed the lesser of (x) $8,000,000 and (y) the amount required to fund Permitted Disbursements in accordance with the Approved Budget and as further set forth below;

(B) on one or more Borrowing Dates occurring on or after the Final DIP Order Date, but prior to, or on, the New Money Loan Commitment Termination Date, in each case, in an aggregate principal amount not to exceed the lesser of (x) the then-remaining New Money Loan Tranche A Commitment, if any, and (y) the amount required to fund Permitted Disbursements in accordance with the Approved Budget and as further set forth below; and provided, that, New Money Loans shall not be permitted to be made in reliance on this clause (B) to fund any Professional Fee Amount or any portion of the Wind Down Amount;

(C) on the Stalking Horse Sale Closing Date (but solely if the Borrowers reasonably and in good faith believe that the Stalking Horse Sale Closing Date shall occur on the date scheduled therefor, as notified by Borrower Agent to the Administrative Agent in connection herewith), the Obligors shall first apply all Available Cash (if any) as of immediately prior to consummation of the Stalking Horse Sale on the Stalking Horse Sale Closing Date, to finance the Professional Fee Amount; *provided, however*, that, in the event that such Available Cash is insufficient to fund the full amount of the Professional Fee Amount (such shortfall, the "Professional Fee Amount Excess"), New Money Loans utilizing the New Money Loan Tranche A Commitment (subject to the satisfaction of the Stalking Horse Sale Closing Date Funding Conditions) shall be available to be borrowed, on the Stalking Horse Sale Closing Date, in an aggregate principal amount notequal to exceed the lesser of (x) the then remainingProfessional Fee Amount Excess, and (y) the amount of the unused New Money Loan Tranche A Commitment then in effect, if any (determined after taking into account all borrowings in reliance on Section 2.12(a)(i)(A) and Section 2.12(a)(i)(B)), and (y)any New Money Loan Tranche A Commitment Reduction), and all other borrowings utilizing the New Money Loan Tranche A Commitment; provided, that, New Money Loans shall not be required to be made in reliance on this clause (C) to fund any portion of the Wind Down or any other item except the

- 56-

Professional Fee Amount Excess; *provided, further, however*, that, for the avoidance of doubt, in the event that the amount of proceeds of Loans received pursuant to Borrowings under this Section 2.1.2(a)(i)(C) is insufficient to fully fund the Professional Fee Amount Excess, or if any Professional Fees remain payable notwithstanding a Borrowing hereunder, none of the Secured Parties shall have any commitment to finance, or to extend any other loans or provide other financial accommodations to facilitate payment of, or shall have any other liability or obligation with respect to, any such shortfall under this Agreement with respect to any Professional Fees.; and

provided, (D) on the Stalking Horse Sale Closing Date (but solely if the Borrowers reasonably and in good faith believe that the Stalking Horse Sale Closing Date shall occur on the date scheduled therefor, as notified by the Borrower Agent to the Administrative Agent in connection herewith), after New Money Loans, if any, are borrowed pursuant to Section 2.1.2(a)(i)(C) hereof, the Obligors shall first apply all Available Cash (if any remains after application to finance the Professional Fee Amount as required by Section 2.1.2(a)(i)(C)) as of the time immediately prior to consummation of the Stalking Horse Sale on the Stalking Horse Sale Closing Date to finance (or be set aside to finance) the Wind Down Related Disbursements up to the Tranche A Wind Down Cap; *provided, however*, that in the event such Available Cash (if any) is insufficient to fund the full amount of the Wind Down Related Disbursements up to the Tranche A Wind Down Cap (such shortfall, the "Tranche A Wind Down Shortfall"), then, New Money Loans utilizing the New Money Loan Tranche A Commitment shall (subject to the satisfaction of the Stalking Horse Sale Closing Date Funding Conditions) be available to be borrowed, on the Stalking Horse Sale Closing Date in an aggregate principal amount equal to the lesser of (x) the Tranche A Wind Down Shortfall, and (y) the amount of the then in effect unused New Money Loan Tranche A Commitment (determined immediately prior to consummation of the Stalking Horse Sale after first taking into account any New Money Loan Tranche A Commitment Reduction, and any other borrowings under the New Money Loan Tranche A Commitment, including borrowings in reliance on clause (A), (B) or (C) of Section 2.1.2(a)(i)) (the amount permitted to be borrowed in accordance with the foregoing, the "Tranche A Wind Down Amount"); provided, further that, for the avoidance of doubt, notwithstanding anything contained herein to the contrary, in the event that the amount of proceeds of Loans is insufficient to fund the Tranche A Wind Down Amount, or if the Tranche A Wind Down Amount remains unpaid notwithstanding a Borrowing hereunder, none of the Secured Parties shall have any commitment to finance, or to extend any other loans or provide other financial accommodations to facilitate payment of, or shall have any other liability

- 57 -

or obligation with respect to, any such shortfall under this Agreement with respect to the Tranche A Wind Down Amount; provided, that, notwithstanding anything herein, the Lenders shall not be required to fund any amount of any New Money Loan incurred pursuant to the New Money Loan Tranche A Commitment on any Borrowing Date pursuant to this Section 2.1.2(a)(i) if: (I) in the case of Loans made in reliance on clause (A) or (B) above, the amount requested to be funded on the applicable Borrowing Date exceeds the amount required to fund Permitted Disbursements in accordance with the Approved Budget then-in effect, or (II) in the case of any Loan, the funding thereof would cause the aggregate principal amount of New Money Loans outstanding that were incurred pursuant to the New Money Loan Tranche A Commitment on a pro forma basis (after giving effect to the amount funded on such Borrowing Date) to exceed $22,000,000 (or, if less, the aggregate principal amount authorized to be incurred at such time pursuant to the DIP Order then in effect); provided, further, that, notwithstanding any amount of New Money Loans that may be determined to be available to be borrowed on the basis of the foregoing, such available amount of New Money Loans shall in any event not be permitted to be borrowed in reliance hereon in connection with (x) any Wind Down Statutory Expenses, or (y) any other amount relating to the Wind Down (except solely an amount not to exceed an amount equal to (I) $5,000,000 *minus* (II) the amount of Liquidity as of such time; provided, that, the Borrowers shall apply cash on hand to finance such Wind Down amounts prior to applying any proceeds of New Money Loans obtained hereunder, and such New Money Loans shall in any event not be made until the Stalking Horse Sale Closing Date); and an amount equal to $22,000,000 (as reduced by the amount of any New Money Loan Tranche A Commitment Reduction (if any)).

(ii)    subject to occurrence of the Final DIP Order Date, New Money Loans funded pursuant to the New Money Loan Tranche B Commitment on a single Borrowing Date occurring on the Stalking Horse Sale Closing Date (but solely if the Borrowers reasonably and in good faith believe that the Stalking Horse Sale Closing Date shall occur on the date scheduled therefor, as notified by Borrower Agent to the Administrative Agent in connection herewith) in an aggregate principal amount not equal to exceed the Tranche B Wind Down Amount. Proceeds of Loans utilizing the New Money Loan Tranche B Commitment then in effect (or, if less, the aggregate principal amount authorized in the Final DIP Order); provided, that such New Money Loan shall be used for Wind Down Related Disbursements only be required to be funded if and to the extent that the Borrowers demonstrate that the proceeds thereof shall be required to finance Wind Down Statutory Expenses in an amount not exceeding the Wind Down Statutory Expense Amount payable on or after the Stalking Horse Sale Closing Date in accordance with, and as set forth in, the Wind Down Budget contained in the Approved Budget then in-effect, and such payment shall occur at a time when the Borrowers shall not have sufficient cash on hand to fund such amount without borrowing the New Money Loan hereunder (as evidenced by the Approved Budget then in effect and the cash balance report dated as of the

- 58-

Borrowing Date required to be delivered pursuant to Section 10.1.12(d)(i)); provided, that, the Borrowers shall apply cash on hand to finance such Wind Down amounts prior to applying any proceeds of New Money Loans obtained hereunder.

Notwithstanding the foregoing or anything else in this Agreement or in any other Loan Document to the contrary, (A) no Lender shall be required to fund New Money Loans on more than two (2) Borrowing Dates in any calendar week (unless consented to in writing by such Lender), (B) (except in the case of Loans borrowed pursuant to Section 2.1.2(a)(i)(C) to pay the Professional Fee Amount Excess, Section 2.1.2(a)(i)(D) and/or Section 2.1.2(a)(ii)) no Lender shall be required to make any New Money Loan on any Borrowing Date that has not been previously specified in the Approved Budget in effect at the time a request for such New Money Loan is delivered in accordance herewith; provided, that, the Borrowing Date for New Money Loans pursuant to Section 2.1.2(a)(i)(C), Section 2.1.2(a)(i)(D) and/or Section 2.1.2(a)(ii) shall be the Stalking Horse Sale Closing Date; provided, further, that, New Money Loans requested in accordance herewith in connection with the Wind Down shall not be required to be funded if the Lenders determine that a need therefor has not been demonstrated in the Wind Down Budget portion of the Approved Budget then in effect, (C) (except in the case of Loans borrowed pursuant to Section 2.1.2(a)(i)(C) to pay the Professional Fee Amount Excess, Section 2.1.2(a)(i)(D) and/or Section 2.1.2(a)(ii)) the Borrowers shall not be permitted to request (and the Lenders shall not be required to make) any New Money Loan except if and to the extent (and in the amount) required to fund any disbursement (which shall include any disbursement in connection with the Wind Down) identified for purposes hereof in the Approved Budget in effect at the time a request for such New Money Loan is delivered in accordance herewith (such disbursement, a "Permitted Disbursement"); provided, further, that each New Money Loan shall be in a minimum amount equal to (I) at least $100,000 and in integral multiples of $10,000 thereafter (or such other amounts as agreed to by the applicable Lender), or (II) if lower that the foregoing, the lesser of (x) the remaining, unfunded amount of such Lender's applicable New Money Loan Commitment, as determined as of such time (after giving effect to the aggregate amount of New Money Loans previously made by such Lender), and (y) the amount authorized pursuant to the Interim DIP Order (in the case of New Money Loans made prior to the Final DIP Order Date) or the Final DIP Order (in the case of New Money Loans made as of the Final DIP Order Date), and (D) without limiting, and subject to, the applicable provisions of the Stalking Horse Agreement (including Section 8.14 thereof), the parties hereby agree that (i) proceeds of Loans made in connection with any Wind Down Amount or Professional Fees shall constitute Excluded Cash, (ii) proceeds of Loans made pursuant to Section 2.1.2(a)(i)(C) shall not be funded or made available to any of the Obligors, but shall instead be funded and deposited into the Escrow Account, and maintained therein at all times until a distribution in accordance herewith to pay the Professional Fees allowed by the Bankruptcy Court pursuant to an applicable order of the Bankruptcy Court in the Chapter 11 Cases, (iii) upon payment in full to the Estate Professionals of all Professional Fees owing to them and allowed to be so paid by the Bankruptcy Court pursuant to an applicable order of the Bankruptcy Court in the Chapter 11 Cases, the Obligors shall deliver (or cause to be delivered) to the Stalking Horse Purchaser, promptly (but in no event until after all deadlines imposed by the Bankruptcy Court for Estate Professionals to submit final fee applications have passed, and all final fee applications of the Estate Professionals have been submitted, and corresponding Final Orders (as defined in the Stalking

- 59-

Horse Agreement) entered by the Bankruptcy Court), all cash and other funds then-remaining in the Escrow Account and (iv) and, as further set forth in the Stalking Horse Agreement, the Stalking Horse Agreement Purchaser shall be entitled to (and the Sale Approval Order (as defined in the Stalking Horse Agreement) shall grant to the Stalking Horse Purchaser, effective as of the Stalking Horse Sale Closing Date, upon consummation of the Stalking Horse Sale in accordance with the Stalking Horse Agreement) a valid, enforceable and automatically perfected first priority priming Lien on and security interest in any such residual Excluded Cash that has not been distributed from the Escrow Account to an Estate Professional pursuant to an order of the Bankruptcy Court in the Chapter 11 Cases.

(b)     Each Lender's New Money Loan Commitment shall, concurrently with the funding of the above New Money Loans by it to the Administrative Agent, be automatically reduced, on a dollar-for-dollar basis, by the principal amount of New Money Loans made by it at such time; provided, that, an Excess Cash Prepayment in accordance with Section 5.3.1 shall cause the New Money Loan Commitment to be replenished by an amount equal to the amount of such Excess Cash Prepayment; provided, that, notwithstanding anything else herein, each Lender's New Money Loan Commitment shall in any event terminate, and shall be deemed permanently discharged, extinguished and cancelled in full, and shall cease to be binding on, or enforceable against, such Lender, in each case, automatically on, and immediately upon the occurrence of, the Termination Date.  For the avoidance of doubt, in no event shall the Lenders be required to fund any Loans if such funding would cause the aggregate principal amount of Loans outstanding hereunder to exceed the aggregate amount authorized pursuant to the Interim DIP Order (in the case of New Money Loans made prior to the Final DIP Order Date) or the Final DIP Order (in the case of New Money Loans made as of the Final DIP Order Date).

(c)     In furtherance of Section 3.2.4 and the agreements set forth in the DIP Facility Commitment Letter, on the Closing Date, the Borrowers shall be required to pay the New Money Loan Commitment Payment for the account of the Lenders, which payment shall be effectuated pursuant to a deemed making by the Lenders of Loans on the Closing Date in an aggregate principal amount equal to the amount of the New Money Loan Commitment Payment (the "DIP Facility Commitment Loans"), which DIP Facility Commitment Loans shall have the same pricing, rights, privileges and other terms as otherwise attach to as all New Money Loans (whether or not any New Money Loans are outstanding as of such time), but shall be made automatically and immediately upon and concurrently with the occurrence of the Closing Date, without requirement for any cash to be advanced by any Lender.  The Borrowers hereby agree that they shall be deemed to have incurred, DIP Facility Commitment Loans, automatically as of the Closing Date, by operation of the provisions hereof, without any further action by any Person, and that all DIP Facility Commitment Loans shall be outstanding as of such time, and interest shall accrue thereon in the same manner as interest would accrue on New Money Loans if any were made on such date.

(d)     Once repaid, no Loan (or portion thereof) may be reborrowed; provided, that, notwithstanding the foregoing, to the extent that any New Money Loans made pursuant to the New Money Loan Tranche A Commitment are repaid or prepaid pursuant to **Section 5.3.1** prior to the Stalking Horse Sale Closing Date, the Borrowers shall be permitted to request to

- 60-

re-borrow, prior to the Stalking Horse Sale Closing Date, New Money Loans in an aggregate principal amount not to exceed the amount of Excess Cash Prepayments made on or prior to such time, subject to satisfaction of the applicable conditions precedent in **Section 6**.

2.1.3    Use of Proceeds.  The proceeds of New Money Loans, and cash and Cash Equivalents of the Obligors, shall, in each case, only be permitted to be used by the Obligors or their Subsidiaries to finance (x) Permitted Disbursements in accordance with the Approved Budget, this Agreement and the DIP Orders, (y) the Wind Down Related Disbursements subject to the applicable provisions in this Agreement and the DIP Orders and (z) Professional Fees subject to the applicable provisions in this Agreement and the DIP Orders.

2.1.4    Termination of Commitments; Voluntary Reduction of Commitments.

(a)    Commitments (if any remain unused, after giving effect to any funding of Loans on such date) shall automatically terminate on the Termination Date. Upon at least 10 Business Days (or such shorter period as Administrative Agent may agree) prior written notice to Administrative Agent at any time, Borrowers may, at their option, terminate any New Money Loan Commitments; *provided*, that such termination shall not become effective unless and until Borrowers shall have paid the Termination Payment calculated on the amount of Commitments so terminated, and Full Payment of all Obligations with respect thereto (but no Lender shall be required to fund any Loan or provide any credit extension or other accommodation pursuant to any such Commitment as of the time that notice of such termination is delivered to the Administrative Agent hereunder).  Any notice of termination given by Borrowers shall be irrevocable.

(b)    Borrowers may permanently reduce any Commitments, on a Pro Rata basis for each Lender, upon at least 10 Business Days (or such shorter period as Administrative Agent may agree) prior written notice to Administrative Agent, which notice shall specify the amount of the reduction and shall be irrevocable once given. Each reduction shall be in a minimum amount of $5,000,000, or an increment of $1,000,000 in excess thereof.  No reduction of any Commitments hereunder shall become effective unless and until Borrowers shall have paid the Termination Payment calculated on the amount of Commitments so reduced, and Full Payment of all Obligations with respect thereto (but no Lender shall be required to fund any Loan or provide any credit extension or other accommodation pursuant to any Commitment amount sought to be so reduced pending any payment owing hereunder).

2.1.5    [Reserved].Specified Limitations.  For the avoidance of doubt, nothing contained herein shall constitute a guarantee, backstop or other commitment on the part of any Secured Party or any Related Party thereof (in any capacity) as to the amount of available cash on hand that the Obligors may have, or the amount of the then-unused New Money Loan Tranche A Commitment, in each case, as of the Stalking Horse Sale Closing Date, and (other than with respect to the New Money Loan Tranche B Commitment), no Lender (in any capacity) shall have any commitment or other obligation to finance, or to extend any other loans or provide other financial accommodations to facilitate payment of, or have any other liability or obligation, in

- 61 -

each case, with respect to, any shortfall or any amount in excess of the New Money Loan Tranche A Commitment, provided, however, the Secured Parties agree that they shall not terminate (pursuant to any provision hereof), in whole or in part, the New Money Loan Tranche A Commitment (other than any termination resulting from the New Money Loan Tranche A Commitment Reduction, if any) and/or the New Money Loan Tranche B Commitment unless the Stalking Horse Purchaser also terminates the Stalking Horse Agreement and the Stalking Horse Agreement is no longer in full force or effect (except with respect to provisions that survive the termination hereof). The Chapter 11 Unsecured Creditors Committee and the Obligors waive any right to object to the consummation of the Stalking Horse Sale on the basis that there are insufficient funds as of the Stalking Horse Sale Closing Date to fund the Professional Fee Amount Excess, the Tranche A Wind Down Amount or any other amounts, whether currently provided in the Approved Budget or otherwise, unless, in each such case, (a) any Secured Party is in breach of its obligations under this Agreement or (b) the consummation of the Stalking Horse Sale is unduly delayed as a result of (i) a breach by any Secured Party of its funding obligations under this Agreement or (ii) any act or failure to act by any Secured Party that is taken or not taken, as the case may be, in bad faith.

2.1.6    Protective Advances.  Administrative Agent shall be authorized, in its discretion, at any time that any conditions in **Section 6** are not satisfied to make Base Rate Loans ("Protective Advances") (a) up to an aggregate amount outstanding at any time of up to ten percent (10%) of the aggregate Commitments, if Administrative Agent deems such Loans necessary or desirable to preserve or protect Collateral, or to enhance the collectability or repayment of Obligations, as long as such Loans do not cause the outstanding Loans to exceed the aggregate Commitments; or (b) to pay any other amounts chargeable to Obligors under any Loan Documents, including interest, costs, fees and expenses.  Each Lender shall participate in each Protective Advance on a Pro Rata basis.  Required Lenders may at any time revoke Administrative Agent's authority to make further Protective Advances under clause (a) by written notice to Administrative Agent.  Absent such revocation, Administrative Agent's determination that funding of a Protective Advance is appropriate shall be conclusive.

2.1.7    Increase in Commitments; Additional Commitments.  Borrowers may, from time to time, upon notice to Administrative Agent, request an increase in, or other modification to, any New Money Loan Commitments, and/or the establishment of more of more additional or new Commitments, as the case may be; *provided*, that, such increase, modification or new Commitment, as applicable, shall not become effective unless and until (a) the Administrative Agent (at the Required Lenders' direction) shall have agreed thereto pursuant to a Commitment Agreement delivered in connection therewith, (b) Borrower Agent shall have obtained such Commitments from one or more Lenders or other Eligible Assignees (or, in the case of any modification to any Lender's existing Commitment, the Borrower Agent shall have obtained agreement thereto from such Lender) pursuant to a Commitment Agreement entered into by the applicable Lenders(s) and/or Eligible Assignee(s), as the case may be, and (c) the conditions precedent thereto, as set forth in the applicable Commitment Agreement, shall have been satisfied or waived in accordance with the terms thereof.  Administrative Agent, Borrowers, and new and existing Lenders shall execute and deliver such documents and agreements (including an amendment of this Agreement if necessary) as Administrative Agent reasonably

- 62-

deems appropriate (without the consent of any other Lender) to evidence the increase in, or other modification to, any Commitments, and/or the establishment of any new or additional Commitment(s), as the case may be, and the allocations of any such applicable Commitments. On the effective date of any increase, modification or establishment of any new or additional Commitment pursuant to any Commitment Agreement, as the case may be, all applicable outstanding Loans and/or other exposures under the applicable Commitments shall be allocated (or reallocated) among the Lenders party to such Commitment Agreement in accordance with the terms thereof, and settled by Administrative Agent if necessary, in accordance with Lenders' adjusted shares of such Commitments.

## SECTION 3.  INTEREST, FEES AND CHARGES

### 3.1.  Interest.

#### 3.1.1  Rates and Payment of Interest.

(a)    The Obligations shall bear interest at the following rates, subject to **Section 3.1.1(b)** (and, in each case, applicable and accruing until Full Payment): (i) in the case of any Base Rate Loan, at the Base Rate in effect from time to time, <u>plus</u> the Applicable Margin; (ii) the case of any LIBOR Loan, at LIBOR for the applicable Interest Period, <u>plus</u> the Applicable Margin; and (iii) the case of any other Obligation, to the extent that the same is overdue (including, to the extent permitted by law, overdue interest, fees, expenses and other amounts not paid when due), at the Base Rate in effect at the applicable time of determination, <u>plus</u> the Applicable Margin.

(b)    As of the occurrence of, and at all times during the continuance of, any Insolvency Proceeding with respect to any Obligor, or any other Event of Default (including if any Loans or other Obligations (or portion thereof) shall remain unpaid as of the Termination Date), all outstanding Loans and overdue Obligations shall automatically accrue interest at the Default Rate (whether before or after any judgment), until Full Payment thereof, and such interest shall be payable in cash on each Regular Interest Payment Date (unless a demand therefor is made on the Borrower Agent sooner or on a more frequent basis, as determined by the Administrative Agent).  Each Borrower acknowledges that the cost and expense to Administrative Agent and Lenders due to an Event of Default are difficult to ascertain and that the Default Rate is fair and reasonable compensation for this.

(c)    Interest accrued on any other Obligations shall be due and payable as provided in the Loan Documents and, if no payment date is specified, shall be due and payable on demand.  Notwithstanding the foregoing, interest accrued at the Default Rate shall be due and payable on demand.

#### 3.1.2  Application of LIBOR to Outstanding Loans.

(a)    Borrowers may on any Business Day, subject to delivery of a Notice of Conversion/Continuation, elect to convert any portion of the Base Rate Loans to, or to continue

- 63-

any LIBOR Loan at the end of its Interest Period as, a LIBOR Loan.  During any Event of Default, Administrative Agent may (and shall at the direction of Required Lenders) declare that no Loan may be made, converted or continued as a LIBOR Loan.

(b)     Whenever Borrowers desire to convert or continue Loans as LIBOR Loans, Borrower Agent shall give Administrative Agent a Notice of Conversion/Continuation, no later than 11:00 a.m. at least three Business Days before the requested conversion or continuation date.  Promptly after receiving any such notice, Administrative Agent shall notify each Lender thereof.  Each Notice of Conversion/Continuation shall be irrevocable, and shall specify the amount of Loans to be converted or continued, the conversion or continuation date (which shall be a Business Day), and the duration of the Interest Period (which shall be deemed to be one month if not specified).  If, upon the expiration of any Interest Period in respect of any LIBOR Loans, Borrowers shall have failed to deliver a Notice of Conversion/Continuation, they shall be deemed to have elected to convert such Loans into Base Rate Loans.  Agent does not warrant or accept responsibility for, nor shall it have any liability with respect to, administration, submission or any other matter related to any rate described in the definition of LIBOR or with respect to any rate that is an alternative or replacement for or successor to any of such rate or the effect of any of the foregoing.

3.1.3   Interest Periods.    In connection with the making, conversion or continuation of any LIBOR Loans, Borrowers shall select an interest period ("Interest Period") to apply, which interest period shall be 1, 2, 3 or 6 months (or, if agreed by the Administrative Agent, 12 months or any other period); *provided*, *however*, that:

(a)     the Interest Period shall begin on the date the Loan is made or continued as, or converted into, a LIBOR Loan, and shall expire on the numerically corresponding day in the calendar month at its end;

(b)     if any Interest Period begins on a day for which there is no corresponding day in the calendar month at its end or if such corresponding day falls after the last Business Day of such month, then the Interest Period shall expire on the last Business Day of such month; and if any Interest Period would otherwise expire on a day that is not a Business Day, the period shall expire on the next Business Day; and

(c)     no Interest Period shall extend beyond the Termination Date, and all Loans outstanding as of such time shall automatically be converted into Base Rate Loans.

3.1.4   Interest Rate Not Ascertainable.  If Administrative Agent shall reasonably determine that on any date for determining LIBOR, due to any circumstance affecting the London interbank market, adequate and fair means do not exist for ascertaining such rate on the basis provided herein, then Administrative Agent shall immediately notify Borrowers of such determination.  Until Administrative Agent notifies Borrowers that such circumstance no longer exists (which it will use commercially reasonable efforts to promptly do when it becomes aware

- 64-

that such circumstances no longer exist), the obligation of Lenders to make LIBOR Loans shall be suspended, and no further Loans may be converted into or continued as LIBOR Loans.

**3.2.     Fees and Commitment Payments**.

3.2.1     Agent Fees.  The Borrowers agree to pay to the Administrative, for its own account, the administrative and collateral agency fees and other amounts set forth in the Agent Fee Letter, in each case, at the times and in the amounts specified therein (the "Agent Fees"). For the avoidance of doubt, the Agent Fees shall be payable in addition to, and nothing herein shall be construed as limiting the Obligors' obligations with respect to payment of, any other fees, expenses, indemnities and other amounts payable to the Administrative Agent pursuant to the Loan Documents (including Extraordinary Expenses, and amounts payable pursuant to **Section 3.4** and **Section 14.2**) or otherwise.

3.2.2     Fees.  Without limiting anything else herein, the Borrowers shall pay all fees set forth in all engagement letters, fee letters and other similar agreements executed in connection with the Loan Documents with the Consenting Lender Side Persons or any other Person (if permitted by the Required Lenders).

3.2.3     No Refunds.  No fees or other amounts payable hereunder (including the New Money Loan Commitment Payment, Termination Payment, and Agent Fees) shall be refundable under any circumstances.

3.2.4     New Money Loan Commitment Payment.  As consideration for delivery of the DIP Facility Commitment Letter to the Obligors and the agreements of the DIP Facility Commitment Party thereunder, and as additional consideration for structuring and arranging the DIP Facility, for providing the New Money Loan Commitments, and, as applicable, for permitting the Borrowers to re-borrow New Money Loans in an aggregate principal amount equal to the amount of Excess Cash Prepayments in accordance with Section 2.1.2(d), and such other accommodations that have been or may be made available to the Borrowers by the Lenders hereunder, and otherwise in connection with the transactions occurring on or about the Closing Date, Borrowers shall pay to each Lender the New Money Loan Commitment Payment on the Closing Date, which New Money Loan Commitment Payment shall be paid pursuant to, and as further set forth in, **Section 2.1.2**.

**3.3.     Computation of Interest, Fees, Yield Protection**.  All interest, as well as fees and other charges calculated on a per annum basis, shall be computed for the actual days elapsed, based on a year of 360 days, except that interest on Base Rate Loans accruing at the "prime rate" shall be computed based on a year of 365 or 366 days (as applicable).  Each determination by Administrative Agent of any interest, fees or interest rate hereunder shall be final, conclusive and binding for all purposes, absent manifest error.  All fees shall be fully earned when due and shall not be subject to rebate, refund or proration.  A certificate as to amounts payable by Borrowers under **Section 3.4**, **3.7**, **3.9** or **5.9**, submitted to Borrower Agent by Administrative Agent or the affected Lender, as applicable, and setting forth in reasonable detail the basis for such payment and the calculation thereof, shall be final, conclusive and binding for all purposes, absent

- 65-

manifest error, and Borrowers shall pay such amounts to the appropriate party within 10 Business Days following receipt of the certificate.

**3.4.   Reimbursement Obligations**.  Borrowers shall reimburse Administrative Agent for all Extraordinary Expenses.  Borrowers shall also reimburse Administrative Agent for all reasonable and documented legal, accounting, examination, consulting, and other reasonable and documented fees, costs and expenses incurred by it in connection with (a) negotiation and preparation of any Loan Documents, including any amendment or other modification thereof; (b) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of Administrative Agent's Liens on any Collateral, to maintain any insurance required hereunder or to verify Collateral; and (c) subject to the limits of **Section 10.1.1(b)**, each inspection, audit or examination with respect to any Obligor or Collateral, whether prepared by Administrative Agent's personnel or a third party (in the case of legal fees and expenses, subject to the immediate following sentence).  All legal and accounting fees incurred by Agent Professionals shall be charged to Borrowers at the actual rate charged by such Agent Professionals; *provided*, that Borrowers' obligation to reimburse Administrative Agent for legal fees and expenses shall be limited to the reasonable and documented legal fees and expenses of one primary counsel, and one local counsel in each relevant jurisdiction.  In addition to the Extraordinary Expenses of Administrative Agent, upon the occurrence and during the continuance of an Event of Default, Borrowers shall reimburse each Lender for any reasonable out-of-pocket fees, charges and disbursements (including without limitation, the reasonable, documented, and out-of-pocket fees, charges and disbursement of one primary outside legal counsel for all of the Lenders) incurred by it in connection with the enforcement, collection or protection of its rights under the Loan Documents, including all such expenses incurred during any workout, restructuring or Insolvency Proceeding. All amounts payable by Borrowers under this Section shall be due on demand.

**3.5.   Illegality**.  If any Lender in good faith reasonably determines that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund LIBOR Loans, or to determine or charge interest rates based upon LIBOR, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to Administrative Agent, any obligation of such Lender to make or continue LIBOR Loans or to convert Base Rate Loans to LIBOR Loans shall be suspended until such Lender notifies Administrative Agent that the circumstances giving rise to such determination no longer exist (which Administrative Agent will promptly do when it becomes aware that such circumstances no longer exist).  Upon delivery of such notice, Borrowers shall prepay or, if applicable, convert all LIBOR Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such LIBOR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such LIBOR Loans.  Upon any such prepayment or conversion, Borrowers shall also pay accrued interest on the amount so prepaid or converted.

**3.6.** **Inability to Determine Rates**.  If Required Lenders notify Administrative Agent for any reason in connection with a request for a Borrowing of, or conversion to or continuation of, a LIBOR Loan that (a) Dollar deposits are not being offered to banks in the London interbank Eurodollar market for the applicable amount and Interest Period of such Loan, (b) adequate and reasonable means do not exist for determining LIBOR for the requested Interest Period, or (c) LIBOR for the requested Interest Period does not adequately and fairly reflect the cost to such Lenders of funding such Loan, then Administrative Agent will promptly so notify Borrower Agent and each Lender.  Thereafter, the obligation of Lenders to make or maintain LIBOR Loans shall be suspended until Administrative Agent (upon instruction by Required Lenders) revokes such notice.  Upon receipt of such notice (which the Required Lenders shall promptly do when they become aware that the circumstances giving rise to such suspension no longer exist), Borrower Agent may revoke any pending request for a Borrowing of, conversion to or continuation of a LIBOR Loan or, failing that, will be deemed to have submitted a request for a Base Rate Loan.

**3.7.** **Increased Costs; Capital Adequacy**.

    3.7.1   Increased Costs Generally.  If any Change in Law shall:

        (a)    impose, modify or deem applicable any reserve, liquidity, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in calculating LIBOR);

        (b)    subject any recipient to Taxes (other than (i) Indemnified Taxes or (ii) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes) with respect to any Loan, Commitment or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

        (c)    impose on any Lender or interbank market any other condition, cost or expense affecting any Loan, Commitment or Loan Document;

and the result thereof shall be to increase the cost to a Lender of making or maintaining any Loan or Commitment, or converting to or continuing any interest option for a Loan, or to reduce the amount of any sum received or receivable by a Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, Borrowers will pay to it such additional amount(s) as will compensate it for the additional costs incurred or reduction suffered; *provided*, that such additional amounts are also being assessed by such Lender generally against similarly situated borrowers under similar credit facilities.

    3.7.2   Capital Requirements.  If a Lender determines that a Change in Law affecting such Lender or its holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's or holding company's capital as a consequence of this Agreement, or such Lender's Commitments, Loans, or participations in Loans, to a level below that which such Lender or holding company could

NY 78904694v1NY 78904694v7

have achieved but for such Change in Law (taking into consideration its policies with respect to capital adequacy), then from time to time Borrowers will pay to such Lender, as the case may be, such additional amounts as will compensate it or its holding company for the reduction suffered; *provided*, that such additional amounts are also being assessed by such Lender against similarly situated borrowers under similar credit facilities.

              3.7.3   <u>Libor Loan Reserves</u>.  If any Lender is required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits beyond those required of it on the Closing Date or, if later, the date it became a Lender, Borrowers shall pay additional interest to such Lender on each LIBOR Loan equal to the costs of such additional reserves allocated to the Loan by the Lender (as reasonably determined by it in good faith, which determination shall be conclusive).  The additional interest shall be due and payable on each interest payment date for the Loan; *provided*, *however*, that if the Lender notifies Borrowers (with a copy to Agent) of the additional interest less than 10 Business Days prior to the interest payment date, then such interest shall be payable 10 Business Days after Borrowers' receipt of the notice.

              3.7.4   <u>Compensation</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of its right to demand such compensation, but Borrowers shall not be required to compensate a Lender for any increased costs incurred or reductions suffered more than nine months prior to the date that the Lender notifies Borrower Agent of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

      **3.8.**    **Mitigation**.  If any Lender requests compensation under **Section 3.7**, or if Borrowers are required to pay additional amounts with respect to a Lender under **Section 5.9**, then such Lender shall (at the request of the Borrowers) use reasonable efforts to designate a different Lending Office or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) reduce amounts payable in the future; and (b) would not subject the Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to it or unlawful.  Borrowers shall pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

      **3.9.**    **Funding Losses**.  If for any reason (other than default by a Lender) (a) any Borrowing of, or conversion to or continuation of, a LIBOR Loan does not occur on the date specified therefor in a Notice of Borrowing or Notice of Conversion/Continuation (whether or not withdrawn), (b) any repayment or conversion of a LIBOR Loan occurs on a day other than the end of its Interest Period, (c) Borrowers fail to repay a LIBOR Loan when required hereunder, or (d) a Lender (other than a Defaulting Lender) is required to assign a LIBOR Loan prior to the end of its Interest Period pursuant to **Section 13.4**, then Borrowers shall pay to Administrative Agent its customary administrative charge and to each Lender all resulting losses and expenses (excluding loss of anticipated profits), including any loss or expense arising from liquidation or

redeployment of funds or from fees payable to terminate deposits of matching funds. Lenders shall not be required to purchase Dollar deposits in any interbank or offshore Dollar market to fund any LIBOR Loan, but this Section shall apply as if each Lender had purchased such deposits.

**3.10.** **Maximum Interest**. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by Applicable Law ("maximum rate"). If Administrative Agent or any Lender shall receive interest in an amount that exceeds the maximum rate, the excess interest shall be applied to the principal of the Obligations or, if it exceeds such unpaid principal, refunded to Borrowers. In determining whether the interest contracted for, charged or received by Administrative Agent or a Lender exceeds the maximum rate, such Person may, to the extent permitted by Applicable Law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest; (b) exclude voluntary prepayments and the effects thereof; and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

## SECTION 4.  LOAN ADMINISTRATION

**4.1.** **Manner of Borrowing and Funding Loans**.

4.1.1  Notice of Borrowing.

(a)    Whenever Borrowers desire funding of a Borrowing of New Money Loans, Borrower Agent shall give notice to the Administrative Agent in the form of a Notice of Borrowing. Each such Notice of Borrowing must be received by Administrative Agent no later than 11:00 a.m. (i) at least (x) one (1) Business Day prior to the requested Borrowing Date, in the case of a Base Rate Loan, and (y) three (3) Business Days prior to the requested Borrowing Date, in the case of a LIBOR Loan (unless the Administrative Agent consents to any shorter time period), or (ii) notwithstanding the foregoing, on the first (1st) Business Day prior to the Stalking Horse Sale Closing Date, in the case of any Borrowing made ~~in connection with the Wind Down (whether~~ pursuant to Section 2.1.2(a)(i)(B~~C), Section 2.1.2(a)(i)(D)~~ or Section 2.1.2(a)(ii)~~, or any Borrowing pursuant to Section 2.1.2(a)(i)(C)~~, in each case, whether such Borrowing shall comprise Base Rate Loans or LIBOR Loans. Notices received after 11:00 a.m. shall be deemed received on the next Business Day. Each Notice of Borrowing shall be irrevocable and shall specify (A) the amount of the Borrowing, ~~which~~and (other than with respect to any Borrowing in respect of 2.1.2(a)(i)(C), 2.1.2(a)(i)(D) and/or 2.1.2(a)(ii)) shall demonstrate a need for the amount requested to be borrowed on the applicable Borrowing Date, by reference to the Approved Budget then in effect ~~(and, in the case of a Borrowing under Section 2.1.2(a)(ii), or otherwise in connection with the Wind Down (including the Wind Down Statutory Expense Amount), by reference to the Wind Down Budget portion of such Approved Budget, updated to reflect the needs as of the applicable Borrowing Date)~~, and shall identify the Permitted

- 69-

Disbursements thereunder with respect to which such funding is being requested, (B) the requested funding date (which must be a Business Day) (each, a "Borrowing Date"), (C) whether the Borrowing is to be made as Base Rate Loans or LIBOR Loans (*provided*, that each Borrowing (other than in connection with the Wind Down Amount or as set forth above) in respect of which a Notice of Borrowing is delivered less than three (3) Business Days prior to the requested Borrowing Date shall be Base Rate Loans unless the Lenders agree in writing to permit such Loans to be made as LIBOR Loans), and (D) in the case of LIBOR Loans, the duration of the applicable Interest Period (which shall be deemed to be one (1) month if a different duration is not specified).

(b)     Unless payment is otherwise timely made by Borrowers, the becoming due of any Obligations (whether principal, interest, fees or other charges, including Extraordinary Expenses) shall be deemed to be a request for Base Rate Loans on the due date, in the amount of such Obligations.  The proceeds of such Loans shall be disbursed as direct payment of the relevant Obligation.  In addition, Administrative Agent may, at its option, during any Cash Dominion Period charge such Obligations against any operating, investment or other account of a Borrower maintained with Administrative Agent or any of its Affiliates (and in any such case will give Borrower Agent prompt notice thereof).

4.1.2   Funding by Lenders.  Each Lender shall timely honor its Commitment by funding its Pro Rata share of each Borrowing of Loans that is properly requested hereunder. Administrative Agent shall notify Lenders of each Notice of Borrowing (or deemed request for a Borrowing).  Each Lender shall fund to Administrative Agent or to the Borrowers such Lender's Pro Rata share of the Borrowing to the account specified by Administrative Agent in immediately available funds not later than 5:00 p.m. on the requested funding date.  Subject to its receipt of such amounts from Lenders, Administrative Agent shall disburse the proceeds of the Loans as directed by Borrower Agent in the applicable Notice of Borrowing.  Unless Administrative Agent shall have received (in sufficient time to act) written notice from a Lender that it does not intend to fund its Pro Rata share of a Borrowing, Administrative Agent may assume that such Lender has deposited or promptly will deposit its share with Administrative Agent, and Administrative Agent may disburse a corresponding amount to Borrowers.  If a Lender's share of any Borrowing or of any settlement pursuant to **Section 4.1.2** is not received by Administrative Agent, then Borrowers agree to repay to Administrative Agent **on demand** the amount of such share, together with interest thereon from the date disbursed until repaid, at the rate applicable to the Borrowing.

4.1.3   Notices.  Neither Administrative Agent nor any Lender shall have any liability for any loss suffered by a Borrower as a result of Administrative Agent or any Lender acting upon its understanding of telephonic or e-mailed instructions from a person believed in good faith by Administrative Agent or any Lender to be a person authorized to give such instructions on a Borrower's behalf.

**4.2.   Defaulting Lender**.

4.2.1   <u>Defaulting Lender Adjustments</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)   <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definitions of Required Lenders.

(b)   <u>Defaulting Lender Waterfall</u>.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to **Section 11** or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to **Section 11.3** shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; *second*, as the Borrower Agent may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower Agent, to be held in a Deposit Account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided*, that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in **Section 6.2** were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with their Commitments without giving effect to clause (d) below.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this **Section 4.2.1(b)** shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

4.2.2   <u>Cure</u>.  If the Borrowers and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any Cash Collateral), that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the

- 71-

other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans and funded and unfunded participations in Letters of Credit to be held pro rata by the Lenders in accordance with their Commitments (without giving effect to **Section 4.2.1(b)**), whereupon such Lender will cease to be a Defaulting Lender; *provided*, that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while that Lender was a Defaulting Lender; and *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

4.2.3   <u>Loans</u>.   So long as any Lender is a Defaulting Lender, (i) the Administrative Agent shall not be required to fund any Loans unless it will have no Fronting Exposure after giving effect to such Loan.

**4.3.**   **<u>Number and Amount of LIBOR Loans; Determination of Rate</u>**.   Each Borrowing of LIBOR Loans when requested shall be in a minimum amount of $100,000 and in integral multiples of $10,000 (or such other amounts as agreed to by the Administrative Agent) (or, if lower, the lesser of (x) the remaining, unfunded amount of such Lender's New Money Loan Commitment, determined as of such time after giving effect to the aggregate amount of New Money Loans previously made by such Lender and (y) the amount authorized pursuant to the Final DIP Order).   No more than six (6) Borrowings of LIBOR Loans may be outstanding at any time, and all LIBOR Loans having the same length and beginning date of their Interest Periods shall be aggregated together and considered one Borrowing for this purpose.   Upon determining LIBOR for any Interest Period requested by Borrowers, Administrative Agent shall promptly notify Borrowers thereof by telephone or electronically and, if requested by Borrowers, shall confirm any telephonic notice in writing.

**4.4.**   **<u>Borrower Agent</u>**.   Each Obligor hereby designates Strike ("<u>Borrower Agent</u>") as its representative and agent for all purposes under the Loan Documents, including requests for Loans and Letters of Credit, designation of interest rates, delivery or receipt of communications, preparation and delivery of financial reports, receipt and payment of Obligations, requests for waivers, amendments or other accommodations, actions under the Loan Documents (including in respect of compliance with covenants), and all other dealings with Administrative Agent or any Lender.   Borrower Agent hereby accepts such appointment.   Administrative Agent and Lenders shall be entitled to rely upon, and shall be fully protected in relying upon, any notice or communication (including any notice of borrowing) delivered by Borrower Agent on behalf of any Obligor.   Administrative Agent and Lenders may give any notice or communication with an Obligor hereunder to Borrower Agent on behalf of such Obligor.   Each of Administrative Agent and Lenders shall have the right, in its discretion, to deal exclusively with Borrower Agent for any or all purposes under the Loan Documents.   Each Obligor agrees that any notice, election, communication, representation, agreement or undertaking made on its behalf by Borrower Agent shall be binding upon and enforceable against it.

**4.5.**   **<u>One Obligation</u>**.   The Loans and other Obligations constitute one general obligation of Borrowers and are secured by Administrative Agent's Lien on all Collateral;

*provided*, *however*, that Administrative Agent and each Lender shall be deemed to be a creditor of, and the holder of a separate claim against, each Borrower to the extent of any Obligations jointly or severally owed by such Borrower.

**4.6.** **Effect of Termination**.   On the effective date of the termination of all Commitments, the Obligations (other than Remaining Obligations) shall be immediately due and payable.   Until Full Payment of the Obligations, all undertakings of Borrowers contained in the Loan Documents shall continue, and Administrative Agent shall retain its Liens in the Collateral and all of its rights and remedies under the Loan Documents.   **Sections 3.7, 5.5, 5.9, 5.10, 12, 14.2**, this Section, and each indemnity or waiver given by an Obligor or Lender in any Loan Document, shall survive Full Payment of the Obligations.

## SECTION 5.   PAYMENTS

**5.1.** **General Payment Provisions**.   Except in the case of any amounts that are expressly permitted to be Paid in Kind hereunder (including as set forth in **Section 3.1.1**), all payments of Obligations shall be made in Dollars, without offset, counterclaim or defense of any kind, free of (and without deduction for) any Taxes (except as otherwise provided herein), and in immediately available funds, not later than 12:00 noon on the due date.   Any payment after such time may be deemed by the Administrative Agent made on the next Business Day.   Any payment of a LIBOR Loan prior to the end of its Interest Period shall be accompanied by all amounts due under **Section 3.9** to the extent then known to the Borrowers, or the Borrowers shall thereafter promptly pay such amounts when ascertained by the Lenders.   Borrowers agree that, during the continuation of an Event of Default, Administrative Agent shall have the continuing, exclusive right to apply and reapply payments and proceeds of Collateral against the Obligations, in such manner as Administrative Agent deems advisable, but whenever possible, any prepayment of Loans shall be applied first to Base Rate Loans and then to LIBOR Loans.

**5.2.** **Voluntary Prepayments**.   Loans may be prepaid from time to time, without penalty or premium, subject to the requirements with respect to the Termination Payment, and **Section 3.9** and **Section 5.12**.   The Administrative Agent shall elect whether any prepayment shall be applied first to Base Rate Loans or to LIBOR Loans.

**5.3.** **Mandatory Prepayments**.

5.3.1   Anti-hoarding.   On and after the earlier of (i) the Final DIP Order Date and (ii) the first Borrowing Date of New Money Loans occurring on or after the Closing Date, if, for any reason, Liquidity exceeds $10,000,000 for any two (2) consecutive Business Day period (the amount of such excess, the "Excess Cash Amount"), the Borrowers shall promptly (and, in any event, by 5 p.m. (New York City time) on the second (2nd) Business Day immediately after the second (2nd) Business Day in such period prepay the Loans in an aggregate principal amount equal to the Excess Cash Amount (each payment hereunder, an "Excess Cash Prepayment").   Notwithstanding anything to contrary contained herein, in no event shall any prepayment pursuant to this Section 5.3.1 reduce the then outstanding New Money Loan Commitment; provided, that, notwithstanding any Excess Cash Prepayment, the Lenders shall not be required

- 73-

to make any Loans unless and until all conditions precedent shall have been satisfied or waived in accordance with Section 6.2.  Payments made by the Borrowers pursuant to this provision shall be applied first to the payment of the outstanding New Money Loans and thereafter to the remaining Loans.

      5.3.2   <u>Termination Date</u>.  On the Termination Date, Borrowers shall repay all outstanding Loans and other Obligations in full to the extent required to constitute Full Payment hereunder.

      5.3.3   <u>Change of Control</u>.  Immediately upon any Change of Control, the Borrowers shall (i) prepay, or cause to be prepaid, the Loans (together with the Termination Payment) and other Obligations, and (ii) terminate, or cause to be terminated, the Commitments, in each case, in an amount that would cause the Full Payment thereof; *provided*, that, pending prepayment of the Loans in accordance herewith, and at all times until Full Payment, all cash, Cash Equivalents and other funds and proceeds thereof shall be held in a Deposit Account subject to a Deposit Account Control Agreement in favor of the Administrative Agent, and no payments, withdrawals, transfers or disbursements shall be made or permitted to be made therefrom at any time (whether or not such payment, withdrawal, transfer or disbursement is otherwise in accordance with the Approved Budget or otherwise permitted hereunder).

      5.3.4   [Reserved].

      5.3.5   <u>Asset Dispositions</u>.  The Borrowers shall prepay the Loans (together with the Termination Payment thereon) as hereinafter provided in an aggregate amount equal to 100% of the Net Cash Proceeds received by any Obligor or any Subsidiary from all Asset Dispositions and Involuntary Dispositions within 3 calendar days of the date of such Asset Disposition or Involuntary Disposition; *provided*, that, pending application of such amounts towards prepayment of the Loans in accordance herewith, all cash, Cash Equivalents and other funds and proceeds thereof shall be held in a Deposit Account subject to a Deposit Account Control Agreement in favor of the Administrative Agent; *provided*, *further*, that, the foregoing shall not be construed as permitting, and shall not operate as a consent or waiver with respect to, any Asset Disposition that would not otherwise be permitted hereunder, or any Default or Event of Default resulting from the same, or any consequence thereof.  For the avoidance of doubt, a prepayment of Loans shall be deemed to be required pursuant to this Section 5.3.5 in connection with proceeds of any Asset Disposition (including any Additional Specified Vehicle Disposition) or Involuntary Disposition, whether or not the receipt of any such proceeds shall (directly or indirectly) cause Liquidity to exceed $10,000,000 (and, even in such event, Loan prepayments shall be governed by, and made in accordance with, this Section 5.3.5, and not in accordance with Section 5.3.1).

      5.3.6   <u>Debt Issuance</u>.  Immediately upon the receipt by any Obligor or Subsidiary thereof of the Net Cash Proceeds of any Debt Issuance, the Borrower shall prepay the Loans (together with the Termination Payment thereon) as hereinafter provided in an aggregate amount equal to 100% of such Net Cash Proceeds; *provided*, that, pending application of such amounts

towards prepayment of the Loans in accordance herewith, all funds shall be held in a Deposit Account subject to a Deposit Account Control Agreement in favor of the Administrative Agent.

5.3.7  <u>Effect of Prepayments</u>.  Notwithstanding limiting anything else herein, except prepayments made pursuant to Section 5.3.1, no other prepayments or repayments of any Loans (including pursuant to this Section 5.3) shall (or shall be deemed to), cause or result in any increase to, or replenish or give rise to any increase to, any Commitment, and the Borrowers shall not be permitted to request to borrow additional Loans as a result of any such prepayment or repayment.

**5.4.**   **Payment of Other Obligations**.  Extraordinary Expenses and other Obligations (except the Loans (including interest thereon) and other Obligations payable pursuant to **Section 5.3.1** or as otherwise required hereby (including pursuant to **Section 5.12**)) shall be paid in cash by Borrowers as provided in the Loan Documents or, if no payment date is specified, within three (3) Business Days after written demand from the Administrative Agent (which may be via e-mail).

**5.5.**   **Marshaling; Payments Set Aside**.  None of Administrative Agent or Lenders shall be under any obligation to marshal any assets in favor of any Obligor or against any Obligations.  If any payment by or on behalf of Borrowers is made to Administrative Agent or any Lender, or Administrative Agent or any Lender exercises a right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other Person, then to the extent of such recovery, the Obligation originally intended to be satisfied, and all Liens, rights and remedies relating thereto, shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

**5.6.**   **Application and Allocation of Payments**.

5.6.1  <u>Application</u>.  Payments made by Borrowers hereunder shall be applied (a) first, as specifically required hereby; (b) second, to Obligations then due and owing; (c) third, to other Obligations specified by Borrowers; and (d) fourth, as determined by Administrative Agent in its good faith reasonable discretion.

5.6.2  <u>Post-Default Allocation</u>.  Notwithstanding anything in any Loan Document to the contrary, during an Event of Default, monies to be applied to the Obligations, whether arising from payments by Obligors, realization on Collateral, setoff or otherwise, shall be allocated as follows:

(a)   <u>first</u>, to all fees, indemnification, costs and expenses, including Extraordinary Expenses, owing to Administrative Agent;

(b)   <u>second</u>, to all amounts owing to Administrative Agent on any Loans fronted by it for the benefit of a Lender, Protective Advances, and Loans and participations that a Defaulting Lender has failed to settle or fund;

- 75-

(c)      third, to all Obligations constituting fees, indemnification, costs or expenses owing to Lenders;

(d)      fourth, to all Obligations constituting interest; and

(e)      last, to all remaining Obligations.

Amounts shall be applied to payment of each category of Obligations only after full payment of all preceding categories.  If amounts are insufficient to satisfy a category, Obligations in the category shall be paid on a pro rata basis.  Monies and proceeds obtained from an Obligor shall not be applied to its Excluded Swap Obligations, but appropriate adjustments shall be made with respect to amounts obtained from other Obligors to preserve the allocations in any applicable category.  If the provider fails to deliver the calculation within five days following request, Administrative Agent may assume the amount is zero.  The allocations set forth in this Section are solely to determine the rights and priorities among Secured Parties, and may be changed by agreement among them without the consent of any Obligor.  This Section is not for the benefit of or enforceable by any Obligor, and each Borrower irrevocably waives the right to direct the application of any payments or Collateral proceeds subject to this Section.

5.6.3   Erroneous Application.  Administrative Agent shall not be liable for any application of amounts made by it in good faith and, if any such application is subsequently determined to have been made in error, the sole recourse of any Lender or other Person to which such amount should have been made shall be to recover the amount from the Person that actually received it (and, if such amount was received by any Lender, such Lender hereby agrees to return it).

5.7.   **Dominion Account**.  Subject to the DIP Order, the ledger balance in the main Dominion Account as of the end of a Business Day shall (a) during a Cash Dominion Period, be applied to the Obligations at the beginning of the next Business Day and (b) at all other times, be immediately transferred to the Primary Operating Account.  If, as a result of such application, a credit balance exists, the balance shall not accrue interest in favor of Borrowers and shall be made available to Borrowers as long as no Event of Default exists.

5.8.   **Account Stated**.  Administrative Agent shall maintain in accordance with its usual and customary practices account(s) evidencing the Debt of Borrowers hereunder.  Any failure of Administrative Agent to record anything in a loan account, or any error in doing so, shall not limit or otherwise affect the obligation of Borrowers to pay any amount owing hereunder.  Entries made in a loan account shall constitute presumptive evidence, absent manifest error, of the information contained therein.

5.9.   **Taxes**.

5.9.1   Payments Free of Taxes.

(a)      All payments by any Obligor under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable

- 76-

Law.  If Applicable Law (as determined by the applicable withholding agent in its good faith discretion) requires the deduction or withholding of any Tax from any such payment, then the applicable withholding agent shall be entitled to make such deduction or withholding based on information and documentation provided pursuant to **Section 5.10**.

(b)    If the applicable withholding agent is required by any Applicable Law to withhold or deduct Taxes, including backup withholding and withholding taxes, from any payment (including amounts payable under this **Section 5.9**), then (i) the applicable withholding agent shall pay the full amount that it determines must be withheld or deducted to the relevant Governmental Authority pursuant to the Applicable Law, and (ii) to the extent the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Obligor (including amounts payable under this **Section 5.9**) shall be increased as necessary so that the Lender (or the Administrative Agent in the case where the Administrative Agent receives the payment for its own account) receives an amount equal to the sum it would have received had no such withholding or deduction been made.

5.9.2    <u>Payment of Other Taxes</u>.  Without limiting the foregoing, Borrowers shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at Administrative Agent's option, timely reimburse Administrative Agent for payment of, any Other Taxes.

5.9.3    <u>Tax Indemnification</u>.  Each Borrower shall indemnify and hold harmless, on a joint and several basis, the Administrative Agent or any Lender against any Indemnified Taxes (including those imposed or asserted on or attributable to amounts payable under this Section) payable or paid by a recipient or required to be withheld or deducted from a payment to a recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  Each Borrower shall make payment within 10 days after demand for any amount or liability payable under this Section.  A certificate as to the amount of such payment or liability delivered to Borrowers by a Lender (with a copy to Administrative Agent), or by Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

5.9.4    <u>Evidence of Payments</u>.  If Administrative Agent or an Obligor pays any Taxes pursuant to this Section, then upon request, Administrative Agent shall deliver to Borrower Agent or Borrower Agent shall deliver to Administrative Agent, respectively, a copy of a receipt issued by the appropriate Governmental Authority evidencing the payment, a copy of any return required by Applicable Law to report the payment, or other evidence of payment reasonably satisfactory to Administrative Agent or Borrower Agent, as applicable.

5.9.5    <u>Treatment of Certain Refunds</u>.  Unless required by Applicable Law, at no time shall Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, nor have any obligation to pay to any Lender, any refund of Taxes withheld or deducted

- 77-

from funds paid for the account of a Lender.  If a Lender or other recipient of the payments from an Obligor under any Loan Document determines in its discretion that it has received a refund of any Taxes as to which it has been indemnified by Borrowers or with respect to which a Borrower has paid additional amounts pursuant to this Section, it shall pay Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrowers with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided*, that Borrowers agree, upon request by the recipient, to repay the amount paid over to Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the recipient if the recipient is required to repay such refund to the Governmental Authority. Notwithstanding anything herein to the contrary, no recipient shall be required to pay any amount to Borrowers if such payment would place the recipient in a less favorable net after-Tax position than it would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  In no event shall Administrative Agent or any recipient be required to make its tax returns (or any other information relating to its taxes that it deems confidential) available to any Obligor or other Person.

5.9.6   Survival.  Each party's obligations under **Sections 5.9** and **5.10** shall survive the resignation or replacement of Administrative Agent or any assignment of rights by or replacement of a Lender, the termination of the Commitments, and the repayment, satisfaction, discharge or Full Payment of any Obligations.

**5.10.   Lender Tax Information.**

5.10.1  Status of Lenders.  Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments of Obligations shall deliver to Borrowers and Administrative Agent, at the time or times reasonably requested by Borrowers or Administrative Agent, such properly completed and executed documentation reasonably requested by Borrowers or Administrative Agent or prescribed by Applicable Law as will permit such payments to be made without or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Borrowers or Administrative Agent, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrowers or Administrative Agent to enable them to determine whether such Lender is subject to backup withholding or information reporting requirements.   Notwithstanding the foregoing, such documentation (other than documentation described in **Sections 5.10.2(a)**, **(b)** and **(d)**) shall not be required if a Lender reasonably believes delivery of the documentation would subject it to any material unreimbursed cost or expense or would materially prejudice its legal or commercial position.

5.10.2  Documentation.  Without limiting the foregoing, if any Borrower is a U.S. Person,

(a)      Any Lender that is a U.S. Person shall deliver to Borrowers and Administrative Agent on or prior to the date on which such Lender becomes a Lender hereunder (and from time to time thereafter upon reasonable request of Borrowers or Administrative Agent), executed copies of IRS Form W-9, certifying that such Lender is exempt from U.S. federal backup withholding Tax; or

(b)      Any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender hereunder (and from time to time thereafter upon reasonable request of Borrowers or Administrative Agent), whichever of the following is applicable:

(i)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party, (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E or W-8BEN (as applicable) establishing an exemption from or reduction of U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty, and (y) with respect to other payments under the Loan Documents, IRS Form W-8BEN-E or IRS Form W-8BEN (as applicable) establishing an exemption from or reduction of U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(ii)      executed copies of IRS Form W-8ECI;

(iii)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Exhibit F** hereto, to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10-percent shareholder" of a Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to a Borrower, as described in Section 881(c)(3)(C) of the Code ("U.S. Tax Compliance Certificate"), and (y) executed copies of IRS Form W-8BEN-E or W-8BEN (as applicable); or

(iv)      to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E or W8-BEN, a U.S. Tax Compliance Certificate substantially in the form of **Exhibit F** hereto, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided*, that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in form of **Exhibit F** hereto, on behalf of each such direct and indirect partner;

(c)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrowers and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes

- 79-

a Lender hereunder (and from time to time thereafter upon the reasonable request of Borrowers or Administrative Agent), executed copies of any other form prescribed by Applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Applicable Law to permit Borrowers or Administrative Agent to determine the withholding or deduction required to be made; and

(d) if payment of an Obligation to a Lender would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code), such Lender shall deliver to Borrowers and Administrative Agent at the time(s) prescribed by law and otherwise as reasonably requested by Borrowers or Administrative Agent such documentation prescribed by Applicable Law (including Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrowers or Administrative Agent as may be necessary for them to comply with their obligations under FATCA and to determine whether such Lender has complied with its obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (d), "FATCA" shall include any amendments made to FATCA after the date hereof.

5.10.3  <u>Redelivery of Documentation</u>.  If any form or certification previously delivered by a Lender pursuant to this Section expires or becomes obsolete or inaccurate in any respect, such Lender shall promptly update the form or certification or notify Borrowers and Administrative Agent in writing of its inability to do so.

5.10.4  <u>Lenders' Authorization</u>.  Each Lender hereby authorizes the Administrative Agent to deliver to the Obligors and to any successor Administrative Agent any documentation provided by such Lender to the Administrative Agent pursuant to **Section 5.10**.

**5.11.  <u>Nature and Extent of Each Borrower's Liability</u>**.

5.11.1  <u>Joint and Several Liability</u>.  Each Borrower agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to Administrative Agent and Lenders the prompt payment and performance of, all Obligations and all agreements under the Loan Documents, except its Excluded Swap Obligations. Each Borrower agrees that its guaranty obligations hereunder constitute a continuing guaranty of payment and not of collection, that such obligations shall not be discharged until Full Payment of the Obligations, and that such obligations are absolute and unconditional, irrespective of (a) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Obligor is or may become a party or be bound; (b) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by Administrative Agent or any Lender with respect thereto; (c) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any

- 80-

security or guaranty for the Obligations or any action, or the absence of any action, by Administrative Agent or any Lender in respect thereof (including the release of any security or guaranty); (d) the insolvency of any Obligor; (e) any election by Administrative Agent or any Lender in an Insolvency Proceeding for the application of Section 1111(b)(2) of the Bankruptcy Code; (f) any borrowing or grant of a Lien by any other Borrower, as debtor-in-possession under Section 364 of the Bankruptcy Code or otherwise; (g) the disallowance of any claims of Administrative Agent or any Lender against any Obligor for the repayment of any Obligations under Section 502 of the Bankruptcy Code or otherwise; or (h) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except a defense of partial payment and Full Payment of all Obligations.

5.11.2 <u>Waivers</u>.

(a)      Each Borrower expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel Administrative Agent or Lenders to marshal assets or to proceed against any Obligor, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Borrower.  Each Borrower waives all defenses available to a surety, guarantor or accommodation co-obligor other than Full Payment of all Obligations and waives, to the maximum extent permitted by law, any right to revoke any guaranty of any Obligations as long as it is a Borrower.  It is agreed among each Borrower, Administrative Agent and Lenders that the provisions of this **Section 5.11** are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, Administrative Agent and Lenders would decline to make Loans and issue Letters of Credit.  Each Borrower acknowledges that its guaranty pursuant to this Section is necessary to the conduct and promotion of its business, and can be expected to benefit such business.

(b)      Administrative Agent and Lenders may, in their discretion, during the continuation of an Event of Default, pursue such rights and remedies as they deem appropriate, including realization upon Collateral or any Real Estate by judicial foreclosure or nonjudicial sale or enforcement, to the extent permitted under Applicable Law and this Agreement, without affecting any rights and remedies under this **Section 5.11**.  If, in taking any action in connection with the exercise of any rights or remedies, Administrative Agent or any Lender shall forfeit any other rights or remedies, including the right to enter a deficiency judgment against any Borrower or other Person, whether because of any Applicable Laws pertaining to "election of remedies" or otherwise, each Borrower consents to such action and, to the extent permitted under Applicable Law, waives any claim based upon it, even if the action may result in loss of any rights of subrogation that any Borrower might otherwise have had.  To the extent permitted under Applicable Law, any election of remedies that results in denial or impairment of the right of Administrative Agent or any Lender to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Obligations.  To the extent permitted under Applicable Law, each Borrower waives all rights and defenses arising out of an election of remedies, such as nonjudicial foreclosure

with respect to any security for the Obligations, even though that election of remedies destroys such Borrower's rights of subrogation against any other Person. To the extent permitted under Applicable Law, Administrative Agent may bid all or a portion of the Obligations at any foreclosure, trustee or other sale, including any private sale, and the amount of such bid need not be paid by Administrative Agent but shall be credited against the Obligations. To the extent permitted under Applicable Law, the amount of the successful bid at any such sale, whether Administrative Agent or any other Person is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral, and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this **Section 5.11**, notwithstanding that any present or future law or court decision may have the effect of reducing the amount of any deficiency claim to which Administrative Agent or any Lender might otherwise be entitled but for such bidding at any such sale.

      5.11.3  <u>Extent of Liability; Contribution</u>.

      (a)    Notwithstanding anything herein to the contrary, each Borrower's liability under this **Section 5.11** shall be limited to the greater of (i) all amounts for which such Borrower is primarily liable, as described below, and (ii) such Borrower's Allocable Amount.

      (b)    If any Borrower makes a payment under this **Section 5.11** of any Obligations (other than amounts for which such Borrower is primarily liable) (a "<u>Guarantor Payment</u>") that, taking into account all other Guarantor Payments previously or concurrently made by any other Borrower, exceeds the amount that such Borrower would otherwise have paid if each Borrower had paid the aggregate Obligations satisfied by such Guarantor Payments in the same proportion that such Borrower's Allocable Amount bore to the total Allocable Amounts of all Borrowers, then such Borrower shall be entitled to receive contribution and indemnification payments from, and to be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment. The "<u>Allocable Amount</u>" for any Borrower shall be the maximum amount that could then be recovered from such Borrower under this **Section 5.11** without rendering such payment voidable under Section 548 of the Bankruptcy Code or under any applicable state fraudulent transfer or conveyance act, or similar statute or common law.

      (c)    Nothing contained in this **Section 5.11** shall limit the liability of any Borrower to pay Loans made directly or indirectly to that Borrower (including Loans advanced to any other Borrower and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower), and all accrued interest, fees, expenses and other related Obligations with respect thereto, for which such Borrower shall be primarily liable for all purposes hereunder. Administrative Agent shall have the right, at any time that a Default exists, to condition Loans upon a separate calculation of borrowing availability for each Borrower and to restrict the disbursement and use of such Loans to such Borrower.

NY 78904694v1NY 78904694v7

(d)      Each Obligor that is a Qualified ECP when its guaranty of or grant of Lien as security for a Swap Obligation becomes effective hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide funds or other support to each Specified Obligor with respect to such Swap Obligation as may be needed by such Specified Obligor from time to time to honor all of its obligations under the Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP's obligations and undertakings under this **Section 5.11** voidable under any applicable fraudulent transfer or conveyance act).  The obligations and undertakings of each Qualified ECP under this Section shall remain in full force and effect until Full Payment of all Obligations.  Each Obligor intends this Section to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support or other agreement" for the benefit of, each Obligor for all purposes of the Commodity Exchange Act.

5.11.4  <u>Joint Enterprise</u>.  Each Borrower has requested that Administrative Agent and Lenders make this credit facility available to Borrowers on a combined basis, in order to finance Borrowers' business most efficiently and economically.  Borrowers' business is a mutual and collective enterprise, and the successful operation of each Borrower is dependent upon the successful performance of the integrated group.  Borrowers believe that consolidation of their credit facility will enhance the borrowing power of each Borrower and ease administration of the DIP Facility, all to their mutual advantage.  Borrowers acknowledge that Administrative Agent's and Lenders' willingness to extend credit and to administer the Collateral on a combined basis hereunder is done solely as an accommodation to Borrowers and at Borrowers' request.

5.11.5  <u>Subordination</u>.  Each Borrower hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Obligor, howsoever arising, to the Full Payment of all Obligations, *provided*, that, for the avoidance of doubt, so long as no Event of Default has occurred and is continuing, nothing in this **Section 5.11.5** shall prohibit any Obligor from making or accepting payments on any such claims.

**5.12.  Termination Payment**.

(a)      As additional consideration for structuring and arranging the DIP Facility, committing to the New Money Loan Commitments, and on account of such other accommodations provided to the Borrowers by the Lenders, and otherwise in connection with the transactions occurring pursuant hereto, Borrowers shall be liable to the Lenders to pay the Termination Payment (as set forth below) in connection with any Termination Payment Triggering Event.  Each Termination Payment shall be deemed earned in full immediately and automatically upon such Lender executing this Agreement, and shall be Paid in Kind immediately upon the occurrence of any Termination Payment Triggering Event.

(b)      If any Termination Payment becomes due and payable as set forth in this **Section 5.12**, then the Termination Payment, as applicable, shall immediately and without further

NY 78904694v1NY 78904694v7

action constitute part of the Obligations payable by the Borrower (and guaranteed by the Guarantors) in respect of the Loans, which Obligations are guaranteed by the Guarantors and secured by the Collateral, and constitutes liquidated damages, not unmatured interest or a penalty, as the actual amount of damages to the Lenders as a result of the relevant event set forth in clause (a) of this **Section 5.12** would be impracticable and extremely difficult to ascertain. Without limiting the generality of the foregoing, it is further understood and agreed that (i) upon the occurrence of any event set forth in this **Section 5.12**, the Termination Payment shall be automatically and immediately due and payable as of the earliest such date, and shall constitute part of the Obligations payable by the Borrower (and guaranteed by the Guarantors) in respect of the Loans, which Obligations are secured by the Collateral, (ii) the Termination Payment shall also be automatically and immediately due and payable if, and upon such time as, any Loans or Obligations are satisfied, released or discharged by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by any other means at a time when any Termination Payment would otherwise have been due and payable in accordance with this paragraph, and the Termination Payment shall constitute a part of the Obligations at the time. THE BORROWER AND EACH GUARANTOR EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING TERMINATION PAYMENT IN CONNECTION WITH ANY PREPAYMENT, ACCELERATION OR MATURITY OF THE LOANS OR THE COMMENCEMENT OF ANY INSOLVENCY PROCEEDING.   The Borrower and each Guarantor expressly agrees (to the fullest extent that it may lawfully do so) that: (A) the Termination Payment are reasonable and are the product of an arm's-length transaction between sophisticated business people, ably represented by counsel; (B) the Termination Payment shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower and Guarantors giving specific consideration in this transaction for such agreement to pay the Termination Payment; and (D) the Borrower and each Guarantor shall each be estopped hereafter from claiming differently than as agreed to in this paragraph.   The Obligors expressly acknowledge that their agreement to pay the Termination Payment hereunder is a material inducement to the Lenders to provide the DIP Facility and the Commitments, and to make the Loans and enter into this Agreement.

(c)     The parties hereto agree (x) to treat any Termination Payment for U.S. federal income tax purposes as an increase to the yield of the applicable Loans, taxable as original issue discount (i.e., interest) over the remaining term of such Loans in accordance with the applicable rules under the Code and the U.S. Treasury Regulations thereunder and (y) that no U.S. federal, state or local withholding tax should be withheld or deducted on account of any Termination Payment.

**SECTION 6.  CONDITIONS PRECEDENT**

**6.1.     Conditions Precedent to Closing Date and Initial Borrowing**.  The occurrence of the Closing Date, and the effectiveness of this Agreement and of the Lenders' obligations to make any Loans hereunder on the Closing Date, are subject to the satisfaction (or waiver by the

Administrative Agent and the Required Lenders) of the following conditions precedent, in addition to the conditions precedent set forth in **Section 6.2**:

6.1.1    Restructuring Transaction Related Deliverables:

(a)    (i) the Obligors and the other parties thereto shall have entered into the Stalking Horse Agreement in accordance with the requirements of Restructuring Support Agreement, and a fully executed copy of the Stalking Horse Agreement shall have been delivered to the Administrative Agent, and (ii) on and as of the Closing Date, the Stalking Horse Agreement shall be in full force and effect, and no breach or default thereunder shall have occurred or be continuing;

(b)    the Obligors shall have commenced the Chapter 11 Cases in the Bankruptcy Court in accordance with the requirements of Restructuring Support Agreement no later than (and Petition Date shall have occurred on) December 6, 2021;

(c)    each Obligor shall be a debtor and debtor-in-possession in the Chapter 11 Cases, in each case, in accordance with the requirements of Restructuring Support Agreement and as otherwise satisfactory to the Required Lenders;

(d)    not later than the date that is one (1) Business Day after the Petition Date, the Obligors shall have filed with the Bankruptcy Court (i) the First Day Motions, the DIP Motion and the Sale Procedures Motion, in each case, no later than the Petition Date, and (ii) all other motions and other documents required to be filed with or submitted to the Bankruptcy Court in connection with the Chapter 11 Cases, by such time as required pursuant to the Bankruptcy Code (or as requested by the Bankruptcy Court), in a form and in substance reasonably satisfactory to the Required Lenders;

(e)    not later than the date that is three (3) calendar days following the Petition Date, all orders relating to the First Day Motions, the DIP Motion (including the Interim DIP Order) and the Sale Procedures Motion shall have been entered by the Bankruptcy Court;

(f)    the Obligors shall have established a cash management system subject to the entry of the DIP Orders satisfactory to the Obligors and the Required Lenders;

(g)    the Obligors shall have made no payments after the Petition Date on account of any Debt or other obligations arising prior to the Petition Date unless such payment is made pursuant to a Chapter 11 Order and subject to Permitted Variances, in accordance with the Approved Budget;

(h)    the Interim DIP Order (i) shall have been entered by the Bankruptcy Court in the Chapter 11 Cases not later than 3 calendar days after the Petition Date, (ii) shall be in full force and effect on the Closing Date, (iii) shall not have been vacated or reversed, (iv) shall not be subject to a stay, and (v) shall not have been modified or amended in any respect without the prior written consent of the Required Lenders;

- 85-

(i)     the Interim DIP Order shall be effective to create, in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid, binding, enforceable and fully and automatically perfected Lien on the Collateral, on the basis and with the priority set forth therein;

(j)     the Restructuring Support Agreement shall be in full force and effect on and as of the Closing Date, and no Termination Event (as defined in the Restructuring Support Agreement) or notice delivered by any party thereto in respect thereof shall have occurred; and

(k)     each Milestone required to be satisfied prior to the Closing Date shall have been satisfied (or waived) in accordance with the terms hereof.

6.1.2     Administrative Agent shall have received a copy of this Agreement and each other Loan Document, in each case, duly executed and delivered to Administrative Agent by each of the signatories thereto, and each of the foregoing shall be in full force and effect on the Closing Date.

6.1.3     [Reserved].

6.1.4     Administrative Agent and the Lenders shall have received from the Obligors the Initial Budget ~~(which shall include the Wind Down Budget)~~, and the same shall be sufficient to constitute the Approved Budget in effect as of such time.

6.1.5     Administrative Agent shall have received certificates, in form and substance satisfactory to it, from a Senior Officer of the Borrowers certifying that, immediately after giving effect to the incurrence of the Loans and the consummation of the transactions hereunder on the Closing Date, (i) no Default or Event of Default exists; (ii) the representations and warranties set forth in **Section 9** are true and correct in all material respects (or with respect to representations qualified by materiality, in all respects) on and as of the Closing Date (or if such representation or warranty is as of an earlier date, as of such earlier date) and (iii) the conditions set forth in **Section 6.2** are satisfied.

6.1.6     Administrative Agent shall have received a certificate of a duly authorized officer of the Borrowers, certifying (i) that the copies of each Obligator's Organic Documents attached thereto are true and complete, and are in full force and effect, without amendment except as shown; (ii) that an attached copy of resolutions authorizing execution and delivery of the Loan Documents is true and complete, and that such resolutions are in full and effect, were duly adopted, have not been amended, modified or revoked, and constitute all resolutions adopted with respect to this credit facility; and (iii) to the title, name and signature of each officer of each Obligor authorized to sign the Loan Documents.  Administrative Agent may conclusively rely on this certificate until it is otherwise notified by the applicable Obligor or the Borrower in writing.

6.1.7     Administrative Agent shall have received a written opinion of White & Case LLP, in form and substance reasonably satisfactory to Administrative Agent.

- 86-

6.1.8   Administrative Agent shall have received (a) copies of the charter documents of each Obligor, certified by the Secretary of State or other appropriate official of such Obligor's jurisdiction of organization as of a date no earlier than 30 days prior to the Petition Date by the Secretary of State of the state of the applicable Obligor's organization, and (b) good standing certificates for each Obligor, issued by the Secretary of State or other appropriate official of (i) such Obligor's jurisdiction of organization and each jurisdiction where such Obligor's conduct of business or ownership of property necessitates qualification where the failure to be so qualified could reasonably be expected to result in a Material Adverse Effect.

6.1.9   Administrative Agent shall have received certificates of insurance for the insurance policies carried by the Obligors, all in compliance with the Loan Documents, each of which shall have been endorsed or otherwise amended to include a customary lender's loss payable endorsement and to name the Administrative Agent as additional insured, in form and substance reasonably satisfactory to the Required Lenders.

6.1.10  Borrowers shall have paid all reasonable fees, costs, expenses and disbursements of the Administrative Agent, Lenders and the Consenting Lender Advisors; provided, that, if the same shall have not been invoiced until the Closing Date, payment thereof shall not be a condition precedent to the Closing Date, but shall instead constitute an affirmative covenant hereunder requiring payment of all such amounts within two (2) Business Days of receipt of such invoice.

6.1.11  All governmental and third party approvals necessary in connection with the Transactions and the DIP Facility and financing contemplated hereby (including shareholder approvals, if any) shall have been obtained on reasonably satisfactory terms and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the Transactions or the financing thereof or any of the transactions contemplated hereby.

6.1.12  The Obligors and their Subsidiaries shall have (A) no outstanding Debt except as permitted pursuant to **Section 10.2.1**, and (B) no outstanding preferred stock except as set forth on **Schedule 9.1.4**.

6.1.13  All legal (including tax implications) and regulatory matters shall be reasonably satisfactory to Administrative Agent and Lenders, including but not limited to compliance with all applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve System.

6.1.14  The absence of any injunction or temporary restraining order which, in the judgment of Administrative Agent exercising Permitted Discretion, would prohibit the making of the Loans or the consummation of the Transactions; and the absence of any litigation which would reasonably be expected to result in a Material Adverse Effect.

- 87-

6.1.15  Satisfactory results of due diligence investigation of Holdings and its subsidiaries (including without limitation insurance coverage and contingent liabilities (e.g., environmental, retiree medical benefits, ERISA, etc. and contractual obligations)).

6.1.16  Administrative Agent and the Lenders shall have received, at least five (5) Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

**6.2.**   **Conditions Precedent to All Borrowings**.  Except as expressly set forth in this Section 6.2 with respect to certain Loans identified herein, no Loans shall be made (or deemed made) at any time, and the Lenders shall not be required to fund any Loan requested by the Borrowers, unless, in each case, the following conditions are satisfied (or waived by the Administrative Agent and the Required Lenders) prior to (or concurrently with) the making (or deemed making) of such Loan on the Borrowing Date relating thereto; provided, that, if any condition herein is expressed to only constitute a condition precedent to a borrowing of certain Loans (as expressly identified in this Section 6.2), such condition shall only be required to be satisfied or waived (as applicable) in accordance herewith with respect to such Loans, as the case may be:

6.2.1   The Closing Date shall have occurred.  No Default or Event of Default shall exist at the time of, or immediately result from, the making of such Loan.

6.2.2   The representations and warranties of each Obligor in the Loan Documents shall be true and correct in all material respects (or, with respect to representations and warranties qualified by materiality, in all respects) on the date of, and upon giving effect to, the making of such Loan (except for representations and warranties that expressly relate to an earlier date).

6.2.3   There shall be an Approved Budget in full force and effect on and as of each of (a) the Borrowing Date for such Loan, and (b) the time that such Loan is funded; provided, that, if such Borrowing comprises New Money Loans made in connection with the Wind Down (whether pursuant to Section 2.1.2(a)(i)(B) or Section 2.1.2(a)(ii)), the related Notice of Borrowing (which shall be delivered on the first (1st) Business Day prior to the Stalking Horse Sale Closing Date) shall be accompanied by an Approved Budget containing a Wind Down Budget updated to reflect amounts projected as of such time;

6.2.4   The Interim DIP Order (in the case of Loans made prior to the entry of the Final DIP Order) or the Final DIP Order (in the case of Loans made after the entry of the Final DIP Order) (a) shall be in full force and effect, (b) shall not have been reversed, vacated or stayed, (c) shall not have become the subject of any appeal or challenge, and (d) shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

6.2.5    The Restructuring Support Agreement shall be in full force and effect, and no Termination Event (as defined in the Restructuring Support Agreement) or notice delivered by any party thereto in respect thereof shall have occurred or be continuing.

6.2.6    The making of such Loan shall not violate any Applicable Laws and shall not be enjoined, temporarily, preliminarily or permanently.

6.2.7    There shall not have occurred since the Petition Date any development or event which, individually or in the aggregate with other such circumstances, has had or could reasonably be expected to have, a Material Adverse Effect (except to the extent relating to the Chapter 11 Cases).

6.2.8    In the case of a Borrowing of any New Money Loans, in addition to the above, the following shall be satisfied (or waived as provided herein):

(a)    the aggregate principal amount of all New Money Loans requested by the Borrowers on such Borrowing Date shall not exceed the amount identified in the Approved Budget as being required by the Obligors and their Subsidiaries to finance Permitted Disbursements during the period specified in the Approved Budget (or, in the case of New Money Loans borrowed in connection with the Wind Down, the Wind Down Budget) (unless such Lender consents thereto); provided, however, that any amount prepaid pursuant to Section 5.3.1 during such period shall increase such  amount requested by an equivalent amount;

(b)    the making of such New Money Loans, and the use of proceeds therefrom, shall comply with the Approved Budget (and, if such New Money Loans are borrowed in connection with the Wind Down, the Wind Down Budget (after giving effect to compliance with Section 6.2.3)), and with this Agreement in all respects;

(c)    other than with respect to New Money Loans borrowed in connection with the Wind Down, the applicable Lender shall not have advanced New Money Loans on more than one other occasion during the calendar week in which the Borrowing Date for such New Money Loans shall occur (unless such Lender consents thereto);

(d)    the Administrative Agent shall have received a Notice of Borrowing in connection with the applicable New Money Loans in accordance with the requirements of this Agreement; and

(e)    the Administrative Agent shall have received evidence (which may be included in the applicable Notice of Borrowing, or delivered separately in writing) demonstrating that (i) on and as of the time of delivery of the Notice of Borrowing for the applicable New Money Loans, and immediately prior to the incurrence thereof, the aggregate amount of Liquidity, *plus* the amount of New Money Loans then-available to be borrowed hereunder, shall not be less than $2,500,000 following the end of the immediately preceding day, and (ii) pro forma for the making of such New Money Loan (after giving effect to the receipt and use of proceeds thereof), Liquidity shall not exceed $10,000,000 (in each case, unless such Lender consents thereto);

- 89-

provided, that, for the avoidance of doubt, cash in the Escrow Account shall not be included in the calculation of Liquidity hereunder.

Notwithstanding the foregoing, in the case of a Borrowing any of the following Borrowings on the Stalking Horse Sale Closing Date (each, a "Stalking Horse Sale Closing Date Borrowing"): (A) a Borrowing pursuant to Section 2.1.2(a)(i)(C) or (B) a Borrowing pursuant to Section 2.1.2(a)(i)(D) or Section 2.1.2(a)(ii), if and to the extent that, immediately prior to the consummation of the Stalking Horse Sale on the Stalking Horse Sale Closing Date, the Stalking Horse Purchaser determines to proceed with the consummation of the Stalking Horse Sale, such determination shall constitute (i) a waiver by the Administrative Agent and the Required Lenders of any condition precedent to a Stalking Horse Sale Closing Date Borrowing pursuant to Section 2.1.2(a)(i)(C) set forth in Sections 6.2.1 through 6.2.8 that has not been satisfied by such time, and (ii) an agreement by the Administrative Agent and the Required Lenders that the only conditions precedent to the incurrence of New Money Loans pursuant to Section 2.1.2(a)(i)(C) the applicable Stalking Horse Sale Closing Date Borrowing that are required to be satisfied as of such time shall be (x the following (collectively, the "Stalking Horse Sale Closing Date Funding Conditions"): (1) the delivery of an applicable Borrowing Notice in accordance with the requirements of this Agreement at least one (1) Business Day prior to the Stalking Horse Sale Closing Date, (y 2) the concurrent consummation of the Stalking Horse Sale on the Stalking Horse Sale Closing Date, and (z)(3) in the case of a Borrowing pursuant to Section 2.1.2(a)(i)(C), that the Escrow Agreement shall have been duly entered into by the parties thereto and, the Escrow Account shall have been established and shall be in effect and operational, and subject to the terms of the Escrow Agreement, and in the case of a Borrowing in connection with the Professional Fee Amount Excess or the Wind Down Amount, delivery of the AP Trade Balance Report required to be delivered as of the Stalking Sale Closing Date pursuant to Section 10.3.3(b) of this Agreement.

Each Notice of Borrowing (or, in the case of the Borrowing of Loans not constituting New Money Loans, each deemed request by Borrowers for a Loan) shall constitute a representation by Borrowers that the foregoing conditions are satisfied (or, as applicable, have been waived, in the case of a Stalking Horse Sale Closing Date Borrowing pursuant to Section 2.1.2(a)(i)(C), if and to the extent that a waiver thereof has been given in accordance with the immediately preceding paragraph) on and as of each of (i) the date of such Notice of Borrowing (or the date of such deemed request) to the extent such condition is not based on the occurrence of the Stalking Horse Sale Closing Date, (ii) the requested Borrowing Date, and (iii) the date on which such Loan is funded or made (or deemed funded or made, as applicable).

## SECTION 7.  COLLATERAL

**7.1.** **Grant of Security Interest**.  To secure the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of all Obligations to the full extent required hereunder to constitute Full Payment, each Obligor hereby grants to Administrative Agent, for the benefit of the Secured Parties, a continuing security interest in, and Lien upon, all property and assets of such Obligor, whether tangible or intangible, real or personal, wherever located, and whether now owned by or owing to such Obligor, or at

any time hereafter coming into existence, whether prior to or after the Petition Date, whether acquired or obtained by, or arising in favor of, such Obligor, or in which such Obligor now has or at any time in the future may acquire any right, title or interest, and, including, without limitation, all of the following:

(a) all Accounts;

(b) all Chattel Paper, including electronic chattel paper;

(c) all claims and causes of action, including all Commercial Tort Claims (including those shown on **Schedule 7.1(c)** or described in any notice or other instrument delivered to the Administrative Agent at any time), and subject to the entry of a Final DIP Order, all proceeds of Chapter 5 Claims and Causes of Action;

(d) all Deposit Accounts (including the Escrow Account);

(e) all Documents;

(f) all General Intangibles, including Intellectual Property Collateral and Payment Intangibles;

(g) all Goods, including Inventory, Equipment and fixtures;

(h) all Real Estate and interests therein (including all leasehold interests);

(i) all Instruments;

(j) all Investment Property and Financial Assets;

(k) all Letter-of-Credit Rights;

(l) all Supporting Obligations;

(m) all cash, Cash Equivalents, monies and other funds (whether or not in the possession or under the control of Administrative Agent, a Lender, or a bailee or Affiliate of Administrative Agent or a Lender, and including any Cash Collateral and Excluded Cash);

(n) all other assets and properties of the Grantors, whether tangible, intangible, real, personal or mixed;

(o) all accessions to, substitutions for, and all replacements, products, and cash and non-cash proceeds of the foregoing, including proceeds of and unearned premiums with respect to insurance policies, and claims against any Person for loss, damage or destruction of any Collateral; and

(p) all books and records (including customer lists, files, correspondence, tapes, computer programs, print-outs and computer records) pertaining to the foregoing.

- 91-

Notwithstanding anything in this Agreement or any other Loan Document to the contrary, no security interest or Lien is granted in any Excluded Assets.

**7.2.** **Lien on Deposit Accounts; Cash Collateral**.

7.2.1    <u>Deposit Accounts</u>.  To further secure the prompt payment and performance of all Obligations, each Obligor hereby grants to Administrative Agent for the benefit of Secured Parties a continuing security interest in and Lien upon all amounts credited to any Deposit Account of such Obligor (other than any Excluded Accounts), including any sums in any blocked or lockbox accounts or in any accounts into which such sums are swept.  Each Obligor hereby authorizes and directs each bank or other depository to deliver to Administrative Agent, upon request, all statements of balances in any Deposit Account maintained by such Obligor, without inquiry into the authority or right of Administrative Agent to make such request.

7.2.2    <u>Cash Collateral</u>.  Cash Collateral may be invested, at Administrative Agent's discretion (and subject to the prior written consent of Borrower Agent, as long as no Event of Default exists), but Administrative Agent shall have no duty to do so, regardless of any agreement or course of dealing with any Borrower, and shall have no responsibility for any investment or loss.  Each Borrower hereby grants to Administrative Agent, as security for the Obligations, a security interest in all Cash Collateral held from time to time and all proceeds thereof, whether held in a Cash Collateral Account or otherwise.  Administrative Agent may apply Cash Collateral to the payment of Obligations as they become due, in such order as Administrative Agent may elect.  Each Cash Collateral Account and all Cash Collateral shall be under the sole dominion and control of Administrative Agent, and no Borrower or other Person shall have any right to any Cash Collateral, until Full Payment of all Obligations.

**7.3.** **Pledged Collateral**.

7.3.1    <u>Pledged Equity Interests and Debt Securities</u>.  As security for the payment or performance, as the case may be, in full of the Obligations, each Obligor hereby assigns and pledges to Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to Administrative Agent, its successors and assigns, for the benefit of Secured Parties, a security interest in, all of such Obligor's right, title and interest in, to and under (a) the Equity Interests now owned or at any time hereafter acquired by such Obligor, including the Equity Interests set forth opposite the name of such Obligor on **Schedule 7.3(a)**, and all certificates and other instruments representing such Equity Interests (collectively, the "<u>Pledged Equity Interests</u>"); (b) the debt securities now owned or at any time hereafter acquired by such Obligor, including the debt securities set forth opposite the name of such Obligor on **Schedule 7.3(a)**, and all promissory notes and other instruments (collectively, the "<u>Pledged Debt Securities</u>"); (c) all other property that may be delivered to and held by Administrative Agent pursuant to the terms of this Section; (d) subject to **Section 7.3.6**, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other proceeds received in respect of, the Equity Interests, securities and instruments referred to in clauses (a) and (b) above; (e) subject to **Section 7.3.6**, all rights and privileges of such Obligor

- 92-

NY 78904694v1NY 78904694v7

with respect to the securities, instruments and other property referred to in clauses (a), (b), (c) and (d) above; and (f) all proceeds of any and all of the foregoing (the items referred to in clauses (a) through (f) above being collectively referred to as the "<u>Pledged Collateral</u>").

       7.3.2   <u>Delivery of the Pledged Collateral</u>.

       (a)    Subject to the terms of the Intercreditor Agreement, each Obligor agrees to deliver or cause to be delivered to Administrative Agent any and all certificates representing the Pledged Equity Interests of Subsidiaries and all other certificated Pledged Collateral at any time owned by such Obligor with a value in excess of $2,000,000 promptly (and in any event, within 45 days (or such longer period as the Administrative Agent may agree)) following the acquisition thereof by such Obligor, together with instruments of transfer executed in blank by a duly authorized officer of such Obligor.

       (b)    Upon delivery to Administrative Agent, (i) any Pledged Equity Interests shall be accompanied by undated stock powers duly executed by the applicable Obligor in blank or other instruments of transfer reasonably satisfactory to Administrative Agent and by such other instruments and documents as Administrative Agent may reasonably request and (ii) the certificated Pledged Collateral shall be accompanied by undated proper instruments of assignment duly executed by the applicable Obligor in blank and by such other instruments and documents as Administrative Agent may reasonably request.  In connection with any delivery of possessory Pledged Collateral after the date hereof to Administrative Agent, Borrower Agent shall deliver a schedule to Administrative Agent describing the possessory Pledged Collateral so delivered, which schedule shall be attached to **Schedule 7.3(a)** and made a part hereof; *provided*, that failure to deliver any such schedule hereto or any error in a schedule so attached shall not affect the validity of the pledge of any Pledged Collateral.

       7.3.3   <u>Pledge Related Representatives, Warranties and Covenants</u>.  Each Obligor hereby represents, warrants and covenants to Administrative Agent and the Secured Parties that:

       (a)    **Schedule 7.3(a)** sets forth a true and complete list, as of the Closing Date, with respect to such Obligor, of (i) all the Equity Interests owned by such Obligor and the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity Interests owned by such Obligor and (ii) all debt securities owned by such Obligor, and all promissory notes and other instruments evidencing such debt securities.  **Schedule 7.3(a)** sets forth, as of the Closing Date, all Equity Interests, debt securities and promissory notes required to be pledged hereunder.

       (b)    The Pledged Equity Interests and Pledged Debt Securities have (to the knowledge of the Obligors in the case of any of the foregoing that are not issued by an Obligor or Subsidiary) been duly and validly authorized and issued by the issuers thereof and (i) in the case of Pledged Equity Interests, are fully paid and nonassessable and (ii) in the case of Pledged Debt Securities, are legal, valid and binding obligations of the issuers

- 93-

thereof (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(c)     Except for the security interests granted hereunder, such Obligor (i) is and, subject to any transfers or dispositions not prohibited by this Agreement, will continue to be the direct owner, beneficially and of record, of the Pledged Collateral indicated on **Schedule 7.3(a)** as owned by such Obligor, (ii) holds the same free and clear of all Liens (other than Permitted Liens), (iii) will make no assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral (other than Permitted Liens and transfers or dispositions not prohibited by this Agreement) and (iv) will defend its title or interest thereto or therein against any and all Liens (other than Permitted Liens), however arising, of all persons whomsoever.

(d)     Such Obligor has the corporate or company power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated.

(e)     No Governmental Approval or any other action by any Governmental Authority and no consent or approval of any securities exchange or any other person (including stockholders, partners, members or creditors of such Obligor) is or will be required for the validity of the pledge effected hereby (other than such as have been obtained and are in full force and effect).

(f)     By virtue of the execution and delivery by such Obligor of this Agreement, when any Pledged Collateral are delivered to Administrative Agent in accordance with this Agreement, Administrative Agent will obtain a legal, valid and perfected lien upon and security interest in such Pledged Collateral as security for the payment and performance of the Obligations.

7.3.4   <u>Certification of Limited Liability Company and Limited Partnership Interests</u>.  If reasonably requested by Administrative Agent at a time when an Event of Default has occurred and is continuing, each Obligor shall use commercially reasonable efforts to cause each interest in any limited liability company or limited partnership controlled by such Obligor and pledged hereunder to be a "security" within the meaning of Article 8 of the New York UCC.

7.3.5   <u>Registration in Nominee Name; Denominations</u>.  At any time when an Event of Default has occurred and is continuing, Administrative Agent shall have the right (in its sole and absolute discretion) to hold the Pledged Collateral in its own name as pledgee, in the name of its nominee (as pledgee or as sub-agent) or in the name of the applicable Obligor, endorsed or assigned in blank or in favor of Administrative Agent. Administrative Agent shall at a time when an Event of Default has occurred and is continuing have the right to exchange the

- 94-

certificates representing Pledged Equity Interests for certificates of smaller or larger denominations for any purpose consistent with this Agreement.

7.3.6   <u>Voting Rights; Dividends and Interest</u>.

(a)   Unless and until an Event of Default shall have occurred and be continuing and Administrative Agent shall have provided at least one Business Days' prior written notice to the Borrower Agent that the Obligors' rights under this Section are being suspended:

(i)   Each Obligor shall be entitled to exercise any and all voting and other consensual rights and powers inuring to an owner of Pledged Collateral or any part thereof for any purpose consistent with the terms of this Agreement and the other Loan Documents; *provided*, that such rights and powers shall not be exercised in any manner that could reasonably be expected to materially and adversely affect the rights inuring to a holder of any Pledged Collateral or the rights and remedies of Administrative Agent or any other Secured Party under this Agreement or any other Loan Document or the ability of the Secured Parties to exercise the same.

(ii)   Administrative Agent shall execute and deliver to Obligors, or cause to be executed and delivered to Obligors, all such proxies, powers of attorney and other instruments as Obligors may reasonably request for the purpose of enabling Obligors to exercise the voting and other consensual rights and powers they are entitled to exercise pursuant to paragraph (i) above.

(iii)   Each Obligor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Collateral to the extent and only to the extent that such dividends, interest, principal and other distributions are not prohibited by, the terms and conditions of this Agreement, the other Loan Documents and applicable laws; *provided*, that any noncash dividends, interest, principal or other distributions that would constitute Pledged Equity Interests or Pledged Debt Securities, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests of the issuer of any Pledged Collateral or received in exchange for Pledged Collateral or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral and, if received by any Obligor, shall be held in trust for the benefit of Administrative Agent, shall be segregated from other property or funds of such Obligor and shall be forthwith delivered to Administrative Agent upon demand in the same form as so received (with any necessary endorsement).

(b)   Upon the occurrence and during the continuance of an Event of Default, after Administrative Agent shall have notified Obligors of the suspension of their rights under paragraph (a)(iii) of this Section, all rights of Obligors to dividends, interest, principal or other distributions that such Obligor is authorized to receive pursuant to

- 95-

paragraph (a)(iii) of this Section shall cease, and all such rights shall thereupon become vested in Administrative Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions. All dividends, interest, principal or other distributions received by any Obligor contrary to the provisions of this Section shall be held in trust for the benefit of Administrative Agent, shall be segregated from other property or funds of such Obligor and shall be forthwith delivered to Administrative Agent upon demand in the same form as so received (with any necessary endorsement).  Any and all money and other property paid over to or received by Administrative Agent pursuant to the provisions of this paragraph shall be retained by Administrative Agent in an account to be established by Administrative Agent upon receipt of such money or other property, shall be held as security for the Obligations and shall be applied in accordance with the provisions of **Section 5.6**.  After all Events of Default have been cured or waived and Administrative Agent shall have received a certificate from a Senior Officer of Borrower Agent to that effect, Administrative Agent shall promptly repay to Obligors (without interest) all dividends, interest, principal or other distributions that Obligors would otherwise be permitted to retain pursuant to the terms of paragraph (a)(iii) of this Section and that remain in such account.

(c)  Upon the occurrence and during the continuance of an Event of Default, after Administrative Agent shall have notified Obligors of the suspension of their rights under and in accordance with paragraph (a)(i) of this Section, all rights of any Obligor to exercise the voting and other consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section, and the obligations of Administrative Agent under paragraph (a)(ii) of this Section, shall cease, and all such rights shall thereupon become vested in Administrative Agent, which shall have the sole and exclusive right and authority to exercise such voting and other consensual rights and powers; *provided*, that, unless otherwise directed by the Required Lenders, Administrative Agent shall have the right from time to, in its sole discretion, notwithstanding the continuance of an Event of Default, to permit any Obligor to exercise such rights and powers.

**7.4.    Intellectual Property Matters**.

7.4.1  For the purpose of enabling the Administrative Agent, during the continuance of an Event of Default, to exercise rights and remedies hereunder at such time as the Administrative Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Obligor hereby grants to the Administrative Agent, an irrevocable, non-exclusive, worldwide, royalty-free (and free of any other obligation of payment) license to use, assign, license or sublicense any of the Intellectual Property Collateral now owned, licensed or hereafter acquired by such Obligor, wherever the same may be located.  Such license shall include access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof.

- 96-

7.4.2   On a continuing basis, each Obligor shall, at its sole cost and expense, (i) promptly following its becoming aware thereof, notify the Administrative Agent of any adverse determination in any proceeding or the institution of any proceeding in any federal, state or local court or administrative body or in the United States Patent and Trademark Office or the United States Copyright Office regarding any material Intellectual Property Collateral, such Obligor's right to register such material Intellectual Property Collateral or its right to keep and maintain such registration and prosecute applications in full force and effect, (ii) maintain, protect and enforce all material Intellectual Property Collateral as presently used and operated, (iii) not permit to lapse or become abandoned any material Intellectual Property Collateral, and not settle or compromise any pending or future litigation or administrative proceeding with respect to any such material Intellectual Property Collateral, in either case except as shall be consistent with commercially reasonable business judgment, (iv) upon such Obligor obtaining knowledge thereof, promptly notify the Administrative Agent in writing of any event which may be reasonably expected to materially and adversely affect the value or utility of any material Intellectual Property Collateral or the rights and remedies of the Administrative Agent in relation thereto including a levy or threat of levy or any legal process against any material Intellectual Property Collateral, (v) not license any Intellectual Property Collateral, or otherwise disclose any confidential Technology or source code other than licenses entered into by such Obligor in, or incidental to, the ordinary course of business, or amend or permit the amendment of any of the licenses in a manner that materially and adversely affects the right to receive payments thereunder, or in any manner that would materially impair the value of any Intellectual Property Collateral or the Lien on and security interest in the Intellectual Property Collateral created therein hereby, without the consent of the Administrative Agent, (vi) diligently keep adequate records respecting all Intellectual Property Collateral and (vii) furnish to the Administrative Agent from time to time upon the Administrative Agent's request therefor reasonably detailed statements and amended schedules further identifying and describing the Intellectual Property Collateral and such other materials evidencing or reports pertaining to any Intellectual Property Collateral as the Administrative Agent may from time to time reasonably request.

7.4.3   If any Obligor shall at any time after the date hereof (i) obtain any rights to any additional Intellectual Property Collateral or (ii) become entitled to the benefit of any additional Intellectual Property Collateral or any renewal or extension thereof, including any reissue, division, continuation, or continuation-in-part of any Intellectual Property Collateral, or any improvement on any Intellectual Property Collateral, or if any intent-to use trademark application is no longer subject to clause (h) of the definition of Excluded Assets, the provisions hereof shall automatically apply thereto and any such item enumerated in the preceding clause (i) or (ii) shall automatically constitute Intellectual Property Collateral as if such would have constituted Intellectual Property Collateral at the time of execution hereof and be subject to the Lien and security interest created by this Agreement without further action by any party.

**7.5.    Other Collateral**.

7.5.1   <u>Commercial Tort Claims</u>.  Obligors shall promptly take such actions as Administrative Agent reasonably requests from time to time to subject any Commercial Tort

Claim with a claim value in excess of $100,000 to a duly perfected, first priority Lien in favor of Administrative Agent, subject to Permitted Liens.

7.5.2   Certain After-Acquired Collateral.  Obligors shall notify Administrative Agent in the next Compliance Certificate delivered pursuant to this Agreement in accordance with **Section 10.1.2(c)** (or with respect to clause (a), within 30 days thereof) if, after the Closing Date, any Obligor obtains any interest in any Collateral consisting of (a) Deposit Accounts (other than Excluded Accounts), (b) Chattel Paper and Instruments, in each case with a face amount in excess of $100,000, (c) Investment Property with a value in excess of $100,000 or consisting of Equity Interests in a Subsidiary, or (d) Letter-of-Credit Rights with a value in excess of $100,000 and, upon Administrative Agent's request, shall promptly take such actions as Administrative Agent may reasonably request to effect Administrative Agent's duly perfected, first priority Lien (subject to Permitted Liens) upon such Collateral, including obtaining any appropriate possession or Deposit Account Control Agreement.

**7.6.**   **No Assumption of Liability**.  The Lien on Collateral granted hereunder is given as security only and shall not subject Administrative Agent or any Lender to, or in any way modify, any obligation or liability of Obligors relating to any Collateral.

**7.7.**   **Further Assurances**.  All Liens granted to Administrative Agent under the Loan Documents are for the benefit of Secured Parties.  Promptly upon request, Obligors shall deliver such instruments and agreements, and shall take such actions, as Administrative Agent shall reasonably request under Applicable Law to evidence or perfect its Lien on any Collateral.  Each Obligor authorizes Administrative Agent to file any financing statement that describes the Collateral as "all assets" or "all personal property" of such Obligor, or words to similar effect, and ratifies any action taken by Administrative Agent before the Closing Date to effect or perfect its Lien on any Collateral.

**7.8.**   **Further Exceptions**.  Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, no Obligor will be required to perfect any lien on any property subject to a certificate of title.

**7.9.**   **Lien Modifications and Releases**.  None of the Liens granted to Administrative Agent under this Agreement or the DIP Orders shall be terminated, released, discharged, compromised, settled, subordinated or otherwise modified except in accordance with Section 12. For the avoidance of doubt, the Administrative Agent's Liens on the Escrow Account and Excluded Cash shall be released upon Full Payment on the same basis as Liens on other Collateral are released at such time.

## SECTION 8.   COLLATERAL ADMINISTRATION

**8.1.**   **[Reserved]**.

**8.2.**   **Administration of Accounts**.

8.2.1   <u>Records and Schedules of Accounts</u>.  Each Obligor shall keep materially accurate and complete records of its Accounts, including all payments and collections thereon, and shall submit to Administrative Agent sales, collection, reconciliation and other reports in form reasonably satisfactory to Administrative Agent, on such periodic basis as Administrative Agent may reasonably request.  Each Obligor shall also provide to Administrative Agent, on or before the 25th day of each month, a detailed aged trial balance of all Accounts as of the end of the preceding month, specifying each Account's Account Debtor name and address, amount, invoice date and due date, and net of any discount, allowance, credit, authorized return or dispute, and such other information as Administrative Agent may reasonably request.

8.2.2   <u>Taxes</u>.  If an Account of any Borrower includes a charge for any Other Taxes, Administrative Agent is authorized, in its Permitted Discretion, to pay the amount thereof to the proper taxing authority for the account of such Borrower and to charge Borrowers therefor; *provided*, however, neither Administrative Agent nor Lenders shall be liable for any Other Taxes (including any that may be due from Obligors, or any Other Taxes with respect to any Collateral).

8.2.3   <u>Account Verification</u>.  At any time when an Event of Default has occurred and is continuing, Administrative Agent shall have the right, in the name of Administrative Agent, any designee of Administrative Agent or any Borrower, to verify the validity, amount or any other matter relating to any Accounts of Borrowers by mail, telephone or otherwise, *provided*, that, except during the existence of a Specified Event of Default, the Administrative Agent agrees to conduct such activities only through the Borrower Agent and with the assistance of the Borrower Agent, Borrowers shall cooperate fully with Administrative Agent in an effort to facilitate and promptly conclude any such verification process.

8.2.4   <u>Maintenance of Dominion Account</u>.   Borrowers shall ensure that the Administrative Agent has, at all times, pursuant to the DIP Order and such other arrangements acceptable to the Administrative Agent, rights to the Dominion Accounts and control thereof to the extent necessary to enable the Administrative Agent to establish dominion over the Dominion Accounts, and exercise all rights associated therewith during any Cash Dominion Period (including the right to sweep cash, and require immediate deposit of all remittances received in the lockbox to a Dominion Account).  If requested by the Administrative Agent, Borrowers shall use commercially reasonable efforts to obtain a Deposit Account Control Agreement (or other agreement in form and substance reasonably satisfactory to Administrative Agent) from each lockbox servicer and Dominion Account bank, establishing Administrative Agent's control over and Lien in the lockbox or Dominion Account, which may be exercised by Administrative Agent during any Cash Dominion Period.  Administrative Agent and Lenders assume no responsibility to Borrowers for any lockbox arrangement or Dominion Account, including any claim of accord and satisfaction or release with respect to any Payment Items accepted by any bank.

8.2.5   <u>Proceeds of Collateral</u>.  Subject to the applicable DIP Order, Obligors shall ensure that all payments on Accounts or otherwise relating to Collateral are at all times made directly to a Dominion Account (or a lockbox relating to a Dominion Account).  If Holdings or any Subsidiary receives cash or Payment Items with respect to any Collateral, it shall hold same in trust for Administrative Agent and promptly (not later than the second Business

- 99-

Day (or if such cash or Payment Item is with respect to a material amount, the next Business Day) or such later date as is acceptable to Administrative Agent) deposit same into a Dominion Account.

**8.3.**   **[Reserved]**.

**8.4.**   **[Reserved]**.

**8.5.**   **Administration of Deposit Accounts**.   **Schedule 8.5** sets forth all Deposit Accounts maintained by Obligors, including all Dominion Accounts, as of the Closing Date. Obligors shall use commercially reasonable efforts to ensure that the Administrative Agent has a fully perfected first-priority Lien on each Deposit Account (other than Excluded Accounts) at all times until Full Payment, and shall use commercially reasonable efforts necessary to maintain such Lien in effect.  Each Obligor shall be the sole account holder of each Deposit Account, and shall not allow any other Person (other than Administrative Agent or, solely by operation of applicable law, the depositary bank at which such account is held, or pursuant to the DIP Order) to have control over a Deposit Account or any property deposited therein.  Each Obligor shall promptly notify Administrative Agent in writing of any intention to (or notice in connection with any other Person's intention to) open or close any Deposit Account (including an Excluded Account), and shall enter into a Deposit Account Control Agreement or other arrangements reasonably satisfactory to the Administrative Agent, and use commercially reasonable efforts to obtain such Chapter 11 Approvals as required by the Administrative Agent in connection with the same, in each case, prior to any funds being transferred to any such newly opened Deposit Account, and, with the consent of Administrative Agent, will amend **Schedule 8.5** to reflect same.

**8.6.**   **General Provisions**.

8.6.1   Insurance of Collateral; Condemnation Proceeds.   Each Obligor shall maintain insurance with respect to the Collateral (subject to exceptions to be agreed upon by Administrative Agent in its Permitted Discretion), covering casualty, hazard, theft, malicious mischief, flood and other risks, in amounts, with endorsements and with insurers (with a Best's Financial Strength Rating of at least A-VII, unless otherwise approved by Administrative Agent) consistent with industry practice for similarly situated companies or otherwise reasonably satisfactory to Administrative Agent.  All proceeds under each property policy shall be payable to Administrative Agent as loss payee.  From time to time upon reasonable request of the Administrative Agent, Obligors shall deliver to Administrative Agent copies of its insurance policies.  Unless Administrative Agent shall agree otherwise, each property policy and general liability policy shall include customary endorsements (i) showing Administrative Agent as loss payee or additional insured, as applicable; (ii) requiring 10 days prior written notice to Administrative Agent in the event of cancellation of the policy for any reason whatsoever; and (iii) with respect to property policies, specifying that the interest of Administrative Agent shall not be impaired or invalidated by any act or neglect of any Obligor or the owner of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by the policy.  If any Obligor fails to provide and pay for any insurance, Administrative Agent may, at

-100-

its option, but shall not be required to, procure the insurance and charge Obligors therefor.  While no Event of Default exists, Obligors may settle, adjust or compromise any insurance claim, as long as the proceeds are delivered to Administrative Agent.  If an Event of Default exists, only Administrative Agent shall be authorized to settle, adjust and compromise such claims.

8.6.2    Protection of Collateral.  All expenses of protecting, storing, warehousing, insuring, handling, maintaining and shipping any Collateral, all Taxes payable with respect to any Collateral (including any sale thereof), and all other payments required to be made by Administrative Agent to any Person to realize upon any Collateral, shall be borne and paid by Borrowers.  Administrative Agent shall not be liable or responsible in any way for the safekeeping of any Collateral, for any loss or damage thereto (except for reasonable care in its custody while Collateral is in Administrative Agent's actual possession), for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other Person whatsoever, but the same shall be at Borrowers' sole risk.

8.6.3    Defense of Title.  Each Obligor shall defend its title to Collateral and Administrative Agent's Liens therein against all Persons, claims and demands, except Permitted Liens.

**8.7.    Power of Attorney**.  Each Obligor hereby irrevocably constitutes and appoints Administrative Agent (and all Persons designated by Administrative Agent) as such Obligor's true and lawful attorney (and agent-in-fact) for the purposes provided in this Section. Administrative Agent, or Administrative Agent's designee, may, without notice and in either its or any Obligor's name, but at the cost and expense of Borrowers:

(a)    Endorse any Obligor's name on any Payment Item or other proceeds of Collateral (including proceeds of insurance) that come into Administrative Agent's possession or control; and

(b)    During the continuation of an Event of Default, (i) notify any Account Debtors of the assignment of their Accounts, demand and enforce payment of Accounts by legal proceedings or otherwise, and generally exercise any rights and remedies with respect to Accounts; (ii) settle, adjust, modify, compromise, discharge or release any Accounts or other Collateral, or any legal proceedings brought to collect Accounts or Collateral; (iii) sell or assign any Accounts and other Collateral upon such terms, for such amounts and at such times as Administrative Agent deems advisable in its Permitted Discretion; (iv) collect, liquidate and receive balances in Deposit Accounts or investment accounts, and take control, in any manner, of proceeds of Collateral; (v) prepare, file and sign Obligor's name to a proof of claim or other document in a bankruptcy of an Account Debtor, or to any notice, assignment or satisfaction of Lien or similar document; (vi) receive, open and dispose of mail addressed to any Obligor, and notify postal authorities to deliver any such mail to an address designated by Administrative Agent; (vii) endorse any Chattel Paper, Document, Instrument, bill of lading, or other document or agreement relating to any Accounts, Inventory or other Collateral; (viii) use any Obligor's stationery and sign its name to verifications of Accounts and notices to Account Debtors; (ix) use information contained in any data processing, electronic or information systems relating to

-101-

Collateral; (x) make and adjust claims under insurance policies; (xi) take any action as may be necessary or appropriate to obtain payment under any letter of credit, banker's acceptance or other instrument for which any Obligor is a beneficiary; and (xii) take all other actions as Administrative Agent deems, in its Permitted Discretion, appropriate to fulfill any Obligor's obligations under the Loan Documents.

## SECTION 9.   REPRESENTATIONS AND WARRANTIES

**9.1.**    **General Representations and Warranties**.  To induce Administrative Agent and Lenders to enter into this Agreement and to make available the Commitments and Loans, each Obligor represents and warrants that, on and as of the Closing Date and each Borrowing Date:

9.1.1   Organization and Qualification.  Holdings and each of its Subsidiaries is duly organized, validly existing and in good standing (to the extent such concepts are applicable) under the laws of the jurisdiction of its organization. Each Obligor is duly qualified, authorized to do business and in good standing (to the extent such concepts are applicable) as a foreign corporation in each jurisdiction where failure to be so qualified could reasonably be expected to have a Material Adverse Effect.

9.1.2   Power and Authority.  Holdings and each of its Subsidiaries is duly authorized to execute, deliver and perform its Loan Documents (subject to the DIP Orders). The execution, delivery and performance of the Loan Documents have been duly authorized by all necessary corporate or company, as applicable, action, and do not (a) require any consent or approval of any holders of Equity Interests of any Obligor, except those already obtained; (b) contravene the Organic Documents of any Obligor; (c) violate or cause a default under any Applicable Law or Material Contract; or (d) result in or require the imposition of any Lien (other than Permitted Liens) on any Obligor's real or personal property.

9.1.3   Enforceability.  Subject to the entry of the applicable DIP Order and the terms thereof, each Loan Document is a legal, valid and binding obligation of each Obligor party thereto, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally.

9.1.4   Capital Structure.  Each direct or indirect Subsidiary of Holdings is an Obligor, and **Schedule 9.1.4** shows for each Obligor and each direct Subsidiary thereof, its name, jurisdiction of organization, authorized and issued Equity Interests, holders of its Equity Interests, and agreements binding on such holders with respect to such Equity Interests.  Except as disclosed on **Schedule 9.1.4**, in the five years preceding the Closing Date, no Obligor has acquired any substantial assets from any other Person nor been the surviving entity in a merger or combination.  Each Obligor has good title to its Equity Interests in its Subsidiaries, subject only to Permitted Liens, and all such Equity Interests are duly issued, fully paid and non-assessable (in each case to the extent such concepts are applicable).  Other than as set forth on **Schedule 9.1.4**, there are no outstanding purchase options, warrants, subscription rights, agreements to issue or sell, convertible interests, phantom rights or powers of attorney relating to Equity Interests of any Obligor (other than Holdings) or Subsidiary.

-102-

9.1.5   <u>Title to Properties</u>.   Each Obligor has good title to (or valid leasehold interests in) all material Real Estate, and good title to all of its material personal property, including all property reflected in any financial statements delivered to Administrative Agent or Lenders, in each case free of Liens except Permitted Liens.

9.1.6   [Reserved].

9.1.7   <u>Financial Statements</u>.   The historical balance sheets, and related statements of income, cash flow and shareholder's equity, of Strike and its Subsidiaries that have been delivered to Administrative Agent on or prior to the Closing Date, and, following the Closing Date, the consolidated financial statements that have been delivered in accordance with **Section 10.1.2**, are prepared in accordance with GAAP, except as otherwise expressly noted therein, and fairly present in all material respects the financial positions and results of operations of Holdings and its Subsidiaries at the dates and for the periods indicated, and, for unaudited financial statements, subject to normal year-end and audit adjustments and the absence of footnotes.   All projections delivered from time to time to Administrative Agent and Lenders have been prepared in good faith, based on assumptions believed by the Borrowers to be reasonable in light of the circumstances at such time; *provided*, that projections, estimates, and forward-looking statements are not to be viewed as facts or a guaranty of performance or achievement of a certain result, and the actual results during the period or periods covered may differ from such projections, estimates, and forward-looking statements, and such differences may be material.   Since December 31, 2015, there has been no change in the condition, financial or otherwise, of Holdings and its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

9.1.8   <u>Taxes</u>.   Each Obligor and Subsidiary has filed all Tax returns and other reports that it is required by Applicable Law to file, and has paid all Taxes (including in a capacity as a withholding agent) that are due and payable, whether or not shown on a Tax return or report, except in each case (i) to the extent being Properly Contested or (ii) to the extent failure to file such Tax return or report or pay such Taxes could not reasonably be expected to have a Material Adverse Effect or to the extent that failure to file or pay the same could not reasonably be expected to have a Material Adverse Effect.   Each of the Obligors is, as of October 1, 2021, and has continued to be through the Closing Date, classified as a disregarded entity for U.S federal income tax purposes, and no action has been taken during the 75 day period prior to the Closing Date that would result in a change of such classification thereafter.

9.1.9   <u>Brokers</u>.   There are no brokerage commissions, finder's fees or investment banking fees payable in connection with any transactions contemplated by the Loan Documents, exclusive of any fee payable to the Sponsor upon closing of the Transactions.

9.1.10   <u>Intellectual Property</u>.   Each Obligor and Subsidiary owns or has the lawful right to use all Intellectual Property used or held for use in or otherwise necessary for the conduct of its business, without conflict with any rights of others except to the extent the failure of the foregoing to be true could not reasonably be expected to have a Material Adverse Effect.   There is no pending or, to any Borrower's knowledge, threatened Intellectual Property Claim with

-103-

respect to any Borrower, any Subsidiary or any of their property (including any Intellectual Property except to the extent the failure of the foregoing to be true could not reasonably be expected to have a Material Adverse Effect).  Except as disclosed on **Schedule 9.1.10**, as of the Closing Date no Borrower or Subsidiary pays or owes any Royalty or other compensation to any Person with respect to any material Intellectual Property.  As of the Closing Date, all registered and applied for Intellectual Property and Licenses owned, used or licensed by, or otherwise subject to any interests of, any Borrower or Subsidiary is set forth on **Schedule 9.1.10**, other than standard off-the-shelf products.

9.1.11  <u>Governmental Approvals</u>.  Subject to the DIP Orders, as applicable, each Obligor and Subsidiary has, is in compliance with, and is in good standing with respect to, all Governmental Approvals necessary to conduct its business and to own, lease and operate its properties except to the extent failure to be in compliance and good standing could not reasonably be expected to have a Material Adverse Effect.  All necessary import, export or other licenses, permits or certificates for the import or handling of any goods or other Collateral have been procured and are in effect, and each Obligor and Subsidiary has complied with all foreign and domestic laws with respect to the shipment and importation of any goods or Collateral, except where the failure to procure, maintain in effect or noncompliance could not reasonably be expected to have a Material Adverse Effect.

9.1.12  <u>Compliance with Laws</u>.  Each Obligor and Subsidiary has duly complied, and its properties and business operations are in compliance, in all material respects with all Applicable Law, except where noncompliance could not reasonably be expected to have a Material Adverse Effect.  There have been no citations, notices or orders of noncompliance issued to any Borrower or Subsidiary under any Applicable Law except where noncompliance could not reasonably be expected to have a Material Adverse Effect.  No Inventory has been produced in violation of the FLSA.

9.1.13  <u>Compliance with Environmental Laws</u>.  No Obligor or Subsidiary's past or present operations, Real Estate or other properties are subject to any federal, state or local investigation to determine whether any remedial action is needed to address any environmental pollution, hazardous material or environmental clean-up that could reasonably be expected to have a Material Adverse Effect.  No Obligor or Subsidiary has received any Environmental Notice that could reasonably be expected to have a Material Adverse Effect.  No Borrower or Subsidiary has any contingent liability with respect to any Environmental Release, environmental pollution or hazardous material on any Real Estate now or previously owned, leased or operated by it that could reasonably be expected to have a Material Adverse Effect.

9.1.14  <u>Burdensome Contracts</u>.  No Restrictive Agreement to which any Obligor is a party prohibits the execution, delivery or performance of any Loan Document by an Obligor.

9.1.15  <u>Litigation</u>.  Other than the commencement of the Chapter 11 Cases and except as shown on **Schedule 9.1.15**, there are no proceedings or investigations pending or, to any Borrower's knowledge, threatened against any Obligor or Subsidiary, or any of its operations or properties, that (a) as of the Closing Date, relate to any Loan Documents or transactions

-104-

contemplated thereby; or (b) could reasonably be expected to have a Material Adverse Effect. No Obligor or Subsidiary is in default with respect to any order, injunction or judgment of any Governmental Authority to the extent such default could reasonably be expected to have a Material Adverse Effect.

9.1.16 <u>No Defaults</u>.   No event or circumstance has occurred or exists that constitutes a Default or Event of Default.

9.1.17 <u>ERISA</u>.  Except to the extent the failure of the following to be true could not reasonably be expected to have a Material Adverse Effect:

(a)      Each Plan is in compliance with the applicable provisions of ERISA, the Code, and other federal and state laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the knowledge of Borrowers, nothing has occurred which would prevent, or cause the loss of, such qualification.  Each Obligor and ERISA Affiliate has met all applicable requirements under the Code, ERISA and the Pension Protection Act of 2006, and no application for a waiver of the minimum funding standards or an extension of any amortization period has been made with respect to any Plan.

(b)      There are no pending or, to the knowledge of Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan.

(c)      (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) no Obligor or ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) no Obligor or ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; (v) no Obligor or ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA; and (vi) as of the most recent valuation date for any Pension Plan or Multiemployer Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is at least 60%, and no Obligor or ERISA Affiliate knows of any fact or circumstance that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of such date.

(d)      With respect to any Foreign Plan, (i) all employer and employee contributions required by law or by the terms of the Foreign Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any

-105-

Foreign Plan funded through insurance, or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles; and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

9.1.18  <u>Labor Relations</u>.   Except as described on **<u>Schedule 9.1.18</u>**, as of the Closing Date, no Borrower or Subsidiary is party to or bound by any collective bargaining agreement, material management agreement or material consulting agreement.  There are no grievances, disputes or controversies with any union or other organization of any Borrower's or Subsidiary's employees, or, to any Borrower's knowledge, any asserted or threatened strikes, work stoppages or demands for collective bargaining, in each case, the effect of which could reasonably be expected to have a Material Adverse Effect.

9.1.19  <u>Not a Regulated Entity</u>.  No Obligor is an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940.

9.1.20  <u>Margin Stock</u>.   No Obligor is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No Loan proceeds or Letters of Credit will be used by Borrowers to purchase or carry, or to reduce or refinance any Debt incurred to purchase or carry, any Margin Stock or for any related purpose governed by Regulations T, U or X of the Board of Governors.

9.1.21  <u>OFAC</u>.   No Obligor, Subsidiary, director, officer, employee, or, to the knowledge of the Borrowers, agent, affiliate or representative thereof, is or is owned or controlled by any individual or entity that is currently the subject or target of any Sanction, or is located, organized or resident in a Designated Jurisdiction.

9.1.22  <u>Anti-Corruption Laws</u>.   Each Obligor and Subsidiary has conducted its business in accordance with applicable anti-corruption laws in all material respects and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

9.1.23  <u>Affected Financial Institution</u>.   None of the Obligors is an Affected Financial Institution.

9.1.24  <u>Security Interests</u>.   This Agreement and the DIP Orders are effective to create, in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding, enforceable first-priority Lien on and security interest in all right, title and interest of the Obligors in the Collateral, in each case, subject to the Carve Out and junior only to any Permitted Liens (other than as expressly provided in the DIP Orders).  Pursuant to the terms of the DIP Orders, no filings or other action (including the taking of possession or control) are or shall at

NY 78904694v1NY 78904694v7

any time be necessary to perfect, preserve or protect such Liens and security interests; *provided*, that, notwithstanding the foregoing, the Obligors shall have executed and delivered the Guaranty and Collateral Agreement and all other Security Documents, and made (or authorized the making by any Agent of) all filings, in each case, to the extent deemed reasonably necessary and/or appropriate, and requested, by any Agent or the Required Lenders.

9.1.25  <u>Beneficial Ownership Certificate</u>.   The information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

9.1.26  <u>Covered Entities</u>.  No Obligor is a Covered Entity.

9.1.27  <u>Budget</u>.  Each of the Initial Budget attached as <u>Exhibit H</u>, each Approved Budget, each Budget Supplement and each Updated Budget is based upon good faith estimates and assumptions believed by management of the Borrowers to be reasonable at the time made, in light of the circumstances under which they were made.

9.1.28  <u>DIP Budget</u>.  The Initial Budget, which was delivered to Administrative Agent and the Lenders on or prior to, and which shall be in effect as of, the Closing Date, was prepared in good faith based upon assumptions the Borrower believes to be reasonable assumptions on the date of delivery thereof.

**9.2.**   **Disclosure**.  As of the Closing Date, there are no agreements, instruments and corporate or other restrictions to which any Obligor is subject, or other matters known to the Borrowers that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the written reports, financial statements, certificates or other written information furnished by or on behalf of any Obligor to Administrative Agent in connection with the negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished), taken as a whole, contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading in any material respect; *provided*, that, with respect to projected financial information, the Borrowers represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Closing Date, as of the Closing Date.

**SECTION 10.**        **COVENANTS AND CONTINUING AGREEMENTS**

**10.1.**   **Affirmative Covenants**.  Until Full Payment, each Obligor shall, and shall cause each Subsidiary thereof to:

10.1.1  <u>Inspections</u>.

(a)   Permit Administrative Agent from time to time, subject (except when an Event of Default exists) to reasonable notice and normal business hours, to visit and inspect the properties of Holdings or any Subsidiary, inspect, audit and make extracts from Holding's or Subsidiary's books and records, and discuss with its officers, employees, agents, advisors and

-107-

independent accountants Holding's or Subsidiary's business, financial condition, assets and results of operations, subject to any express limits in clause (b) below.  Lenders may participate in any such visit or inspection, at their own expense.  Neither Administrative Agent nor any Lender shall have any duty to any Obligor to make any inspection, nor to share any results of any inspection, examination or report with any Obligor.  Obligors acknowledge that all inspections, examinations and reports are prepared by Administrative Agent and Lenders for their purposes, and Obligors shall not be entitled to rely upon them.

(b)    Reimburse Administrative Agent for all reasonable charges, costs and expenses of Administrative Agent in connection with examinations of any Obligor's books and records or any other financial or Collateral matters (including for the avoidance of doubt, field examinations) as Administrative Agent deems appropriate, up to two times per Loan Year (but no more than once in any six month period); *provided*, *however*, that a second examination during any six month period will be permitted at the Obligors' expense during a Cash Dominion Period; *provided*, *further* that if an examination is initiated during an Event of Default, all charges, costs and expenses therefor shall be reimbursed by Borrowers without regard to such limits; and *provided further* that a third examination may be performed by Administrative Agent at Lenders' expense in the absence of any Default.  Borrowers agree to pay Administrative Agent's then standard charges for examination activities (which shall not be less than $1,100 per man day), including the standard charges of Administrative Agent's internal examination groups, as well as the reasonable charges of any third party used for such purposes.

10.1.2  <u>Financial and Other Information</u>.  Keep adequate records and books of account with respect to its business activities, in which proper entries are made in accordance with GAAP reflecting all financial transactions; and furnish to Administrative Agent and Lenders:

(a)    within 100 days after the close of each Fiscal Year, balance sheets as of the end of such Fiscal Year and the related statements of income, cash flow and shareholders' equity for such Fiscal Year, on consolidated basis for Holdings and Subsidiaries, which consolidated statements shall be audited and certified (without a "going concern" or like qualification or exception (except for qualifications or exceptions resulting solely from the Chapter 11 Cases)) by a firm of independent certified public accountants of recognized standing selected by Borrowers and reasonably acceptable to Administrative Agent (it being acknowledged that Ernst & Young is acceptable), and shall set forth in comparative form corresponding figures for the preceding Fiscal Year;

(b)    within 45 days after the end of each Fiscal Quarter other than the last Fiscal Quarter in a Fiscal Year, unaudited balance sheets as of the end of such Fiscal Quarter and the related statements of income and cash flow for such Fiscal Quarter and for the portion of the Fiscal Year then elapsed, on consolidated basis for Holdings and Subsidiaries, setting forth in comparative form corresponding figures for the preceding Fiscal Year and certified by a Senior Officer of Borrower Agent as prepared in accordance with GAAP and fairly presenting the financial position and results of

operations for such Fiscal Quarter and period, subject to normal year-end and audit adjustments and the absence of footnotes;

(c)     concurrently with delivery of financial statements under clauses (a) and (b) above, a Compliance Certificate executed by a Senior Officer of Borrower Agent, which compliance certificate will include (i) [reserved], (ii) a calculation of the amount of any Pro Forma Adjustment not previously set forth in a Pro Forma Adjustment Certificate or any material change in the amount of a Pro Forma Adjustment set forth in any Pro Forma Adjustment Certificate previously provided and, in reasonable detail, the calculations and basis for such Pro Forma Adjustment or such change, (iii) notice of any event described in **Section 7.4.3** and confirmation of the attachment of the Lien and security interest created by this Agreement to any rights described in clauses (i) and (ii) of **Section 7.4.3** by execution of an instrument in form reasonably acceptable to the Administrative Agent (which shall be promptly filed and recorded with the United States Patent and Trademark Office or United States Copyright Office or any other applicable registry, as applicable) such instruments as shall be reasonably necessary to create, preserve, protect or perfect the Administrative Agent's security interest in such Intellectual Property Collateral and (iv) notice of any Obligor obtaining a Commercial Tort Claim (with the Borrower Agent promptly amending **Schedule 7.1(c)** to include such claim);

(d)     concurrently with delivery of financial statements under clause (a) above, copies of all management letters and other material reports submitted to Borrowers by their accountants in connection with such financial statements;

(e)     not later than 60 days after the end of each Fiscal Year, projections of Holding's and its Subsidiaries' consolidated balance sheets, results of operations, cash flow for the next Fiscal Year, prepared on a month by month basis;

(f)     (without limiting Section 10.3, and, for the avoidance of doubt, in addition to all deliverables required pursuant thereto, including with respect to the AP Trade Balance Testing Dates), reasonably promptly upon Administrative Agent's request, a listing of each Obligor's trade accounts payables, specifying the trade creditor and balance due, and a detailed trade accounts payable aging, all in form reasonably satisfactory to Administrative Agent, *provided*, that, unless an Event of Default exists, such request shall not be made more than once per month;

(g)     promptly after the sending or filing thereof, copies of any regular, periodic and special reports or registration statements or prospectuses that any Obligor files with the Securities and Exchange Commission or any other Governmental Authority, or any securities exchange; and copies of any press releases or other statements made available by any Obligor to the public concerning material changes to or developments in the business of such Obligor;

-109-

(h)     promptly after request, such other reports and information (financial or otherwise) as Administrative Agent may reasonably request from time to time in connection with any Collateral or any Obligor's or its Subsidiary's financial condition or business; and

(i)     promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent or any Lender (through the Administrative Agent) for purposes of compliance with applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act and the Beneficial Ownership Regulation.

10.1.3 <u>Notices</u>.   Notify Administrative Agent in writing, promptly after any Obligor's obtaining knowledge thereof, of any of the following in respect of an Obligor (without limiting any requirements of **Section 10.1.13**):  (a) except with respect to the Chapter 11 Cases, the written threat or commencement of any proceeding or investigation, whether or not covered by insurance, which could reasonably be expected to have a Material Adverse Effect; (b) any pending or threatened in writing labor dispute, strike or walkout, or the expiration of any labor contract, which could reasonably be expected to have a Material Adverse Effect; (c) any uncured default by an Obligor under a Material Contract; (d) the existence of any Default or Event of Default; (e) any judgment not covered by insurance in an amount exceeding $500,000; (f) the assertion of any Intellectual Property Claim, which could reasonably be expected to have a Material Adverse Effect; (g) any violation or asserted violation of any Applicable Law (including ERISA, OSHA, FLSA, or any Environmental Laws) which could reasonably be expected to have a Material Adverse Effect; (h) any Environmental Release by an Obligor or on any real property owned, leased or occupied by an Obligor, or receipt of any Environmental Notice; (i) the occurrence of any ERISA Event; or (j) the discharge of or any withdrawal or resignation by Borrowers' independent accountants which could reasonably be expected to have a Material Adverse Effect.

10.1.4 <u>Compliance with Laws</u>.   Comply with all Applicable Laws, including ERISA, Environmental Laws, FLSA, OSHA, Anti-Terrorism Laws, Anti-Corruption Laws and laws regarding collection and payment of Taxes (solely to the extent specifically provided by **Section 10.1.6**), and maintain all Governmental Approvals necessary to the ownership of its properties or conduct of its business unless failure to comply (other than a failure to comply with Anti-Terrorism Laws) or maintain could not reasonably be expected to have a Material Adverse Effect.  Without limiting the generality of the foregoing, if any Environmental Release occurs at or on any properties of any Obligor or of a Subsidiary thereof, it shall act promptly and diligently to investigate and report to Administrative Agent and all appropriate Governmental Authorities the extent of, and to make appropriate remedial action to eliminate, such Environmental Release to the extent required by Environmental Laws, whether or not directed to do so by any Governmental Authority.

10.1.5 <u>Taxes</u>.   Pay and discharge all Taxes prior to the date on which they become delinquent or penalties attach, unless such Taxes are being Properly Contested or the

-110-

failure to pay or discharge such Taxes could not reasonably be expected to have a Material Adverse Effect.

        10.1.6 <u>Insurance</u>.  In addition to the insurance required hereunder with respect to Collateral, maintain insurance with insurers (with a Best Rating of at least A-VII, unless otherwise approved by Administrative Agent) satisfactory to Administrative Agent, with respect to the properties and business of Borrowers and Subsidiaries of such type (including workers' compensation, larceny, embezzlement, or other criminal misappropriation insurance), in such amounts, and with such coverages and deductibles as are customary for companies similarly situated.

        10.1.7 <u>Licenses</u>.   Keep each License affecting any Collateral (including the manufacture, distribution or disposition of Inventory) or any other material real or personal property of Obligors and Subsidiaries in full force and effect except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect; promptly notify Administrative Agent of any proposed modification to any such License, or entry into any new material License, in each case at least 15 days prior to its effective date; pay all material Royalties when due; and notify Administrative Agent of any default or breach asserted by any Person to have occurred under any material License.

        10.1.8 <u>Further Assurances; etc</u>.

        (a)     Subject to clause (b) below, each Obligor will, and will cause each of the other Obligors to, grant to the Administrative Agent, for the benefit of the Secured Parties, security interests in such assets (other than Excluded Assets) of such Obligor and such other Obligors as are not covered by the grant and perfection requirements of **Section 7** hereto or any other Security Document as of the Closing Date (other than Excluded Assets), and as may be reasonably requested from time to time by the Administrative Agent or the Required Lenders.

        Subject to the limitations set forth herein or any other Loan Document, promptly upon the reasonable request by the Administrative Agent the Obligors shall (i) assist in correcting any jointly identified material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Security Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances, and other instruments as the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of **Section 7** and the Security Documents.

        (b)     With respect to any Person that is or becomes a Subsidiary after the Petition Date, promptly (and in any event, by the time required by the Administrative Agent) (i) deliver to the Administrative Agent or its bailee the certificates, if any, representing all (or such lesser amount as is required) of the Equity Interests of any such Subsidiary that is a direct Subsidiary of an Obligor, together with undated stock powers

-111-

or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all intercompany notes owing from such Subsidiary to any Obligor together with instruments of transfer executed in blank by a duly authorized officer of such Obligor, (ii) cause such new Subsidiary  (A) to execute a joinder agreement, substantially in the form of **Exhibit G** hereto, and (B) subject to the limitation in **Section 7**, to take all actions reasonably necessary or advisable in the reasonable opinion of the Administrative Agent to cause the Lien on the Collateral of such Subsidiary created by **Section 7** hereof or the applicable Security Document to be duly perfected in accordance with all Applicable Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent, and (iii) at the request of the Administrative Agent, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Lenders, of counsel to the Obligors reasonably acceptable to the Administrative Agent as to such matters set forth in this **Section 10.1.9(b)** as the Administrative Agent may reasonably request.

(c)     Each Obligor agrees that each action required by clause (a) of this **Section 10.1.9** shall be completed no event later than 10 calendar days after such action is required to be taken pursuant to such clauses or requested to be taken by the Administrative Agent or the Required Lenders (or such longer period as the Administrative Agent shall otherwise agree), as the case may be; *provided,* that in no event will a Borrower or any of its Subsidiaries be required to take any action, other than using its commercially reasonable efforts (which shall in any event include filing any applicable petition, motion, request or similar with the Bankruptcy Court), to obtain consents from third parties with respect to compliance with clause (a) of this **Section 10.1.9**.

10.1.9  Designation of Subsidiaries.  Each Person that is a Subsidiary of Holdings at any time shall be required to be an Obligor and shall be subject to all terms and conditions hereof applicable to Obligors.  For the avoidance of doubt, no Investment shall be made by Holdings or any Subsidiary thereof in any Person other than an Obligor.

10.1.10     [Reserved].

10.1.11     Lender Calls.  To the extent that any Obligor (or any representative thereof) holds for the benefit of all or a subset of the Prepetition Junior Loan Secured Parties, any meeting (including by conference call) (the costs of such call to be paid by the Borrowers) (including relating to any to review of any financial results, the financial condition of Holdings and its Subsidiaries and/or any budgets), the Borrowers shall invite the Lenders and the Administrative Agent to attend the same at the same time, and on the same terms as, such invitation is made to the applicable Prepetition Junior Loan Secured Parties.  Any information provided for the benefit of all or a subset of the Prepetition Junior Loan Secured Parties shall be delivered to the Administrative Agent concurrently therewith.

10.1.12     Other Reporting.

-112-

(a)     Not later than 5:00 p.m. New York City time every Tuesday occurring until Full Payment (commencing with Tuesday of the calendar week immediately after the Closing Date, i.e., December 14, 2021) (the "Budget Reporting Deadline"), the Obligors shall deliver to the Administrative Agent (for the benefit of it and the Lenders) a nine (9) week supplement to the Approved Budget then in effect (each, a "Budget Supplement"), covering the period that commences with the Monday of the week in which such Budget Supplement is required to be delivered and ending on February 4, 2022,the date on which Full Payment occurs, the form, scope and level of detail of which Budget Supplement shall be consistent with the Initial Budget, and which Budget Supplement shall be otherwise in form and substance satisfactory to the Required Lenders in their sole discretion (as confirmed and approved in writing by the Administrative Agent) (each Budget Supplement, if, but solely if and upon, approved in accordance with the foregoing, an "Updated Budget").  For the avoidance of doubt, no Updated Budget shall become the Approved Budget unless and until Borrower Agent (or its counsel) shall have received written notice thereof from the Administrative Agent (acting at the direction and with the consent of the Required Lenders); *provided*, *however*, that neither the Administrative Agent nor any of the Lenders shall have any obligation to approve any Budget Supplement or any Updated Budget, and, no modification to any Updated Budget or any Approved Budget, or any reforecasting of any information relating to any period covered by any other Updated Budget or any Approved Budget, as the case may be, shall in any event be effective without the Administrative Agent's prior written consent (acting at the direction of the Required Lenders) ; *provided, further, however,* that notwithstanding anything in this **Section 10.1.12(a)** to the contrary, in the event that changes in the Budget Supplement are made (i) in order to reconcile the Obligors' actual business performance during the prior week or (ii) to change any line item by no more than ten percent (10%), the consent or approval of the Required Lenders or Administrative Agent thereto shall not be unreasonably withheld or delayed.

(b)     Not later than 5:00 p.m. New York City time every Tuesday until Full Payment (commencing with Tuesday of the calendar week immediately after the Closing Date, i.e., December 14, 2021) (each, a "Variance Reporting Deadline"), the Obligors shall deliver to the Administrative Agent (for the benefit of it and the Lenders) (i) a variance report in form, scope and detail satisfactory to the Required Lenders (each, a "Variance Report"), which Variance Report shall set forth, with respect to (I) the calendar week ending as of (and including) the Friday of the week immediately preceding the applicable Variance Reporting Deadline (each, a "Weekly Performance Period") and (II) the rolling two-week period ending as of (and including) the Friday of the week immediately preceding the applicable Variance Reporting Deadline, if both such calendar weeks are covered by the Approved Budget then in effect, (each, a "Bi-Weekly Performance Period", and, together with each Weekly Performance Period, each, a "Performance Period"), the variance (i.e. the difference, expressed as a percentage (each, a "Budget Variance")) between (x) the amounts actually realized, achieved or incurred (as applicable) in each applicable Performance Period, and (y) the amounts projected in the Approved Budget to be realized, achieved or incurred (as applicable) in each applicable Performance Period, in each case, calculated with respect to the line-items designated in

-113-

the Approved Budget as each of the following: (A) "Customer Receipts", (B) "Other Receipts", (C) "Total Receipts", (D) "Vendor Payables", (E) "Professional Fees"; provided, that the Approved Budget and Variance Report shall distinguish between, and separately report (on a line-item basis) on, Professional Fees of Company Advisors (which shall be designated as "Company Professionals Fees"), fees and expenses relating to other professionals (which shall be designated as "Other Professionals Fees"), and Professional Fees of the Chapter 11 Unsecured Creditors Committee (which shall be designated as "UCC Professionals Fees"), and (F) "Total Disbursements", and (ii) a certificate of a Senior Officer of Borrower Agent prepared in respect of each Variance Report and (A) explaining, in detail reasonably satisfactory to the Required Lenders, all Budget Variances identified in such Variance Report for each applicable Performance Period, and (B) (x) certifying compliance by Holdings and its Subsidiaries with the Budget Covenant and **Section 10.3.1**, and with each other provision hereof that requires any payment, receipt, distribution or other matter to be in accordance with, or as set forth in, the Approved Budget, or in compliance with the Budget Covenant (or that is conditioned on no Default arising thereunder), or (y) if or to the extent that such certification cannot be made with respect to any item, specifically identifying and describing any non-compliance (including the extent and amount thereof), and explaining, in detail reasonably satisfactory to the Required Lenders, the reason for, and facts and circumstances causing or contributing to any such non-compliance; *provided*, that, compliance with this **Section 10.1.13(b)** (including delivery of any Variance Report or such certificate, and any information, description or explanation therein) shall not cure (or be deemed to cure) any Default or Event of Default resulting from any non-compliance identified hereunder, or under the Budget Covenant or any other provision requiring compliance herewith or therewith.  Variances, if any, from the applicable Approved Budget, and any proposed changes to the applicable Approved Budget, shall be subject to the prior written consent of the Required Lenders.  For the avoidance of doubt, any incurrence of any obligation, or any payment or distribution or disbursement (other than a Specified Disbursement), as applicable, by any of Holdings and its Subsidiaries (x) other than as set forth in the Approved Budget and (y) in excess of the Permitted Variances permitted by the Budget Covenant shall, in each case, constitute a Default under **Section 10.3.1**, and an immediate Event of Default under **Section 11.1(d)**.

(c)     The Obligors shall arrange for a teleconference with Lenders to take place at 10:00 a.m. (New York City time) (or at such other time as is reasonably satisfactory to the Administrative Agent) every Wednesday (commencing with Wednesday, December 15, 2021) (or such other day as is reasonably satisfactory to the Administrative Agent) until Full Payment occurs, which teleconference shall (i) require, at the election of the Required Lenders, participation by at least one Senior Officer of Borrower Agent's management team and/or professional advisors to the Borrower Agent, and (ii) be intended for purposes of discussing Holdings and its Subsidiaries' financials (including any budget proposed to be the Approved Budget, Variance Reports and any projections), the Potential Transaction, and such other information and matters reasonably related thereto (including any matter contemplated pursuant to any Restructuring

-114-

Transaction Documents) or requested by any Lender; *provided*, that such teleconference shall not be required in any week if and to the extent that the Administrative Agent shall have previously waived or postponed the same by written notice to the Borrower Agent.

(d)     Furnish to Administrative Agent and Lenders:

(i)     promptly following the end of each day, a statement of available cash;

(ii)     on at least a weekly basis, (w) a report of work-in-progress under major project divisions (including support for all "estimates at completion"), (x) copies of latest project reviews, (y) reports of any material discussion with contract counterparties, and (z) reports of any litigation, claims, actions and similar events (whether new, ongoing, pending, threatened or anticipated); and

(iii)     promptly following any written request thereof, such other reporting reasonably requested by the Required Lenders from time to time including notice of, and disclosure of all information regarding, all (1) formal and informal arrangements (binding or non-binding) among any and any Obligors or any of its affiliates or Related Parties, (2) side letters or agreements with respect to any Potential Transaction, and any other transaction similar to any transaction described in the definition thereof (irrespective of the Persons involved therein), and (3) formal or informal (binding or non-binding) proposals or communications with respect to any Potential Transaction or any such other transaction (including term sheets, letters of intent, indications of interest and similar items).

10.1.13     Milestones, Restructuring Support Agreement and Related Covenants.

(a)     Satisfy the requirements with respect to each Milestone (including by the time, to the extent, and in the manner required thereby), or as otherwise agreed to by the Administrative Agent in writing.

(b)     (i) Actively and in good faith engage in (and shall procure the same by Company Advisors, and their respective Subsidiaries), and shall not discontinue discussions and negotiations with the Consenting Lender-Side Persons regarding the Potential Transactions, (ii) actively and fully cooperate in good faith with the Consenting Lender-Side Persons in connection with the Potential Transactions (including by actively and promptly providing due diligence and access to books and records, negotiating the terms thereof and all definitive documents), and (iii) promptly deliver to the Person requesting the same all information, documentation, instruments and other materials reasonably requested by any Consenting Lender-Side Person in connection herewith or any Potential Transaction; *provided*, that the foregoing obligation shall not require Obligors to furnish any information that the Obligors reasonably and in good faith and upon advice of outside counsel believe (x) would cause the Obligors to violate any Chapter 11 Order, or (y) to be privileged, unless such information is requested and furnished pursuant to a joint

-115-

defense and/or common interest agreement entered into on mutually agreeable terms with such Consenting Lender-Side Person.

(c)     In addition to any notices or information required to be given under this Agreement (including, without limitation, pursuant to **Sections 10.1.2**, **10.1.3** and **10.1.12**) and the other Loan Documents, each Obligor will use commercially reasonable efforts to provide the Consenting Lender Advisors (for the benefit of the Lenders) with (i) prompt written notice of, in any event no later than one (1) Business Day of the occurrence of any Obligor or any of its Subsidiaries (or any of their respective directors or officers) having actual knowledge of any breach or violation of this Agreement or any other Loan Document, or any Restructuring Transaction Document, by any Obligor or any Affiliate thereof (including Sponsor) that is a party thereto or restricted pursuant to the terms thereof, (ii) reasonably prompt written notice of a default or breach under, or any required redemption (or notice with respect to any required redemption) or other mandatory redemption or purchase relating to any Debt of any Obligor (including, without limitation, the Prepetition Debt) and (iii) reasonably prompt written notice of the occurrence of any default or event of default under, or the pursuit of any remedies against any Obligor in connection with, any material operating contract (including any termination thereof).

(d)     ~~Procure that no disbursements are made with respect to any Wind Down amount, except in accordance with the Wind Down Budget.~~ In addition to all other obligations hereunder, each Obligor shall (and shall cause its Senior Officers and management teams, and each Company FA (and such other Company Advisors as may be requested by the Administrative Agent) to), in each case, (A) provide the Administrative Agent (for its and the Lenders' and Consenting Lender Advisors' benefit) with all information reasonably requested by the Administrative Agent or any of the Consenting Lender Advisors in connection with evaluating, analyzing or making any other determination with respect to the Wind Down ~~Budget or any matters relating thereto (including to the extent required to assess or determine whether any payment or disbursement is made in accordance with the Wind Down Budget and the Approved Budget),~~Amount and (B) actively cooperate and work in good faith with (and simultaneously meet and confer with) the Administrative Agent and the Consenting Lender Advisors to provide information with respect to the Wind Down ~~Budget~~Amount.

10.1.14     <u>Bankruptcy Related Matters</u>.

(a)     Cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Obligations and/or the Loan Documents, the Prepetition Debt and applicable loan documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course or adequate protection, (iv) any Chapter 11 Liquidating Plan and/or any disclosure statement related thereto, (v) orders concerning the financial condition of the Debtors, or other Debt of the Debtors and (vi) orders establishing procedures for administration of the Chapter 11 Cases or approving significant transactions submitted to the Bankruptcy Court, in each

case, proposed by the Debtors, to be in accordance with the terms of this Agreement, to the extent applicable.

(b)     Comply in all respects with each order entered by the Bankruptcy Court in connection with the Chapter 11 Cases.

(c)     Deliver to the Administrative Agent and the Lender Advisors not less than three (3) Business Days (or, if and solely to the extent that, as a result of exigent circumstances, there is a need to file on an expedited basis, not less than two (2) Business Days) prior to any filing, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Obligors with the Bankruptcy Court in the Chapter 11 Cases that affect or may affect any of the Secured Parties, or distributed by or on behalf of the Obligors to the Chapter 11 Unsecured Creditors Committee (or any other official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest), and shall consult in good faith with the Lender Advisors and the Required Lenders regarding the form and substance of any such document.

(d)     If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent and to the Lender Advisors promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Obligors to the Chapter 11 Unsecured Creditors Committee (or any other official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest).

(e)     Provide written notice to the Lenders (via the Administrative Agent) and the Lender Advisors not less than five (5) Business Days (or such shorter period as may be consented to in writing by the Required Lenders or by the Administrative Agent, acting at the Required Lenders' direction) prior to any assumption or rejection of any Debtor's or any Subsidiary's Material Contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected if the Administrative Agent (acting at the direction of the Required Lenders) informs the Borrower Agent in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption or rejection, as applicable.

10.1.15     <u>Priority of Liens and Claims</u>.  Cause the Obligations to, upon and at all times as of entry of the Interim DIP Order (including upon and at all times as of entry of the Final DIP Order) (i) constitute Superpriority DIP Claims having the priority and rights set forth in the DIP Orders and (ii) be secured by a valid, binding, continuing, enforceable and perfected first priority (subject only to the Carve-Out and any other liens expressly permitted by the DIP Orders) security interest in, and Lien, on all Collateral.

NY 78904694v1NY 78904694v7

**10.2.** **Negative Covenants**.  Until Full Payment and as long as any Commitments or Obligations are outstanding, each Obligor shall not, and shall cause each Subsidiary not to:

10.2.1 Permitted Debt.   Create, incur, guarantee or suffer to exist any Debt, except:

(a)    the Obligations;

(b)    the Prepetition Credit Facility Debt;

(c)    any (i) Debt incurred to finance the acquisition, construction, or improvement of any fixed or capital assets (if consummated prior to the Petition Date, solely if and to the extent such acquisition, construction, or improvement was permitted under the Prepetition Loan Agreements, and, if consummated on or at any time after the Petition Date, solely if and to the extent such acquisition, construction, or improvement is permitted hereunder during the Chapter 11 Cases) (whether or not constituting Purchase Money Debt), including Capital Lease Obligations; provided, that no Debt shall be incurred pursuant hereto at any time as of the Petition Date unless permitted pursuant to the applicable Chapter 11 Approvals, and no payments in respect thereof shall be made except to the extent in accordance with the Budget Covenant, and (ii) Debt assumed in connection with the acquisition of any of the foregoing assets or secured by a Lien on any such assets prior to the acquisition thereof (so long as such acquisition was permitted under the Prepetition Loan Agreements); provided, that the aggregate principal amount of Debt incurred in reliance on this clause (c) after the Closing Date shall not exceed $500,000 at any time outstanding;

(d)    Debt incurred prior to the Petition Date and expressly permitted under the Prepetition Credit Agreements and outstanding as of the Closing Date (other than Prepetition Credit Facility Debt or any debt incurred prior to the Petition Date and permitted pursuant to any other clause of this **Section 10.2.1**); provided, that if any such Debt exceeds an aggregate principal amount of $100,000, a description set forth on **Schedule 10.2.1** hereof;

(e)    Debt with respect to Debt in respect of netting services, automatic clearinghouse arrangements, overdraft protections, treasury, depository, corporate purchasing cards and other credit cards, cash management, and similar arrangements, in each case incurred in the Ordinary Course of Business;

(f)    Debt that was in existence when a Person became a Subsidiary prior to the Petition Date, or that is secured by an asset when acquired by Holdings or Subsidiary prior to the Petition Date, as long as such Debt was not incurred in contemplation of such Person becoming a Subsidiary or such acquisition; provided, that the aggregate amount under this clause (f) does not exceed $1,000,000 outstanding at any time;

(g)    Permitted Contingent Obligations;

-118-

(h)      intercompany Debt among the Obligors; *provided*, that any such Debt shall be subordinated on terms reasonably satisfactory to the Administrative Agent to the Obligations hereunder;

(i)      Debt incurred in connection with the financing of insurance premiums in the Ordinary Course of Business;

(j)      Debt owed to any Person providing workers' compensation, unemployment insurance, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the Ordinary Course of Business;

(k)      Debt in respect of performance bonds, completion guarantees, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the Ordinary Course of Business, including, without limitation, pursuant to that certain General Agreement of Indemnity with Chubb Surety and Agreement of Indemnity with Westchester Fire Insurance Company substantially in the forms delivered to the Administrative Agent prior to the Closing Date;

(l)      [reserved];

(m)      Guarantee Obligations by any Obligor with respect to Debt otherwise permitted by this **Section 10.2.1**; *provided*, that if the Debt being guaranteed is subordinated or pari passu with the Obligations, then the guarantee shall be subordinated or pari passu, as applicable, to the same extent as the Debt being guaranteed;

(n)      the Intercreditor Agreement shall, in whole or in part, cease to be effective (or cease to be legally valid, binding and enforceable against any party thereto, or against any person on whose behalf any such party makes covenants or agreements therein), or shall otherwise not be fully effective to create the rights and obligations purported to be created thereunder;

(o)      preferred stock of Holdings issued prior to the Petition Date and that does not constitute Disqualified Equity Interests, as set forth on **Schedule 9.1.4**;

(p)      Debt consisting of take or pay obligations contained in supply arrangements entered into in the Ordinary Course of Business; <u>provided,</u> that the aggregate amount thereof incurred or arising or outstanding at any time shall not exceed $500,000; <u>provided, further,</u> that, no such obligations shall be incurred at any time as of the Petition Date unless permitted by the DIP Orders or other Chapter 11 Order (in each case, in accordance with the Approved Budget);

(q)      guarantees required by Governmental Authorities in the Ordinary Course of Business;

(r)      [reserved];

-119-

(s)      Debt constituting obligations of the Obligors with respect to deferred compensation payable to employees of the Obligors in the Ordinary Course of Business, but only if, and solely to the extent that, such obligations arise pursuant to arrangements in effect as of the Closing Date (so long as the same shall have been approved in writing by the Administrative Agent); provided, no payments or disbursements shall be made in connection therewith except to the extent that a line-item with respect thereto is set forth in the Approved Budget, and the payment thereof shall be in accordance with the Approved Budget;

(t)      endorsements for collection, deposit, or negotiation and warranties of products or services, in each case incurred in the Ordinary Course of Business;

(u)      rental obligations incurred in the Ordinary Course of Business;

(v)      obligations under operating leases incurred in the Ordinary Course of Business; provided, that the aggregate amount thereof incurred or arising at any time as of the Petition Date shall not exceed $500,000;

(w)      trade payables and other current liabilities incurred in the Ordinary Course of Business, so long as, as of the time of, and pro forma for, the incurrence thereof, the Obligors shall be in compliance with Section 10.3 (to the extent applicable at such time in accordance with the terms thereof); and

(x)      all interest accruing on, and all reasonable and documented fees and expenses payable in connection with, the obligations described in the foregoing clauses (in the case of (1) clause (a), without limiting the amounts otherwise included pursuant to the definition of Obligations or as provided elsewhere in this Agreement, and (2) clause (b), without limiting the amounts otherwise included pursuant to the definition of Prepetition Senior Loan Debt or Prepetition Junior Loan Debt).

For purposes of determining compliance with this **Section 10.2.1**, if an item of Debt meets the criteria of more than one of the categories of Debt described above, the Borrower Agent shall, in its sole discretion, classify and reclassify or later divide, classify or reclassify such item of Debt (or any portion thereof) and will only be required to include the amount and type of such Debt in one or more of the above clauses; provided, that all Debt outstanding under the Loan Documents will be deemed to have been incurred in reliance only on the exception in clause (a) of this **Section 10.2.1**.  Notwithstanding anything to the contrary, no payment shall be made in respect of any Debt (whether or not such Debt is permitted hereunder) at any time as of the Closing Date except in accordance with the Approved Budget.

10.2.2  Permitted Liens.   Create or suffer to exist any Lien upon any of its property or assets, except the following (collectively, "Permitted Liens"):

(a)      Liens in favor of Administrative Agent (for the benefit of the Secured Parties) granted pursuant to the Loan Documents to secure the Obligations;

-120-

(b)    [reserved];

(c)    Liens for Taxes not yet due or being Properly Contested;

(d)    statutory or common law Liens of landlords, sub-landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens (other than Liens for Taxes or imposed under ERISA) arising in the Ordinary Course of Business, but only if (i) payment of the obligations secured thereby is not yet due or is being Properly Contested, and (ii) such Liens do not materially impair the value or use of the real or personal property or materially impair operation of the business of any Borrower or Subsidiary;

(e)    customary Liens incurred or deposits made in the Ordinary Course of Business to secure the performance of tenders, bids, leases, contracts (except those relating to Borrowed Money), statutory obligations, surety, stay, customs, and appeal bonds, performance bonds, and other similar obligations, or arising as a result of progress payments under government contracts including, without limitation, pursuant to that certain General Agreement of Indemnity with Chubb Surety and Agreement of Indemnity with Westchester Fire Insurance Company substantially in the forms delivered to the Administrative Agent prior to the Closing Date;

(f)    pledges, deposits, or Liens in the Ordinary Course of Business in connection with (i) workers' compensation, payroll taxes, unemployment insurance, and other social security legislation and (ii) securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Holdings, the Borrowers, the Obligors, or any of the Subsidiaries;

(g)    Liens arising by virtue of a judgment or judicial order against any Obligor, or any real or personal property of an Obligor, as long as such judgment does not otherwise result in an Event of Default under **Section 11.1(h)**;

(h)    easements, rights-of-way, restrictions, covenants, building codes, restrictions (including zoning restrictions), encroachments, licenses, protrusions, or other agreements of record, and other similar charges or encumbrances on Real Estate, that do not secure any monetary obligation and do not interfere with the business of the Obligors in any material respect;

(i)    normal and customary rights of setoff upon deposits in favor of depository institutions, and Liens of a collecting bank on Payment Items in the course of collection;

(j)    Liens granted or arising prior to the Petition Date and existing as of the Closing Date; *provided*, that, if any such Lien secures any Debt exceeding $100,000, a description thereof shall be set forth on **Schedule 10.2.2**;

NY 78904694v1NY 78904694v7

(k)     leases, licenses, subleases or sublicenses granted to others that do not (i) interfere in any material respect with the business of Holdings or the Subsidiaries or (ii) secure any Debt;

(l)     Liens arising from UCC financing statements filed regarding (i) operating leases entered into by an Obligor and (ii) goods consigned or entrusted to or bailed to a Person in the Ordinary Course of Business;

(m)     Liens in favor of customs or revenue authorities to secure payment of customs duties in connection with the importation of goods;

(n)     Liens solely on any cash earnest money deposits made by any Obligor or any Subsidiary in connection with any letter of intent or purchase agreement not prohibited by this Agreement;

(o)     Liens on Collateral securing the "Obligations" under the Prepetition Credit Facility Debt, *provided*, that the liens thereon must be junior in priority to the liens securing Obligations hereunder pursuant to the DIP Order;

(p)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by any Obligor in the Ordinary Course of Business permitted by this Agreement;

(q)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the Ordinary Course of Business and not for speculative purposes;

(r)     Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted hereunder to be applied against the purchase price for such Investment and (ii) consisting of an agreement to dispose of any property in an Asset Disposition permitted hereunder, to the extent that such Asset Disposition would have been permitted on the date of the creation of such Lien;

(s)     ground leases in respect of real property on which facilities owned or leased by any of the Obligors are located;

(t)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto not to exceed the amount of such premiums;

(u)     Liens on specific items of inventory or other goods and the proceeds thereof securing such Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

-122-

(v)     deposits of cash with the owner or lessor of premises leased and operated by any Obligor to secure the performance of such Obligor's obligations under the terms of the lease for such premises;

(w)     [reserved];

(x)     Liens on property subject to any sale-leaseback transaction not prohibited hereunder and general intangibles related thereto;

(y)     Liens arising by operation of law in the United States under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(z)     Liens existing on property at the time of its acquisition by an Obligor in accordance herewith, or existing on the property of any Person at the time such Person becomes an Obligor in accordance herewith, but excluding Liens on the Equity Interests of any Person that becomes a Subsidiary;

(aa)    [reserved];

(bb)    Liens upon real or personal property leased under operating leases in the Ordinary Course of Business by Holdings or any of its Subsidiaries in favor of the lessor created at the inception of the lease transaction, securing obligations of Holdings or any of its Subsidiaries under or in respect of such lease and extending to or covering only the property subject to such lease and improvements thereon;

(cc)    Liens that are contractual rights of set-off or rights of pledge (i) relating to the establishment of depository relations with banks or other deposit-taking financial institutions and not given in connection with the issuance of Debt, (ii) relating to pooled deposit or sweep accounts of Holdings or any of the Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings or any of the Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of any Subsidiary in the Ordinary Course Of Business; and

(dd)    Liens on cash and Cash Equivalents securing reimbursement obligations under letters of credit permitted hereunder.

10.2.3  Distributions; Upstream Payments.  Declare or make any Distributions, except for Upstream Payments, and as follows:

(a)     [reserved];

(b)     [reserved];

(c)     Holdings may declare and make Tax Distributions that are specifically identified in, and made in accordance with, the Approved Budget; and

-123-

(d)      Holdings and its Subsidiaries may make Distributions to any direct or indirect holder of its Equity Interests, but solely if, and to the extent that, (i) such Distributions are set forth in, and made in accordance with, the Approved Budget, and (ii) the proceeds of such Distributions shall be promptly used to pay franchise and excise taxes attributable to Holdings and its Subsidiaries, and reasonable and customary operating or overhead costs required to maintain Holdings' corporate existence during the Chapter 11 Cases; provided, that the aggregate amount of Distributions made under this clause (d) shall not to exceed $100,000 in any Fiscal Year.

No Borrower shall create or permit to exist any encumbrance or restriction on the ability of a Subsidiary to make any Upstream Payment, except for Permitted Restrictions.  Notwithstanding anything to the contrary, no Distribution or other payment shall be made (whether or not permitted hereunder) at any time as of the Closing Date except in accordance with the Approved Budget.

10.2.4   Restricted Investments.  Make any Restricted Investment.

10.2.5   Disposition of Assets.   Make any Asset Disposition, except a Permitted Asset Disposition.

10.2.6   Capital Expenditures.    (a) Permit the aggregate amount of Capital Expenditures made by the Obligors to exceed the amount set forth therefor in the Approved Budget, or (b) make any payment on account of, or incur any obligation with respect to, any Capital Expenditure, except if (i) no Default shall exist or be continuing at the time of, or after giving effect to, the same, and (ii) the type and amount of such Capital Expenditure is set forth in the Approved Budget, and such payment is made in accordance with the Approved Budget.

10.2.7   Restrictions on Creditor Distributions and Payment of Certain Debt.  Make any payment or any Creditor Distribution (whether in cash, kind or consisting of any assets or interests or otherwise, including on account of or in respect of any principal payments, and whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition), in each case, with respect to (a) any Prepetition Debt, or (b) any other Borrowed Money (other than Borrowed Money described in **Sections 10.2.1(h)** or **10.2.1(p)**) or Debt that is contractually subordinated, or is secured by liens that are contractually subordinated to the Liens securing the Obligations, except (i) in accordance with the express provisions of the Intercreditor Agreement, or such other intercreditor agreement acceptable to the Administrative Agent, (ii) payments of regularly scheduled principal and interest under the Prepetition Senior Loan Agreement, solely to the extent permitted and made in accordance with the Approved Budget, (iii) in the case of such other Borrowed Money, payments on their respective due dates under the agreements evidencing such Debt, to the extent that the same is made in accordance with the Approved Budget, and (iv) payments in kind permitted under the Prepetition Senior Loan Agreement (as in effect on the date hereof).

10.2.8   Fundamental Changes.  Change its legal name; change its tax, charter or other organizational identification number; change its form or state of organization; liquidate,

-124-

wind up its affairs or dissolve itself; or effect a Division, merge, combine or consolidate with any Person, whether in a single transaction or in a series of related transactions.

10.2.9  <u>Subsidiaries</u>.  Form or acquire any Subsidiary after the Petition Date; or permit any existing Subsidiary to issue any Equity Interests.

10.2.10  <u>Organic Documents and Material Contracts</u>.  Amend, modify or otherwise change any of its Organic Documents or any Material Contract.

10.2.11  <u>Spectra Agreement</u>.  Amend, modify or otherwise change the terms of Borrower's contractual requirement in the Spectra Agreement.

10.2.12  <u>Accounting Changes</u>.  Make any material change in accounting treatment or reporting practices, except as required by GAAP and in accordance with **Section 1.2**; or change its Fiscal Year.

10.2.13  <u>Restrictive Agreements</u>.  Become a party to any Restrictive Agreement other than agreements containing solely Permitted Restrictions.

10.2.14  <u>Hedging Agreements</u>.  Enter into, amend or modify any Hedging Agreement (including, directly or indirectly, with respect to any notional amount, or any Swap Obligation or other obligation or exposure thereunder) at any time without the prior written consent of the Administrative Agent, or make any payment pursuant to, or in connection with, any Hedging Agreement (or any Swap Obligation or other obligation thereunder) except to the extent set forth in, and made in accordance with, the Approved Budget.

10.2.15  <u>Conduct of Business</u>.  Engage in any line of business materially different than the lines of business conducted by it on the Closing Date and any activities related, similar or incidental thereto or synergistic therewith.

10.2.16  <u>Affiliate Transactions</u>.  Enter into or be party to, or consummate or permit to exist, any transaction with an Affiliate except (a) transactions expressly permitted by the Loan Documents, (b) payment of reasonable compensation to officers and employees for services actually rendered, and payment of customary directors' fees and indemnities (solely to the extent that payment thereof is in accordance with the Approved Budget and approved by the Administrative Agent prior to the Closing Date), (c) the payment of reasonable fees to independent directors of Holdings or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of Holdings or their Subsidiaries in the Ordinary Course of Business, subject to the Approved Budget, (d) transactions solely among Obligors, (e) transactions with Affiliates that were consummated prior to the Closing Date and permitted pursuant to the Prepetition Loan Agreements, (f) transactions with Affiliates consummated in good faith upon approval thereof by such Obligor's board of directors (*provided*, that a copy of the resolution adopted by the majority of such board of directors approving such transaction and a certificate of a Senior Officer thereof certifying that such transaction complies with this <u>sub-clause (f)</u>), and on terms and pricing no less favorable than would be obtained in a comparable arm's-length transaction with a

-125-

non-Affiliate; *provided*, that, without the Administrative Agent's prior written consent, the aggregate amount of payments or other obligation made pursuant to this clause (f) by any Obligor shall not exceed $500,000 per Fiscal Year, (g) shared services agreements with Crossfire and Capstone (as in effect prior to the Closing Date, or as amended thereafter with the Required Lenders' consent), and (h) transactions between or among Holdings and its Subsidiaries; *provided*, that such transactions are intercompany transactions entered into in the Ordinary Course of Business as part of tax, accounting, pension, cash management and other administrative activities and not for the purpose of circumventing any covenant hereunder; *provided*, that, if such any transaction that shall otherwise be permitted hereunder gives rise to any payment or other obligation of the Obligors or any of their Subsidiaries in excess of $500,000 per Fiscal Year, the Administrative Agent's prior written approval shall be required notwithstanding that such transaction shall otherwise comply with the terms hereof.

10.2.17    <u>Plans</u>.  Become party to any Multiemployer Plan or Foreign Plan, other than any in existence on the Closing Date.

10.2.18    <u>Amendments to Subordinated Debt</u>.  Amend, supplement or otherwise modify any document, instrument or agreement relating to any Subordinated Debt.

10.2.19    <u>Holding Company</u>.  Holdings shall not directly or indirectly, conduct, transact or otherwise engage in any material business or operations, or own any material properties or assets, other than the following (to the extent in accordance with an applicable Chapter 11 Order):

(a)    its ownership of the Equity Interests of the Borrowers and its Subsidiaries;

(b)    the maintenance of its legal existence (including the ability to incur fees, costs and expenses related to such maintenance);

(c)    the performance of its obligations under the Loan Documents;

(d)    participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and its Subsidiaries;

(e)    the granting of (i) nonconsensual Liens and obligations arising by operation of law and (ii) Liens to secure the Obligations and the Prepetition Credit Facility Debt;

(f)    Investments in any Obligor;

(g)    the making of Distributions permitted under **Section 10.2.3**;

(h)    establishing and maintaining bank accounts in good faith and for legitimate business purposes not in violation of any provision hereof;

-126-

(i)       performing the activities contemplated pursuant to any of the employment agreements and other customary arrangements with officers, consultants, employees and directors, in each case, entered into in good faith and for legitimate business purposes not in violation of any provision hereof prior to the Petition Date and in effect as of the Closing Date; *provided*, that any payment thereunder shall be in accordance with the Approved Budget;

(j)       Guarantee Obligations with respect to Debt of any of its Subsidiaries not otherwise prohibited under this Agreement;

(k)       the providing of customary indemnification to officers, consultants, managers and directors pursuant to arrangements entered into prior to the Petition Date and in effect as of the Closing Date; and

(l)       activities incidental to the business or activities described in the foregoing subclauses (a) through (k).

10.2.20       Classification.   Take or omit to take any action (or permit any parent entity or other Person Controlling any of the Obligors to take or omit to take any action at any time (including, but not limited to, the making of an election under Treasury Regulations Section 301.7701-3), in each case, to the extent that the same could result in any of the Obligors ceasing to be classified as, or being deemed not to be, a disregarded entity for U.S. federal income tax purposes.

10.2.21       Restricted Actions.   Notwithstanding anything else herein, the Obligors shall not (and shall not permit any of their respective Subsidiaries to) (i) incur any Debt, grant or permit to arise any Lien, make any Investment, Distribution or Upstream Payment, or (ii) undertake any Asset Disposition, Affiliate transaction or any other transaction, enter into or modify any Hedging Agreement, or take any other action or exercise any right or power, in each case, that is subject to the covenants contained in **Sections 10.2.1** through **10.2.20** (each, an "Applicable Transaction") except, in each case, solely if and to the extent that, no Default or Event of Default shall exist or be continuing prior to (or after giving effect to) such Applicable Transaction, and such Applicable Transaction (and any action in connection therewith) (x) does not violate any Applicable Law, and is in accordance with any applicable Chapter 11 Order (and, if any approval, authorization or consent, or any notice, motion, filing or other action, as the case may be, is required to cause such Applicable Transaction to be permitted during the pendency of the Chapter 11 Cases (each of the foregoing, a "Chapter 11 Approval"), the Debtors shall have obtained all such Chapter 11 Approvals prior to consummating such Applicable Transaction and shall consummate the same in accordance with the requirements thereof), (y) is undertaken by the applicable Obligor (or by the Subsidiaries of the Obligors involved therein) acting in good faith, and (z) is effectuated or consummated in the Ordinary Course of Business and in accordance with prudent business practices of the Obligors; provided, that, notwithstanding the foregoing, A) no cash or Cash Equivalents of the Obligors (including resulting from any borrowing of Loans) shall be used to fund any disbursement or payment in connection with any Wind Down (including any Wind Down Statutory Expenses) except to the extent that the same shall be in

-127-

~~accordance with the Wind Down Budget and the DIP Orders, and (B) without limiting anything in foregoing clause (A),~~ any Applicable Transaction (or related series of Applicable Transactions) in excess of $250,000 individually or $500,000 in the aggregate (since the Petition Date) shall in any event require the prior written consent of the Administrative Agent unless the same is in accordance with the DIP Orders and Approved Budget, and does not result in a breach of the Budget Covenant; provided, further, however, that, except in connection with making a payment not in violation of the foregoing, the Obligors shall not (and shall not permit any of their respective Subsidiaries to) transfer any funds (other than such funds to pay payroll) from any account that is (or is required to be) subject to a Deposit Account Control Agreement in favor of the Administrative Agent into any account that is not subject to a Deposit Account Control Agreement in favor of the Administrative Agent (other than a transfer that is made in accordance with customary cash management practices into a deposit account maintained by an Obligor at Bank of America that is subject to a zero balance cash sweep into a deposit account maintained by such Obligor at Bank of America that is not an Excluded Account and that is subject to a Deposit Account Control Agreement in favor of the Administrative Agent).

Notwithstanding anything in this Agreement to the contrary, during the period commencing as of (and including) February 4, 2022 and ending as of (and including) the time of the consummation of the Stalking Horse Sale on the Stalking Horse Sale Closing Date, the Obligors shall be permitted to make (and shall only be permitted to make) the following disbursements, each in the Ordinary Course of Business (other than with respect to clauses (vii), (viii) and (ix) below), and each to the extent authorized pursuant to an order of the Bankruptcy Court in the Chapter 11 Cases, (i) disbursements for payroll and benefits, (ii) disbursements for Taxes, (iii) disbursements in connection with the Obligors' motor vehicle fleet, (iv) disbursements for rent and insurance under contracts being assumed by the Stalking Horse Agreement Purchaser as part of the Stalking Horse Sale pursuant to the Stalking Horse Sale Agreement constituting Assigned Contracts (as defined in the Stalking Horse Sale Agreement), (v) disbursements to pay post-petition accounts payable that have accrued but remain unpaid as of February 4, 2022 (the foregoing accounts payable, "Accrued Post-Petition AP"), (vi) disbursements to pay other post-petition accounts payable that are agreed to be paid by the Debtor and the Administrative Agent, (vii) disbursements to pay professional fees and to fund the Professional Fee Amount Excess into the Escrow Account, (viii) disbursements to fund the Wind Down Related Disbursements, and/or (ix) disbursements to pay costs and expenses budgeted for pursuant to the Approved Budget and paid as of or on the Stalking Horse Sale Closing Date. It is also agreed that the disbursements permitted pursuant to this paragraph shall constitute "Specified Disbursements".

### 10.3.   **Financial Covenant**.

10.3.1 Permitted Variances.   Obligors shall not (a) permit (i) actual "Total Receipts", "Customer Receipts" or "Other Receipts" (which shall exclude proceeds of the Additional Specified Vehicle Dispositions that are actually received by the Borrowers) for the Performance Period covered in each Variance Report to be less than 87.5% of each respective projected line-item for such Performance Period in the Approved Budget, for the first Weekly Performance Period of each Approved Budget and on a rolling two week basis for each

-128-

Bi-Weekly Performance Period thereafter for each Approved Budget, (ii) the actual "Total Disbursements" (which shall exclude "UCC Professionals Fees", "Company Professionals Fees" and "Other Professionals Fees" line items) for the most recently ended Performance Period covered in each Variance Report to exceed 112.5% of the projected "Total Disbursements" for such Performance Period in the Approved Budget, for the first Weekly Performance Period of each Approved Budget and on a rolling two week basis for each Bi-Weekly Performance Period thereafter for each Approved Budget, and (iii) the actual "Vendor Payables" for the most recently ended Performance Period covered in each Variance Report to exceed 115% of each respective projected line-item for such Performance Period in the Approved Budget, for the first Weekly Performance Period of each Approved Budget and on a rolling two week basis for each Bi-Weekly Performance Period thereafter for each Approved Budget, and (b) make any payment (whether on account of any disbursement, Investment, Distribution or otherwise) unless, both at the time thereof, and on a pro forma basis (after giving effect to the making of such payment and any other circumstances resulting therefrom), the Obligors shall be in compliance with clause (a) (the requirements set forth in this **Section 10.3.1**, the "Budget Covenant").  The Obligors shall not be required to comply with the Budget Covenant as of any time after February 4, 2022; provided, that nothing herein shall limit or otherwise modify any reporting requirements pursuant to Section 10.1.12, which shall continue to apply in accordance with their terms.

10.3.2  Minimum Liquidity.  Obligors shall not permit the aggregate amount of Liquidity, *plus* the amount of New Money Loans then-available to be borrowed hereunder, to be less than $2,500,000 at the end of each day.

10.3.3  AP Trade Balances.  (a) Obligors shall not permit the AP Trade Balance to exceed, as of the dates set forth in the table below (each, an "AP Trade Balance Testing Date"), the corresponding amount set forth in the table below (such amounts, the "AP Trade Balance Amount"):

| AP Trade Balance Testing Date | AP Trade Balance Amount |
|---|---|
| December 31, 2021 | $8,900,000 |
| January 31, 2022 | $~~10,500,000~~12,500,000 |
| February ~~8,~~4, 2022 | $~~10,500,000~~13,500,000 |
| On the Stalking Horse Sale Closing Date, as of immediately prior to closing of the Stalking Horse Sale | $13,500,000 |

(b) Obligors shall deliver to the Administrative Agent~~,~~ (i) by no later than 4:00 p.m. (New York City time) on the first Business Day following ~~each~~the AP Trade Balance Testing Date~~.~~ that occurs on January 31, 2022, (ii) by no later than 4:00 p.m. (New York City time) on February 8, 2022, in the case of the AP Trade Balance Testing Date that occurs on February 4, 2022, and (iii) by no later than [11:00 a.m.] (New York City time) on the Stalking Horse Sale Closing Date

(receipt of which shall also constitute a condition precedent to any funding of Loans on such date, and shall be relied on by the Administrative Agent in determining whether to effectuate any New Money Loan Tranche A Commitment Reduction), (A) a certificate of the Chief Financial Officer of Strike certifying compliance by the Obligors, on and as of suchthe applicable AP Trade Balance Testing Date, with the corresponding AP Trade Balance Amount (each, an "AP Trade Balance Certificate"), together with a report settingand (B) a report, in form and substance reasonably acceptable to the Administrative Agent (each, an "AP Trade Balance Report"), which AP Trade Balance Report shall (i) set forth, in reasonable detail, the AP Trade Balance as of such AP Trade Balance Testing Date (each, an "AP Trade Balance Report"), and supporting evidence with respect to the foregoing, (ii) in the case of the AP Trade Balance Report required to be delivered on February 8, 2022 and on the Stalking Horse Sale Closing Date, specify the amount of each item of Accrued Post-Petition AP, and the identity of each Person to whom the accounts payable comprising such item of Accrued Post-Petition AP are due as of February 4, 2022, (iii) include a certification by a Senior Officer that no Default or Event of Default shall have occurred or be continuing as of such AP Trade Balance Testing Date and as of the date of delivery of such AP Trade Balance Report, and (iv) include evidence reasonably satisfactory to the Administrative Agent to substantiate and/or support the foregoing.

**10.4.** **Chapter 11 Cases**.

Obligors shall not:

(a)     Other than the claims and Liens of the Administrative Agent arising from this Agreement, and other than the adequate protection claims of permitted in the DIP Orders, as applicable, and except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other Superpriority DIP Claim which is pari passu with, or senior to the claims and Liens of, the Administrative Agent and Lenders.

(b)     Make or permit to be made any amendment or change to the DIP Orders, as applicable, without the consent of the Required Lenders.

(c)     Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against any Agent, any Lender or any Prepetition Secured Party with respect to any Loan Document or any Prepetition Loan Document, or any of the liens, claims, rights, benefits or protections granted hereunder or thereunder, or any of the transactions contemplated thereby or hereby.

(d)     Make (i) any prepetition "critical vendor" payments or other payments on account of any creditor's prepetition unsecured claim, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by Chapter 11 Order after notice and a hearing, and (b) are expressly permitted by, and in compliance with, the terms of the Loan Documents (including the Budget Covenant and the

-130-

Approved Budget, subject to any Permitted Variance), or otherwise with the prior written consent of the Required Lenders.

(e)     File any material motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Debtors without consulting with the Lenders and providing the Lenders prior (in any case, not less than two (2) Business Days' (or as soon as reasonably practicable if two (2) Business Days in advance is not reasonably practicable)) notice and the opportunity to review and comment on each such motion.

(f)     Subject to the applicable DIP Order, object to, contest, delay, prevent, or interfere in any manner with, the exercise of any rights and remedies by the Administrative Agent or the Lenders with respect to the Collateral following the occurrence and during the continuance of an Event of Default.

**SECTION 11.          EVENTS OF DEFAULT; REMEDIES ON DEFAULT**

**11.1.     Events of Default**.  Each and any one or more of the following shall be an "Event of Default" if it occurs for any reason whatsoever, whether voluntary or involuntary, by operation of law or otherwise:

(a)     any Borrower shall fail to pay any principal of any Loan, or any Termination Payment (or portion thereof) when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)     any Borrower shall fail to pay any interest on any Loan or any fee or any other Obligation (other than an amount referred to in clause (a) above) payable under any Loan Document, within three (3) Business Days after the same shall become due and payable;

(c)     any representation or warranty of an Obligor made in any Loan Document is false or misleading in any material respect when given;

(d)     any Obligor or Subsidiary breaches or ~~fail~~fails to perform any covenant applicable to it contained in **Section 7.2**, **7.3**, **8.1**, **8.2.4**, **8.2.5**, **8.5**, **10.1.1**, **10.1.13**, **10.1.14**, **10.1.15**, **10.1.16**, **10.1.17**, **10.2** or **10.3** (provided, however, that, a breach or Default under, or failure to comply with, Section 10.3.3 as of the Stalking Horse Sale Closing Date shall not constitute an Event of Default if the Administrative Agent instead imposes the New Money Loan Tranche A Commitment Reduction (as set forth in, and in accordance with, the definition of such term);

(e)     any Obligor or Subsidiary breaches or fails to perform any other covenant contained in any Loan Documents, and such breach or failure is not cured within 30 days (or 10 days in the case of a breach of **Section 10.1.2**) after a Senior Officer of such Obligor or Subsidiary has knowledge thereof or receives notice thereof from Administrative Agent, whichever is sooner; *provided, however*, that such notice and

-131-

opportunity to cure shall not apply if the breach or failure to perform is not capable of being cured within such period;

(f) any Guarantor repudiates, revokes or attempts to revoke its Guaranty; an Obligor denies or contests the validity or enforceability of any Loan Documents or Obligations, or the perfection or priority of any Lien granted to Administrative Agent; any Loan Document ceases to be in full force or effect for any reason (other than a waiver or release by Administrative Agent and Lenders and other than in accordance with the terms of this Agreement); any lien created hereunder or under the Security Documents ceases to be a valid and perfected lien (other than as a result of any action or inaction by the Administrative Agent and other than by reason of a release of Collateral in accordance with the terms hereof or thereof or Full Payment) or the Obligations cease to be Superpriority DIP Claims;

(g) other than any "Event of Default" (in each case, as defined in the Prepetition Loan Agreements) that occurs under either Prepetition Loan Agreement, any breach or default of an Obligor or Subsidiary occurs under any Hedging Agreement, or under any instrument or agreement to which it is a party or by which it or any of its properties is bound, in each case, relating to any Debt (other than the Obligations) in excess of $500,000 (in the case of any Hedging Agreement, determined on a net basis), if the maturity of or any payment with respect to such Debt may be accelerated or demanded due to such breach;

(h) any judgment or order for the payment of money is entered against an Obligor or Subsidiary in an amount that exceeds, individually or cumulatively with all unsatisfied judgments or orders against all Obligors and Subsidiaries, $500,000 (excluding amounts of insurance coverage therefor that has not been denied by the insurer, or subject to another contractual indemnity arrangement reasonably acceptable to the Administrative Agent, and available to the Obligors for payment of such liabilities), and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty consecutive days;

(i) an Obligor or Subsidiary is enjoined, restrained or in any way prevented by any Governmental Authority from conducting any part of its business which could reasonably be expected to have a Material Adverse Effect; there is a cessation of any part of an Obligor's or Subsidiary's business which could reasonably be expected to have a Material Adverse Effect; a material portion of the Collateral or real or personal property of an Obligor or Subsidiary is taken or impaired through condemnation the effect of which could reasonably be expected to have a Material Adverse Effect;

(j) an Insolvency Proceeding is commenced by an Obligor or Subsidiary; a trustee is appointed to take possession of any substantial real or personal property of or to operate any of the business of an Obligor or Subsidiary; or an Insolvency Proceeding is commenced against an Obligor or Subsidiary, and the Obligor or Subsidiary consents to institution of the proceeding, the petition commencing the proceeding is not

-132-

timely contested by the Obligor or Subsidiary, the petition is not dismissed within 60 days after filing, or an order for relief approving such Insolvency Proceeding is entered in the proceeding; *provided*, *however*, that the Chapter 11 Cases shall not constitute an Event of Default pursuant to this clause (j);

(k)     an ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of an Obligor to a Pension Plan, Multiemployer Plan or PBGC, or that constitutes grounds for appointment of a trustee for or termination by the PBGC of any Pension Plan or Multiemployer Plan to the extent the foregoing could reasonably be expected to have a Material Adverse Effect; an Obligor or ERISA Affiliate fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan to the extent the foregoing could reasonably be expected to have a Material Adverse Effect; or any event similar to the foregoing occurs or exists with respect to a Foreign Plan to the extent the foregoing could reasonably be expected to have a Material Adverse Effect;

(l)     any Obligor or Subsidiary is criminally convicted for (i) a felony committed in the conduct of the Obligor's or Subsidiary's business, or (ii) violating any state or federal law (including the Controlled Substances Act, Money Laundering Control Act of 1986 and Illegal Exportation of War Materials Act) that could reasonably be expected to have a Material Adverse Effect;

(m)     the Borrowers do not immediately (i) prepay, or cause to be prepaid, the Loans and (ii) terminate, or cause to be terminated, the Commitments, in each case, upon the occurrence of a Change of Control pursuant to **Section 5.3.3** hereof or in any amount less than as set forth thereunder;

(n)     the Strike Investment Board, any committee of the Strike Investment Board (including the Restructuring Committee) or any of the members of Strike Investment does any of the following (whether by amendment to the limited liability company agreement of Strike Investment, resolution, written consent or otherwise):  (i) dissolves, terminates or disbands the Restructuring Committee, (ii) limits, reduces, or modifies the powers, responsibilities, rights or authority of the Restructuring Committee, (iii) changes the members of the Restructuring Committee (including by adding additional members to the Restructuring Committee or by removing and/or replacing any members of the Restructuring Committee), (iv) restores or reinstates to the Strike Investment Board any powers or authority of the Strike Investment Board that were limited or restricted by the Special Resolution, or (v) takes any action to impede, delay or frustrate the purpose of any action taken by the Restructuring Committee in accordance with the powers granted to it by the Special Resolution;

(o)     (i) any Restructuring Transaction Documents shall, in whole or in part, cease to be effective and legally valid, binding and enforceable against any Obligor or Affiliate thereof, or shall otherwise cease or fail be effective to create the rights and

-133-

obligations purported to be created thereunder in favor of any Consenting Lender-Side Person, or (ii) any Obligor thereof shall repudiate or revoke (or attempt or purport to repudiate or revoke) any of its obligations or covenants under any Restructuring Transaction Document, or (y) breach or default by any Obligor under (and, in each case, subject to any applicable cure periods thereunder), or any termination of, any other Restructuring Transaction Document (unless such termination results from any breach of default by the Administrative Agent or any other Consenting Lender-side Person);

(p)     there shall have occurred any of the following in the Chapter 11 Cases:

(i)     the bringing of a motion by any Obligor in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (A) obtaining additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under this Agreement in full in cash; (B) granting any Lien other than Liens expressly permitted under this Agreement upon or affecting any Collateral; (C) except as provided in this Agreement, the Interim DIP Order or the Final DIP Order, as the case may be, authorizing use of cash collateral of the Administrative Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent and the Required Lenders; or (D) that (in the case of any Obligor) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Obligor) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Administrative Agent and the Lenders hereunder or their interest in the Collateral;

(ii)     the filing by any Obligor of (A) any disclosure statement or other document or instrument relating to any Chapter 11 Plan that is not a Chapter 11 Liquidating Plan, or (B) any direct or indirect amendment to any disclosure statement or other document or instrument relating to any Chapter 11 Liquidating Plan that would cause the same to cease to constitute a Chapter 11 Liquidating Plan;

(iii)     the modification, expiry or termination of any Obligor's exclusive right to file and solicit acceptances of a Chapter 11 Plan;

(iv)     the entry of an order in any of the Chapter 11 Cases confirming a Plan that does not constitute a Chapter 11 Liquidating Plan;

(v)     the entry of an order in the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document or the DIP Orders or impairing the rights, privileges, benefits or protections of the Administrative Agent and the Lenders under the DIP Orders or the Loan Documents, in each case, without the prior written consent of the Required Lenders;

(vi)     the payment of, or application by any Obligor for authority to pay, any Prepetition Debt or other prepetition claim without the Required Lenders' prior written consent other than (A) as provided in any "first day order" in form and substance acceptable to

-134-

the Required Lenders, or (B) to the extent such payment is expressly permitted pursuant to this Agreement or consented to by the Required Lenders;

(vii)    the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Obligor, for an order seeking the appointment of, in either case, without the prior written consent of the Required Lenders, an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (including any powers beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery from) any of the Secured Parties or against any of the Prepetition Secured Parties; or the sale without the Required Lenders' consent, of any Obligor's assets (including through a sale under section 363 of the Bankruptcy Code), except to the extent expressly permitted hereunder and the DIP Orders;

(viii)   the dismissal of the Chapter 11 Cases which does not contain a provision for Full Payment, or if any Obligor shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases that does not contain a provision for Full Payment;

(ix)    the conversion of any Chapter 11 Case from a case under chapter 11 of the Bankruptcy Code to a case under chapter 7 of the Bankruptcy Code, or into any other bankruptcy proceeding under any Bankruptcy Law, as applicable, or any Obligor shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(x)    the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of the Administrative Agent and the Prepetition Senior Loan Agent, in each case, subject to any Permitted Liens;

(xi)    the entry of an order in the Chapter 11 Cases, avoiding, recharacterizing, subordinating, disgorging or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xii)    the failure of any Obligor to perform any of its obligations under the Interim DIP Order or the Final DIP Order or any violation of any of the terms of the Interim DIP Order or the Final DIP Order, subject to any applicable grace or cure periods;

(xiii)   the challenge (or support) in writing by any Obligor to (and the entry of an order of the Court impairing or modifying in any manner) the validity, enforceability, extent, perfection or priority of any liens or claims granted under the Prepetition Loan Documents, the DIP Orders or the Loan Documents;

-135-

(xiv)   [reserved];

(xv)   the entry of an order in any of the Chapter 11 Cases granting any super priority administrative claim or Lien equal or superior to that granted to the Agent, on behalf of itself and the Lenders without the consent in writing of the Required Lenders, except (A) in respect of the Carve-Out in accordance with the DIP Orders and (B) as expressly provided in the Adequate Protection Provisions;

(xvi)   the filing of a motion by any Obligor requesting, or the entry of any order granting, any super-priority administrative expense claim which is senior to or pari passu with the Lenders' claims or with the claims of the Prepetition Secured Parties without the consent in writing of the Required Lenders, except (A) in respect of the Carve-Out and (B) as expressly provided in the Adequate Protection Provisions;

(xvii)   the entry of an order precluding any Agent or the applicable agent under any Prepetition Credit Facility Debt from having the right to or being permitted to "credit bid" with respect to the assets of the Obligors;

(xviii) any attempt by any Obligor to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing such Obligations to any other debt;

(xix)   the reversal, vacatur, or stay of the effectiveness of either the Interim DIP Order or the Final DIP Order or any provision thereof without the consent of the Required Lenders;

(xx)   the payment of, or granting adequate protection (except pursuant to the Adequate Protection Provisions) with respect to, any Prepetition Credit Facility Debt;

(xxi)   an application for any of the orders described in this Section 11.1(p) shall be (a) made, joined in or supported by any of the Obligors or (b) made by any other Person (other than any Agent or the Lenders) and such application is not, to the extent requested by the Administrative Agent or the Lenders, contested by the Obligors in good faith, and the relief requested is granted in an order that is not stayed pending appeal;

(xxii)   cessation of Liens or super-priority claims granted with respect to this Agreement to be valid, perfected (in the case of any Liens) and enforceable in all respects

(xxiii) the Restructuring Support Agreement is terminated by any party thereto, or otherwise terminates in accordance with the terms thereof except with respect to any termination resulting from a breach by the Lenders;

(xxiv) the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Security Documents and the Collateral;

-136-

(xxv)   the Stalking Horse Agreement is terminated by any party thereto, or otherwise terminates in accordance with the terms thereof, other than as a result of either (A) a breach of the Stalking Horse Agreement by the purchaser under the Stalking Horse Agreement or (B) the Obligors entry into an Alternative Asset Purchase Agreement in accordance with the Sale Procedures;

(xxvi) an Alternative Asset Purchase Agreement is terminated by the Obligors other than as a result of a breach of the Alternative Asset Purchase Agreement by the purchaser thereunder; or

(xxvii) (A) the "Sellers" (as defined in the Stalking Horse Agreement) shall have failed to deliver to the Stalking Horse Purchaser true, accurate and complete copies of all of the "Seller Disclosure Schedules" (as defined in the Stalking Horse Agreement) on or before the date that is seven (7) days after the "Execution Date" (as defined in the Stalking Horse Agreement), or (B) any of the "Seller Disclosure Schedules" (as defined in the Stalking Horse Agreement), or any matter, fact, item of information, circumstance, event, liability or other disclosure set forth on, or described or referred to in, any of the "Seller Disclosure Schedules" (as defined in the Stalking Horse Agreement), shall not be acceptable to the Stalking Horse Purchaser.

**11.2.   Remedies upon Default**.

11.2.1 Remedies Generally.  If an Event of Default described in **Section 11.1(j)** occurs with respect to any Obligor, then to the extent permitted by Applicable Law, all Obligations (including the Termination Payment) shall become automatically due and payable, and all Commitments shall terminate, without any action by Administrative Agent or notice of any kind.  In addition, or if any other Event of Default exists, Administrative Agent may in its discretion (and shall upon written direction of Required Lenders) do any one or more of the following from time to time (in addition to any and all other things as provided elsewhere in **Section 11.2**):

(a)      declare any Obligations (including the Termination Payment and all other premiums thereon) to be immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by Borrowers to the fullest extent permitted by law;

(b)      terminate, reduce or condition any Commitment;

(c)      require the Obligors to cash collateralize then Obligations; and

(d)      exercise any other rights, remedies, powers and privileges afforded under the Loan Documents or any other agreement, pursuant to the DIP Order and any other Chapter 11 Order, by law (including under the Bankruptcy Code and other Applicable Law), at equity and otherwise, including the rights and remedies of a secured party under the UCC.

NY 78904694v1NY 78904694v7

11.2.2  <u>Disposition of Collateral</u>.  Without limiting the generality of the foregoing, the Administrative Agent may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by the Interim DIP Order, or, the Final DIP Order) to or upon any Obligor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived (except as required by the Interim DIP Order or the Final DIP Order)), during the continuance of any Event of Default (personally or through its agents or attorneys), to the maximum extent permitted under the Bankruptcy Code and other Applicable Law (including the DIP Orders):  (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self- help, without judicial process, without first obtaining a final judgment or giving any Obligor or any other Person notice or opportunity for a hearing on the Administrative Agent's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral, (iii) Sell, grant any option to purchase, and/or deliver any Collateral (in its then condition, or after any further manufacturing or processing thereof) (and enter into contractual obligations to do any of the foregoing), in lots or in bulk, in one or more parcels, at public or private sale or sales, at any exchange, broker's board or office of any Secured Party or elsewhere, upon such terms and conditions, and at such prices, as it may deem necessary, prudent or advisable, for cash or on credit or for future delivery (or any combination thereof), or without charge, and/or without assumption of any credit risk, and any of the foregoing may be adjourned from time to time in accordance with Applicable Law, and Administrative Agent shall have the right to purchase all or any portion of the Collateral free of any right or equity of redemption of any Obligor, which right or equity is hereby waived and released, at any public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may credit bid and set off the amount of such price against the Obligations, (iv) withdraw all cash and Cash Equivalents in any Deposit Account or Securities Account of a Obligor and apply such cash and Cash Equivalents and other cash, if any, then held by it as Collateral in satisfaction of the Obligations, and (v) give notice and take sole possession and control of all amounts on deposit in or credited to any Deposit Account or Securities Account pursuant to the related Deposit Account Control Agreement.

11.2.3  <u>Management of Collateral</u>.  Each Obligor further agrees, that, during the continuance of any Event of Default, (i) at the Administrative Agent's request, it shall assemble the Collateral and make it available to the Administrative Agent at places that the Administrative Agent shall reasonably select, whether at such Obligor's premises or elsewhere, (ii) without limiting the foregoing, the Administrative Agent also has the right to require that each Obligor store and keep any Collateral pending further action by the Administrative Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Administrative Agent is able to sell any Collateral, the Administrative Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Administrative Agent, and (iv) the Administrative Agent may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Administrative Agent's remedies (for the benefit of the Lender Parties), with respect to such appointment without prior notice or hearing as to such appointment.  The Administrative Agent shall not have any obligation to any Obligor to maintain or preserve the rights of any Obligor as

-138-

against third parties with respect to any Collateral while such Collateral is in the possession of the Administrative Agent.

11.2.4 <u>Direct Obligation</u>.   Neither the Administrative Agent nor any other Secured Party shall be required to make any demand upon, or pursue or exhaust any right or remedy against, any Obligor or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof.  All of the rights and remedies of the Administrative Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any Applicable Law.  To the extent it may lawfully do so, each Obligor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Administrative Agent or any Lender or other Secured Party, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 calendar days before such Sale or other disposition.

11.2.5 <u>Commercially Reasonable</u>.   To the extent that any Applicable Law imposes duties on the Administrative Agent to exercise remedies in a commercially reasonable manner, each Obligor acknowledges and agrees that the Administrative Agent shall be deemed to have complied with such duties even if it shall:

(i)   fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Administrative Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)   fail to obtain permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by other Applicable Law, fail to obtain permits or other consents for the collection or disposition of any Collateral;

(iii)   fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)   advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Obligor, for expressions of interest in acquiring any such Collateral;

(v)   exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any

-139-

Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Administrative Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Administrative Agent in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi)     dispose of assets in wholesale rather than retail markets;

(vii)     disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii)     purchase insurance or credit enhancements to insure the Administrative Agent against risks of loss, collection or disposition of any Collateral or to provide to the Administrative Agent a guaranteed return from the collection or disposition of any Collateral.

11.2.6   Accounts and Payments in Respect of General Intangibles.

(a)     In addition to, and not in substitution for, any other provision in this Agreement, if required by the Administrative Agent at any time during the continuance of an Event of Default, on and after the date on which at least one deposit account or securities account has been established, any payment of accounts or payment in respect of general intangibles, when collected by any Obligor, shall be promptly (and, in any event, within two (2) Business Days) deposited by such Obligor in the exact form received, duly indorsed by such Obligor to the Administrative Agent, in the Dominion Account or such other account, subject to withdrawal by the Administrative Agent as provided herein. Until so turned over, such payment shall be held by such Obligor in trust for the Administrative Agent, segregated from other funds of such Obligor. Each such deposit of proceeds of accounts and payments in respect of general intangibles shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(b)     At any time during the continuance of an Event of Default:

(A)     each Obligor shall, upon the Administrative Agent's written request, deliver to the Administrative Agent all original and other documents evidencing, and relating to, the contractual obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all original orders, invokes and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to the Administrative Agent and that payments in respect thereof shall be made directly to the Administrative Agent;

(B)     the Administrative Agent may, without notice, at any time during the continuance of an Event of Default, limit or terminate the authority of an Obligor to collect its accounts or amounts due under general intangibles or any thereof and, in its own name or in the name of others, communicate with account debtors to verify with them to the

-140-

Administrative Agent's reasonable satisfaction the existence, amount and terms of any account or amounts due under any general intangible.  In addition, the Administrative Agent may at any lime enforce such Obligor's rights against such account debtors and obligors of general intangibles; and

(C)     each Obligor shall take all actions, deliver all documents and provide all information necessary or reasonably requested by the Administrative Agent to ensure any Internet domain name is registered.

(c)     Anything herein to the contrary notwithstanding, each Obligor shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  No Secured Party shall have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any Loan Document or the receipt by any Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any obligation of any Obligor under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

11.2.7  <u>Proceeds to be Turned over to and Held by Administrative Agent</u>.  Unless otherwise expressly provided in this Agreement, upon the occurrence and during the continuance of an Event of Default, all proceeds of any Collateral received by any Obligor hereunder in cash or Cash Equivalents shall be held by such Obligor in trust for the Administrative Agent and the other Lender Parties, segregated from other funds of such Obligor, and shall, promptly upon receipt by any Obligor, be turned over to the Administrative Agent in the exact form received (with any necessary endorsement).

11.2.8  <u>Deficiency</u>.  Each Obligor shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Obligations and the fees and disbursements of any attorney employed by the Administrative Agent or any other Lender Party to collect such deficiency.

**11.3.**  <u>Setoff</u>.  At any time during an Event of Default, Administrative Agent, Lenders, and any of their Affiliates are authorized, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by Administrative Agent, such Lender or such Affiliate to or for the credit or the account of an Obligor against any Obligations, irrespective of whether or not Administrative Agent, such Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of Administrative Agent, such Lender or such Affiliate different from the branch

-141-

or office holding such deposit or obligated on such indebtedness, *provided*, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of **Section 4.2.2** and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of Administrative Agent, each Lender and each such Affiliate under this Section are in addition to other rights and remedies (including other rights of setoff) that such Person may have.  NOTWITHSTANDING THE FOREGOING, NO LENDER AND NO PARTICIPANT SHALL EXERCISE ANY RIGHT OF SETOFF, BANKER'S LIEN, OR THE LIKE AGAINST ANY DEPOSIT ACCOUNT OR PROPERTY OF ANY OBLIGOR HELD OR MAINTAINED BY SUCH PERSON WITHOUT THE WRITTEN CONSENT OF THE ADMINISTRATIVE AGENT.

**11.4.**    **Remedies Cumulative; No Waiver**.

11.4.1 <u>Cumulative Rights and Remedies</u>.  All agreements, warranties, guaranties, indemnities and other undertakings of the Obligors under the Loan Documents are cumulative and not in derogation of each other.  The rights and remedies of Administrative Agent and Lenders are cumulative, may be exercised at any time and from time to time, concurrently or in any order, and are not exclusive of any other rights or remedies available by agreement, by law, at equity or otherwise.  All such rights and remedies shall continue in full force and effect until Full Payment of all Obligations.  Each Obligor acknowledges that the purpose of **Section 11.2** is, among other things, to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Secured Parties shall not be deemed commercially unreasonable solely on account of not being indicated in such clauses.

11.4.2 <u>Waivers</u>.  No waiver or course of dealing shall be established by (a) the failure or delay of Administrative Agent or any Lender to require strict performance by Borrowers with any terms of the Loan Documents, or to exercise any rights or remedies with respect to Collateral or otherwise; (b) the making of any Loan during a Default, Event of Default or other failure to satisfy any conditions precedent; or (c) acceptance by Administrative Agent or any Lender of any payment or performance by an Obligor under any Loan Documents in a manner other than that specified therein.  It is expressly acknowledged by Borrowers that any failure to satisfy a financial covenant on a measurement date shall not be cured or remedied by satisfaction of such covenant on a subsequent date.

# SECTION 12.  **ADMINISTRATIVE AGENT**

**12.1.**    **Appointment, Authority and Duties of Administrative Agent**.

12.1.1 <u>Appointment and Authority</u>.  Each Secured Party appoints and designates Lightship Capital II LLC as Administrative Agent under all Loan Documents.  Administrative

-142-

Agent may, and each Secured Party authorizes Administrative Agent to, enter into all Loan Documents to which Administrative Agent is intended to be a party and accept all Security Documents, for the benefit of Secured Parties.  Any action taken by Administrative Agent in accordance with the provisions of the Loan Documents, and the exercise by Administrative Agent of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized by and binding upon all Secured Parties.  Without limiting the generality of the foregoing, Administrative Agent shall have the sole and exclusive authority to (a) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents; (b) execute and deliver as Administrative Agent each Loan Document, including any intercreditor or subordination agreement, and accept delivery of each Loan Document; (c) to execute, deliver and perform any intercreditor agreement in respect of this Facility or the Liens granted pursuant to the Security Documents or the DIP Orders, in each case under this clause (ii) to the extent such agreement, amendment or restatement has been approved by the Required Lenders; (d) act as collateral agent for Secured Parties for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein; (e) manage, supervise or otherwise deal with Collateral; and (f) take any Enforcement Action or otherwise exercise any rights or remedies with respect to any Collateral or under any Loan Documents, Applicable Law or otherwise.  The duties of Administrative Agent are ministerial and administrative in nature only, and Administrative Agent shall not have a fiduciary relationship with any Secured Party, Participant or other Person, by reason of any Loan Document or any transaction relating thereto.

12.1.2  <u>Duties</u>.  Administrative Agent shall not have any duties except those expressly set forth in the Loan Documents.  The conferral upon Administrative Agent of any right shall not imply a duty to exercise such right, unless instructed to do so by Lenders in accordance with this Agreement.

12.1.3  <u>Agent Professionals</u>.  Administrative Agent may perform its duties through agents and employees.  Administrative Agent may consult with and employ Agent Professionals, and shall be entitled to act upon, and shall be fully protected in any action taken in good faith reliance upon, any advice given by an Agent Professional.  Administrative Agent shall not be responsible for the negligence or misconduct of any agents, employees or Agent Professionals selected by it with reasonable care.

12.1.4  <u>Instructions of Required Lenders</u>.  The rights and remedies conferred upon Administrative Agent under the Loan Documents may be exercised without the necessity of joinder of any other party, unless required by Applicable Law.  In determining compliance with a condition for any action hereunder, including satisfaction of any condition in **Section 6**, Administrative Agent may presume that the condition is satisfactory to a Secured Party unless Administrative Agent has received notice to the contrary from such Secured Party before Administrative Agent takes the action.  Administrative Agent may request instructions from Required Lenders or other Secured Parties with respect to any act (including the failure to act) in connection with any Loan Documents or Collateral, and may seek assurances to its satisfaction from Secured Parties of their indemnification obligations against Claims that could be incurred by Administrative Agent.  Administrative Agent may refrain from any act until it has received

-143-

such instructions or assurances, and shall not incur liability to any Person by reason of so refraining. Instructions of Required Lenders shall be binding upon all Secured Parties, and no Secured Party shall have any right of action whatsoever against Administrative Agent as a result of Administrative Agent acting or refraining from acting pursuant to instructions of Required Lenders. Notwithstanding the foregoing, instructions by and consent of specific parties shall be required to the extent provided in **Section 14.1.1**. In no event shall Administrative Agent be required to take any action that, in its opinion, is contrary to Applicable Law or any Loan Documents or could subject any Agent Indemnitee to personal liability or violate or conflict with the terms of the Intercreditor Agreement (as the terms thereof may be modified by the DIP Orders). In any case, where the consent of the Administrative Agent is expressly required under this Agreement, the other Loan Documents or the DIP Orders, the withholding or giving of such consent may be conditioned by the Administrative Agent upon the receipt of the approval of the Required Lenders, and the Administrative Agent shall be fully protected and not liable to the Lenders or any other Person in relying upon such approval or failing to act in the absence of such approval.

**12.2.**     **Agreements Regarding Collateral and Borrower Materials**.

        12.2.1 Lien Releases; Care of Collateral. Secured Parties authorize Administrative Agent to, and Administrative Agent shall, (1) release any Lien with respect to any Collateral (a) upon Full Payment of the Obligations; (b) that is the subject of a Permitted Asset Disposition to a Person that is not an Obligor (and Administrative Agent may request that the Obligors certify that such disposition is a Permitted Asset Disposition and may rely conclusively on any such certificate without further inquiry); (c) subject to **Section 14.1**, with the consent of Required Lenders; and (d) if the Collateral subject to such Lien is owned by an Obligor, upon release of such Obligor from its obligations under the Loan Documents pursuant to the following clause (2) and (2) upon request of an Obligor, release any Obligor from its obligations under the Loan Documents if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents. Secured Parties authorize Administrative Agent to subordinate its Liens to any Purchase Money Lien or other Permitted Lien expressly entitled to priority hereunder or the Liens securing the Prepetition Senior Loan Agreement to the extent contemplated in the Intercreditor Agreement. Administrative Agent shall have no obligation to assure that any Collateral exists or is owned by an Obligor, or is cared for, protected or insured, nor to assure that Administrative Agent's Liens have been properly created, perfected or enforced, or are entitled to any particular priority, nor to exercise any duty of care with respect to any Collateral. Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this **Section 12.2.1**. If any Collateral is disposed pursuant to a Permitted Asset Disposition to any Person other than an Obligor, such Collateral shall be sold free and clear of the Liens created by the Loan Documents and the Administrative Agent shall, at the expense of the Obligors, take any and all actions reasonably requested by the Obligors to effect the foregoing (*provided*, that if requested by the Administrative Agent the Obligors shall provide a certification that such disposition is permitted by this Agreement).

12.2.2 <u>Possession of Collateral</u>.   Administrative Agent and Secured Parties appoint each Lender as agent (for the benefit of Secured Parties) for the purpose of perfecting Liens in any Collateral held or controlled by such Lender, to the extent such Liens are perfected by possession or control.  If any Lender obtains possession or control of any Collateral, it shall notify Administrative Agent thereof and, promptly upon Administrative Agent's request, deliver such Collateral to Administrative Agent or otherwise deal with it in accordance with Administrative Agent's instructions.

12.2.3 <u>Reports</u>.  Administrative Agent shall promptly provide to Lenders, when complete, any field audit or examination report prepared for Administrative Agent with respect to any Obligor or Collateral ("<u>Report</u>").   Reports and other Borrower Materials may be made available to Lenders by providing access to them on the Platform, but Administrative Agent shall not be responsible for system failures or access issues that may occur from time to time.  Each Lender agrees (a) that Reports are not intended to be comprehensive audits or examinations, and that Administrative Agent or any other Person performing an audit or examination will inspect only specific information regarding the Obligations or Collateral and will rely significantly upon Borrowers' books, records and representations; (b) that Administrative Agent makes no representation or warranty as to the accuracy or completeness of any Borrower Materials and shall not be liable for any information contained in or omitted from any Borrower Materials, including any Report; and (c) to keep all Borrower Materials confidential and strictly for such Lender's internal use, not to distribute any Report or other Borrower Materials (or the contents thereof) to any Person (except to such Lender's Participants, attorneys and accountants provided such Persons are informed of the confidential nature of such Reports and Borrower Materials and instructed to keep them confidential and strictly for such Lender's use), and to use all Borrower Materials solely for administration of the Obligations.  Each Lender shall indemnify and hold harmless Administrative Agent and any other Person preparing a Report from any action such Lender may take as a result of or any conclusion it may draw from any Borrower Materials, as well as from any Claims arising as a direct or indirect result of Administrative Agent furnishing same to such Lender, via the Platform or otherwise.

**12.3.   Reliance By Administrative Agent**.  Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any certification, notice or other communication (including those by telephone, telex, telegram, telecopy or e-mail) believed by it to be genuine and correct and to have been signed, sent or made by the proper Person except to the extent such reliance is the result of the gross negligence or willful misconduct of the Administrative Agent.  Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon except to the extent such reliance is the result of the gross negligence or willful misconduct of the Administrative Agent.   In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any

-145-

such counsel, accountants or experts.   Administrative Agent shall have a reasonable and practicable amount of time to act upon any instruction, notice or other communication under any Loan Document, and shall not be liable for any delay in acting.

**12.4.   Action Upon Default**.   Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default, or of any failure to satisfy any conditions in **Section 6**, unless it has received written notice from a Borrower or Required Lenders specifying the occurrence and nature thereof.  If any Lender acquires knowledge of a Default, Event of Default or failure of such conditions, it shall promptly notify Administrative Agent and the other Lenders thereof in writing.  Each Secured Party agrees that, except as otherwise expressly provided in any Loan Documents or with the written consent of Administrative Agent and Required Lenders, it will not take any Enforcement Action, accelerate Obligations, or exercise any right that it might otherwise have under Applicable Law to credit bid at foreclosure sales, UCC sales or other dispositions of Collateral, or to assert any rights relating to any Collateral.

**12.5.   Ratable Sharing**.   If any Lender obtains any payment or reduction of any Obligation, whether through set-off or otherwise, in excess of its share of such Obligation, determined on a Pro Rata basis or in accordance with **Section 5.6.2**, as applicable, such Lender shall forthwith purchase from Administrative Agent and the other Lenders such participations in the affected Obligation as are necessary to share the excess payment or reduction on a Pro Rata basis or in accordance with Section **5.6.2**, as applicable.  If any of such payment or reduction is thereafter recovered from the purchasing Lender, the purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest.  Notwithstanding the foregoing, if a Defaulting Lender obtains a payment or reduction of any Obligation, it shall immediately turn over the amount thereof to Administrative Agent for application under **Section 4.2.2** and it shall provide a written statement to Administrative Agent describing the Obligation affected by such payment or reduction.  No Lender shall set off against any Dominion Account without Administrative Agent's prior consent.

**12.6.   Indemnification**.   EACH LENDER SHALL INDEMNIFY AND HOLD HARMLESS AGENT INDEMNITEES, TO THE EXTENT NOT REIMBURSED BY OBLIGORS, ON A PRO RATA BASIS, AGAINST ALL CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY SUCH AGENT INDEMNITEE, PROVIDED, THAT ANY CLAIM AGAINST AN AGENT INDEMNITEE RELATES TO OR ARISES FROM ITS ACTING AS OR FOR ADMINISTRATIVE AGENT (IN THE CAPACITY OF AGENT).  In no event shall any Lender have any obligation hereunder to indemnify or hold harmless an Agent Indemnitee with respect to a Claim that is determined in a final, non-appealable judgment by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Agent Indemnitee.  In Administrative Agent's discretion, it may reserve for any Claims made against an Agent Indemnitee, and may satisfy any judgment, order or settlement relating thereto, from proceeds of Collateral prior to making any distribution of Collateral proceeds to Secured Parties.  If Administrative Agent is sued by any receiver, trustee or other Person for any alleged preference or fraudulent transfer, then any monies paid by Administrative Agent in settlement or satisfaction of such proceeding, together with all interest,

-146-

costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to Administrative Agent by each Lender to the extent of its Pro Rata share.

**12.7.   Limitation on Responsibilities of Administrative Agent**.  Administrative Agent shall not be liable to any Secured Party for any action taken or omitted to be taken under the Loan Documents, except for losses to the extent caused by Administrative Agent's gross negligence or willful misconduct.  Administrative Agent does not assume any responsibility for any failure or delay in performance or any breach by any Obligor, Lender or other Secured Party of any obligations under the Loan Documents.  Administrative Agent does not make any express or implied representation, warranty or guarantee to Secured Parties with respect to any Obligations, Collateral, Loan Documents or Obligor.  No Agent Indemnitee shall be responsible to Secured Parties for any recitals, statements, information, representations or warranties contained in any Loan Documents or Borrower Materials; the execution, validity, genuineness, effectiveness or enforceability of any Loan Documents; the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; the validity, enforceability or collectability of any Obligations; or the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of any Obligor or Account Debtor.  No Agent Indemnitee shall have any obligation to any Secured Party to ascertain or inquire into the existence of any Default or Event of Default, the observance by any Obligor of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Documents.

**12.8.   Successor Agent and Co-Agents**.

  12.8.1   Resignation; Successor Agent.  The Administrative Agent may (x) resign at any time by giving at least 5 days written notice thereof to Lenders and Borrowers (or such shorter time period as agreed to by the Required Lenders) and/or (y) be removed by the Required Lenders on not less than 30 days' prior written notice.  Upon receipt of such notice, Required Lenders shall have the right to appoint a successor Administrative Agent which shall be (a) a Lender or an Affiliate of a Lender; or (b) a financial institution reasonably acceptable to Required Lenders.  If no successor agent is appointed prior to the effective date of Administrative Agent's resignation, then Administrative Agent may (but shall not be obligated to) appoint a successor agent that is a financial institution acceptable to it, which shall be a Lender unless no Lender accepts the role.  Whether or not a successor has been appointed, such resignation shall become effective.  Upon acceptance by a successor Administrative Agent of its appointment hereunder, such successor Administrative Agent shall thereupon succeed to and become vested with all the powers and duties of the retiring Administrative Agent without further act, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder but shall continue to have the benefits of the indemnification set forth in **Sections 12.6** and **14.2**.  Notwithstanding any Administrative Agent's resignation, the provisions of this **Section 12** shall continue in effect for its benefit with respect to any actions taken or omitted to be taken by it while Administrative Agent.  The resigning Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Secured Parties under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such

-147-

collateral security until such time as a successor Administrative Agent is appointed) and except for any indemnity payments or other amounts then owed to the resigning Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.  Any successor to Lightship Capital II LLC by merger or acquisition of stock or this loan shall continue to be Administrative Agent hereunder without further act on the part of any Secured Party or Obligor.

12.8.2  Co-Collateral Agent.  If necessary or appropriate under Applicable Law, Administrative Agent may appoint a Person to serve as a co-collateral agent or separate collateral agent under any Loan Document.  Each right and remedy intended to be available to Administrative Agent under the Loan Document shall also be vested in such agent.  Secured Parties shall execute and deliver any instrument or agreement that Administrative Agent may request to effect such appointment.  If the agent shall die, dissolve, become incapable of acting, resign or be removed, then all the rights and remedies of such agent, to the extent permitted by Applicable Law, shall vest in and be exercised by Administrative Agent until appointment of a new agent.

12.8.3  Delegation of Duties.  Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory provisions of this **Section 12** shall apply to any such sub-agent and to the Affiliates of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

**12.9.   Non-Reliance on the Administrative Agent and the Other Lenders**.   Each Lender expressly acknowledges that neither the Administrative Agent nor the Arranger has made any representation or warranty to it, and that no act by the Administrative Agent hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of any Obligor of any Affiliate thereof, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender as to any matter, including whether the Administrative Agent has disclosed material information in its (or its Related Parties') possession. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent, the Arranger, any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis of, appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors and their Subsidiaries, and all applicable bank or other regulatory laws relating to the transactions contemplated hereby, and made its own

-148-

decision to enter into, or consent to, this Agreement and the other Loan Documents and to extend credit to the Borrower hereunder. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, the Arranger any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Obligors. Each Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility and (ii) it is engaged in making, acquiring or holding commercial loans in the ordinary course and is entering into this Agreement as a Lender for the purpose of making, acquiring or holding commercial loans and providing other facilities set forth herein as may be applicable to such Lender, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender agrees not to assert a claim in contravention of the foregoing. Each Lender represents and warrants that it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.

### 12.10.  <u>Remittance of Payments and Collections</u>.

12.10.1     <u>Remittances Generally</u>.     All payments by any Lender to Administrative Agent shall be made by the time and on the day set forth in this Agreement, in immediately available funds. If no time for payment is specified or if payment is due on demand by Administrative Agent and request for payment is made by Administrative Agent by 11:00 a.m. on a Business Day, payment shall be made by Lender not later than 2:00 p.m. on such day, and if request is made after 11:00 a.m., then payment shall be made by 11:00 a.m. on the next Business Day. Payment by Administrative Agent to any Secured Party shall be made by wire transfer, in the type of funds received by Administrative Agent. Any such payment shall be subject to Administrative Agent's right of offset for any amounts due from such payee under the Loan Documents.

12.10.2     <u>Failure to Pay</u>. If any Secured Party fails to pay any amount when due by it to Administrative Agent pursuant to the terms hereof, such amount shall bear interest, from the due date until paid in full, at the rate determined by Administrative Agent as customary for interbank compensation for two Business Days and thereafter at the Default Rate for Base Rate Loans. In no event shall Borrowers be entitled to receive credit for any interest paid by a Secured Party to Administrative Agent, nor shall any Defaulting Lender be entitled to interest on any amounts held by Administrative Agent pursuant to **Section 4.2**.

12.10.3     <u>Recovery of Payments</u>. If Administrative Agent pays an amount to a Secured Party in the expectation that a related payment will be received by Administrative Agent from an Obligor and such related payment is not received, then Administrative Agent may

-149-

recover such amount from the Secured Party.  If Administrative Agent determines that an amount received by it must be returned or paid to an Obligor or other Person pursuant to Applicable Law or otherwise, then, notwithstanding any other term of any Loan Document, Administrative Agent shall not be required to distribute such amount to any Secured Party.  If any amounts received and applied by Administrative Agent to any Obligations are later required to be returned by Administrative Agent pursuant to Applicable Law, each Lender shall pay to Administrative Agent, **on demand**, such Lender's Pro Rata share of the amounts required to be returned.

**12.11.  <u>Individual Capacities</u>**.  As a Lender, Lightship Capital II LLC shall have the same rights and remedies under the Loan Documents as any other Lender, and the terms "Lenders," "Required Lenders" or any similar term shall include Lightship Capital II LLC in its capacity as a Lender.  Administrative Agent, Lenders and their Affiliates may accept deposits from, lend money to, provide bank products to, act as financial or other advisor to, and generally engage in any kind of business with, Obligors and their Affiliates, as if they were not Administrative Agent or Lenders hereunder, without any duty to account therefor to any Secured Party.  In their individual capacities, Administrative Agent, Lenders and their Affiliates may receive information regarding Obligors, their Affiliates and their Account Debtors (including information subject to confidentiality obligations), and shall have no obligation to provide such information to any Secured Party.

**12.12.  [<u>Reserved</u>]**.

**12.13.  [<u>Reserved</u>]**.

**12.14.  <u>No Third Party Beneficiaries</u>**.  This **Section 12** is an agreement solely among Secured Parties and Administrative Agent, and shall survive Full Payment of the Obligations.  This **Section 12** does not confer any rights or benefits upon Borrowers or any other Person.  As between Borrowers and Administrative Agent, any action that Administrative Agent may take under any Loan Documents or with respect to any Obligations shall be conclusively presumed to have been authorized and directed by Secured Parties.

**12.15.  <u>Withholding Tax</u>**.   To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax.  If the IRS or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document

NY 78904694v1NY 78904694v7

against any amount due to the Administrative Agent under this Section.  The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the commitments and the repayment, satisfaction or discharge of all other Obligations.

**12.16.  Administrative Agent May File Proofs of Claim; Credit Bidding**.

12.16.1    Proofs of Claim.  In case of the pendency of any Insolvency Proceeding or any other judicial proceeding relative to any Obligor, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

12.16.2    Credit Bidding.  The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to take all actions and exercise all rights described in **Section 11.2**, including to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Secured Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the

-151-

United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which an Obligor is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided*, that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a) through (f) of **Section 14.1.1** of this Agreement), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the Lenders, as a result of which each of the Lenders shall be deemed to have received a pro rata portion of any Equity Interests and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

   12.16.3  <u>Exculpatory Provisions</u>.  Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent:

     (a)  shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

     (b)  shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan

-152-

Documents), *provided*, that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Bankruptcy Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Bankruptcy Law;

(c)       shall not have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, to any Lender, any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Obligors or any of their Affiliates, that is communicated to, obtained or in the possession of, the Administrative Agent or any of their Related Parties in any capacity, except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein;

(d)       shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in **Sections 11.2** and **14.1**) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction by a final and nonappealable judgment.   The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower Agent, a Lender;

(e)       shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in **Section 6** or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, but, in each case, subject at all times to the DIP Order, in the event that any controversy arises between or among any of the Secured Parties or any other Person in respect of any Collateral or proceeds thereof in the possession or control of the Administrative Agent, the Administrative Agent shall, to the extent directed by the Required Lenders, have the right to initiate proceedings in the Bankruptcy Court (or to the extent the Bankruptcy Court does not have (or abstains from exercising) jurisdiction over such matter, to any other court of competent

-153-

jurisdiction permitted under **Section 14.14**) for a declaratory judgment to determine the rights of such Secured Parties or other Persons with respect to such Collateral or any proceeds thereof. The provisions of this paragraph are in addition to and not in limitation of any right of resignation or other rights or protections afforded to the Administrative Agent pursuant to the terms of this Agreement.

**12.17.  Certain ERISA Matters**.

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower Agent or any other Obligor, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments or this Agreement,

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement,

(iii)      (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)      such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)      In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation,

-154-

warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower Agent or any other Obligor, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

**12.18. Successors By Merger, Etc**.   Any corporation or association into which the Administrative Agent may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all of its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Administrative Agent is a party, will be and become the successor the Administrative Agent a under this Agreement and will have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, without the execution or filing of any instrument or paper or the performance of any further act.

## SECTION 13.  BENEFIT OF AGREEMENT; ASSIGNMENTS

**13.1.  Successors and Assigns**.   This Agreement shall be binding upon and inure to the benefit of Borrowers, Administrative Agent, Lenders, Secured Parties, and their respective successors and assigns, except that (a) no Borrower shall have the right to assign its rights or delegate its obligations under any Loan Documents; (b) any assignment by a Lender must be made in compliance with **Section 13.3**; and (c) any assignment by the Administrative Agent of its role as such must be made in compliance with **Section 12.8**.  Administrative Agent may treat the Person which made any Loan as the owner thereof for all purposes until such Person makes an assignment in accordance with **Section 13.3**.  Any authorization or consent of a Lender shall be conclusive and binding on any subsequent transferee or assignee of such Lender.

**13.2.  Participations**.

13.2.1 Permitted Participants; Effect.  Subject to **Section 13.3.3**, any Lender may sell to a financial institution ("Participant") a participating interest in the rights and obligations of such Lender under any Loan Documents.  Despite any sale by a Lender of participating interests to a Participant, such Lender's obligations under the Loan Documents shall remain unchanged, it shall remain solely responsible to the other parties hereto for performance of such obligations, it shall remain the holder of its Loans and Commitments for all purposes, all amounts payable by Borrowers shall be determined as if it had not sold such participating interests, and Borrowers and Administrative Agent shall continue to deal solely and directly with such Lender in connection with the Loan Documents.  Each Lender shall be solely responsible for notifying its Participants of any matters under the Loan Documents, and Administrative Agent and the other Lenders shall not have any obligation or liability to any such Participant.  The Borrower agrees

-155-

that each Participant shall be entitled to the benefits of **Sections 3.7** and **5.9** (subject to the requirements and limitations of such Sections and **Section 5.10**; *provided*, that any documentation required under **Section 5.10** shall be delivered solely to the applicable participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to **Section 13.1**.   A Participant shall not be entitled to receive any greater payment under **Section 3.7** or **5.9** than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to a greater payment results from a Change in Law occurring after the sale of the participation.

13.2.2  <u>Voting Rights</u>.  Each Lender shall retain the sole right to approve, without the consent of any Participant, any amendment, waiver or other modification of a Loan Document other than that which forgives principal, interest or fees, reduces the stated interest rate or fees payable with respect to any Loan or Commitment in which such Participant has an interest, postpones the Termination Date or any date fixed for any regularly scheduled payment of principal, interest or fees on such Loan or Commitment, or releases any Borrower, Guarantor or substantially all Collateral.

13.2.3  <u>Benefit of Set-Off</u>.  Borrowers agree that each Participant shall have a right of set-off in respect of its participating interest to the same extent as if such interest were owing directly to a Lender, and each Lender shall also retain the right of set-off with respect to any participating interests sold by it.  By exercising any right of set-off, a Participant agrees to share with Lenders all amounts received through its set-off, in accordance with **Section 12.5** as if such Participant were a Lender.

13.2.4  <u>Participant Register</u>.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); *provided*, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as the Administrative Agent) shall have no responsibility for maintaining a Participant Register.

### 13.3.   **Assignments**.

13.3.1  <u>Permitted Assignments</u>.  A Lender may assign to an Eligible Assignee any of its rights and obligations under the Loan Documents, as long as (a) each assignment is of a constant, and not a varying, percentage of the transferor Lender's rights and obligations under the

-156-

Loan Documents and, in the case of a partial assignment, is in a minimum principal amount of $5,000,000 (unless otherwise agreed by Administrative Agent in its discretion) and integral multiples of $1,000,000 in excess of that amount; (b) except in the case of an assignment in whole of a Lender's rights and obligations, the aggregate amount of the Commitments retained by the transferor Lender is at least $5,000,000 (unless otherwise agreed by Administrative Agent in its discretion); and (c) the parties to each such assignment shall execute and deliver to Administrative Agent, for its acceptance and recording, an Assignment and Acceptance. Nothing herein shall limit the right of a Lender to pledge or assign any rights under the Loan Documents to secure obligations of such Lender, including a pledge or assignment to a Federal Reserve Bank; *provided*, *however*, that no such pledge or assignment shall release the Lender from its obligations hereunder nor substitute the pledge or assignee for such Lender as a party hereto.

13.3.2 <u>Effect; Effective Date</u>. Upon delivery to Administrative Agent of an assignment notice in the form of **Exhibit B** and a processing fee of $3,500 (unless otherwise agreed by Administrative Agent in its discretion), the assignment shall become effective as specified in the notice, if it complies with this **Section 13.3**. From such effective date, the Eligible Assignee shall for all purposes be a Lender under the Loan Documents, and shall have all rights and obligations of a Lender thereunder. Upon consummation of an assignment, the transferor Lender, Administrative Agent and Borrowers shall make appropriate arrangements for issuance of replacement and/or new notes, if applicable. The transferee Lender shall comply with **Section 5.10** and deliver, upon request, an administrative questionnaire satisfactory to Administrative Agent.

13.3.3 <u>Certain Assignees</u>. Without the Administrative Agent's consent, no assignment or participation may be made to a Borrower, Affiliate of a Borrower, Defaulting Lender or natural person. Any assignment by a Defaulting Lender shall be effective only upon payment by the Eligible Assignee or Defaulting Lender to Administrative Agent of an aggregate amount sufficient, upon distribution (through direct payment, purchases of participations or other compensating actions as Administrative Agent deems appropriate), to satisfy all funding and payment liabilities then owing by the Defaulting Lender hereunder. If an assignment by a Defaulting Lender shall become effective under Applicable Law for any reason without compliance with the foregoing sentence, then the assignee shall be deemed a Defaulting Lender for all purposes until such compliance occurs.

13.3.4 <u>Register</u>. Administrative Agent, acting as a non-fiduciary agent of Borrowers, shall maintain (a) a copy of each Assignment and Acceptance delivered to it, and (b) a register for recordation of the names, addresses and Commitments of, and the Loans and stated interest owing to, each Lender (the "<u>Register</u>"). Entries in the Register shall be conclusive, absent manifest error, and Borrowers, Administrative Agent and Lenders shall treat each lender recorded in such Register as a Lender for all purposes under the Loan Documents, notwithstanding any notice to the contrary. The Register shall be available for inspection by Borrowers and any Lender (but, in the case of any Lender, only with respect to its holdings (unless consented to otherwise in writing by the Administrative Agent)), from time to time upon reasonable notice.

**13.4.    Replacement of Certain Lenders**.  If (a) a Lender (i) fails to give its consent to any amendment, waiver or action for which consent of all Lenders was required and Required Lenders consented, (ii) is a Defaulting Lender, or (iii)  requests compensation under **Section 3.7**, or (b) any Borrower is required to pay additional amounts or indemnity payments with respect to a Lender under **Section 5.9**, then, in addition to any other rights and remedies that any Person may have, Administrative Agent or Borrower Agent may, by notice to such Lender within 120 days after such event, require such Lender to assign all of its rights and obligations under the Loan Documents to Eligible Assignee(s), pursuant to appropriate Assignment and Acceptance(s), within 20 days after the notice, *provided*, that (i) in the case of any such assignment resulting from a claim for compensation under Section 3.7 or payments required to be made pursuant to Section 5.9, such assignment will result in a reduction in such compensation or payments thereafter and (ii) a Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.  Administrative Agent is irrevocably appointed as attorney-in-fact to execute any such Assignment and Acceptance if the Lender fails to execute it.  Such Lender shall be entitled to receive, in cash, concurrently with such assignment, all amounts owed to it under the Loan Documents through the date of assignment.

## SECTION 14.        MISCELLANEOUS

### 14.1.    Consents, Amendments and Waivers.

14.1.1 Amendment.  No modification of any Loan Document, including any extension or amendment of a Loan Document or any waiver of a Default or Event of Default, shall be effective without the prior written agreement of Administrative Agent (with the consent of Required Lenders) and each Obligor party to such Loan Document; *provided*, *however*, that

(a)    without the prior written consent of Administrative Agent, no modification shall be effective with respect to any provision in a Loan Document that relates to any rights, duties or discretion of Administrative Agent;

(b)    [reserved];

(c)    without the prior written consent of each affected Lender, including a Defaulting Lender, no modification shall be effective that would (i) increase the Commitment of such Lender (except as provided in **Section 4.2**); (ii) reduce the amount of, or waive or delay payment of, any principal, reimbursement obligation, interest fees or other amounts payable to such Lender (except as provided in **Section 4.2** and any waiver of interest accruing at the Default Rate); (iii) extend the Commitment Termination Date, the Termination Date or the New Money Loan Commitment Termination Date; or (iv) amend this clause (c);

(d)    without the prior written consent of all Lenders (except any Defaulting Lender), no modification shall be effective that would (i) alter **Section 5.6.2**, **7.1** (except to add Collateral) or **14.1.1**; (ii) amend the definition of Pro Rata or Required Lenders, (iii) release all or

-158-

substantially all Collateral; or (iv) except in connection with a merger, disposition or similar transaction expressly permitted hereby, release any Obligor from liability for any Obligations (as measured by value not number);

(e)　　[reserved];

(f)　　[reserved]; and

(g)　　without the prior written consent of each affected Lender, including a Defaulting Lender, no modification shall be effective that would alter **Section 12.5** or **14.3.1**.

Notwithstanding anything herein to the contrary, no amendment, waiver, supplement or other modification of this Agreement or any other Loan Document that adversely affects the terms of the Settlement (as defined in the Sale Approval Order) shall be effective without the prior written consent of  (i) the Lenders and, the Borrower Agent, and (ii) the Chapter 11 Unsecured Creditors Committee,  if adversely affected thereby. The Chapter 11 Unsecured Creditors Committee shall be, and hereby is, an express third-party beneficiary of the terms and provisions of this second paragraph (but no other provision or term of this Agreement).

14.1.2  <u>Limitations</u>.  Only the consent of the parties to any agreement relating to fees shall be required for modification of such agreement.  Any waiver or consent granted by Administrative Agent or Lenders hereunder shall be effective only if in writing and only for the matter specified.  Further, notwithstanding anything to the contrary contained in this **Section 14.1**, if following the Closing Date, the Administrative Agent and any Obligor shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Obligors shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

**14.2.　Indemnity**.  Each Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Lender Related Person</u>") against, and hold each Lender Related Person harmless from, any and all losses, claims, damages, liabilities and related expenses (limited, in the case of legal fees and expenses, to the fees, charges and disbursements of one primary counsel and one local counsel in each relevant jurisdiction for all Lender Related Persons and, in the case of an actual or reasonably perceived conflict of interest, one additional primary counsel (and one additional local counsel in each relevant jurisdiction) per group of similarly situated affected parties), to the extent incurred by any Lender Related Person or asserted against any Lender Related Person by any Person (including each Borrower or any other Obligor) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case

-159-

of the Administrative Agent (and any sub agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in **Section 5.9**), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by Holdings or any of its Subsidiaries, or any Environmental Liability related in any way to Holdings or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, in all cases, whether based on contract, tort or any other theory, whether brought by a third party or by a Borrower or any other Obligor, and regardless of whether any Lender Related Person is a party thereto, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE LENDER RELATED PERSON; *provided*, that such indemnity shall not, as to any Lender Related Person, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Lender Related Person or (y) other than in the case of the Administrative Agent or any of its Related Parties, result from a claim brought by a Borrower or any other Obligor against a Lender Related Person for a material breach of such Lender Related Person's obligations hereunder or under any other Loan Document, if such Borrower or such Obligor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  Without limiting the provisions of **Section 5.9.2**, this **Section 14.2** shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

      **14.3.**   **Notices and Communications**.

      14.3.1 <u>Notice Address</u>.    Subject to **Section 4.1.3**, all notices and other communications by or to a party hereto shall be in writing and shall be given to any Borrower, at Borrower Agent's address shown on the signature pages hereof, and to any other Person at its address shown on the signature pages hereof (or, in the case of a Person who becomes a Lender after the Closing Date, at the address shown on its Assignment and Acceptance), or at such other address as a party may hereafter specify by notice in accordance with this **Section 14.3**.  Each communication shall be effective only (a) if given by facsimile transmission, when transmitted to the applicable facsimile number, if confirmation of receipt is received; (b) if given by mail, three Business Days after deposit in the U.S. mail, with first-class postage pre-paid, addressed to the applicable address; or (c) if given by personal delivery, when duly delivered to the notice address with receipt acknowledged.  Notwithstanding the foregoing, no notice to Administrative Agent pursuant to **Sections 2.1.4**, **3.1.2**, or **4.1.1** shall be effective until actually received by the individual to whose attention at Administrative Agent such notice is required to be sent.  Any written communication that is not sent in conformity with the foregoing provisions shall nevertheless be effective on the date actually received by the noticed party.  Any notice received by Borrower Agent shall be deemed received by all Borrowers.

      14.3.2 <u>Communications</u>.    Electronic communications (including e-mail, messaging and websites) may be used only in a manner acceptable to Administrative Agent and

only for routine communications, such as delivery of Borrower Materials, administrative matters, distribution of Loan Documents and matters permitted under **Section 4.1.3**.  Secured Parties make no assurance as to the privacy or security of electronic communications.  E-mail and voice mail shall not be effective notices under the Loan Documents.

14.3.3 <u>Platform</u>.  Borrower Materials shall be delivered pursuant to procedures approved by Administrative Agent, including via e-mail and other electronic delivery (if possible) upon request by Administrative Agent to an electronic system maintained by Administrative Agent ("<u>Platform</u>").  Borrowers shall notify Administrative Agent of each posting of Borrower Materials on the Platform and the materials shall be deemed received by Administrative Agent only upon its receipt of such notice.  Borrower Materials and other information relating to this credit facility may be made available to Lenders on the Platform.  The Platform is provided "as is" and "as available."  Administrative Agent does not warrant the accuracy or completeness of any information on the Platform nor the adequacy or functioning of the Platform, and expressly disclaims liability for any errors or omissions in the Borrower Materials or any issues involving the Platform.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ADMINISTRATIVE AGENT WITH RESPECT TO BORROWER MATERIALS OR THE PLATFORM.  Lenders acknowledge that Borrower Materials may include material non-public information of Obligors and should not be made available to any personnel who do not wish to receive such information or who may be engaged in investment or other market-related activities with respect to any Obligor's securities.   No Agent Indemnitee shall have any liability to Borrowers, Lenders or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) relating to use by any Person of the Platform or delivery of Borrower Materials, notices and other information through the Platform, any other electronic platform or electronic messaging service, or through the Internet.

14.3.4 <u>Public Information</u>.   Obligors and Secured Parties acknowledge that "public" information may not be segregated from material non-public information on the Platform.  Secured Parties acknowledge that Borrower Materials may include Obligors' material non-public information, and should not be made available to personnel who do not wish to receive such information or may be engaged in investment or other market-related activities with respect to an Obligor's securities.

14.3.5 <u>Non-Conforming Communications</u>.  Administrative Agent and Lenders may rely upon any communications purportedly given by or on behalf of any Borrower even if they were not made in a manner specified herein, were incomplete or were not confirmed, or if the terms thereof, as understood by the recipient, varied from a later confirmation.  Each Borrower shall indemnify and hold harmless each Indemnitee from any liabilities, losses, costs and expenses arising from any electronic or telephonic communication purportedly given by or on behalf of a Borrower.

NY 78904694v1NY 78904694v7

14.3.6  <u>Electronic Mail</u>.  Notwithstanding the foregoing, the parties hereto agree that (i) if an Agent requires or seeks consent and/or direction of any Lender in connection with exercising any of its rights or powers, or otherwise taking any action, under this Agreement or any other Loan Document (including in connection with providing any consent or waiver that this Agreement or such other Loan Document expressly permits such Agent to provide), such Agent shall be entitled to rely on any such consent and/or direction delivered to it by electronic mail ("e-mail") by or on behalf of the applicable Lender (including by any investment advisor, manager or similar Person holding itself out as authorized to act on behalf of such Lender or by any counsel thereto or to such Lender) and (ii) with respect to any provision of this Agreement or any other Loan Document that permits any date by which any Obligor is required to comply with any obligation hereunder (including any date set forth on **Schedule 10.1.13**) or under such other Loan Document to be extended with the consent and/or at the direction of one or more of the Lenders, each Lender shall be permitted to provide its consent and/or direction via its counsel and, in such case, such consent and/or direction shall be deemed to have been validly provided to the extent that such counsel confirms the same by electronic mail ("e-mail") to the Borrower's counsel (it being agreed that, in connection with delivering such e-mail, such counsel shall be permitted to rely on any corresponding consent or direction delivered to such counsel by or on behalf of the applicable Lender (including by any investment advisor, manager or similar entity holding itself out as authorized to act on behalf of such Lender)).

**14.4.**  **Performance of Borrowers' Obligations**.  Administrative Agent may, in its discretion at any time and from time to time, at Borrowers' expense, pay any amount or do any act required of a Borrower under any Loan Documents or otherwise lawfully requested by Administrative Agent to (a) enforce any Loan Documents or collect any Obligations; (b) protect, insure, maintain or realize upon any Collateral; or (c) defend or maintain the validity or priority of Administrative Agent's Liens in any Collateral, including any payment of a judgment, insurance premium, warehouse charge, finishing or processing charge, or landlord claim, or any discharge of a Lien.  All payments, costs and expenses (including Extraordinary Expenses) of Administrative Agent under this Section shall be reimbursed to Administrative Agent by Borrowers, within 10 Business Days after demand, with interest from the date incurred until paid in full, at the Default Rate applicable to Base Rate Loans.  Any payment made or action taken by Administrative Agent under this Section shall be without prejudice to any right to assert an Event of Default or to exercise any other rights or remedies under the Loan Documents.

**14.5.**  **Credit Inquiries**.  Administrative Agent and Lenders may (but shall have no obligation) to respond to usual and customary credit inquiries from third parties concerning any Obligor or Subsidiary.

**14.6.**  **Severability**.  Wherever possible, each provision of the Loan Documents shall be interpreted in such manner as to be valid under Applicable Law.  If any provision is found to be invalid under Applicable Law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of the Loan Documents shall remain in full force and effect.

**14.7.**  **Cumulative Effect; Conflict of Terms**.  The provisions of the Loan Documents are cumulative.  The parties acknowledge that the Loan Documents may use several limitations

NY 78904694v1NY 78904694v7

or measurements to regulate similar matters, and they agree that these are cumulative and that each must be performed as provided.  Except as otherwise provided in another Loan Document (by specific reference to the applicable provision of this Agreement), if any provision contained herein is in direct conflict with any provision in another Loan Document, the provision herein shall govern and control.

**14.8.  Counterparts; Execution**.    Any Loan Document may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement shall become effective when Administrative Agent has received counterparts bearing the signatures of all parties hereto.    The words "execute," "execution," "signed," "signature," and words of like import in or related to any document to be signed in connection with this Agreement and the transactions contemplated hereby (including without limitation Assignment and Acceptances, amendments or other modifications, Notices of Borrowing, waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; *provided*, that notwithstanding anything contained herein to the contrary the Administrative Agent is under no obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent pursuant to procedures approved by it.

**14.9.   Entire Agreement**.  Time is of the essence with respect to all Loan Documents and Obligations.  The Loan Documents constitute the entire agreement, and supersede all prior understandings and agreements, among the parties relating to the subject matter thereof.

**14.10. Relationship with Lenders**.    The obligations of each Lender hereunder are several, and no Lender shall be responsible for the obligations or Commitments of any other Lender.  Amounts payable hereunder to each Lender shall be a separate and independent debt.  It shall not be necessary for Administrative Agent or any other Lender to be joined as an additional party in any proceeding for such purposes.    Nothing in this Agreement and no action of Administrative Agent, Lenders or any other Secured Party pursuant to the Loan Documents or otherwise shall be deemed to constitute Administrative Agent and any Secured Party to be a partnership, joint venture or similar arrangement, nor to constitute control of any Obligor.

**14.11. No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated by any Loan Document, Borrowers acknowledge and agree that (a)(i) this credit facility and any related arranging or other services by Administrative Agent, any Lender, any of their Affiliates or any arranger are arm's-length commercial transactions between Borrowers and such Person; (ii) Borrowers have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate; and (iii) Borrowers are capable of evaluating, and understand and accept, the terms, risks and conditions of the

-163-

transactions contemplated by the Loan Documents; (b) each of Administrative Agent, Lenders, their Affiliates and any arranger is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Borrowers, any of their Affiliates or any other Person, and has no obligation with respect to the transactions contemplated by the Loan Documents except as expressly set forth therein; and (c) Administrative Agent, Lenders, their Affiliates and any arranger may be engaged in a broad range of transactions that involve interests that differ from those of Borrowers and their Affiliates, and have no obligation to disclose any of such interests to Borrowers or their Affiliates.  To the fullest extent permitted by Applicable Law, each Borrower hereby waives and releases any claims that it may have against Administrative Agent, Lenders, their Affiliates and any arranger with respect to any breach of agency or fiduciary duty in connection with any transaction contemplated by a Loan Document.

**14.12.  Confidentiality**.  Each of Administrative Agent and Lenders shall maintain the confidentiality of all Information (as defined below), except that Information may be disclosed (a) to its Affiliates, and to its and their partners, directors, officers, employees, agents, advisors and representatives (*provided* such Persons are informed of the confidential nature of the Information and instructed to keep it confidential); (b) to the extent requested by any governmental, regulatory or self-regulatory authority purporting to have jurisdiction over it or its Affiliates; (c) to the extent required by Applicable Law or by any subpoena or other legal process; (d) to any other party hereto; (e) in connection with any action or proceeding relating to any Loan Documents or Obligations; (f) subject to an agreement containing provisions substantially the same as this Section, to any Transferee or any actual or prospective party (or its advisors) to any bank product; (g) with the consent of Borrower Agent; or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) is available to Administrative Agent, any Lender or any of their Affiliates on a nonconfidential basis from a source other than Borrowers.  Notwithstanding the foregoing, Administrative Agent and Lenders may publish or disseminate general information concerning this credit facility for league table, tombstone and advertising purposes, and may use Borrowers' logos, trademarks or product photographs in advertising materials.  As used herein, "Information" means all information received from an Obligor or Subsidiary relating to it or its business.  Any Person required to maintain the confidentiality of Information pursuant to this Section shall be deemed to have complied if it exercises a degree of care similar to that which it accords its own confidential information.  Each of Administrative Agent and Lenders acknowledges that (i) Information may include material non-public information; (ii) it has developed compliance procedures regarding the use of material non-public information; and (iii) it will handle such material non-public information in accordance with Applicable Law.

**14.13.  GOVERNING LAW**.  **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, UNLESS OTHERWISE SPECIFIED, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO CONFLICT OF LAW PRINCIPLES TO THE EXTENT SUCH PRINCIPLES WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

-164-

**14.14.  Consent to Forum.  EACH BORROWER HEREBY CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, SOLELY TO THE EXTENT THAT THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM EXERCISING) JURISDICTION OVER ANY MATTER, ANY STATE COURT SITTING IN THE CITY OF NEW YORK IN THE BOROUGH OF MANHATTAN OR THE UNITED STATES DISTRICT COURT IN THE SOUTHERN DISTRICT OF NEW YORK IN THE BOROUGH OF MANHATTAN, IN ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING RELATING IN ANY WAY TO ANY LOAN DOCUMENTS, AND AGREES THAT ANY DISPUTE, ACTION, LITIGATION OR OTHER PROCEEDING SHALL BE BROUGHT BY IT SOLELY IN ANY SUCH COURT.  EACH BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVES ALL CLAIMS, OBJECTIONS AND DEFENSES THAT IT MAY HAVE REGARDING ANY SUCH COURT'S PERSONAL OR SUBJECT MATTER JURISDICTION, VENUE OR INCONVENIENT FORUM.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 14.3.1.  A final judgment in any proceeding of any such court shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or any other manner provided by Applicable Law.**

14.15.  **Waivers by Borrowers**.  To the fullest extent permitted by Applicable Law, each Borrower waives (a) the right to trial by jury (which Administrative Agent and each Lender hereby also waives) in any proceeding or dispute of any kind relating in any way to any Loan Documents, Obligations or Collateral; (b) presentment, demand, protest, notice of presentment, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any commercial paper, accounts, documents, instruments, chattel paper and guaranties at any time held by Administrative Agent on which a Borrower may in any way be liable, and hereby ratifies anything Administrative Agent may do in this regard; (c) notice prior to taking possession or control of any Collateral; (d) any bond or security that might be required by a court prior to allowing Administrative Agent to exercise any rights or remedies; (e) the benefit of all valuation, appraisement and exemption laws; (f) any claim against Administrative Agent or any Lender, on any theory of liability, for special, indirect, consequential, exemplary or punitive damages (as opposed to direct or actual damages) in any way relating to any Enforcement Action, Obligations, Loan Documents or transactions relating thereto; and (g) notice of acceptance hereof.  Each Borrower acknowledges that the foregoing waivers are a material inducement to Administrative Agent and Lenders entering into this Agreement and that they are relying upon the foregoing in their dealings with Borrowers.  Each Borrower has reviewed the foregoing waivers with its legal counsel and has knowingly and voluntarily waived its jury trial and other rights following consultation with legal counsel.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

14.16.  **Patriot Act Notice**.  Administrative Agent and Lenders hereby notify Borrowers that pursuant to the Patriot Act, Administrative Agent and Lenders are required to obtain, verify and record information that identifies each Borrower, including its legal name, address, tax ID number and other information that will allow Administrative Agent and Lenders to identify it in

-165-

accordance with the Patriot Act.  Administrative Agent and Lenders will also require information regarding each guarantor, if any, and may require information regarding Borrowers' management and owners, such as legal name, address, social security number and date of birth.  Borrowers shall, promptly upon request, provide all documentation and other information as Administrative Agent or any Lender may request from time to time in order to comply with any obligations under any "know your customer," anti-money laundering or other requirements of Applicable Law.

**14.17.  <u>NO ORAL AGREEMENT</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.  THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES**.

**14.18.  <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>**.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)  the application of any Write-Down and Conversion Powers by an Affected Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)  the effects of any Bail-In Action on any such liability, including, if applicable:

(i)  a reduction in full or in part or cancellation of any such liability;

(ii)  a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)  the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any Affected Resolution Authority.

**14.19.  <u>DIP Orders</u>**.  The Obligors, the Administrative Agent and the Lenders hereby expressly agree that, in the event of any conflict or inconsistency between this Agreement (or any

NY 78904694v1NY 78904694v7

other Loan Document), on the one hand, and any DIP Order, on the other hand, the DIP Order then in effect shall control. Notwithstanding anything to the contrary herein, the provisions of this Agreement are subject to the terms, covenants, conditions and provisions of, the DIP Orders, as applicable. This Agreement is subject in all respects (including with respect to all obligations and agreements of the Obligors provided for hereunder) to the terms of the Interim DIP Order (and, when applicable, the Final DIP Order) and, notwithstanding anything in the foregoing, the Obligors shall not be required to undertake any obligation, make any agreement or take any action that is prohibited by the terms of the Interim DIP Order (and, when applicable, the Final DIP Order).

**14.20. <u>Acknowledgment Regarding any Supported QFCs</u>**. To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States).

(a)        In the event a Covered Entity that is party to a Supported QFC (each, a "<u>Covered Party</u>") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)        As used in this **Section 14.20**, the following terms have the following meanings:

"<u>BHC Act Affiliate</u>" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

NY 78904694v1NY 78904694v7

"Covered Entity" means any of the following:

i.      a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

ii.      a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

iii.      a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 381.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

*[Remainder of page intentionally left blank]*

-168-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**STRIKE, LLC**

By: _____

 Name:

 Title:

**STRIKE HOLDCO, LLC**

By: _____

 Name:

 Title:

**DELTA DIRECTIONAL DRILLING, LLC**

By: _____

 Name:

 Title:

**STRIKE GLOBAL HOLDINGS, LLC**

By: _____

 Name:

 Title:

**CROSSFIRE, LLC**


By: _____

 Name:

 Title:

**CAPSTONE INFRASTRUCTURE
SERVICES, LLC**

By: _____

Name:

Title:

[DIP Loan and Security Agreement]

**LIGHTSHIP CAPITAL II LLC, as Administrative Agent**

By:_____

Name:

Title:

**LIGHTSHIP CAPITAL II LLC, as Lender**

By:_____

Name:

Title:

**Schedule 10.1.13**

**Milestones**

(a)     On or before the date that is twenty-one (21) calendar days following the Petition Date, the Sale Procedures Order shall have been entered by the Bankruptcy Court;

(b)     On or before the date that is thirty-five (35) calendar days following the Petition Date, the Final DIP Order shall have been entered by the Bankruptcy Court;

(c)     On or before the date that is forty-nine (49) calendar days following the Petition Date, the deadline for the submission of final qualified bids in connection with the Sale Process shall have occurred;

(d)     On or before the date that is fifty-one (51) calendar days following the Petition Date, the Sale Auction (if required in accordance with the Sale Procedures) shall have occurred;

(e)     On or before the date that is fifty-two (52) calendar days following the Petition Date, the Sale Approval Order shall have been entered by the Bankruptcy Court; and

(f)     On or before the date that is sixty-six (66) calendar days following the Petition Date, the Sale Transaction shall have been consummated.

**Schedule 2**

<u>Amendments to Stalking Horse Agreement</u>

**Schedule 2**

Modifications to Stalking Horse Agreement

The Stalking Horse Agreement shall be amended as follows:

1.      Section 1.1(j) of the Stalking Horse Agreement shall be amended and restated in its entirety to read as follows:

"(j)      (i) all claims and causes of action that may be asserted by such Seller or its estate against any Designated Party, including all of the Specified Avoidance Actions, and (ii) all rights (including lien rights), claims (including commercial tort claims), settlement proceeds, causes of action, choses in action, rights of recovery, rights of recoupment, rights of set off, equity rights and defenses that may be asserted by such Seller or its estate relating to the Business, any of the Purchased Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to, any of the Assigned Contracts) or any of the Assumed Liabilities, including all rights under vendors', manufacturers' and contractors' representations, warranties, indemnities and guarantees (clauses (i) and (ii) of this Section 1.1(j), the "Purchased Claims"); provided, however, and notwithstanding anything in clauses 1.1(j)(i) and 1.1(j)(ii) to the contrary, that (A) Purchased Claims shall not include any claims and causes of action that may be asserted by such Seller or its estate against any director, officer or equity holder of the Sellers or their related persons (in each case, other than a current officer or employee of any of the Sellers or any Transferred Employee) and (B) all Specified Avoidance Actions shall be waived effective as of the Closing Date by execution of the Waiver;"

2.      Section 1.1(k) of the Stalking Horse Agreement shall be amended and restated in its entirety to read as follows:

"(k)      [Intentionally Deleted];"

3.      Section 1.2 of the Stalking Horse Agreement shall be further amended by (i) deleting the "and" at the end of Section 1.2(i), (ii) deleting the period at the end of Section 1.2(j) and inserting "; and" in lieu thereof, and (iii) adding a new Section 1.2(k) to read as follows:

"(k)      all claims and causes of action (including Avoidance Actions) that may be asserted by such Seller or its estate, including all claims and causes of action that may be asserted by such Seller or its estate against any director, officer or equity holder of the Sellers or their related persons (in each case, other than a current officer or employee of any of the Sellers or any Transferred Employee), but excluding (i) all Purchased Claims, including all Specified Avoidance Actions, and (ii) without limiting the definition of "Purchased Claims," any claims or causes of action listed or described in any of clauses (a), (d), (i), (l), (m) and (t) of Section 1.1."

4.      Section 1.3(c) of the Stalking Horse Agreement shall be amended and restated in its entirety to read as follows:

"(c)    all Liabilities for trade accounts payable (excluding any Taxes) that are incurred in the Ordinary Course of Business after the Petition Date and at or prior to the Closing and have not been paid on or prior to the Closing Date; provided, however, that the Liabilities described in this Section 1.3(c) shall not include (i) any fees or expenses due to professional persons retained by any Seller or any other Person involved in the Chapter 11 Cases, including any creditors' committee, (ii) any claims arising after the commencement of the Chapter 11 Cases that are provided to any Person in exchange for, on account of, or in connection with any claims that arose prior to the commencement of the Chapter 11 Cases, (iii) without limitation to Section 1.3(b), Cure Costs with respect to any of the Assigned Contracts, and (iv) wages, salaries and other compensation for any employee of any of the Sellers (but without limitation of Sections 1.3(e), (f), (g) and (l) and Article VI);"

5.      Section 8.2 of the Stalking Horse Agreement shall be amended by adding the following as subsection (d):

"(d)    The Purchaser shall provide commercially reasonable access to any relevant documents or information or personnel (so long as not disruptive to business operations) reasonably requested by the litigation trustee (the "Litigation Trustee") appointed pursuant to a liquidating chapter 11 plan of the Sellers related to claims and causes of action of the Sellers (the "Litigation Claims") assigned to the Litigation Trustee and the reconciliation of claims against the Sellers' estates. The Purchaser shall preserve, for the benefit of the Litigation Trustee, all records and documents (including all electronic records or documents) related to the Litigation Claims until such time as the Litigation Trustee notifies Purchaser in writing that such records are no longer required to be preserved, or all necessary and available records and documents have been provided to the Litigation Trustee."

6.      Section 8.14(a) of the Stalking Horse Agreement shall be amended and restated in its entirety to read as follows:

"(a)    [Intentionally Deleted.]"

7.      Section 9.1 of the Stalking Horse Agreement shall be amended by (i) deleting the "and" at the end of Section 9.1(b), (ii) deleting the period at the end of Section 9.1(c) and inserting "; and" in lieu thereof, and (iii) adding a new Section 9.1(d) to read as follows:

"(d) neither (i) an "Event of Default" (as defined in the DIP Credit Agreement) shall have occurred and be continuing nor (ii) the indebtedness outstanding under the DIP Credit Agreement has been paid off, the commitments under the DIP Credit Agreement have been terminated by the DIP Lenders (excluding any such termination as a result of funding the commitments under the DIP Credit Agreement or a New Money Loan Tranche A Commitment Reduction (as defined in the DIP Credit Agreement)) or the DIP Credit Agreement has terminated;"

8.      Section 9.3(d) of the Stalking Horse Agreement shall be amended and restated in its entirety to read as follows:

"(d)     [Intentionally Deleted.]"

9.      Section 9.3 of the Stalking Horse Agreement shall be amended by (i) deleting the "and" at the end of Section 9.3(g), (ii) deleting the period at the end of Section 9.3(h) and inserting "; and" in lieu thereof, and (iii) adding a new Section 9.3(i) to read as follows:

"(i)     the Purchaser shall have received a certificate of the chief financial officer of the Sellers certifying compliance by the Sellers, on and as of the Closing Date, with Section 10.3.3 of the DIP Credit Agreement with respect to the AP Trade Balance (as defined in the DIP Credit Agreement) as of immediately prior to the Closing.""

10.     Section 10.1(tt) of the Stalking Horse Agreement shall be amended and restated in its entirety to read as follows:

"(tt)     "Excluded Cash" means an amount of cash of the Sellers as of immediately prior to the Closing equal to the sum of (and without duplication of any of the following) (i) the Wind Down Amount, (ii) the Professional Fee Amount, (iii) the aggregate amount payable by the Sellers pursuant to any check issued by the Sellers in the Ordinary Course of Business if such check has been previously identified to the DIP Agent but has not cleared as of such time, and (iv) any costs and expenses (other than Professional Fees (as defined in the DIP Credit Agreement) and the Wind Down (as defined in the DIP Credit Agreement)) budgeted for pursuant to the Approved Budget (or otherwise approved by the DIP Agent) and paid or payable on the Closing Date; provided, that such costs and expenses are set forth in a funds flow memorandum (or similar document) reasonably satisfactory to the DIP Agent and the Sellers, and payment thereof is permitted pursuant to a Chapter 11 Order (as defined in the DIP Credit Agreement) in effect at such time))."

11.     Section 10.1(ppp) of the Stalking Horse Agreement shall be amended and restated in its entirety to read as follows:

"(ppp)  [Intentionally Deleted.]"

12.     Section 10.1(ggggg) of the Stalking Horse Agreement shall be amended and restated in its entirety to read as follows:

"(ggggg)     "Wind Down Amount" means an amount of cash equal to the lesser of (i) the Sellers' aggregate cash on hand as of immediately prior to the Closing (excluding cash to be used to pay the items described in clauses (ii), (iii) or (iv) in the definition of "Excluded Cash") plus (and without duplication to cash on hand) the amount borrowed by the Sellers under the DIP Credit Agreement at such time to fund the Wind Down and (ii) $11,500,000."

13.     Section 10.1(hhhhh) of the Stalking Horse Agreement shall be amended and restated in its entirety to read as follows:

"(hhhhh)        [Intentionally Deleted.]"

14.     Section 10.1 of the Stalking Horse Agreement shall be amended by adding the following new defined terms in appropriate alphabetical order:

""Designated Party" means any of the following Persons:  (i) any Purchaser Party, (ii) any Lender Party, (iii) any counterparty to any Assigned Contract, (iv) any current officer or employee of any Seller, (v) any Transferred Employee, (vi) any vendor, supplier, trade creditor or customer doing business with any Seller at any time within the two (2)-year period prior to the Petition Date, and (vii) any Affiliates, officers, directors, employees, shareholders, agents or representatives of any Person described in any of clauses (i), (ii), (iii), (iv), (v) or (vi) solely in their capacities as such.

"Specified Avoidance Action" means any Avoidance Action against any Designated Party."

15.     Section 10.2 of the Stalking Horse Agreement shall be amended by deleting the reference to "Specified Avoidance Action" listed under the heading "Defined Term" set forth therein.

16.     Section 11.3 of the Stalking Horse Agreement shall be amended and restated in its entirety to read as follows:

"Section 11.3  Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules and exhibits hereto) and the Ancillary Agreements constitute the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understanding among the parties hereto with respect thereto.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each of the Purchaser and Strike HoldCo, or in the case of a waiver, by the party against whom the waiver is to be effective; provided, however, that none of Section 1.1(j), Section 1.2(k), Section 1.3(c), the definitions "Designated Party," "Excluded Cash," Specified Avoidance Action," and "Wind Down Amount," this proviso and clause (b) of Section 11.11 shall be amended without the prior written consent of the Chapter 11 Unsecured Creditors Committee (as defined in the DIP Credit Agreement) if such amendment adversely affects the Chapter 11 Unsecured Creditors Committee with respect to the Global Settlement (as defined in the Sale Approval Order entered by the Bankruptcy Court).  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power or remedy hereunder or otherwise shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party

preclude any other or further exercise thereof or the exercise of any other right, power or remedy."

17.    Section 11.11 of the Stalking Horse Agreement shall be amended and restated in its entirety to read as follows:

"Section 11.11        Third Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable benefit, claim, cause of action, remedy or right of any kind hereunder, except that (a) each of the Seller Parties and the Purchaser Parties shall be a third party beneficiary of Sections 3.5, 11.2 and 11.12; provided, that in each case such party will be subject to all the limitations and procedures of this Agreement as if it were a party hereunder, and (b) the Chapter 11 Unsecured Creditors Committee shall be a third party beneficiary of the proviso set forth in Section 11.3."

## AMENDMENTS TO ASSET PURCHASE AGREEMENT

The Asset Purchase Agreement shall be amended as follows:

1.      Section 1.1(l) of the Asset Purchase Agreement shall be amended and restated in its entirety to read as follows:

"(l)     all of such Seller's insurance policies designated by the Purchaser in a Designation Notice delivered by the Purchaser to the Sellers pursuant to Section 1.5(a) to be included in the definition of "Assigned Contracts" (and which designation was not revoked or rescinded by a subsequently delivered Designation Notice), including (i) all rights to indemnification for losses, defense costs and settlements, credits, refunds, proceeds, claims (including first party and third party insurance claims), causes of action or other rights arising under or relating to such insurance policies, (ii) all claims, demands, proceedings and causes of action asserted or that may be asserted by such Seller under such insurance policies and (iii) any letters of credit or other credit support related thereto (collectively, the "Acquired Insurance Policies"); provided, however, that Acquired Insurance Policies shall not include any of the policies, rights, benefits, indemnifications, claims, demands, proceedings, credits, causes of action or rights of set off described in any of Section 1.2(h) or clause (i) of Section 1.2(e);"

2.      Section 1.2(e) of the Asset Purchase Agreement shall be amended and restated in its entirety to read as follows:

"(e)     all of such Seller's (i) director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any automatic or purchased extended reporting periods, tail policies or coverage thereon), and (ii) insurance policies not described in clause (i) or clause (ii) of this Section 1.2(e) that do not constitute Acquired Insurance Policies, and in any such case of any of the foregoing any of such Seller's rights, benefits, indemnifications, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;"

3.      Section 1.5 of the Asset Purchase Agreement shall be amended by adding new clauses (g) and (h) to such Section to read as follows:

"(g)     If the Purchaser and the non-Seller counterparty to any Non-Designated Contract agree to the terms of the assumption and assignment of such Non-Designated Contract, which terms do not result in any Liability to or obligation of any Seller or any waiver of right attributable to, or any loss of, any Excluded Asset (other than such Non-Designated Contract), then, at the sole option of the Purchaser, the Purchaser may notify the Sellers in writing no later than the End Time (as defined below) of such agreement and elect to include such Non-Designated Contract in the definition(s) of "Assigned Contracts," "Assumed Real Property Leases," "Acquired Insurance Policies" and/or "Assumed Seller Plans," and exclude from the definition(s) of "Non-Assigned Contracts" and/or "Excluded Plans," such Non-Designated Contract.  If the Purchaser delivers any such written notice

to the Sellers (such written notice being deemed a "Designation Notice" for purposes of this Agreement) with respect to any Non-Designated Contract, then (i) such Non-Designated Contract shall irrevocably become an "Assigned Contract," "Assumed Real Property Lease," "Acquired Insurance Policy" and/or "Assumed Seller Plan," as applicable, and will be excluded from "Non-Assigned Contracts" and/or "Excluded Plans," as applicable, upon the delivery of such written notice and the entry into of the agreement (if applicable) referred to in clause (ii) by the Purchaser, the applicable Sellers and the non-Seller counterparty to such Non-Designated Contract, (ii) the applicable Sellers shall enter into any agreement with respect to such Non-Designated Contract that is agreed to by the Purchaser and the non-Seller counterparty thereto, (iii) the applicable Sellers shall use reasonable best efforts to promptly take such steps as are reasonably necessary to cause such Non-Designated Contract to be assumed by the applicable Seller and assigned to the Purchaser, including by executing and delivering to the Purchaser an Assignment and Assumption Agreement with respect to such Non-Designated Contract and, in the case of a Real Property Lease, an Assignment and Assumption of Lease Agreement with respect to such Real Property Lease, and (iv) the Purchaser shall pay the Determined Cure Costs with respect to such Non-Designated Contract promptly after the date such Non-Designated Contract is assumed by the applicable Seller and assigned to the Purchaser, or at such other times as the Purchaser and such non-Seller counterparty agree, and execute and deliver to the applicable Seller an Assignment and Assumption Agreement with respect to such Non-Designated Contract and, in the case of a Real Property Lease, an Assignment and Assumption of Lease Agreement with respect to such Non-Designated Real Property Lease.  The term "Non-Designated Contract" means any Contract of any Seller that is not designated by the Purchaser as an "Assigned Contract," "Assumed Real Property Lease," "Acquired Insurance Policy" and/or "Assumed Seller Plan" pursuant to a Designation Notice on or prior to the Designation Deadline for such Contract.  The term "End Time" means the earlier of (x) the Closing Date and (y) the later of (A) 5:00 p.m. (New York time) on February 10, 2022 and (B) 5:00 p.m. (New York time) on the date on which all conditions set forth in Article IX have been satisfied or waived (other than conditions that by their nature are to be satisfied at the Closing and the conditions set forth in Sections 9.2(a), 9.2(b), 9.3(e) and 9.3(f)).

(h)     Notwithstanding anything herein to the contrary, following the Closing Date, nothing in this Agreement shall prevent or restrict any Seller from rejecting any Contract, insurance policy or Seller Plan that is not an Assigned Contract, Assumed Real Property Lease, Acquired Insurance Policy or Assumed Seller Plans and where the Designation Deadline for the same has passed."

4.     Section 3.2 of the Asset Purchase Agreement shall be amended by (i) deleting the "and" at the end of Section 3.2(g), (ii) deleting the period at the end of Section 3.2(h) and inserting "; and" in lieu thereof, and (iii) adding a new Section 3.2(i) to read as follows:

"(i)     the Transition Services Agreement, duly executed by the Sellers."

5.     Section 3.3 of the Asset Purchase Agreement shall be amended by (i) deleting the "and" at the end of Section 3.3(g), (ii) deleting the period at the end of Section 3.3(h) and inserting "; and" in lieu thereof, and (iii) adding a new Section 3.3(i) to read as follows:

"(i)     the Transition Services Agreement, duly executed by the Purchaser."

6.     Section 10.1(cccc) of the Asset Purchase Agreement shall be amended and restated in its entirety to read as follows:

"(cccc)"Purchaser Ancillary Agreements" means, collectively, the Assignment and Assumption Agreement(s), each Assignment and Assumption of Lease Agreement, each IP Assignment Agreement, the Transition Services Agreement and each other certificate, agreement or document (other than this Agreement) that the Purchaser is required to execute and/or deliver pursuant to the terms of this Agreement."

7.     Section 10.1(oooo) of the Asset Purchase Agreement shall be amended and restated in its entirety to read as follows:

"(oooo)     "Seller Ancillary Agreements" means, collectively, the Bill of Sale, the Assignment and Assumption Agreement(s), each Assignment and Assumption of Lease Agreement, each IP Assignment Agreement, the Transition Services Agreement and each other certificate, agreement or document (other than this Agreement) that any Seller is required to execute and/or deliver pursuant to the terms of this Agreement."

8.     Section 10.1 of the Asset Purchase Agreement shall be amended by adding the following new defined term in appropriate alphabetical order:

""Transition Services Agreement" means a transition services agreement to be entered into at the Closing by and between the Sellers and the Purchaser, in form and substance mutually acceptable to the Sellers and the Purchaser, pursuant to which the Sellers will provide certain transition services and other support relating to the businesses, activities and operations of the Purchaser that are mutually agreed upon between the Sellers and the Purchaser."

## **Schedule 3**

Asset Purchase Agreement

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**STRIKE ACQUISITION LLC,**

**as Purchaser,**

**and**

**STRIKE HOLDCO LLC**

**STRIKE, LLC,**

**STRIKE GLOBAL HOLDINGS, LLC,**

**CAPSTONE INFRASTRUCTURE SERVICES, LLC,**

**DELTA DIRECTIONAL DRILLING, LLC, AND**

**CROSSFIRE, LLC,**

**as Sellers**

**Dated as of December 6, 2021**

# TABLE OF CONTENTS

<b>Page</b>

**ARTICLE I.**      PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ................................................................1

| | | |
|---|---|---|
| 1.1 | Purchase and Sale of Assets ................................................ | 1 |
| 1.2 | Excluded Assets .................................................................. | 4 |
| 1.3 | Assumption of Liabilities .................................................... | 5 |
| 1.4 | Excluded Liabilities ............................................................ | 7 |
| 1.5 | Cure Costs; Schedule Updates ............................................ | 9 |

**ARTICLE II.**      CONSIDERATION ................................................................13

| | | |
|---|---|---|
| 2.1 | Consideration ...................................................................... | 13 |
| 2.2 | Allocation of Purchase Price .............................................. | 13 |
| 2.3 | Withholding ......................................................................... | 14 |

**ARTICLE III.**      CLOSING AND TERMINATION .........................................14

| | | |
|---|---|---|
| 3.1 | Closing ................................................................................ | 14 |
| 3.2 | Closing Deliveries by Sellers ............................................ | 14 |
| 3.3 | Closing Deliveries by the Purchaser .................................. | 15 |
| 3.4 | Termination of Agreement .................................................. | 16 |
| 3.5 | Procedure Upon and Effect of Termination ........................ | 20 |

**ARTICLE IV.**      REPRESENTATIONS AND WARRANTIES OF THE SELLERS .................22

| | | |
|---|---|---|
| 4.1 | Organization and Qualification .......................................... | 22 |
| 4.2 | Subsidiaries ......................................................................... | 22 |
| 4.3 | Authority Relative to This Agreement ................................ | 22 |
| 4.4 | Conflicts; Consents and Approvals .................................... | 23 |
| 4.5 | Absence of Certain Changes .............................................. | 23 |
| 4.6 | Litigation ............................................................................ | 23 |
| 4.7 | Intellectual Property ........................................................... | 24 |
| 4.8 | Material Contracts .............................................................. | 26 |
| 4.9 | Permits ................................................................................ | 28 |
| 4.10 | Brokers and Finders ........................................................... | 29 |
| 4.11 | Title to Assets ..................................................................... | 29 |
| 4.12 | Real Property ...................................................................... | 29 |
| 4.13 | Compliance with Law ......................................................... | 30 |
| 4.14 | Tax Returns; Taxes ............................................................ | 30 |
| 4.15 | Benefit Plans ....................................................................... | 32 |
| 4.16 | Labor Matters ..................................................................... | 35 |
| 4.17 | Insurance Policies .............................................................. | 36 |
| 4.18 | Environmental Matters ....................................................... | 36 |
| 4.19 | Vendors and Suppliers ....................................................... | 36 |
| 4.20 | Related Party Transactions ................................................. | 37 |

NY 78800654v17

4.21    Compliance with Anti-Corruption, Economic Sanctions, Money Laundering and Import Laws; Export Controls ....................................................................37
4.22    Financial Statements; No Undisclosed Liabilities ...........................................39
4.23    Warranties ........................................................................................................39
4.24    Surety Bonds....................................................................................................40
4.25    NO OTHER REPRESENTATIONS ................................................................40

ARTICLE V.      REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ..........41

5.1     Organization and Qualification........................................................................41
5.2     Authority Relative to This Agreement .............................................................41
5.3     Conflicts; Consents and Approvals..................................................................42
5.4     Litigation..........................................................................................................42
5.5     Financial Capacity ...........................................................................................42
5.6     Brokers and Finders.........................................................................................43
5.7     Independent Investigation; Reliance By the Purchaser ...................................43

ARTICLE VI.    EMPLOYEES ...................................................................................................44

6.1     Employee Offers ..............................................................................................44
6.2     Seller Plans.......................................................................................................46
6.3     WARN Act Liability........................................................................................47
6.4     Eligibility; Service Credit ................................................................................47
6.5     No Third-Party Beneficiaries ..........................................................................47

ARTICLE VII.   BANKRUPTCY COURT MATTERS ...........................................................48

7.1     Certain Motions and Orders .............................................................................48
7.2     Competing Bids ...............................................................................................49

ARTICLE VIII. COVENANTS AND AGREEMENTS..........................................................50

8.1     Conduct of Business of the Sellers ..................................................................50
8.2     Access to Information .......................................................................................53
8.3     Assignability of Certain Purchased Assets ......................................................55
8.4     Further Agreements ..........................................................................................56
8.5     Consents and Approvals ...................................................................................57
8.6     Publicity............................................................................................................58
8.7     Notification of Certain Matters ........................................................................59
8.8     Prohibition on Use of Purchased Names ..........................................................59
8.9     Tax Matters .......................................................................................................60
8.10    Insurance...........................................................................................................60
8.11    Confidentiality..................................................................................................61
8.12    Headquarters Lease...........................................................................................62
8.13    Return of Specified Collateral .........................................................................62
8.14    Excluded Cash ..................................................................................................63
8.15    Further Assurances............................................................................................63
8.16    Seller Disclosure Schedules .............................................................................64
8.17    Acknowledgements...........................................................................................64

ARTICLE IX.    CONDITIONS TO CLOSING ........................................................................65

9.1     Conditions Precedent to the Obligations of the Purchaser and the Sellers ..................65
9.2     Conditions Precedent to the Obligations of the Sellers ............................................66
9.3     Conditions Precedent to the Obligations of the Purchaser.......................................67

ARTICLE X.     ADDITIONAL DEFINITIONS.........................................................................68

10.1    Certain Definitions..................................................................................................68
10.2    Additional Defined Terms .......................................................................................82

ARTICLE XI.    MISCELLANEOUS ........................................................................................84

11.1    Payment of Expenses ..............................................................................................84
11.2    Survival of Representations and Warranties; Survival of Post-Closing Covenants ....84
11.3    Entire Agreement; Amendments and Waivers ..........................................................85
11.4    Counterparts...........................................................................................................85
11.5    Governing Law .......................................................................................................86
11.6    Jurisdiction, Waiver of Jury Trial ............................................................................86
11.7    Notices ...................................................................................................................87
11.8    Binding Effect; Assignment.....................................................................................88
11.9    Severability ............................................................................................................89
11.10   Injunctive Relief.....................................................................................................89
11.11   Third Party Beneficiaries ........................................................................................89
11.12   Non-Recourse .........................................................................................................90
11.13   Time of the Essence ................................................................................................90
11.14   Disclosure ..............................................................................................................90
11.15   Certain Interpretations ............................................................................................90
11.16   Control of Attorney-Client and All Other Privileges.................................................92

## EXHIBITS

Exhibit A            Form of Sale Approval Order
Exhibit B            Form of Sale Procedures Order

iii

## ASSET PURCHASE AGREEMENT

ASSET PURCHASE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), dated as of December 6, 2021 (the "Execution Date"), by and among (a)(i) Strike HoldCo LLC, a Delaware limited liability company ("Strike HoldCo"), (ii) Strike, LLC, a Texas limited liability company ("Strike LLC"), (iii) Strike Global Holdings, LLC, a Texas limited liability company ("Strike Global"), (iv) Capstone Infrastructure Services, LLC, a Texas limited liability company ("Capstone"), (v) Delta Directional Drilling, LLC, a Texas limited liability company ("Delta"), and (vi) Crossfire, LLC, a Colorado limited liability company ("Crossfire" and together with Strike HoldCo, Strike LLC, Strike Global, Delta and Capstone, each, a "Seller" and, collectively, the "Sellers"), and (b) Strike Acquisition LLC, a Delaware limited liability company (together with its Affiliates to which it assigns, delegates or transfers any of its rights, obligations and/or interests hereunder pursuant to Section 11.8, the "Purchaser").  Article X contains definitions of certain terms used in this Agreement and also provides cross-references to certain terms defined elsewhere in this Agreement.

## RECITALS

WHEREAS, the Sellers are preparing to file voluntary cases (such cases, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"); and

WHEREAS, (a) the Sellers desire to sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser desires to purchase, acquire and accept from the Sellers, all of the Sellers' right, title and interest in and to the Purchased Assets, and (b) the Sellers desire to transfer and assign to the Purchaser, and the Purchaser desires to assume from the Sellers, all of the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code, all on the terms and subject to the conditions set forth in this Agreement and the Sale Approval Order and subject to the entry of the Sale Approval Order;

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I.

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 1.1    Purchase and Sale of Assets.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Approval Order, at the Closing, each Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and the Purchaser shall purchase, acquire and accept from each Seller, free and clear of all Encumbrances (other than Permitted Encumbrances), all of such Seller's

right, title and interest in, to and under all assets, properties, rights and interests of any nature, real, personal or mixed, tangible or intangible, identifiable or contingent, whether or not owned, leased, licensed, used or held for use in or relating to the Business, and whether or not reflected on the books or financial statements of such Seller, as the same shall exist at the Closing, but in all cases excluding the Excluded Assets (as amended or modified by <u>Section 1.5</u>, collectively, the "<u>Purchased Assets</u>"), including the following assets, properties, rights and interests of such Seller:

        (a)      all Accounts Receivable (including Inter-Company Receivables);

        (b)      all Documents used in or relating to the Business or in respect of any of the Purchased Assets or any of the Assumed Liabilities (including customer data and emails);

        (c)      (i) all Contracts designated by the Purchaser in a Designation Notice delivered by the Purchaser to the Sellers pursuant to <u>Section 1.5(a)</u> to be included in the definition of "Assigned Contracts" (and which designation was not revoked or rescinded by a subsequently delivered Designation Notice) and (ii) all Specified Contracts (the Contracts referred to in this <u>Section 1.1(c)</u>, together with the Assumed Real Property Leases, collectively, the "<u>Assigned Contracts</u>");

        (d)      all deposits, advances, deferred assets, rights to refunds, credits, rights to recover overpayments and all prepaid charges, Taxes and expenses of such Seller, including (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) rebates, (iii) tenant reimbursements, (iv) prepaid Taxes (including ad valorem Taxes, personal property Taxes and real estate Taxes), and (v) pre-payments, except to the extent that any of the foregoing relate solely to any Excluded Asset (including a Non-Assigned Contract) or Excluded Liability;

        (e)      all Equipment;

        (f)      (i) the names "Strike", "Capstone", "Delta" and "Crossfire", (ii) the names of any of the Sellers and (iii) any confusingly similar derivations of any thereof (collectively, the "<u>Purchased Names</u>");

        (g)      all Real Property Leases designated by the Purchaser in a Designation Notice delivered by the Purchaser to the Sellers pursuant to <u>Section 1.5(a)</u> to be included in the definition of "Assumed Real Property Leases" (and which designation was not revoked or rescinded by a subsequently delivered Designation Notice) (such Real Property Leases referred to in this <u>Section 1.1(g)</u>, collectively, the "<u>Assumed Real Property Leases</u>" and the underlying Leased Real Property, the "<u>Assumed Leased Real Property</u>");

        (h)      all Permits and all pending applications or filings therefor and renewals thereof and all rights and incidents of interest therein;

        (i)      all rights under non-disclosure or confidentiality, non-compete, non-solicitation, non-interference, non-disparagement or similar agreements or arrangements or clawback arrangements to which such Seller is a party or with respect to which such Seller is a beneficiary or has any rights thereunder (but excluding any Non-Assigned Contracts and

2

Excluded Plans), including any such agreement with current or former directors, managers, officers, employees or agents, or with third parties (including any Preliminary Interested Investor (as defined in the Bidding Procedures) or Bidder (as defined in the Bidding Procedures));

(j)      (i) all claims and causes of action that may be asserted by such Seller or its estate against any Designated Party, including all of the Specified Avoidance Actions, and (ii) all rights (including lien rights), claims (including commercial tort claims), settlement proceeds, causes of action, choses in action, rights of recovery, rights of recoupment, rights of set off, equity rights and defenses that may be asserted by such Seller or its estate relating to the Business, any of the Purchased Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to, any of the Assigned Contracts) or any of the Assumed Liabilities, including all rights under vendors', manufacturers' and contractors' representations, warranties, indemnities and guarantees (clauses (i) and (ii) of this Section 1.1(j), the "Purchased Claims"); provided, however, and notwithstanding anything in clauses 1.1(j)(i) and 1.1(j)(ii) to the contrary, that (A) Purchased Claims shall not include any claims and causes of action that may be asserted by such Seller or its estate against any director, officer or equity holder of the Sellers or their related persons (in each case, other than a current officer or employee of any of the Sellers or any Transferred Employee) and (B) all Specified Avoidance Actions shall be waived effective as of the Closing Date by execution of the Waiver;

(k)      [Intentionally Deleted];

(l)      all of such Seller's insurance policies designated by the Purchaser in a Designation Notice delivered by the Purchaser to the Sellers pursuant to Section 1.5(a) to be included in the definition of "Assigned Contracts" (and which designation was not revoked or rescinded by a subsequently delivered Designation Notice), including (i) all rights to indemnification for losses, defense costs and settlements, credits, refunds, proceeds, claims (including first party and third party insurance claims), causes of action or other rights arising under or relating to such insurance policies, (ii) all claims, demands, proceedings and causes of action asserted or that may be asserted by such Seller under such insurance policies and (iii) any letters of credit or other credit support related thereto (collectively, the "Acquired Insurance Policies"); provided, however, that Acquired Insurance Policies shall not include any of the policies, rights, benefits, indemnifications, claims, demands, proceedings, credits, causes of action or rights of set off described in any of Section 1.2(h) or clause (i) of Section 1.2(e);

(m)      any claim, right or interest of such Seller in or to any refund, rebate, abatement or other recovery for Taxes, in each case, together with any interest due thereon or penalty rebate arising therefrom;

(n)      (i) all Seller Plans designated by the Purchaser in a Designation Notice delivered by the Purchaser to the Sellers pursuant to Section 1.5(a) to be included in the definition of "Assumed Seller Plans" (and which designation was not revoked or rescinded by a subsequently delivered Designation Notice) and (ii) all Specified Plans (the Seller Plans referred to in this Section 1.1(n), collectively, the "Assumed Seller Plans"), and, in any such case, any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with the Assumed Seller Plans and any applicable insurance policies;

3

(o)     all Seller Intellectual Property;

(p)     all Inventory;

(q)     except to the extent that any transfer or assignment is prohibited by applicable Law, (i) all personnel files for Transferred Employees and, (ii) to the extent such files relate to any of the Purchased Assets or any of the Assumed Liabilities, all personnel files for any former or current employee of such Seller that is not a Transferred Employee;

(r)     all goodwill, customer and referral relationships, other intangible assets and all privileges associated with, or relating to, the Business, the Purchased Assets or the Assumed Liabilities;

(s)     subject to section 363(b)(1)(A) of the Bankruptcy Code, all rights to the telephone and facsimile numbers and e-mail addresses used by such Seller;

(t)     all loans and other Indebtedness payable or owed to such Seller;

(u)     all Cash and Cash Equivalents, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit or Surety Bonds or any obligations with respect thereto, but excluding the Excluded Cash;

(v)     all artwork owned by such Seller located at any of the premises occupied by any of the Sellers, including those set forth on Schedule 1.1(v); and

(w)     all proceeds and products of any and all of the foregoing Purchased Assets.

Section 1.2   Excluded Assets.   Notwithstanding anything to the contrary in this Agreement or any of the Ancillary Agreements, in no event shall any Seller be deemed to sell, transfer, assign, convey or deliver to the Purchaser, and each Seller shall retain all right, title and interest to, in and under, the following assets, properties, rights and interests of such Seller (collectively, the "Excluded Assets"):

(a)     all Contracts and Real Property Leases that are not Assigned Contracts (the "Non-Assigned Contracts");

(b)     all Documents (whether copies or originals) (i) to the extent they relate solely to any of the Excluded Assets or the Excluded Liabilities, (ii) that such Seller is required by Law to retain and is prohibited by Law from providing a copy thereof to the Purchaser, or (iii) to the extent they relate solely to any employees of such Seller who are not Transferred Employees (subject to Section 1.1(q));

(c)     all Permits that relate solely to any of the Excluded Assets or the Excluded Liabilities;

(d)     all Equity Interests of, or issued by, any Seller;

4

(e)     all of such Seller's (i) director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any automatic or purchased extended reporting periods, tail policies or coverage thereon), and (ii) insurance policies not described in clause (i) or clause (ii) of this Section 1.2(e) that do not constitute Acquired Insurance Policies, and in any such case of any of the foregoing any of such Seller's rights, benefits, indemnifications, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

(f)     all rights under this Agreement and the Ancillary Agreements (including the right to receive the Purchase Price);

(g)     all Documents (whether copies or originals) relating to formation and existence of such Seller, including qualification to conduct business as a foreign limited liability company, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, equity transfer books, equity ledgers, unit certificates, limited liability company agreements or regulations, and other documents relating to the organization and existence of such Seller as a limited liability company (together with analogous documentation), books and records (including Tax Returns) relating to Taxes of the Sellers (provided that copies of such books and records shall be made available to the Purchaser (at Purchaser's sole cost and expense) to the extent reasonably requested), and books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items to the extent relating solely to any Excluded Assets or Excluded Liabilities;

(h)     all of the Seller Plans other than the Assumed Seller Plans, and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained solely in connection with such Seller Plans and any applicable insurance policies that are maintained solely in connection with such Seller Plans ("Excluded Plans");

(i)     the Excluded Cash, subject to the terms of Section 8.14;

(j)     all Deal Communications and any attorney-client privilege or expectation of client confidence or any other rights to any evidentiary privilege, in each case solely related to Deal Communications; and

(k)     all claims and causes of action (including Avoidance Actions) that may be asserted by such Seller or its estate, including all claims and causes of action that may be asserted by such Seller or its estate against any director, officer or equity holder of the Sellers or their related persons (in each case, other than a current officer or employee of any of the Sellers or any Transferred Employee), but excluding (i) all Purchased Claims, including all Specified Avoidance Actions, and (ii) without limiting the definition of "Purchased Claims," any claims or causes of action listed or described in any of clauses (a), (d), (i), (l), (m) and (t) of Section 1.1.

Section 1.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Approval Order, effective as of the Closing, the Purchaser

5

shall assume from each Seller, and each Seller shall assign to the Purchaser, only the following Liabilities of each Seller (collectively, the "Assumed Liabilities"):

(a)     all Liabilities of such Seller under each Assigned Contract arising after the Closing Date and which relate solely to events occurring after the Closing Date (except for Liabilities arising out of any breach or default of any Assigned Contract on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or after giving notice, or both, would constitute or give rise to such a breach or default);

(b)     all Determined Cure Costs with respect to any Assigned Contract;

(c)     all Liabilities for trade accounts payable (excluding any Taxes) that are incurred in the Ordinary Course of Business after the Petition Date and at or prior to the Closing and have not been paid on or prior to the Closing Date; provided, however, that the Liabilities described in this Section 1.3(c) shall not include (i) any fees or expenses due to professional persons retained by any Seller or any other Person involved in the Chapter 11 Cases, including any creditors' committee, (ii) any claims arising after the commencement of the Chapter 11 Cases that are provided to any Person in exchange for, on account of, or in connection with any claims that arose prior to the commencement of the Chapter 11 Cases, (iii) without limitation to Section 1.3(b), Cure Costs with respect to any of the Assigned Contracts, and (iv) wages, salaries and other compensation for any employee of any of the Sellers (but without limitation of Sections 1.3(e), (f), (g) and (l) and Article VI);

(d)     all Liabilities for trade accounts payable subject to administrative expense status under section 503(b)(9) of the Bankruptcy Code allowed by agreement of the Purchaser and the claimant thereunder or by Final Order of the Bankruptcy Court and which are identified by the Purchaser to the Sellers in writing prior to the Closing to be included as Assumed Liabilities;

(e)     all Liabilities arising under or otherwise in respect of the Assumed Seller Plans arising after the Closing Date, but solely to the extent such Liabilities relate to events occurring after the Closing Date;

(f)     all Liabilities arising from the employment of the Transferred Employees after the Closing Date, but solely to the extent that such Liabilities relate to events occurring after the Closing Date;

(g)     all Liabilities with respect to (i) unused vacation time, sick leave time and other paid time off earned and accrued in the Ordinary Course of Business with respect to the Transferred Employees as of the Closing Date, and (ii) wages, salaries and commissions earned and accrued in the Ordinary Course of Business with respect to the Transferred Employees as of the Closing Date;

(h)     solely to the extent set forth in Section 6.2(d), all Liabilities for affording continuation coverage under COBRA (and any comparable state law) for all individuals who are "M&A qualified beneficiaries," as such term is defined in U.S. Treasury Regulation Section

54.4980B-9, from and after the Closing to the extent coverage is afforded active employees under medical plans offered by the Purchaser;

(i)　　solely to the extent set forth in <u>Section 8.9(a)</u>, all Transfer Taxes;

(j)　　all Inter-Company Payables;

(k)　　all Liabilities arising from the ownership or operation of the Business or the Purchased Assets by the Purchaser after the Closing and which relate solely to events occurring after the Closing Date;

(l)　　all Liabilities under the WARN Act as expressly set forth in <u>Section 6.1(c)</u>;

(m)　　any additional Liabilities set forth on <u>Schedule 1.3(m)</u>.

The parties hereto acknowledge and agree that the disclosure of any Liability on any schedule to this Agreement or any of the Ancillary Agreements shall not create an Assumed Liability or Liability of the Purchaser, except where such disclosed Liability has been expressly assumed by the Purchaser as an Assumed Liability in strict accordance with the provisions of this <u>Section 1.3</u>.

Section 1.4　　<u>Excluded Liabilities</u>.  Notwithstanding any provision in this Agreement to the contrary, except for the Assumed Liabilities expressly set forth in <u>Section 1.3</u>, the Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of or against any Seller, the Business or any of the Purchased Assets of any kind or nature whatsoever, whether accrued or unaccrued, and the Sellers shall not convey, transfer, assign or deliver to the Purchaser any Liabilities of any Seller, the Business or the Purchased Assets other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "<u>Excluded Liabilities</u>"), including the following Liabilities:

(a)　　all Liabilities of any Seller arising under or relating to any of the Excluded Assets (including any of the Non-Assigned Contracts);

(b)　　all Liabilities of any Seller arising out of or relating to services or products of such Seller to the extent such services or products are provided, designed, manufactured or sold on or prior to the Closing Date;

(c)　　all Liabilities relating to any environmental, health or safety matters (including any Liability under any Environmental Law) arising out of or relating to any Seller's operation of its business or its leasing, ownership, use or operation of real property prior to the Closing Date, no matter when raised;

(d)　　all Liabilities of any Seller in respect of Indebtedness (including any Term Loan Obligations), whether or not relating to the Business;

(e)　　all Liabilities of any Seller to any current, former or prospective holder of Equity Interests of or issued by any Seller, Strike Investment, Strike Management or Strike

7

Capital, including all Liabilities of any Seller related to the right to or issuance of any Equity Interests or the payment of any dividend or other distribution (including any tax distribution) on or in respect of any Equity Interests;

(f)     all Liabilities arising out of any breach or default of any of the Assigned Contracts on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or giving of notice, or both, would constitute or give rise to such a breach or default;

(g)     except to the extent that any such Liabilities are specifically assumed by the Purchaser pursuant to Section 1.3(e) or Section 1.3(g), any and all Liabilities arising under or relating to the Assumed Seller Plans or any of the other Seller Plans;

(h)     all Liabilities of any Seller for Taxes, except as expressly set forth in Section 1.3(i);

(i)     all Liabilities of any Seller for the rights and claims for indemnification, contribution and/or reimbursement and advancement of expenses by any current or former officer, director, manager, employee, partner, member or agent of any Seller, Strike Investment, Strike Management or Strike Capital or any of their respective Affiliates, whether or not arising under any Law or any such Person's Organizational Documents or any other Contract;

(j)     all Liabilities of any Seller under any settlement agreements relating to any Actions or any other claims, disputes or other controversies;

(k)     all Liabilities of such Seller for pending or threatened Actions against such Seller, any of its assets or properties, the Business and/or such Seller's operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance that occurred or existed on or prior to the Closing Date;

(l)     all Liabilities (whether civil or criminal) occurring, arising out of or relating to acts or omissions of any Seller or any of its Affiliates, or any of their respective current or former directors, managers, officers, employees, agents or independent contractors, in respect of any violation of Law, or claimed or alleged violation of any Law;

(m)     except to the extent that any such Liabilities are specifically assumed by the Purchaser pursuant to Section 1.3(e) or Section 1.3(g), all Liabilities of any Seller for any and all claims by or on behalf of, relating to or with respect to such Seller's current or former employees, including any Transferred Employee, relating to periods ending, or events occurring, on or prior to the Closing Date, including claims arising under or relating to employment practices, terms and conditions of employment, labor relations, union organizing, employee safety and health, wages and hours, fair labor standards, child labor, employee leaves of absence, unemployment insurance, disability rights or benefits, immigration, plant closings and layoffs, equal employment opportunity, discrimination, harassment, affirmative action, breach of contract and wrongful discharge, employee grievances and Liability for any pension, profit sharing, deferred compensation (and the funding of any such benefits relating to all income earned by such Seller's current or former employees, including any Transferred Employee, relating to

8

periods ending on or prior to the Closing Date), workers' compensation or any other employee health, welfare or other benefit plans or claims thereunder;

(n)     all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by any Seller in connection with, resulting from or attributable to, the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise;

(o)     all Liabilities to effectuate a wind-down of the Sellers' estates or associated with, relating to, or incurred in connection with any plan of reorganization or plan of liquidation for the Sellers; and

(p)     all Liabilities of such Seller under any unpaid legal settlements to which any Seller is a party.

Section 1.5     Cure Costs; Schedule Updates.

(a)     No later than ten (10) days after the Petition Date (the "Delivery Date"), the Sellers shall deliver to the Purchaser a schedule (the "Original Contract & Cure Schedule") which shall contain a list of each Contract (including Real Property Leases and Seller Plans) of the Sellers and the Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Contract, the amount of such Cure Cost for such Contract shall be designated as, and shall be deemed to be designated as, "$0.00").  From the Delivery Date through (and including) the Designation Deadline, promptly following any changes to the information set forth on the Original Contract & Cure Schedule (including any new Contracts to which any Seller becomes a party and any change in the Cure Cost of any Contract), the Sellers shall provide the Purchaser with a schedule (as such schedule may be amended, supplemented or otherwise modified from time to time prior to the Designation Deadline in accordance with the terms of this Agreement, the "Contract & Cure Update Schedule") that updates and corrects such information.  Without limiting the foregoing, if, following the Closing, it is discovered that a Contract that should have been listed on the Original Contract & Cure Schedule or any Contract & Cure Update Schedule was not so listed, the Sellers shall, promptly following the discovery thereof, notify the Purchaser in writing of any such Contract and the Sellers' good faith estimate of the amount of Cure Costs applicable to such Contract (and if no Cure Cost is estimated to be applicable with respect to any such Contract, the amount of such Cure Cost shall be designated for such Contract as, and shall be deemed to be designated as, "$0.00").  The Purchaser may, at any time and from time to time through (and including) the Designation Deadline (including any Designation Deadline that occurs after the Closing Date), include in the definition(s) of "Assigned Contracts," "Assumed Real Property Leases" and/or "Assumed Seller Plans," and exclude from the definition(s) of "Non-Assigned Contracts" and/or "Excluded Plans" any Contract of any of the Sellers; provided, that no such change of the definitions of "Assigned Contracts," "Assumed Real Property Leases," "Assumed Seller Plans," "Non-Assigned Contracts" and/or "Excluded Plans" referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any increase in the assumption of the Assumed Liabilities as a result of Contracts being added to the Assigned Contracts, the Assumed Real Property Leases and/or the Assumed Seller Plans by the Purchaser pursuant to this Section 1.5(a).  The Purchaser may, at

9

any time and from time to time through (and including) the Designation Deadline (including any Designation Deadline that occurs after the Closing Date), exclude from the definition of "Assigned Contracts," "Assumed Real Property Leases" and/or "Assumed Seller Plans," and include in the definition(s) of "Non-Assigned Contracts" and/or "Excluded Plans", any Contract of any of the Sellers (other than Specified Contracts and Specified Plans); provided, that no such change of the definitions of "Assigned Contracts," "Assumed Real Property Leases," "Assumed Seller Plans," "Non-Assigned Contracts" and/or "Excluded Plans" referred to in this sentence shall reduce or increase the amount of the Purchase Price, except to the extent of any reduction in the assumption of the Assumed Liabilities as a result of Contracts being excluded from the Assigned Contracts, the Assumed Real Property Leases and/or the Assumed Seller Plans by the Purchaser pursuant to this Section 1.5(a).  To exercise its rights under this Section 1.5(a) to include Contracts in, or exclude Contracts from, the Assigned Contracts, Assumed Real Property Leases, Assumed Seller Plans, Non-Assigned Contracts and/or Excluded Plans, as applicable, the Purchaser shall deliver one or more written notices (each, a "Designation Notice") to the Sellers specifying the Contract(s) to be so included or excluded, and such inclusion or exclusion of any such Contract shall occur automatically (without any further action on the part of, or notice to, any Person) upon the delivery by the Purchaser of a Designation Notice to the Sellers.  If any Contract is added to (or excluded from) the Assigned Contracts, Assumed Real Property Leases, Assumed Seller Plans, Non-Assigned Contracts and/or Excluded Plans pursuant to this Section 1.5(a), the Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of notice to the non-Seller counterparty to such Contract to cause such Contract to be assumed by the applicable Seller and assigned to the Purchaser, or excluded or rejected, as applicable.

For purposes of this Section 1.5, all Seller Plans (whether or not an executory Contract) shall constitute Contracts and all Assumed Seller Plans shall constitute Assigned Contracts.

(b)      The Sellers shall be responsible for the verification of all Cure Costs for each Assigned Contract and shall, in consultation with the Purchaser, use reasonable best efforts to establish the proper Cure Costs, if any, for each Assigned Contract prior to the Closing Date or, with respect to any Contract that should have been listed on the Original Contract & Cure Schedule or any Contract & Cure Update Schedule but is discovered following the Closing Date to not have been so listed, as promptly as practicable following such discovery.

(c)      To the extent that any Assigned Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, at the Closing or promptly following the Closing, the Determined Cure Costs related to such Assigned Contract, or any portion thereof, shall be paid by the Purchaser; provided, however, that with respect to any Cure Costs that are Undetermined Cure Costs as of the Closing, such Cure Costs, or any portion thereof, shall be paid by the Purchaser pursuant to the provisions of Section 1.5(d).  The Purchaser shall not be required to make any payment for Cure Costs for, or otherwise have any Liabilities with respect to, any Non-Assigned Contract or Excluded Plan (including any Contract or Seller Plan that becomes a Non-Assigned Contract or Excluded Plan after the Cure Cost for such Contract becomes a Determined Cure Cost).

(d)    If any Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, and such Cure Costs will be Undetermined Cure Costs three (3) Business Days or less prior to the Closing Date because a non-Seller counterparty to such Contract proposed Cure Costs in an amount that is different than the amount of Cure Costs proposed by the Sellers and such difference will not be resolved prior to the date that is three (3) Business Days prior to the Closing Date (each such Contract, a "Disputed Amount Contract"), then the Sellers shall provide the Purchaser, not less than three (3) Business Days prior to the Closing Date, with a schedule that lists each such Disputed Amount Contract and the amount of Cure Costs that has been proposed by each such non-Seller counterparty.  If the Sellers, with the consent of the Purchaser, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Costs for such Disputed Amount Contract such that the Undetermined Cure Cost for such Disputed Amount Contract does not become a Determined Cure Cost within five (5) Business Days following the Closing Date, then the Sellers shall seek to have the amount of Cure Costs related to such Disputed Amount Contract determined by the Bankruptcy Court.  With respect to any Contract (including any Real Property Lease or Seller Plan) that has a Designation Deadline after the Closing Date and which becomes an Assigned Contract after the Closing Date in accordance with Section 1.5(a) (including any Disputed Amount Contract for which the Cure Cost becomes a Determined Cure Cost and which becomes an Assigned Contract after the Closing Date in accordance with Section 1.5(a)), (i) the applicable Sellers shall use reasonable best efforts to promptly take such steps as are reasonably necessary, including, if applicable, prompt delivery of notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by the applicable Seller and assigned to the Purchaser, including by executing and delivering to the Purchaser an Assignment and Assumption Agreement with respect to such Assigned Contract and, in the case of an Assumed Real Property Lease, an Assignment and Assumption of Lease Agreement with respect to such Assumed Real Property Lease, and (ii) the Purchaser shall pay the Determined Cure Costs with respect to such Assigned Contract promptly after the date such Assigned Contract is assumed by the applicable Seller and assigned to the Purchaser and execute and deliver to the applicable Seller an Assignment and Assumption Agreement with respect to such Assigned Contract and, in the case of an Assumed Real Property Lease, an Assignment and Assumption of Lease Agreement with respect to such Assumed Real Property Lease.

(e)    The Sellers shall take all reasonable actions required to assume and assign the Assigned Contracts to the Purchaser (other than payment of the Determined Cure Costs, which shall be the sole responsibility of the Purchaser), including taking all reasonable actions required to obtain a Bankruptcy Court order containing a finding that the proposed assumption and assignment of the Assigned Contracts to the Purchaser satisfies all applicable requirements of section 365 of the Bankruptcy Code.  In connection with the assumption and assignment of the Assigned Contracts pursuant to section 365 of the Bankruptcy Code, the Purchaser shall use commercially reasonable efforts to provide reasonable information to counter-parties to Assigned Contracts to establish adequate assurance of future performance of and under the Assigned Contracts within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2) of the Bankruptcy Code.

(f)    Notwithstanding the foregoing, the Purchaser may, in lieu of paying any Determined Cure Costs (or any portion thereof) with respect to any Assigned Contract directly to the applicable non-Seller counterparty, pay such Determined Cure Cost (or portion thereof) to

11

the Sellers who shall hold such amount in trust for the benefit of the Purchaser without commingling the same with other funds or assets of the Sellers, and shall promptly deliver such Determined Cure Cost (or portion thereof) to the applicable non-Seller counterparty.  In addition, notwithstanding anything herein to the contrary, in lieu of paying any Determined Cure Costs (or any portion thereof) with respect to any Assigned Contract pursuant to <u>Section 1.5(c)</u> or <u>Section 1.5(d)</u>, the Purchaser and the applicable non-Seller counterparty to such Assigned Contract may agree to a post-Closing payment schedule pursuant to which the Purchaser will make agreed upon Cure Cost payments to the applicable non-Seller counterparty.

      (g)    If the Purchaser and the non-Seller counterparty to any Non-Designated Contract agree to the terms of the assumption and assignment of such Non-Designated Contract, which terms do not result in any Liability to or obligation of any Seller or any waiver of right attributable to, or any loss of, any Excluded Asset (other than such Non-Designated Contract), then, at the sole option of the Purchaser, the Purchaser may notify the Sellers in writing no later than the End Time (as defined below) of such agreement and elect to include such Non-Designated Contract in the definition(s) of "Assigned Contracts," "Assumed Real Property Leases," "Acquired Insurance Policies" and/or "Assumed Seller Plans," and exclude from the definition(s) of "Non-Assigned Contracts" and/or "Excluded Plans," such Non-Designated Contract.  If the Purchaser delivers any such written notice to the Sellers (such written notice being deemed a "Designation Notice" for purposes of this Agreement) with respect to any Non-Designated Contract, then (i) such Non-Designated Contract shall irrevocably become an "Assigned Contract," "Assumed Real Property Lease," "Acquired Insurance Policy" and/or "Assumed Seller Plan," as applicable, and will be excluded from "Non-Assigned Contracts" and/or "Excluded Plans," as applicable, upon the delivery of such written notice and the entry into of the agreement (if applicable) referred to in <u>clause (ii)</u> by the Purchaser, the applicable Sellers and the non-Seller counterparty to such Non-Designated Contract, (ii) the applicable Sellers shall enter into any agreement with respect to such Non-Designated Contract that is agreed to by the Purchaser and the non-Seller counterparty thereto, (iii) the applicable Sellers shall use reasonable best efforts to promptly take such steps as are reasonably necessary to cause such Non-Designated Contract to be assumed by the applicable Seller and assigned to the Purchaser, including by executing and delivering to the Purchaser an Assignment and Assumption Agreement with respect to such Non-Designated Contract and, in the case of a Real Property Lease, an Assignment and Assumption of Lease Agreement with respect to such Real Property Lease, and (iv) the Purchaser shall pay the Determined Cure Costs with respect to such Non-Designated Contract promptly after the date such Non-Designated Contract is assumed by the applicable Seller and assigned to the Purchaser, or at such other times as the Purchaser and such non-Seller counterparty agree, and execute and deliver to the applicable Seller an Assignment and Assumption Agreement with respect to such Non-Designated Contract and, in the case of a Real Property Lease, an Assignment and Assumption of Lease Agreement with respect to such Non-Designated Real Property Lease.  The term "<u>Non-Designated Contract</u>" means any Contract of any Seller that is not designated by the Purchaser as an "Assigned Contract," "Assumed Real Property Lease," "Acquired Insurance Policy" and/or "Assumed Seller Plan" pursuant to a Designation Notice on or prior to the Designation Deadline for such Contract.  The term "<u>End Time</u>" means the earlier of (x) the Closing Date and (y) the later of (A) 5:00 p.m. (New York time) on February 10, 2022 and (B) 5:00 p.m. (New York time) on the date on which all conditions set forth in <u>Article IX</u> have been satisfied or waived (other than

conditions that by their nature are to be satisfied at the Closing and the conditions set forth in Sections 9.2(a), 9.2(b), 9.3(e) and 9.3(f)).

(h)     Notwithstanding anything herein to the contrary, following the Closing Date, nothing in this Agreement shall prevent or restrict any Seller from rejecting any Contract, insurance policy or Seller Plan that is not an Assigned Contract, Assumed Real Property Lease, Acquired Insurance Policy or Assumed Seller Plans and where the Designation Deadline for the same has passed.

## ARTICLE II.

## CONSIDERATION

Section 2.1     Consideration.  In consideration for the transfer of the Purchased Assets to the Purchaser and the other undertakings set forth herein, the purchase price (the "Purchase Price") for the Purchased Assets shall be (i) the assumption of the Assumed Liabilities by the Purchaser at Closing, plus (ii) a credit bid pursuant to section 363(k) of the Bankruptcy Code (the "DIP Credit Bid") of all DIP Obligations outstanding as of immediately prior to the Closing (the "DIP Credit Bid Amount"), plus (iii) a credit bid pursuant to section 363(k) of the Bankruptcy Code (the "ABL Credit Bid" and, together with the DIP Credit Bid, the "Credit Bid") of all ABL Obligations outstanding as of immediately prior to the Closing (the "ABL Credit Bid Amount" and, together with the DIP Credit Bid Amount, the "Credit Bid Amount"), plus (iv) the Excluded Cash.  Notwithstanding anything to the contrary herein, under no circumstances shall any portion of the Credit Bid Amount be converted into or otherwise require a cash payment.  Anything herein to the contrary notwithstanding, each dollar of DIP Obligations and/or ABL Obligations that is subject to the Credit Bid or assumed as Assumed Liabilities shall be treated as the same as a dollar of cash.

Section 2.2     Allocation of Purchase Price.  The Purchaser shall, not later than one hundred twenty (120) days after the Closing Date, prepare and deliver to the Sellers a schedule allocating the Purchase Price (including Assumed Liabilities to the extent that such Liabilities are required to be treated as part of the purchase price for Tax purposes), among the Purchased Assets of each Seller in accordance with Section 1060 of the Code and U.S. Treasury Regulations thereunder (such schedule, the "Allocation").  If the Sellers raise any objection to the Allocation within forty-five (45) days after the receipt thereof, the Sellers and the Purchaser will negotiate in good faith to resolve such objection(s).  If the Sellers and the Purchaser are unable to reach an agreement on the Allocation within twenty (20) days after the Sellers first raise any objection to the Allocation, the Sellers and the Purchaser shall submit to the Neutral Accountant a notice setting forth in reasonable detail their proposed allocations.  The Neutral Accountant shall determine only the unresolved items with respect to the Allocation.  The Neutral Accountant shall be instructed to determine its best estimate of the Allocation based on the unresolved items and provide a written description of the basis for its determination of the Allocation within twenty (20) days after the matter has been submitted to the Neutral Accountant, which written determination shall be final and binding and shall become the Allocation. The fees and expenses of the Neutral Accountant shall be split equally between the Sellers on the one hand and the Purchaser on the other hand.  If the Sellers do not raise any objection to the Allocation within forty-five (45) days after the receipt thereof, the Sellers shall

13

be deemed to have conclusively accepted and agreed to the Allocation.  The Sellers and the Purchaser shall report and file all Tax Returns (including amended Tax Returns and claims for refund) and Form 8594 consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Body or any other proceeding) except as required by Law or any "closing agreement" pursuant to Section 7121 of the Code; provided, however, that nothing contained herein shall prevent the Sellers or the Purchaser from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation, and neither the Sellers nor the Purchaser shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging the Allocation.  The Purchaser and each of the Sellers shall cooperate in the filing of any forms, Tax Returns or other documents with respect to the Allocation, including any amendments to such forms, Tax Returns or other documents required pursuant to this Agreement with respect to any adjustment to the Purchase Price.

Section 2.3    Withholding.  The Purchaser and any other applicable withholding agent shall be entitled to deduct and withhold from the consideration otherwise payable to any Person pursuant to this Agreement, such amounts as the Purchaser or such other applicable withholding agent are required to deduct and withhold with respect to the making of such payment under any provision of U.S. federal, state, or local or non-U.S. Tax law; provided, that the Purchaser shall use commercially reasonable efforts to provide notice (at least five (5) days prior to the Closing) to the affected Seller (or Sellers) before deducting and withholding any amounts pursuant to this Agreement and to cooperate in good faith with such Seller (or Sellers) in minimizing any such deduction and withholding (to the extent permitted by Law).  If the Purchaser and any other applicable withholding agent withholds amounts pursuant to this Agreement and properly pays such amounts to the appropriate taxing authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which the Purchaser or such other applicable withholding agent made such deduction and withholding.

## ARTICLE III.

## CLOSING AND TERMINATION

Section 3.1    Closing.  Upon the terms and subject to the conditions contained in this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "Closing") shall take place remotely via the exchange of electronic documents and signatures by electronic mail at 10:00 a.m. (New York Time) on a date that is no later than the second (2nd) Business Day following the date on which all of the conditions set forth in Article IX are satisfied or, to the extent permitted by applicable Law, waived in writing by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing), or at such other place, date and/or time as the Purchaser and Strike HoldCo may mutually agree in writing.  The date on which the Closing actually occurs is referred to in this Agreement as the "Closing Date."

Section 3.2    Closing Deliveries by Sellers.  At or prior to the Closing, the Sellers shall deliver, or cause to be delivered, to the Purchaser:

(a)      a bill of sale, in a form reasonably acceptable to and agreed by the Purchaser and the Sellers (the "Bill of Sale"), duly executed by the Sellers;

(b)      an assignment and assumption agreement, in a form reasonably acceptable to and agreed by the Purchaser and the Sellers (the "Assignment and Assumption Agreement"), duly executed by the Sellers;

(c)      an assignment and assumption of lease agreement, in a form reasonably acceptable to and agreed by the Purchaser and the Sellers (each, an "Assignment and Assumption of Lease Agreement"), effecting the assignment to, and the assumption by, the Purchaser of each Assumed Real Property Lease, duly executed by the applicable Sellers;

(d)      intellectual property assignment agreements, each in a form reasonably acceptable to and agreed by the Purchaser and the Sellers (each, an "IP Assignment Agreement"), effecting the assignment to the Purchaser of the Owned Intellectual Property, duly executed by the applicable Sellers;

(e)      a true and correct copy of the Sale Approval Order, as entered by the Bankruptcy Court;

(f)      a valid, complete and accurate IRS Form W-9 in respect of each Seller, or, in the case of a Seller that is a disregarded entity for U.S. federal income Tax purposes, the entity that is treated as the transferor of property for U.S. federal income tax purposes;

(g)      the Escrow Agreement, duly executed by the Sellers and the Escrow Agent;

(h)      the officer's certificates required to be delivered pursuant to Section 9.3(a) and Section 9.3(b); and

(i)      the Transition Services Agreement, duly executed by the Sellers.

Section 3.3      Closing Deliveries by the Purchaser.      At or prior to the Closing, the Purchaser shall deliver, or shall cause to be delivered, to the Sellers:

(a)      a payoff letter, release letter or other similar document acknowledging the DIP Credit Bid of the DIP Credit Bid Amount pursuant to section 363(k) of the Bankruptcy Code as partial consideration for the transfer of the Purchased Assets;

(b)      a payoff letter, release letter or other similar document acknowledging the ABL Credit Bid of the ABL Credit Bid Amount pursuant to section 363(k) of the Bankruptcy Code as partial consideration for the transfer of the Purchased Assets;

(c)      the Assignment and Assumption Agreement, duly executed by the Purchaser;

(d)      each Assignment and Assumption of Lease Agreement, duly executed by the Purchaser;

15

(e)       each IP Assignment Agreement, duly executed by the Purchaser;

(f)       the certificates required to be delivered pursuant to Section 9.2(a) and Section 9.2(b);

(g)       the Escrow Agreement, duly executed by the Purchaser;

(h)       the Waiver, duly executed by the Purchaser; and

(i)       the Transition Services Agreement, duly executed by the Purchaser.

Section 3.4       Termination of Agreement.

This Agreement may be terminated at any time prior to the Closing as follows:

(a)       by the mutual written consent of Strike HoldCo and the Purchaser at any time prior to the Closing;

(b)       by either the Purchaser or Strike HoldCo, if the Closing shall not have been consummated on or prior to May 5, 2022 (the "Outside Date"); provided, that the right to terminate this Agreement under this Section 3.4(b) shall not be available to the Purchaser or Strike Holdco, as applicable, if the Purchaser or any Seller, as applicable, is then in material breach or violation of any of their respective representations, warranties, covenants or agreements under this Agreement;

(c)       by either the Purchaser or Strike HoldCo, if any Governmental Body, including the Bankruptcy Court, shall have enacted, issued, promulgated, enforced or entered any Law or Order that permanently enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated hereby (any such Law or Order, a "Legal Restraint") and such Legal Restraint has become final and nonappealable; provided, that the right to terminate this Agreement under this Section 3.4(c) shall not be available to the Purchaser or Strike HoldCo, as applicable, if the Purchaser or any Seller, as applicable, is then in material breach or violation of this Agreement and such breach or violation is the cause of the Legal Restraint;

(d)       by the Purchaser, if any of the following shall occur (each, a "Milestone"):

(i)       the Chapter 11 Cases shall not have commenced by 8:00 a.m. (prevailing Eastern Time) on December 6, 2021;

(ii)       the Sale Approval Motion shall not have been filed with the Bankruptcy Court on the Petition Date;

(iii)       the Interim DIP Order shall not have been entered by the Bankruptcy Court on or before the date that is three (3) calendar days after the Petition Date;

16

(iv)     the Sale Procedures Order shall not have been entered by the Bankruptcy Court on or before the date that is twenty-one (21) calendar days after the Petition Date;

(v)     the Final DIP Order shall not have been entered by the Bankruptcy Court on or before the date that is thirty-five (35) calendar days after the Petition Date;

(vi)     the deadline for the submission of Qualified Bids, as set forth in the Bidding Procedures (as approved by the Sale Procedures Order), shall be later than the date that is forty-nine (49) calendar days after the Petition Date;

(vii)     the Sellers shall fail to have held and closed the Auction on or before the date that is fifty-one (51) calendar days after the Petition Date; provided, that the Purchaser shall not have the right to terminate this Agreement pursuant to this Section 3.4(d)(vii) if the Bidding Procedures (as approved by the Sale Procedures Order) do not require the Sellers to hold an Auction;

(viii)     the Sale Approval Order shall not have been entered by the Bankruptcy Court on or before the date that is fifty-two (52) calendar days after the Petition Date; or

(ix)     the Closing shall not have occurred on or before the date that is sixty-six (66) calendar days after the Petition Date;

provided, that if a Milestone is not achieved by the applicable date set forth in this Section 3.4(d), but such Milestone is achieved after such date and prior to a valid termination of this Agreement, then the Purchaser shall not have the right to terminate this Agreement pursuant to this Section 3.4(d) as a result of such Milestone not being achieved by the applicable date set forth in this Section 3.4(d); provided, further, that the Purchaser shall not have the right to terminate this Agreement pursuant to this Sections 3.4(d) as a result of a Milestone not being achieved by the applicable date set forth in this Section 3.4(d) if the Milestone was not so achieved primarily as a result of the material breach by the Purchaser of its representations, warranties, covenants or agreements set forth in this Agreement;

(e)     by the Purchaser, if following entry by the Bankruptcy Court of the Sale Procedures Order, the Interim DIP Order, the Final DIP Order or the Sale Approval Order, any such Order is (i) amended, modified or supplemented in a manner adverse to the Purchaser or any of its Affiliates without the Purchaser's prior written consent or (ii) voided, reversed or vacated or is subject to a stay without the Purchaser's prior written consent;

(f)     by the Purchaser, if any of the Sellers seeks an order of the Bankruptcy Court dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to a case or cases under Chapter 7 of the Bankruptcy Code, or the Bankruptcy Court enters such an order for any reason (except with the Purchaser's prior written consent), or if any of the Sellers seeks an order of the Bankruptcy Court appointing a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Seller in the Chapter 11 Cases, or if any such appointment occurs for any reason;

17

(g)        by the Purchaser, if any Seller has entered into, or shall have announced its intention (including by means of any filings made with the Bankruptcy Court or any other Governmental Body) to enter into, an agreement in principle, letter of intent, memorandum of understanding, definitive agreement or other arrangement, whether binding or non-binding, or whether subject to terms and conditions, with any Person (other than the Purchaser or its Affiliates) with respect to any Alternative Transaction;

(h)        automatically, upon consummation of an Alternative Transaction;

(i)        by Strike HoldCo prior to the entry by the Bankruptcy Court of the Sale Procedures Order, if any Seller or the board of directors, board of managers or similar governing body of any Seller reasonably determines in good faith, after consulting with outside counsel, that proceeding with the transactions contemplated by this Agreement or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties under applicable Law;

(j)        by the Purchaser, if for any reason the Purchaser is unable, pursuant to section 363(k) of the Bankruptcy Code, to credit bid all or any portion of the Credit Bid Amount in payment of the Purchase Price as set forth in Section 2.1;

(k)        by either the Purchaser or Strike Holdco, if, following the Sale Hearing, the Bankruptcy Court determines that the Purchaser is not the Successful Bidder;

(l)        by the Purchaser, (i) if any Seller shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in this Agreement, or if any representation or warranty of any Seller in this Agreement shall have become untrue (determined as if the Sellers made their respective representations and warranties at all times on and after the Execution Date and prior to the date this Agreement is terminated), and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of any condition set forth in Section 9.3(a) or Section 9.3(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) thirty (30) days after written notice of such breach, failure or occurrence is given to the Sellers by the Purchaser; provided, that, at the time of such termination, the Purchaser is not in material breach of any of its representations, warranties, covenants or other agreements contained herein;

(m)        by Strike HoldCo, (i) if the Purchaser shall have breached or failed to perform any of its representations, warranties, covenants or other obligations contained in Article V of this Agreement, or if any representation or warranty of the Purchaser contained in Article V of this Agreement shall have become untrue (determined as if the Purchaser made its representations and warranties at all times on and after the Execution Date and prior to the date this Agreement is terminated), and (ii) any such breach, failure to perform or occurrence referred to in clause (i) (A) would result in a failure of a condition set forth in Section 9.2(a) or Section 9.2(b) and (B) is not curable or able to be performed, or, if curable or able to be performed, is not cured or performed prior to the earlier of (x) the Outside Date and (y) thirty (30) days after written notice of such breach, failure or occurrence is given to the Purchaser by Strike Holdco;

provided, that, at the time of such termination, the Sellers are not in material breach of any of their representations, warranties, covenants or other agreements contained herein;

(n)     by the Purchaser, if (i) all of the conditions set forth in Section 9.1 and Section 9.2 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived by Strike Holdco, (ii) the Purchaser has confirmed in writing to the Sellers that all of the conditions set forth in Section 9.1 and Section 9.3 have been satisfied, or waived by the Purchaser (other than conditions that by their nature are to be satisfied at the Closing), (iii) at a time when the foregoing clauses (i) and (ii) are satisfied, the Purchaser has confirmed in writing to the Sellers that the Purchaser is ready, willing and able to effect the Closing and (iv) the Sellers fail to consummate the Closing on or prior to the date on which the Closing is required to have occurred pursuant to Section 3.1;

(o)     by Strike Holdco, if (i) all of the conditions set forth in Section 9.1 and Section 9.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived by the Purchaser, (ii) Strike Holdco has confirmed in writing to the Purchaser that all of the conditions set forth in Section 9.1 and Section 9.2 have been satisfied, or waived by the Sellers (other than conditions that by their nature are to be satisfied at the Closing), (iii) at a time when the foregoing clauses (i) and (ii) are satisfied, Strike Holdco has confirmed in writing to the Purchaser that the Sellers are ready, willing and able to effect the Closing and (iv) the Purchaser fails to consummate the Closing on or prior to the date on which the Closing is required to have occurred pursuant to Section 3.1;

(p)     by the Purchaser, if (i) there shall occur any event, circumstance, condition or event that permits the "Requisite Consenting Lenders" (as defined in the Restructuring Support Agreement) to terminate the Restructuring Support Agreement or (ii) the Restructuring Support Agreement shall have been validly terminated;

(q)     by the Purchaser, if (i) an "Event of Default" (as defined in the DIP Credit Agreement) shall have occurred or (ii) the indebtedness outstanding under the DIP Credit Agreement has been paid off or the DIP Credit Agreement is terminated;

(r)     by the Purchaser, if (i) the Sellers shall have failed to deliver to the Purchaser final and complete copies of all of the Seller Disclosure Schedules on or before the date that is ten (10) days after the Execution Date, or (ii) any of the final and complete Seller Disclosure Schedules, or any matter, fact, item of information, circumstance, event, Liability or other disclosure set forth on, or described or referred to in, any of the Seller Disclosure Schedules, shall not be acceptable to the Purchaser; provided, that the Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 3.4(r) after the date that is the later of (A) one (1) day prior to the hearing before the Bankruptcy Court seeking entry of the Sale Procedures Order and (B) the date that is fourteen (14) days after the date on which the Sellers deliver final and complete copies of the Seller Disclosure Schedules to the Purchaser, unless the Purchaser shall have notified Strike Holdco in writing of its intention to terminate this Agreement pursuant to this Section 3.4(r) on or prior to such date; or

19

(s)     by the Purchaser, if the DIP Credit Agreement shall not have been amended at or prior to 11:59 p.m. (New York Time) on December 30, 2021 to reflect the amendments described on <u>Schedule 3.4(s)</u>.

The Sellers acknowledge and agree, and shall not dispute, that after the commencement of the Chapter 11 Cases, the termination of this Agreement by the Purchaser shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Sellers hereby waive, to the greatest extent possible, the applicability of the automatic stay to the termination of this Agreement by the Purchaser or the giving of a notice of termination of this Agreement by the Purchaser).

Section 3.5    <u>Procedure Upon and Effect of Termination</u>.

(a)     In the event of the valid termination of this Agreement pursuant to <u>Section 3.4</u>, (a) written notice of such termination shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, and (b) this Agreement shall thereupon terminate and become void and of no further force or effect, the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto and there shall be no Liability hereunder on the part of the parties hereto; <u>provided</u>, that (i) the provisions of <u>Section 3.4</u>, this <u>Section 3.5</u> and <u>Article XI</u>, and any defined terms used in any such Section or Article, and the Confidentiality Agreement shall remain in full force and effect and survive the termination of this Agreement; and (ii) no such termination shall relieve any party from liability for any willful and material breach of this Agreement. Any termination of this Agreement pursuant to <u>Section 3.4</u> shall be effective on the date that written notice of such termination is given by the terminating party to the other parties hereto; <u>provided</u>, that (A) in the case of any termination of this Agreement pursuant to <u>Section 3.4(a)</u>, the date of termination shall be the date of termination set forth in the writing signed by the Purchaser and Strike Holdco, and (B) in the case of any automatic termination of this Agreement pursuant to <u>Section 3.4(h)</u>, the date of termination shall be the date that an Alternative Transaction is consummated.

(b)     In the event this Agreement is validly terminated by the Sellers or the Purchaser (other than a termination pursuant to (i) <u>Section 3.4(a)</u>, <u>Section 3.4(m)</u> or <u>Section 3.4(o)</u>, (ii) <u>Section 3.4(b)</u> and the Closing shall not have been consummated on or prior to the Outside Date primarily as a result of the material breach by the Purchaser of its representations, warranties, covenants or agreements set forth in this Agreement, (iii) <u>Section 3.4(c)</u> and the existence of the applicable Legal Restraint is primarily as a result of the material breach by the Purchaser of its representations, warranties, covenants or agreements set forth in this Agreement, (iv) <u>Section 3.4(d)</u> and the applicable Milestone shall not have been achieved on or prior to the applicable date set forth in <u>Section 3.4(d)</u> primarily as a result of the material breach by the Purchaser of its representations, warranties, covenants or agreements set forth in this Agreement or (v) <u>Section 3.4(b)</u> or <u>Section 3.4(d)(ix)</u> if, at the time of such termination, all conditions to Closing set forth in <u>Section 9.1</u> and <u>Section 9.3</u> other than <u>Section 9.3(e)</u> or <u>Section 9.3(f)</u> have been satisfied or, to the extent permitted by applicable Law, waived in writing by the party entitled to waive the applicable condition (other than conditions that by their nature are to be satisfied at the Closing)), then the Sellers shall reimburse the Purchaser for all reasonable, documented out-of-pocket fees, costs and expenses (including reasonable, documented out-of-

20

pocket fees, costs and expenses of legal counsel, financial advisors, consultants and any other advisors) incurred by the Purchaser or any of its Affiliates prior to such termination in connection with this Agreement, the Ancillary Agreements, the Sale Approval Motion, the Bidding Procedures, the Sale Procedures Order, the Sale Hearing, the Sale Approval Order, the Auction or the Restructuring Support Agreement, or any of the transactions contemplated hereby or thereby (other than any cost or expense incurred by the Purchaser or any of its Affiliates directly related to or arising from defending any Actions between the Purchaser, on the one hand, and any Seller, on the other hand, arising from the Purchaser's material breach or material failure to perform any of its agreements, covenants or obligations hereunder), in an aggregate maximum amount of $1,500,000 (the "Reimbursement Amount").  In the event that this Agreement is terminated pursuant to Section 3.4 and the Sellers are required to pay to the Purchaser the Reimbursement Amount, then the Sellers shall pay such amount to the Purchaser in cash, by wire transfer of immediately available funds to an account designated by the Purchaser, within three (3) Business Days following the effective date of any such termination.  In the event that all or any portion of the Reimbursement Amount is not paid by the Sellers to the Purchaser on or before the date set forth in the immediately preceding sentence, then the Purchaser shall also be entitled to immediate reimbursement from the Sellers for all reasonable, documented out-of-pocket fees, costs and expenses incurred by the Purchaser or any of its Affiliates to collect such unpaid portion of the Reimbursement Amount, together with interest on such amount at the prime rate published in the Money Rates Section of the *Wall Street Journal* in effect on the date such payment was required to be made through the date of payment (such fees, costs, expenses and interest, the "Collection Costs").  Any obligation to pay the Reimbursement Amount and the Collection Costs hereunder shall be absolute and unconditional; any such payment shall constitute allowed superpriority administrative claims against the Sellers' estates under sections 503(b) and 507(a)(1) of the Bankruptcy Code and shall be payable as specified herein, and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.  The Sellers hereby acknowledge and agree that (i) the right of the Purchaser to receive payment of the Reimbursement Amount as set forth in this Section 3.5(b) is necessary and essential to induce the Purchaser to execute and deliver this Agreement and to enter into the transactions contemplated hereby, and that the Purchaser would not have done so without receiving such right, and (ii) the obligation of the Sellers to pay the Reimbursement Amount to the Purchaser as set forth in this Section 3.5(b) was negotiated at arms'-length and in good faith and is (x) designed to maximize the value of the Sellers' estates, (y) fair, reasonable and appropriate, and (z) in the best interests of the Sellers and the Sellers' estates, creditors, interest holders, stakeholders, and all other parties in interest.

(c)     Nothing in this Section 3.5 or elsewhere in this Agreement shall be deemed to impair the right of any party to bring any action or actions for specific performance, injunctive and/or other equitable relief (including the right of any party to compel specific performance by another party of its obligations under this Agreement) pursuant to Section 11.10 prior to the valid termination of this Agreement.  The parties acknowledge and hereby agree that in no event shall the Sellers be required to pay the Reimbursement Amount on more than one occasion.  In addition, nothing in this Section 3.5 or elsewhere in this Agreement shall affect the rights of the Purchaser or any of the other Purchaser Parties to receive reimbursement for expenses or other adequate protection pursuant to any order of the Bankruptcy Court, including the Interim DIP Order or the Final DIP Order or any order of the Bankruptcy Court approving the Sellers' use of cash collateral.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Seller Disclosure Schedules, the Sellers hereby, jointly and severally, make the representations and warranties in this <u>Article IV</u> to the Purchaser as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

Section 4.1    <u>Organization and Qualification</u>.  Each Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  Each Seller is qualified and in good standing as a foreign limited liability company in each jurisdiction where the properties owned, leased or operated or the conduct of its Business requires such qualification, except where the failure to be so qualified or in good standing has not had and would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect.  Each Seller has all requisite power and authority to own, lease and operate its properties and to carry on its Business as it is now being conducted, subject to the provisions of the Bankruptcy Code.

Section 4.2    <u>Subsidiaries</u>.  <u>Section 4.2</u> of the Seller Disclosure Schedules sets forth each corporation, partnership, limited liability company, association or other Person in which any Seller owns, of record or beneficially, any direct or indirect Equity Interest.  Except as set forth in <u>Section 4.2</u> of the Seller Disclosure Schedules, no Seller owns, of record or beneficially, any direct or indirect Equity Interest of any corporation, partnership, limited liability company, association or other Person.

Section 4.3    <u>Authority Relative to This Agreement</u>.  Subject to such authorization and approvals as are required from the Bankruptcy Court, each Seller has all requisite power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Seller Ancillary Agreements to be executed by such Seller, and (c) perform its obligations hereunder and under each of the Seller Ancillary Agreements to be executed by such Seller, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by each Seller of this Agreement and each of the Seller Ancillary Agreements to be executed and delivered by such Seller, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of such Seller.  This Agreement has been, and at or prior to the Closing each of the Seller Ancillary Agreements will be, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Procedures Order) this Agreement constitutes, and each of the Seller Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against such Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, fraudulent conveyance, moratorium and similar laws affecting creditors' rights and remedies generally, and subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at Law or in equity) (the "<u>Bankruptcy Exceptions</u>").

22

Section 4.4     Conflicts; Consents and Approvals.

(a)     Except as set forth in Section 4.4(a) of the Seller Disclosure Schedules, none of the execution and delivery by any Seller of this Agreement or any of the Seller Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or the performance by any Seller of any of the provisions hereof or thereof will (i) conflict with or violate the Organizational Documents of any Seller, (ii) subject to and assuming entry of the Sale Approval Order, require any consent under, result in a violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of any Material Contract or Material Permit, (iii) subject to and assuming entry of the Sale Approval Order and assuming that all approvals, orders, Permits, consents, registrations, declarations, notifications and filings set forth in Section 4.4(b) of the Seller Disclosure Schedules have been made, given or obtained, as applicable, violate any Law applicable to any Seller or by which any Purchased Asset is bound or affected, or (iv) result in the imposition or creation of any Encumbrance (other than any Permitted Encumbrance) on any of the Purchased Assets other than, in the case of clauses (ii) and (iii), for any such conflicts, violations, breaches, defaults or other occurrences that would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect.

(b)     Assuming the accuracy of the representations and warranties of the Purchaser in Section 5.3(b) and except as set forth in Section 4.4(b) of the Seller Disclosure Schedules, no approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body or other Person is required on the part of any Seller in connection with the execution and delivery by any Seller of this Agreement or any of the Seller Ancillary Agreements, the performance by any Seller of any of the provisions hereof or thereof, or the consummation by any Seller of the transactions contemplated hereby or thereby (including the assumption by the Sellers of the Assigned Contracts and the assignment thereof to the Purchaser), except for (i) the entry of the Sale Procedures Order and the Sale Approval Order by the Bankruptcy Court, (ii) compliance with any applicable requirements under the HSR Act and other applicable Antitrust Laws and (iii) such other approvals, orders, Permits, consents, registrations, declarations, notifications or filings, the failure of which to obtain or make would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect.

Section 4.5     Absence of Certain Changes.  Since the Balance Sheet Date through the date of this Agreement, (a) the Business has been conducted by the Sellers only in the Ordinary Course of Business in all material respects (subject to the effects resulting from the negotiation, preparation, execution and delivery of this Agreement and the preparation of the Chapter 11 Cases), (b) there has not been any change by the Sellers with respect to any of their finance or Tax accounting elections, methods, principles or practices except as required by applicable Law or GAAP, and (c) there has been no Material Adverse Effect.

Section 4.6     Litigation.  Except for the Chapter 11 Cases and any Order entered in the Chapter 11 Cases or as set forth in Section 4.6 of the Seller Disclosure Schedules, there is no material litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry, subpoena or audit, whether in law or equity, or whether civil, criminal,

23

regulatory, arbitral, investigative, appellate, informal or administrative by or before any Governmental Body (collectively, "Actions"), pending or, to the Knowledge of the Sellers, threatened in writing against any Seller or any property or asset of any Seller which has had or would be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, or would be reasonably expected to materially impair or delay any Seller's ability to consummate the transactions contemplated by this Agreement.  Except with respect to Orders entered in the Chapter 11 Cases or as set forth in Section 4.6 of the Seller Disclosure Schedules, no Seller is subject to any Order that relates to the Business, any of the Purchased Assets or any of the Assumed Liabilities and for which such Seller has continuing obligations or Liabilities.

Section 4.7    Intellectual Property.

(a)    Section 4.7(a) of the Seller Disclosure Schedules sets forth a true, complete and correct list of all of the patents, patent applications, registered trademarks, applications to register trademarks, registered copyrights, Internet domain names, and applications for any of the foregoing, in each case that constitute the Owned Intellectual Property.

(b)    Except as set forth in Section 4.7(b) of the Seller Disclosure Schedules or as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, (i) the Sellers own all right, title and interest in and to the Owned Intellectual Property, free and clear of any Encumbrances (other than Permitted Encumbrances) and free from any requirement of any present or future royalty payments, license fees, charges or other payments, or conditions or restrictions whatsoever, (ii) no Action is pending or, to the Knowledge of the Sellers, threatened challenging the validity, enforceability, registration, ownership or use of any Seller Intellectual Property and (iii) the Seller Intellectual Property is not subject to any outstanding ruling, award, decision, injunction, judgment, order or decree restricting the use or licensing thereof.  Except as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, the consummation of the transactions contemplated hereby will not result in the loss or impairment of, or payment of, additional amounts with respect to, nor require the consent or approval of any other Person in respect of, the Purchaser's right to own, use or hold for use any of the Seller Intellectual Property necessary for the conduct of the Business in the Ordinary Course of Business.

(c)    Except as has not had and would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, (i) none of the Sellers, nor any of their respective products or services, nor the operation or conduct of the Business, has during the prior five (5) years infringed upon, misappropriated, diluted or otherwise violated the Intellectual Property rights (other than patents) or, to the Knowledge of the Sellers, of any Person, and none of the foregoing is currently ongoing; and (ii) to the Knowledge of the Sellers, no Person has during the prior five (5) years infringed upon, misappropriated, diluted or otherwise violated any Seller Intellectual Property, and none of the foregoing is currently ongoing.  Except as set forth in Section 4.7(c) of the Seller Disclosure Schedules, there has not been in the prior five (5) years, nor is there

24

currently, any pending Action against any Seller alleging that any Seller or any of its products or services is infringing, misappropriating, diluting or otherwise violating the Intellectual Property rights of any Person and, to the Knowledge of the Sellers, no such Actions are threatened.

(d)     To the Knowledge of the Sellers, all Seller Intellectual Property that is registered or issued as a patent, trademark or copyright is valid and enforceable and has not been adjudged invalid or unenforceable, in whole or in part, and except as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, the Sellers have paid all renewal, maintenance, and other fees when due as required to maintain each and every registration and pending application of any applicable Seller Intellectual Property in full force and effect.  Except as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, the Sellers have valid and enforceable rights to use the Licensed Intellectual Property as used in the conduct of the Business, free and clear of any Encumbrances (other than Permitted Encumbrances), pursuant to a valid written license, sublicense or other written Contract between one or more of the Sellers and the owner or licensor of such Licensed Intellectual Property.  The Seller Intellectual Property comprises all of the Intellectual Property necessary for the Sellers to conduct and operate the Business in the Ordinary Course of Business.

(e)     The Sellers have taken commercially reasonable actions to maintain and protect all of the Seller Intellectual Property and IT Assets and to protect and preserve the confidentiality of all trade secrets and other confidential information included in the Seller Intellectual Property, including requiring all Persons having access thereto who are not otherwise subject to professional obligations of confidentiality to execute written non-disclosure agreements.  Except as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, the Sellers have obtained from all employees, consultants or other Persons who provide or provided services to the Sellers related to the creation, development, modification or ownership of trade secrets used in the Business, executed agreements under which such employees or consultants are or were required to convey to the Sellers ownership of all inventions and developments conceived or created by them in the course of their work for any of the Sellers or the Business (or all such rights vested in one of the Sellers by operation of Law).

(f)     Except as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, no government funding, nor any facilities of a university, college, other educational institution, or similar institution, or research center, was used in the development of any Owned Intellectual Property.

(g)     The IT Assets are adequate in all material respects for their intended use and for the operation of the Business in the Ordinary Course of Business and are in good working condition (normal wear and tear excepted).   There has not been any material malfunction with respect to any of the IT Assets in the prior five (5) years that has not been remedied or replaced in all material respects.  To the Knowledge of the Sellers, the IT Assets include all of the information technology equipment necessary to operate the Business in the Ordinary Course of Business.  Except as would not be reasonably expected to have, individually

25

or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, the consummation of the transactions contemplated hereby will not result in the loss or impairment of or payment of additional amounts with respect to, nor require the consent of any other Person in respect of, the Purchaser's right to own, use or hold for use any of the IT Assets as owned, used or held for use in the conduct of the Business in the Ordinary Course of Business.

(h)    In connection with its collection, retention, storage, transfer and/or use of any personally identifiable information from any individuals, including any customers, prospective customers, employees and/or other third parties (collectively "Personal Information"), except as has not had and would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, the Sellers have been in compliance with all applicable Laws related to information privacy and data security, including breach of security notification obligations in all relevant jurisdictions, all published privacy policies and the requirements of any Contract to which any Seller is a party.  The Sellers have commercially reasonable physical, technical, organizational and administrative security measures in place to protect all Personal Information collected and/or stored by any of them from and against unauthorized access, use and/or disclosure.  To the Knowledge of the Sellers, and except as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, no Person (including any Governmental Body) has made any claim or commenced any Action relating to the Sellers' information privacy or data security practices, including with respect to the access, disclosure or use of Personal Information maintained by or on behalf of any Seller or threatened any such claim or Action or conducted any investigation or inquiry thereof.  To the Knowledge of the Sellers, the execution, delivery, or performance of this Agreement or any of the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby will not violate any Laws or, except as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, any applicable privacy policy as it currently exists or as it existed at any time during which any Personal Information was collected or obtained by or on behalf of any of the Sellers.  To the Knowledge of the Sellers, and except as has not had and would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, the Sellers have not in the past three (3) years experienced any loss, damage, or unauthorized access, disclosure, use or breach of security of any Personal Information in their possession, custody or control.

Section 4.8    Material Contracts.

(a)    Section 4.8(a) of the Seller Disclosure Schedules sets forth the following Contracts to which any Seller is a party or by which any of the Purchased Assets are bound as of the Execution Date (such Contracts set forth below are collectively referred to as the "Material Contracts"):

(i)    any Contract or group of related Contracts (including any Contract or group of related Contracts for (x) the lease or use of any Equipment by any Seller or (y) the sale or other disposition of any asset or property of any Seller) pursuant to which

26

it is reasonably expected that any Seller will make or receive payments in excess of $2,500,000 during (A) any twelve (12)-month period or (B) during the term of the Contract (or the term of a group of related Contracts), if such term is less than twelve (12) months;

(ii)      any Contract under which any Seller has incurred any Indebtedness with an outstanding amount in excess of $250,000;

(iii)     (x) any employment agreement (excluding any offer letter providing for employment at will that relates solely to position, annual compensation and eligibility of benefits generally, and does not contain any severance entitlement), consulting agreement, severance agreement, change of control agreement, retention agreement or collective bargaining agreement; and (y) and any Contract with any labor union, works council, or similar employee representative of a group of employees of any Seller;

(iv)     any Contract to which any Seller Party (other than a Seller) is a party;

(v)      any Contract for the lease, sublease, license or use of any real property that involves payments in excess of $250,000 during any twelve (12)-month period;

(vi)     any Contract that (A) limits or restricts any Seller from engaging in any business or other activity or from engaging in any business or other activity in any particular jurisdiction or (B) creates any exclusive relationship or arrangement with any Person;

(vii)    any Contract that (A) grants to any Person an option or a right of first refusal, first-offer or similar preferential right to purchase or acquire any of the assets or properties of any Seller or to receive or be furnished with any services provided by any Seller, or (B) limits the ability of any Seller to transfer, encumber or otherwise dispose of any assets or properties;

(viii)   any Contract (other than for commercially available off the shelf systems or software) where a Seller is a licensor or licensee of material Intellectual Property or material IT Assets;

(ix)     any Contract involving a joint venture, partnership or similar arrangement;

(x)      any Contract relating to the acquisition (by merger, consolidation or acquisition of Equity Interests or assets) by any of the Sellers of any Person or division thereof or collection of assets constituting all or substantially all of a business or business unit entered into at any time during the three (3) years prior to the Execution Date and pursuant to which any of the Sellers have any outstanding material Liabilities thereunder;

27

(xi)    any Contract containing a "most favored nation" or other similar provision providing for preferential pricing of products or services sold or provided by any Seller;

(xii)    any Contract that provides for a settlement, resolution or conciliation of any Action since the date that is three (3) years prior to the date of this Agreement, which imposes material continuing obligations (other than confidentiality obligations) on any of the Sellers or pursuant to which any Seller is required to make any payments after the Execution Date; and

(xiii)    any Contract with any Governmental Body.

(b)    Assuming that all consents, approvals, notices and disclosures described in Sections 4.4(a) and 4.4(b) of the Seller Disclosure Schedules are obtained or made (as applicable), (i) each Material Contract (other than any Material Contract that has expired or terminated in accordance with its terms or that has been terminated not in violation of this Agreement) (x) constitutes a valid and legally binding obligation of the Seller party thereto and, to the Knowledge of the Sellers, each other party thereto and (y) is in full force and effect, except in each of the preceding clauses (x) and (y), as limited by the Bankruptcy Exceptions, (ii) no Seller is in any material breach or material default under any Material Contract, except for breaches or defaults arising as a consequence of the commencement of the Chapter 11 Cases or except as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, and (iii) assuming entry of the Sale Approval Order, upon consummation of the transactions contemplated by this Agreement, each Material Contract, to the extent that it is an Assigned Contract, shall continue in full force and effect without penalty or any adverse consequence to the Purchaser (other than any Material Contract that has expired or terminated in accordance with its terms or that has been terminated or rejected not in violation of this Agreement) except as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect.

Section 4.9    Permits.

(a)    All of the material Permits that are necessary for the operation of the Business as presently conducted and the ownership or use of any of the Purchased Assets (collectively, the "Material Permits") are held by the Sellers and are in full force and effect, except where the failure to hold any such Permit or the failure of any such Permit to be in full force and effect has not had and would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect.  Section 4.9(a) of the Seller Disclosure Schedules sets forth a true, complete and correct list of all Material Permits held by the Sellers as of the Execution Date.

(b)    Each Seller is in compliance with its obligations under each of the Material Permits, and no condition exists that with notice or lapse of time or both would constitute a default under, or a violation of, any Material Permit except for such defaults or violations that have not had and would not reasonably be expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any

28

material respect and that would not materially impair or delay the ability of the Sellers to consummate the transactions contemplated hereby.  There is no Action, notice of violation, order of forfeiture or written complaint or investigation against any Seller relating to any of the Material Permits pending or, to the Knowledge of the Sellers, threatened in writing.

Section 4.10   Brokers and Finders.  Except as set forth in Section 4.10 of the Seller Disclosure Schedules, no Seller has engaged any investment banker, broker, finder, consultant or intermediary who is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or any of the transactions contemplated hereby for which the Purchaser is or will become liable.

Section 4.11   Title to Assets.  Upon the entry and effectiveness of the Sale Approval Order, the Sellers will have the power and right to, and at the Closing the Sellers shall, sell, assign, transfer, convey and deliver to the Purchaser good and valid title to (or, in the case of leased Purchased Assets, a valid and subsisting leasehold interest in), free and clear of any Encumbrances (except for Permitted Encumbrances), all of the Purchased Assets.  The Purchased Assets constitute all of the properties, assets and rights used by the Sellers and necessary in the conduct of the Business and are sufficient to conduct and operate the Business in the Ordinary Course of Business, other than the operations and business conducted with respect to the Excluded Assets.  All of the tangible Purchased Assets are in good order and repair, except for ordinary wear and tear and ordinary and routine repairs and maintenance requirements, for assets of comparable age and past use and are capable of being used to operate the Business in the Ordinary Course of Business, in each case, in all material respects, except where the failure to be in such condition has not had and would not reasonably be expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect and would not materially impair or delay the ability of the Sellers to consummate the transactions contemplated hereby.

Section 4.12   Real Property.

(a)   None of the Sellers owns any real property.

(b)   Section 4.12(b)(i) of the Seller Disclosure Schedules sets forth a complete and correct list of all Leased Real Property, specifying the address of such parcel of Leased Real Property and a description of all documents comprising the lease, sublease or other occupancy agreement to which any Seller is a party and leases or otherwise occupies any Leased Real Property (collectively, together with all amendments, supplements and modifications thereto, the "Real Property Leases").  Each Real Property Lease is in full force and effect and is a valid, binding and enforceable obligation of the Seller party thereto and, to the Knowledge of the Sellers, each of the other parties thereto, except as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect.  The applicable Seller party to each Real Property Lease has valid leasehold title to the applicable Leased Real Property, in each case, free and clear of any Encumbrances (other than Permitted Encumbrances).  Each Real Property Lease grants the Seller party thereto the sole and exclusive right to use and occupy the applicable Leased Real Property, in accordance with the terms thereof, subject to Permitted Encumbrances.  Except as set forth on Section 4.12(b)(i) of the Seller Disclosure Schedules, no Seller has assigned, subleased,

29

mortgaged, pledged or otherwise encumbered its interest under any Real Property Lease and no Seller has leased, subleased or granted to any Person the right to access, enter upon, use, occupy, lease, manage, operate, maintain, broker or purchase any portion of such Seller's interest in any Leased Real Property that is not otherwise a Permitted Encumbrance.  There are no matters or restrictions affecting the Real Property Leases that would reasonably be expected to materially interfere with or adversely affect in any material respect the continued use and occupancy by the Sellers or the Purchaser of the applicable Leased Real Property.

(c)     Except as a result of the filing of the Chapter 11 Cases, the applicable Seller and, to the Knowledge of the Sellers, each of the other parties thereto have performed in all material respects all material obligations required to be performed by such Person under each Real Property Lease, and, to the Knowledge of the Sellers, there does not exist any event, condition or omission that would constitute a default or breach (whether by lapse of time or notice or both) under any Real Property Lease.  Each Real Property Lease is in full force and effect and has not been amended, supplemented or modified in any respect except as set forth in Section 4.12(b)(i) of the Seller Disclosure Schedules.  No Seller has received any written notice of, or to the Knowledge of the Sellers, any oral notice of, any condemnation or eminent domain proceedings pending or threatened that affect any Leased Real Property.  No Seller has received any written notice of, or to the Knowledge of the Sellers, any oral notice of, any zoning, ordinance, building, fire or health code or other legal violation affecting any Leased Real Property, except where any such violations has not had and would not reasonably be expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect.

(d)     Each Leased Real Property has been maintained in all material respects by the Seller party thereto in accordance with the applicable Real Property Lease.  To the Knowledge of the Sellers, there are no material defects in, material mechanical failure of or material damage to any Leased Real Property.

Section 4.13   Compliance with Law.   Each Seller is in compliance in all material respects with all applicable Laws, except for any noncompliance that has not had and would not reasonably be expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect and would not materially impair or delay the ability of the Sellers to consummate the transactions contemplated hereby.  In the past three (3) years, no Seller has received any written notice or, to the Knowledge of the Sellers, oral notice from a Governmental Body of any alleged violation by the Sellers of any Law applicable to the Business.  Except as set forth in Section 4.13 of the Seller Disclosure Schedules or as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, no investigations, inquiries or reviews by any Governmental Body have been commenced nor, to the Knowledge of the Sellers, are any contemplated that would impose any Liability on any Seller.

Section 4.14   Tax Returns; Taxes.   Except as set forth in Section 4.14 of the Seller Disclosure Schedules:

(a)     All material Tax Returns required to have been filed by any of the Sellers have been duly and timely filed and are true, correct and complete in all material respects, and no material fact has been omitted therefrom.  No extension of time in which to file any material Tax Return that is required to be filed by any Seller is in effect.

(b)     All material Taxes due and payable by any of the Sellers (whether or not shown on any Tax Return) have been paid in full.  The accruals and reserves with respect to Taxes set forth on the Most Recent Balance Sheet are adequate to cover all material Taxes of the Sellers accruing or payable with respect to Tax periods (or portions thereof) ending on or before the Balance Sheet Date.  All material Taxes of the Sellers attributable to Tax periods (or portions thereof) commencing after the date of the Most Recent Balance Sheet have arisen in the Ordinary Course of Business, and the accruals and reserves with respect to Taxes set forth on the books and records of the Sellers are adequate to cover all such Taxes.

(c)     In the last five (5) years, no claims have been asserted regarding material amounts of Taxes, no material amount of Taxes has been assessed and no proposals or deficiencies for any material amount of Taxes of the Sellers have been asserted, proposed or, to the Knowledge of the Sellers, threatened, and no audit or investigation of any Tax Return of any Seller has occurred in the last five (5) years or is currently underway, pending or, to the Knowledge of the Sellers, threatened.  No claim has been made in the last five (5) years against any Seller by any Governmental Body in a jurisdiction where such Seller does not file Tax Returns that such Seller is or may be subject to taxation in such jurisdiction.

(d)     The Sellers have withheld and paid all material Taxes required to have been withheld and paid by them to the appropriate Governmental Body in connection with amounts paid or owing to any current or former employee, independent contractor, creditor or equity holder thereof or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.  There are no Encumbrances for Taxes with respect to the Sellers or their respective assets or the Business, nor is there any such Encumbrance that is pending or, to the Knowledge of the Sellers, threatened, other than Permitted Encumbrances.

(e)     No Seller has executed or filed with any Governmental Body any agreement or waiver extending the period for assessment, reassessment or collection of any material Taxes.  No Seller has made an election, nor is any Seller required, to treat any of its assets or properties as owned by another Person or as tax-exempt bond financed property or tax-exempt use property within the meaning of Section 168 of the Code or under any comparable provision of state or local Tax law.

(f)     No Seller is a party to or bound by any written tax sharing, tax indemnity or tax allocation agreement or other similar written arrangement with any other Person (other than commercial agreements entered into in the Ordinary Course of Business that are not primarily related to Taxes).  No Seller has any Liability for Taxes of any other Person as a transferee or successor, by Law or by Contract.

(g)     No Seller will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion

31

thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for a taxable period (or portion thereof) ending on or prior to the Closing Date, (ii) "closing agreement," as described in Code §7121 (or any corresponding provision of state, local, or non-U.S. income Tax Law), (iii) installment sale or open transaction made on or prior to the Closing Date, (iv) prepaid amount received on or prior to the Closing Date, or (v) election under Code §108(i).

(h)     No Seller is or has been a party to any "listed transaction," as defined in Code §6707A(c)(2).

(i)     None of the Sellers is a foreign person (within the meaning of Section 1445(f)(3) of the Code).

(j)     Each Seller is (and has been at all times since formation) treated as a disregarded entity within the meaning of Treas. Reg. § 301.7701-2(c) and all applicable U.S. federal, state and local Laws for income Taxes.

(k)     No Seller has a fixed base or permanent establishment in any jurisdiction outside the United States.

(l)     Each Seller has repaid the amount of any payroll Taxes the payment of which has been deferred or delayed as permitted under the CARES Act or any similar applicable federal, state or local Law.  No Seller has (i) availed itself of relief pursuant to Section 2301 of the CARES Act or any similar applicable federal, state, local or foreign Law, or (ii) received a Paycheck Protection Program loan under the CARES Act or any similar applicable federal, state, local or foreign Law.

Section 4.15   Benefit Plans.

(a)     Section 4.15(a) of the Seller Disclosure Schedules contains a list of each material Seller Plan.  "Seller Plans" means (i) all "employee benefit plans" (as defined in Section 3(3) of ERISA), including all employee benefit plans which are "pension plans" (as defined in Section 3(2) of ERISA) or "welfare plans" (as defined in Section 3(1) of ERISA), and, whether or not subject to ERISA, any other benefit or compensation plans, agreements, arrangements, practices or policies (including severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical or life insurance, survivor benefit, executive compensation, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, allowance, perquisite, workers' compensation, cafeteria, fringe benefit, educational assistance, employee loan, bonus or other incentive compensation, stock or unit purchase, stock or unit option, stock or unit appreciation rights, restricted stock or units, and phantom stock or unit plans, agreements, arrangements, practices and policies) and (ii) all key employee incentive, key employee retention, employment, consulting, termination, bonus, severance, notice, change in control or other similar plans, contracts, agreements or arrangements, in each case, whether or not written, to which any Seller is a party, with respect to which any Seller has or could reasonably be expected to have any Liability or obligation (including as an ERISA Affiliate) or which are maintained by any Seller, or to which any Seller contributes or is obligated to

32

contribute with respect to current or former directors, managers, officers, consultants and employees of any Seller or any Seller's Affiliates (including any ERISA Affiliate).

(b)     The Sellers have delivered or made available to the Purchaser true, correct and complete copies of, if applicable: (i) the most recent documents constituting each material Seller Plan and all amendments thereto, (ii) any related trust agreement or other funding instrument and all other material Contracts currently in effect with respect to each material Seller Plan (including all administrative agreements, group insurance contracts and group annuity contracts), (iii) the most recent IRS determination, opinion or advisory letter for each Seller Plan, (iv) the most recent summary plan description, summary of material modifications and any other written communication (or a written description of any oral communications) by any Seller or any of its Affiliates to its employees concerning the extent of the benefits provided under any Seller Plan, and (v) the three most recent (A) Forms 5500 and attached schedules, and (B) audited financial statements for each Seller Plan.

(c)     None of the Seller Plans is a "multiemployer plan" (as defined in Section 3(37) of ERISA), is or has been subject to Sections 4063 or 4064 of ERISA, is a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA, is maintained by more than one employer within the meaning of Section 413(c) of the Code or Section 210 of ERISA, is a voluntary employee benefits association within the meaning of Section 501(c)(9) of the Code, or is or has been subject to Title IV of ERISA or Section 412 or Section 430 of the Code, and neither any Seller nor any of its ERISA Affiliates has or could reasonably be expected to have any Liability under Title IV of ERISA, Section 412 or Section 430 of the Code, or in respect of any such arrangement.  None of the Seller Plans is subject to any Laws outside of the United States.

(d)     Each Seller Plan has been established, administered and maintained in all material respects in accordance with its terms and in material compliance with all applicable Laws, including ERISA and the Code.  Each Seller has performed and complied in all material respects with all of its obligations under or with respect to the Seller Plans.  Each Seller Plan that is intended to be a "qualified plan" within the meaning of Section 401(a) of the Code (a "Qualified Plan") and each trust that is intended to be exempt under Section 501 of the Code (an "Exempt Trust") has received a determination or may rely upon an opinion letter from the Internal Revenue Service to the effect that such Qualified Plan is so qualified and such Exempt Trust is so exempt, and, to the Knowledge of the Sellers, nothing has occurred since the date of the most recent Internal Revenue Service determination or opinion letter, as applicable, that would adversely affect the tax-qualified status of any Qualified Plan or Exempt Trust.

(e)     There is no material Action relating to, or seeking benefits under, any Seller Plan that is pending or, to the Knowledge of the Sellers, threatened against any Seller (other than any routine claims for benefits under the Seller Plans).

(f)     No Seller Plan provides post-retirement or post-termination welfare benefits (including death, medical or health benefits) to or in respect of any current or former employees of any Seller or their beneficiaries, and no Seller has any obligation to provide such benefits other than COBRA continuation coverage (which, if elected, the premiums for which are paid fully by the participant).  All contributions or premiums required to be made by any

Seller to or under each Seller Plan have been made in all material respects in a timely fashion in accordance with applicable Law and the terms of the applicable Seller Plan, and no Seller has, and as of the Closing Date will not have, any actual or potential material unfunded Liabilities with respect to any Seller Plans, including any self-insured welfare plan.  There are no reserves, assets, surpluses or prepaid premiums with respect to any Seller Plan which is a welfare plan.

(g)     Except as set forth in <u>Section 4.15(g)</u> of the Seller Disclosure Schedules, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due, or increase the amount of any compensation due, to any current or former officer, director, manager, employee, leased employee, consultant or agent (or their respective beneficiaries) of any of the Sellers or any of their respective Affiliates, (ii) materially increase any benefits otherwise payable under any Seller Plan, (iii) result in the acceleration of the time of payment or vesting of any compensation or benefits under any Seller Plan, (iv) result in a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code, or (v) result in the payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment," as defined in Section 280G(b)(1) of the Code, or in excise taxes under Section 4999 of the Code.  No current or former officer, director, manager, employee, leased employee, consultant or agent (or their respective beneficiaries) of any of the Sellers or any of their respective Affiliates has or will obtain a right to receive a gross-up payment from any of the Sellers or any other Person with respect to any excise taxes that may be imposed upon such individual pursuant to Section 409A of the Code, Section 4999 of the Code or otherwise.

(h)     The Sellers and each Seller Plan that is a "group health plan" as defined in Section 5000(b) of the Code (a "<u>Company Health Plan</u>") (i) is currently in material compliance with the Patient Protection and Affordable Care Act, Pub. L. No. 111-148 ("<u>PPACA</u>"), the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152 ("<u>HCERA</u>"), and all regulations and guidance issued thereunder (collectively, with PPACA and HCERA, the "<u>Healthcare Reform Laws</u>"), and (ii) has been in material compliance with all applicable Healthcare Reform Laws since March 23, 2010. Neither any of the Sellers nor any ERISA Affiliate has contributed to a nonconforming group health plan (as defined under Section 5000(c) of the Code), and neither any of the Sellers nor any ERISA Affiliate has incurred or could reasonably be expected to incur a material tax under Section 5000(a) of the Code. No event has occurred, and no condition or circumstance exists, that has subjected or would reasonably be expected to subject any of the Sellers or any Company Health Plan to material penalties, Encumbrances, Taxes, or other Liability under Sections 4980D, 4980H, or 4980I of the Code, corresponding provisions of ERISA, or any other provision of the Healthcare Reform Laws. To the extent that any Seller Plan is grandfathered under the Healthcare Reform Laws, the Sellers have complied with the applicable provisions of the Healthcare Reform Laws, and neither any of the Sellers nor any ERISA Affiliate has taken any action which would reasonably be expected to cause any such Seller Plan to lose such grandfathered status. The Sellers have provided to the Purchaser records that are sufficient to satisfy the reporting requirements under Section 6055 and 6056 of the Code, to the extent required, for all periods of time up to and through the Closing Date.

34

(i)      Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby (whether alone or in conjunction with any other event) will limit the ability of the Purchaser to amend or terminate any Seller Plan.

Section 4.16   <u>Labor Matters</u>.

(a)      Except as provided in <u>Section 4.16(a)</u> of the Seller Disclosure Schedules, no Seller is a party to or bound by, either directly or by operation of Law, any collective bargaining agreement, labor contract, letter of understanding, letter of intent, voluntary recognition agreement or legally binding commitment to any labor union, trade union or employee organization or group which may qualify as a trade union in respect of or affecting employees of any Seller, nor is any Seller subject to any union organization effort, nor is any Seller engaged in negotiations regarding any of the foregoing.

(b)      There are no, and within the prior three (3) years there have not been, any (i) strikes, work stoppages, work slowdowns, lockouts, or applications or demands for certification, recognition or representation of a collective bargaining agent made by any labor union, labor organization or group of employees of any Seller, pending or, to the Knowledge of the Sellers, threatened against or involving any Seller, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of the Sellers, threatened by or on behalf of any current or former employee or group of employees of any Seller, which if adversely determined would reasonably be expected to be adverse in any material respect to the Purchased Assets or the Assumed Liabilities, or to any Seller's or the Purchaser's ability to conduct the Business in the Ordinary Course of Business.

(c)      Except pursuant to the Specified Plans or as provided in <u>Section 4.16(c)</u> of the Seller Disclosure Schedules, no Seller has any obligation to make any material severance or termination payment to any current of former employees in excess of any amount required to be paid under applicable Law.   Each Seller is, and has in the past three (3) years been, in compliance with all applicable Laws regarding labor, employment, immigration, fair employment practices, terms and conditions of employment, workers' compensation, occupational safety, plant closings, compensation and benefits and wages and hours, other than as would not, individually or in the aggregate, reasonably be expected to result in material Liability to the Sellers or the Purchaser (or any Affiliate thereof).   No Seller has any direct or indirect material Liability, whether actual or contingent, with respect to any misclassification of any Person as an independent contractor rather than as an employee, with respect to any employee leased from another employer, or with respect to any misclassification of any employee as exempt versus non-exempt, including, without limitation, with respect to any Seller Plan.   Each Seller has fully and timely paid all wages, salaries, wage premiums, prevailing wages, commissions, bonuses, fees, and other compensation which have come due and payable to its current and former employees and independent contractors under applicable Law, Contract, Seller Plan or policy maintained by any Seller.

(d)      Except as provided in <u>Section 4.16(d)</u> of the Seller Disclosure Schedules, there is no Action against any Seller pending or, to the Knowledge of the Sellers, threatened under any Law relating to employees or employment practices or with respect to breaches of any

such Law that would reasonably be expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect.

Section 4.17   Insurance Policies.   Section 4.17 of the Seller Disclosure Schedules lists all material insurance policies owned or held by any Seller or which cover or are otherwise applicable to any Seller, any of the Purchased Assets, any of the Assumed Liabilities or the Business (the "Insurance Policies").   All insurance policies maintained by any Seller and which cover the Purchased Assets, the Assumed Liabilities and the Business (the "Insurance Policies") are in full force and effect, all premiums with respect thereto covering all periods up to and including the Execution Date have been paid (to the extent any such premium is due and payable), and no written notice of cancellation or termination (or, to the Knowledge of the Sellers, any other threatened termination) has been received with respect to any such policy. Except as set forth in Section 4.17 of the Seller Disclosure Schedules, there are no pending claims relating to the Purchased Assets, the Assumed Liabilities or the Business which have not, to the Knowledge of the Sellers, been properly reported under the Insurance Policies or as to which claim coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights.

Section 4.18   Environmental Matters.   Except (x) as set forth in Section 4.18 of the Seller Disclosure Schedules or (y) as has not had and would not reasonably be expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect, (a) each Seller is, and has been for the prior five (5) years, in compliance with all Environmental Laws, which compliance includes the possession of and compliance with all material permits and government authorizations required pursuant to Environmental Laws which are necessary for the operation of the Business in the Ordinary Course of Business, (b) no Seller has received written notice of any Action pending against any Seller, any of the Purchased Assets or the Business arising under or relating to any Environmental Laws and, to the Knowledge of the Sellers, no such Action is threatened, (c) none of the Leased Real Property has been listed on the federal Comprehensive Environmental Response, Compensation Liability Information System (CERCLIS) database or any other similar federal, provincial or state list of known or suspected contaminated sites, (d) no Hazardous Materials have been treated, stored, disposed of or Released in violation of Environmental Law by any Seller at the Leased Real Property, or, to the Knowledge of the Sellers, any other real property formerly owned or leased by any Seller or the Business in any manner or concentration that would reasonably be expected to require investigation, removal or remediation under Environmental Laws, (e) no Seller has received any written notice of or entered into any order, settlement, judgment, injunction or decree involving uncompleted, outstanding or unresolved material obligations, Liabilities or requirements relating to or arising under Environmental Laws, and (f) no Seller has agreed to indemnify any Person or assumed the Liability of any Person arising under Environmental Law. The Sellers have made available to the Purchaser copies of all material written environmental reports, audits, assessments, liability analyses, memoranda and studies in the Sellers' possession or control.

Section 4.19   Vendors and Suppliers.   Section 4.19 of the Seller Disclosure Schedules sets forth a complete and accurate list of all Significant Customers and all Significant Vendors/Suppliers. "Significant Customers" are the ten (10) customers of the Sellers that have purchased the most products or services sold by the Sellers, measured by the total dollar value of

36

revenue received by the Sellers, during each of the year ended December 31, 2020 and the 10-month period ended October 31, 2021.  "Significant Vendors/Suppliers" are the ten (10) vendors and/or suppliers of the Sellers that have sold the most products or services to the Sellers, measured by the dollar value of expenditures by the Sellers, during each of the year ended December 31, 2020 and the 10-month period ended October 31, 2021.  Except as set forth in Section 4.19 of the Seller Disclosure Schedules, no Significant Customer or Significant Vendor/Supplier has given any Seller written notice or, to the Knowledge of the Sellers, oral notice, terminating, canceling or adversely changing or altering in any material respect, or threatening to terminate, cancel or adversely change or alter in any material respect, any Contract or relationship with any Seller.

Section 4.20   Related Party Transactions.  Except as set forth in Section 4.20 of the Seller Disclosure Schedules and except for employment and similar arrangements, no Seller Party (other than the Sellers) (a) is a party to any material transaction, Contract or arrangement with any Seller, (b) owns any Equity Interest in, or is a manager, director or officer of, any Significant Customer, any Significant Vendor/Supplier, lessor of material Equipment or lessor of material Leased Real Property, or (c) has any material direct or indirect interest in any material property, asset or right that is owned or used by any of the Sellers.

Section 4.21   Compliance with Anti-Corruption, Economic Sanctions, Money Laundering and Import Laws; Export Controls.

(a)     The Sellers and their respective Affiliates, and to the Knowledge of the Sellers, its officers, directors, managers, employees, agents, consultants, distributors, resellers, representatives, sales intermediaries and other Persons acting on behalf of any of the Sellers: (i) have not, directly or indirectly, in the last five (5) years, given, promised, offered, authorized the offering of or paid anything of value to any public official, in each case, for purposes of (A) influencing any act or decision of any public official in such official's official capacity, (B) inducing such public official to do or omit to do any act in violation of such official's lawful duty, (C) securing any improper advantage or (D) inducing such public official to use such official's influence with a Governmental Body, or commercial enterprise owned or controlled by any Governmental Body (including state-owned or controlled facilities), in order to assist any of the Sellers or any of their respective Affiliates in obtaining or retaining business, or (ii) have not taken any action in violation of (A) any Sanctions-related rules or regulations of the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") or the U.S. State Department, (B) any applicable export control Law, (C) any applicable U.S. anti-boycott Law, (D) in the last five (5) years, any applicable anticorruption Law, including the U.S. Foreign Corrupt Practices Act of 1977, as amended, and the U.K. Bribery Act of 2010, or (E) in the last five (5) years, any other applicable anti-corruption or anti-bribery Law of any Governmental Body of any jurisdiction applicable to any of the Sellers.

(b)     None of the Sellers or any of their respective Affiliates, and to the Knowledge of the Sellers, its officers, directors, employees, agents, consultants, distributors, resellers, representatives, sales intermediaries or other Persons acting on behalf of any of the Sellers has, in the last five (5) years, made or authorized any bribe, rebate, payoff, influence payment, kickback or other unlawful payment of funds or received or retained any funds in violation of any Law.  There are no pending or, to the Knowledge of the Sellers, threatened

37

issues with respect to violation of any applicable anti-corruption Laws relating to any of the Sellers.  The Sellers have in place controls designed to ensure compliance with any applicable anti-corruption Laws.

(c)     The Sellers are in compliance, and during the prior five (5) years have complied, in all respects with all Laws relating to the prevention of money laundering of any Governmental Body applicable to the Sellers or their property or in respect of their operations, including all applicable criminal Laws, and all applicable financial record-keeping, customer identification, know-your-customer and reporting requirements of the Sellers and the Foreign Transactions Reporting Act of 1970 (the "Money Laundering Laws").  No Action by or before any Governmental Body involving any of the Sellers with respect to any of the Money Laundering Laws is pending or, to the Knowledge of the Sellers, threatened.

(d)     The Sellers, the Sellers have, at all times during the prior five (5) years, been in compliance with all applicable trade-related Laws, including applicable import and export control Laws, Sanctions, and anti-boycott Laws, and, except as specifically authorized by a Permit, have not: (i) exported, re-exported, transferred, or brokered the sale of any goods, services, technology, or technical data to any destination to which, or individual for whom, a license, authorization or other Permit is required under the U.S. Export Administration Regulations (the "EAR" 15 C.F.R. § 730 *et seq.*), the International Traffic in Arms Regulations (the "ITAR" 22 C.F.R. § 120 *et seq.*), or the U.S. economic sanctions administered by the OFAC (31 C.F.R. Part 500 *et seq.*), (ii) exported, re-exported, or transferred any goods, services, technology, or technical data to, on behalf of, or for the benefit of any Person subject to Sanctions, including those (A) designated as a Specially Designated National by OFAC, (B) on the Denied Persons, Entity, or Unverified Lists of the U.S. Department of Commerce's Bureau of Industry and Security or (C) on the Debarred List of the Directorate of Defense Trade Controls of the U.S. Department of State ("DDTC"), (iii) exported any goods, services, technology, or technical data that have been or will be used for any purposes associated with nuclear activities, missiles, chemical or biological weapons, or terrorist activities, or that have been or will be used, transshipped or diverted contrary to applicable U.S. trade and export controls, (iv) exported, re-exported, transferred, or imported any goods, services, technology, or technical data to or from a country subject to comprehensive sanctions, including Cuba, Iran, Libya, North Korea, Syria, or Sudan during a time at which such country and/or its government was subject to U.S. trade sanctions or embargoes under OFAC regulations, the EAR, or any other applicable Law or U.S. Executive Order, (v) manufactured any defense article (as defined in the ITAR, "Defense Article"), including within the United States and without regard to whether such Defense Article was subsequently exported, without being registered and in good standing with the DDTC, (vi) imported any goods except in compliance with the import and customs Laws of the United States, including Title 19 of the United States Code, Title 19 of the Code of Federal Regulations, and all other regulations administered or enforced by U.S. Customs and Border Protection and the U.S. Department of Commerce, or (vii) violated the anti-boycott prohibitions, or failed to comply with the anti-boycott reporting requirements of the EAR and the Tax Reform Act of 1976 (26 U.S.C. § 999).

(e)     The Sellers have in place adequate controls to ensure compliance with any applicable Laws pertaining to the export and import of goods, services, and technology, including the EAR, the ITAR, Sanctions, including those administered by OFAC, the U.S. anti-

boycott Laws, and the applicable import and customs Laws. To the Knowledge of the Sellers, there are no threatened claims, nor presently existing facts or circumstances that would constitute a reasonable basis for any future claims, with respect to exports, imports, or any other trade-related activity by the Sellers or their respective predecessors.

Section 4.22   Financial Statements; No Undisclosed Liabilities.

(a) The Sellers have delivered or made available to the Purchaser the following financial statements: (i) the audited consolidated balance sheets of Strike Capital and its Subsidiaries as of December 31, 2019 and December 31, 2020, and the related consolidated statements of operations, changes in members' equity and cash flows for the years then ended (the "Audited Financial Statements"), and (ii) the unaudited consolidated balance sheet of Strike LLC and its Subsidiaries as of October 31, 2021 (the "Most Recent Balance Sheet" and the date of the Most Recent Balance Sheet, the "Balance Sheet Date"), and the related unaudited consolidated statements of operations and cash flows for the ten (10) month period then ended (the "Unaudited Financial Statements" and, together with the Audited Financial Statements, the "Financial Statements"). Each of the Financial Statements (A) has been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby (except as may be indicated in the notes thereto), subject, in the case of the Unaudited Financial Statements, to the absence of footnotes (none of which, if presented, would materially differ in amount or nature from those included in the Audited Financial Statements) and normal recurring year-end adjustments (the effect of which would not, individually or in the aggregate, reasonably be expected to be adverse to the Sellers or the Purchased Assets in any material respect), and (B) fairly present, in all material respects, the consolidated financial position, results of operations and cash flows of Strike Capital and its Subsidiaries, or Strike LLC and its Subsidiaries, as applicable, as of the respective dates thereof and for the periods referred to therein.

(b) Except as set forth in Section 4.22(b) of the Seller Disclosure Schedules, no Seller has any Liabilities, in respect of the Business required by GAAP to be disclosed or reflected on or reserved against a consolidated balance sheet (or noted thereto) of the Sellers, except for (i) Liabilities reflected or reserved against in the Most Recent Balance Sheet, (ii) Liabilities that have been incurred after the Balance Sheet Date in the Ordinary Course of Business, (iii) Liabilities for performance under Contracts to which any Seller is a party or are otherwise bound, (iv) Liabilities arising out of or incurred in connection with this Agreement, the other Ancillary Agreements or the transactions contemplated hereby or thereby or from the commencement of the Chapter 11 Cases, including Liabilities under the DIP Credit Agreement, or (v) Liabilities that have not had and would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect.

Section 4.23   Warranties. Except as set forth on Section 4.23 of the Seller Disclosure Schedules, there are, and for the past three (3) years there have been, no material pending or, to the Knowledge of the Sellers, threatened in writing claims under or pursuant to any warranty, whether expressed or implied, on the products or services sold by any of the Sellers that are not disclosed or referred to in the Financial Statements and that are not fully reserved against in the Financial Statements in accordance with GAAP, which have had or would be reasonably

39

expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect.  During the past three (3) years, there have been no recalls of any product manufactured or sold by any of the Sellers.

Section 4.24    Surety Bonds.  Section 4.24 of the Seller Disclosure Schedules sets forth a complete and accurate list and description of all outstanding Surety Bonds that any of the Sellers has obtained or otherwise procured in connection with the ownership, use or operation of any its assets or properties, or in the conduct of its Business (such Surety Bonds, collectively, the "Seller Bonds").  All Seller Bonds are in amounts and forms required pursuant to applicable Laws, Permits and/or Contracts.  Except for the Seller Bonds, none of the Sellers is required to obtain or otherwise procure any Surety Bonds in connection with the ownership, use or operation of any of their respective assets or properties, or in the conduct of the Business.  The Sellers have not pledged or deposited, and the Sellers are not required to pledge or deposit, any cash, property or other collateral with any surety or other provider of any of the Seller Bonds in respect thereof, and no Seller has been notified by any such surety or other provider that it is required or will be required to pledge or deposit any such cash, property or other collateral.  All premiums payable under the Seller Bonds have been paid, and the Sellers have otherwise complied with the terms and conditions of all of the Seller Bonds (including any indemnity agreements in respect thereof).  None of the Sellers has received any written notice of any actual or threatened termination, cancellation, non-renewal or revocation of, premium increase with respect to, or material alteration of coverage under, any of the Seller Bonds.  None of the sureties or other providers of any of the Seller Bonds has made any payment under any of the Seller Bonds.

Section 4.25    ***NO OTHER REPRESENTATIONS*.   EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY THE SELLERS IN THIS ARTICLE IV (AS MODIFIED BY THE SELLER DISCLOSURE SCHEDULES) OR ANY CERTIFICATE DELIVERED PURSUANT TO THIS AGREEMENT, NONE OF THE SELLERS OR ANY OF THEIR AFFILIATES (OTHER THAN ANY SUCH AFFILIATE THAT IS A SELLER) OR REPRESENTATIVES MAKES, AND NONE OF THE PURCHASER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES IS RELYING ON ANY REPRESENTATION OR WARRANTY OF ANY KIND OR NATURE WHATSOEVER, ORAL OR WRITTEN, EXPRESS OR IMPLIED (INCLUDING ANY RELATING TO FINANCIAL CONDITION OR RESULTS OF OPERATIONS OF THE BUSINESS OR MAINTENANCE, REPAIR, CONDITION, DESIGN, PERFORMANCE, VALUE, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE PURCHASED ASSETS).   THE SELLERS DISCLAIM ON THEIR OWN BEHALF AND ON BEHALF OF THEIR AFFILIATES AND THEIR RESPECTIVE REPRESENTATIVES, ALL LIABILITY AND RESPONSIBILITY WHATSOEVER FOR ANY REPRESENTATIONS OR WARRANTIES THAT ARE NOT SET FORTH IN ARTICLE IV, INCLUDING ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE PURCHASER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO THE PURCHASER BY ANY REPRESENTATIVE OF THE SELLERS OR ANY OF THE SELLERS' AFFILIATES). NONE OF THE SELLERS, THEIR AFFILIATES OR THEIR RESPECTIVE

40

**REPRESENTATIVES ARE, DIRECTLY OR INDIRECTLY, AND NO OTHER PERSON ON BEHALF OF ANY SELLER IS, MAKING ANY REPRESENTATIONS OR WARRANTIES REGARDING ANY PRO-FORMA FINANCIAL INFORMATION, FINANCIAL PROJECTIONS OR OTHER FORWARD-LOOKING PROSPECTS, RISKS OR STATEMENTS (FINANCIAL OR OTHERWISE) OF THE BUSINESS OR THE PURCHASED ASSETS MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE PURCHASER OR ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE IN ANY MANAGEMENT PRESENTATION OR THE CONFIDENTIAL INFORMATION MEMORANDUM PROVIDED TO THE PURCHASER AND ITS AFFILIATES AND THEIR RESPECTIVE REPRESENTATIVES). IT IS UNDERSTOOD THAT ANY DUE DILIGENCE MATERIALS MADE AVAILABLE TO THE PURCHASER OR ITS AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES DO NOT, DIRECTLY OR INDIRECTLY, AND SHALL NOT BE DEEMED TO, DIRECTLY OR INDIRECTLY, CONTAIN REPRESENTATIONS OR WARRANTIES OF THE SELLERS OR THEIR AFFILIATES OR THEIR RESPECTIVE REPRESENTATIVES.**

**ARTICLE V.**

**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

The Purchaser hereby makes the representations and warranties in this <u>Article V</u> to the Sellers as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date).

Section 5.1    <u>Organization and Qualification</u>.    The Purchaser is a limited liability company, duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization.  The Purchaser is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated, or the business conducted by it, require such qualification, except where the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.  The Purchaser has all requisite power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.

Section 5.2    <u>Authority Relative to This Agreement</u>.    The Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each of the Purchaser Ancillary Agreements, and (c) perform its obligations hereunder and under each of the Purchaser Ancillary Agreements, and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by the Purchaser of this Agreement and each of the Purchaser Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite limited liability company action on behalf of the Purchaser.  This Agreement has been, and at or prior to the Closing each of the Purchaser Ancillary Agreements will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the

41

other parties hereto and thereto, and the entry of the Sale Procedures Order) this Agreement constitutes, and each of the Purchaser Ancillary Agreements when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

Section 5.3    Conflicts; Consents and Approvals.

(a)    None of the execution and delivery by the Purchaser of this Agreement or any of the Purchaser Ancillary Agreements, the consummation of the transactions contemplated hereby or thereby, or the performance by the Purchaser of any of the provisions hereof or thereof will (i) conflict with or violate the Organizational Documents of the Purchaser, (ii) require any consent under, result in a violation of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, any provision of any Contract to which the Purchaser is a party or by which the Purchaser or any of its properties or assets is bound, (iii) assuming that all approvals, orders, Permits, consents, registrations, declarations, notifications and filings described in Section 5.3(b) have been made, given or obtained, as applicable, violate any Law applicable to the Purchaser or any of its Affiliates or by which any of its properties or assets are bound or (iv) result in the imposition or creation of any Encumbrance on any property or asset of the Purchaser, other than, in the case of clauses (ii) and (iii), such conflicts, violations, breaches, defaults or other occurrences that would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.

(b)    No approval, order or Permit from, consent by, or registration, declaration, notification or filing with, any Governmental Body is required on the part of the Purchaser in connection with the execution and delivery by the Purchaser of this Agreement or the Purchaser Ancillary Agreements, the performance by the Purchaser of any of the provisions hereof or thereof, or the consummation by the Purchaser of the transactions contemplated hereby or thereby, except for (i) the entry of the Sale Procedures Order and the Sale Approval Order by the Bankruptcy Court, (ii) compliance with any applicable requirements under the HSR Act and other Antitrust Laws and (iii) such approvals, orders, Permits, consents, registrations, declarations, notifications or filings the failure of which to obtain or make would not, individually or in the aggregate, reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.

Section 5.4    Litigation.  As of the date hereof, there are no material Actions pending or, to the knowledge of the Purchaser, threatened in writing against the Purchaser which would reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.  The Purchaser is not subject to any Order which would reasonably be expected to be adverse in any material respect to the Purchaser's ability to consummate the transactions contemplated by this Agreement.

Section 5.5    Financial Capacity.  The Purchaser has the ability to make, or cause to be made, the Credit Bid and, at the Closing, will have sufficient available funds in an aggregate amount necessary to pay all amounts to be paid by the Purchaser under this Agreement, including amounts required to pay the Determined Cure Costs and to perform the Assumed

42

Liabilities as they become due in accordance with their terms.  The obligations of the Purchaser under this Agreement are not contingent upon the availability of financing.

Section 5.6    Brokers and Finders.  Except as set forth on Schedule 5.6, the Purchaser has not engaged any investment banker, broker, finder, consultant or intermediary who is entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby for which the Sellers or any of their Affiliates or Representatives will become liable.

Section 5.7    Independent Investigation; Reliance By the Purchaser.  The Purchaser has conducted its own independent investigation, verification, review and analysis of the business, operations, assets, Liabilities, results of operations, financial condition, technology and prospects of the Business, the Purchased Assets and the Assumed Liabilities, which investigation, verification, review and analysis was conducted by the Purchaser and its Affiliates and, to the extent the Purchaser deemed appropriate, by the Purchaser's Representatives.  Without waiving its rights under Section 8.2, the Purchaser acknowledges that it and its Representatives have been provided adequate access to the personnel, properties, premises and records of the Sellers. In entering into this Agreement, the Purchaser acknowledges that it has relied solely upon the aforementioned investigation, verification, review and analysis and not on any factual representation, warranty, inducement, promise, understanding, omission, condition or opinion of the Sellers or any of their Affiliates or their respective Representatives (except the specific representations and warranties made by the Sellers in Article IV, in each case, as qualified by the Seller Disclosure Schedules, or any certificate delivered pursuant to this Agreement), and the Purchaser acknowledges and agrees, to the fullest extent permitted by Law, that:

(a)    none of the Sellers nor any of their respective Affiliates or their respective Representatives, direct or indirect equityholders or members or any other Person makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of (i) any of the information set forth in management presentations relating to the Business, the Purchased Assets or the Assumed Liabilities made available to the Purchaser, its Affiliates or its Representatives, in materials made available in any "data room" (virtual or otherwise), including any cost estimates delivered or made available, financial projections or other projections, in presentations by the management of the Sellers or their respective Affiliates, in "break-out" discussions, in responses to questions submitted by or on behalf of the Purchaser, its Affiliates or their respective Representatives, whether orally or in writing, in materials prepared by or on behalf of any Seller or its Affiliates or Representatives, or in any other form (such information, collectively, "Due Diligence Materials"), (ii) any information delivered or made available pursuant to Section 8.2(a) or (iii) the financial information, projections or other forward-looking statements with respect to the Business, in each case in expectation or furtherance of the transactions contemplated hereby;

(b)    none of the Sellers or any of their Affiliates, or any of their respective Representatives, direct or indirect equityholders or members or any other Person shall have any Liability or responsibility whatsoever to the Purchaser, its Affiliates or their respective Representatives on any basis (including in contract, tort or equity, under federal or state securities Laws or otherwise) based on any Due Diligence Materials;

43

(c)     without limiting the generality of the foregoing, the Sellers, their respective Affiliates and their respective Representatives make no representation or warranty regarding any third-party beneficiary rights or other rights which the Purchaser might claim under any studies, reports, tests or analyses prepared by any third parties for the Sellers or any of their respective Affiliates or Representatives, even if the same were made available for review by the Purchaser or its Representatives; and

(d)     without limiting the generality of the forgoing, the Purchaser expressly acknowledges and agrees that none of the documents, information or other materials provided to them at any time or in any format by the Sellers, their respective Affiliates or their respective Representatives constitute legal advice.

## ARTICLE VI.

## EMPLOYEES

Section 6.1     <u>Employee Offers</u>.

(a)     No later than ten (10) days prior to the Closing Date, the Purchaser shall provide the Sellers with a list of employees of the Sellers to whom the Purchaser agrees to offer employment.  On or prior to the Closing Date, the Purchaser shall offer employment (on an "at will" basis) with the Purchaser or one of its Affiliates to each of the employees of the Sellers set forth on the list referred to in the immediately preceding sentence who is, as of immediately prior to the Closing, (a) actively at work in connection with the Business, (b) on short-term disability or workers' compensation in connection with the Business, or (c) on a leave of absence approved by the Sellers in connection with the Business, including under the Family and Medical Leave Act, as amended, and the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended.  Each such offer of employment shall be on such terms and conditions as the Purchaser shall offer in its sole discretion; <u>provided</u>, <u>however</u>, that (i) such offers shall provide for employee benefits to the Transferred Employees, for the duration of the plan year in which the Closing Date occurs under the benefit plans that provide such benefits, that are substantially similar in the aggregate to the employee benefits that the Transferred Employees were entitled to receive from the Sellers immediately prior to the Closing (including group welfare benefits and 401(k) plan benefits, but excluding any defined benefit pension, retiree or post-termination health or welfare, performance-based or incentive compensation, fringe benefit, severance, expense reimbursement, bonus (including any special bonus, project bonus, medium term bonus or success payment) and equity or equity-based plan, program or arrangement), (ii) with respect to Transferred Employees who enter into written employment Contracts with the Purchaser at the Closing, if any (the "<u>Employment Contracts</u>"), the terms of such Employment Contracts shall govern such Transferred Employee's employment with the Purchaser or its designated Affiliate, and, (iii) notwithstanding <u>clause (i)</u> above, the employees of the Sellers party to the Specified Plans shall be entitled to the benefits provided under the Specified Plans.  In addition, any offer of employment to any such employee of the Sellers (including any employee of the Sellers who is a party to a written employment Contract with a Seller that entitles such employee to severance upon any termination of employment with any Seller and whose employment Contract will not be an Assumed Seller Plan) will require, as a condition to the acceptance of such offer of employment, that such employee waive in writing his or her right to receive any severance from

44

the Sellers, the Purchaser and its Affiliates arising from such employee's termination of employment with any of the Sellers; provided, however, that the Purchaser shall be entitled to waive such condition if such employee does not agree to provide such waiver. Notwithstanding the foregoing, nothing in this Agreement will, after the Closing Date, impose on the Purchaser any obligation to retain any Transferred Employee in its employment or the employment of any of its Affiliates.

(b) The employment of each Transferred Employee with the Purchaser or any of its Affiliates (including any such employee not actively at work due to being on short-term disability, workers' compensation or on approved leave of absence, provided that such employee is anticipated to return to active employment within six (6) months of the Closing Date (or such longer period provided by applicable law)) will commence immediately upon the Closing Date (but only if the Closing occurs). Each employee of a Seller to whom the Purchaser has made an offer of employment pursuant to this Section 6.1 and that has accepted such offer and commences employment with the Purchaser or any of its Affiliates on the Closing Date is referred to herein as a "Transferred Employee".

(c) The Sellers shall terminate the employment of all Transferred Employees effective as of the Closing Date and will be responsible for all Liabilities associated with such terminations; provided, that the Purchaser shall be responsible for all Liabilities under the WARN Act arising from such terminations and all Liabilities under the WARN Act arising from any termination occurring on or after the Closing Date of any employee of the Sellers as of the Closing Date who was not made an offer of employment in accordance with the terms of Section 6.1(a). Anything in this Agreement to the contrary notwithstanding, (i) except for Liabilities under the WARN Act as set forth in the immediately preceding sentence and except for any Liabilities specifically assumed by the Purchaser pursuant to Section 1.3(g), the Purchaser shall have no Liability with respect to any employee of a Seller prior to the time he or she becomes a Transferred Employee and, (ii) except for Liabilities under the WARN Act as set forth in the immediately preceding sentence, the Purchaser shall have no Liability with respect to any current or former employee, independent contractor or service provider of a Seller that does not become a Transferred Employee.

(d) The Sellers acknowledge that the Sellers are alone responsible for issuing, serving, and delivering all orders and notices required, if any, pursuant to applicable Laws, in connection with the termination of employment of any employee on or prior to the Closing Date. The Sellers agree to reasonably cooperate and work in good faith with the Purchaser to provide all notices that the Purchaser reasonably determines are necessary or required to minimize the amount of Liabilities that might arise under the WARN Act as a result of the transactions contemplated by this Agreement. The Purchaser acknowledges that the Purchaser is alone responsible for issuing, serving, and delivering all orders and notices required, if any, pursuant to applicable Laws, in connection with the termination of employment of any employee of the Purchaser following the Closing Date.

(e) From time to time after the Execution Date, the Sellers shall deliver to the Purchaser, promptly following receipt of any request therefor from the Purchaser, a schedule that sets forth a true and correct list of all of the employees of each Seller as of the date of such request, specifying their position, employer, date of hire, exempt or non-exempt status, hourly

wage rate or annual base salary, all bonus opportunities, and accrued vacation, sick leave time and other paid time off, earned and accrued wages, salaries, commissions, bonuses, and any other material compensation, whether the employee is absent from active employment on approved leave, and, if so, the nature of such leave, the date such employee commenced such leave, and the anticipated date of return to active employment.

Section 6.2    <u>Seller Plans</u>.

(a)    Except as otherwise set forth in this <u>Section 6.2</u> and subject to <u>Sections 1.3</u> and <u>1.4</u>, the Purchaser shall adopt and assume, as of the Closing Date, each of the Assumed Seller Plans with respect to all benefits to be provided under the provisions of such Assumed Seller Plans.  With respect to each Assumed Seller Plan, the Purchaser or any Person designated by the Purchaser will be substituted for the applicable Seller as the plan sponsor under each such Assumed Seller Plan and the Purchaser shall have all rights of such Seller thereunder, including full authority to maintain, amend or terminate any such Assumed Seller Plan at any time, in the Purchaser's sole discretion.  The Sellers agree to cooperate with the Purchaser in adopting and effectuating any plan amendments to the Assumed Seller Plans reasonably desired by the Purchaser, so long as such amendments are effective as of, or after, the Closing Date and are consistent with applicable Law.  The parties agree to cooperate in all respects and take any actions necessary to implement the assumption by the Purchaser of the Assumed Seller Plans.  The Sellers agree to use commercially reasonable efforts to cooperate with the Purchaser in adopting and effectuating any plan amendments to such Assumed Seller Plans reasonably desired by the Purchaser, so long as such amendments are effective as of, or after, the Closing Date and are consistent with applicable Law.  The parties agree to cooperate in all respects and take any actions necessary to implement the assumption by the Purchaser of the Assumed Seller Plans.

(b)    Without limiting the obligations of the Sellers under <u>Section 1.1</u>, before, or to the extent not practicable before, as soon as administratively practicable after, the Closing, the Sellers will supply the Purchaser with (i) all records concerning participation, vesting, accrual of benefits, payment of benefits, and election forms of benefits under each Assumed Seller Plan, and (ii) any other information reasonably requested by the Purchaser as necessary or appropriate for the administration of each Assumed Seller Plan.

(c)    Anything in this Agreement to the contrary notwithstanding, the Purchaser shall not assume any Liabilities arising out of any acts or omissions of any of the Sellers or any fiduciaries or trustees of any Assumed Seller Plan occurring on or prior to the Closing Date in connection with the operation or administration of such Assumed Seller Plan (all of which Liabilities shall be Excluded Liabilities).  The Sellers shall retain all Liabilities for (i) the payment or provision of severance, separation pay or similar benefits in connection with the termination of employment of any Transferred Employee as of the Closing Date, or the termination of employment of any current or former employee of a Seller who is not a Transferred Employee (whether before, as of, or after the Closing Date) and (ii) the payment or provision of any change in control payment, transaction bonus, retention payment or similar benefits arising as a result of the transactions described herein, and no such Liabilities shall be assumed by the Purchaser under this <u>Section 6.2</u> or <u>Section 1.3</u>.

(d)     The Purchaser shall be responsible for affording continuation coverage under Section 4980B of the Code ("COBRA") (and any comparable state law) for all individuals who are "M&A qualified beneficiaries," as such term is defined in U.S. Treasury Regulation Section 54.4980B-9, from and after the Closing to the extent coverage is afforded active employees under medical plans offered by the Purchaser.  Immediately prior to the Closing, the Sellers will provide to the Purchaser a list of all current and former employees of the Sellers (i) terminated by the Sellers within the ninety (90) days immediately preceding the Closing and (ii) receiving continuation coverage under COBRA on the Closing Date.

Section 6.3     WARN Act Liability.  On or before the date that is ten (10) days before the Closing Date, the Sellers shall provide the Purchaser with a list of all employees who the Sellers have caused to experience "employment losses" (within the meaning of the WARN Act) within ninety (90) days prior to the Closing Date and the Sellers shall update this list up to and including the Closing Date.  The Sellers shall be solely responsible, on a joint and several basis, for any obligations or other Liabilities under the WARN Act that might arise on or prior to the Closing Date (other than Liabilities under the WARN Act described in the proviso in the first sentence of Section 6.1(c)), including providing any notice of layoff or plant closing, or maintaining the employees of any Seller on such Seller's payroll for any period of notice required by the WARN Act.  The Sellers shall retain all Liabilities, if any, for any severance or termination costs relating to employees of any Seller who, on or at the Closing, experience a termination of employment by any Seller as a result of the transactions contemplated by this Agreement.

Section 6.4     Eligibility; Service Credit.  From and after the Closing Date, each Transferred Employee shall (to the extent permitted by applicable Laws) be credited (except where such credit would result in a duplication of benefits) under each of the Purchaser's employee benefit plans or programs in which such Transferred Employee participates, with his or her years of service with the Sellers before the Closing Date for purposes of vesting and eligibility (but not for benefit accrual under a defined benefit plan or vesting in any equity or equity based or other compensation plan, but for determining the level of benefits under any vacation or severance policy) to the same extent as such Transferred Employee was entitled, before the Closing Date, to credit for such service with the Sellers under any similar Seller Plan in which such Transferred Employee participated immediately prior to the Closing Date.  In addition, and without limiting the generality of the foregoing, the Purchaser shall (to the extent that such limitation would not apply with respect to substantially similar Seller Plans maintained by the Sellers prior to the Closing Date) use its commercially reasonable efforts to (i) cause to be waived any eligibility requirements (to the extent such requirements were satisfied by the applicable Transferred Employee prior to the Closing Date with respect to the similar Seller Plan) or pre-existing condition limitations applicable to any Transferred Employee, and (ii) to the extent all necessary information has been received from the Sellers, give effect, in determining any deductible or maximum out of pocket limitations, to amounts paid by any Transferred Employee during the plan year in which the Closing Date occurs.

Section 6.5     No Third-Party Beneficiaries.

(a)     Notwithstanding anything set forth in this Article VI, nothing contained herein, whether express or implied, (i) shall be treated as an amendment or other modification of

47

any Seller Plan or (ii) shall limit the right of the Purchaser or any of its Affiliates to amend, terminate or otherwise modify any Seller Plan or any of the Purchaser's or any of its Affiliate's employee benefit plans or programs following the Closing Date.

(b)     Without limiting the generality of Section 11.11, the Sellers and the Purchaser acknowledge and agree that all provisions contained in this Article VI with respect to current and former employees of the Sellers are included for the sole benefit of the Sellers and the Purchaser, and that nothing herein, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any current or former employees, directors, managers, officers, contractors or consultants of any Seller, any participant in any Seller Plan, or any dependent or beneficiary thereof, or (ii) to continued employment with the Purchaser or any of its Affiliates.

## ARTICLE VII.

## BANKRUPTCY COURT MATTERS

Section 7.1     Certain Motions and Orders.

(a)     No later than the Petition Date, the Sellers shall file with the Bankruptcy Court the Sale Approval Motion.  The Sale Approval Motion shall seek approval of, and the Sale Procedures Order shall approve, the payment by the Sellers of the Reimbursement Amount and the Collection Costs to the extent such amounts are required to be paid by the Sellers under this Agreement.  The Reimbursement Amount and the Collection Costs shall constitute allowed super-priority administrative claims against the Sellers' estates under sections 503(b) and 507(a)(1) of the Bankruptcy Code with priority over all administrative claims against the Sellers' estates (except for the "Carve Out" and the DIP Obligations under the DIP Credit Agreement, each of which shall be senior in priority to the Reimbursement Amount and the Collection Costs).  The Sale Procedures Order shall provide for such super-priority administrative expense rights in form and substance satisfactory to the Purchaser.  The Sellers shall comply in all material respects with, and take no actions inconsistent with, all of the terms and conditions contained in the Sale Procedures Order (including the Bidding Procedures and the Assumption and Assignment Procedures) including the occurrence of the events by the dates and the times set forth therein, all of which are expressly incorporated herein by reference.

(b)     The Sellers and the Purchaser each acknowledges that this Agreement and the transactions contemplated hereby are subject to Bankruptcy Court approval. The Sellers shall use their reasonable best efforts to: (i) obtain entry by the Bankruptcy Court of the Interim DIP Order no later than the date that is three (3) calendar days after the Petition Date, (ii) obtain entry by the Bankruptcy Court of the Sale Procedures Order no later than the date that is twenty-one (21) calendar days after the Petition Date, (iii) obtain entry by the Bankruptcy Court of the Final DIP Order no later than the date that is thirty-five (35) calendar days after the Petition Date, (iv) ensure that Qualified Bids are due no later than the date that is forty-nine (49) calendar days after the Petition Date, (v) ensure that the Auction, which will be conducted in accordance with the Bidding Procedures and the Sale Procedures Order, shall be held and closed no later than the date that is fifty-one (51) calendar days after the Petition Date; provided, that the Sellers shall not have to comply with this clause (v) if the Sellers are not required to hold an Auction pursuant to

48

the Bidding Procedures (as approved by the Sale Procedures Order), (vi) ensure that the Assignment Objection Deadline shall be scheduled no later than the date that is thirty-seven (37) days after the Petition Date, (vii) obtain entry by the Bankruptcy Court of the Sale Approval Order no later than on or before the date that is fifty-two (52) calendar days after the Petition Date, and (viii) subject to the satisfaction or waiver of the conditions precedent contained in this Agreement, consummate the Closing as soon as reasonably practicable after the entry by the Bankruptcy Court of the Sale Approval Order (but in no event later than the date that is sixty-six (66) calendar days after the Petition Date).  The Purchaser agrees that it will use commercially reasonable efforts to promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of such Orders and a finding of adequate assurance of future performance by the Purchaser of the Assigned Contracts.

(c)     The Sale Approval Motion, including any exhibits thereto and any notices or other materials in connection therewith, must be in form and substance satisfactory to the Purchaser.

(d)     If the Sale Procedures Order, the Sale Approval Order or any other order of the Bankruptcy Court relating to this Agreement (all such orders, the "Bankruptcy Court Orders") shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any Bankruptcy Court Order), the Sellers shall use their reasonable best efforts to diligently defend against any such appeal, petition or motion and shall use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion, and, upon the reasonable request of the Sellers, the Purchaser shall use its reasonable best efforts to assist the Sellers with the foregoing.  The Sellers shall notify the Purchaser of such appeal, petition or motion as promptly as practicable and shall keep the Purchaser reasonably informed and updated regarding the status of any such appeal, petition or motion.

(e)     The Sellers and the Purchaser shall provide to the other party draft copies of all motions, notices, statements, schedules, applications, reports and other papers such party intends to file with the Bankruptcy Court in connection with the Sale Procedures Order, the Sale Approval Order or any other Bankruptcy Court Order in connection with the transactions contemplated by this Agreement within a reasonable period of time prior to the date such party intends to file any of the foregoing and consult in advance in good faith with the other party regarding the form and substance of any such proposed filing with the Bankruptcy Court.

(f)     The Sellers covenant and agree that, after the Closing, the terms of any reorganization plan or plan of liquidation it submits to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction contemplated by or approved pursuant to the Sale Procedures Order or the Sale Approval Order.

Section 7.2   Competing Bids.   This Agreement and the transactions contemplated hereby are subject to the Sellers' right and ability to consider higher and better competing bids with respect to the Business and the Purchased Assets.  In furtherance thereof, the Sellers shall have the right to, and may cause their Representatives and Affiliates to, (a) initiate contact with,

49

solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to the Purchaser and its Affiliates and Representatives) in connection with any sale or other disposition of the Purchased Assets, and (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person; provided, that, from any after the Execution Date, the Sellers' consideration of other bids for the Business and the Purchased Assets (including the taking by the Sellers or any of their respective Representatives and Affiliates of any of the actions described in <u>clause (a)</u> or <u>clause (b)</u> of this sentence) shall be exercised solely in compliance with, and not in a manner inconsistent with, the Bidding Procedures (it being understood that, prior to the time at which the Sale Procedures Order is entered by the Bankruptcy Court, the Sellers shall comply with the Bidding Procedures as if the Bankruptcy Court had entered the Sale Procedures Order and such Order was in effect).  Following the earlier of (i) the conclusion of the Auction, and (ii) the date on which the Auction is cancelled, none of the Sellers shall, and the Sellers shall cause their respective Affiliates and Representatives not to, directly or indirectly, consider other bids for the Business and the Purchased Assets (including the taking by the Sellers or any of their respective Representatives and Affiliates of any of the actions described in <u>clause (a)</u> or <u>clause (b)</u> of the preceding sentence).  Anything in this Agreement or any of the Ancillary Agreements to the contrary notwithstanding, the Purchaser, the DIP Agent, the ABL Agent and/or the Term Loan Agent shall be entitled to participate in the Auction and shall be permitted, pursuant to section 363(k) of the Bankruptcy Code, to credit bid all or any portion of the DIP Obligations, the ABL Obligations and/or the Term Loan Obligations to acquire the Purchased Assets (each dollar of such obligations that is so credit bid shall be treated the same as a dollar of cash).  The Sellers shall not seek (or support any other Person in seeking) to limit the Purchaser's, the DIP Agent's, the ABL Agent's and/or Term Loan Agent's ability to make such credit bid "for cause" under section 363(k) of the Bankruptcy Code.

## ARTICLE VIII.

## COVENANTS AND AGREEMENTS

Section 8.1     <u>Conduct of Business of the Sellers</u>.

(a)     During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with <u>Section 3.4</u> and the Closing Date, except (1) as required by any Governmental Body, including the Bankruptcy Court (and any Orders thereof), (2) as required by the Bankruptcy Code or any other applicable Law or Order to which any Seller is bound, (3) as otherwise expressly contemplated, permitted or required by this Agreement or any other Ancillary Agreement, (4) as set forth on <u>Schedule 8.1(a)</u>, (5) directly related to the taking of any Emergency Response, or (6) with the prior written consent of the Purchaser, each Seller shall:

(i)     conduct the Business in the Ordinary Course of Business in all material respects (taking into account (x) the fact that the Chapter 11 Cases shall have commenced, (y) that the Business will be conducted while in bankruptcy and may require additional financing, and (z) such Seller's status as a debtor in possession);

50

(ii)     use commercially reasonable efforts to preserve in all material respects the Purchased Assets (excluding sales of Inventory in the Ordinary Course of Business); and

(iii)     use commercially reasonable efforts to preserve in all material respects its relationships with any Governmental Bodies, customers, suppliers, vendors, lessors, licensors, licensees and other Persons with which it has material business dealings or relationships.

(b)     During the period from the Execution Date and continuing until the earlier of the valid termination of this Agreement in accordance with Section 3.4 and the Closing Date, except (1) as required by any Governmental Body, including the Bankruptcy Court (and any Orders thereof), (2) as required by the Bankruptcy Code or any other applicable Law or Order to which any Seller is bound, (3) as otherwise expressly contemplated, permitted or required by this Agreement or any other Ancillary Agreement, (4) as set forth on Schedule 8.1(b), or (5) with the prior written consent of the Purchaser, no Seller shall:

(i)     acquire any material assets or properties, tangible or intangible, other than the acquisition of assets (x) in the Ordinary Course of Business, (y) directly related to the taking of any Emergency Response, or (z) contemplated by the Approved Budget;

(ii)     sell, lease, transfer or assign any material assets or properties, other than (x) in the Ordinary Course of Business, (y) those that are reflected in the Approved Budget or (z) the disposition of obsolete or immaterial assets not necessary for the conduct of the Business by the Sellers in the Ordinary Course of Business;

(iii)     (x) terminate or cancel (other than at its stated expiry date) or modify or amend in any material respect any Material Contract or any Contract that would be a Material Contract if in effect on the Execution Date, other than amendments (including, change orders) to Contracts with customers, suppliers or vendors in the Ordinary Course of Business, (y) waive, release or assign any material rights or claims under any Material Contract or any Contract that would be a Material Contract if in effect on the Execution Date, or (z) enter into any Contract that would have been a Material Contract had it been entered into prior to the Execution Date, except, in the case of this clause (z) (other than any such Contract with a Seller Party), in the Ordinary Course of Business;

(iv)     reject any Contract to which such Seller is a party or is otherwise subject to or bound;

(v)     impose, suffer or create any Encumbrance (other than Permitted Encumbrances, Encumbrances arising under any Order of the Bankruptcy Court relating to the use of cash collateral (as defined in the Bankruptcy Code) and Encumbrances arising under the DIP Credit Agreement) upon any material Purchased Assets;

51

(vi)     create, incur, assume or guarantee any Indebtedness, except (x) Indebtedness (other than Indebtedness for borrowed money) created, incurred, assumed or guaranteed in the Ordinary Course of Business, and (y) DIP Obligations;

(vii)     incur or make any material capital expenditures, except (x) in the Ordinary Course of Business, (y) in connection with the taking of any Emergency Response or (z) to the extent permitted by the DIP Credit Agreement (including as contemplated by the Approved Budget);

(viii)     transfer, assign, abandon, dispose, permit to lapse or grant any license or sublicense of, or any rights to use, any rights under or with respect to any material Seller Intellectual Property (other than nonexclusive licenses granted in the Ordinary Course of Business); take any action or fail to take any action that would reasonably be expected to result in the abandonment, cancellation or unenforceability of any material Seller Intellectual Property; enter into any settlement regarding breach or infringement of any material Seller Intellectual Property; or disclose to any Person (not an employee of the Sellers) any Seller Intellectual Property not heretofore a matter of public knowledge (except subject to non-disclosure agreements or confidentiality obligations);

(ix)     make any loans, advances or capital contributions to, or investments in, any other Person (other than to a Seller);

(x)     except as required pursuant to applicable Law or the terms of an existing Seller Plan, (x) grant any increase in compensation or benefits payable or provided to, or to become payable or provided to, any directors, managers, officers or employees of any Seller, (y) accelerate any payments or benefits, or the funding of any payments or benefits, payable or provided to, or to become payable or provided to, any directors, managers, officers or employees of any Seller, or (z) grant or promise to grant any bonuses, change in control payments, deferred compensation, severance, retention or equity or equity-based rights or other compensatory payments or benefits to any directors, managers, officers or employees of any Seller;

(xi)     establish, adopt, terminate or amend any Seller Plan (or any employee benefit plan, program, policy, agreement or arrangement that would constitute a Seller Plan if in existence as of the Execution Date), except as required by applicable Law or by the terms of any Seller Plan;

(xii)     make any change in any finance or Tax accounting elections, methods, principles or practices, except as required by applicable Law or GAAP;

(xiii)     (x) make or rescind any material election relating to Taxes, (y) file any amended Tax Return of, or claim any refund for, any Seller, or (z) settle or compromise any material Tax Liability;

(xiv)     declare or make any distributions or dividends (payable in Cash and Cash Equivalents, assets or properties) on or in respect of any of the outstanding

52

Equity Interests of any of the Sellers, Strike Investment, Strike Management or Strike Capital, or purchase or otherwise acquire any such Equity Interests;

(xv)    settle or agree to settle any litigation, proceeding or other Action that would reasonably be expected to result in (x) any Seller being enjoined from consummating the transactions contemplated by this Agreement, (y) any adverse effect on the Business or the Purchased Assets in any material respect or (z) an Assumed Liability;

(xvi)   enter into any Contract that limits any Seller from engaging or competing in any line of business or in any geographic area or location or, except in the Ordinary Course of Business, from soliciting or hiring any Person;

(xvii)  cancel or terminate any insurance coverage with respect to the Business, the Purchased Assets or the Assumed Liabilities without replacing such coverage with a comparable amount of insurance coverage;

(xviii) terminate any officer, director, manager, or executive or management-level employee of any Seller, unless such termination is for cause;

(xix)   assume or enter into any collective bargaining agreement, labor contract, letter of understanding, letter of intent, voluntary recognition agreement or legally binding commitment to any labor union, trade union or employee organization in respect of or affecting employees of any Seller;

(xx)    amend or change, as applicable, any of the Organizational Documents of any Seller in a manner that would reasonably be expected to materially delay or impede the Sellers' ability to consummate the transactions contemplated hereby or adversely affect the Purchaser, the Business, the Purchased Assets or the Assumed Liabilities;

(xxi)   amend, supplement or otherwise modify any of the Specified Plans; or

(xxii)  enter into any Contract or agree to take any of the actions prohibited by the foregoing clauses (b)(i) through (b)(xxi).

Section 8.2    Access to Information.

(a)    From the Execution Date until the earlier of the Closing and the valid termination of this Agreement in accordance with Section 3.4, to the extent not prohibited by Law, each of the Sellers shall afford the officers, directors, managers, employees, auditors, counsel, professionals, advisors, accountants, agents, contractors and other representatives (such people, with respect to any Seller or with respect to the Purchaser or any of its Affiliates, as applicable, the "Representatives") of the Purchaser or any of its Affiliates reasonable access (at the Purchaser's sole expense), during normal business hours and upon reasonable advance written notice from the Purchaser, to (i) the employees of the Sellers possessing information relating to the Business, the Purchased Assets or the Assumed Liabilities, (ii) subject to all

53

applicable Laws and the Sellers' COVID-19 virus policies, the properties, offices and other facilities of the Sellers and (iii) all books, records and other Documents, Contracts, and all financial, operating and other data and information to the extent relating to the Business, the Purchased Assets or the Assumed Liabilities that are in the possession of the Sellers, in each case, as the Purchaser may reasonably request; provided, that in exercising its rights hereunder, the Purchaser and its Representatives shall conduct themselves so as not to interfere in the conduct of the business of the Sellers and to minimize disruptions to the Business, the Chapter 11 Cases and the Auction; provided, further, that in connection with the Purchaser's and/or the Purchaser's Representatives' access of such offices and other facilities, the Purchaser and/or the Purchaser's Representatives (x) shall, at the election of Strike Holdco, be accompanied by a representative of the Sellers, (y) shall not materially interfere with the use and operation of such offices and other facilities, and (z) shall comply with all reasonable safety and security rules and regulations for such offices and other facilities that are communicated to the Purchaser or its Representatives.  Notwithstanding anything to the contrary contained in this Agreement, the Sellers may restrict the foregoing access and shall not be required to (I) provide any information or access that the Sellers reasonably believe would violate applicable Law, including Antitrust Laws and data protection Laws, or the terms of any applicable Contract (including confidentiality obligations) or cause forfeiture of any attorney-client privilege or an expectation of client confidence or any other rights to any evidentiary privilege (such limitations, "Disclosure Limitations"); provided, that the Purchaser and the Sellers shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of the Sellers after consultation with outside legal counsel) reasonably be likely to cause such violation to occur or such privilege to be forfeited with respect to such information, (II) provide any information relating to the sale process contemplated by the Bidding Procedures, bids received from other Persons and information and analysis (including financial analysis) relating to such bids (except to the extent provided under the Sale Procedures Order or the Bidding Procedures) or (III) conduct, or permit the Purchaser or any of its Representatives to conduct, any Phase II environmental site assessment or investigation, or other environmental sampling relating to any Leased Real Property.  The Purchaser acknowledges and agrees that, notwithstanding anything to the contrary in this Agreement, all documents, materials, communications, analyses and other information relating to the sale process contemplated by the Bidding Procedures and bids received from the Purchaser and other Persons are in the possession of the Sellers as of the date of this Agreement and through the Closing and the Sellers shall not be required to grant access to such documents, materials and other information to the Purchaser or any of its Affiliates at any time (except to the extent provided under the Sale Procedures Order or the Bidding Procedures).  After the Purchaser is selected as the Successful Bidder, the Sellers shall coordinate with the Purchaser to arrange for a meeting or call with Significant Customers and Significant Vendors/Suppliers to discuss the transactions contemplated by this Agreement and/or the transition of the Business and the Purchased Assets to the Purchaser.

(b)     From and after the Closing, for a period of three (3) years following the Closing Date (or, if earlier, the closing of the Chapter 11 Cases), the Purchaser will provide the Sellers (and their respective successors) and their respective Representatives, at the Sellers' sole expense, with reasonable access, during normal business hours, and upon reasonable advance notice, subject to reasonable denials of access or delays to the extent any such access would unreasonably interfere with the operations of the Purchaser or the Business and compliance with any health and safety policies of the Purchaser and/or the Business, including with respect to

54

COVID-19, to the books and records, including work papers, schedules, memoranda, and other documents (for the purpose of examining and copying) relating to the Purchased Assets or the Assumed Liabilities with respect to periods or occurrences prior to the Closing Date that are in the possession of the Purchaser, solely for the purposes of (i) the closing of the Chapter 11 Cases and the wind down of the Sellers' estates (including reconciliation of claims), (ii) making insurance claims, (iii) complying with applicable Laws and (iv) defending or prosecuting any Action (other than any Action involving the Purchaser or any of its Affiliates) to which any Seller is a party.  Notwithstanding the foregoing, the Purchaser shall not be obligated to provide any such access that would conflict with the Disclosure Limitations; provided, that the Purchaser and the Sellers shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of the Purchaser after consultation with outside counsel) reasonably be likely to cause such violation to occur or such privilege to be undermined with respect to such information.  The Sellers acknowledge and agree that any and all information received from or on behalf of, or made available by or on behalf of, the Purchaser pursuant to this Section 8.2(b) shall be subject to the terms of the confidentiality provision in Section 8.11.

(c)     All information obtained by the Purchaser or its Affiliates or any of their respective Representatives pursuant to Section 8.2(a) shall be subject to the terms of the Confidentiality Agreement prior to the Closing.

(d)     The Purchaser shall provide commercially reasonable access to any relevant documents or information or personnel (so long as not disruptive to business operations) reasonably requested by the litigation trustee (the "Litigation Trustee") appointed pursuant to a liquidating chapter 11 plan of the Sellers related to claims and causes of action of the Sellers (the "Litigation Claims") assigned to the Litigation Trustee and the reconciliation of claims against the Sellers' estates.  The Purchaser shall preserve, for the benefit of the Litigation Trustee, all records and documents (including all electronic records or documents) related to the Litigation Claims until such time as the Litigation Trustee notifies Purchaser in writing that such records are no longer required to be preserved, or all necessary and available records and documents have been provided to the Litigation Trustee.

Section 8.3     Assignability of Certain Purchased Assets.    To the extent that the assignment to the Purchaser of any Purchased Asset pursuant to this Agreement is not permitted without the consent, waiver, confirmation or other approval of a third party or is prohibited by applicable Law, and such consent, waiver, confirmation or other approval or waiver of such Law cannot be overridden by the Sale Approval Order or other related order of the Bankruptcy Court (such Purchased Assets, the "Nonassignable Assets"), then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Nonassignable Asset or any right or interest therein unless and until such consent, waiver, confirmation or other approval is obtained or such waiver of Law is obtained, and the parties hereto shall use reasonable best efforts prior to the Closing to obtain such consents, waivers, confirmations or approvals or waiver of Law; provided, however, that the Sellers and their Affiliates will not be required to pay any amount to obtain any such consent, waiver, confirmation or other approval is obtained or such waiver of Law unless the Purchaser agrees to reimburse the Sellers or their Affiliates for any such amount or any such amount has been funded to the Sellers pursuant to the DIP Credit Agreement.  If any such consent, waiver, confirmation or other approval or waiver or Law is not

55

obtained prior to the Closing Date in respect of a Nonassignable Asset, then, the Nonassignable Asset shall not be transferred at the Closing and the Closing will proceed with respect to the remaining Purchased Assets upon the terms and subject to the conditions hereof, and there will be no reduction in the Purchase Price as a result thereof, and solely to the extent not prohibited under applicable Law (including the Bankruptcy Code), the Purchaser and the Sellers shall, for a period of twelve (12) months following the Closing Date (or the remaining term of any applicable Contract or the closing of the Chapter 11 Cases, if shorter), (a) use their respective reasonable best efforts to cooperate with each other to obtain such consent, waiver, confirmation or other approval or waiver of applicable Law, and (b) cooperate in a lawful and reasonable arrangement proposed by the Purchaser designed to provide the Purchaser with the benefits of such Nonassignable Asset (an "Interim Arrangement"), including enforcement by the Sellers, for the benefit of the Purchaser, of any and all rights of the Sellers against any party to an Assigned Contract arising out of the breach or cancellation thereof by such party; provided, however, that, the Sellers and their Affiliates shall not be required to (i) pay any amount, grant any accommodation therefor or incur any obligation to any Person from whom any such consent, waiver, confirmation or other approval may be required (unless the Purchaser agrees to reimburse the Seller or their Affiliates for any such amount or any such amount has been funded to the Sellers pursuant to the DIP Credit Agreement) or (ii) initiate any Action to obtain any such consent, waiver, confirmation or other approval (unless the Purchaser agrees to reimburse the Seller or their Affiliates for the costs and expenses incurred by the Sellers or their Affiliates in connection with any such Action or any such costs and expenses have been funded to the Sellers pursuant to the DIP Credit Agreement).  The Purchaser shall be responsible for performing all obligations under each such Nonassignable Asset required to be performed by the Sellers after the Closing Date (or, in the case of a Contract that became an Assigned Contract after the Closing Date, after such later date) to the extent that if such Nonassignable Asset were transferred and assigned to the Purchaser as of the Closing Date (or such later date), the obligations thereunder would have constituted Assumed Liabilities.  Upon obtaining any applicable consent, waiver, confirmation or other approval with respect to any Nonassignable Asset and/or waiver of any applicable Law, such Nonassignable Asset shall be promptly transferred and assigned to the Purchaser in accordance with the terms of this Agreement, the Sale Approval Order and the Bankruptcy Code.  Nothing in this Section 8.3 shall obligate the Purchaser to waive any right or condition under this Agreement.

Section 8.4    Further Agreements.

(a)    Each Seller shall (a) promptly deliver to the Purchaser any mail or other communication addressed to any of the Sellers relating to any of the Purchased Assets or any of the Assumed Liabilities and received by such Seller on or after the Closing Date, (b) promptly transfer in immediately available funds to the Purchaser any cash, electronic credits or deposits received by such Seller on or after the Closing Date to the extent that such cash, electronic credits or deposits are Purchased Assets (including any cash or other amounts received by any of the Sellers that was deposited with, or held by, any bank, surety, financial institution or other Person as collateral, security or other support for any outstanding letters of credit, Surety Bonds, banker's acceptances or other financial assurances) or are otherwise properly due and owing to the Purchaser in accordance with the terms of this Agreement and (c) promptly forward to the Purchaser any checks or other instruments of payment that it receives on or after the Closing Date to the extent that such checks or other instruments are Purchased Assets or are otherwise

properly due and owing to the Purchaser in accordance with the terms of this Agreement. The Purchaser shall (i) promptly deliver to the Sellers any mail or other communication addressed to the Sellers not relating to the Purchased Assets or the Assumed Liabilities and received by the Purchaser on or after the Closing Date, (ii) promptly transfer in immediately available funds to the Sellers, any cash, electronic credits or deposits received by the Purchaser to the extent that such cash, electronic credits or deposits are Excluded Assets or are otherwise properly due and owing to the Sellers in accordance with the terms of this Agreement and (iii) promptly forward to the Sellers any checks or other instruments of payment that it receives on or after the Closing Date to the extent that such checks or other instruments are Excluded Assets or are otherwise properly due and owing to the Sellers in accordance with the terms of this Agreement.

(b)     Subject to the terms of this Agreement and the other Ancillary Agreements, during the six (6)-month period following the Closing, if either the Purchaser or any Seller becomes aware that any right, property or asset forming part of the Purchased Assets has not been transferred to the Purchaser or that any right, property or asset not forming part of the Purchased Assets has been transferred to the Purchaser, it shall promptly notify such other parties hereto and the Purchaser or the Sellers, as applicable, shall, as soon as reasonably practicable thereafter, ensure that such right, property or asset is transferred, at the expense of the party that is seeking the assets to be transferred to it, to (i) the Purchaser, in the case of any right, property or asset forming part of the Purchased Assets which was not transferred to the Purchaser at or in connection with the Closing, or (ii) the Sellers, in the case of any right, property or asset not forming part of the Purchased Assets which was transferred to the Purchaser at the Closing.

Section 8.5     Consents and Approvals.

(a)     Prior to the earlier of the valid termination of this Agreement and the Closing, the Purchaser and each of the Sellers shall use their reasonable best efforts to take, or shall cause its "ultimate parent entity" (as such term is defined by the rules to the HSR Act, "UPE"), if any, to use its reasonable best efforts to take, all appropriate action to take, or cause to be done, all things necessary, proper or advisable under applicable Law to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements, including to use reasonable best efforts to obtain all necessary waivers, consents and approvals and effecting all necessary registrations and filings, including all necessary waivers, consents and approvals from customers and other parties. Without limiting the generality of the previous sentence, the Purchaser and each of the Sellers shall, and shall cause its respective UPE, if any, to, (i) use their reasonable best efforts to obtain, as promptly as practicable and in any event prior to the Outside Date, all approvals, authorizations, clearances, qualifications, consents, orders and waivers from Governmental Bodies as are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, including antitrust clearance under the HSR Act and under any other Antitrust Law, (ii) as promptly as reasonably practicable following the date hereof, file all notices and other filings, and thereafter make any other required submissions, with regulatory and other Governmental Bodies and all other Persons that are necessary or required under the HSR Act or any other applicable Law, including any other Antitrust Law, to consummate the transactions set forth herein, (iii) use their reasonable best efforts to provide such other information and communications to Governmental Bodies to comply with any formal or informal request for additional information or documentary material

57

regarding such party received by it or any of its Affiliates from any Governmental Body, (iv) cooperate with each other in obtaining, filing or making, as soon as practicable, all such approvals, authorizations, clearances, consents, waivers, notices and filings or in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any party hereto in connection with proceedings under or relating to any applicable Laws (including, to the extent permitted by applicable Law, providing copies of all such documents to the non-filing parties and their Affiliates and Representatives prior to filing and considering in good faith their reasonable views, additions, deletions or changes) and in connection with resolving any investigation or other inquiry of any Governmental Body under the HSR Act or under any other applicable Antitrust Law with respect to any such filing; provided, however, that notwithstanding anything to the contrary contained herein, the Sellers and the Purchaser may designate any documents or materials provided to the other party for purposes of compliance with this Section 8.5 as "Outside Counsel Eyes' Only" that it, in its sole discretion, deems confidential and such confidential documents or materials shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside legal counsel to employees, officers or directors of the recipient unless express permission is obtained in advance from the providing party or its counsel, (v) not extend any waiting period under the HSR Act or enter into any agreement with a Governmental Body not to consummate the transactions contemplated hereby; and (vi) use their reasonable best efforts to defend and resolve any investigation or other inquiry of any Governmental Body under all applicable Laws; provided, that the Purchaser shall not be required to institute, commence or defend against any suit, proceeding or litigation.

(b)      Anything herein to the contrary notwithstanding, (i) neither the Purchaser nor any of its UPE or Affiliates shall be required to (x) disclose to any other party hereto any information contained in its HSR Notification and Report Form or any other form or filing under any other Antitrust Law which such party, in its reasonable discretion, deems confidential, except as may be required by applicable Law as a condition to the expiration or termination of the applicable waiting period under the HSR Act or any other applicable Antitrust Law with respect to the transactions contemplated under this Agreement, or (y) hold separate (including by trust or otherwise) or divest any businesses or assets of the Sellers, the Purchaser or any of its Affiliates or agree to any condition, restraint or limitation relating to its ability to freely own or operate all or a portion of any businesses or assets of the Sellers, the Purchaser or any of its Affiliates and (ii) in connection with seeking clearance or approval from any Governmental Body, neither any of the Sellers nor any of their respective Affiliates shall, without the Purchaser's prior written consent, commit to any divestiture transaction, or commit to alter any Seller's businesses or commercial practices in any way, or otherwise take or commit to take any action that limits the Purchaser's freedom of action with respect to, or the Purchaser's ability to retain or otherwise receive the full benefits of, this Agreement.

Section 8.6      Publicity.    Unless otherwise required by or reasonably necessary to comply with applicable Law or Bankruptcy Court requirements, and except for disclosure of matters that become a matter of public record as a result of the Chapter 11 Cases and any filings or notices made with the Bankruptcy Court related thereto, each of the Sellers and the Purchaser agree that it (a) shall communicate and consult with each other prior to making any public disclosure or statements with respect to this Agreement or the transactions contemplated hereby and (b) shall not issue, and it shall cause its respective Affiliates and Representatives not to issue,

any public release or public announcement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the Purchaser or Strike Holdco, respectively.  Unless otherwise required by the Bankruptcy Court, this Agreement shall be filed with the Bankruptcy Court without Schedules or Exhibits designated by the Purchaser; provided, that nothing in this Agreement shall restrict or prohibit the Sellers or their Affiliates from (x) making announcements to their respective employees subject to the prior reasonable consultation with the Purchaser, (y) communicating directly (and not through a public release or announcement or other broad dissemination of information or communication) with their employees, customers, suppliers or other business relations or (z) making any announcement to their respective employees, customers and other business relations to the extent that such announcement consists solely of, or is otherwise consistent in all material respects with, previous press releases, public disclosures or public statements made by any party hereto in accordance with this Agreement.

Section 8.7    Notification of Certain Matters.

(a)    The Sellers shall give prompt written notice to the Purchaser of (i) the initiation, institution or commencement of any material Action by a Governmental Body or other Person (or written communications indicating that the same may be contemplated or threatened) challenging the validity of the transactions contemplated by this Agreement or any of the Ancillary Agreements or seeking to enjoin, restrain or prohibit this Agreement or any of the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby, (ii) any Material Adverse Effect, and/or (iii) the receipt of written notice from any Governmental Body or other Person alleging that the consent of such Person is or may be required under any Organizational Document, Material Contract, Material Permit or Law in connection with the consummation of any part of the transactions contemplated by this Agreement or any of the Ancillary Agreements.

(b)    No information received by the Purchaser pursuant to this Section 8.7 nor any information received or learned by the Purchaser or any of its Representatives pursuant to an investigation made or access provided under Section 8.2 shall be deemed to (i) qualify, modify, amend or otherwise affect any representations, warranties, conditions, covenants or other agreements of any Seller set forth in this Agreement or any of the Seller Ancillary Agreements, (ii) amend or otherwise supplement the information set forth in any of the Schedules (including any Seller Disclosure Schedules), (iii) limit or restrict the remedies available to the Purchaser under this Agreement, applicable Law or otherwise arising out of a breach of this Agreement, or (iv) limit or restrict the ability of the Purchaser to invoke or rely on, or effect the satisfaction of, the conditions to the obligations of the Purchaser to consummate the transactions contemplated by this Agreement set forth in Article IX.

Section 8.8    Prohibition on Use of Purchased Names.  The Sellers shall, from and after the Closing, cease using, and shall cause their respective Affiliates to cease using, the Purchased Names or any names or marks confusingly similar thereto; provided, however, that the Sellers may continue to use the Purchased Names as their company names solely in connection with (i) conducting and administering the Chapter 11 Cases, (ii) as a former name for legal and noticing purposes, and (iii) for non-commercial purposes relating to the preservation of records and other historical or archived documents containing or referencing such Purchased Names.  After the

59

Closing Date, each Seller shall promptly (but in any event within ten (10) days after the Closing Date) legally change their business and corporate names to new names that are not the Purchased Names or any names or marks that are confusingly similar thereto and file notices of such name changes with the Bankruptcy Court.  In furtherance of the foregoing, each Seller will (a) revoke any filing that it may have made heretofore with any Governmental Body relating to its use of the Purchased Names and of any like names or combinations of words or derivations thereof and (b) prepare and file with the appropriate Governmental Bodies appropriate documents, including articles of amendment, changing its name so as to effectuate the same and promptly deliver evidence of such name change to the Purchaser.

      Section 8.9    <u>Tax Matters</u>.

      (a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, recording or other similar Taxes which arise solely from the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein (all of the foregoing, "<u>Transfer Taxes</u>"), as well as any related Tax Return preparation and filing costs, shall be borne and timely paid by the Purchaser.  Each Tax Return with respect to such Transfer Taxes will be prepared and timely filed by the Purchaser.  In the event that any such Tax Return requires execution by any of the Sellers, such Seller shall promptly execute such Tax Return after receipt thereof from the Purchaser and deliver it to the Purchaser.  The parties will each timely sign and deliver (or cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate (and will each otherwise cooperate) to establish any available exemption (or reduction) with respect to any such Transfer Taxes.  The parties shall cooperate in good faith to minimize, to the fullest extent possible under applicable Law, the amount of any such Transfer Taxes.

      (b)    Each of the Sellers and the Purchaser agrees to furnish or cause to be furnished to the other party, upon request, as promptly as practicable, such information and assistance relating to the Business, the Purchased Assets and the Assumed Liabilities (including access to books and records) as is reasonably necessary for the preparation and filing of any Tax Returns (including any claim for a Tax refund) by the Sellers or the Purchaser, the making of any election relating to Taxes by the Sellers or the Purchaser, the determination of liability for Taxes, the preparation for any audit by any Governmental Body, and the prosecution or defense of any claim, suit or other Action relating to any Tax.  The Sellers shall give the Purchaser thirty (30) days' written notice prior to transferring, destroying or discarding any Tax records and, if the Purchaser so requests, shall allow the Purchaser to take possession of such Tax records.

      (c)    Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets to the Purchaser shall be free and clear of any and all Encumbrances (other than Permitted Encumbrances), including any Encumbrances or claims arising out of any bulk transfer Laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Approval Order.  Without limiting the foregoing, the parties agree that the Sale Approval Order shall provide either that (i) the Sellers have complied with the requirements of any Law relating to bulk sales and transfer or (ii) compliance with any Law relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

      Section 8.10    <u>Insurance</u>.

60

(a)     Following the Closing, to the extent that any of the Purchaser's rights to insurance under any of the Acquired Insurance Policies (including the right to make claims under any of the Acquired Insurance Policies), or to proceeds therefrom, relating to loss, damage, destruction, taking, interruption or other impairment of, or incidents, events or occurrences relating to, any of the Purchased Assets or the Business, or to loss, damages or Liabilities arising from any of the Assumed Liabilities, including insurance for occurrences, property loss or damage and business interruption, are not transferable or assignable to the Purchaser, then as promptly as practicable following the Sellers' receipt of a written request from the Purchaser, each of the Sellers shall, at the Purchaser's sole cost and expense, use reasonable best efforts to exercise any such rights and to pursue and collect any such proceeds, all subject to the direction and control by the Purchaser.  In connection with any such exercise of such rights or any such pursuit or collection of any such proceeds, the Sellers shall, at the reasonable request of the Purchaser, at the Purchaser's sole cost and expense, (i) execute, deliver, authenticate, acknowledge, attest, certify, submit and file all such documents, instruments, notices, powers of attorney, letters, forms and other papers that are necessary or desirable (in the reasonable judgment of the Purchaser) in connection therewith, (ii) take such steps and actions, and do such other things, that are necessary or desirable (in the reasonable judgment of the Purchaser) in connection therewith, and (iii) cooperate and work with the Purchaser in any reasonable way that is necessary or desirable (in the reasonable judgment of the Purchaser) in connection therewith.

(b)     Upon the receipt by the Sellers of any proceeds under any of the Acquired Insurance Policies, the Sellers shall hold such proceeds in trust for the benefit of the Purchaser without commingling the same with other funds or assets of the Sellers, and shall promptly deliver such proceeds to the Purchaser, together with any necessary endorsements or assignments, without set-off, counterclaim or reduction of any kind.  Additionally, the Purchaser shall pay the amount of any deductibles, co-insurance or similar expenses (other than increases in premiums) that would otherwise be borne by the Sellers, according to the specific terms and conditions of the Acquired Insurance Policies, as a result of any such claims, damages or losses.

Section 8.11   Confidentiality.  Following the Closing, the Sellers shall, and the Sellers shall use reasonable best efforts to cause their respective Affiliates and Representatives to, maintain as confidential and not use (other than any use expressly set forth in Section 8.2(b)(i)-(ii)) or disclose (except (a) as may be necessary in the administration of their chapter 11 estates, (b) as otherwise required by Law (including disclosure required in respect of the Sellers' or their Affiliates' Tax returns), (c) as required or requested by any Governmental Body, (d) as disclosed in connection with, and directly related to, any litigation regarding this Agreement or the Ancillary Agreements or the transactions contemplated hereby and thereby, or (e) as authorized in writing by the Purchaser), (i) any confidential, proprietary or non-public information or materials relating to the Purchased Assets or the Assumed Liabilities and (ii) any materials developed by the Purchaser or any of its Representatives or provided by the Purchaser or any of its Representatives to any Seller.  In the event any Seller is required by Law to disclose any such information or materials, such Seller shall, to the extent legally permissible and feasible, promptly notify the Purchaser in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall reasonably cooperate with the Purchaser, at the Purchaser's sole expense, to obtain a protective order and otherwise preserve the confidentiality of such information or materials consistent with applicable Law.  Information and materials subject to the confidentiality obligations in this Section 8.11 do not include any

61

information or materials which (i) at the time of disclosure is or thereafter becomes generally available to or known by the public (other than as a result of the disclosure of such information or materials by the Sellers or their Affiliates or Representatives in breach of this Section 8.11) or (ii) becomes available to any of the Sellers or their Affiliates and Representatives after the Closing Date on a non-confidential basis from a Person (other than the Purchaser or any of its Affiliates) who is not bound by a confidentiality agreement with the Purchaser or any of its Affiliates.

Section 8.12   Headquarters Lease.   At the request of the Purchaser, during the period beginning on the Closing Date and ending on the date that is thirty (30) days following the Closing Date (the "Transition Period"), the Sellers shall provide the Purchaser and its Affiliates with free, unfettered and sole and exclusive access to, and the right to occupy and use, the Leased Real Property that is subject to the Headquarters Lease (such Leased Real Property, the "Specified Property"), and shall permit the Purchaser and its Affiliates to conduct their respective businesses and operations, and to use and operate their assets and properties, at and from the Specified Property, in each case, subject to the terms and conditions of the Headquarters Lease.   During the Transition Period, the Sellers shall (a) pay all rent, additional rent and other sums and charges payable by any Seller under the Headquarters Lease, (b) not amend, supplement, alter or otherwise modify the Headquarters Lease, (c) not terminate or reject the Headquarters Lease, (d) provide the Purchaser with prompt notice of the occurrence of a default under the Headquarters Lease or the occurrence of any event that (with notice or lapse of time, or both) would reasonably be expected to constitute a default under the Headquarters Lease or give any Person the right to terminate, cancel or modify the Headquarters Lease which any Seller becomes aware of, (e) not sublease any portion of the Specified Property or otherwise allow or permit any Person (other than the Purchaser and its Affiliates) to possess, use or occupy any portion of the Specified Property, and (f) not sell, encumber (other than Permitted Encumbrances), dispose or transfer the Headquarters Lease or any of the Specified Property. Notwithstanding the foregoing, the Purchaser shall indemnify the Sellers for any damages incurred by the Sellers directly arising from the Sellers' occupancy of the Specified Property pursuant to this Section 8.12 and which damages cannot be discharged or compromised pursuant to the Bankruptcy Code.

Section 8.13   Return of Specified Collateral.   Promptly following the Closing, the Sellers shall, at the Purchaser's sole cost and expense, use their reasonable best efforts to obtain, procure, collect and secure the return of all cash, property and other amounts ("Specified Collateral") held, possessed, deposited with, or controlled by any bank, surety, financial institution or other Person as collateral, security or other support for any letters of credit, Surety Bonds, banker's acceptances or other financial assurances that were provided or issued to, or for the benefit or account of, any of the Sellers.   In furtherance of the Sellers' obligations to use such efforts to obtain, procure, collect and secure the return of any Specified Collateral, the Sellers shall (a) execute, deliver, authenticate, acknowledge, attest, certify, submit and file all such documents, instruments, notices, powers of attorney, letters, forms and other papers that are necessary or desirable (in the reasonable judgment of the Purchaser) in connection therewith, (b) take such steps and actions, and do such other things, that are necessary or desirable (in the reasonable judgment of the Purchaser) in connection therewith, and (c) cooperate and work with the Purchaser in any reasonable way that is necessary or desirable (in the reasonable judgment of the Purchaser) in connection therewith.   If any Specified Collateral is paid or distributed to, or

received by, any of the Sellers, then such Seller hold such Specified Collateral in trust for the benefit of the Purchaser without commingling the same with other funds or assets of the Sellers, and shall promptly turn the same over to the Purchaser, together with any necessary endorsements or assignments, without set-off, counterclaim or reduction of any kind.

Section 8.14   <u>Excluded Cash</u>.

(a)   [Intentionally Deleted.]

(b)   At the Closing, the Excluded Cash constituting the Professional Fee Amount shall be deposited into the Escrow Account solely to pay Estate Professionals and shall only be distributed from the Escrow Account to an Estate Professional pursuant to an Order of the Bankruptcy Court.   When all amounts owing to the Estate Professionals allowed by the Bankruptcy Court have been paid in full, any remaining portion of the Excluded Cash constituting the Professional Fee Amount that remains in the Escrow Account thereafter shall be promptly delivered to the Purchaser (but in no event until after all deadlines for Estate Professionals to submit final fee applications have passed and all final fee applications of the Estate Professionals have been submitted and corresponding Final Orders entered by the Bankruptcy Court), and the Purchaser shall be entitled to (and the Sale Approval Order shall grant to the Purchaser), effective as of the Closing, a valid, enforceable and automatically perfected first priority priming lien on and security interest in any such residual Excluded Cash that is not distributed from the Escrow Account to an Estate Professional pursuant to an Order of the Bankruptcy Court.

Section 8.15   <u>Further Assurances</u>.

(a)   Subject to the terms and conditions of this Agreement and applicable Law, at all times prior to the earlier of the Closing and the termination of this Agreement in accordance with <u>Section 3.4</u>, each Seller and the Purchaser shall use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable to obtain entry of the Sale Procedures Order and, to the extent the Purchaser is the Successful Bidder, the Sale Approval Order and to consummate and make effective the transactions contemplated hereby.

(b)   Subject to the terms and conditions of this Agreement, neither the Sellers nor the Purchaser shall take any action or refrain from taking any action the effect of which would be to delay or impede the ability of the Sellers or the Purchaser to consummate the transactions contemplated by this Agreement unless taking such action or refraining from taking such action is required by applicable Law.

(c)   Following the Execution Date and until the earlier of the Closing Date and the date on which this Agreement is validly terminated in accordance with <u>Section 3.4</u>, the Sellers, on the one hand, and the Purchaser, on the other hand, shall keep each other reasonably informed as to the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by the Sellers or the Purchaser or by any of their respective Affiliates (as the case may

be), from any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement.

(d)     Subject to the terms and conditions of this Agreement, at and following the Closing until the dissolution and liquidation of the Sellers and the termination of the Sellers' certificates for formation, each of the parties hereto shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate and as the Purchaser may reasonably request to vest in the Purchaser, all of the Sellers' right, title and interest in, to or under the Purchased Assets, and for the Purchaser to assume the Assumed Liabilities, and to otherwise make effective as promptly as practicable the transactions contemplated by this Agreement and the Ancillary Agreements.  Nothing in this Section 8.15 or elsewhere in this Agreement shall (i) obligate any party hereto to waive any right or condition under this Agreement, (ii) except as expressly required by this Agreement, require the Sellers or the Purchaser to make any expenditure or incur any obligation on their own or on behalf of the other parties (unless such any such other party agrees to reimburse the Sellers or the Purchaser, as applicable, for the amount of such expenditure or obligation or, in the case of the Sellers, if the amount of such expenditure or obligation is covered by the Approved Budget), or (iii) prohibit any Seller from ceasing operations or winding up its affairs following the Closing so long as the other Sellers or their Affiliates assume responsibility and are able to perform any remaining post-Closing obligations of such Seller.

Section 8.16    Seller Disclosure Schedules.   As soon as possible after the Execution Date, but in no event later than the date that is ten (10) days after the Execution Date, the Sellers shall (a) deliver to the Purchaser true, accurate and complete copies of all of the Seller Disclosure Schedules and (b) confirm to the Purchaser that such Seller Disclosure Schedules are final and complete and can be attached to this Agreement and incorporated herein.

Section 8.17    Acknowledgements.   The Purchaser agrees, warrants and represents that (a) the Purchaser is purchasing the Purchased Assets on an "AS IS", "WHERE IS" and "WITH ALL FAULTS" basis based solely on the Purchaser's own investigation of the Purchased Assets and (b) neither the Sellers nor any of their Representatives has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Purchased Assets, any part of the Purchased Assets, the financial performance of the Purchased Assets or the Business, or the physical condition of the Purchased Assets, except (in any such case) as expressly set forth in Article IV of this Agreement.  The Purchaser further acknowledges that the consideration for the Purchased Assets specified in this Agreement has been agreed upon by the Sellers and the Purchaser after good-faith arms-length negotiation in light of the Purchaser's agreement to purchase the Purchased Assets "AS IS" and "WITH ALL FAULTS".  EXCEPT AS SET FORTH IN ARTICLE IV OF THIS AGREEMENT (AS MODIFIED OR QUALIFIED BY THE SELLER DISCLOSURE SCHEDULES), THE PURCHASER ACKNOWLEDGES AND AGREES THAT THE SELLERS ARE CONVEYING THE PURCHASED ASSETS WITHOUT REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED AT COMMON LAW, BY STATUTE, OR OTHERWISE (ALL OF WHICH THE SELLERS HEREBY DISCLAIM), RELATING TO (I) TITLE, SUITABILITY OR ADEQUACY, (II) THE MERCHANTABILITY, DESIGN, OR QUALITY OF THE BUSINESS OR THE PURCHASED ASSETS, (III) THE FITNESS OF THE PURCHASED

ASSETS FOR ANY PARTICULAR PURPOSE OR QUALITY WITH RESPECT TO THE BUSINESS AND ANY OF THE PURCHASED ASSETS OR THE CONDITION OF THE WORKMANSHIP THEREOF OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT, (IV) ANY REAL OR PERSONAL PROPERTY OR ANY FIXTURES, (V) THE ABSENCE OF PATENT, LATENT OR REDHIBITORY VICES OR DEFECTS, (VI) THE ENVIRONMENTAL OR PHYSICAL CONDITION OF THE PURCHASED ASSETS (SURFACE AND SUBSURFACE), (VII) COMPLIANCE WITH APPLICABLE LAWS, (VIII) ANY ESTIMATES OF THE VALUE OF THE PURCHASED ASSETS OR FUTURE REVENUES GENERATED BY THE PURCHASED ASSETS, (IX) CONTRACTUAL, ECONOMIC, FINANCIAL INFORMATION AND/OR OTHER DATA AND ANY RELATED ESTIMATIONS OR PROJECTIONS MADE IN SALE PRESENTATIONS OR MARKETING MATERIALS, (X) CONTINUED FINANCIAL VIABILITY, INCLUDING PRESENT OR FUTURE VALUE OR ANTICIPATED INCOME OR PROFITS, (XI) THE CONTENT, CHARACTER OR NATURE OF ANY INFORMATION MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (XII) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO THE PURCHASER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY DISCUSSION OR PRESENTATION RELATING THERETO, (XIII) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM INTELLECTUAL PROPERTY INFRINGEMENT, MISAPPROPRIATION OR OTHER VIOLATION OR (XIV) ANY OTHER MATTER WHATSOEVER (INCLUDING THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO THE PURCHASER), IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES HERETO THAT THE PURCHASER WILL BE DEEMED TO BE OBTAINING THE PURCHASED ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND WITH ALL FAULTS AND THAT THE PURCHASER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS THE PURCHASER DEEMS APPROPRIATE AND THE PURCHASER IRREVOCABLY WAIVES ANY AND ALL CLAIMS IT MAY HAVE AGAINST THE SELLERS ASSOCIATED WITH THE SAME. NOTHING IN THIS <u>SECTION 8.17</u> OR ELSEWHERE IN THIS AGREEMENT SHALL PREVENT THE PURCHASER FROM BRINGING ANY CLAIM FOR ACTUAL AND INTENTIONAL FRAUD WITH RESPECT TO ANY OF THE REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE BY SELLERS IN THIS AGREEMENT OR IN ANY OF THE SELLER ANCILLARY AGREEMENTS.

## CONDITIONS TO CLOSING

Section 9.1    <u>Conditions Precedent to the Obligations of the Purchaser and the Sellers</u>. The respective obligations of each of the Sellers and the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to the extent permitted by applicable Law, joint written waiver by the Purchaser and Strike HoldCo, on or prior to the Closing Date, of each of the following conditions:

65

(a) no Law or Order (whether temporary, preliminary or permanent) that enjoins, restrains, prevents, makes illegal or otherwise prohibits the consummation of the transactions contemplated hereby shall be in effect;

(b) any waiting period (and any extension thereof) under the HSR Act or any other applicable Antitrust Laws shall have expired or shall have been terminated or the necessary consents or clearances thereunder shall have been received and shall remain in full force and effect;

(c) (i) the Bankruptcy Court shall have entered the Sale Procedures Order and the Sale Approval Order, and each such order shall be a Final Order, and (ii) no Order of any Governmental Body staying, reversing, modifying or amending the Sale Approval Order shall be in effect; and

(d) neither (i) an "Event of Default" (as defined in the DIP Credit Agreement) shall have occurred and be continuing nor (ii) the indebtedness outstanding under the DIP Credit Agreement has been paid off, the commitments under the DIP Credit Agreement have been terminated by the DIP Lenders (excluding any such termination as a result of funding the commitments under the DIP Credit Agreement or a New Money Loan Tranche A Commitment Reduction (as defined in the DIP Credit Agreement)) or the DIP Credit Agreement has terminated.

Section 9.2    Conditions Precedent to the Obligations of the Sellers.  The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Strike HoldCo, in whole or in part, to the extent permitted by applicable Law):

(a) the representations and warranties of the Purchaser contained in Article V shall be true and correct in all material respects (without giving effect to any limitation or qualification as to materiality set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be so true and correct in all material respects as of such date), and the Sellers shall have received a certificate duly signed by an authorized person of the Purchaser, dated the Closing Date, certifying the foregoing;

(b) the Purchaser shall have performed and complied in all material respects with all covenants, obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and the Sellers shall have received a certificate duly signed by an authorized person of the Purchaser, dated the Closing Date, certifying the foregoing;

(c) the Sellers shall have received all of the items set forth in Section 3.3;

(d) the DIP Lenders shall have complied with their obligations to make loans to the Sellers under the DIP Credit Agreement; and

(e)      the Purchaser shall have delivered the Credit Bid Amount in accordance with Section 2.1.

Section 9.3      Conditions Precedent to the Obligations of the Purchaser.  The obligations of the Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser in whole or in part to the extent permitted by applicable Law):

(a)      each of (i) the representations and warranties of each Seller set forth in Section 4.1, Section 4.2, Section 4.3, clause (c) of Section 4.5, Section 4.10, and Section 4.11 shall be true and correct in all respects and (ii) the other representations and warranties of each Seller set forth in Article IV shall be true and correct in all respects (without regard for any "materiality" or "Material Adverse Effect" qualifiers set forth therein) except where the failure of such representations and warranties referred to in this clause (ii) to be so true and correct would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, in each case of clauses (i) and (ii), on and as of the Closing Date as if made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), and the Purchaser shall have received a certificate duly signed by an authorized officer of Strike HoldCo, dated the Closing Date, certifying the foregoing;

(b)      each Seller shall have performed and complied in all material respects with all covenants, obligations and agreements required in this Agreement to be performed or complied with by it on or prior to the Closing Date, and the Purchaser shall have received a certificate duly signed by an authorized officer of Strike HoldCo, dated the Closing Date, certifying the forgoing;

(c)      the Purchaser shall have received all of the items set forth in Section 3.2;

(d)      [Intentionally Deleted];

(e)      either (i) all of the Material Permits shall have been transferred to the Purchaser and shall be in full force effect without (A) the occurrence of any material breach or default thereunder, (B) any amendment or modification thereto or any loss, waiver or termination of any material rights, benefits or privileges thereunder, or (C) the imposition of any material conditions or restrictions on the use or availability thereof or on any of the rights, benefits or privileges thereunder, or (ii) the Purchaser shall have obtained Permits that are substantially the same as the Material Permits and such Permits are in full force and effect;

(f)      the Purchaser shall have obtained or otherwise procured Surety Bonds in amounts and forms that are required pursuant to applicable Laws, Permits and/or Contracts in connection with the ownership, use or operation of any of the Purchased Assets or in the conduct of the Business following the Closing except as would not be reasonably expected to have, individually or in the aggregate, an adverse effect on the Business or the Purchased Assets, taken as a whole, in any material respect;

(g)     the Bankruptcy Court shall have approved and authorized, other than with respect to Cure Costs, the assumption and assignment of each Assigned Contract, except as would not have an adverse effect on the Business and the Purchased Assets, taken as a whole, in any material respect from and after the Closing;

(h)     neither (i) the "Requisite Consenting Lenders" (as defined in the Restructuring Support Agreement) shall have the right to terminate the Restructuring Support Agreement nor (ii) the Restructuring Support Agreement shall have been validly terminated; and

(i)     the Purchaser shall have received a certificate of the chief financial officer of the Sellers certifying compliance by the Sellers, on and as of the Closing Date, with Section 10.3.3 of the DIP Credit Agreement with respect to the AP Trade Balance (as defined in the DIP Credit Agreement) as of immediately prior to the Closing.

## ARTICLE X.

## ADDITIONAL DEFINITIONS

Section 10.1   Certain Definitions.  As used herein:

(a)     "ABL Agent" means Lightship Capital II LLC, in its capacity as successor administrative agent and collateral agent under the ABL Credit Agreement and the other "Loan Documents" (as defined in the ABL Credit Agreement), including any successor thereto.

(b)     "ABL Credit Agreement" means that certain ABL Loan and Security Agreement, dated as of November 30, 2016, by and among Strike LLC, Delta and Strike Global, as borrowers, Strike HoldCo, as holdings, the ABL Lenders, and the ABL Agent, as amended, supplemented, amended and restated or otherwise modified from time to time.

(c)     "ABL Lenders" means the "Lenders," as such term is defined in the ABL Credit Agreement.

(d)     "ABL Obligations" means the "Obligations" as defined in the ABL Credit Agreement, including any Termination Payment (as defined in the ABL Credit Agreement).

(e)     "Accounts Receivable" means (i) any and all accounts receivable, trade accounts, retainage, unbilled receivables, contract billings, and other amounts receivable owed to any Seller and any other rights of any Seller to payment from third parties, including those reflected (or required to be reflected under GAAP) in the books and records of such Seller, and the full benefit of all security for such accounts, retainage, unbilled receivables, contract billings, other amounts receivable or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped, products sold or services rendered, in each case owing to such Seller, (ii) all other accounts or notes receivable of any Seller and the full benefit of all security for such accounts or notes receivable, and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon.

(f)     "Affiliate" means, with respect to any Person, any other Person that (either directly or indirectly) controls, is controlled by, or is under common control with the specified Person, and shall also include (i) any Related Fund of such Person and (ii) in the case of a specified Person who is an individual, any Family Member or Personal Representative of such Person.  The term "control" (including, with its correlative meanings, "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person (whether through ownership of securities, by Contract or otherwise).

(g)     "Alternative Transaction" means (i) any sale, transfer or other disposition, directly or indirectly, of a material portion of the assets and properties of the Sellers, whether proposed to be effected pursuant to the Auction or a merger, consolidation, share exchange or sale, amalgamation, foreclosure, compromise, asset sale, issuance, financing, recapitalization, liquidation, transfer or redemption of any assets or securities of any Seller or any successor thereto or any similar transaction, in one transaction or a series of transactions with one or more Persons other than the sale of the Purchased Assets to the Purchaser in accordance with the terms hereof, or (ii) any restructuring or reorganization of any of the Sellers or their assets, properties or liabilities (including pursuant to a plan of reorganization) other than the sale of the Purchased Assets to the Purchaser in accordance with the terms hereof.

(h)     "Ancillary Agreements" means, collectively, the Purchaser Ancillary Agreements and the Seller Ancillary Agreements.

(i)     "Antitrust Laws" means the HSR Act, the  Sherman Act, 15 U.S.C. §§ 1-7, as amended, the Clayton Act, 15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53, as amended, the Federal Trade Commission Act, 15 U.S.C. § 41-58, as amended, and any other applicable federal, state and foreign antitrust, merger control, competition or trade regulation Laws of any Governmental Body or Laws issued by any Governmental Body that are otherwise designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization, restraint of trade or harm to competition.

(j)     "Approved Budget" means the "Approved Budget" as defined in the DIP Credit Agreement.

(k)     "Assignment Objection Deadline" has the meaning ascribed to such term in the Sale Procedures Order.

(l)     "Assumption and Assignment Procedures" means the procedures for assumption, assignment and/or transfer of the Assigned Contracts as set forth in the Sale Procedures Order (including the procedures set forth in any Assumption and Assignment Notice (as defined in the Sale Procedures Order)).

(m)     "Auction" has the meaning ascribed to such term in the Sale Procedures Order.

(n)    "Avoidance Action" means any claim, right or cause of action of any Seller for avoidance, recovery, subordination or other relief arising under chapter 5 of the Bankruptcy Code or applicable state fraudulent conveyance, fraudulent transfer, or similar Laws.

(o)    "Bidding Procedures" has the meaning ascribed to such term in the Sale Procedures Order.

(p)    "Business" means any and all business or commercial activities or operations of any kind that are conducted by any of the Sellers, including, among other things, the business of providing engineering, construction, and maintenance, integrity and specialty services, as well as construction services to pipeline and construction projects.

(q)    "Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or required by Law to be closed.

(r)    "CARES Act" means the U.S. Coronavirus Aid, Relief, and Economic Security Act of 2020, as amended (Pub. L. No. 116-136 (H.R. 748)), and all regulations and guidance issued by any Governmental Body with respect thereto, as in effect from time to time, including subsequent legislation in effect as of the date of this Agreement amending paragraph 36 of Section 7(a) of the Small Business Act.

(s)    "Cash and Cash Equivalents" means, collectively, all of the Sellers' cash (including petty cash and undeposited checks), checking account balances, marketable securities, short-term instruments, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, whether on hand, in transit, in banks or other financial institutions, or otherwise held net of uncleared checks, and specifically including any cash collateral used to secure letters of credit, Surety Bonds or other transactional assurances.

(t)    "Code" means the Internal Revenue Code of 1986, as amended.

(u)    "Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of September 13, 2021, between Lightship Capital II LLC and Strike LLC.

(v)    "Contract" means any contract, indenture, note, bond, lease, license, commitment or other legally enforceable agreement, instrument or arrangement.

(w)    "COVID-19" means the novel coronavirus, SARS-CoV-2 or COVID-19 (and all related strains and sequences).

(x)    "Cure Costs" means the amounts necessary to cure all of the Sellers' monetary defaults, if any, and to pay all actual pecuniary losses that have resulted from such defaults under any Contract (including any Real Property Lease or Seller Plan) and that must be paid pursuant to section 365(b)(1)(A) and section 365(b)(1)(B) of the Bankruptcy Code to effectuate the assumption of such Contract by the applicable Seller and the assignment thereof to the Purchaser as provided hereunder.

70

(y)     "Deal Communications" means all communications (whether before, at or after the Closing and whether in writing, electronic or other form) between internal or external legal counsel and any Seller or any of their respective Affiliates or any of their respective Representatives that relate in any way to the transactions contemplated by this Agreement or the Chapter 11 Cases that are entitled to any attorney-client privilege or an expectation of client confidence or any other rights to any evidentiary privilege.

(z)     "Designated Party" means any of the following Persons:  (i) any Purchaser Party, (ii) any Lender Party, (iii) any counterparty to any Assigned Contract, (iv) any current officer or employee of any Seller, (v) any Transferred Employee, (vi) any vendor, supplier, trade creditor or customer doing business with any Seller at any time within the two (2)-year period prior to the Petition Date, and (vii) any Affiliates, officers, directors, employees, shareholders, agents or representatives of any Person described in any of clauses (i), (ii), (iii), (iv), (v) or (vi) solely in their capacities as such.

(aa)     "Designation Deadline" means the date that is the later of (x) three (3) days prior to the date of the Sale Hearing and (y) three (3) Business Days after the Assignment Objection Deadline; provided, however, that (i) with respect to any Contract (including any Real Property Lease or Seller Plan) that has an Undetermined Cure Cost three (3) Business Days or less prior to such later date referred to in clause (x) or clause (y) above, the Designation Deadline for such Contract shall be five (5) Business Days after such Undetermined Cure Cost becomes a Determined Cure Cost and (ii) with respect to any Contract (including any Real Property Lease or Seller Plan) that is first disclosed to the Purchaser on or after such later date referred to in clause (x) or clause (y) above, the Designation Deadline for such Contract shall be five (5) Business Days after the later of the date (A) a copy of such Contract is first provided to the Purchaser and (B) the Cure Costs for such Contract become a Determined Cure Cost.

(bb)     "Determined Cure Cost" means, with respect to the Cure Cost of any particular Contract (including any Real Property Lease or Seller Plan), that such Cure Cost is finally established by the Bankruptcy Court or by agreement by the parties to such Contract at the date or time in question.

(cc)     "DIP Agent" means the administrative agent and collateral agent under the DIP Credit Agreement and the other "Loan Documents" (as defined in the DIP Credit Agreement), including any successor thereto.

(dd)     "DIP Credit Agreement" means the credit agreement entered into by the Sellers after the Execution Date that governs the DIP Financing, as amended, supplemented, amended and restated or otherwise modified from time to time.

(ee)     "DIP Financing" means the senior secured super-priority postpetition financing for the Sellers provided by one or more of the ABL Lenders or their Affiliates after the Petition Date.

(ff)     "DIP Lenders" means the lenders from time to time party to the DIP Credit Agreement.

(gg)    "DIP Obligations" means the "Obligations" as defined in the DIP Credit Agreement.

(hh)    "Documents" means all of the Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, correspondence, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies, Tax Returns, ledgers, journals, title policies, customer lists, supplier lists, vendor lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.) and other similar materials, in each case whether or not in electronic form.

(ii)    "Emergency Event" means any event, circumstance, development, state of facts, occurrence, change, effect, incident or accident of the type referred to in any of clauses (D) or (E) of the definition of "Material Adverse Effect".

(jj)    "Emergency Response" means any reasonable protective action taken by any Seller, in its good faith reasonable determination to be in the best interests of the Business, in order to mitigate, remedy, respond to or otherwise address the effects or impact of any Emergency Event.

(kk)    "Encumbrance" means any encumbrance, charge, restrictive covenant or condition, easement, encroachment, servitude, pledge, security interest, mortgage, lease, deed of trust, option, right of use, first offer or refusal, hypothecation or lien (statutory or otherwise) or similar restriction, whether imposed by Contract or Law.

(ll)    "Environmental Laws" means all applicable Laws relating to pollution or protection of natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §9601 et seq.), and other similar federal, state, provincial and local statutes.

(mm)    "Equipment" means all items of furniture, fixtures, furnishings, leasehold improvements, equipment, machinery, automobiles, trucks, trailers, tractors, forklifts, other industrial vehicles and other vehicles, storage tanks and other tangible personal property of every kind and description, and improvements and tooling, owned, leased or used, or held for use, by any of the Sellers, wherever located, including communications equipment, the IT Assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents.

(nn)    "Equity Interests" means, with respect to any Person, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability

72

company interests, partnership interests and any other equity, ownership, beneficial or profits interests of such Person, and options, warrants, rights, stock appreciation rights, phantom units, incentives, or other securities or agreements to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for, the shares (or any class thereof) of capital stock (including common stock and preferred stock), limited liability company interests, partnership interests or any other equity, ownership, or profits interests of such Person.

(oo)   "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(pp)   "ERISA Affiliate" means any trade or business, whether or not incorporated, that together with any of the Sellers would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA or is under common control within the meaning of Section 414(b), (c), (m) or (o) of the Code.

(qq)   "Escrow Account" means the escrow account established pursuant to the Escrow Agreement.

(rr)   "Escrow Agent" means an escrow agent that is mutually acceptable to the Sellers and the Purchaser.

(ss)   "Escrow Agreement" means an escrow agreement to be entered into at the Closing by and among the Sellers, the Purchaser and the Escrow Agent, in form and substance reasonably satisfactory to the Sellers and the Purchaser.

(tt)   "Estate Professional" means an "Estate Professional" as defined in the DIP Credit Agreement.

(uu)   "Excluded Cash" means an amount of cash of the Sellers as of immediately prior to the Closing equal to the sum of (and without duplication of any of the following) (i) the Wind Down Amount, (ii) the Professional Fee Amount, (iii) the aggregate amount payable by the Sellers pursuant to any check issued by the Sellers in the Ordinary Course of Business if such check has been previously identified to the DIP Agent but has not cleared as of such time, and (iv) any costs and expenses (other than Professional Fees (as defined in the DIP Credit Agreement) and the Wind Down (as defined in the DIP Credit Agreement)) budgeted for pursuant to the Approved Budget (or otherwise approved by the DIP Agent) and paid or payable on the Closing Date; provided, that such costs and expenses are set forth in a funds flow memorandum (or similar document) reasonably satisfactory to the DIP Agent and the Sellers, and payment thereof is permitted pursuant to a Chapter 11 Order (as defined in the DIP Credit Agreement) in effect at such time)).

(vv)   "Family Member" means, with respect to any individual, (i) any Related Person of such individual or (ii) any trust, limited partnership, limited liability company or other entity, the sole owners or beneficiaries of which are such individual and/or one or more of such individual's Related Persons.

(ww)   "Final DIP Order" has the meaning ascribed to such term in the DIP Credit Agreement.

(xx)   "Final Order" means an Order of the Bankruptcy Court (or other court of competent jurisdiction having jurisdiction over the Chapter 11 Cases) entered by the Clerk of the Bankruptcy Court on the docket in any of the Chapter 11 Cases (or by the clerk of such other court of competent jurisdiction on the docket of such court) that:  (i) is and remains in full force and effect, (ii) has not been modified, amended, reversed, vacated or stayed, (iii) as to which the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending, and (iv) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing shall have expired, as a result of which such Order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, however, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order.

(yy)   "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(zz)   "Governmental Body" means any applicable federal, municipal, state, provincial, territorial, local or foreign governmental or quasi-governmental, administrative, taxing or regulatory authority, agency, bureau, board, commission, official, body, department or other similar authority or instrumentality (including any self-regulatory authority, securities exchange, court or similar tribunal).

(aaa)   "Hazardous Materials" means petroleum and all derivatives thereof or synthetic substitutes thereof, asbestos and asbestos containing materials, polychlorinated biphenyls, and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," or "toxic" (or words of similar meaning) under or pursuant to any Environmental Law, including any regulations adopted by a Governmental Body pursuant thereto.

(bbb)   "Headquarters Lease" means, individually and/or collectively (as the context may require), (i) that certain One Hughes Landing Office Lease, dated as of July 16, 2013, by and between HH One Hughes Landing, LLC (as successor-in-interest to One Hughes Landing, LLC) and Strike LLC, as amended, supplemented, amended and restated or otherwise modified from time to time, and (ii) that certain Sublease Agreement – Additional Seventh and Eighth Floor Premises, dated as of December 28, 2018, by and between Layne Christensen Company, and Strike LLC, as amended, supplemented, amended and restated or otherwise modified from time to time.

(ccc)   "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

74

(ddd) "Indebtedness" means, with respect to any Person, (i) the principal, accrued and unpaid interest, prepayment and redemption premiums or penalties (if any), fees and expenses and other monetary obligations in respect of (A) indebtedness of such Person for borrowed money and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (ii) all obligations of such Person issued or assumed as the deferred purchase price of property (including any "earnouts"), all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement, but excluding any accounts payable to trade creditors of such Person incurred in the ordinary course of business, (iii) all obligations of such Person in respect of any interest rate swaps, currency swaps, forward currency or interest rate contracts or other hedging arrangements, (iv) all obligations under leases which are required, in accordance with GAAP, to be recorded as capital leases in respect of which such Person is liable as lessee, (v) all obligations of such Person to reimburse any Person in respect of amounts actually drawn or funded under banker's acceptances, letters of credit or Surety Bonds and not repaid, (vi) all obligations of the type referred to in clauses (i) through (v) of any other Person the payment of which such Person is liable as obligor, guarantor, surety or otherwise, and (vii) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance on any property or asset of such Person, whether or not such obligation is assumed by such Person.

(eee) "Inter-Company Payable" means any accounts payable, trade accounts payable and other amounts payable owed to a Seller by or from a Seller.

(fff) "Inter-Company Receivable" means any accounts receivable, trade accounts and other amounts receivable owed to a Seller by or from a Seller.

(ggg) "Interim DIP Order" has the meaning ascribed to such term in the DIP Credit Agreement.

(hhh) "Intellectual Property" means any and all intellectual property and industrial property rights in any jurisdiction throughout the world (whether or not registered), including: (i) patents, (ii) trademarks, service marks, trade dress, trade names, domain names, logos and corporate names and all goodwill symbolized by the foregoing, (iii) copyrights and works of authorship, whether or not copyrightable, (iv) rights in software, (v) trade secrets and confidential information or know-how (including research and development, formulas, compositions, manufacturing and production processes and techniques, technical data and designs) and (vi) all applications, registrations, renewals and common-law rights associated in connection with any of the foregoing.

(iii) "Inventory" means all inventories of any kind or nature (including raw materials, work in process and finished goods) that are owned or used, or held for use, by any of the Sellers, whether or not prepaid, and wherever located (including in any storage facility).

(jjj) "IT Assets" means all computers, computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation that are owned or used, or held for use, by any of the Sellers.

75

(kkk)   "Knowledge of the Sellers" means the actual knowledge, after reasonable due inquiry, of Charles Davison, Sean Gore, Jason Heckt, Jarvie Arnold, Dario Deferrari, Chase Sorrels, Bryan Dempsey, Andrew Duffin and Ryan Herrera.

(lll)   "Laws" means all federal, state, provincial, local, municipal, foreign or other laws, statutes, legislations, constitutions, common law, resolutions, rules, edicts, codes, regulations, restrictions, ordinances, orders, decrees, proclamations, treaties, conventions, directives, judgments, rulings, injunctions, requirements, determinations, writs and awards of, or issued, promulgated, enforced or entered by, any Governmental Body.

(mmm)"Leased Real Property" means all of the real property leased, subleased, licensed, used or occupied by any of the Sellers, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights, privileges, easements, licenses, hereditaments and other appurtenances relating thereto.

(nnn)   "Lender Parties" means (i) each of the DIP Lenders, the DIP Agent, the ABL Lenders, the ABL Agent, the Term Loan Lenders and the Term Loan Agent, (ii) each of the current or former Affiliates of any of the Persons described in clause (i), and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii); provided, that in no event shall the term "Lender Parties" include the Sellers, Strike Investment or Strike Capital, or any Affiliates of any of the Sellers, Strike Investment or Strike Capital.

(ooo)   "Liability" means, as to any Person, any claim, debt, Indebtedness, adverse claim, lien, liability, duty, responsibility, obligation, commitment, assessment, cost, expense (including reasonable attorneys' fees and reasonable costs of investigation and defense), loss, damage, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, ascertained or ascertainable, fixed, absolute or contingent, matured or unmatured, direct or indirect, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, vested or unvested, due or to become due, vested or unvested, executory, determined, determinable, in contract, tort, strict liability, or otherwise, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(ppp)   "Licensed Intellectual Property" means any Intellectual Property that is licensed or purported to be licensed to any of the Sellers.

(qqq)   [Intentionally Deleted.]

(rrr)   "Material Adverse Effect" means any event, circumstance, change, occurrence or state of facts that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect on (i) the Purchased Assets, the Assumed Liabilities or the Business or (ii) the ability of any Seller to consummate the transactions contemplated by this Agreement or perform its obligations under this Agreement except for any such effect resulting from any of the following:  (A) changes in conditions in the U.S. or global economy or

76

capital or financial markets generally, except to the extent such changes have a disproportionately adverse impact on the Sellers relative to other Persons engaged in the industry in which the Sellers operate, (B) changes after the Execution Date in any applicable Law or in GAAP, except to the extent such changes have a disproportionately adverse impact on the Sellers relative to other Persons engaged in the industry in which the Sellers operate, (C) the announcement or pendency of this Agreement or the transactions contemplated hereby or the filing of the petitions for the Chapter 11 Cases on relationships, contractual or otherwise, with customers, suppliers, vendors or employees, (D) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism, except to the extent such changes have a disproportionately adverse impact on the Sellers relative to other Persons engaged in the industry in which the Sellers operate, (E) earthquakes, hurricanes, floods, storms, tornadoes, fires, epidemics, pandemics, disease, outbreak, public health crises or acts of god or natural disasters (including any effects of climate change) or man-made disasters or any escalation or worsening thereof, whether or not occurring or commenced before or after the date of this Agreement, in each case, including outbreaks or additional waves of outbreaks of any contagious diseases (including influenza, COVID-19 or any variation thereof), (F) any action or omission taken or not taken by the Sellers which is required by this Agreement (excluding conducting the Business in the Ordinary Course of Business) or is taken at the request of the Purchaser, (G) the commencement and existence of the Chapter 11 Cases, (H) general changes or developments in operating, business, regulatory or other conditions affecting the industries in which the Business operates, except to the extent such changes have a disproportionately adverse impact on the Sellers relative to other Persons engaged in the industry in which the Sellers operate and (I) failure of any Seller or its Affiliates to meet any internal or published projections, forecasts, estimates or predictions (provided, that this clause (I) shall not prevent a determination that any event, circumstance, change, occurrence or state of facts underlying such failure has resulted in a Material Adverse Effect, unless such event, circumstance, change, occurrence or state of facts is otherwise excepted by this definition).

(sss)    "Neutral Accountant" means an independent accounting firm jointly selected by the Purchaser and the Sellers.  If the Purchaser and the Sellers cannot jointly agree on a Neutral Accountant, the Purchaser and the Sellers shall each submit to their respective accountants the name of an accounting firm (which shall not be either of their respective accounting firms), and the Neutral Accountant shall be selected by lot from these two firms by the respective accountants of the  Purchaser and the Sellers.

(ttt)    "Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or award made, issued or entered by or with any Governmental Body, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Chapter 11 Cases (including the Sale Approval Order).

(uuu)    "Ordinary Course of Business" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice and in compliance with applicable Law.

(vvv)    "Organizational Documents" means, with respect to any Person other than a natural person, the documents by which such Person was organized or formed (such as a

NY 78800654v17

certificate of incorporation, certificate of formation, certificate of limited partnership or articles of organization, and including any certificates of designation for preferred stock or other forms of preferred equity) or which relate to the internal governance of such Person (such as by-laws, a partnership agreement or an operating, limited liability company or members agreement).

(www) "Owned Intellectual Property" means all Intellectual Property owned or purported to be owned by any of the Sellers.

(xxx)   "Permits" means all permits, approvals, concessions, grants, franchises, licenses, clearances, registrations, variances, certifications, exemptions, endorsements, waivers and other authorizations issued by any Governmental Body.

(yyy)   "Permitted Encumbrances" means (i) Encumbrances for utilities or current Taxes that are not yet due and payable or that are due but may not be paid as a result of the commencement of the Chapter 11 Cases, (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Business or the applicable Purchased Asset in any material respect, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law (but not restrictions arising from a violation of any such Law), (iv) any Encumbrances created by this Agreement or any of the Ancillary Agreements or created by the actions of the Purchaser or its Affiliates, (v) any Encumbrances that are removed or released by operation of the Sale Approval Order on or prior to the Closing Date, (vi) any Encumbrances on Intellectual Property created by non-exclusive licenses of such Intellectual Property granted by any of the Sellers in the Ordinary Course of Business, (vi) Encumbrances on any landlord's interest in any Leased Real Property and (vii) mechanics', carriers', workers', repairers', landlords' and similar statutory Encumbrances arising or incurred in the Ordinary Course of Business after the Petition Date for amounts (other than Indebtedness) not yet delinquent.

(zzz)   "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(aaaa) "Personal Representative" means the legal representative (including a guardian, executor, administrator or conservator) of a deceased or incompetent Person that is an individual.

(bbbb) "Petition Date" means the date on which the Sellers commence the Chapter 11 Cases.

(cccc) "Professional Fee Amount" means the "Professional Fee Amount" as defined in the DIP Credit Agreement.

(dddd) "Purchaser Ancillary Agreements" means, collectively, the Assignment and Assumption Agreement(s), each Assignment and Assumption of Lease Agreement, each IP Assignment Agreement, the Transition Services Agreement and each other certificate, agreement

or document (other than this Agreement) that the Purchaser is required to execute and/or deliver pursuant to the terms of this Agreement.

(eeee) "<u>Purchaser Parties</u>" means (i) the Purchaser, (ii) each of the current or former Affiliates of the Purchaser, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in <u>clause (i)</u> or <u>clause (ii)</u> of this definition, and each of the Affiliates of any of the Persons described in this <u>clause (iii)</u>.

(ffff)   "<u>Qualified Bids</u>" has the meaning ascribed to such term in the Bidding Procedures.

(gggg) "<u>Related Fund</u>" means, with respect to any Person, any fund, account or investment vehicle that is controlled, advised or managed by (i) such Person, (ii) an Affiliate of such Person or (iii) the same investment manager, advisor or subadvisor that controls, advises or manages such Person or an Affiliate of such investment manager, advisor or subadvisor.

(hhhh) "<u>Related Person</u>" means, with respect to any individual, any of such individual's parents, spouse, siblings, children and grandchildren (by blood, adoption or marriage).

(iiii)   "<u>Release</u>" means, with respect to any Hazardous Material, any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating into or through any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

(jjjj)   "<u>Restructuring Support Agreement</u>" means that certain Restructuring Support Agreement, dated as of November 22, 2021, by and among the Sellers and each of the ABL Lenders and Term Loan Lenders party thereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

(kkkk) "<u>Sale Approval Motion</u>" means the motion to be filed by the Sellers in the Chapter 11 Cases seeking entry of the Sale Procedures Order and the Sale Approval Order.

(llll)   "<u>Sale Approval Order</u>" means an order in the form attached hereto as <u>Exhibit A</u> or otherwise in form and substance satisfactory to the Sellers and the Purchaser.

(mmmm)   "<u>Sale Hearing</u>" means the hearing seeking entry of the Sale Approval Order.

(nnnn) "<u>Sale Procedures Order</u>" means an order of the Bankruptcy Court in the form attached hereto as <u>Exhibit B</u> or otherwise in form and substance satisfactory to the Sellers and the Purchaser.

(oooo) "<u>Sanctions</u>" means those trade, economic and financial sanctions laws, regulations, embargoes, and restrictive measures (in each case having the force of law)

administered, enacted or enforced from time to time by the United States (including the Department of Treasury, Office of Foreign Assets Control or the Department of State).

(pppp) "Seller Ancillary Agreements" means, collectively, the Bill of Sale, the Assignment and Assumption Agreement(s), each Assignment and Assumption of Lease Agreement, each IP Assignment Agreement, the Transition Services Agreement and each other certificate, agreement or document (other than this Agreement) that any Seller is required to execute and/or deliver pursuant to the terms of this Agreement.

(qqqq) "Seller Disclosure Schedules" means the Schedules to this Agreement that relate solely to the representations and warranties of the Sellers set forth in Article IV and which are delivered by the Sellers to the Purchaser after the Execution Date pursuant to Section 8.16.

(rrrr)   "Seller Intellectual Property" means, collectively, Owned Intellectual Property and Licensed Intellectual Property.

(ssss)   "Seller Parties" means (i) each of the Sellers, Strike Investment, Strike Management and Strike Capital, (ii) each of the current or former Affiliates of any of the Persons described in clause (i), and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

(tttt)   "Specified Avoidance Action" means any Avoidance Action against any Designated Party.

(uuuu) "Specified Contracts" means any Contract entered into by any of the Sellers in the Ordinary Course of Business with any customer or supplier of any of the Sellers (other than any Seller Party) for the purchase or sale of products or services so long as (i) such Contract was entered into by the applicable Seller after the date on which the Sale Approval Order is entered by the Bankruptcy Court and (ii) the entry into of such Contract by the applicable Seller does not violate the terms of this Agreement or the DIP Credit Agreement.

(vvvv) "Specified Plans" means the Seller Plans listed on Schedule 10.1.

(wwww)       "Stalking Horse Bid" has the meaning ascribed to such term in the Bidding Procedures.

(xxxx) "Strike Capital" means Strike Capital, LLC, a Texas limited liability company.

(yyyy) "Strike Investment" means Strike Investment, LLC, a Delaware limited liability company.

(n)      "Strike Management" means Strike Management Incentive Plan LLC, a Delaware limited liability company.

80

(o)　"Successful Bidder" has the meaning ascribed to such term by the Bidding Procedures.

(p)　"Surety Bonds" means surety bonds, license and permit bonds, financial guarantee bonds, bid bonds, performance bonds, payment bonds and all similar bonds.

(zzzz)　"Tax" and "Taxes" means any foreign or U.S. federal, state, county, or local income, transfer, sales, use, excise, franchise, profits, real and personal property, gross receipt, value added, stamp, license, capital gains, capital stock, production, business and occupation, disability, employment, payroll, severance, withholding or other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), including all interest, additions, surcharges, fees or penalties related thereto and any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

(aaaaa)"Tax Return" means any return, report, information return, declaration, claim for refund or other information or document (including any schedule or related or supporting information) filed or provided, or required to be filed or provided, with or to any Governmental Body with respect to Taxes (including in connection with the determination, assessment or collection of Taxes or the administration of any Law with respect to Taxes), including amendments thereto.

(bbbbb)　"Term Loan Agent" means Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent under the Term Loan Credit Agreement and the other "Loan Documents" (as defined in the Term Loan Credit Agreement), including any successor thereto.

(ccccc)"Term Loan Credit Agreement" means that certain Term Loan and LC Loan and Security Agreement, dated as of November 30, 2016, by and among Strike LLC, as borrower, Strike HoldCo, as holdings, the subsidiary guarantors party thereto, the Term Loan Lenders and the Term Loan Agent, as amended, supplemented, amended and restated or otherwise modified from time to time.

(ddddd)　"Term Loan Lenders" means the "Lenders," as such term is defined in the Term Loan Credit Agreement.

(eeeee)"Term Loan Obligations" means the "Obligations" as defined in the Term Loan Credit Agreement.

(fffff)　"Transition Services Agreement" means a transition services agreement to be entered into at the Closing by and between the Sellers and the Purchaser, in form and substance mutually acceptable to the Sellers and the Purchaser, pursuant to which the Sellers will provide certain transition services and other support relating to the businesses, activities and operations of the Purchaser that are mutually agreed upon between the Sellers and the Purchaser.

(ggggg)　"Undetermined Cure Cost" means, with respect to the Cure Cost of any particular Contract, that such Cure Cost is not finally determined by the Bankruptcy Court or by agreement by the parties to such Contract as of the time or date in question.

(hhhhh)     "Waiver" means a written waiver in form and substance acceptable to the Purchaser signed by the Purchaser at the Closing waiving on behalf of the Purchaser all Specified Avoidance Actions.

(iiiii)     "WARN Act" means the federal Worker Adjustment Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (1988), and any similar provision of any federal, state, provincial, regional, foreign or local Law.

(jjjjj)     "Wind Down Amount" means an amount of cash equal to the lesser of (i) the Sellers' aggregate cash on hand as of immediately prior to the Closing (excluding cash to be used to pay the items described in clauses (ii), (iii) or (iv) in the definition of "Excluded Cash") plus (and without duplication to cash on hand) the amount borrowed by the Sellers under the DIP Credit Agreement at such time to fund the Wind Down and (ii) $11,500,000.

(kkkkk)     [Intentionally Deleted.]

Section 10.2    Additional Defined Terms.   The following terms have the meanings set forth in the Sections set forth below:

| **Defined Term** | **Location** |
| --- | --- |
| ABL Credit Bid | 2.1 |
| ABL Credit Bid Amount | 2.1 |
| Acquired Insurance Policies | 1.1(l) |
| Actions | 4.6 |
| Agreement | Preamble |
| Allocation | 2.2 |
| Assigned Contracts | 1.1(c) |
| Assignment and Assumption Agreement | 3.2(b) |
| Assignment and Assumption of Lease Agreement | 3.2(c) |
| Assumed Leased Real Property | 1.1(g) |
| Assumed Liabilities | 1.3 |
| Assumed Real Property Leases | 1.1(g) |
| Assumed Seller Plans | 1.1(n) |
| Audited Financial Statements | 4.22(a) |
| Balance Sheet Date | 4.22(a) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Court Orders | 7.1(d) |
| Bankruptcy Exceptions | 4.3 |
| Bill of Sale | 3.2(a) |
| Capstone | Recitals |
| Chapter 11 Cases | Recitals |
| Closing | 3.1 |
| Closing Date | 3.1 |
| COBRA | 6.2(d) |
| Collection Costs | 3.5(b) |
| Company Health Plan | 4.15(h) |

82

| **Defined Term** | **Location** |
|---|---|
| Contract & Cure Update Schedule | 1.5(a) |
| Credit Bid | 2.1 |
| Credit Bid Amount | 2.1 |
| Crossfire | Recitals |
| DDTC | 4.21(d) |
| Defense Article | 4.21(d) |
| Delivery Date | 1.5(a) |
| Delta | Recitals |
| Designation Notice | 1.5(a) |
| DIP Credit Bid | 2.1 |
| DIP Credit Bid Amount | 2.1 |
| Disclosure Limitations | 8.2(a) |
| Disputed Amount Contract | 1.5(d) |
| Due Diligence Materials | 5.7(a) |
| e-mail | 11.7 |
| EAR | 4.21(d) |
| Employment Contracts | 6.1(a) |
| End Time | 1.5(g) |
| Excluded Assets | 1.2 |
| Excluded Liabilities | 1.4 |
| Excluded Plans | 1.2(h) |
| Execution Date | Preamble |
| Exempt Trust | 4.15(d) |
| Financial Statements | 4.22(a) |
| HCERA | 4.15(h) |
| Healthcare Reform Laws | 4.15(h) |
| Insurance Policies | 4.17 |
| Interim Arrangement | 8.3 |
| IP Assignment Agreement | 3.2(d) |
| ITAR | 4.21(d) |
| Legal Restraint | 3.4(c) |
| Litigation Claims | 8.2(d) |
| Litigation Trustee | 8.2(d) |
| Material Contracts | 4.8(a) |
| Material Permits | 4.9(a) |
| Milestone | 3.4(d) |
| Money Laundering Laws | 4.21(c) |
| Most Recent Balance Sheet | 4.22(a) |
| Nonassignable Assets | 8.3 |
| Non-Assigned Contracts | 1.2(a) |
| Non-Designated Contract | 1.5(g) |
| OFAC | 4.21(a) |
| Original Contract & Cure Schedule | 1.5(a) |
| Outside Date | 3.4(b) |
| Personal Information | 4.7(h) |

NY 78800654v17

| **Defined Term** | **Location** |
|---|---|
| PPACA | 4.15(h) |
| Purchase Price | 2.1 |
| Purchased Assets | 1.1 |
| Purchased Names | 1.1(f) |
| Purchased Claims | 1.1(j) |
| Purchaser | Preamble |
| Qualified Plan | 4.15(d) |
| Real Property Lease | 4.12(b) |
| Reimbursement Amount | 3.5(b) |
| Representatives | 8.2(a) |
| Seller | Preamble |
| Seller Bonds | 4.24 |
| Seller Plans | 4.15(a) |
| Significant Customer | 4.19 |
| Significant Vendors/Suppliers | 4.19 |
| Specified Collateral | 8.13 |
| Specified Property | 8.12 |
| Strike Global | Recitals |
| Strike HoldCo | Recitals |
| Strike LLC | Recitals |
| Transfer Taxes | 8.9(a) |
| Transferred Employee | 6.1(b) |
| Transition Period | 8.12 |
| Unaudited Financial Statements | 4.22(a) |
| UPE | 8.5(a) |

## ARTICLE XI.

## MISCELLANEOUS

Section 11.1   <u>Payment of Expenses</u>.  Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each party hereto will bear its own costs and expenses (including investment advisory and legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby; <u>provided</u>, that (a) all Transfer Taxes (as well as the costs and expenses incurred in connection with the preparation and filing of all Tax Returns with respect thereto) shall be borne solely by the Purchaser, (b) the Reimbursement Amount and the Collection Costs payable to the Purchaser, if any of the foregoing are payable under this Agreement, shall be borne solely by the Sellers, and (c) all filing fees (but not the costs and expenses of preparing any applicable filings) in connection with any required filings or submissions under the HSR Act or any other Antitrust Law shall be borne by the Purchaser.

Section 11.2   <u>Survival of Representations and Warranties; Survival of Post-Closing Covenants</u>.  The representations, warranties, covenants and agreements of the Sellers and the Purchaser in this Agreement and/or the Ancillary Agreements or in the schedules or exhibits attached hereto shall terminate at, and not survive, the Closing, except that each of the covenants and agreements set forth in this Agreement or any of the Ancillary Agreements that are to be

84

performed after the Closing shall survive in accordance with the terms of the particular covenant or agreement until fully performed in accordance with its terms.  At and at all times after the Closing, in no event shall the Purchaser, on the one hand, or the Sellers, on the other hand, have any recourse against (a) the Sellers or any of the Seller Parties, or (b) the Purchaser or any of the Purchaser Parties, respectively, in each such case, with respect to any representation, warranty, covenant or agreement made by the Sellers or the Purchaser, as applicable, in this Agreement or any of the Ancillary Agreements, except with respect to breaches of covenants or agreements set forth in this Agreement or any of the Ancillary Agreements that are to be performed after the Closing.

Section 11.3   Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules and exhibits hereto) and the Ancillary Agreements constitute the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understanding among the parties hereto with respect thereto.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by each of the Purchaser and Strike HoldCo, or in the case of a waiver, by the party against whom the waiver is to be effective; provided, however, that none of Section 1.1(j), Section 1.2(k), Section 1.3(c), the definitions "Designated Party," "Excluded Cash," Specified Avoidance Action," and "Wind Down Amount," this proviso and clause (b) of Section 11.11 shall be amended without the prior written consent of the Chapter 11 Unsecured Creditors Committee (as defined in the DIP Credit Agreement) if such amendment adversely affects the Chapter 11 Unsecured Creditors Committee with respect to the Global Settlement (as defined in the Sale Approval Order entered by the Bankruptcy Court).  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party hereto to exercise, and no delay in exercising, any right, power or remedy hereunder or otherwise shall operate as a waiver thereof nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 11.4   Counterparts.  For the convenience of the parties hereto, this Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, may be executed and delivered in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement, and to the extent signed and delivered by means of electronic signature (including signature via DocuSign or similar services), a photographic, photostatic, facsimile, portable document format (.pdf), or similar reproduction of such signed writing using a facsimile machine or electronic mail shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any such agreement or instrument shall raise the use of electronic signature, a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 11.5  <u>Governing Law</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

Section 11.6  <u>Jurisdiction, Waiver of Jury Trial</u>.  (a)  THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL ACTIONS, CLAIMS, SUITS OR PROCEEDINGS, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY AND EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT (OR ANY COURT EXERCISING APPELLATE JURISDICTION OVER THE BANKRUPTCY COURT) IN RESPECT OF ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING AND AGREES THAT IT WILL NOT BRING ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING IN ANY OTHER COURT; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT IF THE CHAPTER 11 CASES ARE DISMISSED OR IF THE BANKRUPTCY COURT IS UNABLE TO HEAR ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING, THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK (AND ANY APPELLATE COURTS OF THE FOREGOING) WILL HAVE SOLE JURISDICTION OVER ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, AND AGREES NOT TO ASSERT AS A DEFENSE, COUNTERCLAIM OR OTHERWISE, IN ANY SUCH ACTION, CLAIM, SUIT OR PROCEEDING, (A) ANY CLAIM THAT IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF THE ABOVE NAMED COURTS FOR ANY REASON OTHER THAN THE FAILURE TO SERVE PROCESS IN ACCORDANCE WITH <u>SECTION 11.7</u>, (B) ANY CLAIM THAT IT OR ITS PROPERTY IS EXEMPT OR IMMUNE FROM JURISDICTION OF ANY SUCH COURT OR FROM ANY LEGAL PROCESS COMMENCED IN SUCH COURTS (WHETHER THROUGH SERVICE OF NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OF JUDGMENT, EXECUTION OF JUDGMENT OR OTHERWISE) AND (C) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (I) THE ACTION, CLAIM, SUIT OR PROCEEDING IN SUCH COURT IS BROUGHT IN AN INCONVENIENT FORUM, (II) THE VENUE OF SUCH ACTION, CLAIM, SUIT OR PROCEEDING IS IMPROPER OR (III) THIS AGREEMENT OR ANY OTHER AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR ENTERED INTO IN CONNECTION HEREWITH, OR THE SUBJECT MATTER HEREOF OR THEREOF, MAY NOT BE ENFORCED IN OR BY SUCH COURTS.  EACH PARTY HERETO AGREES THAT NOTICE OR THE SERVICE OF PROCESS IN ANY ACTION, CLAIM, SUIT OR PROCEEDING ARISING OUT OF, BASED UPON OR RELATING TO THIS AGREEMENT OR ANY OF THE RIGHTS AND OBLIGATIONS ARISING HEREUNDER OR THEREUNDER, SHALL BE PROPERLY SERVED OR DELIVERED IF DELIVERED IN THE MANNER CONTEMPLATED BY <u>SECTION 11.7</u>.

NY 78800654v17

(b)     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, CLAIM, SUIT OR PROCEEDING (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF, BASED UPON OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 11.7   Notices.   Except as otherwise expressly provided in this Agreement, all notices, requests, demands, consents, document deliveries and other communications under this Agreement shall be in writing and shall be deemed to have been duly given, provided, made or received (a) when sent by electronic mail ("e-mail"), (b) when delivered personally, (c) one (1) Business Day after deposit with an overnight courier service, or (d) three (3) Business Days after the date of mailing by certified or registered mail, return receipt requested, with postage prepaid, in any such case to the parties hereto at the following addresses or e-mail addresses (or at such other address or e-mail address for a party as shall be specified by like notice to the other parties hereto):

If to the Sellers:

c/o Strike, LLC
1800 Hughes Landing Blvd., Suite 500
The Woodlands, TX 77380
Attn: Sean Gore; Bryan Dempsey
Email: Sean.Gore@strikeusa.com; Bryan.Dempsey@strikeusa.com

with a copy (which shall not constitute effective notice) to:

White & Case LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 3131
Attention: Thomas E. Lauria
Email: tlauria@whitecase.com

and

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Attention: Andrew F. O'Neill
Email: aoneill@whitecase.com

and

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020

87

Attention: Adam Cieply
Email: adam.cieply@whitecase.com

If to the Purchaser:

c/o American Industrial Partners
450 Lexington Avenue, 40th Floor
New York, NY 10017
Attn: Jason Perri
Attn: Richard Dennis
Attn:  Michael Infante
Email:  Jason@americanindustrial.com
Email:  Rdennis@americanindustrial.com
Email:  Minfante@americanindustrial.com

With a copy (which shall not constitute effective notice) to:

Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Attn: Kris Hansen, Esq.
Attn: Matthew A. Schwartz, Esq.
Attn:  Erez Gilad, Esq.
Email:  khansen@stroock.com
Email:  mschwartz@stroock.com
Email:  egilad@stroock.com

Section 11.8   Binding Effect; Assignment.  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and permitted assigns, including, in the case of the Sellers, any trustee or estate representative appointed in the Chapter 11 Cases.  No assignment of this Agreement or any rights, interests or obligations hereunder may be made by any party hereto (by operation of Law or otherwise) without the prior written consent of the Purchaser and Strike HoldCo, and any attempted assignment without the required consents shall be void; provided, however, that the Purchaser may assign, delegate or transfer, in whole or in part, this Agreement and any of its rights, obligations and/or interests hereunder, without the consent of Strike HoldCo, to any Affiliate of the Purchaser so long as (i) such Affiliate is designated in writing by the Purchaser to Strike HoldCo prior to the Closing, (ii) the Purchaser continues to remain obligated in full hereunder, (iii) any such assignment would not reasonably be excepted to impede or delay the Closing and (iv) such Affiliate executes a joinder to this Agreement in a form reasonably satisfactory to the Sellers, which joinder shall include the same representations and warranties by such Affiliate as those of the Purchaser set forth in Article V; provided, further, that the Purchaser may assign or transfer, in whole or in part, any of its rights hereunder to any lender or other debt financing source providing financing to the Purchaser or any of its Affiliates for collateral security for such financing.  No assignment of any obligations hereunder shall relieve the parties hereto of any obligations hereunder.  Upon

88

any permitted assignment to an Affiliate of the Purchaser, the references in this Agreement to the Purchaser shall also apply to any such Affiliate unless the context requires otherwise.

Section 11.9   Severability.   If any term, condition or other provision of this Agreement is held to be invalid, illegal or incapable of being enforced under any applicable Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or affect the validity, legality or enforceability of any provision in any other jurisdiction and all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party hereto.   Upon such determination that any term, condition or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to eliminate such invalidity, illegality or incapability of enforcement and to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

Section 11.10   Injunctive Relief.   The parties hereto acknowledge and agree that (a) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (b) an award of money damages would not be adequate to compensate the non-breaching party.   Accordingly, each of the parties hereto and the third-party beneficiaries of this Agreement shall be entitled, in addition to any other rights and remedies existing in its favor at law or in equity, to equitable relief, an injunction or injunctions or Orders for specific performance to prevent breaches or threatened breaches of the provisions of this Agreement and to enforce its rights hereunder, without the necessity of proving the inadequacy of money damages as a remedy.   The right to equitable relief, including specific performance and injunctive relief, shall exist in addition to and notwithstanding, and shall not be limited by, any other provision of this Agreement.   Each of the parties hereto hereby irrevocably waives any defense that a remedy at law is adequate and any requirement to obtain, furnish or post any bond, security or other instrument in connection with or as a condition to any actions instituted for injunctive relief, specific performance or other equitable remedies.   Each of the parties hereto hereby agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law or inequitable for any reason.   The right of specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, none of the parties hereto would have entered into this Agreement.

Section 11.11   Third Party Beneficiaries.   This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable benefit, claim, cause of action, remedy or right of any kind hereunder, except that (a) each of the Seller Parties and the Purchaser Parties shall be a third party beneficiary of Sections 3.5, 11.2 and 11.12; provided, that in each case such party will be subject to all the limitations and procedures of this Agreement as if it were a party hereunder, and (b) the Chapter 11 Unsecured Creditors Committee shall be a third party beneficiary of the proviso set forth in Section 11.3.

Section 11.12  <u>Non-Recourse</u>.  Except as expressly contemplated by this Agreement, no Purchaser Party (other than the Purchaser) and no Seller Party (other than the Sellers) shall have any Liability under this Agreement or the Ancillary Agreements for any claim based on, in respect of, or by reason of, the transactions contemplated hereby or thereby.

Section 11.13  <u>Time of the Essence</u>.  Time is of the essence in the performance of each of the obligations of the parties and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

Section 11.14  <u>Disclosure</u>.  It is expressly understood and agreed that (a) the disclosure of any fact or item on any of the Seller Disclosure Schedules with respect to a particular representation or warranty set forth in <u>Article IV</u> shall be deemed disclosure of such fact or item with respect to any other representation or warranty set forth in <u>Article IV</u> to the extent that it is reasonably apparent on the face of such disclosed fact or item that such disclosed fact or item would apply to such other representation or warranty, (b) the disclosure of any matter or item on the Seller Disclosure Schedules shall not be deemed to constitute an acknowledgement that such matter or item is required to be disclosed therein, or otherwise imply that any such matter is material or creates a measure for materiality for purposes of this Agreement, and (c) the mere inclusion of an item on the Seller Disclosure Schedules as an exception to a representation or warranty set forth in <u>Article IV</u> shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has resulted in and would reasonably be expected to result in a Material Adverse Effect.  Anything herein to the contrary notwithstanding, the disclosure of any fact, matter, occurrence, event, circumstance, asset, Liability or other matter on any of the Seller Disclosure Schedules shall not mean, and shall not be deemed or construed to mean, that such fact, matter, occurrence, event, circumstance, asset, Liability or other matter is disclosed or included on any other Schedule to this Agreement that is not a Seller Disclosure Schedule.Certain Interpretations.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)     All references in this Agreement to Articles, Sections, clauses, parts, Schedules and Exhibits shall be deemed to refer to Articles, Sections, clauses, parts, Schedules and Exhibits of or to this Agreement, unless otherwise specified.

(ii)     All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)     The table of contents and Article, Section and paragraph captions herein are for convenience of reference only, and shall not be deemed to limit or otherwise affect the meaning or interpretation of any of the provisions hereof.

(iv)     The words "include," "includes" and "including" and words of similar import, when used herein shall be deemed in each case to be followed by the

words "without limitation" (regardless of whether such words or similar words actually appear).

(v)      When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day. Any reference to "days" means calendar days unless Business Days are expressly specified.

(vi)      Any reference in this Agreement to "$" or "dollars" shall mean U.S. dollars.

(vii)      Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)      The words "herein," "hereinafter," "hereof" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not merely to a subdivision or particular provision in which such words appear unless the context otherwise requires.

(ix)      The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."

(x)      The word "will" shall be construed to have the same meaning and effect as the word "shall."

(xi)      The term "or" is disjunctive and not exclusive.

(xii)      The phrases "delivered" or "made available" and words of similar import, when used in this Agreement in reference to information or materials delivered or made available to the Purchaser, shall mean that such information or materials that have been posted to the "Project Nolan Ryan" electronic data room hosted by IntraLinks, Inc. at least 24 hours prior to the date hereof.

(b)      The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

(c)      Prior drafts of this Agreement or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement shall not be construed in favor of or against any party on account of its participation in such negotiations and drafting or be used as an aid of construction or otherwise constitute evidence of the intent of the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of such prior drafts.

91

Section 11.16  <u>Control of Attorney-Client and All Other Privileges</u>.

(a)     The Purchaser agrees, on behalf of itself and its Affiliates, that all Deal Communications (including any Deal Communications between or among the Sellers or any of their Affiliates and White & Case LLP and any other lawyer representing the Sellers or any of their Affiliates) shall not be acquired by the Purchaser and shall remain privileged and fully owned by the Sellers and their Affiliates from and after the Closing except as otherwise expressly provided in this Agreement.  For the period immediately prior to the Closing, the attorney-client and all other privileges available to the Sellers and their Affiliates with respect to Deal Communications shall remain privileged and the expectation of client confidence belongs to, and shall remain controlled by, the Sellers and will not pass to or be claimed by the Purchaser or its Affiliates.  Any disclosure of Deal Communications shall be agreed as between the Purchaser and the Sellers to be inadvertent and in good faith mistake.

(b)     The Sellers agree that the Sellers shall protect and shall not waive any attorney-client and other legal privileges available to the Sellers and their Affiliates, and the Sellers agree that Sellers will make efforts that are satisfactory to the Purchaser in its reasonable discretion to ensure that any such attorney-client and other legal privileges are protected and not waived notwithstanding the dissolution of any of the Sellers after Closing.  This <u>Section 11.17(b)</u> is subject to compliance with the covenant set forth in <u>Section 11.17(a).</u>

(c)     Notwithstanding any other provision of this Agreement, the covenants set forth in <u>Section 11.17(b)</u> shall survive the Closing in accordance with the full performance of their terms.

*[Remainder of page intentionally left blank]*

NY 78800654v17

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

### SELLERS:

**STRIKE HOLDCO LLC**

By: _____
Name:
Title:


**STRIKE, LLC**

By: _____
Name:
Title:


**STRIKE GLOBAL HOLDINGS, LLC**

By: _____
Name:
Title:


**CAPSTONE INFRASTRUCTURE SERVICES, LLC**

By: _____
Name:
Title:


**DELTA DIRECTIONAL DRILLING, LLC**

By: _____
Name:
Title:

**CROSSFIRE, LLC**

By:
Name:
Title:

**PURCHASER:**

STRIKE ACQUISITION LLC


By: _____
Name:
Title: