**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| STRIKE, LLC, *et al.*[1] | ) Case No. 21-90054 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**ORDER (I) APPROVING THE DISCLOSURE STATEMENT, (II) CONFIRMING**
**THE DEBTORS' JOINT CHAPTER 11 PLAN OF LIQUIDATION, AND**
**(III) GRANTING RELATED RELIEF**

The debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") having:[2]

a.   commenced the Chapter 11 Cases on December 6, 2021 (the "**Petition Date**") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**");

b.   continued to operate their businesses and manage their properties as debtors in possession in accordance with sections 1107(a) and 1108 of the Bankruptcy Code;

c.   sold substantially all of their assets on February 14, 2022, pursuant to the *Order (I) Authorizing and Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; (III) Authorizing the Sale Transaction; and (IV) Granting Related Relief* [Docket No. 588] (the "**Sale Order**");

d.   entered into a global settlement with the Committee and the AIP Parties, as reflected in the Sale Order (the "**Global Settlement**");

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Strike, LLC (2120); STH ShellCo LLC (*f/k/a* Strike HoldCo, LLC) (0607); Delta Directional Drilling, LLC (9896); SGH ShellCo LLC (*f/k/a* Strike Global Holdings, LLC) (4661); CIS ShellCo LLC (*f/k/a* Capstone Infrastructure Services, LLC) (0161); and Crossfire, LLC (7582).  The location of Debtor Strike, LLC's principal place of business and the Debtors' service address is: 460 Wildwood Forest Dr, Spring, Texas 77380.  Additional information regarding this case may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/StrikeLLC.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Second Modified Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of Strike, LLC and Its Affiliated Debtors*, attached hereto as **Exhibit A**.

e.  filed, on March 23, 2022, (i) the *Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of Strike, LLC and Its Affiliated Debtors* [Docket No. 898], and (ii) the *Emergency Motion for Entry of an Order (I) Conditionally Approving the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures; (III) Approving the Form of Ballot and Notices; (IV) Approving Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan; and (V) Scheduling a Combined Hearing on (A) Final Approval of the Disclosure Statement and (B) Confirmation of the Plan* [Docket No. 899];

f.  filed, on April 5, 2022, the *Modified Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of Strike, LLC and Its Affiliated Debtors* [Docket No. 946];

g.  obtained, on April 5, 2022, entry of the *Order (I) Conditionally Approving the Disclosure Statement; (II) Approving the Solicitation and Notice Procedures; (III) Approving the Form of Ballot and Notices; (IV) Approving Certain Dates and Deadlines in Connection with the Solicitation and Confirmation of the Plan; and (V) Scheduling a Combined Hearing on (A) Final Approval of the Disclosure Statement and (B) Confirmation of Plan* [Docket No. 950] (the "**Disclosure Statement Order**"), (i) conditionally approving the Disclosure Statement, (ii) approving the following solicitation materials (collectively, the "**Solicitation Materials**"): the solicitation, voting, and tabulation procedures (the "**Solicitation Procedures**"), the solicitation packages (the "**Solicitation Packages**"), the Ballot, the combined hearing notice (the "**Combined Hearing Notice**"), the publication notice (the "**Publication Notice**"), the notices of non-voting status and disputed claims (collectively, the "**Notices of Non-Voting Status and Disputed Claims**"), and other related notices, (iii) setting deadlines in connection with confirmation, and (iv) scheduling a combined hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "**Combined Hearing**");

h.  caused the Solicitation Materials to be distributed beginning on or about April 11, 2022, in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the local rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**"), the Procedures for Complex Cases in the Southern District of Texas (the "**Complex Case Procedures**"), the Disclosure Statement Order, and the Solicitation Procedures, as evidenced by, among other things, the *Affidavit of Service of Solicitation Materials* [Docket No. 993] (the "**Solicitation Affidavit**");

i.  caused the Publication Notice of the Combined Hearing to be published in the national edition of *The Wall Street Journal* and the *Houston Chronicle* on April 11, 2022, as evidenced by the *Affidavits of Publication* [Docket Nos. 1033, 1034] (the "**Publication Affidavits**");

j.  filed, on May 2, 2022, the *Notice of Filing of Plan Supplement* [Docket No. 1021];

2

k.    filed, on May 13, 2022, the *Declaration of Emily Young of Epiq Corporate Restructuring, LLC Regarding Voting and Tabulation of Ballots Cast on the Second Modified Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of Strike, LLC and Its Affiliated Debtors* [Docket No. 1081] (the "**Voting Report**");

l.    filed, on May 16, 2022, the *Second Modified Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of Strike, LLC and Its Affiliated Debtors* [Docket No. 1094], a copy of which is attached hereto as **Exhibit A** (including all exhibits and supplements thereto and as may be amended, supplemented, or modified, the "**Disclosure Statement**" or "**Plan**" or "**Plan and Disclosure Statement**");

m.    filed, on May 16, 2022, the declarations of Glenn Sniezek and Anthony R. Horton in support of the Plan and Disclosure Statement [Docket Nos. 1098, 1099];

n.    filed, on May 16, 2022, the *Notice of Filing of Amended Plan Supplement* [Docket No. 1095] (as may be amended, supplemented, or modified, the "**Plan Supplement**"); and

the Court having:

a.    entered the Disclosure Statement Order on April 5, 2022;

b.    set May 9, 2022 at 5:00 p.m. (prevailing Central Time) as the deadline for voting on the Plan (the "**Voting Deadline**") and deadline for filing objections to final approval of the Disclosure Statement and confirmation of the Plan (the "**Plan and Disclosure Statement Objection Deadline**");

c.    set May 17, 2022 at 2:00 p.m. (prevailing Central Time) as the date and time for the commencement of the Combined Hearing;

d.    reviewed the Plan, the Plan Supplement, the Solicitation Affidavit, the Publication Affidavits, the Voting Report, and all pleadings, exhibits, declarations, affidavits, statements, responses, and comments regarding the Disclosure Statement and confirmation of the Plan, including all objections, statements, and reservations of rights filed by parties in interest on the docket of these Chapter 11 Cases;

e.    held the Combined Hearing on May 17, 2022;

f.    heard the statements and arguments made by counsel in respect of final approval of the Disclosure Statement and confirmation of the Plan;

g.    considered all oral representations, live testimony, proffered testimony, exhibits, documents, filings and other evidence presented at the Combined Hearing; and

h.    made rulings on the record at the Combined Hearing.

NOW, THEREFORE, after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following findings of fact, conclusions of law, and order (collectively, this "**Order**"):

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**IT IS HEREBY FOUND, DETERMINED, ADJUDGED, DECREED, AND ORDERED THAT:**

**A.     Findings and Conclusions**

1.       The findings and conclusions set forth herein and in the record of the Combined Hearing constitute the Court's findings of fact and conclusions of law under rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**B.     Jurisdiction and Venue**

2.       Venue in this Court was proper as of the Petition Date and continues to be proper under 28 U.S.C. §§ 1408 and 1409. Approval of the Disclosure Statement and confirmation of the Plan are core proceedings under 28 U.S.C. § 157(b)(2). The Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1334. The Court has exclusive jurisdiction to determine whether the Disclosure Statement and Plan comply with the applicable provisions of the Bankruptcy Code and should be approved and confirmed, respectively, and to enter a final order with respect thereto.

**C.     Commencement and Joint Administration of the Chapter 11 Cases**

3.       On the Petition Date, the Debtors commenced the Chapter 11 Cases, and the Court entered an order authorizing the joint administration of the Chapter 11 Cases in accordance

with Bankruptcy Rule 1015(b). [Docket No. 7]. The Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.  On December 15, 2021, the Office of the United States Trustee (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code.  [Docket No. 174].  The Committee was reconstituted on February 28, 2022. [Docket No. 807].

**D.      Judicial Notice**

4.      The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of the Court, including, but not limited to, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, adduced, and/or presented at the various hearings held before the Court during the pendency of the Chapter 11 Cases.

**E.      Objections**

5.      All parties have had a fair opportunity to litigate all issues raised, or that might have been raised, in objections to final approval of the Disclosure Statement and confirmation of the Plan and such objections, if any, have been fully and fairly litigated or resolved.

**F.      Plan Supplement**

6.      On May 2, 2022, the Debtors filed the Plan Supplement with the Court. The Plan Supplement (including as subsequently modified, supplemented, or otherwise amended in accordance with the Plan as of the date hereof), complies with the terms of the Plan.  The Debtors provided good and proper notice of the filing of the Plan Supplement in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order.  All documents included in the Plan Supplement are integral to, part of, and incorporated by reference

into the Plan.   No other or further notice is or will be required with respect to the Plan Supplement.

**G.      Modifications to the Plan**

7.      Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan made after the entry of the Disclosure Statement Order, including those described or set forth in this Order, constitute technical or clarifying changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially or adversely affect or change the treatment of any other Claim or Interest under the Plan. These modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and Solicitation Materials served pursuant to the Disclosure Statement Order, and notice of these modifications was adequate and appropriate under the facts and circumstances of the Chapter 11 Cases. In accordance with Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan is properly before this Court and all votes cast with respect to the Plan prior to such modifications shall be binding and shall apply with respect to the Plan.

**H.      Adequacy of the Disclosure Statement**

8.      The Disclosure Statement contains "adequate information" (as such term is defined in section 1125(a) of the Bankruptcy Code and used in section 1126(b)(2) of the Bankruptcy Code) with respect to the Debtors, the Plan, and the transactions contemplated therein.

### I.      Disclosure Statement Order and Notice

9.      On April 5, 2022, the Court entered the Disclosure Statement Order. As evidenced by the Solicitation Affidavit, the Publication Affidavits, and the record in the Chapter 11 Cases, the Debtors provided due, adequate, and sufficient notice of the Plan and Disclosure Statement, the Disclosure Statement Order, the Solicitation Materials, the Plan Supplement, the settlement, release, exculpation, and injunction provisions contained in the Plan, the Combined Hearing, the Voting Deadline, the Plan and Disclosure Statement Objection Deadline, and any other applicable bar dates described in the Disclosure Statement Order, in compliance with the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 2002(b), 3016, 3017, 3019, and 3020(b), the Bankruptcy Local Rules, the Complex Case Procedures, the Solicitation Procedures, and the Disclosure Statement Order. No other or further notice is or shall be required.

### J.      Solicitation

10.     The Debtors solicited votes for acceptance and rejection of the Plan in good faith, and such solicitation complied with the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code, the Bankruptcy Rules, including Bankruptcy Rules 3017, 3018, and 3019, the Disclosure Statement Order, the Solicitation Procedures, the Bankruptcy Local Rules, the Complex Case Procedures, and all other applicable rules, laws, and regulations. Transmission and service of the Solicitation Packages was timely, adequate, and sufficient under the facts and circumstances of the Chapter 11 Cases. No other or further notice is or shall be required.

### K.      Service of Opt-Out Form

11.     The Ballot and Notices of Non-Voting Status and Disputed Claims included a form for opting out of the Third-Party Release (as defined below) (the "**Opt-Out Form**") and instructions for opting out of the Third-Party Release through the submission of the Opt-Out

Form to the Claims and Noticing Agent for recording or the filing of a pleading on the docket that includes an election to opt out of the Third-Party Release by the Plan and Disclosure Statement Objection Deadline. The process described in the Disclosure Statement Order, the Solicitation Procedures, and the Solicitation Affidavit that the Debtors and the Claims and Noticing Agent followed to identify the relevant parties on which to serve the Ballot and Notices of Non-Voting Status and Disputed Claims and to distribute the Opt-Out Forms was reasonably calculated to ensure that each of the Holders of Claims and Interests was informed of its ability to opt out of the Third-Party Release and the consequences for failing to timely do so. Transmission and service of the Opt-Out Forms was timely, adequate, and sufficient under the facts and circumstances of the Chapter 11 Cases. No other or further notice is or shall be required.

**L.     Voting Report**

12.     The Voting Report was admitted into evidence during the Combined Hearing without objection. The procedures used to tabulate Ballots were fair and conducted in accordance with the Disclosure Statement Order, the Solicitation Procedures, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, the Complex Case Procedures, and all other applicable rules, laws, and regulations.

13.     As set forth in the Plan, Holders of Claims in Class 3 (the "**Voting Class**") were eligible to vote to accept or reject the Plan in accordance with the Solicitation Procedures. As evidenced by the Voting Report, the Voting Class at each Debtor entity voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.

**M.     Bankruptcy Rule 3016**

14.     The Plan and all modifications thereto are dated and identify the entities submitting them, satisfying Bankruptcy Rule 3016(a). The Debtors appropriately filed the Plan

and Disclosure Statement with the Court, satisfying Bankruptcy Rule 3016(b). The injunction, release, and exculpation provisions in the Plan and Disclosure Statement describe, in bold font and with specific and conspicuous language, all acts to be enjoined and identify the entities that will be subject to the injunction, satisfying Bankruptcy Rule 3016(c).

**N.       Burden of Proof**

15.      The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, the applicable evidentiary standard for confirmation. Further, to the extent applicable, the Debtors have proven the elements of sections 1129(a) and 1129(b) by clear and convincing evidence. Each witness who testified (by declaration, proffer, or otherwise) on behalf of the Debtors in connection with the Combined Hearing was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

**O.       Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

16.      Based on the following findings of fact and conclusions of law, the Plan, all pleadings, documents, exhibits, statements, declarations, and affidavits filed in connection with confirmation of the Plan, and all evidence and arguments made, proffered, or adduced at the Combined Hearing, all requirements for plan confirmation set forth in section 1129 of the Bankruptcy Code have been satisfied.

   **1.       Section 1129(a)(1): Compliance with Applicable Provisions of the Bankruptcy Code**

17.      The Plan complies with all applicable provisions of the Bankruptcy Code, including sections 1122 and 1123, as required by section 1129(a)(1) of the Bankruptcy Code.

### a.      Sections 1122 and 1123(a)(1): Proper Classification

18.      The Plan designates all Claims and Interests, other than the Claims of the type described in sections 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code, into seven Classes. The Claims or Interests in each designated Class have the same or substantially similar rights as the other Claims or Interests in such Class. Valid business, legal, and factual reasons exist for separately classifying the various Classes of Claims and Interests under the Plan. The Plan, therefore, satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

### b.      Section 1123(a)(2): Specification of Unimpaired Classes

19.      The Plan specifies that Claims in Class 1, Class 2, and Class 4 are Unimpaired or potentially Unimpaired (the "**Presumed Accepting Classes**") within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

### c.      Section 1123(a)(3): Specification of Treatment of Impaired Classes

20.      The Plan specifies that Claims or Interests in Classes 3 through 7 are Impaired or potentially Impaired within the meaning of section 1124, and specifies the treatment of such Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

### d.      Section 1123(a)(4): No Disparate Treatment

21.      The Plan provides for the same treatment for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to less favorable treatment on account of such Claim or Interest.  Pursuant to the Global Settlement, and as reflected in the Plan, the AIP Parties have agreed to less favorable treatment on account of their Prepetition Junior Loan Claims. Accordingly, the Plan satisfies section 1123(a)(4) of the Bankruptcy Code.

### e.   Section 1123(a)(5): Adequate Means for Plan Implementation

22.   The Plan, the various documents included in the Plan Supplement, and the terms of this Order provide adequate and proper means for the implementation of the Plan, including, among other things: (a) the general settlement of Claims and Interests, including the implementation of the Global Settlement; (b) the sources of consideration for Distributions under the Plan, including the establishment of the Liquidating Trust Reserve; (c) the establishment of the Liquidating Trust; (d) the appointment of the Liquidating Trustee; (e) the vesting of the Liquidating Trust Assets, including the Preserved Estate Claims, in the Liquidating Trust; and (f) the wind down of the Debtors' affairs.   Accordingly, the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### f.   Section 1123(a)(7): Directors, Officers, and Trustees

23.   The identities of the Wind-Down Manager and the Liquidating Trustee are disclosed in the Plan or the Plan Supplement, as applicable. In accordance with the Plan, the Liquidating Trustee has been selected and appointed by the Committee, in consultation with the Debtors and AIP.   The selection of the Wind-Down Manager and the Liquidating Trustee is consistent with the interests of Holders of Claims and Interests and public policy. Thus, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### g.   Sections 1123(a)(6) and 1123(a)(8): Inapplicable Provisions

24.   The Plan does not provide for the issuance of new equity interests and, therefore, section 1123(a)(6) of the Bankruptcy Code is inapplicable.   Additionally, none of the Debtors are individuals and, therefore, section 1123(a)(8) of the Bankruptcy Code is inapplicable.

### h.   Section 1123(b): Discretionary Contents of the Plan

25.     The Plan's discretionary provisions comply with section 1123(b) of the Bankruptcy Code and are not inconsistent with the applicable provisions of the Bankruptcy Code. Thus, the Plan satisfies section 1123(b) of the Bankruptcy Code.

#### 1.   Impairment/Unimpairment of Any Class of Claims or Interests

26.     In accordance with section 1123(b)(1) of the Bankruptcy Code, each Class of Claims and Interests is either Impaired or Unimpaired under the Plan.

#### 2.   Assumption and Rejection of Executory Contracts and Unexpired Leases

27.     In accordance with section 1123(b)(2) of the Bankruptcy Code, the Plan provides that, on the Effective Date, except as otherwise provided therein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code effective as of the Confirmation Date, unless such Executory Contract or Unexpired Lease: (a) is subject to a motion to reject, assume, or assume and assign pending as of the Effective Date; (b) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (c) is an Insurance Policy; or (d) is a Sale Document.

28.     The Debtors' determinations regarding the assumption (or assumption and assignment) or rejection of Executory Contracts and Unexpired Leases are based on, and within, the sound business judgment of the Debtors, are necessary to the implementation of the Plan, and are in the best interests of the Debtors, their Estates, Holders of Claims and Interests, and other parties in interest in the Chapter 11 Cases. Entry of this Order by the Court shall constitute

approval of such assumptions, assumptions and assignments, and/or rejections, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

### 3. Compromise and Settlement

29.     In accordance with section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions, releases, and other benefits provided under the Plan, including the benefits provided by the Global Settlement, and with the support of the various creditors, stakeholders, and other parties in interest, including the Committee, upon the Effective Date, the provisions of the Plan constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, as applicable, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan. Such settlements and compromises, including the Global Settlement, are fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

### 4. Preservation of Preserved Estate Claims

30.     In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Plan provides that all Preserved Estate Claims shall be preserved and shall be transferred to, and vest in, the Liquidating Trust in accordance with sections 1123(b) and 1141 of the Bankruptcy Code. The Plan and the Plan Supplement, including the Preserved Estate Claims Schedule, provide adequate disclosure with respect to the Preserved Estate Claims that the Liquidating Trust shall retain.  The Plan and Plan Supplement, including the descriptions of Preserved Estate Claims as contained in the Plan and the Preserved Estate Claims Schedule and potential defendants therein, are specific and unequivocal with respect to Causes of Action to be preserved and retained by the Liquidating Trust and comply with standards set forth in *Dynasty Oil & Gas, LLC v. Citizens Bank (In re United Operating, LLC)*, 540 F.3d 351, 355 (5th Cir. 2008) and its progeny.  All

parties in interest received adequate notice with respect to such Preserved Estate Claims.  The provisions regarding Preserved Estate Claims in the Plan are appropriate and in the best interests of the Debtors, their respective Estates, and Holders of Claims and Interests.  For the avoidance of doubt, Causes of Action released or exculpated under the Plan will not be retained by the Liquidating Trust.

### 5. Debtor Release

31.     Article XII.B of the Plan (the "**Debtor Release**") describes certain releases granted by the Debtors and their Estates, which represent an inextricable element of the Global Settlement. Such releases are a necessary and integral element of the Plan, and are fair, reasonable, and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. The Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of the Claims released by the Debtor Release; (c) given and made after due notice and opportunity for hearing; (d) appropriately tailored under the facts and circumstances of the Chapter 11 Cases; and (e) a bar to any of the Debtors and their Estates asserting any Cause of Action released by the Debtor Release against the Released Parties or their property.  Accordingly, the Debtor Release is approved.

32.     The Debtors have satisfied their burden with respect to the propriety of the Debtor Release.    The Debtor Release appropriately offers protection to parties that provided consideration to the Debtors and that participated in the Debtors' restructuring process.  The Released Parties made significant concessions and contributions to the Chapter 11 Cases, including by actively supporting the Sale Transaction, the Plan and the Chapter 11 Cases.  The scope of the Debtor Release is appropriately tailored under the facts and circumstances of the Chapter 11 Cases.

### 6.   Release by Holders of Claims and Interests

33.     Article XII.C of the Plan (the "**Third-Party Release**") describes certain releases granted by the Releasing Parties to the Released Parties, which include: (a) each Debtor; (b) each Debtor Related Party; (c) the Purchaser; (d) the AIP Parties; (e) the Committee and each Committee Member; (f) each Related Party of each Entity in clauses (c) through (e); (g) the DIP Agent; (h) the Prepetition Senior Loan Agent; and (i) the Prepetition Junior Loan Agent; *provided, however*, that each Entity that timely and properly opts out of the release in Article XII of the Plan shall not be a Released Party.

34.     The Releasing Parties were provided proper and sufficient notice of the Plan, the Third-Party Release, and the Plan and Disclosure Statement Objection Deadline through the service of the Solicitation Materials and the publication of the Publication Notice in the national edition of *The Wall Street Journal* and the *Houston Chronicle* on April 11, 2022.  No further notice is necessary.   The Plan, the Ballot, the Notices of Non-Voting Status and Disputed Claims, and the Combined Hearing Notice each included the Third Party Release provision in conspicuous, boldface type, and the Ballot and Notices of Non-Voting Status and Disputed Claims informed Holders of Claims or Interests in the Debtors that they would be deemed to have consented to the Third Party Release if they did not (a) timely return the Opt-Out Form included in the Ballot and Notices of Non-Voting Status and Disputed Claims by the Voting Deadline or (b) object to their inclusion as a Releasing Party by the Plan and Disclosure Statement Objection Deadline.   The Plan provides appropriate and specific disclosure with respect to the claims and Causes of Action that are subject to the Third-Party Release, and no other disclosure is necessary.   The Third Party Release is specific in language, integral to the Plan, and given for substantial consideration.

35.     The Third-Party Release is (a) consensual with respect to the Releasing Parties, (b) an essential provision of the Plan and the Global Settlement, (c) given in exchange for the good and valuable consideration provided by the Released Parties, (d) a good-faith settlement and compromise of the Causes of Action released by the Third-Party Release, (e) materially beneficial to, and in the best interests of, the Debtors, their Estates, and their stakeholders, and important to the overall objectives of the Plan to finally resolve certain Cause of Actions among or against certain parties in interest in the Chapter 11 Cases, (f) fair, equitable, and reasonable, (g) given and made after due notice and opportunity for hearing, (h) a bar to any of the Releasing Parties asserting any Cause of Action released by the Third-Party Release against any of the Released Parties or their property, and (i) consistent with sections 105, 524, 1123, 1129, and 1141 and other applicable provisions of the Bankruptcy Code.   Accordingly, the Third-Party Release is approved.

### 7.  Exculpation

36.     The exculpation set forth in Article XII.D of the Plan (the "**Exculpation**") is appropriate under applicable law because it was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, is essential to the Plan, and is appropriately limited in scope. The Exculpated Parties relied upon the Exculpation as a material inducement to engage in prepetition and postpetition negotiations with the Debtors that culminated in the Plan and the settlements and compromises therein that maximize value for the Debtors' Estates and their stakeholders. The record in the Chapter 11 Cases fully supports the Exculpation, which is appropriately tailored to protect the Exculpated Parties from unnecessary litigation and contains appropriate carve outs for actions determined by a Final Order to have constituted actual fraud, willful misconduct, and gross negligence. Accordingly, the Exculpation is approved.   The Exculpated Parties, subject to the exculpation

provision have, and upon entry of this Order will be deemed to have, participated in good faith and in compliance with all applicable laws with regard to the Distribution of recoveries under the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing solicitation or such Distributions made pursuant to the Plan.

### 8.  Injunction

37.     The injunction provisions set forth in Article XII.E of the Plan (the "**Injunction**") are essential to the Plan and are necessary to implement the Plan and to preserve and enforce the Debtor Release, the Third-Party Release, and the Exculpation provisions. The Injunction is appropriately tailored to achieve those purposes and is, therefore, approved.

### 9.  Additional Plan Provisions

38.     The other discretionary provisions in the Plan, including the Plan Supplement, are appropriate and consistent with applicable provisions of the Bankruptcy Code, including, without limitation, the treatment of Insurance Policies and the retention of Court jurisdiction.

### 2.     Section 1129(a)(2): Compliance of the Debtors and Others with the Applicable Provisions of the Bankruptcy Code

39.     The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1128, and 1129, and with Bankruptcy Rules 2002, 3017, 3018, and 3019.  The Debtors and their agents transmitted the Solicitation Materials and related documents and solicited and tabulated votes with respect to the Plan fairly, in good faith, and in compliance with the Disclosure Statement Order, the Solicitation Procedures, the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Case Procedures, including, but not limited to, sections 1125 and 1126(b) of the Bankruptcy Code.

### 3.  Section 1129(a)(3): Proposal of Plan in Good Faith

40.     The Plan is the product of the open, honest, and good faith process through which the Debtors have conducted their Chapter 11 Cases and reflects extensive, good faith, arm's length negotiations among the Debtors, the Committee, the AIP Parties and the Debtors' key economic stakeholders. The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of Holders of Claims. In addition to achieving a result consistent with the objectives of the Bankruptcy Code, the Plan allows the Debtors' economic stakeholders to realize the highest possible recoveries under the circumstances. Consistent with the overriding purpose of the Bankruptcy Code, the Chapter 11 Cases were filed and the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates. Accordingly, the Plan is fair, reasonable, and consistent with sections 1122, 1123, and 1129 of the Bankruptcy Code. Based on the foregoing, as well as the facts and record of the Chapter 11 Cases, including, but not limited to, the Combined Hearing, the Plan has been proposed in good faith and not by any means forbidden by law, thereby satisfying section 1129(a)(3) of the Bankruptcy Code.

### 4.  Section 1129(a)(4): Court Approval of Certain Payments as Reasonable

41.     All payments made or to be made by the Debtors for services or for costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been authorized by, approved by, or are subject to the approval of, the Court as reasonable, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

### 5.  Section 1129(a)(5): Service of Certain Individuals

42.     The Plan provides that, on the Effective Date, other than the Wind-Down Manager and any other personnel retained by the Wind-Down Debtors, all directors, managers, members, officers, and employees of the Debtors shall be deemed to have resigned.  The Wind-

Down Manager shall serve as the Wind-Down Debtors' sole director, manager, officer, and member, as applicable, and shall have sole authority to act on behalf of the Wind-Down Debtors with respect to the Wind-Down. The Plan further provides for the appointment of the Liquidating Trustee to administer the Liquidating Trust in accordance with the Plan and Liquidating Trust Agreement. The Liquidating Trustee was selected and appointed by the Committee, in consultation with the Debtors and AIP.

43. The Wind-Down Manager and Liquidating Trustee were selected in a manner consistent with the interests of Holders of Claims and Interests and with public policy. The Debtors disclosed the identities of the Wind-Down Manager and the Liquidating Trustee in the Plan or Plan Supplement, as applicable. Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

### 6. Section 1129(a)(6): Rate Changes

44. The Plan does not provide for any rate changes over which a governmental regulatory commission has jurisdiction, and, accordingly, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan.

### 7. Section 1129(a)(7): Best Interests of Holders of Claims and Interests

45. Each Holder of a Claim or Interest either (a) has voted to accept the Plan, (b) is Unimpaired and deemed to have accepted the Plan, or (c) shall receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code. In addition, the liquidation analysis attached as Exhibit A to the Plan and Disclosure Statement (the "**Liquidation Analysis**"), as well as the other evidence related thereto in support of the Plan that was proffered or adduced at or prior to the Combined Hearing, (a) are reasonable, persuasive, credible, and accurate as of the dates such

analysis or evidence was proffered, adduced, and/or presented, (b) utilize reasonable and appropriate methodologies and assumptions, (c) have not been controverted by other evidence, and (d) establish that, with respect to each Impaired Class of Claims or Interests, each Holder of an Allowed Claim or Interest in such Class, unless otherwise agreed to by such Holder, shall receive under the Plan on account of such Allowed Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

46.     Accordingly, the Debtors have satisfied the requirements of section 1129(a)(7) of the Bankruptcy Code.

### 8.     Section 1129(a)(8): Acceptance by Certain Classes

47.     The Presumed Accepting Classes are Unimpaired under the Plan and are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. The Voting Class is Impaired under the Plan and has voted to accept the Plan at each Debtor entity. Accordingly, section 1129(a)(8) of the Bankruptcy Code has been satisfied with respect to the Presumed Accepting Classes and the Voting Class.

48.     Claims in Classes 4 through 7 are Impaired or potentially Impaired under the Plan and deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code (the "**Deemed Rejecting Classes**"). Although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Deemed Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Deemed Rejecting Classes and, thus, satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.

**9.      Section 1129(a)(9): Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code**

49.      The treatment of Administrative Claims, Professional Fee Claims, Priority Tax Claims, and Priority Non-Tax Claims under the Plan satisfies the requirements of and complies in all respects with section 1129(a)(9) of the Bankruptcy Code.

**10.     Section 1129(a)(10): Acceptance by Impaired Class**

50.      As evidenced by the Voting Report, without including any acceptance of the Plan by any insider (as defined in the Bankruptcy Code), Holders of Claims in the Voting Class voted to accept the Plan at each Debtor entity in accordance with section 1126(c) of the Bankruptcy Code. As such, with respect to each Debtor's Plan, there is at least one Impaired Class of Claims that has accepted the Plan and, therefore, section 1129(a)(10) of the Bankruptcy Code has been satisfied.

**11.     Section 1129(a)(11): Feasibility of the Plan**

51.      The evidence supporting the Plan proffered or adduced by the Debtors at or before the Combined Hearing: (a) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (b) has not been controverted by other persuasive evidence; (c) establishes that the Plan is feasible and confirmation of the Plan is not likely to be followed by liquidation (other than as contemplated by the Plan) or the need for further financial reorganization; and (d) establishes that the Debtors will have sufficient funds available to meet their obligations under the Plan.    Accordingly, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code.

**12.     Section 1129(a)(12): Payment of Statutory Fees**

52.      The Plan provides for the payment of all fees payable under section 1930 of title 28 of the United States Code in accordance with section 1129(a)(12) of the Bankruptcy Code.

### 13.        Sections 1129(a)(13), (14), (15), and (16): Inapplicable Provisions

53.     Section 1129(a)(13) is inapplicable because the Debtors do not maintain any retirement benefits as defined in section 1114 of the Bankruptcy Code. Section 1129(a)(14) is inapplicable because the Debtors are not required to pay domestic support obligations pursuant to a judicial or administrative order or statute. Section 1129(a)(15) is inapplicable because the Debtors are not individuals under the Bankruptcy Code. Section 1129(a)(16) of the Bankruptcy Code is inapplicable because the Debtors are not nonprofit entities or trusts.

### 14.        Section 1129(b): No Unfair Discrimination; Fair and Equitable

54.     Notwithstanding the rejection of the Plan by the Deemed Rejecting Classes, based upon the record before the Court and the treatment provided on account of such Claims and Interests, (a) the Plan does not discriminate unfairly against, and is fair and equitable with respect to, such Classes of Claims and Interests and (b) the Plan satisfies all the requirements for confirmation set forth in section 1129(a) of the Bankruptcy Code, except for section 1129(a)(8) of the Bankruptcy Code. The evidence in support of confirmation of the Plan proffered or adduced by the Debtors at, or prior to, or in declarations filed in connection with, the Combined Hearing regarding the Debtors' classification and treatment of Claims and Interests and the requirements for confirmation of the Plan under section 1129(b) of the Bankruptcy Code (x) is reasonable, persuasive, credible, and accurate, (y) utilizes reasonable and appropriate methodologies and assumptions, and (z) has not been controverted by other credible evidence. Accordingly, the Plan satisfies section 1129(b) of the Bankruptcy Code with respect to the Deemed Rejecting Classes.

### 15.        Section 1129(c): Only One Plan

55.     The Plan is the only plan filed in the Chapter 11 Cases and, accordingly, satisfies section 1129(c) of the Bankruptcy Code.

**16.     Section 1129(d): Principal Purpose of the Plan Is Not Avoidance of Taxes or Section 5 of the Securities Act**

56.     The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act, thereby satisfying the requirements of section 1129(d) of the Bankruptcy Code.

**17.     Section 1129(e): Not Small Business Cases**

57.     The Chapter 11 Cases are not small business cases and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

**P.     Good Faith**

58.     The Debtors, the Committee, the AIP Parties and the Exculpated Parties have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Case Procedures in connection with all of their respective activities relating to support and consummation of the Plan, including the solicitation of acceptances of the Plan, their participation in the Chapter 11 Cases and the activities described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.

**Q.     Implementation**

59.     All documents and agreements necessary to implement the transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement, and all other relevant and necessary documents have been negotiated in good faith and at arm's-length, are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests, and shall, upon completion of documentation and execution, be valid, binding, and enforceable documents and agreements not in conflict with any federal, state, or local law.  Such documents

and agreements are essential elements of the Plan, and entry into and consummation of the transactions contemplated by each such document or agreement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests. The Debtors have exercised reasonable business judgment in determining which documents and agreements to enter into and have provided sufficient and adequate notice of such documents and agreements. The Debtors or the Liquidating Trust, as applicable, are authorized to take any action reasonably necessary or appropriate to implement, effectuate and consummate the Plan, the documents and agreements necessary to implement the Plan, this Order and the transactions contemplated thereby or hereby, and including performance under the Liquidating Trust Agreement.

## ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

**A.      Findings of Fact and Conclusions Law**

60.      The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein.

**B.      Approval of the Disclosure Statement**

61.      The Disclosure Statement is approved on a final basis pursuant to section 1125 of the Bankruptcy Code.

**C.      Confirmation of the Plan**

62.      The Plan, including (a) all modifications to the Plan filed with the Court prior to or during the Combined Hearing and (b) all documents incorporated into the Plan through the Plan Supplement, is approved in its entirety, as modified herein, and confirmed pursuant to section 1129 of the Bankruptcy Code.   All terms of the Plan and the Plan Supplement are incorporated herein by reference and are an integral part of this Order.   The failure to specifically

include or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document in this Order does not diminish or impair the effectiveness or enforceability of such article, section, or provision.

## D.    Objections Overruled

63.    All objections, responses, statements, reservation of rights, and comments in opposition, if any, to final approval of the Disclosure Statement or confirmation of the Plan that have not been withdrawn, waived, settled, resolved prior to the Combined Hearing or otherwise resolved on the record of the Combined Hearing or in this Order are hereby overruled and denied on the merits, with prejudice.  All objections to the entry of this Order or to the relief granted herein that were not timely filed and served prior to the Plan and Disclosure Statement Objection Deadline are deemed waived and forever barred.

## E.    Plan Transactions

64.    All of the transactions contemplated by the Plan and the Plan Supplement are hereby approved.  The Debtors, the Wind-Down Debtors, and the Liquidating Trust are authorized to and may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of the Plan, including the Plan Supplement, in each case, in the name of and on behalf of the Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, without the need for any approvals, authorization or consents except those expressly required pursuant to the Plan.

65.    The entry of this Order shall constitute authorization for the Debtors, the Wind-Down Debtors, and the Liquidating Trust, as applicable, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan, including the Plan Supplement, prior to, on and after the Effective Date and all such actions

taken or caused to be taken shall be deemed to have been authorized and approved by this Court without the need for further approval, act or action under any applicable law, order, rule or regulation.   Notwithstanding any requirement under non-bankruptcy law, all matters provided for in the Plan, including the Plan Supplement, or deemed necessary or desirable by the Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, including the dissolution of the Debtors, and all actions authorized to be taken pursuant to the Plan shall be deemed to have occurred and shall be in effect on the Effective Date or as otherwise provided under the Plan, without any requirement of or further action by the equity holders, directors, managers, members or officers of the Debtors or the Wind-Down Debtors and without further application to, or order of, the Court.

**F.      Recourse Solely Against the Liquidating Trust Assets**

66.      As of the Effective Date, each Claim against the Debtors shall be deemed satisfied, settled, and released as to the Debtors and the Wind-Down Debtors as provided with respect to each such Claim under the Plan.   Except as otherwise set forth in the Plan, this Order, or other Final Orders of the Court, any Holder of an Allowed or Disputed Claim against the Debtors will have recourse solely to the assets of the Liquidating Trust, including the Liquidating Trust Reserve, as applicable, for the payment of any such Claim that is Allowed or becomes Allowed in accordance with the Plan and the Liquidating Trust Agreement; *provided, however*, the recovery provided to any Holder of a Claim that is Allowed or becomes Allowed shall be limited to and consistent with the terms of the Plan.

**G.      Dissolution of Certain Debtors**

67.      On the Effective Date, each Debtor other than the Wind-Down Debtors shall be deemed dissolved without further order of the Court or action by the Debtors, provided that the

Wind-Down Debtors and Liquidating Trust are authorized to file certificates of cancellation and any other documents with the secretary of state in which such dissolved Debtor is formed or any other jurisdiction.

68.     The Wind-Down Debtors shall continue in existence on and after the Effective Date until, at the earliest, the expiration of the Transition Period (as defined in the Transition Services Agreement) solely for purposes of performing the Debtors' obligations under the Transition Services Agreement.   From and after the Effective Date, except to the extent necessary to comply with the Transition Services Agreement and to perform their obligations thereunder, the Wind-Down Debtors (a) shall be deemed to have withdrawn their business operations from any state in which the Wind-Down Debtors were previously conducting operations and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, and (b) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Without limiting the immediately preceding sentence, following the Effective Date, the Wind-Down Debtors shall continue to be authorized, empowered and directed to perform their respective obligations under the Transition Services Agreement and to consummate all of the transactions contemplated thereby, and the Wind Down Debtors and the Wind Down Manager shall be authorized to take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of the Transition Services Agreement.   All Interests in Strike, LLC shall be deemed to be irrevocably transferred to, and shall vest in, the Liquidating Trust on the Effective Date.   Notwithstanding anything to the contrary herein or in the Plan, the licenses and permits held by the Debtors as of the Effective Date shall remain property of the Wind-Down Debtors and be subject to the Transition Services Agreement.

69.     Upon completion of the Wind-Down, the Wind-Down Debtors shall file a certificate of completion in the Remaining Case and, upon such filing, be deemed dissolved without further order of the Court or action by the Wind-Down Debtors, provided that the Wind-Down Debtors or the Liquidating Trust shall be authorized to file certificates of cancellation and any other documents with the secretary of state in which such dissolved Wind-Down Debtor is formed or any other jurisdiction. Upon dissolution of the Wind-Down Debtors, any remaining property of the Wind-Down Debtors shall automatically vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, or interests, subject to the terms of the Plan and the Liquidating Trust Agreement.  Notwithstanding the foregoing, the Wind-Down Debtors shall not be dissolved until expiration of the Transition Period (as defined in the Transition Services Agreement).

## H.     Debtors' Directors and Officers; Wind-Down Manager

70.     The appointment of Dario Deferrari to serve as the Wind-Down Manager is approved in all respects.  On the Effective Date, other than the Wind-Down Manager and any other personnel retained by the Wind-Down Debtors, all directors, managers, members, officers, and employees of the Debtors shall be deemed to have resigned.  On and after the Effective Date, except as otherwise provided in the Plan and the Liquidating Trust Agreement, the Wind-Down Manager shall serve as the Wind-Down Debtors' sole director, manager, officer, and member, as applicable, and shall have sole authority to act on behalf of the Wind-Down Debtors with respect to the Wind-Down.  The certificates of formation, operating agreements, articles of incorporation, and other organizational or governing documents of the Wind-Down Debtors shall be deemed amended by the Plan (a) to permit and authorize the appointment of the Wind-Down Manager in accordance with the Plan, and (b) to provide the Wind-Down Manager with the same

rights as any member, employee, officer or manager of the applicable Wind-Down Debtor as of immediately prior to the Effective Date under its organizational or governing documents.

## I.     Liquidating Trust

71.     On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all steps necessary to establish the Liquidating Trust in accordance with the Plan and for the benefit of the Liquidating Trust Beneficiaries.

72.     On the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust all of the Debtors' and Estates' rights, title, and interest in and to all of the Liquidating Trust Assets, including the Strike, LLC Interests, and, in accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets, shall automatically vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, or interests, subject to the terms of the Plan and the Liquidating Trust Agreement; *provided*, that notwithstanding anything to the contrary herein or in the Plan, the licenses and permits held by the Debtors as of the Effective Date shall remain property of the Wind-Down Debtors and be subject to the Transition Services Agreement.  For the avoidance of doubt, notwithstanding anything in the Plan and the Liquidating Trust Agreement to the contrary, the Liquidating Trust and Liquidating Trustee shall hold no greater rights in the Escrow Accounts than were held by the Debtors under the governing escrow agreements as of immediately prior to the Effective Date.  The act of transferring the Liquidating Trust Assets to the Liquidating Trust shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the Debtors. The Liquidating Trust shall be governed by the Liquidating Trust Agreement.

**J.**     **Liquidating Trustee**

73.     The appointment of Redan Advisors LLC to serve as the Liquidating Trustee is approved in all respects and the Liquidating Trustee is authorized to carry out all rights and duties set forth in the Plan and Liquidating Trust Agreement.   The compensation of the Liquidating Trustee as set forth in the Plan Supplement is approved in all respects and the Liquidating Trustee shall perform its duties in its capacity as such as set forth in the Plan and the Liquidating Trust Agreement.

**K.**     **No Successor in Interest**

74.     Except as otherwise expressly provided in the Plan or this Order, the Liquidating Trust and the Wind-Down Manager (a) are not agreeing to, and shall not be deemed to assume the obligation to, perform, pay, or otherwise have any responsibilities for any liabilities or obligations of the Debtors or any other Entity relating to or arising out of the operations or the assets of the Debtors on or prior to the Effective Date, (b) are not, and shall not be, a successor to the Debtors or Wind-Down Debtors by reason of any theory of law or equity or responsible for the knowledge or conduct of any Debtor prior to the Effective Date, and (c) shall not have any successor, transferee, or similar liability of any kind or character.

**L.**     **Substitution in Pending Legal Actions**

75.     On the Effective Date, the Liquidating Trust or the Liquidating Trustee, as applicable, shall be deemed to be substituted as the party to any litigation in which the Debtors are a party and shall be authorized, but not required, to file notices or other pleadings in such actions to effectuate its substitution for the applicable Debtor or Debtors.   Such substitution shall not result in Holders of Claims, including litigation Claims, against the Debtors receiving greater rights in or against the Liquidating Trust than they are otherwise entitled to under the Plan and Liquidating Trust Agreement on account of such Claims.

**M.     Securities Exempt**

76.     The Liquidating Trust Interests (including beneficial interests in the Liquidating Trust) to be distributed to the Liquidating Trust Beneficiaries pursuant to the Plan and Disclosure Statement shall not constitute "securities" under applicable law.   Such interests shall not be transferrable (except under limited circumstances set forth in the Liquidating Trust Agreement) and shall not have consent or voting rights or otherwise confer on the Liquidating Trust Beneficiaries any rights similar to the rights of stockholders of a corporation in respect of actions to be taken by the Liquidating Trustee and the Liquidating Trust Oversight Committee (if any) in connection with the Liquidating Trust (except as otherwise provided in the Liquidating Trust Agreement).   To the extent the Liquidating Trust Interests are considered "securities" under applicable law, the issuance of such interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act and any state or local law requiring registration. To the extent any "offer or sale" of the Liquidating Trust Interests may be deemed to have occurred, such offer or sale is under the Plan and in exchange for Claims against one or more of the Debtors, or principally in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.

**N.     Exemption from Transfer Tax and Recording Fees**

77.     Pursuant to section 1146(a) of the Bankruptcy Code, any transfer of property pursuant to or in connection with the Plan, including the transfer of the Liquidating Trust Assets to the Liquidating Trust, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax or assessment.   This Order hereby directs the appropriate federal, state, or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the

instruments or documents filed or recorded pursuant to the Plan without payment of any such tax or governmental assessment.

**O.      Preservation of Preserved Estate Claims**

78.      Except as provided in the Plan, this Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust will retain and may enforce any Preserved Estate Claim that any Estate may hold against any Entity. The Liquidating Trust may pursue any such Preserved Estate Claims in accordance with the Plan and the Liquidating Trust Agreement. The Debtors' inclusion or failure to include or describe with sufficient specificity any Preserved Estate Claim on the Preserved Estate Claims Schedule shall not be deemed an admission, denial or waiver of any Preserved Estate Claim that the Debtors or Estates may hold. No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to the Preserved Estate Claims upon or after the entry of this Order or the Effective Date of the Plan based on the Plan or this Order, including any argument of waiver on account of the failure to include or describe with sufficient specificity any Preserved Estate Claim on the Preserved Estate Claims Schedule.

**P.      Access to Purchaser's Books and Records and Personnel**

79.      On and after the Effective Date, the Purchaser and its subsidiaries shall provide commercially reasonable access to any relevant documents, information, or personnel reasonably requested by the Liquidating Trust in connection with carrying out its responsibilities under the Plan and Liquidating Trust Agreement, so long as such access is not disruptive to normal business operations.   The Wind-Down Debtors and the Purchaser shall preserve, for the benefit of the Liquidating Trust, all records and documents (including all electronic records or

32

documents) related to any Preserved Estate Claims or Claims against the Debtors' Estates until such time as the Liquidating Trustee notifies the Purchaser in writing that such records are no longer required to be preserved or all necessary and available records and documents have been provided to the Liquidating Trustee.

**Q.      Cancellation of Notes, Instruments, Certificates, and Other Documents**

80.      Except as provided in (a) the Plan, (b) this Order, (c) any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (d) the Sale Order, or (e) any of the asset sales effectuated during the pendency of the Debtors' Chapter 11 Cases, on the Effective Date, all notes, instruments, certificates and other documents evidencing Claims against or Interests in the Debtors shall be deemed canceled and surrendered and of no further force and effect against the Debtors, the Wind-Down Debtors, or the Liquidating Trust without any further action on the part of the Debtors, the Wind-Down Debtors, or the Liquidating Trust.

**R.      Closing the Chapter 11 Cases**

81.      As soon as practicable after the Effective Date, the Liquidating Trustee shall, and shall be authorized to, close the Chapter 11 Cases except for the Remaining Case, which shall be designated as the lead case. All contested matters and adversary proceedings relating to any of the Debtors, including objections to Claims, shall be filed, administered and adjudicated in the Remaining Case without the need to reopen any of the other Chapter 11 Cases; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Remaining Case is closed.

82.      The Liquidating Trustee shall be authorized to close the Remaining Case only after: (a) the Administrative Claims Bar Date and the Claims Bar Dates have expired; (b) all Disputed Claims have become Allowed, disallowed, withdrawn, or otherwise settled in

accordance with the Plan; and (c) all Debtors and the Wind-Down Debtors have been dissolved in accordance with the Plan.

## S.      Treatment of Executory Contracts and Unexpired Leases

83.     On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code effective as of the Confirmation Date, unless such Executory Contract or Unexpired Lease: (a) is subject to a motion to reject, assume, or assume and assign pending as of the Effective Date; (b) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (c) is an Insurance Policy; or (d) is a Sale Document.

84.     For the avoidance of doubt, the Specified Plans (as defined in the Asset Purchase Agreement) set forth on Schedule 10.1 of the Asset Purchase Agreement have been assumed by the Debtors and assigned to the Purchaser pursuant to the Asset Purchase Agreement and the Sale Order.

## T.      Insurance Policies

85.     Notwithstanding anything to the contrary in the Plan and Disclosure Statement, this Order, the Liquidating Trust Agreement, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Court jurisdiction, or requires a party to opt out of any releases):

a. nothing, including the dissolution or winding down of the Debtors, the vesting of the Insurance Policies (other than the D&O Liability Policies) with the Liquidating Trust, or any relief permitting any Entity to pursue proceeds available under any Insurance Policy granted pursuant to the Plan and Disclosure Statement, this Order, or any other order of the Court, shall impair, expand, or modify (i) the rights and obligations of the Debtors (and their Estates), the Liquidating Trust, or named insureds, or any of the Insurers under any of the Insurance Policies, (ii) the coverage and benefits provided under the Insurance Policies, (iii) the obligations, terms and conditions of the Insurance Policies or the Chubb Stipulation, or (iv) the enforceability of the Insurance Policies;

b. on and after the Effective Date, (i) all Insurance Policies (other than the D&O Liability Insurance Policies) which identify any of the Debtors as first named insureds or as a counterparty thereto shall vest unaltered in their entireties with the Liquidating Trust; (ii) any non-monetary obligations together with direct or derivative rights, interests, claims, entitlements or Causes of Action of any Debtor under any of the Insurance Policies, including the rights of any Debtor to proceeds, indemnification, reimbursement, contribution, benefits, or other payment arising out of or under the Insurance Policies, shall vest with the Liquidating Trust; (iii) the Liquidating Trust shall have standing to pursue the Insurance Coverage Rights; and (iv) the Liquidating Trust shall be authorized to perform any administrative responsibilities on behalf of any named insured under the Insurance Policies;

c. to the extent the Debtors (or, after the Effective Date, the Liquidating Trust) seek coverage or payment under any Insurance Policies, the Insurers shall be entitled to payment or reimbursement in full from the applicable Debtor or Liquidating Trust, to the extent required under the applicable Insurance Policy and applicable non-bankruptcy law, in the

ordinary course and without the need for the Insurer to file a Proof of Claim, Cure Claim, or a request, application, claim, proof or motion for payment or alliance of any Administrative Claim; *provided* that any and all rights of the Debtors and Liquidating Trust to dispute such payments or reimbursements are expressly reserved; *provided, however,* without limiting the Insurance Coverage Rights granted to the Liquidating Trust, the Liquidating Trust shall not be an "insured" or "named insured" (as defined or described in the Insurance Policies) under the Insurance Policies at any time without the express written consent of the applicable Insurer; *provided,* for the avoidance of doubt, any amounts payable on account of Claims covered by Insurance Policies (i) up to the applicable self-insured retention amount under such applicable Insurance Policy or (ii) that exceed the aggregate amount payable under such applicable Insurance Policy, shall be treated in accordance with the Plan; and

    d. the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XII.E of the Plan and Disclosure Statement, if and to the extent applicable, shall be deemed lifted without further order of this Court, solely to permit: (i) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Court, (A) claims where a claimant has been granted relief to proceed with their claims pursuant to the Plan and Disclosure Statement, this Order, or by any other order of the Court,  and (B) all costs in relation to each of the foregoing; and (ii) Insurers to take other actions relating to the Insurance Policies in the ordinary course of business (including effectuating a setoff) permitted under the Insurance Policies and/or applicable non-bankruptcy law; *provided, however,* that each applicable Insurer is prohibited from, and this Order shall be deemed an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to the Chapter 11 Cases, the Plan or any provision within the Plan, including

the treatment or means of liquidation set out within the Plan for any insured Claim or Causes of Action.

**U.      Settlement and Compromise**

86.      Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.   Without limiting the foregoing, the Global Settlement is approved. Pursuant to the Global Settlement, the AIP Parties agreed to, among other things, (a) remove certain limitations to the use of Cash under the DIP Order and Asset Purchase Agreement in order to fund the payment of professional fees incurred through the closing of the sale and fund the wind down the Debtors' estates, and remove any reversionary interest of the Purchaser in such Cash (other than the Existing Professional Fee Escrow Account), (b) remove certain claims and causes of action as purchased assets under the Asset Purchase Agreement and allow the Debtors to transfer such claims to the Liquidating Trust to be prosecuted for the benefit of Liquidating Trust Beneficiaries, (c) vote their Prepetition Junior Loan Claims to accept the Plan, and (d) waive the right to a recovery on account of their Prepetition Junior Loan Claims unless and until the recovery received by Holders of General Unsecured Claims satisfies the GUC Distribution Threshold Condition.   The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, including the Global Settlement, and the entry of this Order shall constitute the Court's approval of such compromise and settlement, including the Global Settlement as set forth in the Plan, under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the

Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Subject to the terms of the Plan, all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

**V.      The Releases, Injunction,  Exculpation,  and Related Provisions Under the Plan**

87.      The  releases,  exculpations,  injunction  and  related  provisions  set  forth  in Article XII,  including  Articles  XII.B,  XII.C,  XII.D,  XII.E,  and  XII.G,  of  the  Plan  are incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order or action on the part of this Court or any other party.

88.      For  the  avoidance  of  doubt,  pursuant  to  Bankruptcy  Rule  3020(c)(1),  the following provisions in the Plan are approved and will be effective immediately on the Effective Date without further order or action by the Court, any of the parties to such release, or any other Entity: (a)  Debtor  Release  (Article  XII.B),  (b)  Third  Party  Release  (Article  XII.C); (c) Exculpation  (Article  XII.D);  (d)  Injunction  (Article  XII.E);  and  (e)  Lien  Release (Article  XII.G).

**1.      Releases by the Debtors**

89.      **Except as otherwise specifically provided in the Plan, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors and their Estates, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the Debtors or their Estates, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any**

derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Mill Point Transaction, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Mill Point Transaction, the Restructuring Support Agreement and related prepetition transactions, the Plan and Disclosure Statement, the Sale Transaction, the Sale Documents, the DIP Facility, the DIP Documents, or any contract, instrument, release, or other Plan Document, agreement, or document created or entered into in connection with the Mill Point Transaction, the Restructuring Support Agreement, the Plan and Disclosure Statement, the Chapter 11 Cases, the DIP Facility, the Sale Transaction, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to

the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in <u>Article XII.B</u> of the Plan do not release: (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (c) any rights or obligations under any Sale Document.

**2.      Third-Party Release**

90.      **Except as otherwise specifically provided in the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the Releasing Parties, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, that such Entity would have been legally entitled to assert, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Mill Point Transaction, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit,**

performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Mill Point Transaction, the Restructuring Support Agreement and related prepetition transactions, the Plan and Disclosure Statement, the Sale Transaction, the Sale Documents, the DIP Facility, the DIP Documents, or any contract, instrument, release, or other Plan Document, agreement, or document created or entered into in connection with the Mill Point Transaction, the Restructuring Support Agreement, the Plan and Disclosure Statement, the Chapter 11 Cases, the DIP Facility, the Sale Transaction, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in Article XII.C of the Plan do not release: (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (c) any rights or obligations under any Sale Document.

3.      Exculpation

91.      **Except as otherwise specifically provided in the Plan, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each**

41

Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Cases, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Restructuring Support Agreement and related prepetition transactions, the Plan and Disclosure Statement, the Sale Transaction, the Sale Documents, the DIP Facility, the DIP Documents, or any contract, instrument, release or other Plan Document, agreement, or document created or entered into in connection with the Plan and Disclosure Statement, the Chapter 11 Cases, the DIP Facility, the Sale Transaction, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the

solicitation of votes and Distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

4.      Injunction

92.      **Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or this Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Liquidating Trust, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts,**

43

has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.

5.      **Release of Liens**

93.      **Except (a) with respect to Liens securing an Allowed Secured Claim, to the extent elected by the Debtors or the Liquidating Trust, and (b) as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, (i) all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, (ii) each of the Debtors, the Wind-Down Debtors, the Liquidating Trust, or their delegates are authorized to file such documents as may be necessary to effectuate, or reflect in the public record, the release and discharge such Liens and interests, (iii) the Holders of any such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, to reflect or effectuate such releases and discharges, and (iv) all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests to be released shall revert to the Liquidating Trust.  The Holder (and any other Person) of any mortgages, deeds of trust, Liens, pledges, or other security interests that are to be released is entitled to rely on Article XII.G of the Plan for the purpose of executing and delivering any documentation related to, or otherwise assisting with, the release or discharge of any such mortgages, deeds of trust, Liens, pledges, or other security interests.**

44

**W.      Post-Confirmation Notices and Bar Dates**

94.      In accordance with Bankruptcy Rules 2002 and 3020(c), no later than ten (10) Business Days after the Effective Date, the Liquidating Trustee must cause notice of confirmation and the occurrence of the Effective Date (the "**Notice of Confirmation**") to be filed on the docket and be served by United States mail, first-class postage prepaid, by hand, by overnight courier service, or by electronic service to all parties served with the Combined Hearing Notice and Notices of Non-Voting Status and Disputed Claims; *provided*, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Combined Hearing Notice or Notice of Non-Voting Status and Disputed Claims but received such notice returned marked as "undeliverable as addressed," "moved, left no forwarding address," "forwarding order expired," or similar language, unless such Entity has informed the Debtors in writing of or the Debtors are otherwise aware of such Entity's new address. For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements.

**X.      Administrative Claims**

95.      Except as otherwise provided in the Plan or this Order, requests for payment of Administrative Claims must be filed no later than the Administrative Claims Bar Date. **HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS THAT DO NOT FILE AND SERVE SUCH A REQUEST ON OR BEFORE THE ADMINISTRATIVE CLAIM BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS, THE ESTATES, THE WIND-DOWN DEBTORS, THE LIQUIDATING TRUST, OR THEIR RESPECTIVE PROPERTY, AND SUCH ADMINISTRATIVE**

45

**CLAIMS SHALL BE DEEMED COMPROMISED, SETTLED, AND RELEASED AS OF THE EFFECTIVE DATE. IF FOR ANY REASON ANY SUCH ADMINISTRATIVE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE TO ANY PROPERTY TO BE DISTRIBUTED PURSUANT TO THE PLAN.** Objections to an Administrative Claim must be filed and served on the requesting party by the later of (a) ninety (90) days after the filing of the applicable request for payment of administrative claims, subject to extensions sought by motion filed within such period and as such period may be extended from time to time, or (b) such other period of limitation as may be specifically fixed by a Final Order for objecting to such Administrative Claims.

96.     The Debtors or Wind-Down Debtors, as applicable, shall provide the Liquidating Trust with notice and any available documentation relating to any known or asserted Administrative Claim by a governmental unit arising under Bankruptcy Code sections 503(b)(1)(B) or 503(b)(1)(C) (whether arising in the ordinary course of the Debtors' business or otherwise) to the extent such governmental unit has not filed a proof of claim or request for payment of such administrative expense.

**Y.     Notice of Subsequent Pleadings**

97.     Except as otherwise provided in the Plan or in this Order, notice of all subsequent pleadings in the Chapter 11 Cases after the Effective Date will be limited to the following parties: (a) the Wind-Down Debtors and their counsel; (b) the U.S. Trustee; (c) the Liquidating Trustee; (d) any party known to be directly affected by the relief sought by such pleadings; (e) the Purchaser; and (f) any party that specifically requests additional notice in writing to the Liquidating Trustee, or files a request for notice under Bankruptcy Rule 2002 after the Effective Date. The Claims and Noticing Agent shall not be required to file updated service lists.

46

## Z.      Reports

98.      After entry of this Order, the Debtors, Wind-Down Debtors, and the Liquidating Trust, as applicable, shall have no obligation to file with the Court, serve on any parties, or otherwise provide any party with any other report that the Debtors were obligated to provide under the Bankruptcy Code or an order of the Court, including obligations to provide (a) any reports to any parties otherwise required under the "first" and "second" day orders entered in the Chapter 11 Cases, (b) monthly operating reports (even for those periods for which a monthly operating report was not filed before the Confirmation Date), (c) ordinary course professional reports, and (d) monthly or quarterly reports for Professionals; *provided*, that after the Effective Date, the Liquidating Trust shall file quarterly reports if and when they become due, in a form reasonably acceptable to the U.S. Trustee. Except as set forth in the Liquidating Trust Agreement, the Liquidating Trustee shall have no obligation to file quarterly reports with respect to a Debtor once such Debtor's case is closed, converted, dismissed or a final decree has been entered by the Court.

## AA.     Binding Effect

99.      On the date of and after entry of this Order and subject to the occurrence of the Effective Date, the terms of the Plan, and the final versions of the documents contained in the Plan Supplement and this Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, the Liquidating Trust, any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunction described in the Plan, all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors, and all other parties in interest. All Claims against and

Interests in the Debtors shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

100.    Pursuant to section 1141 of the Bankruptcy Code, subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 11 Cases, all documents and agreements executed by the Debtors as authorized and directed under such prior orders, and all motions or requests for relief by the Debtors pending before this Court as of the Effective Date shall be binding upon and shall inure to the benefit of the Debtors, the Wind-Down Debtors, the Liquidating Trust, and each of their respective successors and assigns.

101.    The Plan, all documents and agreements executed by the Debtors in connection therewith, this Order, and all prior orders of the Court in the Chapter 11 Cases shall be binding against and binding upon and shall not be subject to rejection or avoidance by any Chapter 7 or Chapter 11 trustee appointed in any of the Chapter 11 Cases or any successor case or the Liquidating Trustee.

## BB.   Professional Compensation and Reimbursement Claims and Professional Fee Escrow Account

102.    Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors and the Wind-Down Debtors and, subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee may employ and pay any professional, including professionals for the Committee, for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order or approval of the Court and any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or any prior order of the Court

governing compensation of Professionals in seeking retention or compensation for services rendered after such date shall terminate.

103.    [Intentionally omitted]

## CC.    Nonseverability of Plan Provisions upon Confirmation

104.    Each term and provision of the Plan, as may have been altered or interpreted by the Court prior to the entry of this Order in accordance with the Plan, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified except in accordance with the Plan, and (c) nonseverable and mutually dependent.

## DD.    Waiver or Estoppel

105.    Except as otherwise set forth in the Plan or this Order, each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan or papers filed with the Court before the Confirmation Date.

## EE.    Authorization to Consummate

106.    The Debtors are authorized to consummate the Plan at any time after the entry of this Order subject to satisfaction or waiver, in accordance with the terms of the Plan, of the conditions precedent to Consummation set forth in Article XIII of the Plan. The substantial consummation of the Plan, within the meaning of sections 1101(2) and 1127 of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

## FF.    Injunctions and Automatic Stay

107.    Unless otherwise provided in the Plan or in this Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any

order of the Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or this Order shall remain in full force and effect in accordance with their terms.

**GG.     Professional Fee Escrow Accounts**

108.    As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the New Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The New Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Court. Except as discussed below, no liens, claims, or interests shall encumber the New Professional Fee Escrow Account or Cash held in the New Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Debtors or their Estates or the Liquidating Trust; *provided*, that the Liquidating Trustee shall be the designated Entity authorized to release funds from the New Professional Fee Escrow Account in accordance with the governing escrow agreement.

**HH.     Third-Party Release Opt-Out**

109.    For the avoidance of doubt and notwithstanding anything to the contrary contained herein or in the Plan, any party in interest that timely (including any extensions agreed by the Debtors) filed a pleading on the docket including an election to opt out of the Third-Party Release or properly submitted an Opt-Out Form to the Claims and Noticing Agent by the Plan and Disclosure Statement Objection Deadline shall not be considered a Releasing Party pursuant to the Plan, irrespective of whether such party submitted a Ballot or form electing to opt out of the Third-Party Release.

50

**II.    The United States**

110.    Notwithstanding anything to the contrary in the Plan, any Plan Documents, or this Order, (i) the United States is not a releasing party under the Plan, the Plan Documents, or this Order and is not providing a release; and (ii) the United States' setoff rights under federal law as recognized in Section 553 of the Bankruptcy Code shall be preserved and are unaffected. Nothing in this Order, the Plan, or the Plan Documents divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order, the Plan, or the Plan Documents.

**JJ.    Tennessee Department of Revenue**

111.    The Tennessee Department of Revenue shall not be required to file any notice or request for payment in order to be paid any Allowed Administrative Claims for taxes that arise in the ordinary course of the Debtors' business, including taxes incurred by the Debtors after the Petition Date; *provided*, that the Debtors' and the Liquidating Trust's right to object to any such Claims are expressly preserved.

112.    Interest, if any, payable with respect to any Allowed administrative expense, priority, or secured tax claim of the Tennessee Department of Revenue shall be paid at the applicable statutory rate.

**KK.    Texas Comptroller of Public Accounts and Texas Workforce Commission**

113.    Notwithstanding anything to the contrary in the Plan or this Order, these provisions will govern the treatment of the Claims of the Texas Comptroller of Public Accounts (the "**Texas Comptroller**") and Texas Workforce Commission ("**TWC**"):

  a.  All Administrative Claims of the Texas Comptroller and TWC, including but not limited to those that are currently on file, shall to the extent Allowed be paid in accordance with section 1129(a)(9)(A) of the Bankruptcy Code or, if not due on the Effective

Date, in the ordinary course of business in accordance with applicable law, or as otherwise agreed to by the Debtors or the Liquidating Trust, as applicable, and the Texas Comptroller or TWC, as applicable; *provided* that the Debtors shall have no liability with respect to tax obligations assumed by the Purchaser under the Asset Purchase Agreement and Sale Order. Neither the TWC nor Texas Comptroller shall be required to file any proof of claim, motion or request for payment in order to be paid any Allowed Administrative Claims for taxes that arise in the ordinary course of the Debtors' business, including taxes incurred by the Debtors after the Petition Date; *provided* that the Debtors' and the Liquidating Trust's right to object to any such Claims are expressly preserved.

b.      The priority tax claims of the Texas Comptroller and TWC shall to the extent Allowed be paid in full in cash (1) on the Effective Date; (2) in equal monthly installments of principal and interest in accordance with section 1129(a)(9)(C) over a period ending not later than sixty (60) months after the Petition Date; or (3) as otherwise agreed to by the Debtors or the Liquidating Trust, as applicable, and the Texas Comptroller or the TWC, as applicable.

c.      The Purchaser assumed liability for claims arising from the current sales and use tax audit of Strike LLC by the Texas Comptroller for the period of June 1, 2016, to December 31, 2018 (the "**Texas Sales Tax Audit**") pursuant to the Sale Order and Asset Purchase Agreement.   Neither the Debtors nor the Liquidating Trust shall have any liability relating to the Texas Sales Tax Audit.   Nothing herein impacts or infringes upon in any way the Texas Comptroller's rights to pursue full payment of the Texas Sales Tax Audit from the Purchaser or other parties, save and except the Debtors and the Liquidating Trust.   To the maximum extent allowed by law, the Texas Comptroller reserves and maintains all rights against

all parties other than the Debtors and the Liquidating Trust, including setoff, default, and collection rights as pertains to the Texas Sales Tax Audit. It is expressly understood that nothing herein acts in any way to release Purchaser or its successors and assigns and any other responsible parties from liability relating to the Texas Sales Tax Audit; provided that neither the Debtors nor the Liquidating Trust shall be responsible parties or have any liability relating the Texas Sales Tax Audit. The Texas Sales Tax Audit shall be determined, resolved, and paid in accordance with the laws of the State of Texas, including the Texas audit and administrative hearings processes and prosecution in Texas state courts. The Purchaser reserves all rights to exhaust all judicial and administrative remedies related to the Texas Sales Tax Audit. If any funds are owed to Purchaser for the TXFT Refund Requests, as defined in the Sale Order, the Texas Comptroller may offset the final amount of undisputed liability to be paid by Purchaser under the Texas Sales Tax Audit by the amount of the funds due and owing pursuant to the TXFT Refund Requests, if any. The Texas Comptroller shall not be required to file any proof of claim or other request for payment in the Chapter 11 Cases in order to receive payment of or preserve its rights as relates to the Texas Sales Tax Audit. No further action in the Chapter 11 Cases is required by the Texas Comptroller as relates to seeking payment of the Texas Sales Tax Audit from Purchaser or its successors and assigns and any other responsible parties; provided that neither the Debtors nor the Liquidating Trust shall be responsible parties or have any liability relating the Texas Sales Tax Audit.

        d.      Interest, if any, payable with respect to any Allowed administrative expense, priority, or secured tax claim of the Texas Comptroller or TWC shall be paid at the applicable statutory rate. All Allowed claims of the Texas Comptroller or TWC shall be entitled to interest as allowed by law.

e.      The Texas Comptroller and TWC may amend their Claims at any point in accordance with applicable law to reflect the results of the actual assessment of tax liabilities without the consent of the Court, the Debtors, Wind-Down Debtors, the Liquidating Trust, the Liquidating Trustee, or any other related party, and all rights of parties in interest to object to any such amended Claims are expressly preserved.

f.      All rights of the Texas Comptroller and TWC related to their respective tax Claims (including Claims against any non-Debtor third parties) are reserved and all parties reserve all rights related thereto. Neither the Texas Comptroller nor TWC shall be a Releasing Party.

g.      Nothing provided in the Plan or this Order shall affect or impair any statutory or common law setoff rights of the Texas Comptroller or TWC in accordance with 11 U.S.C. § 553.

h.      Notwithstanding anything to the contrary in the Plan or this Order, the Debtors, the Wind-Down Debtors, and the Liquidating Trust (solely to the extent such documents are provided to the Liquidating Trustee) will retain documents for the four-year inspection period set forth in Texas Tax Code § 111.0041(a) (or for any pending audits, the later of four years or the time any and all Claim(s) based on such audit are resolved).

LL.    **Dissolution of Creditors' Committee**

114.   Upon the Effective Date: (a) the Committee shall be dissolved except with respect to the matters set forth in clause (c) of this sentence; (b) the current and former members of the Committee and their respective representatives shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases except with respect to the matters set forth in clause (c) of this sentence; and (c) the Professionals retained by the Committee will not be entitled to assert

54

any Professional Fee Claims for any services rendered or expenses incurred after the Effective Date in their capacity as Professionals for the Committee, except to the extent necessary to (i) participate with respect to any appeals of this Order, (ii) prepare, file and, if necessary, litigate final applications for compensation, and (iii) object to final fee applications filed by other Professionals.

## MM.   Texas Taxing Authorities

115.    The Texas Taxing Authorities[3] shall retain their liens on the Tax Escrow Account on account of (1) the pre-Closing ad valorem taxes for the 2022 tax year and (2) the pre-2022 ad valorem tax claims asserted by Zavala CAD, Goliad County and Goliad ISD (the "**Pre-2022 Claims**") until such taxes and/or claims are paid in full in their allowed amount. On the Effective Date, the Debtors' rights, title, and interest in the Tax Escrow Account, and the Debtors' rights and obligations under the escrow agreement governing the Tax Escrow Account (the "**Tax Escrow Agreement**"), shall be transferred to and shall vest in the Liquidating Trust, subject to the liens of the Texas Taxing Authorities. Pre-2022 Claims shall be paid in accordance with the Sale Order and the Tax Escrow Agreement. The Pre-2022 Claims shall include all accrued interest properly charged under applicable non-bankruptcy law through the date of payment, to the extent the Texas Tax Code provides for interest with respect to any portion of the Pre-2022 Claims; *provided that*, the Debtors' and Liquidating Trust's defenses and rights to object to such Claims or to the inclusion of such interest in such Claims are fully preserved to the extent set forth in the Sale Order.

---

[3]    The Texas Taxing Authorities are: Dilley Independent School District, Frio Hospital District, Reeves County, Cypress-Fairbanks Independent School District, Goliad County, Harris County, Hidalgo County, Jefferson County, Jim Wells CAD, Montgomery County, Nueces County, Val Verde County, Zavala CAD, Midland Central Appraisal District, The County of Wharton, Texas, Reeves County Tax District, Panola County, City of Cleburne, Cleburne Independent School District, Johnson County, Brazoria County Tax Office, Chambers County Tax Office, Barbers Hill Independent School District, The City of Mont Belvieu, Montgomery County Municipal Utility District #67, Karnes County Tax Office, Midland County, and La Pryor Independent School District.

**NN.    Mississippi Department of Revenue**

116.    Notwithstanding anything to the contrary in the Plan or this Order, these provisions will govern the treatment of the Claims of the Mississippi Department of Revenue (the "**MDOR**"):

a.    All Administrative Claims of the MDOR, including but not limited to those that are currently on file, shall to the extent Allowed be paid in accordance with section 1129(a)(9)(A) of the Bankruptcy Code or, if not due on the Effective Date, in the ordinary course of business in accordance with applicable law, or as otherwise agreed to by the Debtors or the Liquidating Trust, as applicable, and the MDOR, as applicable; *provided* that the Debtors shall have no liability with respect to tax obligations of the Purchaser.  The MDOR shall not be required to file any proof of claim, motion or request for payment in order to be paid any Allowed Administrative Claims for taxes that arise in the ordinary course of the Debtors' business, including taxes incurred by the Debtors after the Petition Date; *provided* that the Debtors' and the Liquidating Trust's right to object to any such Claims are expressly preserved.

b.    The priority tax claims of the MDOR shall to the extent Allowed be paid in full in cash (1) on the Effective Date; (2) in equal monthly installments of principal and interest in accordance with section 1129(a)(9)(C) over a period ending not later than sixty (60) months after the Petition Date; or (3) as otherwise agreed to by the Debtors or the Liquidating Trust, as applicable, and the MDOR.

c.    Interest, if any, payable with respect to any Allowed administrative expense, priority, or secured tax claim of the MDOR shall be paid at the applicable statutory rate.

d.    The MDOR may amend their Claims in accordance with applicable law to reflect the results of the actual assessment of tax liabilities without the consent of the Court, the Debtors, Wind-Down Debtors, the Liquidating Trust, the Liquidating Trustee, or any other

related party, and all rights of parties in interest to object to any such amended Claims are expressly preserved.

        e.      All rights of the MDOR related to their respective tax Claims (including Claims against any non-Debtor third parties) are reserved and all parties reserve all rights related thereto. The MDOR shall not be a Releasing Party.

        f.      Nothing provided in the Plan or this Order shall affect or impair any statutory or common law setoff rights of the MDOR in accordance with 11 U.S.C. § 553.

## OO. Commonwealth of Pennsylvania Department of Revenue

117.    The Commonwealth of Pennsylvania, Department of Revenue shall not be required to file any proof of claim, motion or request for payment in order to be paid any Allowed Administrative Claims for taxes that arise in the ordinary course of the Debtors' business, including taxes incurred by the Debtors after the Petition Date; *provided* that the Debtors' and the Liquidating Trust's right to object to any such Claims are expressly preserved.

## PP. Louisiana Department of Revenue

118.    Notwithstanding anything to the contrary in the Plan or this Order, these provisions will govern the treatment of the Claims of the Secretary of the Louisiana Department of Revenue (the "**LDOR**"):

        a.      The Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, shall furnish such information as may be required by the LDOR to determine Strike LLC's withholding tax obligations for the periods from March 31, 2012 to June 30, 2016, in light of the condition of the Debtors' books and records and the availability of such information, consistent with the Debtors' obligations under section 1106(a)(6) of the Bankruptcy Code. The Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, shall furnish such available information within 120 days of the Effective Date, subject to extension upon consent of

the LDOR (such consent not to be unreasonably withheld) and without notice to the Court; *provided* that the Court shall retain jurisdiction with respect to any disputes regarding consent to such extension.

      b.      The Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, shall also furnish evidence of any Debtor's disregarded tax status within the same time period and subject to the same conditions set forth in the preceding paragraph.

      c.      To the extent that the Liquidating Trust has any obligations under Paragraphs 118(a) and 118(b) of this Order, such obligations shall be limited to the extent the Liquidating Trust has access to relevant information; *provided* that the Liquidating Trustee shall make timely requests under this Order and the Sale Order of the Debtors and the Purchaser, as applicable, to obtain all relevant information.

      d.      All Administrative Claims of the LDOR, including but not limited to those that are currently on file, shall, to the extent Allowed, be paid in accordance with section 1129(a)(9)(A) of the Bankruptcy Code or, if not due on the Effective Date, in the ordinary course of business in accordance with applicable law, or as otherwise agreed to by the Debtors or the Liquidating Trust, as applicable, and the LDOR; *provided* that the Debtors shall have no liability with respect to tax obligations of the Purchaser.

      e.      The LDOR shall not be required to file any proof of claim, motion or request for payment in order to be paid any Allowed Administrative Claims for taxes that arise in the ordinary course of the Debtors' business, including taxes incurred by the Debtors after the Petition Date; *provided* that the Debtors' and the Liquidating Trust's right to object to any such Claims are expressly preserved.

f. The priority tax claims of the LDOR shall to the extent Allowed be paid in full in cash (1) on the Effective Date; (2) beginning in the calendar month after such priority claims are Allowed, in equal monthly installments of principal and interest in accordance with section 1129(a)(9)(C) over a period ending not later than sixty (60) months after the Petition Date; or (3) as otherwise agreed to by the Debtors or the Liquidating Trust, as applicable, and the LDOR.

g. Article XI, Section F of the Plan shall not be applicable to the LDOR.

h. In no event shall *any* Distribution owed to the LDOR on any Allowed Priority Tax Claim be forfeited or otherwise become property of the estate, whether unclaimed or if it would fall within the Liquidating Trustee's designation of a *de minimis* amount; for the avoidance of doubt, Article X, Sections F(1)-(3), G, an K shall not apply to Allowed Claims of the LDOR.

i. Any interest required by the Bankruptcy Code with respect to any Allowed administrative expense, priority, or secured tax claim of the LDOR shall be paid at the applicable Louisiana statutory rate.

j. The LDOR may amend its Claims in accordance with applicable law to reflect the results of the actual assessment of tax liabilities without the consent of the Court, the Debtors, Wind-Down Debtors, the Liquidating Trust, the Liquidating Trustee, or any other related party, and all rights of parties in interest to object to any such amended Claims are expressly preserved.

k. All rights of the LDOR related to its respective tax Claims (including Claims against any non-Debtor third parties) are reserved, and all parties reserve all rights related thereto. The LDOR shall not be a Releasing Party.

l.      Nothing provided in the Plan or this Order shall affect or impair any statutory or common law setoff and/or recoupment rights of the LDOR.

**QQ.    Megellan Crude Oil Pipeline Company, L.P.**

119.    Notwithstanding anything to the contrary in the Plan or this Order, any right of setoff held by Magellan Crude Oil Pipeline Company, L.P. ("**Magellan**"), which is based upon indemnification or related obligations of Strike, LLC to Magellan and any mutual obligations owed by Magellan to Strike, LLC under Invoice F00227359 in the amount of $59,712.88, are hereby preserved.  All of Strike, LLC's objections to such setoff, if any, are likewise preserved, except for an objection based on the failure of Magellan to timely file a motion for authority to perform such setoff as set forth in the Plan or this Order.

**RR.    Effectiveness of the Plan**

120.    The Plan shall not become effective unless and until the conditions set forth in Article XIII.B of the Plan have been satisfied or waived in accordance with Article XIII.C of the Plan.

**SS.    Effect of Non-Occurrence of Conditions to the Effective Date**

121.    Notwithstanding the entry of this Order, if the Effective Date does not occur and circumstances make clear that the Effective Date will not occur, then (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**TT.     Effect of Conflict Between Plan, the Plan Supplement, and this Order**

122.     If there is any inconsistency between the terms of the Plan (including the Plan Supplement) and the terms of this Order, the terms of this Order shall govern and control. Except as set forth in the Plan, in the event of any inconsistency among the Plan and any document or agreement filed in the Plan Supplement, the Plan Supplement shall control.

**UU.     Retention of Jurisdiction**

123.     Notwithstanding entry of this Order and the occurrence of the Effective Date, on and after the Effective Date, this Court retains exclusive jurisdiction over the Chapter 11 Cases, all matters arising out of or related to the Chapter 11 Cases and the Plan, including the matters set forth in Article XV of the Plan (except as otherwise provided in the Plan or Liquidating Trust Agreement).

**VV.     Waiver of 14-Day Stay**

124.     Notwithstanding Bankruptcy Rule 3020(e), and, to the extent applicable, Bankruptcy Rules 6004(h), 6006(d), 7062, and 9014 and any other Bankruptcy Rule, this Order is effective immediately and not subject to any stay.

**WW.   Final Order**

125.     This Order is a final order and the period in which an appeal must be filed will commence upon entry of this Order.

Houston, Texas
Dated:  _____, 2022

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

Plan

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STRIKE, LLC, *et al.*[1] | ) | Case No. 21-90054 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SECOND MODIFIED COMBINED DISCLOSURE STATEMENT AND JOINT**
**CHAPTER 11 PLAN OF LIQUIDATION OF STRIKE, LLC AND ITS AFFILIATED DEBTORS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Strike, LLC (2120); STH ShellCo LLC (*f/k/a* Strike HoldCo, LLC) (0607); Delta Directional Drilling, LLC (9896); SGH ShellCo LLC (*f/k/a* Strike Global Holdings, LLC) (4661); CIS ShellCo LLC (*f/k/a* Capstone Infrastructure Services, LLC) (0161); and Crossfire, LLC (7582).  The location of Debtor Strike, LLC's principal place of business and the Debtors' service address is: 460 Wildwood Forest Dr, Suite 350N, Spring, Texas 77380.  Additional information regarding this case may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/StrikeLLC.

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy Peguero (TX Bar No. 24102776)
Genevieve Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
Email: kpeguero@jw.com
Email: ggraham@jw.com


*Counsel to the Debtors and Debtors in Possession*

**WHITE & CASE LLP**
Thomas E Lauria (TX Bar No. 11998025)
Matthew C. Brown (admitted *pro hac vice*)
Fan B. He (admitted *pro hac vice*)
Gregory L. Warren (admitted *pro hac vice*)
Nicolas Abbattista (admitted *pro hac* vice)
200 South Biscayne Boulevard, Suite 900
Miami, FL 33131
Telephone: (305) 371-2700
Email: tlauria@whitecase.com
Email: mbrown@whitecase.com
Email: fhe@whitecase.com
Email: gregory.warren@whitecase.com
Email: nick.abbattista@whitecase.com

Andrew F. O'Neill (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
Email: aoneill@whitecase.com

Charles Koster (admitted *pro hac vice*)
609 Main Street, Suite 2900
Houston, TX 77002
Telephone: (713) 496-9700
Email: charles.koster@whitecase.com

Aaron Colodny  (admitted *pro hac vice*)
R.J. Szuba (admitted *pro hac vice*)
555 South Flower Street, Suite 2700
Los Angeles, CA 90071
Telephone: (213) 620-7700
Email: aaron.colodny@whitecase.com
Email: rj.szuba@whitecase.com


*Counsel to the Debtors and Debtors in Possession*

Dated: May 16, 2022
Houston, Texas

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES..................................................7

    A.    Defined Terms..............................................................................................7

    B.    Rules of Interpretation ...............................................................................22

    C.    Computation of Time .................................................................................23

    D.    Governing Law...........................................................................................23

    E.    Reference to Monetary Figures ..................................................................23

    F.    Reference to the Debtors or the Wind-Down Debtors ...............................23

    G.    Controlling Document................................................................................23

ARTICLE II. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW.........................................................................................23

    A.    The Debtors' Corporate History.................................................................23

    B.    The Debtors' Business Operations .............................................................24

    C.    The Debtors' Prepetition Capital Structure ...............................................25

ARTICLE III. EVENTS LEADING TO THE CHAPTER 11 FILINGS .............................26

    A.    Major Project Challenges and Headwinds in the Oil and Gas Industry..........26

    B.    Amendment to the Prepetition Junior Loan Agreement and Mill Point Transaction .......27

    C.    Operational Changes..................................................................................27

    D.    Evaluation of Potential Restructuring Transactions and Negotiations with AIP .............28

    E.    Execution of Restructuring Support Agreement ........................................28

ARTICLE IV. MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES ........29

    A.    First Day Relief .........................................................................................29

    B.    DIP Financing ...........................................................................................29

    C.    Appointment of Creditors' Committee .....................................................29

    D.    Schedules and Statements..........................................................................30

    E.    Retention of Professionals .........................................................................30

    F.    Bidding Procedures....................................................................................30

    G.    Marketing Process .....................................................................................31

    H.    Sale Hearing..............................................................................................31

    I.    Global Settlement .....................................................................................32

    J.    Independent Investigation of the Debtors' Directors and Officers...............32

    K.    Resolution of Customer Payment Dispute ................................................33

    L.    Rejection and Assumption of Executory Contracts and Unexpired Leases ...................33

ARTICLE V. SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES.........34

ARTICLE VI. ADMINISTRATIVE PROFESSIONAL AND PRIORITY TAX CLAIMS ...................36

    A.    Administrative Claims ...............................................................................36

    B.    Statutory Fees............................................................................................37

C.      Professional Fee Claims ................................................................................37
D.      Priority Tax Claims ......................................................................................38
E.      DIP Claims ..................................................................................................39

ARTICLE  VII.  CLASSIFICATION,  TREATMENT,  AND  VOTING  OF  CLAIMS  AND
        INTERESTS ............................................................................................... 39
A.      Classification of Claims and Interests...........................................................39
B.      Treatment of Claims and Interests................................................................39
C.      Reservation of Rights Regarding Claims ......................................................42
D.      Separate Classification of Secured Claims ...................................................43
E.      Elimination of Vacant Classes .....................................................................43
F.      Voting Classes Where No Valid Votes Are Received.....................................43
G.      Subordinated Claims ....................................................................................43
H.      Controversy Concerning Impairment ...........................................................43
I.      Withdrawal of Plan; Confirmation Pursuant to Section 1129(b) of the Bankruptcy
        Code ............................................................................................................43

ARTICLE VIII. MEANS FOR IMPLEMENTATION OF THE PLAN ................................. 44
A.      Sources of Consideration for Plan Distributions ...........................................44
B.      Recourse Solely Against the Liquidating Trust Reserve and Liquidating Trust Assets ...44
C.      Wind-Down of the Debtors ...........................................................................44
D.      Liquidating Trust .........................................................................................46
E.      Preservation of Preserved Estate Claims ......................................................49
F.      Access to Purchaser's Books and Records and Personnel ..............................50
G.      Corporate Action .........................................................................................50
H.      Intercompany Claim Settlement ...................................................................50
I.      Cancellation of Notes, Instruments, Certificates, and Other Documents.......51
J.      Effectuating Documents; Further Transactions .............................................51
K.      Closing the Chapter 11 Cases ......................................................................51

ARTICLE IX. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES........... 51
A.      Rejection of Executory Contracts and Unexpired Leases ...............................51
B.      Claims Arising from the Rejection of Executory Contracts and Unexpired Leases ........52
C.      Contracts and Leases Entered Into After the Petition Date ............................52
D.      Insurance Policies ........................................................................................52
E.      Warranties....................................................................................................53
F.      Reservation of Rights...................................................................................53

ARTICLE X. PROVISIONS GOVERNING DISTRIBUTIONS..........................................54
A.      Distributions on Account of Claims Allowed as of the Effective Date ...........54
B.      Disbursing Agent..........................................................................................54
C.      Disputed Claims Reserves............................................................................54
D.      Special Rules for Distributions to Holders of Disputed Claims.....................55
E.      Delivery of Distributions ..............................................................................55

F.     Undeliverable and Unclaimed Distributions Held by Disbursing Agent ........................55

G.     Time Bar to Cash Payments ...........................................................................................56

H.     Manner of Payment .......................................................................................................56

I.     Fractional Distributions .................................................................................................56

J.     Foreign Currency Exchange Rate ..................................................................................56

K.     *De Minimis* Distributions ..............................................................................................56

L.     No Postpetition Interest on Claims ................................................................................56

M.     Allocation Between Principal and Accrued Interest.......................................................57

N.     Single Satisfaction ........................................................................................................57

O.     Compliance with Tax Requirements..............................................................................57

P.     Claims Paid or Payable by Third Parties .......................................................................58

Q.     Setoffs and Recoupments ..............................................................................................59

ARTICLE XI. PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS ............59

A.     Allowance of Claims .....................................................................................................59

B.     Prosecution and Settlement of Disputed Claims ...........................................................59

C.     Amendments to Proofs of Claim ...................................................................................60

D.     Pending Objections .......................................................................................................60

E.     Post-Petition Trade Claims ...........................................................................................60

F.     Adjustment to Claims Without Objection .....................................................................60

G.     Estimation of Claims ....................................................................................................60

H.     Disallowance of Claims and Interests............................................................................61

ARTICLE XII. RELEASE, INJUNCTION, AND RELATED PROVISIONS.....................................61

A.     General Settlement of Claims and Interests....................................................................61

B.     Releases by the Debtors .................................................................................................61

C.     Releases by the Releasing Parties...................................................................................62

D.     Exculpation ...................................................................................................................63

E.     Injunction......................................................................................................................63

F.     Reimbursement or Contribution ....................................................................................64

G.     Release of Liens ............................................................................................................64

ARTICLE XIII. CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE.............................64

A.     Conditions Precedent to Confirmation...........................................................................64

B.     Conditions Precedent to the Effective Date ...................................................................65

C.     Waiver of Conditions Precedent ...................................................................................65

D.     Effect of Non-Occurrence of Conditions to Consummation ..........................................66

ARTICLE XIV. MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN.................66

A.     Modification of Plan .....................................................................................................66

B.     Effect of Confirmation on Modifications .......................................................................66

C.     Withdrawal of Plan .......................................................................................................66

ARTICLE XV. RETENTION OF JURISDICTION ...........................................................................67

ARTICLE XVI. MISCELLANEOUS PROVISIONS ................................................................ 68

    A.     Immediate Binding Effect ................................................................................ 68
    B.     Additional Documents .................................................................................... 69
    C.     Dissolution of Official Committee ................................................................. 69
    D.     Reservation of Rights ..................................................................................... 69
    E.     Exemption from Transfer Taxes ...................................................................... 69
    F.     Successors and Assigns ................................................................................... 69
    G.     Service of Documents ..................................................................................... 70
    H.     Term of Injunctions or Stays .......................................................................... 70
    I.     Entire Agreement ............................................................................................ 71
    J.     Plan Supplement Exhibits ............................................................................... 71
    K.     Non-Severability ............................................................................................ 71
    L.     Votes Solicited in Good Faith ......................................................................... 71
    M.     Waiver or Estoppel ......................................................................................... 71

ARTICLE XVII. CONFIRMATION OF THE PLAN .............................................................. 72

    A.     Voting Procedures and Acceptance ................................................................. 72
    B.     Statutory Requirements for Confirmation of the Plan ..................................... 72
    C.     The Best Interest of Creditors Test ................................................................. 73
    D.     Feasibility ....................................................................................................... 74
    E.     Confirmation Without Acceptance by All Impaired Classes ............................ 75

ARTICLE XVIII. PLAN-RELATED RISK FACTORS ......................................................... 76

    A.     General Bankruptcy Law and Plan Related Considerations ............................ 76
    B.     Financial Information Disclaimer .................................................................... 78
    C.     Disclosure Statement Disclaimer ................................................................... 78
    D.     Alternatives to Confirmation and Consummation of the Plan ........................ 80

ARTICLE XIX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........ 81

    A.     General Tax Considerations ............................................................................ 81
    B.     U.S. Federal Income Tax Consequences to the Debtors .................................. 82
    C.     U.S. Federal Income Tax Consequences to Holders of Claims and Interests .... 82
    D.     U.S. Federal Income Tax Treatment of the Liquidating Trust ......................... 87
    E.     Information Reporting and Backup Withholding ............................................. 88
    F.     Reservation of Rights ..................................................................................... 88

## TABLE OF EXHIBITS

Exhibit A          Liquidation Analysis

Exhibit B          Organizational Chart

## Introduction

Strike, LLC, STH ShellCo, LLC (f/k/a Strike HoldCo, LLC), Delta Directional Drilling, LLC, SGH ShellCo LLC (f/k/a Strike Global Holdings, LLC), CIS ShellCo LLC (f/k/a Capstone Infrastructure Services, LLC), and Crossfire, LLC (collectively, the "**Debtors**"), as debtors and debtors in possession in the above-captioned cases (the "**Chapter 11 Cases**"), propose this *Combined Disclosure Statement and Joint Chapter 11 Plan of Liquidation of Strike, LLC and Its Affiliated Debtors* (the "**Disclosure Statement**," "**Plan and Disclosure Statement**," or "**Plan**") for the resolution of all outstanding claims against and equity interests in the Debtors. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Other agreements and documents supplement this Plan and have been or will be filed with the Bankruptcy Court.  Unless otherwise indicated, capitalized terms used herein shall have the meanings set forth in Article I, below.

The Plan is a liquidating plan. Pursuant to prior orders of the Bankruptcy Court, the Debtors conducted a competitive court-supervised marketing process and sold substantially all of their assets to Strike Acquisition LLC (n/k/a Strike Holdco LLC), an affiliate of American Industrial Partners. The Plan provides for the satisfaction in full of all senior claims, including Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims.  Holders of General Unsecured Claims will receive interests in a Liquidating Trust that will administer and liquidate all remaining property of the Debtors.  Among other things, the Liquidating Trust is expected to prosecute certain Causes of Action of the Debtors not sold, assigned, or otherwise released on or before the Effective Date of the Plan, including certain litigation claims against the Debtors' former officers and directors. The Debtors believe that the creation of the Liquidating Trust will maximize the value of the preserved Causes of Action.

**THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED IN THE CHAPTER 11 CASES (THE "COMMITTEE") BELIEVE THAT HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS (OTHER THAN THE AIP PARTIES) WILL RECEIVE HIGHER RECOVERIES UNDER THIS PLAN THAN THEY WOULD RECEIVE UNDER AN ALTERNATIVE CHAPTER 7 LIQUIDATION BASED ON AT LEAST THREE SIGNIFICANT BENEFITS PROVIDED UNDER THIS PLAN. First, under the Plan, the AIP Parties are waiving their right to receive a recovery on account of their approximately $175 million General Unsecured Claim until such time as the other Holders of Allowed General Unsecured Claims have received an agreed upon threshold recovery.  Second, the Debtors and the Committee anticipate there would be additional costs, expenses, and time that would be incurred in replacing existing management and professionals in a chapter 7 case, which would further diminish Estate assets, delay the prosecution of the Preserved Estate Claims, and delay distributions to creditors.  Finally, the Debtors and the Committee believe the prosecution of Preserved Estate Claims in a focused and effective manner by the Liquidating Trustee will maximize the value of the Preserved Estate Claims compared with a potential prosecution by a chapter 7 trustee.**

**For these and other reasons, it is the Debtors' and the Committee's opinion that confirmation and implementation of the Plan is in the best interest of and will maximize recoveries to the Debtors' Estates, creditors, and other stakeholders. THEREFORE, THE DEBTORS AND THE COMMITTEE RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN CAST A VOTE TO ACCEPT THE PLAN.**

## Disclaimer

This Plan and Disclosure Statement describes certain statutory provisions, events in the Chapter 11 Cases and certain documents that may be attached or incorporated by reference. Although the Debtors believe that this information is fair and accurate, this information is qualified in its entirety to the extent that it does not set forth the entire text of such documents or statutory provisions. The information contained herein or attached hereto is made only as of the date of this Plan and Disclosure Statement. There can be no assurances that the statements contained herein will be correct at any time after such date.

This Plan and Disclosure Statement has been prepared in accordance with sections 1123 and 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws. This Plan and Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "**SEC**"), any state securities commission or any securities exchange or association, nor has the SEC, any state securities commission or any securities exchange or association reviewed or commented on the accuracy or adequacy of the statements contained herein. Other than the Court, no other governmental or other regulatory agency approvals have been sought or obtained as of the date of the mailing of this Plan and Disclosure Statement.

The Debtors submit this Plan and Disclosure Statement, as may be amended from time to time, under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 to all of the Debtors' known Holders of Claims entitled to vote on the Plan. The purpose of this Plan and Disclosure Statement is to provide adequate information to enable Holders of Claims who are entitled to vote on the Plan to make an informed decision in exercising their respective right to vote on the Plan. Every effort has been made to provide adequate information to Holders of Claims on how various aspects of the Plan affect their respective interests. The Bankruptcy Court entered an order conditionally approving the Disclosure Statement on April 5, 2022. [Docket No. 950].

In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and records or that was otherwise made available to them at the time of such preparation and on various assumptions. Although the Debtors believe that such information fairly reflects the financial condition of the Debtors as of the date hereof and that the assumptions regarding future events reflect reasonable business judgments, the Debtors make no representations or warranties as to the accuracy of the financial information contained herein or assumptions regarding the Debtors' financial condition and their future results and operations. Except where specifically noted, the financial information contained in this Plan and Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction.

This Plan and Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver. A party with standing may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Plan and Disclosure Statement identifies any such objections to Claims.

The Debtors are making the statements and providing the financial information contained in this Plan and Disclosure Statement as of the date hereof, unless otherwise specifically noted. Although the Debtors may subsequently update the information in this Plan and Disclosure Statement, the Debtors do not have an affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise. Holders of Claims and Interests reviewing this Plan and Disclosure Statement should not infer that, at the time of their

2

review, the facts set forth herein have not changed since this Plan and Disclosure Statement was filed. Information contained herein is subject to completion or amendment. The Debtors reserve the right to file an amended plan and disclosure statement.

Confirmation and effectiveness of the Plan are subject to certain conditions precedent described in <u>Article XIII</u> of the Plan. There is no assurance that the Plan will be confirmed or, if confirmed, that such conditions precedent will be satisfied or waived. You are encouraged to read this Plan and Disclosure Statement in its entirety, including, but not limited to <u>Article XVIII</u> of this Plan and Disclosure Statement entitled "Plan-Related Risk Factors," before submitting your ballot to vote to accept or reject the Plan.  Even after the Effective Date, Distributions under the Plan may be subject to delay so that Disputed Claims can be resolved.

The Debtors have not authorized any entity to give any information about or concerning the Plan and Disclosure Statement other than that which is contained in this Plan and Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Plan and Disclosure Statement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims and Interests (including those Holders of Claims or Interests who are not entitled to vote on the Plan) will be bound by the terms of the Plan and any transactions contemplated hereby.

The contents of this Plan and Disclosure Statement should not be construed as legal, business, financial, or tax advice. Each Holder of a Claim or Interest should consult his, her, or its own legal counsel, accountant, or other advisors as to legal, business, financial, tax and other matters concerning his, her, or its Claim or Interest, the solicitation, or the transactions contemplated by the Plan and Disclosure Statement. This Plan and Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

Nothing contained herein shall constitute an admission of any fact or liability by any party or be deemed evidence of the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests.

## <u>The Solicitation</u>

This Plan and Disclosure Statement is submitted by the Debtors to be used in connection with the solicitation of votes on the Plan and to describe and provide the terms of the plan of liquidation of the Debtors.

The Debtors requested that the Bankruptcy Court hold a hearing on conditional approval of this Plan and Disclosure Statement to determine whether this Plan and Disclosure Statement contains "adequate information" in accordance with section 1125 of the Bankruptcy Code. The Bankruptcy Court entered an order conditionally approving the Disclosure Statement as containing adequate information on April 5, 2022. [Docket No. 950] (the "**DS Order**"). Pursuant to section 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the Debtors and the condition of the Debtors' books and records . . . that would enable a hypothetical reasonable investor typical of Holders of claims or interests of the relevant Class to make an informed judgment about the plan . . . ."

**All Holders of Claims are encouraged to read and carefully consider this Plan and Disclosure Statement in its entirety before voting to accept or reject the Plan.  In making a decision to accept or reject the Plan, each Holder of a Claim must rely on its own examination and**

evaluation of the Debtors as described in this Plan and Disclosure Statement, including the merits and risks involved with respect to such Plan and Disclosure Statement.

A hearing to consider the final approval of the Disclosure Statement and confirmation of the Plan has been set for May 17, 2022, at 2:00 p.m. (prevailing Central Time). Objections to the final approval of the Disclosure Statement or objections to Confirmation of the Plan must be made in writing and must be filed with the Bankruptcy Court and served on counsel for the Debtors on or before 5:00 p.m. (prevailing Central Time), on May 9, 2022. Bankruptcy Rule 3007 and the DS Order govern the form of any such objection.

## Answers to Commonly Asked Questions

### What is chapter 11 of the Bankruptcy Code?

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or liquidate their assets in a controlled and value-maximizing fashion. The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed. During a chapter 11 bankruptcy case, the debtor remains in possession of its assets unless the bankruptcy court orders the appointment of a trustee. No trustee has been appointed in the Chapter 11 Cases. The Plan is being proposed by the Debtors. The Debtors have worked to propose a plan of liquidation in an effort to minimize the overall administrative costs associated with the Chapter 11 Cases and maximize value to Holders of Allowed Claims and Interests.

### How do I determine how my Claim or Interest is classified?

Under the Plan, Administrative Claims and Priority Tax Claims are unclassified and will be treated in accordance with Article VI of the Plan. All other Claims and Interests are classified in a series of Classes, as described in Article V and Article VII of the Plan. You may review such Articles to determine how your Claim or Interest is classified.

### How do I determine what I am likely to recover on account of my Claim or Interest?

After you determine the classification of your Claim or Interest, you can determine the likelihood and range of potential recovery under the Plan with respect to your Claim or Interest by referring generally to the chart below, which is also included in Article V of the Plan and qualified by Article VII of the Plan. The estimated recoveries in this chart do not include projected proceeds of the Preserved Estate Claims, which may increase the ultimate recoveries of the Class of General Unsecured Claims.

| Class | Claims or Interests | Status | Voting Rights | Estimated Allowed Claims or Interests | Estimated Recoveries of Allowed Claims or Interests |
|---|---|---|---|---|---|
| 1 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0 | N/A |
| 2 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0.3 million | 100% |

4

| Class | Claims or Interests | Status | Voting Rights | Estimated Allowed Claims or Interests | Estimated Recoveries of Allowed Claims or Interests |
|---|---|---|---|---|---|
| 3 | General Unsecured Claims | Impaired | Entitled to Vote | $314.8 million to $357.4 million[2] | Non-AIP Parties: 1.2% to 2.7% plus Distributions, if any, from Liquidating Trust Proceeds, including proceeds of Preserved Estate Claims<br><br>AIP Parties: 0% plus Distributions, if any, from Liquidating Trust Proceeds, including proceeds of Preserved Estate Claims, after the aggregate recovery to all other Allowed General Unsecured Claims exceeds 7.5% of such other Allowed General Unsecured Claims |
| 4 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept/Reject) | $0 | 0% |
| 5 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | 0% |
| 6 | STH ShellCo Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | 0% |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | 0% |

The chart above provides an estimate of recoveries under the Plan and may be compared to the estimated recoveries that such Classes would receive in a hypothetical chapter 7 liquidation, as reflected in the liquidation analysis attached to this Plan and Disclosure Statement as **Exhibit A**.

---

[2]   The high end of the range of estimated Allowed General Unsecured Claims includes approximately $26 million of Claims asserted in prepetition litigation against the Debtors that may be covered in whole or in part under the Debtors' Insurance Policies. To the extent such Claims are covered under applicable Insurance Policies, recoveries for other Holders of Allowed General Unsecured Claims under the Plan would increase in the high end scenario.

The projected recovery of 1.2% to 2.7% for Class 3 (Non-AIP Parties) assumes that there is approximately $2.1 million to $3.7 million of cash available for Distribution to the Liquidating Trust Beneficiaries after payment of all senior Claims and funding of anticipated costs to administer the Estates and the Liquidating Trust. It does not include amounts that may be recovered from the prosecution of the Preserved Estate Claims, including certain Causes of Action that are expected to be brought by the Liquidating Trust against the Debtors' former officers and directors, or the cost of prosecuting the Preserved Estate Claims, which are currently unliquidated and not reasonably subject to estimation at this time. As a result, the actual recovery to Holders of General Unsecured Claims may be higher than set forth above.

**What is necessary to confirm the Plan?**

Under applicable provisions of the Bankruptcy Code, confirmation of the Plan requires that, among other things, at least one Class of Impaired Claims votes to accept the Plan. Acceptance by a Class of Claims means that at least two-thirds in the total dollar amount and more than one-half in number of the Allowed Claims actually voting in the Class vote in favor of the Plan. Because only those Holders of Claims who vote on the Plan will be counted for purposes of determining acceptance or rejection of the Plan by an Impaired Class, the Plan can be approved with the affirmative vote of members of an Impaired Class who own less than two-thirds in amount and one-half in number of the Claims in that Class. In addition to acceptance of the Plan by a Class of Impaired Claims, the Bankruptcy Court must find that the Plan satisfies a number of statutory requirements before it may confirm the Plan.

If one or more Classes vote to reject the Plan, the Debtors may still request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code. In such case, the Debtors will be required to demonstrate that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Impaired Claims or Interests that has rejected the Plan. This method of confirming a plan is commonly called a "cramdown." In addition to the statutory requirements imposed by the Bankruptcy Code, the Plan itself also provides for certain conditions that must be satisfied for the Plan to be confirmed and go effective.

**Is there an official committee of unsecured creditors in this case?**

Yes. An official committee of unsecured creditors was appointed on December 15, 2021. The Committee is represented by the law firm of Akin Gump Strauss Hauer & Feld LLP and financial advisor FTI Consulting, Inc. The Committee supports the confirmation of the Plan.

**When is the deadline for returning my ballot?**

**THE BANKRUPTCY COURT HAS DIRECTED THAT, TO BE COUNTED FOR VOTING PURPOSES, YOUR BALLOT MUST BE RECEIVED BY THE CLAIMS AND NOTICING AGENT NOT LATER THAN MAY 9, 2022 AT 5:00 P.M. (PREVAILING CENTRAL TIME).**

**It is important that all Holders of Impaired Claims vote on the Plan. The Debtors believe that the Plan provides the best possible recovery to Holders of Claims and Interests. The Debtors believe that acceptance of the Plan is in the best interest of Holders of Claims and Interests and recommend that Holders of Impaired Claims vote to accept the Plan.**

If you would like to obtain additional copies of this Plan and Disclosure Statement or any of the documents attached or referenced herein, or have questions about the solicitation and voting process or these Chapter 11 Cases generally, please contact Epiq Corporate Restructuring, LLC, the Debtors' claims

and noticing agent, by either (a) visiting the Debtors' restructuring website at https://dm.epiq11.com/StrikeLLC, (b) calling (855) 675-2860 (Toll Free) or +1 (503) 520-4488 (International), or (c) emailing strikeinfo@epiqglobal.com and referencing "Strike" in the subject line.

## Overview of Plan

An overview of the Plan is set forth below. This overview is qualified in its entirety by reference to the Plan. If the Bankruptcy Court confirms the Plan and, in the absence of any applicable stay, all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.

The Debtors sold substantially all of their assets to the Purchaser on February 14, 2022. Pursuant to the Sale Documents, the Debtors retained any assets that were not acquired by the Purchaser, including certain litigation claims (other than the Purchased Claims) and certain funds to wind down their operations and make Distributions to creditors. On the Effective Date, the Liquidating Trust will be created and the Debtors will transfer the Liquidating Trust Assets, including the Preserved Estate Claims, to the Liquidating Trust. The Liquidating Trust Assets, including the net proceeds, if any, from the prosecution of Preserved Estate Claims, will be distributed to creditors as set forth in the Plan and Disclosure Statement and the Liquidating Trust Agreement. Pursuant to the Global Settlement, the AIP Parties have agreed to waive their receipt of any recoveries on account of their General Unsecured Claims under the Plan until an agreed upon threshold recovery is achieved by other Holders of Allowed General Unsecured Claims, which will provide other Holders of Allowed General Unsecured Claims a larger portion of the available Distributions. As of the Effective Date of the Plan, except as otherwise provided in the Plan and Disclosure Statement, the Liquidating Trust will be responsible for all payments and Distributions to be made under the Plan to the Holders of Allowed Claims.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, AND OTHER REFERENCES

### A.    Defined Terms

1.    "*Administrative Claim*" means a Claim against any of the Debtors for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, all fees and charges assessed against the Debtors' Estates under 28 U.S.C. § 1930, and all Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court.

2.    "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days following the Effective Date, except as specifically set forth in the Plan or a Final Order.

3.    "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

4.    "*AIP*" means AIPCF VII LLC and/or one or more of its or its affiliates' managed entities or funds.

5.    "*AIP Parties*" means AIP, American Industrial Partners, Ltd., and certain funds and entities managed by or affiliated with AIP that are the beneficial owners (or nominees, investment managers, advisors or subadvisors for the beneficial owners) of Claims, including in their capacities as DIP Lenders, Prepetition Senior Loan Lenders and Prepetition Junior Loan Lenders.

6.        "*Allowed*" means, with respect to any Claim or Interest, except as otherwise provided herein, such Claim or Interest (or any portion thereof) (a) that is evidenced by a Proof of Claim filed by the Claims Bar Date, the Administrative Claims Bar Date, or such other date fixed by the Bankruptcy Court, as applicable (or for which Claim or Interest a Proof of Claim is not or shall not be required to be filed under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court); (b) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; (c) that has been expressly Allowed under the Plan, any stipulation approved by the Bankruptcy Court, or a Final Order of the Bankruptcy Court; or (d) is compromised, settled, or otherwise resolved to by the Debtors and the Holder of such Claim or Interest; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof or request for estimation thereof is interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim has been Allowed by a Final Order; *provided*, *further*, that except as otherwise expressly provided herein, the amount of any Allowed Claim or Allowed Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code. Except as otherwise expressly specified in the Plan or any Final Order, and except to the extent such interest is Allowed pursuant to section 506(b) of the Bankruptcy Code, the amount of an Allowed Claim shall not include interest or any premium on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, (x) a Proof of Claim filed after the Claims Bar Date or a request for payment of an Administrative Claim filed after the Administrative Claims Bar Date, as applicable, shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim, and (y) a Claim or Interest that has been disallowed by a Final Order or settlement shall not be Allowed for any purposes whatsoever. "Allow," "Allowance," and "Allowing" shall have correlative meanings.

7.        "*Asset Purchase Agreement*" means that certain Asset Purchase Agreement, dated as of December 6, 2021, between the Debtors and Strike Acquisition LLC (as has been amended from time to time), a copy of which is attached as Schedule 3 to the Sale Order.

8.        "*Ballot*" means the applicable form or forms of ballot(s) distributed to each Holder of an Impaired Claim entitled to vote on the Plan on which the Holder indicates either acceptance or rejection of the Plan and (when applicable) any election for treatment of such Claim under the Plan.

9.        "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or as may be amended hereafter and applicable to the Chapter 11 Cases.

10.        "*Bankruptcy Court*" means (a) the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases; (b) to the extent any reference made under section 157 of title 28 of the United States Code is withdrawn or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code; or (c) such other court as may have jurisdiction over the Chapter 11 Cases or any aspect thereof to the extent of such jurisdiction.

11.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated by the United States Supreme Court pursuant to 28 U.S.C. § 2075 and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

12.    "*Bid Procedures Order*" means the *Order (A) Establishing Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors' Entry into Stalking Horse Agreement and Approving the Reimbursable Expenses, (C) Establishing Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Related Notices, (E) Scheduling a Hearing to Consider the Proposed Sale; and (F) Granting Related Relief* [Docket No. 279].

13.    "*Business Day*" means any day other than a Saturday, Sunday, "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or day on which commercial banks in New York, New York are required or authorized by law to remain closed.

14.    "*Cash*" means legal tender of the United States of America and equivalents thereof.

15.    "*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of state, federal, or other law, in each case other than the Purchased Claims. For the avoidance of doubt, "Causes of Action" includes: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or to otherwise contest, recharacterize, reclassify, subordinate, or disallow any Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) claims for breach of statutory, equitable, or constructive trusts created under applicable law or in equity or the misappropriation of funds held in trust or other causes of action or claims related thereto; and (e) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

16.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court; and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

17.    "*Chubb Stipulation*" that certain *Stipulation and Order Regarding the Assumption and Assignment of Certain Chubb Insurance Contracts* [Docket No. 744].

18.    "*Claim*" means any "claim," as such term is defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

19.    "*Claims and Noticing Agent*" means Epiq Corporate Restructuring, LLC, the claims, noticing, and solicitation agent retained by the Debtors in the Chapter 11 Cases by order of the Bankruptcy Court [Docket No. 9].

20.    "*Claims Bar Date*" means the applicable deadline for filing proofs of Claim as set forth in the *Order (I) Setting Bar Dates for Filing Proofs of Claims, Including Requests for Payment Under*

*Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, and (IV) Approving Notice of Bar Dates* [Docket. No. 341] or another order of the Bankruptcy Court.

21.      "*Claims Objection Deadline*" means the date that is 360 days after the Effective Date.

22.      "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Claims and Noticing Agent.

23.      "*Class*" means a category of Holders of Claims or Interests under section 1122(a) of the Bankruptcy Code.

24.      "*Class A Trust Interests*" means the beneficial interests in the Liquidating Trust entitling the holders thereof to their pro rata share of Liquidating Trust Proceeds, in accordance with the Plan and Liquidating Trust Agreement; *provided*, that (a) prior to satisfaction of the GUC Threshold Distribution Condition, such pro rata share shall be calculated as the proportion that a Class A Trust Interest bears to the aggregate amount of all Class A Trust Interests distributed pursuant to the Plan, and (b) after satisfaction of the GUC Threshold Distribution Condition, such pro rata share shall be calculated as the proportion that a Class A Trust Interest bears to the aggregate amount of all Class A Trust Interests and Class B Trust Interests distributed pursuant to the Plan.

25.      "*Class B Trust Interests*" means beneficial interests in the Liquidating Trust entitling the holders thereof to their pro rata share of Liquidating Trust Proceeds, in accordance with the Plan and the Liquidating Trust Agreement, after satisfaction of the GUC Threshold Distribution Condition; *provided*, that such pro rata share shall be calculated as the proportion that a Class B Trust Interest bears to the aggregate amount of all Class A Trust Interests and Class B Trust Interests distributed pursuant to the Plan.

26.      "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases on December 15, 2021.

27.      "*Committee Members*" means, each solely in its capacity as a former or current member of the Committee, (a) Mears Group, Inc., (b) CBK Transport, LLC, (c) Aspen American Insurance Company, (d) Ardent Services, LLC, and (e) Jones Transport, LLC.

28.      "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

29.      "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

30.      "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order, as such hearing may be continued from time to time.

31.      "*Confirmation Order*" means the order of the Bankruptcy Court approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code and confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

32.      "*Consummation*" means the occurrence of the Effective Date.

33.     "*Cure*" means a Claim (unless waived or modified by the applicable counterparty) for cure of a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor pursuant to section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

34.     "*Customer Payments*" means payments of not more than $13,852,720.80 to be made to the Debtors under the *Stipulation and Order with Respect to Sale Transaction Closing* [Docket No. 727].

35.     "*D&O Liability Insurance Policies*" means, collectively, all insurance policies (including any "tail policy") issued at any time, whether expired or unexpired, to any of the Debtors or an Affiliate of any Debtor for certain liabilities of one or more Debtors and/or their current or former directors, managers, and officers, and all agreements, documents or instruments related thereto.

36.     "*Debtor Directors and Independent Managers*" means, each solely in his or her capacity as a director or manager of Strike Investment, (a) Anthony Horton, (b) Patrick Bartels, (c) Michael Duran, (d) Dustin Smith, (e) Aileen Wang, (f) Knut Eriksen, (g) Anthony Dowd, and (h) Charles Davison, Jr.

37.     "*Debtor Officers*" means, each solely in his capacity as an officer, (a) Sean Gore, (b) Charles Davison, Jr., (c) Bryan Dempsey, (d) Jamie Black, and (e) Dario Deferrari.

38.     "*Debtor Related Party*" means (a) each Debtor Officer, (b) each Debtor Director and Independent Manager, (c) Mill Point Strike Splitter L.P., and each current and former equity holder (regardless of whether such interests are held directly or indirectly), limited partner, and general partner of Mill Point Strike Splitter L.P., (d) Strike Investment, (e) White & Case LLP, (f) Opportune Partners LLC, (g) Opportune LLP, (h) Jackson Walker LLP, and (i) each of the Debtors' financial advisors, attorneys, accountants, investment bankers, consultants, and other professionals and advisors retained in connection with the Debtors' Chapter 11 Cases on or after the Petition Date. For the avoidance of doubt, neither Strike Capital LLC nor any of its equity holders shall be a "Debtor Related Party."

39.     "*Debtors*" means, collectively, (a) Strike, LLC; (b) STH ShellCo LLC (f/k/a Strike HoldCo, LLC); (c) Delta Directional Drilling, LLC; (d) SGH ShellCo LLC (f/k/a Strike Global Holdings, LLC); (e) CIS ShellCo LLC (f/k/a Capstone Infrastructure Services, LLC); and (f) Crossfire, LLC.

40.     "*Delta Directional*" means Delta Directional Drilling, LLC.

41.     "*DIP Agent*" means Lightship Capital II LLC, in its capacities as collateral agent and administrative agent under the DIP Credit Agreement, including any successors.

42.     "*DIP Claims*" means any and all Claims held by the DIP Lenders or the DIP Agent arising under or relating to the DIP Credit Agreement or the DIP Order, and which constitute "Obligations," under, and as defined in, the DIP Credit Agreement.

43.     "*DIP Credit Agreement*" means that certain Senior Secured Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of December 10, 2021, by and among Strike, LLC, Delta Directional Drilling, LLC, and Strike Global Holdings, LLC, as borrowers, Strike HoldCo, LLC and the other guarantors party thereto, the lenders party thereto from time to time, and the DIP Agent, as may have been amended, modified, supplemented, or amended and restated from time to time, including pursuant to the Sale Order.

44.     "*DIP Documents*" means the DIP Credit Agreement and the "Loan Documents," as such term is defined in the DIP Credit Agreement, and all related agreements and documents executed by any

Debtor in connection therewith, in each case, as the same may have been amended, modified, supplemented, or amended and restated from time to time.

45.     "*DIP Facility*" means the DIP Term Facility and the DIP Roll-Up Facility.

46.     "*DIP Lenders*" means the financial institutions or entities from time to time party to the DIP Credit Agreement as lenders.

47.     "*DIP Loans*" means the loans under the DIP Facility.

48.     "*DIP Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket. No. 348], as deemed amended from time to time in accordance with the terms thereof, including  pursuant to the Sale Order.

49.     "*DIP Roll-Up Facility*" means the roll-up facility provided under the DIP Credit Agreement and approved by the DIP Order, pursuant to which all amounts outstanding under the Prepetition Senior Loan Agreement were deemed "rolled up" into the DIP Facility, on a cashless dollar for dollar basis and deemed to be DIP Loans under the DIP Credit Agreement.

50.     "*DIP Term Facility*" means the new money multiple-draw term loan facility provided under the DIP Credit Agreement and approved by the DIP Order, in the aggregate principal amount of up to $26 million  (exclusive of amounts paid in kind thereunder).

51.     "*Disbursing Agent*" means, as applicable, (a) with respect to Distributions required to be made on the Effective Date on account of Allowed Administrative Claims (including Professional Fee Claims), Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims, the Debtors, and (b) with respect to all other Distributions, the Liquidating Trustee or a Third Party Disbursing Agent designated by the Liquidating Trustee in accordance with the Plan and Liquidating Trust Agreement.

52.     "*Disclosure Statement*" has the same meaning as Plan and Disclosure Statement.

53.     "*Disputed*" means, with respect to any Claim or Interest, a Claim or Interest (or any portion thereof) that is (a) not yet Allowed, and (b) not disallowed under the Plan, the Bankruptcy Code, or a Final Order or settlement, as applicable.

54.     "*Disputed Claims Reserve*" means one or more reserves for those Claims that are Disputed Claims established and maintained by the Liquidating Trustee in accordance with the Plan and the Liquidating  Trust Agreement.

55.     "*Distribution*" means the payment or distribution under the Plan of Cash or Liquidating Trust Interests on account of an Allowed Claim, including distributions by the Liquidating Trust to Liquidating  Trust Beneficiaries.

56.     "*Distribution Date*" means a date selected by the Debtors or the Liquidating Trustee in accordance with the terms of the Plan and, in the case of the Liquidating Trustee, the Liquidating Trust Agreement to make Distributions  on account of Allowed Claims.

57.     "*Effective Date*" means, with respect to the Plan, the date that is a Business Day on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent to the occurrence of the Effective Date set forth in <u>Article XIII</u> of the Plan have been satisfied or waived in accordance with the Plan; and (c) the Plan is declared effective by the Debtors.  Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

58.     "*Entity*" has the meaning set for in section 101(15) of the Bankruptcy Code.

59.     "*Escrow Accounts*" means the Existing Professional Fee Escrow Account, the New Professional Fee Escrow Account, the Tax Escrow Account, and any other escrow accounts established by the Debtors prior to the Effective Date.

60.     "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

61.     "*Exculpated Party*" means each of the following in its capacity as such: (a) each Debtor; (b) each Debtor Related Party; (c) the Committee and each Committee Member; and (d) each Related Party of each entity in clause (c).

62.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to rejection, assumption, or assumption and assignment under section 365 of the Bankruptcy Code.

63.     "*Existing Professional Fee Escrow Account*" means the escrow account established in connection with the Sale Transaction pursuant to the Existing Professional Fee Escrow Agreement, which is subject to a reversionary interest in favor of the Purchaser.

64.     "*Existing Professional Fee Escrow Agreement*" means that certain Escrow Agreement, dated February 14, 2022, among Strike HoldCo, LLC, Strike Construction, LLC, and Citibank, N.A., for the purpose of paying certain professional fees incurred through the closing of the Sale Transaction.

65.     "*Final Distribution Date*" means, with respect to a particular Class of Claims, the Distribution Date upon which final Distributions to claimants in the Class are to be made.

66.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought; <u>provided</u>, <u>that</u>, the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, the local rules of the Bankruptcy Court or applicable non-bankruptcy law, may be filed relating to such order shall not prevent such order from being a Final Order.

67.     "*General Unsecured Claim*" means any Prepetition Junior Loan Claim and any other Claim against the Debtors as of the Petition Date, other than (a) an Administrative Claim, (b) a DIP Claim, (c) a Priority Tax Claim, (d) a Priority Non-Tax Claim, (e) a Secured Claim, (f) an Intercompany Claim, or (g) a Section 510(b) Claim.

68. "*Global Settlement*" means the settlement among the Debtors, Committee, and the AIP Parties memorialized in the term sheet attached as Schedule 2 to the Sale Order, as approved by the Sale Order (subject to confirmation of the Plan), and implemented through this Plan and Disclosure Statement and the Plan Documents.

69. "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

70. "*GUC Threshold Distribution Condition*" means the Distribution (whether under the Plan, the Liquidating Trust Agreement, or otherwise) of Liquidating Trust Proceeds to holders of Class A Trust Interests in amount equal to 7.5% of the aggregate amount of Allowed General Unsecured Claims represented by the Class A Trust Interests.

71. "*Holder*" means an Entity holding a Claim or an Interest, as applicable, each solely in its capacity as such.

72. "*Impaired*" means, when used in reference to a Class, a Class of Claims or Interests that are impaired within the meaning of section 1124 of the Bankruptcy Code.

73. "*Insurance Coverage Rights*" means any direct or derivative rights, interests, claims, entitlements or Causes of Action of any Debtor under any of the Insurance Policies, including the rights of any Debtor to proceeds, indemnification, reimbursement, contribution, benefits, or other payment arising out of or under the Insurance Policies.

74. "*Insurance Policies*" means the D&O Liability Insurance Policies and any and all known and unknown insurance policies or contracts that have been issued at any time to, whether expired or unexpired, or that provide coverage to, any of the Debtors or any Affiliate of any Debtor, and all agreements, documents or instruments related thereto, including but not limited to, any agreements with third-party administrators; provided, that "Insurance Policies" shall not include any insurance policies or contracts that were assigned to the Purchaser in connection with the Sale (including pursuant to the Chubb Stipulation), except to the extent of any rights retained by the Debtors under such transferred insurance policies or contracts pursuant to the Sale Order, the Chubb Stipulation, or any other Final Order.

75. "*Insurer*" means any company or other entity that issued any Insurance Policies, any third-party administrators of claims against the Debtors or asserted under the Insurance Policies, and any respective predecessors and/or affiliates thereof.

76. "*Intercompany Claim*" means a Claim held by any Debtor against any other Debtor, other than any Administrative Claim.

77. "*Intercompany Interest*" means an Interest held by a Debtor in another Debtor.

78. "*Intercreditor Agreement*" means that certain ABL Intercreditor Agreement, dated as of November 30, 2016, by and among the Prepetition Senior Loan Agent and the Prepetition Junior Loan Agent, and acknowledged by certain obligors party thereto, as amended, restated, supplemented, or otherwise modified from time to time.

79. "*Interest*" means any common stock, limited liability company interest, equity, ownership, profit interest, unit, or share in any Debtor (including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights,

convertible, exercisable, or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, or to obtain any such interest or other ownership interest in any Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferrable, preferred, common, voting, or denominated "stock" or a similar security.

80.     "*Junior Lender Parties*" means the Prepetition Junior Loan Agent together with the Prepetition Junior Loan Lenders and the other Secured Parties (as defined in the Prepetition Junior Loan Agreement).

81.     "*Junior Loan Guaranty*" means an unconditional joint and several guaranty of the Prepetition Junior Secured Obligations provided to the Junior Lender Parties under the Prepetition Junior Loan Documents by Strike HoldCo, and certain subsidiaries of Strike, LLC, which guaranty was secured by the Prepetition Junior Loan Collateral.

82.     "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

83.     "*Liquidating Trust*" means the trust established pursuant to Article VIII of the Plan and the Liquidating Trust Agreement.

84.     "*Liquidating Trust Agreement*" means the agreement governing the Liquidating Trust to be included in the Plan Supplement, which agreement shall be in form and substance reasonably acceptable to the Debtors, AIP, and the Committee.

85.     "*Liquidating Trust Assets*" means the Preserved Estate Claims, the Liquidating Trust Reserve, the Insurance Coverage Rights, and all other property, interests, and rights of the Debtors and the Estates as of the Effective Date (excluding, for the avoidance of doubt, any Purchased Assets (as defined in the Asset Purchase Agreement)), including the Debtors' rights and interests in the Escrow Accounts and the Debtors' rights and obligations under the escrow agreements governing such Escrow Accounts, remaining after all payments required to be made by the Debtors pursuant to the Plan and the Confirmation Order on the Effective Date have been made, including payment by the Debtors of all Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims that are Allowed as of the Effective Date; *provided*, that, for the avoidance of doubt, any Escrow Accounts shall remain subject to the terms of the escrow agreements governing such Escrow Accounts.

86.     "*Liquidating Trust Beneficiaries*" means holders of the Liquidating Trust Interests.

87.     "*Liquidating Trust Expenses*" means the reasonable fees and expenses incurred by the Liquidating Trust and reimbursable pursuant to the Liquidating Trust Agreement, including fees and expenses incurred to pursue to the Preserved Estate Claims.

88.     "*Liquidating Trust Interests*" means the Class A Trust Interests and the Class B Trust Interests, which shall not be certificated and shall not be transferrable (except under limited circumstances set forth in the Liquidating Trust Agreement).

89.     "*Liquidating Trust Oversight Committee*" means a committee as described in the Liquidating Trust Agreement that may be appointed on the Effective Date by the Committee, in consultation with the Debtors and AIP, or after the Effective Date by the Liquidating Trust Beneficiaries in accordance with the Liquidating Trust Agreement.

90.     "*Liquidating Trust Proceeds*" means net Cash proceeds of the Liquidating Trust Assets, excluding the Liquidating Trust Reserve, available for Distribution to Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement.

91.     "*Liquidating Trustee*" means the Person appointed by the Committee, in consultation with the Debtors and AIP, to serve as trustee of the Liquidating Trust, who will be identified in the Plan Supplement.

92.     "*Liquidating Trust Reserve*" means Cash remaining after funding the New Professional Fee Escrow Account, and making Distributions required to be made by the Debtors under the Plan on the Effective Date, which Cash shall be transferred to and held by the Liquidating Trust and used to (a) fund the Wind-Down Manager Reserve, (b) satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims not previously paid, including such Claims Allowed after the Effective Date, (c) fund Disputed Claims Reserves relating to Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and Secured Claims, (d) fund the Prepetition Junior Loan Agent Fee Reserve, and (e) fund the Liquidating Trust Expenses not previously paid; *provided*, that the Liquidating Trust Reserve shall be available for Distribution to Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement following the payment or funding of amounts required under the preceding clauses (a)-(e).

93.     "*New Professional Fee Escrow Account*" means the escrow account established and funded by the Debtors with Cash in an amount equal to the Professional Fee Amount, which shall not constitute property of the Debtors or the Estates or Liquidating Trust Assets.

94.     "*Petition Date*" means December 6, 2021, the date on which the Chapter 11 Cases were commenced.

95.     "*Plan*" has the same meaning as Plan and Disclosure Statement.

96.     "*Plan and Disclosure Statement*" means this plan and disclosure statement, including the Plan Supplement and any exhibits, appendices, schedules, ballots, and related documents hereto, as amended, supplemented or modified in accordance with applicable law, and any procedures related to the solicitation of votes to accept or reject the Plan, as the same may be amended, modified, supplemented, or amended and restated from time to time, in accordance with the terms hereof.

97.     "*Plan Documents*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court, including, without limitation, the Plan Supplement, the Liquidating Trust Agreement, and the Confirmation Order, each of which document shall be in form and substance reasonably acceptable to the Debtors, the Committee, and AIP.

98.     "*Plan Supplement*" means the documents and forms of documents, schedules, and Plan exhibits, as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, to be filed in a supplement to the Plan that includes the necessary documentation to effectuate the Plan, including (a) the Liquidating Trust Agreement, and (b) the Preserved Estate Claims Schedule, each of which document shall be in form and substance reasonably acceptable to the Debtors, the Committee, and AIP.

99.     "*Post-Petition Trade Claims*" means certain trade claims incurred by the Debtors from the Petition Date through the Sale Closing Date that were assumed by the Purchaser under, and in accordance with Section 1.3(c) of, the Asset Purchase Agreement and the Sale Order.

16

100.  "*Pre-Closing Professional Fee Claims*" means Professional Fee Claims incurred through and including February 14, 2022 that are payable from the Existing Professional Fee Escrow Account in accordance with the Existing Professional Fee Escrow Agreement.

101.  "*Prepetition ABL Facility*" means a revolving asset-backed loan facility governed by the Prepetition Senior Loan Agreement.

102.  "*Prepetition Collateral*" means the Prepetition Junior Loan Collateral and Prepetition Senior Loan Collateral.

103.  "*Prepetition Bridge Facility*" means the incremental delayed draw term loan facility provided by the AIP Parties prior to the Petition Date and governed by the Prepetition Senior Loan Agreement.

104.  "*Prepetition Junior Liens*" means the liens and security interests granted on the Prepetition Junior Loan Collateral under the Prepetition Junior Loan Documents.

105.  "*Prepetition Junior Loan Agent*" means Wilmington Trust, National Association, in its capacity as administrative agent and collateral agent under the Prepetition Junior Loan Agreement, including any successor thereto.

106.  "*Prepetition Junior Loan Agent Fee Reserve*" means a Cash reserve in an amount no greater than $50,000, which shall be established as part of the Liquidating Trust Reserve on the Effective Date for purposes of paying the fees and expenses of the Prepetition Junior Loan Agent (including the fees and expenses of counsel to the Prepetition Junior Loan Agent) incurred during the period from and after the Sale Closing Date through and including the Effective Date, in accordance with the Sale Order.

107.  "*Prepetition Junior Loan Agreement*" means that certain Term Loan and LC Loan and Security Agreement, dated as of November 30, 2016, by and among Strike, LLC, as borrower, Strike HoldCo, LLC, as holdings, the guarantors party thereto from time to time, the lenders party thereto from time to time, and the Prepetition Junior Loan Agent, as amended, restated, supplemented, or otherwise modified from time to time.

108.  "*Prepetition Junior Loan Claims*" means all Claims against each of the Debtors arising from or based upon the Prepetition Junior Loan Agreement or any other Prepetition Junior Loan Document.

109.  "*Prepetition Junior Loan Collateral*" means Collateral (as defined in the Prepetition Junior Loan Agreement), consisting of substantially all assets of the Debtors, other than certain Excluded Assets (as defined in the Prepetition Junior Loan Agreement).

110.  "*Prepetition Junior Loan Documents*" means the Prepetition Junior Loan Agreement and the other "Loan Documents," as such term is defined in the Prepetition Junior Loan Agreement, and all related agreements and documents executed by any Debtor in connection therewith, in each case, as amended, restated, supplemented, or otherwise modified from time to time.

111.  "*Prepetition Junior Loan Facility*" means a term loan facility governed by the Prepetition Junior Loan Agreement.

112.  "*Prepetition Junior Loan Lenders*" means the lenders under the Prepetition Junior Loan Agreement.

17

113. "*Prepetition Junior Loan Secured Obligations*" means all obligations under the Prepetition Junior Loan Documents.

114. "*Prepetition Liens*" means the Prepetition Junior Liens and Prepetition Senior Liens.

115. "*Prepetition Senior Liens*" means the liens and security interests granted on the Prepetition Senior Loan Collateral under the Prepetition Senior Loan Documents.

116. "*Prepetition Senior Loan Agent*" means Lightship Capital II, LLC (as successor in interest to Bank of America, N.A.), in its capacity as administrative agent and collateral agent under the Prepetition Senior Loan Agreement, and any successor thereto.

117. "*Prepetition Senior Loan Agreement*" means that certain ABL Loan and Security Agreement, dated as of November 30, 2016, by and among Strike, LLC, Delta Directional Drilling, LLC, and Strike Global Holdings, LLC, as borrowers, Strike HoldCo, LLC and the other guarantors party thereto from time to time, the lenders party thereto from time to time, and the Senior Loan Agent, as amended, restated, supplemented, or otherwise modified from time to time.

118. "*Prepetition Senior Loan Collateral*" means Collateral (as defined in the Prepetition Senior Loan Agreement), consisting of substantially all assets of the Debtors, but excluding certain Excluded Assets (as defined in the Prepetition Senior Loan Agreement).

119. "*Prepetition Senior Loan Documents*" means the Prepetition Senior Loan Agreement and the other "Loan Documents," as such term is defined in the Prepetition Senior Loan Agreement, and all related agreements and documents executed by any Debtor in connection therewith, in each case, as amended, restated, supplemented, or otherwise modified from time to time.

120. "*Prepetition Senior Loan Facility*" means the Prepetition Bridge Facility and Prepetition ABL Facility.

121. "*Prepetition Senior Loan Lenders*" means the lenders under the Prepetition Senior Loan Agreement.

122. "*Prepetition Senior Loan Secured Obligations*" means all obligations under the Prepetition Senior Loan Documents.

123. "*Preserved Estate Claims*" means all Causes of Action of the Debtors that are not waived, relinquished, released, compromised, or settled in the Plan or any Final Order, including, but not limited to, Causes of Action identified on the Preserved Estate Claims Schedule. Notwithstanding the foregoing, "Preserved Estate Claims" do not include any Purchased Claims or any Causes of Action that were transferred to the Purchaser in connection with the Sale Transaction or released pursuant to the Sale Order.

124. "*Preserved Estate Claims Schedule*" means the schedule of Preserved Estate Claims, as the same may be amended, modified, or supplemented from time to time, which will be included the Plan Supplement and shall be in form and substance reasonably acceptable to the Debtors, the Committee and AIP.

125. "*Priority Non-Tax Claim*" means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim, DIP Claim, or Priority Tax Claim.

126.     "*Priority Tax Claim*" means any Claim of a Governmental Unit entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

127.     "*Pro Rata*" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests entitled to the same treatment in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interest under the Plan, as applicable.

128.     "*Professional*" means any Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 363 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been Allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

129.     "*Professional Fee Amount*" means (a) the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services prior to and as of the Confirmation Date, which estimates Professionals shall deliver to the Debtors as set forth in Article VI of the Plan, (b) *less* the smaller of (i) the aggregate amount of Pre-Closing Professional Fee Claims that remain unpaid as of the Confirmation Date, and (ii) the funds available in the Existing Professional Fee Escrow Account for the payment of Pre-Closing Professional Fee Claims.

130.     "*Professional Fee Claim*" means any Administrative Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

131.     "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

132.     "*Purchased Claims*" has the meaning ascribed to such term in the Asset Purchase Agreement.

133.     "*Purchaser*" means Strike Acquisition LLC (n/k/a Strike Holdco LLC) and its subsidiaries.

134.     "*Reinstated*," or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder to demand or receive payment of such Claim prior to the stated maturity of such Claim from and after the occurrence of a default.

135.     "*Related Party*" means, each solely in its capacity as such, with respect to any Entity (but, for the avoidance of doubt, excluding any Debtor), such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, assignors, participants,

19

successors, assigns, subsidiaries, affiliates, direct or indirect partners, limited partners, general partners, and members, principals, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors. Notwithstanding the foregoing, and for the avoidance of doubt, "Related Party" shall not include any Debtor, any Debtor's current or former Affiliates, or any Debtor's or its current or former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, assignors, participants, successors, assigns, subsidiaries, affiliates, direct or indirect partners, limited partners, general partners, and members, principals, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors; *provided*, that "Related Party" shall include each Transferred Employee (as such term is defined in the Asset Purchase Agreement).

136.    "*Released Party*" means each of the following in its capacity as such: (a) each Debtor; (b) each Debtor Related Party; (c) the Purchaser; (d) the AIP Parties; (e) the Committee and each Committee Member; (f) each Related Party of each Entity in clauses (c) through (e); (g) the DIP Agent; (h) the Prepetition Senior Loan Agent; and (i) the Prepetition Junior Loan Agent; *provided, however*, that each Entity that timely and properly opts out of the release in Article XII of the Plan shall not be a Released Party.

137.    "*Releasing Party*" means each of the following in its capacity as such: (a) each Debtor; (b) each Debtor Related Party; (c) the Purchaser; (d) the AIP Parties; (e) the Committee and each Committee Member; (f) each Related Party of each Entity in clauses (c) through (e); (g) the DIP Agent; (h) the Prepetition Senior Loan Agent; (i) the Prepetition Junior Loan Agent; and (j) each Holder of a Claim or Interest that does not timely and properly opt out of the release in Article XII of the Plan.

138.    "*Remaining Case*" means the Chapter 11 Case of Strike, LLC, which shall be designated as the lead case in accordance with Article VIII.K of the Plan.

139.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated November 22, 2021, by and among the Debtors and certain lenders party thereto from time to time, including all exhibits and attachments thereto.

140.    "*Sale Closing Date*" means February 14, 2022.

141.    "*Sale Documents*" means the Asset Purchase Agreement and all other documents executed and delivered or adopted by the Debtors and the Purchaser in connection with the Sale Transaction and/or pursuant to the Sale Order, including the Transition Services Agreement and the agreements governing the Escrow Accounts established in connection with the Sale Transaction.

142.    "*Sale Order*" means the *Order (I) Authorizing and Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, and Encumbrances, and Interests; (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; (III) Authorizing the Sale Transaction; and (IV) Granting Related Relief* [Docket No. 588].

143.    "*Sale Transaction*" means the sale of substantially all the assets of the Debtors to the Purchaser under section 363 of the Bankruptcy Code on the terms and conditions set forth in the Sale Documents, as approved by the Sale Order.

144.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as such schedules and statements may be amended, modified, or supplemented from time to time.

145.    "*Section 510(b) Claim*" means any Claim arising from: (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim, which Claim may only become Allowed by Final Order of the Bankruptcy Court.

146.    "*Secured Claim*" means any Claim, other than a DIP Claim, (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order entered by the Bankruptcy Court to the extent of the value of the creditor's interest in the Estate's interest in such property, or (b) subject to setoff pursuant to section 553 of the Bankruptcy Code to the extent of the amount subject to setoff, in each case as determined pursuant to section 506(a) of the Bankruptcy Code. For the avoidance of doubt, Prepetition Junior Loan Claims are not "Secured Claims."

147.    "*Securities Act*" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and the rules and regulations promulgated thereunder.

148.    "*Senior Loan Guaranty*" means an unconditional joint and several guaranty of the Prepetition Senior Loan Secured Obligations provided to the Senior Secured Parties under the Prepetition Senior Loan Documents by Strike HoldCo, and the other Guarantors (as defined in the Prepetition Senior Loan Agreement), which guaranty was secured by the Prepetition Senior Loan Collateral.

149.    "*Senior Secured Parties*" means the Prepetition Senior Loan Agent, the Prepetition Senior Loan Lenders, and the other Secured Parties (as defined in the Prepetition Senior Loan Agreement).

150.    "*Stay Modification Orders*" means the stipulations and agreed orders modifying the automatic stay entered by the Bankruptcy Court to permit the commencement or continuation of proceedings for the purpose of recovering from available proceeds under the Insurance Policies, including those entered by the Bankruptcy Court at Docket Nos. 552, 589, 701, 717, 718, 719, 835, 849, 930, 937, 983, 1004, and 1066.

151.    "*SGH ShellCo*" means SGH ShellCo LLC (f/k/a Strike Global Holdings, LLC).

152.    "*STH ShellCo*" means STH ShellCo LLC (f/k/a Strike HoldCo, LLC").

153.    "*STH ShellCo Interests*" means all Interests in STH ShellCo.

154.    "*Strike Global Holdings*" means Strike Global Holdings, LLC (n/k/a SGH ShellCo LLC).

155.    "*Strike HoldCo*" means Strike HoldCo, LLC (n/k/a STH ShellCo LLC).

156.    "*Strike Investment*" means Strike Investment, LLC.

157.    "*Tax Escrow Account*" means the escrow account established in connection with the Sale Transaction pursuant to the Escrow Agreement, dated February 14, 2022, between Strike HoldCo, LLC and Citibank, N.A., for the purpose of paying certain asserted tax claims.

158.    "*Third Party Disbursing Agent*" means an Entity designated by the Liquidating Trustee to act as a Disbursing Agent in accordance with the Liquidating Trust Agreement.

159.    "*Transition Services Agreement*" means the Transition Services agreement between the Debtors and the Purchaser dated February 14, 2022.

160.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 of the Bankruptcy Code.

161.    "*Unimpaired*" means, when used in reference to a Class, a Class of Claims or Interests that are unimpaired within the meaning of section 1124 of the Bankruptcy Code.

162.    "*Wind-Down*" means the continued existence of the Wind-Down Debtors after the Effective Date for limited purposes of performing the Debtors' obligations under the Transition Services Agreement and under this Plan.

163.    "*Wind-Down Debtors*" means, in each case as of the Effective Date, (a) Strike, LLC, (b) Delta Directional Drilling, LLC, (c) CIS ShellCo LLC (f/k/a Capstone Infrastructure Services, LLC), and (d) Crossfire, LLC.

164.    "*Wind-Down Manager*" means Dario Deferrari, and any successor thereto.

165.    "*Wind-Down Manager Reserve*" means a Cash reserve in an amount no greater than $100,000, which shall be established as part of the Liquidating Trust Reserve on the Effective Date for purposes of paying the fees and expenses incurred by the Wind-Down Debtors in connection with the Wind-Down.

## B.    Rules of Interpretation

For purposes of this Plan and Disclosure Statement: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Plan and Disclosure Statement in its entirety rather than to any particular portion of the Plan and Disclosure Statement; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (i) references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (j) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (k) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to

be followed by the words "without limitation;" and (l) any immaterial effectuating provisions may be interpreted by the Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan all without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

## C.      Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may or shall occur pursuant to the Plan is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

## D.      Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Wind-Down Debtor, as applicable.

## E.      Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## F.      Reference to the Debtors or the Wind-Down Debtors

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Wind-Down Debtors mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

## G.      Controlling Document

In the event of any inconsistency among this Plan and Disclosure Statement or any exhibit or schedule hereto, the provisions of this Plan and Disclosure Statement shall govern. In the event of any inconsistency among this Plan and Disclosure Statement and any document or agreement filed in the Plan Supplement, such document or agreement shall control. In the event of any inconsistency among this Plan and Disclosure Statement or any document or agreement filed in the Plan Supplement and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II.
## THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

## A.      The Debtors' Corporate History

Prior to the Sale Transaction, the Debtors provided pipeline, facilities, and infrastructure solutions to the energy sector. Partnering closely with clients in all major oil and gas basins in the United States, the Debtors delivered a full range of integrated engineering, construction, maintenance, integrity, and

specialty services to oil and gas companies. An organizational chart illustrating the Debtors' current corporate structure is attached hereto as **Exhibit B**.

**B.    The Debtors' Business Operations**

Prior to the Sale Transaction, the Debtors had approximately 2,500 employees and locations in all of the major oil and gas basins across the United States. The Debtors' operating revenue for the twelve-month period that ended 2020 was approximately $1 billion, and, as of the Petition Date, the Debtors had over $308,000,000 in aggregate original principal amount of prepetition funded debt obligations.

The Debtors' business was generally divided into two segments: (a) infrastructure and integrity services or "IIS" and (b) facilities and specialty services or "FSS." The Debtors also performed certain construction services for the renewable energy sector.

**1.    The Debtors' IIS Segment**

The Debtors' IIS segment was comprised of five regional business units and provided oil and gas companies with services that assisted them in constructing and maintaining the condition of their pipeline and related facility assets. Those services included predictive maintenance and inspection to identify any anomalies in the assets. The Debtors also provided their clients with repair and remediation services when such services were required.

**2.    The Debtors' FFS Segment**

The Debtors' FFS segment performed major capital projects and provides facilities, EPC, fabrication, directional drilling, industrial instrumentation, and electrical services for their customers. The major capital projects division of the Debtors' FFS segment focused on the construction of pipeline, pump and compressor stations, and other facilities used primarily in connection with the transportation of hydrocarbons (*i.e.* oil and natural gas). The Debtors specialized in congested corridor installation and complex installation techniques. They have significant experience working along the Texas gulf coast and all other major basins across the United States. The Debtors have performed some of the largest pipeline and facilities projects in the industry, including installing the largest diameter natural gas pipeline constructed in the last 50 years.

The services division of the FSS segment included three specialty brands under the Bolt, Delta Directional, and Pickett brands. Bolt specialized in industrial instrumentation and electrical contractor services. Delta Directional was a leader in horizontal drilling, boring, and fiber installation services for the pipeline and telecom industries. Finally, Pickett was a premium measurement and fabrication services company that specialized in the manufacturing of skid-mounted measurement equipment.

**3.    Renewable Energy Services**

The Debtors also leveraged the expertise of their IIS and FFS segments to perform work in the green energy and clean technology industries, including solar, wind and geothermal projects. For instance, the Debtors constructed a 100-megawatt solar farm facility from the ground up, prepared wind power collection sites for wind turbine installations, and provided geothermal energy pipeline solutions.

**C.        The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors' capital structure consisted of:  (a) the Prepetition Senior Loan Facility; (b) the Prepetition Junior Loan Facility; (c) certain capital lease obligations; and (d) a cash-collateralized undrawn letter of credit in an aggregate face amount of $2,000,000.

### 1.        Prepetition Senior Loan Facility

Strike, LLC, Delta Directional, and Strike Global Holdings, as borrowers, Strike Holdco, as Holdings, subsidiaries of Strike, LLC, as subsidiary guarantors, the Prepetition Senior Loan Lenders, and the Prepetition Senior Loan Agent were parties to the Prepetition Senior Loan Agreement, which provided for (a) the Prepetition ABL Facility and (b) the Prepetition Bridge Facility.

Pursuant to the Prepetition Senior Loan Documents, the Debtors granted the Senior Secured Parties liens on, and security interests in, the Prepetition Senior Loan Collateral to secure all Prepetition Senior Loan Secured Obligations and Strike Holdco, Strike, LLC (except as to its own obligations) and the other Guarantors (as defined in the Prepetition Senior Loan Agreement) provided to the Senior Secured Parties the Senior Loan Guaranty, which guaranty was secured by the Prepetition Senior Loan Collateral.

As of the Petition Date, the aggregate amount of revolving loans outstanding under the Prepetition ABL Facility and bridge loans outstanding under the Prepetition Bridge Facility was, collectively, approximately $84,100,000. All obligations under the Prepetition Senior Loan Facility were rolled-up into the DIP Facility pursuant to the DIP Order and satisfied in full pursuant to the Sale Order. *See* Art. IV.

### 2.        Prepetition Junior Loan Facility

Strike, LLC, as borrower, Strike Holdco, as guarantor, subsidiaries of Strike, LLC, as subsidiary guarantors, the Prepetition Junior Loan Lenders, and the Prepetition Junior Loan Agent are parties to the Prepetition Junior Loan Agreement.

Pursuant to the Prepetition Junior Loan Documents, the Debtors granted the Junior Lender Parties liens on, and security interests in, the Prepetition Junior Loan Collateral to secure the Prepetition Junior Loan Secured Obligations and Strike HoldCo, Strike, LLC (except as to its own obligations), and the other subsidiary guarantors provided the Junior Lender Parties the Junior Loan Guaranty, which guaranty was secured by the Prepetition Junior Loan Collateral.

As of the Petition Date, the aggregate amount of term loans outstanding under the Prepetition Term Loan Agreement was approximately $260,730,000. All of the collateral securing the Prepetition Junior Loan Facility was sold pursuant to the Sale Order and the obligations under the Prepetition Junior Loan Facility constitute unsecured obligations of the Debtors.

### 3.        Intercreditor Agreement

The rights and remedies of the Senior Secured Parties and the Junior Lender Parties, and the relative priorities of the Prepetition Liens on the Prepetition Collateral granted to the Prepetition Senior Loan Agent, on behalf of itself and the Senior Secured Parties, and to the Prepetition Junior Loan Agent, on behalf of itself and the Junior Lender Parties, respectively, are set forth in the Intercreditor Agreement by and between the Prepetition Senior Loan Agent, as Senior Lien Representative, and the Prepetition Junior Loan Agent, as Junior Lien Representative, and Strike Holdco and Strike, LLC, as Grantors, and

the other grantors.  The Intercreditor Agreement contains provisions governing the relationship between the Prepetition Senior Loan Agent and the other Senior Secured Parties and the Prepetition Junior Loan Agent and the other Junior Lender Parties, including with respect to the relative lien and payment priority of their respective interests in the Prepetition Collateral and set forth the parties' rights with regard to post-petition financing and other bankruptcy related rights.  The Intercreditor Agreement provides that the Prepetition Senior Liens were senior in all respects to the Prepetition Junior Liens on all Prepetition Collateral, and the Prepetition Junior Loan Secured Obligations were subordinated to the Prepetition Senior Loan Secured Obligations.

### 4.    Capital Leases

As of the Petition Date, Debtor Strike, LLC also was a party to certain capital lease agreements with respect to certain of its fleet and IT equipment.  The lessors and total outstanding amount with respect to each such capital lease, as of October 31, 2021, are listed in the table below.

| Counterparty | Outstanding Amount (October 31, 2021) |
|---|---|
| Merchants Automotive Group, Inc. | $14,024,360 |
| VFS Leasing Co. | $854,058 |
| Caterpillar Financial Services Corporation | $414,686 |
| Wells Fargo Financial Services | $77,572 |
| FlexTG Financial Services – MN | $71,586 |
| Canon Financial Services Inc. | $31,089 |

### ARTICLE III.
### EVENTS LEADING TO THE CHAPTER 11 FILINGS

#### A.    Major Project Challenges and Headwinds in the Oil and Gas Industry

The Debtors' business and revenue grew exponentially in the early 2000's and they quickly began to compete for, and win, some of the largest projects in the oil and gas industry.  During that period of rapid expansion, the Debtors experienced some growing pains due to the volatile nature of their major projects division, challenges with certain of their major projects, and the competitive and cyclical nature of the oil and gas industry.

In 2018, the Debtors encountered operational issues related to delays and cost overruns with respect to three significant projects undertaken by their major projects division.  Those issues were compounded in late 2019, when a confluence of factors caused the Debtors to experience a liquidity crunch.  *First*, one of the Debtors' projects with a major liquefied natural gas company became delayed due to, among other things, regulatory oversight from the Federal Energy Regulatory Commission and abnormally heavy rainfall in the Oklahoma area.  Those delays significantly affected the Debtors' cash flows from the end of 2019 through beginning of 2020.  *Second*, in March 2020, competition between Saudi Arabia and Russia caused the price of crude oil to drop precipitously resulting in reduced pipeline volumes.  As a result, many of the Debtors' customers opted to defer the non-critical capital and maintenance projects that drive the Debtors' business until volume rebounded.  *Third*, administrative delays with respect to the permitting of new pipeline construction reduced the anticipated demand for major capital projects work.  Finally, like most other businesses, the Debtors' projects were affected by the lock-down orders, work stoppages, and economic contraction in response to the COVID-19 pandemic.

26

The Debtors responded swiftly to those challenges, and the resulting drop in revenue, by eliminating structural costs and reducing head count. The Debtors also developed, and began to implement, a plan to reduce their fleet and other overhead to adjust to the lower volume of business. Ultimately, those cost saving measures were not adequate and the Debtors' financial issues placed in doubt their ability to comply with certain financial covenants under their Prepetition Junior Loan Agreement.

## B.  Amendment to the Prepetition Junior Loan Agreement and Mill Point Transaction

In September 2020, following arm's-length negotiations with their lenders, the Debtors entered into an amendment to the Prepetition Junior Loan Agreement to increase the leverage the Debtors could incur through the end of 2021 and provided the Debtors with the breathing room needed to attempt to stabilize their business. That amendment was contingent on the Debtors raising additional equity or subordinated debt to reduce the principal amount of the Prepetition Junior Loan Secured Obligations and provide the Debtors with liquidity to fund their operational restructuring initiatives and working capital needs.

In the winter of 2020-2021, the Debtors ran a competitive process to raise the required additional capital. On February 12, 2021, Mill Point Capital, LLC ("**Mill Point**") purchased $65,000,000 of preferred equity units (the "**Preferred Units**") in Strike Investment (a newly formed parent company of the Debtors) (the "**Mill Point Transaction**").

On the same date, the Debtors amended their Prepetition Senior Loan Documents and the Prepetition Junior Loan Documents to, among other things, substitute Strike HoldCo for Strike Capital, LLC ("**Strike Capital**") and release Strike Capital from its obligations under the Prepetition Senior Loan Documents and the Prepetition Junior Loan Documents. In addition, the Prepetition Senior Loan Agreement was amended to reduce the existing revolver commitments from the original maximum amount of $100,000,000  to $85,000,000.

Of the $65,000,000 raised by the sale of the Preferred Units, $40,000,000 was used to pay down the outstanding principal amount of the term loan obligations, approximately $10,000,000 was used to pay costs and expenses associated with the Mill Point Transaction, and the remaining approximately $15,000,000  was used to fund the Debtors' working capital needs and restructuring initiatives.

## C.  Operational Changes

The Debtors' performance, however, did not improve in the first three quarters of 2021 and the Debtors missed revenue targets by approximately 35% and 40% in the second and third quarters respectively. Given this top line deterioration, the additional capital from Mill Point proved insufficient to solve the Debtors' financial issues.

In late June 2021, the board of managers (the "**Board of Mangers**") of Strike Investment, the sole member of Strike HoldCo, determined to replace the Debtors' existing management. On July 1, 2021, Strike, LLC announced the appointment of Chuck Davison, Jr. as Chief Executive Officer and Sean Gore as Chief Financial Officer. The new management team executed a number of initiatives to improve the Debtors' culture, operations, and balance sheet, including (a) holding regular town hall meetings with employees, (b) implementing improved forecasting processes, (c) identifying and addressing issues with key customers, (d) defining and executing a reduction in the Debtors' fixed costs, (e) removing redundancies between business units (and in certain cases completely eliminating business units to streamline operations), and (f) implementing a number of leadership changes at certain of the Debtors' key business units.

27

**D.      Evaluation of Potential Restructuring Transactions and Negotiations with AIP**

Notwithstanding the Mill Point investment and the operational changes, the Debtors recognized that they would face severe liquidity issues in the fourth quarter of 2021.  The Debtors and their advisors entered into discussions with Mill Point regarding an additional capital infusion.  Ultimately, Mill Point determined that it would not provide additional capital to the Debtors.

On September 19, 2021, the Debtors appointed Anthony Horton and Patrick Bartels as independent managers (the "**Independent Managers**") to the Board of Managers in order to evaluate potential restructuring and refinancing transactions.  The Board of Managers established a restructuring committee consisting of the Independent Managers and delegated the sole authority to investigate, evaluate, negotiate, and enter into potential restructuring transactions on behalf of the Debtors to the Independent Managers.  The Independent Managers worked closely with the Debtors in all aspects of the restructuring negotiations.

In addition to Mill Point, the Debtors and their advisors contacted additional financing sources regarding potential rescue financing.  The AIP Parties, who at the time held more than two-thirds in amount of the outstanding obligations under the Prepetition Junior Loan Agreement, were the only parties that offered to provide that financing.  The AIP Parties subsequently purchased all of the outstanding obligations and became administrative agent under the Prepetition Senior Loan Agreement in order to resolve certain impending defaults that the incumbent asset-backed lenders were unwilling to waive.

Throughout the fall of 2021, the Debtors continued to engage in good faith negotiations with the AIP Parties to obtain the funding needed to preserve their businesses as a going-concern on the best possible terms and agree on the terms of a comprehensive restructuring.  On September 30, 2021, the Debtors and the AIP Parties entered into forbearance agreements with respect to certain defaults under the Prepetition Senior Loan Agreement and the Prepetition Junior Loan Agreement, which allowed the Debtors to avoid potential cash dominion under the Prepetition Senior Loan Agreement.  On October 18, 2021, the Debtors and the AIP Parties executed several agreements necessary to preserve liquidity and continue operations, including (a) a forbearance and amendment to the Prepetition Junior Loan Agreement, (b) a forbearance and amendment to the Prepetition Senior Loan Agreement that, among other things, provided the Debtors with the initial bridge loan in the aggregate amount of $20,000,000 to fund their working capital needs, and (c) an amendment to the Intercreditor Agreement subordinating the Prepetition Junior Loan to the Prepetition Senior Loan.

**E.      Execution of Restructuring Support Agreement**

On November 12, 2021, the Debtors and certain of the AIP Parties agreed to further amend the Prepetition Senior Loan Agreement to provide for an additional bridge loan necessary to fund the Debtors' businesses in an incremental principal amount not to exceed $20,000,000.  Immediately thereafter, the Debtors' investment banker, Opportune Partners, LLC ("**Opportune Partners**") commenced a marketing process for the sale of substantially all of the Debtors' assets.

On November 22, 2021, the Debtors and the AIP Parties entered into the Restructuring Support Agreement.  Under the Restructuring Support Agreement, (1) the AIP Parties agreed to provide a senior secured superpriority priming debtor-in-possession financing facility to fund the competitive sale process and the Chapter 11 Cases, including the orderly wind-down of the Debtors' estates pursuant to a chapter 11 plan of liquidation, on terms to be agreed upon by the Debtors and the AIP Parties; and (2) an affiliate of the AIP Parties agreed to enter into a stalking horse asset purchase agreement that would be subject to higher and better offers solicited through a court-approved bidding and auction process.

# ARTICLE IV.
# MATERIAL DEVELOPMENTS AND EVENTS OF THE CHAPTER 11 CASES

## A.    First Day Relief

On December 6, 2021, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas and several motions (the "**First Day Motions**") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and service providers, and other third parties following the commencement of the Chapter 11 Cases.  At a hearing on December 6, 2021, the Bankruptcy Court granted all of the relief initially requested in the First Day Motions on an interim or final basis.

The First Day Motions and all orders for relief granted in the Chapter 11 Cases can be viewed free of charge at https://dm.epiq11.com/case/strikellc.  A brief description of each of the First Day Motions and the evidence in support thereof is also set forth in the *Declaration of Sean Gore in Support of Debtors' Petitions and Requests for First Day Relief* [Docket No. 18].

## B.    DIP Financing

On December 8, 2021, the Debtors filed the *Debtors' Emergency Motion for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 79] (the "**DIP Motion**") seeking authority to enter into an approximately $112.6 million senior secured, priming, superpriority DIP Facility, consisting of (a) a fully committed new-money multiple-draw term loan facility in an aggregate principal amount of up to $26 million and (b) upon entry of the Final Order, a roll-up facility in the aggregate amount of not less than $86.6 million, comprised of a cash-less roll-up of all amounts outstanding under the Prepetition Senior Loan Facility. On December 8, 2021, the Bankruptcy Court entered an order approving the DIP Motion on an interim basis [Docket No. 87].

On January 3, 2022, the Bankruptcy Court held a hearing to approve the DIP Facility on a final basis.  In advance of the hearing, the Debtors, the Committee, and AIP began negotiating a consensual resolution to the Committee's outstanding objections to the DIP financing package [Docket No. 306]. The parties reached an agreement on the afternoon of the hearing, and on January 4, 2022, the Bankruptcy Court entered the DIP Order, as modified to reflect the consensual resolution and approving the DIP Motion on a final basis [Docket No. 348].

## C.    Appointment of Creditors' Committee

On December 15, 2021, the U.S. Trustee appointed five members to the Committee [Docket No. 174].  The Committee filed applications for, and the Bankruptcy Court entered orders approving, the retention of Akin Gump Strauss Hauer & Feld LLP, as counsel [Docket Nos. 450, 715], and FTI Consulting, Inc., as financial advisor [Docket Nos. 476, 716].  On January 27, 2022 and February 28, 2022, the U.S. Trustee filed the *Notice of Reconstituted Committee of Unsecured Creditors* [Docket Nos. 587 and 807].  The Committee is currently comprised of the following three members: (a) Mears Group, Inc., (b) CBK Transport, LLC, and (c) Aspen American Insurance Company.

**D.      Schedules and Statements**

On December 20, 2021, the Debtors filed their Schedules [Docket Nos. 224-235].  On March 22, 2022, the Debtors filed supplements to certain Schedules [Docket No. 897].

**E.      Retention of Professionals**

The Debtors filed applications for, and the Bankruptcy Court entered orders approving, the retention of various professionals to assist the Debtors in carrying out their duties as debtors in possession and to represent their interests in the chapter 11 cases, including: (a) White & Case LLP, as restructuring counsel [Docket Nos. 200, 465]; (b) Jackson Walker LLP, as restructuring co-counsel and conflicts counsel [Docket Nos. 363, 651]; (c) Opportune, LLP, as financial advisor [Docket Nos. 295, 495]; and (d) Opportune Partners, as investment banker [Docket Nos. 296, 496].

**F.      Bidding Procedures**

On the Petition Date, the Debtors filed a motion for entry of an order (a) establishing bidding and auction procedures (the "**Bidding Procedures**") for a competitive marketing and auction process, (b) approving the selection of Strike Acquisition LLC (n/k/a Strike Holdco LLC) as "stalking horse" bidder (the "**Stalking Horse Bidder**"), (c) authorizing the Debtors to enter into an asset purchase agreement with the Stalking Horse Bidder (the "**Stalking Horse Agreement**"), and (d) establishing a hearing to approve the sale of substantially all of the Debtors' assets to the bidder with the highest and best bid after completion of the Debtors' in-court sales process (including, if necessary, a live auction with all qualified bidders) [Docket No. 60] (the "**Sale Procedures Motion**").

On December 22, 2021, the Bankruptcy Court held a contested hearing to consider the Sale Procedures Motion focusing primarily on the Committee's position that the sale process should be extended and that the Committee should be afforded maximum time to conduct its investigation of the AIP Parties.  The Bankruptcy Court ultimately entered the Bidding Procedures Order, approving the Bidding Procedures and the sale timeline set forth below [Docket No. 279]:

| Deadline | Item |
|---|---|
| **December 29, 2021 at 4:00 p.m. (prevailing Central Time)** | Deadline to file Initial Assumption and Assignment Notice |
| **December 30, 2021 at 4:00 p.m. (prevailing Central Time)** | Deadline for the Debtors to file and serve Stalking Horse Agreement, Bidding Procedures, Sale Notice, and Publication Notice |
| **January 12, 2022 at 4:00 p.m. (prevailing Central Time)** | Deadline to file Assignment Objections, including Cure Objections and Adequate Assurance Objections |
| **January 19, 2022 at 4:00 p.m. (prevailing Central Time)** | Deadline for Objections to the Sale Transaction other than Assignment Objections |
| **January 24, 2022 at 11:59 p.m. (prevailing Central Time)** | Bid Deadline |
| **January 26, 2022 at 9:00 a.m. (prevailing Central Time)** | Auction Date |

| Deadline | Item |
|---|---|
| **January 27, 2022 at 11:00 a.m. (prevailing Central Time)** | Sale Hearing; *provided that* if no Qualified Bid, other than the Stalking Horse Bid, is received by the Auction Date, then the Sale Hearing shall occur on January 26, 2022 at 4:30 p.m. (prevailing Central Time) unless the Committee objects to the acceleration of the occurrence of the Sale Hearing to such date. |

## G.      Marketing Process

During the Debtors' prepetition and postpetition marketing process, Opportune Partners contacted 224 entities identified as potential purchasers, including 14 parties referred to the Debtors by the Committee.  Opportune distributed an opportunity summary (commonly known as a "teaser") to 194 of those potential purchasers.

The Debtors further provided interested parties that had executed non-disclosure agreements with a confidential information memorandum (the "**CIM**"), which summarized the Debtors' operations, described their services and products, and included historical and projected financial information.  The CIM also included illustrative descriptions of the Debtors' assets.  To allow potential purchasers to conduct due diligence and prepare bids, the Debtors established a virtual data room consisting of hundreds of documents, including the necessary information a potential purchaser would need to make a proposal.  Access to the virtual data room was promptly granted to each potential purchaser that requested and executed a non-disclosure agreement.  Overall, 44 potential buyers requested non-disclosure agreements and 24 signed a non-disclosure agreement and were granted access to diligence materials.

Opportune Partners also marketed the Debtors' various business units separately to generate bids that collectively could have provided the estates a higher and better return than the Stalking Horse Agreement.  A number of potential buyers expressed interest in purchasing certain of the Debtors' businesses.

During the marketing process, three potential bidders expressed significant interest in potentially bidding to buy substantially all the Debtors' assets.  Those potential bidders conducted extensive diligence, including participation in management presentations.  The Debtors, however, received no Qualified Bids (other than the Stalking Horse Bid) by the Bid Deadline.

## H.      Sale Hearing

Following the expiration of the Bid Deadline and pursuant to the Bidding Procedures Order, the Debtors filed the *Notice of Cancellation of Auction, Selection of Successful Bidder, and Scheduling of Sale Hearing* [Docket No. 533], which provided, among other things, that no Qualified Bids apart from the Stalking Horse Bid were received by the Bid Deadline and accordingly, announced the cancellation of the auction and designation of the Stalking Horse Bidder as the successful bidder.

The Stalking Horse Agreement included (a) a credit bid of AIP's DIP Claims and (b) the assumption of certain liabilities, including approximately $45 million in cure costs related to the assumption of certain of the Debtors' contracts and leases, and (c) the assumption of Post-Petition Trade Claims.[3]

---

[3]     This is intended as a general summary only and is qualified in its entirety by the actual terms of the Asset Purchase Agreement.

On January 27, 2022, the Bankruptcy Court held a hearing to approve the sale to the Stalking Horse Bidder in accordance with the terms of the Stalking Horse Agreement. In advance of the hearing, the Debtors, the Committee, and the AIP Parties, together with their respective representatives, agents, and professionals, engaged in extensive, arm's-length negotiations regarding the terms of a consensual resolution to the Chapter 11 Cases, including all potential claims, objections, and other disputes raised by the Committee in connection with AIP's liens and the Sale Transaction. Those negotiations resulted in the Global Settlement, discussed below. The Debtors similarly resolved all objections to the Sale Transaction and the assumption and assignment of certain executory contracts and unexpired leases through revisions to the Sale Order. On January 28, 2022, the Bankruptcy Court entered the Sale Order. The Sale Transaction closed on February 14, 2022 [Docket No. 728]. The Debtors believe the Sale Transaction included all collateral securing the Prepetition Junior Loan Facility.

## I.     Global Settlement

This Plan implements the Global Settlement among the Debtors, the Committee, and the AIP Parties. Pursuant to the Global Settlement, the terms of which are appended to the Sale Order, the AIP Parties agreed to, among other things, (a) remove certain limitations on the use of Cash under the DIP Order and Asset Purchase Agreement and remove any reversionary interest of the Purchaser in such Cash (other than in the Existing Professional Fee Escrow Account); (b) remove certain claims and causes of action as purchased assets under the Asset Purchase Agreement and allow the Debtors to transfer such claims to the Liquidating Trust to be prosecuted for the benefit of Liquidating Trust Beneficiaries; and (c) vote their Prepetition Junior Loan Claims to accept the Plan and waive the right to a recovery on account of their Prepetition Junior Loan Claims unless and until the recovery received by Holders of General Unsecured Claims satisfies the GUC Distribution Threshold Condition. The Global Settlement was implemented through amendments to the DIP Credit Agreement and the Asset Purchase Agreement (and a deemed amendment to the DIP Order) (copies of which are attached as exhibits to the Sale Order). In accordance with the Global Settlement, the Prepetition Junior Loan Claims are Allowed in an amount of no less than $260,730,000 against each of the Debtors.

Upon its appointment in these Chapter 11 Cases, the Committee undertook an extensive investigation pursuant to Bankruptcy Rule 2004 and the Committee's challenge rights pursuant to the DIP Order, including as it relates to lien perfection claims, claims challenging the prepetition secured debt of the AIP Parties, other preference claims and other avoidance actions, and other potential claims and causes of action. In an effort to understand the viability of those potential claims, the Committee analyzed documents contained in the data room established by the Debtors, reviewed documents and emails produced by the Debtors and the AIP Parties in response to Rule 2004 discovery requests, conducted a wide-ranging diligence and discovery session with the AIP Parties, and conducted discussions with creditors related to potential claims. As a result of the investigation, the Committee determined that the Global Settlement, which provides for a release of the AIP Parties and AIP Related Parties, but preserves other claims and causes of action for the benefit of unsecured creditors, was in best interests of the Debtors' estates and was likely to provide a better outcome for unsecured creditors than pursuing any claims or causes of action that are to be released or transferred in connection with the Plan and Global Settlement.

## J.     Independent Investigation of the Debtors' Directors and Officers

The Independent Managers retained Jackson Walker LLP (the "**Independent Investigators**") to perform an independent investigation into potential releases and exculpations of certain members of the Board of Managers and certain officers of the Debtors. As part of that investigation, the Independent Investigators were also asked to examine potential releases of Mill Point Strike Splitter L.P. and certain of

its agents and related entities. The Independent Investigators (under the direction of the Independent Managers) reviewed and assessed transactions identified by the Independent Managers, other members of the Board of Managers, and current officers to determine whether the Debtors possessed viable causes of action or claims of value related to such transactions. The Independent Investigators interviewed the Independent Managers, other members of the Board of Managers, and the Debtors' current officers. The Independent Investigators also interviewed the managing partner of Mill Point. As part of this process, the Independent Investigators collected more than 900,000 emails and documents from the Debtors' electronic databases. The Independent Investigators performed targeted review of the Debtors' documents and emails related to any transactions identified for particular investigation. Further, the Independent Investigators reviewed the email accounts of the officers and members of the Board of Managers proposed to be released. Throughout the investigation, the Independent Investigators consulted with the Independent Managers to refine the scope of the investigation and identify or eliminate potential claims of the Estates. The Independent Investigators also examined potential defenses to such claims, including prior releases and exculpations, and considered the cost of potential litigation. As a result of the investigation, the Independent Managers, in their reasoned business judgment, concluded that releases and exculpations of (i) Mill Point Strike Splitter L.P. and its equity holders, limited partners, and general partners, (ii) certain members of the Board of Managers (Anthony Horton, Patrick Bartels, Michael Duran, Dustin Smith, Aileen Wang, Knut Eriksen, Anthony Dowd, and Charles Davison, Jr.) and (iii) the Debtor Officers are warranted under the circumstances. The Independent Managers were unable to conclude based on the investigation that releases and exculpations are warranted for other current and former directors and officers.

## K.    Resolution of Customer Payment Dispute

Prior to the closing of the Sale Transaction, the Debtors faced a liquidity shortfall due to the lack of payment of certain amounts by certain of the Debtors' customers. Following extensive negotiations, the Debtors, the Committee and the Purchaser entered into the *Stipulation and Order with Respect to Sale Transaction Closing* [Docket No. 727], pursuant to which the Customer Payments are to be paid to the Debtors subject to the conditions therein.

## L.    Rejection and Assumption of Executory Contracts and Unexpired Leases

As part of the Sale Transaction, and pursuant to the assumption and assignment procedures approved under the Bidding Procedures Order, the Debtors assumed and assigned certain executory contracts and unexpired leases (collectively, the "**Assigned Contracts**") to the Purchaser pursuant to section 365 of the Bankruptcy Code.

On December 29, 2021, the Debtors filed and served the *Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale and Cure Costs* [Docket No. 309] (the "**Initial Assumption Notice**"), which listed certain Assigned Contracts that could have been assumed and assigned in connection with the Sale Transaction attached as Exhibit A thereto.

On January 27, 2022, the Debtors filed and served the *Supplemental Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale and Cure Costs* [Docket No. 571], which supplemented the Assigned Contracts attached to the Initial Assumption Notice and removed contracts that were not being assumed and assigned as part of the Sale Transaction.

On January 28, 2022, the Bankruptcy Court entered the Sale Order, which authorized the assumption and assignment of the Assigned Contracts attached as Schedule 1 thereto to the Purchaser or its applicable Affiliate in connection with the Sale Transaction. The Debtors were authorized and directed

to assume and assign the Assigned Contracts to the Purchaser or its applicable Affiliate upon the closing of the Sale Transaction, which occurred on February 14, 2022.

Following the entry of the Sale Order, the Debtors filed and served seven additional supplemental notices of assumption and assignment of executory contracts and unexpired leases in connection with the Sale Transaction [Docket Nos. 571, 637, 666, 702, 796, 863, and 904], which supplemented the Assigned Contracts listed on Schedule 1 of the Sale Order.

The Debtors have also filed ten omnibus motions [Docket Nos. 25, 35, 300, 541, 608, 617, 667, 732, 750, and 784] seeking to reject executory contracts and unexpired leases that were not among the contracts and leases designated to be assumed and assigned as part of the Sale Transaction.

## ARTICLE V.
## SUMMARY OF TREATMENT OF CLAIMS AND ESTIMATED RECOVERIES

The Plan classifies Claims and Interests into seven different Classes. The following chart provides a summary of the Debtors' estimate of the anticipated recoveries of each Class of Claims and Interests.[4] **The estimated recoveries in this chart do not include projected proceeds of or the cost of prosecuting the Preserved Estate Claims, which the Debtors do not believe is subject to estimation at this time and will likely increase the ultimate recoveries of the Class of General Unsecured Claims**. The treatment provided in this chart is for informational purposes only and is qualified in its entirety by Article VII of this Plan and Disclosure Statement.

| Class | Claims or Interests | Status | Voting Rights | Estimated Allowed Claims or Interests | Estimated Recoveries of Allowed Claims or Interests |
|---|---|---|---|---|---|
| 1 | Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0 | N/A |
| 2 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $0.3 million | 100% |

---

[4]   The amounts contained in this Article V represent the Debtors' estimate of the Claims that they believe will ultimately be Allowed based on their review of the filed Proofs of Claim and their books and records, and do not represent amounts actually asserted by Creditors in Proofs of Claim or otherwise. The Debtors have not completed their analysis of Claims in the Chapter 11 Cases and such Claims remain subject to objections as necessary or appropriate. Therefore, there can be no assurances of the exact amount of the Allowed Claims at this time. The actual amount of the Allowed Claims may be greater or lower than estimated. See Art. XVIII.

| Class | Claims or Interests | Status | Voting Rights | Estimated Allowed Claims or Interests | Estimated Recoveries of Allowed Claims or Interests |
|-------|---------------------|--------|---------------|----------------------------------------|------------------------------------------------------|
| 3 | General Unsecured Claims | Impaired | Entitled to Vote | $314.8 million to $357.4 million[5] | Non-AIP Parties: 1.2% to 2.7% plus Distributions, if any, from Liquidating Trust Proceeds, including proceeds of Preserved Estate Claims[6]<br><br>AIP Parties: 0% plus Distributions, if any, from Liquidating Trust Proceeds, including proceeds of Preserved Estate Claims, after the aggregate recovery to all other Allowed General Unsecured Claims exceeds 7.5% of such other Allowed General Unsecured Claims |
| 4 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Deemed to Accept/Reject) | $0 | 0% |
| 5 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | 0% |
| 6 | STH ShellCo Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | 0% |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) | $0 | 0% |

---

[5]   The high end of the range of estimated Allowed General Unsecured Claims includes approximately $26 million of Claims asserted in prepetition litigation against the Debtors that may be covered in whole or in part under the Debtors' Insurance Policies. To the extent such Claims are covered under applicable Insurance Policies, recoveries for other Holders of Allowed General Unsecured Claims under the Plan would increase in the high end scenario.

[6]   The projected recovery of 1.2% to 2.7% for Class 3 (Non-AIP Parties) assumes that there is approximately $2.1 million to $3.7 million available for distribution to the Liquidating Trust Beneficiaries after payment of all senior Claims and funding of anticipated costs to administer the Estates and the Liquidating Trust. It does not include amounts that may be recovered from the prosecution of the Preserved Estate Claims, including certain Causes of Action that are expected to be brought by Liquidating Trust against the Debtors' former officers and directors, or the cost of prosecuting the Preserved Estate Claims, which are currently unliquidated and not reasonably subject to estimation at this time. As a result, the actual recovery to Holders of General Unsecured Claims may be higher than set forth above.

## ARTICLE VI.
## ADMINISTRATIVE PROFESSIONAL AND PRIORITY TAX CLAIMS

Administrative Claims, Professional Fee Claims, and Priority Tax Claims are treated in accordance with section 1129(a)(9) of the Bankruptcy Code.  In accordance with section 1123(a)(1) of the Bankruptcy Code, such Claims are not designated as Classes of Claims.

**A.      Administrative Claims**

**1.      Filing of Administrative Claims**

The Holder of an Administrative Claim, other than a Professional Fee Claim, or an Administrative Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors and the Liquidating Trustee, notice of such Administrative Claim by no later than the Administrative Claims Bar Date.  Such notice must include, at a minimum, (a) the name of the Holder of the Claim, (b) the amount of the Claim, and (c) the basis of the Claim (including  the date on which services or goods were provided) and evidence thereof.

**HOLDERS WHO ARE REQUIRED BUT FAIL TO FILE AND SERVE A REQUEST FOR PAYMENT OF AN ADMINISTRATIVE CLAIM (OTHER THAN A PROFESSIONAL FEE CLAIM) BY THE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED FROM ASSERTING SUCH ADMINISTRATIVE CLAIM AGAINST THE DEBTORS, THE ESTATES, THE WIND-DOWN DEBTORS, THE LIQUIDATING TRUST OR THEIR RESPECTIVE PROPERTY, AND SUCH ADMINISTRATIVE CLAIM WILL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.  OBJECTIONS TO AN ADMINISTRATIVE CLAIM MUST BE FILED AND SERVED ON THE REQUESTING PARTY BY THE LATER OF (I) NINETY (90) DAYS AFTER THE FILING OF THE APPLICABLE REQUEST FOR PAYMENT OF ADMINISTRATIVE CLAIMS, SUBJECT TO EXTENSIONS SOUGHT BY MOTION FILED WITHIN SUCH PERIOD AND AS SUCH PERIOD MAY BE EXTENDED FROM TIME TO TIME, OR (II) SUCH OTHER PERIOD OF LIMITATION AS MAY BE SPECIFICALLY FIXED BY A FINAL ORDER FOR OBJECTING TO SUCH ADMINISTRATIVE CLAIMS.**

**2.      Payment of Allowed Administrative Claims**

The Purchaser has assumed and will pay, in accordance with the Asset Purchase Agreement, each Post-Petition Trade Claim pursuant to the terms and conditions of the particular transaction giving rise to the Post-Petition Trade Claim.  With respect to all other Administrative Claims, unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors (with the consent of the Committee), prior to the Effective Date, or the Liquidating Trustee, on or after the Effective Date, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to 28 U.S.C. § 1930) will receive, in full and final satisfaction, settlement, release, and discharge of, and, in exchange for such Administrative Claim, treatment as is consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or an amount of Cash equal to the unpaid amount of such Allowed Administrative Claims in accordance with the following: (a) if an Administrative Claim is Allowed as of the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty (60) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date

(other than Administrative Claims assumed by the Purchaser) in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court or as agreed with the Liquidating Trustee.

**B.    Statutory Fees**

On or before the Effective Date, all fees due and payable pursuant to section 1930(a) of the Judicial Code, including fees and expenses payable to the U.S. Trustee, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each applicable Debtor for each quarter (including any fraction thereof).   After the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 will be paid by the Liquidating Trustee from the Liquidating Trust Assets until the applicable Chapter 11 Case is converted, dismissed, or closed, whichever occurs first. Each of the Debtors shall file all monthly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the Liquidating Trustee shall file quarterly reports if and when they become due, in a form reasonably acceptable to the U.S. Trustee. The U.S. Trustee shall not be required to file any Administrative Claim in the Chapter 11 Cases and shall not be treated as providing any release under the Plan in connection therewith.

**C.    Professional Fee Claims**

    **1.    Professional Fee Escrow Accounts**

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the New Professional Fee Escrow Account with Cash equal to the Professional Fee Amount. The New Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. Except as discussed below, no liens, claims, or interests shall encumber the New Professional Fee Escrow Account or Cash held in the New Professional Fee Escrow Account in any way. Such funds shall not be considered property of the Debtors or their Estates or the Liquidating Trust; *provided*, that the Liquidating Trustee shall be the designated Entity authorized to release funds from the New Professional Fee Escrow Account in accordance with the governing escrow agreement.

The amount of (a) Pre-Closing Professional Fee Claims shall be paid in Cash to the applicable Professional from the funds held in the Existing Professional Fee Escrow Account and, solely to the extent the funds in the Existing Professional Fee Escrow Account are exhausted, the New Professional Fee Escrow Account, and (b) all other Professional Fee Claims shall be paid in Cash to the applicable Professional from the funds held in the New Professional Fee Escrow Account, in each case, as soon as reasonably practicable, but no later than three (3) Business Days after, such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Estates' and the Liquidating Trust's obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Existing Professional Fee Escrow Account or the New Professional Fee Escrow Account and, to the extent the funds available in such Escrow Accounts are exhausted, remaining Allowed Professional Fee Claims shall be payable from Cash held by the Liquidating Trust. When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in (x) the Existing Professional Fee Escrow Account shall revert to the Purchaser in accordance with the Existing

Professional Fee Escrow Agreement, and (y) the New Professional Fee Escrow Account shall be transferred to the Liquidating Trustee to be reserved or disbursed in accordance with the Plan and the Liquidating Trust Agreement.

### 2. Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed and served no later than forty-five (45) days after the Effective Date. Holders of Professional Fee Claims who fail to timely file and serve final fee application shall be forever barred from asserting such Professional Fee Claim against the Estates, the Estates, the Wind-Down Debtors, the Liquidating Trust or their respective property, and such Professional Fee Claim will be deemed discharged as of the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior applicable Bankruptcy Court orders.

### 3. Professional Fee Amount

Each Professional shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors or the Committee for the periods (a) from the Petition Date through the Sale Closing Date, and (b) from the Sale Closing Date through the Confirmation Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days prior to the anticipated Effective Date; *provided* that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by such estimates. If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided* that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The estimated Professional Fee Amount shall be utilized by the Debtors to determine the amount to be funded to the New Professional Fee Escrow Account on the Effective Date.

### 4. Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in this Plan, from and after the Confirmation Date, the Debtors and the Wind-Down Debtors and, subject to the terms of the Liquidating Trust Agreement, the Liquidating Trustee may employ and pay any professional for services rendered or expenses incurred after the Confirmation Date in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court and any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or any prior order of the Bankruptcy Court governing compensation of Professionals in seeking retention or compensation for services rendered after such date shall terminate.

## D. Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of an Allowed Priority Tax Claim and the Debtors, prior to the Effective Date with the consent of the Committee, or the Liquidating Trustee, on or after the Effective Date, each Holder of an Allowed Priority Tax Claim will receive, at the option of the Debtor or the Liquidating Trustee, as applicable, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Priority Tax Claim, (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim or (b) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the

Bankruptcy Code. A Priority Tax Claim that becomes Allowed after the Effective Date shall receive such treatment in accordance with the Plan as soon as reasonably practicable after such Priority Tax Claim becomes Allowed.

**E.  DIP Claims**

All DIP Claims (including all DIP Claims in respect of the DIP Roll-Up Facility) were satisfied in full and discharged in connection with the closing of the Sale Transaction. *See* Docket No. 588.  No Distributions shall be made on account of any Claims arising under the DIP Facility.

**ARTICLE VII.**
**CLASSIFICATION, TREATMENT, AND VOTING OF CLAIMS AND INTERESTS**

**A.  Classification of Claims and Interests**

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in <u>Article VI</u> of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving Distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  The votes of each Class shall be tabulated on a Debtor-by-Debtor basis.

**B.  Treatment of Claims and Interests**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different or less favorable treatment is agreed to by the Debtors with the consent of the Committee, prior to the Effective Date, or the Liquidating Trustee, on or after the Effective Date, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, (a) the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter, and (b) the Holder of a Claim or Interest that is not Allowed as of the Effective Date shall receive such treatment as soon as reasonably practicable after such Claim or Interest becomes Allowed.

1.  Class 1 – Secured Claims

    a.  *Classification*: Class 1 consists of any Secured Claims against any Debtor.

    b.  *Treatment*:  Each Holder of an Allowed Secured Claim shall receive, at the option of the Debtors with the consent of the Committee, prior to the Effective Date, or the Liquidating Trust, on or after the Effective Date:

        (i)  payment in full in Cash in an amount equal to its Allowed Secured Claim;

39

(ii)     the applicable Debtors' interest in the collateral securing such Holder's Allowed Secured Claim if and only if such collateral, as of the day prior to the Effective Date, was property of the Estate of the applicable Debtor; or

(iii)     such other treatment rendering such Holder's Allowed Secured Claims Unimpaired in accordance with section 1124 of the Bankruptcy Code.

c.     *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Holders of Allowed Secured Claims are not entitled to vote to accept or reject the Plan.

2.     Class 2 – Priority Non-Tax Claims

a.     *Classification*: Class 2 consists of any Priority Non-Tax Claims against any Debtor.

b.     *Treatment*: Each Holder of an Allowed Priority Non-Tax Claim shall receive, at the option of the Debtors with the consent of the Committee, prior to the Effective Date, or the Liquidating Trust, on or after the Effective Date:

(i)     payment in full in Cash in an amount equal to its Allowed Priority Non-Tax Claim; or

(ii)     such other treatment rendering such Holder's Allowed Priority Non-Tax Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

c.     *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Priority Non-Tax Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Allowed Priority Non-Tax Claims are not entitled to vote to accept or reject the Plan.

3.     Class 3 – General Unsecured Claims

a.     *Classification*: Class 3 consists of any General Unsecured Claims against any Debtor.

b.     *Treatment*: Each Holder of an Allowed General Unsecured Claim, except for the AIP Parties, shall only receive its Pro Rata share of the Class A Trust Interests without regard to the particular Debtor against which such Claim is Allowed. The AIP Parties shall only receive Class B Trust Interests on account of such AIP Parties' Prepetition Junior Loan Claims without regard to the particular Debtor against which such Claims are Allowed. For the avoidance of doubt, under the Plan, Holders of Allowed General Unsecured Claims shall only receive Liquidating Trust Interests as provided herein.

(i)     Class A Trust Interests shall entitle the Holders of such interests to receive their pro rata share of Liquidating Trust Proceeds pursuant to the terms of this Plan and the Liquidating Trust Agreement; *provided*, that (a) prior to satisfaction of the GUC Threshold Distribution Condition, such pro rata share shall be calculated as the proportion that a Class A Trust Interest bears to the aggregate amount of all Class A Trust Interests, and (b) after satisfaction of the GUC Threshold Distribution Condition, such pro rata share shall be calculated as the proportion that a Class A Trust Interest bears to the aggregate amount of all Class A Trust Interests and Class B Trust Interests distributed pursuant to the Plan.

(ii)    Class B Trust Interests shall entitle the Holders of such interests to receive a Distribution under the Plan to the extent that GUC Threshold Distribution Condition is satisfied, in which case, such Holders shall receive their pro rata share of Liquidating Trust Proceeds pursuant to the terms of this Plan and the Liquidating Trust Agreement; *provided*, that such pro rata share shall be calculated as the proportion that a Class B Trust Interest bears to the aggregate amount of all Class A Trust Interests and Class B Trust Interests distributed pursuant to the Plan.

(iii)    No Holder of an Allowed General Unsecured Claim shall receive a recovery that exceeds one hundred percent (100%) of the Allowed amount of its General Unsecured Claim.

c.    *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

4.    **Class 4 – Intercompany Claims**

a.    *Classification*: Class 4 consists of any Intercompany Claims against any Debtor.

b.    *Treatment*: On or after the Effective Date, each Allowed Intercompany Claim shall, at the option of the Liquidating Trustee, either be (a) Reinstated or (b) adjusted, set off, released, or otherwise addressed without any Distribution on account thereof.

c.    *Voting*: Class 4 is either (a) Unimpaired, in which case Holders of Allowed Intercompany Claims are conclusively deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or (b) Impaired and not receiving any Distribution, in which case Holders of Allowed Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan.

5.    **Class 5 – Intercompany Interests**

a.    *Classification*: Class 5 consists of any Intercompany Interests.

b.    Treatment: On the Effective Date, all Intercompany Interests other than Intercompany Interests in the Wind-Down Debtors shall be canceled, released,

41

and extinguished and of no further force or effect without any Distribution on account of such Intercompany Interests. The Intercompany Interests in the Wind-Down Debtors shall be reinstated for administrative purposes only, *provided* that the Interests in Strike, LLC shall be transferred to the Liquidating Trust as further provided herein.

 c. Voting: Class 5 is Impaired under the Plan. Holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

6. Class 6 – STH ShellCo Interests

 a. *Classification*: Class 6 consists of any STH ShellCo Interests.

 b. *Treatment*: Each Holder of an Allowed STH ShellCo Interest shall not be entitled to any Distribution on account thereof, and each such STH ShellCo Interest shall be deemed automatically cancelled, released, and extinguished without further action by the Debtors.

 c. *Voting*: Class 6 is Impaired under the Plan. Holders of STH ShellCo Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of STH ShellCo Interests are not entitled to vote to accept or reject the Plan.

7. Class 7 – Section 510(b) Claims

 a. *Classification*: Class 7 consists of any Section 510(b) Claims against any Debtor.

 b. *Treatment*: Each Holder of Section 510(b) Claims shall not be entitled to any Distribution on account thereof, and such Section 510(b) Claims shall be cancelled, released, and extinguished without further action by the Debtors and will have no further force or effect.

 c. *Voting*: Class 7 is Impaired under the Plan. Holders of Section 510(b) Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

## C. Reservation of Rights Regarding Claims

Except as otherwise provided in this Plan, nothing herein shall be deemed to affect, diminish, waive, relinquish, or impair the Debtors' or the Liquidating Trust's Causes of Action, including any legal or equitable rights or defenses, with respect to any Claim or Interest, including any Impaired, Reinstated, or Unimpaired Claim or Interest.

**D.      Separate Classification of Secured Claims**

Each Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Secured Claim, shall be treated as being in a separate Class for purposes of receiving a Distribution under this Plan.

**E.      Elimination of Vacant Classes**

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court or otherwise entitled to vote under the solicitation and voting procedures approved by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**F.      Voting Classes Where No Valid Votes Are Received**

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, then such Class shall be deemed to have accepted the Plan.

**G.      Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.[7]  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Liquidating Trustee, as applicable, reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**H.      Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, which may be on shortened notice, determine such controversy on or before the Confirmation Date.

**I.      Withdrawal of Plan; Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors, in consultation with the Committee, reserve the right, prior to the Confirmation Hearing, to withdraw the Plan with respect to any particular Debtor and seek confirmation of the Plan as to the remaining Debtors, pursue confirmation of the Plan with respect to any Debtor by providing alternative treatment to Holders of General Unsecured Claims at any such Debtor or seek to substantively consolidate the Debtors.

The Debtors request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify

---

[7]      The treatment of Class 3 – General Unsecured Claims accounts for the subordination of Claims under the Global Settlement.

the Plan in accordance with Article XIV of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE VIII.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.      Sources of Consideration for Plan Distributions**

On the Effective Date, the Debtors shall make Distributions in accordance with the Plan to Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims that are due and payable as of the Effective Date using Cash on hand.  Upon completion of such Distributions, on the Effective Date, the Debtors shall transfer to the Liquidating Trust all remaining Cash, the Preserved Estate Claims, and other Liquidating Trust Assets (if any); *provided* that the Liquidating Trustee shall use such Cash to fund the Liquidating Trust Reserve. After the Effective Date, the Liquidating Trustee shall make Distributions from the Liquidating Trust Assets on account of Allowed Claims in accordance with the Plan and Liquidating  Trust Agreement.

**B.      Recourse Solely Against the Liquidating Trust Reserve and Liquidating Trust Assets**

As of the Effective Date, each Claim against the Debtors shall be deemed satisfied, settled, and released as to the Debtors and the Wind-Down Debtors as provided with respect to each such Claim under this Plan and Disclosure Statement and, except as otherwise set forth in this Plan and Disclosure Statement or other Final Orders of the Bankruptcy Court, any Holder of an Allowed or Disputed Claim against the Debtors will have recourse solely to the assets of the Liquidating Trust, including the Liquidating Trust Reserve, as applicable, for the payment of any such Claim that is Allowed or becomes Allowed in accordance with the Plan and the Liquidating Trust Agreement; *provided, however*, the recovery provided to any Holder of a Claim that is Allowed or becomes Allowed shall be limited to and consistent with the terms of the Plan.

**C.      Wind-Down of the Debtors**

**1.      Dissolution of Certain Debtors**

On the Effective Date, each Debtor other than the Wind-Down Debtors shall be deemed dissolved without further order of the Bankruptcy Court or action by the Debtors, provided that the Wind-Down Debtors and Liquidating Trust are authorized to file certificates of cancellation and any other documents with the secretary of state in which such dissolved Debtor is formed or any other jurisdiction.

**2.      Continuation of the Wind-Down Debtors**

**a.      The Wind-Down Debtors**

The Wind-Down Debtors shall continue in existence on and after the Effective Date until, at the earliest, the expiration of the Transition Period (as defined in the Transition Services Agreement) solely for purposes of performing the Debtors' obligations under the Transition Services Agreement.  From and after the Effective Date, except to the extent necessary to comply with the Transition Services Agreement and to perform their obligations thereunder, the Wind-Down Debtors (a) shall be deemed to have withdrawn their business operations from any state in which the Wind-Down Debtors were previously conducting operations and shall not be required to file any document, pay any sum, or take any other

44

action in order to effectuate such withdrawal, and (b) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Without limiting the immediately preceding sentence, following the Effective Date, the Wind-Down Debtors continue to be authorized, empowered and directed to perform their respective obligations under the Transition Services Agreement and to consummate all of the transactions contemplated thereby. Notwithstanding anything to the contrary herein, the licenses and permits held by the Debtors as of the Effective Date shall remain property of the Wind-Down Debtors and be subject to the Transition Services Agreement. All Interests in Strike, LLC shall be transferred to, and shall vest in, the Liquidating Trust on the Effective Date.

<h4 style="text-align:center;">b.        The Wind-Down Manager</h4>

On the Effective Date, other than the Wind-Down Manager and any other personnel retained by the Wind-Down Debtors, all directors, managers, members, officers, and employees of the Debtors shall be deemed to have resigned. On and after the Effective Date, except as otherwise provided in this Plan and Disclosure Statement and the Liquidating Trust Agreement, the Wind-Down Manager shall serve as the Wind-Down Debtors' sole director, manager, officer, and member, as applicable, and shall have sole authority to act on behalf of the Wind-Down Debtors with respect to the Wind-Down. The certificates of formation, operating agreements, articles of incorporation, and other organizational or governing documents of the Wind-Down Debtors shall be deemed amended by the Plan to permit and authorize the appointment of the Wind-Down Manager in accordance with this Plan.

The Wind-Down Manager's compensation after the Effective Date (if any) shall be determined by the Debtors with the consent of the Committee and AIP prior to the Effective Date. The Wind-Down Manager shall have the authority to employ and compensate professionals or other personnel (including professionals and personnel employed by the Debtors prior to the Effective Date or pursuant to the Transition Services Agreement) on behalf of the Wind-Down Debtors with the consent of the Liquidating Trustee and without further application to or order of the Bankruptcy Court, *provided, however,* the compensation for such professionals and personnel shall be paid from the Wind-Down Manager Reserve. The Debtors or Wind-Down Debtors, as applicable, in consultation with the Committee and AIP, may purchase appropriate liability insurance for the Wind-Down Manager consistent with coverage provided to principals serving in similar capacities, which insurance policy shall be paid in full prior to the Effective Date in accordance with the Transition Services Agreement. To the extent the cost of such liability insurance is the responsibility of the Debtors or the Wind-Down Debtors, such cost shall be deducted from the Wind-Down Manager Reserve.

The Wind-Down Manager may resign by seeking approval from the Bankruptcy Court of its resignation and the appointment of a successor; *provided*, that such resignation shall only become effective upon entry of an order by the Bankruptcy Court approving such resignation and the appointment of a successor Wind-Down Manager who is reasonably acceptable to the Purchaser and the Liquidating Trustee. The Liquidating Trust may terminate and replace the Wind-Down Manager (including in his capacity as sole manager of Strike, LLC) on account of his willful misconduct, gross mismanagement or personal dishonesty, breach of fiduciary duty involving personal profit, willful violation of any law, rule, or regulation (other than traffic violations or similar offenses) or material breach of any provision of the Plan applicable to him.

Upon completion of the Wind-Down, the Wind-Down Debtors shall file a certification of completion in the Remaining Case and be deemed dissolved without further order of the Bankruptcy Court or action by the Wind-Down Debtors, provided that the Wind-Down Debtors or the Liquidating Trust shall be authorized to file certificates of cancellation and any other documents with the secretary of state in which such dissolved Wind-Down Debtor is formed or any other jurisdiction. Upon dissolution of

the Wind-Down Debtors, any remaining property of the Wind-Down Debtors shall automatically vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, or interests, subject to the terms of this Plan and the Liquidating Trust Agreement.  Notwithstanding the foregoing, the Wind-Down Debtors cannot be dissolved until expiration of the Transition Period (as defined in the Transition Services Agreement).

## D.  Liquidating Trust

### 1.  Creation of the Liquidating Trust

On the Effective Date, the Debtors and the Liquidating Trustee shall execute the Liquidating Trust Agreement and shall take all steps necessary to establish the Liquidating Trust in accordance with the Plan and for the benefit of the Liquidating Trust Beneficiaries.  Additionally, on the Effective Date, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidating Trust all of the Debtors' and Estates' rights, title, and interest in and to all of the Liquidating Trust Assets and, in accordance with section 1141 of the Bankruptcy Code, the Liquidating Trust Assets shall automatically vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, or interests, subject to the terms of this Plan and the Liquidating Trust Agreement.  For the avoidance of doubt, notwithstanding anything in this Plan and the Liquidating Trust Agreement to the contrary, the Liquidating Trust and Liquidating Trustee shall hold no greater rights in the Escrow Accounts than were held by the Debtors under the governing escrow agreements.  The act of transferring the Liquidating Trust Assets to the Liquidating Trust shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the Debtors.   The Liquidating Trust shall be governed by the Liquidating Trust Agreement to be filed with the Plan Supplement.

### 2.  Liquidating Trust Reserve

On the Effective Date, the Debtors shall fund the Liquidating Trust Reserve, which shall vest in the Liquidating Trust free and clear of all Claims, Liens, encumbrances, and charges.  The Liquidating Trust Reserve shall be held separately from the other Liquidating Trust Assets and shall be used to (a) fund the Wind-Down Manager Reserve, (b) satisfy all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims not paid by the Debtors on or prior to the Effective Date, (c) fund Disputed Claims Reserves relating to such Claims in clause (b) above, (d) fund the Prepetition Junior Loan Agent Fee Reserve, and (e) fund the Liquidating Trust Expenses. Any excess funds in the Liquidating Trust Reserve remaining after the payment or funding of amounts required under the preceding clauses (a)-(e) shall be deemed to be Liquidating Trust Proceeds and shall be available for Distribution to Liquidating Trust Beneficiaries in accordance with the Plan and Liquidating Trust Agreement.

The Liquidating Trustee shall transfer any net Cash proceeds from the Preserved Estate Claims to the Liquidating Trust Reserve until such time as (a) all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims have been paid in full or otherwise resolved or the Disputed Claims Reserves relating to such Claims have been fully funded, and (b) the Administrative Claims Bar Date and any other applicable Claims Bar Date has expired.

### 3.  Liquidating Trust Oversight Committee

On the Effective Date, the Committee, in consultation with the Debtors and AIP, may appoint a Liquidating Trust Oversight Committee to oversee the Liquidating Trust and Liquidating Trustee, subject to the terms of the Liquidating Trust Agreement.  If appointed on the Effective Date, the identities of the

Liquidating Trust Oversight Committee members will be disclosed in the Plan Supplement. If the Committee does not appoint the Liquidating Trust Oversight Committee on the Effective Date, the Liquidating Trust Beneficiaries shall have the right, subject to the terms of the Liquidating Trust Agreement, to establish the Liquidating Trust Oversight Committee at any time during the term of the Liquidating Trust Agreement.

### 4.   The Liquidating Trustee

The Liquidating Trust shall be administered by the Liquidating Trustee, who shall be appointed by the Committee, in consultation with the Debtors and AIP, and whose identity will be disclosed in the Plan Supplement. The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include, without limitation, the power to (a) hire and compensate professionals and advisors selected by the Liquidating Trustee in consultation with AIP (but without application to or order of the Bankruptcy Court) (b) object to and settle Disputed Claims after the Effective Date; (c) investigate, prosecute, and settle Preserved Estate Claims; (d) monetize the Liquidating Trust Assets; (e) make Distributions; and (f) close the Chapter 11 Cases, in each case in accordance with the Plan, the Liquidating Trust Agreement, and the Transition Services Agreement. The compensation of the Liquidating Trustee shall be governed by the Liquidating Trust Agreement.

### 5.   Substitution in Pending Legal Actions

On the Effective Date, the Liquidating Trust or the Liquidating Trustee, as applicable, shall be deemed to be substituted as the party to any litigation in which the Debtors are a party and shall be authorized, but not required, to file notices or other pleadings in such actions to effectuate its substitution for the applicable Debtor or Debtors. Such substitution shall not result in Holders of Claims, including litigation Claims, against the Debtors receiving greater rights in or against the Liquidating Trust than they are otherwise entitled to under the Plan and Liquidating Trust Agreement on account of such Claims.

### 6.   Tax Treatment; No Successor in Interest

The Liquidating Trust is intended to be treated for U.S. federal income tax purposes as a liquidating trust described in Treasury Regulation section 301.7701-4(d), subject to the Liquidating Trustee's ability to timely elect to treat any portion of the Liquidating Trust attributable to the disputed claims as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation section 1.468B-9. Pursuant to the Liquidating Trust Agreement, all relevant parties shall treat, for U.S. federal income tax purposes, the transfer of assets by the Debtors to the Liquidating Trust as (a) in part as the transfer of assets by the Debtors to the Holders of Allowed Claims, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such Holders to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust, and (b) in part as the transfer of assets by the Debtors to one or more Disputed Claims Reserves. Notwithstanding the foregoing provisions of this Article VIII.D. 6, in the event of a final determination under section 1313(a) of the Internal Revenue Code that the Liquidating Trust does not qualify as a grantor trust, the Liquidating Trust Beneficiaries and the Liquidating Trustee intend that the Liquidating Trust be treated as a partnership for U.S. federal income tax purposes and will take all actions reasonably necessary to cause the Liquidating Trust to be treated as such a partnership. See Article XIX for a more detailed discussion of the U.S. federal income tax treatment of the Plan.

### a.    Purpose of the Liquidating Trust

The Liquidating Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Accordingly, the Liquidating Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Assets, make timely Distributions to the Liquidating Trust Beneficiaries and not unduly prolong its duration. The Liquidating Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in this Plan or in the Liquidating Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidating Trustee expressly for such purpose.

The Liquidating Trust is intended to qualify as a "grantor trust" as governed by sections 671 through section 679 of the Internal Revenue Code for U.S. federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust. For all U.S. federal income tax purposes, all parties (including the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets (other than the assets in any Disputed Claims Reserves) by the Debtors to the Liquidating Trust, as set forth in the Liquidating Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims entitled to Distributions from the Liquidating Trust Assets, followed by a transfer by such Holders to the Liquidating Trust. As soon as practicable after the Effective Date, the Liquidating Trustee shall make a good faith determination of the fair market value of the Liquidating Trust Assets as of the Effective Date. This valuation shall be used consistently by all parties (including the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) for all U.S. federal income tax purposes. See Article XIX for a more detailed discussion of the U.S. federal income tax treatment of the Plan.

### b.    Disputed Claims Reserves

The Liquidating Trustee shall treat each Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment). The Liquidating Trustee shall be the administrator of the Disputed Claims Reserves within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all tax reporting and withholding required by the Disputed Claims Reserves. Pursuant to Treasury Regulation section 1.468B-9, no Holder of a Claim will be treated as the grantor or deemed owner of any asset reserved for Disputed Claims until such Holder receives or is allocated an interest in such asset. The Liquidating Trustee will file all Tax returns on a basis consistent with the treatment of the Liquidating Trust in part as a liquidating trust described in Treasury Regulation section 301.7701-4(d) (and grantor trust pursuant to Treasury Regulation section 1.671-l(a)) and in part as one or more Disputed Claims Reserves taxed as disputed ownership funds, and will pay all taxes imposed on the Liquidating Trust (including any taxes imposed on the portion of the Liquidating Trust treated as a "disputed ownership fund") from Liquidating Trust Assets (although any taxes imposed on any Disputed Claims Reserve will be paid out of such Disputed Claims Reserve and not out of general assets held by the Liquidating Trust). See Article XIX for a more detailed discussion of the U.S. federal income tax treatment of the Plan.

### 7.    Abandonment of Liquidating Trust Assets

Subject to the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trustee may abandon any Liquidating Trust Assets which the Liquidating Trustee determines in his or her reasonable discretion to be of *de minimis* value or burdensome to the Liquidating Trust.

8.      **Securities Exempt**

The Liquidating Trust Interests (including beneficial interests in the Liquidating Trust) to be distributed to the Liquidating Trust Beneficiaries pursuant to the Plan and Disclosure Statement shall not constitute "securities" under applicable law. Such interests shall not be transferrable (except under limited circumstances set forth in the Liquidating Trust Agreement) and shall not have consent or voting rights or otherwise confer on the Liquidating Trust Beneficiaries any rights similar to the rights of stockholders of a corporation in respect of actions to be taken by the Liquidating Trustee and the Liquidating Trust Oversight Committee (if any) in connection with the Liquidating Trust (except as otherwise provided in the Liquidating Trust Agreement). To the extent the Liquidating Trust Interests are considered "securities" under applicable law, the issuance of such interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act and any state or local law requiring registration. To the extent any "offer or sale" of the Liquidating Trust Interests may be deemed to have occurred, such offer or sale is under the Plan and in exchange for Claims against one or more of the Debtors, or principally in exchange for such Claims and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.

9.      **Dissolution of Liquidating Trust**

The Liquidating Trustee, the Liquidating Trust Oversight Committee, and the Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Liquidating Trustee determines, with the approval of the Liquidating Trust Oversight Committee (if any), that the pursuit of Preserved Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such Preserved Estate Claims; (b) the Liquidating Trustee has liquidated or abandoned all Liquidating Trust Assets; (c) all objections to the Disputed Claims have been resolved; (d) all Distributions required to be made by the Liquidating Trust under the Plan have been made; and (e) the Transition Period (as defined in the Transition Services Agreement) has expired, but in no event shall the Liquidating Trust be dissolved later than five (5) years after the Effective Date unless the Bankruptcy Court, upon a motion filed within the six-month period prior to the fifth anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed two years, including any prior extensions, without a favorable private letter ruling from the Internal Revenue Service or a "should" level opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the assets of the Liquidating Trust. Upon dissolution of the Liquidating Trust, and pursuant to the Liquidating Trust Agreement, any remaining Liquidating Trust Assets will be transferred (in the sole discretion of the Liquidating Trustee) in Cash or in-kind to the Liquidating Trust Beneficiaries unless the Liquidating Trustee determines that the value of such assets is insufficient to justify the administrative cost of effecting such transfer, in which case the Liquidating Trustee may distribute such assets to a charity of his or her selection.

E.      **Preservation of Preserved Estate Claims**

Except as provided in this Plan, the Confirmation Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidating Trust will retain and may enforce any Preserved Estate Claim that any Estate may hold against any Entity. The Liquidating Trust may pursue any such Preserved Estate Claims in accordance with this Plan and the Liquidating Trust Agreement. The Debtors' inclusion or failure to include or describe with sufficient specificity any Preserved Estate Claim on the Preserved Estate Claims Schedule shall not be deemed an admission, denial or waiver of any Preserved Estate Claim

that the Debtors or Estates may hold. The Debtors intend to preserve all Preserved Estate Claims. No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to the Preserved Estate Claims upon or after the entry of the Confirmation Order or the Effective Date of the Plan based on the Plan or the Confirmation Order, including any argument of waiver on account of the failure to include or describe with sufficient specificity any Preserved Estate Claim on the Preserved Estate Claims Schedule.

F.      **Access to Purchaser's Books and Records and Personnel**

On and after the Effective Date, the Purchaser and its subsidiaries shall provide commercially reasonable access to any relevant documents, information, or personnel reasonably requested by the Liquidating Trust in connection with carrying out its responsibilities under the Plan and Liquidating Trust Agreement, so long as such access is not disruptive to normal business operations.  The Wind-Down Debtors and the Purchaser shall preserve, for the benefit of the Liquidating Trust, all records and documents (including all electronic records or documents) related to any Preserved Estate Claims or Claims against the Debtors' Estates until such time as the Liquidating Trustee notifies the Purchaser in writing that such records are no longer required to be preserved or all necessary and available records and documents have been provided to the Liquidating  Trustee.

G.      **Corporate Action**

The entry of the Confirmation Order shall constitute authorization for the Debtors, the Wind-Down Debtors, and the Liquidating Trust, as applicable, to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including, without limitation (a) the establishment of the Liquidating Trust and the appointment of the Liquidating Trustee and Liquidating Trust Oversight Committee; (b) the transfer of assets to the Liquidating Trust; (c) the adoption, execution, delivery and implementation of all contracts, instruments, releases and other agreements or documents related to any of the foregoing; and (d) the other matters provided for under this Plan involving the corporate structure of the Debtors or corporate action to be taken by or required by the Debtors, the Wind-Down Debtors, or the Liquidating Trustee.  Notwithstanding any requirement under non-bankruptcy law, all matters provided for in the Plan or deemed necessary or desirable by the Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, including the dissolution of the Debtors shall be deemed to have occurred and shall be in effect on the Effective Date or as otherwise provided under the Plan, without any requirement of further action by the security holders, directors, managers, members or officers of the Debtors or the Wind-Down Debtors.

H.      **Intercompany Claim Settlement**

The entry of the Confirmation Order and the treatment accorded to Holders of General Unsecured Claims pursuant to this Plan shall constitute a settlement pursuant to section 1123(b)(3) of all disputes relating to the Intercompany Claims and the allocation of value among the various Debtors.

I.      **Cancellation of Notes, Instruments, Certificates, and Other Documents**

Except as provided in (a) this Plan, (b) the Confirmation Order, (c) any contract, instrument or other agreement or document entered into or delivered in connection with this Plan, (d) the Sale Order, or (e) any of the asset sales effectuated during the pendency of the Debtors' Chapter 11 Cases, on the Effective Date, all notes, instruments, certificates and other documents evidencing Claims against or Interests in the Debtors shall be deemed canceled and surrendered and of no further force and effect against the Debtors, the Wind-Down Debtors, or the Liquidating Trust without any further action on the part of the Debtors, the Wind-Down Debtors, or the Liquidating Trust.

J.      **Effectuating Documents; Further Transactions**

The Debtors, the Wind-Down Debtors, and the Liquidating Trust are authorized to and may issue, execute, deliver, file, or record such contracts, instrument, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of this Plan, in each case, in the name of and on behalf of the Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, without the need for any approvals, authorization or consents except those expressly required pursuant to this Plan. The Debtors and the Liquidating Trustee shall take all actions required under the agreements governing the Escrow Accounts for the assignment of the Debtors' rights and obligations thereunder to the Liquidating Trust.

K.      **Closing the Chapter 11 Cases**

As soon as practicable after the Effective Date, the Liquidating Trustee shall, and shall be authorized to, close the Chapter 11 Cases except for the Remaining Case, which shall be designated as the lead case. All contested matters and adversary proceedings relating to any of the Debtors, including objections to Claims, shall be filed, administered and adjudicated in the Remaining Case without the need to reopen any of the other Chapter 11 Cases; *provided* that for purposes of sections 546 and 550 of the Bankruptcy Code, the Chapter 11 Cases shall be deemed to remain open until the Remaining Case is closed.

The Liquidating Trustee shall be permitted to close the Remaining Case only after: (a) the Administrative Claims Bar Date and the Claims Bar Dates have expired; (b) all Disputed Claims have become Allowed or disallowed, withdrawn, or otherwise settled in accordance with the Plan; and (c) all Debtors and the Wind-Down Debtors have been dissolved in accordance with the Plan.

## ARTICLE IX.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      **Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code effective as of the Confirmation Date, unless such Executory Contract or Unexpired Lease: (a) is subject to a motion to reject, assume, or assume and assign pending as of the Effective Date; (b) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; (c) is an Insurance Policy; or (d) is a Sale Document.

**B.      Claims Arising from the Rejection of Executory Contracts and Unexpired Leases**

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan, if any, must be filed within thirty (30) days after entry of the Confirmation Order. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to this Plan not filed within such time shall be disallowed, forever barred, estopped, and enjoined from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Wind-Down Debtors, the Liquidating Trust, or property of any of the foregoing, without the need for any objection by the Debtors or the Liquidating Trust or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of any Executory Contract and Unexpired Leases shall constitute and be treated as General Unsecured Claims. Nothing herein shall constitute an extension of any Claims Bar Date otherwise applicable to a Claim arising from an Executory Contract or Unexpired Lease that was previously rejected by the Debtors.

**C.      Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into or assumed by the Debtors after the Petition Date that are not assigned to the Purchaser or the Liquidating Trust (or have not otherwise previously been assigned pursuant to a Final Order prior to the Effective Date) shall be considered repudiated by the Debtors as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must file a proof of Claim within thirty (30) days of the Effective Date in accordance with this Plan or have their rights forever satisfied, settled, released, and discharged.

**D.      Insurance Policies**

Notwithstanding anything to the contrary in the Plan and Disclosure Statement, the Confirmation Order, the Liquidating Trust Agreement, any bar date notice or claim objection, any other document related to any of the foregoing or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, confers Bankruptcy Court jurisdiction, or requires a party to opt out of any releases):

1.      nothing, including the dissolution or winding down of the Debtors, the vesting of the Insurance Policies (other than the D&O Liability Policies) with the Liquidating Trust, or any relief permitting any Entity to pursue proceeds available under any Insurance Policy granted pursuant to this Plan and Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court, shall impair, expand, or modify (i) the rights and obligations of the Debtors (and their Estates), the Liquidating Trust, or named insureds, or any of the Insurers under any of the Insurance Policies, (ii) the coverage and benefits provided under the Insurance Policies, (iii) the obligations, terms and conditions of the Insurance Policies or the Chubb Stipulation, or (iv) the enforceability of the Insurance Policies;

2.      on and after the Effective Date, (i) all Insurance Policies (other than the D&O Liability Insurance Policies) which identify any of the Debtors as first named insureds or as a counterparty thereto shall vest unaltered in their entireties with the Liquidating Trust; (ii) any non-monetary obligations together with direct or derivative rights, interests, claims, entitlements or Causes of Action of any Debtor under any of the Insurance Policies, including the rights of any Debtor to proceeds, indemnification, reimbursement, contribution, benefits, or other payment arising out of or under the Insurance Policies,

shall vest with the Liquidating Trust; (iii) the Liquidating Trust shall have standing to pursue the Insurance Coverage Rights; and (iv) the Liquidating Trust shall be authorized to perform any administrative responsibilities on behalf of any named insured under the Insurance Policies;

3.      to the extent the Debtors (or, after the Effective Date, the Liquidating Trust) seek coverage or payment under any Insurance Policies, the Insurers shall be entitled to payment or reimbursement in full from the applicable Debtor or Liquidating Trust, to the extent required under the applicable Insurance Policy and applicable non-bankruptcy law, in the ordinary course and without the need for the Insurer to file a Proof of Claim, Cure Claim, or a request, application, claim, proof or motion for payment or alliance of any Administrative Claim; *provided*, that any and all rights of the Debtors and Liquidating Trust to dispute such payments or reimbursements are expressly reserved; *provided, however,* without limiting the Insurance Coverage Rights granted to the Liquidating Trust, the Liquidating Trust shall not be an "insured" or "named insured" (as defined or described in the Insurance Policies) under the Insurance Policies at any time without the express written consent of the applicable Insurer; provided, for the avoidance of doubt, any amounts payable on account of Claims covered by Insurance Policies (i) up to the applicable self-insured retention amount under such applicable Insurance Policy or (ii) that exceed the aggregate amount payable under such applicable Insurance Policy, shall be treated in accordance with the Plan; and

4.      the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XII.E of the Plan and Disclosure Statement, if and to the extent applicable, shall be deemed lifted without further order of this Bankruptcy Court, solely to permit: (i) the Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) claims where a claimant has been granted relief to proceed with their claims pursuant to this Plan and Disclosure Statement, the Confirmation Order, or by any other order of the Bankruptcy Court, and (B) all costs in relation to each of the foregoing; and (ii) Insurers to take other actions relating to the Insurance Policies in the ordinary course of business (including effectuating a setoff) permitted under the Insurance Policies and/or applicable non-bankruptcy law; *provided, however,* that each applicable Insurer is prohibited from, and the Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to the Chapter 11 Cases, this Plan or any provision within this Plan, including the treatment or means of liquidation set out within this Plan for any insured Claim or Causes of Action.

E.      **Warranties**

Notwithstanding the rejection of any of the Debtors' Executory Contracts under this Plan or by separate motion, the Debtors and the Liquidating Trust, as applicable, shall retain and be entitled to enforce any warranties provided to, or for the benefit of, the Debtors under applicable federal or state law; *provided*, however, for the avoidance of doubt, that the foregoing does not include any warranties provided to, or for the benefit of, the Debtors pursuant to any contract that has been assumed and assigned (other than to the Liquidating Trust) by order entered by the Bankruptcy Court on or before the Effective Date. For the avoidance of doubt, the Debtors are not assuming any warranty obligations of the Debtors or otherwise provided by the Debtors under any Executory Contract that is rejected pursuant to this Plan or otherwise rejected in the Chapter 11 Cases.

F.      **Reservation of Rights**

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or the Liquidating Trust has any liability thereunder. If there is a dispute regarding

53

whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Liquidating Trustee shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

# ARTICLE X.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided in this Article X, Distributions to be made on the Effective Date to Holders of Allowed Claims shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable. In the event a Distribution shall be due on a day other than a Business Day, such Distribution shall instead be made on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on Distributions, regardless of whether such Distributions are delivered on or at any time after the Effective Date.

### B.    Disbursing Agent

All Distributions shall be made by the applicable Disbursing Agent. Each Disbursing Agent may serve without bond. The Disbursing Agent shall be empowered to: (a) make all Distributions contemplated in this Plan; (b) effectuate all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; (c) employ or contract with other entities to assist in or make the Distributions; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

Except on account of gross negligence or willful misconduct, the Disbursing Agent shall have no (a) liability to any party for actions taken in accordance with this Plan or in reliance upon information provided to it in accordance with this Plan or (b) obligation or liability to any party who does not hold a Claim against the Debtors or who does not otherwise comply with the terms of this Plan.

### C.    Disputed Claims Reserves

On the Effective Date or as soon thereafter as is practicable, the Liquidating Trustee shall establish and administer Disputed Claims Reserves for each Class or category, in the case of unclassified Claims, of Disputed Claims in accordance with the Liquidating Trust Agreement. The Liquidating Trustee shall reserve, in Cash and Liquidating Trust Interests, as applicable, the expected recovery that such Disputed Claim would receive if it were ultimately determined to be an Allowed Claim (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing) with respect to each such Disputed Claim. For the avoidance of doubt, the Liquidating Trustee may administer the Disputed Claims Reserves by book entry.

The Cash and Liquidating Trust Interests in the Disputed Claims Reserves shall be held in trust for the benefit of the Holders of Claims ultimately determined to be Allowed in each applicable Class or category, in the case of unclassified Claims. Each Disputed Claims Reserve shall be closed by the Liquidating Trust when all Distributions required to be made under this Plan to the Holders of Disputed Claims that subsequently become Allowed have been made in accordance with the terms of this Plan and no Disputed Claims relating to such Disputed Claims Reserve remain. Upon closure of a Disputed Claims Reserve, all Cash and other property held in that Disputed Claims Reserve shall be reserved or distributed in accordance with the Plan and the Liquidating Trust Agreement.

D.      **Special Rules for Distributions to Holders of Disputed Claims**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties, no partial payments and no partial Distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order. When a Disputed Claim becomes an Allowed Claim, the Holder of such Allowed Claim shall thereupon become entitled to receive the Distributions in respect of such Claim, the same as though such Claim had been an Allowed Claim on the Effective Date.

E.      **Delivery of Distributions**

Distributions to Holders of Allowed Claims will be made by a Disbursing Agent: (a) at the addresses set forth on the respective Proofs of Claim filed by Holders of such Claims or request for payment of Administrative Claim, as applicable; (b) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim filed with the Bankruptcy Court; (c) at the addresses set forth in any written notice of address change filed with the Bankruptcy Court or delivered to the Disbursing Agent after the date of filing of any related Proof of Claim; (d) at the addresses reflected in the Debtors' Schedules or otherwise in the Debtors' books and records if no proof of Claim has been filed and the Disbursing Agent has not received a written notice of a change of address; or (e) if clauses (a) through (d) are not applicable, at the last address directed by such Holder after such Claim becomes an Allowed Claim. Notwithstanding the foregoing, Distributions to Holders of Junior Term Loan Claims shall be made at the addresses provided to the Disbursing Agent by the Prepetition Junior Loan Agent or, if no such address is provided, to the Prepetition Junior Loan Agent in accordance with preceding sentence.

F.      **Undeliverable and Unclaimed Distributions Held by Disbursing Agent**

1.      **Holding of Undeliverable Distributions**

If any Distribution to a Holder of an Allowed Claim is returned to the Disbursing Agent as undeliverable, no further Distributions will be made to such Holder unless and until the Disbursing Agent is notified by written certification of such Holder's then-current address. Nothing contained in the Plan shall require the Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

2.      **After Distributions Become Deliverable**

On each Distribution Date, the applicable Disbursing Agent will make all Distributions that became deliverable to Holders of Allowed Claims after the most recent Distribution Date; *provided, however*, that the Disbursing Agent, in its sole discretion, may establish a record date prior to each Distribution Date, such that only Claims Allowed as of the record date will participate in such periodic Distribution. Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right to postpone a Distribution Date, if it determines a Distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable.

3.      **Failure to Claim Undeliverable Distributions**

Any Holder of an Allowed Claim that does not assert its right to an undeliverable Distribution prior to the date that is six months after the applicable Distribution Date will be forever barred from asserting any such Claim against the Debtors, the Estates, the Wind-Down Debtors, the Liquidating Trust, and their respective property. In such cases, (a) the undeliverable Distributions shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and vest in the Liquidating Trust, (b) the Allowed Claims with respect to such Distributions shall be automatically cancelled, (c) the right of

the Holders entitled to those Distributions shall be discharged and forever barred, and (d) the undeliverable Distributions shall be reserved or distributed in accordance with the Plan and the Liquidating Trust Agreement.

## G.   Time Bar to Cash Payments

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 120 days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Liquidating Trustee by the holder of the Allowed Claim to whom such check was originally issued. If any Holder of an Allowed Claim holding an un-negotiated check does not request reissuance of that check within six months after the date the check was mailed or otherwise delivered to the Holder, the entitlement of the Holder regarding such un-negotiated check and the funds represented thereby shall be released and the Holder thereof shall be forever barred, estopped and enjoined from asserting any claim with respect to such un-negotiated check and the funds represented thereby against any of the Debtors, the Wind-Down Debtors, the Liquidating Trust, or the Liquidating Trustee. In such cases, any Cash held for payment on account of such un-negotiated check shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest in the Liquidating Trust and be deemed to be a Liquidating Trust Asset.

## H.   Manner of Payment

Unless a Holder of an Allowed Claim and the Disbursing Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## I.   Fractional Distributions

Whenever any payment of Cash of a fraction of a dollar pursuant to the Plan would otherwise be required, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars or less being rounded down.

## J.   Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

## K.   *De Minimis* Distributions

The Liquidating Trust Agreement shall set forth the minimum threshold for making a cash Distribution and provide additional details as necessary regarding any *de minimis* Distributions.

## L.   No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any

Claims, including any Disputed Claims, against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

## M.  Allocation Between Principal and Accrued Interest

To the extent that any Allowed Claim entitled to a Distribution from Liquidating Trust Assets consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts, if any.

## N.  Single Satisfaction

In no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100 percent of the underlying Allowed Claim plus applicable interest, if any.

## O.  Compliance with Tax Requirements

In connection with this Plan, to the extent applicable, the Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate. The Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens and encumbrances.

The Disbursing Agent may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim provide any information necessary to allow the Disbursing Agent to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority.  If the Disbursing Agent makes such a request and the Holder fails to comply before the date that is 180 days after the request is made or such later date agreed to by the Disbursing Agent in writing in its discretion, then the Disbursing Agent, in its sole discretion, may (a) make a Distribution net of any applicable withholding, or (b) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the Debtors or the Liquidating Trust, as applicable, for Distribution on account of other Allowed Claims and the Claim of the Holder originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court.  Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

**P.**     **Claims Paid or Payable by Third Parties**

    **1.**     **Claims Paid by Third Parties**

To the extent that the Holder of an Allowed Claim receives payment on account of such Claim by an Entity other than the Disbursing Agent, the Liquidating Trustee shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of such third-party payment, and such Claim shall be disallowed or deemed satisfied, as applicable, to the extent of such third-party payment without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.  Any Holder of a Claim that receives full or partial payment on account of such Claim from an Entity that is not the Disbursing Agent shall provide notice of the date and amount of such payment to the Liquidating Trustee within five (5) Business Days of receipt of such payment.  Such Holder shall repay, return, or deliver to the Liquidating Trustee any Distribution received on account of the portion of its Claim that was satisfied by such third-party payment.

    **2.**     **Claims Payable by Insurance Carriers**

No Distribution shall be made on account of an Allowed Claim that is payable pursuant to one of the Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Insurers agrees to satisfy in full or in part a Claim, then immediately upon such Insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Claims and Noticing Agent without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

    **3.**     **Applicability of Insurance Policies**

Except as otherwise provided herein, payments on account of Claims covered by Insurance Policies shall be in accordance with the provisions of any applicable Insurance Policy and applicable law. Except as otherwise expressly provided herein, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, the Liquidating Trust, or any Entity may hold against any other Entity, including Insurers, under any Insurance Policy, nor shall anything contained herein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

Notwithstanding anything in this Plan to the contrary, (a) nothing in this Plan, including the injunctions set forth in Article XII.E, shall impair the rights of any Entity under the Stay Modification Orders to commence or continue a proceeding against the Debtors or the Liquidating Trust in accordance with the terms thereof; (b) nothing in this Plan shall impair the rights or insurance coverage available to the Wind-Down Manager pursuant any D&O Liability Insurance Policy to the extent such rights or coverage exist under any applicable D&O Liability Insurance Policy; and (c) an Entity shall be permitted to commence and/or continue a proceeding against the Debtors or the Liquidating Trust for purposes of pursuing proceeds available under any insurance policy to the extent such Entity obtains the prior written consent, as filed (on no less than ten (10) calendar days' notice) with and approved by an order of the Bankruptcy Court, of the Debtors (prior to the Effective Date) or the Liquidating Trustee (on or after the Effective Date), in which event the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XII.E, to the extent applicable, shall be deemed lifted to permit such actions in accordance with such written consent.

## Q.     Setoffs and Recoupments

Except as otherwise expressly provided herein, the Debtors and the Liquidating Trust may, but shall not be required to, set off against or recoup from any Claims of any nature whatsoever that the Debtors or the Liquidating Trust may have against the Holder, but neither the failure to do so nor the Allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Liquidating Trust of any such Claim they may have against the Holder of such Claim.  In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or the Liquidating Trust, as applicable, unless (a) the Debtors and the Committee, prior to the Effective Date, or the Liquidating Trustee, on or after the Effective Date, have consented; or (b) notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise, such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date and a Final Order granting such Motion has been entered.

## ARTICLE XI.
## PROCEDURES FOR RESOLVING DISPUTED CLAIMS AND INTERESTS

## A.     Allowance of Claims

After the Effective Date, the Liquidating Trustee shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or satisfied, settled, released, and discharged under this Plan. All settled Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no proof of Claim has been timely filed by the applicable Claims Bar Date, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

## B.     Prosecution and Settlement of Disputed Claims

Except as otherwise specifically provided in this Plan, the Debtors in consultation with the Committee, before the Effective Date, and the Liquidating Trustee, after the Effective Date, subject to the Liquidating Trust Agreement, shall have the sole authority to: (a) file, withdraw or litigate to judgment, objections to Claims; (b) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court (other than a Professional Fee Claim); and (c) direct the Claims and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order, or approval by the Bankruptcy Court.  Notwithstanding the foregoing, (i) the consent of the Committee and AIP shall be required for the settlement or compromise of Disputed Claims, for purposes of Distribution, by the Debtors before the Effective Date and (ii) the consent of the Purchaser shall be required with respect to any objection, settlement, or compromise of Disputed Post-Petition Trade Claims; *provided*, that the Purchaser shall only have a consultation right with respect to objections to Post-Petition Trade Claims on the basis that such liabilities are not obligations of the Debtors or the Liquidating Trust, and Purchaser's rights to contest that a Claim is a Post-Petition Trade Claim are reserved.

Objections to Claims and Interests must be filed and served by no later than the Claims Objection Deadline (subject to such being extended by an order of the Bankruptcy Court). For the avoidance of doubt, the Claims Objection Deadline may be extended on multiple occasions.

## C.     Amendments to Proofs of Claim

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim or Proof of Claim may not be amended without the prior authorization of the Bankruptcy Court or the Liquidating Trustee, and any such amended Claim or Proof of Claim filed after the Effective Date without proper authorization by the Bankruptcy Court shall be deemed disallowed in full and expunged without any further action or notice to the Bankruptcy Court; *provided*, that the filing of an unauthorized amendment shall not affect the underlying Claim or Proof of Claim.   Nothing in this paragraph shall remove any claimant's ability to seek leave from the Bankruptcy Court to amend a Claim or Proof of Claim.

## D.     Pending Objections

To the extent the Debtors have filed objections to Claims that remain pending as of the Effective Date, the Liquidating Trust shall be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court.   To the extent the Debtors have filed objections to Post-Petition Trade Claims that remain pending as of the Effective Date, the Purchaser shall be substituted as the objecting party without further action of the parties or order of the Bankruptcy Court; *provided*, that the Debtors' and the Liquidating Trust's rights to argue that a Claim is a Post-Petition Trade Claim for which the Purchaser is liable  are reserved.

## E.     Post-Petition Trade Claims

Any Proof of Claim or request for payment of an Administrative Claim that has been filed with respect to a Post-Petition Trade Claim shall be deemed to be an asserted obligation of the Purchaser and disallowed as against the Debtors, the Wind-Down Debtors, the Estates and the Liquidating Trust without further action of the parties or the Bankruptcy Court.   Notwithstanding anything to the contrary in this Plan, the Purchaser shall have (a) any and all rights and defenses that the Debtors had with respect to any Post-Petition Trade Claims immediately prior to the Sale Closing Date, and (b) the sole authority to (i) file, withdraw or litigate to judgment objections to Post-Petition Trade Claims; *provided*, that the Debtors and Liquidating Trust, as applicable, shall be authorized to file objections to Post-Petition Trade Claims on the basis that such liabilities are not obligations of the Debtors or the Liquidating Trust, and (ii) settle or compromise any Post-Petition Trade Claim without any further notice to or action, order or approval by the Bankruptcy Court.

## F.     Adjustment to Claims Without Objection

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Debtors, prior to the Effective Date, or the Liquidating Trustee, on or after the Effective Date, without having to file an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

## G.     Estimation of Claims

The Debtors, prior to the Effective Date, and the Liquidating Trustee, on or after the Effective Date, may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any Party previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.   In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute the maximum limitation on such

Claim for all purposes under the Plan (including for purposes of Distribution) until the resolution of any such Disputed Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

**H.      Disallowance of Claims and Interests**

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless such late filed Claim has been deemed timely filed by a Final Order at or before the Confirmation Hearing.**

## ARTICLE XII.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

**A.      General Settlement of Claims and Interests**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any Distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed non-severable from each other and from all other terms of the Plan. Notwithstanding any other provision of this Plan, the Debtors shall not receive a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code.

**B.      Releases by the Debtors**

**Except as otherwise specifically provided in the Plan, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors and their Estates, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the Debtors or their Estates, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor, the Estates, or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Mill Point Transaction, the Chapter 11 Cases, the formulation, preparation,**

61

dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Mill Point Transaction, the Restructuring Support Agreement and related prepetition transactions, the Plan and Disclosure Statement, the Sale Transaction, the Sale Documents, the DIP Facility, the DIP Documents, or any contract, instrument, release, or other Plan Document, agreement, or document created or entered into in connection with the Mill Point Transaction, the Restructuring Support Agreement, the Plan and Disclosure Statement, the Chapter 11 Cases, the DIP Facility, the Sale Transaction, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this **Article XII.B** do not release: (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (c) any rights or obligations under any Sale Document.

## C.    Releases by the Releasing Parties

Except as otherwise specifically provided in the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the Releasing Parties, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or noncontingent, in law, equity, contract, tort or otherwise, including any derivative claims, asserted or assertable on behalf of the Debtors or their Estates, as applicable, that such Entity would have been legally entitled to assert, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Mill Point Transaction, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Mill Point Transaction, the Restructuring Support Agreement and related prepetition transactions, the Plan and Disclosure Statement, the Sale Transaction, the Sale Documents, the DIP Facility, the DIP Documents, or any contract, instrument, release, or other Plan Document, agreement, or document created or entered into in connection with the Mill Point Transaction, the Restructuring Support Agreement, the Plan and Disclosure Statement, the Chapter 11 Cases, the DIP Facility, the Sale Transaction, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the

releases set forth in this <u>Article XII.C</u> do not release: (a) any Released Party from any Causes of Action arising from or related to any act or omission by such Released Party that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; (b) any post-Effective Date obligations of any party or Entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (c) any rights or obligations under any Sale Document.

**D.    Exculpation**

Except as otherwise specifically provided in the Plan, to the fullest extent permissible under applicable law, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, the Chapter 11 Cases, the Debtors (including management, ownership, or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, filing, pursuit, performance, or consummation of the Chapter 11 Cases (including, without limitation, any payments, distributions or transfers in connection therewith), the Restructuring Support Agreement and related prepetition transactions, the Plan and Disclosure Statement, the Sale Transaction, the Sale Documents, the DIP Facility, the DIP Documents, or any contract, instrument, release or other Plan Document, agreement, or document created or entered into in connection with the Plan and Disclosure Statement, the Chapter 11 Cases, the DIP Facility, the Sale Transaction, Confirmation, or Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, any payments, distributions or transfers made by the Debtors during the Chapter 11 Cases, any settlement or agreement in the Chapter 11 Cases or upon the negotiations regarding or concerning any of the foregoing or any other act or omission, transaction, agreement, event, or other occurrence relating to the foregoing taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and Distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**E.    Injunction**

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Liquidating Trust, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind

against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action unless such Holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.

**F.      Reimbursement or Contribution**

If the Bankruptcy Court Allows or disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of Allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (a) such Claim has been adjudicated as non-contingent; or (b) the relevant Holder of a Claim has filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**G.      Release of Liens**

**Except (a) with respect to Liens securing an Allowed Secured Claim, to the extent elected by the Debtors or the Liquidating Trust, and (b) as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, (i) all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, (ii) each of the Debtors, the Wind-Down Debtors, the Liquidating Trust, or their delegates are authorized to file such documents as may be necessary to effectuate, or reflect in the public record, the release and discharge such Liens and interests, (iii) the Holders of any such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors, the Wind-Down Debtors, or the Liquidating Trust, as applicable, to reflect or effectuate such releases and discharges, and (iv) all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests to be released shall revert to the Liquidating Trust. The Holder (and any other Person) of any mortgages, deeds of trust, Liens, pledges, or other security interests that are to be released is entitled to rely on this __Article XII.G__ for the purpose of executing and delivering any documentation related to, or otherwise assisting with, the release or discharge of any such mortgages, deeds of trust, Liens, pledges, or other security interests.**

**ARTICLE XIII.**
**CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE**

**A.      Conditions Precedent to Confirmation**

The following are conditions precedent to confirmation of the Plan:

1.      the Bankruptcy Court shall have entered an order or orders: (a) approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code; (b) authorizing the solicitation of votes with respect to the Plan; (c) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan; (d) confirming and giving

effect to the terms and provisions of the Plan; (e) determining that all applicable tests, standards and burdens in connection with confirmation of the Plan have been duly satisfied and met by the Debtors and the Plan; (f) approving the Plan Documents; and (g) authorizing the Debtors to execute, enter into and deliver the Plan Documents, and to execute, implement and to take all actions otherwise necessary or appropriate to give effect to the transactions and transfer of assets contemplated by the Plan and the Plan Documents; and

2.    the Confirmation Order, the Plan Documents and the Plan shall each be in form and substance reasonably acceptable to the Debtors, the Committee, and AIP.

## B.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article XIII.C of the Plan:

1.    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably acceptable to the Debtors, the Committee, and AIP, and such order shall not be subject to a stay nor have been rescinded, vacated, or reversed on appeal;

2.    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3.    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Plan and shall be in form and substance acceptable to the Debtors, the Committee, and AIP;

4.    the Liquidating Trust shall have been formed and the Liquidating Trustee shall have been appointed;

5.    the New Professional Fee Escrow Account shall be created and funded as set forth herein;

6.    the Debtors shall have received the Customer Payments;

7.    all statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full;

8.    no orders, decisions, or injunctions have been issued by a Governmental Unit prohibiting, modifying, or conditioning any transaction contemplated herein; and

9.    the Debtors shall have purchased liability insurance for the Wind-Down Manager in accordance with Article VIII.C.2.b of the Plan.

## C.    Waiver of Conditions Precedent

The Debtors, with the prior written consent (which may be provided by electronic mail and shall not be unreasonably withheld) of the Committee and, with respect to the condition to the Effective Date set forth in Article XIII.B.3, AIP, may waive any of the conditions to the Effective Date set forth in Article XIII.B.2, 3, 6, 8, and 9 of the Plan at any time without notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court and without any formal action other that proceeding to consummate the Plan.

### D.     Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur and circumstances make clear that the Effective Date will not occur, then (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

## ARTICLE XIV.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### A.     Modification of Plan

The Debtors reserve the right, with the consent of the Committee (such consent not to be unreasonably withheld), to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and the Bankruptcy Rules and, as appropriate, not resolicit votes on such modified Plan; *provided* that any such modification to the Plan shall also require the consent of AIP to the extent such modification adversely affects the AIP Parties or their treatment under the Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan one or more times after Confirmation and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### B.     Effect of Confirmation on Modifications

Entry of the Confirmation Order shall constitute approval of all modifications to the Plan occurring after the solicitation thereof pursuant to section 1127(a) of the Bankruptcy Code and a finding that such modifications to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### C.     Withdrawal of Plan

The Debtors reserve the right, in consultation with the Committee, to withdraw the Plan before the Confirmation Date and to file subsequent Chapter 11 plans; *provided* that any such subsequent Chapter 11 plans shall be consistent with the Global Settlement.  If the Debtors withdraw the Plan, or if the Confirmation Date or the Effective Date does not occur, then (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto will be null and void in all respects; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

# ARTICLE XV.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Claim or Interest and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests, notwithstanding any arbitration or similar provision in any contract to the contrary; *provided* that, in the case of a Post-Petition Trade Claim, the Bankruptcy Court's jurisdiction shall be non-exclusive;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to Distributions under the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Chapter 11 Cases and (b) the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

7.      enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      grant any consensual request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

67

10.     hear, determine, and resolve any adversary proceedings, motions, cases, matters, controversies, suits, disputes, or Causes of Action in connection with or in any way related to the Chapter 11 Cases or the management of the Debtors, including: (a) with respect to the releases, injunctions, and other provisions contained in Article XII of the Plan, including entry of such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions; (b) that may arise in connection with the Consummation, interpretation, implementation, or enforcement of the Plan, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan; (c) related to section 1141 of the Bankruptcy Code; or (d) with respect to Preserved Estate Claims that may be instituted by the Liquidating Trustee.

11.     to hear, determine, and resolve all adversary proceedings, motions, cases, matters, controversies, suits, disputes, or Causes of Action that may relate to, impact upon or arise in connection with the Plan Documents or their interpretation, implementation, enforcement or consummation (including, but not limited to, any disputes concerning the Liquidating Trust);

12.     to extend the initial stated term of the Liquidating Trust in accordance with this Plan and the applicable Liquidating Trust Agreement;

13.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

15.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

16.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

17.     hear and determine matters concerning exemptions from state and federal registration requirements in accordance with section 1145 of the Bankruptcy Code;

18.     enter an order closing the Chapter 11 Cases, including the Remaining Case;

19.     enforce all orders previously entered by the Bankruptcy Court; and

20.     hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XVI.
## MISCELLANEOUS PROVISIONS

## A.     Immediate Binding Effect

Subject to Article XIII hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidating Trustee, the Liquidating Trust Oversight Committee, and any and all Holders of Claims or Interests, parties in interest, Entities, and their respective successors and assigns.

**B.      Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Liquidating Trustee, the Liquidating Trust Oversight Committee, and all Holders of Claims receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**C.      Dissolution of Official Committee**

Upon the Effective Date: (a) the Committee shall be dissolved except with respect to the matters set forth in clause (c) of this sentence; (b) the current and former members of the Committee and their respective representatives shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases except with respect to the matters set forth in clause (c) of this sentence; and (c) the Professionals retained by the Committee will not be entitled to assert any Professional Fee Claims for any services rendered or expenses incurred after the Effective Date in their capacity as Professionals for the Committee, except to the extent necessary to (i) participate with respect to any appeals of the Confirmation Order, (ii) prepare, file and, if necessary, litigate final applications for compensation and (iii) object to final fee applications filed by other Professionals.

**D.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan and the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

**E.      Exemption from Transfer Taxes**

Pursuant to and to the extent permitted under section 1146 of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under or in connection with the Plan, including the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax. Such transfers include, without limitation, the transfer of the Liquidating Trust Assets to the Liquidating Trust, and any transfer, sale or exchange of the assets that is the subject of a motion or notice pursuant to section 363 of the Bankruptcy Code filed by the Debtors before the Effective Date regardless of the date the transaction is approved by the Court or the date such transfer, sale or exchange closes. To effectuate the terms of this Article XVI.E, the Bankruptcy Court may enter any order necessary or appropriate to implement this provision of the Plan.

**F.      Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### G.    Service of Documents

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Wind-Down Debtors or the Liquidating Trust shall be served on:

| | |
|---|---|
| **Wind-Down Debtors** | **Strike, LLC**<br>Attn: Dario Deferrari<br>460 Wildwood Forest Dr<br>Suite 350N<br>Spring, TX 77380<br>Phone: (713) 389-2486<br>Email: dario.deferrari@strikeusa.com |
| **Counsel to the Wind-Down Debtors** | **Jackson Walker LLP**<br>Matthew D. Cavenaugh (TX Bar No. 24062656)<br>Kristhy Peguero (TX Bar No. 24102776)<br>Genevieve Graham (TX Bar No. 24085340)<br>1401 McKinney Street, Suite 1900<br>Houston, Texas 77010<br>Telephone: (713) 752-4200<br>Facsimile: (713) 752-4221<br>Email: mcavenaugh@jw.com<br>Email: kpeguero@jw.com<br>Email: ggraham@jw.com |
| **Liquidating Trust** | At the notice address set forth in the Liquidating Trust Agreement |
| **Counsel to the Liquidating Trust** | At the notice address set forth in the Liquidating Trust Agreement |
| **United States Trustee** | **Office of the United States Trustee for the Southern District of Texas**<br>515 Rusk Street, Suite 3401<br>Houston, Texas 77002 |

### H.    Term of Injunctions or Stays

**Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.**

## I.      Entire Agreement

Except as otherwise indicated, and without limiting the effectiveness of the Sale Order, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## J.      Plan Supplement Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to Debtors' counsel or by downloading such exhibits and documents from the Debtors' restructuring website at https://dm.epiq11.com/StrikeLLC, or the Bankruptcy Court's website, available via PACER.

## K.      Non-Severability

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable; *provided*, that at the request of the Debtors, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted provided that any such alteration or interpretation shall be acceptable to the Debtors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without consent from the Debtors; and (c) nonseverable and mutually dependent.

## L.      Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their representatives will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

## M.      Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan and Disclosure Statement or papers filed with the Bankruptcy Court prior to the Confirmation Date.

## ARTICLE XVII.
## CONFIRMATION OF THE PLAN

### A.      Voting Procedures and Acceptance

The Debtors are providing copies of this Plan and Disclosure Statement and Ballots to all known Holders of Impaired Claims who are entitled to vote on the Plan. The procedures for voting on the Plan were approved the Court by Order entered on April 5, 2022. [Docket No. 950].

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a chapter 11 plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest, each as more specifically set forth in section 1124 of the Bankruptcy Code.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

Claims in Classes 1 and 2 are not Impaired under the Plan, and, as a result, the Holders of such Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and their votes will not be solicited.

Claims in Class 3 are Impaired under the Plan. Such Class (with respect to each applicable Debtor) will have accepted the Plan if the Plan is accepted by at least two-thirds in amount and a majority in number of the Claims in such Class (other than any Claims of creditors designated under section 1126(e) of the Bankruptcy Code) that have voted to accept or reject the Plan.

Claims in Classes 4 and 7 and the Interests in Classes 5 and 6 are Impaired and will not receive a Distribution under the Plan. Pursuant to section 1126(g) of the Bankruptcy Code, the Holders of Claims and Interests in such Classes are deemed to reject the Plan and their votes will not be solicited.

### B.      Statutory Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.   The Debtors believe that: (a) the Plan satisfies or will satisfy all of the applicable requirements of chapter 11 of the Bankruptcy Code; (b) the Debtors have complied or will have complied with all of the applicable provisions of the Bankruptcy Code; and (c) the Plan has been proposed in good faith.   The confirmation requirements under section 1129 of the Bankruptcy Code include the following:

1.      The Plan complies with the applicable provisions of the Bankruptcy Code.

2.      The Debtors have complied with the applicable provisions of the Bankruptcy Code.

3.  The Plan has been proposed in good faith and not by any means forbidden by law.

4.  Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

5.  Each Holder of an Impaired Claim or Interest either has accepted the Plan or will receive or retain under the Plan, on account of the Claims or Interests held by such entity, property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.

6.  Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such Class pursuant to section 1129(b) of the Bankruptcy Code.

7.  Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims and Priority Non-Tax Claims will be paid in full, in cash, on the Effective Date, or as soon as reasonably practical thereafter, and Priority Tax Claims will be paid in regular installments over a period ending not later that five (5) years after the Petition Date, of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claims.

8.  At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

9.  Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan except to the extent contemplated under the Plan.

10.  All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

## C.    The Best Interest of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires, as a condition to confirmation, that each holder of a claim or an equity interest in an impaired class either (a) vote to accept or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to Holders of each Impaired Class of Claims and Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if these Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code.  To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if each of the Debtors' Chapter 11 Cases were converted to a chapter 7 case and the assets of such Debtors' Estates were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of an Impaired Claim or Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the Distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as compensation of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in their Chapter 11 Cases (such as compensation of attorneys, financial advisors and accountants) that are allowed in the chapter 7 cases, litigation costs, and claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases.

In these cases, notwithstanding the difficulty in quantifying recoveries to Holders of Allowed Claims, as described below, the Debtors believe that anticipated recoveries to each Class of Impaired Claims under the Plan implies a greater or equal recovery to Holders of Claims in Impaired Classes than the recovery available in a chapter 7 liquidation. On February 14, 2022, the Debtors consummated the Sale Transaction, thereby selling substantially all of their assets as provided by the Asset Purchase Agreement and approved by the Sale Order. The Plan provides that all of the Liquidating Trust Assets will vest in and be transferred to the Liquidating Trust. The Liquidating Trustee will distribute the proceeds from the Liquidating Trust Assets to the Holders of Allowed Claims in accordance with the priorities set forth in the Plan and the Liquidating Trust Agreement. Attached as **Exhibit A** to this Plan and Disclosure Statement is a liquidation analysis. Importantly, due to the difficulty in estimating recoveries from litigation claims, the liquidation analysis does not include any amounts that may be recovered from the prosecution of the Preserved Estate Claims, including certain Causes of Action that are expected to be brought by the Liquidating Trust against the Debtors' former officers and directors, or the cost of prosecuting the Preserved Estate Claims.

Because the Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is similar to the estimates of the liquidation contemplated by the Plan. However, the Debtors and the Committee believe this Plan provides at least three benefits that will increase the value realized by unsecured creditors as compared to a chapter 7 liquidation. First, under the Plan, the AIP Parties are waiving their right to receive a recovery on account of their approximately $175 million General Unsecured Claim until such time as the other Holders of Allowed General Unsecured Claims have received an agreed upon threshold recovery. The Debtors and the Committee believe this waiver provides a significant benefit to other Holders of General Unsecured Claims that will increase their initial recoveries under the Plan. Second, the Debtors and the Committee anticipate there would be additional costs, expenses, and time that would be incurred replacing existing management and professionals in a chapter 7 case, which would further diminish Estate assets, delay the prosecution of the Preserved Estate Claims, and delay distributions to creditors. Finally, the Debtors and the Committee believe the prosecution of Preserved Estate Claims in a focused and effective manner by the Liquidating Trustee will maximize the value of the Preserved Estate Claims. Moreover, the Liquidating Trustee will likely have more flexibility to construct fee arrangements with professionals designed to maximize the value of the Preserved Estate Claims. Notably, because the benefits of the second and third points above are difficult to quantify, the Debtors have not accounted for such benefits or ascribed any value to the Preserved Estate Claims in the liquidation analysis attached hereto as **Exhibit A**. Accordingly, the Debtors and the Committee believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

## D.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find, as a condition to confirmation, that confirmation is not likely to be followed by the Debtors' liquidation or the need for further financial reorganization, unless that liquidation or reorganization is contemplated by the Plan. The Plan clearly complies with this requirement because all of the Debtors' remaining assets will be distributed pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the

Debtors' Estates will no longer exist to be subject to future reorganization or liquidation. Since the Plan contemplates a liquidation and provides for a waterfall in accordance with the priority of Allowed Claims, the feasibility requirement is satisfied. The Debtors believe that sufficient funds will exist to make all payments required by the Plan.

## E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it if the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the Debtors' request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 1.    No Unfair Discrimination

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.    Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens; or (b) each holder of a secured claim receive the indubitable equivalent of its secured claim.

Unsecured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirements that either: (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior equity interest.

Equity Interests: The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either: (a) the plan provides that each holder of an equity interest in such class receives or retains under the plan on account of that equity interest property of a

75

value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

Since Classes 4 through 7 are deemed to reject the Plan, the Debtors seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. The Debtors believe that the Plan satisfies the foregoing requirements for nonconsensual confirmation of the Plan. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan and any exhibits thereto or the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

## ARTICLE XVIII.
## PLAN-RELATED RISK FACTORS

### A.      General Bankruptcy Law and Plan Related Considerations

#### 1.      Parties in Interest May Object to the Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created certain Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.      Failure to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or may be forced to liquidate under chapter 7 of the Bankruptcy Code. The terms of any such alternative chapter 11 plan would likely not provide treatment as favorable to the Holders of Allowed Claims as those proposed in the Plan.

#### 3.      The Debtors May Not Be Able to Secure Confirmation of the Plan or Confirmation May Be Delayed

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will

confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of the Disclosure Statement or whether the solicitation procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the solicitation procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.

The Confirmation and Consummation of the Plan also are subject to certain other conditions. No assurance can be given that these conditions will be satisfied.

If the Plan is not confirmed in a timely manner, it is unclear whether the transactions contemplated thereby could be implemented through an alternative mechanism or plan and what Holders of Claims and Interests would ultimately receive in respect of their Claims and Interests. Any alternative would likely provide Holders of Claims with less than they would have received pursuant to the Plan. Moreover, an inability to confirm the Plan could result in an extended chapter 11 proceeding with greater administrative costs.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.

### 4.  Nonconsensual Confirmation – "Cramdown"

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the Debtors' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

### 5.  Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors and the Liquidating Trustee reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Plan and Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

### 6.  Conversion into Chapter 7 Cases

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

### 7.  Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article XII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 8.   Risk of Nonoccurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing, as to whether all of the conditions precedent to the Effective Date will be satisfied or waived, or as to whether the Effective Date will, in fact, occur.

### 9.   Risks Affecting Potential Recoveries of Holders of General Unsecured Claims

The Debtors cannot state with any degree of certainty what recovery will be available to Holders of General Unsecured Claims. Several unknown factors make certainty impossible. First, it is possible that the number and amount Allowed Claims senior to the General Unsecured Claims will exceed the Debtors' estimates.  The Claims Bar Date applicable to Governmental Units is June 4, 2022.  The universe of potential senior claims will not be known until that date has passed and all claims of Governmental Units have been filed and adjudicated.  Accordingly, the Debtors cannot know with certainty, at this time, the number or amount of Claims senior to the General Unsecured Claims that will ultimately be Allowed. Second, the Debtors cannot know with certainty, at this time, the value of the Preserved Estate Claims or estimate the costs and time required for the prosecution of the Preserved Estate Claims, which costs may reduce the projected recoveries for General Unsecured Claims.  Further, the collectability of a judgment awarded to the Liquidating Trust on a Preserved Estate Claim is uncertain.  Third, the Debtors cannot know, at this time, how much money will remain after paying all Allowed Claims which are senior to the General Unsecured Claims. Fourth, the Debtors cannot know with any certainty, at this time, the number or size of the General Unsecured Claims that will ultimately be Allowed.

## B.   Financial Information Disclaimer

The financial information contained in this Plan and Disclosure Statement has not been audited. In preparing this Plan and Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Plan and Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

## C.   Disclosure Statement Disclaimer

### 1.   Information Contained Herein Is for Soliciting Votes

The information contained in this Plan and Disclosure Statement is for purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

### 2.   This Plan and Disclosure Statement Was Not Reviewed or Approved by the Securities and Exchange Commission

This Plan and Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Plan and Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

### 3. This Plan and Disclosure Statement May Contain Forward Looking Statements

This Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The liquidation analysis, Distribution projections or other information contained herein and attached hereto are estimates only, and the timing and amount of actual Distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

### 4. No Legal or Tax Advice Is Provided to You by this Plan and Disclosure Statement

This Plan and Disclosure Statement is not legal or tax advice to you. The contents of this Plan and Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Plan and Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### 5. No Admissions Made

The information and statements contained in this Plan and Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors and the Committee) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Committee, the Liquidating Trust, Holders of Allowed Claims or Interest or any other parties in interest.

### 6. Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation claim, cause of action, avoidance action or projected objection to claim is, or is not, identified in this Plan and Disclosure Statement. Moreover, the Liquidating Trustee may seek to investigate, file and prosecute litigation claims, causes of action, and avoidance actions and projected objections to claims after the Confirmation or Effective Date of the Plan irrespective of whether this Plan and Disclosure Statement identifies any such claims or objections to claims.

### 7. No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors or the Liquidating Trust (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent or other voidable transfer or assets, regardless of whether any claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

**8.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Plan and Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Plan and Disclosure Statement, they have not verified independently the information contained herein.

**9.      Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Plan and Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Plan and Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Plan and Disclosure Statement, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Plan and Disclosure Statement. Further, although the Debtors may subsequently update the information in this Plan and Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**10.      No Representations Outside the Plan and Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Plan and Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Plan and Disclosure Statement, should not be relied upon by you in arriving at your decision.

**D.      Alternatives to Confirmation and Consummation of the Plan**

The Debtors believe that the Plan affords the Holders of Claims the potential for a better realization on the Debtors' assets than a chapter 7 liquidation, and therefore, is in the best interests of such Holders. If, however, the Plan is not confirmed, the theoretical alternatives include (a) formulation of an alternative plan or plans of liquidation under chapter 11, (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code, or (c) dismissal of the Chapter 11 Cases. Each of these possibilities is discussed in turn below.

**1.      Alternative Plan(s) of Liquidation**

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors could attempt to formulate and propose a different plan or plans of liquidation.

With respect to an alternative liquidation plan, the Debtors have explored various other alternatives in connection with the formulation and development of the Plan. The Debtors believe that the Plan enables creditors to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan of liquidation, has the greatest chance to be confirmed and consummated and will maximize recoveries of unsecured creditors.

### 2. Liquidation under Chapter 7

If the Plan is not confirmed, the Debtors' Chapter 11 Cases could be converted to liquidation cases under chapter 7 of the Bankruptcy Code. In a case under chapter 7 of the Bankruptcy Code, a trustee would be appointed to promptly liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against the Debtors.

The Debtors believe that in a liquidation under chapter 7 of the Bankruptcy Code, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, would cause a substantial diminution in the value of the Estates. The assets available for distribution to Holders of Claims would be reduced by such additional expenses. Additionally, the AIP Parties' agreement to waive their receipt of recovery on account of their General Unsecured Claims under this Plan until the other Holders of Allowed General Unsecured Claims receive an agreed upon threshold recovery would not apply in a chapter 7 liquidation. Thus, the AIP Parties would fully participate in distributions made by the chapter 7 trustee on account of General Unsecured Claims, thereby diluting the recoveries available for other Holders of Allowed General Unsecured Claims.

### 3. Dismissal of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors or other parties in interests may seek dismissal of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code. Without limitation, dismissal of the Chapter 11 Cases would terminate the automatic stay and might allow certain creditors to attempt to collect on their Claims or otherwise foreclose on the assets of the Debtors. Moreover, the dismissal of the Chapter 11 Cases would severely impair the Debtors' ability to liquidate their largest remaining assets, the Preserved Estate Claims, for the benefit of creditors. Accordingly, the Debtors believe that dismissal of the Chapter 11 Cases would reduce the value of the Debtors' remaining assets.

## ARTICLE XIX.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. General Tax Considerations

The following discussion is a summary of certain material U.S. federal income tax consequences expected to result from the consummation of the Plan for a Holder of a Claim in Class 3, is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest. This discussion does not purport to be a complete analysis or listing of all potential tax considerations. This discussion does not address aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim or Interest subject to special treatment under U.S. federal income tax laws (such as broker dealers; traders in securities that elect to use a mark-to-market method of accounting for securities holdings; banks; thrifts; insurance companies; financial institutions; regulated investment companies; real estate investment trusts; pension plans; partnerships (or other entities or arrangements treated as a partnership for U.S. federal income tax purposes) or a partner, member or owner therein; persons that hold a Claim or Interest as part of a straddle or a hedging, conversion or constructive sale transaction; persons whose functional currency is not the U.S. dollar and other tax exempt investors). This summary does not discuss any aspects of state, local or foreign tax laws or any U.S. federal estate or gift tax considerations. Furthermore, this summary does not address all of the U.S. federal income tax consequences that may be relevant to a Holder of a Claim or Interest, such as the potential application of the alternative minimum tax.

This discussion is based on existing provisions of the Internal Revenue Code of 1986, as amended (the "**IRC**"), existing and proposed Treasury Regulations promulgated thereunder, and current administrative rulings and court decisions. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the federal income tax consequences of the Plan.

No ruling has been or will be requested or obtained from the Internal Revenue Service (the "**IRS**") with respect to any tax aspects of the Plan and no opinion of counsel has been or will be sought or obtained with respect thereto. No representations or assurances are being made to the Holders of Claims or Interests with respect to the U.S. federal income tax consequences described herein.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.**      **U.S. Federal Income Tax Consequences to the Debtors**

The Debtors are limited liability companies and are treated as disregarded entities for U.S. federal income tax purposes and therefore not subject to U.S. federal income tax. Instead, the owner of the Debtors (the "**Owner**") is required to report the Debtors' income, gain, loss, deduction or credit for the taxable year as if such items were incurred directly by the Owner.

Since the Debtors are treated as disregarded entities for U.S. federal income tax purposes, the Claims are expected to be treated as nonrecourse liabilities of the Owner for purposes of Treasury Regulation Section 1.1001-2. Accordingly, the transfer of the assets to the Holders of the Claims pursuant to the Plan in exchange for the Claims would result in an amount realized under IRC Section 1001 equal to the excess, if any, of (a) the amount of the Claims from which the Debtors are (or are deemed to be) discharged; over (b) the Debtors' adjusted bases in the assets to be transferred to the Liquidating Trust pursuant to the Plan. Any resulting gain or loss from such transfer would be reported by the Owner on its tax return.

**C.**      **U.S. Federal Income Tax Consequences to Holders of Claims and Interests**

     **1.**      **Consequences to U.S. Holders of Claims**

For purposes of this discussion, a "**U.S. Holder**" is a beneficial owner of a Claim or a Liquidation Trust Beneficiary that is, for U.S. federal income tax purposes:

     a.      an individual citizen or resident of the United States;

     b.      a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States, any state therein or the District of Columbia;

c.      an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

d.      a trust if a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have the authority to control all substantial decisions of the trust or otherwise if the trust has a valid election in effect under current Treasury regulations to be treated as a United States person.

A "Non-U.S. Holder" is any Holder that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes). If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

Pursuant to the Plan, Claims in Class 3 will be surrendered for their pro-rata share of either Class A Trust Interests or Class B Trust Interests. This will be treated as a taxable exchange of their Class 3 Claims for a pro rata share of the Liquidating Trust Assets, under IRC Section 1001, followed by a contribution of the Liquidating Trust Assets to the Liquidating Trust in exchange for their respective Liquidating Trust Interests. Accordingly, U.S. Holders of such Claims should recognize gain or loss equal to the difference between: (a) the fair market value of the Liquidating Trust Assets received in exchange for such Claims; and (b) the U.S. Holder's adjusted basis, if any, in such Claims. Such gain or loss should be capital in nature so long as such Claims are held as capital assets (subject to the "market discount" rules described below) and should be long term capital gain or loss if such Claims were held for more than one year. To the extent that a portion of the Liquidating Trust Assets (and, ultimately, the Liquidating Trust Interests) received in exchange for such Claims is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income. See the section entitled "Accrued But Untaxed Interest" below.

The fair market value of the Liquidating Trust Interests is contingent in part on the outcome of certain Causes of Action included in the Liquidating Trust. It is therefore plausible that a U.S. Holder could treat the transaction as an "open" transaction for tax purposes, in which case the recognition of any gain or loss on the transaction might be deferred pending the determination of the amount of any recoveries under Causes of Action included in the Liquidating Trust Interests. The federal income tax consequences of an open transaction are uncertain and highly complex, and a U.S. Holder should consult with its own tax advisor if it believes open transaction treatment might be appropriate.

a.      **Accrued but Untaxed Interest**

To the extent that any amount received under the Plan by a U.S. Holder is attributable to accrued but untaxed interest, such amount should be taxable to the U.S. Holder as ordinary interest income, if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, a U.S. Holder may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent that any accrued interest was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

The extent to which amounts received by a U.S. Holder will be attributable to accrued but untaxed interest is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal

amount of the Allowed Claim for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S. federal income tax purposes. However, the IRS could take the position that the consideration received by a U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### b.      Market Discount

U.S. Holders who exchange Claims for the Liquidating Trust Interests may be affected by the "market discount" provisions of the sections 1276 through 1278 of the IRC. Under these rules, some or all of the gain realized by a U.S. Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claims.

In general, a debt obligation with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt obligation's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with original issue discount) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory de minimis amount (equal to 0.25 percent of the debt obligation's stated redemption price at maturity or revised issue price, in the case of a debt obligation issued with original issue discount).

Any gain recognized by a U.S. Holder on the taxable disposition of Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claims were considered to be held by a U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### c.      Receipt of Interest in the Liquidating Trust

The Liquidating Trust shall be established on the Effective Date and is currently anticipated to exist as a grantor trust for the benefit of certain creditors. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), pursuant to Treasury Regulation Section 1.671-1(a) and/or Treasury Regulation Section 301.7701-4(d) and related regulations, the Liquidating Trustee is expected to designate and file returns for the Liquidating Trust as a "grantor trust" and/or "liquidating trust" and therefore, for U.S. federal income tax purposes, the Liquidating Trust's taxable income (or loss) (other than income or loss from the Disputed Claims Reserves) should be allocated to its beneficiaries. U.S. Holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Secured Claims not previously paid, including such Claims Allowed after the Effective Date, generally will be allocated their pro rata share of any income from assets in the Liquidating Trust Reserve that are not in the Disputed Claims Reserves. U.S. Holders of Allowed Class 3 Claims generally will be allocated their pro rata share of any income from assets in the Liquidating Trust that are not in the Liquidating Trust Reserve.

U.S. Holders of Claims that receive a beneficial interest in the Liquidating Trust will be required to report on their U.S. federal income tax returns their share of the Liquidating Trust's items of income gain, loss, deduction and credit in the year recognized by the Liquidating Trust (other than items from the Disputed Claims Reserves). This requirement may result in U.S. Holders being subject to tax on their allocable share of the Liquidating Trust's taxable income prior to receiving any cash Distributions from the Liquidating Trust. On the other hand, a Distribution of cash by the Liquidating Trust will not be

separately taxable to a U.S. Holder of an interest in the Liquidating Trust because the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust).

The Liquidating Trustee will comply with all applicable governmental withholding and tax reporting requirements.

### 2. Consequences to Non-U.S. Holders of Claims

The following discussion addresses some of the U.S. federal income tax consequences to a beneficial owner of a Claim or a Liquidation Trust Beneficiary that is a Non-U.S. Holder. The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder.

#### a. Gain Realized / Income Allocated to Non-U.S. Holders

Whether a non-U.S. Holder realizes (a) gain or loss on the exchange and the amount of such gain or loss and (b) income from holding an interest in the Liquidating Trust is generally determined in the same manner as set forth above in connection with U.S. Holders.

#### b. Gain / Income Recognition by Non-U.S. Holders

Any gain realized by a Non-U.S. Holder on the exchange of its Allowed Class 3 Claim and/or any income allocated to a Non-U.S. Holder with respect to holding an interest in the Liquidating Trust generally will not be subject to U.S. federal income taxation unless: (a) except as otherwise covered by clause (b) below, (i) with respect to capital gains, the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Plan becomes effective and certain other conditions are met or (ii) with respect to income other than capital gains, the income is otherwise deemed to be derived from US sources, or (b) such gain and/or income is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) or the conduct of a trade or business in the United States deemed to be conducted by the Non-US Holder by reason of the activities of the Liquidating Trust.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange and potentially at different tax rates on any income from the Liquidating Trust. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange and income from the Liquidating Trust if such gain and/or income is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a "branch profits tax" equal to 30 percent (or such lower rate provided by an applicable income tax treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### c.   Accrued Interest

Subject to the discussion of backup withholding and FATCA below, payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest with respect to the Claims generally will not be subject to U.S. federal income or withholding tax; provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

    a.    the Non-U.S. Holder actually or constructively owns 10 percent or more of the capital or profits interest in the Owner;

    b.    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Owner (each, within the meaning of the IRC);

    c.    the Non-U.S. Holder is a bank receiving interest described in IRC Section 881(c)(3)(A); or

    d.    such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business. In addition, a corporate Non-U.S. Holder may, under certain circumstances, be subject to an additional "branch profits tax" at a 30 percent rate (or such lower rate provided by an applicable income tax treaty) on its effectively connected earnings and profits attributable to such interest (subject to adjustments).

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### d.   FATCA

Under the Foreign Account Tax Compliance Act ("**FATCA**"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders

and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."

For this purpose, "withholdable payments" are generally U.S.-source payments of fixed or determinable, annual or periodical income. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such Non-U.S. Holder's exchange of its Claim.

## D.     U.S. Federal Income Tax Treatment of the Liquidating Trust

### 1.     Formation of the Liquidating Trust

The Liquidating Trust shall be established on the Effective Date. Except as described in Article XIX.D.2 below, it is intended that the Liquidating Trust be treated as a "liquidating trust" under Treasury Regulation Section 301.7701-4(d) and to qualify as a "grantor trust" as governed by IRC Sections 671 through 679. In order to qualify the Liquidating Trust as a grantor trust, the Liquidating Trust Agreement requires all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the assets to the Liquidating Trust as (a) the transfer of assets by the Debtors to the Holders of Allowed Claims, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such assets, followed by (b) the transfer of such assets (subject to such liabilities) by such Holders to the Liquidating Trust in exchange for the beneficial interests in the Liquidating Trust. Accordingly, except with respect to the assets transferred to any Disputed Claims Reserve, the Liquidating Trust Beneficiaries should be treated for U.S. federal income tax purposes as the grantors and owners of their respective shares of the Liquidating Trust Assets.

Although the Liquidation Trust has been structured with the intention of complying with guidelines established by the IRS in Revenue Procedure 94-45, 1994-2 C.B. 684, for the formation of a liquidating trust, it is possible that the IRS could require a different characterization of the Liquidation Trust, which could result in a different and possibly greater tax liability to the Liquidation Trust or the Liquidation Trust Beneficiaries. The Liquidating Trust Agreement provides that in the event of a final determination under IRC Section 1313(a) that the Liquidating Trust does not qualify as a grantor trust, the Liquidating Trust Beneficiaries and the Liquidating Trustee intend that the Liquidating Trust be treated as a partnership for U.S. federal income tax purposes and will take all actions reasonably necessary to cause the Liquidating Trust to be treated as such a partnership. However, it is also possible that the Liquidating Trust could be treated as an association taxable as a corporation. Each Holder of a Claim or Interest is strongly urged to consult its own tax advisors regarding the specific tax consequences described herein.

### 2.     Disputed Claims Reserves

The Liquidating Trust Agreement provides that the relevant parties intend to treat each Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9 (and make any appropriate elections consistent with such tax treatment).

Pursuant to Treasury Regulation Section 1.468B-9(c)(2)(ii), the Liquidating Trustee may, in the Liquidating Trust's first taxable year, elect to treat the Disputed Claims Reserves as disputed ownership funds as governed by Treasury Regulation Section 1.468B-9. Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claim Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets (including any gain recognized upon the disposition of such assets). All Distributions from such reserves (which Distributions will be net of the expenses, including taxes, relating to the retention or disposition of

such assets) will be treated as received by the Holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Holders of interests in the Liquidating Trust) will be required to report for tax purposes consistently with the foregoing. A Disputed Claim Reserve will be responsible for payment, out of the assets of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the Distribution of the assets in such reserve), assets of the Disputed Claim Reserve may be sold to pay such taxes. However, it is possible that the IRS could require a different characterization of the Disputed Claims Reserves.

The Liquidating Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any Non-U.S. Holders of interests in the Liquidating Trust, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding). All Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

**E.      Information Reporting and Backup Withholding**

Under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to Distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.

The Debtors and Liquidating Trust will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors and Liquidating Trust will comply with all applicable reporting requirements of the IRC.

**The foregoing discussion is intended only as a summary of certain income tax consequences of the plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Claim Holder's particular circumstances. Accordingly, Claim Holders are urged to consult their tax advisors about the United States federal, state and local, and applicable foreign income and other tax consequences of the Plan.**

**F.      Reservation of Rights**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtors and their advisors reserve the right to further modify, revise or supplement this Article XIX and the other tax related sections of the Plan prior to the date by which objections to Confirmation of the Plan must be filed and served.

**CONCLUSION, RECOMMENDATION, AND CONFIRMATION REQUEST**

**The Debtors and the Committee believe that Confirmation of the Plan is in the best interests of all holders of Claims and Interests. The Debtors and the Committee urge you to vote to accept**

**the Plan and to evidence such acceptance by returning your Ballot so it will be received by the Voting Deadline.**

The Debtors request Confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

Respectfully submitted,

STRIKE, LLC, *et al.*
on behalf of itself and all other Debtors

By:      /s/ *Dario Deferrari*

Name:   Dario Deferrari
Title:      Senior Vice President and Treasurer

**Exhibit A**

Liquidation  Analysis

**A.**   **Introduction**

The Debtors, together with their advisors, have prepared this hypothetical Liquidation Analysis in connection with the Plan and Disclosure Statement for purposes of evaluating whether the Plan meets the "best interests" of creditors test set forth in section 1129(a)(7) of the Bankruptcy Code. That section requires that a plan provide each holder of a claim or interest that does not vote in favor of the plan with property of a value, as of the effective date of the plan, that is at least as much as the value such holder would receive in a hypothetical case under chapter 7 of the Bankruptcy Code.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan and Disclosure Statement to which this Liquidation Analysis is attached.

**B.**   **Basis of Presentation**

The Liquidation Analysis is based upon the Debtors' unaudited balance sheets as of January 31, 2022, as adjusted to reflect the sale of substantially all of the Debtors' balance sheet assets and assumption of certain liabilities pursuant to the Asset Purchase Agreement. It represents an estimated recovery for all creditors of the Debtors based upon a hypothetical liquidation of the Debtors as if a chapter 7 trustee ("Chapter 7 Trustee") were appointed by the Bankruptcy Court to conduct an orderly liquidation of the Debtors' remaining assets, which include the Preserved Estate Claims and cash on the balance sheet, beginning on or about May 18, 2022 (the "Conversion Date").

The Liquidation Analysis does not attribute a specific value to the Preserved Estate Claims or a specific cost to prosecuting them. Instead, it assumes that the Chapter 7 Trustee would take the same amount of time to monetize, incur the same costs to prosecute, and realize the same value from the Preserved Estate Claims as the Liquidating Trustee under the Plan. The assumed expenses of a hypothetical liquidation under chapter 7 of the Bankruptcy Code are identical to the Plan and based on a good faith estimate of wind-down costs over six months.

The Liquidation Analysis also does not reflect the incremental cost of conversion or additional priority claims in a chapter 7 liquidation process, including fees and commissions that may be owed to the Chapter 7 Trustee or the U.S. Trustee. In a hypothetical chapter 7 liquidation, the allowed administrative expenses incurred by the Chapter 7 Trustee, including expenses associated with prosecuting and liquidating the Preserved Estate Claims, would be entitled to payment in full prior to any distributions on account of Administrative Claims and Priority Tax Claims. The estimates used in the Liquidation Analysis for such expenses are identical to the assumptions under the Plan.

While the assumptions regarding distributable value are identical, the Liquidation Analysis accounts for the fact that the AIP Parties' agreement pursuant to the Global Settlement to waive their right to receive a recovery on account of their General Unsecured Claims until such time as the other Holders of Allowed General Unsecured Claims have received an agreed upon threshold recovery is only applicable under the Plan. This distinction alone results in all Holders of Allowed General Unsecured Claims other than the AIP Parties receiving property of a value, as of the effective date of the Plan, that is at least as much as the value they would receive in a hypothetical case under chapter 7 of the Bankruptcy Code.

The Liquidation Analysis was conducted on an entity-by-entity basis, assumes that the Debtors would be liquidated in a jointly administered process and is presented on a consolidated basis for convenience.

**C.**      **Statement of Limitations and Disclaimers**

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management and their advisors. Inevitably, some assumptions in the Liquidation Analysis would likely not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in a chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose.

THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT THAT THESE CHAPTER 11 CASES ARE CONVERTED TO A CHAPTER 7 LIQUIDATION, ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

The Liquidation Analysis includes estimates for Claims not currently asserted in the Chapter 11 Cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and chapter 7 Administrative Claims such as wind down costs and trustee fees and tax liabilities. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION BY THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

**D.**      **Liquidation Analysis**

The Debtors have determined, based on the following analysis, that upon the Effective Date, the Plan will provide all Holders of Allowed Claims and Interests, with the exception of the AIP Parties, with a recovery (if any) that is at least as much as the value they would receive in a hypothetical chapter 7 liquidation, and as such believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

## SUMMARY OF ESTIMATED CLAIMS RECOVERY

| ($ in thousands) | Notes | Estimated NBV | Consolidated Strike | | | |
|---|---|---|---|---|---|---|
| | | | Low Potential Recovery | | High Potential Recovery | |
| | | | % | $ | % | $ |
| **Assets:** | | | | | | |
| Cash and Cash Equivalents | A | $ 8,814 | 100.0% | $ 8,814 | 100.0% | $ 8,814 |
| **Gross Liquidation Proceeds** | | | | $ 8,814 | | $ 8,814 |
| **Liquidation Adjustments:** | | | | | | |
| Net Wind-Down Expenses | B | | | (850) | | (850) |
| Trustee Fees | C | | | (264) | | (264) |
| Trustee Legal & Financial Advisors | D | | | (700) | | (700) |
| **Subtotal** | | | | $ (1,814) | | $ (1,814) |
| **Net Liquidation Proceeds Available for Distribution:** | | | | $ 7,000 | | $ 7,000 |

| | Notes | Consolidated Strike | | | | | |
|---|---|---|---|---|---|---|---|
| | | Claims Estimate | | Liquidation | | | |
| | | | | Low Recovery Estimate | | High Recovery Estimate | |
| | | Low | High | % | $ | % | $ |
| Administrative Claims | E | $ 1,569 | $ 1,569 | 100.0% | $ 1,569 | 100.0% | $ 1,569 |
| Priority Tax Claims | F | 1,463 | 3,056 | 100.0% | 3,056 | 100.0% | 1,463 |
| Class 1: Secured Claims | G | - | - | n/a | - | n/a | - |
| Class 2: Priority Non-Tax Claims | H | 246 | 281 | 100.0% | 281 | 100.0% | 246 |
| Class 3: General Unsecured Claims | I | 314,821 | 357,449 | 0.6% | 2,094 | 1.2% | 3,721 |
| Class 4: Intercompany Claims | J | - | - | n/a | - | n/a | - |
| Class 5: Intercompany Interests | K | - | - | n/a | - | n/a | - |
| Class 6: Strike HoldCo Interests | L | - | - | n/a | - | n/a | - |
| Class 7: Section 510(b) Claims | M | - | - | n/a | - | n/a | - |
| **Total Estimated Claims and Recoveries** | | $ 318,100 | $ 362,354 | | $ 7,000 | | $ 7,000 |

## Specific Notes to the Liquidation Analysis:

### Assets

**A. Cash & Cash Equivalents**

Cash and Cash Equivalents consist of all bank accounts held by the Debtors, including deposit accounts and investment accounts. The pro forma balance is based on the Debtors' forecasted cash balance as of the Conversion Date, which is expected to be fully recoverable. Cash excludes estimated amounts held in the Escrow Accounts, as these amounts will be utilized to satisfy specific chapter 11 administrative and priority claims.

As stated above, the Liquidation Analysis does not attribute a specific value to the Preserved Estate Claims and assumes that the Chapter 7 Trustee would realize the same value from the Preserved Estate Claims as the Liquidating Trustee under the Plan.

### Liquidation Adjustments

**B. Net Wind-Down Expenses**

The Liquidation Analysis assumes the chapter 7 liquidation process will take six (6) months to complete and that certain limited functions would be required during the liquidation process to effectuate an orderly wind-down of the business. Examples of such costs incurred during a chapter 7 liquidation would include, but are not limited to, expenses associated with maintaining office space, insurance, records retention and other general and administrative expenses during the orderly wind-down of the estate. This Liquidation Analysis does not include costs associated with employee compensation as the Debtors have ceased operations and do not currently have any employees as substantially all of the Debtors operations were purchased and employees transferred to the Purchaser pursuant to the Asset Purchase Agreement.

**C. Trustee Fees**

The Chapter 7 Trustee would be compensated pursuant to section 326(a) of the Bankruptcy Code. The Debtors have estimated trustee fees based on the fee guidelines as provided by the U.S. Trustee at 3.0% of the Cash and Cash Equivalents. The Liquidation Analysis assumes that the Chapter 7 Trustee and the Liquidating Trustee would incur the same fees. The Liquidation Analysis does not reflect additional fees that only the Chapter 7 Trustee would earn upon the liquidation of Preserved Estate Claims.

**D. Trustee Professional Fees**

Compensation for the Chapter 7 Trustee's professionals (counsel and other legal, financial, and professional services) during the chapter 7 case is estimated to be $700,000, or 8.0% of the Cash and Cash Equivalents. The Liquidation Analysis assumes that the Chapter 7 Trustee and the Liquidating Trustee would incur the same professional fees.

*Claims*

### E. Administrative Claims

Administrative Claims of $1.6 million consist among other things, of approximately $0.4 million of unpaid prepetition 503(b)(9) claims, $0.2 million of unpaid postpetition taxes and $1.0 million of unpaid postpetition professional fees and other costs and expenses of administration of the Debtors' Estates. Estimated amounts as of the Conversion Date held in escrow for unpaid professional fees and taxes are excluded as these claims are assumed be settled from the amounts held in escrow. The Liquidation Analysis projects a recovery rate of 100.0%.

### F. Priority Tax Claims

Priority Tax Claims are estimated to range from $1.5 million to $3.1 million consist of franchise, sales & use, payroll and other taxes. Estimated amounts held in escrow for unpaid priority taxes are excluded as these claims are assumed to be settled from the amounts held in escrow. The Liquidation Analysis projects a recovery rate of 100.0%.

### G. Class 1 – Secured Claims

There are currently no estimated Secured Claims. To the extent such claims exist, these claims are projected to receive a 100.0% recovery.

### H. Class 2 – Priority Non-Tax Claims

Priority Non-Tax Claims of $0.3 million primarily consist of estimated unpaid priority employee wage claims subject to the $13,650 individual cap per Section 507(a)(4) of the Bankruptcy Code. The Liquidation Analysis projects a recovery rate of 100.0%.

### I. Class 3 – General Unsecured Claims

General Unsecured Claims are estimated to range from $314.8 million to $357.4 million, and include a claim for obligations owed under the Prepetition Junior Loan Facility, trade payable claims, estimates for employee obligations not subject to the priority individual cap per Section 507(a)(4) of the Bankruptcy Code, estimated contract rejection damages claims, litigation claims in excess of available insurance proceeds and other general unsecured claims. The claim for the Prepetition Junior Loan Facility includes the portion of the Prepetition Junior Loan Facility held by the AIP Parties, and the Liquidation Analysis assumes that the AIP Parties will share pro rata in any value available for Holders of Allowed General Unsecured Claims in a hypothetical chapter 7 case since the AIP Parties' agreement pursuant to the Global Settlement to waive their right to receive a recovery on account of their General Unsecured Claims until such time as the other Holders of Allowed General Unsecured Claims have received an agreed upon threshold recovery is only applicable in the context of the Plan. The Liquidation Analysis projected recovery is 0.6% to 1.2% based on estimated values, not including potential recoveries on account of the Preserved Estate Claims.

**J. Class 4 – Intercompany Claims**

Intercompany Claims include any claims held by a Debtor or an Affiliate against a Debtor. There are currently no estimated Intercompany Claims. To the extent such claims exist, these claims are expected to receive zero recovery.

**K. Class 5 – Intercompany Interests**

For purposes of the Liquidation Analysis, Intercompany Interests are treated as equity. Intercompany Interests are expected to receive zero recovery.

**L. Class 6 – Strike HoldCo Interests**

For purposes of the Liquidation Analysis, Strike HoldCo Interests are treated as equity. Strike HoldCo Interests are expected to receive zero recovery.

**M. Class 7 – Section 510(b) Claims**

Subordinated securities Claims per Section 510(b) of the Bankruptcy Code, if any, are expected to receive zero recovery.

**Exhibit B**

Organizational Chart

# ORG CHART

