## IN THE CIRCUIT COURT OF NEWTON COUNTY, MISSISSIPPI

**BILLY CLEVELAND AND TAMMY CLEVELAND**                    **PLAINTIFF**

**VS.**                                          CAUSE NO: 21-CV-133-
                                                        NWMD

**OEP STRIKE LLC; PATE HOLDING COMPANY, LP;**
**MILLPOINT STRIKE SPLITTER, LLC;**
**STRIKE, LLC; STRIKE CAPITAL, LLC; and**
**STRIKE INVESTMENT, LLC**                              **DEFENDANTS**

---

### COMPLAINT

---

Plaintiffs Billy Cleveland ("Billy") Tammy Cleveland, Circle C ("Tammy"), Circle C Investments, LLC ("Circle C" or with Billy and Tammy, "Plaintiffs"), bring this Complaint against OEP Strike LLC ("OEP"), Pate Holding Company, LP ("PHC"), Mill Point Strike Splitter, LLC ("Mill Point"), Strike, LLC ("Strike"), Strike Capital, LLC ("Strike Capital"), and Strike Investment, LLC ("Strike Investment", or with Strike and Strike Capital, "the Strike Entities"). In support thereof, Plaintiffs state as follows:

### I.    PARTIES

1.    Billy and Tammy are adult resident citizens of Newton County, Mississippi.

2.    Circle C is a Mississippi limited liability company.

3.    Defendant PHC is a Texas limited partnership.

4.    Defendant OEP is a Delaware limited liability company.

5.    Defendant Mill Point is a Delaware limited partnership.

6.    Defendant Strike is a Texas limited liability company.

7.    Defendant Strike Capital is a Texas limited liability company.

8.    Defendant Strike Investment is a Delaware limited liability company.

FILED

OCT 07 2021

**Exhibit 1**

TIME:
MICHAEL L. BUTLER, CIRCUIT CLERK
BY _____ D.C.

## II.   JURISDICTION & VENUE

9.      Subject matter jurisdiction is proper in this Court pursuant to Miss. Const. At. 6, § 156, because this is a case at law seeking primarily money damages.

10.     The Court has personal jurisdiction over all Defendants, because they entered into contracts to be performed in part here, breached those contracts in part here, and/or committed tortious conduct in part here, and/or caused damage to Mississippi residents.

11.     Venue is proper here because the contracts at issue were performed in part here, were breached in part here, the tortious conduct at issue occurred in part here, and the damages sought herein occurred here.

## III.   FACTS

### PLAINTIFFS' OWNERSHIP IN THE STRIKE ENTITIES

12.     In 2000, Plaintiffs established Delta Drilling, LLC, a Mississippi limited liability company ("Delta Mississippi").

13.     During the time that it operated, Delta Mississippi engaged in horizontal drilling, boring, and related services.

14.     During the time that it operated, Delta Mississippi had rigs strategically located throughout the United States.

15.     Delta Mississippi turned a profit for almost early year of its existence, particularly after its early years.

16.     In 2014, the owners of Strike approached Delta Mississippi about purchasing Delta Mississippi.

17.     Ultimately, Strike and Plaintiffs entered into a Contribution and Purchase Agreement (the "Purchase Agreement") through which a Strike affiliate purchased substantially all of the assets of Delta Mississippi (the "Delta Purchase").   Exhibit A.

2

18.     After purchasing Delta Mississippi, Strike folded Delta Mississippi's operations, goodwill, etc. into a new entity operating with the same trade name.

19.     Strike paid Plaintiffs $18.5 million in cash for the Delta Purchase.

20.      Strike also paid Plaintiffs with 4,108.0283 Strike units with a distribution right (discussed below) valued at approximately $18 million when interest is included.

21.     The Strike units were initially paid to Delta Mississippi.

22.     Delta Mississippi transferred the strike units to Circle C.

23.     Delta Mississippi, Billy, and Tammy created Circle C as a new entity to hold he units because Strike wanted to use the trade name Delta Drilling.

24.     Circle C is a pass-through entity that operates for the sole benefit its members of Tammy and Billy.

25.     Plaintiffs' Strike units have priority distribution rights (the "Priority Distribution Rights").

26.     Strike provided the Strike units and the Priority Distribution Rights to Plaintiffs as a substitute for a promissory note that the parties previously had negotiated.   Exhibit B, Draft Promissory Note.

27.     Strike later reported that its lender(s) would not permit Strike to execute the promissory note.

28.     As a result, the parties negotiated the Preferred Distribution Rights as a substitute for the promissory note.

29.     As part of the Mill Point Transaction, Strike has described the units and the Priority Distribution Rights as follows:

> As and when approved its Board of Directors, the Company shall distribute to the holder of these units a preferred distribution of $9.0 million, plus any unpaid priority return calculated at the remaining unpaid balance multiplied by an applicable rate of 8% per annum through June 30, 2019 and 12% thereafter.

Exhibit C, Disclosure Statement for Mill Point Transaction.

30. Plaintiffs have not received any payment pursuant to the Preferred Distribution Rights.

31. Simultaneous with the closing of the Delta Purchase, Strike amended its Operating Agreement, resulting in the Fifth Amended and Restated Regulations of Strike, LLC ("the Strike Operating Agreement"). Exhibit D.

32. The Strike Operating Agreement has provisions pertinent to Plaintiffs' rights to receive distributions, including but not limited to the following:

    a. Section 4.8(b) provides the Preferred Distribution Rights;

    b. Section 4.8(d) provided that "[u]nless otherwise determined by the Board of Directors . . . the Company shall [each year] distribute to the Members an amount equal to the tax liabilities of the Members . . ."; and

    c. Section 5.1(c), when read together with Section 1.13(o), provided that OEP and PHC could not assign their Strike interests without Plaintiffs' consent if such assignment(s) would cause any entity other than OEP or PHC to "become[] the 'beneficial owner' . . . of more than 50% of the outstanding units of the Company" or constituted a "merger, consolidation, recapitalization, or reorganization of the Company with or into an independent third party that results in the inability of the members of the Company as of the Closing Date to designate or elect a majority of the governing body of the Company."

33. At the time of the Delta Purchase, Plaintiffs also entered into a Voting and Equity Holder Agreement, by which they agreed to vote their units "60% . . . in favor of the approval of any action agreed upon by OEP . . . and the remaining 40% . . . in favor of the approval of any action agreed upon by PHC" (the "Voting Agreement"). Exhibit E.

34. OEP and PHC induced Plaintiffs to sign the Voting Agreement by stating the Voting Agreement would merely allow typical, day-to-day, business (such as acquiring equipment and the like).

35.   In 2016, PHC and OEP merged Strike into Strike Capital (the "Strike Capital Merger").

36.   Strike Capital was created solely for the purpose of the Strike Capital Merger.

37.   Plaintiffs were not asked to vote on the Strike Capital Merger or otherwise participate in that decision, in violation of applicable law.

38.   The votes necessary to approve this merger were not the type of day-to-day votes contemplated by the Voting Agreement.

39.   Plaintiffs did not execute any agreement providing OEP or PHC with any rights to vote their units in Strike Capital.

40.   Strike Capital takes the position that it assumed OEP's and PHC's rights to vote Plaintiffs' units under the Voting Agreement.

41.   Strike Capital's regulations/operating agreement (hereinafter referred to as the "Strike Capital Operating Agreement") was substantively identical to the Strike Operating Agreement.  Exhibit F.

42.    Among other things, the Strike Capital Operating Agreement retained Plaintiffs' Preferred Distribution Rights, the tax distribution rights set forth in 4.8(d), and the transfer limitations set forth in 5.1(c).  *Id.*

43.   The Strike Operating Agreement and the Strike Capital Operating Agreement both provided that there were 581,406.7740 Units, all of which had been issued, and 71,351.3504 Junior Units, with 32,432.5138 issued and 38,919.0166 reserved.

44.   Each tax year from 2014-2019, Strike and Strike Capital made tax distributions to Plaintiffs and to all other Strike owners sufficient for those owners to pay the taxes stemming from any income allocated to them.

45.    In particular, the Strike Entities made such distributions to Plaintiffs in 2015, 2016, 2017, 2018, and 2019.

46.    Upon information and belief, the Strike Entities' pertinent Board(s) of Directors made no findings and held no meetings prior to the Strike Entities making these tax distributions. The Board(s) of Directors made no such findings and held no such meetings prior to the Strike Entities making tax distributions because it was understood as a matter of company policies that tax distributions would be made as a matter of course.

47.    In 2020, PHC and OEP began negotiating another re-structuring, this time with Mill Point Strike Splitter, LP ("Mill Point").

48.    Neither OEP nor PHC notified Plaintiffs of the Mill Point negotiations.

49.    Certain members of the operational leadership team notified Billy of the pending deal with Mill Point days before it was set to close.

50.    Billy then contacted Cole Pate, who confirmed the pending transaction, told Billy that Billy could not do anything to stop the transaction, and informed Billy that OEP, PHC, and Mill Point had "spent millions of dollars on New York lawyers" in order "to get around" the Preferred Distribution Rights.

51.    Mill Point was represented by lawyers in the New York office of White & Case law firm.

52.    The restructuring with Mill Point (the "Mill Point Transaction") closed on February 12, 2021.

53.    Plaintiffs were not asked to vote on the Mill Point Transaction or otherwise participate in that decision, in violation of applicable law.

54.    Plaintiffs were not permitted to vote on the Mill Point Transaction.

6

55.     Upon information and belief, OEP and PHC voted their units (and Plaintiffs' units) in favor of the Mill Point Transaction.

56.     Strike Capital contributed all Strike units to another newly-created company, Strike Investment.

57.     Strike Investment implemented regulations that were substantially and substantively different from the Strike Operating Agreement and the Strike Capital Operating Agreement. Exhibit G ("the Strike Investment Operating Agreement").

58.     The Strike Investment Operating Agreement did not retain the Preferred Distribution Rights.

59.     The Strike Investment Operating Agreement did not provide for 581,406.7740 Units and 71,351.3504 Junior Units.

60.     The Strike Investment Operating Agreement instead provided for "three (3) classes of Units, designated (i) preferred Units, (ii) Class A Common Units, and (iii) Class B Common Units."

61.     Mill Point acquired all of the preferred Units in Strike Investment.

62.     As a result of its acquisition of all of the preferred Units in Strike Investment, Mill Point became entitled to a priority distribution, to the exclusion of all others.

63.     In addition, Mill Point was given authority to select and did in fact select eight of the nine Board members.

64.     Mill Point, OEP, and PHC control Strike Investment.

65.     Simultaneous with the closing of the Mill Point Transaction, Mill Point arranged for one of its affiliates, Mill Point Capital LLC, to provide "management advisory services", for which it is to be paid $1,000,000 no later than January 1, 2022, followed by a quarterly fee of

$500,00 per quarter until an additional $2,000,000 is paid.   Exhibit H, Management Services Agreement.

66.     In the spring/summer of 2021, Plaintiffs were notified that they were being allocated substantial taxable income for the tax year 2020, resulting in a tax liability in the approximate amount of $680,000, based on their ownership of 4,108.0283 units in Strike.

67.     Strike was not a profitable entity in tax year 2020.

68.     Upon information and belief, no other Strike owner has been allocated any taxable income for tax year 2020.

69.     Plaintiffs requested that the Strike Entities distribute funds sufficient for them to pay his 2020 taxes (the "2020 Tax Distribution").

70.     Various officer of the Strike Entities have from time to time acknowledged to Plaintiffs that the 2020 Tax Distribution should be made and will be made.

71.     The Strike Entities have not made the 2020 Tax Distribution.

72.     As a result of Strike's 2020 allocation to them, Plaintiffs' state and federal tax liabilities increased by approximately $700,000, and they were forced to pay the resulting amount from their own funds to avoid an unpaid tax liability and the adverse consequences resulting from such liability.

73.     In the last sixty days, Plaintiffs have requested that the Strike Entities provide basic financial records related to the allocation of taxable income to Plaintiffs for 2020, as well as data that will help Plaintiffs determine the future taxable income that Plaintiffs should expect.

74.     Plaintiffs made these requests to, among other persons, KPMG, the accounting firm for the Strike Entities.

75.     Neither the Strike Entities nor KPMG initially responded to these inquiries.

8

76.     On October 1, 2021, Plaintiffs contacted KPMG by phone, urgently asking that KPMG provide the requested information.

77.     KPMG returned the call almost immediately, explaining that it had to obtain certain permissions before providing the requested information.

78.     Late in the afternoon of October 1, 2021, Strike's CFO responded by e-mail and stated that Strike would not authorize KPMG to provide the information.   In full, the response stated as follows:

> We have been informed there are continued requests for information from KPMG related to the 2020 tax returns delivered to your client Circle C/Billy Cleveland.  As you know, Strike was left in a precarious position with respect to these returns after the February 2021 transformative transaction which saw the former Strike Capital be replaced in the organization structure by a new holdco.  At the same time, Strike Capital became a minority equity holder of the new holdco structure.  As such, we here at Strike, LLC no longer have any authority with respect to the delivery of tax return information related Strike Capital, LLC.  We have continued to do the best we can to facilitate delivery of these returns so that all partners of Strike Capital had their K-1s for filing for 2020.  It is my understanding that the controlling partner of Strike Capital, LLC is One Equity Partners ("OEP").  We are not aware of who controls Strike Capital at this juncture nor do we know who the officers of same are now.  What must happen is that someone in authority at Strike Capital engage separately with KPMG and direct them accordingly as it relates to your further requests.  Without this engagement and directive, KPMG is not authorized to continue to incur costs to fulfill requests for information related to Strike Capital under their engagement with Strike LLC.  Again, no one at Strike LLC has the authority to act on behalf of Strike Capital.  We suggest Billy reach out to his partners directly and determine how best to move forward with any future tax matters.  Strike LLC will facilitate the delivery of the financial information for the period from January 1, 2021 through February 12, 2021 to Strike Capital for inclusion in its books and records for the full year 2021 and ultimately its tax returns for 2021.  This is the only remaining obligation that Strike LLC has as it relates to Strike Capital going forward.

79.     Upon information and belief, the Strike Entities are in the process of amending previously-filed federal income tax returns (to include K-1s).

80.     Plaintiffs have requested that the Strike Entities provide any and all information related to these amended tax returns (or Administrative Adjust Requests ("AAR"), as amended returns are referred to under applicable tax law).

81.     The Strike Entities have not provided any information to Plaintiffs as to the amended tax returns/AAR.

## BILLY'S EMPLOYMENT WITH STRIKE

82.     Simultaneous with the closing of the Delta Purchase, Strike entered into an Employment Agreement with Billy (the "Cleveland Employment Agreement").  Exhibit I

83.     The Cleveland Employment Agreement had an initial term of five years, and automatically renewed each year after the expiration of that five-year term unless certain conditions were met.

84.     Billy's initial five-year term of employment concluded in 2019.

85.     After the conclusion of Billy's initial five-year employment term, his employment automatically renewed for one year in 2020 and again for one year in 2021.

86.     In the summer and fall of 2021, Billy made inquiries regarding the 2020 Tax Distribution.

87.     After Billy persisted in his inquiries regarding the 2020 Tax Distribution, the Strike Entities notified Billy that his employment was being terminated, effective immediately.

88.     The person who fired Billy (Charles Davison, Jr.) came to Mississippi to do so.

89.     Mr. Davison is employed by Strike Investment but was hand-selected by Mill Point for his position.

90.     The Strike Entities replaced Billy with Megan Shuler, a/k/a Megan Reed.

DSK01 4844-9555-9419
2930445-000001

91.     Ms. Shuler, a/k/a Ms. Reed is not qualified for the position for which she was hired, as even prior to her promotion she had numerous issues/complaints as to her management style, as well as certain ethical concerns related to job bidding.

92.     Defendants' choice of Ms. Shuler, a/k/a Ms. Reed, is further confirmation that Billy's termination was based not on merit, but as part of Defendants' campaign of harassment and freeze-out.

93.     OEP, PHC, and/or Mill Point caused the Strike Entities to terminate Billy in direct retaliation for his attempts to obtain the tax distribution he was rightfully owed.

94.     The Strike Entities are closely-held.

95.     The Strike Entities have few shareholders and their shares are not publicly traded.

## COUNT I

## DECLARATORY AND INJUNCTIVE RELIEF

## (All Defendants)

96.     Plaintiffs adopt and incorporate each of the preceding paragraphs as though fully set forth herein.

97.     The Cleveland Employment Agreement contains provisions that restrict Billy's future conduct and employment.  Exhibit I.

98.     The Cleveland Employment Agreement states that in the event Billy's employment is terminated without cause, the covenants would be null and void.  *Id.*

99.     Defendants have caused Billy's employment to be terminated without cause.

100.     As explained herein, Defendants have caused Billy to be terminated as part of a campaign to freeze him out and constructively strip him of his interest(s) in the Strike Entities.

11

101.   The restrictive covenants are broadly drawn in a way that makes it difficult or impossible for Billy to obtain future employment.  As such, to the extent the covenants apply, they are void as against public policy.

102.   Upon information and belief, Defendants take the position that these covenants apply, notwithstanding their termination of Billy.  Given this position, a substantial controversy exists between the parties that this Court has the ability to resolve.

103.   Billy seeks a declaratory judgment that none of the restrictive covenants in his Employment Agreement apply.

104.   Plaintiffs also seek a temporary restraining order or a preliminary injunction requiring that the Strike Defendants immediately either themselves provide or cause KPMG to provide all records necessary to (a) demonstrate the basis for the calculation that led to Plaintiffs being allocated taxable income for 2020, (b) demonstrate whether taxable income will again be allocated to Plaintiffs for 2021, and (c) all documents necessary to explain any amended tax returns/AAR.

105.   Plaintiffs further seek an injunction (and to the extent necessary, a temporary restraining order) prohibiting any Defendant from paying, distributing, disbursing, etc. any funds to Mill Point Capital, or to any member/owner of the Strike Entities, without first funding the Preferred Distribution and the 2020 Tax Distribution in full.

106.   There is a substantial likelihood that Plaintiffs will prevail on the merits of one or more of their claims herein; Defendants have no justification for failing to fund the Preferred Distributions, for failing to fund the 2020 Tax Distribution, for deliberately structuring the Mill Point Transaction in a fashion to dishonor/harm/eradicate the Preferred Distribution Rights, and/or for refusing to provide Plaintiffs with documents to support the calculation of income

12

allocated to Plaintiffs and reported to the IRS by the Strike Entities, and to provide documents related to the tax returns/AAR.

107.   The injunction is necessary to prevent irreparable harm; Defendants have told Plaintiffs that the Strike Entities have no money and may soon have to file for bankruptcy. Accordingly, they should not be permitted to make payments (seven figures or otherwise) to themselves or their affiliates.  Moreover, as to the tax information sought, Plaintiffs needs the information to understand their tax payment obligations for year 2020 make important planning decisions for future tax years by year end.

108.   The harm to Plaintiffs from any of the types of payments, distributions, etc. would be irreparable, given the purported financial condition of the Strike Entities. Likewise, the harm to Plaintiffs from the inability to obtain basic tax information could result in Plaintiffs losing their ability to challenge those amounts with the IRS or losing the ability to engage in proper business planning and/or estate planning.

109.   There is no harm to Defendants in being forced to refrain from making payments to insiders.  Likewise, there is no harm to Defendants in either providing or having their accountants provide financial documentation, particularly given that Plaintiffs are entitled to the information as a matter of law anyway.

110.   The public interest favors Plaintiffs; the law does not permit parties to deliberately subvert their contractual obligations, then funnel to themselves funds that could be used to pay the obligations.

## COUNT II

## ACCOUNTING

### (All Defendants)

111.   Plaintiffs adopt and incorporate each of the preceding paragraphs as though fully set forth herein.

112.   Section 10.3 of the Strike Operating Agreement requires that Strike "keep, or cause to be kept, at the principal office of the Company, correct and complete books and records of account of the Company."

113.   Section 10.3 of the Strike Capital Operating Agreement requires that Strike Capital "keep, or cause to be kept, at the principal office of the Company, correct and complete books and records of account of the Company."

114.   Section 7.1 of the Strike Investment Operating Agreement requires that Strike Investment keep, at its "principal place of business:  the books and records pertaining to the Company's business showing all of its assets and liabilities, receipts and disbursements, profits and losses, the Capital Accounts of the Members and all transactions entered into by the Company[.]"

115.   Plaintiffs have not had regular access to these records.

116.   The primary financial records that Plaintiffs have received have been a K-1s and W-2s.

117.   Billy has from time-to-time received other financial information due to his position as Strike employee, but that information still has not been complete.

118.   Despite being members/owners of the Strike Entities, Plaintiffs have not been kept properly apprised of the Strike Entities' financial transactions or its other affairs.

119.   As members in the Strike Entities, Plaintiffs are entitled as a matter of law to inspect the book and records.

120.   On information and belief, the Strike Entities have a complex accounting system. In this respect, it is notable that Strike's own CFO has (as noted herein) stated that (a) "Strike

14

was left in a precarious position with respect to these returns after the February 2021 transformative transaction", (b) "we here at Strike, LLC no longer have any authority with respect to the delivery of tax return information related Strike Capital, LLC" and (c) "[w]e are not aware of who controls Strike Capital at this juncture nor do we know who the officers of same are now."

121. The accountants who prepare the Strike Entities' books are believed to already have completed the equivalent of an accounting, or to have the records necessary to do so.

122. Plaintiffs request that his Court enter an order compelling each of the Strike Entities to produce an accounting of all their financial dealings and transactions for the last six years, within thirty days, at the Strike Entities' expense.

## COUNT III

## BREACH OF CONTRACT

### (OEP, PHC, Strike, Strike Capital)

123. Plaintiffs adopt and incorporate each of the preceding paragraphs as though fully set forth herein.

124. Section 4.8(b) of the Strike Operating Agreement and the Strike Capital Operating Agreement provided Plaintiffs with the Priority Distribution Rights.

125. Section 5.1(c), together with Section 1.13(o), of the Strike Operating Agreement and the Strike Capital Operating Agreement forbade OEP and PHC from transferring their interests in a manner that would dilute or eliminate the Priority Distribution Rights, without Plaintiffs' consent.

126. The creation of Strike Investment and/or the transfer of Strike and Strike Capital interest to Mill Point constituted a "Change of Control Event", as that term is defined in the Strike Operating Agreement and the Strike Investment Operating Agreement.

127.   By entering into the Mill Point Transaction, OEP and PHC breached the aforementioned Sections 4.8(b) and 5.1(c).

128.   In addition, upon information and belief, distributions were made to parties other than Plaintiffs in violation of the Priority Distribution Rights.

129.   At least one person affiliated with PHC took extremely valuable art work from Strike's offices without any form of payment or renumeration to Strike.

130.   The Defendants have also sold new and valuable equipment to insiders at less than fair market value.

131.   These distributions are a breach of contract.

132.   In addition, Section 4.8(d) of the Strike Operating Agreement and the Strike Capital Operating Agreement provided that Plaintiffs were entitled to tax distributions.

133.   For tax years 2014-2019, Strike made tax distributions to Plaintiffs as appropriate, and as further detailed in the factual recitation herein.

134.   The Strike Entities have refused to make the 2020 Tax Distribution.

135.   The failure to make the 2020 Tax Distribution is a breach of contract.

136.   As a matter of law, these contracts contained an implied term requiring that they provide financial records to Plaintiffs upon request.

137.   Defendants have refused to provide Plaintiffs with requested financial information, namely the documentation and data necessary to support the 2020 tax calculation, the documentation and data necessary to calculate likely future tax allocations; and information as to apparent amended tax returns/AAR that they are either preparing or have filed.

138.   Defendants' refusal to provide the foregoing information is a breach of contract.

139.   Strike and Strike Capital are liable for the breaches stated herein.

DSK01 4844-9555-9419
2930445-000001

140.    Plaintiffs have been damaged by the breaches herein, in a manner to be provided at trial, but in an amount not less than $19 million.

141.    In addition, these breaches of contract are so egregious and outrageous that they support an award of punitive damages and attorney's fees.

## COUNT IV

### BREACH OF THE IMPLIED DUTY OF
### GOOD FAITH AND FAIR DEALING

### (OEP, PHC, Strike, Strike Capital)

142.    Plaintiffs restate and incorporate by reference the allegations in each of the paragraphs above as if set forth fully herein.

143.    All of the contracts at issue as a matter of law contain an implied duty of good faith and fair dealing.

144.    OEP and PHC have breached this duty of good faith and fair dealing in several different ways.

145.    OEP and PHC, contrary to the requirements of Section 5.1(c) in the Strike Operating Agreement and the Strike Capital Operating Agreement, transferred control of Strike and/or Strike Capital to Mill Point.

146.    The creation of Strike Investment and/or the transfer of Strike interests to Mill Point constituted a "Change of Control Event", as that term is defined in the Strike Operating Agreement and the Strike Investment Operating Agreement.

147.    OEP and PHC have purportedly voted Plaintiffs' units in a manner directly harmful to Plaintiffs' interests on matters of fundamental corporate structuring.

148.    Defendants have unreasonably declined and/or refused to make the 2020 Tax Distribution.

149.    Defendants have refused to provide Plaintiffs with information to support and explain the allocations of income that Defendants reported to the IRS.

150.    These actions were reckless, malicious, and in bad faith.

151.    Strike and Strike Capital are liable for the conduct described herein.

152.    Plaintiffs have been damaged by the breaches herein, in a manner to be proven at trial, but in an amount not less than $19 million.

153.    In addition, these breaches of the duty of good faith and fair dealing support an award of punitive damages and attorney's fees.

## COUNT V

### FRAUD /SILENT FRAUD

### (OEP, PHC, Strike, Strike Capital)

154.    Plaintiffs adopt and incorporate each of the preceding paragraphs as though fully set forth herein.

155.    At the time that they began the Mill Point negotiations, OEP and PHC had a duty to notify Plaintiffs of the negotiations.

156.    OEP and PHC did not notify Mill Point of the Mill Point negotiations.

157.    OEP and PHC did not tell Plaintiffs about the Mill Point negotiations because they wanted to ensure that Plaintiffs did not take action to try to prevent the negotiations from moving forward.

158.    Even after Plaintiffs belatedly learned of the Mill Point negotiations, OEP and PHC informed Plaintiffs that they could do nothing to stop the Mill Point Transaction.  They made this statement with the intent that Plaintiffs rely upon it.

159.    Plaintiffs relied both on Defendants' silence and Defendants' affirmative statements as to the Mill Point Transaction.

18

160.   Plaintiffs were entitled to rely upon this silence and upon these statements.

161.   Plaintiffs were damaged by these statements, in an amount not less than $19 million.

162.   Strike and Strike Capital are liable for the fraudulent conduct stated herein.

163.   Plaintiffs have been damaged by the breaches herein, in a manner to be provided at trial, but in an amount not less than $19 million.

164.   In addition, the fraudulent contact at issue here support an award of punitive damages and attorney's fees.

## COUNT VI

## BREACH OF FIDUCIARY DUTY

### (All Defendants)

165.   Plaintiffs restate and incorporate by reference the allegations in each of the paragraphs above as if set forth fully herein.

166.   As majority owners of the Strike Entities, OEP, PHC, and Mill Point owe duties of loyalty, care, and good faith and fair dealing to all of the minority owners, including Plaintiffs.

167.   This obligation began no later than 2014 for OEP and PHC, and no later than 2021 for Mill Point.

168.   These duties include but are not limited to managing the Strike Entities and making distributions as appropriate for the benefit and in the best interests of the minority owners, and with due care and loyalty to those minority interests.

169.   Until the time of the Mill Point Transaction, OEP and PHC, have dominated and controlled the affairs of Strike and Strike Capital.

170.   OEP and PHC had a duty not to use their control over Strike and Strike Capital and its assets to benefit themselves or to benefit third parties at Plaintiffs' expense.

19

171.    OEP and PHC breached this duty.

172.    Following the Mill Point Transaction, OEP, PHC, and Mill Point have dominated and controlled the affairs of the Strike Entities.

173.    OEP, PHC, and Mill Point each had a duty not to use their control over the Strike Entities and their assets to benefit themselves or to benefit third parties at Plaintiffs' expense.

174.    OEP, PHC, and Mill Point have breached their duties to Plaintiffs by, among other things: freezing them out of the Strike Entities; improperly engaging in transactions meant to harm the Priority Distribution Rights;  improperly terminating Billy's employment; failing to fund the Priority Distribution Rights; failing to make the 2020 Tax Distribution; causing Plaintiffs to be improperly allocated taxable income for the year 2020 in an amount not reflective of their percentage of ownership; refusing to provide Plaintiffs with the documentation and data necessary to explain the 2020 tax allocation; refusing to provide Plaintiffs with the documentation and data necessary to calculate likely future tax allocations; and refusing to provide Plaintiffs with information as to apparent amended tax returns/AAR.

175.    The Strike Entities are liable for the conduct of OEP, PHC, and Mill Point.

176.    As a direct and proximate result of these breaches of fiduciary duties, Plaintiffs have suffered damages in an amount to be proven at trial, in an amount not less than $19 million.

177.    In addition, these breaches support an award of punitive damages and attorney's fees.

## COUNT VII

## CONVERSION OF PLAINTIFFS' PRIORITY DISTRIBUTION RIGHTS

### (All Defendants)

178.    Plaintiffs restate and incorporate by reference the allegations in each of the paragraphs above as if set forth fully herein.

20

179. Defendants have wrongfully converted Plaintiffs' Priority Distribution Rights.

180. Plaintiffs have the sole and exclusive right to the Priority Distribution Rights.

181. Defendants have usurped/converted Plaintiffs' Priority Distribution Rights by giving Mill Point superior rights.

182. Plaintiffs are entitled to immediate funding of the Priority Distribution Rights.

183. Plaintiffs have suffered damages in an amount to be proven at trial, in an amount not less than $19 million.

184. The conduct at issue supports an award of punitive damages and attorney's fees against Defendants.

## COUNT VIII

### FREEZE OUT/MINORITY SHAREHOLDER OPPRESSION

### (All Defendants)

185. Plaintiffs restate and incorporate by reference the allegations in each of the paragraphs above as if set forth fully herein.

186. Defendants have frozen Plaintiffs out of the Strike Entities and/or engaged in minority shareholder oppression.

187. Defendants have frozen Plaintiffs out of the Strike Entities and/or engaged in shareholder oppression by terminating Billy's employment without cause.

188. Defendants have frozen Plaintiffs out of the Strike Entities and/or engaged in shareholder oppression by improperly allocating income to Plaintiffs and/or by allocating a disproportionate share of income to Plaintiffs that is far greater than their percentage of ownership; refusing to provide Plaintiffs with the documentation and data necessary to explain the 2020 tax allocation; refusing to provide Plaintiffs with the documentation and data necessary

21

to calculate likely future tax allocations; and refusing to provide Plaintiffs with information as to apparent amended tax returns/AAR.

189.    Defendants have frozen Plaintiffs out of the Strike Entities and/or engaged in minority shareholder oppression by refusing/failing to make the 2020 Tax Distribution.

190.    Defendants have frozen Plaintiffs out of the Strike Entities and/or engaged in minority shareholder oppression by depriving Plaintiffs of their Preferred Distribution by violating Section 5.1(c) of the Strike Operating Agreement and Section 5.1(c) Strike Capital Operating Agreement.

191.    Defendants have frozen Plaintiffs out of the Strike Entities and/or engaged in minority shareholder oppression by, in their own words, "spen[ding] millions of dollars on New York lawyers" in order "to get around" the Preferred Distribution Rights.

192.    Plaintiffs have been damaged by this conduct in a manner to be proven at trial, but in an amount not less than $19 million.

193.    In addition, this conduct supports an award of punitive damages and attorney's fees.

## COUNT IX

### CONSPIRACY

### (OEP, PHC, and Mill Point)

194.    Plaintiffs restate and incorporate by reference the allegations in each of the paragraphs above as if set forth fully herein.

195.    OEP, PHC, and Mill Point are each a separate business entity.

196.    In 2020 and into 2021, OEP, PHC, and Mill Point were negotiating the Mill Point Transaction.

22

197.   Mill Point was not willing to consummate the Mill Point Transaction if it or any of the Strike Entities had to pay Plaintiffs the Preferred Distributions or the Tax Distribution.

198.   OEP, PHC, and Mill Point formulated a business strategy and/or legal strategy that they believed would permit the Strike Entities to avoid paying Plaintiffs these amounts.

199.   OEP, PHC, and Mill Point agreed on the course of action and the objective.

200.   OEP, PHC, and Mill Point completed multiple acts in furtherance of these goals. Without limitation, they created Strike Investment and thereby stripped Strike Capital and/or Strike of all of its/their meaningful assets; "spent millions of dollars on New York lawyers" in order to "get around" the Preferred Distribution Rights; refused to pay the 2020 Tax Distribution post-closing; and fired Billy.

201.   OEP, PHC, and Mill Point also caused the accounting records to reflect that only Plaintiffs would have a substantial 2020 tax liability based on their ownership interest in Strike and Strike Capital, notwithstanding their minimal interest as compared to others who were assessed no tax liability; refused to provide Plaintiffs with the documentation and data necessary to explain the 2020 tax allocation; refused to provide Plaintiffs with the documentation and data necessary to calculate likely future tax allocations; and refused to provide Plaintiffs with information as to apparent amended tax returns/AAR.

202.   Plaintiffs have been damaged by the breaches herein, in a manner to be proven at trial, but in an amount not less than $19 million.

203.   In addition, these conspiratorial acts support an award of punitive damages and attorney's fees.

## COUNT X

### TORTIOUS INTERFERENCE

### (Mill Point)

204.    Plaintiffs restate and incorporate by reference the allegations in each of the paragraphs above as if set forth fully herein.

205.    Mill Point learned of the Preferred Distribution Rights and the right to the 2020 Tax Distribution during its negotiations with OEP and PHC.  Exhibit C.

206.    Instead of requiring the Strike Defendants to honor these contractual obligations, Mill Point worked to avoid the Preferred Distribution Rights.

207.    Mill Point had no legitimate purpose or legitimate right to dishonor the Preferred Distribution Rights; it could have made its investment without violating those rights.

208.    Plaintiffs have not received any distributions, preferred or otherwise, since February 2021.

209.    Persons affiliated with PHC have told Plaintiffs that they will not receive any distributions following the Mill Point Transaction.

210.    Plaintiffs have been damaged by the breaches herein, in a manner to be provided at trial, but in an amount not less than $19 million.

211.    In addition, these acts of tortious interference support an award of punitive damages and attorney's fees.

## COUNT XI

## CONSTRUCTIVE TRUST/DISGORGEMENT

### (All Defendants)

212.    Plaintiffs restate and incorporate by reference the allegations in each of the paragraphs above as if set forth fully herein.

213.    For the reasons explained herein, Defendants have engaged in fraud, an abuse of confidence, unconscionable conduct, and otherwise engaged in inequitable conduct.  All of these,

DSK01 4844-9555-9419
2930445-000001

and each of them, entitle Plaintiffs to a constructive trust for all distributions paid to any of the Defendants from 2014 forward.

214.    Plaintiffs further request that any funds paid to OEP, to PHC, or to any member, owner, etc. of either entiy as a result of the Mill Point transaction be disgorged to the full extent and amount of the Preferred Distribution Rights, and paid to Plaintiffs.

## COUNT XII

### PUNITIVE DAMAGES

### (All Defendants)

215.    Plaintiffs restate and incorporate by reference the allegations in each of the paragraphs above as if set forth fully herein.

216.    Defendants' conduct, as alleged above, demonstrates a willful, wanton, malicious, gross, and reckless disregard for the rights Plaintiffs, such that it warrants the imposition of punitive damages.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray for the following relief:

a.    That an order be issued requiring Defendants to produce an accounting of the books and records of the Strike Entities within 30 days, to include and not limited to refusing all documents to support the calculation of income allocated to Plaintiffs and reported to the IRS by the Strike Entities;

b.    That an order be issued stating that Billy is not subject to any of the restrictive covenants from his Employment Agreement;

c.    That an order be issued enjoining Defendants from paying any funds to themselves, to any other Defendant, or to any affiliate of any Defendant, until such time as the Preferred Distribution Rights and the 2020 Tax Distribution are fully paid;

DSK01 4844-9555-9419
2930445-000001

e.      That all costs and attorney's fees be assessed against Defendants;

f.      That Plaintiffs be awarded the maximum amount of punitive damages available under applicable law; and

g.      That Plaintiffs be granted all other relief, at law or equity, that this Court may deem just and proper.

This the 7th of October 2021.

Respectfully submitted,

BILLY CLEVELAND AND TAMMY CLEVELAND

By Its Attorneys,

BAKER, DONELSON, BEARMAN,
 CALDWELL & BERKOWITZ, P.C.

By:_____
D. STERLING KIDD

DSK01 4844-9555-9419
2930445-000001

# EXHIBIT A

# CONTRIBUTION AND PURCHASE AGREEMENT

## BY AND AMONG

**DELTA DIRECTIONAL DRILLING, LLC**
**"Buyer"**

**STRIKE, LLC**
**"Strike Parent"**

**DELTA DIRECTIONAL, LLC**
**"Seller"**

**AND**

**BILLY and TAMMY CLEVELAND**
**"Owners"**

**June 30, 2014**

53548023.15

# TABLE OF CONTENTS

**Page**

Article 1 Definitions ...................................................................................................1

    1.1    Definitions..........................................................................................1
    1.2    Other Definitional Provisions ...........................................................7

Article 2 Contribution, Purchase and Sale; Closing ..................................................9

    2.1    Contribution of Assets .......................................................................9
    2.2    Purchase and Sale of Assets...............................................................9
    2.3    Excluded Assets................................................................................10
    2.4    Assumed Liabilities..........................................................................11
    2.5    Excluded Liabilities..........................................................................11
    2.6    Purchase Price...................................................................................13
    2.7    The Closing.......................................................................................13
    2.8    Deliveries at the Closing..................................................................13
    2.9    Purchase Price Adjustment...............................................................15
    2.10   Closing Date Balance Sheet..............................................................16
    2.11   Third Party Consents........................................................................17
    2.12   Withholding......................................................................................17
    2.13   Allocation of Purchase Price............................................................17

Article 3 Representations and Warranties of Seller ..................................................18

    3.1    Organization and Good Standing......................................................18
    3.2    Authority...........................................................................................18
    3.3    Title to Purchased Assets..................................................................18
    3.4    Noncontravention..............................................................................19
    3.5    Financial Statements.........................................................................19
    3.6    Events Subsequent to Most Recent Fiscal Year End .......................20
    3.7    Undisclosed Liabilities.....................................................................20
    3.8    Accounts Receivable........................................................................20
    3.9    Legal Compliance.............................................................................20
    3.10   Tax Matters.......................................................................................21
    3.11   Real Property....................................................................................23
    3.12   Intellectual Property.........................................................................24
    3.13   Investor Representations...................................................................24
    3.14   Tangible Assets.................................................................................25
    3.15   Customers and Suppliers...................................................................25
    3.16   Contracts...........................................................................................26
    3.17   Insurance..........................................................................................27
    3.18   Litigation and Governmental Orders ...............................................28
    3.19   Employees.........................................................................................28
    3.20   Employee Benefits............................................................................29
    3.21   Environmental Matters.....................................................................30

**TABLE OF CONTENTS**
(continued)

**Page**

| | | | |
|---|---|---|---|
| | 3.22 | Certain Business Relationships with Seller | 31 |
| | 3.23 | Foreign Corrupt Practices Act | 31 |
| | 3.24 | Brokers' Fees | 31 |
| | 3.25 | Disclaimer of Other Representations and Warranties | 32 |

Article 4 Representations and Warranties of Buyer ........................................................32

| | | | |
|---|---|---|---|
| | 4.1 | Organization and Good Standing | 32 |
| | 4.2 | Authority | 32 |
| | 4.3 | Noncontravention | 32 |
| | 4.4 | Litigation | 33 |
| | 4.5 | Brokers' Fees | 33 |
| | 4.6 | Solvency | 33 |
| | 4.7 | Valid Issuance | 33 |
| | 4.8 | Material Adverse Change | 33 |
| | 4.9 | Strike Parent Financials | 33 |

Article 5 Covenants ........................................................................................................34

| | | | |
|---|---|---|---|
| | 5.1 | General | 34 |
| | 5.2 | Books and Records | 34 |
| | 5.3 | Confidentiality | 35 |
| | 5.4 | Tax Matters | 35 |
| | 5.5 | Employees and Employee Benefits | 35 |
| | 5.6 | Non-Competition; Non-Solicitation | 36 |
| | 5.7 | Bulk Sales Laws | 37 |
| | 5.8 | Receivables | 37 |
| | 5.9 | Change of Name | 37 |
| | 5.10 | Public Announcements | 37 |
| | 5.11 | Financial Reporting | 38 |

Article 6 Indemnification ................................................................................................38

| | | | |
|---|---|---|---|
| | 6.1 | Survival | 38 |
| | 6.2 | Indemnification of Buyer | 38 |
| | 6.3 | Indemnification of Seller | 39 |
| | 6.4 | Limitations | 39 |
| | 6.5 | Exclusive Remedy | 40 |
| | 6.6 | Third Party Claims | 41 |
| | 6.7 | Other Claims | 42 |
| | 6.8 | Tax Indemnification | 43 |
| | 6.9 | Additional Matters | 43 |

## TABLE OF CONTENTS
### (continued)

**Page**

Article 7 Miscellaneous ...................................................................................................43

| | | | |
|---|---|---|---|
| 7.1 | Press Releases and Public Announcements | ..................................... | 43 |
| 7.2 | No Third-Party Beneficiaries | ............................................................ | 44 |
| 7.3 | Entire Agreement | ............................................................................... | 44 |
| 7.4 | Succession and Assignment | .............................................................. | 44 |
| 7.5 | Multiple Counterparts | ...................................................................... | 44 |
| 7.6 | Headings | ........................................................................................... | 44 |
| 7.7 | Notices | .............................................................................................. | 44 |
| 7.8 | Governing Law | .................................................................................. | 45 |
| 7.9 | Arbitration | ........................................................................................ | 46 |
| 7.10 | Amendments and Waivers | ................................................................ | 47 |
| 7.11 | Severability | ...................................................................................... | 47 |
| 7.12 | Expenses | ........................................................................................... | 47 |
| 7.13 | Construction | ..................................................................................... | 47 |
| 7.14 | Incorporation of Exhibits and Schedules | .......................................... | 47 |
| 7.15 | Specific Performance | ........................................................................ | 48 |
| 7.16 | Time of Essence | ............................................................................... | 48 |

## TABLE OF CONTENTS
### (continued)

<u>**Exhibits**</u>

Exhibit A            Contributed Assets
Exhibit B            Net Working Capital Principles
Exhibit C            List of Employees of Seller entering Employment Agreements

<u>**Disclosure Schedules**</u>

## CONTRIBUTION AND PURCHASE AGREEMENT

This Purchase Agreement (this "Agreement") is entered into as of June 30, 2014, by and among Delta Directional Drilling, LLC, a Texas limited liability company ("Buyer"), Strike, LLC, a Texas limited liability company ("Strike Parent"), Delta Directional, LLC, a Mississippi limited liability company ("Seller"), and Billy and Tammy Cleveland (collectively referred to as the "Owners"). Buyer, Strike Parent, Seller, and the Owners are collectively referred to herein as the "Parties."

## RECITALS

WHEREAS, Seller is in the business of horizontal directional drilling, boring and related services other than for use in fracking and other down-hole oil and natural gas exploration and production activities (the "Business") and is collectively owned by the Owners;

WHEREAS, Buyer is a wholly owned subsidiary of Strike Parent; and

WHEREAS, on and subject to the terms and conditions of this Agreement, (i) Seller desires to contribute to Buyer and Buyer desires to acquire from Seller, certain assets of the Business, through a contribution such assets in exchange for units of Strike Parent, and (ii) Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, certain assets of the Business in exchange for the Purchase Price.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1     Definitions.  The following terms used in this Agreement shall have the following meanings (unless otherwise expressly provided herein).

"Action" means any claim, action, suit, proceeding, arbitration, mediation, audit, inquiry or other investigation by or before any Governmental Authority.

"Adverse Consequences" means with respect to any Person, any actual damage, Liability, demand, claim, action, cause of action, cost, Tax, deficiency, penalty, fine or other actual loss or reasonable out-of-pocket expenses (including reasonable fees and expenses of accountants, attorneys or other advisors), whether or not arising out of a third party claim, against or affecting such Person.

"Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

"Annual Interest Rate" shall mean 5% per annum.

"Assets" means the Contributed Assets and the Purchased Assets.

"Business Day" means any day except a Saturday, Sunday or a legal holiday on which banks in Texas are authorized or obligated by law to close.

"Buyer Fundamental Representations" means the representations and warranties of Buyer and Strike Parent set forth in Sections 4.1 (Organization) 4.2 (Authority) and 4.5 (Brokers).

"Capital Stock" means (i) in the case of a Person that is a corporation, any shares, interests, participation or other equivalents of capital stock and (ii) in the case of a Person that is not an individual or a corporation, any partnership, membership or other equity interests of each Person.

"Cause" means (i) the conviction (or plea of no contest) of the employee of (a) any act that is materially injurious to any member of the Business financial or otherwise (b) any act by the employee of misappropriation or fraud, including but not limited to: (1) any such act with respect to any accounting or financial statements of the Business, Strike Parent or its Affiliates or (2) embezzlement or conversion by the employee of the property of the Business, Strike Parent or its Affiliates; or (c) any felony involving moral turpitude; or (ii) the employee's alcohol or prescription or other drug abuse substantially affecting work performance.

"Charter Documents" means (i) in the case of a Person that is a corporation, its articles, certificate or memorandum of incorporation or association and bylaws or regulations, and each certificate or other document setting forth the designation, amount and relative rights, limitations and preferences of any class or series of the corporation's Capital Stock, (ii) in the case of a Person that is a limited liability company, its articles or certificate of formation or organization, limited liability company agreement, operating agreement or other similar governing documents and, (iii) in the case of a Person that is a general or limited partnership, its certificate of formation or limited partnership, partnership agreement or limited partnership agreement or similar governing documents.

"Cleveland Employment Agreement" means that certain Employment Agreement dated as of the Closing Date by and between Strike Parent and Billy Cleveland.

"COBRA" means the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code, as amended.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contracts" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"Contributed Assets" means the assets of Seller set forth on Exhibit A.

"Current Assets" means, as of the close of business on the Closing Date, the consolidated current assets (excluding cash and cash equivalents) of Seller as determined in accordance with this Agreement and GAAP applied on a basis consistent with the preparation of the Most Recent Financial Statements and the adjustments set forth on Exhibit B.

"Current Liabilities" means, as of the close of business on the Closing Date, the consolidated current liabilities of Seller as determined in accordance with this Agreement and GAAP applied on a basis consistent with the preparation of the Most Recent Financial Statements and the adjustments set forth on Exhibit B, provided that Current Liabilities shall not include, in whole or in part, Indebtedness or Transaction Expenses.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in ERISA §3(3)) and any other employee benefit plan, program, agreement or arrangement of any kind, including, without limitation, any welfare, supplemental unemployment benefit, bonus, retirement, pension, profit sharing, employment, consulting, change in control, retention, severance, collective bargaining, per job labor, executive compensation, deferred compensation, incentive compensation, equity or equity-based compensation, commission, health, medical, dental, life, disability or other insurance, and fringe benefit plan, program, agreement or arrangement, whether or not subject to ERISA, whether formal or informal, oral or written, legally binding or not.

"Employee Pension Benefit Plan" has the meaning set forth in ERISA §3(2).

"Employee Welfare Benefit Plan" has the meaning set forth in ERISA §3(1).

"Environmental, Health, and Safety Requirements" shall mean all federal, state and local statutes, regulations, ordinances, codes and other provisions having the force or effect of law, all binding judicial and administrative orders and determinations, all current, pending or unresolved complaints and notices of violation concerning, all contractual obligations and all common law (i) public health, safety and welfare, (ii) occupational, worker and contractor health, safety, illness and injury, (iii) pollution or (iv) protection of the environment, including, but not limited to all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, or cleanup of any of the following: chemical substances, mixtures or wastes, hazardous materials, substances or wastes, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, lead, polychlorinated biphenyls, noise or radiation.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"GAAP" means United States generally accepted accounting principles as in effect as of the Most Recent Fiscal Year End.

"Governmental Authority" means any federal, state or local court or other governmental, administrative or regulatory authority, agency or body exercising executive, legislative, judicial, regulatory or administrative functions, or any arbitrator.

"Indebtedness" means, without duplication, (i) any indebtedness of Seller for borrowed money and accrued but unpaid interest, fees, premiums and penalties relating thereto, including any premiums and penalties associated with prepaying any such indebtedness or other similar amounts, (ii) any indebtedness of Seller evidenced by a note, bond, debenture or other similar security, (iii) any lease that has been accounted for as a capital lease on the balance sheet of Seller, prepared in accordance with GAAP including those equipment leases set forth in Section 1.1.3 of the Disclosure Schedules, (iv) any overdrafts, (v) any obligations in respect to interest rate and currency obligations, swaps, hedges or similar arrangements, (vi) any obligation of Seller to reimburse any bank or other Person for amounts paid under a letter of credit or similar arrangement, (vii) any obligations (contingent or otherwise) for deferred purchase price of property or services (including any earn-out obligations), (viii) any unpaid management fees, and (ix) any indebtedness referred to in clauses (i) through (viii) above of any Person which is either guaranteed by, or secured by a Lien upon any property or asset owned by, Seller, but shall not include accrued liabilities or accounts payable.

"Intellectual Property" means all domestic and foreign intellectual property and proprietary rights including all patents, trademarks, service marks, trade dress, trade names, internet domain names, copyrights and copyrightable works (including software), trade secrets, know-how and confidential business information, and all applications and registrations in connection therewith.

"Intellectual Property Agreements" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, permissions and other Contracts (including any right to receive or obligation to pay royalties or any other consideration), whether written or oral, relating to any Intellectual Property that is used in or necessary for the conduct of the Business as currently conducted to which Seller is a party, beneficiary or otherwise bound.

"Intellectual Property Assets" means all Intellectual Property that is owned by Seller and used in or necessary for the conduct of the Business as currently conducted.

"Key Employees" means the following employees of Seller: Billy Cleveland, Tammy Cleveland, Brian Dawson, Randy Alford, Bobby McCray, Terry Sessions and Joshua Richardson.

"Knowledge," "Known," "Knowledge of Seller" and derivatives thereof mean the actual knowledge of the Owners and the Key Employees.

"Law" means any statute, law, ordinance, code, regulation, rule, or other requirement (including the Code) of any Governmental Authority.

"Leased Real Property" means all leasehold or subleased estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by Seller and related to the Business.

"Leases" means all leases, subleases, licenses, concessions and other arrangements, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property, including the right to all

security deposits and other amounts and instruments deposited by or on behalf of Seller thereunder.

"Liability" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

"Lien" means any mortgage, pledge, lien, encumbrance, charge, or other security interest.

"LLC Agreement" means the Fourth Amended and Restated Regulations of Strike Parent dated as of August 30, 2013, as amended by the Fifth Amended and Restated Regulations of Strike Parent in connection with the Closing.

"Losses" means all Liabilities, fines, penalties, judgments, actions and costs.

"Material Adverse Effect" means, with respect to Seller, any change, occurrence, event, development or effect, individually or in the aggregate with all other changes, occurrences, events, developments and effects, that has had, or would reasonably be expected to have, a material adverse effect on the business, assets, Liabilities, condition (financial or otherwise) or results of operations of Seller, other than any change, occurrence, event, development or effect arising from or related to (i) general business, economic, political, social, legal or regulatory conditions generally affecting the industries in which Seller operates in general and not specifically arising from or related to the Business, (ii) financial, banking or securities markets (including any disruption thereof), (iii) seasonal fluctuations in the Business that are reasonably consistent with the Business' historical seasonal fluctuations in operating performance, (iv) changes in applicable law or GAAP, (v) outbreak of hostilities, terrorist attack (whether against a nation or otherwise) or war, or (vi) the announcement or pendency of this Agreement or any of the transactions contemplated hereby.

"Most Recent Balance Sheet" means the balance sheet contained within the Most Recent Financial Statements.

"Multiemployer Plan" has the meaning set forth in ERISA §3(37).

"Net Working Capital" means the amount equal to (a) the Current Assets less (b) the Current Liabilities.

"Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice.

"Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a Governmental Authority or other entity, of whatever nature.

"Personal Property and Equipment" shall mean, with respect to Seller, all of the furniture, fixtures, furnishings, machinery, equipment, computer hardware, software, appliances, cranes, vehicles and other personal property currently owned or leased by Seller, wherever located (including all warranty rights with respect thereto).

"Related Party" means (i) any Owners or any officer (including mid-level managers), director, stockholder, member, or Affiliate of Seller or Owners; (ii) any individual related by blood, marriage or adoption to any such Person in clause (i); or (iii) any entity in which any such Person in clause (i) owns any beneficial interest.

"Related to the Business" means owned, leased, licensed, used, usable, held for use or held for sale, in each case in connection with the Business.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller Fundamental Representations" means the representations and warranties of Seller and the Owners set forth in Sections 3.1 (Organization), 3.2 (Authority), 3.3 (Title) and 3.24 (Brokers).

"Subsidiary" or "Subsidiaries" of any Person means any corporation, partnership, limited liability company or other legal entity in which such Person (either alone or through or together with any other Subsidiary), owns, directly or indirectly, 50% or more of the stock or other equity or ownership interests, the holder of which is generally entitled to elect a majority of the board of directors or other governing body of such legal entity.

"Tax" or "Taxes" means, however denominated, (i) any and all taxes, assessments, customs, duties, levies, fees, tariffs, imposts, unclaimed property and escheat obligations, deficiencies and other charges of any kind whatsoever imposed by any Taxing Authority (including, but not limited to, taxes on or with respect to net or gross income, franchise taxes, profits taxes, gross receipts taxes, capital taxes, sales taxes, use taxes, ad valorem taxes, value added taxes, transfer taxes, real property transfer taxes, transfer gains taxes, inventory taxes, escheat and unclaimed property obligations, capital stock tax, license fees, payroll taxes, employment taxes, social security taxes, unemployment taxes, severance taxes, occupation taxes, real or personal property taxes, estimated taxes, rent taxes, excise taxes, occupancy taxes, recordation fees, bulk transfer obligations, intangibles taxes, alternative minimum taxes, doing business taxes, withholding taxes and stamp taxes), together with any interest thereon, penalties, fines, damages, costs, fees, additions to tax or additional amounts with respect thereto, whether disputed or not; or (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of the operation of Law or any express or implied obligation to indemnify any other Person.

"Tax Return" means any report, return, document, declaration, statement, notice or other documents (including any amendments, elections, disclosures, schedules, estimates and information returns) required to be filed with, required to be filed with, or required to be maintained by any Taxing Authority, including, where permitted or required, combined or consolidated returns for any Combined Group, any documents with respect to or accompanying payments of estimated Taxes, or with respect to or accompanying requests for the extension of

time in which to file any such report, return, document, declaration, statement, notice or other document.

"Taxing Authority" means, with respect to any Tax, the Governmental Authority or political subdivision thereof that imposes such Tax, and the agency (if any), including the Internal Revenue Service, charged with the collection of such Tax for such entity or subdivision, including any Governmental Authority or agency that imposes, or is charged with collecting, social security or similar charges or premiums.

"Transaction Documents" means this Agreement, the agreements to be delivered by Seller in Section 2.8(a), and any other contracts, notices or documents necessary in connection with the transactions contemplated by this Agreement.

"Transaction Expenses Amount" means an amount equal to all Transaction Expenses that have not been paid prior to the close of business on the Closing Date, whether or not Seller have been billed for such expenses.

"Transaction Expenses" means all fees and expenses payable by Seller and the Owners in connection with the negotiation and consummation of the transactions contemplated by this Agreement (including any fees and expenses relating to the Sale Process that is not specifically related to this Agreement) including, without limitation, (i) those fees and expenses payable to Bradley Arant Boult Cummings LLP, Legacy Capital, LLC, May & Company, a limited liability partnership, and other professional advisors in connection with the transactions contemplated by this Agreement, (ii) all bonuses or incentive amounts, if any, payable to officers and employees of Seller as a result of or arising due to the consummation of the transactions contemplated by this Agreement, and (iii) the employer portion of any FICA Tax withholding payments that are required in connection with the payment of any bonuses or incentive amounts payable pursuant to clause (ii) above.

"Working Capital Deficit" means the amount by which the Net Working Capital as of the close of business on the Closing Date is less than $3,800,000.

"Working Capital Surplus" means the amount by which the Net Working Capital as of the close of business on the Closing Date is greater than $3,800,000.

1.2    Other Definitional Provisions.  Each of the terms below has the meaning set forth in the provision of the Agreement identified opposite such term in the table below.

| Term | Provision |
| --- | --- |
| $ or Dollars | Section 7.13 |
| Accounting Firm | Section 2.10(b) |
| Agreement | Preamble |
| Annual Financial Statements | Section 3.5 |
| Arbitration Body | Section 7.9(a) |
| Arbitration Rules | Section 7.9(a) |
| Assignment and Assumption Agreement | Section 2.8(a)(ii) |

| **Term** | **Provision** |
|----------|---------------|
| Assignment and Assumption of Lease | Section 2.8(a)(iv) |
| Assumed Liabilities | Section 2.4 |
| Bill of Sale | Section 2.8(a)(i) |
| Books and Records | Section 2.2(o) |
| Business | Recitals |
| Buyer | Preamble |
| Buyer Material Adverse Effect | Section 4.1 |
| Cap | Section 6.4(a) |
| Cash Payment Adjustment | Section 2.9(b) |
| Closing | Section 2.7 |
| Closing Date | Section 2.7 |
| Closing Date Balance Sheet | Section 2.10(b) |
| Closing Date Cash Purchase Price | Section 2.6 |
| Closing Statement | Section 2.10(a) |
| Closing Statement Unresolved Items | Section 2.10(b) |
| Disclosure Schedules | Article 3 |
| DOL | Section 3.20(b) |
| Draft Closing Date Balance Sheet | Section 2.10(a) |
| Excluded Assets | Section 2.3 |
| Excluded Contracts | Section 2.3(a) |
| Excluded Liabilities | Section 2.5 |
| Financial Statements | Section 3.5 |
| Insurance Policies | Section 3.17 |
| Intellectual Property Assignments | Section 2.8(a)(iii) |
| Inventory | Section 2.2(b) |
| Major Customer | Section 3.15(a) |
| Material Contracts | Section 3.16(a) |
| Most Recent End Date | Section 3.5 |
| Most Recent Financial Statements | Section 3.5 |
| Most Recent Fiscal Year End | Section 3.5 |
| Net Working Capital Principles | Exhibit B |
| Owners | Preamble |
| Parties | Preamble |
| Permitted Liens | Section 3.3 |
| Preliminary Purchase Price | Section 2.6 |
| Purchase Price | Section 2.6 |
| Purchased Assets | Section 2.2 |
| Required Consents | Section 2.8(a)(v) |
| Seller | Preamble |
| Seller Indemnified Parties | Section 6.3 |
| Strike Parent | Preamble |
| Strike Units | Section 2.1 |
| Tangible Personal Property | Section 2.2(d) |

| Term | Provision |
|------|-----------|
| Transferred Leases | Section 2.2(h) |

## ARTICLE 2

## CONTRIBUTION, PURCHASE AND SALE; CLOSING

2.1    Contribution of Assets.    On and subject to the terms and conditions of this Agreement, (a) Buyer shall acquire from Seller, and Seller shall contribute, transfer, assign, convey and deliver to Buyer, all right, title and interest in and to all of the assets that are set forth on Exhibit A (the "Contributed Assets"), free and clear of all mortgages, pledges, liens, encumbrances, charges, other securities interests, at the Closing and (b) in consideration for the Contributed Assets, Strike Parent shall issue to Seller at the Closing 4,108.0283 Units (as defined in the LLC Agreement) representing limited liability company membership interests in Strike Parent (the "Strike Units").

2.2    Purchase and Sale of Assets.    On and subject to the terms and conditions of this Agreement, concurrent with the contribution set forth in Section 2.1, Buyer shall purchase from Seller and Seller shall sell, convey, assign and otherwise transfer to Buyer, free and clear of all Liens (other than Permitted Liens), in exchange for the payment of the Purchase Price (which may be adjusted pursuant to Section 2.9) and the assumption of the Assumed Liabilities, all of Seller's right, title and interest in and to all of Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, whether or not reflected on the books and records of Seller and wherever located, other than the Excluded Assets and the Contributed Assets (collectively, the "Purchased Assets"), including the following:

(a)    all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing;

(b)    all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories ("Inventory");

(c)    all Contracts listed on Schedule 2.2(c) (the "Assigned Contracts");

(d)    all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property (the "Tangible Personal Property");

(e)    all Leased Real Property;

(f)    all Permits which are held by Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Assets, including, without limitation, those listed on Section 3.9(b) of the Disclosure Schedules;

(g)    the Intellectual Property owned by Seller and any and all rights Seller has to use any of the Intellectual Property that is not owned by Seller but that is used in the Business as listed on Schedule 2.2(g);

(h)     the Leases listed on Schedule 2.2(h) (the "Transferred Leases");

(i)     all of the goodwill associated with the Purchased Assets or the Business;

(j)     all rights of Seller with respect to insurance or awards in condemnation, in each case to the extent relating to the Purchased Assets or the Contributed Assets (i) received or receivable after the Closing in respect of Assumed Liabilities, (ii) received or receivable in respect of any asset damaged, lost or condemned prior to the Closing and which, if not so damaged, lost or condemned, would have been a Purchased Asset or (iii) received or receivable in respect of business interruption to the extent relating to the period following the Closing;

(k)     all rights under warranties, representations and guaranties made by suppliers, manufacturers and contractors relating to the Purchased Assets or the Contributed Assets;

(l)     any Actions of Seller against any third party relating to the Purchased Assets or the Contributed Assets, whether choate or inchoate, known or unknown, contingent or noncontingent, except as described in the Excluded Assets;

(m)     all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes);

(n)     all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets or the Contributed Assets;

(o)     originals, or where not available, copies, of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements and marketing and promotional surveys ("Books and Records");

(p)     the operating bank accounts of Seller as set forth on Schedule 2.2(p); and

(q)     all Employee Benefit Plans listed on Schedule 2.2(q) and assets attributable thereto.

2.3     Excluded Assets.  Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "Excluded Assets"):

(a)     All cash and cash equivalents;

(b)      Contracts, that are not Assigned Contracts (the "Excluded Contracts");

(c)      the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller;

(d)      all Employee Benefit Plans not listed on Schedule 2.2(q) and assets attributable thereto;

(e)      the assets, properties and rights specifically set forth on Schedule 2.3(e);

(f)      the Seller's claim against BP and any trust funds related thereto, including any awards or settlement proceeds received therefrom;

(g)      all awards in condemnation and insurance benefits, rights and proceeds arising from or related to the operation of the Business and the Assets prior to the Closing insofar as the foregoing relate exclusively to an Excluded Asset or Excluded Liability; and

(h)      the rights which accrue or will accrue to Seller under the Transaction Documents.

2.4    Assumed Liabilities.  Subject to the terms and conditions set forth herein, Buyer shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (collectively, the "Assumed Liabilities"), and no other Liabilities:

(a)      all trade accounts payable of Seller to third parties in connection with the Business that remain unpaid and are not delinquent as of the Closing Date and that either are reflected on the Most Recent Financial Statements or arose in the ordinary course of business consistent with past practice since the Most Recent Financial Statements;

(b)      all Liabilities in respect of the Assigned Contracts but only to the extent that such Liabilities thereunder are required to be performed after the Closing Date, were incurred in the ordinary course of business and do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller on or prior to the Closing; and

2.5    Excluded Liabilities.  Notwithstanding the provisions of Section 2.4 or any other provision in this Agreement to the contrary, Buyer shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "Excluded Liabilities").  Seller shall, and shall cause each of its Affiliates to, pay and satisfy in due course all Excluded Liabilities which they are obligated to pay and satisfy.  Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)      any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the other

Transaction Documents and the transactions contemplated hereby and thereby, including, without limitation, the Transaction Expenses;

(b)     any Liability for (i) Taxes of Seller or Owners (or any other stockholder or Affiliate of Seller or Owners) or relating to the Business, the Purchased Assets or the Assumed Liabilities for any taxable period ending on or before the Closing Date; (ii) Taxes that arise out of the consummation of the transactions contemplated hereby or that are the responsibility of Seller or Owners pursuant to Section 5.4(a); or (iii) other Taxes of Seller or Owners (or any other stockholder or Affiliate of Seller) of any kind or description (including any Liability for Taxes of Seller or Owners (or any other stockholder or Affiliate of Seller) that becomes a Liability of Buyer under any common law doctrine of de facto merger or transferee or successor liability or otherwise by operation of contract or Law);

(c)     any Liabilities relating to or arising out of the Excluded Assets;

(d)     any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(e)     any Liability or similar claim for injury to a Person or property which arises out of or is based upon the Business prior to the Closing;

(f)     any Liabilities arising prior to the Closing under or in connection with any Employee Benefit Plan;

(g)     any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(h)     any claims or Liabilities under Environmental, Health, and Safety Requirements, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(i)     any trade accounts payable of Seller (i) to the extent not accounted for on the Most Recent Financial Statements; (ii) which constitute intercompany payables owing to Affiliates of Seller; (iii) which constitute debt, loans or credit facilities to financial institutions; or (iv) which did not arise in the ordinary course of business;

(j)     any Liabilities for accrued but unpaid bonus amounts to employees of the Seller;

(k)     any Liabilities to indemnify, reimburse or advance amounts to any present or former officer, director, employee or agent of Seller (including with respect to any

breach of fiduciary obligations by same), except for indemnification of same pursuant to Article 6 as Seller Indemnified Parties;

(l)   any Liabilities under the Excluded Contracts or any other Contracts, (i) which are not validly and effectively assigned to Buyer pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by Seller of such Contracts prior to Closing;

(m)   any Liabilities associated with debt, loans or credit facilities of Seller, Owners and/or the Business;

(n)   any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or order of a Governmental Authority; and

(o)   any Third Party Claim based upon, resulting from or arising out of the business, operations, properties, assets or obligations of Seller, Owners or any of their Affiliates (other than the Purchased Assets, Contributed Assets or Assumed Liabilities) conducted, existing or arising on or prior to the Closing Date, including but not limited to, warranty claims for services provided by Seller prior to Closing, other claims related to construction defects, failure to provide sufficient maintenance or other services, and any claims related to performance failures under any construction maintenance or services contract.

2.6   Purchase Price.  The aggregate purchase price for the Purchased Assets shall be $18,500,000, minus (a) the outstanding amount of all Indebtedness as of the close of business on the Closing Date, plus (b) the Working Capital Surplus, if any, minus (c) the Working Capital Deficit, if any, (the foregoing, collectively, the "Closing Date Purchase Price"), collectively, as adjusted following the final determination of the Working Capital Surplus or Working Capital Deficit, if any, in accordance with Section 2.10 (collectively, the "Purchase Price").  At Closing, Seller and Buyer estimate that the Closing Date Purchase Price is $18,500,000 (the "Preliminary Purchase Price").

2.7   The Closing.  The closing of the purchase and sale of the Purchased Assets and the contribution of the Contributed Assets in exchange for the Strike Units and the other transactions contemplated by this Agreement (the "Closing") shall take place on and subject to the terms and conditions of this Agreement at the offices of Fulbright & Jaworski LLP, 1301 McKinney, Suite 5100, Houston, Texas, on the date hereof (the "Closing Date").

2.8   Deliveries at the Closing.  At the Closing:

(a)   The Seller shall deliver to Buyer the following documents:

(i)   a bill of sale in form and substance satisfactory to Buyer (the "Bill of Sale") and duly executed by Seller, transferring the tangible personal property included in the Assets to Buyer;

(ii)     an assignment and assumption agreement in form and substance satisfactory to Buyer (the "Assignment and Assumption Agreement") and duly executed by Seller, effecting the assignment to and assumption by Buyer of the Assets and the Assumed Liabilities;

(iii)    assignment(s) in form and substance satisfactory to Buyer (the "Intellectual Property Assignments") and duly executed by Seller, transferring all of Seller's right, title and interest in and to the Intellectual Property Assets to Buyer;

(iv)    with respect to each Lease, an Assignment and Assumption of Lease in form and substance satisfactory to Buyer (each, an "Assignment and Assumption of Lease") and duly executed by Seller;

(v)     each of the third-party consents, and each of the authorizations, consents and approvals of governments and governmental agencies, specified on Schedule 3.4 to the Disclosure Schedules (the "Required Consents");

(vi)    a certificate of existence and good standing of Seller, issued by the applicable Governmental Authorities, dated no earlier than ten Business Days prior to the Closing Date;

(vii)   a counterpart signature page to the LLC Agreement whereby Seller agrees to become a member of Strike Parent, duly executed by Seller;

(viii)  certificates of the secretary or other authorized officer of Seller certifying to copies of resolutions duly and validly adopted by its board of managers evidencing authorization of and approval of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby;

(ix)    mutually acceptable employment agreements between Buyer and each employee of Seller listed on Exhibit C, duly executed by each such employee;

(x)     a proprietary information, invention assignment, non-competition and non-solicitation agreement between Buyer and each employee of Seller listed on Exhibit C in form and substance satisfactory to Buyer, duly executed by such employee;

(xi)    an equityholder agreement executed by Seller relating to the Strike Units held by him in form and substance satisfactory to Buyer;

(xii)   a lease agreement for the Leased Real Property located at 9027 Highway 15, Newton, MS 39345, executed by Circle C Properties, LLC in form and substance satisfactory to Buyer;

(xiii)  a non-foreign affidavit dated as of the Closing Date, executed under penalty of perjury and in form and substance required under Treasury

Regulation issued pursuant to Section 1445 of the Code, making such statements as may be required to evidence that Seller is not a foreign person as defined in Section 1445 of the Code;

(xiv)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement; and

(b)    The Buyer shall pay or deliver the following:

(i)    to Seller, the Closing Date Purchase Price paid in accordance with Section 2.6;

(ii)    a mutually acceptable amendment to the LLC Agreement duly executed by OEP Strike LLC and Pate Holding Company LP;

(iii)    mutually acceptable employment agreements between Buyer and each employee of Seller listed on Exhibit C, duly executed by Buyer;

(iv)    a certificate of existence and good standing of Buyer, issued by the applicable Governmental Authorities for the States of Delaware and Texas, as applicable, dated no earlier than ten Business Days prior to the Closing Date;

(v)    a certificate of the secretary or other authorized officer of Buyer certifying to copies of resolutions duly and validly adopted by its board of directors evidencing authorization of and approval of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby;

(vi)    a certificate of the secretary or other authorized officer of Strike Parent certifying to copies of resolutions duly and validly adopted by its board of directors evidencing authorization of and approval of the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby; and

2.9    Purchase Price Adjustment.  Upon final determination of the Net Working Capital in accordance with Section 2.10, the Preliminary Purchase Price shall be adjusted as follows:

(a)    if the Closing Date Purchase Price exceeds the Preliminary Purchase Price, then such excess shall be paid in cash by Buyer to Seller within two Business Days after the Closing Date Balance Sheet and the Closing Statement become final and binding on the parties pursuant to Section 2.10; or

(b)    if the Preliminary Purchase Price exceeds the Closing Date Purchase Price (such excess, the "Cash Payment Adjustment"), then the Seller or the Owners shall jointly and severally make a payment to Buyer, within two Business Days after the Closing Date Balance Sheet and the Closing Statement become final and binding on the parties pursuant to Section 2.10, by wire transfer in immediately available funds of the Cash Payment Adjustment.

All payments to the Owners pursuant to Section 2.9(a) shall be made by wire transfer of immediately available funds to an account or accounts designated by the Owners in writing. All payments to Buyer pursuant to Section 2.9(b) shall be made by wire transfer of immediately available funds to an account designated by Buyer in writing.

2.10   Closing Date Balance Sheet.

(a)   Within 90 days following the Closing, Buyer shall prepare and furnish to Seller (i) a draft consolidated balance sheet as of the close of business on the Closing Date (the "Draft Closing Date Balance Sheet"), which balance sheet shall be prepared using GAAP and the reserves reflected in the Most Recent Financial Statements, and (ii) a statement setting forth Buyer's good faith calculation of (A) the Net Working Capital as of the close of business on the Closing Date (prepared consistent with the accounting methodologies, policies and procedures used to prepare Exhibit B and the Working Capital Surplus or Working Capital Deficit, if any), (B) the outstanding amount of all Indebtedness as of immediately prior to the Closing and the Transaction Expenses Amount, (C) Related Party accounts, and (D) based on the amounts set forth in clauses (A), (B), and (C), the Purchase Price (the "Closing Statement"). The Parties agree that any proposed adjustment to the Preliminary Purchase Price will not involve changes in or challenges to the accounting methodologies, policies or procedures that were made in accordance with the Financial Statements and Exhibit B.

(b)   If the Owners have any objections to such Draft Closing Date Balance Sheet or the Closing Statement, the Owners shall deliver a detailed written statement describing in reasonable detail their objections to the Draft Closing Date Balance Sheet and/or such Closing Statement within 30 days after receipt. The Buyer shall, upon the Owners reasonable request, promptly make available to the Owners, a copy of all workpapers, financial information and any other books and records utilized by Buyer in the preparation of the Draft Closing Date Balance Sheet and proposed Closing Statement and shall allow the Owners reasonable access to Buyer's and Strike Parent's personnel as may be reasonably necessary to permit Owners and their advisors to review in detail the manner in which the Draft Closing Date Balance Sheet and the calculations contained therein were prepared. The Owners' failure to deliver written objections within 30 days of receipt shall constitute their acceptance of the Draft Closing Date Balance Sheet and the Closing Statement. The Parties hereto will use commercially reasonable efforts to resolve any such objections among themselves. If the Parties hereto do not obtain a final resolution of such objections within 30 days after Buyer has received the statement of objections, then at the request of either Buyer or Owners, Buyer and Owners shall jointly engage and submit the unresolved Draft Closing Balance Sheet or Closing Statement (the "Closing Statement Unresolved Items") to BDO USA, LLP or such other a regionally recognized accounting firm mutually agreed upon by Buyer and Owners to finally and conclusively resolve any remaining objections reflected in such written objections from the Owners (the "Accounting Firm"). Buyer and Owners shall use commercially reasonable efforts to cause the Accounting Firm to issue its written determination regarding the Closing Statement Unresolved Items within 30 days after such items are submitted for review. The determination of the Accounting Firm shall be final, conclusive and binding upon Buyer and Owners, and Buyer and the Owners shall revise

the Draft Closing Date Balance Sheet and the Closing Statement as appropriate to reflect the resolution of any objections thereto pursuant to this Section 2.10. The "Closing Date Balance Sheet" shall mean the Draft Closing Date Balance Sheet together with any revisions thereto pursuant to this Section 2.10. The final Closing Statement, however determined pursuant to this Section 2.10, will produce the Working Capital Surplus or Working Capital Deficit, if any, and the outstanding amount of all Indebtedness as of the close of business on the Closing Date, and the Transaction Expenses Amount, in each case to be used to determine the final Purchase Price. In the event the Parties submit any unresolved objections to an accounting firm for resolution as provided in this Section 2.10, the fees and expenses of the accounting firm will be borne 50% by Buyer and 50% by the Owners. The payment required to be made pursuant to Section 2.9 shall be delayed during the pendency of any dispute as set forth in this Section 2.10 with respect to disputed items only.

2.11   Third Party Consents.  To the extent that Seller's rights under any Contract or Permit constituting an Asset, or any other Asset, may not be assigned to Buyer without the consent of another Person which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful, and, Seller, at its expense, shall use its reasonable best efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the Asset in question so that Buyer would not in effect acquire the benefit of all such rights, Seller, to the maximum extent permitted by law and the Asset, shall act after the Closing as Buyer's agent in order to obtain for it the benefits thereunder and shall cooperate, to the maximum extent permitted by Law and the Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer. Notwithstanding any provision in this Section 2.11 to the contrary, Buyer shall not be deemed to have waived its rights under Section 2.8(a)(v) hereof unless and until Buyer either provides written waivers thereof or elects to proceed to consummate the transactions contemplated by this Agreement at Closing.

2.12   Withholding.  The Buyer shall be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted and withheld under the Code or other applicable Tax law. Any amounts deducted and withheld pursuant to this Section 2.12 and remitted to the appropriate Taxing Authority shall be treated for all purposes of this Agreement as having been paid to Seller with respect to which such deduction or withholding was made.

2.13   Allocation of Purchase Price.  Buyer and Seller hereby agree to allocate the Purchase Price (plus the amount of other capitalized costs) among the Purchased Assets in accordance with the methodology attached hereto as Schedule 2.13, which the Parties intend to be consistent with the requirements of Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provision of state, local and foreign Law, as appropriate). Buyer and Seller shall report, act and file Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) in all respects and for all purposes consistent with such allocations set forth on Schedule 2.13, as amended. Neither Buyer nor Seller will take a position (whether in audits, tax returns or otherwise) inconsistent with the terms of any such allocation without the written consent of the other party unless required to do so by applicable law.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF SELLER

Each representation and warranty contained in this <u>Article 3</u> is qualified by the disclosures made with respect to the corresponding section of disclosure schedules to this Agreement delivered by Seller to Buyer (the "<u>Disclosure Schedules</u>") and any other disclosure made in the Disclosure Schedules that expressly cross references such section. Except as set forth in the Disclosure Schedules, Seller and the Owners jointly and severally, and the Owners severally represent and warrant to Buyer that:

3.1    <u>Organization and Good Standing</u>.  Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.  Seller has the requisite entity power and authority necessary to own, operate or lease its property and assets and to carry on the Business as now being conducted.  Seller is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required, except where failures to be so qualified or in good standing would not, individually or in the aggregate, have a Material Adverse Effect.  Seller has made available to Buyer correct and complete copies of the Charter Documents of Seller, as amended, and no amendments thereto are pending.  Seller is not in violation of any of its Charter Documents.

3.2    <u>Authority</u>.  Each Seller and each Owner that is not an individual has all requisite power and authority, and each Owner that is an individual has the requisite competence and capacity, to execute and deliver this Agreement and all agreements and documents contemplated hereby to be executed and delivered by it, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  Each Owner that is an individual has the requisite competence and capacity to execute and deliver this Agreement and all agreements and documents contemplated hereby to be executed and delivered by him or her, to perform his or her obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement by Seller and each Owner that is not an individual and any other documents contemplated by this Agreement, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by Seller or such Owners, as applicable.  This Agreement and all agreements and documents contemplated hereby to be executed and delivered have been duly executed and delivered by Seller and Owners and, assuming due execution and delivery by all other Parties hereto and thereto (other than Seller and Owners), constitute the valid and legally binding obligation of Seller and each Owner, enforceable against Seller and each Owner in accordance with their respective terms and conditions, except as the same may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, preference, moratorium or similar laws now or hereafter in effect relating to or affecting creditors generally or by general equity principles (regardless of whether such enforceability is considered in a proceeding in equity or at law) and the remedy of specific performance and injunctive or other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding may be brought.

3.3    <u>Title to Purchased Assets</u>.  Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets and the Contributed Assets.  All such Purchased Assets

and Contributed Assets (including leasehold interests) are free and clear of Liens except for the following (collectively referred to as "Permitted Liens"):

(a)     those items set forth in Schedule 3.3 of the Disclosure Schedules;

(b)     liens for Taxes not yet due and payable or being contested in good faith by appropriate procedures and for which there are adequate accruals or reserves on the Most Recent Financial Statements;

(c)     mechanics', carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business consistent with past practice or amounts that are not delinquent and which are not, individually or in the aggregate, material to the Business, the Purchased Assets or the Contributed Assets; or

(d)     easements, rights of way, zoning ordinances and other similar encumbrances affecting the Leased Real Property which are not, individually or in the aggregate, material to the Business, the Purchased Assets or the Contributed Assets, which do not prohibit or interfere with the current operation of any Leased Real Property.

3.4     Noncontravention.  Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, does or will (a) violate any law, regulation, order, injunction, judgment, decree or ruling of any government, governmental agency or court to which Seller is subject or any provision of the Charter Documents of Seller; (b) except as set forth in Schedule 3.4 to the Disclosure Schedules, conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice or consent under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which Seller is bound or to which any of Seller's assets are subject (or result in the imposition of any Lien upon any of such assets) (including any Assigned Contract); (c) violate any material law applicable to the Business or applicable to, binding upon or enforceable against Seller; or (d) result in the creation or imposition of any Lien upon any of the material property or material assets of Seller.  Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement.

3.5     Financial Statements.  Attached to Schedule 3.5 of the Disclosure Schedules are true and complete copies of the following financial statements (collectively, including the notes contained therein, the "Financial Statements"): (a) the reviewed consolidated balance sheets and related statements of income, shareholders' equity and cash flows (the "Annual Financial Statements") of Seller as of and for the fiscal years ended December 31, 2013 (the "Most Recent Fiscal Year End"), December 31, 2012 and December 31, 2011, together with notes thereto; and (b) the unaudited consolidated balance sheet and related statements of income, shareholders' equity and cash flows (the "Most Recent Financial Statements") for the Seller as of and for the 4-month period ended May 31, 2014 (the "Most Recent End Date").  Except as set forth in Schedule 3.5, the Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, and fairly present, in accordance with the past practices of Seller, in all material respects the assets, Liabilities and financial condition

of Seller on a consolidated basis as of such dates and the results of operations of Seller on a consolidated basis for such periods, and are consistent with the books and records of Seller (which books and records are correct and complete in all material respects); provided, however, that the Most Recent Financial Statements are subject to normal year-end adjustments and are subject to the absence of notes, schedules and other presentation items.   The Financial Statements reflect the actual rent paid for Leased Real Property, including Leased Real Property that is leased from the Owners or their Affiliates, and all cash compensation paid and distributions made to the Owners or their Affiliates and withholding Taxes, if any, with respect to the Owners or their Affiliates.

3.6     Events Subsequent to Most Recent Fiscal Year End.   Since the Most Recent Fiscal Year End, except as contemplated by this Agreement, as disclosed on Schedule 3.6 or in the Ordinary Course of Business (including distributions to Owners for estimated income taxes), there has not been any event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate a Material Adverse Effect. Without limiting the generality of the foregoing, since that date the Seller has not taken any action outside the Ordinary Course of Business the primary purpose or effect of which has been to generate or preserve Cash.

3.7     Undisclosed Liabilities.   The Seller has no Liability that is required to be reflected or reserved against on a balance sheet prepared in accordance with GAAP, except for any: (a) Liability reflected on or reserved against the Most Recent Balance Sheet, (b) those which have been incurred in the ordinary course of business consistent with past practice since the Most Recent Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

3.8     Accounts Receivable.   All accounts receivable of Seller listed on the Most Recent Financial Statement (net of applicable reserves set forth on the Most Recent Financial Statements) and all accounts receivable which have arisen since the Most Recent End Date (net of applicable reserves established since such date in the Ordinary Course of Business and set forth on Section 3.8 of the Disclosure Schedules) have been recorded in accordance with GAAP and represent valid and enforceable receivables arising from services rendered, projects performed and products sold in the Ordinary Course of Business.   To the Knowledge of Seller, there is no contest, claim, defense or right of setoff with respect to any account receivable.

3.9     Legal Compliance.

(a)     Seller is in compliance in all material respects with all applicable laws (including regulations, orders, injunctions, judgments, decrees and rulings) of federal, state and local governments (and all agencies thereof) (including, without limitation, all laws regarding labor, employment, and termination of employment), except where the failure to comply would not have a Material Adverse Effect. No action, charge, petition, suit or proceeding has been filed or commenced, or to the Knowledge of the Key Employees threatened, against Seller alleging any failure so to comply.   Since January 1, 2014, Seller has not been cited, fined or otherwise notified in writing (or to the Knowledge of the Key Employees, notified orally) of any failure to comply with any laws or received any written notification or communication (or, to the Knowledge of the

Key Employees, any oral notification or communication) threatening to revoke any material permit, contract, license, franchise, certification, accreditation and other approval or authorization owned or held by Seller.

(b)     All Permits required for Seller to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets and the Contributed Assets have been obtained by Seller and are valid and in full force and effect, except where the failure to obtain would not have a Material Adverse Effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full. Section 3.9(b) of the Disclosure Schedules lists all current Permits issued to Seller which are related to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets and the Contributed Assets, including the names of the Permits and their respective dates of issuance and expiration. To the Knowledge of Seller, no event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in Section 3.9(b) of the Disclosure Schedules.

(c)     Seller has not, directly or indirectly, made, authorized, offered, or agreed to make any payment, transfer of value, or gift to any Person connected with or related to any Governmental Authority or to any other Person with knowledge or unreasonable disregard that such Person will act as a conduit for otherwise prohibited payments or gifts, in each case in violation of the United States Foreign Corrupt Practices Act or any similar anti-corruption legislation of any Governmental Authority, other than payments or contributions required or allowed by applicable law.

3.10    Tax Matters. Except as set forth on Schedule 3.10 of the Disclosure Schedules:

(a)     All Tax Returns required to be filed by Seller have been duly and timely filed, and all such Tax Returns are true, correct, and complete. All material Taxes (whether or not shown on any Tax Return) that are due and payable by the Seller have been timely paid.

(b)     Seller has not been and is not currently the subject of an audit, other examination, matter in controversy, proposed adjustment, refund litigation or other proceeding with respect to Taxes, and to the Knowledge of Seller no such issue or potential issue with respect to any Tax Authority exists. No Tax deficiency has been proposed or assessed against Seller, and Seller has not executed any waiver of any statute of limitations on the assessment or collection of any Tax.

(c)     Except with respect to Taxes not yet due and payable, there are no Liens for unpaid Taxes upon the Assets and no claim for unpaid Taxes has been made by any Tax Authority that could give rise to any such Lien.

(d)     There is no Tax sharing agreement, Tax allocation agreement, Tax indemnity obligation or similar written or unwritten agreement, arrangement, understanding or practice with respect to Taxes (including any advance pricing

agreement, closing agreement or other arrangement relating to Taxes) that will require any payment by Seller as a result of the sale of the Assets.

(e)     Seller is not a "foreign person" within the meaning of Section 1445 of the Code.

(f)     Seller has withheld and paid all material Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party.

(g)     None of the Assets includes any stock, partnership interests, limited liability company interests, legal or beneficial interests or any other equity interests in or of any person, and none of the Assets are subject to any Tax partnership agreement or provisions requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code.

(h)     None of the Assumed Liabilities includes:  (1) an obligation to make a payment to any Person under any Tax allocation agreement, Tax sharing agreement, Tax indemnity obligation or similar written or unwritten agreement, arrangement, understanding or practice with respect to Taxes; (2) an obligation under any record retention, transfer pricing, closing or other agreement or arrangement with any Taxing Authority that will survive the Closing or impose any liability on Buyer after the Closing; (3) an obligation under any and all agreements, contracts, arrangements and plans to indemnify, gross-up or otherwise compensate any Person, in whole or in part, for any excise Tax under Section 4999 of the Code that is imposed on such Person or individual or any other Person; or (4) an obligation to pay the Taxes of any Person as a transferee or successor, by contract or otherwise, including an obligation under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law).

(i)     Seller is not, and has never been, a party to any "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4.  There are no disputes or appeals pending regarding the amount of the Taxes on, or the assessed valuation of, any of the Assets, and no special arrangements or agreements exist with any Tax Authority with respect thereto.  There is no tax assessment (in addition to the normal, annual general property tax assessment) pending or threatened with respect to any portion of the Assets.

(j)     Seller has made a valid election to be an "S" corporation pursuant to Section 1362 of the Code, and valid state "S" corporation elections, where applicable, and such elections are in full force and effect and have not been revoked or otherwise terminated.  Since January 1, 2008, Seller has been a valid "S" corporation for all federal and state Tax purposes (to the extent applicable) and will remain an "S" corporation up to and including the Closing.  No Taxing Authority has challenged or is challenging Seller's qualification as an "S" corporation.  The income of Seller is not taxable to Seller for federal and state income Tax purposes (where applicable), and for such purposes is included in the gross income of, and taxable to, the Owners pursuant to Section 1366(a)

of the Code and any analogous state Law provisions.  Seller has never been treated as a "C corporation" as defined in Section 1361(a)(2).

(k)     None of the Assets constitute "tax exempt use property" within the meaning of Section 168(h)(1) of the Code.  None of the Assets is property required to be treated as being owned by another Person pursuant to the provisions of Section 168(f)(8) of the Internal Revenue Code of 1954, as amended and in effect immediately prior to the enactment of the Tax Reform Act of 1986.

(l)     The total of all real estate and personal Taxes and all rents, utilities and other charges against, or payable by the owner of, any of the Assets relating to a time period beginning prior to, and ending after, the Closing are either zero or negligible.

3.11    Real Property.

(a)     Seller owns no real property.

(b)     Schedule 3.11(b) of the Disclosure Schedules sets forth the address of each parcel of Leased Real Property.  Seller has made available to Buyer true and complete copies of all such Leases.  With respect to each of the Leases:

(1)     such Lease constitutes a valid and binding obligation of Seller enforceable against such Person in accordance with its terms, and to the Knowledge of the Key Employees is in full force and effect; and

(2)     The Seller is not in breach or default under such Lease in any material respect, and no event has occurred that, with notice or lapse of time, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease.

(c)     The Leased Real Property identified in Schedule 3.11(b) of the Disclosure Schedules comprises all of the real property used by Seller in the Business.

(d)     Seller has not received any written notice of (i) material violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Leased Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Leased Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to materially and adversely affect the ability to operate the Leased Real Property as currently operated. Neither the whole nor any material portion of the Leased Real Property has been damaged or destroyed by fire or other casualty.

(e)     The Leased Real Property collectively are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the real property necessary to conduct the Business as currently conducted.

3.12   Intellectual Property.   Schedule 3.12 of the Disclosure Schedules sets forth all of the material Intellectual Property used in the Business.

3.13   Investor Representations.

(a)   Seller understands and accepts that the purchase of the Units involves various risks. Seller represents that it is able to bear any loss associated with an investment in the Units.

(b)   Seller confirms that it is not relying on any communication (written or oral) of Strike Parent or any of its affiliates, as investment advice or as a recommendation to purchase the Units. It is understood that information and explanations related to the terms and conditions of the Units provided by Strike Parent or any of its affiliates shall not be considered investment advice or a recommendation to purchase the Units, and that neither Stike Parent nor any of its affiliates is acting or has acted as an advisor to Seller in deciding to invest in the Units.

(c)   Seller is familiar with the business and financial condition and operations of Strike Parent. Seller has had access to such information concerning Strike Parent and the Units as it deems necessary to enable it to make an informed investment decision concerning the purchase of the Units.

(d)   Seller understands that no federal or state agency has passed upon the merits or risks of an investment in the Units or made any finding or determination concerning the fairness or advisability of investment in the Units.

(e)   Seller confirms that Strike Parent has not (i) given any guarantee or representation as to the potential success, return, effect or benefit (either legal, regulatory, tax, financial, accounting or otherwise) of an investment in the Units or (ii) made any representation to Seller regarding the legality of an investment in the Units under applicable legal investment or similar laws or regulations. In deciding to purchase the Units, Seller has made its own independent decision that the investment in the Units is suitable and appropriate for Seller.

(f)   Seller has such knowledge, skill and experience in business, financial and investment matters that Seller is capable of evaluating the merits and risks of an investment in the Units. With the assistance of Seller's own professional advisors, Seller has made its own legal, tax, accounting and financial evaluation of the merits and risks of an investment in the Units. Seller considered the suitability of the Units as an investment in light of its own circumstances and financial condition and Seller is able to bear the risks associated with an investment in the Units and its authority to invest in the Units.

(g)   Seller is an "accredited investor" as defined in Rule 501(a) under the Securities Act. Seller agrees to furnish any additional information requested by Strike Parent or any of its affiliates to assure compliance with applicable U.S. federal and state securities laws in connection with the purchase and sale of the Units.

(h)      Seller is acquiring the Units solely for the Seller's own beneficial account, for investment purposes, and not with a view to, or for resale in connection with, any distribution of the Units. Seller understands that the Units have not been registered under the Securities Act or any state securities laws by reason of specific exemptions under the provisions thereof which depend in part upon the investment intent of the Seller. Seller understands that Strike Parent is relying upon the representations and agreements contained in this Agreement (and any supplemental information) for the purpose of determining whether this transaction meets the requirements for such exemptions.

(i)      Seller understands that it must bear the economic risks of the investment in the Units for an indefinite period of time.

3.14    Tangible Assets.

(a)      Except as disclosed on Schedule 3.14(a), Seller owns or leases pursuant to valid and enforceable leases all buildings, Personal Property and Equipment and other tangible assets that are material to the conduct of the Business as presently conducted. Such assets are structurally sound, are in good operating condition and repair, normal wear and tear excepted, and are adequate for the uses to which they are being put.  The Purchased Assets, the Contributed Assets and the Leased Real Property collectively are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted.   None of the Excluded Assets are material to the Business.

(b)      Schedule 3.14(b) of the Disclosure Schedules lists each item of Personal Property and Equipment owned or leased by Seller, as of the date hereof with a fair market value in excess of $50,000.

3.15    Customers and Suppliers.

(a)      Section 3.15(a) of the Disclosure Schedules sets forth with respect to the Business (i) each customer who has paid aggregate consideration to Seller for goods or services rendered in an amount greater than or equal to $100,000 over the course of the two most recent fiscal years (collectively, the "Major Customers"); and (ii) the amount of consideration paid by each Major Customer during such periods.  Seller has not received any notice, and the Key Employees have no reason to believe, that any of the Major Customers have ceased, or, to the Knowledge of Seller, intends to cease after the Closing except for termination of specific non-recurring projects where a Major Customer has no further project needs from the Seller, to use the goods or services of the Business or to otherwise terminate or materially reduce its relationship with the Business.

(b)      Section 3.15(b) of the Disclosure Schedules sets forth with respect to the Business (i) each supplier to whom Seller has paid consideration for goods or services rendered in an amount greater than or equal to $100,000 over the course of calendar year 2013 (collectively, the "Material Suppliers"); and (ii) the amount of purchases from each Material Supplier during such periods.  Seller has not received any notice, and no

Material Supplier has ceased, or, to the Knowledge of Seller, intends to cease, to supply goods or services to the Business or to otherwise terminate or materially reduce its relationship with the Business.

3.16    Contracts.

(a)    Schedule 3.16 of the Disclosure Schedules lists all of the following contracts and agreements, written or oral, including all amendments and supplements thereto, to which Seller is a party or by which it or its property or assets is bound (together with those contracts listed on Schedule 3.17 (insurance policies), collectively the "Material Contracts"):

(i)    all Contracts involving aggregate consideration in excess of $100,000;

(ii)    all Contracts that require Seller to purchase or sell a stated portion of the requirements or outputs of the Business or that contain "take or pay" provisions;

(iii)    all Contracts that provide for the indemnification of any Person or the assumption of any Tax, environmental or other Liability of any Person entered into within three years of the Closing Date;

(iv)    all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(v)    all Contracts for the employment or engagement of any individual on a full-time, part-time or consulting basis (or similar arrangements);

(vi)    except for Contracts relating to trade receivables, all Contracts relating to Indebtedness (including, without limitation, guarantees);

(vii)    all Contracts with any Governmental Authority;

(viii)    all Contracts that limit or purport to limit the ability of Seller to compete in any line of business or with any Person or in any geographic area or during any period of time;

(ix)    all Contracts for the sale of any of the Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

(x)    Contracts concerning partnerships or joint ventures to which Seller is a party;

(xi)     profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, or other plans or arrangements for the benefit of the current or former directors, officers, managers and employees of Seller;

(xii)    Contracts with a Major Customer or Material Supplier;

(xiii)   Contracts under which Seller has advanced or loaned any amount to any Person;

(xiv)    Contracts containing transaction bonus agreements payable in connection with the consummation of the transactions contemplated by this Agreement;

(xv)     performance bonds issued on behalf of the Seller to a third party;

(xvi)    all other Contracts that are material to the Purchased Assets, the Contributed Assets or the operation of the Business not previously disclosed pursuant to this Section 3.16.

(b)     Seller has made available to Buyer copies of each Material Contract that are true and complete in all material respects.  Each Material Contract is a valid and binding agreement of Seller and to the Knowledge of the Key Employees, enforceable in accordance with its respective terms, except as the same may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, preference, moratorium or similar laws now or hereafter in effect relating to or affecting creditors generally or by general equity principles (regardless of whether such enforceability is considered in a proceeding in equity or at law) and the remedy of specific performance and injunctive or other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding may be brought.  Seller has not received any written notice (nor to the Knowledge of the Key Employees, oral notice), nor does any Key Employee have Knowledge, that any other party to a Material Contract intends to terminate or materially amend such Material Contract.  To the Knowledge of the Key Employees, there are no material disputes pending or threatened under any Contract included in the Purchased Assets or the Contributed Assets.  Neither Seller nor, to the Knowledge of the Key Employees, any other party to any Material Contract, is in default or breach in any material respect and no event has occurred that, with the giving of notice or lapse of time or both, would constitute such a default or breach of any Material Contract.

3.17    Insurance.  Schedule 3.17 of the Disclosure Schedules sets forth a list of (a) all material insurance policies maintained as of the date hereof or during the prior three years by Seller with respect to which Seller is a named insured or otherwise the beneficiary of such coverage (collectively, the "Insurance Policies") and (b) with respect to the Business, the Purchased Assets, the Contributed Assets or the Assumed Liabilities, a list of all pending claims and the claims history for Seller for the prior three years.  Such Insurance Policies are in full force and effect on the date of this Agreement and all premiums due on such Insurance Policies have been paid.  Seller is not in breach or default (including any such breach or default with respect to the giving of notice), and, to the Knowledge of the Key Employees, no event has

occurred which, with notice or the lapse of time, would constitute such a breach or default under any such Insurance Policy. No notice of cancellation, non-renewal, disallowance or reduction in coverage or claim or termination has been received by Seller, and, to the Knowledge of the Key Employees, no such action has been threatened.

3.18    Litigation and Governmental Orders.    Seller is not a party to, nor, to the Knowledge of the Key Employees, is threatened to be made a party to, any actions, demands, claims, arbitrations, hearings, suits or proceedings  (a) relating to or affecting the Business, the Purchased Assets, the Contributed Assets or the Assumed Liabilities or (b) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To the Knowledge of Seller, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such action. There are no outstanding orders by any Governmental Authority and no unsatisfied judgments, penalties or awards against, relating to or affecting the Business.

3.19    Employees.

(a)    Seller has made available to Buyer the following information with respect to each employee: (i) employee identification number, (ii) name, (iii)  position, (iv) 2013 and year-to-date 2014 compensation and benefits, (v) hire date, (vi) date inactivated, if any, (vii) length of service and (viii) noncompetition agreements with such individual, as applicable. Except for payments to certain former or current employees, each as individually set forth in Schedule 3.19(a) of the Disclosure Schedules, Seller is not obligated to (or otherwise intends to) provide severance payments or benefits to any former or current employee.

(b)    Except as shown on Schedule 3.19(b) of the Disclosure Schedules, Seller is not a party to or bound by any collective bargaining, labor, per job or similar agreement and, to the Knowledge of the Key Employees, there are currently no efforts to organize or form any collective bargaining unit or similar labor group involving employees of Seller. There is no pending, or to the Knowledge of the Key Employees, threatened strikes and Seller has not experienced any strikes, material grievances, claims of unfair labor practices, or other collective bargaining or labor disputes during the past five years. Except as shown on Schedule 3.19(b), no Person performing services for Seller has been improperly excluded from participating in any employee benefit plan of Seller. Seller has not incurred any liability or obligation which remains unsatisfied under the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar laws regarding the termination or layoff of employees. There are no pending charges, petitions, complaints, investigations or other actions against Seller complaining of any unfair employment practices, including but not limited to (i) claims arising under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, 42 U.S.C. §1981, the Americans with Disabilities Act, the Fair Labor Standards Act, the Family and Medical Leave Act, the Uniformed Services Employee Readjustment and Retraining Act, or comparable state statutes and laws; and (ii) claims for discrimination, harassment, retaliation, wrongful termination or other alleged wrongdoing arising out of employment with Seller.

3.20   <u>Employee Benefits</u>.   <u>Schedule 3.20</u> of the Disclosure Schedules lists each Employee Benefit Plan that Seller maintains or has any Liability or to which Seller contributes or has any obligation to contribute.

(a)   To the Knowledge of Seller, each such Employee Benefit Plan (and each related trust, insurance contract or fund) complies in form and in operation in all material respects with the applicable requirements of ERISA, the Code and other applicable laws.

(b)   All required reports and descriptions (including Form 5500 Annual Reports, summary annual reports, PBGC-1's and summary plan descriptions) have been, in all material respects, timely filed or distributed appropriately with respect to each such Employee Benefit Plan.   Neither Seller nor any plan administrator of any such Employee Benefit Plan for which a Form 5500 is required to be timely filed with the Internal Revenue Service pursuant to Title I of ERISA has received any communication or correspondence from the Department of Labor (the "<u>DOL</u>") or the Internal Revenue Service in respect of the failure to comply with such Form 5500 filing requirements, including, but not limited to, any notification in writing of any failure to file a timely annual report under Title I of ERISA or any DOL Notice of Intent to Assess a Penalty. The requirements of COBRA have been met, in all material respects, with respect to each such Employee Benefit Plan which is an Employee Welfare Benefit Plan to which COBRA is applicable.

(c)   All contributions (including all employer contributions and employee salary reduction contributions) which are due have been timely paid to each such Employee Benefit Plan which is an Employee Pension Benefit Plan.   All premiums or other payments which are due have been timely paid with respect to each such Employee Benefit Plan which is an Employee Welfare Benefit Plan.

(d)   Each such Employee Benefit Plan which is an Employee Pension Benefit Plan that is intended to meet the requirements of a "qualified plan" under Code §401(a) has received a favorable determination letter from the Internal Revenue Service that it is a "qualified plan" or is maintained on a volume submitter or prototype plan that has received a favorable opinion or advisory letter from the Internal Revenue Service.

(e)   Seller has made available to Buyer copies of the plan documents (or, if unwritten, a written summary of all material terms and conditions) for each such Employee Benefit Plan that are true and complete, and, with respect to each such Employee Benefit Plan, correct and complete copies of the most recent determination letter, advisory or opinion letter received from the Internal Revenue Service, the most recent Form 5500 Annual Report, all related trust agreements, insurance contracts and other funding agreements which implement or relate to each such Employee Benefit Plan, all material communications by Seller to its employees, all correspondence with any Governmental Authority and the most recent financial statements and actuarial valuation reports (if any), in each case including all applicable amendments and schedules thereto.

(f)   No claim, action, suit, charge, arbitration, investigation, inquiry or other proceeding by any Governmental Authority or plan participant (or beneficiary thereof) is

pending or, to the Knowledge of the Key Employees, threatened relating to any such Employee Benefit Plan, any fiduciaries thereof with respect to their duties to any such Employee Benefit Plan or the assets of any of the trusts under any such Employee Benefit Plan (other than routine claims for benefits). The Seller maintains no "nonqualified deferred compensation plan" (as such term is defined in Section 409A(d)(1) of the Code).

(g)    Seller does not maintain, or contribute to, is or was required to maintain or contribute to, or has any Liability with respect to, (i) any Employee Benefit Plan that (A) is subject to Section 302 or Title IV of ERISA or Section 412 or 430 of the Code or (B) provides health or welfare benefits to any Person beyond his or her retirement or other termination of service (other than coverage mandated by Section 4980B of the Code or any similar state law), (ii) any Multiemployer Plan or (iii) any "multiple employer plan" within the meaning of Section 413(c) of the Code. No Employee Benefit Plan is maintained outside the jurisdiction of the United States or covers any employee residing or working outside of the United States. None of the execution and delivery of this Agreement, member approval of this Agreement or the consummation of the transactions contemplated by this Agreement could (either alone or in combination with another event) result in (1) severance pay or any increase in severance pay upon any termination of employment after the date of this Agreement; (2) any payment, compensation or benefit becoming due, or increase in the amount of any payment, compensation or benefit due, to any current or former employee or service provider of the Seller; (3) the acceleration of the time of payment or vesting or result in any funding of compensation or benefits; (4) any new material obligation pursuant to any of the Employee Benefit Plans set forth in Schedule 3.20 of the Disclosure Schedules; (5) any limitation or restriction on the right of the Seller to merge, amend or terminate any Employee Benefit Plan set forth in Schedule 3.20 of the Disclosure Schedules; or (6) the payment of any "excess parachute payment" within the meaning of Section 280G of the Code.

3.21    Environmental Matters.

(a)    To the Knowledge of Seller, Seller is not, and since December 31, 2011, has not been, in material violation of Environmental, Health, and Safety Requirements;

(b)    Seller has not received any written notice of, any violation, investigation relating to any violation or threat to be charged with any violation with respect to compliance with all Environmental, Health, and Safety Requirements;

(c)    Seller possesses all permits, licenses and other authorizations that are currently required pursuant to Environmental, Health, and Safety Requirements for the operation of the Business, and each of the foregoing is in full force and effect;

(d)    Seller has not received any written notice, demand, request for information, citation, summons or order, and there is no proceeding pending or, to the Knowledge of Seller, threatened against Seller arising out of or relating to any (i) remedial obligation under any applicable Environmental, Health, and Safety Requirement, (ii) violation by the Seller of any Environmental, Health, and Safety

Requirement, (iii) personal injury or property damage claim relating to a Release of Hazardous Materials, or (iv) response, removal, or remedial costs under Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Solid Waste Disposal Act, as amended, or any other Environmental, Health, and Safety Requirements;

except in each case, where the consequences of such non-compliance is attributable to the conduct of the Ordinary Course of Business consistent with past practice and will not result in uninsured liability to the Seller in excess of $100,000 in the aggregate.

(e)     Seller has provided or otherwise made available to Buyer all audits, reports, and assessments concerning Environmental, Health and Safety Requirements for the Business, including of the Leased Real Property, that are in the possession, custody or control of Seller.

3.22    Certain Business Relationships with Seller.  Except as shown on Schedule 3.22 of the Disclosure Schedules, neither Seller nor Owners, nor any relative of any Owner, any Person of which Seller or any Owner or any relative of any Owner is a director, officer, equity holder or Affiliate nor any Affiliate of any of the foregoing has (a) borrowed money from or loaned money to Seller that is currently outstanding, (b) any contractual or other claims, express or implied, or of any kind whatsoever against Seller, (c) any interest in any property or assets used by Seller; or (d) engaged in any other transaction with the Seller where the Seller has or will have any liability in excess of $50,000 in the aggregate.

3.23    Foreign Corrupt Practices Act.  Neither Seller nor any Person acting for or on behalf of the Seller has (a) used any funds for unlawful contributions, gifts, gratuities, entertainment or other unlawful expenses related to political activity, (b) made any payment or offered, promised or authorized the payment of anything of value to any government official or employee or any political party or candidate for political office for the purpose of influencing any act or decision of such official or of the government to obtain or retain business or direct business to any Person in violation of Law, (c) made any other unlawful payment, or (d) violated any applicable export control, money laundering or anti-terrorism law or regulation, nor have any of them otherwise taken any action which would cause the Seller to be in violation of the Foreign Corrupt Practices Act of 1977, as amended, or any applicable Law of similar effect.  For the purposes of this Section 3.23, the acts specified include, but are not limited to (x) the making or payment of any illegal contributions, commissions, fees, gifts, entertainment, travel or other unlawful expenses relating to political activity, (y) the direct or indirect payment, gift, offer, promise or authorization to make a payment, gift, offer or promise of, anything of material value to any Governmental Authority in violation of applicable law, and (z) the making of any bribe, illegal payoff, influence payment, kickback or other unlawful payment, in each case using funds of Seller or otherwise on behalf of Seller.

3.24    Brokers' Fees.  Except as shown on Schedule 3.24 of the Disclosure Schedules, neither Seller nor Owners have incurred any obligation or Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions, consulting arrangements providing for contingent payments or other similar payment arrangements in connection with this Agreement or the transactions contemplated hereby.

3.25   <u>Disclaimer of Other Representations and Warranties</u>.  Except as expressly set forth in this <u>Article 3</u>, Seller makes no representations or warranty, express or implied, at law or in equity, in respect of any of its assets (including without limitation, the Assets), liabilities or operations, including, without limitations, with respect to merchantability or fitness for any particular purpose, and any such other representations or warranties are hereby expressly disclaimed, <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, Buyer and Strike Parent each reserve their right to make claims based upon fraud.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer and Strike Parent hereby jointly and severally represent and warrant to Seller that as of the date hereof and as of the Closing Date:

4.1   <u>Organization and Good Standing</u>.  Buyer and Strike Parent are each Texas limited liability companies.  Each of Buyer and Strike Parent is a duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.  Each of Buyer and Strike Parent has the requisite power and authority necessary to own, operate or lease its property and assets and carry on its business as it is now being conducted.  Buyer and Strike Parent are duly authorized to conduct business and are in good standing under the laws of each jurisdiction where such qualification is required, except where failures to be so qualified or in good standing would not, individually or in the aggregate, have a Material Adverse Effect -on the assets, liabilities or business of Buyer or Strike Parent or materially and adversely affect Buyer's or Strike Parent's ability to consummate the transactions contemplated by this Agreement, including payment of the Purchase Price and issuance of the Strike Units ("<u>Buyer Material Adverse Effect</u>").

4.2   <u>Authority</u>.  Buyer and Strike Parent have all requisite power and authority necessary to enter into and perform their respective obligations under this Agreement and any other documents contemplated by this Agreement to which Buyer and Strike Parent are a party, and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and any other documents contemplated by this Agreement to which Buyer and Strike Parent are party, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by Buyer and Strike Parent.  This Agreement has been duly executed and delivered by Buyer and Strike Parent and, assuming due execution and delivery by all other Parties hereto, constitutes the valid and legally binding obligation of Buyer and Strike Parent, enforceable against each of them in accordance with its terms and conditions, except as the same may be limited by bankruptcy, insolvency, reorganization, fraudulent transfer, preference, moratorium or similar laws now or hereafter in effect relating to or affecting creditors generally or by general equity principles (regardless of whether such enforceability is considered in a proceeding in equity or at law) and the remedy of specific performance and injunctive or other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding may be brought.

4.3   <u>Noncontravention</u>.  Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (a) violate any law, regulation,

order, injunction, judgment, decree or ruling of any government, governmental agency or court to which Buyer or Strike Parent are subject or any provision of the Charter Documents of either Buyer or Strike Parent; or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer or Strike Parent are a party or by which Buyer or Strike Parent are bound or to which any of their respective assets are subject (or result in the imposition of any Lien upon any of their respective assets), except as would not, individually or in the aggregate, have a Buyer Material Adverse Effect.  Neither Buyer nor Strike Parent are required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of, any government or governmental agency in order for the Parties to consummate the transactions contemplated by this Agreement.

4.4     Litigation.  There is no outstanding action, demand, claim, arbitration, hearing, order, injunction, judgment, decree or ruling pending against or, to the Knowledge of Buyer, threatened against Buyer or Strike Parent which would reasonably be likely, individually or in the aggregate, to restrain, enjoin or otherwise prohibit the transactions contemplated by this Agreement.

4.5     Brokers' Fees.  Neither Buyer nor Strike Parent have incurred any obligation or Liability for brokerage or finders' fees or agents' commissions, consulting arrangements providing for contingent payments or other similar payment arrangements in connection with this Agreement or the transactions contemplated hereby.

4.6     Solvency.  Immediately prior to giving effect to the transactions contemplated by this Agreement: (i) Buyer has not incurred debts beyond their ability to pay such debts as they mature or become due, (ii) the present fair salable value (determined on a going concern basis) of the assets of Buyer exceeds the total amount of their Liabilities (including the probable amount of all contingent Liabilities), and (iii) Buyer does not have unreasonably small capital to carry on its businesses as presently conducted or as proposed to be conducted. Buyer is not making any transfer of property and are not incurring any obligation in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud creditors of Buyer, Strike Parent or any of their Affiliates.

4.7     Valid Issuance.  The Strike Units issued by Strike Parent pursuant to Section 2.1 will, when issued and delivered to Seller in accordance with the terms hereof, be validly issued in accordance with the LLC Agreement.

4.8     Material Adverse Change.  Since the end of the most recent fiscal year of Strike Parent, except as disclosed on Schedule 4.8, there have been no transactions, conditions or events which, individually or in the aggregate constitute or has had a material adverse effect on the business assets, liabilities, condition (financial or otherwise) or results of operation of Strike Parent.

4.9     Strike Parent Financials.  Attached to Schedule 4.9 of the Disclosure Schedules are true and complete copies of the following financial statements (collectively, including the notes contained therein, the "Strike Parent Financial Statements"): (a) the audited consolidated

balance sheets and related statements of income, shareholders' equity and cash flows (the "Annual Strike Parent Financial Statements") of Strike Parent as of and for the fiscal year ended December 31, 2013, together with notes thereto; and (b) the unaudited consolidated balance sheet and related statements of income, shareholders' equity and cash flows (the "Most Recent Strike Parent Financial Statements") for Strike Parent as of and for the 3-month period ended March 31, 2014 (the "Most Recent Strike Parent End Date"). The Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, and fairly present, in accordance with the past practices of Strike Parent, in all material respects the assets, Liabilities and financial condition of Strike Parent on a consolidated basis as of such dates and the results of operations of Strike Parent on a consolidated basis for such periods, and are consistent with the books and records of Strike Parent (which books and records are correct and complete in all material respects); provided, however, that the Most Recent Strike Parent Financial Statements are subject to normal year-end adjustments and are subject to the absence of notes, schedules and other presentation items.

## ARTICLE 5

## COVENANTS

The Parties agree as follows with respect to the period following the Closing.

5.1    General. In case at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instruments and documents) as any other Party reasonably may request, at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefore under Article 6).

5.2    Books and Records. From and after the Closing, Buyer shall retain all books and records relating to the Business for a period of six years after the Closing Date or such longer period as may be required under applicable law. In addition to the foregoing, from and after the Closing, each of Buyer and Seller shall afford to any Party hereto, and its counsel, accountants and other authorized agents and representatives, during normal business hours, upon reasonable notice and upon the execution and delivery of a confidentiality and non-disclosure agreement in customary form and substance, reasonable access to the personnel, books, records and other data relating to the Business in its possession, and the right to make copies and extracts therefrom, to the extent that such access may be reasonably required by the requesting Party (a) for the preparation of Tax Returns and other documents and reports that such Party or its Affiliates are required to file with Governmental Authorities, (b) for accounting purposes (including for purposes of preparing closing financial statements, and closing the books and records, of the Business) and (c) for any other reasonable business purpose. The foregoing shall not require any Party to (i) take any action beyond commercially reasonable efforts or that would unreasonably disrupt their normal business operations, or (ii) permit any inspection, or to disclose any information, that in its reasonable judgment is reasonably likely to result in the waiver of any attorney-client privilege, the disclosure of any protected intellectual property of any third party, or the violation of any of their obligations with respect to confidentiality.

5.3   Confidentiality. From and after the Closing, Seller and Owners shall, and shall cause their respective Affiliates to, hold, and shall use their reasonable best efforts to cause their respective representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates or their respective representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller or any of its Affiliates or their respective representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Buyer in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, provided that Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

5.4   Tax Matters.

(a)   Transfer Taxes.   Seller agrees to pay all transfer stamp, registration, documentary, excise, real property transfer or gains, or similar Taxes incurred as a result of the transactions contemplated in this Agreement and Seller and Buyer agree to jointly file all required change of ownership and similar statements.   Buyer agrees to pay all sales, use, value added taxes (including but not limited to motor vehicle registration) incurred as a result of the transactions contemplated in this Agreement.

(b)   Payroll Tax. For purposes of payroll taxes with respect to each Employee that becomes an employee of Buyer, Seller and Buyer shall treat the transactions contemplated herein as a transaction described in Treas. Reg. Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-1(b)(2), and as of the Closing, Buyer and Seller agree to use the alternative procedure set forth in Revenue Procedure 2004-53 with respect to wage reporting.

5.5   Employees and Employee Benefits.

(a)   Commencing on the Closing Date, Seller shall terminate all employees of the Business who are actively at work on the Closing Date, and Buyer will make an offer of employment to all of such employees on an "at will" basis, except for those employees listed on Schedule 5.5(a).

(b)   Seller shall be solely responsible, and Buyer shall have no obligations whatsoever for, any compensation or other amounts payable to any current or former employee, officer, director, independent contractor or consultant of the Business, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits or severance pay for any period relating to the service with Seller at any time on or prior to the Closing Date and Seller shall pay all such amounts to all entitled persons on or prior to the Closing Date.

(c)     Seller shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits brought by or in respect of current or former employees, officers, directors, independent contractors or consultants of the Business or the spouses, dependents or beneficiaries thereof, which claims relate to events occurring on or prior to the Closing Date.  Seller also shall remain solely responsible for all worker's compensation claims of any current or former employees, officers, directors, independent contractors or consultants of the Business which relate to events occurring on or prior to the Closing Date.  Seller shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

(d)     Each employee of the Business who becomes employed by Buyer in connection with the transactions contemplated by this Agreement shall be eligible to receive the salary and benefits maintained for employees of Buyer on substantially similar terms and conditions in the aggregate as are provided to similarly situated employees of Buyer.

(e)     Each employee of the Business who becomes employed by Buyer in connection with the transaction shall be given service credit for the purpose of eligibility under the group health plan and eligibility and vesting only under the defined contribution retirement plan for his or her period of service with Seller prior to the Closing Date; provided, however, that (i) such credit shall be given pursuant to payroll or plan records, at the election of Buyer, in its sole and absolute discretion; and (ii) such service crediting shall be permitted and consistent with Buyer's defined contribution retirement plan.

5.6     Non-Competition; Non-Solicitation.

(a)     For a period of five years commencing on the Closing Date (the "Restricted Period"), Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, (i) engage in or assist others in engaging in the Business within the United States (the "Territory"); (ii) have an interest in any Person that engages directly or indirectly in the Restricted Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee or consultant; or (iii) cause, induce or encourage any material actual or prospective client, customer, supplier or licensor of the Business (including any existing or former client or customer of Seller and any Person that becomes a client or customer of the Business after the Closing), or any other Person who has a material business relationship with the Business, to terminate or modify any such actual or prospective relationship. Notwithstanding the foregoing, Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 5% or more of any class of securities of such Person.

(b)     During the Restricted Period, Seller shall not, and shall not permit any of its Affiliates to, directly or indirectly, hire or solicit any person who is offered employment by Buyer pursuant to Section 5.5(a) or is or was employed in the Business during the Restricted Period, or encourage any such employee to leave such employment

or hire any such employee who has left such employment, except pursuant to a general solicitation which is not directed specifically to any such employees; provided, that nothing in this Section 5.6(b) shall prevent Seller or any of its Affiliates from hiring (i) any employee whose employment has been terminated by Buyer or (ii) after 180 days from the date of termination of employment, any employee whose employment has been terminated by the employee.

(c)    Seller acknowledges that a breach or threatened breach of this Section 5.6 would give rise to irreparable harm to Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by Seller of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(d)    Seller acknowledges that the restrictions contained in this Section 5.6 are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this Section 5.6 should ever be adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law. The covenants contained in this Section 5.6 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

5.7    Bulk Sales Laws. The Parties hereby waive compliance with the provisions of any bulk sales, bulk transfer or similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

5.8    Receivables. From and after the Closing, if Seller or any of its Affiliates receives or collects any funds relating to any Accounts Receivable or any other Purchased Asset, Seller or its Affiliate shall remit such funds to Buyer within five Business Days after its receipt thereof.

5.9    Change of Name. Immediately upon the Closing, Seller covenants and agrees to change its name from "Delta Directional, LLC" to a name not including the phrase "Delta Directional," or any variant thereof, and to cease using the trade name "Delta Directional".

5.10    Public Announcements. No Party will issue or cause the publication of any press release or other public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the other Parties hereto; provided, however, that nothing herein will prohibit any party from issuing or causing publication of any such press release or public announcement to the extent that such disclosure is upon advice of

counsel required by Law, in which case the party making such determination will, if practicable in the circumstances, use reasonable efforts to allow the other parties reasonable time to comment on such release or announcement in advance of its issuance; provided, further, that the foregoing shall not restrict communications between Buyer and the investors or potential investors of Buyer or its Affiliates in the ordinary course of business consistent with past practice.

5.11    Financial Reporting.   For the term beginning on Closing Date and ending upon the date upon which Strike Parent has no outstanding unpaid payment obligations under the Section 4.8(b) of the LLC Agreement, Strike Parent will provide to Seller: (i) annual financial statements within 120 days after the end of each fiscal year, and (ii) quarterly financial statements within 75 days after the end of each of the first, second and third fiscal quarters.

## ARTICLE 6

## INDEMNIFICATION

6.1    Survival.   Each representation and warranty contained herein and in any certificate delivered at the Closing shall survive the Closing and continue in full force and effect for a period eighteen (18) months following the Closing (the "Release Date"); provided, that Seller Fundamental Representations shall survive the Closing indefinitely, the representations and warranties contained in Section 3.21 (Environmental) shall survive until the fifth anniversary of the Closing and the representations and warranties contained in Section 3.10 (Taxes), Section 3.20 (Employee Benefit Plans) and Section 3.19(b) (Employees) shall survive until 60 days following the expiration of the applicable statute of limitations (including any extensions thereof) (the Release Date or such other date described above, the "Expiration Date").   Each covenant and obligation in this Agreement and in any certificate or document delivered pursuant to this Agreement shall survive the Closing until the expiration of the applicable statute of limitations, unless a different period is expressly contemplated herein or thereby, in which case until the expiration of such other period.   Notwithstanding the foregoing sentences of this Section 6.1, if Buyer or Seller, as applicable, deliver written notice to the other party of a claim for indemnification for a breach of any representations, warranties, covenants or agreements set forth herein or in any certificate or document delivered pursuant to this Agreement (stating in reasonable detail, to the extent then known, the nature of, and basis for, any such claim for indemnification) within the applicable time periods set forth above, such claim shall survive until finally resolved or judicially determined.

6.2    Indemnification of Buyer.   Subject to the limitations set forth in this Article 6, from and after the Closing, Seller and the Owners, jointly and severally, shall indemnify and hold harmless, to the fullest extent permitted by Law, Buyer and its directors, employees, officers, Affiliates, partners and equity holders, and their respective successors and assigns (collectively, the "Buyer Indemnified Parties") from, against and in respect of any and all Losses based upon, arising out of or incurred as a result of any of the following:

(a)    any breach of, or any inaccuracy in, any representation or warranty made by Seller or an Owner in this Agreement, any other Transaction Document or in any certificate or document delivered with respect hereto or thereto, other than the

representations and warranties set forth in Section 3.10 (Taxes) (which are addressed in Section 6.8(a));

(b)    any breach or default in performance by Seller or Owners or any of their respective covenants or agreements contained in this Agreement, any other Transaction Document or in any certificate or document delivered with respect hereto or thereto; or

(c)    any Excluded Liabilities.

6.3    Indemnification of Seller.  Subject to the limitations set forth in this Article 6, from and after the Closing, Buyer and Strike Parent shall indemnify and hold harmless, to the fullest extent permitted by Law, Seller, the Owners, and their respective Affiliates and their respective successors and assigns (collectively, the "Seller Indemnified Parties") from, against and in respect of any and all Losses based upon, arising out of or incurred as a result of any of the following:

(a)    any breach of, or inaccuracy in, any representation or warranty made by Buyer and Strike Parent in this Agreement, any other Transaction Document or in any certificate or document delivered with respect hereto or thereto;

(b)    any breach or default in performance by Buyer or Strike Parent of any covenant or agreement of Buyer or Strike Parent contained in this Agreement, any other Transaction Document or in any certificate or document delivered with respect hereto or thereto; or

(c)    any Assumed Liabilities.

6.4    Limitations.

(a)    Notwithstanding any other provision of this Agreement, (i) Seller and the Owners shall not have any obligation to indemnify any Buyer Indemnified Party pursuant to Section 6.2(a) unless and until, and only to the extent that, the aggregate amount of all such individual Losses incurred or sustained by all Buyer Indemnified Parties with respect to which Buyer Indemnified Parties are entitled to indemnification under Section 6.2(a) exceeds $300,000 (the "Threshold Amount"), whereupon Seller and Owners shall be jointly and severally liable for all such Losses exceeding the Threshold Amount and (ii) the aggregate Liability of Seller and the Owners to indemnify Buyer Indemnified Parties for Losses under Section 6.2(a) shall in no event exceed $3,500,000 (the "Cap"); provided, however, that the Cap will not be applicable with respect to Losses incurred or sustained by all Buyer Indemnified Parties with respect to Seller Fundamental Representations. Seller's and Owners' aggregate Liability under this Agreement with respect to Seller Fundamental Representations to all Buyer Indemnified Parties that are entitled to indemnification under Section 6.2(a) shall not exceed an amount equal to the amount of the Purchase Price actually received by Seller.  The parties acknowledge and agree that a Buyer Indemnified Party shall have the right to proceed directly against Seller and Owners for any claims for Losses under Section 6.2(b) or Section 6.2(c).  For the purposes of this Section 6.4(a), if a claim for Losses relates to a matter arising under

both (i) the provisions of Section 6.2(a) and (ii) any of the other provisions of Section 6.2, such claim shall be deemed to relate to such other provision of Section 6.2.

(b)     Notwithstanding any other provision of this Agreement, (i) neither Buyer nor Strike Parent shall have any obligation to indemnify any Seller Indemnified Party pursuant to Section 6.3(a) unless and until, and only to the extent that, the aggregate amount of all individual Losses incurred or sustained by all Seller Indemnified Parties with respect to which Seller Indemnified Parties are entitled to indemnification under Section 6.3(a) exceeds the Threshold Amount, whereupon Buyer shall be liable for all such Losses exceeding the Threshold Amount, and (ii) the aggregate liability of Buyer to indemnify Seller Indemnified Parties for Losses under Section 6.3(a) shall in no event exceed an amount equal to the remaining Deferred Payment owed by Strike Parent to Owners; provided, however, that such limitations in (i) and (ii) above will not be applicable with respect to Losses incurred or sustained by Seller Indemnified Parties with respect to Buyer Fundamental Representations, claims related to the Strike Units arising under the LLC Agreement.  Buyer's aggregate Liability under this Agreement with respect to Buyer Fundamental Representations to all Seller Indemnified Parties that are entitled to indemnification under Section 6.3(a) shall not exceed an amount equal to the Purchase Price.  For the purposes of this Section 6.4(b), if a claim for Losses relates to a matter arising under both (i) the provisions of Section 6.3(a) and (ii) any of the other provisions of Section 6.3, such claim shall be deemed to relate to such other provisions of Section 6.3.

(c)     Notwithstanding any other provision of this Agreement, Seller and Owners shall not be required to indemnify any Buyer Indemnified Party pursuant to this Article 6 for any Losses to the extent (i) any Buyer Indemnified Party actually receives proceeds from insurance policies obtained by Seller to pay such Losses or (ii) any Buyer Indemnified Party actually receives payment from a third party also required to indemnify a Buyer Indemnified Party, in each case net of costs and expenses (including any increase in premiums) incurred in connection with the collection of such amounts without any reduction relating to the indemnification provisions pursuant to this Article 6.  Buyer shall refund any amount it actually receives (net of costs and expenses incurred in connection with the collection of such amount) pursuant to the preceding sentence from insurance or a third party to the extent it actually receives such amount after payment by Seller or any Owner.

6.5     Exclusive Remedy.  From and after the Closing, and except with respect to claims arising from fraud, the provisions of this Article 6 shall constitute the exclusive remedy for money damages in respect of breaches of representations or warranties, or the failure to perform any covenants or agreements contained in this Agreement.  Neither a Buyer Indemnified Party nor a Seller Indemnified Party shall be entitled to recover any punitive, exemplary, treble or other special damages in each such case that are intended to punish or set an example to other wrongdoers (collectively, "Special Damages") pursuant to this Article 6, unless such Special Damages are required to be paid to a third party in connection with the final judicial resolution of a Third Party Claim.

6.6     Third Party Claims.

(a)     Promptly after the receipt by any Person entitled to indemnification pursuant to this Article 6 (the "Indemnified Party") of notice of the commencement of any action (such action, a "Third Party Claim"), such Indemnified Party shall, if a claim with respect thereto is to be made against any party or parties obligated to provide indemnification pursuant to this Article 6 (the "Indemnifying Party"), give such Indemnifying Party written notice of such Third Party Claim in reasonable detail in light of the circumstances then known to such Indemnified Party; provided, that the failure of the Indemnified Party to provide such notice shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent that such failure to give notice shall prejudice any defense or claim available to the Indemnifying Party.

(b)     The Indemnifying Party shall be entitled to assume the defense of any Third Party Claim with counsel reasonably satisfactory to the Indemnified Party, at the Indemnifying Party's sole expense; provided that the Indemnifying Party shall not be entitled to assume or continue control of the defense of any Third Party Claim if: (i) the Third Party Claim relates to or arises in connection with any criminal proceeding, action, indictment, allegation or investigation, (ii) the Third Party Claim seeks an injunction or equitable relief against any Indemnified Party, (iii) the Third Party Claim has or would reasonably be expected to result in Losses in excess of the amounts available for indemnification pursuant to Section 6.4, (iv) the Indemnifying Party has failed to defend or is failing to defend in good faith the Third Party Claim or (v) the Indemnifying Party has not acknowledged that such Third Party Claim is subject to indemnification pursuant to this Article 6.

(c)     If the Indemnifying Party assumes the defense of any Third Party Claim, (i) it shall not settle the Third Party Claim unless the settlement shall include (A) no admission of liability on the part of any Indemnified Party and (B) an unconditional release of each Buyer Indemnified Party or Seller Indemnified Party, as applicable, reasonably satisfactory to the Indemnified Party, from all liability with respect to such Third Party Claim, (ii) it shall indemnify and hold the Indemnified Party harmless from and against any and all Losses caused by or arising out of any settlement or judgment of such claim and may not claim that it does not have an indemnification obligation with respect thereto and (iii) the Indemnified Party shall have the right (but not the obligation) to participate in the defense of such Third Party Claim and to employ, at its own expense, counsel separate from counsel employed by the Indemnifying Party.

(d)     The Indemnified Party shall not settle any Third Party Claim if the Indemnifying Party shall have any obligation as a result of such settlement (whether monetary or otherwise) unless such settlement is consented to in writing by the Indemnifying Party, such consent not to be unreasonably withheld or delayed.

(e)     Each party shall cooperate, and cause their respective Affiliates to cooperate, in the defense or prosecution of any Third Party Claim. Any consent to be given by Buyer Indemnified Parties under this Section 6.6 shall be given by Buyer acting on behalf of Buyer Indemnified Parties and any consent to be given by Seller Indemnified

Parties under this Section 6.6 shall be given by Seller acting on behalf of Seller Indemnified Parties.

6.7     Other Claims.

(a)     In order to seek indemnification under this Article 6 (other than a Third Party Claim), an Indemnified Party shall deliver written notice of such claim in reasonable detail in light of the circumstances then known to such Indemnified Party (a "Claim Notice"): provided, that the failure of the Indemnified Party to provide such Claim Notice shall not relieve the Indemnifying Party of its obligations hereunder, except to the extent that such failure to give notice shall prejudice any defense or claim available to the Indemnifying Party. As used herein, "Claimed Amount" shall mean the amount of any Losses incurred or reasonably expected to be incurred by the Indemnified Party.

(b)     Within 20 days after delivery of a Claim Notice, the Indemnifying Party shall deliver to the Indemnified Party a written response containing the information provided for in this Section 6.7(b) (the "Response"), in which the Indemnifying Party shall: (i) agree that the Indemnified Party is entitled to receive all of the Claimed Amount (in which case the Response shall be accompanied by a payment by the Indemnifying Party to the Indemnified Party of the Claimed Amount, by check or by wire transfer; (ii) agree that the Indemnified Party is entitled to receive part, but not all of the Claimed Amount (the "Agreed Amount") (in which case the Response shall be accompanied by a payment by the Indemnifying Party to the Indemnified Party of the Agreed Amount, by check or by wire transfer; or (iii) dispute that the Indemnified Party is entitled to receive any of the Claimed Amount.

(c)     During the 30-day period following the delivery of a Response that reflects a dispute resulting from the Indemnifying Party disputing its liability in a Response for all or part of the Claimed Amount (a "Dispute"), the Indemnifying Party and the Indemnified Party shall use good faith efforts to resolve the Dispute.   If the Dispute is not resolved within such 30-day period, the parties will resolve such Dispute in accordance with the provisions of Section 7.9.

(d)     Buyer and Strike Parent may fully set off any payment owed to Seller as a Distribution (as such term is defined in the LLC Agreement) by the amount ultimately determined to be owed to Buyer pursuant to Article 6, provided, however, that to the extent any Claimed Amounts by Buyer are in dispute on the date of any such Distribution, Strike Parent shall deposit the amount of such set off in escrow with a third party escrow agent mutually acceptable to Seller and Buyer and upon terms mutually acceptable to such escrow agent, Seller and Buyer, negotiating in good faith, pending resolution of the dispute.   Nothing in this Section 6.7(d) shall limit Buyer Indemnified Parties' ability to recover the full amount of any such Claimed Amounts (subject to the provisions of Article 6).

6.8     <u>Tax Indemnification</u>.

(a)     From and after the Closing Date, Seller shall indemnify Buyer, Strike Parent and its Affiliates and Subsidiaries (each a "<u>Tax Indemnified Buyer Party</u>" and collectively, the "<u>Tax Indemnified Buyer Parties</u>") against and hold harmless from any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties (including reasonable fees for both in-house and outside counsel, accountants and other outside consultants) suffered or incurred (each a "<u>Tax Loss</u>" and collectively, the "<u>Tax Losses</u>") arising out of (i) Taxes of Seller for periods or portions thereof ending on or before the Closing Date ("<u>Pre-Closing Taxes</u>"); and (ii) without duplication, Taxes imposed on a Tax Indemnified Buyer Party as a result of (x) a breach of a representation or warranty set forth in <u>Section 3.10</u> (Taxes) of this Agreement or (y) a breach of a covenant or agreement set forth in <u>Section 5.4</u> (Tax Matters) of this Agreement.  Seller's aggregate Liability under this Agreement with respect to the Tax Losses to all Tax Indemnified Buyer Parties that are entitled to indemnification under this <u>Section 6.8(a)</u> shall not exceed an amount equal to amounts of the Purchase Price actually received by the Seller.

(b)     From and after the Closing Date, Buyer shall indemnify Seller, Owners and their respective Affiliates (each a "<u>Tax Indemnified Seller Party</u>" and collectively, the "<u>Tax Indemnified Seller Parties</u>"') against and hold harmless from any and all Tax Losses arising out of (i) Taxes of Buyer for periods or portions thereof beginning after the Closing Date ("<u>Post-Closing Taxes</u>"): and (ii) without duplication, Taxes imposed on a Tax Indemnified Seller Party as a result of a breach of a covenant or agreement set forth in <u>Section 5.4</u> (Tax Matters) of this Agreement; <u>provided</u>, that Buyer has no obligation to indemnify any Tax Indemnified Seller Party hereunder for any amounts arising as a result of or in connection with Seller's breach of a representation, warranty or covenant contained in this Agreement.  Buyer's aggregate Liability under this Agreement with respect to the Tax Losses to all Tax Indemnified Seller Parties that are entitled to indemnification under this <u>Section 6.8(b)</u> shall not exceed an amount equal to the Purchase Price.

6.9     <u>Additional Matters</u>.  For purposes solely of this <u>Article 6</u>, the representations and warranties contained in this Agreement (other than <u>Section 3.6</u>) shall be deemed to have been made without any qualifications as to materiality, Material Adverse Effect, specified dollar thresholds or similar qualifications.  All indemnification payments pursuant to this <u>Article 6</u> shall be made, together with interest, from the date that the Losses for which indemnification is sought were incurred to the date of payment, at the Annual Interest Rate.  To the extent permitted by applicable Law, any amounts payable under this <u>Article 6</u> shall be treated by Buyer and Seller as adjustments to the Purchase Price.

## ARTICLE 7

## MISCELLANEOUS

7.1     <u>Press Releases and Public Announcements</u>.  No Party hereto shall issue any press release or make any public announcement relating to the subject matter of this Agreement

without the prior written approval of the other Parties hereto; provided, however, that any Party hereto may make any public disclosure it, he or she believes in good faith is required by applicable law or any listing or trading agreement concerning its publicly-traded securities (in which case the disclosing Party will use its commercially reasonable efforts to advise the other Parties hereto prior to making the disclosure).

  7.2 <u>No Third-Party Beneficiaries</u>. This Agreement shall not confer any rights or remedies upon any Person other than the Parties hereto and their respective successors and permitted assigns, except for <u>Article 6</u> (to the extent provided therein).

  7.3 <u>Entire Agreement</u>. This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties hereto and supersede any prior covenants, understandings, agreements, undertakings, obligations, promises, arrangements, communications, representations or warranties, by or among the Parties hereto, written or oral, to the extent they have related in any way to the subject matter hereof. None of the Parties is relying upon any statement or representation of the other Parties except as expressly set forth herein and each Party is relying on its own judgment in connection with the execution of this Agreement and the consummation of the transactions contemplated hereby.

  7.4 <u>Succession and Assignment</u>. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party hereto may assign either this Agreement or any of his, her or its rights, interests or obligations hereunder without the prior written approval of the other Parties hereto; provided that the foregoing limitation shall not apply to the assignment of any rights, interests or obligations to an Affiliate of the Buyer.

  7.5 <u>Multiple Counterparts</u>. This Agreement may be executed in one or more counterparts, including by facsimile and portable document format (.pdf) delivery, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Parties agree and acknowledge that delivery of a signature by facsimile or in .pdf form shall constitute execution by such signatory.

  7.6 <u>Headings</u>. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

  7.7 <u>Notices</u>. All notices, requests, demands, claims, consents and other communications required or permitted to be given hereunder will be in writing and shall be deemed to have been duly given on the date delivered by hand or by internationally recognized courier service such as Federal Express, or upon delivery by registered or certified mail (return receipt requested), postage prepaid, to the Parties at the following addresses:

If to Buyer:

>
> Delta Directional Drilling, LLC
> 1800 Hughes Landing Blvd.
> Suite 500
> The Woodlands, TX 77380
> Attention: Frank Victor-McCawley
> Facsimile: (713) 389-2746
> Email: frank.victor-mccawley@strikeusa.com

With a copy (which shall not constitute notice) to:

>
> Fulbright & Jaworski LLP
> 1301 McKinney Suite 5100
> Houston, Texas  77010
> Attention: Edward Rhyne
> Facsimile: (713) 651-5246
> Email: edward.rhyne@nortonrosefulbright.com.

If to the Seller and/or Owners:

>
> Billy and Tammy Cleveland
> Delta Directional, LLC and Billy and Tammy Cleveland
> c/o Circle C Investments, LLC
> 1032 Hurst Road
> Hickory, MS 39332

With a copy (which shall not constitute notice) to:

>
> Bradley Arant Boult Cummings LLP
> Attention: Stephen M. Wilson
> 188 E. Capitol Street, Suite 400
> Jackson, MS  39201
> Email: swilson@babc.com

or to such other Persons or addresses as the Person to whom notice is given may have previously furnished to the other Parties hereto in writing in the manner set forth above (provided that notice of any change of address shall be effective only upon receipt thereof).

    7.8    Governing Law.  This Agreement, and any disputes arising out of, or with respect to, this Agreement, shall be governed by and construed in accordance with the domestic laws of the State of New York applicable to agreements made and to be performed entirely therein, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

7.9     Arbitration.

(a)     Any dispute arising out of or relating to this Agreement will be settled by binding arbitration and, except as specifically stated otherwise in this Agreement, in accordance with Commercial Arbitration Rules then in effect (the "Arbitration Rules") of the American Arbitration Association (the "Arbitration Body"). After the 30 day period described in Section 6.7(c), either party may require arbitration of the disputed issue by a demand for arbitration served on the other party as provided in Section 7.7.

(b)     Such arbitration shall be conducted before a single arbitrator selected by the parties who shall be an admitted lawyer knowledgeable in the negotiation of agreements for the purchase of businesses who has not performed services for any party. If the parties cannot agree on an arbitrator by the end of the 14th day after the notice of demand for arbitration is given, the Arbitration Body shall select the arbitrator upon request of either party from a list of at least five potential qualified arbitrators that it shall develop. The Arbitration Body shall establish procedures by which each potential arbitrator shall furnish information on his or her qualifications and any relationship to either party. A party may object to the qualifications of any potential arbitrator, and the Arbitration Body shall disqualify any potential arbitrator not qualified. The Arbitration Body shall choose the arbitrator from the remaining potential arbitrators. The arbitrator will be paid a fee or rate determined by the parties. If the parties cannot agree, the fee will be determined by the Arbitration Body based on the reasonable hourly or daily rates. The parties agree to execute an engagement letter in the customary form required by arbitrator. To the extent not otherwise directed by the provisions of this Section 7.9 or by mutual agreement of the parties, the Arbitration Body shall use the Arbitration Rules in the resolution of any dispute.

(c)     The parties intend that the arbitrator will have the power to conduct an arbitration procedure to the greatest extent provided by law, including the determination of the scope of arbitration. Except as specifically provided by the Rules of the Arbitration Body or this Agreement, the arbitrator shall establish all rules for the arbitration not otherwise specifically specified herein, by mutual agreement of the parties or by the Arbitration Rules. The arbitration will be conducted in Nashville, TN. Each party shall bear the portion of any deposit, advance, or other expense as determined by the arbitrator. A record shall be kept of all hearings and all evidence (including exhibits, deposition transcripts, and affidavits admitted into evidence) in the arbitration proceeding. The award of the arbitrator shall be based on a preponderance of the evidence. The arbitrator shall reach a decision in compliance with the applicable law and shall render a written decision setting forth the factual and legal bases of the award. The arbitrator may award any type of relief, including monetary damages and equitable relief (including provisional relief).

(d)     Neither party nor the arbitrator shall disclose to any person any information about the arbitration, including the fact of arbitration, the status thereof, or any documents or other information disclosed in connection therewith, except that the award itself may be made public by any of the parties, whether or not entered as a

judgment by a court. The parties and the arbitrator will take reasonable precautions to keep all such information confidential.

7.10    <u>Amendments and Waivers</u>.   No amendment or other modification of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the each of the Parties hereto. No breach of any provision hereof shall be deemed waived unless expressly waived in writing by the Party hereto who may assert such breach. No waiver that may be given by a Party hereto shall be applicable except in the specific instance for which it is given. No waiver of any provision hereof shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar), nor shall any such waiver constitute a continuing waiver, unless otherwise expressly provided therein. Except where a specific period for action or inaction is provided in this Agreement, neither the failure nor any delay on the part of any Party hereto in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any waiver on the part of any party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any other or further exercise thereof or the exercise of any other such right, power or privilege. The rights and remedies of the Parties hereto are cumulative and not alternative.

7.11    <u>Severability</u>.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

7.12    <u>Expenses</u>.  Except as otherwise provided in <u>Section 2.10</u>, each Party hereto will bear his, her or its own costs and expenses (including legal fees and expenses) incurred in connection with the negotiation and execution of this Agreement and the transactions contemplated hereby.

7.13    <u>Construction</u>.  The Parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party hereto by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state or local statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. Unless the context clearly indicates otherwise: (a) each definition herein includes the singular and the plural, (b) each reference herein to any gender includes the masculine, feminine and neuter where appropriate, (c) the words "include" and "including" and variations thereof shall not be deemed terms of limitation, but rather shall be deemed to be followed by the words "without limitation," (d) the words "hereof," "herein," "hereto," "hereby," "hereunder" and derivative or similar words refer to this Agreement as an entirety and not solely to any particular provision of this Agreement, (e) each reference in this Agreement to a particular Section, Exhibit or Schedule means a Section of, or an Exhibit or Schedule to, this Agreement, unless another agreement is specified, and (f) all references to "$" or "Dollars" shall mean United States Dollars.

7.14    <u>Incorporation of Exhibits and Schedules</u>.  The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

7.15   Specific Performance.

(a)      The Parties acknowledge and agree that any Party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached.  Accordingly, the Parties agree that any Party shall be entitled to an order or injunction to prevent breaches of the terms and provisions of this Agreement (including failing to take such actions as are required of it hereunder in order to consummate this Agreement) and to enforce specifically the terms and provisions of this Agreement.  The Parties' rights to specific performance granted under this Section 7.15 are an integral part of the transactions contemplated hereby, and that, without these rights, the Parties would not enter into this Agreement.

(b)      Each Party agrees that it will not oppose the granting of an injunction, specific performance and other equitable remedies when available pursuant to this Agreement on the basis that (i) there is an adequate remedy at Law or (ii) an award of specific performance is not an appropriate remedy for any reason at Law or equity.  Any Party seeking an order or injunction when expressly available pursuant to the terms of this Section 7.15(b) and to enforce specifically the terms and provisions of this Agreement when available pursuant to the terms of this Agreement shall not be required to provide any bond or security in connection with any such order or injunction.

7.16   Time of Essence.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.  The Parties hereto acknowledge that each will be relying upon the timely performance by the other of its obligations hereunder as a material inducement to such Party's execution of this Agreement.

*[Remainder of Page Intentionally Left Blank.  Signature Pages Follow.]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first above written.

**BUYER:**

DELTA DIRECTIONAL DRILLING, LLC

By: _____
Name: Steve Pate
Title: manager

**STRIKE PARENT:**

STRIKE, LLC

By: _____
Name: Steve Pate
Title: Chief Executive officer

**SELLER:**

DELTA DIRECTIONAL, LLC

By: _____
Name: _Billy Cleveland_____
Title: _Manager_____

**OWNERS:**

_____
BILLY CLEVELAND

_____
TAMMY CLEVELAND

# EXHIBIT B

JD Draft 6/19/14

## SUBORDINATED NOTE

THE NOTE EVIDENCED HEREBY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED  (THE "SECURITIES ACT") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (1) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE), (2) TO AN ACCREDITED INVESTOR IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, (3) IN ACCORDANCE WITH ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OR (4) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT.  THIS NOTE AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE TO ALL SENIOR INDEBTEDNESS (AS DEFINED BELOW) IN THE MANNER AND TO THE EXTENT SET FORTH HEREIN AND IN THE SENIOR SUBORDINATION AGREEMENT (AS DEFINED BELOW), AND EACH HOLDER OF THIS NOTE, BY ACCEPTANCE HEREOF, SHALL BE SUBJECT TO AND BOUND BY THE SUBORDINATION PROVISIONS SET FORTH HEREIN AND IN THE SENIOR SUBORDINATION AGREEMENT IN ALL RESPECTS.

Strike, LLC

5% Subordinated Note due 2019

New York, New York
June [**30**], 2014                                                                 $12,750,000

In connection with the Acquisition Agreement (as defined below), Strike, LLC, a Texas limited liability company (the "Company", which includes any successor entity) hereby promises to pay to the order of Delta Directional, LLC, a Mississippi limited liability company, or its successors or permitted assigns (the "Holder"), (a) the principal sum of Twelve Million Seven Hundred Fifty Thousand dollars ($12,750,000) and (b) interest on the principal amount of this 5% Subordinated Note due 2019 (as amended, modified, supplemented or restated, this "Note") as follows.  The principal amount of this Note shall be payable in 20 quarterly installments of $637,500 each, on [**March 31, June 30, September 30 and December 31**] of each year, beginning [**September 30**], 2014 (each, a "Payment Date"), with all remaining unpaid principal hereunder being due and payable on [**June 30**], 2019.[1]  Interest on this Note will accrue from the date hereof until the principal hereof is paid in full at the rate of 5% per annum and shall be payable quarterly in arrears on each Payment Date.  Notwithstanding the forgoing or anything to the contrary herein (a) if any Payment Date is not a Business Day, the principal and interest payment due on such Payment Date shall instead be due on the next succeeding Business Day, (b) to the extent payment on this Note on any Payment Date would then be prohibited by the terms of the Company Credit Agreement, the due date of such payment shall be deferred to the earliest Business Day that any such payment would not be prohibited under the Company Credit Agreement, (c) upon and after the occurrence of a Deferred Purchase Price Termination Event,

---

[1] NTD:  Payment dates to be confirmed.

all remaining unpaid obligations of the Company hereunder, for principal, interest or otherwise, shall be cancelled, deemed no longer owing, and null and void, (d) subject to clauses (b) and (c) above, if a Deferred Purchase Price Acceleration Event occurs, all then unpaid principal owing hereunder shall be due within 14 days of the occurrence of such Deferred Purchase Price Acceleration Event (together with all accrued and unpaid interest thereon to the date of payment) and (e) the principal amount of this Note may be prepaid in full or in part, together with all accrued and unpaid interest in respect of such prepaid principal, at any time at the election of the Company (and any such partial prepayments shall be applied to the principal installments due hereunder in order of maturity).

All payments hereunder shall be made in lawful money of the United States by wire transfer of immediately available funds to such account or accounts as the Holder may designate in writing to the Company with reasonable advance notice from time to time.  Principal and interest shall be considered paid for all purposes hereunder on the date that, and to the extent that, the Company deposits immediately available funds in such amounts sufficient to pay such principal and interest into such account or accounts.  Interest shall be computed on the basis of a 360-day year comprised of twelve 30-day months.  The interest rate on this Note will in no event be higher than the maximum rate permitted by New York law as the same may be modified by United States law of general application.

## ARTICLE I

## DEFINITIONS AND INCORPORATION BY REFERENCE

SECTION 1.1    Definitions.

"Acquisition Agreement" means that certain Contribution and Purchase Agreement by and among Delta Directional Drilling, LLC, the Company, the Holder, and Billy and Tammy Cleveland, dated as of June [**30**], 2014, as such agreement may be amended, supplemented, waived or otherwise modified from time to time.

"Commission" means the U.S. Securities and Exchange Commission.

"Company Credit Agreement" means that certain First Amended and Restated Credit Agreement, dated as of August 30, 2013, among the Company, Compass Bank, as administrative agent, swingline lender and LC issuer, and the lenders party thereto, including any related notes, guarantees, collateral documents, instruments and agreements executed in connection therewith, and in each case as amended, restated, supplemented, modified, renewed, replaced (whether at maturity or thereafter) or refinanced from time to time in one or more agreements or indentures (in each case with the same or new agents, lenders, institutional investors or other creditors), including any agreement adding or changing any borrower or any guarantor or extending the maturity thereof or otherwise restructuring all or any portion of the indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof.

"Deferred Purchase Price Acceleration Event" means the occurrence of one of the following:  (a) the sale of all or substantially all of the assets of the Company to an independent third party; (b) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of

the Exchange Act), other than Sponsor or the Pate Group, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act) of more than 50% of the Units (as defined in the LLC Agreement) of the Company; (c) a merger, consolidation, recapitalization or reorganization of the Company with or into an independent third party that results in the inability of the current members of the Company to designate or elect a majority of the governing body of the Company (or of the resulting entity or its parent company); or (d) the sale, in a firm commitment underwritten public offering led by a nationally recognized underwriting firm pursuant to an effective registration statement under the Securities Act, of equity interests of the Company constituting at least 30% of the outstanding equity interests of the Company on a fully diluted basis to the public and after which such equity interests are listed on any national securities exchange.

"Deferred Purchase Price Termination Event" means the termination of Billy Cleveland's employment with the Company (i) by the Company for Cause or (ii) by Billy Cleveland without Good Reason (as defined in the Cleveland Employment Agreement).

"Designated Senior Indebtedness" means, with respect to the Company:

(i)     any and all amounts payable under or in respect of the Company Credit Agreement (to the extent constituting Senior Indebtedness), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof; and

(ii)     any other Senior Indebtedness of the Company that, at the date of determination, has an aggregate principal amount outstanding of, or under which, at the date of determination, the holders thereof are committed to lend up to, at least $1 million and is specifically designated by the Company as "Designated Senior Indebtedness" for purposes of this Note.

"Equity Interests" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (including any debt security or other instrument that is convertible into, or exchangeable for, Capital Stock).

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission promulgated thereunder.

"Pate Group" means all or any of (a) Stephen V. Pate, Richmond Pate, Kevin Pate, and Aaron Cole Pate, any of their parents, spouses, lineal descendants of any of their parents, any spouse of a lineal descendant of any of their parents, or any estate or heir of any of the foregoing, and (b) any trust, limited partnership, limited liability company, corporation or other entity, the beneficiaries, partners, members, shareholders or other equity holders of which consist of one or more Persons referenced in clause (a) of this definition.

"Permitted Junior Securities" means unsecured debt or Equity Interests of the Company or any successor corporation issued pursuant to a plan of reorganization or readjustment of the

Company that are subordinated to the payment of all then outstanding Senior Indebtedness of the Company (and any debt securities issued in exchange for Senior Indebtedness), at least to the same extent that this Note is subordinated to the payment of all Senior Indebtedness of the Company, as applicable, on the date hereof, so long as to the extent that any Senior Indebtedness of the Company, as applicable, outstanding on the date of consummation of any such plan of reorganization or readjustment is not paid in full in cash on such date, the class of holders of any such Senior Indebtedness not so paid in full in cash have consented to the terms of such plan of reorganization or readjustment.

"Representative" means the trustee, agent or representative (if any) for an issue of Senior Indebtedness or Designated Senior Indebtedness, as applicable; provided that if, and for so long as, such Senior Indebtedness lacks such a Representative, then the Representative for such Senior Indebtedness shall at all times constitute the holder or holders of a majority in outstanding principal amount of obligations under such Senior Indebtedness.

"Senior Indebtedness" means all indebtedness of the Company, including interest thereon (including interest accruing on or after the filing of any petition in bankruptcy or similar proceeding or for reorganization relating to the Company at the rate specified in the documentation with respect thereto whether or not a claim for post-filing interest is allowed in such proceeding), it being understood that the Company Credit Agreement constitutes Senior Indebtedness, and other amounts (including fees, expenses, reimbursement obligations under letters of credit and indemnities) owing in respect thereof, whether outstanding on the date hereof or thereafter incurred, unless the instrument creating or evidencing the same or pursuant to which the same is outstanding expressly provides that such obligations are subordinated in right of payment to any other indebtedness of the Company. If any Senior Indebtedness is disallowed, avoided or subordinated pursuant to the provisions of Section 548 of Title 11 of the United States Code or any applicable state fraudulent conveyance law, such Senior Indebtedness nevertheless will constitute Senior Indebtedness.

"Senior Subordination Agreement" means the subordination agreement, dated as of the date hereof, executed by the Holder, Compass Bank, and the Company (the "Initial Subordination Agreement"), and any other subordination agreement executed by any Holder hereof in connection with any Designated Senior Indebtedness, in each case as any such subordination agreement may be amended, restated, replaced, supplemented, or otherwise modified from time to time.

"Sponsor" means any of One Equity Partners V, L.P., a Cayman Islands exempted limited partnership ("OEP"), OEP II Partners Co-Invest, L.P., a Cayman Islands exempted limited partnership, any Person that acquires all or substantially all of the assets of OEP, and any Affiliate of any of the foregoing.

"Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

SECTION 1.2    Rules of Construction.

Capitalized terms used herein without definition have the meanings given such terms in the Acquisition Agreement.  Unless the context clearly indicates otherwise: (a) each definition herein includes the singular and the plural, (b) each reference herein to any gender includes the masculine, feminine and neuter where appropriate, (c) the words "include" and "including" and variations thereof shall not be deemed terms of limitation, but rather shall be deemed to be followed by the words "without limitation," (d) the words "hereof," "herein," "hereto," "hereby," "hereunder" and derivative or similar words refer to this Note as an entirety and not solely to any particular provision of this Note, (e) each reference in this Note to a particular Article or Section means an Article or Section of this Note unless another agreement is specified, (f) all references to "$" or "Dollars" shall mean United States Dollars and (g) references to sections of or rules under the Securities Act or the Exchange Act shall be deemed to include substitute, replacement or successor sections or rules adopted by the Commission from time to time.

ARTICLE II

SUBORDINATION

SECTION 2.1    Agreement To Subordinate.  The Company agrees, and the Holder by accepting this Note agrees, that the payment of all obligations owing in respect of this Note is subordinated in right of payment, to the extent and in the manner provided in this Article II, to the prior payment in full of all existing and future Senior Indebtedness of the Company and that the subordination is for the benefit of and enforceable by the holders of such Senior Indebtedness.   All provisions of this Article II shall be subject to Section 2.10.

SECTION 2.2    Liquidation, Dissolution, Bankruptcy.  Upon any payment or distribution of the assets of the Company to creditors upon a total or partial liquidation or a total or partial dissolution of the Company or in a reorganization of or similar proceeding relating to the Company or its property:

(a)    the holders of Senior Indebtedness of the Company shall be entitled to receive payment in full in cash of such Senior Indebtedness (including interest accruing after, or which would accrue but for, the commencement of any such proceeding at the rate specified in the applicable Senior Indebtedness, whether or not a claim for such interest would be allowed) before the Holder of this Note shall be entitled to receive any payment; and

(b)    until the Senior Indebtedness of the Company is paid in full in cash, any payment or distribution to which the Holder of this Note would be entitled but for the subordination provisions of this Note shall be made to holders of such Senior Indebtedness as their interests may appear, except the Holder of this Note may receive and retain Permitted Junior Securities; and

(c)    if a distribution is made to the Holder that, due to the subordination provisions, should not have been made to it, the Holder is required to hold it in trust for the holders of Senior Indebtedness of the Company and pay it over to them as their interests may appear.

SECTION 2.3    Default on Senior Indebtedness of the Company.

The Company shall not pay principal of, premium, if any, or interest on this Note (or pay any other obligations relating to this Note, including fees, costs, expenses, indemnities and rescission or damage claims) and may not purchase, redeem or otherwise retire this Note (collectively, "pay this Note") (except that the Holder of this Note may receive and retain Permitted Junior Securities), if a default on any Designated Senior Indebtedness of the Company has occurred and is continuing or if such payment would otherwise be prohibited under any applicable Senior Subordination Agreement, unless, in either case, the applicable default has been cured or waived or such Designated Senior Indebtedness has been indefeasibly paid in full in cash; provided, however, that the Company shall be entitled to pay this Note without regard to the foregoing if the Company receives written notice approving such payment from the Representatives of all Designated Senior Indebtedness with respect to which such default has occurred and is continuing.

SECTION 2.4    When Distribution Must Be Paid Over.  If a distribution is made to the Holder that, due to the subordination provisions, should not have been made to it, the Holder is required to hold it in trust for the holders of Senior Indebtedness of the Company, and pay it over to them as their interests may appear.

SECTION 2.5    Subrogation.  After all Senior Indebtedness of the Company is paid in full and until this Note is paid in full, the Holder shall be subrogated to the rights of holders of such Senior Indebtedness to receive distributions applicable to such Senior Indebtedness.

SECTION 2.6    Relative Rights.  This Article II defines the relative rights of the Holder and holders of Senior Indebtedness of the Company.  Nothing in this Article II shall:

(a)    impair, as between the Company and the Holder, the obligation of the Company, which is absolute and unconditional, to pay principal of and interest on this Note in accordance with its terms; or

(b)    affect the relative rights of the Holder and creditors of the Company other than their rights in relation to holders of Senior Indebtedness.

SECTION 2.7    Subordination May Not Be Impaired by the Company.  No right of any holder of Senior Indebtedness of the Company to enforce the subordination of the indebtedness evidenced by this Note shall be impaired by any act or failure to act by the Company or by its failure to comply with this Note.

SECTION 2.8    Distribution or Notice to Representative.  Whenever a distribution is to be made or a notice given to holders of Senior Indebtedness of the Company, the distribution may be made and the notice given to their Representative (if any).

SECTION 2.9    Holder Entitled To Rely.  Upon any payment or distribution pursuant to this Article II, the Holder shall be entitled to rely (a) upon any order or decree of a court of competent jurisdiction in which any proceedings of the nature referred to in Section 2.2 hereof are pending, (b) upon a certificate of the liquidating trustee or agent or other Person making such payment or distribution to the Holder or (c) upon the Representatives of Senior Indebtedness of

the Company for the purpose of ascertaining the Persons entitled to participate in such payment or distribution, the holders of such Senior Indebtedness and other indebtedness of the Company, the amount thereof or payable thereon, the amount or amounts paid or distributed thereon and all other facts pertinent thereto or to this Article II.

SECTION 2.10   Reliance by Holders of Senior Indebtedness of the Company on Subordination Provisions.

(a)  The Holder by accepting this Note acknowledges and agrees that the foregoing subordination provisions are, and are intended to be, an inducement and a consideration to each holder of any Senior Indebtedness of the Company, whether such Senior Indebtedness was created or acquired before or after the issuance of this Note, to acquire and continue to hold, or to continue to hold, such Senior Indebtedness and such holder of such Senior Indebtedness shall be deemed conclusively to have relied on such subordination provisions in acquiring and continuing to hold, or in continuing to hold, such Senior Indebtedness.

(b)  Without in any way limiting the generality of the foregoing paragraph, the holders of Senior Indebtedness of the Company may, at any time and from time to time, without the consent of or notice to the Holder, without incurring responsibility to the Holder and without impairing or releasing the subordination provided in this Article II or the obligations hereunder of the Holder to the holders of the Senior Indebtedness of the Company, do any one or more of the following:  (i) change the manner, place or terms of payment or extend the time of payment of, or renew, increase, alter or otherwise amend or supplement in any manner Senior Indebtedness of the Company or any instrument evidencing the same or any agreement under which Senior Indebtedness of the Company is outstanding; (ii) sell, exchange, release or otherwise deal with any property pledged, mortgaged or otherwise securing Senior Indebtedness of the Company; (iii) release any Person liable in any manner for the payment or collection of Senior Indebtedness of the Company; and (iv) exercise or refrain from exercising any rights against the Company and any other Person

SECTION 2.11   Senior Subordination Agreement.  In the event of any conflict between the terms of this Note and the Senior Subordination Agreement, the latter shall control.  The Holder hereby agrees that if any Company Credit Agreement is proposed to be refinanced and the Company so requests, the Holder will execute a new Senior Subordination Agreement in favor of the creditors under the applicable new Company Credit Agreement, or an agent therefor, in substantially the form of the Initial Subordination Agreement or such other form as the Company may request.

ARTICLE III

MISCELLANEOUS

SECTION 3.1   Notices.  All notices, requests, demands, claims, consents and other communications required or permitted to be given hereunder will be in writing and shall be deemed to have been duly given on the date delivered by hand or by internationally recognized courier service such as Federal Express, or upon delivery by registered or certified mail (return receipt requested), postage prepaid, to the parties hereto at the following addresses:

If to the Company:

> 1800 Hughes Landing Blvd
> Suite 500
> The Woodlands, TX 77380
> Attention:  Frank Victor-McCawley
> Telecopy: (713) 389-2746

With a copy (which shall not constitute notice) to:

> Fulbright & Jaworski LLP
> 1301 McKinney Suite 5100
> Houston, Texas  77010
> Attention:  Edward Rhyne
> Facsimile: (713) 651-5246

If to the Holder:

> [**to come**][2]

With a copy (which shall not constitute notice) to:

> Bradley Arant Boult Cummings LLP
> Attention:  Stephen M. Wilson
> 188 E. Capitol Street, Suite 400
> Jackson, MS  39201.
> Telecopy:  (601) 948-3000

or to such other Persons or addresses as the Person to whom notice is given may have previously furnished to the other parties hereto in writing in the manner set forth above (provided that notice of any change of address shall be effective only upon receipt thereof).

SECTION 3.2    Governing Law.  This Note, and any disputes arising out of, or with respect to, this Note, shall be governed by and construed in accordance with the domestic laws of the State of New York applicable to agreements made and to be performed entirely therein, without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York..

SECTION 3.3    Successors and Assignment; No Third-Party Beneficiaries.  This Note shall be binding upon and inure to the benefit of the parties named herein and their respective successors and permitted assigns.  No party hereto may assign either this Note or any of [**its**] rights, interests or obligations hereunder without the prior written approval of the other party hereto; provided that the foregoing limitation shall not apply to the assignment hereof or of any

---

[2] Seller to provide.

rights, interests or obligations hereunder to an Affiliate of the Company.  This Note shall not confer any rights or remedies upon any Person other than the parties hereto and their respective successors and permitted assigns.

SECTION 3.4     Severability.  In case any provision in this Note shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 3.5     Multiple Counterparts.  This Note  may be executed in one or more counterparts, including by facsimile and portable document format (.pdf) delivery, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  The parties hereto agree and acknowledge that delivery of a signature by facsimile or in .pdf form shall constitute execution by such signatory.

SECTION 3.6     Arbitration.  Any dispute arising out of or relating to this Note will be settled by binding arbitration as provided for in Section 7.9 of the Acquisition Agreement, the provisions of which section are hereby incorporated herein, *mutatis mutandis*.

SECTION 3.7     Headings.  The section and article headings contained in this Note are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Note.

SECTION 3.8     Offset.  The Company may fully set off any payment owing hereunder by the amount ultimately determined to be owed to the Company pursuant to Article 6 of the Acquisition Agreement, provided, however, that to the extent any Claimed Amounts by the Company or Buyer are in dispute on any Payment Date, the Company shall deposit the amount so set off in escrow with a third party escrow agent mutually acceptable to the Company and the Holder upon terms mutually acceptable to such escrow agent, the Company and the Holder, negotiating in good faith, pending resolution of the dispute.  Notwithstanding anything to the contrary herein, interest shall cease to accrue or be owed hereunder by the Company in respect of any principal so offset and/or escrowed as of the date thereof.  For the avoidance of doubt, nothing in this Section 3.8 shall limit the Buyer Indemnified Parties' ability to recover the full amount of any such Claimed Amounts (subject to the provisions of Article 6 of the Acquisition Agreement).

[Signatures on following page]

JD Draft 6/19/14

      IN WITNESS WHEREOF, the parties hereto have caused this Note to be duly executed as of the first date written above.


**COMPANY:**

**Strike, LLC**


By: _____
      Name:
      Title:


Acknowledged and Agreed:

**HOLDER:**

**Delta Directional, LLC**


By: _____
      Name:
      Title:

# EXHIBIT C

VOTING AND EQUITY HOLDER AGREEMENT

THIS VOTING AND EQUITY HOLDER AGREEMENT (this "Agreement") is made and entered into as of the 30th day of June, 2014, by and among Delta Directional, LLC, a Mississippi limited liability company ("Delta"), Pate Holding Company, LP, a Texas limited partnership ("PHC"), OEP Strike, LLC, a Delaware limited liability company ("OEP"), Billy Cleveland, an individual, Tammy Cleveland, an individual, and Strike, LLC, a Texas limited liability company (the "Company", and collectively with Delta, PHC, OEP, Billy Cleveland and Tammy Cleveland, the "Parties" and each a "Party").

WHEREAS, on the date hereof, the Strike and Delta entered into that certain Contribution and Purchase Agreement by and among Delta Directional Drilling, LLC, a Texas limited liability company, the Company, Delta, and Billy and Tammy Cleveland (the "Purchase Agreement");

WHEREAS, on the date hereof, Delta became a party to the Company's Fifth Amended and Restated Regulations adopted by the Members of the Company on the date hereof (the "Operating Agreement") by executing a counterpart signature page, by which Delta agreed to be bound by the Operating Agreement;

WHEREAS, Billy and Tammy Cleveland hold all of the outstanding equity interests in Delta;

WHEREAS, pursuant to the terms of the Purchase Agreement, Strike issued to Delta 4,108.0283 Units (the "Company Securities") of the Company on the date hereof, and the Parties intend that the Company Securities be subject to this Agreement; and

WHEREAS, Billy Cleveland is an employee of the Company or its subsidiaries pursuant to that certain Employment Agreement by and between Billy Cleveland and the Company dated as of the date hereof (the "Employment Agreement"), and Billy Cleveland and Tammy Cleveland are each beneficial owners of the Company Securities by reason of their ownership interest in Delta.

NOW THEREFORE, THE PARTIES AGREE AS FOLLOWS:

ARTICLE I
VOTING AGREEMENT

A.      Delta hereby agrees to vote all Company Securities it owns of record as of the record date of any regular or special meeting of members of the Company, and to direct the vote of all Company Securities which Delta owns beneficially and has the power and authority to direct the voting thereof as of the record date of any regular or special meeting of the members of the Company, in the manner provided in this Article I. Delta hereby agrees to vote 60% of the Company Securities in favor of the approval of any action agreed upon by OEP (or its successors) and the remaining 40% of the Company Securities in favor of the approval of any action agreed upon by PHC (or its successors). Delta acknowledges and agrees that OEP and

PHC may each assign its rights under this <u>Article I</u> to a successor or successors who may be appointed from time to time, which successor or successors shall have the right to direct the vote of the Company Securities by Delta, and which successor or successors shall be effective and binding upon Delta upon notice from OEP or PHC, as applicable.  Following any such notice from OEP or PHC, any successor to OEP or PHC shall thereafter have the right to direct the vote of Delta's Company Securities and to notify Delta of any such successor or successors in the manner provided above with respect to OEP or PHC, as applicable.  In addition, Delta agrees to execute (or cause to be executed) with respect to all its Company Securities any written consent of the members of the Company in lieu of any regular or special meeting of the members of the Company with respect to 60% of its units in the manner determined by OEP (or its successors) and with respect to the remaining 40% of its units in the manner determined by PHC (or its successors).

B.     In order better to effect the provisions of the previous paragraph, Delta hereby revokes any previously executed proxies and hereby constitutes and appoints OEP (or its successors) with respect to 60% of the Company Securities and PHC with respect to the remaining 40% of the Company Securities the (each, individually or collectively, the "<u>Proxy Holder</u>"), individually and with full power of substitution, its true and lawful proxy and attorney-in-fact to vote at any regular or special meeting of members of Delta's Company Securities in the manner provided herein, and to execute any written consents in lieu of any such meetings.

C.     This proxy and power of attorney shall be limited strictly to the power to vote the Company Securities (or execute written consents with respect to the Company Securities) in the manner set forth in this Agreement and shall not extend to any other matters.  The irrevocable proxy granted pursuant hereto shall continue in effect until the termination of this Agreement.  Delta hereby acknowledges that OEP (or its successors) and PHC (or its successors) is relying on this Agreement in maintaining its investment in the Company and that the proxy granted hereby is coupled with an interest and is irrevocable to the maximum extent permitted by applicable law.  The vote of either Proxy Holder shall control in any conflict between a Proxy Holder's vote of the Company Securities and a vote by Delta of the Company Securities.

ARTICLE II
REPURCHASE RIGHTS

A.     <u>Definitions</u>.  For purposes of this <u>Article II</u>:

(a)     "Cause" shall have the meaning given to that term in the Employment Agreement.

(b)     "Good Reason" shall have the meaning given to that term in the Employment Agreement.

(c)     "Cleveland Termination Event" means a termination of Billy Cleveland's employment with, or provision of services to, the Company or any of its subsidiaries (a) by the Company for Cause; or (b) by Billy Cleveland without Good Reason.

(d)     "Repurchase Price" means an amount equal to the sum of (a) the Priority Return and the Unreturned Balance payable to Delta pursuant to <u>Section 4.8(b)</u> of the

Operating Agreement, including such adjustments set forth therein as a result of the termination of Billy Cleveland for Cause or without Good Reason (as applicable) (b) the lesser of (i) the Board Value (as defined below) and (ii) $2.5 million.

B.  <u>Generally</u>.  Within 120 days following a Cleveland Termination Event, the Company shall have the right, but not the obligation, to purchase from Delta (such right, the "<u>Repurchase Right</u>") and Delta shall, in such case, sell to the Company all of the Company Securities then held by Delta at a price equal to the Repurchase Price.  Notwithstanding the foregoing, in the event that the Company is restricted from fully exercising the Repurchase Right pursuant to this paragraph at any time during such 120 day period due to the Company's obligations under any credit agreement, financing arrangement or other restrictive agreement, then the Company will be permitted to exercise the Repurchase Right until the later of (i) the expiration of the 120 day period or (ii) 30 days following the lapse of all applicable restrictions under all credit agreements, financing arrangements or other restrictive agreements.

C.  <u>Fair Market Value Determination</u>.  Within 60 days after a Cleveland Termination Event, the Board of Directors of the Company shall make a good-faith determination as to the fair market value of the Company Securities, measured as of the date of such event (the "<u>Board Value</u>").  In making such a determination, the Board of Directors will use standard industry valuation practices for valuing companies on a going concern basis and take into account all relevant factors (but not taking into account any discounts for lack of liquidity, marketability, control or similar discounts), including, as determined by the Board of Directors as applicable: (i) the value of the Company's tangible and intangible assets; (ii) the present value of the anticipated future cash flows of the Company; (iii) the value of the stock of any publicly traded company engaged in a substantially similar business and of a substantially similar size; and (iv) recent arm's-length transactions involving the sale of any equity or profits interest.

D.  <u>Payment of Repurchase Price</u>.  The Company shall pay the Repurchase Price upon exercise of the Repurchase Right by the Company's delivery of a check or wire transfer of immediately available funds against delivery of the certificates or other instruments, if any, representing the Company Securities so purchased, duly endorsed.

ARTICLE III
OTHER MATTERS.

A.  <u>Indirect Transfers</u>.  For the avoidance of doubt, the Parties agree that any change of control (other than by the laws of descent and distribution at the time of Billy or Tammy Cleveland's death) of Delta whereby Billy Cleveland or Tammy Cleveland no longer collectively hold all of the equity interests in Delta shall be considered a Transfer as such term is defined in the Operating Agreement and, notwithstanding anything to the contrary in the Operating Agreement, shall not be considered a Permitted Transfer.

B.  <u>Agreement of Delta Equity Holders</u>.  Billy Cleveland and Tammy Cleveland agree to be bound by this Agreement and further agree to take any and all necessary actions to cause and/or direct Delta to comply with the terms of this Agreement, the Operating Agreement and any and all other agreements pertaining to the Company Securities.

ARTICLE IV
MISCELLANEOUS PROVISIONS

A.    This Agreement shall terminate upon the earlier of: (1) the dissolution or termination of the Company; (2) such time as neither OEP (or its successors) nor PHC (or its successors) beneficially own any equity interests in the Company; and (3) the written agreement of OEP (or its successors), PHC (or its successors), the Company and Delta.

B.    This Agreement shall be binding upon the parties hereto and their heirs, successors, assigns and personal representatives.

C.    This Agreement may be amended only by a written agreement executed by the Members.

D.    This Agreement and the legal relations between the parties with respect hereto shall be governed by and construed in accordance with the domestic laws of the State of Texas without regard or giving effect to any choice or conflict of law provision or rule (whether of such state or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than such state.

E.    Any proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be heard and determined in Harris County, Texas and each of the parties hereto hereby consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts therefrom in any such proceeding) and irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any such proceeding in any such court or that any such proceeding that is brought in any such court has been brought in an inconvenient forum. With respect to any such proceeding in any such court, each of the parties irrevocably waives and releases to the other its right to a trial by jury, and agrees that it will not seek a trial by jury in any such proceeding.

F.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument. A signature page to this Agreement that contains a copy of a party's signature and that is sent by such party or its agent with the apparent intention (as reasonably evidenced by the actions of such party or its agent) that it constitute such party's execution and delivery of this Agreement or any such other document, including a document sent by facsimile transmission or by email in portable document format (pdf), shall have the same effect as if such party had executed and delivered an original of this Agreement or any such other document. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any such other document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

G.    All notices required to be given under this Agreement shall be in writing and shall be deemed to have been given when received if personally delivered or sent by a nationally recognized overnight delivery service, or when mailed if sent by registered or certified mail,

postage pre-paid, return receipt requested, addressed to a Member at the Member's address as then shown on the records of the Company.

H.      For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires: (a) the meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting any gender shall include all genders as the context requires; (b) where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning; (c) the terms "hereof," "herein," "hereunder," "hereby" and "herewith" and words of similar import shall be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement; (d) when a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule, such reference is to an Article, Section, paragraph, Exhibit or Schedule of this Agreement; (e) the words "include," "includes" and "including" when used in this Agreement shall be deemed to be modified by the words "without limitation;" (f) the use of the word "or" is not intended to be exclusive; (g) the word "shall" shall be construed to have the same meaning and effect of the word "will"; (h) a reference to any party to this Agreement or any other agreement or document shall include such party's predecessors, successors and permitted assigns; and (i) a reference to any law means such law as amended, modified, codified, replaced or reenacted, as of the date hereof, and all rules and regulations promulgated thereunder as of the date hereof.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed and delivered as of the date first above written.

**OEP**:

OEP STRIKE LLC

By: _JBACherm_
Name: _James B.A. Cherry_
Title: _Director_

**PHC**:

PATE HOLDING COMPANY LP

By:     Pate Holding GP LLC
        its General Partner

By: _____
Name: _____
Title: _____

**COMPANY**:

STRIKE, LLC

By: _____
Name: _____
Title: _____

40681892                 *Signature Page to Voting and Equity Holder Agreement*

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed and delivered as of the date first above written.

**OEP**:

OEP STRIKE LLC

By: _____
Name: _____
Title: _____

**PHC**:

PATE HOLDING COMPANY LP

By:     Pate Holding GP LLC
        its General Partner

By: _____
Name: Steve Pate
Title: Manager

**COMPANY**:

STRIKE, LLC

By: _____
Name: Steve Pate
Title: Chief Executive Officer

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly executed and delivered as of the date first above written.

**DELTA:**

DELTA DIRECTIONAL, LLC

By: _____
Name: _Billy Cleveland_
Title: _Manager_


_____
Billy Cleveland, Individually

_____
Tammy Cleveland, Individually

# EXHIBIT D

FIFTH AMENDED AND RESTATED REGULATIONS

OF

STRIKE, LLC

A Texas Limited Liability Company

THE SECURITIES REPRESENTED BY THESE LIMITED LIABILITY COMPANY REGULATIONS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AS AMENDED ("1933 ACT") OR THE SECURITIES LAWS OF ANY STATE IN RELIANCE UPON EXEMPTIONS FROM SUCH REGISTRATION. ACCORDINGLY, THEY MAY NOT BE TRANSFERRED IN ABSENCE OF SUCH REGISTRATION UNLESS AN EXEMPTION FROM REGISTRATION UNDER THE 1933 ACT AND APPLICABLE STATE SECURITIES LAWS IS AVAILABLE. THESE FIFTH AMENDED AND RESTATED REGULATIONS CONTAIN ADDITIONAL RESTRICTIONS ON TRANSFER OF SECURITIES.

# FIFTH AMENDED AND RESTATED REGULATIONS

## OF

## STRIKE, LLC

### (a Texas Limited Liability Company)

These Fifth Amended and Restated Regulations (these "Regulations") of Strike, LLC, formerly known as Strike Construction, LLC (the "Company"), dated as of June 30, 2014, are adopted, effectuated and agreed to, for good and valuable consideration, by OEP and Pate (as such terms are defined below) on behalf of the Members of the Company pursuant to Section 10.1 of the Fourth Amended and Restated Regulations of the Company dated as of August 30, 2013.

### RECITALS

WHEREAS, the Articles of Organization for the Company were filed with the Texas Secretary of State on March 18, 2003 (the "Articles");

WHEREAS, the parties thereto entered into those certain First Amended and Restated Regulations of Strike Construction, LLC effective as of January 24, 2007 (the "First Amended Regulations");

WHEREAS, the parties thereto entered into those certain Second Amended and Restated Regulations of Strike, LLC effective as of August 1, 2011 (the "Second Amended Regulations");

WHEREAS, the parties thereto entered into those certain Third Amended and Restated Regulations of Strike, LLC effective as of February 29, 2012 (the "Third Amended Regulations");

WHEREAS, the parties thereto entered into those certain Fourth Amended and Restated Regulations of Strike, LLC effective as of August 30, 2013 (the "Fourth Amended Regulations");

WHEREAS, reference is made to that certain Contribution and Purchase Agreement (the "Contribution and Purchase Agreement") dated as of June 30, 2014, by and among Delta Directional Drilling, LLC, the Company, Delta Directional, LLC ("Delta"), and Billy and Tammy Cleveland pursuant to which the Company is purchasing certain assets of Delta and issuing certain Units to Delta as described therein;

WHEREAS, contemporaneously with the transactions contemplated by the Contribution and Purchase Agreement, the undersigned are amending and restating the Fourth Amended Regulations as set forth in these Regulations to account for the recitals set forth above and to modify and amend other provisions of the Fourth Amended Regulations.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, have entered into these Regulations to amend and restate the Fourth Amended Regulations in their entirety.

# ARTICLE I
## GENERAL PROVISIONS

1.1     Formation.   The Company was formed as a Texas limited liability company pursuant to the Act and the filing of the Articles with the Secretary of State of Texas, and the Members hereby amend and restate the Fourth Amended Regulations of the Company in their entirety.

1.2     Name.   The name of the Company is "STRIKE, LLC" and all Company business shall be conducted in that name or such other names that comply with applicable law as the Board of Directors may select from time to time.

1.3     Principal Office.   The principal business office of the Company shall be 831 Crossbridge Dr., Spring, Texas 77373, or as subsequently designated by the Board of Directors. The Company may also have offices at such other places as the Board of Directors may from time to time determine or that the business of the Company may require.

1.4     Registered Office of Company.   The Company shall have and maintain a registered office in the State of Texas.   The registered office shall be 831 Crossbridge Dr., Spring, Texas 77373 or such address within the state of Texas as the Board of Directors shall decide from time to time.

1.5     Registered Agent of Company.   The registered agent in the State of Texas for service of process shall be Stephen V. Pate or such other registered agent as the Board of Directors shall decide from time to time.

1.6     Business Purposes.   The purpose for which the Company is organized is to engage in any lawful activity, within or without the State of Texas.

1.7     Powers.   The Company shall be empowered to do any and all acts and things necessary and appropriate for the furtherance and accomplishment of the purposes and business described in Section 1.6 and for the protection and benefit of the Company.

1.8     Term of Company.   The Company commenced on the date the Company filed the Articles with the Secretary of State of Texas and shall continue in existence for the period fixed in the Articles for the duration of the Company, or such earlier time as these Regulations may specify.

1.9     Mergers and Exchanges.   The Company may be a party to (i) a merger, or (ii) an exchange or acquisition of the type described in Part Ten of the Act, subject to the requirements of these Regulations.

1.10    Power of Attorney.   Each Member hereby constitutes and appoints the Board of Directors and each of its authorized officers and attorneys-in-fact, as the case may be, with full

power of substitution, as his true and lawful agent and attorney-in-fact, with full power and authority in his name, place and stead, to execute, swear to, acknowledge, deliver, file and record in the appropriate public offices pursuant to the terms of these Regulations:

(a)    all certificates, documents and other instruments (including these Regulations and the Articles and all amendments or restatements hereof or thereof) that the Board of Directors determines to be necessary or appropriate to form, qualify or continue the existence or qualification of the Company as a limited liability company in the State of Texas and in all other jurisdictions in which the Company may conduct business or own property;

(b)    all certificates, documents and other instruments that the Board of Directors determines to be necessary or appropriate to reflect, in accordance with its terms, any amendment, change, modification or restatement of these Regulations;

(c)    all certificates, documents and other instruments (including conveyances and a certificate of cancellation) that the Board of Directors determines to be necessary or appropriate to reflect the dissolution and liquidation of the Company pursuant to the terms of these Regulations;

(d)    all certificates, documents and other instruments relating to the admission, withdrawal, removal, redemption or substitution of any Member pursuant to, or as described in, Article III or V;

(e)    all certificates, documents and other instruments relating to the determination of the rights, preferences and privileges of any class or series of Company Securities issued pursuant to Article III; and

(f)    all certificates, documents and other instruments (including agreements and a certificate of merger) relating to a Sale of the Company.

Nothing contained in this Section 1.10 shall be construed as authorizing the Board of Directors to amend these Regulations except in accordance with Section 10.1 or as may be otherwise expressly provided for in these Regulations.

The foregoing power of attorney is hereby declared to be irrevocable and a power coupled with an interest, and it shall survive and, to the maximum extent permitted by law, not be affected by the subsequent death, incompetency, disability, incapacity, dissolution, bankruptcy or termination of any Member and the transfer of all or any portion of such Member's Company Securities and shall extend to such Member's heirs, successors, assigns and personal representatives. Each such Member hereby agrees to be bound by any representation made by the Board of Directors acting in good faith pursuant to such power of attorney; and each such Member, to the maximum extent permitted by law, hereby waives any and all defenses that may be available to contest, negate or disaffirm the action of the Board of Directors taken in good faith under such power of attorney. Each Member shall execute and deliver to the Board of Directors within 15 days after receipt of the request therefor, such further designation, powers of attorney and other instruments as the Board of Directors determines to be necessary or appropriate to effectuate these Regulations and the purposes of the Company.

1.11   Title to Company Assets.  Title to Company assets, whether real, personal or mixed and whether tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member, Director or Officer, individually or collectively, shall have any ownership interest in such Company assets or any portion thereof.  Title to any or all of the Company assets may be held in the name of the Company or one or more nominees, as the Board of Directors may determine.

1.12   Limited Liability Company Treatment.  It is the expressed intent and purpose of the Members of the Company that the Company shall be treated for all purposes as a limited liability company for purposes of the Act and that, therefore, the Company shall not be treated as a partnership (including, without limitation, a limited partnership) or joint venture.  Accordingly, no Member shall be treated as a partner or joint venturer of any other Member, for any purposes other than federal and state tax purposes, and these Regulations shall not be construed to suggest otherwise.

1.13   Definitions.  The following terms shall have the indicated meaning for purposes of these Regulations:

(a)   "1933 Act":  As defined on the cover page of these Regulations.

(b)   "1934 Act":  Shall mean the Securities Exchange Act of 1934, as amended.

(c)   "Act":  Shall mean the Texas Business Organizations Code and any successor statute, as amended from time to time.

(d)   "Adjusted Capital Account" Shall mean, as of the end of any taxable year, a Member's Capital Account balance as of the end of such taxable year (taking into account all contributions made by such Member and distributions made to such Member during such taxable year and any special allocations required by Section 4.2), increased by the sum of (i) such Member's share of Company Minimum Gain and (ii) such Member's share of Member Nonrecourse Debt Minimum Gain, both determined after taking into account any such special allocations.

(e)   "Adjusted Capital Account Deficit":  Shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:  (1) credit to such Capital Account any amounts which such Member is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentence of Reg. §1.704-2(g)(1) and Reg. §1.704-2(i)(5); and (2) debit to such Capital Account the items described in Reg. §1.704-1(b)(2)(ii)(d)(4), (5) and (6) generally including certain Capital Account adjustments for depletion allowances, certain future allocations of loss and deduction which are reasonably expected as of year end, and future distributions, in excess of offsetting Capital Account increases, which are reasonably expected as of year end.  The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Reg. §1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(f)   "Affiliate":  Shall mean with respect to any Person, (i) each Person that controls, is controlled by or is under common control with any such Person or any Affiliate of such Person, (ii) each of such Person's officers, managers, directors, joint venturers, members,

partners and other equity holders and (iii) such Person's spouse, children, siblings and parents or a trust entirely for the benefit of such Person or his or her spouse, children, siblings and parents. For purposes of this definition, "control" of a Person means the possession, directly or indirectly, of the power to direct or cause the direction of its management of policies, whether through the ownership of voting interests, by contract or otherwise.

(g)      "Allocation Year": Shall mean (i) the period commencing on the day after the Closing Date and ending on December 31, (ii) any subsequent 12 month period commencing on January 1 and ending on December 31, or (iii) any portion of the period described in clause (i) or (ii) for which the Company is required to allocate Profit, Loss and other items of Company income, gain, loss or deduction for U.S. federal income tax purposes, unless the Company is required by Section 706 of the Code to use a different tax year, in which case such tax year.

(h)      "Annual Distribution Amount": Shall mean $2,000,000 in the aggregate.

(i)      "Articles": As defined in the recitals to these Regulations.

(j)      "Base Amount": Shall mean for each Unit $405.6247 per unit (as proportionally adjusted for all splits, dividends and other recapitalizations affecting the Units).

(k)      "Board of Directors": Shall mean the board of directors of the Company.

(l)      "Book" means the method of accounting prescribed for compliance with the capital account maintenance rules set forth in Treas. Reg. § 1.704-l(b)(2)(iv), as distinguished from any accounting method which the Company may adopt for other purposes such as financial reporting.

(m)      "Book Value" means, with respect to any item of Company property, the book value of such property within the meaning of Treas. Reg. § 1.704-1(b)(2)(iv)(g)(3); provided, however, that if the Company adopts the remedial allocation method described in Treas. Reg. § 1.704-3(d) with respect to any item of Company property, the Book Value of such property shall be its book basis determined in accordance with Treas. Reg. § 1.704-3(d)(2).

(n)      "Capital Account": Shall mean the capital account of a Member maintained pursuant to the terms of these Regulations. "Capital Accounts" shall mean the aggregate Capital Accounts of all Members.

(o)      "Change of Control Event": Shall mean the occurrence of either of the following: (i) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the 1934 Act), other than OEP or Pate, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the 1934 Act) of more than 50% of the outstanding Units of the Company or (ii) a merger, consolidation, recapitalization or reorganization of the Company with or into an independent third party that results in the inability of the members of the Company as of the Closing Date to designate or elect a majority of the governing body of the Company (or of the resulting entity or its parent company).

(p)      "Chairman": As defined in Section 6.2(i) of these Regulations.

(q)   "Cleveland Employment Agreement":   Shall mean the Employment Agreement by and between the Company and Billy Cleveland dated as of June 30, 2014.

(r)   "Closing Date"   As defined in the Contribution and Purchase Agreement.

(s)   "Code":   Shall mean the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of future laws.

(t)   "Company":   As defined in the preamble of these Regulations.

(u)   "Company Minimum Gain":   Shall mean partnership minimum gain determined pursuant to Reg. § 1.704-2(d).

(v)   "Company Sale Date":   Shall mean (i) with respect to OEP, August 30, 2016 and (ii) with respect to Pate, August 30, 2018.

(w)   "Contribution and Purchase Agreement":   As defined in the recitals to these Regulations.

(x)   "Company Securities":   Shall mean any class or series of equity interest in the Company, including Units, Junior Units and any options, rights, warrants, phantom securities and appreciation rights relating to an equity interest in the Company.

(y)   "Covered Person":   As defined in Section 7.2(e)(i) of these Regulations.

(z)   "Director":   Shall mean a member of the Board of Directors.

(aa)   "Distributions":   Shall mean any cash and the fair market value of any property distributed to a Member.

(bb)   "Distributed Base Amount":   As defined in Section 4.8(c)(ii) of these Regulations.

(cc)   "Distributed Junior Base Amount":   As defined in Section 4.8(c)(iii) of these Regulations.

(dd)   "Drag-Along Notice":   As defined in Section 5.4(a) of these Regulations.

(ee)   "Drag-Along Purchaser":   As defined in Section 5.4(b) of these Regulations.

(ff)   "Drag-Along Sale":   As defined in Section 5.4(a) of these Regulations.

(gg)   "Drag-Along Seller":   As defined in Section 5.4(a) of these Regulations.

(hh)   "Delta":   As defined in the recitals to these Regulations.

(ii)   "Delta Rate Increase Event":   Shall mean the date of any of the following: (i) a Change of Control Event or (ii) June 30, 2019.

(jj)    "Delta Units": Shall mean the Units issued to Delta pursuant to the Contribution and Purchase Agreement.

(kk)    "Final Adjudication": As defined in Section 7.1(e) of these Regulations.

(ll)    "First Amended Regulations": As defined in the recitals to these Regulations.

(mm)   "First Resort Indemnitors": As defined in Section 7.2(e)(i) of these Regulations.

(nn)    "Founding Members": Shall mean Pate Holding Company LP, Kacey Smart, Jarvie N. Arnold, Jason Heckt and the Aaron Cole Pate 2012 Trust.

(oo)    "Immediate Family": With respect to any specified Person, means any of such Person's, or such Person's current or former spouse's, spouse, parents, children, siblings, grandchildren, great-grandchildren, nieces, nephews, uncles, aunts, grandparents or cousins, including in each case by way of marriage.

(pp)    "Indemnitee": As defined in Section 7.1(a) of these Regulations.

(qq)    "Independent Director": As defined in Section 6.2(c)(iv) of these Regulations.

(rr)    "Individual Representations": As defined in Section 5.4(b) of these Regulations.

(ss)    "Information": As defined in Section 2.4(b) of these Regulations.

(tt)    "Interim Tax Distribution": As defined in Section 4.8(d)(iv) of these Regulations.

(uu)    "Issue Date": Shall mean, with respect to any Unit, the date of issuance thereof provided that with respect to any Company Security outstanding as of August 30, 2013, the "Issue Date" shall be deemed to be August 30, 2013.

(vv)    "Junior Base Amount": Shall mean for each Junior Unit $1.5417 per unit (as proportionally adjusted for all splits, dividends and other recapitalizations affecting the Junior Units).

(ww)   "Junior Unit Investment Agreements": Shall mean those Junior Unit Investment Agreements entered into from time to time by the Company and Members who purchase Junior Units, in each case as such agreements may be amended or restated from time to time.

(xx)    "Junior Units": Shall mean those Company Securities designated as "Junior Units" with such rights and obligations as set forth in these Regulations.

(yy)   "Last Resort Indemnitors":   As defined in Section 7.2(e)(i) of these Regulations.

(zz)   "Liquidating Trustees":  As defined in Section 9.2 of these Regulations.

(aaa)   "Member":  Shall mean any Person executing these Regulations as of the date of these Regulations as a Member or hereafter admitted to the Company as a Member as provided in these Regulations, but does not include any Person who has ceased to be a Member in the Company.

(bbb)   "Member Nonrecourse Debt":  Shall mean any liability of the Company that is a partner nonrecourse debt within the meaning of Reg. § 1.704-2(b)(4).

(ccc)   "Member Nonrecourse Debt Minimum Gain":  Shall mean minimum gain attributable to Member Nonrecourse Debt pursuant to Treas. Reg. § 1.704-2(i)(3).

(ddd)   "Member Nonrecourse Deductions":  Shall mean any item of Book loss or deduction that is a partner nonrecourse deduction within the meaning of Treas. Reg. § 1.704-2(i)(1) and (2).

(eee)   "Membership Interest and Warrant Purchase and Redemption Agreement":  Shall mean that certain Membership Interest and Warrant Purchase and Redemption Agreement dated as of July 20, 2013, by and between the Members and OEP.

(fff)   "Nonrecourse Deductions":  Shall mean a nonrecourse deduction determined pursuant to Treas. Reg. § 1.704-2(b)(1) and Treas. Reg. §1.704-2(c).

(ggg)   "OEP":  Shall mean OEP Strike LLC, a Delaware limited liability company.

(hhh)   "OEP Director":  As defined in Section 6.2(c)(i) of these Regulations.

(iii)   "Offer":  As defined in Section 5.4(f) of these Regulations.

(jjj)   "Officers":  As defined in Section 6.5(a) of these Regulations.

(kkk)   "Option Period":  As defined in Section 5.4(f) of these Regulations.

(lll)   "Other Business":  As defined in Section 2.3 of these Regulations.

(mmm)"Pate":  Shall mean Pate Holding Company LP, a Texas limited partnership.

(nnn)   "Pate Director":  As defined in Section 6.2(c)(i) of these Regulations.

(ooo)   "Permitted Transfer":  As defined in Section 5.1(e) of these Regulations.

(ppp)   "Permitted Transferee":  As defined in Section 5.1(e) of these Regulations.

(qqq)   "Person":   Shall mean any individual, partnership, limited partnership, limited liability company, foreign limited liability company, trust, estate, corporation, custodian, trustee, executor, administrator, nominee or entity of any kind.

(rrr)   "Phantom Unit Plan" means that certain Phantom Unit Plan adopted by the Board of Directors as of August 30, 2013.

(sss)   "Phantom Units" means those certain Company Securities having the rights and subject to the terms and conditions as set forth in the Phantom Unit Plan.

(ttt)   "Pro Rata Unit Ownership":   Shall mean, with respect to each Member, the number of Units and Junior Units owned by such Member as a percentage of the total number of Units and Junior Units then issued and outstanding by the Company, excluding all other Company Securities or any rights or securities convertible into Units.

(uuu)   "Profits and Losses":   Any reference to "Profits" shall mean the net income of the Company as determined for Federal income tax purposes, and any reference to "Losses" shall mean the net losses of the Company as determined for Federal income tax purposes, (including all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(l), adjusted as follows:   (1) items of gain, loss, depreciation, amortization, or depletion that would be computed for Federal income tax purposes by reference to the tax basis of an item of Company property shall be determined by reference to the Book Value of such item of property; (2) there shall be added to such net income or losses any income exempt from Federal income taxes and not otherwise taken into account in computing Profits and Losses; (3) there shall be deducted from such net income or losses any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Reg. §1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses; (4) the effects of upward and downward revaluations of Company property pursuant to Section 3.4(c) shall be treated as gain or loss respectively from the sale of such property; and (5) there shall be excluded from such net income or losses those items subject to special allocations under Section 4.2.   Except as otherwise provided in Reg. §1.704-3(d)(2), for purposes of clause (1) above, if the Book Value of any item of Company property differs from its tax basis, the amount of Book depreciation, depletion, or amortization for a period with respect to such property shall be computed so as to bear the same relationship to the Book Value of such property as the depreciation, depletion, or amortization computed for tax purposes with respect to such property for such period bears to the tax basis of such property; provided that, if the tax basis of such property is zero, the Book depreciation, depletion, or amortization with respect to such property shall be computed by using a method consistent with the method that would be used for tax purposes if the tax basis of such property were greater than zero.   The amounts of the items of income, gain, loss or deduction available to be specially allocated pursuant to Section 4.2 shall be determined by applying rules analogous to the foregoing.

(vvv)   "Public Offering":   Any underwritten sale of Company Securities pursuant to an effective registration statement under the 1933 Act filed with the Securities and Exchange Commission on Form S-1 (or a successor form adopted by the Securities and Exchange Commission); provided, that the following shall not be considered a Public Offering:   (1) any issuance of Company Securities as consideration or financing for a merger or acquisition and (2)

any issuance of Company Securities or rights to acquire Company Securities pursuant to the Junior Unit Investment Agreements.

(www) "Redemption Units"  As defined in the Membership Interest and Warrant Purchase and Redemption Agreement.

(xxx)  "Regulations": As defined in the preamble to these Regulations.

(yyy)  "Related Party":  With respect to the Company, means (a) any Founding Member or any of Steve Pate, A. Cole Pate, Kevin Pate or Richie Pate; (b) any Immediate Family of any natural person listed or described in clause (a) or clause (c); or (c) any Affiliate of the Company (which includes OEP) or any Affiliate of any Person described in clause (a) or clause (c).

(zzz)  "Revaluation Event" means:  (i) a liquidation of the Company (within the meaning of Reg. §1.704-1(b)(2)(ii)(g) but not including a deemed liquidation (deemed to occur pursuant to Reg. §1.708-1(b)(4))); (ii) a contribution of more than a de minimis amount of money or other property to the Company by a new or existing Member or a distribution of more than a de minimis amount of money or other property to a retiring or continuing Member in exchange for Company Securities; (iii) the grant of any Company Securities in connection with the provision of services to or for the benefit of the Company, including, without limitation, the issuance of Junior Units; (iv) the grant of a noncompensatory option to acquire Company Securities (other than an option for a de minimis Company interest); and (v) the distribution of money or other property (other than a de minimis amount) by the Company to a retiring or continuing Member as consideration for Units.

(aaaa)  "Sale of the Company":  Shall mean the occurrence of any one or more of the following:  (1) any Person (other than a direct or indirect Related Party), becomes the beneficial owner (as defined under Rule 13d-3 or any successor rule or regulation promulgated under the 1933 Act, except that a Person will be deemed to have "beneficial ownership" of all securities that such Person has the right to acquire, whether such right is exercisable immediately or only after the passage of time) of at least 90% of the Company Securities or such lesser percentage as may be agreed to by OEP and Pate; (2) the effective date of a merger or consolidation of the Company with any Person (other than a direct or indirect Related Party) in which at least 90% of the Company Securities outstanding or such lesser percentage as may be agreed to by OEP and Pate immediately prior to such merger or consolidation and at least 90% of the voting power of the voting securities of the surviving entity outstanding immediately after such merger or consolidation are cancelled or owned and controlled by Persons other than the Members, direct or indirect Related Parties and their Affiliates; or (3) the sale, conveyance, exchange or transfer (for cash, shares of stock, securities or other consideration) of all or substantially all of the assets of the Company to any Person at least 90% of whose voting power and equity securities (including any options, rights, warrants, phantom securities and appreciation rights relating to an equity interest) are owned and controlled by Persons other than Members, direct or indirect Related Parties and their Affiliates; provided, that no consideration shall be exchanged or paid to any Member or any Affiliate of any Member for any reason other than with respect to the Transfer of Company Securities other than customary consulting or employment agreements on arms-length terms.

(bbbb) "Sale Units"   As defined in the Membership Interest and Warrant Purchase and Redemption Agreement.

(cccc) "Second Amended Regulations":   As defined in the recitals to these Regulations.

(dddd) "Seller Notice":  As defined in Section 5.4(f) of these Regulations.

(eeee) "Spouse's Agreement":  As defined in Section 5.2 of these Regulations.

(ffff)   "Tax Distribution":  As defined in Section 4.8(d) of these Regulations.

(gggg) "Tax Matters Partner":  As defined in Section 10.6 of these Regulations.

(hhhh) "Third Amended Regulations":   As defined in the recitals to these Regulations.

(iiii)   "Transfer":  shall mean, with respect to a Company Security, directly or indirectly, a voluntary or involuntary sale, assignment, transfer, conveyance, exchange, bequest, devise, gift or any other alienation, including any pledge or grant of a security interests, (in each case, with or without consideration and whether by operation of law or otherwise, including, without limitation, by merger or consolidation or upon liquidation or dissolution) of any rights, interests or obligations with respect to all or any portion of such Company Security.

(jjjj)   "Treasury Regulations" or "Reg":  shall mean the designated Treasury Regulation promulgated under the Code, as such Treasury Regulation may be amended from time to time.

(kkkk) "Units":  Shall mean those Company Securities designated as "Units" with such rights and obligations as set forth in these Regulations.

(llll)   "Unpaid Base Amount":  Shall mean, for each Unit, an amount equal to the excess, if any, of (i) the Base Amount of such Unit plus any amount added to the Base Amount pursuant to Section 4.8(a) over (ii) the aggregate amount of Distributions made by the Company that constitutes a payment of Base Amount of such Unit pursuant to Section 4.8(c)(ii). If any Units are transferred in accordance with the terms of these Regulations, the transferee of such Units shall succeed to the Unpaid Base Amount of the transferor to the extent the Unpaid Base Amount relates to the Units so transferred.

(mmmm)   "Unpaid Junior Base Amount":  Shall mean, for each Junior Unit, an amount equal to the excess, if any, of (i) the Junior Base Amount of such Junior Unit over (ii) the aggregate amount of Distributions made by the Company that constitutes a payment of Junior Base Amount of such Junior Unit pursuant to Section 4.8(c)(iii).  If any Junior Units are transferred in accordance with the terms of these Regulations, the transferee of such Junior Units shall succeed to the Unpaid Junior Base Amount of the transferor to the extent the Unpaid Junior Base Amount relates to the Junior Units so transferred.

(nnnn) "Unpaid Yield":   Shall mean, for each Unit, an amount equal to the excess, if any, of (i) the aggregate Yield accrued on such Unit since the Issue Date, over (ii) the aggregate amount of Distributions made by the Company that constitutes payment of Yield on such Unit pursuant to <u>Section 4.8(a)</u> and <u>(c)(i)</u>.  If any Units are transferred in accordance with the terms of these Regulations, the transferee of such Units shall succeed to the Unpaid Yield of the transferor to the extent the Unpaid Yield relates to the Units so transferred.

(oooo) "Yield":   Shall mean, with respect to each holder of Units for each calendar quarter, the amount accruing on such Unit each day during such quarter at the rate of 8% per annum of the sum of (i) such Unit's Unpaid Base Amount, plus (ii) Unpaid Yield thereon for all prior quarters.  Yield shall begin accruing on the Issue Date.  In calculating the amount of any distribution to be made during a calendar quarter, the portion of Yield for such portion of such quarter elapsing before such distribution is made shall be taken into account.   Yield computed for any period less than one year shall be computed on the basis of a 365-day year (or, in the case of a leap year, on the basis of a 366-day year) and the actual number of days elapsed in the period during which such Yield accrues.  If any Units are transferred in accordance with the terms of these Regulations, the transferee of such Units shall succeed to the Yield of the transferor to the extent the Yield relates to the Units so transferred.

(pppp) "Yield Amount":   As defined in <u>Section 4.8(c)(i)</u> of these Regulations.

Other terms not defined in this Section shall have the meaning given such terms as provided in these Regulations.

## ARTICLE II
## MEMBER PROVISIONS

2.1    <u>Liability of Members</u>.   No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

2.2    <u>Management of Business</u>.   No Member, in its capacity as such, shall participate in the operation or management of the Company's business, transact any business in the Company's name or have the power or authority to sign documents for or otherwise act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company solely by reason of being a Member.

2.3    <u>Outside Activities of the Members</u>.   The Members expressly acknowledge that (i) OEP and its Affiliates are, and so long as a Founding Member is no longer subject to a non-competition agreement running in favor of the Company, such Founding Member is, permitted to have, and may presently or in the future have, investments or other business relationships with entities engaged in businesses that are and may be competitive or complementary with the businesses engaged in by the Company or any of its subsidiaries, other than through the Company or any of its subsidiaries (an "<u>Other Business</u>"), (ii) OEP and its Affiliates have and may, and so long as a Founding Member is no longer subject to a non-competition agreement running in favor of the Company, such Founding Member may, develop strategic relationships with businesses that are and may be competitive or complementary with the businesses engaged in by the Company or any of its subsidiaries, (iii) neither OEP nor any of its Affiliates will be,

and so long as a Founding Member is no longer subject to a non-competition agreement running in favor of the Company, such Founding Member will not be, prohibited by virtue of their investments in the Company or its subsidiaries or the service of any individual associated with OEP or its Affiliates, or such Founding Member, as applicable, on the Company's or any of its subsidiaries' board of directors (or body performing similar duties) from pursuing and engaging in any such activities, (iv) neither OEP nor any of its Affiliates will be, and so long as a Founding Member is no longer subject to a non-competition agreement running in favor of the Company, such Founding Member will not be, obligated to present to the Company or the Board of Directors any such opportunity, relationship or investment; *provided, however*, that OEP shall be obligated to disclose to the Company or the Board of Directors each Other Business in which it or its Affiliates is or becomes engaged, (v) OEP shall have no, and so long as a Founding Member is no longer subject to a non-competition agreement running in favor of the Company, such Founding Member shall have no, obligation or duty express or implied to present business opportunities to the Company, to any subsidiaries of the Company or to any Member that may become available to OEP or Affiliates of OEP or such Founding Member, as applicable, (vi) the other Members will not acquire or be entitled to any interest or participation in any Other Business as a result of the participation therein of OEP or any of its Affiliates or such Founding Member, as applicable, and (vii) the involvement of OEP or any of its Affiliates in any Other Business, and so long as a Founding Member is no longer subject to a non-competition agreement running in favor of the Company, such Founding Member's involvement in any Other Business, will not constitute a conflict of interest by such Persons with respect to any Member, the Company or any of its subsidiaries.

2.4    <u>Access to and Confidentiality of Company Information</u>.  Information regarding the Company shall be subject to the following provisions:

(a)    <u>Member's Entitlement to Company Information</u>.

(i)    Each holder of Units is entitled to all information to which that Member is entitled to have access pursuant to Section 101.502 of the Act under the circumstances and subject to the conditions therein stated.

(ii)    Each holder of Junior Units hereby waives and agrees to the maximum extent permitted under the Act that such holder of Junior Units shall not be entitled to have access pursuant to Section 101.502 of the Act.

(iii)    The Members agree that the Board of Directors from time to time may in the sole discretion of the Board of Directors determine that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members due to contractual obligations, business concerns, or other considerations.

(b)    <u>Confidential Information</u>.  The Members (other than OEP and the Founding Members) acknowledge that they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or Persons with which it does business.  Each Member (other than OEP and the Founding Members) shall hold in strict confidence any such information, it receives

regarding the Company and may not disclose it to any Person other than another Member or a Director or Officer of the Company. This prohibition on the disclosure of confidential information of the Company shall not apply where such disclosure is compelled by law provided that such Member has, if at all reasonably possible, previously notified the Board of Directors, in writing, promptly of any subpoena or judicial order for that information.

Each of OEP and each Founding Member agrees to maintain the confidentiality of information it may receive from or regarding the Company in the nature of trade secrets or otherwise is confidential the release of which will be damaging to the Company ("Information") except that such Information may be disclosed (a) to its Affiliates and to such Peron's and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and such disclosing party shall be liable for breaches of this Section 2.4(b) by those Persons to whom it discloses Information), (b) to the extent requested by any regulatory authority, (c) to the extent required by applicable statute or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies under, or any suit, action or proceeding relating to, the Membership Interest and Warrant Purchase and Redemption Agreement, these Regulations or the enforcement of rights hereunder or thereunder, (e) with the consent of the disinterested Directors, (f) to the extent such Information (i) is publicly available at the time of disclosure or becomes publicly available other than as a result of a breach of this Section 2.4(b) or (ii) becomes available to such Person on a non-confidential basis from a source other than the Company or any of its subsidiaries which source is not, to the actual knowledge of such Person, subject to a confidentiality obligation to the Company or its subsidiaries, (g) in connection with a Sale of the Company or (h) if such disclosure was made in good faith, without any intent to injure the Company. Any Person required to maintain the confidentiality of Information as provided in this paragraph shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential Information.

The Members acknowledge that breach of the provisions of this Section 2.4 may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Section 2.4 may be enforced by specific performance.

2.5   Member Withdrawal. A Member does not have the right or power to withdraw from the Company as a Member prior to the end of the term specified herein.

2.6   Compensation and Reimbursement of Member. Except as otherwise provided in these Regulations or as determined by the Board of Directors, no Member shall receive any salary, fee, or draw for services rendered to or on behalf of the Company in such Member's capacity as a Member, nor shall any Member be reimbursed for any expenses incurred by such Member on behalf of the Company in such Member's capacity as a Member.

2.7   Member Expenses. The Company may pay or reimburse a Member for all reasonable expenses of the Company incurred and paid for by the Member pursuant to authority granted to the Member by the Board of Directors, which expenses may include (but are not

limited to) travel, lodging (if necessary), and other reasonable expenses incurred for the benefit of the Company and approved by the Board of Directors.  Any payment or reimbursement under this Section 2.7 shall be in accordance with a reimbursement policy approved by the Board of Directors and such reimbursement policy shall apply equally in all respects to all Members.

2.8     Voting.  Members shall not be entitled to vote on any matter except as may be required by the Act.  On any matter on which a Member is entitled to vote, such Member shall be entitled to one vote for each Unit and all Units shall vote together as a single class.

## ARTICLE III
## CAPITAL CONTRIBUTIONS AND ISSUANCE OF COMPANY SECURITIES

3.1     [Intentionally Omitted].

3.2     Interest and Withdrawal.  No interest shall be paid by the Company on Capital Contributions.   No Member shall be entitled to the withdrawal or return of its Capital Contribution, except as provided pursuant to Section 4.8.

3.3     Additional Capital Contribution.   No Member shall have a duty to make any capital contributions to the Company.

3.4     Capital Accounts.

(a)     General.  A single Capital Account shall be maintained for each Member in accordance with the rules of Reg. §1.704-1(b)(2)(iv), which shall control over any inconsistent provisions in these Regulations provided, that the Board of Directors (provided such action by the Board of Directors includes a vote in favor of such action of at least one Pate Director) may from time to time, in its sole discretion, modify the manner in which the Capital Accounts, or any decreases or increases thereto, are computed (including a manner other than as described in Reg. §1.704-1(b)(2)(iv)) to the extent it more appropriately reflects the economic interests of the Members.  As soon as reasonably practical after the filing of the Company's U.S. federal income tax return for the taxable year that includes the Closing Date, the Board of Directors shall cause the Capital Account balance of each Member (as of the beginning of the day after the Closing Date) to be reflected next to such Member's name on an amended Exhibit A.

(b)     General Increases.  The Capital Account of a Member shall be increased by (i) the amount of money and the fair market value of any assets contributed by the Member to the Company (net of liabilities securing such Contributed Property that the Company is considered to assume or take subject to under §752 of the Code), (ii) the amount of Profits allocated to the Member and items of income or gain specially allocated to the Member under Section 4.2; and (iii) the amount of any Company liabilities assumed by such Member or which are secured by any Company property distributed to such Member.

(c)     General Decreases.  The Capital Account of a Member shall be decreased by (i) the amount of money and the fair market value of property distributed by the Company to the Member (net of liabilities securing such distributed property that the Member is considered to assume or take subject to under §752 of the Code), (ii) the amount of Losses allocated to the Member and items of deduction specially allocated to the Member under Section 4.2; and (iii)

the amount of any liabilities of such Member assumed by the Company or which are secured by property contributed by such Member to the Company.

(d)     Credits.  The Capital Account of a Member shall also be decreased by the amount, if any, by which the basis in Company property is reduced as a result of any tax credit which is allocated to the Member and increased by the amount, if any, by which the basis in Company property is increased as a result of any tax credit recapture which is allocated to the Member.

(e)     Notes.  If a promissory note is contributed to the Company by a Member who is the maker of the note (or a Person related to the maker of the note within the meaning of Reg. §1.704-1(b)(2)(ii)(c)), the Member's Capital Account shall be increased with respect to the note only when there is a taxable disposition of the note by the Company or when the maker of the note makes principal payments on the note, except to the extent provided otherwise by Reg. §1.704-1(b)(2)(iv)(d)(2).   If a promissory note is distributed to a Member by the Company and the Company is the maker of the note (or a Person related to the maker of the note within the meaning of Reg. §1.704-1(b)(2)(ii)(c)), the Member's Capital Account shall be decreased with respect to the note only when there is a taxable disposition of the note by the Member or when the maker of the note makes principal payments on the note, except to the extent provided otherwise in Reg. §1.704-1(b)(2)(iv)(e)(2).

(f)     Transfer of Capital Accounts.  A transferee of all Company Securities of a Member will succeed to the Capital Account relating to the Company Securities of such transferring Member, provided such transfer is made in accordance with these Regulations. Upon the transfer of a portion of a Member's Company Securities, the portion of such Member's Capital Account attributable to the transferred portion shall carry over to the transferee.

(g)     Section 754 Elections.   Upon adjustment to the adjusted tax basis of Company property under §§732, 734 or 743 of the Code regarding transfers of Company Securities and similar events, the Capital Accounts of the Members shall also be adjusted as provided in Reg. §1.704-1(b)(2)(iv)(m).

(h)     Revaluations of Property.   Upon the occurrence of a Revaluation Event, the Board of Directors shall, in accordance with Reg. §1.704-1(b)(2)(iv), revalue all Company property (whether tangible or intangible) for Book purposes to reflect their respective gross fair market values (taking section 7701(g) of the Code into account) on the date of the Revaluation Event, and shall increase or decrease the Capital Accounts of the Members to reflect such revaluation of the Company property for Book purposes; provided that, other than with respect to a Revaluation Event constituting a liquidation of the Company or in connection with the transactions contemplated by the Membership Interest and Warrant Purchase and Redemption Agreement, the adjustments otherwise required by this Section 3.4(c) may not be made if the Board of Directors determines that such adjustments are not necessary to reflect the relative economic interests of the Members in the Company.  For the avoidance of doubt, the Members agree that a Revaluation Event with respect to the Company occurred on the Closing Date in connection with the transactions contemplated by the Contribution and Purchase Agreement.

3.5     Company Securities.

(a)     The membership interests of the Company shall initially be divided into two (2) classes consisting of Units and Junior Units. As of the date hereof there shall be (A) 581,406.7740 Units authorized, all of which will be issued and outstanding on the date hereof and (B) 71,351.5304 Junior Units authorized, 32,432.5138 of which will be issued and outstanding pursuant to Junior Unit Investment Agreements and 38,919.0166 of which will be reserved for future issuances pursuant to Junior Unit Investment Agreements; provided that the number of Junior Units authorized and reserved for future issuances shall be adjusted, in each case, by (i) decreasing such number by the amount of Phantom Units issued, and (ii) increasing such number by the amount of any such Phantom Units that have been forfeited or purchased by the Company or have expired, terminated or been cancelled.

(b)     Other Issuances.   Subject to Section 6.3, the Company may issue additional Company Securities for any Company purpose at any time and from time to time . Each Company Security authorized to be issued by the Company pursuant to this Section 3.5(b) may be issued in one or more classes, or one or more series of any such classes, with such designations, preferences, rights, powers and duties (which may be senior to existing classes and series of Company Securities), as shall be fixed by the Board of Directors (subject to complying with Section 6.3), including (i) the right to share Company profits and losses or items thereof; (ii) the right to share in Company distributions; (iii) the rights upon dissolution and liquidation of the Company; (iv) whether, and the terms and conditions upon which, the Company may redeem the Company Security; (v) whether such Company Security is issued with the privilege of conversion or exchange and, if so, the terms and conditions of such conversion or exchange; (vi) the terms and conditions upon which each Company Security will be issued, evidenced by certificates, or other evidence of the issuance of uncertificated Company Securities, and assigned or transferred; and (vii) the right, if any, of each such Company Security to vote on Company matters, including matters relating to the relative rights, preferences and privileges of such Company Security.

(c)     Authority of Board of Directors as to Company Securities.  The Board of Directors shall take all actions that it determines to be necessary or appropriate in connection with (i) each issuance of Company Securities pursuant to Section 3.5(b), and (ii) the admission of additional Members. The Board of Directors shall do all things necessary to comply with applicable law and is authorized and directed to do all things that it determines to be necessary or appropriate in connection with any future issuance of Company Securities pursuant to the terms of these Regulations.

## ARTICLE IV
## COMPANY PROFITS, LOSSES AND DISTRIBUTIONS

4.1     Allocation of Profits and Losses.  Except as provided in Section 4.2, the Profits and Losses of the Company (and, if necessary, items of gross Book income, gain, loss and deduction) shall be allocated for each Allocation Year in such a manner as to cause the Adjusted Capital Account of each Member as nearly as possible to equal the amount that would be distributable to such Member at the end of such Allocation Year if (i) all the assets of the Company (including, without limitation, intangible assets such as goodwill) were sold for cash equal to their respective Book Values as of such date, (ii) all liabilities of the Company were paid in full (except that in the case of a nonrecourse liability, such payment would be limited to the

Book Value of the asset or assets securing such liability), and (iii) all remaining cash were distributed to the Members pursuant to Section 4.8. For the avoidance of doubt, for purposes of the deemed distribution pursuant to this Section 4.1, any unvested Unit shall be treated as a vested Unit.

4.2     Special Allocations. The following special Book allocations shall be made for the Company's Allocation Year in the following order,

(a)     Minimum Gain Chargeback. If there is a net decrease in Company Minimum Gain for an Allocation Year of the Company, then before any other allocations are made for such Allocation Year, each Member shall be allocated items of Book income and gain for such Allocation Year (and, if necessary, for subsequent years) to the extent required by Reg. § 1.704-2(f). This Section 4.2(a) is intended to comply with the minimum gain chargeback requirement in Reg. §1.704-2(f) and shall be interpreted consistently therewith.

(b)     Member Nonrecourse Debt Minimum Gain Chargeback. If there is a net decrease in Member Nonrecourse Debt Minimum Gain for an Allocation Year of the Company, then after taking into account allocations pursuant to paragraph (a) immediately preceding, but before any other allocations are made for such Allocation Year, each Member with a share of Member Nonrecourse Debt Minimum Gain at the beginning of such Allocation Year shall be allocated items of Book income and gain for such Allocation Year (and, if necessary, for subsequent Allocation Years) to the extent required by Reg. §1.704-2(i)(4). This Section 4.2(b) is intended to comply with the minimum gain chargeback requirement in Reg. §1.704-2(i)(4) pertaining to Member Nonrecourse Debt and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Reg. §1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.2(c) shall be made only if and to the extent that any such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV have been tentatively made as if this Section 4.2(c) were not in these Regulations.

(d)     Gross Income Allocation. In the event any Member has an Adjusted Capital Account Deficit at the end of an Allocation Year, each such Member shall be specially allocated items of Book income and gain in the amount and in the proportion needed to eliminate such deficit as quickly as possible, provided that an allocation pursuant to this Section 4.2(d) shall be made only if and to the extent that any such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV have been tentatively made as if Section 4.2(c) hereof and this Section 4.2(d) were not in these Regulations.

(e)     Nonrecourse Deductions. Nonrecourse Deductions for any Allocation Year or other periods shall be allocated among the Members in proportion to their respective Pro Rata Unit Ownership.

(f)   Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Allocation Year or other period shall be allocated to the Members who bear the risk of loss with respect to the loan to which such Member Nonrecourse Deductions are attributable in accordance with Reg. §1.704-2(1).

4.3   Combined Reporting.  If Texas law requires any Member (or an Affiliate thereof) and the Company to participate in the filing of a combined group report for Texas franchise tax purposes, such Member (or an Affiliate thereof) shall cause one of the members of the combined group other than the Company to be the reporting entity and pay the Texas franchise tax liability due in connection with such combined report.  The Company's Texas franchise tax liability shall be equal to the amount of the Texas franchise tax that the Company would have paid if it had computed its Texas franchise tax liability for the reporting period on a separate entity basis (rather than as a member of the combined group).  The Company shall bear all costs related to such separate entity Texas franchise tax computation.  The Members agree that the Company shall no later than five (5) business days prior to the due date of any estimated or final Texas franchise tax report, pay such Member (or an Affiliate thereof) the Texas franchise tax determined as owed under such separate entity Texas franchise tax computation.  Except as provided in this Section 4.3 with respect to the amount of such combined group's Texas franchise tax that the Company is required to pay any such Member (or an Affiliate thereof), such Member (or an Affiliate thereof) shall indemnify and hold the Company harmless from and against any and all Texas franchise tax of such combined group that is imposed on the Company.

4.4   Allocations for Federal Tax Purposes.

(a)   Except as otherwise provided in this Section 4.4, each item of income, gain, loss, and deduction will be allocated for Federal income tax purposes in the same manner as the corresponding allocation for Book purposes.

(b)   If the Book Value of an item of Company property differs from its tax basis, allocations of depreciation, depletion, amortization, gain, and loss with respect to such property will be made for Federal income tax purposes in a manner that takes account of the variation between the tax basis and Book Value of such property in accordance with Section 704(c)(1)(A) of the Code and Reg. §1.704-1(b)(4)(i).  The Board of Directors (provided such action by the Board of Directors includes a vote in favor of such action of at least one Pate Director) may select any method or methods for making such allocations with respect to any property of the Company, including, without limitation, any method described in Reg. § 1.704-3(b), (c), or (d); provided that, notwithstanding anything else in these Regulations to the contrary, with respect to any such allocations related (or otherwise attributable) to the transactions that are contemplated by the Membership Interest and Warrant Purchase and Redemption Agreement, the Company shall select to use the "remedial method" described in Reg. § 1.704-3(b).

(c)   Tax credits shall be allocated among the Members in accordance with Reg. § 1.704-1(b)(4)(ii).

(d)   Any "excess nonrecourse liability" of the Company, within the meaning of Reg. § 1.752-3(a)(3), shall be allocated first among the Members in proportion to and to the

extent of the amount of built-in gain that is allocable to each Member on Code Section 704(c) property or property for which reverse Code Section 704(c) allocations are applicable where such property is subject to the nonrecourse liability to the extent that such built-in gain exceeds the gain described in Reg. § 1.752-3(a)(2) with respect to such property.  The amount of any excess nonrecourse liabilities not allocated pursuant to the preceding sentence shall be allocated in accordance with the Members interests in Company profits.  Solely for purposes of this Section 4.4(d), the Members' interests in Company profits are in proportion to the number of Units held.  For purposes of Reg. § 1.752-3(b), the liabilities of the Company will be allocated among the Company's assets proportionately by value.

4.5     Pre-Closing Periods.  Notwithstanding any provision of these Regulations to the contrary, the Fourth Amended Regulations shall continue to apply to all tax periods or portions thereof ending on or before the Closing Date for all U.S. federal, state, local, and foreign tax purposes, including the allocation of the Company's Profits and Losses and filing tax returns, and Pate shall continue to be the Tax Matters Partner (or equivalent thereof) for all of such tax periods that end on or before the Closing Date.

4.6     Debt Covenant.  Without the prior written consent of Pate and OEP, no Member shall guarantee any indebtedness of the Company including any indebtedness contemplated by the Debt Financing (as defined in the Membership Interest and Warrant Purchase and Redemption Agreement) or otherwise take any other action that would cause such Member to bear the economic risk of loss with respect to such indebtedness within the meaning of Treasury Regulations Section 1.752-2, and (for the avoidance of doubt) it is intended that the Company allocate such indebtedness among the Members in accordance with the provisions of Treasury Regulations Section 1.752-3.

4.7     Change or Transfer of Company Interest.  If during any Allocation Year of the Company there is a change in any Member's Company Securities, allocations of Book income or loss for such Allocation Year shall take into account the varying interests of the Members in the Company based on an interim closing of the books consistent with Section 706 of the Code; provided that, another method consistent with Section 706 of the Code may be utilized for this purpose to the extent determined by the Board of Directors.

4.8     Distributions to Members.  The Company shall make distributions in the order and priority set forth in the following paragraphs:

(a)     Minimum Annual Distribution.  Within 90 days following each year end, the Company shall make a Distribution to OEP and the Founding Members in an aggregate amount equal to the Annual Distribution Amount.  The Annual Distribution shall be distributed to OEP and the Founding Members pro rata based on the number of Units held by OEP and each Founding Member.  No Distribution or any portion thereof shall be made under Section 4.8(b) or Section 4.8(c) until the entire Annual Distribution Amount, determined as of the time of such Distribution, has been paid in full.  If the Company does not distribute the full Annual Distribution Amount to OEP and the Founding Members for any given year, the difference between the Annual Distribution Amount and the amount distributed for such year under this Section 4.8(a) (which amount shall be equal to the Annual Distribution Amount if the Company failed to make any Distribution under this Section 4.8(a)) shall be added ratably to the Unpaid

Base Amount of the outstanding Units of OEP and the Founding Members. Distributions made pursuant to this Section 4.8(a) shall constitute a payment of Yield.

      (b)    Delta Distribution.

         (i)    Subject to the provisions of Section 4.8(b)(iii) below, the Company shall distribute, at such times and in such amounts as the Board may approve from time to time, to the Members holding Delta Units an amount equal to the excess, if any, of the Priority Return over aggregate distributions made to the Delta Units under this Section 4.8(b)(i) for all prior periods. "Priority Return" means a sum equal to the Applicable Rate, determined on the basis of a year of 365 or 366 days, as the case may be, for the actual number of days in the period for which the Priority Return is being determined, cumulative and compounded quarterly to the extent not distributed in any given quarter pursuant to this Section 4.1(b)(i), of the Unreturned Balance from time to time during the period to which the Priority Return relates. The "Unreturned Balance" shall equal $9,000,000, reduced, but not below zero, by aggregate distributions to the Members holding Delta Units made pursuant to Section 4.8(b)(ii). The "Applicable Rate" shall equal a per annum rate of: (A) 8% during the period from the Closing Date through the date on which a Delta Rate Increase Event occurs, and (B) 12% on and after the date on which a Delta Rate Increase Event occurs.

         (ii)    An amount equal to the Unreturned Balance (or a portion thereof), if any.

         (iii)    If, during the five-year period following the Closing, Billy Cleveland's employment with the Company is terminated (A) by the Company for Cause (as such term is defined in the Contribution and Purchase Agreement) or (B) by Billy Cleveland without Good Reason (as such term is defined in the Cleveland Employment Agreement), (1) the Unreturned Balance shall be reduced by an amount equal to $9,000,000 multiplied by a fraction, the numerator of which is the number of calendar quarters remaining in that five-year period as of the date of such termination (including the calendar quarter during which such termination occurs), and the denominator of which is 20, and (2) the Priority Return shall be reduced by an amount equal to the Applicable Rate, determined on the basis of a 365 or 366 day year, as the case may be, from the Closing Date until the date of such employment termination, cumulative and compounded quarterly, on the product determined under clause (1). For the avoidance of doubt, no Priority Return shall accrue or be payable on the amounts described in clauses (1) and (2) of the preceding sentence after a termination of Billy Cleveland's employment described in clause (A) or (B) of the preceding sentence. Upon the occurrence of a Change of Control Event, however, the provisions of this Section 4.8(b)(iii) shall cease to apply.

      (c)    Priority of General Distributions. Following payment by the Company of the Annual Distribution Amount pursuant to Section 4.8(a) and the Distributions to Delta pursuant to Section 4.8(b), all other Distributions other than those set forth (subject to Section 4.8(d)), if any, including upon any dissolution, liquidation or termination of the Company in accordance with Article IX hereof, shall be made in the following order of priority:

         (i)    First, the holders of the outstanding Units shall, in the aggregate, be entitled to receive all or a portion of such Distribution equal to the aggregate Unpaid Yield of

the outstanding Units as of the time of such Distribution (the "Yield Amount"). Each holder of Units shall be entitled to receive a ratable portion of the Yield Amount, based on the aggregate Unpaid Yield of the Units held by such holder, compared to the aggregate Unpaid Yield of the outstanding Units, in each case, as of the time of such Distribution. No Distribution or any portion thereof shall be made under Section 4.8(c)(ii), Section 4.8(c)(iii) or Section 4.8(c)(iv) of these Regulations until the entire Yield Amount as of the time of such Distribution has been paid in full.

(ii)     Second, the holders of the outstanding Units shall, in the aggregate, be entitled to receive all or a portion of such Distribution equal to the aggregate Unpaid Base Amount of the outstanding Units as of the time of such Distribution (the "Distributed Base Amount"). Each holder of Units shall be entitled to receive a ratable portion of the Distributed Base Amount, based on the aggregate Unpaid Base Amount of the Units held by such holder, compared to the aggregate Unpaid Base Amount of the outstanding Units, in each case, as of the time of such Distribution. No Distribution or any portion thereof shall be made under Sections 4.8(c)(iii) or Section 4.8(c)(iv) until the entire amount of the Distributed Base Amount as of the time of such Distribution has been paid in full.

(iii)     Third, the holders of the outstanding and vested Junior Units shall, in the aggregate, be entitled to receive all or a portion of such Distribution equal to the aggregate Unpaid Junior Base Amount of the outstanding and vested Junior Units as of the time of such Distribution (the "Distributed Junior Base Amount"). Each holder of vested Junior Units shall be entitled to receive a ratable portion of the Distributed Junior Base Amount, based on the aggregate Unpaid Junior Base Amount of the vested Junior Units held by such holder, compared to the aggregate Unpaid Junior Base Amount of the outstanding vested Junior Units, in each case, as of the time of such Distribution. No Distribution or any portion thereof shall be made under Sections 4.8(c)(iv) until the entire amount of the Distributed Junior Base Amount as of the time of such Distribution has been paid in full.

(iv)     Thereafter, the holders of Units and vested Junior Units as a group shall be entitled to receive the remaining portion of such Distribution ratably based upon the number of Units and vested Junior Units held by each such holder at the time of such Distribution.

(d)     Tax Distributions.  Unless otherwise determined by the Board of Directors (provided such majority of the Board of Directors includes a Pate Director), the Company shall distribute to the Members an amount equal to the tax liabilities of the Members or their ultimate owners attributable to such Members' interest in the Company (calculated in the manner described in Section 4.8(d)(i)) arising from allocations of income, gain, loss, deduction, and credit of the Company (each a "Tax Distribution").

(i)     Amount of Distribution.  In determining the amount of any Tax Distribution, it shall be assumed that the items of income, gain, deduction, loss and credit in respect of the Company were the only such items entering into the computation of tax liability of the Member for the fiscal year in respect of which the Tax Distribution was made and that the Member was subject to tax at the highest marginal effective rate of federal, state and local income tax applicable to an individual resident in New York, New York, taking account of any

difference in rates applicable to ordinary income, capital gains and dividends and any allowable deductions in respect of such state and local taxes in computing the Member's liability for federal income taxes, without regard to the alternative minimum tax and (for the avoidance of doubt) Section 1411 of the Code. For this purpose, taxable income shall be calculated to take into account, to the extent permitted as a current deduction under applicable law, and as determined by taking into account only items of income and loss of the Company allocated to the Member (i) items of deductible loss or expense allocated to such Member for the taxable year and (ii) the taxable losses and items of deductible loss or expense for all prior taxable years (except to the extent such taxable losses and items of deductible loss or expense have previously been taken into account).

(ii)     Effect of Tax Distributions.   Any Tax Distribution made pursuant to this Section 4.8(d) shall be considered an advance against distributions otherwise payable pursuant to Sections 4.8(a), 4.8(b) and 4.8(c) in the following manner: Tax Distributions shall be advances on distributions payable pursuant to Sections 4.8(a), 4.8(b), 4.8(c)(i), 4.8(c)(ii), 4.8(c)(iii) and 4.8(c)(iv), as applicable.   For the avoidance of doubt, Tax Distributions to a Member pursuant to this Section 4.8(d) shall be deemed advances against distributions otherwise payable to the Member, and will reduce the amounts otherwise distributable to the Member, so that the cumulative amounts distributed to the Member under these Regulations will be the same as the respective amounts that would have been distributed to the Member if no distributions had been made pursuant to this Section 4.8(d).

(iii)     Reduction of Tax Distributions.   All Tax Distributions attributable to a calendar year shall be reduced by the amount of distributions made pursuant to Sections 4.8(a) 4.8(b) and 4.8(c) in such calendar year to the extent such Tax Distributions would have otherwise been allocable to such other distributions pursuant to Section 4.8(d)(ii) in such calendar year.

(iv)     Time for Making Tax Distributions.   A Tax Distribution shall be made (i) on or before the tenth day of April, June and September and on or before the 31st day of December of any year on an estimated basis ("Interim Tax Distributions") or (ii) on or before April 15 of any year in respect of the tax liability for the immediately preceding calendar year which shall be paid only to the extent that such Tax Distribution exceeds the aggregate of the Interim Tax Distributions paid with respect to the preceding calendar year.

(v)     Limitation.   No Tax Distribution shall be made pursuant to this Section 4.8(d): (i) with respect to any income realized pursuant to Section 83 of the Code upon the issuance or vesting of a Unit, (ii) with respect to any gain recognized on the sale of all or substantially all of the assets of the Company, or (iii) to the extent that distributable cash from ordinary course Company operations is not otherwise available for such Tax Distribution.   For the avoidance doubt, the Company shall not be required to borrow or sell any asset in order to make a Tax Distribution and no Tax Distribution shall be made if such distribution would be in violation of any loan or credit agreement or indenture to which the Company is a party or by which it is bound.

(vi)     Withholding.   All amounts withheld pursuant to the Code or any provision of any state, local or foreign tax law with respect to any payment, distribution or

allocation to the Company or the Members shall be treated as amounts paid or distributed, as the case may be, to the Members with respect to which such amount was withheld pursuant to this Section 4.8(d)(vi) for all purposes under these Regulations and shall be treated as a Tax Distribution for purposes of this Section 4.8(d). The Company is authorized to withhold from payments and distributions, or with respect to allocations to the Members, and to pay over to any federal, state and local government or any foreign government, any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law or any foreign law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

(e)    Redemption.  Notwithstanding any provision of these Regulations to the contrary, the redemption of the Redemption Units by the Company pursuant to the Membership Interest and Warrant Purchase and Redemption Agreement shall be treated as pro rata distribution made under the Third Amended Regulations and shall not be taken into account as a distribution under these Regulations.

## ARTICLE V
## TRANSFER RESTRICTIONS; MEMBER RIGHTS; PREEMPTIVE RIGHTS

5.1    Restrictions on Transfer.

(a)    Without the consent of OEP and Pate, no Member may Transfer all or any portion of its Company Securities other than in accordance with the provisions of this Article V. Any purported Transfer of all or any portion of a Company Security that is not made in accordance with the provisions of this Article V shall be null and void and of no effect whatsoever; provided, however, that if the Company is required by a legal authority of competent jurisdiction to recognize a Transfer of a Company Security that is not made in accordance with the provisions of this Article V, the rights of the holder of the transferred Company Security shall be strictly limited to the transferor's rights to allocations and distributions as provided by these Regulations with respect to the transferred Company Security and the obligations of the holder of the transferred Company Security shall be the same as the obligations of the transferor with respect to the transferred Company Security.  To the fullest extent permitted by applicable laws, in the case of a Transfer or attempted Transfer of a Company Security that is not made in accordance with the provisions of this Article V, the parties engage or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all losses, costs, liability and damages that any of such indemnified Persons may incur (including incremental tax liability and reasonable attorney's fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

(b)    Without the consent of OEP (which, for the avoidance of doubt, may be withheld in its sole discretion), (i) Pate shall not permit any of its partnership interests to be Transferred, including for the avoidance of doubt, indirect Transfers of partnership interests, such as if a partner of Pate is an entity and the ownership of such entity changes (or the ownership of such owners and so on) or admit any new partners and (ii) the Aaron Cole Pate 2012 Trust shall not permit any Transfer of its beneficial interests or admit, add or otherwise include any additional beneficiary.

(c)     Neither Pate nor OEP may Transfer any portion of their respective Company Securities to a third party if such Transfer would result in a Change of Control unless Delta has received, or in connection with such Transfer will receive, all the Distributions (including the applicable rate of return thereon) described in Section 4.8(b).

(d)     Notwithstanding any of the foregoing, changes in the ownership of the entities that directly or indirectly control OEP shall not be restricted in any way.

(e)     Notwithstanding the foregoing, the Transfers listed below shall not require the prior written consent of OEP and Pate (each such Transfer, a "Permitted Transfer", and the transferee with respect to each such Permitted Transfer, a "Permitted Transferee"):

(i)     Transfers of Company Securities (A) to the extent such transferor is an entity, to an equity holder of such transferor as of the date of these Regulations, (B) with respect to any natural person that may hold Company Securities as a result of a transfer pursuant to clause (A) or otherwise, (I) to a parent of such natural person, (II) to a lineal descendant of a parent of such natural person, (III) to a spouse of a lineal descendant of a parent of such natural person and (IV) to a spouse of such natural person, and (C) to a trust, limited partnership, limited liability company, corporation or other entity, the beneficiaries, partners, members, shareholders or other equity holders of which are solely one or more of the foregoing Permitted Transferees referred to in this Section 5.1(e)(i);

(ii)     Transfers by OEP to any direct or indirect officer, director, partner, employee or member of OEP; and

(iii)     purchases, repurchases or redemptions by the Company of (i) Company Securities issued to employees of the Company or its subsidiaries pursuant to any Junior Unit Investment Agreement or other equity incentive plan with such employees approved by the Board of Directors and entered into in the ordinary course of business.

provided, however, that in the case of Sections 5.1(d)(i) and (d)(ii), the transferor must retain sole and exclusive power to direct the voting and disposition of such Company Security until the first to occur of a Drag-Along Sale, the termination of these Regulations or the death or incapacity of such transferor, and if such transferor does not retain such sole and exclusive power, such Transfer shall be deemed not to be a Permitted Transfer hereunder.

(f)     Notwithstanding anything else in these Regulations to the contrary, except in connection with any pledge of any Company Securities securing any financing of the Company, the Board of Directors must be notified at least 10 business days before any proposed Transfer of Company Securities by the transferring Member, and if the Board of Directors determines that a proposed Transfer would, alone or in conjunction with one or more other Transfers, terminate the partnership that is the Company for Federal income tax purposes, the proposed Transfer can be delayed until the earliest time, as determined by the Board of Directors that the Transfer may occur without causing a termination of the Company for Federal income tax purposes. If at any time more than one Transfer is being delayed under this Section 5.1(f), the Transfers are to be made in the order in which the Board of Directors received notice of the proposed Transfer.

(g)     Notwithstanding anything else in these Regulations to the contrary, nothing contained in this Section 5.1 or any other provision of these Regulations shall (i) prohibit or restrict any Member from pledging any Company Securities in connection with securing any financing of the Company, or (ii) require the consent of any Person in connection with a pledge of any Company Securities in connection with securing any financing of the Company.

5.2     Spouses of Members.  Spouses of the Members do not become Members as a result of such marital relationship.  Each spouse of a Member, if applicable, has executed a Spouse's Agreement in the form attached hereto as Exhibit B (each a "Spouse's Agreement").

5.3     Treatment of Non-permitted Transferees.  Any attempted assignment or transfer of a Company Security or any beneficial interest therein in contravention of these Regulations shall be of no force or effect and shall not be binding upon or recognized by the Company or any of its Members.  The Company and its Members shall be entitled to treat such affected Member as the absolute owner thereof, and shall be entitled to make Distributions, if any, to such Member without any liability whatsoever to any purported assignee or transferee.

5.4     Drag-Along Rights.

(a)     Notice and Grant of Right.  Subject to first complying with Section 5.4(f), at any time following the applicable Company Sale Date, OEP or Pate may propose to consummate a Sale of the Company (such Member, the "Drag-Along Seller", and such event, a "Drag-Along Sale"), by such Drag-Along Seller providing written notice of such Drag-Along Sale to each other Member (a "Drag-Along Notice").  Notwithstanding anything to the contrary in the definition of Sale of the Company, the proposed purchaser in a Drag-Along Sale may be different than that described in such definition if approved by OEP and Pate.  The Drag-Along Notice will include (i) a statement of the bona fide intention of the Drag-Along Seller to consummate a Sale of the Company, (ii) the name and address of the proposed purchaser, (iii) the purchase price which shall not be less per Unit than that set forth in the Seller Notice pursuant to Section 5.4(f), (iv) the proposed structure for the proposed Drag-Along Sale, (v) copies of any letters of intent and current drafts of closing documents, and (vi) the other material terms and conditions of the proposed Drag-Along Sale, including the timing.  Each Member shall (i) consent to, vote for, raise no objections against, and waive dissenters and appraisal rights (if any) with respect to the Drag-Along Sale, and (ii) be obligated to sell, transfer or exchange the same percentage of its Company Securities that the Drag-Along Seller is transferring in the Drag-Along Sale, on the same terms and conditions with respect to such Company Securities (taking into account the distribution priority set forth in Section 4.8) pursuant to which the Drag-Along Seller proposes to sell its Company Securities and in accordance with the terms of the Sale of the Company, the terms of this Section 5.4 and the terms of the Drag-Along Sale as set forth in the Drag-Along Notice.  For the avoidance of doubt, neither OEP nor Pate shall consummate a Sale of the Company without following the provisions of this Section 5.4.

(b)     Exercise of Right.  Prior to the closing of the Drag-Along Sale, each other Member or Person that is the addressee of such Drag-Along Notice will deliver to a representative of the Drag-Along Seller designated in the Drag-Along Notice, or otherwise make available at the time of closing specified by the Drag-Along Seller, all documents required to be executed by such Member or Person in connection with the Sale of the Company pursuant to this

Section 5.4 at the closing of such Drag-Along Sale against delivery to such Member or Person of the consideration therefor; provided that each such Member shall not be obligated to make any representations or warranties to the proposed purchaser or its affiliates (the "Drag-Along Purchaser") other than representations and warranties relating to its ownership of the Company Securities to be sold by it, its authority to sell such Company Securities and that upon the consummation of such sale, such Company Securities will be sold without being subject to any liens attributable to such Member's ownership of such Company Securities (such representations being referred to herein as the "Individual Representations"), provided further that each such Member may be required to indemnify such Drag-Along Purchaser for losses resulting from breaches of the sale agreement (or similar selling document) by the Company or such Member, provided that the aggregate amount of such indemnification obligations in connection with any Drag-Along Sale (other than with respect to Individual Representations) shall be limited to the lesser of (x) such Member's pro rata portion of any such liability, to be determined in accordance with such Member's portion of the total number of Units sold or (y) the proceeds received by such Member pursuant to such sale agreement (or similar selling document) and the aggregate amount of such indemnification obligations in connection with any Drag-Along Sale with respect to Individual Representations shall be limited to the proceeds received by such Member pursuant to such sale agreement (or similar selling document); provided, however, that (i) any holdback or escrow in connection with such Drag-Along Sale shall be pro rata among the Members participating in such Drag-Along Sale (based on consideration received by each such Member in its capacity as an equity holder of the Company in connection with such Drag-Along Sale), (ii) neither OEP, nor any of its Affiliates shall be required to enter into any agreement that contains a non-competition restriction that (A) requires it (or any of its Affiliates) to divest itself of any ownership interest in any Person, (B) prohibits it (or any of its Affiliates) from making loans to any Person, or (C) prohibits it (or any of its Affiliates) from acquiring any capital stock or other equity interest of any other Person and (iii) none of Steve Pate, A. Cole Pate, Kevin Pate and Richie Pate shall be required to enter into any agreement that contains a non-competition restriction for a term greater than two years.

(c)     Closing.  Upon or promptly after the consummation of a Drag-Along Sale, which Drag-Along Sale may not be consummated at a price or on terms less favorable to the Members than as set forth in the Drag-Along Notice, the Drag-Along Seller will (i) give notice thereof to the participating Members or Persons who are not present at the closing, (ii) remit to each participating Member or Person the total consideration for its Company Securities sold or exchanged pursuant thereto (if not paid directly to such Member or Person by the Drag-Along Purchaser) and (iii) furnish such other evidence of the completion and time of completion of the Drag-Along Sale and the terms thereof as may be reasonably requested by any participating Member or Person.  Any proceeds required to be paid or otherwise distributed to the Members or Persons in connection with any Drag-Along Sale shall be paid or otherwise distributed to them in accordance with such Member's or Person's pro rata portion of any such proceeds, to be determined in accordance with the distribution priority set forth in Section 4.8.  Members will bear their pro rata share (based upon the proceeds to be received by Members in the Drag-Along Sale) of the costs of any Drag-Along Sale to the extent such costs are incurred for the benefit of all holders of Company Securities and are not otherwise paid by the Company or the acquiring party.  For purposes of this Section 5.4(c), costs incurred in exercising reasonable efforts to take all necessary actions for the consummation of a Drag-Along Sale in accordance with Section 5.4(a) above shall be deemed to be for the benefit of all holders of Company Securities.

(d)     Exculpation.  No Drag-Along Seller will be liable to any other Member if any Drag-Along Sale is not consummated (for any reason).

(e)     Company Cooperation.  The Company, the Officers and the Directors shall cooperate with the Drag-Along Seller in connection with any Drag-Along Sale or proposed Drag-Along Sale.

(f)     Offer.  Following the applicable Company Sale Date and prior to either Pate or OEP exercising its respective rights as a Drag-Along Seller under Section 5.4, OEP shall offer to Pate and Pate shall offer to OEP, as applicable, all of their respective Units and Junior Units and, in the case of Pate, all of the Units and Junior Units of any Founding Members pursuant to a written notice (the "Seller Notice"), which sets forth the proposed purchase and all other terms and conditions of such proposed offer ("Offer").  For a period of fifteen (15) days after receiving the Seller Notice (such period, the "Option Period"), the recipient shall have the right, but not the obligation, to accept the Offer by delivering written notice of the exercise thereof, prior to the expiration of the Option Period, to the proposed seller.  The failure of the recipient to respond within the Option Period shall be deemed to be a rejection of the Offer; provided that the recipient may waive its rights under this Section 5.4(f) prior to the expiration of the Option Period by giving written notice to such effect.  If the Offer is not timely accepted or if it is rejected, Pate or OEP, as applicable, may exercise its respective rights as a Drag-Along Seller.  If the closing of the Drag-Along Sale does not occur within 270 days of the end of the Option Period, the provisions of this Section 5.4(f) shall again apply.  The closing of the purchase pursuant to the Offer shall be held at the executive office of the Company at such time and place as the parties to the transaction may agree; provided, that such closing shall occur no later than the 60th day after the giving of the Seller Notice.  At such closing, OEP or Pate, as applicable, shall deliver, or cause to be delivered, all certificates representing the Units and Junior Units to be sold, duly endorsed for transfer and accompanied by all requisite transfer taxes, if any, shall be free and clear of any liens and encumbrances and the proposed seller shall represent and warrant to the recipient clean title to such Units and Junior Units, its authority to sell without restriction, no conflicts, and full compliance with all laws in connection therewith against full payment therefor in immediately available funds.

5.5     Preemptive Rights.

(a)     Except in connection with (i) issuances in a Public Offering, (ii) upon the conversion or exercise of securities convertible into or containing options or rights to acquire equity securities of the Company (to the extent such securities were issued in compliance with the provisions of this Section 5.5), (iii) issuances pursuant to the Junior Unit Investment Agreements or the Phantom Unit Plan not exceeding 71,351.5304 Junior Units and Phantom Units in the aggregate, (iv) acquisitions of businesses or assets and (v) incurrence of Debt if the Company authorizes the issuance or sale of any Company Securities, in connection with any issuance or sale by the Company of Company Securities, the Company shall offer to sell to each Member holding Units a portion of such Company Securities equal to the quotient determined by dividing (A) the number of Units held by such Member immediately prior to such issuance or sale by (B) the total number of Units held by all Members choosing to participate immediately prior to such issuance or sale.  The Members exercising their rights pursuant to this Section 5.5 will be required to purchase the same types of Company Securities or rights (on the same terms

and in the same ratios) that the Company desires to issue and sell. The purchase price for all securities offered to each Member will be the same price per equity security as those proposed to be offered by the Company and shall be payable at the same time as the closing of the sale proposed to be consummated by the Company, in cash or by wire transfer of immediately available funds. Any Person affirmatively exercising rights hereunder who defaults in whole or in part in payment with respect to the purchase of any securities hereunder automatically and irrevocably forfeits the right to participate in any future issuances to which this Section 5.5(a) is applicable.

(b)     In order to exercise its purchase rights hereunder, each Member must deliver a written notice to the Company describing its election hereunder within fifteen (15) days after receipt of written notice from the Company describing in reasonable detail the securities being offered, the purchase price thereof, the payment terms and such Member's percentage allotment.

(c)     Upon the expiration of the fifteen (15) day offering period described above, the Company will be entitled to sell such securities which the Members have not elected to purchase during the 120 days following such expiration on terms and conditions no more favorable to the purchasers thereof than those offered to the Members. Any securities offered or sold by the Company to any Person after such 120 day period must be reoffered to the Members pursuant to the terms of this Section 5.5.

(d)     The provisions of this Section 5.5 will terminate and be of no further force or effect upon the consummation of a Public Offering.

## ARTICLE VI
## MANAGEMENT AND OPERATION OF THE BUSINESS

6.1     General Management Powers of the Board of Directors. The Members have appointed the Board of Directors to generally manage the affairs of the Company for and on behalf of all Members hereof. In doing so Members have expressly delegated to the Board of Directors the reasonable discretion to assume and execute the responsibilities with respect to all Company actions, decisions, consents, approvals, elections and authority to negotiate and execute on behalf of the Company all documents in furtherance of such matters. The actions (or inactions) of the Board of Directors shall be binding upon the Company and all of its Members.

6.2     Board of Directors.

(a)     Powers. Except as otherwise expressly provided in these Regulations, the business and affairs of the Company shall be managed by or under the direction of the Board of Directors. As provided in Section 6.5, the Board of Directors shall have the power and authority to appoint Officers of the Company. The Board of Directors shall constitute the "manager" within the meaning of the Act. No Member, by virtue of its status as such, shall have any management power over the business and affairs of the Company or actual or apparent authority to enter into, execute or deliver contracts on behalf of, or to otherwise bind, the Company. In addition to the powers that now or hereafter can be granted to managers under the Act and to all other powers granted under any other provision of these Regulations, the Board of Directors

shall have full power and authority to do, and to direct or delegate to the Officers to do, all things and on such terms as it determines to be necessary or appropriate to conduct the business of the Company, to exercise all powers set forth in these Regulations and to effectuate the purposes set forth in Section 1.6, including the following:

(i)     the making of any expenditures, the lending or borrowing of money, the assumption or guarantee of, or other contracting for, indebtedness and other liabilities, the issuance of evidences of indebtedness with exception to any indebtedness that is convertible into Company Securities, except as otherwise provided by these Regulations, and the incurring of any other obligations;

(ii)     the making of tax, regulatory and other filings, or rendering of periodic or other reports to governmental or other agencies having jurisdiction over the business or assets of the Company;

(iii)     the use of the assets of the Company (including cash on hand) for any purpose consistent with the terms of these Regulations, including the financing of the conduct of the operations of the Company; the lending of funds to other Persons (including Members); the repayment of obligations of the Company and the making of capital contributions to any Affiliate of the Company or distributions to a Member of the Company;

(iv)     the negotiation, execution and performance of any contracts, conveyances or other instruments (including instruments that limit the liability of the Company under contractual arrangements to all or particular assets of the Company);

(v)     the distribution of Company cash;

(vi)     the selection and dismissal of officers, employees, agents, outside attorneys, accountants, consultants and contractors and the determination of their compensation and other terms of employment or hiring, the creation and operation of employee benefit plans, employee programs and employee practices;

(vii)     the maintenance of insurance for the benefit of the Company, its Affiliates, Officers, Directors and the Members;

(viii)     the formation of, or acquisition of an interest in, and the contribution of property and the making of loans to, any limited or general partnerships, joint ventures, corporations, limited liability companies or other relationships (including the acquisition of interests in, and the contributions of property to, any Affiliate of the Company or distributions to any Member from time to time);

(ix)     the control of any matters affecting the rights and obligations of the Company, including the bringing and defending of actions at law or in equity and otherwise engaging in the conduct of litigation, arbitration or remediation, and the incurring of legal expense and the settlement of claims and litigation;

(x)     the indemnification of any Person against liabilities and contingencies to the extent permitted by law;

(xi)     the undertaking of any action in connection with the Company's participation in any transactions, agreements or relationships with an Affiliate of the Company or any Member;

(xii)    the acquisition by purchase, lease, or otherwise of any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(xiii)   the power and authority to operate, maintain, finance, improve, construct, own, grant options with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(xiv)    the execution of any and all agreements, contracts, documents, certifications, and instruments necessary or convenient in connection with the management, maintenance, and operation of Company property, or in connection with managing the affairs of the Company;

(xv)     the execution and delivery of all checks, drafts or other orders for payment of funds belonging to the Company;

(xvi)    the power and authority to borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Company property;

(xvii)   the execution of any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Company property;

(xviii)  the power and authority to prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting Company property and in connection therewith execute any extensions or renewals of encumbrances on any or all Company property;

(xix)    the power and authority to contract on behalf of the Company for the employment and services of employees and/or independent contractors, such as lawyers and accountants, and delegate to such Persons the duty to manage or supervise any of the assets or operations of the Company;

(xx)     the power and authority to institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought on or in behalf of, or against, the Company, the Members in connection with activities arising out of, connected with, or incidental to these Regulations, and to engage counsel or others in connection therewith and to execute powers of attorney, consents, waivers and other documents that may be necessary before any court, administrative board or agency of any governmental authority, affecting the properties owned by the Company;

(xxi)    the power and authority to cause to be filed such other certificates or documents that it determines to be necessary or appropriate for the formation, continuation,

qualification and operation of a limited liability company in the State of Texas or any other state in which the Company may elect to do business or own property, and to direct the appropriate Officers of the Company to file amendments to and restatements of the Articles and do all things to maintain the Company as a limited liability company under the laws of the State of Texas or of any other state in which the Company may elect to do business or own property; and

(xxii) the power and authority to waive or modify all provisions permitted to be waived or modified under the Act, including those provisions set forth in Section 101.04 of the Act.

(b)    Number of Directors.   The Board of Directors shall consist of seven natural Persons.  Each Director shall be appointed as provided in Section 6.2(c) and shall serve in such capacity until his successor has been duly appointed and qualified or until such Director dies, resigns or is removed.  A Director may resign at any time upon written notice to the Board of Directors.

(c)    Appointment of Directors.

(i)    (A) For so long OEP is the holder of a number of Units and Junior Units equal to or greater than thirty percent of all issued and outstanding Units and Junior Units, OEP shall appoint three Directors (each an "OEP Director") and (B) for so long as all the Members (other than OEP) as of the date of these Regulations collectively are the holders of a number of Units and Junior Units equal to or greater than twenty percent of all issued and outstanding Units and Junior Units, Pate shall appoint two Directors (each a "Pate Director").

(ii)    In addition to Section 6.2(c)(i), OEP shall have the right to appoint one independent Director to the Board of Directors; provided that Pate consents in writing to such appointment and OEP is the holder of a number of Units and Junior Units equal to or greater than thirty percent of all issued and outstanding Units and Junior Units.

(iii)    In addition to Section 6.2(c)(i), Pate shall have the right to appoint one independent Director (who is not a Related Party or the Immediate Family of any Member) to the Board of Directors; provided that OEP consents in writing to such appointment and Pate is the holder of a number of Units and Junior Units equal to or greater than twenty percent of all issued and outstanding Units and Junior Units,.

(iv)    Any Director appointed pursuant to Section 6.2(c)(ii) or 6.2(c)(iii) is hereinafter referred to as an "Independent Director."

(d)    Removal and Vacancies.   A Director, including, for the avoidance of doubt an Independent Director, may be removed at any time by the Member who appointed such Director pursuant to Section 6.2(c).  Vacancies existing on the Board of Directors with respect to Directors shall be filled by appointment pursuant to Section 6.2(c).

(e)    Qualification of Directors.   Directors need not be Members.  The Board of Directors may, from time to time and by the adoption of resolutions, establish qualifications for Directors.

(f)     Voting. Unless otherwise required by the Act, other law or the provisions hereof:

(i)     each member of the Board of Directors shall have one vote;

(ii)     the presence at a meeting of the Board of Directors of a majority of the members of the Board of Directors shall constitute a quorum at any such meeting for the transaction of business provided that at least one OEP Director and one Pate Director is present and if some of the OEP Directors or Pate Directors are not present, then the OEP Director(s) and Pate Director, as applicable, that are present shall have the authority to vote for and on behalf of the non-present OEP Director(s) and Pate Director, as applicable, subject to the sole and complete discretion of the OEP Director(s) and Pate Director, as applicable, then present and in attendance as if such non-present OEP Director(s) and Pate Director, as applicable, were present and in attendance; and

(iii)     the act of a majority of the members of the Board of Directors present at a meeting of the Board of Directors at which a quorum is present shall be deemed to constitute the act of the Board of Directors provided that such majority of the members of the Board of Directors includes at least one OEP Director;

(g)     Meetings of the Board of Directors. Regular meetings of the Board of Directors and any committee thereof shall be held at such times and places as shall be designated from time to time by resolution of the Board of Directors or such committee. Notice of such regular meetings shall not be required. No less than once every fiscal quarter, the Board of Directors shall meet in person and hold a meeting. Special meetings of the Board of Directors or meetings of any committee thereof may be called by the Chairman of the Board or the chair of such committee, as applicable, or on the written request of any two Directors or committee members, as applicable, to the Secretary, in each case on provision of at least twenty-four hours personal, written, facsimile, electronic, telegraphic, cable or wireless notice to each Director or committee member, which notice may be waived by any Director. Any such notice, or waiver thereof, need not state the purpose of such meeting except as may otherwise be required by law. Attendance of a Director at a meeting (including pursuant to the last sentence of this Section 6.2(g)) shall constitute a waiver of notice of such meeting, except where such Director attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Any action required or permitted to be taken at a meeting of the Board of Directors, or any committee thereof, may be taken without a meeting, without prior notice and without a vote if a consent or consents in writing or by electronic transmission, setting forth the action so taken, are provided by all of the members of the Board of Directors, or of such committee, as applicable.

(h)     Committees of the Board of Directors. The Board of Directors shall designate an audit committee and a compensation committee as soon as practicable following the date hereof. In addition to the audit committee and a compensation committee, the Board of Directors may, by resolution of a majority of the Board of Directors provided such majority of the Board of Directors includes a Pate Director, designate one or more additional committees. Each committee designated by the Board of Directors shall include the Independent Director appointed by Pate. The Board of Directors may designate one or more Directors as alternate

- 33 -

members of any committee, who may replace any absent or disqualified Director at any meeting of such committee. Any such committee, to the extent provided in the resolution of the Board of Directors or in these Regulations, shall have and may exercise all powers and authority of the Board of Directors in the management of the business and affairs of the Company; but no such committee shall have the power or authority in reference to the following matters: (1) approving or adopting, or recommending to the Members, any action or matter expressly required by these Regulations or the Act to be submitted to the Members for approval or (2) adopting, amending or repealing any provision of these Regulations. The Board of Directors shall appoint an Independent Director to serve as chairman of any committee designated hereunder. The committees shall keep regular minutes of its proceedings and report the same to the Board of Directors when requested, and, subject to Section 6.2(g), shall fix its own rules or procedures and shall meet at such times and at such place or places as may be provided by such rules. At every meeting of any such committee, the presence of a majority of all the members thereof shall constitute a quorum and the affirmative vote of a majority of the members present at a meeting in which a quorum is present shall be necessary for the adoption by the committee of any resolution.

(i)     Chairman of the Board of Directors. The Board of Directors shall elect one of its members as Chairman of the Board (the "Chairman"). The Chairman, if present and acting, shall preside at all meetings of the Board of Directors and of Members, unless otherwise directed by the Board of Directors. If the Chairman is absent from the meeting, a Director chosen by a majority of the Directors then present, shall preside. In the absence of a Secretary, the Chairman or presiding Director, as the case may be, may appoint any Person to serve as Secretary of the meeting.

(j)     Presence at Meetings by Means of Communication Equipment. Subject to the requirements in Section 6.2(g), with respect to the quarterly in person meeting, Directors of the Company or any committee designated by the Board of Directors may participate in and hold a meeting of the Board of Directors or such committee by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 6.2(j) shall constitute presence in person at such meeting except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(k)     Compensation of Directors. The Directors shall be paid their reasonable expenses, if any, of attendance at each meeting of the Board of Directors and the Independent Directors may be paid a fixed sum for attendance at each meeting of the Board of Directors or paid a stated salary or paid other compensation as Director as shall be determined by the Board of Directors. No such payment shall preclude any Director from serving the Company in any other capacity and receiving compensation therefor. Members of special or standing committees may also be paid their expenses, if any, and allowed compensation for attending committee meetings.

6.3     Actions Requiring Consent of OEP and Pate. Notwithstanding any other provision of these Regulations to the contrary, and in addition to any other matters under these Regulations, nether the Board of Directors nor any officer, employee, agent or representative of

the Board of Directors or the Company shall approve or take any of the following actions with respect to the Company without first having received written approval of OEP for so long as OEP is the holder of Units and Junior Units equal to or greater than 30% percent of all outstanding Units and Junior Units and Pate for so long as Pate and the Aaron Cole Pate 2012 Trust collectively are the holders of Units and Junior Units equal to or greater than 15% percent of all outstanding Units and Junior Units:

      (a)    adopt or amend the Company's annual budget and business plan;

      (b)    obligate or cause the Company to be a direct or indirect party to any acquisition, disposition, merger, asset sale (other than sales of assets in the ordinary course of business), spin-off, conversion, interest exchange, consolidation, joint venture, restructuring, recapitalization, reorganization or similar transaction other than in connection with a Drag-Along Sale;

      (c)    obligate or cause the Company to incur any indebtedness for borrowed money in excess of $15,000,000 or enter into any amendment of any credit or debt facility to which the Company is a party other than in connection with a Drag-Along Sale;

      (d)    obligate or cause the Company to make any expenditure or series of related expenditures in excess of $2,000,000 in the aggregate other than in connection with a Drag-Along Sale;

      (e)    obligate or cause the Company to issue Company Securities or issue Company Securities without complying with the provisions of Section 5.5 if applicable;

      (f)    accepting capital contributions from any Member after the date of these Regulations;

      (g)    obligate or cause the Company to register any Company Securities with the Securities and Exchange Commission or with any similar foreign governmental authority or regulatory agency other than in connection with a Drag-Along Sale;

      (h)    hire, modify the engagement of or terminate the independent accounting firm or independent auditors of the Company;

      (i)    amend or modify these Regulations other than in connection with a Drag-Along Sale;

      (j)    obligate or cause the Company to wind-up, liquidate or dissolve other than in connection with a Drag-Along Sale;

      (k)    obligate, approve or cause the Company to enter into an agreement with a Related Party or OEP or any of its Affiliates other than as contemplated by Section 4.8 or in connection with a Drag-Along Sale;

      (l)    make material changes in the focus or line of business of the Company;

(m)   obligate or cause the Company to make any distribution to its Members, whether of cash or property other than as expressly required by these Regulations;

(n)   the hiring, appointment and dismissal of any officer (other than any senior vice president level officer) or employee of the Company;

(o)   any amendment, suspension, discontinuation or termination of the Phantom Unit Plan or any award agreement issued thereunder;

(p)   the determination not to make Tax Distributions under Section 4.8;

(q)   cause the Company to be converted into any entity such that the Company is no longer taxed as a partnership; and

(r)   the entering into of any arrangement or agreement to do any of the foregoing.

6.4   Duties of Directors.   A Director shall, in the performance of his duties, be fully protected in relying in good faith upon the records of the Company and on such information, opinions, reports or statements presented to the Company by any of the Company's Officers or employees, or committees of the Board of Directors, or by any other Person as to matters the Director reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company.   The Board of Directors shall have the right, in respect of any of its powers or obligations hereunder, to act through a duly appointed attorney or attorneys-in-fact or the duly authorized Officers of the Company.

6.5   Officers.

(a)   Power to Appoint Officers.   The Board of Directors shall have the power and authority to appoint such officers with such titles, authority and duties as determined by the Board of Directors.   Such Persons so designated by the Board of Directors shall be referred to as "Officers."   Unless provided otherwise by resolution of the Board of Directors, the Officers shall have the titles, power, authority and duties described below in this Section 6.5.   The Board of Directors may from time to time delegate the powers or duties of any Officer to any other Officers or agents, notwithstanding any provision hereof.

(b)   Officer Positions.   The Officers of the Company shall include a Chief Executive Officer, a Secretary, and may also include a Treasurer, one or more Vice Presidents (who may be further classified by such descriptions as "executive," "senior," "assistant" or otherwise, as the Board of Directors shall determine), one or more Assistant Secretaries and one or more Assistant Treasurers, and any other such Officers as determined by the Board of Directors.   Officers shall be elected by the Board of Directors and shall hold office until his or her successor is elected and qualified or until his or her earlier death, resignation or removal. Any number of offices may be held by the same Person.   The compensation of Officers elected by the Board of Directors shall be fixed from time to time by the Board of Directors or by the Chief Executive Officer or such other Officers as may be designated by the Board of Directors.

(c)     Resignation of Officers.  Any Officer may resign at any time upon written notice to the Company.  Any Officer, agent or employee of the Company may be removed by the Board of Directors with or without cause at any time.  The Board of Directors may delegate the power of removal as to Officers, agents and employees who have not been appointed by the Board of Directors.  Such removal shall be without prejudice to a Person's contract rights, if any, but the appointment of any Person as an Officer, agent or employee of the Company shall not of itself create contract rights.

(d)     Chairman of the Board.  If elected, the Chairman of the Board shall not be an executive and shall preside at all meetings of the Members and of the Board of Directors; and shall have such other powers and duties as designated in these Regulations and as from time to time may be assigned to him by the Board of Directors.

(e)     Chief Executive Officer.  Subject to the control of the Board of Directors and any employment agreement to which he is a party, the Chief Executive Officer shall have general executive charge, management and control of the properties, business and operations of the Company with all such powers as may be reasonably incident to such responsibilities; he may employ and discharge employees and agents of the Company except such as shall be appointed by the Board of Directors, and he may delegate these powers; he may agree upon and execute all leases, contracts, evidences of indebtedness and other obligations in the name of the Company, and shall have such other powers and duties as designated in accordance with these Regulations and as from time to time may be assigned to him by the Board of Directors including the full power and authority to do, and to direct or delegate to other Officers to do, all things and on such terms as it determines to be necessary or appropriate to conduct the business of the Company.

(f)     Vice Presidents.  Vice Presidents shall perform such other duties and have such other powers as the Board of Directors or Chief Executive Officer may from time to time prescribe.  Unless otherwise provided by the Board of Directors or Chief Executive Officer, each Vice President will have authority to act within his or her respective areas and to sign contracts relating thereto.

(g)     Secretary.  The Secretary shall issue all authorized notices for, and shall keep minutes of, all meetings of the Members and the Board of Directors.  The Secretary shall have charge of the corporate books and shall perform such other duties as the Board of Directors may from time to time prescribe.  In the absence or inability to act of the Secretary, any Assistant Secretary may perform all the duties and exercise all the powers of the Secretary.  The performance of any such duty shall, in respect of any other Person dealing with the Company, be conclusive evidence of his or her power to act.  An Assistant Secretary shall also perform such other duties as the Secretary or the Board of Directors may assign to him or her.

(h)     Treasurer.  The Treasurer shall have responsibility for the custody and control of all the funds and securities of the Company and shall have such other powers and duties as designated in these Regulations and as from time to time may be assigned to the Treasurer by the Board of Directors or the Chief Executive Officer.  The Treasurer shall perform all acts incident to the position of Treasurer, subject to the control of the Chief Executive Officer and the Board of Directors.  Each Assistant Treasurer shall have the usual powers and duties

pertaining to his office, together with such other powers and duties as designated in these Regulations and as from time to time may be assigned to him by the Chief Executive Officer or the Board of Directors. The Assistant Treasurers shall exercise the powers of the Treasurer during that Officer's absence or inability or refusal to act. An Assistant Treasurer shall also perform such other duties as the Treasurer or the Board of Directors or Chief Executive Officer may assign to him.

6.6     Loans or Contributions from the Company or any Affiliate of the Company. The Company may lend or contribute to any Director, Officer or Member, or any Affiliate thereof, and any Director, Officer or Member, or any Affiliate thereof, may borrow from the Company, funds on terms and conditions determined by the Board of Directors (provided such majority of the Board of Directors includes a Pate Director). No borrowing by any Director, Officer or Member, or any Affiliate thereof, or the approval thereof by the Board of Directors shall be deemed to constitute a breach of any duty (including any fiduciary duty), expressed or implied, of the Board of Directors to the Company or the Members by reason of the fact that the purpose or effect of such borrowing is directly or indirectly to enable distributions to the Members.

6.7     Employment of Related Persons. The fact that any Director, Officer or Member or Related Party is directly or indirectly interested in or connected with any Person employed by the Company to render or perform a service, or any Person from which or whom the Company may buy services, materials or other property, shall not prohibit the Company from employing such Person or from otherwise dealing with such Person under reasonable terms and conditions.

## ARTICLE VII
## INDEMNIFICATION

7.1     Indemnification.

(a)     To the fullest extent permitted by law as it currently exists and to such greater extent as applicable law hereafter may permit, but subject to the limitations expressly provided in these Regulations, the Company shall indemnify any Person who was or is a party or is threatened to be made a party to, or otherwise requires representation of counsel in connection with, any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Company) by reason of the fact that such Person is or was a Member, Director or Officer of the Company (each an "Indemnitee") or by reason of any action alleged to have been taken or omitted in such capacity, against losses, expenses (including attorneys' fees payable subject to Section 7.1), judgments, fines, damages, penalties, interest, liabilities and amounts paid in settlement actually and reasonably incurred by the Person in connection with such action, suit or proceeding if the Person acted in good faith and in a manner the Person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such Person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Person did not act in good faith and in a manner which the Person reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that the Person's conduct was unlawful.

(b)     Notwithstanding Section 7.1(d), to the extent an Indemnitee has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 7.1(a), or in the defense of any claim, issue or matter therein, such Person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such Person in connection therewith.

(c)     Any indemnification under Section 7.1(a) (unless ordered by a court) shall be made by the Company only as authorized in the specific case upon a determination that indemnification of the Indemnitee is proper in the circumstances because the Person has met the applicable standard of conduct set forth in such section. Such determination shall be made, with respect to a Person who is a Director or Officer at the time of such determination, (i) by a majority vote of the Board of Directors (provided such majority of the Board of Directors includes a Pate Director as long as there are Pate Directors) or (ii) by a committee of the Directors designated by majority vote of the Board of Directors (provided such majority of the Board of Directors includes a Pate Director as long as there are Pate Directors).

(d)     Expenses (including reasonable attorneys' fees) incurred by an Indemnitee in defending any action, suit or proceeding referred to in Section 7.1(a) shall be paid by the Company in advance of the final disposition of such action, suit or proceeding and in advance of any determination that such Indemnitee is not entitled to be indemnified, upon receipt of an undertaking by or on behalf of such Indemnitee to repay such amount if it shall ultimately be determined by final judicial decision from which there is no further right to appeal (a "Final Adjudication") that such Person is not entitled to be indemnified by the Company as authorized in this Section 7.1.

(e)     The indemnification, advancement of expenses and other provisions of this Section 7.1 shall be in addition to any other rights to which an Indemnitee may be entitled under any agreement, as a matter of law or otherwise, as to actions in the Indemnitee's capacity as an Indemnitee and shall continue as to an Indemnitee who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of the Indemnitee.

(f)     The Company may purchase and maintain insurance, on behalf of its Directors and Officers, and such other Persons as the Board of Directors shall determine, against any liability that may be asserted against or expense that may be incurred by such Person in connection with the Company's activities or such Person's activities on behalf of the Company, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of these Regulations.

(g)     Any indemnification pursuant to this Section 7.1 shall be made only out of the assets of the Company, it being agreed that the Members shall not be personally liable for such indemnification and shall have no obligation to contribute or loan any monies or property to the Company to enable it to effectuate such indemnification.

(h)     An Indemnitee shall not be denied indemnification in whole or in part under this Section 7.1 because the Indemnitee had an interest in the transaction with respect to

which the indemnification applies if the transaction was otherwise permitted by the terms of these Regulations.

(i)     The Company may pay or reimburse expenses incurred by an Indemnitee in connection with such Person's appearance as a witness or other participation in a proceeding at a time when such Person is not a named defendant or respondent in the proceeding.

(j)     The Company may indemnify any Person to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Officers or Directors under this Article VII who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (whether or not an action by or in the right of the Company) by reason of the fact that the Person is or was an employee (other than an Officer) or agent of the Company, or, while serving as an employee (other than an Officer) or agent of the Company is or was serving at the request of the Company as a director, officer, employee, partner, fiduciary, trustee or agent of an Affiliate of the Company or another Person to the extent (i) permitted by the laws of the State of Texas as from time to time in effect, and (ii) authorized by the Board of Directors.

(k)     The indemnification, advancement of expenses and other provisions of this Section 7.1 are for the benefit of the Indemnitees, their heirs, successors, assigns and administrators and shall not be deemed to create any rights for the benefit of any other Persons.

(l)     Except to the extent otherwise provided in this Section 7.1, the right to be indemnified and to receive advancement of expenses in this Section 7.1 shall be a contract right. No amendment, modification or repeal of this Section 7.1 or any provision hereof shall in any manner terminate, reduce or impair the right of any past, present or future Indemnitee to be indemnified by the Company, nor the obligations of the Company to indemnify any such Indemnitee under and in accordance with the provisions of this Section 7.1 as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted. It is expressly acknowledged that the indemnification provided in this Article VII could involve indemnification for negligence or under theories of strict liability.

(m)     For the avoidance of doubt, this Section 7.1 shall not apply to any claims under the Membership Interest and Warrant Purchase and Redemption Agreement.

7.2     Exculpation of Liability of Indemnitees.

(a)     Severability of Indemnification. If this Article VII or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Indemnitee to the full extent permitted by any applicable portion of this Article VII that shall not have been invalidated and to the fullest extent permitted by applicable law.

(b)     No Director Liability. Notwithstanding anything to the contrary set forth in these Regulations, no Director shall be liable to the Company or the Members for monetary

damages for breach of fiduciary duty as a Director, except for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law.

(c)     Power of Board of Directors.  Subject to its obligations and duties as set forth in this Article VII, the Board of Directors may exercise any of the powers granted to it by these Regulations and perform any of the duties imposed upon it hereunder either directly or by or through its agents, and the Board of Directors shall not be responsible for any misconduct or negligence on the part of any such agent appointed by the Board of Directors in good faith.

(d)     Reliance.  To the extent that, at law or in equity, an Indemnitee has duties (including fiduciary duties) and liabilities relating thereto to the Company or to the Members, the Directors and any other Indemnitee acting in connection with the Company's business or affairs shall not be liable to the Company or to any Member for its good faith reliance on the provisions of these Regulations.  The provisions of these Regulations, to the extent that they restrict or eliminate or otherwise modify the duties (including fiduciary duties) and liabilities of an Indemnitee otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Indemnitee.

(e)     Prioritizing Indemnification Obligations.

(i)     Notwithstanding anything to the contrary in these Regulations, the Company and the Members hereby acknowledge that Pate, OEP and/or certain of their respective Affiliates (each a "Covered Person") may have rights to indemnification, advancement of expenses and/or insurance pursuant to charter documents or agreements of such Covered Person or with the employer or Affiliate of such Covered Person, a Member, or a direct or indirect parent or brother/sister Affiliate of the Covered Person or Member (collectively, the "Last Resort Indemnitors").  A Covered Person may also have rights to indemnification, advancement of expenses and/or insurance provided by a subsidiary of the Company or pursuant to agreements with third parties in which the Company or any subsidiary of the Company has an interest (collectively, the "First Resort Indemnitors").  Notwithstanding anything to the contrary in these Regulations, as to each Covered Person's rights to indemnification and advancement of expenses pursuant to this Article VII, the Company and the Members hereby agree that:

(A)     the First Resort Indemnitors, if any, are the indemnitors of first resort (i.e., their indemnity obligations to such Covered Person are primary and any obligation of the Company to advance expenses or to provide indemnification for the Claims incurred by such Covered Person are secondary), and the First Resort Indemnitors shall be obligated to indemnify such Covered Person for the full amount of all Claims and expenses covered by this Article VII, to the full extent of their indemnity obligations to the Covered Person and to the extent of the First Resort Indemnitors' assets legally available to satisfy such obligations, without regard to any rights the Covered Person may have against the Company or the Last Resort Indemnitors;

(B)     the Company is the indemnitor of second resort (i.e., its indemnity and advancement of expense obligations to such Covered Person are secondary to the obligations of any First Resort Indemnitors, but precede any indemnity and advancement of expense obligations of any Last Resort Indemnitors), and the

Company shall be liable for the full amount of all remaining claims and expenses covered by this Article VII after the application of Section 7.2(e)(i)(A), to the full extent of its obligations under the other subsections of this Article VII and to the extent of the Company's assets legally available to satisfy such obligations, without regard to any rights such Covered Person may have against the Last Resort Indemnitors; and

(C)    the Last Resort Indemnitors, if any, are the indemnitors of last resort and shall be obligated to indemnify such Covered Person for any remaining Claims covered by this Article VII only after the application of Sections 7.2(e)(i)(A) and (B).

(ii)    The First Resort Indemnitors and the Company irrevocably waive, relinquish and release each Last Resort Indemnitors from any and all claims against such Last Resort Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company and the Members further agree that no advancement or payment by any Last Resort Indemnitors on behalf of a Covered Person with respect to any claim covered by the other sections of this Article VII shall affect the foregoing and such Last Resort Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Covered Person against the Company. The Last Resort Indemnitors, if any, are express third party beneficiaries of the terms of this Section 7.2(e).

(f)    No Modification.    Any amendment, modification or repeal of this Section 7.2 or any provision hereof shall be prospective only and shall not in any way affect the limitations on the liability of any Indemnitee under this Section 7.2 as in effect immediately prior to such amendment, modification or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment, modification or repeal, regardless of when such claims may arise or be asserted.

## ARTICLE VIII
## NOTICE PROVISIONS

8.1    Form of Notice.    All notices required or permitted to be given to a Member or Person pursuant to the Articles or these Regulations, shall be completed in accordance with the following provisions:

(a)    Notice Addresses.    All written notices required or permitted by these Regulations may be completed by regular or special delivery mail, hand delivered communications, or email, if directed to the addresses or email addresses reflected on Exhibit C hereto, unless a specific provision of these Regulations requires a specific form of notice, in such event such specific notice provisions must be complied with to achieve the necessary notice of a party.

(b)    Change of Address.    A Member or Person entitled to notice by these Regulations must notify the Company of any change in addresses by delivering a written notice to such affect to the principal office of the Company. Any such Member or Person who fails to

so notify the Company of a changed address shall waive such Member or Person's right(s) to notice.

8.2     Waiver of Notice.  Any written waiver executed or authored if sent by email by a Member or Person shall be equivalent to the giving and receipt of such notice.

## ARTICLE IX
## DISSOLUTION AND TERMINATION

9.1     Causes for Dissolution.  The Company shall be dissolved and terminated upon the happening of any of the following events:  (i) if and as contemplated by a Drag-Along Sale or (ii) entry of a decree of judicial dissolution of the Company under Section 11.301 of the Act.

9.2     Liquidation of Company.  In the event that the Company is to be dissolved and terminated, the Company shall engage in no further business other than that necessary to wind down its affairs and distribute its assets.  Liquidation and the filing of Articles of Dissolution as required by the Act shall be handled by the Board of Directors as liquidating trustees (the "Liquidating Trustees").

9.3     Disposition of Assets.  Upon the dissolution of the Company, the Liquidating Trustees shall liquidate the Company and dispose of the Company assets in accordance with the following provisions:

(a)     Statement of Account.  The Liquidating Trustees shall prepare as promptly as possible a final statement of account which shall show the status of each Member's Capital Account and the amount that each Member owes to the Company, if any.

(b)     Payment of Debts.  The Liquidating Trustees shall pay all Company debts, including debts owed to Members other than with respect to distributions, or otherwise make adequate provisions for their disposition, except for non-recourse indebtedness which exceeds the fair market value of the property securing the non-recourse indebtedness, in which event the Liquidating Trustees may surrender the property securing the non-recourse indebtedness to the secured party in lieu of paying the indebtedness.

(c)     No Restoration of Deficit Capital Accounts.  In the event that any Member shall have a deficit Capital Account balance upon the liquidation of the Member's interest in the Company, the Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

(d)     Determination of Company Assets.  The Liquidating Trustees shall determine the interest of the Company in each of the remaining Company properties.

(e)     Valuation of Company Properties.  The Liquidating Trustees shall determine the fair market value of the remaining Company properties using appraisal techniques which they deem to be appropriate and shall determine the amount of any non-recourse indebtedness secured by the remaining Company properties.  Any difference between the fair market value and the bases of properties as carried on the books of the Company shall be

allocated among the Members in accordance with their respective Pro Rata Unit Ownership as though such properties had been sold or transferred; provided, however, in the case of Company property having a fair market value less than the non-recourse indebtedness which it secures, for purposes of determining gain or loss on the sale or transfer of the property the amount of the non-recourse indebtedness shall be treated as the amount realized on the sale or transfer.

(f) <u>Distribution of Remaining Company Properties</u>. The Liquidating Trustees shall distribute the remaining Company properties, or cash realized from their sale, after the payment of all Company debts, to the Members no later than the end of the Company fiscal year in which the liquidation occurs or, if later, NINETY (90) days after the liquidation, to the Members in accordance with the distribution priority set forth in <u>Section 4.8</u>.

(g) <u>Indebtedness Owed by Members</u>. If any Member is indebted to the Company pursuant to <u>Section 6.6</u> at liquidation, then the Liquidating Trustees shall retain the Member's distributive interest of Company properties and apply so much of the Member's interest as shall be required to pay such indebtedness. The balance of the Member's distributive interest, if any, shall then be distributed to the Member. If the Member's distributive interest is not sufficient to satisfy the indebtedness, the Member shall remain liable for the deficiency.

## ARTICLE X
## MISCELLANEOUS PROVISIONS

10.1   <u>Amendment</u>. These Regulations may not be amended without the prior written consent of OEP and Pate. <u>Section 4.8(b)</u> (relating to Distributions to Delta) may not be amended in any manner which is adverse to Delta, and these Regulations may not be amended to provide for Distributions having priority over those Distributions set forth in <u>Section 4.8(b)</u> other than Annual Distribution Amounts and Tax Distributions, without the prior written consent of Delta.

10.2   <u>Fiscal Year</u>. The fiscal year of the Company shall end on December 31 of each year.

10.3   <u>Company Records</u>. The Board of Directors shall keep, or cause to be kept, at the principal office of the Company, correct and complete books and records of account of the Company. If the registered office of the Company is at any time not also the principal office of the Company, the Company shall keep in its registered office and make available to the Members on reasonable request the street address of its principal office in which the above-described records are maintained. The Company shall also maintain the following records:

(a) <u>List of Members and Ownership</u>. The name and mailing address of each Member, separately identifying each Member and the amount and class of Company Security held by each Member;

(b) <u>Tax Returns</u>. Copies of the Company's federal, state, and local information or income tax returns for each of the Company's three (3) most recent tax years; and

(c) <u>Regulations</u>. A copy of these Regulations, all amendments or restatements thereof, and all amendments or restatements to these Regulations, and copies of any document that creates under these Regulations any classes of Company Securities.

10.4   Company Tax Returns.   Subsequent to the close of each fiscal year of the Company, the Board of Directors, at the expense of the Company, shall prepare or cause to be prepared all required Company tax returns and, in connection therewith, shall (except as otherwise expressly provided in these Regulations, including pursuant to Section 4.4(b)) make any available or necessary elections (including elections with respect to the useful lives of the assets of the Company and the rates of depreciation on such assets); provided that, OEP has sole discretion in selecting a tax return preparer for such Company tax returns (which, for the avoidance of doubt, may be KPMG in OEP's sole discretion).   The Board of Directors shall thereafter furnish the Members with all such tax information required to be set forth in each Member's respective income tax return(s); provided that, no later than 30 days after the end of the Company's tax year, the Company shall deliver to each Member a final Schedule K-1.

10.5   Code §754 Election.   The Board of Directors may, in their sole discretion, make (and if made, may revoke) the election referred to in Section 754 of the Code, or any similar provision enacted in lieu thereof.   Each of the Members will, upon request by the Board of Directors, supply the information necessary to properly give effect to such election. Notwithstanding anything else in these Regulations to the contrary, the Company shall make (and have in effect) a valid election referred to in Section 754 of the Code with respect to any tax year to the extent required by the Membership Interest and Warrant Purchase and Redemption Agreement.

10.6   Tax Matters Partner.   Pate Holding Company LP is hereby appointed the "Tax Matters Partner" for purposes of Section 6231(a)(7) of the Code.   The Board of Directors is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.   The other Members agree to cooperate with the Board of Directors and to do or refrain from doing any or all things reasonably required by the Board of Directors to conduct such proceedings.   The Tax Matters Partner shall not (i) enter into any settlement agreement with a tax authority which purports to bind any person other than the Tax Matters Partner without the prior written consent of such other person, or (ii) enter into any agreement extending the period of limitations as contemplated by Section 6229(b)(1)(B) of the Code (or any similar provision of state, local or foreign law) without first obtaining the consent of the Board of Directors. In the event of a conflict between the provisions of this Section 10.6 and the provisions of the Membership Interest and Warrant Purchase and Redemption Agreement, the provisions of the Membership Interest and Warrant Purchase and Redemption Agreement shall control.

10.7   Federal Income Tax Classification.   Neither the Company nor any Member shall file or cause to be filed any election the effect of which would be to cause the Company to be classified as other than a partnership for Federal income tax purposes, without the prior written consent of all the Members.

10.8   Reserved.

10.9   Bank Accounts.   The Board of Directors or the Chief Executive Officer shall open and maintain a bank account, savings account or similar account or accounts into which shall be

deposited all funds of the Company. Withdrawals from such account or accounts shall be made upon the authorized signature or signatures of such Person or Persons as the Board of Directors or Chief Executive Officer shall designate.

10.10  Loans.  No loans shall be contracted on behalf of the Company and no evidence of indebtedness shall be issued in its name unless authorized by a resolution of, or authority granted by, the Board of Directors.  Such authority may be general or confined to specific instances.

10.11  Invalid Provisions.  If any part of these Regulations shall be held invalid or inoperative for any reason, then, so far as possible and reasonable, the remaining part shall be valid and operative, and effect shall be given so far as possible to the intent manifested by the part held invalid or inoperative.

10.12  Binding Effect.  Subject to the restrictions on transfers of Company Securities set forth in these Regulations, these Regulations are binding on and inure to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

10.13  Governing Law.  THESE REGULATIONS ARE GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THESE REGULATIONS TO THE LAW OF ANOTHER JURISDICTION.  In the event of a direct conflict between the provisions of these Regulations and (i) any provision of the Articles, or (ii) any mandatory provision of the Act or (to the extent such statutes are incorporated into the Act), the application provision of the Articles or the Act shall control.

10.14  Execution of Additional Documents.  In connection with these Regulations and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate in the judgment of the Board of Directors to effectuate and perform the provisions of these Regulations and such transactions.

10.15  Construction of Regulations.  The headings used in these Regulations have been inserted for administrative convenience only and do not constitute matter to be construed in interpretation and construction of these Regulations.  All Exhibits attached hereto are incorporated by reference for all purposes hereof.

*[Remainder of Page Intentionally Left Blank]*

DELTA DIRECTIONAL, LLC

By: _____
     Name: Billy Cleveland
     Title: Chief Executive Officer

**PATE HOLDING COMPANY LP**

By: Pate Holding Company GP LLC, its
general partner

By: _____
      Name: Stephen V. Pate
      Title: Manager

**OEP STRIKE LLC**

By: _____

Name: James B. A. Cherry
Title: Managing Director

By: _____
Kacey Smart

By: _____
Jason Heckt

By:
Doug Jones

By: _____

Jarvie Arnold

Aaron Cole Pate as Trustee of the Aaron
Cole Pate 2012 Trust

By: _____
Name: Aaron Cole Pate

By: _____
Sam Anaya

By: _____
Raul Garza

By: _____
Steve Barton

SIGNATURE PAGE TO FIFTH AMENDED AND RESTATED REGULATIONS OF STRIKE, LLC

By: _____
Robert Boykin

SIGNATURE PAGE TO FIFTH AMENDED AND RESTATED REGULATIONS OF STRIKE, LLC

By: _____

Angie Gomes

Exhibit B

Spouse's Agreement

     The undersigned, being the spouse of _____, agrees to be bound by the provisions of these Fifth Amended and Restated Regulations of Strike, LLC, in their present form and as they may be amended from time, to time, to the extent applicable to the undersigned (Article 2 and any other provisions applicable to the spouses of Members).

Date:                            By:        _____

                                        Name:    _____

Exhibit A

| Member | Units | Junior Units |
|---|---|---|
| OEP Strike LLC | 346,379.2474 | |
| Pate Holding Company, LP | 149,443.1019 | |
| Kacey Smart | 26,686.2682 | |
| Jarvie N. Arnold | 26,686.2682 | |
| Jason Heckt | 10,674.5073 | |
| Aaron Cole Pate 2012 Trust | 10,674.5073 | 32,432.5138 |
| Douglas K. Jones | 3,697.9991 | |
| Sam Anaya | 611.3693 | |
| Steve Barton | 611.3693 | |
| Raul Garza | 611.3693 | |
| Angela Goines | 611.3693 | 325.0000 |
| Robert Boykin | 611.3693 | 325.0000 |
| Dario Deferrari | | 950.0000 |
| Gary Meurer | | 1,250.0000 |
| Rhonda Sigman | | 950.0000 |
| Mike Smithey | | 1,250.0000 |
| Frank Victor-McCawley | | 1,575.0000 |
| Robert J. Jessen | | 972.9754 |
| Delta Directional, LLC | 4,108.0283 | |

# EXHIBIT E

**SIXTH AMENDED AND RESTATED REGULATIONS**

**OF**

**STRIKE, LLC**
**(a Texas limited liability company)**

THESE SIXTH AMENDED AND RESTATED REGULATIONS (this "*Agreement*") of Strike, LLC (the "*Company*") dated as of this 30th day of November, 2016, by Strike Capital, LLC, a Texas limited liability company as the sole member of the Company (the "*Member*").

**RECITALS**

WHEREAS, the Articles of Organization for the Company were filed with the Texas Secretary of State on March 18, 2003 (the "Articles");

WHEREAS, the parties thereto entered into those certain First Amended and Restated Regulations of Strike Construction, LLC effective as of January 24, 2007;

WHEREAS, the parties thereto entered into those certain Second Amended and Restated Regulations of Strike, LLC effective as of August 1, 2011;

WHEREAS, the parties thereto entered into those certain Third Amended and Restated Regulations of Strike, LLC effective as of February 29, 2012;

WHEREAS, the parties thereto entered into those certain Fourth Amended and Restated Regulations of Strike, LLC effective as of August 30, 2013;

WHEREAS, the parties thereto entered into those certain Fifth Amended and Restated Regulations of Strike, LLC effective as of June 30, 2014 (the "*Fifth Amended Regulations*");

WHEREAS, reference is made to that certain Agreement and Plan of Merger (the "*Merger Agreement*") dated as of the date hereof, by and between the Company, Strike Capital, LLC, a Texas limited liability Company ("*Holdco*") and Strike Merger Subsidiary, LLC, a Texas limited liability Company ("*Merger Sub*"), pursuant to which the Company merged with Merger Sub, with the Company as the surviving entity and a wholly owned subsidiary of Holdco;

WHEREAS, contemporaneously with the transactions contemplated by the Merger Agreement, the undersigned are amending and restating the Fifth Amended Regulations as set forth in this Agreement to account for the recitals set forth above and to modify and amend other provisions of the Fifth Amended Regulations.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, have entered into this Agreement to amend and restate the Fifth Amended Regulations in their entirety.

**ARTICLE I**
**THE LIMITED LIABILITY COMPANY**

54739876.1

1.1     <u>Formation</u>.   The Company was formed as a Texas limited liability company pursuant to the Texas Business Organizations Code and any successor statute, as amended from time to time (the "***TBOC***"), and the filing of the Articles with the Secretary of State of Texas, and the Members hereby amend and restate the Fifth Amended Regulations of the Company in their entirety.

1.2     <u>Name</u>.   The name of the Company shall be "Strike, LLC" and its business shall be carried on in such name with such variations and changes as the Member shall determine or deem necessary to comply with requirements of the jurisdictions in which the Company's operations are conducted.

1.3     <u>Business Purpose; Powers</u>.   The Company is formed for the purpose of engaging in any lawful business, purpose or activity for which limited liability companies may be formed under the TBOC.  The Company shall possess and may exercise all the powers and privileges granted by the TBOC or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

1.4     <u>Registered Office and Agent</u>.   The location of the registered office of the Company shall be 1800 Hughes Landing Blvd. Ste. 500, The Woodlands, TX 77380, and the Company's Registered Agent at such address shall be Stephen V Pate.  The registered office and agent of the Company may be changed by the Member at any time or from time to time.

1.5     <u>Term</u>.   Subject to the provisions of <u>Article V</u> below, the Company shall have perpetual existence.

**ARTICLE II**
**<u>THE MEMBER</u>**

2.1     <u>Member</u>.   The name and address of the Member are as follows:

| **Name** | **Address** |
|---|---|
| Strike Capital, LLC | 1800 Hughes Landing Blvd., Ste 500<br>The Woodlands, TX 77380 |

2.2     <u>Actions by the Member; Meetings</u>.   The Member may approve a matter or take any action at a meeting or without a meeting by the written consent of the Member. Meetings of the Member may be called at any time by the Member.

2.3     <u>Management by Member</u>. Management of the Company shall be vested in the Member. The Member shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, possessed by members of a limited liability company under the laws of the State of Texas. The Member has the authority to bind the Company.

2.4     <u>Liability of the Member</u>.   All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities

54739876.1                                        - 2 -

of the Company, and the Member shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.

2.5     Admission of Members.  Persons or entities may be admitted as members of the Company only upon the prior written approval of the Member.

2.6     Officers.  The Member may, from time to time as it deems advisable, appoint officers of the Company (the "*Officers*") and assign titles (including, without limitation, President, Vice President, Secretary, and Treasurer) to any such person. Unless the Member decides otherwise, if the title is one commonly used for officers of a business corporation formed under the TBOC, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this Section 2.6 may be revoked at any time by the Member.

## ARTICLE III
## CAPITAL STRUCTURE AND CONTRIBUTIONS

3.1     Capital Structure.  The Member owns all the membership interest of the Company.  Additional membership interests in the Company may be issued only with the consent of the Member, which additional membership interest shall dilute the membership interest held by the Member only to the extent determined by the Member.

3.2     Capital Contributions.  The Member may, but shall not be required to make capital contribution(s) to the Company in such amounts as may be determined by the Member. A capital account shall be maintained for the Member, to which contributions and profits shall be credited and against which distributions and losses shall be charged.

## ARTICLE IV
## PROFITS, LOSSES AND DISTRIBUTIONS

4.1     Profits and Losses.  For financial accounting and tax purposes, the Company's net profits or net losses shall be determined on an annual basis in accordance with the manner determined by the Member. In each year, profits and losses shall be allocated entirely to the Member.

4.2     Distributions.  The Member shall determine profits available for distribution and the amount, if any, to be distributed to the Member, and the Member shall authorize and distribute the determined amount when, as and if declared by the Member.  Distributions of the Company shall be allocated entirely to the Member.

## ARTICLE V
## WINDING UP AND TERMINATION

5.1     The Company shall wind up and terminate upon the occurrence of any of the following events (each, an "*Event of Termination*"):

(a)     the Member's determination to wind up and terminate the Company; or

CONFIDENTIAL

(b)     a judicial dissolution of the Company under Section 101.621 of the TBOC.

5.2     Except as provided in <u>Section 5.1</u>, no event shall cause the winding up and termination of the Company; *provided, however*, that in the event of any occurrence resulting in the termination of the continued membership of the last remaining member of the Company, the Company shall be dissolved unless, within 90 days following such event, the personal representative of the last remaining member agrees in writing to continue the Company and to the admission of such personal representative (or any other person or entity designated by such personal representative) as a member of the Company, effective upon the event resulting in the termination of the continued membership of the last remaining member of the Company.

## ARTICLE VI
## TRANSFER OF INTERESTS IN THE COMPANY

6.1     The Member may sell, assign, transfer, convey, gift, exchange, pledge, hypothecate or otherwise dispose of ("**Transfer**") any or all of its membership interest in the company to any person or entity in the Member's sole and absolute discretion; *provided, however*, that such person or entity to whom such membership interest is Transferred shall not be a substitute member of the Company, but an assignee, and shall have no right to participate in the Company's business and affairs unless and until such person or entity shall be admitted as a member of the Company upon receipt by the Company of a written agreement executed by the person or entity to whom such membership interest is Transferred agreeing to be bound by the terms of this Agreement.

## ARTICLE VII
## EXCULPATION AND INDEMNIFICATION

7.1     <u>Exculpation</u>. Notwithstanding any other provisions of this Agreement, whether express or implied, or any obligation or duty at law or in equity, neither the Member, nor any officer, employee, representative or agent of the Company (individually, a "**Covered Person**" and, collectively, the "**Covered Persons**") shall be liable to the Company or any other person for any act or omission (in relation to the Company, its property or the conduct of its business or affairs, this Agreement, any related document or any transaction contemplated hereby or thereby) taken or omitted by a Covered Person in good faith in the reasonable belief that such act or omission is in, or is not contrary to, the best interests of the Company and is within the scope of authority granted to such Covered Person by this Agreement, provided such act or omission does not constitute fraud, willful misconduct or gross negligence.

7.2     <u>Indemnification</u>. To the fullest extent permitted by the TBOC, the Company shall indemnify and hold harmless each Covered Person from and against any and all losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative ("**Claims**"), in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of the fact that he, she or it is a Covered Person or which relates to or arises out of the Company or its property, business or affairs. A Covered Person shall not be entitled to indemnification under this <u>Section 7.2</u> with respect to (i) any Claim with respect to which such Covered Person has engaged in fraud, willful misconduct or

CONFIDENTIAL

gross negligence or (ii) any Claim initiated by such Covered Person unless such Claim (A) was brought to enforce such Covered Person's rights to indemnification hereunder or (B) was authorized or consented to by the Member. Expenses incurred in defending any Claim by (y) the Member shall be paid by the Company and (z) any other Covered Person may be paid by the Company, but only upon the prior written approval of the Member in its sole and absolute discretion, upon such terms and conditions, if any, as the Member deems appropriate, in each case, in advance of the final disposition of such Claim upon receipt by the Company of an undertaking by or on behalf of such Covered Person to repay such amount if it shall be ultimately determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this Section 7.2.

7.3   Amendments.  Any repeal or modification of this Article VII shall not adversely affect any rights of a Covered Person pursuant to this Article VII, including the right to indemnification and to the advancement of expenses of a Covered Person, existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

## ARTICLE VIII
## MISCELLANEOUS

8.1   Tax Treatment. For so long as the Member is the only member of the Company, the Member intends for the Company to be disregarded as an entity separate from the Member for U.S. federal tax purposes and, where applicable, for all relevant state and local tax purposes and that the activities of the Company be deemed to be the activities of the Member for such tax purposes; provided, that the Company is not intended to be and shall not be disregarded as an entity for any purpose other than such tax purposes.  All provisions of the Certificate of Formation and this Agreement are to be construed so as to preserve that tax status under those circumstances.

8.2   Amendments.  Amendments to this Agreement and to the Certificate of Formation shall be effective only if approved in writing by the Member. An amendment shall become effective as of the date specified in the approval of the Member or if none is specified as of the date of such approval.

8.3   Severability. If any provision of this Agreement is held to be invalid or unenforceable for any reason, such provision shall be ineffective to the extent of such invalidity or unenforceability; provided, however, that the remaining provisions will continue in full force without being impaired or invalidated in any way.

8.4   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to the principles of conflicts of laws thereof.

8.5   Limited Liability Company. The Member intends to form a limited liability company and does not intend to form a partnership under the laws of the State of Texas or any other laws.

[Remainder of page intentionally left blank. Signature page follows.]

CONFIDENTIAL

IN WITNESS WHEREOF, the undersigned has duly executed this Agreement as of the date first above written.

**Strike Capital, LLC**

By: _____
Name: Stephen V. Pate
Title: Manager

SIGNATURE PAGE TO SIXTH AMENDED AND RESTATED REGULATIONS OF
STRIKE, LLC

CONFIDENTIAL

# EXHIBIT F

DISCLOSURE SCHEDULES

TO THE

SECURITIES PURCHASE AGREEMENT

BY AND BETWEEN

STRIKE CAPITAL, LLC

STRIKE INVESTMENT, LLC

AND

MILL POINT STRIKE SPLITTER, LP

Dated as of February 12, 2021

This document contains the Disclosure Schedules (the "**Disclosure Schedules**") referenced in the Securities Purchase Agreement (the "**Agreement**"), dated February 12, 2021, by and between **Strike Capital, LLC**, a Texas limited liability company (the "**Company**"), **Strike Investment, LLC**, a Delaware limited liability company (the "**Issuer**") and **Mill Point Strike Splitter, LP**, a Delaware limited partnership ("**Purchaser**").  Capitalized terms used herein and not otherwise defined shall have the respective meanings ascribed to such terms in the Agreement. These Disclosure Schedules shall be interpreted in accordance with Section 7.14 of the Agreement.

## Index of Sections

Section 3.03(a)(iv) No Violation or Approval; Consents .......................................................... 1
Section 3.04 Capitalization ........................................................................................................ 5
Section 3.05 Financial Statements; Accounts Receivable ...................................................... 9
Section 3.07 Debt; Guarantees ................................................................................................... 14
Section 3.08 Assets ...................................................................................................................... 16
Section 3.09  Real Property ........................................................................................................ 17
Section 3.10 Intellectual Property ............................................................................................. 20
Section 3.11 Tax Matters ............................................................................................................ 31
Section 3.12 Employee Benefit Plans ........................................................................................ 33
Section 3.13 Contracts ................................................................................................................ 38
Section 3.14 Related Party Transactions .................................................................................. 56
Section 3.15(e)  Labor Matters ................................................................................................... 59
Section 3.16  Litigation; Proceedings ....................................................................................... 61
Section 3.17 Compliance with Laws; Permits ......................................................................... 65
Section 3.18 Insurance ................................................................................................................ 66
Section 3.19 Customers and Suppliers ...................................................................................... 68
Section 3.20 Brokers ................................................................................................................... 69
Section 3.21 Environmental ....................................................................................................... 70
Section 3.22 Customer Warranties ............................................................................................ 73

## Section 3.03(a)(iv)
## No Violation or Approval; Consents

1. Master Open End Lease Agreement, dated October 7, 2011, by and between Merchants Automotive Group, Inc. and Strike, LLC, as amended by that Addendum to Master Open End Lease Agreement dated October 23, 2012.

2. Master Equipment Lease Agreement, dated May 12, 2017, by and between Merchants Automotive Group, Inc. and Strike, LLC.

3. Master Lease Agreement, dated May 18, 2015, by and between Deere Credit, Inc. and Strike, LLC, as amended by that Amendment to Master Lease Agreement dated May 2015.

4. Lease Agreement, dated August 20, 2019, by and between Automotive Rentals, Inc. and Strike, LLC, as amended by that First Amendment to Lease Agreement dated September 10, 2019, and as amended by that Second Amendment to Lease Agreement dated December 9, 2019.

5. Master Lease Agreement, dated September 26, 2016, by and between Summit Funding Group, Inc. and Strike, LLC.

6. Lease Agreement (Master), dated April 6, 2017, by and between VFS Leasing Co. and Strike, LLC.

7. Construction Lease Agreement (Master)(Negotiated for Capital Leases Only), dated April 6, 2018, by and between VFS Leasing Co. and Strike, LLC.

8. Master Lease Agreement, dated July 24, 2018, by and between Wintrust Commercial Finance, a division of Wintrust Asset Finance, Inc. and Strike, LLC.

9. Master Service Agreement, dated November 15, 2017, by and between Arsenal Resources, LLC and Strike, LLC

10. Master Subcontract Agreement, dated August 23, 2017, by and between Brown & Root Industrial Services, LLC and Strike, LLC

11. Master Services Agreement, dated February 10, 2011, by and between CenterPoint Energy Field Services, Inc. and Strike Construction, LLC

12. Master Service Agreement, dated July 2, 2018, by and between CNX Midstream Partners LP and Strike, LLC

13. Master Services Agreement, dated December 29, 2014, by and between Colonial Pipeline Company and Strike, LLC

14. Master Service Agreement, dated June 12, 2015, by and between CONE Midstream Partners LP and Capstone Energy Services, LLC

15. Master Services Agreement, dated October 15, 2014, by and between Extraction Oil & Gas and Crossfire, LLC

16. Master Service Contract, dated June 15, 2015, by and between FDL Operating, LLC and Crossfire, LLC

17. Master Service Agreement, dated April 17, 2019, by and between Gemini Arklatex, LLC and Strike, LLC

18. Master Service Agreement, dated April 17, 2019, by and between Gemini Arklatex, LLC and Crossfire, LLC

19. Master Service Agreement, dated August 14, 2019, by and between Laurel Mountain Production, LLC

and Strike, LLC

20. Maintenance Mechanical Agreement, dated April 1, 2012, by and between Lucite International Inc. and Strike Construction, LLC

21. Master Field Services Agreement, dated July 1, 2020, by and between Lyondell Chemical Company, Equistar Chemicals, LP, Houston Refining, LP, LyondellBasell Acetyls, LLC, LyondellBassell Advanced Polymers Inc. and Strike, LLC

22. Master Service Contract, dated May 29, 2014, by and between Medallion Midstream, LLC and Strike, LLC

23. Master Services Agreement No. 22000023199, dated September 9, 2016, by and between OXY USA, Inc., and Strike, LLC

24. Master Construction Services Agreement MCSA-MPJ-2011-00024, dated November 16, 2011, by and between Occidental Oil and Gas Corporation and Strike, LLC

25. Domestic Master Services Agreement 30000000121, dated May 1, 2014, by and between Oxy Midstream Strategic Development, LLC and Strike, LLC

26. Master Construction Services Agreement MCSA-MPJ-2011-00003, dated July 31, 2011, by and between Occidental Oil and Gas Corporation and Crossfire, LLC

27. General Terms and Conditions for Purchases that Include Services, dated June 12, 2019, by and between Public Service Company of North Carolina d/b/a Dominion Energy North Carolina and Strike, LLC d/b/a Capstone Energy Services

28. Master Services Agreement, dated June 18, 2018, by and between Sigma Equipment, LLC and Strike, LLC dba Bolt Instrumentation & Electrical

29. Master Services Agreement, dated October 30, 2018, by and between Silver Creek Midstream Holdings, LLC and Crossfire, LLC

30. Master Services and Supply Agreement, dated September 12, 2011, by and between Spartan Energy Services, LLC and Strike, LLC

31. Chubb Directors & Officers Liability, Fiduciary, Employment Practice Liability Insurance Policy, dated August 30, 2020

32. Beazley Directors & Officers Liability, Fiduciary, Employment Practice Liability Insurance Policy, dated August 30, 2020

33. RSUI Directors & Officers Liability, Fiduciary, Employment Practice Liability Insurance Policy, dated August 30, 2020

34. CNA Directors & Officers Liability, Fiduciary, Employment Practice Liability Insurance Policy, dated August 30, 2020

35. AIG Crime Insurance Policy, dated August 30, 2020

36. Indian Harbor (XL) Cyber Insurance Policy, dated August 30, 2020

37. Everest Re Surety Program, dated April 29, 2020

38. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Angela Goines

39. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Dario Deferrari

40. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Frank Victor-McCawley

41. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Gary Meurer

42. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Michael Smithey

43. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Rhonda Sigman

44. Third Amended and Restated Regulations of Strike Capital, LLC

45. Engagement Letter, dated June 22, 2020, by and between Guggenheim Securities, LLC and Strike, LLC (as amended on November 4, 2020)

46. Lease Agreement, dated October 7, 2018, between Crossfire, LLC and WWS, LLC, for the property located at 1820 Pyrite Rd, Casper, WY 82604, as amended on March 31, 2020 and September 24, 2020

47. Lease Agreement, executed as of November 5, 2014, between Strike, LLC and CNMK Texas Properties, LLC, for the property located at 1643 West Henderson, Unit A, Cleburne, TX 76033, as amended on February 19, 2018

48. Lease Agreement, dated September 27, 2016, between Strike, LLC and IDV VPID, LP, for the property located at 232 North Padre Island Drive, Corpus Christi, TX 78401, as amended on September 20, 2017

49. Lease Agreement, dated June 14, 2019, between Crossfire, LLC and the City of Durango, for the property located at 820 Airport Road, Durango, CO 81303

50. Lease Agreement, dated July 16, 2013, between Strike, LLC and HH One Hughes Landing, LLC, for the property located at 1800 Hughes Landing Blvd, Suites 400, 500 and 600, The Woodlands, TX 77380, as amended on September 4, 2013, February 3, 2014, May 6, 2014, and April 18, 2017

51. Sublease Agreement, dated December 28, 2018, by and between Layne Christensen Company, as sublessor, and Strike, LLC, as sublessee, pertaining to that certain real property located at 1800 Hughes Landing Blvd., Suite 700, The Woodlands, Texas 77380

52. Lease Agreement, dated July 25, 2017, between Strike, LLC and WOODLANDS-SAROFIM #1, LTD., for the property located at 1440 Lake Front Circle, Suite 150, The Woodlands, TX 77380, as amended on June 30, 2020

53. Reliant Stadium Suite Lease Agreement, dated August 1, 2012, by and between Strike, LLC and Houston NFL Holdings, L.P., as amended by that Second Addendum to NRG Stadium Suite Lease Agreement, dated October 1, 2015, by and between Strike, LLC and Houston NFL Holdings, L.P

54. Cherwell Order Confirmation, dated September 6, 2016, by and between Cherwell Software, LLC and Strike, LLC

55. Renewal Pricing Terms Confirmation Sheet, dated September 14, 2018, by and between Cherwell Software, LLC and Strike, LLC

56. Service Order, dated September 21, 2018, by and between InEight Inc. and Strike, LLC

57. Order Form, dated April 17, 2020, by and between InEight Inc. and Strike, LLC

58. NRG Stadium Suite License Agreement, dated September 21, 2020, by and between Houston Livestock Show and Rodeo, Inc. and Strike, LLC

59. Master Service Agreement, dated August 30, 2013, by and between CyrusOne, LLC and Strike, LLC.

4

### Section 3.04
### Capitalization

**(a)**

The Delta Distribution.

### Holders of Equity Interests of the Company Designated as Common Units

| Owner | Common Equity Units | Percent of Common Ownership |
|---|---|---|
| Pate Holding Company LP | 160,344.5816 | 23.8770% |
| Kacey Smart | 26,997.0311 | 4.0201% |
| Kacey Smart Family Ins. Trust | 3,100.0000 | 0.4616% |
| Jarvie Arnold | 30,097.0311 | 4.4818% |
| Jason Heckt | 11,214.2203 | 1.6699% |
| Aaron Cole Pate 2012 Trust | 19,846.8649 | 2.9554% |
| Sam Anaya | 611.3693 | 0.0910% |
| Steve Barton | 611.3693 | 0.0910% |
| Raul Garza | 611.3693 | 0.0910% |
| Angela Goines | 927.0980 | 0.1381% |
| Robert Boykin | 611.3693 | 0.0910% |
| Doug Jones | 3,697.9991 | 0.5507% |
| Delta Directional, LLC | 4,108.0283 | 0.6117% |
| OEP Strike, LLC | 390,386.3444 | 58.1326% |
| Ezra Lee | 10,373.2723 | 1.5447% |
| Pate Holding Company 3, LLC | 6,948.9483 | 1.0348% |
| Frank Victor-McCawley | 498.9050 | 0.0743% |
| Rhonda Sigman | 358.8465 | 0.0534% |
| Lee Gardner | 199.5136 | 0.0297% |

**(b)**

None.

**(c)(i)**

1.  Third Amended and Restated Regulations of Strike Capital, LLC.

2.  Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Aaron Cole Pate 2012 Trust (assumed by Strike Capital, LLC)

3.  Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Angela Goines (assumed by Strike Capital, LLC)

4.  Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Doug Jones (assumed by Strike Capital, LLC)

5.  Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Jarvie Arnold (assumed by Strike Capital, LLC)

NAI-1515649509v14

6. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Jason Heckt (assumed by Strike Capital, LLC)

7. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Kacey Smart (assumed by Strike Capital, LLC)

8. Voting and Equity Holder Agreement, dated October 1, 2020, by and between Pate Holding Company, LP, OEP Strike, LLC, Strike Capital, LLC, and Lee Gardner

9. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Raul Garza (assumed by Strike Capital, LLC)

10. Voting and Equity Holder Agreement, dated October 1, 2020, by and between Pate Holding Company, LP, OEP Strike, LLC, Strike Capital, LLC, and Rhonda Sigman

11. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Robert Boykin (assumed by Strike Capital, LLC)

12. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Sam Anaya (assumed by Strike Capital, LLC)

13. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Steve Barton (assumed by Strike Capital, LLC)

14. Voting and Equity Holder Agreement, dated June 30, 2014, by and between Pate Holding Company, LP, OEP Strike, LLC, Strike, LLC, Delta Directional, LLC, Billy Cleveland, and Tammy Cleveland (assumed by Strike Capital, LLC)

15. Strike Capital, LLC Gift Assignment of Units, dated June 1, 2018, by and between Kacey Smart and Smart 2014 Family Insurance Trust

16. Voting and Equity Holder Agreement, dated December 30, 2016, by and between Pate Holding Company, LP, OEP Strike, LLC, Strike Capital, LLC, and Ezra Lee

17. Voting and Equity Holder Agreement, dated December 30, 2016, by and between Pate Holding Company, LP, OEP Strike, LLC, Strike Capital, LLC, and Frank Victor-McCawley

**(c)(ii)**

1. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Aaron Cole Pate 2012 Trust (assumed by Strike Capital, LLC)

2. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Angela Goines (assumed by Strike Capital, LLC)

3. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Doug Jones (assumed by Strike Capital, LLC)

4. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Jarvie Arnold (assumed by Strike Capital, LLC)

5. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Jason Heckt (assumed by Strike Capital, LLC)

6. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Kacey Smart (assumed by Strike Capital, LLC)

7. Voting and Equity Holder Agreement, dated October 1, 2020, by and between Pate Holding Company, LP, OEP Strike, LLC, Strike Capital, LLC, and Lee Gardner

NAI-1515649509v14

8. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Raul Garza (assumed by Strike Capital, LLC)

9. Voting and Equity Holder Agreement, dated October 1, 2020, by and between Pate Holding Company, LP, OEP Strike, LLC, Strike Capital, LLC, and Rhonda Sigman

10. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Robert Boykin (assumed by Strike Capital, LLC)

11. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Sam Anaya (assumed by Strike Capital, LLC)

12. Member Voting Agreement, dated August 30, 2013, by and between Pate Holding Company, LP, Strike, LLC, and Steve Barton (assumed by Strike Capital, LLC)

13. Voting and Equity Holder Agreement, dated June 30, 2014, by and between Pate Holding Company, LP, OEP Strike, LLC, Strike, LLC, Delta Directional, LLC, Billy Cleveland, and Tammy Cleveland (assumed by Strike Capital, LLC)

14. Strike Capital, LLC Gift Assignment of Units, dated June 1, 2018, by and between Kacey Smart and Smart 2014 Family Insurance Trust

15. Voting and Equity Holder Agreement, dated December 30, 2016, by and between Pate Holding Company, LP, OEP Strike, LLC, Strike Capital, LLC, and Ezra Lee

16. Voting and Equity Holder Agreement, dated December 30, 2016, by and between Pate Holding Company, LP, OEP Strike, LLC, Strike Capital, LLC, and Frank Victor-McCawley

**(e)(i)**

| Entity | Equity Securities | Owners | Number Owned |
|---|---|---|---|
| Strike, LLC | Membership Interests | Strike Capital, LLC | 100% |
| Strike Global Holdings, LLC | Membership Interests | Strike, LLC | 100% |
| Capstone Infrastructure Services, LLC | Membership Interests | Strike, LLC | 100% |
| Delta Directional Drilling, LLC | Membership Interests | Strike, LLC | 100% |
| Crossfire, LLC | Membership Interests | Strike, LLC | 100% |
| Strike Cooperatief U.A. | N/A | Strike, LLC | 99.99% |
| | | Strike Global Holdings, LLC | 0.01% |
| Strike Energy B.V. | Ordinary Shares | Strike Cooperatief U.A | 100% |
| Strike Mexico S. de R.L.de C.V. | N/A | Strike Global Holdings, LLC | 0.01% |
| | | Strike Energy B.V. | 99.99% |

**(e)(ii)**

None.

**(e)(iii)**

7

None.

NAI-1515649509v14

**Section 3.05**
**Financial Statements; Accounts Receivable**

**(a)**

The audited consolidated financial statements for the Company Group for the fiscal year ended December 31, 2019 are attached hereto as Attachment 3.05(a)(i), the audited financial statements for the Company Group for the fiscal year ended December 31, 2018 are attached hereto as Attachment 3.05(a)(ii) and the unaudited financial statements as of November 30, 2020 and for the 11-month period ended November 30, 2020 are attached hereto as Attachment 3.05(a)(iii).

**(b)**

A list of accounts that have been delinquent for payments in excess of $50,000 or for more than 90 days is attached hereto as Attachment 3.05(b).

9

**Attachment 3.05(a)(i)**

**(see attached)**

# Strike Capital, LLC and Subsidiaries

Consolidated Financial Statements as of December 31, 2019 and 2018 and for the years
ended December 31, 2019 and 2018

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Report of Independent Auditors | 1 |
| Consolidated Balance Sheets | 2 |
| Consolidated Statements of Operations | 3 |
| Consolidated Statements of Changes in Members' Equity | 4 |
| Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6 |



Ernst & Young LLP
5 Houston Center 1401 McKinney
Street, Suite 1200,
Houston 77010

Tel: +1 713 750 1500
Fax: +1 713 750 1501
ey.com

**Building a better
working world**

**Report of Independent Auditors**

To the Board of Directors and Members of
Strike Capital, LLC and subsidiaries
The Woodlands, Texas

We have audited the accompanying consolidated financial statements of Strike Capital, LLC and subsidiaries, which comprise the consolidated balance sheets as of December 31, 2019 and 2018, and the related consolidated statements of operations, changes in members' equity and cash flows for the years then ended, and the related notes to the consolidated financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Strike Capital, LLC and subsidiaries at December 31, 2019 and 2018, and the results of their operations and their cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*Ernst & Young LLP*

Houston, Texas
April 9, 2020

## STRIKE CAPITAL, LLC AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS

| | | December 31, | |
|---|---|---|---|
| (in thousands ) | | **2019** | 2018 |
| **Assets** | | | |
| Cash and cash equivalents | $ | **14,644** $ | 1,031 |
| Accounts receivable, net | | **195,892** | 228,062 |
| Contract assets | | **35,950** | 141,607 |
| Inventory | | **4,849** | 4,549 |
| Prepaid expenses and other current assets | | **8,150** | 11,565 |
| Total current assets | | **259,485** | 386,814 |
| Property and equipment, net | | **85,592** | 95,533 |
| Goodwill | | **74,809** | 74,809 |
| Intangible assets, net | | **216,478** | 230,566 |
| Deferred loan costs, net | | **857** | 1,304 |
| Other long-term assets | | **1,376** | 1,481 |
| **Total assets** | | **638,597** | 790,507 |
| **Liabilities and members' equity** | | | |
| Accounts payable | $ | **159,998** $ | 173,264 |
| Accrued expenses | | **28,596** | 30,663 |
| Contract liabilities | | **38,895** | 38,804 |
| Current portion of long-term debt | | **24,382** | 24,140 |
| Total current liabilities | | **251,871** | 266,871 |
| Long-term debt, net of current portion | | **271,855** | 322,542 |
| Deferred income tax liability | | **110** | 68 |
| Deferred rent | | **2,836** | 3,510 |
| Total noncurrent liabilities | | **274,801** | 326,120 |
| Commitments and Contingencies (See Note 14) | | | |
| Members' equity | | **111,925** | 197,516 |
| **Total liabilities and members' equity** | $ | **638,597** $ | 790,507 |

*The accompanying notes are an integral part of these consolidated financial statements*

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| (in thousands) | | Year ended December 31, | |
| --- | --- | --- | --- |
| | | **2019** | 2018 |
| Revenue | $ | **1,763,695** | $ 1,697,570 |
| Cost of revenues | | **1,712,558** | 1,605,463 |
| Gross profit | | **51,137** | 92,107 |
| | | | |
| Payroll and payroll related costs | | **41,430** | 35,297 |
| Depreciation and amortization | | **23,331** | 23,754 |
| General and administrative | | **33,160** | 45,027 |
| (Gain) loss on sale of property and equipment | | **(3,395)** | (1,775) |
| Total operating expenses | | **94,526** | 102,303 |
| **Income (loss) from operations** | | **(43,389)** | (10,196) |
| Interest expense | | **(39,646)** | (41,504) |
| Other income | | **150** | 57 |
| **Income (loss) before taxes** | | **(82,885)** | (51,643) |
| Provision for income taxes | | **454** | 1,182 |
| **Net income (loss)** | $ | **(83,339)** | $ (52,825) |

*The accompanying notes are an integral part of these consolidated financial statements*

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY**

| (in thousands) | Total Members' Equity |
|---|---|
| Balance at January 1, 2018 | $ 258,048 |
| Cumulative effect of adoption, revenue recognition (Topic 606) | 1,500 |
| Net Loss | (52,825) |
| Distributions | (12,419) |
| Equity-based compensation | 3,212 |
| **Balance at December 31, 2018** | **$ 197,516** |
| **Net Loss** | **(83,339)** |
| **Distributions** | **(4,813)** |
| **Equity-based compensation** | **2,561** |
| **Balance at December 31, 2019** | **$ 111,925** |

*The accompanying notes are an integral part of these consolidated financial statements*

4

STRIKE CAPITAL, LLC AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF CASH FLOWS

| | | Year ended December 31, | |
|---|---|---|---|
| (in thousands) | | **2019** | 2018 |
| **Operating activities** | | | |
| Net income (loss) | $ | **(83,339)** $ | (52,825) |
| Adjustments to reconcile net (income) loss provided by operating activities: | | | |
| Non-cash items: | | | |
| Depreciation and amortization of property and equipment | | **25,548** | 24,683 |
| Amortization of intangible assets | | **14,088** | 11,065 |
| Amortization of deferred loan costs | | **3,852** | 3,640 |
| (Gain) loss on sales of property and equipment | | **(3,395)** | (1,775) |
| Provision for bad debt | | **3,455** | 446 |
| Equity-based compensation | | **2,561** | 3,212 |
| Changes in operating accounts: | | | |
| Accounts receivable | | **28,715** | 24,607 |
| Contract assets | | **105,657** | (33,700) |
| Inventory | | **(299)** | (1,916) |
| Prepaid expenses and other assets | | **7,147** | 2,884 |
| Accounts payable | | **(13,266)** | 7,962 |
| Taxes payable | | **42** | 6 |
| Accrued expenses | | **(2,069)** | 6,767 |
| Contract liabilities | | **91** | (11,469) |
| Deferred rent | | **(673)** | (734) |
| **Cash (used in) provided by operating activities** | $ | **88,115** $ | (17,147) |
| **Investing activities** | | | |
| Purchases of property and equipment | | **(25,378)** | (19,799) |
| Proceeds from disposal of property and equipment | | **13,166** | 4,164 |
| Cash paid for acquisition, net of cash acquired | | **-** | (4,157) |
| **Cash used in investing activities** | $ | **(12,212)** $ | (19,792) |
| **Financing activities** | | | |
| Payments for deferred loan costs | | **(1,291)** | (1,241) |
| Net repayments on revolving line of credit | | **(32,000)** | (8,000) |
| Principal payments on long-term debt | | **(24,186)** | (27,058) |
| Proceeds from long-term debt | | **-** | 75,000 |
| Distributions to members | | **(4,813)** | (12,419) |
| **Cash (used in) provided by financing activities** | $ | **(62,290)** $ | 26,282 |
| Net increase (decrease) in cash and cash equivalents | | **13,613** | (10,657) |
| Cash and cash equivalents at beginning of period | | **1,031** | 11,688 |
| **Cash and cash equivalents at end of period** | $ | **14,644** $ | 1,031 |
| **Supplemental information** | | | |
| Interest paid | $ | **36,070** $ | 40,178 |
| Income taxes paid | | **973** | 1,076 |
| Purchases of property and equipment through capital leases | | **-** | 28,666 |

*The accompanying notes are an integral part of these consolidated financial statements*

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## Note 1.  Description of Company

Strike Capital, LLC ("Strike", or the "Company") is a Texas limited liability company whose only assets is the 100% equity units of Strike, LLC. In August 2013, Strike, LLC became a portfolio company of One Equity Partners ("OEP"), a middle market private equity firm focused on the industrial, healthcare and technology sectors in North America and Europe.  In November 2016, Strike, LLC created a holding company, Strike Capital, LLC, and became a wholly-owned subsidiary of the holding company. There are no restrictions of cash flows between Strike Capital, LLC and Strike, LLC.

Strike is a nationwide provider of end-to-end pipeline, facilities, energy and civil infrastructure solutions. Strike offers a full complement of integrated engineering, construction, and maintenance, integrity, and specialty services to its diversified, long-standing client base, which includes some of the largest midstream and upstream companies in North America. Strike provides end-to-end support from initial construction to ongoing integrity, maintenance, engineering, design, program management and operations. Strike also provides construction services for large-scale pipeline and facility construction projects across the United States. With more than 30 locations across key U.S. energy markets, Strike is able to leverage local crews to deliver the regional terrain expertise, quick mobilization, and specialized service required for any project. Strike provides its clients with a single point of contact for the full scope of their infrastructure needs across the nation and throughout an asset's life cycle, from initial project engineering to ongoing support. Strike operates and reports its results under two reportable segments: (1) Infrastructure and Integrity Services ("IIS") and (2) Major Projects (see Note 17 for more information on reportable segments).

In May 2008, Strike, LLC acquired Pickett Measurement Systems, Inc. ("Pickett"), a measurement and fabrication services company specializing in skid-mounted measurement equipment.  In June 2014, Strike acquired substantially all of the assets of Delta Directional, LLC ("Delta"), a horizontal directional drilling contractor with rigs strategically located across the country. In June 2015, Strike acquired substantially all of the net assets of Circle K of Arkansas, Inc., an oil and gas construction company. In December 2016, Strike acquired Crossfire, LLC ("Crossfire"), a pipeline and facilities construction company offering a full suite of construction and infrastructure services operating in the Western region of the United States. The Crossfire acquisition cemented Strike as one of the largest service providers in the Permian Basin and bolstered its presence in the Rockies and Bakken regions.  In January 2018, Strike acquired substantially all of the assets of Capstone Energy Services, LLC ("Capstone"), a pipeline and facility construction service company within the Northeastern region of the United States. The Capstone acquisition solidified Strike's presence in the Utica and Marcellus shale plays.

The Company operates through multiple service and fabrication facilities principally located in Texas, New Mexico, Oklahoma, Pennsylvania, Mississippi, Colorado and Louisiana, with its corporate headquarters located in The Woodlands, Texas.

## Note 2.  Basis of Presentation and Significant Accounting Policies

*Common Control Transaction.*  As noted above, Strike, LLC created a holding company, Strike Capital, LLC, and became a wholly-owned subsidiary of the holding company in November 2016. This transaction was among entities under common control and did not result in a change in control. Therefore, it did not meet the definition of a business combination in accordance with Accounting Standard Codification ("ASC") 805, Business Combinations. Accordingly, the net assets have been recorded at historical cost basis.

### STRIKE CAPITAL, LLC
### NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

*Basis of Consolidation.* The accompanying consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP") and include Strike and its subsidiaries after elimination of intercompany balances and transactions. The Company's investments in other entities for which the Company does not have a controlling interest, but for which it has the ability to exert significant influence, are accounted for using the equity method of accounting. Equity method investments are recorded as other long-term assets. Income or loss from these investments is recorded as a separate line item in the statements of operations. Intercompany profits or losses associated with the Company's equity method investments are eliminated until realized by the investee in transactions with third parties.

*Use of Estimates.*  The presentation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions affecting the reported amounts in the consolidated financial statements and accompanying notes.  Such estimates include but are not limited to estimated cost to complete construction-type contracts using the percentage-of-completion method, net realizable value of inventory, estimated lives of depreciable assets, estimates related to fair value of reporting units for purposes of assessing goodwill and other indefinite-lived intangible assets for impairment, estimates related to deferred tax assets and liabilities including any related valuation allowances, and allocation of purchase price in business combinations.  While management believes that such estimates are reasonable when considered in conjunction with the Company's consolidated financial position and results of operations taken as a whole, actual results could differ materially from those estimates.

*Limitation of Members' Liability.*  Under the terms of the limited liability agreement, as amended, the members are not obligated for debt, obligations, or other liabilities of the Company.  Profits and losses are allocated to members based on their ownership interests.

**Significant Accounting Policies**

The following is a summary of significant accounting policies followed in the preparation of the accompanying consolidated financial statements.

*Revenue Recognition.* Revenue is derived from construction projects performed under master and other service agreements as well as from contracts for specific projects or jobs requiring the construction and installation of an entire infrastructure system or specified units within an entire infrastructure system.

On January 1, 2018, the Company adopted the requirements of Accounting Standards Update ("ASU") 2014-09, Revenue from Contracts with Customers, which is also referred to as Accounting Standards Codification ("ASC") Topic 606 ("606"), under the modified retrospective transition approach, with application to all existing contracts that were not substantially completed as of January 1, 2018. A cumulative effect adjustment of $1.5 million was made to the opening balance of retained earnings as of January 1, 2018 based on the difference between the recognition criteria under Topic 606 and the Company's previous revenue recognition practices under the previous revenue recognition guidance, ASC Topic 605-35.

Under Topic 606, revenue is recognized when, or as, control of promised goods and services is transferred to customers, and the amount of revenue recognized reflects the consideration to which an entity expects to be entitled in exchange for the goods and services transferred. Revenue is recognized by the Company primarily over time utilizing the cost-to-cost measure of progress for fixed price contracts and certain master service and other service agreements, consistent with the Company's previous revenue recognition practices. The Company concluded the cost-to-cost measure of progress best depicts the transfer of control of goods or services to the customer for these contracts.

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

*Contracts.* Revenue is derived from construction projects performed under master and other service agreements as well as from contracts for specific projects or jobs requiring the construction and installation of an entire infrastructure system or specified units within an entire infrastructure system. The Company frequently provides services under time and materials, unit price, cost-plus, or fixed price master service or other service agreements. Revenue and related costs for master and other service agreements billed on a time and materials basis are recognized as the services are rendered. The Company performs services under master and other service agreements on a fixed fee basis, under which Strike furnishes specified units of service for a fixed price per unit of service and revenue is recognized as the services are rendered.

Revenue from fixed price contracts provides for a fixed amount of revenue for the entire project, subject to certain additions for changed scope or specifications. Under unit-based contracts, Strike is compensated as units are completed based on pricing established with the customer for each delivered unit. The Company also performs services under master and service agreements on a cost-plus basis, under which Strike is paid for all of its allowed expenses plus an agreed percentage of profit. Revenue from these contracts, as well as for certain projects pursuant to master and other service agreements, is recognized over time using the percentage-of-completion method, under which the percentage of revenue to be recognized for a given project is measured by the percentage of costs incurred to date on the contract to the total estimated costs for the contract. Such contracts provide that the customer accept completion of progress to date and compensate the Company for services rendered, which may be measured in terms of costs incurred, units installed, hours expended or some other measure of progress.

Contract costs include all direct materials, labor and subcontracted costs and those indirect costs related to contract performance, such as indirect labor, supplies, tools, repairs and the operational costs of capital equipment. The estimation process for revenue recognized under the percentage-of-completion method is based on the professional knowledge and experience of the Company's project managers, engineers and financial professionals. Management reviews estimates of contract revenue and costs on an ongoing basis. Changes in job performance, job conditions and management's assessment of expected contract settlements are factors that influence estimates of total contract value and total costs to complete those contracts and, therefore, the Company's profit recognition. Changes in these factors may result in revisions to costs and income, and their effects are recognized in the period in which the revisions are determined, which could materially affect the Company's results of operations in the period in which such changes are recognized.

The timing of customer billings is generally dependent upon advance billing terms, milestone billings based on the completion of certain phases of the work, or when services are provided. Under the typical payment terms of master and other service agreements and fixed price contracts, the customer makes progress payments based on quantifiable measures of performance by the Company as defined by each specific agreement. Progress payments, generally net of amounts retained, are paid by the customer over the duration of the contract. Amounts billed and due from customers are classified within accounts receivable, net, in the consolidated balance sheets. Provisions for losses on uncompleted contracts are made in the period in which such losses are determined to be probable and the amount can be reasonably estimated.

During the years ended December 31, 2019 and 2018, the Company recognized revenue from its contracts with customers of $220.0 million and $198.0 million, respectively, on a time and materials basis, and $1,543.7 million and $1,500.0 million, respectively, on the basis of percentage-of-completion.

*Performance Obligations.* A performance obligation is a contractual promise to transfer a distinct good or service to a customer, and is the unit of account under Topic 606. The transaction price of a contract is allocated to each distinct performance obligation and recognized as revenue when or as the performance obligation is satisfied. The Company's contracts often require significant integration services, and even when delivering multiple distinct services, are generally accounted for as a single performance obligation. Contract amendments and change orders are generally not distinct from the existing contract and are accounted for as a modification of the existing contract and performance obligation. The majority of the Company's performance obligations are completed within one year.

8

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

When more than one contract is entered into with a customer on or close to the same date, the Company evaluates whether those contracts should be combined and accounted for as a single contract as well as whether those contracts should be accounted for as one, or more than one, performance obligation. This evaluation requires significant judgment and is based on the facts and circumstances of the various contracts.

Remaining performance obligations represent the amount of unearned transaction prices under contracts for which work is wholly or partially unperformed. As of December 31, 2019, the amount of the Company's remaining performance obligations was $531.4 million, of which the Company expects to recognize $401.4 million during the year ending December 31, 2020 and $130 million during the year ending December 31, 2021. As of December 31, 2018, the amount of the Company's remaining performance obligations was $801.8 million.

Additionally, Strike may incur incremental costs to obtain certain contracts, such as sales commissions and legal fees or initial set-up or mobilization costs, certain of which can be capitalized under the newly adopted revenue recognition guidance. As of December 31, 2019 and 2018, the Company capitalized mobilization costs of $0.5 million and $5.7 million, respectively, which are included in the accompanying balance sheet and will be amortized over the life of the associated contract.

*Variable Consideration.* Transaction prices for the Company's contracts may include variable consideration, which comprises items such as change orders, claims, incentives and liquidated damages. Change orders are modifications of an original contract, which effectively change deliverables under a contract. Either the Company or its customers and suppliers may initiate change orders. Change orders may include, among other things, changes in specifications or design, manner of performance, equipment, materials, scope of work, and/or the period of completion of the project. Management estimates variable consideration for a performance obligation utilizing estimation methods that best predict the amount of consideration to which the Company will be entitled. Variable consideration is included in the estimated transaction price to the extent it is probable that a significant reversal of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is resolved. Management's estimates of variable consideration and determination of whether to include estimated amounts in transaction price are based largely on past practices with the customer, specific discussions, correspondence or preliminary negotiations with the customer, legal opinions and all other relevant information that is reasonably available. The effect of variable consideration on the transaction price of a performance obligation is typically recognized as an adjustment to revenue on a cumulative catch-up basis. To the extent unapproved change orders, claims and liquidated damages reflected in transaction price are not resolved in the Company's favor, or to the extent incentives reflected in transaction price are not earned, there could be reductions in, or reversals of, previously recognized revenue.

As of December 31, 2019, the Company included approximately $0.2 million of unapproved change orders and/or claims in the transaction price for a pipeline project that is in the process of being resolved. This transaction price adjustment is included within contract assets. The Company actively engages with its customers to complete the final approval process, and generally expects these processes to be completed within one year. Amounts ultimately realized upon final acceptance by customers could be higher or lower than such estimated amounts. As of December 31, 2018, there were approximately $29.4 million of unapproved change orders and/or claims included in transaction price for certain contracts that were resolved during 2019.

*Contract Assets and Liabilities.* With respect to the Company's contracts, interim payments are typically received as work progresses in accordance with agreed-upon contractual terms, either at periodic intervals or upon achievement of contractual milestones. As a result, under fixed price contracts the timing of revenue recognition and contract billings results in contract assets and contract liabilities. Contract assets represent revenues recognized in excess of amounts billed for fixed price contracts and are current assets that are transferred to accounts receivable when billed or the billing rights become unconditional. Contract assets are not considered a significant financing component as the intent is to protect the customer in the event the Company does not perform on its obligations under the contract.

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Conversely, contract liabilities represent billings in excess of revenues recognized for fixed price contracts. These arise under certain contracts that allow for upfront payments from the customer or contain contractual billing milestones, which result in billings that exceed the amount of revenues recognized for certain periods. Contract liabilities are current liabilities and are not considered a significant financing component, as they are used to meet working capital requirements that are generally higher in the early stages of a contract and protect the Company from the other party failing to meet its obligations under the contract. Contract assets and liabilities are recorded on a performance obligation basis at the end of each reporting period.

Contract assets and liabilities consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| (in thousands) | **2019** | 2018 |
| Contract assets | $ **35,950** | $ 141,607 |
| Contract liabilities | **38,895** | 38,804 |

The decrease in contract assets for the year ended December 31, 2019, as compared to the year ended December 31, 2018, was due to large underbillings on certain construction projects at December 31, 2018 that were subsequently completed and billed in 2019. The decrease in contract liabilities was primarily due to normal fluctuations in the mix of projects and billing terms.

The Company recognizes unbilled receivables for non-fixed price contracts within "Accounts receivable" in certain circumstances, such as when revenues have been earned and recorded but we have an unconditional right to bill. As of December 31, 2019 and 2018, the Company had unbilled receivables related to these contracts of $10.6 million and $12.6 million, respectively, included in accounts receivable on the accompanying consolidated balance sheets.

*Accounts Receivable and Credit Policies.* Accounts receivable include third party obligations primarily under contracts described in the aforementioned "Revenue Recognition" policy due under terms specified in the contract, and generally subject to lien rights on the underlying construction projects. Typically, contract terms require payment within 30 days from the invoice date. Certain contracts provide for retainage, which is generally due upon completion of the contracts and acceptance by the customer but for which we have an unconditional right to receive payment. Based on the Company's experience, retainage balances are expected to be collected within the next twelve months. As of December 31, 2019 and 2018, the Company had retainage receivables of approximately $63.8 million and $62.2 million, respectively, included in accounts receivable on the accompanying consolidated balance sheets.

*Allowance for Doubtful Accounts.* The Company maintains an allowance for doubtful accounts for estimated losses resulting from the inability of its customers to make required payments and establishes an allowance for doubtful accounts for anticipated losses of its business units when a business unit has historical experience of losses in the ordinary course of business. In addition, an allowance is established when it is probable that a specific receivable is not collectible and the loss can be reasonably estimated. Amounts are written off against the allowance when they are considered to be uncollectible.

Management actively monitors the economic environment and its impact on the Company's customers and their creditworthiness in connection with its evaluation of the Company's accounts receivable portfolio and the adequacy of its allowance for doubtful accounts. The Company's billings are pursuant to contract provisions and contracts are with established companies; however, accounts receivable may be exposed to potential credit risk if the customers should encounter financial difficulties. The Company recorded an allowance for doubtful accounts of approximately $3.6 million and $0.9 million as of December 31, 2019 and 2018, respectively.

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

*Cash and Cash Equivalents.* All highly liquid investments purchased with an original maturity of three months or less are considered to be cash equivalents, which are carried at fair value. As of December 31, 2019 and 2018, the Company did not hold any cash equivalents.

*Inventories.* Inventories, including materials consumed in the construction process, are measured at the lower of cost or net realizable value, which is defined as the estimated selling price in the ordinary course of business, less reasonable predictable costs of completion, disposal, and transportation. Inventories consist primarily of parts and supplies held for use in the ordinary course of business. Technological or market changes can render certain materials obsolete. Allowances for inventory obsolescence are determined based upon specific facts and circumstances and market conditions. Management determined no allowance for slow-moving and obsolete items was necessary as of December 31, 2019 and 2018.

*Property and Equipment.* Property and equipment are stated at cost, or, if acquired in a business combination, at the acquisition date fair value. Depreciation is computed over the estimated useful lives of the related assets using the straight-line method. Leasehold improvements are depreciated over the shorter of the term of the lease or the estimated useful lives of the improvements. Property and equipment under capital leases are depreciated over their estimated useful lives. The cost and related accumulated depreciation of assets retired or otherwise disposed of are eliminated from the accounts, and any resulting gain or losses are recognized in operations in the year of disposal. The cost of routine repairs and maintenance are charged to expense as incurred; and significant renewals and improvements are capitalized. Identifiable intangible assets with estimated useful lives are amortized on a straight-line basis over the shorter of the estimated useful life or term of related agreements.

*Impairment of Long-Lived Assets.* The Company periodically evaluates the appropriateness of remaining depreciable lives assigned to long-lived assets. The assessment of possible impairment is based on the Company's ability to recover the carrying value of the asset or asset group from the expected undiscounted future pre-tax cash flows of the related operations. If these cash flows are less than the carrying value of such asset, an impairment loss is recognized for the difference between estimated fair value and carrying value. Fair values take into consideration management's estimates of risk-adjusted discount rates, which are believed to be consistent with assumptions that market participants would use in their estimates of fair value. The Company concluded there were no indicators evident or other circumstances present that these assets were not recoverable and accordingly, no impairment losses have been recognized for the periods presented.

*Goodwill and Indefinite-Lived Intangible Assets.* The Company has goodwill and certain indefinite-lived intangible assets that have been recorded in connection with its acquisitions of businesses. Goodwill represents the excess of acquisition consideration paid over the fair value of identifiable net tangible and identifiable intangible assets acquired. Goodwill and identifiable intangible assets with indefinite useful lives are tested for impairment annually. The Company performs its annual impairment tests of goodwill and indefinite-lived intangible assets during the fourth quarter of each year, and on a quarterly basis, management monitors these assets for potential impairment triggers. Goodwill is required to be tested for impairment at the reporting unit level. The Company tests goodwill at the reporting unit level which is the level for which there are distinct cash flows, products, capabilities and available financial information. The Company performs a qualitative assessment of the fair value of its reporting units before calculating the fair value of the reporting unit in step one of the two-step goodwill impairment model. If, through the qualitative assessment, the Company determines that it is more likely than not that the reporting unit's fair value is greater than its carrying value, the remaining impairment steps would be unnecessary.

In January 2017, the FASB issued guidance, which simplifies the accounting for goodwill impairment. The updated guidance eliminates Step 2 of the impairment test, which requires entities to calculate the implied fair value of goodwill to measure a goodwill impairment charge. Instead, entities will record an impairment charge based on the excess of a reporting unit's carrying amount over its fair value. Strike is required to adopt the guidance in the first quarter of fiscal year 2021 using a prospective approach. Earlier adoption is permitted. Strike early adopted this guidance as of January 1, 2018 and the implementation of this guidance did not have a material impact on its consolidated financial statements.

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Management has determined there are six reporting units for goodwill impairment analysis purposes. For each of the years ended December 31, 2019 and 2018, management performed an annual impairment test of its goodwill and indefinite-lived intangible assets by examining relevant events and circumstances that could have an effect on their fair values, such as: macroeconomic conditions, industry and market conditions, entity-specific events, financial performance and other relevant factors or events that could affect earnings and cash flows.

Based on the qualitative analysis performed and due to significant losses in the Major Projects reporting unit, the Company performed a quantitative impairment analysis of the Major Projects reporting unit during the fourth quarter of 2019.

The estimated fair value of the Major Projects reporting unit was based on a combination of income and market approaches. Under the market approach, fair values were estimated using published market multiples for comparable companies. Under the income approach, a discounted cash flow methodology was used, including: (i) management estimates, such as projections of revenue, operating costs and cash flows, taking into consideration historical and anticipated financial results; (ii) general economic and market conditions and (iii) the impact of planned business and operational strategies. Estimated discounts rates were determined using our average cost of capital at time of the analysis, taking into consideration the risks inherent within the reporting unit individually, which are greater than the risks inherent to the Company as a whole. Significant assumptions used in testing the reporting unit included a downward revenue adjustment in 2020 with subsequent annual growth rate of 3.0% with constant margins, terminal values based on a terminal growth rate of 2.0% of revenue, which is consistent with historical results, prior assumptions used in the past analyses, and in line with guideline public company data. We believe the assumptions used in our quantitative goodwill impairment tests are reflective of the risks inherent in the business models of our reporting units and within our industry.

Based on the results of the quantitative assessment, the Company reached the conclusion that there is no impairment in 2019 as the estimated fair value of the Major Projects reporting segment was determined to exceed its carrying value. Further, the Company's qualitative analysis over the remaining five reporting units indicated that it was not more likely than not that the fair value was less than their respective carrying amounts.

*Deferred Loan Costs.* Debt issuance costs, net of amortization, are recorded as a reduction from the debt's carrying value on the balance sheet. For line of credit arrangements, debt issuance costs are stated net of amortization as an asset on the balance sheet. Debt issuance costs are amortized over the term of the arrangements. Amortization of deferred loan costs of $3.9 million and $3.6 million were recorded for the years ended December 31, 2019 and 2018, respectively. Deferred loan costs, net of accumulated amortization, totaled $9.8 million and $12.4 million as of December 31, 2019 and 2018, respectively.

*Concentration of Credit Risk.* Financial instruments that potentially subject the Company to credit risk are cash and cash equivalents and accounts receivable. Cash balances are maintained in financial institutions which at times exceed federally insured limits. The Company monitors the financial condition of the financial institutions in which accounts are maintained and has not experienced any losses in such accounts. The Company performs ongoing credit evaluations as to the financial condition of its customers with respect to receivables. Generally, no collateral is required as a condition of sale. The Company's consideration of allowance for doubtful accounts is based upon current market conditions and other factors.

*Product Warranties.* The Company provides a warranty for a period of time based on the terms of each contract. The Company recorded an accrual of associated with warranty costs of approximately $2.3 million and $2.5 million as of December 31, 2019 and 2018, respectively.

*Fair Value Measurements.* From time to time, the Company may record financial assets and financial liabilities at fair value. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly

12

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

transaction between market participants at the measurement date. These fair value measurements incorporate nonperformance risk (i.e., the risk that an obligation will not be fulfilled). In measuring fair value, the Company reflects the impact of credit risk on liabilities, as well as any collateral. The Company also considers the credit standing of counterparties in measuring the fair value of assets.

The Company uses any of three valuation techniques to measure fair value: the market approach, the income approach, and the cost approach in determining the appropriate valuation technique based on the nature of the asset or liability being measured and the reliability of the inputs used in arriving at fair value.

The inputs used in applying valuation techniques include assumptions that market participants would use in pricing the asset or liability (i.e., assumptions about risk). Inputs may be observable or unobservable. The Company uses observable inputs in the Company's valuation techniques, and classifies those inputs in accordance with the fair value hierarchy establish by applicable accounting guidance, which prioritizes those inputs. The fair value hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to unobservable inputs (Level 3 measurements).

The three levels are defined as follows:

Level 1 – Inputs to the valuation methodology are quoted prices (unadjusted) for identical assets or liabilities in active markets.

Level 2 – Inputs to the valuation methodology include quoted pries for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

Level 3 – Inputs to the valuation methodology are unobservable and significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement. The Company's assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment and considers factors specific to the asset or liability.

*Fair Value of Financial Instruments.* The Company's financial instruments consist primarily of cash, accounts receivable, equity investments, accounts payable and other current liabilities, and debt obligations.

Fair value is the price that would be received to sell an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. The fair value guidance establishes a valuation hierarchy, which requires maximizing the use of observable inputs when measuring fair value. In instances in which the inputs used to measure fair value fall into different levels of the fair value hierarchy, the fair value measurement classification is determined based on the lowest level input that is significant to the fair value measurement in its entirety. Management's assessment of the significance of a particular item to the fair value measurement in its entirety requires judgment, including the consideration of inputs specific to the asset or liability.

Fair values of financial instruments are estimated using public market prices, quotes from financial institutions and other available information. The fair value of the Company's short-term financial assets and liabilities approximates their carrying value represented in the balance sheets principally due to the short-term nature of these instruments. The fair value of the Company's long-term equipment notes approximate carrying value based on their effective interest rates compared to current market rates. The carrying amounts of the revolving loan and term loan debt approximate fair value because those financial instruments bear interest at variable rates that approximate current market rates for loans with similar maturities and credit quality.

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

*Derivative Instruments.* Derivatives are recognized in the consolidated balance sheets at fair value, with classification as current or noncurrent based upon the maturity of the derivative instruments. Changes in the fair value of derivative instruments are recorded in current earnings. Cash flows from derivative contracts are reported in the consolidated statement of cash flows in the same categories as the cash flows from the underlying transactions. The primary risk associated with interest rate swaps is the ability of third parties to meet their obligations under the terms of the contracts. The Company does not anticipate nonperformance by third parties. The Company had no derivatives outstanding as of December 31, 2019 or 2018.

*Assets and Liabilities Measured at Fair Value on a Non-Recurring Basis.* Assets and liabilities recognized or disclosed at fair value on a non-recurring basis, for which remeasurement occurs in the event of an impairment or other measurement event, if applicable, may include items such as equity investments, long-lived assets, goodwill, and other intangible assets.

*Valuation of Net Assets Acquired.* The determination of the fair value of net assets acquired in a business combination requires estimates and judgments of future cash flow expectations for the acquired business and the related identifiable tangible and intangible assets. Fair values are calculated using expected cash flows and industry-standard valuation techniques. For current assets and current liabilities, book value is generally assumed to equal fair value. Goodwill is the amount by which consideration paid exceeds the fair value of acquired net assets. Acquisition costs, including acquisition integration costs, are expensed as incurred and are included within general and administrative expenses in the consolidated statements of operations.

Due to the time required to gather and analyze the necessary data for each acquisition, U.S. GAAP provides a "measurement period" of up to one year in which to finalize these fair value determinations. During the measurement period, preliminary fair value estimates may be revised if new information is obtained about the facts and circumstances existing as of the date of acquisition based on the final net assets and net working capital of the acquired business, as prescribed in the applicable purchase agreements. Such adjustments may result in the recognition of, or adjust the fair values of, acquisition-related assets and liabilities and/or consideration paid. There were no such adjustments recorded during the year ended December 31, 2019 or for the year ended December 31, 2018. Fair value adjustments resulting from circumstances that developed after the date of acquisition are reflected as income or expense, as appropriate, in the period the adjustment is considered probable.

*Investments in Affiliates.* Investments in entities of which the Company is not the primary beneficiary, but over which the Company has the ability to exercise significant influence, are accounted for using the equity method of accounting. The Company's share of net income or losses from unconsolidated equity investments is included in equity in earnings (losses) of unconsolidated affiliates in the consolidated statements of operations when applicable. Equity investments are reviewed for impairment by assessing whether any decline in the fair value of the investment below the carrying value is other than temporary. In making this determination, factors such as the ability to recover the carrying amount of the investment and the inability of the investee to sustain an earnings capacity are evaluated in determining whether a loss in value should be recognized. Any impairment losses related to investments would be recognized in other expense. Equity method investments are carried at original cost and are included in Investment in Affiliate in the consolidated balance sheet and are adjusted for the Company's proportionate share of the investees' income, losses and distributions. The Company had no equity method investments as of December 31, 2019 or 2018.

*Income Taxes.* As a limited liability company, the Company has elected to be taxed as a partnership and is not subject to federal income taxes, as components of its income and expenses flow through directly to the members. Accordingly, no provision for federal income taxes has been reflected in these consolidated financial statements. However, the Company is subject to state income taxes in various states in which it operates.

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The liability method is used in accounting for deferred income taxes. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial reporting and tax basis of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when these differences are expected to reverse. The realizability of deferred tax assets is evaluated annually and a valuation allowance is provided if it is more likely than not that the deferred tax assets will not give rise to future benefits.

The Company follows guidance issued by the FASB which clarifies accounting for uncertainty in income taxes by prescribing the minimum recognition threshold an income tax position is required to meet before being recognized in the financial statements and applies to all income tax positions. Each income tax position is assessed using a two-step process. A determination is first made as to whether it is more likely than not that the income tax position will be sustained, based upon technical merits, upon examination by the taxing authorities. If the income tax position is expected to meet the more likely than not criteria, the benefit recorded in the financial statements equals the largest amount that is greater than 50% likely to be realized upon its ultimate settlement.

In accordance with this guidance, the Company has elected to record income tax related interest and penalties, if any, as a component in the provision of income tax expense. For the years ended December 31, 2019 and 2018 the Company incurred no material income tax related interest or penalties. The Company completed its analysis of its tax positions and believes there are no uncertain tax positions that would require recognition in the consolidated financial statements as of December 31, 2019 and 2018. The Company believes that there are no tax positions taken or expected to be taken that would significantly increase or decrease unrecognized tax benefits within the next twelve months. The Company is subject to federal tax examinations for 2016 and later years. The Company is also subject to state tax examinations for years 2015 and later. There are no income tax examinations currently in process.

*Equity-Based Compensation.* As of December 31, 2019 and 2018, the Company had certain member units issued and outstanding related to an acquisition completed in 2014. As and when approved by the Board of Directors, the Company shall distribute to the holder of the units a preferred distribution, plus any unpaid return calculated at the remaining unpaid balance, multiplied by an applicable rate of 8% per annum through June 30, 2019 and 12% thereafter. The units required the holder to remain employed by the Company for a period of five years from the date of acquisition; otherwise, the distribution will be reduced pro-rata based on the number of calendar quarters remaining in the five-year period. The preferred distribution is recorded as equity-based compensation expense in the accompanying consolidated statement of operations. Refer to Note 11. Members' Equity for additional information.

*Self-Insurance.* The Company is insured for employer's liability, workers' compensation, auto liability and general liability claims. Under these programs, the deductible for workers' compensation is $5,000 per occurrence. The Company has no deductibles for auto liability and general liability. The Company also has employee health care benefit plans for most employees, of which the primary plan is subject to a deductible of $1,000 per claimant per year.

The Company's self-insurance liability is reflected in the consolidated balance sheets within current liabilities. The determination of such claims and expenses and the appropriateness of the related liability is reviewed and updated quarterly, however, these insurance liabilities are difficult to assess and estimate due to unknown factors, including the severity of an injury, the determination of the Company's liability in proportion to other parties and the number of incidents not reported. Accruals are based upon known facts and historical trends. Although management believes its accruals are adequate, a change in experience or actuarial assumptions could materially affect the Company's results of operations in a particular period.

*Litigation and Contingencies.* Accruals for litigation and contingencies are reflected in the consolidated financial statements based on management's assessment, including advice from legal counsel, of the expected outcome of litigation or other dispute resolution proceedings and/or the expected resolution of contingencies. Liabilities for estimated losses are accrued if the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated. Significant judgment is required in both the determination of probability of loss and the determination as to whether the amount is reasonably estimable. Accruals are based only on information

15

STRIKE CAPITAL, LLC
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

available at the time of the assessment due to the uncertain nature of such matters. As additional information becomes available, management reassesses potential liabilities related to pending claims and litigation and may revise its previous estimates, which could materially affect the Company's results of operations in a given period.

*Going Concern.* Management evaluates for each annual reporting period whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year after the date the financial statements are issued, and has concluded there are no such events for the current reporting period.

**Note 3.  Recently Issued Accounting Standards**

See the revenue recognition discussion within Significant Accounting Policies above, and the recently issued accounting standards discussion below for information pertaining to the effects of recently adopted and other recently issued accounting standards.

In August 2018, the FASB issued an update that aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). Entities can choose to adopt the new guidance prospectively or retrospectively. This update is effective for interim and annual periods beginning after December 15, 2019, and early adoption is permitted. The Company does not expect this update to materially impact its consolidated financial statements and will adopt the new standard by January 1, 2020.

In June 2018, the FASB issued guidance, which expands the guidance in Topic 718 to include share-based payments for goods and services to nonemployees and generally aligns it with the guidance for share-based payments to employees. This standard is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2019, with early adoption permitted. The Company is currently evaluating the effect of this ASU on its consolidated financial statements.

In February 2016, the FASB issued guidance which requires the recognition of operating lease right-of-use assets and the corresponding lease liabilities on the balance sheet. The new guidance has been deferred and is now effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2020, with early adoption permitted. The Company will adopt this guidance as of January 1, 2021, and will adopt the new guidance using the transition method that allows entities to initially apply the new standard as of the date of adoption and recognize a cumulative effect adjustment to the opening balance of retained earnings as of that date. In addition, the Company will utilize the package of practical expedients that allows entities to retain the classification of lease contracts existing as of the date of adoption.

The Company is currently completing its assessment of the new guidance on its consolidated financial statements, business processes, systems and controls. The standard is expected to have a material impact on the Company's consolidated balance sheets, but will not have a material impact on the Company's consolidated income statements. The most significant impact is expected to be the recognition of right-of-use ("ROU") assets and lease liabilities for operating leases, while the accounting for finance leases remained substantially unchanged.

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### Note 4.  Goodwill and Other Intangible Assets

The following table provides a reconciliation of changes in goodwill for the periods indicated:

| (in thousands) | Goodwill |
|---|---|
| Balance at December 31, 2017 | 63,216 |
| Acquisitions | 11,593 |
| Balance at December 31, 2018 | 74,809 |
| Balance at December 31, 2019 | $ 74,809 |

The following table provides a reconciliation of changes in identifiable intangible assets for the periods indicated:

| Identifiable Intangible Assets | As of December 31, 2019 | | | As of December 31, 2018 | | | As of December 31, 2019 |
|---|---|---|---|---|---|---|---|
| (in thousands) | Intangible Assets | Accumulated Amortization | Intangible Assets, Net | Intangible Assets | Accumulated Amortization | Intangible Assets, Net | Remaining weighted average amortization in years |
| **Amortizing** | | | | | | | |
| Trade Names | $ 10,150 | $ (3,200) | $ 6,950 | $ 10,150 | $ (2,180) | $ 7,970 | 6.99 |
| Backlog | - | - | - | (3,600) | 3,600 | - | - |
| Customer Relationships | 190,490 | (79,105) | 111,385 | 190,490 | (66,037) | 124,453 | 8.57 |
| Software | 4,330 | (4,330) | - | 4,330 | (4,330) | - | - |
| **Non-amortizing** | | | | | | | |
| Trade names | 98,143 | - | 98,143 | 98,143 | - | 98,143 | N/A |
| Total identifiable intangible assets | $ 303,113 | $ (86,635) | $ 216,478 | $ 299,513 | $ (68,947) | $ 230,566 | |

All definite-lived intangibles are amortized using the straight-line method of amortization based upon the estimated useful life of the asset. The expense is included in depreciation and amortization expense in the consolidated statement of operations.

The Company did not have any impairment of amortizable long-lived assets for the years ending December 31, 2019 and 2018.

Amortization expense associated with intangible assets for the years ended December 31, 2019 and 2018 totaled $14.1 million and $11.1 million, respectively. The assumed backlog from the Capstone acquisition (Note 5) of $3.6 million was fully amortized to revenue during the year ended December 31, 2018. Expected future amortization expense as of December 31, 2019 is summarized in the following table:

| (in thousands) | Amortization expense |
|---|---|
| 2020 | $ 14,088 |
| 2021 | 14,088 |
| 2022 | 14,088 |
| 2023 | 14,088 |
| 2024 | 13,898 |
| Thereafter | 48,085 |
| Total | $ 118,335 |

STRIKE CAPITAL, LLC
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

### Note 5.  Business Combinations

*Capstone Acquisition.* On December 31, 2016, the Company obtained a 44% membership interest in Capstone.  Capstone provides maintenance and construction activities for the oil and natural gas industry primarily in Pennsylvania and Ohio. The Company accounted for its investment in Capstone as an equity method investment.

On January 1, 2018, the Company entered into an exchange and redemption agreement with the majority owner of Capstone whereby the Company exchanged its 44% ownership and paid approximately $4.2 million cash and acquired certain assets of Capstone for an aggregate purchase consideration of approximately $12.1 million. This asset acquisition was accounted for as a business combination and the results of the acquired business have been included in the Company's consolidated financial statements since the acquisition date. As of December 31, 2018, the Company had finalized its assessment of the fair values of the acquired assets and assumed liabilities related to the acquired business and an adjustment to the purchase price allocation was recorded allocating goodwill to specifically identifiable intangible assets.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date:

**Fair value of assets acquired and liabilities assumed:**
*(in thousands)*

| | | |
|---|---|---:|
| Property and equipment | $ | 3,116 |
| Identifiable intangible assets | | 3,900 |
| Current liabilities | | (6,515) |
| Total identifiable net assets | | 501 |
| Goodwill | | 11,593 |
| Total purchase consideration | $ | 12,094 |

The excess of purchase price over the fair value amounts assigned to the assets acquired and liabilities assumed represents the goodwill amount resulting from the acquisition. Goodwill attributable to the acquisition has been recorded as a non-current asset and is not amortized, but is subject to review at least on an annual basis for impairment. Goodwill recognized was primarily attributable to expected operating efficiencies and expansion opportunities in the businesses acquired. Goodwill and intangible assets recognized from the acquisition are expected to be tax deductible.

The following table summarizes the estimated fair values of identifiable intangible assets for the Capstone acquisition as of the acquisition date and the related weighted average amortization periods by type.

| *(in thousands)* | Estimated Fair Value | Weighted Average Amortization Period in Years |
|---|---:|---:|
| Customer relationships | $   5,800 | 10 |
| Backlog | (3,600) | 1 |
| Trade name | 1,700 | 10 |
| Total identifiable intangible assets | $   3,900 | |

## STRIKE CAPITAL, LLC
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

### Note 6.  Accounts Receivable, Net Of Allowance

The following table provides details of accounts receivable, net of allowance, as of the dates indicated:

| Accounts receivable, net of allowance | December 31, | |
| --- | --- | --- |
| (in thousands) | **2019** | 2018 |
| Contract billings | $ **125,201** | $ 154,180 |
| Retainage | **63,752** | 62,170 |
| Unbilled receivables | **10,561** | 12,600 |
| Total accounts receivable | $ **199,514** | $ 228,950 |
| Less allowance for doubtful accounts | **(3,622)** | (888) |
| Total accounts receivable, net | $ **195,892** | $ 228,062 |

Retainage, which has been billed, but is not due until completion of performance and acceptance by customers, is expected to be collected within one year.

The Company's billings are pursuant to contract provisions and contracts are with established companies; however, accounts receivable may be exposed to potential credit risk if our customers should encounter financial difficulties.  The Company recorded an allowance for doubtful accounts of approximately $3.6 million and $0.9 million as of December 31, 2019 and 2018, respectively. Bad debt expense for the years ended December 31, 2019 and 2018 was approximately $0.2 million and $0.4 million, respectively.

### Note 7. Inventories

The following table provides details of inventory by major class as of the dates indicated:

| Inventory by Major Class | As of December 31, | |
| --- | --- | --- |
| (in thousands) | **2019** | 2018 |
| Raw materials | $ **3,200** | $ 2,868 |
| Finished goods | **1,526** | 1,617 |
| Other | **123** | 64 |
| Total inventories | $ **4,849** | $ 4,549 |

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### Note 8. Costs and Estimated Profit on Uncompleted Contracts

The following table provides details of cost and estimated profit on uncompleted contracts as of the dates indicated:

| | As of December 31, | |
|---|---|---|
| *(in thousands)* | **2019** | 2018 |
| Costs incurred on uncompleted contracts to date | $ 2,279,672 | $ 2,460,792 |
| Estimated earnings to date | 104,643 | 168,911 |
| Contract revenues earned to date | $ 2,384,315 | $ 2,629,703 |
| Less: billings to date | 2,387,260 | 2,526,900 |
| Total net contract assets | (2,945) | 102,803 |

Included in the accompanying consolidated balance sheets under the following captions:

| | As of December 31, | |
|---|---|---|
| *(in thousands)* | **2019** | 2018 |
| Contract assets | $ 35,950 | $ 141,607 |
| Contract liabilities | (38,895) | (38,804) |
| Total net contract assets | (2,945) | 102,803 |

The Company had total contract values of approximately $2,605.2 million and $3,362.7 million related to uncompleted contracts, including approved change orders at December 31, 2019 and 2018, respectively. The contracts were in various stages of completion at these respective dates.

### Note 9.  Property and Equipment, Net

The following table provides details of property and equipment, net, including property and equipment held under capital leases as of the dates indicated:

**Property and equipment, net**

| | | December 31, | |
|---|---|---|---|
| *(in thousands)* | Estimated Useful Lives | **2019** | 2018 |
| Furniture, fixtures, and data processing equipment | 1 - 7 | $ 32,440 | $ 27,706 |
| Leasehold improvement | Lesser of userful life or lease term | 23,271 | 23,669 |
| Machinery and equipment | 5 - 10 | 72,380 | 84,816 |
| Construction mats | 2 | 6,272 | 2,994 |
| Vehicles | 2 - 7 | 19,840 | 21,052 |
| Construction-in-process | | 5,477 | 895 |
| Total property and equipment | | 159,680 | 161,132 |
| Less acummulated depreciation and amortization | | (74,088) | (65,599) |
| Total property and equipment, net | | $ 85,592 | $ 95,533 |

For the years ended December 31, 2019 and 2018, total depreciation and amortization expense, including amortization of assets recorded under capital leases, totaled approximately $25.5 million and $24.7 million, respectively.  This amount is inclusive of depreciation and amortization expense reported in "Costs of revenues earned" in the accompanying consolidated statements of operations of approximately $16.3 million and $15.6 million, respectively.

STRIKE CAPITAL, LLC
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

### Note 10. Long-Term Debt

The following table provides details of debt as of the dates indicated:

| Long-term debt (in thousands) | Rate | December 31, | |
|---|---|---|---|
| | | 2019 | 2018 |
| ABL loan | | $         - | $      32,000 |
| Term loan: $325 million | | 279,605 | 296,053 |
| Capital leases | 2.15% - 7.99% | 21,971 | 27,268 |
| Short-term financing | 3.5% - 4.4% | 3,627 | 2,440 |
| Debt issuance costs and unamortized discount on debt | | (8,966) | (11,079) |
| Total debt | | 296,237 | 346,682 |
| Less current portion | | (24,382) | (24,140) |
| Total long-term debt | | $    271,855 | $    322,542 |

Required principal payments on long-term debt and capital leases as of December 31, 2019 are as follows:

| (in thousands) | |
|---|---|
| 2020 | $      24,382 |
| 2021 | 21,055 |
| 2022 | 259,766 |
| 2023 | - |
| 2024 | - |
| Thereafter | - |
| Total | $    305,203 |

*Term Loan.* On November 30, 2016, the Company entered into a $250 million term loan and $100 million letter of credit facility agreement (Term Loan Agreement) with Bank of America, N.A., as administrative agent, and certain financial institutions as lenders. The term loan bears interest at LIBOR plus an applicable margin and is due quarterly. Principal payments of $3.1 million are due quarterly with all unpaid principal and interest due on November 30, 2022, the term loan maturity date. In addition to interest on any borrowings on the letter of credit facility, the Company is also assessed an unused line fee and a facility fee. The term loan and letter of credit facility agreement is secured by all assets of the Company. On December 30, 2016, the letter of credit facility was increased to $110 million. The letter of credit commitment expired on August 31, 2018. Thereafter, all letters of credit are drawn from the ABL loan discussed below.

On March 27, 2018, the Company entered into an incremental term loan of $75 million in accordance with the Term Loan Agreement. As a result of the incremental term loan, principal payments of $4.1 million are due quarterly with all unpaid principal and interest due on November 30, 2022, the term loan maturity date. The interest rate was 10.064% (inclusive of the applicable margin) as of December 31, 2019.

The credit agreement has certain restrictive and financial covenants including a net leverage covenant. Effective April 9, 2020, the Company amended the terms of its term loan credit agreement to modify certain terms, including the net leverage covenant, and install a minimum liquidity threshold. The Company was in compliance with these covenants as of the date of this report.

*ABL.* On November 30, 2016, the Company entered into its ABL Loan and Security Agreement (ABL) with Bank of America, N.A., as administrative agent, and certain financial institutions as lenders. The ABL was amended on March 23, 2018 (Amendment No. 1) and November 14, 2018 (Amended ABL Credit Agreement.) The Amended ABL Credit

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Agreement provides a revolver commitment up to $100 million and bears interest at LIBOR plus a floating applicable margin, which was 6.5% (inclusive of the applicable margin) as of December 31, 2019. The ABL termination date is November 30, 2021. The Amended ABL Credit Agreement includes customary restrictive covenants regarding indebtedness, sales of assets, liens, and investments, among other restrictions. In addition to interest, the ABL also includes an unused line fee and letter of credit facility fees.

The Amended ABL Credit Agreement requires that the Company maintain a fixed charge coverage ratio of at least 1.0 to 1.0 as of each fiscal quarter end while a trigger period is in effect. A trigger period is the period (a) commencing on the day that excess availability is less than the greater of (i) $10.0 million or (ii) 10.0% of availability, and (b) continuing until, during the preceding 30 consecutive days, excess availability has been at all times more than the greater of (i) $10.0 million and (ii) 10.0% of availability. No such trigger period has occurred during the year ended December 31, 2019.

As of December 31, 2019, the Company had no letters of credit outstanding under the Amended ABL Credit Agreement. As of December 31, 2018, the Company had approximately $23.7 million of letters of credit outstanding under the Amended ABL Credit Agreement.

As of December 31, 2019, we had $100 million of available credit under the ABL Credit Agreement.

Debt issuance costs associated with line of credit arrangements are classified as an asset and all other debt issuance costs are recorded as a reduction to the long-term debt balance on the consolidated balance sheets. Debt issuance costs are amortized over the term of the arrangements.

As of December 31, 2019 and 2018, accrued interest payable, which is recorded within accrued expenses in the consolidated balance sheets, totaled $0.4 million and $0.7 million, respectively.

### Note 11. Members' Equity and Unit-Based Compensation

*Member Units.* In accordance with the Company's limited liability agreement, as amended, the Company has 1,000,000 member units authorized, 671,544 and 663,889 member units issued and outstanding as of December 31, 2019 and 2018, respectively. Additionally, under the terms of the agreement, within 90 days following year end, a minimum annual distribution of $2.0 million is to be paid to certain members of the Company pro rata based on the number of member units held by each. Following payment of the annual minimum distribution amount, all other distributions, including upon any dissolution, liquidation or termination of the Company, are to be paid out in accordance with the terms of the agreement.

*Delta Units.* In connection with the purchase of substantially all of the assets of Delta Directional, LLC in 2014, the Company issued 4,108 member units to the seller. As and when approved its Board of Directors, the Company shall distribute to the holder of these units a preferred distribution of $9.0 million, plus any unpaid priority return calculated at the remaining unpaid balance multiplied by an applicable rate of 8% per annum through June 30, 2019 and 12% thereafter. The Delta units also require the holder to remain employed by the Company for a period of five years from the date of the acquisition; otherwise the distribution will be reduced pro rata based on number of calendar quarters remaining in the five-year period. Since the $9.0 million payment is contingent on the holder remaining employed by the Company, the preferred distribution was recorded as share-based compensation expense ratably over the five-year period. During the years ended December 31, 2019 and 2018, the Company recognized equity-based compensation expense of approximately $2.5 million and $3.2 million, respectively.

*Phantom and Junior Units.* Effective August 30, 2013, the Company adopted the Strike LLC Phantom Unit Plan. The combined aggregate number of Junior Units and Phantom Units available to be issued were not to exceed 100,000. As of December 31, 2018, the Company had 47,626 Junior Units issued and outstanding. Of the Junior Units issued, 32,355 were immediately vested. The remaining Junior Units vested at 20% annually. A Phantom Unit under this plan

22

STRIKE CAPITAL, LLC
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

represented a hypothetical Junior Unit and would vest only upon the consummation of the sale of the Company. As of December 31, 2018, 22,650 Phantom Units under this plan were issued and outstanding, respectively. Holders of Junior Units and Phantom Units did not have voting rights on any matters. No value was reflected in the financial statements for these Phantom Units because the units would not vest until the occurrence of a sale of the Company. During 2019, the Strike LLC Phantom Unit Plan was terminated by the Company. The phantom award agreements issued under such Phantom Unit Plan were also terminated in exchange for certain cash-retention bonus awards. During 2019, the Company also repurchased certain Junior Units and converted Junior Units held by certain individuals to member units. As of December 31, 2019, the Company had zero Junior Units and Phantom Units issued and outstanding under the Strike LLC Phantom Unit Plan. After the Strike LLC Phantom Unit Plan was terminated, the Company adopted the Strike Capital LLC 2019 Phantom Unit Plan, effective October 28, 2019. The combined aggregate number of Phantom Units available to be issued under this Plan were not to exceed 50,000. A Phantom Unit under this plan represents a hypothetical member unit and would vest only upon the consummation of a sale of the Company. As of December 31, 2019, the Company had 19,902 Phantom Units issued and outstanding, respectively. Holders of these Phantom Units do not have voting rights on any matters. No value was reflected in the financial statements for these Phantom Units because the units would not vest until the occurrence of a sale of the Company.

## Note 12. Income Taxes

The provision for income taxes consists of the following:

| Income Taxes | Year ended December 31, | | | |
|---|---|---|---|---|
| (in thousands) | **2019** | | 2018 | |
| Current: | | | | |
| State | $ | **412** | $ | 1,177 |
| Deferred: | | | | |
| State | | **42** | | 5 |
| Total provision for income taxes | $ | **454** | $ | 1,182 |

Deferred income taxes result primarily from the following:

| Deferred Income Taxes | Year ended December 31, | | | |
|---|---|---|---|---|
| (in thousands) | 2019 | | 2018 | |
| Deferred income tax liabilities (long-term): | | | | |
| Property and equipment | $ | **110** | $ | 68 |
| Total deferred income tax liabilities | $ | **110** | $ | 68 |

## Note 13. Related Party Transactions

The Company leases office, shop and yard space from related parties under lease agreements that extend through December 31, 2024. Rent expense incurred with related parties totaled approximately $2.0 million and $1.5 million for the years ended December 31, 2019 and 2018, respectively. In addition to rent expense with related parties, the Company purchased materials and received services from related parties that totaled approximately $1.7 million and $1.6 million for the years ended December 31, 2019, and 2018, respectively. See Note 14 for future minimum annual lease payments.

As of December 31, 2019 and 2018, the Company had approximately $3.0 million and $1.5 million due from related parties and is recorded in prepaid and other current assets on the consolidated balance sheets.

STRIKE CAPITAL, LLC
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

**Note 14. Commitments and Contingencies**

The Company is involved in various disputes arising from the normal course of business. Management does not believe the outcome of these disputes will have a material adverse effect on the Company's consolidated financial position or results of operations.

*Capital Leases.* The Company entered into agreements that provide lease financing for machinery and equipment in the current year. Leases meeting certain criteria are capitalized, with the related asset recorded in property and equipment and a corresponding amount recorded within the Company's debt obligations. Capital lease additions are reflected in the consolidated statements of cash flows within the supplemental disclosures of non-cash information.

*Operating Leases.* The Company entered into multiple office leases which include escalation features, where the rates increase over the terms of the leases.  The amount of rent expensed is based on a straight-line calculation of the amount owed over the entire lease term.  The difference between the straight-line amount and the contractual amount owed is classified as deferred rent and is amortized to rent expense over the lease term.  In addition, two of the office leases contained an allowance for leasehold improvements.  These amounts were capitalized as leasehold improvements, with the deferred rent being ratably allocated to rent expense over the lease terms.  The Company entered into sublease agreements for certain office leases. These subleases were terminated in 2019. Sublease income for the years ended December 31, 2019 and 2018 was approximately $0.5 million and $0.8 million, respectively. The Company also leases certain equipment and vehicles under non-cancelable operating leases which expire at various dates through March 2025.  During the years ended December 31, 2019 and 2018, total rent expense for these leases and other short-term leases amounted to approximately $88.8 million and $65.8 million, respectively.

Future minimum annual lease payments for the years subsequent to December 31, 2019, including rental payments due to related parties, are approximately as follows:

**Commitments and contingencies**

| *(in thousands)* | Non-Affiliates | | Related Party | | Total | |
|---|---|---|---|---|---|---|
| Year ending December 31, | | | | | | |
| 2020 | $ | 69,598 | $ | 1,920 | $ | 71,518 |
| 2021 | | 49,672 | | 1,908 | | 51,580 |
| 2022 | | 17,824 | | 1,884 | | 19,708 |
| 2023 | | 7,995 | | 1,434 | | 9,429 |
| 2024 | | 3,904 | | 204 | | 4,108 |
| Thereafter | | 1,220 | | - | | 1,220 |
| Total commitments and contingencies | $ | 150,213 | $ | 7,350 | $ | 157,563 |

*Concentrations of Risk.* The Company is subject to certain risk factors, including, but not limited to: risks related to customer consolidation, rapid technological and regulatory changes; changes in customers' capital spending plans; risks related to market conditions and/or economic downturns; competition; the ability to manage projects effectively and in accordance with management's estimates; customer disputes related to the performance of services; the nature of its contracts, which do not obligate the Company's customers to undertake any infrastructure projects and may be canceled on short notice; seasonality, adverse weather conditions and fluctuations in operational factors; risks related to the Company's acquisitions and investment arrangements, including acquisition integration and financing; recoverability of goodwill; governmental and/or regulatory changes or other factors affecting the industries in which the Company operates; potential exposure to environmental liabilities; collectability of receivables; exposure from system or information technology interruptions; availability of qualified employees; the adequacy of our reserves; and exposure to litigation. The Company grants credit, generally without collateral, to its customers. Consequently, the Company is subject to potential credit risk related to changes in business and economic factors. However, the Company generally has certain lien rights on that work and maintains a diverse customer base. The Company believes its billing and collection policies are adequate to minimize potential credit risk. Strike's customers include public and private energy

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

providers and the primary industry served by the Company's customers is utilities (including petroleum and natural gas pipeline infrastructure; electrical utility transmission and distribution; power generation; heavy civil and industrial infrastructure). See Note 16 below for information on the Company's significant customers.

*Self-Insurance.* As discussed in Note 2, the Company maintains insurance policies for workers' compensation, general liability and automobile liability, which are subject to per claim deductibles. The Company is self-insured up to the amount of the deductible. As of December 31, 2019 and 2018, the amount accrued for insurance claims totaled $1.9 million and $1.9 million, respectively. The Company considers all insurance claims to be short-term in nature and includes them in current liabilities. The Company had no related insurance recoveries/receivables as of December 31, 2019 and 2018.

*Indemnities.* The Company generally indemnifies its customers for the services it provides under its contracts, as well as other specified liabilities, which may subject the Company to indemnity claims, liabilities and related litigation. As of December 31, 2018 and 2017, the Company was not aware of any material asserted or unasserted claims in connection with these indemnity obligations.

*Other Guarantees.* In the ordinary course of its business, the Company generally warrants the work it performs for a one to two-year period following substantial completion of a project. Much of the work performed by the Company is evaluated for defects shortly after the work is completed. Accrued warranty claims are not, and have historically not been, material. However, if warranty claims occur, the Company could be required to repair or replace warrantied items, or, if customers elect to repair or replace the warrantied item using the services of another provider, the Company could be required to pay for the cost of the repair or replacement.

## Note 15.  Employee Benefit Agreement

The employees of the Company are eligible to participate in a 401(k) plan (the "Plan") sponsored by the Company.  The Plan covers substantially all of the Company's employees subject to certain length of service requirements.  All eligible employees may contribute a percent of their compensation subject to a maximum imposed by the Internal Revenue Code. The Plan also permits the Company to make matching contributions at a discretionary percentage determined by the Company each year.  For the years ended December 31, 2019 and 2018, the Company made contributions of approximately $3.0 million and $3.1 million, respectively.

## Note 16.  Significant Customers

During the year ended December 31, 2019, the Company recognized contract revenues from two customers totaling approximately $575.4 million, or 33% of total contract revenues. Amounts due from these customers also included in accounts receivable in the accompanying consolidated balance sheet was approximately $36.3 million as of December 31, 2019. No other customers accounted for 10% or more of the Company's contract revenues during 2019.

During the year ended December 31, 2018, the Company recognized contract revenue from one customer totaling approximately $194.4 million, or 11.5% of total contract revenues. Amounts due from this customer included in accounts receivable in the accompanying consolidated balance sheets was approximately $10.3 million as of December 31, 2018. No other customer accounted for 10% or more of the Company's contract revenues during 2018.

## Note 17. Segment Information

The "management approach" has been used to present the following segment information. This approach is based upon the way management of the Company organizes segments for making operating decisions and assessing performance. Financial information is reported on the basis that it is used internally by the chief operating decision maker ("CODM") for evaluating segment performance and deciding how to allocate resources to segments. The Company's chief executive

## STRIKE CAPITAL, LLC
## NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

officer ("CEO") has been identified as the CODM. The CODM evaluates operating results and financial data on a two-segment basis, and uses revenue and gross profit as key performance measures.

The Company's two reportable segments are:

- Major Projects – The Major Projects segment provides construction services including scheduling, management, and construction of pipelines up to 48" across various terrains and challenging environments.

- Infrastructure and Integrity Services – The Infrastructure and Integrity Services segment provides comprehensive pipeline related services from initial construction to ongoing integrity, maintenance and operations services, engineering and professional services, as well as ancillary services that include hydrostatic testing, instrumentation and electrical, fiber installation, horizontal directional drilling, fabrication, and other services.

The Company manages its business primarily on the segment basis, with the CODM evaluating the Company's performance based upon gross profit, which is defined as revenue less cost of revenues that are directly attributable to each segment. Segment gross profit does not include certain operating costs directly or indirectly associated with the operations of each business segment, such as depreciation and amortization recorded as operating expense, selling, general and administrative expenses and other costs. Segment gross profit is the key metric that is used by the CODM in evaluating business performance and is one of the bases for comparing performance; however, other companies within this industry may define Segment gross profit differently than the Company, and as a result it may be difficult to use for comparison. The Company records certain intersegment transactions, which are eliminated in consolidation.

All of the Company's operations are conducted in the United States and all revenues are derived from customers located in that region.

For the years ended December 31, 2019 and 2018, all property, plant, and equipment is located in the United States.

The following table includes operating results by segment:

|  | Year ended December 31, | |
|---|---|---|
| (in thousands) | 2019 | 2018 |
| Revenues by segment, net: | | |
| Infrastructure and Integrity Services | $ 1,083,540 | $ 1,073,744 |
| Major Projects | 680,155 | 623,826 |
| Total consolidated revenue | 1,763,695 | 1,697,570 |
| Gross profit (loss) by segment: | | |
| Infrastructure and Integrity Services | 84,073 | 109,043 |
| Major Projects | (32,936) | (16,936) |
| Total consolidated gross profit | $ 51,137 | $ 92,107 |

Separate measures of Strike's assets and cash flows, including capital expenditures, are not produced or utilized by management to evaluate segment performance.

**STRIKE CAPITAL, LLC**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

### Note 18. Termination of Transaction Agreement

On October 19, 2018, it was announced that the Company had entered into a transaction agreement and plan of merger (the "Transaction Agreement") with Sentinel Energy Services Inc. ("Sentinel"). This transaction was expected to close the first quarter of fiscal year 2019. On February 13, 2019, the Company and Sentinel entered into a Termination Agreement (the "Termination Agreement"), pursuant to which the parties mutually agreed to terminate the Transaction Agreement. The termination of the Transaction Agreement is effective as February 12, 2019. In connection with the transaction, the Company incurred certain transaction expenses related to professional fees such as audit, consulting, and legal. These expenses are reflected in general and administrative expenses in the accompanying statement of operations.

### Note 19. Disposal of Major Facilities

In March 2019, the Company elected to cease certain operations (collectively the "Disposal Group") within the Major Projects reporting unit due to unsatisfactory financial performance and challenging market conditions. The Company completed all performance obligations under the existing contracts of the Disposal Group during the year ended December 31, 2019.  The following table summarizes the operating results of the Disposal Group as of and for the years ended December 31, 2019 and 2018:

| Operating Results of the Disposal Group | Year ended December 31, | |
|---|---|---|
| (in thousands) | **2019** | 2018 |
| Revenues | $   **14,673** | $   171,556 |
| Gross profit (loss) | **(28,485)** | (40,403) |

The decision to exit this market was an indicator of impairment for the Major Projects reporting unit. Management prepared impairment analyses as of October 1, 2019 to assess if long-lived tangible assets and intangible assets, including goodwill, were impaired.   Based on the results of this quantitative assessment, the Company reached the conclusion that there is no impairment as the estimated fair value of the Major Projects reporting segment was determined to exceed its carrying value.

### Note 20. Subsequent Events

The Company has evaluated all events subsequent to the consolidated balance sheet date through April 9, 2020, the date the financial statements were issued.

There are no comparable recent events which may provide guidance as to the effect of the spread of COVID-19 and a potential pandemic. The ultimate impact of the COVID-19 outbreak or a similar health epidemic is highly uncertain and subject to change. We do not yet know the full extent of potential delays or impacts on our business, our operations or the global economy as a whole. However, the effects could have a material impact on our operations. We will continue to closely monitor the COVID-19 situation.

**Attachment 3.05(a)(ii)**

**(see attached)**

CONSOLIDATED FINANCIAL STATEMENTS

Strike Capital, LLC and Subsidiaries
December 31, 2018 and 2017 and for
the years ended December 31, 2018 and 2017
with Report of Independent Auditors

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Report of Independent Auditors | 1 |
| Consolidated Balance Sheets | 2 |
| Consolidated Statements of Operations | 3 |
| Consolidated Statements of Changes in Members' Equity | 4 |
| Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6 |



**EY**
**Building a better
working world**

Ernst & Young LLP
5 Houston Center
Suite 1200
1401 McKinney Street
Houston, TX  77010

Tel: +1 713 750 1500
Fax: +1 713 750 1501
ey.com

## Report of Independent Auditors

To the Board of Directors and Members of
Strike Capital, LLC and subsidiaries
The Woodlands, Texas

We have audited the accompanying consolidated financial statements of Strike Capital, LLC and subsidiaries, which comprise the consolidated balance sheets as of December 31, 2018 and 2017, and the related consolidated statements of operations, changes in members' equity and cash flows for the years then ended, and the related notes to the consolidated financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in conformity with U.S. generally accepted accounting principles; this includes the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free of material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Strike Capital, LLC and subsidiaries at December 31, 2018 and 2017, and the consolidated results of their operations and their cash flows for the years then ended in conformity with U.S. generally accepted accounting principles.

**Adoption of ASU No. 2014-09, Revenue from Contracts with Customers (Topic 606)**

As discussed in Note 2 to the consolidated financial statements, the Company changed its method for recognizing revenue due to the adoption of Accounting Standards Update (ASU) No. 2014-09, Revenue from Contracts with Customers (Topic 606), effective January 1, 2018. Our opinion is not modified with respect to this matter.

*Ernst & Young LLP*

Houston, Texas
April 1, 2019

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**

| | December 31, | |
|---|---|---|
| (in thousands) | **2018** | 2017 |
| **Assets** | | |
| Cash and cash equivalents | $ **1,031** | $ 11,688 |
| Accounts receivable, net | **228,062** | 253,116 |
| Contract assets | **141,607** | 106,407 |
| Inventory | **4,549** | 2,633 |
| Prepaid expenses and other current assets | **11,565** | 11,286 |
| Total current assets | **386,814** | 385,130 |
| Property and equipment, net | **95,533** | 72,165 |
| Goodwill | **74,809** | 63,216 |
| Intangible assets, net | **230,566** | 237,730 |
| Deferred loan costs, net | **1,304** | 1,752 |
| Investment in affiliate | **-** | 7,936 |
| Other long-term assets | **1,481** | 2,211 |
| **Total assets** | $ **790,507** | $ 770,140 |
| **Liabilities and members' equity** | | |
| Accounts payable | $ **173,264** | $ 165,302 |
| Accrued expenses | **30,663** | 24,534 |
| Contract liabilities | **38,804** | 44,260 |
| Current portion of long-term debt | **24,140** | 20,281 |
| Total current liabilities | **266,871** | 254,377 |
| Long-term debt, net of current portion | **322,542** | 253,407 |
| Deferred income tax liability | **68** | 64 |
| Deferred rent | **3,510** | 4,244 |
| Total noncurrent liabilities | **326,120** | 257,715 |
| Commitments and Contingencies (See Note 14) | | |
| Members' equity | **197,516** | 258,048 |
| **Total liabilities and members' equity** | $ **790,507** | $ 770,140 |

*The accompanying notes are an integral part of these consolidated financial statements.*

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | Year ended December 31, | |
|---|---|---|
| *(in thousands)* | **2018** | 2017 |
| Revenue | $ **1,697,570** | $ 1,402,524 |
| Cost of revenues | **1,605,463** | 1,264,101 |
| Gross profit | **92,107** | 138,423 |
| | | |
| Payroll and payroll related costs | **35,297** | 40,168 |
| Depreciation and amortization | **23,754** | 21,119 |
| General and administrative | **45,027** | 31,248 |
| Gain on sale of property and equipment | **(1,775)** | (6,179) |
| Income (loss) from operations | **(10,196)** | 52,067 |
| Interest expense | **(41,504)** | (37,474) |
| Other income | **57** | 41 |
| Income (loss) before taxes | **(51,643)** | 14,634 |
| Provision for income taxes | **1,182** | 1,114 |
| Earnings from investment in affiliate | **-** | 100 |
| Net income (loss) | $ **(52,825)** | $ 13,620 |

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN MEMBERS' EQUITY**

| (in thousands) | | Total Members' Equity |
|---|---|---:|
| Balance at January 1, 2017 | $ | 245,930 |
| Net income | | 13,620 |
| Distributions | | (3,392) |
| Revaluation of member units | | (960) |
| Equity-based compensation | | 2,850 |
| **Balance at December 31, 2017** | $ | 258,048 |
| **Cumulative effect of adtoption, revenue recognition (Topic 606)** | | **1,500** |
| **Net loss** | | **(52,825)** |
| **Distributions** | | **(12,419)** |
| **Equity-based compensation** | | **3,212** |
| **Balance at December 31, 2018** | $ | **197,516** |

*The accompanying notes are an integral part of these consolidated financial statements.*

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

| | | Year ended December 31, | |
|---|---|---|---|
| *(in thousands )* | | **2018** | 2017 |
| **Operating activities** | | | |
| Net income (loss) | $ | **(52,825)** $ | 13,620 |
| Adjustments to reconcile net income (loss) provided by operating activities: | | | |
| Non-cash items: | | | |
| Depreciation and amortization of property and equipment | | **24,683** | 25,555 |
| Amortization of intangible assets | | **11,065** | 12,443 |
| Amortization of deferred loan costs | | **3,640** | 3,530 |
| Gain on sales of property and equipment | | **(1,775)** | (6,179) |
| Earnings from equity method investment | | **-** | (100) |
| Deferred income tax expense | | **-** | 26 |
| Provision for bad debt | | **446** | 1,257 |
| Equity-based compensation | | **3,212** | 2,850 |
| Changes in operating accounts: | | | |
| Accounts receivable | | **24,607** | (135,870) |
| Contract assets | | **(33,700)** | (47,080) |
| Inventory | | **(1,916)** | (987) |
| Prepaid expenses and other assets | | **2,884** | (3,706) |
| Accounts payable | | **7,962** | 105,738 |
| Accrued expenses | | **6,767** | 11,336 |
| Contract liabilities | | **(11,469)** | 33,801 |
| Taxes payable | | **6** | |
| Deferred rent | | **(734)** | (485) |
| **Cash (used in) provided by operating activities** | $ | **(17,147)** $ | 15,749 |
| **Investing activities** | | | |
| Purchases of property and equipment | | **(19,799)** | (22,497) |
| Proceeds from sale of property and equipment | | **(4,157)** | 5,416 |
| Cash paid for acquisition, net of cash acquired | | **4,164** | - |
| **Cash used in investing activities** | $ | **(19,792)** $ | (17,081) |
| **Financing activities** | | | |
| Payments for deferred loan costs | | **(1,241)** | (149) |
| Net repayments on revolving line of credit | | **(8,000)** | 25,000 |
| Principal payments on long-term debt | | **(27,058)** | (27,326) |
| Proceeds from long-term debt | | **75,000** | - |
| Distributions to members | | **(12,419)** | (3,392) |
| **Cash (used in) provided by financing activities** | $ | **26,282** $ | (5,867) |
| Net decrease in cash and cash equivalents | | **(10,657)** | (7,199) |
| Cash and cash equivalents at beginning of period | | **11,688** | 18,887 |
| **Cash and cash equivalents at end of period** | $ | **1,031** $ | 11,688 |
| **Supplemental information** | | | |
| Interest paid | $ | **40,178** $ | 33,173 |
| Income taxes paid | | **1,076** | 1,069 |
| Purchases of property and equipment through capital leases | | **28,666** | - |
| Revaluation of units issued through acquisition | | **-** | (960) |

*The accompanying notes are an integral part of these consolidated financial statements.*

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 1.  Description of Company**

Strike Capital, LLC ("Strike" or the "Company") is a Texas limited liability company whose only asset is the 100% equity units of Strike, LLC. In August 2013, Strike, LLC became a portfolio company of One Equity Partners ("OEP"), a middle market private equity firm focused on the industrial, healthcare and technology sectors in North America and Europe. In November 2016, Strike, LLC created a holding company, Strike Capital, LLC, and became a wholly-owned subsidiary of the holding company. There are no restrictions of cash flows between Strike Capital, LLC and Strike, LLC.

Strike is a nationwide provider of end-to-end pipeline, facilities, energy and civil infrastructure solutions. Strike offers a full complement of integrated engineering, construction, maintenance, integrity, and specialty services to its diversified, long-standing client base, which includes some of the largest midstream and upstream companies in North America. Strike provides end-to-end support from initial construction to ongoing integrity, maintenance, engineering, design, program management and operations. Strike also provides construction services for large-scale pipeline and facility construction projects across the United States. With more than 30 locations across key U.S. energy markets, Strike is able to leverage local crews to deliver the regional terrain expertise, quick mobilization, and specialized service required for any project. Strike provides its clients with a single point of contact for the full scope of their infrastructure needs across the nation and throughout an asset's life cycle, from initial project engineering to ongoing support.

In May 2008, Strike, LLC acquired Pickett Measurement Systems, Inc. ("Pickett"), a measurement and fabrication services company specializing in skid-mounted measurement equipment. In June 2014, Strike acquired Delta Directional, LLC ("Delta"), a horizontal directional drilling contractor with rigs strategically located across the country. In June 2015, Strike acquired substantially all of the net assets of Circle K of Arkansas, Inc., an oil and gas services company. In December 2016, Strike acquired Crossfire, LLC ("Crossfire"), a pipeline and facility services company offering a full suite of construction and infrastructure services operating in the Western region of the United States. The Crossfire acquisition cemented Strike as one of the largest service providers in the Permian Basin and bolstered its presence in the Rockies and Bakken regions. In January 2018, Strike acquired substantially all of the assets of Capstone Energy Services, LLC ("Capstone"), a pipeline and facility services company within the Northeastern region of the United States. The Capstone acquisition solidified Strike's presence in the Utica and Marcellus shale plays.

The Company operates through multiple service and fabrication facilities principally located in Texas, New Mexico, Oklahoma, Pennsylvania, Mississippi, Colorado and Louisiana, and has approximately 7,000 employees, with its corporate headquarters located in The Woodlands, Texas.

**Note 2.  Basis of Presentation and Significant Accounting Policies**

*Common Control Transaction.*  As noted above, Strike, LLC created a holding company, Strike Capital, LLC, and became a wholly-owned subsidiary of the holding company in November 2016. This transaction was among entities under common control and did not result in a change in control. Therefore, it did not meet the definition of a business combination in accordance with Accounting Standard Codification (ASC) 805, Business Combinations. Accordingly, the net assets have been recorded at historical cost basis. The historical operations of Strike, LLC are deemed to be those of the Company. Thus, the financial statements included in this report reflect (i) the historical operating results of Strike, LLC prior to the common control transaction and (ii) the combined results of Strike, LLC and Strike following the common control transaction.

*Basis of Consolidation.* The accompanying consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP") and include Strike and its subsidiaries after elimination of intercompany balances and transactions. The Company's investments in other entities for which the Company does not have a controlling interest, but for which it has the ability to exert significant influence, are accounted for using the equity method of accounting. Equity method investments are recorded as other long-term assets. Income or loss from these investments is recorded as a separate line item in the statements of operations. Intercompany profits or losses associated with the Company's equity method investments are eliminated until realized by the investee in transactions with third parties.

*Reclassification of Prior Year Presentation.* Certain prior year amounts have been reclassified for consistency with the current year presentation. See the Revenue Recognition policy included below for further details regarding these updates. Specifically, the amounts previously reported as "Costs and estimated earnings in excess of billings on uncompleted contracts" and "Billings in excess of costs and

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

estimated earnings on uncompleted contracts" on the Company's consolidated balance sheets have been included in the newly titled "Contract assets" and "Contract liabilities" in accordance with the newly adopted revenue recognition guidance discussed below.

*Use of Estimates.* The presentation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions affecting the reported amounts in the consolidated financial statements and accompanying notes. Such estimates include but are not limited to estimated cost to complete construction-type contracts using the percentage-of-completion method, net realizable value of inventory, estimated lives of depreciable assets, estimates related to fair value of reporting units for purposes of assessing goodwill and other indefinite-lived intangible assets for impairment, estimates related to deferred tax assets and liabilities including any related valuation allowances, and allocation of purchase price in business combinations. While management believes that such estimates are reasonable when considered in conjunction with the Company's consolidated financial position and results of operations taken as a whole, actual results could differ materially from those estimates.

*Limitation of Members' Liability.* Under the terms of the limited liability agreement, as amended, the members are not obligated for debt, obligations, or other liabilities of the Company. Profits and losses are allocated to members based on their ownership interests.

**Significant Accounting Policies**
The following is a summary of significant accounting policies followed in the preparation of the accompanying consolidated financial statements.

*Revenue Recognition.* Revenue is derived from construction projects performed under master and other service agreements as well as from contracts for specific projects or jobs requiring the construction and installation of an entire infrastructure system or specified units within an entire infrastructure system.

The Company early adopted the requirements of Accounting Standards Update ("ASU") 2014-09, Revenue from Contracts with Customers, referred to as Accounting Standards Codification ("ASC") Topic 606 ("Topic 606"), under the modified retrospective transition approach effective January 1, 2018, with application to all existing contracts that were not substantially completed as of January 1, 2018. A cumulative effect adjustment of $1.5 million was made to the opening balance of retained earnings as of January 1, 2018 based on the difference between the recognition criteria under Topic 606 and the Company's previous revenue recognition practices under the previous revenue recognition guidance, ASC Topic 605-35. Consistent with the modified retrospective transition approach, the comparative 2017 prior period was not adjusted to conform to the current period presentation.

Under Topic 606, revenue is recognized when, or as, control of promised goods and services is transferred to customers, and the amount of revenue recognized reflects the consideration to which an entity expects to be entitled in exchange for the goods and services transferred. Revenue is recognized by the Company primarily over time utilizing the cost-to-cost measure of progress for fixed price contracts and certain master service and other service agreements, consistent with the Company's previous revenue recognition practices. The Company concluded the cost-to-cost measure of progress best depicts the transfer of control of goods or services to the customer for these contracts.

*Contracts.* Revenue is derived from construction projects performed under master and other service agreements as well as from contracts for specific projects or jobs requiring the construction and installation of an entire infrastructure system or specified units within an entire infrastructure system. The Company frequently provides services under time and materials, unit price, cost-plus, or fixed price master service or other service agreements. Revenue and related costs for master and other service agreements billed on a time and materials basis are recognized as the services are rendered. The Company performs services under master and other service agreements on a fixed fee basis, under which Strike furnishes specified units of service for a fixed price per unit of service and revenue is recognized as the services are rendered.

Revenue from fixed price contracts provides for a fixed amount of revenue for the entire project, subject to certain additions for changed scope or specifications. Under unit-based contracts, Strike is compensated as units are completed based on pricing established with the customer for each delivered unit. The Company also performs services under master and service agreements on a cost-plus basis, under which Strike is paid for all of its allowed expenses plus an agreed percentage of profit. Revenue from these contracts, as well as for certain projects pursuant to master and other service agreements, is recognized over time using the percentage-of-completion method, under which the percentage of revenue to be recognized for a given project is measured by the percentage of costs incurred to date on the contract to the total estimated costs for the contract. Such contracts provide that the

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

customer accept completion of progress to date and compensate the Company for services rendered, which may be measured in terms of costs incurred, units installed, hours expended or some other measure of progress.

Contract costs include all direct materials, labor and subcontracted costs and those indirect costs related to contract performance, such as indirect labor, supplies, tools, repairs and the operational costs of capital equipment. The estimation process for revenue recognized under the percentage-of-completion method is based on the professional knowledge and experience of the Company's project management, engineers and financial professionals. Management reviews estimates of contract revenue and costs on an ongoing basis. Changes in job performance, job conditions and management's assessment of expected contract settlements are factors that influence estimates of total contract value and total costs to complete those contracts and, therefore, the Company's profit recognition. Changes in these factors may result in revisions to costs and income, and their effects are recognized in the period in which the revisions are determined, which could materially affect the Company's results of operations in the period in which such changes are recognized.

The timing of customer billings is generally dependent upon advance billing terms, milestone billings based on the completion of certain phases of the work, or when services are provided. Under the typical payment terms of master and other service agreements and fixed price contracts, the customer makes progress payments based on quantifiable measures of performance by the Company as defined by each specific agreement. Progress payments, generally net of amounts retained (if applicable), are paid by the customer over the duration of the contract. Amounts billed and due from customers are classified within accounts receivable, net, in the consolidated balance sheets. Provisions for losses on uncompleted contracts are made in the period in which such losses are determined to be probable and the amount can be reasonably estimated.

During the years ended December 31, 2018 and 2017, the Company recognized revenue from its contracts with customers of $198.0 million and $577.2 million, respectively, on a time and materials basis, and $1,500.0 million and $825.3 million, respectively, on the basis of percentage-of-completion.

*Performance Obligations.* A performance obligation is a contractual promise to transfer a distinct good or service to a customer, and is the unit of account under Topic 606. The transaction price of a contract is allocated to each distinct performance obligation and recognized as revenue when or as the performance obligation is satisfied. The Company's contracts often require significant integration services, and even when delivering multiple distinct services, are generally accounted for as a single performance obligation. Contract amendments and change orders are generally not distinct from the existing contract and are accounted for as a modification of the existing contract and performance obligation. The majority of the Company's performance obligations are completed within one year.

When more than one contract is entered into with a customer on or close to the same date, the Company evaluates whether those contracts should be combined and accounted for as a single contract as well as whether those contracts should be accounted for as one, or more than one, performance obligation. This evaluation requires significant judgment and is based on the facts and circumstances of the various contracts.

Remaining performance obligations represent the amount of unearned transaction prices under contracts for which work is wholly or partially unperformed. As of December 31, 2018, the amount of the Company's remaining performance obligations was $801.8 million, which the company expects to recognize in the subsequent twelve months.

Additionally, Strike may incur incremental costs to obtain certain contracts, such as sales commissions and legal fees or initial set-up or mobilization costs, certain of which can be capitalized under the newly adopted revenue recognition guidance. As of December 31, 2018, the Company capitalized $5.7 million of mobilization costs, which are included in the accompanying balance sheet within Prepaid expenses and other current assets and will be amortized over the life of the associated contract.

*Variable Consideration.* Transaction prices for the Company's contracts may include variable consideration, which comprises items such as change orders, claims, incentives and liquidated damages. Change orders are modifications of an original contract, which effectively change deliverables under a contract. Either the Company or its customers and suppliers may initiate change orders. Change orders may include, among other things, changes in specifications or design, manner of performance, equipment, materials, scope of work, and/or the period of completion of the project. Management estimates variable consideration for a performance obligation utilizing estimation methods that best predict the amount of consideration to which the Company will be entitled. Variable consideration is included in the estimated transaction price to the extent it is probable that a significant reversal of cumulative revenue

- 8 -

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

recognized will not occur when the uncertainty associated with the variable consideration is resolved. Management's estimates of variable consideration and determination of whether to include estimated amounts in transaction price are based largely on past practices with the customer, specific discussions, correspondence or preliminary negotiations with the customer, legal opinions and all other relevant information that is reasonably available. The effect of variable consideration on the transaction price of a performance obligation is typically recognized as an adjustment to revenue on a cumulative catch-up basis. To the extent unapproved change orders, claims and liquidated damages reflected in transaction price are not resolved in the Company's favor, or to the extent incentives reflected in transaction price are not earned, there could be reductions in, or reversals of, previously recognized revenue.

As of December 31, 2018, the Company included approximately $29.4 million of unapproved change orders and/or claims in the transaction price for certain contracts that were in the process of being resolved in the normal course of business. These transaction price adjustments are included within contract assets, as appropriate. The Company actively engages with its customers to complete the final approval process, and generally expects these processes to be completed within one year. Amounts ultimately realized upon final acceptance by customers could be higher or lower than such estimated amounts. There were no such change orders or claims outstanding as of December 31, 2017.

*Contract Assets and Liabilities.* With respect to the Company's contracts, interim payments are typically received as work progresses in accordance with agreed-upon contractual terms, either at periodic intervals or upon achievement of contractual milestones. As a result, under fixed price contracts the timing of revenue recognition and contract billings results in contract assets and contract liabilities. Contract assets represent revenues recognized in excess of amounts billed for fixed price contracts and are current assets that are transferred to accounts receivable when billed or the billing rights become unconditional. Contract assets are not considered a significant financing component as the intent is to protect the customer in the event the Company does not perform on its obligations under the contract.

Conversely, contract liabilities represent billings in excess of revenues recognized for fixed price contracts. These arise under certain contracts that allow for upfront payments from the customer or contain contractual billing milestones, which result in billings that exceed the amount of revenues recognized for certain periods. Contract liabilities are current liabilities and are not considered a significant financing component, as they are used to meet working capital requirements that are generally higher in the early stages of a contract and protect the Company from the other party failing to meet its obligations under the contract. Contract assets and liabilities are recorded on a performance obligation basis at the end of each reporting period.

Contract assets and liabilities consisted of the following:

| | As of December 31, | |
| --- | --- | --- |
| (*in thousands*) | **2018** | 2017 |
| Contract assets | **$   141,607** | $   106,407 |
| Contract liabilities | **38,804** | 44,260 |

The increase in contract assets was primarily due to the increase in revenues for the year ended December 31, 2018 as compared to the year ended December 31, 2017. The decrease in contract liabilities was primarily due to normal fluctuations in the mix of projects and billing terms.

During the year ended December 31, 2018, the Company recognized revenue of approximately $39.8 million related to contract liabilities outstanding at December 31, 2017.

The Company recognizes unbilled receivables for non-fixed price contracts within "Accounts receivable" in certain circumstances, such as when revenues have been earned and recorded but are yet to be billed or if amounts arise from routine lags in billing.

During the year ended December 31, 2018, there was a $17.9 million negative impact to gross profit due to a commercial settlement on a large pipeline project.

*Practical Expedients and Exemptions.* The Company utilizes certain practical expedients and exemptions associated with the new revenue recognition guidance. For example, the Company elected the modified retrospective transition method, which allowed the guidance to be applied only to contracts that were not considered substantially complete as of January 1, 2018. Additionally, in cases

- 9 -

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

where the Company has a right to consideration from a customer in an amount that corresponds directly with the value of the Company's performance completed to date, the Company recognizes revenue in the amount to which it has a right to invoice and does not disclose such performance as a remaining performance obligation. Also, contract consideration is not adjusted for the effects of a significant financing component if payment is expected to be collected less than one year from when the services are performed.

*Accounts Receivable and Credit Policies.* Accounts receivable include third party obligations primarily under contracts described in the aforementioned "Revenue Recognition" policy due under terms specified in the contract, and are generally subject to lien rights on the underlying construction projects. Typically, contract terms require payment within 30 days from the invoice date. Certain contracts provide for retainage provision which are generally due upon completion of the contracts and acceptance by the customer. As of December 31, 2018 and 2017, the Company had retainage receivables of approximately $62.2 million and $59.4 million, respectively, included in accounts receivable on the accompanying consolidated balance sheets.

*Allowance for Doubtful Accounts.* The Company maintains an allowance for doubtful accounts for estimated losses resulting from the inability of its customers to make required payments and establishes an allowance for doubtful accounts for anticipated losses of its business units when a business unit has historical experience of losses in the ordinary course of business. In addition, an allowance is established when it is probable that a specific receivable is not collectible and the loss can be reasonably estimated. Amounts are written off against the allowance when they are considered to be uncollectible.

Management actively monitors the economic environment and its impact on the Company's customers and their creditworthiness in connection with its evaluation of the Company's accounts receivable portfolio and the adequacy of its allowance for doubtful accounts. The Company's billings are pursuant to contract provisions whereby contracts are with established companies; however, accounts receivable may be exposed to potential credit risk if the customers should encounter financial difficulties. The Company recorded an allowance for doubtful accounts of approximately $0.9 million and $0.8 million as of December 31, 2018 and 2017, respectively.

*Cash and Cash Equivalents.* All highly liquid investments purchased with an original maturity of three months or less are considered to be cash equivalents, which are carried at fair value. As of December 31, 2018 and 2017, the Company did not hold any cash equivalents.

*Inventories.* Inventories, including materials consumed in the construction process, are stated at the lower of cost or market value. On January 1, 2017, the Company adopted the new inventory standard, Accounting Standards Update 2015-11, simplifying the Measurement of Inventory ("ASU 2015-11"). Under this ASU, inventory is measured at the lower of cost or net realizable value, which is defined as the estimated selling price in the ordinary course of business, less reasonable predictable costs of completion, disposal, and transportation. Prior to adoption of this ASU, inventories were stated at the lower of cost or market, with cost determined by using either the first-in, first-out or the weighted-average methods. The adoption of this ASU did not have a material impact on the consolidated financial statements.

Inventories consist primarily of parts and supplies held for use in the ordinary course of business, which are valued by the Company at the lower of cost or net realizable value. Technological or market changes can render certain materials obsolete. Allowances for inventory obsolescence are determined based upon specific facts and circumstances and market conditions. Management determined no allowance for slow-moving and obsolete items was necessary as of December 31, 2018 and 2017.

*Property and Equipment.* Property and equipment are stated at cost, or, if acquired in a business combination, at the acquisition date fair value. Depreciation is computed over the estimated useful lives of the related assets using the straight-line method. Leasehold improvements are depreciated over the shorter of the term of the lease or the estimated useful lives of the improvements. Property and equipment under capital leases are depreciated over their estimated useful lives. The cost and related accumulated depreciation of assets retired or otherwise disposed of are eliminated from the accounts, and any resulting gain or losses are recognized in operations in the year of disposal. The cost of routine repairs and maintenance are charged to expense as incurred, and significant renewals and improvements are capitalized. Identifiable intangible assets with estimated useful lives are amortized on a straight-line basis over the shorter of the estimated useful life or term of related agreements.

*Impairment of Long-Lived Assets.* The Company periodically evaluates the appropriateness of remaining depreciable lives assigned to long-lived assets. The assessment of possible impairment is based on the Company's ability to recover the carrying value of the asset or asset group from the expected undiscounted future pre-tax cash flows of the related operations. If these cash flows are less than the carrying value of such asset, an impairment loss is recognized for the difference between estimated fair value and carrying value. Fair values take into consideration management's estimates of risk-adjusted discount rates, which are believed to be consistent with assumptions that market

- 10 -

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

participants would use in their estimates of fair value. The Company concluded there were no indicators evident or other circumstances present that these assets were not recoverable and accordingly, no impairment losses have been recognized for the periods presented.

*Goodwill and Indefinite-Lived Intangible Assets.* The Company has goodwill and certain indefinite-lived intangible assets that have been recorded in connection with its acquisitions of businesses. Goodwill represents the excess of acquisition consideration paid over the fair value of identifiable net tangible and identifiable intangible assets acquired. Goodwill and identifiable intangible assets with indefinite useful lives are tested for impairment annually. The Company performs its annual impairment tests of goodwill and indefinite-lived intangible assets during the fourth quarter of each year, and on a quarterly basis. Management monitors these assets for potential impairment triggers. Goodwill is required to be tested for impairment at the reporting unit level. The Company tests goodwill at the reporting unit level which is the level for which there are distinct cash flows, products, capabilities and available financial information. The Company performs a qualitative assessment of the fair value of its reporting units before calculating the fair value of the reporting unit in step one of the two-step goodwill impairment model. If, through the qualitative assessment, the Company determines that it is more likely than not that the reporting unit's fair value is greater than its carrying value, the remaining impairment steps would be unnecessary.

In January 2017, the Financial Accounting Standards Board (FASB) issued an update intended to simplify the subsequent measurement of goodwill by eliminating the second step in the two-step goodwill impairment test. The update requires an entity to perform its annual, or interim, goodwill impairment test by comparing the fair value of a reporting unit with its carrying amount and to recognize an impairment charge for the amount by which the carrying amount exceeds the fair value. The income tax effect associated with an impairment of tax deductible goodwill is also considered in the measurement of the goodwill impairment. The Company elected to adopt the provisions of the update in connection with its annual impairment test performed in the fourth quarter of 2017.

Management has determined there are six reporting units for goodwill impairment analysis purposes. For each of the years ended December 31, 2018 and 2017, management performed an annual impairment test of its goodwill and indefinite-lived intangible assets by examining relevant events and circumstances that could have an effect on their fair values, such as: macroeconomic conditions, industry and market conditions, entity-specific events, financial performance and other relevant factors or events that could affect earnings and cash flows.

Based on the qualitative analysis performed and due to the significant losses in the Major Projects reporting unit during the fourth quarter of 2018, the Company performed a quantitative impairment analysis of the Major Projects reporting unit as of December 31, 2018.

The estimated fair value of the Major Projects reporting unit was based on a combination of income and market approaches. Under the market approach, fair values were estimated using published market multiples for comparable companies. Under the income approach, a discounted cash flow methodology was used, including: (i) management estimates, such as projections of revenue, operating costs and cash flows, taking into consideration historical and anticipated financial results; (ii) general economic and market conditions; and (iii) the impact of planned business and operational strategies. Estimated discount rates were determined using our average cost of capital at the time of the analysis, taking into consideration the risks inherent within the reporting unit individually, which are greater than the risks inherent to the Company as a whole. Significant assumptions used in testing the reporting unit included projected revenue at an annual growth rate of 3.0%, with constant margins, terminal values based on a terminal growth rate of 2.0% based on the 10-year average observed in the consumer price index ("CPI"). Capital expenditures were forecasted at 2.0% of revenue, which is consistent with historical results, prior assumptions used in past analyses, and in line with guideline public company data. We believe the assumptions used in our quantitative goodwill impairment tests are reflective of the risks inherent in the business models of our reporting units and within our industry.

Based on the results of the quantitative assessment, the Company reached the conclusion that there is no impairment in 2018 as the estimated fair value of the Major Projects reporting segment was determined to substantially exceed its carrying value. Further, the Company's qualitative analysis over the remaining five reporting units indicated that the fair value of each was in excess of their respective carrying amounts.

*Deferred Loan Costs.* Debt issuance costs, net of amortization, are recorded as a reduction from the debt's carrying value on the balance sheet. For line of credit arrangements, debt issuance costs are stated net of amortization as an asset on the balance sheet. Debt issuance costs are amortized over the term of the arrangements. Amortization of deferred loan costs of $3.6 million and $3.5 million were recorded for the years ended December 31, 2018 and 2017, respectively. Deferred loan costs, net of accumulated amortization, totaled $12.4 million and $14.8 million as of December 31, 2018 and 2017, respectively.

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

*Concentration of Credit Risk.* Financial instruments that potentially subject the Company to credit risk are cash and cash equivalents and accounts receivable. Cash balances are maintained in financial institutions which at times exceed federally insured limits. The Company monitors the financial condition of the financial institutions in which accounts are maintained and has not experienced any losses in such accounts. The Company performs ongoing credit evaluations as to the financial condition of its customers with respect to receivables. Generally, no collateral is required as a condition of sale. The Company's consideration of allowance for doubtful accounts is based upon current market conditions and other factors.

*Product Warranties.* The Company provides a warranty for a period of time based on the terms of each contract. The Company recorded an accrual of $2.5 million for the year ended December 31, 2018 associated with warranty costs and did not record any accrual for warranty for the year ended December 31, 2017 due to little or no associated cost incurred.

*Fair Value Measurements.* From time to time, the Company may record financial assets and financial liabilities at fair value. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. These fair value measurements incorporate nonperformance risk (i.e., the risk that an obligation will not be fulfilled). In measuring fair value, the Company reflects the impact of credit risk on liabilities, as well as any collateral. The Company also considers the credit standing of counterparties in measuring the fair value of assets.

The Company uses any of three valuation techniques to measure fair value: the market approach, the income approach, and the cost approach in determining the appropriate valuation technique based on the nature of the asset or liability being measured and the reliability of the inputs used in arriving at fair value.

The inputs used in applying valuation techniques include assumptions that market participants would use in pricing the asset or liability (i.e., assumptions about risk). Inputs may be observable or unobservable. The Company uses observable inputs in the Company's valuation techniques, and classifies those inputs in accordance with the fair value hierarchy established by applicable accounting guidance, which prioritizes those inputs. The fair value hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to unobservable inputs (Level 3 measurements).

The three levels are defined as follows:

Level 1 – Inputs to the valuation methodology are quoted prices (unadjusted) for identical assets or liabilities in active markets.

Level 2 – Inputs to the valuation methodology include quoted pries for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

Level – Inputs to the valuation methodology are unobservable and significant to the fair value measurement.

A financial instrument's categorization within the valuation hierarchy is based upon the lowest level of input that is significant to the fair value measurement. The Company's assessment of the significance of a particular input to the fair value measurement in its entirety requires judgment and considers factors specific to the asset or liability.

*Fair Value of Financial Instruments.* The Company's financial instruments consist primarily of cash, accounts receivable, equity-method investments, accounts payable and other current liabilities, and debt obligations.

Fair value is the price that would be received to sell an asset and paid to transfer a liability (an exit price) in the principal market (or in the absence of a principal market, the most advantageous market) for the asset or liability in an orderly transaction between market participants on the measurement date. The fair value guidance establishes a valuation hierarchy, which requires maximizing the use of observable inputs when measuring fair value. In instances in which the inputs used to measure fair value fall into different levels of the fair value hierarchy, the fair value measurement classification is determined based on the lowest level input that is significant to the fair value measurement in its entirety. Management's assessment of the significance of a particular item to the fair value measurement in its entirety requires judgment, including the consideration of inputs specific to the asset or liability.

- 12 -

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Fair values of financial instruments are estimated using public market prices, quotes from financial institutions and other available information. The fair value of the Company's short-term financial assets and liabilities approximates their carrying value represented in the balance sheets principally due to the short-term nature of these instruments. The fair value of the Company's long-term equipment notes approximate carrying value based on their effective interest rates compared to current market rates. The carrying amounts of the revolving loan and term loan debt approximate fair value because those financial instruments bear interest at variable rates that approximate current market rates for loans with similar maturities and credit quality.

*Derivative Instruments.* Derivatives are recognized in the consolidated balance sheets at fair value, with classification as current or noncurrent based upon the maturity of the derivative instruments. Changes in the fair value of derivative instruments are recorded in current earnings. Cash flows from derivative contracts are reported in the consolidated statement of cash flows in the same categories as the cash flows from the underlying transactions. The primary risk associated with interest rate swaps is the ability of third parties to meet their obligations under the terms of the contracts. The Company does not anticipate nonperformance by third parties. The Company had no derivatives outstanding as of December 31, 2018 or 2017.

*Assets and Liabilities Measured at Fair Value on a Non-Recurring Basis.* Assets and liabilities recognized or disclosed at fair value on a non-recurring basis, for which remeasurement occurs in the event of an impairment or other measurement event, if applicable, may include items such as equity investments, long-lived assets, goodwill, and other intangible assets.

*Valuation of Net Assets Acquired.* The determination of the fair value of net assets acquired in a business combination requires estimates and judgments of future cash flow expectations for the acquired business and the related identifiable tangible and intangible assets. Fair values are calculated using expected cash flows and industry-standard valuation techniques. For current assets and current liabilities, book value is generally assumed to equal fair value. Goodwill is the amount by which consideration paid exceeds the fair value of acquired net assets. Acquisition costs, including acquisition integration costs, are expensed as incurred and are included within general and administrative expenses in the consolidated statements of operations.

Due to the time required to gather and analyze the necessary data for each acquisition, U.S. GAAP provides a "measurement period" of up to one year in which to finalize these fair value determinations. During the measurement period, preliminary fair value estimates may be revised if new information is obtained about the facts and circumstances existing as of the date of acquisition based on the final net assets and net working capital of the acquired business, as prescribed in the applicable purchase agreements. Such adjustments may result in the recognition of, or adjust the fair values of, acquisition-related assets and liabilities and/or consideration paid. For the year ended December 31, 2017, measurement period adjustments included certain adjustments to the preliminary estimates of intangible assets and acquisition-related contingent consideration, and resulted in approximately $1.0 million reduction in the final valuation of the equity issued and approximately $1.4 million allocated from goodwill to specifically identifiable intangible assets for businesses acquired in 2016. There were no such adjustments recorded during the year ended December 31, 2018. Fair value adjustments resulting from circumstances that developed after the date of acquisition are reflected as income or expense, as appropriate, in the period the adjustment is considered probable.

*Investments in Affiliates.* Investments in entities of which the Company is not the primary beneficiary, but over which the Company has the ability to exercise significant influence, are accounted for using the equity method of accounting. The Company's share of net income or losses from unconsolidated equity investments is included in equity in earnings (losses) of unconsolidated affiliates in the consolidated statements of operations when applicable. Equity investments are reviewed for impairment by assessing whether any decline in the fair value of the investment below the carrying value is other than temporary. In making this determination, factors such as the ability to recover the carrying amount of the investment and the inability of the investee to sustain an earnings capacity are evaluated in determining whether a loss in value should be recognized. Any impairment losses related to investments would be recognized in other expense. Equity method investments are carried at original cost and are included in Investment in Affiliate in the consolidated balance sheet and are adjusted for the Company's proportionate share of the investees' income, losses and distributions. The Company had no equity method investments as of December 31, 2018.

*Income Taxes.* As a limited liability company, the Company has elected to be taxed as a partnership and is not subject to federal income taxes, as components of its income and expenses flow through directly to the members. Accordingly, no provision for federal income taxes has been reflected in these consolidated financial statements. However, the Company is subject to state income taxes in various states in which it operates.

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The liability method is used in accounting for deferred income taxes. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial reporting and tax basis of assets and liabilities and are measured using the enacted tax rates and laws that will be in effect when these differences are expected to reverse. The realizability of deferred tax assets is evaluated annually and a valuation allowance is provided if it is more likely than not that the deferred tax assets will not give rise to future benefits.

The Company follows guidance issued by the FASB which clarifies accounting for uncertainty in income taxes by prescribing the minimum recognition threshold an income tax position is required to meet before being recognized in the financial statements and applies to all income tax positions. Each income tax position is assessed using a two-step process. A determination is first made as to whether it is more likely than not that the income tax position will be sustained, based upon technical merits, upon examination by the taxing authorities. If the income tax position is expected to meet the more likely than not criteria, the benefit recorded in the financial statements equals the largest amount that is greater than 50% likely to be realized upon its ultimate settlement.

In accordance with this guidance, the Company has elected to record income tax related interest and penalties, if any, as a component in the provision of income tax expense. For the years ended December 31, 2018 and 2017, the Company incurred no material income tax related interest or penalties. The Company completed its analysis of its tax positions and believes there are no uncertain tax positions that would require recognition in the consolidated financial statements as of December 31, 2018 and 2017. The Company believes that there are no tax positions taken or expected to be taken that would significantly increase or decrease unrecognized tax benefits within the next twelve months. The Company is subject to federal tax examinations for 2015 and later years. The Company is also subject to state tax examinations for years 2014 and later. There are no income tax examinations currently in process.

*Equity-Based Compensation.* As of December 31, 2018 and 2017, the Company had certain member units issued and outstanding related to an acquisition completed in 2014. As and when approved by the Board of Directors, the Company shall distribute to the holder of the units a preferred distribution, plus any unpaid return calculated at the remaining unpaid balance, multiplied by an applicable rate of 8% per annum. The units require the holder to remain employed by the Company for a period of five years from the date of acquisition; otherwise, the distribution will be reduced pro-rata based on the number of calendar quarters remaining in the five-year period. The preferred distribution is recorded as equity-based compensation expense in the accompanying consolidated statement of operations. Refer to Note 11. Members' Equity for additional information.

*Self-Insurance.* The Company is insured for employer's liability, workers' compensation, auto liability and general liability claims. Under these programs, the deductible for workers' compensation is $5,000 per occurrence. The Company has no deductibles for auto liability and general liability. The Company also has employee health care benefit plans for most employees, of which the primary plan is subject to a deductible of $1,000 per claimant per year. The Company is also required to post letters of credit and provide cash collateral to certain of its insurance carriers. Cash collateral deposited with insurance carriers is included in other long-term assets in the consolidated balance sheets.

The Company's self-insurance liability is reflected in the consolidated balance sheets within current liabilities. The determination of such claims and expenses and the appropriateness of the related liability is reviewed and updated quarterly, however, these insurance liabilities are difficult to assess and estimate due to unknown factors, including the severity of an injury, the determination of the Company's liability in proportion to other parties and the number of incidents not reported. Accruals are based upon known facts and historical trends. Although management believes its accruals are adequate, a change in experience or actuarial assumptions could materially affect the Company's results of operations in a particular period.

*Litigation and Contingencies.* Accruals for litigation and contingencies are reflected in the consolidated financial statements based on management's assessment, including advice from legal counsel, of the expected outcome of litigation or other dispute resolution proceedings and/or the expected resolution of contingencies. Liabilities for estimated losses are accrued if the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated. Significant judgment is required in both the determination of probability of loss and the determination as to whether the amount is reasonably estimable. Accruals are based only on information available at the time of the assessment due to the uncertain nature of such matters. As additional information becomes available, management reassesses potential liabilities related to pending claims and litigation and may revise its previous estimates, which could materially affect the Company's results of operations in a given period.

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

*Going Concern.* Management evaluates for each annual reporting period whether there are conditions or events, considered in the aggregate, that raise substantial doubt about the Company's ability to continue as a going concern within one year after the date the financial statements are issued, and has concluded there are no such events for the current reporting period.

**Note 3.  Recently Issued Accounting Standards**

See the revenue recognition discussion within Significant Accounting Policies above, and the recently issued accounting standards discussion below for information pertaining to the effects of recently adopted and other recently issued accounting standards.

In August 2018, the FASB issued an update that amends certain disclosure requirements related to fair value measurements. Certain disclosure requirements will be removed, such as the valuation processes for Level 3 fair value measurements, and other disclosure requirements will be modified or added, including a new requirement to disclose the range and weighted average (or a more reasonable and rational method to reflect the distribution) of significant unobservable inputs used to develop Level 3 fair value measurements. This update is effective for interim and annual periods beginning after December 15, 2019. Certain amendments, including the disclosure of the range and weighted average of significant observable inputs used to develop Level 3 fair value measurements, should be applied prospectively, while other amendments should be applied retrospectively. The Company is evaluating the impact of this new standard on its consolidated financial statements and will adopt the new standard effective January 1, 2020.

Also in August 2018, the FASB issued an update that aligns the requirements for capitalizing implementation costs incurred in a hosting arrangement that is a service contract with the requirements for capitalizing implementation costs incurred to develop or obtain internal-use software (and hosting arrangements that include an internal-use software license). Entities can choose to adopt the new guidance prospectively or retrospectively. This update is effective for interim and annual periods beginning after December 15, 2019, and early adoption is permitted. The Company does not expect this update to materially impact its consolidated financial statements and will adopt the new standard by January 1, 2020.

In June 2018, the FASB issued guidance, which expands the guidance in Topic 718 to include share-based payments for goods and services to nonemployees and generally aligns it with the guidance for share-based payments to employees. This standard is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2019, with early adoption permitted. The Company is currently evaluating the effect of this ASU on its consolidated financial statements.

In May 2017, the FASB issued guidance which provided clarification as to when a change to the terms or conditions of a share-based payment award must be accounted for as a modification. Limited and administrative modifications that do not change the value, vesting conditions, or classification of the award are exempt from following the modification guidance in the related topic. This standard, which the Company adopted as of January 1, 2018, did not have a material effect on the consolidated financial statements.

In January 2017, the FASB issued guidance, which simplifies the accounting for goodwill impairment. The updated guidance eliminates Step 2 of the impairment test, which requires entities to calculate the implied fair value of goodwill to measure a goodwill impairment charge. Instead, entities will record an impairment charge based on the excess of a reporting unit's carrying amount over its fair value. Strike is required to adopt the guidance in the first quarter of fiscal year 2021 using a prospective approach. Earlier adoption is permitted. Strike early adopted this guidance in 2017 and the implementation of this guidance did not have a material impact on its consolidated financial statements.

In August 2016, the FASB issued guidance which reduces diversity in practice by providing guidance on the classification of certain cash receipts and payments in the statement of cash flows. These transactions include contingent consideration payments made after a business combination, proceeds from the settlement of insurance claims, proceeds from the settlement of corporate-owned life insurance policies and distributions received from equity method investments. This ASU, which the Company adopted as of January 1, 2018, is effective on a retrospective basis, and the changes did not have an impact on its consolidated financial statements.

In February 2016, the FASB issued guidance which requires the recognition of operating lease right-of-use assets and the corresponding lease liabilities on the balance sheet. The new guidance is effective for fiscal years, and for interim periods within those fiscal years, beginning after December 15, 2018, with early adoption permitted. The Company will adopt this guidance as of January 1, 2020, and will adopt the new guidance using the transition method that allows entities to initially apply the new standard as of the date of adoption and

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

recognize a cumulative effect adjustment to the opening balance of retained earnings as of that date. In addition, the Company will utilize the package of practical expedients that allows entities to retain the classification of lease contracts existing as of the date of adoption.

The Company is currently completing its assessment of the new guidance on its consolidated financial statements, business processes, systems and controls. The standard is expected to have a material impact on the Company's consolidated balance sheets, but will not have a material impact on the Company's consolidated income statements. The most significant impact is expected to be the recognition of right-of-use ("ROU") assets and lease liabilities for operating leases, while the accounting for finance leases remained substantially unchanged.

In January 2016, the FASB issued guidance, which amends the existing accounting standards for the recognition and measurement of financial assets and financial liabilities. The guidance primarily addresses certain aspects of recognition, measurement, presentation, and disclosure of financial instruments. The new standard is effective for interim and annual periods beginning after December 15, 2017, and the Company adopted the new standard effective January 1, 2018. The amendments should be applied by means of a cumulative-effect adjustment to the balance sheet as of the beginning of the fiscal year of adoption, with other amendments related specifically to equity securities without readily determinable fair values applied prospectively. The adoption did not have a material effect on the Company's consolidated financial statements.

**Note 4. Goodwill and Other Intangible Assets**

The following table provides a reconciliation of changes in goodwill for the periods indicated:

| (in thousands) | Goodwill |
|---|---|
| Balance at December 31, 2016 | $ 64,584 |
| Purchase price allocation adjustment | (1,368) |
| Balance at December 31, 2017 | 63,216 |
| Acquisitions | 11,593 |
| Balance at December 31, 2018 | $ 74,809 |

The purchase price allocation adjustment recorded in the year ended December 31, 2017 resulted from the completion of the Company's valuation of the consideration paid, assets acquired and liabilities assumed.

The following table provides a reconciliation of changes in identifiable intangible assets for the periods indicated:

| Identifiable Intangible Assets | As of December 31, 2018 | | | As of December 31, 2017 | | | As of December 31, 2018 |
|---|---|---|---|---|---|---|---|
| (in thousands) | Intangible Assets | Accumulated Amortization | Intangible Assets, Net | Intangible Assets | Accumulated Amortization | Intangible Assets, Net | Remaining weighted average amortization in years |
| **Amortizing** | | | | | | | |
| Trade Names | $ 10,150 | $ (2,180) | $ 7,970 | $ 8,450 | $ (1,170) | $ 7,280 | 8.03 |
| Backlog | (3,600) | 3,600 | - | (1,760) | 1,760 | - | - |
| Customer Relationships | 190,490 | (66,037) | 124,453 | 184,690 | (52,960) | 131,730 | 9.62 |
| Software | 4,330 | (4,330) | - | 4,330 | (3,753) | 577 | - |
| **Non-amortizing** | | | | | | | |
| Trade names | 98,143 | - | 98,143 | 98,143 | - | 98,143 | N/A |
| Total identifiable intangible assets | $ 299,513 | $ (68,947) | $ 230,566 | $ 293,853 | $ (56,123) | $ 237,730 | |

All definite-lived intangibles are amortized using the straight-line method of amortization based upon the estimated useful life of the asset. The expense is included in depreciation and amortization expense in the consolidated statement of operations.

The Company did not have any impairment of amortizable long-lived assets for the years ending December 31, 2018 and 2017.

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

Amortization associated with intangible assets for the years ended December 31, 2018 and 2017 totaled $11.1 million and $12.4 million, respectively. The assumed backlog from the Capstone acquisition (Note 5) of $3.6 million was fully amortized to revenue during the year ended December 31, 2018. In addition, the assumed backlog from the Crossfire acquisition (Note 5) of $1.8 million was fully amortized to revenue during the year ended December 31, 2017. Expected future amortization expense as of December 31, 2018 is summarized in the following table:

| (in thousands ) | | Amortization expense |
|---|---|---|
| 2019 | $ | 14,088 |
| 2020 | | 14,088 |
| 2021 | | 14,088 |
| 2022 | | 14,088 |
| 2023 | | 14,088 |
| Thereafter | | 61,983 |
| Total | $ | 132,423 |

**Note 5. Business Combinations**

*Capstone Acquisition.* On December 31, 2016, the Company contributed a business consisting of machinery and equipment, vehicles, certain contracts and cash to Capstone Energy Services, LLC ("Capstone") in exchange for a 44% membership interest in Capstone. Capstone provides maintenance and construction activities for the oil and natural gas industry primarily in the Northeastern region of the United States. As a result of the contribution, the Company's ownership interest in Capstone was 44% which resulted in the de-recognition of these assets as of December 31, 2016. There was no gain or loss recognized on this transaction.

The Company accounted for its investment in Capstone as an equity method investment. The basis difference between the amount at which the investment is carried and the amount of the underlying equity in net assets of Capstone, referred to as equity method goodwill was approximately $5.8 million as of December 31, 2017.

On January 1, 2018, the Company entered into an exchange and redemption agreement with the majority owner of Capstone whereby the Company exchanged its 44% ownership and paid approximately $4.2 million cash and acquired certain assets of Capstone for an aggregate purchase consideration of approximately $12.1 million. This asset acquisition was accounted for as a business combination and the results of the acquired business have been included in the Company's consolidated financial statements since the acquisition date. The Company has finalized its assessment of the fair values of the acquired assets and assumed liabilities related to the acquired business and an adjustment to the purchase price allocation was recorded allocating goodwill to specifically identifiable intangible assets.

The following table summarizes the fair values of the assets acquired and liabilities assumed at the acquisition date:

**Fair value of assets acquired and liabilities assumed:**
*(in thousands)*

| | | |
|---|---|---|
| Property and equipment | $ | 3,116 |
| Identifiable intangible assets | | 3,900 |
| Current liabilities | | (6,515) |
| Total identifiable net assets | | 501 |
| Goodwill | | 11,593 |
| Total purchase consideration | $ | 12,094 |

- 17 -

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

The excess of purchase price over the fair value amounts assigned to the assets acquired and liabilities assumed represents the goodwill amount resulting from the acquisition. Goodwill attributable to the acquisition has been recorded as a non-current asset and is not amortized, but is subject to review on an annual basis for impairment. Goodwill recognized was primarily attributable to expected operating efficiencies and expansion opportunities in the businesses acquired. Goodwill and intangible assets recognized from the acquisition are expected to be tax deductible.

The following table summarizes the estimated fair values of identifiable intangible assets for the Capstone acquisition as of the acquisition date and the related weighted average amortization periods by type.

| (in thousands) | Estimated Fair Value | Weighted Average Amortization Period in Years |
|---|---|---|
| Customer relationships | $ 5,800 | 10 |
| Backlog | (3,600) | 1 |
| Trade name | 1,700 | 10 |
| Total identifiable intangible assets | $ 3,900 | |

## Note 6.  Accounts Receivable, Net of Allowance

The following table provides details of accounts receivable, net of allowance, as of the dates indicated:

| Accounts receivable, net of allowance | December 31, | |
|---|---|---|
| (in thousands) | 2018 | 2017 |
| Contract billings | $ 166,780 | $ 194,512 |
| Retainage | 62,170 | 59,439 |
| Total accounts receivable | 228,950 | $ 253,951 |
| Less allowance for doubtful accounts | (888) | (835) |
| Total accounts receivable, net | $ 228,062 | $ 253,116 |

Retainage, which has been billed, but is held by our customers until project completion including performance and client acceptance, is expected to be collected within one year.

The Company's billings are pursuant to contract provisions and contracts are with established companies; however, accounts receivable may be exposed to potential credit risk if our customers should encounter financial difficulties. The Company recorded an allowance for doubtful accounts of approximately $0.9 million and $0.8 million as of December 31, 2018 and 2017, respectively. Bad debt expense for the years ended December 31, 2018 and 2017 was approximately $0.4 million and $1.3 million, respectively.

## Note 7. Inventories

The following table provides details of inventory by major class as of the dates indicated:

| Inventory by Major Class | As of December 31, | |
|---|---|---|
| (in thousands) | 2018 | 2017 |
| Raw materials | $ 2,868 | $ 1,598 |
| Finished goods | 1,617 | 996 |
| Other | 64 | 39 |
| Total inventories | $ 4,549 | $ 2,633 |

STRIKE CAPITAL, LLC AND SUBSIDIARIES
NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

### Note 8. Costs and Estimated Profit on Uncompleted Contracts

The following table provides details of cost and estimated profit on uncompleted contracts as of the dates indicated:

| Costs and Estimated Profit on Uncompleted Contracts | As of December 31, | |
|---|---|---|
| (in thousands) | 2018 | 2017 |
| Costs incurred on uncompleted contracts to date | $ 2,460,792 | $ 1,074,407 |
| Estimated earnings to date | 168,911 | 92,079 |
| Contract revenues earned to date | $ 2,629,703 | $ 1,166,486 |
| Less: billings to date | 2,526,900 | 1,104,339 |
| Total net contract assets | $ 102,803 | $ 62,147 |

Included in the accompanying consolidated balance sheets under the following captions:

| Costs and Estimated Profit on Uncompleted Contracts | As of December 31, | |
|---|---|---|
| (in thousands) | 2018 | 2017 |
| Contract assets | $ 141,607 | $ 106,407 |
| Contract liabilities | (38,804) | (44,260) |
| Total net contract assets | $ 102,803 | $ 62,147 |

The Company had total contract values of approximately $3,362.7 million and $1,619.9 million related to uncompleted contracts, including approved change orders at December 31, 2018 and 2017, respectively. The contracts were in various stages of completion at these respective dates.

### Note 9. Property and Equipment, Net

The following table provides details of property and equipment, net, including property and equipment held under capital leases as of the dates indicated:

| Property and equipment, net | Estimated | December 31, | |
|---|---|---|---|
| (in thousands) | Useful Lives | 2018 | 2017 |
| Furniture, fixtures and data processing equipment | 1 – 7 | $ 27,706 | $ 18,963 |
| Leasehold improvement | Lesser of useful life or lease term | 23,669 | 22,346 |
| Machinery and equipment | 5 – 10 | 84,816 | 53,348 |
| Construction mats | 2 | 2,994 | 16,574 |
| Vehicles | 2 – 7 | 21,052 | 18,073 |
| Construction-in-process | | 895 | 4,782 |
| Total property and equipment | | 161,132 | 134,086 |
| Less accumulated depreciation and amortization | | (65,599) | (61,921) |
| Total property and equipment, net | | $ 95,533 | $ 72,165 |

For the years ended December 31, 2018 and 2017, total depreciation and amortization expense, including amortization of assets recorded under capital leases, totaled approximately $24.7 million and $25.5 million, respectively. This amount is inclusive of depreciation and amortization expense reported in "Costs of revenues earned" in the accompanying consolidated statements of operations of approximately $15.6 million and $18.6 million, respectively.

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 10.  Long-Term Debt**

The following table provides details of debt as of the dates indicated:

| Long-term debt | Rate | December 31, | |
| | | **2018** | 2017 |
| --- | --- | --- | --- |
| *(in thousands)* | | | |
| ABL loan | | $ **32,000** | $ 40,000 |
| Term loan | | **296,053** | 237,500 |
| Capital leases | 2.15% - 7.99% | **27,268** | 4,904 |
| Equipment notes payable* | 3.4% - 7.4% | **2,440** | 4,315 |
| Debt issuance costs and unamortized discount on debt | | **(11,079)** | (13,030) |
| Total debt | | **346,682** | 273,689 |
| Less current portion | | **(24,140)** | (20,282) |
| Total long-term debt | | $ **322,542** | $ 253,407 |

* Payable to various financial institutions secured by certain equipment, with monthly principal and interest payments.

Required principal payments on long-term debt and capital leases as of December 31, 2018 are as follows:

| *(in thousands)* | |
| --- | --- |
| 2019 | $ 24,140 |
| 2020 | 20,775 |
| 2021 | 53,006 |
| 2022 | 259,231 |
| 2023 | 270 |
| Thereafter | 339 |
| Total | $ 357,761 |

On November 30, 2016, the Company entered into a $250 million term loan and $100 million letter of credit facility agreement (Term Loan Agreement) with Bank of America, N.A., as administrative agent, and certain financial institutions as lenders.  The term loan bears interest at LIBOR plus an applicable margin and is due quarterly. Principal payments of $3.1 million are due quarterly with all unpaid principal and interest due on November 30, 2022, the term loan maturity date.  In addition to interest on any borrowings on the letter of credit facility, the Company is also assessed an unused line fee and a facility fee.  The term loan and letter of credit facility agreement is secured by all assets of the Company.  On December 30, 2016, the letter of credit facility was increased to $110 million. The letter of credit commitment expired on August 31, 2018. Thereafter, all letters of credit are issued under the Amended ABL Credit Agreement discussed below.

On March 27, 2018, the Company entered into an incremental term loan of $75 million in accordance with the Term Loan Agreement. As a result of the incremental term loan, principal payments of $4.1 million are due quarterly with all unpaid principal and interest due on November 30, 2022, the term loan maturity date. The interest rate was 10.453% (inclusive of the applicable margin) as of December 31, 2018.

The Term Loan Agreement has certain restrictive and financial covenants including a net leverage ratio.  The Company was in compliance with these covenants as of December 31, 2018.

On November 30, 2016, the Company entered into its ABL Loan and Security Agreement (ABL) with Bank of America, N.A., as administrative agent, and certain financial institutions as lenders. The ABL was amended on March 23, 2018 (Amendment No. 1) and November 14, 2018 (Amended ABL Credit Agreement). The Amended ABL Credit Agreement provides a revolver commitment up to $100 million and bears interest at LIBOR plus a floating applicable margin, which was 6.5% (inclusive of the applicable margin) as of

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

December 31, 2018. The ABL termination date is November 30, 2021. The Amended ABL Credit Agreement includes customary restrictive covenants regarding indebtedness, sales of assets, liens, and investments, among other restrictions. In addition to interest, the Amended ABL Credit Agreement also includes an unused line fee and letter of credit facility fees.

The Amended ABL Credit Agreement requires that the Company maintain a fixed charge coverage ratio of at least 1.0 to 1.0 as of each fiscal quarter end while a trigger period is in effect. A trigger period is the period (a) commencing on the day that excess availability is less than the greater of (i) $10.0 million or (ii) 10.0% of availability, and (b) continuing until, during the preceding 30 consecutive days, excess availability has been at all times more than the greater of (i) $10.0 million and (ii) 10.0% of availability. No such trigger period has occurred during the year ended December 31, 2018.

As of December 31, 2018 and 2017, the Company had approximately $23.7 million and $17.2 million of letters of credit outstanding under the Amended ABL Credit Agreement and ABL, respectively. As of December 31, 2018, the Company had $44.3 million of available credit capacity under its Amended ABL Credit Agreement.

Debt issuance costs associated with line of credit arrangements are classified as an asset and all other debt issuance costs are recorded as a reduction to the long-term debt balance on the consolidated balance sheets. Debt issuance costs are amortized over the term of the arrangements.

As of December 31, 2018 and 2017, accrued interest payable, which is recorded within accrued expenses in the consolidated balance sheets, totaled $0.7 million and $3.0 million, respectively.

## Note 11.  Members' Equity and Unit-Based Compensation

*Member Units.* In accordance with the Company's limited liability agreement, as amended, the Company has 1,000,000 member units authorized, 663,889 member units issued and outstanding as of December 31, 2018. Additionally, under the terms of the agreement, within 90 days following the year end, a minimum annual distribution of $2.0 million is to be paid to certain members of the Company pro rata based on the number of member units held by each. Following payment of the annual minimum distribution amount, all other distributions, including upon any dissolution, liquidation or termination of the Company, are to be paid out in accordance with the terms of the agreement.

*Delta Units.* In connection with the acquisition of Delta Directional, LLC in 2014, the Company issued 4,108 member units to the seller. As and when approved by its Board of Directors, the Company shall distribute to the holder of these units a preferred distribution of $9.0 million, plus any unpaid priority return calculated at the remaining unpaid balance multiplied by an applicable rate of 8% per annum from the date of acquisition through June 30, 2019 (or a change of control event if sooner) and 12% thereafter. The Delta units also require the holder to remain employed by the Company for a period of five years from the date of the acquisition; otherwise the distribution will be reduced pro rata based on number of calendar quarters remaining in the five-year period. Since the $9.0 million payment is contingent on the holder remaining employed by the Company, the preferred distribution will be recorded as share-based compensation expense ratably over the five-year period. During the years ended December 31, 2018 and 2017, the Company recognized equity-based compensation expense of approximately $3.2 million and $2.8 million, respectively.

*Phantom and Junior Units.* Effective August 30, 2013, the Company adopted the Strike LLC Phantom Unit Plan. The combined aggregate number of Junior Units and Phantom Units available to be issued will not exceed 100,000. As of December 31, 2018 and 2017, the Company has 47,626 Junior Units issued and outstanding. Of the Junior Units issued, 32,355 were immediately vested. The remaining Junior Units will vest 20% annually. The Phantom Units under this plan represent a hypothetical Junior Units and will vest only upon the consummation of the sale of the Company. As of December 31, 2018 and 2017, 22,650 Phantom Units under this plan were issued and outstanding, respectively. Holders of Junior Units and Phantom Units do not have voting rights on any matters. No value has been reflected in the financial statements for these Phantom Units as the units will not vest until the occurrence of a sale of the Company.

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

## Note 12. Income Taxes

The provision for (benefit from) income taxes consists of the following:

| Income Taxes | Year ended December 31, | |
| --- | --- | --- |
| (in thousands) | **2018** | 2017 |
| Current: | | |
| State | $ **1,177** | $ 1,088 |
| Deferred: | | |
| State | **5** | 26 |
| Total provision for income taxes | $ **1,182** | $ 1,114 |

Deferred income taxes result primarily from the following:

| Deferred Income Taxes | Year ended December 31, | |
| --- | --- | --- |
| (in thousands) | **2018** | 2017 |
| Deferred income tax liabilities (long-term): | | |
| Property and equipment | $ **68** | $ 64 |
| Total deferred income tax liabilities | $ **68** | $ 64 |

## Note 13. Related Party Transactions

The Company leases office, shop and yard space from related parties under lease agreements that extend through August 31, 2021, with optional renewal terms through 2033. Rent expense incurred with related parties totaled approximately $1.5 million and $1.6 million for the years ended December 31, 2018 and 2017, respectively. In addition to rent expense with related parties, the Company purchased materials and received services from related parties that totaled approximately $1.6 million and $1.4 million for the years ended December 31, 2018, and 2017, respectively.  See Note 14 for future minimum annual lease payments.

As of December 31, 2018 and 2017, the Company had approximately $1.5 million and $2.2 million due from related parties and is recorded in prepaid and other current assets on the consolidated balance sheets.

## Note 14. Commitments and Contingencies

The Company is involved in various disputes arising from the normal course of business. Management does not believe the outcome of these disputes will have a material adverse effect on the Company's consolidated financial position or results of operations.

*Capital Leases.* The Company entered into agreements that provide lease financing for machinery and equipment in the current year. Leases meeting certain criteria are capitalized, with the related asset recorded in property and equipment and a corresponding amount recorded within the Company's debt obligations. Capital lease additions are reflected in the consolidated statements of cash flows within the supplemental disclosures of non-cash information.

*Operating Leases.* The Company entered into multiple office leases which include escalation features, where the rates increase over the terms of the leases.  The amount of rent expensed is based on a straight-line calculation of the amount owed over the entire lease term. The difference between the straight-line amount and the contractual amount owed is classified as deferred rent and is amortized to rent expense over the lease term.  In addition, two of the office leases contained an allowance for leasehold improvements.  These amounts were capitalized as leasehold improvements, with the deferred rent being ratably allocated to rent expense over the lease terms.  The Company entered into sublease agreements for certain office leases.  These subleases extend through 2019.  Sublease income for the years ended December 31, 2018 and 2017 was approximately $0.8 million and $0.8 million, respectively.  The Company also leases certain equipment and vehicles under non-cancelable operating leases which expire at various dates through June 2021.  During the

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

years ended December 31, 2018 and 2017, total rent expense for these leases and other short-term leases amounted to approximately $65.8 million and $58.2 million, respectively.

Future minimum annual lease payments for the years subsequent to December 31, 2018, including rental payments due to related parties, are approximately as follows:

| **Commitments and contingencies** | | | | | | |
|---|---|---|---|---|---|---|
| *(in thousands)* | | Non-Affiliates | | Related Party | | Total |
| Year ending December 31, | | | | | | |
| 2019 | $ | 71,644 | $ | 1,350 | $ | 72,994 |
| 2020 | | 47,209 | | 996 | | 48,205 |
| 2021 | | 27,110 | | 963 | | 28,073 |
| 2022 | | 2,442 | | - | | 2,442 |
| 2023 | | 2,477 | | - | | 2,477 |
| Thereafter | | 1,852 | | - | | 1,852 |
| Total commitments and contingencies | $ | 152,734 | $ | 3,309 | $ | 156,043 |

The total minimum rentals remaining to be received in the future under noncancelable subleases are approximately $0.6 million as of December 31, 2018.

*Concentrations of Risk.* The Company is subject to certain risk factors, including, but not limited to: risks related to customer consolidation, rapid technological and regulatory changes; changes in customers' capital spending plans; risks related to market conditions and/or economic downturns; competition; the ability to manage projects effectively and in accordance with management's estimates; customer disputes related to the performance of services; the nature of its contracts, which do not obligate the Company's customers to undertake any infrastructure projects and may be canceled on short notice; seasonality, adverse weather conditions and fluctuations in operational factors; risks related to the Company's acquisitions and investment arrangements, including acquisition integration and financing; recoverability of goodwill; governmental and/or regulatory changes or other factors affecting the industries in which the Company operates; potential exposure to environmental liabilities; collectability of receivables; exposure from system or information technology interruptions; availability of qualified employees; the adequacy of our reserves; exposure to litigation; exposure related to foreign operations; and exposure to multiemployer pension plan liabilities. The Company grants credit, generally without collateral, to its customers. Consequently, the Company is subject to potentials credit risk related to changes in business and economic factors. However, the Company generally has certain lien rights on that work and maintains a diverse customer base. The Company believes its billing and collection policies are adequate to minimize potential credit risk. Strike's customers include public and private energy providers and the primary industry served by the Company's customers is utilities (including petroleum and natural gas pipeline infrastructure; electrical utility transmission and distribution; power generation; heavy civil and industrial infrastructure). See Note 16 below for information on the Company's significant customers.

*Self-Insurance.* As discussed in Note 2, the Company maintains insurance policies for workers' compensation, general liability and automobile liability, which are subject to per claim deductibles. The Company is self-insured up to the amount of the deductible. As of December 31, 2018 and 2017, the amount accrued for insurance claims totaled $1.9 million and $1.3 million, respectively. The Company considers all insurance claims to be short-term in nature and includes them in current liabilities. The Company had no related insurance recoveries/receivables as of December 31, 2018 and 2017.

*Indemnities.* The Company generally indemnifies its customers for the services it provides under its contracts, as well as other specified liabilities, which may subject the Company to indemnity claims, liabilities and related litigation. As of December 31, 2018 and 2017, the Company was not aware of any material asserted or unasserted claims in connection with these indemnity obligations.

*Other Guarantees.* In the ordinary course of its business, the Company generally warrants the work it performs for a one to two-year period following substantial completion of a project. Much of the work performed by the Company is evaluated for defects shortly after the work is completed. Accrued warranty claims are not, and have historically not been, material. However, if warranty claims occur, the Company could be required to repair or replace warrantied items, or, if customers elect to repair or replace the warrantied item using the services of another provider, the Company could be required to pay for the cost of the repair or replacement.

- 23 -

**STRIKE CAPITAL, LLC AND SUBSIDIARIES**
**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**Note 15.  Employee Benefit Agreement**

The employees of the Company are eligible to participate in a 401(k) plan (the "Plan") sponsored by the Company.  The Plan covers substantially all of the Company's employees subject to certain length of service requirements.  All eligible employees may contribute a percent of their compensation subject to a maximum imposed by the Internal Revenue Code.  The Plan also permits the Company to make matching contributions at a discretionary percentage determined by the Company each year.  For the years ended December 31, 2018 and 2017, the Company made contributions of approximately $3.1 million and $2.6 million, respectively.

**Note 16.  Significant Customers**

During the year ended December 31, 2018, the Company recognized contract revenue from one customer totaling approximately $194.4 million, or 11.5% of total contract revenues.  Amounts due from this customer included in accounts receivable in the accompanying consolidated balance sheets was approximately $10.3 million as of December 31, 2018.  No other customer accounted for 10% or more of the Company's contract revenues during 2018.

During the year ended December 31, 2017, the Company recognized contract revenue from two customers totaling approximately $701.6 million, or 50% of total contract revenues.  Amounts due from these customers included in accounts receivable in the accompanying consolidated balance sheets was approximately $111.1 million as of December 31, 2017.  No other customer accounted for 10% or more of the Company's contract revenues during 2017.

**Note 17.  Termination of Transaction Agreement**

On October 19, 2018, it was announced the Company had entered into a transaction agreement and plan of merger (the "Transaction Agreement") with Sentinel Energy Services Inc. ("Sentinel"). This transaction was expected to close in the first quarter of fiscal year 2019. On February 13, 2019, the Company and Sentinel entered into a Termination Agreement (the "Termination Agreement"), pursuant to which the parties agreed to mutually terminate the Transaction Agreement. The termination of the Transaction Agreement is effective as of February 12, 2019. In connection with the transaction, the Company incurred certain transaction expenses related to professional fees such as audit, consulting, and legal. These expenses are reflected in general and administrative expenses in the accompanying statement of operations.

**Note 18.  Subsequent Events**

In March 2019, the Company elected to cease certain operations (collectively the "Disposal Group") within the Major Projects reporting unit due to unsatisfactory financial performance and challenging market conditions. The Company is completing all performance obligations under the existing contracts of the Disposal Group as of December 31, 2018. Management estimates the final completion and disposal of the Disposal Group to occur prior to June 30, 2019. The following table summarizes the operating results of the Disposal Group as of and for the years ended December 31, 2018 and 2017:

| Operating Results of the Disposal Group | December 31, | |
|---|---|---|
| (in thousands) | 2018 | 2017 |
| Revenue | $ 171,556 | $ 87,035 |
| Gross profit (loss) | (40,403) | 6,378 |

The decision to exit this market was an indicator of impairment for the Major Projects reporting unit. Management prepared a quantitative impairment analysis as of February 28, 2019 in order to determine whether an impairment was indicated.

Based on the results of this quantitative assessment, the Company reached the conclusion that there is no impairment as of February 28, 2019 as the estimated fair value of the Major Projects reporting segment was determined to substantially exceed its carrying value.

The Company has evaluated all events subsequent to the consolidated balance sheet date through April 1, 2019, the date the financial statements were issued.

**Attachment 3.05(a)(iii)**

**(see attached)**



**Strike Capital, LLC and Subsidiaries**
Consolidated Financial Statements as of November 30, 2020
and for the periods ended November 30, 2020 and 2019

Strike Capital, LLC and Subsidiaries

Consolidated Balance Sheets
*(In Thousands)*

| | November 30, | |
| | 2020 | 2019 |
|---|---|---|
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 3,769 | $ - |
| Accounts receivable, net | 137,607 | 224,591 |
| Contract assets | 30,411 | 68,843 |
| Inventory | 2,712 | 4,715 |
| Prepaid expenses and other current assets | 3,741 | 3,581 |
| Total current assets | 178,240 | 301,730 |
| | | |
| Property and equipment, net | 72,834 | 88,008 |
| Goodwill | 74,809 | 74,809 |
| Intangible assets, net | 203,564 | 217,652 |
| Deferred loan costs, net | 448 | 895 |
| Other long-term assets | 1,396 | 1,393 |
| Total assets | $ 531,291 | $ 684,487 |
| | | |
| **Liabilities and members' equity** | | |
| Current liabilities: | | |
| Accounts payable | $ 97,042 | $ 148,626 |
| Accrued expenses | 31,076 | 37,290 |
| Contract liabilities | 67,171 | 26,495 |
| Current portion of long-term debt | 21,245 | 20,769 |
| Total current liabilities | 216,534 | 233,180 |
| | | |
| Long-term debt, net of current portion | 252,338 | 276,058 |
| Deferred income tax liability | 98 | 68 |
| Deferred rent | 2,380 | 2,876 |
| Total noncurrent liabilities | 254,816 | 279,002 |
| | | |
| Commitments and Contingencies | | |
| | | |
| Members' equity | 59,941 | 172,305 |
| Total liabilities and members' equity | $ 531,291 | $ 684,487 |

Strike Capital, LLC and Subsidiaries

Consolidated Statements of Operations
*(In Thousands)*

| | Month ended November 30, | |
| | 2020 | 2019 |
|---|---|---|
| Revenue | $ 78,526 | $ 111,177 |
| Cost of revenues | 65,878 | 114,565 |
| Gross profit | 12,648 | (3,388) |
| | | |
| Operating expenses: | | |
| Payroll and payroll related costs | 3,358 | 4,830 |
| Depreciation and amortization | 1,882 | 1,918 |
| General and administrative | 2,002 | 3,907 |
| (Gain) loss on sale of property and equipment | 23 | (264) |
| Total operating expenses | 7,265 | 10,391 |
| Income (loss) from operations | 5,383 | (13,779) |
| | | |
| Interest expense | (3,261) | (3,129) |
| Other income | - | - |
| Income (loss) before taxes | 2,122 | (16,908) |
| | | |
| Provision for income taxes | 78 | 100 |
| Net income (loss) | $ 2,044 | $ (17,008) |
| | | |
| EBITDA | $ 8,077 | $ (10,512) |
| EBITDA Adjustments | 734 | 2,240 |
| Adjusted EBITDA | $ 8,811 | $ (8,272) |

Strike Capital, LLC and Subsidiaries

Consolidated Statements of Operations
*(In Thousands)*

| | Year-to-date November 30, | |
| | 2020 | 2019 |
|---|---:|---:|
| Revenue | $ 923,906 | $ 1,702,085 |
| Cost of revenues | 866,997 | 1,598,458 |
| Gross profit | 56,909 | 103,627 |
| | | |
| Operating expenses: | | |
|     Payroll and payroll related costs | 36,660 | 40,185 |
|     Depreciation and amortization | 21,078 | 21,252 |
|     General and administrative | 24,820 | 29,551 |
|     (Gain) loss on sale of property and equipment | (7,387) | (3,275) |
| Total operating expenses | 75,171 | 87,713 |
| Income (loss) from operations | (18,262) | 15,914 |
| | | |
| Interest expense | (32,468) | (36,868) |
| Other income | 1 | 79 |
| Loss before taxes | (50,729) | (20,875) |
| | | |
| Provision for income taxes | 227 | 941 |
| Net loss | $ (50,956) | $ (21,816) |
| | | |
| EBITDA | $ 14,947 | $ 52,224 |
| EBITDA Adjustments | 11,200 | 45,042 |
| Adjusted EBITDA | $ 26,147 | $ 97,266 |

Strike Capital, LLC and Subsidiaries

Consolidated Statements of Cash Flows
*(In Thousands)*

| | Month ended November 30, | |
| | 2020 | 2019 |
|---|---:|---:|
| **Operating activities** | | |
| Net income (loss) | $ 2,044 | $ (17,008) |
| Adjustments to reconcile net income (loss) provided by (used in) operating activities: | | |
| Depreciation and amortization of property and equipment | 1,520 | 2,092 |
| Amortization of intangible assets | 1,174 | 1,174 |
| Amortization of deferred loan costs | 570 | 316 |
| Gain on sales of property and equipment | 23 | (264) |
| Changes in operating accounts: | | |
| Accounts receivable | 3,806 | 83,626 |
| Contract assets | 3,161 | (4,208) |
| Inventory | 40 | 235 |
| Prepaid expenses and other assets | 814 | 1,060 |
| Accounts payable | (4,523) | (9,564) |
| Accrued expenses | 3,509 | (7,177) |
| Contract liabilities | 230 | (3,470) |
| Deferred rent | (42) | (39) |
| Cash provided by operating activities | 12,326 | 46,773 |
| | | |
| **Investing activities** | | |
| Purchases of property and equipment | (818) | (5,249) |
| Proceeds from disposal of property and equipment | - | 1,611 |
| Cash used in investing activities | (818) | (3,638) |
| | | |
| **Financing activities** | | |
| Payments for deferred loan costs | - | - |
| Net repayments on revolving line of credit | (7,499) | (42,600) |
| Principal payments on long-term debt | (469) | (535) |
| Distributions to members | 1 | - |
| Cash used in financing activities | (7,967) | (43,135) |
| | | |
| Net increase (decrease) in cash and cash equivalents | 3,541 | - |
| Cash and cash equivalents at beginning of period | 228 | - |
| Cash and cash equivalents at end of period | $ 3,769 | $ - |
| | | |
| **Supplemental information** | | |
| Interest paid | $ 2,310 | $ 171 |
| Income taxes paid | $ - | $ - |

Strike Capital, LLC and Subsidiaries

Consolidated Statements of Cash Flows
*(In Thousands)*

|  | Year-to-date November 30, | |
|  | 2020 | 2019 |
|---|---|---|
| **Operating activities** | | |
| Net loss | $ (50,956) $ | (21,816) |
| Adjustments to reconcile net loss provided by (used in) operating activities: | | |
|     Depreciation and amortization of property and equipment | 20,278 | 23,318 |
|     Amortization of intangible assets | 12,914 | 12,914 |
|     Amortization of deferred loan costs | 4,975 | 3,536 |
|     Gain on sales of property and equipment | (7,387) | (3,275) |
|     Equity-based compensation | 1,318 | 2,144 |
|     Changes in operating accounts: | | |
|         Accounts receivable | 58,175 | 26,408 |
|         Contract assets | 5,539 | 72,764 |
|         Inventory | 2,137 | (166) |
|         Prepaid expenses and other assets | 4,388 | (14,865) |
|         Accounts payable | (64,864) | (22,809) |
|         Taxes payable | (13) | - |
|         Accrued expenses | 4,405 | 5,082 |
|         Contract liabilities | 28,276 | (12,310) |
|         Deferred rent | (456) | (634) |
| Cash provided by operating activities | 18,729 | 70,291 |
| | | |
| **Investing activities** | | |
| Purchases of property and equipment | (18,925) | (26,799) |
| Proceeds from disposal of property and equipment | 19,076 | 13,996 |
| Cash used in investing activities | 151 | (12,803) |
| | | |
| **Financing activities** | | |
| Payments for deferred loan costs | (7,596) | (1,291) |
| Net repayments on revolving line of credit | - | (32,000) |
| Principal payments on long-term debt | (19,800) | (19,690) |
| Distributions to members | (2,359) | (5,538) |
| Cash used in financing activities | (29,755) | (58,519) |
| | | |
| Net increase (decrease) in cash and cash equivalents | (10,875) | (1,031) |
| Cash and cash equivalents at beginning of period | 14,644 | 1,031 |
| Cash and cash equivalents at end of period | $ 3,769 $ | - |
| | | |
| **Supplemental information** | | |
| Interest paid | $ 25,358 $ | 28,637 |
| Income taxes paid | $ - $ | 1,140 |

**<u>Attachment 3.05(b)</u>**

**<u>(see attached)</u>**

| Customer Number | Open Regular A/R | Open Retention | Total Open A/R | Current | 1 to 30 Days | 31 to 60 Days | 61 to 90 Days | 91 To 120 Days | 121+ Days | Total > 90 days | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total - 11507 - Gibson Energy | 753,325.53 | | 753,325.53 | | | | | 14,385.00 | 738,940.53 | 753,325.53 | In dispute, Mediation scheduled for 2/9/21 |
| Total - 11377 - Bennett Construction | 372,440.79 | | 372,440.79 | | | | | | 372,440.79 | 372,440.79 | In dispute, Mediation scheduled for 2/26/21 |
| Total - 10900 - Bgp Construction | 371,608.10 | | 371,608.10 | | | | | | 371,608.10 | 371,608.10 | BGP has filed bankruptcy. This will be written off due to collectability concerns. |
| Total - 10681 - Nextera Energy, Inc. | 421,020.78 | 125,870.81 | 546,891.59 | 295,549.21 | 14,473.27 | 0.00 | 83,440.22 | 26,558.08 | 0.00 | 109,998.30 | |
| Total - 10622 - Cheniere Energy, Inc. | 250,000.00 | 0.02 | 250,000.02 | 0.00 | 0.00 | | 0.00 | 0.00 | 250,000.00 | 250,000.00 | |
| Total - 10559 - Phillips 66 Company | 839,364.76 | 0.00 | 839,364.76 | 164,308.85 | 113,144.82 | -1,740.10 | 0.00 | 574,013.88 | -10,362.69 | 563,651.19 | $574k in dispute |
| Total - 10315 - Howard P Midstream Energy Partners, LLC | 94,593.00 | | 94,593.00 | | | | 94,593.00 | | | 94,593.00 | |
| Total - 10224 - Lyondellbasell/Equistar Chemical | 2,782,835.41 | | 2,782,835.41 | 644,619.42 | 737,670.55 | 700,975.29 | 268,831.62 | 221,474.10 | 209,464.43 | 699,770.15 | Client implemented a new accounting software and working to get us caught up |
| Total - 10128 - Williams Partners L.P. | 1,345,997.49 | 125,111.83 | 1,471,109.32 | 1,026,873.54 | 194,092.13 | 0.00 | 0.00 | 125,031.82 | 0.00 | 125,031.82 | |
| Total - 10123 - Enbridge Inc. | 1,463,448.07 | 373,338.77 | 1,836,786.84 | 388,028.05 | 371,730.27 | 533,407.98 | -10,490.28 | 168,197.72 | 17,574.33 | 175,281.77 | |
| Total - 10121 - Conocophillips Company | 1,485,276.25 | | 1,485,276.25 | 1,096,973.26 | 129,504.99 | 0.00 | 258,798.00 | 0.00 | 0.00 | 258,798.00 | |
| Total - 10057 - Spectra Energy Corporation | 4,203,298.11 | 60,813.23 | 4,263,111.34 | 3,331,593.60 | 43,958.81 | 795,540.97 | 251,316.56 | -1,353.83 | 0.00 | 249,004.73 | Client back office impacted by Covid and working to get us caught up |
| Total - 10005 - Energy Transfer Partners, LP | 435,023.27 | 206,216.45 | 641,239.72 | 161,136.63 | 0.00 | 0.00 | 149,647.29 | 36,032.27 | 88,207.09 | 124,239.36 | |
| Total - 10001 - Enterprise Products Partners L.P. | 9,944,244.90 | 2,811,030.59 | 12,755,275.49 | 9,887,748.92 | 0.00 | 0.00 | 14,627.94 | 0.00 | 41,868.64 | 56,495.98 | |

## Section 3.07
## Debt; Guarantees

1. ABL Loan and Security Agreement, dated as of November 30, 2016, among Strike Capital, LLC, Strike, LLC, Delta Directional Drilling, LLC, Strike Global Holdings, LLC, the financial institutions party thereto from time to time as lenders, and Bank of America, N.A., as administrative agent.

2. Term Loan and LC Loan and Security Agreement, dated as of November 30, 2016, among Strike, LLC, Strike Capital, LC, the Company Subsidiaries party thereto, the financial institutions party thereto from time to time as lenders and Wilmington Trust, N.A., as administrative agent.

3. Lease Agreement, dated August 20, 2019, by and between Automotive Rentals, Inc. and Strike, LLC, as amended by that First Amendment to Lease Agreement dated September 10, 2019, and as amended by that Second Amendment to Lease Agreement dated December 9, 2019.

4. Master Tax Lease, dated November 20, 2013, by and between Caterpillar Financial Services Corporation and Strike, LLC, with Rider to Master Tax Lease dated as of September 18, 2014.

5. Master Finance Lease, dated March 29, 2018, by and between Caterpillar Financial Services Corporation and Strike, LLC.

6. Master Lease Agreement, dated May 18, 2015, by and between Deere Credit, Inc. and Strike, LLC, as amended by that Amendment to Master Lease Agreement dated May 2015.

7. Master Lease Agreement, dated April 17, 2018, by and between Kinetic Leasing, Inc. and Strike, LLC.

8. Master Equipment Lease, dated December 4, 2015, by and between Komatsu Financial Limited Partnership and Strike, LLC.

9. Retail Installment Contract, dated July 15, 2016, by and between Ewald Kubota, Inc. and Strike, LLC.

10. Master Open End Lease Agreement, dated October 7, 2011, by and between Merchants Automotive Group, Inc. and Strike, LLC, as amended by that Addendum to Master Open End Lease Agreement dated October 23, 2012.

11. Master Equipment Lease Agreement, dated May 12, 2017, by and between Merchants Automotive Group, Inc. and Strike, LLC.

12. Master Lease Agreement, dated February 4, 2109, by and between Signature Financial LLC and Strike, LLC.

13. Master Lease Agreement, dated September 26, 2016, by and between Summit Funding Group, Inc. and Strike, LLC.

14. Lease Agreement (Master), dated April 6, 2017, by and between VFS Leasing Co. and Strike, LLC.

15. Construction Lease Agreement (Master)(Negotiated for Capital Leases Only), dated April 6, 2018, by and between VFS Leasing Co. and Strike, LLC.

16. Master Lease, dated May 25, 2011, by and between Wells Fargo Equipment Finance, Inc. and Strike Construction, LLC, as amended by that Amendment dated May 15, 2012 with Strike, LLC.

17. Master Lease Agreement, dated July 24, 2018, by and between Wintrust Commercial Finance, a division of Wintrust Asset Finance, Inc. and Strike, LLC.

18. Premium Finance Agreement, dated December 18, 2020, by and between AFCO Premium Credit,

LLC and Strike LLC and Strike Capital, LLC.

19. Corporate Payment Solution Agreement dated September 17, 2019, by and between Comdata, Inc. and Strike, LLC.

NAI-1515649509v14

## Section 3.08
## Assets

1.  The personal property below was acquired by Delta Directional, LLC in 2008.  Company Group purchased this asset during the sale of substantially all of Delta Directional, LLC's assets in 2014. Company Group has obtained the MSO but is also researching further to verify if the property is a titled asset in need of a title.

| Asset_ID | Asset_Notes | Asset_Serial |
|---|---|---|
| D08-MS271 | 2008 BIG BUBBA 18' BUMPER PULL TRAILER - 105 | 5F7US16218U013472 |

2.  The personal property below was acquired by Delta Directional, LLC in 2004.  Company Group purchased this asset during the sale of substantially all of Delta Directional, LLC's assets in 2014. Company Group does not possess a title for this asset.

| | | |
|---|---|---|
| D04-TB1 | 2004 TEXAS BRAGG 20' BUMPER PULL TRAILER - 46 | 17XFP202X41045254 |

3.  The personal property below currently has no MSO or title.  Company Group has contacted the vendor requesting an MSO.

| | | |
|---|---|---|
| S18-PW36 | 2018 SHARK 3500 PSI HOT WATER TRAILER MOUNTED PRESSURE WASHER | |

4.  The personal property below was purchased by Company Group over five years ago and Company Group has no record of an MSO or title.  Company Group is gathering the equipment documents necessary to apply for a bonded title.

| | | |
|---|---|---|
| S93-VB41 | 1993 KENTUCKY 53' VAN TOOL TRAILER | 1KKVE5025PL095143 |

5.  Company Group has ordered a duplicate title for the personal property below.  Title is expected to arrive by March 2021.

| | | |
|---|---|---|
| S19-MS387 | 2019 ROOSE RR250 REEL TRAILER | 595YC2627KM000335 |

6.  Vendor failed to provide title at purchase. Company Group has contacted the vendor to obtain the MSO for the personal property below.

| | | |
|---|---|---|
| S19-MS383 | 2019 LAWRIMORE 20' BUMPER PULL UTILITY TRAILER W/ FOLDING RAMPS | 5WUBU2022LF058852 |

7.  The personal property set forth below was acquired by the Company or one of its Subsidiaries pursuant to the Asset Purchase Agreement, dated April 4, 2019, by and between Advanced Builders, Inc., GAL Construction, Inc. and Strike, LLC.  Title has not yet been received due to an ongoing dispute regarding this transaction.

| | | |
|---|---|---|
| S17-ME555 | FINN B260-26 STRAW BLOWER | 1F9MS1628EF135159 |
| S10-MK26 | MACK CHU613 TRIAXLE HAUL TRUCK | 1M1AN07Y7AN005427 |
| S00-PR105 | PETERBUILT 379 TRIAXLE HAUL TRUCK | 1XP5PBEXOYN535636 |
| S14-FT139 | FONTAINE 55H LOWBOY TRAILER | 13NE5230XE3561323 |
| S14-FT140 | FONTAINE 55H LOWBOY TRAILER | 13NE5230XE3561322 |
| S89-MK25 | MACK RD690ZSX TRIAXLE ROLL OFF TRUCK | 1M2P199C3KW003581 |

NAI-1515649509v14

**Section 3.09**
**Real Property**

## (c)(i)  Leased Real Property:

| Company | Landlord/Payment Name | Address | City | State | Zip |
|---------|----------------------|---------|------|-------|-----|
| STRIKE | Blairtown Energy Center | 1266 US 281 | Alice | TX | 78332 |
| STRIKE | Richard Fenner | US Hwy 281 and CR 119 | Alice | TX | 78332 |
| STRIKE | Crossbridge | 10919 Interstate 10 E | Baytown | TX | 77520 |
| STRIKE | JBD Properties | 13727 Interstate 10 | Baytown | TX | 77523 |
| STRIKE | Bursca 79 South Industrial Park | 800 Bursca Drive, Ste 801 | Bridgeville | PA | 15017 |
| STRIKE | AGES Associates, L.P. | 4 Grandview Circle, Suite 203 | Canonsburg | PA | 15317 |
| STRIKE | HB Properties, LLC | R233 Carrasco Rd, Lots E and F | Carlsbad | NM | 88220 |
| STRIKE | HB Properties, LLC | R231 Carrasco Rd | Carlsbad | NM | 88220 |
| CROSSFIRE | Irrigo, LLC | 3466 SW Loop | Carthage | TX | 75633 |
| CROSSFIRE | Karst Holdings, LLC | 1999 Pyrite Road | Casper | WY | 82644 |
| CROSSFIRE | WWS, LLC | 1820 Pyrite Rd | Casper | WY | 82604 |
| STRIKE | CNMK Texas Properties, LLC | Unit A, 1643 West Henderson | Cleburne | TX | 76033 |
| STRIKE | Crossbridge | 7619 Up River Road | Corpus Christi | TX | 78409 |
| STRIKE | IDV VPID, LP | 232 North Padre Island Drive | Corpus Christi | TX | 78401 |
| STRIKE | La Puerta Azul Rentals | 9044 Up River Road | Corpus Christi | TX | 78409 |
| STRIKE | Johnny Dachsund, L.P. | 21101 Route 19 | Cranberry Township | PA | 16066 |
| STRIKE | Jimmy & Ann Cranford | 745 North Linwood | Cushing | OK | 74023 |
| STRIKE | Southwest Livestock & Trucking Co., Inc. | E Hwy 90 | Del Rio | TX | 78840 |
| STRIKE | Crossbridge | 1500 S Interstate 35 | Dilley | TX | 78017 |
| STRIKE | Bishop Commercial Rentals, LLC | 606 S C Street | Duncan | OK | 73533 |
| STRIKE | Crimson Insulation, Inc. | 11148 Highway 82 East | Duncanville | AL | 35456 |
| STRIKE | Crimson Insulation, Inc. | 13742 Bartow Lane | Duncanville | AL | 35456 |
| CROSSFIRE | City of Durango | 820 Airport Road | Durango | CO | 81303 |
| STRIKE | DAEC Industrial Park, LLC | 900 & 902 Gladys Street | El Campo | TX | 77437 |
| CROSSFIRE | 3939 Carson, LLC | 3939 Carson Avenue | Evans | CO | 80620 |
| STRIKE | Richard Fenner | 911-5201-B E. Hwy 44 | Freer | TX | 78357 |

17

| STRIKE | Pate Lodge, LLC | 170 Private Road 387 | Freestone County | TX | 75831 |
|---|---|---|---|---|---|
| DELTA DIRECTIONAL | Phillips Distributors, Inc. | 3412 Highway 90 | Gautier | MS | 39553 |
| STRIKE | James G. and Sonya Keeling | 31901 I-10 | Hankamer | TX | 77560 |
| DELTA DIRECTIONAL | Circle C Properties, LLC | 9560 Hwy 503 | Hickory | MS | 39332 |
| CROSSFIRE | Ezra Lee | 223 Chickenhawk Lane | Ignacio | CO | 81137 |
| STRIKE | Storage Solutions | 2519 Route C | Jefferson City | MO | 65109 |
| CROSSFIRE | 4 Horse Construction, LLC | 6019 FM 2509 | Kenedy | TX | 78119 |
| STRIKE | Norman Rash | 780 W. Kennedale Parkway | Kennedale | TX | 76060 |
| STRIKE | DHMH | Hwy 57 W | La Pryor | TX | 78872 |
| STRIKE | Jon A. Box | 490 Hwy 57 W | La Pryor | TX | 78872 |
| STRIKE | Gary L. Butch/Cynthia S. Butch | 1815 Mercer Grove City Rd. | Mercer | PA | 16137 |
| CROSSFIRE | Irrigo, LLC | 5505 South FM 1788 | Midland | TX | 79706 |
| STRIKE | James H Pankey Separate Property Trust | 2001 Westar Rd | Midland | TX | 79706 |
| STRIKE | The Park at 1788 South, LLC | 10201 West County Road 148 | Midland | TX | 79706 |
| STRIKE | Sacramento Land Investments, LLC | 10465 N Conway | Mission | TX | 78573 |
| STRIKE | Post Oaks Holdings, LLC | 9235 Highway 146 North, #7A | Mont Belvieu | TX | 77523 |
| STRIKE | B/CS Leasing, LLC | 9867 FM 1227 | Navasota | TX | 77868 |
| DELTA DIRECTIONAL | Circle C Properties, LLC | 9027 Eastside Drive Extension | Newton | MS | 39345 |
| DELTA DIRECTIONAL | Old Branch Agriculture, LLC | Old Highway 43 North | Pelahatchie | MS | 39145 |
| CROSSFIRE | Irrigo, LLC | 7 US Hwy 285 | Pecos | TX | 79772 |
| STRIKE | Robert Wiggins | 6851 West Port Arthur Road | Port Arthur | TX | 77640 |
| STRIKE | Steve Dupuis Equipment, Inc. | 1050 Hwy 365 | Port Arthur | TX | 77640 |
| CROSSFIRE | Giles Brown | 1026 Coonie Jackson Rd. | Ragley | LA | 70657 |
| CROSSFIRE | Irrigo, LLC | 1 Rio Vista Circle | Rangely | CO | 81648 |
| STRIKE | Bruce and Cathy Chisler | 200 Wrights Run Rd | Spraggs | PA | 15362 |
| STRIKE | Cecil Joe Stark Sawmill & Logging Inc. | 24524 Highway 35 | Sweeny | TX | 77480 |
| DELTA DIRECTIONAL | Richards Outdoor Power Equipment, LLC | 416 Pine Street | Taylorsville | MS | 39168 |
| STRIKE | HH One Hughes Landing, LLC | 1800 Hughes Landing Blvd., Suite 500 | The Woodlands | TX | 77380 |
| STRIKE | WOODLANDS-SAROFIM #1, LTD. | 1440 Lake Front Circle, Suite 150 | The Woodlands | TX | 77380 |

NAI-1515649509v14

| CROSSFIRE | CR McB Investments, LLC | 1360 E. Hwy 40 | Vernal | UT | 84078 |
|-----------|-------------------------|----------------|--------|----|-------|
| CROSSFIRE | Three Star Rentals, LLC | 587 Riner Avenue | Wamsutter | WY | 82336 |
| STRIKE | Atlantis Self Storage, Inc. | 1221 Green Street | Washington | PA | 15301 |
| CROSSFIRE | HCJ Investments, LLC | 12599 Zoe Rd | Watford City | ND | 58854 |
| STRIKE | Dorothy B. Koratich | 340 E Roy Furman Hwy | Waynesburg | PA | 15370 |

## (c)(ii) Subleased Real Property:

| STRIKE | Layne Christensen Company | 1800 Hughes Landing Blvd., Suite 700 | The Woodlands | TX | 77380 |
|--------|---------------------------|--------------------------------------|---------------|----|-------|
| STRIKE | Crossfire, LLC | 7 US Hwy 285 | Pecos | TX | 79772 |

## (d)

None.

NAI-1515649509v14

## Section 3.10
## Intellectual Property

**(a)**

1. Term Loan and LC Trademark Security Agreement, dated as of November 30, 2016, by and between Bank of America, N.A. and Strike, LLC (assigned to Wilmington Trust, National Association pursuant to the Term Loan and LC Trademark Security Agreement Assignment Agreement, dated as of September 4, 2020, by and between Bank of America, N.A. and Wilmington Trust, National Association).

2. ABL Loan Trademark Security Agreement, dated as of November 30, 2016, by and between Bank of America, N.A. and Strike, LLC.

3. Term Loan and LC Trademark Security Agreement, dated as of April 9, 2020, by and among Bank of America, N.A., Strike, LLC, Delta Directional Drilling, LLC and Crossfire, LLC (assigned to Wilmington Trust, National Association pursuant to the Term Loan and LC Trademark Security Agreement Assignment Agreement, dated as of September 4, 2020, by and between Bank of America, N.A. and Wilmington Trust, National Association)

4. ABL Loan Trademark Security Agreement, dated as of April 9, 2020, by and among Bank of America, N.A., Strike, LLC, Delta Directional Drilling, LLC and Crossfire, LLC.

**(e)(i)**

## Trademarks:

| Owner | Trademark/SN/RN | Status/Status Date | Filing Date & Number | Registration Date & Number |
|---|---|---|---|---|
| Strike, LLC | Lightning Bolt Logo  | Registered August 28, 2018 | August 23, 2017<br><br>SN: 87-581406 | August 28, 2018<br><br>RN: 5,548,745 |
| Strike, LLC | "Capstone" | Registered March 12, 2019 | August 3, 2018<br><br>SN: 88-064723 | March 12, 2019<br><br>RN: 5,697,273 |
| Strike, LLC | Capstone flame Logo with "Capstone"  | Registered April 9, 2019 | August 3, 2018<br><br>SN: 88-064771 | April 9, 2019<br><br>RN: 5,720,657 |

| | | | | |
|---|---|---|---|---|
| Strike, LLC | "Bolt" | Registered March 12, 2019 | September 6, 2018<br><br>SN: 88-107704 | March 12, 2019<br><br>RN: 5,697,387 |
| Strike, LLC | Bolt Logo with "Bolt"<br><br>⚡BOLT | Registered April 9, 2019 | September 6, 2018<br><br>SN: 88-107737 | April 9, 2019<br><br>RN: 5,722,174 |
| Strike, LLC | P PICKETT SYSTEMS and Design<br><br>🅟 PICKETT SYSTEMS | Registered February 19, 2013 | September 20, 2011<br><br>SN: 85-427162 | February 19, 2013<br><br>RN: 4,293,076 |
| Strike, LLC | STRIKE<br><br>STRIKE | Registered August 21, 2012 | September 20, 2011<br><br>SN: 85-427037 | August 21, 2012<br><br>RN: 4,195,914 |
| Strike, LLC | STRIKE and Design<br><br>⚡STRIKE | Registered August 21, 2012 | September 20, 2011<br><br>SN: 85-427071 | August 21, 2012<br><br>RN: 4,195,915 |
| Strike, LLC | STRIKE CONSTRUCTION and Design<br><br>⚡Strike CONSTRUCTION | Registered May 27, 2008 | August 23, 2007<br><br>SN: 77-263058 | May 27, 2008<br><br>RN: 3,434,733 |
| Strike, LLC | STRIKE CONSTRUCTION, LLC<br><br>STRIKE CONSTRUCTION, LLC | Registered May 1, 2012 | September 12, 2011<br><br>SN: 85-420489 | May 1, 2012<br><br>RN: 4,135,488 |

NAI-1515649509v14

| Strike, LLC | FIELD TICKET MANAGEMENT SYSTEM<br><br>FIELD TICKET MANAGEMENT SYSTEM | Registered Supplemental Register April 19, 2011 | April 29, 2010<br><br>SN: 85-026758 | April 19, 2011<br><br>RN: 3,949,500 |
|---|---|---|---|---|
| Delta Directional Drilling, LLC | "Delta Directional" | Registered<br><br>May 7, 2019 | September 5, 2018<br><br>SN: 88105048 | May 7, 2019<br><br>RN: 5,744,589 |
| Delta Directional Drilling, LLC | Delta Directional Logo with "Delta Directional"<br><br>DELTA DIRECTIONAL | Registered<br><br>May 7, 2019 | September 5, 2018<br><br>SN: 88-105101 | May 7, 2019<br><br>RN: 5,744,593 |
| Crossfire, LLC | "Crossfire" | Registered<br><br>February 26, 2019 | July 9, 2018<br><br>SN: 88-030287 | February 26, 2019<br><br>RN: 5,685,567 |
| Crossfire, LLC | Crossfire "CS" Logo with "Crossfire"<br><br>CROSSFIRE | Registered<br><br>February 26, 2019 | July 9, 2018<br><br>SN: 88-030420 | February 26, 2019<br><br>RN: 5,685,577 |

## Domain Names:

| Owner | Domain Name | Status | Expiration Date | Auto-renew | Security |
|---|---|---|---|---|---|
| Strike, LLC | boltcompanies.biz | Active | 5/31/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.business | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.co | Active | 5/31/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.company | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.consulting | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.info | Active | 6/1/2022 | Yes | Locked |

NAI-1515649509v14

| Strike, LLC | boltcompanies.life | Active | 6/1/2022 | Yes | Locked |
|---|---|---|---|---|---|
| Strike, LLC | boltcompanies.ltd | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.mobi | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.online | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.org | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.team | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.tech | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.technology | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.us | Active | 5/31/2022 | Yes | Locked |
| Strike, LLC | boltcompanies.xyz | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | boltcompaniesinc.com | Active | 7/31/2024 | Yes | Locked |
| Strike, LLC | boltcompaniesinc.info | Active | 7/31/2024 | Yes | Locked |
| Strike, LLC | boltcompaniesinc.net | Active | 7/31/2024 | Yes | Locked |
| Strike, LLC | boltcompaniesinc.org | Active | 7/31/2024 | Yes | Locked |
| Strike, LLC | browntesting.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | campaignforchange.org | Active | 9/23/2021 | Yes | Locked |
| Strike, LLC | capstone-energyservices.com | Active | 1/13/2022 | Yes | Locked |
| Strike, LLC | capstone-energyservicesllc.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | capstone-infrastructureservices.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | capstoneenergysvs.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructure.services | Active | 2/21/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructuregroup.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructurellc.com | Active | 2/20/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructureservice.com | Active | 2/20/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructureservice.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructureservice.org | Active | 2/21/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructureservices.biz | Active | 2/21/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructureservices.business | Active | 2/21/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructureservices.com | Active | 2/20/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructureservices.company | Active | 2/21/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructureservices.info | Active | 2/21/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructureservices.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructureservices.org | Active | 2/21/2022 | Yes | Locked |
| Strike, LLC | capstoneinfrastructureservices.us | Active | 2/21/2022 | Yes | Locked |

23

| Strike, LLC | circlekar.com | Active | 1/2/2022 | Yes | Locked |
|---|---|---|---|---|---|
| Strike, LLC | crossfire-llc.com | Active | 1/29/2022 | Yes | Locked |
| Strike, LLC | deltadirectional.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | edge-testingusa.com | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edge-testusa.com | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetest-usa.com | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetesting-us.co | Active | 4/8/2021 | Yes | Locked |
| Strike, LLC | edgetesting-us.com | Active | 4/8/2021 | Yes | Locked |
| Strike, LLC | edgetesting-us.info | Active | 4/8/2021 | Yes | Locked |
| Strike, LLC | edgetesting-usa.biz | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetesting-usa.co | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetesting-usa.com | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetesting-usa.mobi | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetesting-usa.net | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetesting-usa.org | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingis.com | Active | 4/8/2021 | Yes | Locked |
| Strike, LLC | edgetestings.com | Active | 4/8/2021 | Yes | Locked |
| Strike, LLC | edgetestingsolutions.com | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingus.club | Active | 4/8/2021 | Yes | Locked |
| Strike, LLC | edgetestingus.com | Active | 4/8/2021 | Yes | Locked |
| Strike, LLC | edgetestingus.live | Active | 4/8/2021 | Yes | Locked |
| Strike, LLC | edgetestingus.online | Active | 4/8/2021 | Yes | Locked |
| Strike, LLC | edgetestingus.org | Active | 4/8/2021 | Yes | Locked |
| Strike, LLC | edgetestingus.store | Active | 4/8/2021 | Yes | Locked |
| Strike, LLC | edgetestingusa.app | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingusa.biz | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingusa.club | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingusa.co | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingusa.com | Active | 2/17/2025 | Yes | Locked |
| Strike, LLC | edgetestingusa.info | Active | 2/17/2025 | Yes | Locked |
| Strike, LLC | edgetestingusa.live | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingusa.me | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingusa.mobi | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingusa.net | Active | 2/17/2025 | Yes | Locked |
| Strike, LLC | edgetestingusa.org | Active | 2/17/2025 | Yes | Locked |

24

| Strike, LLC | edgetestingusa.shop | Active | 2/17/2021 | Yes | Locked |
|---|---|---|---|---|---|
| Strike, LLC | edgetestingusa.site | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingusa.tech | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingusa.today | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestingusa.us | Active | 2/17/2025 | Yes | Locked |
| Strike, LLC | edgetestingusa.xyz | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetests.com | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestservices.com | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestsusa.com | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.biz | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.club | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.com | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.info | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.io | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.me | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.net | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.online | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.org | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.shop | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.site | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.store | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.tech | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.today | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | edgetestusa.xyz | Active | 2/17/2021 | Yes | Locked |
| Strike, LLC | etapconstruction.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | etapllc.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | iamstrike.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | iamstrike.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | iamstrike.org | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | lakemont.ws | Active | 2/1/2022 | Yes | Locked |
| Strike, LLC | mystrikeenergy.co | Active | 7/28/2021 | Yes | Locked |
| Strike, LLC | mystrikeenergy.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | mystrikeenergy.org | Active | 7/29/2022 | Yes | Locked |
| Strike, LLC | mystrikeenergy.us | Active | 7/28/2022 | Yes | Locked |
| Strike, LLC | picketsystem.com | Active | 10/1/2022 | Yes | Locked |

NAI-1515649509v14

| Strike, LLC | picketsystem.net | Active | 10/1/2022 | Yes | Locked |
|---|---|---|---|---|---|
| Strike, LLC | pickettmeasurement.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | pickettmeasurements.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | pickettsystems.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | r-rcontractors.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | ras-pipeline.us | Active | 3/15/2021 | Yes | Locked |
| Strike, LLC | strike-energy.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strike-zero.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strike.cc | Active | 2/23/2021 | Yes | Locked |
| Strike, LLC | strike.email | Active | 3/23/2021 | Yes | Locked |
| Strike, LLC | strike.energy | Active | 4/28/2021 | Yes | Locked |
| Strike, LLC | strike.xxx | Active | 5/5/2021 | Yes | Locked |
| Strike, LLC | strikecon.com | Active | 2/19/2022 | Yes | Locked |
| Strike, LLC | strikeconst.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikeconstruction.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikeconstruction.xxx | Active | 1/26/2022 | Yes | Locked |
| Strike, LLC | strikecorp.com | Active | 10/12/2021 | Yes | Locked |
| Strike, LLC | strikeenergy.cc | Active | 6/2/2022 | Yes | Locked |
| Strike, LLC | strikeenergy.co | Active | 6/1/2021 | Yes | Locked |
| Strike, LLC | strikeenergy.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikeenergy.us | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | strikeenergy.ws | Active | 6/2/2021 | Yes | Locked |
| Strike, LLC | strikeenergyservices.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikeenterprises.com | Active | 8/22/2021 | Yes | Locked |
| Strike, LLC | strikeesp.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikellc.cc | Active | 6/2/2022 | Yes | Locked |
| Strike, LLC | strikellc.co | Active | 6/1/2021 | Yes | Locked |
| Strike, LLC | strikellc.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikellc.us | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | strikellc.ws | Active | 6/2/2021 | Yes | Locked |
| Strike, LLC | strikena.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikeos.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikepipe.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikepipeline.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikeserv.com | Active | 7/31/2022 | Yes | Locked |

NAI-1515649509v14

| Strike, LLC | striketesting.com | Active | 7/31/2022 | Yes | Locked |
|---|---|---|---|---|---|
| Strike, LLC | strikeus.co | Active | 7/24/2021 | Yes | Locked |
| Strike, LLC | strikeus.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikeus.org | Active | 7/25/2022 | Yes | Locked |
| Strike, LLC | strikeusa.com | Active | 8/21/2021 | Yes | Locked |
| Strike, LLC | strikeusa.info | Active | 7/25/2022 | Yes | Locked |
| Strike, LLC | strikeusa.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikeusa.org | Active | 7/25/2022 | Yes | Locked |
| Strike, LLC | strikeusa.us | Active | 7/24/2022 | Yes | Locked |
| Strike, LLC | strikeusa.xxx | Active | 1/26/2022 | Yes | Locked |
| Strike, LLC | strikeusaapps.co | Active | 10/20/2021 | Yes | Locked |
| Strike, LLC | strikeusaapps.com | Active | 10/21/2021 | Yes | Locked |
| Strike, LLC | strikeusaapps.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikeusaapps.org | Active | 10/21/2021 | Yes | Locked |
| Strike, LLC | strikezero.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikezero.info | Active | 5/5/2021 | Yes | Locked |
| Strike, LLC | strikezero.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strikezero.org | Active | 5/5/2021 | Yes | Locked |
| Strike, LLC | strikezero.us | Active | 5/4/2021 | Yes | Locked |
| Strike, LLC | strk.cc | Active | 6/2/2022 | Yes | Locked |
| Strike, LLC | strk.co | Active | 6/1/2021 | Yes | Locked |
| Strike, LLC | strk.us | Active | 6/1/2022 | Yes | Locked |
| Strike, LLC | strk.ws | Active | 6/2/2021 | Yes | Locked |
| Strike, LLC | strke.co | Active | 7/25/2021 | Yes | Locked |
| Strike, LLC | strke.info | Active | 7/26/2022 | Yes | Locked |
| Strike, LLC | strke.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strke.org | Active | 7/26/2022 | Yes | Locked |
| Strike, LLC | strke.us | Active | 7/25/2022 | Yes | Locked |
| Strike, LLC | strlke.co | Active | 7/24/2021 | Yes | Locked |
| Strike, LLC | strlke.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strlke.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strlke.org | Active | 7/25/2022 | Yes | Locked |
| Strike, LLC | strlke.us | Active | 7/24/2022 | Yes | Locked |
| Strike, LLC | strlkeinc.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strlkeusa.biz | Active | 5/31/2021 | Yes | Locked |

NAI-1515649509v14

| Strike, LLC | strlkeusa.co | Active | 7/25/2021 | Yes | Locked |
|---|---|---|---|---|---|
| Strike, LLC | strlkeusa.info | Active | 7/26/2022 | Yes | Locked |
| Strike, LLC | strlkeusa.mobi | Active | 6/1/2021 | Yes | Locked |
| Strike, LLC | strlkeusa.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | strlkeusa.org | Active | 7/26/2022 | Yes | Locked |
| Strike, LLC | strlkeusa.us | Active | 7/25/2022 | Yes | Locked |
| Strike, LLC | strsrv.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | struke.co | Active | 7/25/2021 | Yes | Locked |
| Strike, LLC | struke.info | Active | 7/26/2022 | Yes | Locked |
| Strike, LLC | struke.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | struke.org | Active | 7/26/2022 | Yes | Locked |
| Strike, LLC | struke.us | Active | 7/25/2022 | Yes | Locked |
| Strike, LLC | tempboltco.com | Active | 10/3/2021 | Yes | Locked |
| Strike, LLC | thepatecompanies.com | Active | 6/28/2021 | Yes | Locked |
| Strike, LLC | thestrikeenergy.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | wearestrike.co | Active | 7/28/2021 | Yes | Locked |
| Strike, LLC | wearestrike.com | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | wearestrike.net | Active | 7/31/2022 | Yes | Locked |
| Strike, LLC | wearestrike.org | Active | 7/29/2022 | Yes | Locked |
| Strike, LLC | wearestrike.us | Active | 7/28/2022 | Yes | Locked |
| Strike, LLC | wearestrikes.com | Active | 7/31/2022 | Yes | Locked |

**(e)(ii)**

**None.**

**(e)(iii)**

- The Field Ticket Management System

- Custom Purchase Order Functionality for use with JD Edwards ERP system

**(h)**

JD Edwards has custom code, which is not part of the commercially available product. This customization process is supported by our license agreement and Oracle's future upgrade process.

**(i)**

1. Phishing Incident – February 15, 2019

28

Strike experienced a phishing incident believed to have started on February 15, 2019 when a hacker ("Bad Actor") posed as a member of Strike's HR team, sent an attachment to a Strike HR team member (the "Team Member") requesting a review, and gained access to the Team Member's email account. The Bad Actor then used the Team Member's account to send out additional emails with the phishing attachment to individuals listed in the Team Member's contacts list and attempted to use the Team Member's password on other employee accounts.

After receiving reports of suspicious emails, Strike IT shut down the Team Member's email account, executed a password reset for affected email accounts, and notified all employees of the potential phishing emails. Strike immediately initiated an investigation and ultimately discovered that 82 Strike employees were affected by the incident. It was determined that the Bad Actor gained unauthorized access or made changes to the Workday accounts of 65 employees and of those 65 employees, 42 also reported suspicious activity in their Outlook accounts. In addition, 17 other employees reported unauthorized access to their Outlook accounts only. Approximately $88,000 in payroll was sent out to accounts controlled by the Bad Actor.

Strike retained Norton Rose Fulbright as breach litigation counsel and Ankura for computer forensics. Based on Ankura's analysis, it did not appear that other Strike systems were compromised. Strike took steps to remediate the vulnerability that led to the security incident. Written notifications of the potential breach were sent to the affected employees and to one state regulator, as required by applicable law.

Strike obtained a Cyber Liability Policy following this incident to cover these types of events after it was determined that the incident was not covered under Strike's Crime policy. In addition, Strike implemented a phishing end user training program which sends out phony phishing messages and provides users with training materials if they handle the phishing attempts incorrectly. Strike has implemented security measures designed to protect against the reoccurrence of a similar incident. Strike has not been, and does not anticipate being, subject to any regulatory action, litigation or liability related to this incident.

2.   Simbeck and Associates – November 26, 2019

Simbeck and Associates ("Simbeck"), one of Strike's vendors, was apparently breached by a hacker ("Bad Actor"). Strike's systems were not breached in this incident.

Strike Accounts Payable ("AP") sent a request to complete an ACH Vendor Authorization form to one of Simbeck's legitimate addresses. The Bad Actor responded to the request from a fake Simbeck account with a letter containing a completed ACH Vendor Authorization form requesting status of payment. In response, AP requested outstanding invoices and a purchase order number to which the Bad Actor provided a legitimate invoice and legitimate purchase order number. AP processed payment for $132,154.

Simbeck notified Strike requesting that it cease all ACH payments when it realized a Bad Actor had fraudulently sent Strike the ACH Vendor Authorization form. Bank of America Fraud Investigator was contacted as well as Special Agents with the Secret Service in the Cyber Investigation team. The Bad Actor's account was frozen with approximately $85,000 remaining and the Special Agents reported that they did not believe Strike's systems were compromised during the incident.

Since the incident, Strike has strengthened its AP systems with RedBox Recorder, which records calls with vendors and then sends those calls to vendors following receipt of ACH Vendor Authorization forms. This provides an additional layer of protection as it verifies vendor banking information over the phone while also creating a record should a vendor later dispute a transaction. Strike has not been, and does not anticipate being, subject to any regulatory action, litigation or liability related to this incident.

**(j)**

None.

NAI-1515649509v14

**Section 3.11**
**Tax Matters**

**(c)**

The following tax audits are ongoing:

| Jurisdiction | Company | Tax Type | Tax Periods |
|---|---|---|---|
| Federal | Strike, LLC | Fuel | 2019 |
| Texas | Strike, LLC | Franchise - R&D | 2016-2019 |
| Louisiana | Strike, LLC | Sales & Use | 1/2014-6/2017 |
| Louisiana | Strike, LLC | Payroll | 1/2014-6/2017 |
| Tennessee | Strike, LLC | Sales & Use | 1/2015-12/2018 |
| Texas | Strike, LLC | Sales & Use | 9/2012-5/2016 |
| Texas | Strike, LLC | Sales & Use | 6/2016-12/2018 |
| Wyoming | Strike, LLC | Sales & Use | 1/2017-12/2019 |
| Wyoming | Crossfire, LLC | Sales & Use | 9/2017-8/2020 |

**(d)**

The Company agreed to extend the Texas statute of limitations with respect to the current on-going sales and use tax exam.

**(n)**

| Entity | Jurisdiction of Organization | Tax Residence |
|---|---|---|
| Strike, LLC | Texas | US |
| Strike Global Holdings, LLC | Texas | US |
| Capstone Infrastructure Services, LLC | Texas | US |
| Delta Directional Drilling, LLC | Texas | US |
| Crossfire, LLC | Colorado | US |
| Strike Cooperatief U.A. | Netherlands | Netherlands |
| Strike Energy B.V. | Netherlands | Netherlands |
| "Strike Mexico", S. de R.L. de C.V. | Mexico | Mexico |

All U.S. and foreign entities are disregarded for U.S. tax purposes except Strike Capital, LLC (which is a partnership).

**(o)**

From time to time the Company and the U.S. Company Subsidiaries receive notices from various local Taxing Authorities that the Company or such Company Subsidiary may be required to file a Tax Return

with or pay Tax to such Taxing Authorities. As of the date hereof, all such notices have been resolved except for the matters listed below.

1. *Strike, LLC v. David Gerregano, in his capacity as Commissioner of Revenue for the State of Tennessee;* Cause No. 20-1070-IV; 12th Judicial District Chancery Court of Nashville, TN.

   This lawsuit arises out of the Commissioner of Revenue's erroneous interpretation of current law characterizing pipeline as personal property contrary to case law and statutes. Strike filed its complaint on 10/30/2020.

2. *State of Goliad, Texas v. Strike, LLC;* Cause No. 18-04-0685-CV; 24th Judicial District Court of Goliad County, TX.

   Strike renders its business personal property in the county in which the property is situated on January 1st of each year. In addition, each year, various taxing authorities, like Goliad County and Goliad ISD, reopen closed Strike tax accounts and incorrectly assess business personal property taxes.  Strike is currently protesting this assessment. Strike filed its general denial on May 29, 2015. Strike is working in conjunction with the appropriate appraisal district to demonstrate that no taxes are due and owing.

3. *The County of Leon, Texas v. Strike, LLC;* Cause No. T-14-563 in the 278th District Court of Leon County, TX.

   Strike renders its business personal property in the county in which the property is situated on January 1st of each year. And each year, various counties, like Leon County, reopen closed Strike tax accounts and incorrectly assess business personal property taxes.  Strike is currently protesting this assessment and is working in conjunction with the appropriate appraisal district to pull the necessary records to illustrate that no taxes are due and owing.

4. *Red River Parish Tax Agency vs. Strike, LLC of Texas f/k/a Strike Construction, LLC;* (Cause No. 37805) 39th Judicial District Court of Parish of Red River, LA.

   This lawsuit arises out of sales and use tax assessment in Red River Parish, Louisiana. The matter is resolved and is pending settlement documentation.

**(p)**

The Company took advantage of the payroll tax deferral under the CARES Act. The estimated total deferral was approximately $12.5 million. 50% of the deferred payroll taxes are due on December 31, 2021 and the remaining 50% is due on December 31, 2022.

NAI-1515649509v14

## Section 3.12
## Employee Benefit Plans

**(a)**

1. Strike, LLC 401(k) Plan.

2. Strike, LLC Employee Welfare Benefit Plan.

   a. Medical Insurance

   b. Voluntary Dental Insurance

   c. Voluntary Vision Insurance

   d. Life and Accidental Death and Dismemberment Insurance

   e. Voluntary Life and Accidental Death and Dismemberment Insurance

   f. Voluntary Short-Term Disability Insurance

   g. Voluntary Long Term Disability Insurance

   h. Voluntary Accident Insurance

   i. Voluntary Critical Illness Insurance

   j. Voluntary Hospital Indemnity

   k. Voluntary Whole Life Insurance (for grandfather participants only)

   l. Flexible Spending Accounts (Health Care and Dependent Care)

   m. Health Savings Account

   n. Employees may receive premium credits based on 5 years or more of service (beginning on the first pay date of the month after the employee becomes eligible, not to exceed elected coverage for employee's tier rate) as follows:

   | Tier of Coverage | Credit |
   | --- | --- |
   | Employee Only | Up to $21.86/week |
   | Employee + Spouse | Up to $74.19/week |
   | Employee + Children | Up to $64.66/week |
   | Employee + Family | Up to $134.47/week |

3. Stop Loss Coverage Policy between BlueCross BlueShield of Texas and Strike, LLC (Group Number 170695).

4. MetLife Metropolitan Life Insurance Company Group Life and Accidental Death and Dismemberment Insurance Policy (Group Policy Number 0221544-1-G).

5. Strike, LLC offers employee discount programs through Perks at Work.

6. In addition, Strike, LLC offers the following exclusive programs:

   a. Naturally Slim Program

   b. Learning Management System

   c. 24Hour Fitness Corporate Membership Rates

33

    d.   AT&T Plan Discounts

    e.   AAA Plan Discounts

    f.   Ford X-Plan Partner Recognition

    g.   Verizon Plan Discounts

    h.   YMCA Corporate Membership Rates

7.  Strike, LLC Form of Offer Letter generally used to engage employees in legal, accounting, human resources, safety or management level positions (the terms of each individual letter do not materially deviate from the form of letter).

8.  Strike Family of Companies Employee Handbook (revised August 2019).

9.  Strike, LLC Time Off Policy. (included in Employee Handbook Pg. 23)

10. Strike, LLC Per Diem Policy. (included in Employee Handbook Pg. 19)

11. EHS Bonus Process –R1

12. Field Leadership Bonus Structure

13. Structured Bonus Plan

14. 2017 Structured Bonus Plan (Execs)

15. Strike, LLC has historically paid discretionary bonuses to certain eligible employees (generally, an employee who has been with Strike, LLC for at least one year) who remain employed on the date such bonuses are paid.

16. Certain employees are entitled to vehicle allowances or a company-provided vehicle as provided under the Strike, LLC Form of Offer Letter.

17. Strike, LLC Bring Your Own Device Program – Eligible employees are entitled to receive $75/month to be paid in weekly installments.

18. Strike, LLC Employee Referral Program.

19. Strike, LLC Educational Assistance Program

20. Strike, LLC Employee Fitness Program

21. Strike Capital, LLC 2019 Phantom Unit Plan.

    a.   Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Andrew Duffin.

    b.   Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Andrew Standley.

    c.   Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Angela Goines.

    d.   Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Robert "Bobby" Simons.

    e.   Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Aaron Cole Pate.

    f.   Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and

NAI-1515649509v14

Dario Deferrari.

    g.  Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Frank Victor-McCawley.

    h.  Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Franklin Patterson.

    i.  Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Gary Meurer.

    j.  Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Guy Skipper.

    k.  Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Melton Edwards.

    l.  Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Rhonda Sigman.

    m.  Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Richard Winn.

    n.  Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Ryan Herrera.

    o.  Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Scott Hodges.

    p.  Award Agreement, dated as of November 1, 2019, by and between Strike Capital, LLC and Michael Smithey.

    q.  Award Agreement, dated as of April 1, 2020, by and between Strike Capital, LLC and Page Pickett.

    r.  Award Agreement, dated as of April 1, 2020, by and between Strike Capital, LLC and James Cooper.

    s.  Award Agreement, dated as of April 1, 2020, by and between Strike Capital, LLC and Chase Sorrels.

22. Employee Retention Agreement, dated February 3, 2020, by and between Strike, LLC and Frank Patterson.

23. Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Aaron Cole Pate (as amended on August 17, 2020).

24. Employment Agreement, dated May 16, 2016, by and between Crossfire, LLC and Ezra Lee (as amended on August 17, 2020 and August 26, 2020).

25. Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Jarvie Arnold.

26. Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Jason Heckt.

27. Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Kacey Smart.

28. Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Kevin Pate.

29. Employment Agreement, dated January 1, 2018, by and between Strike, LLC and Gary Meurer (as amended on December 4, 2019).

30. Employment Agreement, dated January 1, 2018, by and between Strike, LLC and Michael Smithey (as amended on December 4, 2019).

31. Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Richmond Pate.

32. Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Stephen V. Pate (as amended on August 17, 2020).

33. Employment Agreement, dated December 30, 2015, by and between Strike, LLC and Troy Smith.

34. Employment Agreement, dated June 30, 2014, by and between Strike, LLC and William "Billy" Cleveland.

35. Employment Agreement, dated January 1, 2018, by and between Strike, LLC and Melton Edwards (as amended on December 4, 2019).

36. Employment Agreement, dated January 1, 2018, by and between Strike, LLC and Guy Skipper (as amended on April 30, 2020).

37. Employment Agreement, dated January 1, 2018, by and between Strike, LLC and Scott Hodges (as amended on April 30, 2020).

38. Employment Agreement, dated January 1, 2019, by and between Strike, LLC and Richard Winn.

39. Employment Agreement, dated January 1, 2019, by and between Strike, LLC and Andrew Duffin.

40. Employment Agreement, dated January 1, 2019, by and between Strike, LLC and Ryan Herrera.

41. Employment Agreement, dated January 1, 2019, by and between Strike, LLC and Andrew Standley.

42. Employment Agreement, dated January 1, 2019, by and between Strike, LLC and Robert "Bobby" Simons.

43. Employment Agreement, dated January 1, 2020, by and between Strike, LLC and Jackie Shannon Jett.

44. Employment Agreement, dated January 6, 2020, by and between Strike, LLC and Robert "Johnny" Boykin.

45. Employment Agreement, dated August 17, 2020, by and between Strike, LLC and Frank Victor-McCawley.

46. Employment Agreement, dated August 17, 2020, by and between Strike, LLC and Rhonda Sigman.

47. Board Services Agreement, dated September 15, 2020, by and between Joseph Michels and Strike, LLC.

48. Board Services Agreement, dated January 1, 2017, by and between Strike, LLC and Lee M. Gardner.

49. Severance Agreement, dated January 31, 2020, by and between Strike, LLC and Mike Quick.

50. Separation Agreement and Release, dated November 20, 2020, by and between Strike, LLC, Strike Capital, LLC, and Justin Heckt.

51. Transition Services and Separation Agreement, effective November 30, 2020, by and between Strike, LLC, Strike Capital, LLC, and DeWayne Fitzgerald.

52. Transition Services and Separation Agreement, effective January 20, 2021, by and between Strike, LLC, Strike Capital, LLC, and Chase Sorrels.

53. Retention Agreement, effective January 25, 2021, by and between Strike, LLC and Peter Nguyen.

NAI-1515649509v14

**(b)**

1. Nondiscrimination testing has not been completed historically for the Strike, LLC Flexible Benefits Plan, but the Company does not reasonably expect a material liability to result as a result of such noncompliance.

**(d)(i)**

1. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Angela Goines.

2. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Dario Deferrari.

3. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Frank Victor-McCawley.

4. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Gary Meurer.

5. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Michael Smithey.

6. Retention Letter Agreement, dated June 24, 2019, by and between Strike Capital, LLC and Rhonda Sigman.

**(d)(ii)**

The items set forth on Section 3.12(d)(i) of the Disclosure Schedules are hereby incorporated by reference.

**(h)**

1. The Company or one of the Company Subsidiaries currently provides health and medical insurance benefits for three individuals who are not employees: Marta Pate, mother of Aaron Cole Pate, Tori Hollowell, daughter of Stephen V. Pate, and Kourtney Sullivan, daughter of Kevin Pate, but the Company does not expect there to be material liability with respect to such participation in the Company's benefit plans.

**(i)**

1. None.

## Section 3.13
## Contracts

**(a)**

    **(i)**

        **(A)**    Customer Contracts

1. Master Agreement for Provision of Construction Services No. CW2042303, dated February 5, 2014, by and between BP America Production Co. and Crossfire, LLC, as amended by Amendment No. 1, dated May 1, 2014, Amendment No. 2, dated September, 2014, Amendment No. 3, dated January 7, 2015, Amendment No. 4, dated November 30, 2016, Amendment No. 5, dated April 6, 2018, Amendment 6, dated January 30, 2019, and Amendment 7, dated January 1, 2019.

2. Master Service Agreement No. CW2220406, dated March 1, 2019, by and between Petrohawk Energy Corporation and Crossfire, LLC.

3. Construction Services Agreement No. CW2223275, dated December 13, 2019, by and between BPX Midstream LLC and Crossfire, LLC.

4. Construction Agreement No. BPLSTR101618, dated October 16, 2018, by and between Buckeye Partners, LP and Strike, LLC dba Bolt.

5. Construction Agreement - LED Lighting, dated October 14, 2020, by and between Buckeye Partners, LP and Strike, LLC dba Bolt.

6. Construction Agreement No. BPLSTR031820 - FHR Valve Electric, dated March 19, 2020, by and between South Texas Gateway Terminal LLC. and Strike, LLC dba Bolt.

7. Purchase Order JF-381, dated September 27, 2019, by and between Cable East and Delta Directional Drilling, LLC.

8. Purchase Order JF-382, dated September 27, 2019, by and between Cable East and Delta Directional Drilling, LLC.

9. Purchase Order JF-385, dated October 15, 2019, by and between Cable East and Delta Directional Drilling, LLC.

10. Purchase Order JF-415, dated March 27, 2020, by and between Cable East and Delta Directional Drilling, LLC.

11. Purchase Order JF-420, dated April 23, 2020, by and between Cable East and Delta Directional Drilling, LLC.

12. Purchase Order JF-423, dated June 9, 2020, by and between Cable East and Delta Directional Drilling, LLC.

13. Purchase Order JF-424, dated June 9, 2020, by and between Cable East and Delta Directional Drilling, LLC.

14. Purchase Order JF-426, dated July 10, 2020, by and between Cable East and Delta Directional Drilling, LLC.

15. Purchase Order JF-430, dated September 3, 2020, by and between Cable East and Delta Directional Drilling, LLC.

16. Purchase Order AV-018, dated March 4, 2020, by and between Cable East and Delta Directional Drilling, LLC.

17. Purchase Order AV-020, dated April 13, 2020, by and between Cable East and Delta Directional Drilling, LLC.

18. Purchase Order AV-022, dated May 1, 2020, by and between Cable East and Delta Directional Drilling, LLC.

19. Purchase Order AV-023, dated May 1, 2020, by and between Cable East and Delta Directional Drilling, LLC.

20. Purchase Order AV-024, dated May 1, 2020, by and between Cable East and Delta Directional Drilling, LLC.

21. Purchase Order AV-027, dated June 18, 2020, by and between Cable East and Delta Directional Drilling, LLC.

22. Master Construction Services Agreement, dated January 9, 2020, by and between Centurion Pipeline Company, LLC and Strike, LLC.

23. Master Service Agreement, dated September 18, 2015, by and between Cheniere Corpus Christi Pipeline, LP and Strike, LLC.

24. Lump Sum Construction Agreement - Midship Pipeline Project, dated March 19, 2018, by and between Midship Pipeline Company, LLC and Strike, LLC.

25. Amended and Restated Master Engineering, Procurement, Construction, and Installation Contract No. CW1374076, dated April 30, 2020, by and between Chevron USA, Inc., through its division Chevron North America Exploration and Production Company and Crossfire, LLC, as amended by Amendment No. 1, dated June 26, 2017, Amendment No. 2, dated February 18, 2019, and Amendment 3, dated March 25, 2020.

26. Contract No. 1450924, dated April 1, 2016, by and between Chevron USA, Inc., through its division Chevron North America Exploration and Production Company and Crossfire, LLC, as amended by Amendment No. 1, dated June 26, 2017, and Amendment No. 2, dated February 18, 2019.

27. Contract No. CW1775231, dated December 15, 2019, by and between Chevron USA, Inc. and Crossfire, LLC.

28. Master Service Agreement, dated July 2, 2018, by and between CNX Midstream Partners LP and Strike, LLC.

29. Master Agreement - Construction (Onshore Facilities) No. 305445, dated May 1, 2015, by and between ConocoPhillips Company and Crossfire, LLC, as amended by Amendment No. 1, dated May 1, 2018, and Amendment No. 2, dated March 12, 2020 .

30. Master Service Agreement, dated May 16, 2018, by and between Crestwood Operations LLC and Crossfire, LLC.

31. Engineering Services Agreement, dated July 15, 2016, by and between Crestwood Delaware Basin LLC and Strike, LLC.

32. Major Construction Agreement - Bucking Horse 2 West Inlet Project, dated September 6, 2019, by and between Jackalope Gas Gathering Services, L.L.C. and Strike, LLC.

33. Major Construction Agreement - Desert Hills Water Pipeline Project, dated January 31, 2020, by and between CPB Water, LLC and Strike, LLC.

34. Contract, dated March 26, 2018, by and between DTE Pipeline Company and Strike, LLC.

35. Pipeline Construction Contract - Pelican Residue PL, dated April 7, 2020, by and between DTE LEAP Gas Gathering, LLC and Crossfire, LLC.

36. Pipeline Construction Contract - Cameron Lateral, dated April 7, 2020, by and between DTE LEAP Gas Gathering, LLC and Crossfire, LLC.

37. Revised Master Services Agreement, dated April 1, 2015, by and between Enbridge Energy Partners, LP and Midcoast Energy Partners, LP and Strike, LLC.

38. Contract No. CORE-20-1-1-01A - Wildhorse Connectivity, dated February 21, 2020, by and between ENBRIDGE Storage (Cushing) L.L.C. and Strike, LLC.

39. Contract No. CORE-20-1-1-01B - Basin Bypass, dated March 12, 2020, by and between ENBRIDGE Storage (Cushing) L.L.C. and Strike, LLC.

40. Lump Sum Construction Contract - Cameron Compressor Station, dated November 18, 2020, by and between Texas Eastern Transmission, LP and Strike, LLC.

41. Standard Purchase Order No. 131011637, dated May 15, 2020, by and between EUS OU and Strike, LLC.

42. Standard Purchase Order No. 131011765, dated July 16, 2020, by and between EUS OU and Strike, LLC.

43. General Services and Maintenance Agreement No. GSMA-410-2016-2548, dated August 3, 2016, by and between La Grange Acquisition, L.P. and Strike, LLC, as amended by Amendment No. 1, dated July 24, 2017, and Amendment No. 2, dated October 30, 2017.

44. Master Construction Agreement No. 200129128 - LSX II Pump Station LSX4 Meter & Filtration Project, dated February 17, 2020, by and between Lone Star NGL Pipeline LP and Strike, LLC.

45. Master Construction Agreement No. C-19117-GL-23080013 - Hardy East Well Connect Pipeline Project, dated June 9, 2020, by and between Regency Marcellus Gas Gathering LLC and Strike, LLC.

46. Work Contract No. 4142, dated November 24, 2004, by and between Enterprise Products Operating, LLC and Strike, LLC dba Pickett Systems, as amended by Amendment No. 1, dated February 25, 2019.

47. Work Contract No. 2260, dated September 30, 2004, by and between Enterprise Products Partners L.P. and Strike, LLC, as amended by Amendment No. 1, dated March 1, 2007, Amendment No. 2, dated Mary 1, 2010, Amendment No. 3, dated October 7, 2010, Amendment No. 4, dated March 1, 2011, Amendment No. 5, dated January 1, 2013, Amendment No. 6, dated August 29, 2016, and Amendment No. 7, dated January 25, 2017.

48. Service Agreement No. 6922, dated March 22, 2011, by and between EPCO Holdings, Inc. and Crossfire, LLC.

49. Pipeline Construction Contract No. 9616, dated September 6, 2018, by and between Enterprise Crude Pipeline, LLC and Strike, LLC.

50. Engineering, Procurement and Construction Contract No. 9664, dated November 13, 2018, by and between Enterprise Field Services, LLC and Strike, LLC.

NAI-1515649509v14

51. Engineering, Procurement and Construction Contract No. 11438, dated October 27, 2020, by and between Enterprise Products Operating, LLC and Strike, LLC.

52. Pipeline Construction Contract No. 11439, dated October 27, 2020, by and between South Texas NGL Pipeline, LLC and Strike, LLC.

53. Engineering, Procurement and Construction Contract No. 11330, dated May 21, 2020, by and between Enterprise Pelican Pipeline LP and Strike, LLC.

54. General Services Agreement No. 163831, dated July 9, 2019, by and between Kinder Morgan Contracting Services, LLC and Strike, LLC, as amended by Kinder Morgan Contracting Services, LLC.

55. General Services Agreement No. 101050, dated February 16, 2017, by and between Natural Gas Pipeline Company of America LLC and Strike, LLC.

56. General Services Agreement No. 163985, dated September 18, 2019, by and between Kinder Morgan Contracting Services, LLC and Crossfire, LLC.

57. Master Service Agreement - Lucid Artesia, dated September 13, 2019, by and between Lucid Artesia Company and Strike, LLC.

58. Master Service Agreement - Lucid Delaware, dated September 13, 2019, by and between Lucid Energy Delaware, LLC and Strike, LLC.

59. Master Field Services Contract No. MA-00278-2009, dated February 17, 2010, by and between Lyondell Chemical Company, Equistar Chemicals, LP, Houston Refining LP, Millennium Petrochemicals, Inc., Bassell USA Inc. and Strike Construction, LLC, as amended by Amendment No. 1, dated July 1, 2011, Amendment No. 2, dated February 18, 2013, Amendment No. 3, dated March 31, 2014, Amendment No. 4, dated February 10, 2015, Amendment No. 5, dated March 30, 2017, Amendment No. 6, dated December 31, 2017, Amendment No. 7, dated June 30, 2018, Amendment No. 8, dated December 31, 2018, Amendment No. 9, dated July 31, 2019, and Amendment No. 10, dated August 31, 2019.

60. Master Field Services Contract No. CW-2302288, dated July 1, 2020, by and between Lyondell Chemical Company, Equistar Chemicals, LP, Houston Refining LP, LyondellBasell Acetyls, LLC, LyondellBasell Advanced Polymers Inc. and Strike, LLC.

61. Master Services Agreement No. 05MMLP118, dated May 1, 2005, by and between Magellan Pipeline Company, L.P. and Strike Construction, LLC, as amended by Amendment No. 1, dated December 4, 2012.

62. Major Construction Contract No. 17355 - 20" Pipeline/EH2H, dated September 27, 2018, by and between Magellan Pipeline Company, L.P. and Strike, LLC.

63. Major Construction Contract No. 18700 - Relocation of 18" Pipeline, dated February 25, 2020, by and between Magellan Pipeline Company, L.P. and Strike, LLC.

64. Major Service Contract No. CW2229794, dated July 2, 2018, by and between Marathon Pipe Line LLC and Strike, LLC.

65. Master Worldwide Major Service Contract No. 1112559, dated December 2, 2011, by and between Marathon Oil Company and Crossfire, LLC.

41

66. Construction & Engineering Services Agreement, dated July 6, 2018, by and between MasTec Network Solutions, LLC and Delta Directional Drilling, LLC, as amended by First Amendment, dated November 20, 2019.

67. Master Service Agreement, dated June 20, 2019, by and between Glass Mountain Pipeline, LLC and Strike, LLC.

68. Construction Agreement No. 3531335, dated June 6, 2017, by and between New Mexico Gas Company, Inc. and Crossfire, LLC.

69. Capital Construction Agreement - Hillsboro to Mauston Loop, dated April 24, 2020, by and between Northern Natural Gas Company and Crossfire, LLC.

70. Capital Construction Agreement No. NNGCCA-2020-03492-NNGOPS - LaCrosse Branch Line, dated June 12, 2020, by and between Northern Natural Gas Company and Crossfire, LLC.

71. Capital Construction Agreement No. NNGCCA-2020-03903-NNGOPS - Ventura Interconnect, dated July 20, 2020, by and between Northern Natural Gas Company and Crossfire, LLC.

72. Capital Construction Agreement No. NNGCCA-2020-03915-NNGOPS - Tomah Branch, dated July 27, 2020, by and between Northern Natural Gas Company and Crossfire, LLC.

73. USA Master Services Agreement No. CW2339054, dated April 18, 2019, by and between Phillips 66 Company and Strike, LLC.

74. Amended and Restated Master Service/Sales Agreement, dated February 19, 2016, by and between Pioneer Natural Resources USA, Inc., Pioneer Natural Resources Pumping Services, LLC, Pioneer Natural Resources Well Services, LLC, Pioneer Water Management LLC, and Premier Silica LLC and Strike, LLC.

75. General Terms and Conditions that Include Services, dated June 12, 2019, by and between Public Service Company of North Carolina and Strike, LLC d/b/a Capstone Energy Services.

76. Master Services Agreement, dated July 27, 2018, by and between Southern Diversified Technologies, Inc. and Delta Directional Drilling, LLC.

77. Standing Agreement No. CW2230501, dated October 28, 2015, by and between Spectra Energy Transmission II, LLC and Strike, LLC, as amended by First Amendment, dated March 1, 2016, and Second Amendment, dated October 27, 2020.

78. United States Master Construction Agreement No. CW2234411, dated January 0, 1900, by and between Spectra Energy Transmission II, LLC and Strike, LLC, as amended by First Amendment, dated May 13, 2019, Second Amendment, dated January 16, 2020, and Amendment No. 3, dated December 9, 2020.

79. Lump Sum Construction Agreement No. 20-1126 - VCP EFM Meter Station and Lateral, dated March 11, 2020, by and between Valley Crossing Pipeline, LLC and Strike, LLC.

80. Lump Sum Engineering and Construction Agreement No. 20-1141 - VCP Whistler Tap, dated June 4, 2020, by and between Valley Crossing Pipeline, LLC and Strike, LLC.

81. Master Service Agreement, dated August 24, 2018, by and between Taproot Rockies Midstream LLC and Crossfire, LLC.

82. Master Services Agreement no. SCM-01364, dated July 8, 2008, by and between Targa Resources LLC and Strike Construction, LLC.

83. Master Engineering, Procurement and Construction Agreement No. SCM-03257, dated July 3, 2019, by and between Targa Resources LLC and Strike, LLC.

84. Construction Agreement - Kingfisher Pump Station, dated March 20, 2020, by and between Targa Resources LLC and Strike, LLC.

85. Call-out Purchase Orders by and between Telepak Networks, Inc. and Delta Directional Drilling, LLC.

86. Agreement No. CW2254685, dated May 20, 2020, by and between TransCanada USA Operations Inc. and Strike, LLC.

87. Pipeline Construction Subcontract, dated June 27, 2019, by and between Universal Ensco, Inc. and Strike, LLC, as amended by Amendment No. 1, dated August 8, 2019, Amendment No. 2, dated September 18, 2019, and Amendment No. 3, dated October 7, 2019.

88. Subcontract No. 99994-MSA-010, dated February 13, 2020, by and between Universal Ensco, Inc. and Strike, LLC, as amended by First Amendment, dated May 10, 2020, and Second Amendment, dated January 4, 2021.

89. Subcontract No. 24162-S05, dated March 11, 2019, by and between Universal Ensco, Inc. and Strike, LLC.

90. Turnkey Agreement - Port Arthur Terminal Bi-Directional Pipeline Project, dated May 30, 2020, by and between Port Arthur Terminal LLC and Strike, LLC.

91. Onshore Construction Contract - Bronco CTF, dated February 7, 2020, by and between WGR Operating, LP and Strike, LLC.

92. Onshore Construction Contract - Hawk CTF, dated February 7, 2020, by and between WGR Operating, LP and Strike, LLC.

93. Onshore Construction Contract - Laser CTF, dated February 7, 2020, by and between WGR Operating, LP and Strike, LLC.

94. Master Construction Services Contract No. WWM-20170007, dated February 16, 2017, by and between Whitewater Midstream, LLC and Strike, LLC.

95. Whistler Pipeline Construction and Installation Contract No. WWM-20190320, dated August 5, 2019, by and between WWM Operating, LLC and Strike, LLC.

96. Master Services Agreement, dated April 22, 2020, by and between XTO Energy, Inc. and Strike, LLC.

97. Master Services Agreement, dated January 23, 2012, by and between XTO Energy, Inc. and Crossfire, LLC.

98. Master Construction Services Agreement, dated February 22, 2019, by and between Gibson Energy Infrastructure, LLC and Strike, LLC.

99. Master Service Agreement, dated October 2, 2017, by and between Natgasoline LLC, and Strike, LLC.

100. Master Services Agreement, dated November 12, 2019, by and between Easton Energy, LLC and Strike, LLC.

101. General Commercial Agreement, dated December 11, 2019, by and between LG&E and KU Services Company, Louisville Gas and Electric Company, , and Kentucky Utilities Company and Strike, LLC.

102.    General Service Agreement, dated April 4, 2008, by and between Transcontinental Gas Pipeline Corporation and Strike Construction, LLC.

103.    General Service Agreement, dated July 15, 2011, by and between Northwest Pipeline GP and Crossfire, LLC.

104.    Master Service Contract, dated January 22, 2015, by and between Anadarko Petroleum Corporation and its Affiliate Companies and Strike, LLC.

105.    Master Service Contract, dated January 22, 2015, by and between Anadarko Petroleum Corporation and its Affiliate Companies and Strike, LLC, as amended by First Amendment, dated June 12, 2014, Second Amendment, dated April 8, 2015, and Third Amendment, dated June 4, 2018.

106.    Master Service Agreement, dated August 6, 2020, by and between Western Midstream Operating, LP and its Affiliate Companies and Strike, LLC and its Affiliate Companies.

107.    Master Service Agreement, dated July 23, 2020, by and between Western Midstream Operating, LP and its Affiliate Companies and Strike, LLC and its Affiliate Companies.

108.    Master Service Agreement, dated September 13, 2018, by and between Goodnight Midstream Permian, LLC and Crossfire, LLC.

109.    Master Service Agreement, dated January 18, 2016, by and between Goodnight Midstream Bakken, LLC and Crossfire, LLC.

110.    Enterprise Agreement, dated May 22, 2017, by and between US Gas Assets LLC and Strike, LLC, as amended by Change Form No. 1, dated January 4, 2019.

111.    Master Services Agreement, dated February 10, 2011, by and between Centerpiont Energy Field Services, LLC and Strike Construction, LLC.

112.    General Services Agreement for Professional, Construction, and Maintenance Services and Materials, dated November 15, 2019, by and between NiSource Corporate Services Company and its entities and/or respective Affiliates and Strike, LLC d/b/a Capstone Energy Services, LLC.

113.    Master Maintenance Services Contract, dated January 15, 2020, by and between Olin Corporation and Strike, LLC.

(B)      Supplier Contracts

1.  Master Equipment Lease, dated December 4, 2015, by and between Komatsu Financial Limited Partnership and Strike, LLC.

2.  Master Service Agreement, dated January 20, 2020, by and between Delta Directional Drilling, LLC and Strike, LLC.

3.  Master Lease Agreement, dated May 18, 2015, by and between Deere Credit, Inc. and Strike, LLC, as amended by that Amendment to Master Lease Agreement dated May 2015.

4.  Master Service Agreement, dated March 11, 2020, by and between Yak Mat, LLC and Strike, LLC.

5.  Master Open End Lease Agreement, dated October 7, 2011, by and between Merchants Automotive Group, Inc. and Strike, LLC, as amended by that Addendum to Master Open End Lease Agreement dated October 23, 2012.

6.  Master Equipment Lease Agreement, dated May 12, 2017, by and between Merchants Automotive Group, Inc. and Strike, LLC.

7. Master Hauling Agreement, dated April 24, 2020, by and between Jones Transport, LLC and Strike, LLC.

8. Master Terms and Conditions, dated June 17, 2020, by and between Delta Fuel Company, LLC and Strike, LLC.

9. Master Service Agreement, dated February 1, 2017, by and between CRC Evans Pipeline International, Inc. and Strike, LLC, as amended by that First Amendment to Master Service Agreement dated February 20, 2020.

10. Standard Terms and Conditions of Purchase, dated January 30, 2020, by Pipeline Supply & Service, LLC and Strike, LLC.

11. Insurance Binder dated effective December 1, 2020 through December 1, 2021, by and between Strike, LLC and Berkley Oil & Gas

12. Master Service Agreement, dated March 5, 2013, by and between Blackwell Enterprises, Inc. and Strike, LLC

13. National Account Agreement, dated January 1, 2009, by and between United Rentals, Inc. and Strike, LLC, as amended by that Amendment No. 1 on November 1, 2012, and by that Amendment No. 3 on April 1, 2018 and by that Amendment No. 3 on December 1, 2018.

14. Master Service Agreement, dated September 12, 2011, by and between Excel Aircraft, LLC dba Excel Mulching and Strike, LLC.

15. Master Terms and Conditions, dated May 15, 2020, by and between American Cast Iron Pipe Company and Strike, LLC.

16. Standard Terms and Conditions of Purchase, dated March 2, 2020, by Cross Country Infrastructure Services USA, Inc. and Strike, LLC.

17. Master Tax Lease, dated November 11, 2013, by and between Caterpillar Financial Services Corporation and Strike, LLC, with Rider to Master Tax Lease dated as of September 18, 2014.

18. Master Finance Lease, dated March 29, 2018, by and between Caterpillar Financial Services Corporation and Strike, LLC.

19. Master Lease Agreement, dated February 4, 2109, by and between Signature Financial LLC and Strike, LLC.

20. Master Service Agreement, dated May 4, 2018, by and between Ardent Services, LLC and Crossfire, LLC.

21. Master Services Agreement, dated January 23, 2019, by and between CSS International, Inc. and Strike, LLC.

22. Master Service Agreement, dated March 1, 2019, by and between Patt Enterprises, Inc. dba 405 HDD Services and Strike, LLC.

23. Master Hauling Agreement, dated June 8, 2018, by and between Pe Ben USA, Inc. and Strike, LLC.

24. Terms and Conditions, dated December 15, 2000, by and between Horizontal Technology, Inc. and Delta Directional Drilling, LLC.

25. Reference & Terms, dated January 25, 2017, by and between Gopher Mats, LLC dba Viking Mat Company and Strike, LLC.

26. Reference & Terms, dated October 3, 2018, by and between Kirby-Smith Machinery, Inc. and Strike, LLC.

27. Reference and Terms, dated July 22, 2020, by and between Pipeline Machinery Int. and Delta Directional Drilling, LLC.

28. Master Service Agreement, dated January 20, 2020, by and between Flatirons Drilling, Inc. and Crossfire, LLC.

29. Master Service Agreement, dated November 3, 2017, by and between Strike, LLC dba Bolt and Crossfire, LLC.

30. Master Hauling Agreement, dated November 30, 2018, by and between Standard Freight, LLC and Strike, LLC.

31. Master Service Agreement, dated January 13, 2020, by and between Tech Con Trenching, Inc. and Crossfire, LLC.

32. Master Service Agreement, dated February 10, 2020, by and between JPH Holdings, LLC dba JP Services and Crossfire, LLC.

33. Master Service Agreement, dated November 14, 2018, by and between Di-Trol Systems, Inc. and Strike, LLC.

34. Rental Agreement, executed as needed for short term rentals, by and between Vermeer MidSouth, Inc. and Delta Directional Drilling, LLC.

35. Master Service Agreement, dated July 10, 2020, by and between Applus RTD USA, Inc. and Strike, LLC

**(ii)**

The items set forth on <u>Section 3.04(c)</u> of the Disclosure Schedules are hereby incorporated by reference.

**(iii)**

The items set forth on <u>Section 3.07</u> of the Disclosure Schedules are hereby incorporated by reference.

**(iv)**

1. Professional Services Subcontractor Agreement between Bluestream Professional Services, LLC dba KGPCo and Delta Directional Drilling, LLC, dated October 30, 2020 (restricting competition on business opportunities introduced by KGPCo.).

2. Confidentiality and Non-disclosure Agreement between OE2 North, LLC and Crossfire, LLC, dated May 4, 2020 (restricting competition in owner-related midstream offerings that are not Crossfire's core business).

3. Asset Purchase Agreement, dated as of August 27, 2020, by and between Strike, LLC and JPH Holdings, LLC.

**(v)**

1. Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Stephen V. Pate (as amended on August 17, 2020)

NAI-1515649509v14

2.  Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Kevin Pate

3.  Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Richie Pate

4.  Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Jarvie Arnold

5.  Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Kacey Smart

6.  Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Jason Heckt

7.  Employment Agreement, dated August 30, 2013, by and between Strike, LLC and Cole Pate (as amended on August 17, 2020)

8.  Employment Agreement, dated June 30, 2014, by and between Strike, LLC and William ("Billy") Cleveland

9.  Employment Agreement, dated December 30, 2015, by and between Strike, LLC and Troy Smith

10. Employment Agreement, dated May 16, 2016, by and between Crossfire, LLC and Ezra Lee (as amended on August 17, 2020 and August 26 ,2020)

11. Employment Agreement, dated January 1, 2018, by and between Strike, LLC and Gary Meurer (as amended on December 4, 2019)

12. Employment Agreement, dated January 1, 2018, by and between Strike, LLC and Guy Skipper (as amended on April 30, 2020)

13. Employment Agreement, dated January 1, 2018, by and between Strike, LLC and Scott Hodges (as amended April 30, 2020)

14. Employment Agreement, dated January 1, 2019, by and between Strike, LLC and Andrew Duffin

15. Employment Agreement, dated January 1, 2019, by and between Strike, LLC and Ryan Herrera

16. Employment Agreement, dated January 1, 2019, by and between Crossfire, LLC and Andrew Standley

17. Employment Agreement, dated January 1, 2019, by and between Strike, LLC and Robert "Bobby" Simons

18. Employment Agreement, dated January 1, 2020, by and between Strike, LLC and Jackie Shannon Jett

19. Employee Retention Agreement, dated February 3, 2020, by and between Strike, LLC and Franklin Patterson

20. Employment Agreement, dated January 6, 2020, by and between Strike, LLC and Robert "Johnny" Boykin

21. Employment Agreement, dated August 17, 2020, by and between Strike, LLC and Rhonda Sigman

22. Employment Agreement, dated August 17, 2020, by and between Strike, LLC and Frank Victor-McCawley

**(vi)**

None.

**(vii)**

1. Lease Agreement, dated September 6, 2018, by and between Blairtown Energy Center, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 1266 US 281, Alice, Texas 78332

2. Lease Agreement, dated September 24, 2018, by and between Richard Fenner, Individually, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at the intersection of US Hwy 281 and County Road 119, Alice, Texas 78332, and as amended by that First Amendment to Lease Agreement dated October 31, 2019

3. Lease, dated February 10, 2021, by and between Stellar Investments, Inc., as lessor, and Delta Directional Drilling, LLC, as lessee, pertaining to that certain real property located at 525 E. Roy Long Road, Athens, Alabama 35611

4. Lease, dated August 30, 2013, by and between Crossbridge, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 10919 Interstate 10 E. Baytown, Texas 77520, and as amended by that First Amendment to Lease Agreement dated June 25, 2018, and that Second Amendment to Lease Agreement dated December 3, 2019

5. Commercial Lease, effective December 1, 2012, by and between JBD Properties One, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 13727 Interstate 10, Baytown, Texas 77523, and as amended by that First Amendment to Lease Agreement dated December 29, 2017

6. Lease, dated February 26, 2018, by and between Bursca 79 South Industrial Park Partners, L.P., as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 800 Bursca Drive, Suite 801, South Fayette Township, Pennsylvania, 15017

7. Lease Agreement, dated January 26, 2018, by and between Ages Associates, L.P., as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 4 Grandview Circle, Suite 203, Canonsburg, Pennsylvania 15317, and as amended by that First Amendment to Lease Agreement dated November 8, 2019

8. Lease Agreement, dated December 26, 2018, by and between HB Properties, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at R233 Carrasco Road Lot E & F, Carlsbad, New Mexico 88220

9. Lease Agreement, dated March 26, 2019, by and between HB Properties, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at R231 Carrasco Road, Carlsbad, New Mexico 88220

10. Lease Agreement, dated June 19, 2013, by and between Irrigo, LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 3466 Southwest Loop, Carthage, Texas 75633, and as amended by that First Amendment to Lease Agreement dated June 27, 2018, and that Second Amendment to Lease Agreement dated October 10, 2019

11. Commercial Lease Agreement, dated September 1, 2019, by and between Karst Holdings, LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 1999 Pyrite Road, Air-Rail Industrial Commercial Lot 9, Casper, Wyoming 82604

12. Standard Industrial Commercial Single-Tenant Lease, dated October 7, 2018, by and between WWS, LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 1820 Pyrite Road, Casper, Wyoming 82604, and as amended by that First Amendment to Standard Industrial

48

Commercial Single-Tenant Lease dated April 2, 2020, and that Second Amendment to Standard Industrial Commercial Single-Tenant Lease dated September 24, 2020

13. Shopping Center Lease, dated November 5, 2014, by and between CNMK Texas Properties, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at Unit A, 1643 West Henderson, Cleburne, Texas 76033, as amended by that First Amendment to Shopping Center Lease dated February 19, 2018, and that Second Amendment to Shopping Center Lease dated effective January 26, 2021

14. Lease Agreement, dated August 30, 2013, by and between Crossbridge, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 7619 Up River Road, Corpus Christi, Texas 78409, and as amended by that First Amendment to Lease Agreement, dated June 25, 2018, and that Second Amendment to Lease Agreement, dated December 3, 2019

15. Lease Agreement, dated September 27, 2016, by and between IDV NPID, LP, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 232 North Padre Island Drive, Corpus Christi, Texas 78401, and as amended by that First Amendment to Lease Agreement, dated September 20, 2017

16. Commercial Lease, dated February 21, 2020, by and between La Puerta Azul Rentals, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 9044 Up River Road, Corpus Christi, Texas 78409

17. Lease Agreement, dated March 1, 2018, by and between Johnny Dachsund, L.P., as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 21101 Route 19, Cranberry Township, PA 16066, and as amended by that Lease Amendment No. 1, dated June 26, 2018

18. Lease Agreement, dated January 1, 2021, by and between Jimmy R. Cranford and Ann A. Cranford, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 745 North Linwood, Cushing, Oklahoma 74023

19. Industrial Lease Agreement, dated July 31, 2018, by and between Southwest Livestock & Trucking Co., Inc., as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at E Hwy 90, Lots 5, 6 & 7, Del Rio, Texas 78840

20. Lease Agreement, dated August 1, 2012, by and between Crossbridge, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 1500 South Interstate 35, Dilley, Texas 78017, and as amended by that First Amendment to Lease Agreement, dated June 25, 2018, and that Second Amendment to Lease, dated December 3, 2019

21. Lease Agreement, dated September 22, 2020, by and between Bishop Commercial Rentals, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 606 S. C Street, Duncan, Oklahoma 73533

22. Lease Agreement, dated February 14, 2020, by and between Crimson Insulation, Inc., as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 11148 Highway 82 East, Duncanville, Alabama 35456

23. Lease Agreement, dated October 14, 2019, by and between Crimson Insulation, Inc., as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 13742 Bartow Lane, Duncanville, Alabama 35456

24. Facility Lease Agreement, dated June 14, 2019, by and between the City of Durango, Colorado, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 820 Airport Road, Durango, Colorado 81303

25. Lease Agreement, dated January 1, 2020, by and between DAEC Industrial Park, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 900 & 902 Gladys Street, El

49

Campo, Texas 77437, and as amended by that First Amendment to Lease Agreement, dated March 13, 2020

26. Lease Agreement, dated October 31, 2016, by and between 3939 Carson, LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 3939 Carson Avenue, Evans, Colorado 80620, as extended by that Lease Extension for 3939 Carson LLC, dated February 27, 2019

27. Lease Agreement, dated November 19, 2018, by and between Richard Fenner, Individually, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 911-5201-B E. Hwy 44 Unit B, Freer, Texas 78357, and as amended by that First Amendment to Duval County, Texas Lease Agreement, dated effective as of October 31, 2019, and that Second Amendment to Lease Agreement, dated effective as of March 18, 2020, and that Third Amendment to Lease Agreement, dated effective as of October 31, 2020

28. Lease Agreement, dated effective as of May 11, 2020, by and between Phillips Distributors, Inc., as lessor, and Delta Directional Drilling, LLC, as lessee, pertaining to that certain real property located at 3412 Highway 90, Gautier, Mississippi 39553

29. Commercial Lease, commencing March 14, 2016, by and between James G. Keeling and Sonya Keeling, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 31901 I-10, Hankamer, Texas 77560, as amended by that Commercial Lease Addendum for Extension of Term commencing April 1, 2017, and that Notice of Lease Extension dated February 14, 2018, and that Notice of Lease Extension dated February 9, 2019, and that Commercial Lease Amendment dated effective April 1, 2019, and that Second Amendment to Lease Agreement dated March 3, 2020

30. Lease Agreement, dated June 1, 2020, by and between Circle C Properties, LLC, as lessor, and Delta Directional Drilling, LLC, as lessee, pertaining to that certain real property located at 9560 Hwy 503, Hickory, Mississippi 39332

31. Lease Agreement, dated February 1, 2008, by and between Ezra E. Lee, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 223 Chickenhawk Ln., Ignacio, Colorado 81137, as amended by that First Amendment to Lease Agreement dated June 27, 2018, and that Second Amendment to Lease Agreement dated October 10, 2019

32. Lease Agreement, dated September 1, 2020, by and between Storage Solutions, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 2519 Route C, Jefferson City, Missouri 65109

33. Lease Agreement, dated May 21, 2019, by and between 4 Horse Construction, LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 6019 FM 2509, Kenedy, Texas 78119

34. Lease Agreement, dated November 5, 2019, by and between Norman and Virginia Rash, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 780 W. Kennedale Pkwy., Kennedale, Texas 76060

35. Lease Agreement, dated August 1, 2018, by and between Dwight McHazlett, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at Hwy 57 W., La Pryor, Texas 76060, as amended by that First Amendment to Lease Agreement dated August 3, 2018

36. Lease Agreement, dated August 1, 2018, by and between Equity Trust Company, Custodian FBO Jon A. Box IRA, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 490 Hwy. 57 W., La Pryor, Texas 78872, as amended by that First Amendment to Lease Agreement dated August 7, 2018, and that Second Amendment to Lease Agreement dated November 6, 2019

37. Commercial Lease, dated September 25, 2019, by and between Gary L. Butch and Cynthia S. Butch, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 1815 Mercer-Grove City Rd., Mercer, Pennsylvania 16137

38. Lease Agreement, dated February 27, 2012, by and between Irrigo, LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 5505 South FM 1788, Midland, Texas 79706, as amended by that First Amendment to Lease Agreement dated June 13, 2018, and that Second Amendment to Lease Agreement dated June 27, 2018, and that Third Amendment to Lease Agreement dated October 10, 2019

39. Lease Agreement, dated effective December 7, 2018, by and between James H. Pankey Separate Property Trust, as lessor, and Strike, LLC dba Bolt, as lessee, pertaining to that certain real property located at 2001 Westar Road, Midland, Texas 79706

40. Lease Agreement, dated November 30, 2018, by and between The Park at 1788 South, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 10201 W. County Rd. 148, Midland Texas 78706

41. Lease Agreement, dated August 1, 2019, by and between Sacramento Land Investments, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 10465 N. Conway, Mission, Texas 78573, as extended by that Notice of Lease Extension dated January 13, 2020

42. Commercial Lease, dated February 19, 2020, by and between Post Oaks Holdings, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 9235 Hwy. 146 North, #7A, Mont Belvieu, Texas 77523

43. Lease Agreement, dated January 15, 2021, by and between B/CS Leasing, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 9867 FM 1227, Navasota, Texas 77868

44. Form of Lease, dated effective June 30, 2014, by and between Circle C Properties, LLC, as lessor, and Delta Directional Drilling, LLC, as lessee, pertaining to that certain real property located at 9027 Eastside Drive Extension, Newton, Mississippi 39345, as extended pursuant to that Notice of Extension dated June 26, 2018

45. Lease Agreement, dated October 15, 2020, by and between Old Branch Agriculture, LLC, as lessor, and Delta Directional Drilling, LLC, as lessee, pertaining to that certain real property located at Old Hwy. 43, North Pelahatchie, Mississippi 39145

46. Lease Agreement, dated January 1, 2015, by and between Irrigo, LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 7 US Hwy 285, Pecos, Texas 79772, as amended by that First Amendment to Lease Agreement dated effective April 1, 2017

47. Lease Agreement, dated April 27, 2020, by and between Robert Wiggins, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 6851 West Port Arthur Rd. Port Arthur, Texas 77640

48. Commercial Lease, dated August 17, 2020, by and between Steve Dupuis Equipment, Inc., as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 1050 Hwy 365, Port Arthur, Texas 77640

49. Lease Agreement, dated July 27, 2020, by and between Giles Brown, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 1026 Coonie Jackson Rd. Ragley, Louisiana 70657

50. Lease Agreement, dated August 18, 2014, by and between Irrigo, LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 1 Rio Vista Circle, Rangely, Colorado 81648

NAI-1515649509v14

51. Lease Agreement, dated September 10, 2018, by and between Bruce Chisler and Cathy Chisler, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 200 Wrights Run Rd., Spraggs, Pennsylvania 15362

52. Lease Agreement, dated November 1, 2020, by and between Cecil Joe Stark Sawmill & Logging, Inc., as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 24524 Hwy. 35, Sweeny, Texas 77480

53. Lease Agreement, dated October 9, 2020, by and between Richards Outdoor Power Equipment, LLC, as lessor, and Delta Directional Drilling, LLC, as lessee, pertaining to that certain real property located at 416 Pine Street, Taylorsville, Mississippi 39168

54. One Hughes Landing Office Lease, dated July 16, 2013, by and between One Hughes Landing, LLC, as predecessor-in-interest to HH One Hughes Landing, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 1800 Hughes Landing Blvd., Suites 400, 500 and 600, The Woodlands, Texas 77380, as amended by that First Amendment to Office Lease dated effective September 4, 2013, and that Second Amendment to Office Lease dated effective February 3, 2014, and that Third Amendment to Office Lease dated effective May 6, 2014, and that Fourth Amendment to Office Lease dated effective April 18, 2017

55. Lease Agreement, dated July 25, 2017, by and between Woodlands-Sarofim #1, Ltd., as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 1440 Lake Front Circle, Suite 150, The Woodlands, Texas 77380, as amended by that First Amendment to Office Lease dated effective June 30, 2020

56. Lease Agreement, dated October 24, 2014, by and between CR McB Investments, LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 1360 E. Hwy. 40, Vernal, Utah 84078, as amended by that Amendment to Lease dated October 23, 2017, that Second Amendment to Lease Agreement dated June 23, 2018, and that Third Amendment to Lease Agreement dated January 21, 2020

57. Lease Agreement, dated February 15, 2017, by and between Three Star Rentals, LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 587 Riner Ave., Wamsutter, Wyoming 82336

58. Commercial Lease Agreement, dated October 25, 2019, by and between Atlantis Self Storage, Inc., as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 1221 Green Street, Washington, Pennsylvania 15301

59. Lease Agreement, dated October 19, 2020, by and between HCJ Investments LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located at 12599 Zoe Rd., Watford City, North Dakota 58854

60. Lease Agreement, dated November 19, 2018, by and between Dorothy B. Koratich, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 340 E. Roy Furman Hwy, Waynesburg, Pennsylvania 15370

61. Sublease Agreement, dated April 1, 2018, by and between Crossfire, LLC, as sublessor, and Strike, LLC, as sublessee, pertaining to that certain real property located at 7 US Hwy 285, Pecos, Texas 79772

62. Sublease Agreement, dated December 28, 2018, by and between Layne Christensen Company, as sublessor, and Strike, LLC, as sublessee, pertaining to that certain real property located at 1800 Hughes Landing Blvd., Suite 700, The Woodlands, Texas 77380

63. Lease Agreement, dated January 14, 2020, by and between Ranger 40 Water Solutions, LLC, as lessor, and Crossfire, LLC, as lessee, pertaining to that certain real property located in Orla, Texas, in Section 32, Block 57 T1

64. Net Land Lease Agreement, dated October 16, 2018, by and between Williams Family Investments, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 3351 N. Gregory Road, Suite 100, Yukon, Oklahoma 73099

65. Lease, dated August 30, 2013, by and between Pate Lodge, LLC, as lessor, and Strike, LLC, as lessee, pertaining to that certain real property located at 170 Private Road 387, Freestone County, Texas, as amended by that First Amendment to Lease, effective as of August 30, 2013, as further amended by that Second Amendment to Lease, effective as of August 1, 2018

### (viii)

1. Terms of Service, currently under negotiation with anticipated execution date in February 2021, by and between Rubbl, LLC and Strike, LLC for Rubbl to act as an online equipment rental broker.

### (ix)

1. ABL Loan and Security Agreement, dated as of November 30, 2016, among Strike Capital, LLC, Strike, LLC, Delta Directional Drilling, LLC, Strike Global Holdings, LLC, the financial institutions party thereto from time to time as lenders, and Bank of America, N.A., as administrative agent.

2. Term Loan and LC Loan and Security Agreement, dated as of November 30, 2016, among Strike, LLC, Strike Capital, LC, the Company Subsidiaries party thereto, the financial institutions party thereto from time to time as lenders and Wilmington Trust, N.A., as administrative agent.

3. Third Amended and Restated Regulations of Strike Capital, LLC.

4. Letter Agreement dated August 27, 2020, by and between JPH Holdings, LLC and Strike, LLC granting to JPH Holdings, LLC a right of last offer on specific hydrostatic testing services, such right to terminate August 27, 2022.

5. Strike is entitled to a Preferential Right to Lease under the One Hughes Landing Office Lease dated July 16, 2013, by and between One Hughes Landing, LLC and Strike, LLC, as such was amended on September 4, 2013, February 3, 2014, May 6, 2014 and April 18, 2017.

6. Strike is entitled to Right of First Offer under the Sublease Agreement dated September 11, 2018, by and between Layne Christensen Company and Strike, LLC.

### (x)

1. ABL Loan and Security Agreement, dated as of November 30, 2016, among Strike Capital, LLC, Strike, LLC, Delta Directional Drilling, LLC, Strike Global Holdings, LLC, the financial institutions party thereto from time to time as lenders, and Bank of America, N.A., as administrative agent.

2. Term Loan and LC Loan and Security Agreement, dated as of November 30, 2016, among Strike, LLC, Strike Capital, LC, the Company Subsidiaries party thereto, the financial institutions party thereto from time to time as lenders and Wilmington Trust, N.A., as administrative agent.

3. Corporate Payment Solution Agreement dated September 17, 2019, by and between Comdata, Inc. and Strike, LLC.

### (xi)

1. Subscription Order Form, dated February 2, 2015, by and between Pervasive Software, Inc. and Strike, LLC

2.  Software License Agreement, dated September 27, 2019, by and between Bottomline Technologies, Inc. and Strike, LLC

3.  Cherwell Order Confirmation, dated September 6, 2016, by and between Cherwell Software, LLC and Strike, LLC

4.  Renewal Pricing Terms Confirmation Sheet, dated September 14, 2018, by and between Cherwell Software, LLC and Strike, LLC

5.  Order Form, dated March 27, 2019, by and between Concur Technologies, Inc. and Strike, LLC

6.  Purchase Agreement, dated November 30, 2019, by and between Global Software, LLC d/b/a insightsoftware and Strike, LLC

7.  Service Order, dated September 21, 2018, by and between InEight Inc. and Strike, LLC

8.  Service Order, dated April 17, 2020, by and between InEight Inc. and Strike, LLC

9.  Invoice #9876515314, dated January 1, 2018, by and between Microsoft Corporation and Strike, LLC

10. Invoice #9876515305, dated January 1, 2018, by and between Microsoft Corporation and Strike, LLC

11. Master Subscription Agreement, dated December 22, 2014, by and between MuleSoft, Inc. and Strike, LLC

12. Order Form, dated December 6, 2017, by and between MuleSoft Inc. and Strike LLC

13. Order Form, dated February 9, 2018, by and between Procore Technologies, Inc. and Strike, LLC

14. Invoice, dated March 26, 2018, by and between Dexter + Chaney and Strike Construction

15. Ordering Document, dated May 14, 2019, by and between Oracle America, Inc. and Strike, LLC

16. General Terms, dated May 14, 2019, by and between Oracle America, Inc. and Strike, LLC

17. Ordering Document, dated May 9, 2019, by and between Oracle America, Inc. and Strike, LLC

18. Essential Studio Software License Agreement, undated, by and between Syncfusion, Inc. and Strike, LLC

19. Purchase Order, dated April 27, 2018, by and between Syncfusion, Inc. and Strike, LLC

20. Quote Confirmation, dated July 11, 2018, by and between CDW LLC and Strike Construction

21. Order Form to Master Subscription Agreement, dated April 2, 2014, by and between Workday, Inc. and Strike, LLC

**(xii)**

None.

**(xiii)**

1.  Settlement Agreement, by and between Gibson Energy Infrastructure, LLC and Strike, LLC, to be entered into pursuant to that certain Settlement Agreement Memorandum, dated February 9, 2021

**(b)**

1.  Dispute between Gibson Energy Infrastructure, LLC and Strike, LLC related to the Gibson Energy Wink South a/k/a Pyote East Pipeline Expansion Project.  Strike has filed a lien against Gibson Energy for failure to pay in accordance with the terms of the agreement. This matter resolved at mediation and a formal settlement agreement and release is being drafted.

2. Dispute between Phillips 66 Company and Strike, LLC related to the Jefferson City East Project – Phillips 66 improperly asserts that risks of site conditions are assumed by Strike and therefore disputes reimbursement of costs incurred due to unknown subsurface obstructions in the amount of $944,820.92.

3. Strike LLC v. Turn Key Specialists - (Cause No. 2016 - 24439 STAYED LITIGATION); (BK Case No. 18-33170)

4. Strike, LLC d/b/a Pickett Systems v Linn Energy, LLC, et al (Case No. 16-60040 (DRJ)

5. Strike, LLC v BNP Petroleum Corporation  (Cause No. 09-20206)

6. Strike, LLC v Chemtex International Inc. (Cause No. 17-12307)

7. Strike, LLC v. ASI Aviation, LLC , Aircraft Charter & Management Services, LLC and Justin Smith (No. 201600825-7)

8. Crossfire, LLC v. Big Guns Petroleum, Inc., James Mann, and Belinda Juarez (Cause No. 2017CI21045)

9. Magellan Midstream Partners, L.P. et al. v. Gullett & Associates, Inc.; Strike, LLC; Directional Services South, L.L.C., et al. (Cause No. 202068052)

10. Advanced Energy Development fka Capstone Energy Services, LLC v. Strike, LLC (Arbitration Case No. 1450007247)

11. Magellan Pipeline Company, L.P. and V-Tex Logistics LLC (Cause No. CJ-2020-01491)

12. Johnny Dachsund, LP v. Strike, LLC (Cause No. 19-10905)

13. Dennis Berry v. Strike, LLC (Cause No. 2019DCV-5171-B)

14. Horse Head Holdings, LLC v. Magellan Pipeline Company, LP (Cause No. 34872)

15. Eagle Capital Corporation v. Strike, LLC dba Strike USA, LLC (Cause No. 202009238 stayed pending Ad Hoc Arbitration)

16. Delta Directional Drilling, LLC v. Bennett Construction, Inc. and NGM Insurance Company a/k/a National Grange Mutual Insurance Company (Cause No. CJ-20-08 stayed pending Arbitration Case No. 01-20-0015-5904)

17. Strike, LLC v. Intertek Asset Integrity Management, Inc (Cause No. 2020-81003)

18. Mears Group, Inc. v. Strike, LLC; (Cause No. 2021-03258 stayed pending AAA Arbitration).

19. Dispute between Crossfire, LLC and Corrpro Companies, Inc. related to Corrpro's improper demand for payment for delays in the amount of $39,836.10.

## Section 3.14
## Related Party Transactions

1.     Crossbridge, LLC Leases

   a. Lease Agreement dated August 30, 2013, between Crossbridge, LLC and Strike, LLC, as amended by First Amendment to Lease Agreement, dated June 25, 2018, and as further amended by Second Amendment to Lease Agreement, dated December 3, 2019, for the premises located at 10919 Interstate 10 E. Baytown, Texas 77520.

   b. Lease Agreement dated August 30, 2013, between Crossbridge, LLC and Strike, LLC, as amended by First Amendment to Lease Agreement, dated June 25, 2018, and as further amended by Second Amendment to Lease Agreement, dated December 3, 2019, for the premises located at 7619 Up River Rd., Corpus Christi, Texas 78409.

   c. Lease Agreement dated August 30, 2013, between Crossbridge, LLC and Strike, LLC, as amended by First Amendment to Lease Agreement, dated June 25, 2018, and as further amended by Second Amendment to Lease Agreement, dated December 3, 2019, for the premises located at 1500 South Interstate 35 Dilley, Texas 78017.

2.     Ezra Lee Lease

   a. Lease Agreement dated February 1, 2008, between Ezra E. Lee and Crossfire, LLC, for the premises located at 223 Chickenhawk Lane, Ignacio, Colorado 81137.

3.     Irrigo, LLC (owned by Isaiah Lee, brother of Ezra Lee) Leases

   a. Lease Agreement dated January 1, 2015, between Irrigo, LLC and Crossfire, LLC, as amended by First Amendment to Lease Agreement, dated April 1, 2017, for the premises located at 7 US Highway 285 North Pecos, Texas 79772.

   b. Lease Agreement dated June 19, 2013, between Irrigo, LLC and Crossfire, LLC, as amended by First Amendment to Lease Agreement, dated July 1, 2018, and as further amended by Second Amendment to Lease Agreement, dated October 19, 2019,  for the premises located at 3466 Southwest Loop Carthage, Texas 75633.

   c. Lease Agreement dated February 27, 2012, between Irrigo, LLC and Crossfire, LLC, as amended by First Amendment to Lease Agreement, dated June 13, 2018, as further amended by Second Amendment to Lease Agreement, dated June 27, 2018, and as further amended by Third Amendment to Lease Agreement, dated October 10, 2019, for the premises located at 5505 South FM 1788 Midland, Texas 79706.

   d. Lease Agreement dated August 18, 2014, between Irrigo, LLC and Crossfire, LLC, for the premises located at 1 Rio Vista Circle Rangely, Colorado 81648.

4.     Circle C Properties, LLC Lease (owned by Billy Cleveland and Tammy Cleveland)

   a. Lease Agreement dated June 30, 2014, between Circle C Properties, LLC and Delta Directional Drilling, LLC, for the premises located at 9027 Eastside Drive Extension Newton, Mississippi 39345.

     b.   Lease Agreement dated June 1, 2020, between Circle C Properties, LLC and Delta Directional Drilling, LLC, for the premises located at 9560 Hwy 503, Hickory, Mississippi 39332.

5.      Pate Lodge, LLC Lease

     a.   Lease Contract dated June 30, 2010, Lease dated August 30, 2013, as amended by First Amendment to Lease dated August 30, 2013, as further amended by Second Amendment to Lease dated August 1, 2018, as further amended by First Assignment and Assumption of Lease effective January 1, 2015, and Second Assignment and Assumption of Lease effective December 1, 2015, between Pate Lodge, LLC and Strike, LLC, for the premises located at 170 Private Road 387, Freestone County, Texas.

6.      Related Party Sublease

     a.   Sublease Agreement dated April 1, 2018, between Crossfire, LLC and Strike, LLC for the premises located at 7 US Highway 285 North, Pecos, Texas 79772.

7.      Master Hauling Agreement dated July 11, 2017, between Crossfire, LLC and Crossfire Aggregate Services, LLC. Approximate volume is $140,000/month for 2018; current AP balance $221,963 (as of September 24, 2018).

8.      Promissory Note dated August 6, 2018, between Crossfire Aggregate Services, LLC (owned by Ezra Lee) and Strike, LLC, secured by that certain Personal Guaranty of Payment by Ezra Lee, related to debt owed in connection with the original acquisition of Crossfire, LLC.

9.      Ezra Lee is a passive minority investor and a member of the board of directors of Utah Gas Corp., an E&P company for whom Crossfire, LLC has performed work. 2018 year-to-date payments total

$19,675 (as of September 24, 2018). Additional projects may be awarded.

10.      Lone Star Ropes, a rodeo rope vendor, is a provider of certain ropes and other items for business development use by Strike, LLC. Lone Star Ropes is owned by Kevin Pate and Richmond Pate.

11.      Certain phones, iPads, computers, information technology equipment and services and similar such items and related fees and expenses have been provided for or paid for by the Company or one of the Company Subsidiaries for the benefit of certain Sellers and other family members and related Persons related thereto.

12.      The Company or one of the Company Subsidiaries currently pays for automobile insurance, fuel cards, car maintenance, tires, car washes and similar auto expenses for the benefit of certain members.

13.      Certain venue tickets used by the Company or one of the Company Subsidiaries primarily for business development purposes have been purchased in the name of certain members.

14.      Wives, family members and other Persons related or associated with Sellers have attended entertainment events, dinners, and various other outings or events paid for or sponsored by the Company or one of the Company Subsidiaries.

15.      Charitable donations have been made by the Company or the Company Subsidiaries to charities and non-profit organizations at the request or proposal of certain members.

16.      Pate Aviation, LLC provides jet services as a supplier to Strike, LLC. Pate Aviation, LLC is owned and/or controlled by Stephen V. Pate, Aaron Cole Pate, Kevin Pate, and Richmond Pate.

17.      Twin Timbers, LLC provides bus transportation services to Strike, LLC. Twin Timbers is owned and/or controlled by Kyle Pate, Stephen V. Pate's son.

18.      Bend Construction provides general interior construction services to Strike, LLC. Bend Construction is owned and/or controlled by Drew Hollowell, Stephen V. Pate's son-in-law.

19.      RP Ranches LLC is a potential supplier of hunting services to Strike, LLC. RP Ranches LLC is owned and/or controlled by Richmond Pate.

20.      Icehole LLC provides custom ice chests with logos as a vendor to Strike, LLC. Icehole LLC is owned and/or controlled by Richmond Pate.

21.      Pate Brothers Land Cattle LLC rents certain equipment for use at the Pate Lodge to Strike, LLC. Pate Brothers Land Cattle LLC is owned and/or controlled by Kevin T. Pate Revocable Living Trust and Richmond A. Pate Revocable Living Trust.

22.      Heavyquip provides repair services and parts to Strike, LLC pursuant to the General Terms and Conditions of ITR America, LLC, the parent company of Heavyquip. Heavyquip and ITR America, LLC are owned and/or controlled, at least in part, by One Equity Partners.

23.      The Company or one of the Company Subsidiaries currently pays for medical insurance for the benefit of Marta Pate, mother of Aaron Cole Pate, Tori Hollowell, daughter of Stephen V. Pate, and Kourtney Sullivan, daughter of Kevin Pate.

24.      The duties of certain paid employees of the Company, including executive assistants, accountants, lawyers, office services personnel and facilities management personnel, may involve professional duties and other labor and assistance related to personal matters of certain members.

NAI-1515649509v14

Section 3.15(e)
**Labor Matters**

1. *In the matter of Don Murphey*

   This dispute involves claims of unlawful discrimination on the basis of medical disability and retaliation brought by a former employee of Pickett, a dba of Strike, LLC. Claimant has initially demanded $360,000 but has since lowered his demand to $180,000. Pickett denies liability and has responded to the claim. The parties attempted to mediate this dispute in January 2021, but it was unsuccessful. Pickett plans to vigorously defend against this claim.

2. *In the Matter of Oranita Zamora;* EEOC Charge No. 453-2018-01563 in the US EEOC El Paso Area Office

   This dispute involves claims of unlawful discrimination on the basis of race, sex, and retaliation brought by a former employee of Crossfire. Crossfire submitted a position statement and an additional response requesting additional information to the EEOC. No additional action is required at this time.

3. *Department of Labor Corpus Christi Investigation*

   The U.S. Department of Labor contacted Strike, LLC to investigate the Company's Corpus Christi project location regarding wage and hour matters under the Fair Labor Standards Act. To date, the focus has been on whether Strike properly pays a subgroup of welders who are receiving rig pay while not using their rigs. The DOL has indicated that it is their position that the rig pay should be included in their regular hourly rate for the purpose of calculating overtime. On August 30, 2019, Strike submitted additional correspondence to the DOL. On April 16, 2020, the DOL responded to Strike's August 30, 2019 correspondence, indicating that it was rejecting Strike's arguments. According to the DOL, Strike's arguments did not match what the welders told the DOL in their interviews. The investigator indicated that Strike has two options: (i) agree to come into compliance and work with the DOL on back wages calculations, or (ii) refuse to come into compliance and the case will be sent to upper management. Given our legal positions, we will refuse compliance and continue to argue Strike's case to upper management. There are at least two additional levels of DOL management we must work through before a decision is made whether the DOL will pursue the case in litigation.

4. *In the Matter of James Warren*; EEOC Charge No. 31C-2019-01463 in the US EEOC Houston District Office

   This dispute involves claims of unlawful discrimination on the basis of age brought by a former employee of Strike. Strike denies these allegations on the basis that the employee failed a client-required weld test making him ineligible for work on the project. Strike has responded to the charge. Since this response, Warren has contacted the EEOC requesting to withdraw his claim. Warren's claim expired under the statute of limitations on 11/25/2020. This case is considered closed.

5. *In the Matter of Tanner Prater;* EEOC Charge No. 564-2020-00269 in the US EEOC Oklahoma City Area Office

This dispute involves claims of unlawful discrimination and retaliation on the basis of sex brought by a former employee of Strike. Strike denies these allegations on the basis that the employee was terminated as a part of a reduction of force. Strike has responded to the charge and is awaiting response form the EEOC.

6. *In the Matter of Jonathan Prater;* EEOC Charge No. 564-2020-00270 in the US EEOC Oklahoma City Area Office

This dispute involves claims of unlawful discrimination and retaliation brought by a former employee of Strike. Strike denies these allegations on the basis that the employee failed to perform duties as required of the position leading to his termination. Strike has responded to the charge and is awaiting response form the EEOC.

7. *Jennifer Parker v. Strike, LLC;* Cause No. 18-10-13558 in the 284th Judicial District Court of Montgomery County, Texas

This lawsuit is brought by a former employee of Strike who alleges that she was discriminated or retaliated against after suffering a workplace injury that allegedly occurred on April 5, 2018. Strike denies these allegations on the basis that the employee violated a safety protocol, which led to her termination. Mediation was unsuccessful and the parties are agreed to arbitration parameters via Rule 11 Agreement on April 30, 2020.

8. *Tanner Prater and Jonathan Prater v Strike, LLC;* (Case# CIV-20-132-J) US District Court Western District OK. Discrimination.

This dispute involves claims of unlawful discrimination on the basis of sex and retaliation brought by a former employee of Strike. Strike denies these allegations on the basis that Prater was termed for a reduction in force. The Praters are subject to a Dispute Resolution Agreement requiring mediation and if unsuccessful, then arbitration. This is related to the claims in Item 28 and 29 above.

9. *Antonio Vitela v. Strike, LLC;* (CV57259) In the 441st Judicial District Court of Midland County, Texas

This lawsuit is brought by a former employee of Strike who alleges that he was wrongfully terminated on January 25, 2020 after suffering a workplace injury that occurred on November 14, 2019. Strike denies these allegations on the basis that the employee was termed for a reduction in force. Vitela is subject to a Dispute Resolution Agreement requiring mediation and if unsuccessful, then arbitration.

NAI-1515649509v14

**Section 3.16**
**Litigation; Proceedings**

**(a)**

1. *Strike, LLC v. Turn Key Specialists;* (Cause No. 2016-24439) In the 295th District Court of Harris County, Texas (Stayed)*; Strike, LLC v. Turn Key Specialists;* (Case No. 18-33170) in the US Southern District of Texas Bankruptcy Court

2. *Strike, LLC d/b/a Pickett Systems v Linn Energy, LLC, et al.;* (Case No. 16-60040 (DRJ) In the US Bankruptcy Court - Southern District of Texas

3. *Strike, LLC v. ASI Aviation, LLC, Aircraft Charter & Management Services, LLC and Justin Smith;* (Cause No. 201600825-7) In the 234th Judicial District Court of Harris County, Texas

4. *Strike, LLC v. BNP Petroleum Corporation;* (Cause No. 09-20206) In the US Southern District of Texas Bankruptcy Court

5. *Strike, LLC v. Chemtex International Inc.;* (Cause No. 17-12307) In the US District of Delaware Bankruptcy Court

6. *Crossfire, LLC v. Big Guns Petroleum, Inc., James Mann, and Belinda Juarez;* Cause No. 2017CI21045 In the Judicial District Court of Bexar County, Texas; (Case No. 18-50569) in the US Bankruptcy Court Western District of Texas

7. *Strike, LLC v. GW Ridge, LLC, Christopher G. Williams, and Justin Ballard;* (Cause No. 4:20-00712) In the 284th Judicial District Court of Montgomery County, Texas

8. *Delta Directional Drilling, LLC v. Bennett Construction, Inc. and NGM Insurance Company a/k/a National Grange Mutual Insurance Company;* (Case No. CJ-20-8 stayed pending Arbitration Case No. 01-20-0015-5904) In the District Court for Latimer County, Oklahoma

9. *Strike, LLC v. Sandy Creek Farms, Steve Barrington, et al.;* (Cause No. CIV-20-571-PRW) In the United States District Court for the Western District of Oklahoma

10. *State of Goliad, Texas v. Strike, LLC;* (Cause No. 18-04-0685-CV) In the 24th Judicial District Court of Goliad County, Texas

11. *The County of Leon, Texas v. Strike, LLC;* (Cause No. T-14-563) In the 278th Judicial District Court of Leon County, Texas

12. *Internal Audit of Strike, LLC dba Pickett Systems* (RN103057576) for air permitting compliance at the Pickett facility

13. *Geico General Insurance Company v. Mack Locklear, et al. and Delta Directional Drilling, LLC;* (Cause No. 2018-0143749-CV) In the Superior Court Division of Cobb County, Georgia

14. *Joseph Montie v. Crossfire, LLC and Logan Goodrich;* (Cause No. 2:19-cv-10455-GAD-EAS) In the US District Court for the Eastern District of Michigan

15. *Johnny Dachsund, LP v. Strike, LLC;* (Cause No. 19-10905) In the Court of Common Pleas of Butler County, Pennsylvania

16. *Dennis Berry v. Strike, LLC;* (Cause No. 2019DCV-5171-B) In the Judicial District Court of Nueces County, Texas

17. *Horse Head Holdings, LLC v. Magellan Pipeline Company, LP, et al;* (Cause No. 34872) In the 12th District Court of Grimes County, Texas

18. *Damone N. Eddy, in his capacity as the Administrator and Personal Representative of the Estate of Stephanie N. Eddy and Allison M. Lippert vs. Strike, LLC et al;* (Cause No. 20-C-50) In the Circuit Court of Monongalia County, West Virginia

19. *Eagle Capital Corporation v. Strike, LLC dba Strike USA, LLC;* (Cause No. 202009238 stayed pending Ad Hoc Arbitration) In the 165th Judicial District Court of Harris County, Texas

20. *Brenda Wozencraft et al v. Neptali Puente and Strike, LLC;* (Cause No. B-0206046) In the 60th Judicial District Court of Jefferson County, Texas

21. *In the matter of Don Murphey* – claim involving discrimination on the basis of medical disability and retaliation brought by a former employee of Strike

22. *Magellan Pipeline Company, L.P. and V-Tex Logistics LLC v. Strike, LLC and Berkley National Insurance Company;* (Cause No. CJ-2020-01491) In the Judicial District Court of Tulsa County, Oklahoma

23. *In the Matter of Oranita Zamora;* EEOC Charge No. 453-2018-01563 in the US EEOC El Paso Area Office

24. *Department of Labor Corpus Christi Investigation* regarding whether Strike properly pays a subgroup of welders who are receiving rig pay while not using their rigs

25. *FVL, LTD., Et Al v. Strike, LLC, a/k/a Strike USA, Precision HDD LLC, Directional Service South, L.L.C., Kestrel Field Services, Inc., a/k/a Kestrel Engineering, and Keystone Engineering, Inc.* (Cause No. 2020V-0128) In the 155th Judicial District Court of Austin County, Texas

26. *In the Matter of Tanner Prater;* EEOC Charge No. 564-2020-00269 in the US EEOC Oklahoma City Area Office

27. *In the Matter of Jonathan Prater;* EEOC Charge No. 564-2020-00270 in the US EEOC Oklahoma City Area Office

28. *Jennifer Parker v. Strike, LLC;* (Cause No. 18-10-13558) In the 284th Judicial District Court of Montgomery County, Texas

29. *William Lively v. Strike, LLC;* (Cause No. 2018-53007) In the 113rd Judicial District Court Harris County, Texas

30. *Eunice Valenzuela, Individually and as the heir and representative of the estate of Arturo A. Valenzuela, Deceased, and as next friend for Geovanni A. Valenzuela, a minor, Ulysses Y. Valenzuela, a minor, and Armando S. Valenzuela, a minor v. Crossfire, LLC dba Crossfire Oilfield Services Inc. and Matthew Scott;* (Cause No. 7:19-cv-4) In the US District Court Western District Texas

31. *Michael Ratliff, in his Capacity as Conservator of the Estate of Matthew Tristan Scott, Bradley Thyson Hord, Individually and as Representative of the Estate of Douglas Mack Hord, Deceased, and January Elaine Hord Plaintiffs v. Arturo A. Valenzuela, Deceased, and Tim Icenhower Oil & Gas, Inc. Defendants and Eunice Valenzuela, Individually, and as the Heir and Permanent Administrator of the Estate of Arturo A. Valenzuela, Deceased et al. Counter-Plaintiff and Interveners v. Crossfire, LLC D/B/A Crossfire Oilfield Services, Inc., Matthew Tristan Scott by and through his Conservators Michael Ratliff and January Elane Hord, Third Party Defendants;* (Cause No. 2020080271) In the 2nd Judicial District Court of Cherokee County, Texas

32. *Jesse C. Finch v. Thomas Collins, Crossfire, LLC, and Crossfire Seeding;* (Cause No. D-504-CV-2018-00957) In the 5th Judicial District Court of Chaves County, New Mexico

33. *Fredrick Robinson v. Oryx Midstream Services, LLC, Strike Force Midstream, LLC, Strike LLC, and Oryx Energy Company;* (Cause No. DC-20-16068) in the Judicial District Court Dallas County, Texas

34. *City of Huntsville D/B/A Huntsville Utilities v. Delta Directional Drilling, AT&T Corp., Fictitious Defendant 1, Fictitious Defendant 2, Fictitious Defendant 3;* (Cause No. 47-DV-2020-901774.00) In the Judicial District Court Madison County, Alabama

35. *Magellan Midstream Partners, L.P. et al. v. Gullett & Associates, Inc.; Strike, LLC; Directional Services South, L.L.C., et al.* (Cause No. 202068052) In the 334th Judicial District Court Harris County, Texas

36. *Strike, LLC v. David Gerregano, Commissioner of Revenue, State of Tennessee;* (Cause No. 20-1070-IV) In the 20th Judicial District Court of Davidson County, Tennessee

37. *Advanced Builders* Arbitration Matter involving payment dispute under certain purchase and supplier agreements between Advanced Builders and Strike, LLC

38. *Tanner Prater and Jonathan Prater v Strike, LLC;* (Case# CIV-20-132-J) In the US District Court Western District Oklahoma

39. *Jason Bynum v. Strike, LLC, STS Consulting Services LLC, Anadarko E&P Onshore LLC, Anadarko Petroleum Corporation, and Anadarko Lone Creek Gathering LLC;* (Cause No. 19-05-22950-CVR) In the 143rd Judicial District Court of Reeves County, Texas

40. *Juan de Jesus Perez v. William Bynum and Strike, LLC;* (Cause No. 2020-22728) In the 269th Judicial District Court of Harris County, Texas

41. *Timothy Posey v. Delta Directional Drilling, LLC;* (Case No. 58-SM-2021-900024.00) In the State of Alabama Unified Judicial System

42. *Jeremy Hershey v. Tony Power, Customer Crane Rental, LLC, Strike LLC;* (Case # 21-1-135) In Montgomery County District Court, Texas

43. *Strike, LLC v. Intertek Asset Integrity Management, Inc.;* (Cause # 2020-81003) In the 157th Judicial District Court Harris County, Texas

44. *Lee Lopez and Sandra Diaz v. Strike, LLC and Dusty Ann Sparkman;* (Cause No. 2020-21688) In the 55th Judicial District Court of Harris County, Texas

45. *Mears Group, Inc. v. Strike, LLC*; (Cause No. 2021-03258) In the 215th Judicial District Court of Harris County, Texas

46. *Antonio Vitela v. Strike, LLC;* (CV57259) In the 441st Judicial District Court of Midland County, Texas

47. *In the Matter of James Warren;* EEOC Charge No. 31C-2019-01463 in the US EEOC Houston District Office

48. *Leonides Gonzalez c. Unknown Driver and Strike, LLC;* (Cause No. 19-01-14337-ZCV) 365th District Court Zavala County, TX

49. *Red River Parish Tax Agency vs. Strike, LLC of Texas f/k/a Strike Construction, LLC;* (Cause No. 37805) 39th Judicial District Court of Parish of Red River, Louisiana

NAI-1515649509v14

**Section 3.17**
**Compliance with Laws; Permits**

**(b)**

1. *Internal Audit of Strike, LLC dba Pickett Systems* (RN103057576) for air permitting compliance at the Pickett facility

**(c)**

1. Company made a political contribution of $25,000 on September 8, 2020 to the Wesley Hunt Victory Fund in support of Wesley Hunt, a Republican candidate for the 7th Congressional District of Texas.

**Section 3.18**
**Insurance**

| Type of Policy | Carrier Name |
| --- | --- |
| 1.   Workers Compensation | Berkley Regional Insurance Company |
| 2.   General Liability | Berkley National Insurance Company |
| 3.   Commercial Auto Liability | Berkley National Insurance Company |
| 4.   Umbrella – Primary Layer | Berkley National Insurance Company |
| 5.   Excess Liability – 1st Layer | Westchester Fire Insurance Company |
| 6.   Excess Liability – 2nd Layer | Berkley National Insurance Company |
| 7.   Excess Liability – 3rd Layer (quota share) | General Security National Insurance Company |
| 8.   Excess Liability – 3rd Layer (quota share) | Endurance American Insurance Company |
| 9.   Excess Liability – 4th Layer | Great American Assurance Company |
| 10.  Commercial Real/Personal Property | Aspen American Insurance Company |
| 11.  Business Travel Accident | Zurich American Insurance Company |
| 12.  Aviation – Non Owned Aircraft | United States Aircraft Insurance Group |
| 13.  Contractor Services Environmental Liability | Great American E&S Insurance Company |
| 14.  Professional Liability | Allied World Surplus Lines Insurance Company |
| 15.  Directors & Officers, Employment Practices Liability, and Fiduciary | Federal Insurance Company |
| 16.  Directors & Officers – 1st Excess Layer | Beazley Insurance Company, Inc. |
| 17.  Directors & Officers – 2nd Excess Layer | RSUI Indemnity Company |
| 18.  Directors & Officers – Side A/DIC Liability | Continental Casualty Company |
| 19.  Commercial Crime | National Union Fire Insurance Company of Pittsburgh, Pa. |
| 20.  Cyber Liability | Indian Harbor Insurance Company |
| 21.  Special Crime | Tokio Marine Specialty Insurance Company |
| 22.  Key Man insuring Richmond A. Pate | American General |
| 23.  Key Man insuring A. Cole Pate | AXA Equitable Life Insurance |

| 24. Key Man insuring A. Cole Pate | New York Life |
|---|---|

NAI-1515649509v14

## Section 3.19
## Customers and Suppliers

### Top 10 Largest Customers of the Company Group by Revenue

| Customer | Revenue |
|---|---|
| Kinder Morgan, Inc. | $134,510,126.39 |
| Cheniere Energy, Inc. | $79,275,893.83 |
| Whitewater Midstream | $78,947,542.01 |
| Chevron USA, Inc. | $72,471,531.80 |
| Enterprise Products Partners L.P. | $54,020,440.74 |
| Phillips 66 Company | $43,508,369.38 |
| BPX Energy | $40,466,467.49 |
| Spectra Energy Corporation | $37,352,750.97 |
| Crestwood Midstream Partners LP | $23,433,219.62 |
| Magellan Midstream Partners, LP | $21,919,623.99 |

### Top 10 Largest Suppliers of the Company Group by Spend

| Supplier | Expenditure |
|---|---|
| Komatsu Financial Limited Partnership | $26,508,987.64 |
| Delta Directional Drilling LLc | $20,977,436.89 |
| Deere Credit, Inc | $12,552,683.10 |
| Yak Mat LLC | $11,386,611.20 |
| MERCHANTS AUTOMOTIVE GROUP | $19,163,922.28 |
| Jones Transport LLc - STR | $10,727,873.50 |
| Delta Fuel Company | $10,196,907.91 |
| Crc Evans Pipeline Int'l Inc | $8,660,374.19 |
| Pipeline Supply & Service | $8,130,635.80 |
| BERKLEY OIL & GAS | $7,964,034.75 |

**Section 3.20**
**<u>Brokers</u>**

1.  Engagement Letter, dated June 22, 2020, by and between Guggenheim Securities, LLC and Strike, LLC (as amended on November 4, 2020)

## Section 3.21
## Environmental

**(a)**

1. Strike, LLC received a Notice of Enforcement for Compliance Evaluation Investigation relating to the Strike, LLC – Angleton Yard, 27375 FM 2004, Angleton, Texas, dated May 18, 2018, from the Texas Commission on Environmental Quality (Incident No. 269488) for unauthorized (outdoor burning of prohibited items and unauthorized/disposal of municipal solid waste.) This matter has been resolved with no outstanding costs or obligations

**(e)**

1. Standard Indemnities to Customers

<u>Environmental Contractual Indemnities to Customers</u>: Company Group warrants that its work is performed in an environmentally sound manner and in compliance with the customer's respective specification and applicable environmental law. To the extent Company Group generates or introduces hazardous materials at the site during performance of the work, Company Group is obligated to remediate the site and indemnify the customer for any damages arising out of such action. For clarity, the foregoing indemnity obligation does not extend to pre-existing site conditions or hazardous conditions caused by the customer.

2. Standard Indemnities from Subcontractors

The environmental obligations and indemnities given to Company Group from subcontractors varies depending upon the type of work typically performed by that subcontractor. The table below outlines such obligations and indemnities categorized by contract type.

| Contract Type | Tier Level Use | Environmental Provisions |
|---|---|---|
| Master Services Agreement - Tier 1 | High Risk Onsite Activity (examples: drilling, hydro excavation, hot topping, I&E services) | •Subcontractor shall remove all Hazardous Substances and waste from the Project site. Subcontractor covenants and warrants that such waste will be disposed of in accordance with all applicable environmental permits and laws.<br>•Subcontractor shall ensure that all personnel have received all training regarding environmental, health, safety, or any other matters required by law. Subcontractor will comply with all erosion control, revegetation, maintenance and any environmental requirements and/or plans created by Owner and/or Contractor including compliance with the action necessary to secure a FERC certificate.<br>•Subcontractor warrants that it shall: (i) notify Strike in writing of any intended usage of Hazardous Substances prior to such usage; (ii) follow all applicable reporting and notification requirements; (iii) obtain safety data sheets for all Hazardous Substances; and (iv) obtain all necessary permits and licenses for the Work.<br>•Subcontractor shall defend, indemnify, and hold Strike harmless from any and all liabilities asserted against Strike as a direct or indirect result of the presence or release of any Hazardous Substances which is attributable in any way to the Work, or to the acts or omissions of the Subcontractor Parties. |
| Master Services Agreement - Tier 2 | Mid Risk Onsite Activity (examples: concrete work, site | •Subcontractor shall remove all Hazardous Substances and waste from the Project site. Subcontractor covenants and warrants that such waste will be disposed of in accordance with all applicable environmental permits and laws. |

| | security, fence installation) | •Subcontractor shall defend, indemnify, and hold Strike harmless from any and all liabilities asserted against Strike as a direct or indirect result of the presence or release of any Hazardous Substances which is attributable in any way to the Work, or to the acts or omissions of the Subcontractor Parties. |
|---|---|---|
| Master Services Agreement - Tier 3 Onsite | Low Risk Onsite Activity (examples: equipment maintenance, landscaping, traffic control) | •Subcontractor shall follow all applicable laws including but not limited to orders and requirements of the Environmental Protection Agency and the Federal Energy Regulatory Commission. |
| Master Services Agreement - Tier 3 Offsite | Low Risk Offsite Activity (examples: offsite fabrication, offsite equipment maintenance, weld testing lab) | •Subcontractor shall follow all applicable laws including but not limited to orders and requirements of the Environmental Protection Agency and the Federal Energy Regulatory Commission. |
| Master Hauler Agreement | Hauling Services | •Subcontractor shall defend, indemnify, and hold Strike harmless from any and all liabilities asserted against Strike as a direct or indirect result of the presence or release of any Hazardous Substances which is attributable in any way to the Work, or to the acts or omissions of the Subcontractor Parties. |
| Master Professional Services Agreement | Professional Services (examples: consulting, engineering, surveying) | •Subcontractor shall follow all applicable laws including but not limited to orders and requirements of the Environmental Protection Agency and the Federal Energy Regulatory Commission. |

**(f)**

**Company-Owned Above ground Storage Tanks:**

| Location | | | Volume | Contents | Containment Type | Registration Number |
|---|---|---|---|---|---|---|
| Baytown | Tank 1 | | 12,000 gallon | Off-Road Diesel | Double Wall | 87932 |
| | Tank 2 | Compartment 1 | 14,000 gallon | On-Road Diesel | Double Wall | 87932 |
| | | Compartment 2 | 6,000 gallon | Gasoline | Double Wall | 87932 |
| Dilley | Tank 1 | | 12,000 gallon | Off-Road Diesel | Double Wall | 86308 |
| | Tank 2 | Compartment 1 | 14,000 gallon | On-Road Diesel | Double Wall | 86308 |
| | | Compartment 2 | 6,000 gallon | Gasoline | Double Wall | 86308 |
| Four Corners/Ignacio | Tank 1 | | 300 BBL | N/A | Concrete Berm | N/A Inactive |
| | Tank 2 | | 300 BBL | N/A | Concrete Berm | N/A Inactive |
| | Tank 3 | | 300 BBL | N/A | Concrete Berm | N/A Inactive |

| | Tank 4 | | 500 gallon | N/A | Concrete Berm | N/A Inactive |
|---|---|---|---|---|---|---|
| | Tank 5 | | 1,000 gallon | N/A | Concrete Berm | N/A Inactive |
| | Tank 6 | | 8,000 gallon | N/A | Concrete Berm | N/A Inactive |
| | Tank 7 | | 10,000 gallon | N/A | Concrete Berm | N/A Inactive |
| | Tank 8 | | 3,000 gallon | N/A | Concrete Berm | N/A Inactive |
| | Tank 9 | | 5,000 gallon | N/A | Concrete Berm | N/A Inactive |
| | Tank 10 | | 6,000 gallon | N/A | Concrete Berm | N/A Inactive |

NAI-1515649509v14

**Section 3.22**
**Customer Warranties**

**Tennessee Gas Pipeline, LLC (Kinder Morgan) – Broad Run Expansion Project – Station 563 – Restoration and Painting Claims**

Restoration work included clean-up, grading, seeding, and painting activities. All of the painting items were performed by Hollywood Services by December 2020. Strike civil crew came in behind Hollywood Services to dress everything up and complete the restoration items. Warranty items related to this project are complete.

**Columbia Gulf Transmission, LLC (TransCanada) Gulf Xpress Project – Restoration Claims**

Restoration work included clean-up, grading, and seeding, and painting activities. Warranty claims are substantially complete. Strike received a recent warranty claim on a grading issue at the Cane Ridge station that is currently being addressed. The scope of the warranty is pending, however, preliminary review suggests the work to be immaterial.

**Magellan Pipeline Company, LP – 20" Pipeline/ EH2H – Restoration Claims**

Magellan has provided eighty-three (83) warranty claims of which fifty-seven (57) items are pending. These claims include clean-up and repair to environmental control devices, fencing, subsidence, soil compaction, and reseeding. All warranty work is ongoing and is scheduled for completion by March 2021.

**Enterprise Crude Pipeline, LLC (Enterprise) – Restoration Claims**

Enterprise forwarded a list of warranty claims by a ROW landowner (Ann Frost) during pipeline construction activities. The claims included grading, holes in the ground, mud, mud lines on trees and underbrush, ruts, open trenches, ponding water, and seeding. Restoration has been completed by the beginning of 2019.

**Midship Pipeline Company, LLC (Cheniere) – Restoration Claims**

Cheniere forwarded a list containing twenty-nine (29) warranty claims by ROW landowners and FERC in February 2020. The claims include subsidence, ponding, grading, clean-up, soil erosion, slope breaker outlet erosion, vegetation growth, and sediments deposition. Restoration is ongoing with a substantial number of such claims already resolved as of February 11, 2021.

# EXHIBIT G

EXECUTION VERSION

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

OF

STRIKE INVESTMENT, LLC

(A DELAWARE LIMITED LIABILITY COMPANY)

DATED AS OF FEBRUARY 12, 2021

TABLE OF CONTENTS

Page

ARTICLE I FORMATION ............................................................................................. 1

    Section 1.1.    Name ................................................................................ 1
    Section 1.2.    Board of Managers ......................................................... 2
    Section 1.3.    Principal Office; Registered Office; Registered Agent; Other Offices ................ 2
    Section 1.4.    Purpose and Business ..................................................... 2
    Section 1.5.    Company Powers and Limitations; Limitation of Liability of the Members ......... 2
    Section 1.6.    Term .............................................................................. 2
    Section 1.7.    Fiscal Year ..................................................................... 3
    Section 1.8.    Admission of Members ................................................... 3
    Section 1.9.    Title to Company Assets ................................................ 3

ARTICLE II CAPITAL CONTRIBUTIONS ................................................................ 3

    Section 2.1.    Initial Capital Contributions ......................................... 3
    Section 2.2.    Additional Capital Contributions; New Members ............... 3
    Section 2.3.    Return of Capital Contributions; Interest ....................... 4

ARTICLE III MEMBERSHIP INTERESTS AND CAPITAL ACCOUNTS ................... 5

    Section 3.1.    Membership Interests ..................................................... 5
    Section 3.2.    Capital Accounts ............................................................ 5
    Section 3.3.    Rights of the Preferred Units Member ............................ 5
    Section 3.4.    Rights of Common Units Members ................................. 5

ARTICLE IV ALLOCATIONS ..................................................................................... 6

    Section 4.1.    Allocation of Net Income and Net Loss ......................... 6
    Section 4.2.    Limitation on Loss Allocation ....................................... 6
    Section 4.3.    Special Allocations ........................................................ 6
    Section 4.4.    Tax Incidents ................................................................. 8
    Section 4.5.    Section 704(c) Allocations ............................................ 8
    Section 4.6.    Changes in Percentage Interest ..................................... 8

ARTICLE V DISTRIBUTIONS ................................................................................... 8

    Section 5.1.    Distributions ................................................................. 8
    Section 5.2.    Withholding Taxes; Authority to Withhold; Treatment of Withheld Tax ........... 10

ARTICLE VI OPERATIONS AND MANAGEMENT ................................................. 11

    Section 6.1.    Exclusive Authority to Manage; Composition of the Board ................ 11
    Section 6.2.    Term ............................................................................ 11
    Section 6.3.    Vacancy and Removal .................................................. 11
    Section 6.4.    Meetings and Approval Requirements ........................... 12
    Section 6.5.    Compensation and Reimbursement ............................... 13
    Section 6.6.    Limitation on Liability of Covered Persons .................... 13
    Section 6.7.    Officers ....................................................................... 14

ARTICLE VII ACCOUNTING AND RECORDS; TAX MATTERS; OTHER COVENANTS OF THE COMPANY ........................................................................ 15

    Section 7.1.    Books and Records ...................................................... 15
    Section 7.2.    Reports; Tax Returns .................................................... 15

Section 7.3. U.S. Federal Tax Elections ............................................................. 16
Section 7.4. U.S. Federal Tax Partnership Representative ................................... 16
Section 7.5. Tax Compliance .............................................................................. 17
Section 7.6. Information ...................................................................................... 17

ARTICLE VIII TRANSFER OF UNITS .......................................................................... 18

Section 8.1. Restrictions ..................................................................................... 18
Section 8.2. Permitted Transfers ......................................................................... 18
Section 8.3. Sales by Mill Point Subject to Tag-Along Rights ........................... 19
Section 8.4. Grant to Mill Point of Drag-Along Rights ...................................... 22
Section 8.5. Right of First Refusal ...................................................................... 24
Section 8.6. Right to Purchase Upon Involuntary Transfer ................................ 25
Section 8.7. Grant of Preemptive Rights to Members ......................................... 25
Section 8.8. Assignment ...................................................................................... 26
Section 8.9. Publicly Traded Partnership Provision ............................................ 26
Section 8.10. Registration Rights .......................................................................... 26
Section 8.11. Blocker Sales ................................................................................... 27

ARTICLE IX .................................................................................................................... 27

DISSOLUTION, LIQUIDATION CONVERSION AND TERMINATION OF THE COMPANY ......... 27

Section 9.1. Limitations ....................................................................................... 27
Section 9.2. Dissolution ....................................................................................... 27
Section 9.3. Liquidation ....................................................................................... 27
Section 9.4. Continuation of the Company .......................................................... 28
Section 9.5. Change in Business Form ................................................................. 28

ARTICLE X MISCELLANEOUS ................................................................................... 30

Section 10.1. Entire Agreement ............................................................................. 30
Section 10.2. Construction ..................................................................................... 30
Section 10.3. Counterparts ..................................................................................... 31
Section 10.4. Notices .............................................................................................. 31
Section 10.5. Successors and Assigns .................................................................... 32
Section 10.6. Governing Law ................................................................................. 32
Section 10.7. Submission to Jurisdiction; Waiver of Jury Trial ............................ 33
Section 10.8. Benefits Only to Parties ................................................................... 34
Section 10.9. Termination; Survival of Benefits ................................................... 34
Section 10.10. Publicity ........................................................................................... 34
Section 10.11. Confidentiality .................................................................................. 34
Section 10.12. Amendments; Waivers ..................................................................... 35
Section 10.13. Fiduciary Duties ............................................................................... 35
Section 10.14. Other Business .................................................................................. 36
Section 10.15. Severability ....................................................................................... 36
Section 10.16. Further Action .................................................................................. 37
Section 10.17. Nature of Interests ............................................................................ 37
Section 10.18. Representations and Warranties ........................................................ 37
Section 10.19. Fees and Expenses ............................................................................ 37

NAI-1516004280v9

| | |
|---|---|
| Exhibit A | Capitalization Table |
| Exhibit B | Definitions |
| Exhibit C | Certificate of Formation |
| Exhibit D | Form of Joinder |

AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

OF

STRIKE INVESTMENT, LLC

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT, dated as of February 12, 2021 (this "Agreement"), is by and among Strike Investment, LLC, a Delaware limited liability company (the "Company"), Mill Point Strike Splitter, LP, a Delaware limited partnership ("Mill Point"), Strike Capital, LLC, a Texas limited liability company ("Strike Capital", and together with Mill Point and any other Person identified as a member on the signature pages hereto from time to time, the "Members," and each, a "Member").

W I T N E S S E T H:

WHEREAS, the Company was formed by Strike Capital on February 11, 2021, pursuant to the filing of the Certificate of Formation with the Secretary of State of the State of Delaware;

WHEREAS, upon the consummation of the transactions contemplated by that certain Contribution Agreement, dated as of 12, 2021 (the "Contribution Agreement"), by and among the Company, Strike Capital and Strike Holdco, LLC ("Strike Holdco"), (i) Strike Capital contributed all of the issued and outstanding equity interests of Strike, LLC ("Strike") to the Company in exchange for all of the issued and outstanding equity interests of the Company (the "Class A Common Units") and (ii) the Company immediately thereafter contributed all of the issued and outstanding equity interest of Strike to Strike Holdco in exchange for all of the issued and outstanding equity interests of Strike Holdco;

WHEREAS, on February 12, 2021, the Company and Strike Capital entered into the Limited Liability Company Agreement of the Company (the "Original Agreement") ;

WHEREAS, the Company, Mill Point and Strike Capital entered into the Securities Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"), pursuant to which Mill Point is acquiring all of the authorized Preferred Units;

WHEREAS, on the date hereof, the Company has not issued any Class B Common Units, and each Class B Common Unit is intended to be held as a "profits interest" (the "Class B Common Units"); and

WHEREAS, contemporaneously with the consummation of the transactions contemplated by the Purchase Agreement, the Members desire to amend and restate the Original Agreement in its entirety to reflect the terms set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and obligations herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

ARTICLE I

FORMATION

Section 1.1.    Name    The name of the Company is "Strike Investment, LLC".    All business of the Company shall be conducted under such name or any other name or names as determined by the Board.  The Board may change the name of the Company at any time and from time to time and shall notify the Members of such change in its next regular communication to the Members.

1

Section 1.2.     <u>Board of Managers</u>   The management of the Company shall be vested in its "managers," within the meaning of the Act.  The Members hereby initially appoint nine (9) Persons (which number may be increased or decreased in accordance with <u>Section 6.1</u>) to act as "managers" of the Company (the "<u>Managers</u>") with the authority to manage the Company as a board of managers (the "<u>Board</u>") in accordance with <u>Section 6.1</u>.

Section 1.3.     <u>Principal Office; Registered Office; Registered Agent; Other Offices</u>   The address of the principal office of the Company shall be 1800 Hughes Landing Blvd #500, The Woodlands, TX 77380, or as subsequently designated by the Board.  The address of the registered office of the Company shall be 1209 Orange Street, Wilmington, Delaware 19801, and the registered agent for the service of process on the Company at such registered office shall be The Corporation Trust Company.  The Company may maintain offices at such other place or places within or outside of the State of Delaware as the Board deems necessary or appropriate.  The Board may, at any time, on ten (10) days' prior notice to all of the Members change the location of the Company's principal office or registered office or change the registered agent.

Section 1.4.     <u>Purpose and Business</u>   The Company is formed for the purpose of engaging in any lawful activity for which a limited liability company may be organized under the Act, and for any other purpose, and to engage in such other activities, as the Board deems necessary, convenient or incidental to the conduct, promotion or attainment of such purpose.  Notwithstanding the foregoing, the Members acknowledge and agree that the Company was formed to acquire and own Equity Securities of Strike and its Subsidiaries. To the maximum extent permitted by Applicable Law, the Board will not have any duty or obligation to propose or approve, and may decline to propose or approve, the conduct by the Company of any business, free of any fiduciary duty or obligation whatsoever to the Company or any Member, and, in declining to so propose or approve, shall not be required to act in good faith or pursuant to any other standard imposed by this Agreement, any agreement contemplated hereby or under the Act or any other Applicable Law.

Section 1.5.     <u>Company Powers and Limitations; Limitation of Liability of the Members</u>.

(a)     The Company shall be empowered to do any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of the purposes and business described in <u>Section 1.5</u> and for the protection and benefit of the Company. Notwithstanding anything herein to the contrary, the Company shall not do business in any jurisdiction in which the limitation on liability afforded to the Members under the Act or this Agreement would be jeopardized.

(b)     In no event shall any Member (i) be obligated to make any Capital Contribution or payment to or on behalf of the Company or (ii) have any liability to return distributions received by such Member from the Company, in each case except as (A) otherwise specifically provided in this Agreement or other related agreements, (B) such Member shall otherwise expressly agree in writing or (C) may be required by Applicable Law.

(c)     The Members intend that the Company shall be treated as a partnership for U.S federal (and applicable state and local) income tax purposes. The intention that the Company be treated as a partnership for income tax purposes does not extend to any other purpose or classification of the Company, and no Member shall be deemed an agent, partner or joint venturer of any other Member for any purposes other than U.S. federal (and applicable state and local) income tax purposes, and this Agreement shall not be construed to suggest otherwise.

Section 1.6.     <u>Term</u>   The term of the Company commenced upon the filing of the Certificate of Formation in accordance with the Act and shall continue until the dissolution of the Company in accordance with the provisions of <u>Article IX</u>.  The existence of the Company as a separate legal entity

shall continue until a Certificate of Cancellation of a Limited Liability Company is filed with respect to the Company in accordance with the Act.

Section 1.7.    Fiscal Year  The fiscal year of the Company (the "Fiscal Year") shall be the calendar year unless otherwise required pursuant to Section 706 of the Code.

Section 1.8.    Admission of Members  Upon execution of this Agreement, each Member set forth on Exhibit A shall be admitted to the Company as a Member. Subject to Section 2.2(b), each party that subsequently signs a joinder agreement substantially in the form of Exhibit D shall, upon the Company's countersignature of such joinder agreement, be admitted to the Company as a Member. Each Member shall contribute, or be deemed to have contributed, to the capital of the Company its Capital Contribution as set forth in Section 2.1. Except as expressly provided to the contrary in this Agreement, the rights, duties (including fiduciary duties), liabilities and obligations of the Members and the administration, dissolution and termination of the Company shall be governed by the Act. All Membership Interests shall constitute personal property of the owner thereof for all purposes.

Section 1.9.    Title to Company Assets  Title to Company assets, whether real, personal or mixed, whether tangible or intangible, shall be deemed to be owned by the Company as an entity, and no Member, individually or collectively, shall have any ownership interest in such Company assets or any portion thereof. Title to any or all of the Company assets may be held in the name of the Company or one or more of its Affiliates or nominees, as the Board may determine in its sole and absolute discretion. All Company assets shall be recorded as the property of the Company on its books and records, irrespective of the name in which record title to such Company assets is held.

ARTICLE II

CAPITAL CONTRIBUTIONS

Section 2.1.    Initial Capital Contributions

(a)    As of the date hereof, each Member has made Capital Contributions to the Company of cash and/or other property in the amount set forth, or as otherwise described, opposite such Member's name on Exhibit A attached hereto.

(b)    Each Member's interest in the Company, including such Member's interest, if any, in the capital, income, gains, losses, deductions and expenses of the Company and the right to vote, if any, on certain Company matters as provided in this Agreement, shall be represented by units of membership interests (each, a "Unit"). The Units shall be uncertificated. The Company shall initially have three (3) classes of Units, designated (i) Preferred Units, (ii) Class A Common Units, and (iii) Class B Common Units. The ownership by a Member of Units shall carry the rights, privileges and burdens in the Company as set forth in this Agreement and, where applicable, the Act, including the rights and allocations of profits and losses and other items and distributions of cash and/or other property as set forth in Article III, Article IV and Article V.

Section 2.2.    Additional Capital Contributions; New Members

(a)    Except as set forth in Section 2.1 and this Section 2.2, no Member shall be required to make any Capital Contributions. To the extent that a Member from time to time exercises its rights under Section 8.7, additional Capital Contributions ("Additional Capital Contributions") shall be called for from such Member in the amount described in Section 8.7. In addition, the Members shall be permitted to make such Additional Capital Contributions as are necessary for the conduct of the Company's business, subject to compliance with Section 8.7. In connection with each Additional Capital Contribution, the Percentage Interests of the Members shall be adjusted so as to reflect such Additional Capital Contribution, based on

the number of Units of the Members immediately after such Additional Capital Contribution is made. If any such adjustment is made pursuant to this Section 2.2(a), Exhibit A attached hereto and the books and records of the Company shall be amended accordingly. In the event that any Units are redeemed, retired or otherwise repurchased by the Company, such Units shall only be cancelled on the books and records of the Company upon determination of the Board that such Units should be deemed cancelled; provided, however, that no Member shall retain any rights (including any rights to distribution) in respect of any Units redeemed, retired or otherwise repurchased by the Company. In the event of any Additional Capital Contribution, redemption, retirement, repurchase or any other change to the Membership Interest of any Member, Exhibit A hereto and the books and records of the Company shall be updated accordingly.

(b)     Subject to compliance with Section 8.7, the Board may cause the Company to issue additional Units to any Person and admit such Person as a new Member to the Company (without the consent of any Member) only if such new Member (i) has duly executed and delivered to the Company a joinder agreement substantially in the form of Exhibit D or in such other form as is satisfactory to the Board, pursuant to which such new Member shall agree to be bound by the terms and conditions set forth in this Agreement, (ii) has delivered such additional documentation to the Company as the Board shall require to so admit such new Member to the Company, and (iii) has delivered such consideration to the Company as the Board shall determine (it being understood that the Board may determine that it is in the best interest of the Company to issue Units representing profit interests within the meaning of Revenue Procedure 93-27 and Revenue Procedure 2001-43). Upon the admission of any new Member to the Company pursuant to this Section 2.2(b), the Percentage Interests of the Members shall be adjusted to reflect the admission of such new Member, based upon the number of Units of the Members. If an adjustment is made pursuant to this Section 2.2(b), Exhibit A attached hereto and the books and records of the Company shall be amended accordingly. No new Member shall be admitted to the Company if the Company would or may, in the sole and absolute determination of the Board, have in the aggregate more than one hundred Members. Solely for purposes of determining the number of Members under this Section 2.2(b), a Person (the "Beneficial Owner") indirectly owning an interest in the Company through a Flow-Through Entity shall be considered a Member, but only if (A) substantially all of the value of the Beneficial Owner's interest in the Flow-Through Entity is attributable to the Flow-Through Entity's interest (direct or indirect) in the Company and (B) in the sole and absolute determination of the Board, a principal purpose of the use of the tiered arrangement is to permit the Company to satisfy the one hundred Member limitation.

(c)     The Board may from time to time issue additional Class B Common Units to individuals for the provision of services to or for the benefit of the Company. Members who are issued Class B Common Units have not made and are not deemed to have made a Capital Contribution in connection with such issuance. Exhibit A reflects the outstanding Class B Common Units held by each of the holders of Class B Common Units and indicates $0 as their Capital Contribution corresponding to such Units. The Class B Common Units listed on Exhibit A may be subject to certain vesting requirements as described in Exhibit A or in the applicable grant agreement pursuant to which such Class B Common Units were issued, and such Class B Common Units shall be subject to the restrictions contained herein.

Section 2.3.     Return of Capital Contributions; Interest  No Member shall be entitled to withdraw any part of its Capital Contribution, to receive interest or other earnings on its Capital Contribution or to receive any distributions from the Company, except as expressly provided in this Agreement. No Member shall be entitled to resign or withdraw from the Company except as expressly provided in this Agreement, and no Member shall be entitled to receive any distribution or otherwise receive the fair market value of its Units in compensation for any purported resignation or withdrawal not in accordance with the terms of this Agreement.

ARTICLE III

MEMBERSHIP INTERESTS AND CAPITAL ACCOUNTS

Section 3.1.      Membership Interests  A Member's "Membership Interest" shall mean the entire ownership interest of such Member in the Company, including any and all rights, powers and benefits accorded a Member under this Agreement and the duties and obligations of such Member hereunder, as represented by the Units held by such Member. The "Percentage Interest" of each Member used in computing certain allocations and distributions to such Member upon the terms and subject to the conditions set forth in this Agreement shall be as set forth on Exhibit A attached hereto, as adjusted from time to time pursuant to this Agreement. In the event of a Transfer or other change in the ownership of Units in accordance with this Agreement, Exhibit A (and, if applicable, the Schedules and Annexes to this Agreement) shall be amended accordingly.

Section 3.2.      Capital Accounts

(a)      A separate capital account ("Capital Account") shall be maintained for each Member in accordance with Treasury Regulations § 1.704-1(b)(2)(iv). Without limiting the foregoing, each Member's Capital Account shall be credited with the sum of (i) the amount of cash and the Gross Asset Value of other property (net of liabilities that the Company is considered to assume or take subject to) transferred by such Member to the Company (or otherwise attributed to such Member pursuant to the terms of this Agreement) as Capital Contributions and (ii) the amount of all Net Income (or items thereof) credited to the account of such Member pursuant to Section 4.1 and 4.3. Each Member's Capital Account shall be reduced by the sum of (A) the cash and the Gross Asset Value of other property distributed to it pursuant to this Agreement (net of liabilities that such Member is considered to assume or take subject to) and (B) allocations to it pursuant to Article IV of Net Loss (or items thereof). No Member shall be obligated to restore any negative balance in its Capital Account.  No Member shall be compensated for any positive balance in its Capital Account except as otherwise expressly provided herein.  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with the provisions of Treasury Regulations § 1.704-1(b)(2) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  The Capital Accounts of the Members as of the date hereof shall be as set forth on Exhibit A attached hereto, in each case, as adjusted from time to time pursuant to this Agreement.  In the event of any transfer of any interest in the Company in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(b)      The Capital Accounts of the Members shall be increased or decreased in accordance with Treasury Regulations § 1.704-1(b)(2)(iv)(f) and § 1.704-1(b)(2)(iv)(g) in the manner set forth in this Agreement.

Section 3.3.      Rights of the Preferred Units Member. The Preferred Units Members shall (i) have no conversion or exchange rights, except to the extent set forth in Section 9.5, (ii) be entitled to distributions of Company property in accordance with, and in the priorities set forth in, Article V and Section 9.3(d), as applicable, (iii) be entitled to one vote per Preferred Unit held by them on matters submitted to a vote or consent of the Preferred Units Member, and (iv) share in each item of Net Income and Net Loss as provided in Article IV.

Section 3.4.      Rights of Common Units Members. The Common Units Members shall (i) share in each item of Net Income and Net Loss as provided in Article IV, (ii) be entitled to distributions of Company property in accordance with, and in the priorities set forth in, Article V and Section 9.3(d), as applicable, (iii) have no conversion or exchange rights, except to the extent set forth in Section 9.5, and (iv) not have any voting rights except as provided by law or as otherwise set forth in this Agreement, in which

5

event they shall be entitled to one vote per Common Unit on matters submitted to a vote or consent of the Common Units Members.

ARTICLE IV

ALLOCATIONS

Section 4.1.    Allocation of Net Income and Net Loss  Net Income, Net Losses and to the extent necessary, individual items of income, gain, loss or deduction, of the Company shall be allocated among the Members (including Members holding "unvested" Common Units) in a manner such that, after giving effect to the special allocations set forth in this Article IV, the Capital Account of each Member, immediately after making such allocation is, as nearly as possible, equal (proportionately) to (a) the distributions that would be made to a Member pursuant to Section 5.1(a) if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, all Company liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Value of the assets securing such liability), and the net assets of the Company were distributed in accordance with such clauses of Section 5.1(a) to the Members immediately after making such allocation minus (b) such Member's share of Company Minimum Gain and Member Minimum Gain, computed immediately prior to the hypothetical sale of assets.  Notwithstanding the foregoing, the Board may make such allocations as it deems reasonably necessary to give economic effect to the provisions of this Agreement taking into account such facts and circumstances as the Board deems reasonably necessary for this purpose.

Section 4.2.    Limitation on Loss Allocation  Net Losses allocated to a Member pursuant to Section 4.1 shall not exceed the maximum amount of losses that can be allocated without causing a Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  In the event that any Member would have an Adjusted Capital Account Deficit as a consequence of an allocation of losses pursuant to Section 4.1, the amount of losses that would be allocated to such Member but for the application of this Section 4.2 shall be allocated to the other Members to the extent that such allocations would not cause such Members to have an Adjusted Capital Account Deficit and allocated among such Members in proportion to the amount of their Capital Account balances that are in excess of the amount that would cause them to have an Adjusted Capital Account Deficit.  Any allocation of items of loss pursuant to this Section 4.2 shall be taken into account in computing subsequent allocations pursuant to Section 4.1, and prior to any allocation of items in such Section so that the net amount of any items allocated to each Member pursuant to Section 4.1 and this Section 4.2 shall, to the maximum extent practicable, be equal to the net amount that would have been allocated to each Member pursuant to the provisions of Section 4.1 and this Section 4.2 if such allocation under this Section 4.2 had not occurred.

Section 4.3.    Special Allocations  Notwithstanding any of the provisions set forth above in this Article IV to the contrary, the following special allocations shall be made in the following order:

(a)    Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations § 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Treasury Regulations § 1.704-2(f)(6) and § 1.704-2(j)(2).  This Section 4.3(a) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations § 1.704-2(f) and shall be interpreted consistently therewith.

(b)    Member Minimum Gain Chargeback.  Notwithstanding any other provision of this Article IV, except Section 4.3(a), if there is a net decrease in Member Minimum Gain attributable to

Member Nonrecourse Debt during any Fiscal Year, each Member which has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations § 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Treasury Regulations § 1.704-2(i)(4) and § 1.704-2(j)(2)(ii). This Section 4.3(b) is intended to comply with the minimum gain chargeback requirement in Treasury Regulations § 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)     Qualified Income Offset. In the event that any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations § 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible; provided, that an allocation pursuant to this Section 4.3(c) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV have been tentatively made as if this Section 4.3(c) were not in this Agreement. The foregoing provision is intended to comply with Treasury Regulations § 1.704-1(b)(2)(ii)(d) and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

(d)     Gross Income Allocation. In the event that any Member has an Adjusted Capital Account Deficit at the end of any Fiscal Year, then each such Member shall be specially allocated items of Company income and gain as quickly as possible; provided, that an allocation pursuant to this Section 4.3(d) shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article IV have been tentatively made as if Section 4.3(c) and this Section 4.3(d) were not in this Agreement.

(e)     Section 754 Adjustment. To the extent that an adjustment to the adjusted tax basis of any Company asset pursuant to Section 734(b) or Section 743(b) of the Code is required, pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(m)(2) or Treasury Regulations § 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Treasury Regulations section.

(f)     Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year shall be allocated to the Members in the same manner in which such items would have been allocated pursuant to Section 4.1.

(g)     Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations § 1.704-2(i).

(h)     Curative Allocations. It is the intent of the Members that, to the extent possible, the allocations set forth in the foregoing provisions of this Section 4.3 shall be offset with special allocations of other items of Company income, gain, loss, and deduction pursuant to this Section 4.3(h). Therefore, notwithstanding any other provision of this Article IV (other than this Section 4.3), the Board shall make

such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner the Board determines to be appropriate in its reasonable discretion so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the allocations set forth in the foregoing provisions of this Section 4.3 were not part of this Agreement.

Section 4.4.    Tax Incidents.   Subject to Section 704(c) of the Code, for U.S. federal, state and local income tax purposes, all items of Company income, gain, loss, deduction, credit and any other allocations not otherwise provided for shall be allocated among the Members in the same manner as the corresponding item of income, gain, loss or deduction was allocated pursuant to the preceding Sections of this Article IV.

Section 4.5.    Section 704(c) Allocations   In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, or any property owned by the Company at the time of any revaluation of the Company's assets, shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted tax basis of such property to the Company for federal income tax purposes and its Gross Asset Value at the time of contribution or revaluation. Any elections or decisions relating to such allocations shall be made by the Board in a manner that reasonably reflects the purpose and intention of this Agreement; provided that, the Company shall use the "traditional method" described in Treasury Regulations § 1.704-3(b) with respect to all property of the Company as of the date that this Agreement was first amended is treated as having been contributed to the Company by Strike Capital for U.S. federal (and applicable state and local) income tax purposes. Allocations pursuant to this Section 4.5 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses or other items or distributions pursuant to any provision of this Agreement.

Section 4.6.    Changes in Percentage Interest   Notwithstanding the foregoing, in the event a Member's economic interest in the Company or Percentage Interest changes during the Fiscal Year for any reason, including the transfer of any interest in the Company or any adjustment of the Member's Percentage Interest hereunder, the allocations under this Article IV and distributions under Article V shall be adjusted as necessary to reflect the varying interests of the Members during such year using an interim closing of the books method as of the date of such change or such other method as is approved by the Board.

ARTICLE V

DISTRIBUTIONS

Section 5.1.    Distributions

(a)      Subject to Section 5.1(e) and Article IX, the Company shall make distributions to the Members of Distributable Cash at such times and in such manner as determined by the Board in its sole and absolute discretion, and any such distributions shall be made in the following priorities:

(i)      FIRST, to the Preferred Units Members, in proportion to their respective Preferred Capital Amounts, until each Preferred Units Member has received distributions pursuant to this Section 5.1(a)(i) equal to the First Hurdle;

(ii)     SECOND, 90% to Preferred Units Members and 10% to the Class B Common Units Members, in each case in accordance with their respective Relative Percentage Interests, until each Preferred Units Member has received aggregate, cumulative distributions pursuant to Section 5.1(a)(i) and this Section 5.1(a)(ii) equal to the Second Hurdle;

(iii)      THIRD, 70% to Preferred Units Members, 20% to Class A Common Units Members and 10% to the Class B Common Units Members, in each case in accordance with their respective Relative Percentages, until each Preferred Units Member has received cumulative, aggregate distributions pursuant to Section 5.1(a)(i), Section 5.1(a)(ii) and this Section 5.1(a)(iii) equal to the Third Hurdle; and

(iv)      FOURTH, 60% to Preferred Units Members, 30% to Class A Common Units Members and 10% to the Class B Common Units Members, in each case in accordance with their respective Relative Percentage Interests.

(b)      Notwithstanding Section 5.1(a) above, as of any time, a holder of a Class B Common Unit shall be entitled to aggregate distributions of Distributable Cash pursuant to Section 5.1(a), or Section 9.3(d) (including for purposes of Section 8.3(c) and Section 8.4(c)) only to the extent that such distributions do not exceed the aggregate amount of Available Profits allocated to such holder in respect of such Class B Common Units through such time. The Company and each Person receiving Class B Common Units hereby acknowledge and agree that each such Person's Class B Common Units, and the rights and privileges associated with such Units, collectively are intended to constitute a "profits interest" in the Company within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343, or any successor IRS or Treasury Department regulation or other pronouncement applicable at the date of issuance of such Units. The provisions of this Agreement shall be interpreted and applied in accordance with such intent. Except as otherwise provided in Section 5.1(a) above, for so long as Revenue Procedure 2001-43, 2001-2 C.B. 343 and Revenue Procedure 93-27 are effective, the Company and the Members hereby agree to comply with the provisions of Revenue Procedures 2001-43 and 93-27, and neither the Company nor the Members shall perform any act or take any position inconsistent with the application of Revenue Procedures 2001-43 and 93-27. For the avoidance of doubt, neither the Company nor any Member is providing any covenant or guarantee that the characterization of any Class B Common Unit as a "profits interest" as described in this Section 5.1(b) will be accepted by the IRS or any other any taxing or governmental authority or a court of law. Each Person receiving Class B Common Units shall make a timely election under Section 83(b) of the Code with respect to such Units upon their issuance, in a manner reasonably prescribed by the Company (which shall include each such Person providing the Company a copy of such election promptly after making such election).

(c)      Immediately upon receipt of cash or other property in respect of its interest as a member in Management LLC, the Company shall distribute the remaining cash or other property exclusively to the Preferred Units Members and Class A Common Units Members in proportion to their Relative Percentage Interests.

(d)      Notwithstanding the foregoing, for all purposes of Section 5.1(a), a Class B Common Units Member shall not have the right to receive any distributions pursuant to Section 5.1(a) with respect to any Class B Common Unit, and each such Class B Common Unit shall be disregarded for purposes of apportioning distributions among the Members pursuant to Section 5.1(a), until the aggregate distributions that have been made to all Threshold Units with respect to such Class B Common Unit are equal to the Participation Threshold of such Class B Common Unit.

(e)      Tax Distributions. Notwithstanding Section 5.1(a) above, as soon as reasonably practicable before the due date for each quarterly "estimated tax" payment for federal income tax purposes (which as of the date hereof are due as of each January 15, April 15, June 15 and September 15), the Board shall determine the Tax Allowance Amount for every Member in respect of such quarter. Upon such determination, the Company shall distribute each Member's Tax Allowance Amount to the appropriate Member, provided that such distribution is not prohibited by applicable law, the Financing Facilities or any refinancing thereof, and further provided that the amount distributed under this Section 5.1(e) shall not exceed Distributable Cash as computed before the Tax Allowance Amount. The Company shall use

commercially reasonable efforts to ensure that the Members' Tax Allowance Amounts will be distributable under any such agreement. All such distributions shall have priority over any distributions pursuant to Section 5.1(a) above. Amounts distributed pursuant to this Section 5.1(e) shall not offset or reduce subsequent distributions and other payments made pursuant to Section 5.1(a), Section 8.3(c), Section 8.4(c) and/or Section 9.3(d)(v), as applicable. If the aggregate distributions made to a Member pursuant to this Section 5.1(e) for any given year exceed the distributions that would be required to be made to such Member pursuant to this Section 5.1(e) assuming such distributions were made on an annual basis rather than on a quarterly estimated basis as determined by the Board, such excess shall be credited against any amounts that would be due to such Member as a distribution pursuant to this Section 5.1(e) for the next following fiscal quarter (and any subsequent fiscal quarters until such excess shall have been credited in full) or promptly repaid to the Company upon demand therefor. Notwithstanding any provision herein, the Company shall not enter into any agreement, arrangement or understanding after the date of this Agreement that restricts or otherwise limits distributions pursuant to this Section 5.1(e), or distributions by any of the Company's Subsidiaries to the Company or any other of its Subsidiaries of funds necessary to allow the Company to make distributions pursuant to this Section 5.1(e), in each case, such that the Company or any of its Subsidiaries is subject to restrictions or limitations that are materially worse than those imposed by the Financing Facilities on the date hereof. A Member, regardless of the nature of the Member's Capital Contribution, has no right to demand and receive any distribution from the Company in any form other than money. For the avoidance of doubt, amounts received by the Company in respect of its interest as a member in Management LLC shall be distributed solely to the Preferred Units Members and Class A Common Units Members and shall not constitute "Distributable Cash" with respect to Class B Common Units Members for purposes of this Section 5.1(e).

Section 5.2.    Withholding Taxes; Authority to Withhold; Treatment of Withheld Tax.

(a)    Notwithstanding any other provision of this Agreement, each Member hereby authorizes the Company to withhold and to pay over, or otherwise pay, any withholding or other taxes payable by the Company or any of its Affiliates (pursuant to the Code or any provision of United States federal, state or local or non-U.S. tax law) with respect to such Member or as a result of such Member's participation in the Company. If and to the extent that the Company shall be required to withhold or pay any such withholding or other taxes, such Member shall be deemed for all purposes of this Agreement to have received a payment from the Company as of the time such withholding or other tax is required to be paid, which payment shall be deemed to be a distribution pursuant to the relevant clause of Section 5.1 and/or Section 9.3(d)(v) (including for purposes of Section 8.3(c) and Section 8.4(c)), as applicable, with respect to such Member's Units to the extent that such Member (or any successor or permitted assign to such Member's Units) would have received a distribution but for such withholding. To the extent that the aggregate of such payments to a Member for any period exceeds the distributions that such Member would have received for such period but for such withholding, the Board shall notify such Member as to the amount of such excess and such Member shall make a prompt payment to the Company of such amount by wire transfer of immediately available funds to the account designated in writing by the Company. Any withholdings by the Company referred to in this Section 5.2 shall be made at the maximum applicable statutory rate under the applicable tax law unless the Board shall have received an opinion of counsel in writing or other evidence, satisfactory to the Board, to the effect that a lower rate is applicable, or that no withholding is applicable. The obligations of a Member set forth in this Section 5.2(a) shall survive the withdrawal of any Member from the Company or any transfer of a Member's Units.

(b)    Withholding from Distributions of Property. If the Company makes a distribution in kind and such distribution is subject to withholding or other taxes payable by the Company on behalf of any Member, such Member shall make a prompt payment to the Company of the amount required to be withheld.

(c)        Withholding from Distributions to the Company.  In the event that the Company receives a distribution from or in respect of which tax has been withheld, the Company shall be deemed to have received cash in an amount equal to the amount of such withheld tax, and each Member shall be deemed to have received as a distribution pursuant to the relevant clause of Section 5.1 and/or Section 9.3(d)(v) (including for purposes of Section 8.3(c) and Section 8.4(c)) the portion of such amount that is attributable to such Member's Units as equitably determined by the Board in its sole and absolute discretion.

ARTICLE VI

OPERATIONS AND MANAGEMENT

Section 6.1.        Exclusive Authority to Manage; Composition of the Board   Except as provided in the Act or as expressly provided herein, the Board shall have the sole and exclusive power and authority over the conduct of the Company's business, operations and affairs. The Board is hereby authorized and empowered by the Members, on behalf and in the name of the Company, to (a) carry out the purposes and business of the Company, (b) perform all acts, and to enter into and to perform all contracts and other undertakings, which the Board may in its sole and absolute discretion deem necessary or advisable, or which are incidental, to carry out the purposes and business of the Company, and (c) delegate any and all authority or responsibility granted to the Board pursuant to this Agreement to one or more other Persons, including to agents, officers, employees or committees of the Board or the Company. Any action taken by the Board in accordance with this Agreement shall constitute the act of and serve to bind the Company and each Member in its capacity as a Member pursuant to terms of this Agreement. The Board shall be the sole body of the Company with the power to bind the Company, except to the extent that such power and authority is expressly delegated to any other Person by the Board or this Agreement.  Except as permitted by the Board or this Agreement, no Member shall have any right or authority to take any action on behalf of the Company with respect to third parties.  The number of Managers on the Board shall initially be nine, and the initial Managers shall be as follows: (i) eight (8) Managers designated by Mill Point in its sole discretion (any Manager designated by Mill Point pursuant to this Agreement, a "Mill Point Manager"), who shall initially be Michael Duran, Dustin Smith, Aileen Wang, Sean Gore, Knut Erikson, Steve Pate, Cole Pate and Frank Victor-McCawley; and (ii) for so long as OEP Strike LLC ("OEP") owns, directly or indirectly, at least 30% of the Class A Common Units which are owned indirectly by OEP immediately following the execution of this Agreement (the "Required Threshold"), the Board will include at least one member designated by OEP, who shall initially be James B. Cherry (the "OEP Manager"). In the event that OEP's ownership falls below the Required Threshold, the OEP Manager shall automatically and without any further action on the part of any Person be removed from the Board. The number of Managers may be further increased or decreased only by Mill Point in its sole discretion (provided that no such reduction in the number of Managers will remove the OEP Manager, except in accordance with Section 6.3(a)), with any additional Managers being nominated by Mill Point in its sole discretion.  No delegation of power and authority by the Board shall cause the Board to cease to have management authority of the Company.

Section 6.2.        Term. Unless otherwise removed in accordance with Section 6.3, the Managers of the Board shall hold office until their respective successors shall have been duly appointed.

Section 6.3.        Vacancy and Removal

(a)        In the event that any of the Managers ceases to serve as a member of the Board during his or her term of office for any reason (including death, resignation or removal), a majority of the Board shall elect in writing a substitute Manager designated by (i) Mill Point in the event that the departing Manager was a Mill Point Manager or the applicable vacancy resulted from the failure of the Required Threshold to be satisfied and (ii) by OEP in the event the departing Manager was the OEP Manager and the applicable vacancy did not arise as a result of any failure of the Required Threshold to be satisfied.

(b)     Any Manager shall be removed from the Board only (i) upon the written request or the written approval of the Person that designated such Manager or (ii) in accordance with Section 6.3(c). In such case, the Board agrees to do all things necessary under Applicable Law to remove such Manager and replace such Manager in accordance with the provisions of Section 6.1 and this Section 6.3. If the Manager is also a Member, its removal shall not, by itself, affect such Person's rights as a Member and shall not constitute such Person's withdrawal as a Member.

(c)     A Manager may resign at any time, and the resignation of such Manager shall take effect immediately. If the Manager is also a Member, such resignation shall not, by itself, affect such Peron's rights as a Member and shall not constitute such Person's withdrawal as a Member.

Section 6.4.     Meetings and Approval Requirements.

(a)     Regular and Special Meetings. The Board may hold semiannual meetings each calendar year at such times and places as are established by action of the Board. The Board may adopt appropriate rules and regulations concerning the frequency and conduct of its meetings; provided, however, that special meetings of the Board shall be called at the written request of any Manager then in office; provided, further, that no more than two special meetings may be called by any Manager in a calendar year.

(b)     Telephonic Meetings. Any meeting of the Board may be held by conference telephone call or through similar communications equipment by means of which all Persons participating in the meeting can communicate with each other. Participation in a telephonic meeting held pursuant to this Section 6.4(b) shall constitute presence in person at such meeting.

(c)     Notices. Notices of regular meetings of the Board are not required. Notices of special meetings of the Board shall state the date and hour of the meeting and the purpose or purposes for which the meeting is called. Special meetings shall be held at the office of the Company, or at such other place as shall be agreed to by the Board. The notice of a special meeting shall be given by the Board in writing not less than five (5) nor more than twenty (20) days before the date of the meeting. A Manager may waive in writing the requirements for notice before, at or after a special meeting, and attendance at such a meeting without objection by a Manager shall be deemed a waiver of such notice requirements.

(d)     Quorum. At each meeting of the Board, the presence in person or by telephone, as appropriate, of a majority of Managers then in office (unless such Managers are present solely to object to the meeting) shall be necessary to constitute a quorum for the transaction of business; provided, that if at any meeting of the Board there should be less than a quorum present, a majority of those present may adjourn the meeting from time to time until a quorum shall have been obtained.

(e)     Approval Requirements. The Managers shall act only as a Board and the individual Managers shall have no power as such. Each Manager shall have one vote on all matters which may come before the Board for decision. Actions by the Board shall require the affirmative vote of a majority of Managers present in person or by telephone, as appropriate, and voting at a duly held meeting of the Board at which a quorum shall be present and acting throughout.

(f)     Written Consents. Any action required or permitted to be taken at a meeting of the Board may be taken without a meeting if a majority of Managers then in office consents thereto in writing. Such consents shall be filed with the minutes of the proceedings of the Board.

(g)     Approval Matters. The Company shall not, and shall cause its Subsidiaries not to, without the prior written consent of Strike Capital:

(i)     effect any transactions between the Company and Mill Point or any of Mill Point's Affiliates, other than issuances of equity interests that are subject to the preemptive rights set forth in Section 8.7;

(ii)     make any change in the nature of the business of the Company or its Subsidiaries; or

(iii)    take any action (including, as applicable, any Conversion) that would result in a change in the classification of the Company or any Subsidiary of the Company to an entity taxed as a corporation for U.S. federal (and applicable state and local) income tax purposes.

Section 6.5.     <u>Compensation and Reimbursement</u>  As consideration for their agreement to serve as Managers, the Company may pay to each Manager who is not an employee of the Company or any of its Subsidiaries or an Affiliate of any Member a reasonable and customary annual fee, in an amount determined from time to time by the Board (which may be uniform among such Managers or disproportionate, as determined in the sole discretion of the Board).  The Company shall reimburse each Manager for its reasonable, documented out-of-pocket fees, costs, expenses and disbursements (including reasonable and documented travel and lodging expenses) in connection with attending all meetings (including participation in telephonic meetings) of the Board and of its subcommittees or in the performance of services for the Company or any of its Subsidiaries.

Section 6.6.     <u>Limitation on Liability of Covered Persons</u>

(a)     No Covered Person shall be liable to the Company or any other Covered Person (i) for mistakes of judgment or for any act or omissions suffered or taken by them, or for losses due to any such mistakes, action or inaction, except to the extent that such Covered Person has engaged in fraud, intentional acts of willful misconduct or acts or omissions not in good faith or (ii) for the willful misfeasance, negligence, bad faith, fraud or other conduct of any independent contractor of the Company selected by such Covered Person; <u>provided</u>, that such independent contractor (including any who may be a Covered Person) was selected, engaged and retained in good faith.  In addition, no Covered Person shall, solely by reason of being a Covered Person, be bound by, or be personally liable to any third Person for a judgment, decree or order of any Governmental Authority or in any other manner, for the expenses, liabilities or obligations of the Company, whether arising in contract, tort or otherwise.

(b)     To the maximum extent permitted by Applicable Law, no Covered Person shall be liable for, and the Company shall indemnify all of the Covered Persons against, and agrees to hold all of the Covered Persons harmless from, all liabilities and claims (including reasonable attorneys' fees and expenses in defending against any claimant seeking to impose any such liabilities and claims) against the Covered Persons, arising from the Covered Persons' performance of their duties or otherwise relating to or arising out of such Covered Person's affiliation or association with the Company, except to the extent that such Covered Person has been adjudged to have engaged in fraud, intentional acts of willful misconduct or acts or omissions not in good faith.  Expenses incurred by any Covered Person who may have a right of indemnification under this <u>Section 6.6(b)</u> in defending a civil or criminal action, suit or proceeding shall be paid by the Company in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such Covered Person to repay such amount where such Covered Person has been adjudged to have engaged in fraud, intentional acts of willful misconduct or acts or omissions not in good faith.

(c)     Covered Persons may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.  Covered Persons may consult with legal counsel, accountants, appraisers, management consultants, investment bankers and other consultants and advisers selected by them, and any action or omission suffered or taken in good faith in reliance and in accordance with the opinion or advice of any such Persons as to matters that the Covered Persons reasonably believe to be within such Person's professional or expert competence shall be conclusively presumed to have been done or omitted in good

faith and in accordance with such and shall be full protection and justification with respect to the action or omission so suffered or taken.

(d)    The obligation of the Company under this <u>Section 6.6</u> to indemnify or advance expenses to a Covered Person shall be the primary source of indemnification and advancement of such Covered Person in connection therewith and any obligation on the part of a Member or any of its Affiliates (excluding, for the avoidance of doubt, the Company and its Subsidiaries) (an "<u>Upstream Indemnifying Party</u>") with respect thereto (such obligation, a "<u>Member Indemnification Agreement</u>") shall be secondary to the Company's obligation and shall be reduced by the amount that the Covered Person may collect as indemnification or advancement from the Company. In the event that the Company fails to indemnify or advance expenses to a Covered Person as required or contemplated by this Agreement (such amounts the "<u>Unpaid Indemnity Amounts</u>") and an Upstream Indemnifying Party makes any payment to such Covered Person in respect of indemnification or advancement of expenses under any Member Indemnification Agreement on account of such Unpaid Indemnity Amounts, such Upstream Indemnifying Party shall be subrogated to the rights of such Covered Person under this <u>Section 6.6</u> or any similar arrangement or agreement for indemnification or advancement of expenses by the Company (a "<u>Company Indemnification Agreement</u>").

(e)    The Company hereby agrees that, to the fullest extent permitted by Applicable Law, its obligation to indemnify a Covered Person under this <u>Section 6.6</u> or any Company Indemnification Agreement shall include any amounts expended by an Upstream Indemnifying Party under any Member Indemnification Agreement in respect of indemnification or advancement of expenses to any Covered Person relating to or arising out of such Covered Person's affiliation or association with the Company.

(f)    The Company may purchase and maintain director and officer liability insurance, on terms and in an amount approved by the Board, on behalf of any Covered Person, against any liability asserted against such Covered Person or incurred by such Covered Person arising out of its or his status as a Covered Person, whether or not the Company would have the power to indemnify such Covered Person against that liability under this <u>Section 6.6</u>.

(g)    In the event that any Covered Person or former Covered Person shall, notwithstanding any provisions of the Act to the contrary (and solely as a result of the inapplicability, or deemed inapplicability of such provision of the Act), become liable under a judgment, decree or order of a Governmental Authority, or in any other manner, for a debt, obligation or liability of the Company, then the Company shall indemnify such Covered Person or former Covered Person and hold such Covered Person or former Covered Person harmless from and against any such debt, obligation or liability of such Covered Person or former Covered Person (together with reasonable attorneys' fees and expenses in defending against any claimant seeking to impose any such debt, obligation or liability).

(h)    No Covered Person shall be personally liable for the return of all or any part of a Member's Capital Contribution or payment of any amounts allocated to it or credited to its Capital Account (if applicable), which return or payment shall be made solely from, and to the extent of, the Company's assets pursuant to the terms of this Agreement.

Section 6.7.    <u>Officers</u>.

(a)    <u>Appointment of Officers</u>. The Officers shall be a Chairman, a Chief Executive Officer, one or more Presidents, one or more Vice Presidents, a Secretary, a Treasurer and such other officers as the Board shall approve from time to time in its sole discretion (the "<u>Officers</u>," and each, an "<u>Officer</u>"). Any two or more offices may be held by the same Person. The initial officers of the Company shall be: Steve Pate, Chief Executive Officer and Chairman; Cole Pate, President; Frank McCawley, Vice President and Treasurer; and Rhonda Sigman, Vice President and Secretary.

(b)     Election; Term.  Officers shall be elected at such time or times as the Board shall determine.  Officers shall hold office, unless removed, until their successors are elected.

(c)     Delegation.  The Officers shall have such other powers and duties of an executive nature as may be delegated to them from time to time by the Board.  The Officers shall have the authority to manage the day-to-day affairs of the Company under the supervision of the Board and shall act at all times in accordance with the instructions of the Board, if any.  The acts of the Officers shall bind the Company and its Members to the extent that such acts are within the scope of their authority.  The Officers shall be subject at all times to the direction of the Board, and shall keep the Board informed as to all matters concerning the Company.  The Chairman, if he or she is present, shall be chairman of all meetings of the Board, as well as any subcommittee of which he or she is a member.

(d)     Removal, Resignation and Filling of Vacancy of Officers.  The Board may remove any Officers with or without cause at any time in accordance with the terms of his or her employment agreement with the Company or any of its Affiliates, if applicable.  Any Officer may resign at any time by giving written notice to the Board.  Any such resignation shall take effect at the date of the receipt of that notice or at such later effective time as may be specified in such notice; and, unless otherwise specified in that notice, the acceptance of the resignation shall not be necessary to make it effective.  The Board may fill any vacancy created by any such removal or resignation by majority vote.

(e)     Salaries of Officers.  The salaries of all Officers shall be fixed by a resolution of the Board or pursuant to a written employment agreement approved by the Board; provided, that Officers who are not employees of the Company or its Subsidiaries shall not receive compensation for serving as an Officer.

ARTICLE VII

ACCOUNTING AND RECORDS; TAX MATTERS; OTHER COVENANTS OF THE COMPANY

Section 7.1.     Books and Records   The Board shall cause to be maintained at the Company's principal place of business:

(a)     the books and records pertaining to the Company's business showing all of its assets and liabilities, receipts and disbursements, profits and losses, the Capital Accounts of the Members and all transactions entered into by the Company (which such books and records of the Company shall be kept by the Company at its principal office and which books of account shall be maintained in United States dollars and kept on the accrual method of accounting and otherwise in accordance with generally accepted accounting principles in the United States of America consistently applied); and

(b)     all other records necessary, convenient, or incidental to the business of the Company as provided for herein.

For U.S. federal income tax purposes, the books of account of the Company shall be maintained on the accrual method of accounting.

Section 7.2.     Reports; Tax Returns   The Board shall perform or cause to be performed an annual review of the books and accounts of the Company as of the end of each Fiscal Year.  The Board shall prepare or cause to be prepared all income and other tax returns of the Company and shall cause the same to be filed in a timely manner (including extensions).  In addition, the Board shall be entitled to take any other action on behalf of the Company required to cause the Company to be in compliance with any applicable governmental regulations.  As soon as practicable after the end of each Fiscal Year, the Board shall deliver or cause to be delivered to each Member a copy of Schedule K-1 for the Company with respect to such Fiscal Year, together with such information with respect to the Company as may be reasonably

requested in writing by such Member or reasonably necessary for the preparation by such Member of its U.S. federal and state income or other tax and information returns. For the avoidance of doubt, neither the Company nor an Member (other than Strike Capital) shall have any authority over the preparation or filing of any U.S. federal and state income or other tax and information returns (including any amended returns for prior years) of Strike Capital as relates to the allocation of items with respect to its equity holders or otherwise. None of the Company, any Company Subsidiary or any Member shall take any position on any tax return with respect to the determination of each Member's share of the "nonrecourse liabilities" of the Company (within the meaning of Treasury Regulations § 1.752-1(a)(2)) that were nonrecourse liabilities of the Company as of the date that this Agreement was first amended, to the extent such position is inconsistent with an allocation of at least 40% of such nonrecourse liabilities to Strike Capital and the holders of Class B Common Units (collectively) under Treasury Regulations § 1.752-3 (with the remaining 60% allocated to the maximum extent possible to Mill Point), unless (i) Strike Capital shall have consented to use a different percentage (such consent not to be unreasonably withheld, conditioned or delayed), or (ii) no advice of an accounting firm of national standing (whether retained by Strike Capital or the Company) shall have been obtained that such allocation is at least "more likely than not" supported under Applicable Law and other guidance published by the Internal Revenue Service, provided, however, that (x) nothing shall prevent any Party or any of their respective Affiliates from settling, or require any of them to litigate, any challenge or other similar proceeding by any Governmental Authority with respect to the allocation of nonrecourse liabilities to Strike Capital and the holders of Class B Common Units under Treasury Regulations § 1.752-3 and (y) the Company and the Company Subsidiaries shall (at Mill Point's direction) revise such allocation, to the extent permitted under Applicable Law or other guidance published by the Internal Revenue Service, if Mill Point determines such allocation has a material impact on Mill Point. Nonrecourse liabilities that are not required to be allocated in the manner described in the foregoing sentence shall be allocated as determined by the Board.

Section 7.3.    U.S. Federal Tax Elections    Except as otherwise provided in this Agreement, the Company may make any and all elections provided for under the Code or applicable tax law of any state, local or non-United States jurisdiction, including the election provided for in Section 754 of the Code to adjust the basis of the Company's property and the election provided for in Section 709 of the Code to amortize organization expenses. Each Member, by its execution of this Agreement, hereby grants the Board an irrevocable power of attorney to make any U.S. federal, state or local income tax election as may be required or appropriate to cause the Company to be classified as a "partnership" for U.S. federal, state or local income tax purposes, or to maintain such classification, and no Member shall make any election to the contrary.

Section 7.4.    U.S. Federal Tax Partnership Representative

(a)    Mill Point shall serve as the initial "partnership representative" of the Company under Section 6223(a) of the Code until such time as the Board, to the extent permitted by applicable law, determines otherwise (the "Company Representative"). Subject to Section 7.4(b)-(e), in the event the Company shall be the subject of an income tax audit by any federal, state or local authority, the Company Representative shall be authorized to act for, and its decision shall be final and binding upon, the Company and each Member thereof.

(b)    The Company Representative shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and may expend Company funds for professional services and costs associated therewith. All reasonable outs-of-pocket expenses of administrative proceedings relating to the determination of Company items, including legal and accounting fees, claims, liabilities, losses and damages incurred by the Company Representative in connection with its serving in that capacity shall be Company expenses. The Company Representative shall keep the Board reasonably informed of the progress of any such examinations or proceedings.

(c)      In the event that the Company becomes liable for any taxes, interest, or penalties under Section 6225 or 6227 of the Code (following a final determination of such liability by the relevant governmental authority), each person that was a Member of the Company for the taxable year to which such liability relates will indemnify and hold harmless the Company for such person's allocable share of the amount of such tax liability, including any interest and penalties associated therewith, as reasonably determined by the Company Representative.  If requested by the Company Representative, each Member, or former Member, will promptly deliver to the Company any form, instrument, or information reasonably requested by the Company relating to any Member (or its direct or indirect owners, as the case may be) in order to comply with, or avail itself of any election with respect to, any tax law (including the Code).  The provisions of this Section 7.4(c) will survive the termination of the Company or the termination of any Member's interest in the Company and will remain binding on the Members, and former Members, for as long of a period of time as is necessary to resolve with the relevant governmental authority any and all matters regarding the income taxation of the Company or the Members, including former Members, and for Members, and former Members, to satisfy their indemnification obligations pursuant to this Section 7.4(c).

(d)      In the event of an audit of the Company that is subject to the partnership audit procedures enacted under Section 1101 of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74 (the "BBA Procedures"), the Company Representative, acting at the direction of the Board, shall have the right to make any and all elections and to take any actions that are available to be made or taken by the Company Representative or the Company under the BBA Procedures; provided that no such election or action shall be made or taken if such election or action would have a material disproportionate adverse impact on Strike (or its direct or indirect equity holders) without the consent of Strike, such consent not to be unreasonably withheld, conditioned or delayed.  Upon reasonable request by the Company Representative, the Members shall promptly take any actions and shall provide the Company with all information necessary to make any such election or take any such action.

(e)      The Company Representative shall not be liable for any action taken or omitted to be taken by it in good faith except to the extent that a court of competent jurisdiction determines that the Company Representative's gross negligence or willful misconduct was the primary cause of any loss to the Company or the Members.  The Company Representative may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which the Company Representative shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same.

Section 7.5.    Tax Compliance. Each Member hereby undertakes promptly to provide to the Board, at its request, any and all information, statements or certificates which the Board may reasonably request to comply with the tax laws of any jurisdiction, or in order to minimize any obligation which the Company may have to withhold tax on distributions to such Members.

Section 7.6.    Information At any time prior to the closing of an IPO, the Company shall, and shall cause each of its Subsidiaries to, deliver to each Member:

(a)      as soon as practicable, but in any event within one hundred and twenty (120) days after the end of each Fiscal Year, audited annual consolidated and consolidating financial statements of the Company, including the notes thereto, consisting of a consolidated and consolidating balance sheet at the end of such completed Fiscal Year and the related consolidated and consolidating statements of income, retained earnings, cash flows and owners' equity for such completed Fiscal Year, which financial statements shall be prepared and certified by an independent certified public accounting firm and accompanied by related management letters, if available;

(b)      as soon as available and in any event within forty-five (45) calendar days after the end of each fiscal quarter (other than the last fiscal quarter of each Fiscal Year), unaudited consolidated and consolidating financial statements of the Company consisting of a balance sheet and statements of income, retained earnings, owner's equity and cash flows as of the end of the immediately preceding fiscal quarter; and

(c)      promptly from time to time, such other information regarding the operations, business affairs and financial condition of the Company or any of its Subsidiaries, as any Member may reasonably request (including any information necessary to enable such Member to file any form required by any governmental authority).

## ARTICLE VIII

### TRANSFER OF UNITS

Section 8.1.      Restrictions

(a)      No Member other than Mill Point (each a "Non-Mill Point Member" and collectively the "Non-Mill Point Members") shall, voluntarily or involuntarily or by operation of law, directly or indirectly, sell, assign, donate, gift, pledge, hypothecate, dispose of, encumber or grant a security interest in, or in any other manner, transfer any Units, in whole or in part, with or without consideration, or any other right or interest therein, or enter into any transaction which results in the economic equivalent of a transfer to any Person, including, any derivative transaction that has the effect of changing materially the economic benefits and risks of ownership (each such action, a "Transfer") except in accordance with this Article VIII.

(b)      Any attempt to transfer any Unit which is not in accordance with this Agreement shall be null and void, and the Company agrees that it shall not cause, permit or give any effect to any Transfer of any Unit to be made on its books and records unless such Transfer is permitted by this Agreement and has been made in accordance with the terms hereof.

(c)      Each Non-Mill Point Member agrees that such Non-Mill Point Member shall not effect any Transfer of Units unless such Transfer is a Permitted Transfer and is made (i) pursuant to an effective registration statement under the Securities Act or pursuant to an exemption from the registration requirements of the Securities Act and (ii) in accordance with all Applicable Laws (including all applicable securities laws).

Section 8.2.      Permitted Transfers

(a)      Notwithstanding anything to the contrary contained herein and subject to Section 8.1(c), Section 8.2(b) and Section 8.2(c), a Non-Mill Point Member may at any time effect any of the following Transfers of Units (each a "Permitted Transfer," and each transferee of such Member in respect of such Transfer, a "Permitted Transferee"):

(i)      subject to Section 8.2(b), any Transfer (except a Transfer to a Non-Qualified Person) of any or all Units held by a Member that is a natural person following such Member's death by will or intestacy to such Member's legal representative, heir or legatee;

(ii)      subject to Section 8.2(b), any Transfer (except a Transfer to a Non-Qualified Person) of any or all Units held by a Member that is a natural person as a gift or gifts during such Member's lifetime to such Member's spouse, former spouse, descendants (whether natural or adopted), parents and siblings or a trust or other similar legal entity solely for the benefit of such Member or any of the foregoing Persons; provided, that in the event of a Transfer to a Member's spouse pursuant to this Section 8.2(a)(ii), such Member's spouse shall have first

executed a Spousal Acknowledgement and Consent in such form as is reasonably satisfactory to the Board;

(iii)     any Transfer of any or all applicable Units held by a Member which is made pursuant to (A) Section 8.3 or (B) Section 8.4;

(iv)     any Transfer of any or all Units held by a Member which is made pursuant to an effective registration statement filed pursuant to the Securities Act;

(v)     any Transfer of Units not described in any of clauses (i) through (iv) above if expressly permitted in writing by the Board; and

(vi)     any Transfer of any or all Preferred Units held by any Preferred Units Member that is not an individual, to an Affiliate of such Preferred Units Member that is not an individual so long as such Preferred Units Member remains an Affiliate thereof

provided, that the restrictions contained in this Section 8.2 shall continue to be applicable to the Units after the Permitted Transfer (other than a Permitted Transfer made pursuant to Section 8.2(a)(iv) or as part of a transaction which is a Sale of the Company (and the transferee has elected not to be bound by the provisions of this Agreement)).

(b)     In any Transfer referred to above in Section 8.2(a) (other than Section 8.2(a)(iii)(B) or Section 8.2(a)(iv)), the Permitted Transferee shall agree in writing to be bound by the provisions of this Agreement and shall execute and deliver to the Company a copy of an executed joinder agreement with respect to this Agreement substantially in the form of Exhibit D or in such other form as is satisfactory to the Board as a condition to such Transfer. Each such Permitted Transferee shall hold such Units subject to the provisions of this Agreement as a "Member" hereunder as if such Permitted Transferee were an original signatory hereto and shall be deemed to be a party to this Agreement. Promptly thereupon, the applicable schedules and exhibits hereto shall be revised to include all applicable information of such Member.

(c)     In any Transfer of Units by Mill Point (and, in the case of a transaction which is a Sale of the Company, such transferee elects to be bound by the provisions of this Agreement), such transferee shall thereafter be referred to, collectively with Mill Point, as "Mill Point" for all purposes of this Agreement.

(d)     The Company shall have the right to require, as a condition to any Permitted Transfer pursuant to Section 8.2(a), receipt of a written opinion of external legal counsel, which such opinion and legal counsel shall be satisfactory to the Company, to the effect that such Transfer is not required to be registered under the Securities Act and is not in violation of any Applicable Law (including applicable securities laws).

(e)     Any Units owned by a Member on or after the date of this Agreement shall have the benefit of and be subject in all respects to the terms and conditions of this Agreement.

(f)     Notwithstanding anything to the contrary contained herein, the Board may prohibit any Transfer, including a Permitted Transfer (and may not recognize any such assignment, transfer or substitution), if the Board reasonably believes that such assignment, transfer or substitution would not be within (or would cause the Company to fail to qualify for) one or more of the safe harbors described in paragraphs (e), (f), (g), (h), or (j) of Treasury Regulations §1.7704-1 or otherwise poses a material risk that the Company will be treated as a "publicly traded partnership" within the meaning of §7704 of the Code and the regulations promulgated thereunder.

Section 8.3.     Sales by Mill Point Subject to Tag-Along Rights

(a)        In the event that Mill Point proposes to effect a Transfer of any Units then held by it to an unaffiliated third party (which, for the avoidance of doubt, shall not include any Transfer by Mill Point (i) to any of its Affiliates or limited partners or (ii) of a type described in Section 8.2(a)(iii)(B) or 8.2(a)(iv)), Mill Point shall promptly give written notice (the "Transfer Notice") to the Company and each of the other Members (the "Tag Members") at least thirty (30) Business Days prior to the closing of such Transfer.  The Transfer Notice shall (A) describe in reasonable detail the proposed Transfer including the number and type of Preferred Units, as applicable, to be sold, the identity of the prospective transferee(s), the purchase price of each such Preferred Unit, as applicable, to be sold, and the date such proposed sale is expected to be consummated and (B) have attached thereto, if available, an executed copy (or a substantially final draft copy) of the agreement pursuant to which the proposed Transfer is to be consummated.

(b)        Each Tag Member shall have the right, exercisable upon delivery of an irrevocable written notice to Mill Point within five (5) Business Days after receipt of the Transfer Notice, to participate in such proposed Transfer on the same terms and conditions, as set forth in the Transfer Notice, including the execution and delivery of all documents (including purchase agreements, if applicable) and instruments as Mill Point and the prospective transferee reasonably request to effect such Transfer. Such documents and instruments shall include the Non-Mill Point Members making all representations, warranties, agreements, covenants and obligations and granting all indemnifications and similar agreements and arrangements agreed to and made by Mill Point in the executed agreement (or substantially final draft agreement) delivered with the Transfer Notice pursuant to Section 8.3(a) hereof, provided, however, that in the event that the Non-Mill Point Members are exercising their rights set forth in this Section 8.3 in connection with a Sale of the Company and Mill Point has not exercised its rights pursuant to Section 8.4, then the Non-Mill Point Members' representations and warranties shall be limited to their respective organization and authority, title to and ownership of Units, ability to Transfer the Units without conflicts and other similar matters (the liability for which shall be borne only by such Non-Mill Point Member) (including participating in any escrow arrangements to the extent of their respective *pro rata* portion). Each Non-Mill Point Member who holds Class B Common Units hereby agrees, at the request of the transferee in the proposed Sale of the Company, to enter into (A) non-solicitation and non-hire arrangements for the benefit of such proposed transferee, and (B) non-competition, non-solicitation and non-interference arrangements for the benefit of such proposed transferee, in each case, substantially similar to the terms of each such Non-Mill Point Member's current relevant arrangement, if applicable.  Notwithstanding anything herein to the contrary in this Section 8.4, but subject to the immediately preceding sentence, in connection with any such Sale of the Company, (x) no Member (other than Members holding Class B Common Units) shall be required to agree to any non-competition limitations on business activities (other than non-solicitation and non-hire arrangements pursuant to the immediately preceding sentence) or be prohibited from investing in any Person, and (y) the indemnification obligation of each Member provided to the proposed transferee with respect to the breach of any representation or warranty concerning the Company or its Subsidiaries or their respective business or operations shall be *pro rata*, several and not joint and limited to the gross proceeds received by, and any amount deposited into escrow on behalf of, each such Member in connection with such Transfer.  Each Tag Member electing to participate in the Transfer described in the Transfer Notice (each, a "Participant") shall indicate in its irrevocable notice of election to Mill Point the maximum number of applicable Units that such Tag Member desires to Transfer. Each such Participant shall be entitled to Transfer a number of applicable Units equal to such holder's *pro rata* portion of the total number of applicable Units to be Transferred, as set forth in the Transfer Notice, up to such maximum number. For purposes of this Section 8.3, "*pro rata* portion" shall mean a fraction, the numerator of which is the liquidation value of the applicable Units held by such Member, and the denominator of which is the total liquidation value of the applicable Units outstanding immediately prior to the Transfer described in the Transfer Notice, in each case, as determined in accordance with Article X in good faith by the Board (it being understood that for purposes of this Section 8.3, unvested Units shall have a liquidation value of zero (0)).

(c)      Upon the consummation of the Transfer described in the Transfer Notice, (other than to the extent any Member receives consideration in such Transfer in the form of equity securities in connection with such Member's election to roll over all or any portion of such Member's Units), each holder of participating in such Transfer will receive the same form of consideration and the same portion of the aggregate consideration that such holders of Units participating in such Transfer would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in Section 9.3 as in effect immediately prior to such Transfer; provided, that any Transferee receiving Preferred Units pursuant to a Transfer under this Section 8.3 shall be deemed to have assumed the Preferred Capital Amount allocable to such Preferred Units as of immediately prior to such Transfer.

(d)      Each Participant shall effect its participation in the Transfer by delivering to Mill Point (to hold in trust as agent for such Participant), at least three (3) Business Days prior to the date scheduled for such Transfer as set forth in the Transfer Notice, (i) one or more certificates (to the extent such Units are certificated) or other instruments, as applicable, in proper form for transfer, which represent the number of Units which such Participant elected to Transfer in accordance with Section 8.3(b), (ii) a joinder agreement pursuant to which such Participant shall agree to be bound by the terms and conditions set forth in the agreement included with the Transfer Notice pursuant to Section 8.3(a)(B) in form and substance satisfactory to Mill Point, (iii) a form of assignment of such Units, and (iv) executed copies (or signature pages thereof) of such other agreements, documents or certificates as Mill Point and/or its Transferee shall reasonably request.  Such Transferee shall remit to each such Participant its *pro rata* portion of the net sale proceeds to which such Participant is entitled by reason of its participation in such sale, taking into account any transaction costs and expenses incurred by Mill Point in connection with such Transfer (including any fee payable to Mill Point pursuant to, and to the extent payable under, the Mill Point Management Agreement), which costs and expenses shall be borne by all Participants on a *pro rata* basis, based on each Participant's *pro rata* portion of net sale proceeds derived from such sale.

(e)      The exercise or non-exercise of the rights of any of the Tag Members hereunder to participate in one or more Transfers of Units made by Mill Point shall not adversely affect their rights to participate in subsequent Transfers of Units subject to this Section 8.3.

(f)      It is understood and agreed that in consideration of investment banking services provided by an investment banking group (including Mill Point or any of its Affiliates), a fee may be paid in connection with a Transfer of Units by Mill Point pursuant to this Section 8.3 in an amount in cash that is customary and equivalent to a fee arrangement negotiated on an "arm's-length" basis (it being understood and acknowledged that the fees set forth in the Mill Point Management Agreement shall in all respects be deemed to be customary and equivalent to a fee arrangement negotiated on an "arm's-length" basis).

(g)      Notwithstanding anything contained in this Section 8.3 to the contrary, there shall be no liability on the part of Mill Point (or any of its Affiliates and Permitted Transferees) to any Tag Member in the event any transaction for the sale of Units to which this Section 8.3 applies is not consummated even if the provisions of this Section 8.3 have been triggered.

(h)      For convenience of administration, Mill Point may sell Units without first offering Tag Members the opportunity to participate in such sale in compliance with this Section 8.3, so long as each Tag Member is provided with the opportunity to sell their *pro rata* portion of applicable Units to Mill Point and, no later than fifteen (15) Business Days of consummation of the sale of Mill Point's Units, Mill Point purchases such Units from each Tag Member on the same terms and conditions (including price) as Mill Point sold its Units to such transferee, subject in all respects to (i) the limitations contained in Section 8.3(b), (ii) any distribution on such Units being withheld or, if paid, transferred together with the applicable Units, and (iii) Mill Point refraining from voting such Units during such fifteen (15) Business Day period.

Section 8.4.    Grant to Mill Point of Drag-Along Rights

(a)    At the request of Mill Point or the Board, each Non-Mill Point Member agrees to consent to, and raise no objection to, a Sale of the Company and shall take, and cause the Company to take, any and all other actions necessary or reasonably required to cause the consummation of such Sale of the Company upon the terms and subject to the conditions proposed by Mill Point, which shall control all decisions in connection therewith (including the hiring or termination of any investment bank or other professional advisor, which may include, for the avoidance of doubt, Mill Point or any of its Affiliates). Without limiting the foregoing, if such Sale of the Company is structured as a sale of assets or a merger or consolidation, then each Member shall vote, or cause to be voted, all voting Units over which such Person has the power to vote or direct the voting and which are entitled to vote on such Sale of the Company at a special or annual meeting of Members or by written consent in lieu of a meeting in favor of such transaction and shall irrevocably waive any dissenter's rights, appraisal rights or similar rights which such Member may be entitled under Applicable Law in connection therewith (and each such Member does hereby irrevocably waive all such rights).   In order to effectuate the foregoing covenants, each Non-Mill Point Member hereby grants Mill Point with respect to all of such Non-Mill Point Member's Units an irrevocable proxy and power of attorney (which is deemed to be coupled with an interest) for the term of this Agreement to take all necessary actions, and to cause the Company to take all necessary actions, and execute and delivery all documents deemed necessary and appropriate by Mill Point to effect such Sale of the Company in compliance with this Section 8.4. To the extent any Non-Mill Point Member fails to comply with the provisions of this Section 8.4, such Non-Mill Point Member hereby, to the fullest extent permitted by law, indemnifies, defends and holds Mill Point, its officers, directors, employees, counsel, representatives, agents and partners harmless severally (and not jointly or jointly and severally), in accordance with the respective *pro rata* share of the aggregate consideration (including any holdbacks, earn-outs or amounts in escrow) payable to such Non-Mill Point Member in any such Sale of the Company, against all claims, liability, loss or damage (or actions in respect thereof), together with all reasonable costs and expenses (including reasonable legal fees and expenses, costs of investigation, and expenses incurred in settlement of any litigation commenced or threatened), relating to or arising from its exercise of such proxy and power of attorney granted hereby.

(b)    Mill Point shall exercise the rights provided to it under this Section 8.4 by delivery of a written notice to the Company and each Non-Mill Point Member holding Units at least ten (10) Business Days prior to the proposed closing of such Sale of the Company.   Such notice shall describe the proposed Sale of the Company, including the amount and form of consideration to be received in connection therewith, the identity of the proposed purchaser, and the date of anticipated completion thereof.   Such Sale of the Company shall be on economic terms no less favorable in the aggregate, in each case, within each class or series of Units for each of the Non-Mill Point Members as compared to Mill Point. The Company and the Non-Mill Point Members each hereby agree to cooperate fully (including by waiving any appraisal rights to which such Non-Mill Point Member may be entitled under Applicable Law and each such Non-Mill Point Member does hereby waive all such appraisal rights) with Mill Point and the purchaser in any such Sale of the Company, including, in the case of the Company, by (i) identifying and soliciting prospective purchasers (including securing the services of an investment bank and/or other professional advisors, selected by Mill Point, to assist in procuring such purchasers), (ii) preparing and delivering preliminary marketing and auction materials, (iii) preparing or assisting in the preparation of due diligence materials, (iv) making such due diligence materials available to prospective purchasers, (v) providing access to the Company's and each of its Subsidiaries' books, records, properties and other proprietary materials (subject, in each case, to the execution of customary confidentiality and non-disclosure agreements) to prospective purchasers, (vi) making the managers, officers and employees of the Company and its Subsidiaries available to prospective purchasers for presentations and due diligence interviews and (vii) causing cause its representatives to so cooperate and to execute and deliver all documents (including purchase agreements, if applicable) and instruments as Mill Point and such purchaser reasonbly request in

connection with such Sale of the Company. Such documents and instruments shall include the Non-Mill Point Members making all representations, warranties, agreements, covenants and obligations and granting all indemnifications and similar agreements and arrangements agreed to by Mill Point it being understood that the Non-Mill Point Members' representations and warranties shall be limited to their respective organization and authority, title to and ownership of Units, ability to Transfer the Units without conflicts and other similar matters (the liability for which shall be borne only by such Non-Mill Point Member) (including participating in any escrow arrangements to the extent of their respective *pro rata* portion). Each Non-Mill Point Member who holds Class B Common Units hereby agrees, at the request of the transferee in the proposed Sale of the Company, to enter into (A) non-solicitation and non-hire arrangements for the benefit of such proposed transferee, and (B) non-competition, non-solicitation and non-interference arrangements for the benefit of such proposed transferee, in each case, substantially similar to the terms of each such Non-Mill Point Member's current relevant arrangement, if applicable. Notwithstanding anything herein to the contrary in this Section 8.4, but subject to the immediately preceding sentence, in connection with any such Sale of the Company, (x) no Member (other than Members holding Class B Common Units) shall be required to agree to any non-competition limitations on business activities (other than non-solicitation and non-hire arrangements pursuant to the immediately preceding sentence) or be prohibited from investing in any Person, and (y) the indemnification obligation of each Member provided to the proposed transferee with respect to the breach of any representation or warranty concerning the Company or its Subsidiaries or their respective business or operations shall be *pro rata*, several and not joint and limited to the gross proceeds received by, and any amount deposited into escrow on behalf of, each such Member in connection with such Sale of the Company. For purposes of this Section 8.4, "*pro rata* portion" shall be based on the proceeds received by such Member in connection with such Sale of the Company, as calculated in accordance with Section 8.4(c)).

(c)    Upon the consummation of a Transfer described in this Section 8.4, (other than to the extent any Member receives consideration in such Transfer in the form of equity securities in connection with such Member's election to roll over all or any portion of such Member's Units), each holder of participating in such Transfer will receive the same form of consideration and the same portion of the aggregate consideration that such holders of Units participating in such Transfer would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in Section 9.3 as in effect immediately prior to such Transfer; provided, that unless otherwise determined by the Board or in an applicable unit grant agreement, all unvested Class B Common Units held by a Non-Mill Point Member participating in such Transfer at the time of the consummation of a Transfer that is Sale of the Company shall be forfeited and cancelled without compensation therefor unless such unvested Class B Common Units vest in connection with or as a result of such Transfer; it being understood and agreed that the Board shall have the right, in its sole discretion, (x) to cause each unvested Class B Common Unit to be treated in connection with such Transfer as if vested immediately prior to such Transfer and (y) to cause the consideration payable in respect of each unvested Class B Common Unit pursuant to clause (x) above to be withheld subject to satisfaction of the vesting requirements applicable in respect of such unvested Class B Common Unit immediately prior to such Transfer.

(d)    It is understood and agreed that in consideration of investment banking services provided by an investment banking group (including Mill Point or any of its Affiliates), a fee may be paid in connection with the Sale of the Company pursuant to, and to the extent payable under, the Mill Point Management Agreement in an amount that is customary and equivalent to a fee arrangement negotiated on an "arm's-length" basis (it being understood and acknowledged that the fees set forth in the Mill Point Management Agreement shall in all respects be deemed to be negotiated on an "arm's-length" basis).

(e)    Notwithstanding anything contained in this Section 8.4 to the contrary, there shall be no liability on the part of Mill Point (or any of its Affiliates and Permitted Transferees) to any Non-Mill Point Member in the event a Sale of the Company is not consummated notwithstanding the delivery of any

written request by Mill Point pursuant to <u>Section 8.4(a)</u> or the compliance with any other provision in this <u>Section 8.4</u>.

        Section 8.5.     <u>Right of First Refusal</u>

        (a)     Except for Transfers described in <u>Section 8.2(a)(i)-(iv)</u>, transfers of Units by any Non-Mill Point Member shall not be permitted unless such Non-Mill Point Member (the "<u>Selling Holder</u>") has complied with this <u>Section 8.5</u>.  If a Selling Holder intends to sell any of his, her or its Units at any time, then he, she or it shall give written notice (the "<u>Seller's Notice</u>") to (i) the Company and (ii) the Preferred Units Members and Members holding Class A Common Units other than the Selling Holder (such parties in clause (ii), the "<u>First Refusal Holders</u>") stating that the Selling Holder intends to make such a sale or Transfer, identifying the party to whom the Selling Holder intends to sell or Transfer (the "<u>Proposed Transferee</u>"), specifying the class and amount of Units proposed to be purchased or acquired pursuant to the sale or Transfer (the "<u>First Refusal Units</u>"), the nature of such sale or transfer, all material terms of the proposed sale, including the per Unit purchase price the Proposed Transferee has agreed to pay for the First Refusal Units (the "<u>Sale Price</u>") and the name and address of each Proposed Transferee.  A copy of the offer, if available, shall be attached to the Seller's Notice.

        (b)     <u>Notice</u>.

        (i)     Upon receipt of the Seller's Notice, the Company shall have the irrevocable and exclusive option to purchase, upon delivery to the Selling Holder within fifteen (15) calendar days of the Company's receipt of the Seller's Notice, all of the First Refusal Units on the same terms and conditions, including the Sale Price, as set forth in the Seller's Notice.  The Company shall deliver a notice (the "<u>Company Notice</u>") to the Selling Holder and the Members of the Company's election to purchase or not to purchase such First Refusal Units within such fifteen (15) day period.  To the extent that the Company does not elect to purchase all of the First Refusal Units, the First Refusal Holders shall have the irrevocable and exclusive option to purchase all of the First Refusal Units on a *pro rata* basis (based on the ratio of the applicable Percentage Interests held by such First Refusal Holder to the total number of applicable Percentage Interests held by all First Refusal Holders on the same terms and conditions, including the Sale Price, as set forth in the Seller's Notice.  Within twenty (20) calendar days after delivery of the Company Notice, each First Refusal Holder shall deliver to the Company and the Selling Holder a written notice stating whether the First Refusal Holder elects to exercise its option under this <u>Section 8.5</u>, and such notice shall constitute an irrevocable commitment by such First Refusal Holder to purchase such Units.

        (ii)     Any Preferred Units Member shall be entitled to assign its rights pursuant to this <u>Section 8.5</u> to any of its Affiliates or Permitted Transferees.

        (iii)     If the Company or any of the First Refusal Holders, as applicable, have agreed to purchase all of the First Refusal Units, the closing for such transaction shall occur within thirty (30) calendar days of the Company's delivery of notice that it intends to purchase all of the First Refusal Units, or in the event that some or all of the First Refusal Holders have agreed to purchase all or a portion of such Units, then within thirty (30) calendar days of delivery by such First Refusal Holders of such notice.

        (iv)     If all of the First Refusal Units are not elected to be purchased pursuant to this <u>Section 8.5</u>, then the Selling Holder shall be free, for a period of ninety (90) calendar days from the date of the Seller's Notice, to sell all of the First Refusal Units to the Proposed Transferee, at a price equal to or greater than the Sale Price and upon terms no more favorable to the Proposed Transferee than those specified in the Seller's Notice.  Any transfer of the First Refusal Units by the Selling Holder after the end of such ninety (90) day period or any change in the terms of the sale as set forth in the Seller's Notice that are more favorable to the Proposed Transferee shall require that a new notice of intent to transfer to be

NAI-1516004280v9

delivered to the Company and the First Refusal Holders, and shall give rise anew to the rights provided in this <u>Section 8.5</u>.

(v)    If the Company or any of the First Refusal Holders elect to purchase all of the First Refusal Units mentioned in the Seller's Notice, the Company or such First Refusal Holders, as applicable, shall have the right to purchase the First Refusal Units for cash consideration whether or not part or all of the consideration specified in the Seller's Notice is other than cash.  If part or all of the consideration to be paid for the First Refusal Units as stated in the Seller's Notice is other than cash, the price stated in such Seller's Notice shall be deemed to be the sum of the cash consideration, if any, specified in such Seller's Notice, plus the fair market value of the non-cash consideration.  The fair market value of the non-cash consideration shall be determined in good faith by the Board.

(c)    <u>Termination of Rights of First Refusal</u>  The rights provided in this <u>Section 8.5</u> shall terminate upon the earlier to occur of (i) an IPO of the Company or (ii) a Sale of the Company.

Section 8.6.    <u>Right to Purchase Upon Involuntary Transfer</u>   Upon the Involuntary Transfer of any Units of any Member or other holder, as the case may be, such Member or other holder, as the case may be, shall promptly deliver written notice to the Company indicating that an Involuntary Transfer has occurred, specifying the name of the Person to whom such Units have been Transferred (the "<u>Involuntary Transferee</u>") and giving a detailed description of the circumstances giving rise to, and stating the legal basis for, the Involuntary Transfer.  Upon such Involuntary Transfer, at any time during the ninety (90) days following the receipt of such notice (or at any time thereafter if such notice has not been given), the Company shall have the right to purchase, and the Involuntary Transferee shall have the obligation to sell, all or any portion of the Units acquired by the Involuntary Transferee for a purchase price equal to the lesser of (a) the fair market value (as determined in good faith by the Board) of such Units on the date on which the Transfer to the Involuntary Transferee occurred and (b) the amount of the indebtedness or other liability that gave rise to the Involuntary Transfer plus the excess, if any, of the price per Unit paid by such Member or other holder, as the case may be, over the amount of such indebtedness or other liability that gave rise to the Involuntary Transfer; <u>provided</u>, <u>however</u>, that this clause (b) shall not apply in the case of a divorce.  Notwithstanding the foregoing, the Board may, for good cause shown by the Member or other holder, as the case may be, who made the Involuntary Transfer, determine that payment of a purchase price equal to the fair market value (as determined in good faith by the Board) of such Units on the date of Transfer to the Involuntary Transferee, if higher than the price determined pursuant to clause (b) above, would be appropriate under the circumstances and direct that payment be made in such amount.

Section 8.7.    <u>Grant of Preemptive Rights to Members</u>

(a)    In the event that, at any time, the Company shall decide to undertake an issuance of New Units, other than Class B Common Units, the Company shall at such time deliver written notice of such decision to each Member who holds Preferred Units and Common Units.  Such written notice shall describe the amount, type and terms of such New Units, the purchase price per New Unit (the "<u>New Units Purchase Price</u>") to be paid by the purchasers of such New Units and the other terms upon which the Company has decided to issue the New Units including the expected timing of such issuance, which shall in no event be more than thirty (30) days or less than ten (10) Business Days after the date on which such notice is given (the "<u>Preemptive Notice</u>").  Each Member that received a Preemptive Notice shall have ten (10) days from the date on which the Preemptive Notice is given to agree by written notice to the Company to purchase up to its *pro rata* portion of such New Units for the New Units Purchase Price and upon the general terms and subject to the conditions specified in the Preemptive Notice and stating therein the quantity of New Units to be purchased by any such Member.  In the event that in connection with such a proposed issuance of New Units, any such Member shall for any reason fail or refuse to give such written notice to the Company within such ten (10) day period, such Member shall, for all purposes of this <u>Section 8.7</u>, be deemed to have refused (in that particular instance only) to purchase any of such New Units and to

have waived (in that particular instance only) all of its rights under this Section 8.7 to purchase any of such New Units.  Such New Units shall be acquired by the exercising Member making an Additional Capital Contribution in an amount equal to the number of New Units acquired by such Member multiplied by the New Units Purchase Price.  For purposes of this Section 8.7, "*pro rata* portion" shall mean a fraction, the numerator of which is the liquidation value of the Units held by such Member, and the denominator of which is the total liquidation value of the Units outstanding immediately prior to the proposed issuance, in each case, as determined in accordance with Article IX in good faith by the Board based on the value implicit in the proposed issuance of New Units.

(b)    In the event and to the extent that any New Units are not acquired by the Members entitled to subscribe for and purchase such New Units, the Company shall be free to issue such New Units to any Person; provided, that (x) the price per New Unit at which such New Units are being issued to and purchased by such Person is equal to or greater than the New Units Purchase Price and (y) the other terms and conditions pursuant to which such Person purchases such New Units are not more favorable, in the aggregate, to such Person than the terms set forth in the Preemptive Notice.  Any New Units not issued or sold within one hundred fifty (150) days after the date of the Preemptive Notice shall again be subject to the provision of this Section 8.7.

(c)    For convenience of administration, the Company may sell New Units to Mill Point without first offering the Members who hold a Membership Interest the opportunity to participate in such sale in compliance with this Section 8.7, so long as (i) each Member is provided the opportunity to purchase its *pro rata* portion of applicable New Units from Mill Point, within ten (10) Business Days of consummation of Mill Point's purchase of New Units from the Company, on the same terms and conditions (including price) as Mill Point purchased its New Units from the Company and (ii) if such opportunity is exercised, the purchase is consummated.

Section 8.8.    Assignment  If the Company shall at any time during the term of this Agreement have the right to purchase from a Member any Units held by such Member, and the Company at such time is either unable, or elects not, to exercise such right with respect to all or any part of such Units, the Company may assign its right and delegate its obligations under Section 8.6 to (i) Mill Point or (ii) with Mill Point's prior written consent, any employee of the Company or any of its subsidiaries, and Mill Point or such employee, as the case may be, may then exercise all of the rights of the Company with respect to the purchase of such Units as to which such rights are assigned.

Section 8.9.    Publicly Traded Partnership Provision  Each Member hereby severally covenants and agrees with each of the other Members for the benefit of all Members, that (a) it is not currently making a market in interests in the Company and will not in the future make such a market and (b) it will not transfer its interest in the Company on an established securities market, a secondary market or an over the counter market or the substantial equivalent thereof within the meaning of Section 7704 of the Code and Treasury Regulations and rulings and other pronouncements of the Internal Revenue Service or the Department of the Treasury thereunder.  Each Member further agrees that it will not assign any interest in the Company to any assignee unless such assignee agrees to be bound by this Section 8.9 and to assign such interest only to such Persons who agree to be similarly bound.

Section 8.10.    Registration Rights  The Company and the Members acknowledge and agree that upon an IPO, the Company will enter into a registration rights agreement to request or participate in the registration of Units or any other equity securities of the Company or any of its Subsidiaries, or any securities convertible or exchangeable into or exercisable for such securities ("Registration Rights"), and such Registration Rights shall include demand and piggyback registration rights in form and substance satisfactory to Mill Point.

NAI-1516004280v9

Section 8.11.   Blocker Sales.  Notwithstanding anything to the contrary in this Agreement, in connection with any Transfer of Units by any Member, if, at the time of such Transfer, such Member (or any direct or indirect equity owner of such Member) is a corporation for U.S. federal income tax purposes (any such Person, a "Blocker"), then the Board shall (to the extent doing so would not cause any unreasonable cost or delay, as determined by the Board in its sole discretion) use commercially reasonable efforts to permit any owner of the equity interests of such Blocker (such equity, "Blocker Equity") to transfer, in lieu of a transfer of Units owned indirectly by such owner, an amount of Blocker Equity owned by such owner of Blocker Equity to the transferee or purchaser which represents, indirectly, such Units upon the same terms as were applicable to such Transfer of such Units.

ARTICLE IX

DISSOLUTION, LIQUIDATION CONVERSION AND TERMINATION OF THE COMPANY

Section 9.1.   Limitations  The Company may be dissolved, liquidated and terminated pursuant to and only pursuant to the provisions of this Article IX, and the parties hereto do hereby irrevocably waive any and all other rights they may have to cause a dissolution of the Company or a sale or partition of any or all of the Company's assets.

Section 9.2.   Dissolution  The Company shall be dissolved and liquidated pursuant to Section 9.3 upon the earliest to occur of (it being understood that the following events are the only events that can cause the dissolution and liquidation of the Company):

(a)   the written election by the Board to dissolve, liquidate and terminate the Company;

(b)   the entry of a decree of judicial dissolution pursuant to Section 18-802 of the Act; or

(c)   the sale or other disposition by the Company of all or substantially all of its assets and the assets its Subsidiaries on a consolidated basis.

Section 9.3.   Liquidation  In all cases of dissolution of the Company, the business of the Company shall be continued to the extent necessary to allow an orderly winding up of its affairs, including the liquidation of the assets of the Company pursuant to the provisions of this Section 9.3, as promptly as practicable thereafter, and each of the following shall be accomplished:

(a)   The Board shall prepare or cause to be prepared a statement setting forth the assets and liabilities of the Company as of the date of dissolution, a copy of which statement shall be furnished to all of the Members.

(b)   The property of the Company shall be liquidated or distributed in kind by the Board as promptly as possible, but in an orderly, businesslike and commercially reasonable manner.  The Board may, in the exercise of its commercially reasonable business judgment, determine (i) to sell all or any portion of the property of the Company to a Member (provided, that the purchase price is not less than the fair market value of such property as so determined by the Board in good faith) or to any other Person or (ii) not to sell all or any portion of the property of the Company, in which case, such property and assets shall be distributed in kind pursuant to Section 9.3(d).

(c)   Any gain or loss realized by the Company upon the sale of its property shall be deemed recognized and allocated to the Members in the manner set forth in Article IV.  To the extent that an asset is to be distributed in kind, such asset shall be deemed to have been sold at its fair market value on the date of distribution, the gain or loss deemed realized upon such deemed sale shall be allocated in accordance with Article IV and the amount of the distribution shall be considered to be such fair market value of the asset.

27

NAI-1516004280v9

(d)     The proceeds of sale and all other assets of the Company shall be applied and distributed as follows and in the following order of priority:

(i)     to pay the expenses of the winding-up, liquidation and dissolution of the Company;

(ii)     to pay all creditors of the Company, other than the Members, either by the payment thereof or the making of reasonable provision therefor;

(iii)     to the setting up of any reserves which the Board shall determine to be reasonably necessary for contingent, unliquidated or unforeseen liabilities or obligations of the Company or the Members arising out of or in connection with the Company. Such reserves may, in the sole and absolute discretion of the Board, be held by the Board or paid over to a bank or trust company selected by it, in each case, to be held by the Board or such bank or trust company as escrow holder or liquidating trustee for the purposes of disbursing such reserves to satisfy the liabilities and obligations described above. Such reserves shall be held for such period as the Board shall deem advisable;

(iv)     to pay, in accordance with the terms agreed among them and otherwise on a *pro rata* basis, all creditors of the Company that are Members (including, for the avoidance of doubt, any amounts due, owing or payable under the Mill Point Management Agreement), either by the payment thereof or the making of reasonable provision therefor; and

(v)     the balance, if any, to the Members in the order and priority set forth in Section 5.1(a).

Section 9.4.     Continuation of the Company  Notwithstanding anything to the contrary contained herein, the death, retirement, resignation, expulsion, bankruptcy, dissolution or removal of a Member shall not cause the dissolution of the Company, and the Members are expressly authorized to continue the business of the Company, in such case, without any further action on the part of the Members.

Section 9.5.     Change in Business Form

(a)     Except as otherwise provided in this Agreement, upon the approval of a majority of the Managers constituting the Board, the Company may consummate a Conversion, in which event, at the Board's option, (i) the terms and conditions contained herein shall be, as closely as possible, adopted by the resulting corporation (or the equivalents thereof) or other form of business organization (the "Successor Entity") and (ii) each Member shall receive shares of capital stock or other equity interests in proportion to and reflecting the liquidation value of such Member's Units pursuant to this Article IX (including Section 9.3) (it being understood that all Units may be converted into a single class of equity securities of the Successor Entity). At the request of the Board, all Members shall execute and deliver any agreement, instrument or other document reasonably required to consummate such Conversion. In connection with any Conversion for which the Successor Entity is treated as a corporation for U.S. federal income tax purposes, the Board shall (to the extent doing so would not cause any unreasonable cost or delay, as determined by the Board in its sole discretion) use commercially reasonable efforts to permit any owner of Blocker Equity, in a tax-efficient manner, to directly or indirectly transfer (including by merger) any Units (including by the transfer of Blocker Equity owned by such owner) to the Successor Entity, so that such Blocker is not required to directly or indirectly own equity in the Successor Entity.

(b)     Immediately prior to and in connection with the consummation of an IPO of the Company (which shall include, for the purposes of this Section 9.5, a SPAC Transaction), a Conversion of the Company may be effected. In connection with such Conversion, the Board shall ensure that the fair market value of equity interests of the Successor Entity received by the Members in such Conversion shall

be no less than the fair market value of the Units exchanged therefor as of immediately prior to such Conversion (as determined in good faith by the Board, which determination may take into account such factors including the offering price set forth in the prospectus which is distributed in connection with such IPO, the impact of the provisions of Section 5.1 or Section 9.3 and the relative rights of each class of Unit, and such other factors in each case as the Board may determine). Further, the certificate of incorporation and bylaws of the Successor Entity shall incorporate the governance provisions of this Agreement and a stockholders agreement shall incorporate the rights provided for in Article II, Article VI, Article VII, Article VIII, and Article X herein, except as would cease to be applicable on consummation of the Conversion, with such modifications as may be necessary or appropriate to reflect the form of the Successor Entity, and may include such other provisions as may be customary for a publicly-listed company. The Board shall use its commercially reasonable efforts to consummate the Conversion in the most tax-efficient manner practicable for the Company and the Members.

(c)     Upon the approval of a majority of the Managers constituting the Board, an IPO may be structured as an "UP-C" transaction (an "UP-C IPO") as determined by the Board. Prior to an UP-C IPO, the Company shall form a corporation that will control the Company (an "UP-C IPO Entity"), the shares of which UP-C IPO Entity shall be offered in the IPO and for which shares (or, at the option of the UP-C IPO Entity, cash in an amount equal to the fair market value of such shares) the Units of the Company shall, following the consummation of the IPO, be exchangeable, on a one-to-one basis, from time to time at the election of the Member holding such Units.

(d)     In the case of an UP-C IPO:

(i)      the Board shall admit the UP-C IPO Entity as the sole managing Member of the Company, in which case, the UP-C IPO Entity shall replace the Board as the manager of the Company. Thereafter, the business and affairs of the UP-C IPO Entity and the Company shall be conducted as nearly as practicable in such manner that: (w) the UP-C IPO Entity shall have no business activities other than the management of, and ownership of interests in, the Company and any other entity hereafter acquired by the Company after obtaining any requisite Board and Member approvals provided herein; (x) all of the ongoing costs and expenses of the UP-C IPO Entity shall be borne or reimbursed by the Company and any funds received by the UP-C IPO Entity shall be contributed (in the case of a sale of equity or other receipt of non-borrowed funds) or loaned (in the case of incurrence of Indebtedness) to the Company; (y) the net proceeds from any sale of shares of the UP-C IPO Entity ("UP-C Entity Stock") shall be invested in Units of the Company, and the net proceeds from the incurrence of Indebtedness by the UP-C IPO Entity shall be invested in Indebtedness of the Company; and (z) the UP-C IPO Entity shall otherwise have no assets or liabilities (other than temporary investments of cash pending a contribution or loan of such amounts to the UP-C IPO Entity, *de minimis* assets and operating payables) other than its ownership interest in the Company. In connection with the formation of the UP-C IPO Entity and its admission to the Company as managing Member, the Members shall be issued, for nominal consideration, shares of UP-C Entity Stock that carry voting rights that are equivalent to the voting rights such Member would have received in the event of a Conversion. Such shares shall carry no economic rights and shall be surrendered upon an exchange of Units for UP-C Entity Stock.

(ii)     The Members shall be entitled to periodic payments from the UP-C IPO Entity (and any successor entity thereto) equal to 85% (or such other amount as may be agreed to by the Board) of the cash tax savings to the UP-C IPO Entity (and any consolidated, combined or unitary group of which the UP-C IPO Entity is, or thereafter becomes, a member) arising from any step-up in tax basis resulting from each exchange by the Member of Units for shares of UP-C Entity Stock (or shares of stock of any successor

entity) and any other tax assets, as provided in any tax receivables agreement. Prior to the UP-C IPO, the Members and the UP-C IPO Entity may enter into one or more tax receivable agreements with customary terms to govern the calculation and making of such payments, it being understood that such tax savings shall be determined using a "with and without" methodology.

(e)　　In connection with a Conversion or an IPO, the Board shall prepare or cause to be prepared, and the Board shall have the right to require all of the Members to execute and deliver, any and all agreements, instruments or other documents reasonably required to consummate or facilitate the Conversion or the IPO, including, in the case of an UP-C IPO, amending this Agreement to provide for a single class of equity securities (with Members receiving equity interests of such single class with a fair market value equal to no less than the fair market value of the Units held by such Member immediately prior to such restructuring of the Company) which are exchangeable, on a one-to-one basis, from time to time at the election of the Member into equity interests in the UP-C IPO Entity of the same class offered in the IPO (or, at the option of the UP-C IPO Entity, cash in an amount equal to the fair market value of such equity interests). Each Member hereby agrees that it shall execute and deliver any and all agreements, instruments and documents as are required, in the reasonable judgment of the Board or as may otherwise be requested by the underwriters of the IPO, to be executed by such Member in order to consummate or facilitate the Conversion or IPO.

(f)　　Each Member hereby makes, constitutes and appoints the Board, with full power of substitution and resubstitution, its true and lawful attorney, for it and in its name, place and stead and for its use and benefit, to act as its proxy in respect of any vote or approval of Members required to give effect to this Section 9.5, including any vote or approval required under Delaware law. The proxy granted pursuant to this Section 9.5 is a special proxy coupled with an interest and is irrevocable.

ARTICLE X

MISCELLANEOUS

Section 10.1.　Entire Agreement　This Agreement (including the schedules, annexes and exhibits hereto), the Mill Point Management Agreement, the Purchase Agreement and the transactions contemplated thereby represent the entire understanding and agreement among the parties hereto with respect to the subject matter hereof and thereof and supersedes all prior understandings, agreements or arrangements among the parties (whether written or oral) respecting the subject matter hereof.

Section 10.2.　Construction　In this Agreement, unless otherwise specified or where the context otherwise requires:

(a)　　the headings of particular provisions of this Agreement are inserted for convenience only and shall not be construed as a part of this Agreement or serve as a limitation or expansion on the scope of any term or provision of this Agreement;

(b)　　words importing any gender shall include other genders;

(c)　　words importing the singular only shall include the plural and vice versa;

(d)　　the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation";

(e)　　the words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement;

(f)     the words "year" and "years" mean and refer to calendar year(s);

(g)     references to "Schedules," "Exhibits", "Annexes" or "Sections" shall be to Schedules, Exhibits, Annexes or Sections of or to this Agreement;

(h)     references to any Person include the successors and permitted assigns of such Person;

(i)     the use of the words "or," "either" and "any" shall not be exclusive;

(j)     whenever this Agreement refers to a number of days, that number shall refer to calendar days unless Business Days are specified and whenever any action must be taken under this Agreement on or by a day that is not a Business Day, then that action may be validly taken on or by the next day that is a Business Day.

(k)     references to a statute include all rules and regulations promulgated thereunder and, unless otherwise specified, the provisions of any statute, rule or regulation, as applicable, which amends, supplements or supersedes any such statute, rule or regulation, as applicable;

(l)     references to "writing" or comparable expressions include a reference to facsimile transmission or comparable means of communications (but shall not include electronic mail);

(m)     wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control in all respects but solely to the extent of such conflict;

(n)     references to any agreement, contract or schedule, unless otherwise stated, are to such agreement, contract or schedule as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof; and

(o)     the parties hereto have participated jointly in the negotiation and drafting of this Agreement; accordingly, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provisions of this Agreement.

Section 10.3.   Counterparts   For the convenience of the parties, any number of counterparts of this Agreement may be executed (including by means of facsimile or electronically transmitted scanned signature pages) by the parties hereto and each such executed counterpart shall be deemed to be an original instrument and all such executed counterparts, when taken together, shall be deemed to constitute one and the same agreement.

Section 10.4.   Notices   Except as otherwise provided herein, any notice or other communication required or permitted under this Agreement shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile transmission to the respective parties as follows and shall be effective and deemed to have been duly given (i) when received or rejected by the addressee if sent by registered or certified mail, postage prepaid, return receipt requested, (ii) when sent, if sent by facsimile (with written confirmation of transmission), (iii) when delivered, if delivered personally by hand to the intended recipient (with written confirmation of receipt) and (iv) one (1) Business Day following deposit with a nationally recognized overnight courier service (with written confirmation of receipt), in each case, addressed as follows:

If to the Company, to:

Strike Investment, LLC
1800 Hughes Landing Blvd., Suite 500
The Woodlands, TX 77380
Attention:      Frank Victor-McCawley; Rhonda Sigman
Email:          frank.victor-mccawley@strikeusa.com; rhonda.sigman@strikeusa.com


with a copy (which shall not constitute notice) to its legal counsel:

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Attention:      Dan Latham
Email:          dlatham@whitecase.com


If to Mill Point, to:

Mill Point Strike Splitter, LP
555 Madison Avenue, 16th Floor
New York, NY 10022
Attention:      Michael Duran
Email:          mduran@millpoint.com


with a copy (which shall not constitute notice) to its legal counsel:

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Attention:      Dan Latham
Email:          dlatham@whitecase.com

and if to any of the Non-Mill Point Members, to the addresses or facsimile numbers set forth opposite each of their names on Exhibit A attached hereto, or to such other address or facsimile number as any such party hereto may, from time to time, designate in writing to all other parties hereto.  In the event that the address of any Member should change from those set forth above, or as set forth on Exhibit A, such Member shall provide written notice of such change and an updated notice address and information to the Board as promptly as practicable.  Notices sent by multiple means, each of which is in compliance with the provisions of this Agreement, shall be deemed to have been received at the earliest time provided for by this Agreement.

Section 10.5.    Successors and Assigns  This Agreement shall be binding upon and inure to the benefit of the Company, the Members and each of their respective successors, assigns and Permitted Transferees.  Any or all of the rights of a Member under this Agreement may be assigned or otherwise conveyed by any Member only in connection with a Transfer of its Membership Interest which is in compliance with this Agreement.

Section 10.6.    Governing Law  THIS AGREEMENT, INCLUDING ITS EXISTENCE, VALIDITY, CONSTRUCTION AND OPERATING EFFECT, AND THE RIGHTS OF EACH OF THE PARTIES HERETO, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE

LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS.

Section 10.7.    Submission to Jurisdiction; Waiver of Jury Trial

(a)    Each of the parties hereto hereby irrevocably acknowledges and consents that any legal action or proceeding brought with respect to any of the obligations arising under or relating to this Agreement shall be brought in any state or federal court sitting in the State of Delaware, and each of the parties hereto hereby irrevocably submits to and accepts with regard to any such action or proceeding, for itself and in respect of its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts. Each party hereby further irrevocably waives any claim that any such courts lack jurisdiction over such party, and agrees not to plead or claim, in any legal action or proceeding with respect to this Agreement or the transactions contemplated hereby brought in any of the aforesaid courts, that any such court lacks jurisdiction over such party. Each party irrevocably consents to the service of process in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such party, at its address for notices set forth in Section 10.4 or the applicable Schedule or Exhibit, such service to become effective ten (10) days after such mailing. Each party hereby irrevocably waives any objection to such service of process and further irrevocably waives and agrees not to plead or claim in any action or proceeding commenced hereunder or under any other documents contemplated hereby that service of process was in any way invalid or ineffective. Subject to Section 10.7(b), the foregoing shall not limit the rights of any party to serve process in any other manner permitted by law. The foregoing consents to jurisdiction shall not constitute general consents to service of process in the State of Delaware for any purpose except as provided above and shall not be deemed to confer rights on any Person other than the respective parties to this Agreement.

(b)    Each of the parties hereto hereby waives any right it may have under the laws of any jurisdiction to commence by publication any legal action or proceeding with respect to this Agreement. To the fullest extent permitted by Applicable Law, each of the parties hereto hereby irrevocably waives the objection which it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement in any of the courts referred to in Section 10.7(a) and hereby further irrevocably waives and agrees not to plead or claim that any such court is not a convenient forum for any such suit, action or proceeding.

(c)    The parties hereto agree that any judgment obtained by any party hereto or its successors or assigns in any action, suit or proceeding referred to above may, in the discretion of such party (or its successors or assigns), be enforced in any jurisdiction by suit on the judgment or in any other manner permitted by Applicable Law.

(d)    The parties hereto hereby agree that the remedy at law for any breach of this Agreement would be inadequate and that should any dispute arise concerning the sale, disposition or issuance of any equity securities of the Company or the voting thereof or any other matter hereunder, this Agreement shall be enforceable in a court of equity by an injunction or a decree of specific performance. Such remedies shall, however, be cumulative and nonexclusive, and shall be in addition to any other remedies which the parties hereto may have.

(e)    Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any right it may have to a trial by jury in respect of any action, proceeding or counterclaim as between the parties directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto. Each of the parties hereto hereby (i) certifies that no representative, agent or attorney of any other party hereto has represented, expressly or otherwise that such other party hereto would not, in the event of litigation, seek to enforce the

foregoing waiver and (ii) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this <u>Section 10.7(e)</u>.

Section 10.8.   <u>Benefits Only to Parties</u>  Nothing expressed or implied by or mentioned in this Agreement is intended or shall be construed to give any Person, other than Persons indemnified pursuant to <u>Section 6.6</u>, the parties hereto and their respective successors or assigns and Permitted Transferees, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision herein contained, this Agreement and all conditions and provisions hereof being intended to be and being for the sole and exclusive benefit of the parties hereto and their respective successors and assigns and Permitted Transferees, and for the benefit of no other Person.

Section 10.9.   <u>Termination; Survival of Benefits</u>  This Agreement shall terminate upon the closing of a Sale of the Company (unless the purchaser in such transaction elects to be bound by the terms of this Agreement); <u>provided</u>, that the rights and obligations of the Members and the Company under <u>Article VI</u>, <u>Article VIII</u> (other than <u>Section 8.3</u>), <u>Article IX</u> and this <u>Article X</u> shall survive any such termination of this Agreement.

Section 10.10.   <u>Publicity</u>  Except as otherwise required by Applicable Law, none of the parties hereto shall issue or cause to be issued any press release or make or cause to be made any other public statement, in each case, relating to or connected with or arising out of this Agreement or the matters contained herein, without obtaining the prior written consent of the Board to the contents and the manner of presentation and publication thereof.

Section 10.11.   <u>Confidentiality</u>

(a)   Each Member hereby agrees that throughout the term of this Agreement it shall keep (and shall cause each of its directors, officers, general and limited partners, employees, representatives, outside advisors and Affiliates to keep) all information received by such Member solely by reason of such Member's status as a Member relating to the Company (including any such information received prior to the date hereof) confidential except information which (i) becomes known to such Member from a source, other than the Company or its Managers, directors, officers, employees, representatives or outside advisors, which source was not known by such Member to be obligated to the Company or any of its Affiliates to keep such information confidential, or otherwise prohibited from transmitting the information to such Member or any of its representatives or agents by a contractual, legal or fiduciary obligation, (ii) was in such Member's possession from a source, prior to being furnished by or on behalf of the Company, which source was not known by such Member to be obligated to the Company or any of its Affiliates to keep such information confidential, or otherwise prohibited from transmitting the information to such Member or any of its representatives or agents by a contractual, legal or fiduciary obligation or (iii) becomes generally available to the public through no breach of this Agreement by any party hereto.  Notwithstanding the foregoing, each of the Members hereby agrees that (A) such information may be communicated to the directors, officers, general and limited partners, employees, representatives, outside advisors and Affiliates of a Member and (B) it shall cause its directors, officers, general and limited partners, employees, representatives, outside advisors or Affiliates to keep such information confidential (except to the extent the disclosure of such information is necessary in connection with tax returns or tax audits of a Member and its Affiliates or in connection with any claim brought or dispute or disagreement arising under, out of or in connection with this Agreement or the transactions contemplated hereby) and shall not, and shall cause its directors, officers, general and limited partners, employees, representatives, outside advisors and Affiliates not to, use such information to either compete with the Company or to conduct itself in a manner inconsistent with the antitrust laws of the United States of America or any State thereof.  Notwithstanding the foregoing, a party hereto may disclose information if required to do so upon request for disclosure pursuant to a federal or state freedom of information statute or by a court of competent jurisdiction or by any governmental agency; <u>provided</u>, <u>however</u>, that prompt notice of such required disclosure be given to

the Company prior to the making of such disclosure so that the Company may seek, at its sole expense, a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, the party hereto required to disclose the information shall disclose only that portion which such party is advised by counsel is legally required to be disclosed and shall request that confidential treatment be accorded such portion of the information.

(b)     Notwithstanding the provisions of the Act to the contrary, the Members hereby agree (i) that the schedules attached hereto contain confidential information with respect to the Members and that such confidential information shall not be disclosed to the Members without the express written consent of the applicable Member and (ii) the Members shall not be entitled to receive or review any information with respect to the Company except as expressly set forth herein, in the Mill Point Management Agreement or in another written agreement between the Company and such Member.

Section 10.12.   <u>Amendments; Waivers</u>   Any provision of the Certificate of Formation or this Agreement may be amended, modified or otherwise altered with the prior written consent of the Board, and the prior written consent of the Board shall be required for any amendment, modification or waiver thereof; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, neither this Agreement nor the Certificate of Formation shall be amended, modified or otherwise altered (a) in any manner that, by its terms, would be disproportionately adverse to any Member relative to the other Members without the consent of such Member, (b) so as to modify the limited liability of a Member without the consent of such Member, (c) so as to increase a Member's obligations to contribute to the capital of the Company without the consent of such Member, (d) so as to amend <u>Article VIII</u> (or any defined term used in such Article) in a manner that would reduce or eliminate any Member's rights thereunder without the consent of such Member, or (e) so as to amend <u>Section 1.2</u>, <u>Section 2.2(a)</u>, <u>Section 6.1(ii)</u>, <u>Section 6.3(a)(ii)</u>, <u>Section 6.3(b)</u>, <u>Section 6.3(c)</u>, <u>Section 6.4(g)</u>, this <u>Section 10.12</u>, or <u>Section 10.13</u>, without the consent of Strike Capital.  Notwithstanding the foregoing, neither the addition of parties to this Agreement in accordance with its terms nor the issuance of additional classes of Units in accordance with the terms of this Agreement shall be deemed to be an amendment, modification or waiver requiring the consent of any Member.  The failure of any party hereto to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with their respective terms.

Section 10.13.   <u>Fiduciary Duties</u>   To the fullest extent permitted by Applicable Law, no Waived Party shall have any direct or indirect duties (including any and all fiduciary duties) or liabilities to the Company, any Member or any other Person, and the Members shall have no direct or indirect rights against any Waived Party or the Company, beyond any duties, liabilities and rights set forth in, and subject to, the express terms of this Agreement, it being agreed that all other duties (including any and all fiduciary duties), liabilities and rights relating to the Company or any Member, whether by operation of law or in equity, are hereby irrevocably waived and released by the Members, the Company and each Waived Party and in doing so, acknowledges and agrees that the duties and obligations of each Waived Party to each other and to the Company (if applicable) are only as expressly set forth in this Agreement and each Waived Party may fully rely on the express provisions of this Agreement in performing as such for or on behalf of the Company. This Agreement is not intended to, and does not, create or impose any fiduciary duty or liability on any Waived Party. Except as otherwise expressly stipulated in this Agreement, each Member acknowledges and agrees that each Member, in its capacity as a Member, and each Manager and Officer may decide or determine any matter subject to the approval of such Member or any such Manager or Officer pursuant to any provision of this Agreement in the sole and absolute discretion of such Member or any such Manager or Officer, and in making such decision or determination such Member or any such Manager or Officer shall have no duty, fiduciary or otherwise, to any other Member or to the Company, it being the intent of all Members that such Member, in its capacity as a Member, and each Manager and Officer have the right to make such determination solely on the basis of its own interests or the interests of the Member(s) that designated such Manager. Notwithstanding any other provision of this Agreement or otherwise

applicable provision of law or equity, whenever in this Agreement a Waived Party is permitted or required to make a decision or take an action (including a decision or action that is in such Waived Party's "sole discretion" or "discretion" or under a grant of similar authority or latitude), the Waived Party shall be entitled to consider only such interests and factors as such Waived Party desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement, any Waived Party is permitted or required to make a decision in such Waived Party's "good faith," or under another express standard, the Waived Party shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any other Applicable Law. Each of the Company and the Members hereby agree that any claims against, actions, rights to sue, other remedies or other recourse to or against the Company or any of their respective Affiliates, and each Manager and officer, for, or in connection with, any such decision or determination, in each case whether arising in common law or equity or created by rule of law, statute, constitution, contract (including this Agreement) or otherwise, are in each case expressly released and waived by the Company and each Member, to the fullest extent permitted by law, as a condition of, and as part of the consideration for, the execution of this Agreement, and the incurring by the Member of the obligations provided in such agreements. Nothing herein shall be deemed to alter the contractual obligations of a Member to another Member or to the Company pursuant to this Agreement. In making such express waiver of fiduciary duties, the Members recognize, acknowledge and agree that the provisions of this Agreement, to the extent that they restrict or eliminate the duties or liabilities of a particular Person otherwise existing at law or in equity, replace such duties and liabilities existing at law or in equity of such Person. Notwithstanding any other terms of this Agreement to the contrary, whether express or implied, or any obligation or duty at law or in equity, and, to the fullest extent permitted by law, no Waived Party shall be liable to the Company, any Member or any other Person for any breach of any fiduciary or other duties. Nothing in this Section 10.13 shall create any duty or liability that does not exist at law or in equity.

Section 10.14.   Other Business  Subject to any other agreement or obligation by which Mill Point is bound, Mill Point and any of its Affiliates shall have the right to, and shall have no duty (contractual or otherwise) not to, directly or indirectly, engage in or possess an interest in any other business venture of any kind, nature or description, independently or with others, whether or not such ventures are competitive with the Company or any of its Subsidiaries, notwithstanding that representatives of Mill Point or any of its Affiliates may be serving on the Board. Neither Mill Point nor any of its Affiliates, as a Member, officer or director of the Company or any of its Subsidiaries, shall have any obligation to communicate, present or offer first to the Company or any of its Subsidiaries any business opportunity or venture of any kind, nature or description that Mill Point or such Affiliates, as the case may be, may wish to pursue from time to time, independently or with others. Nothing in this Agreement shall be deemed to prohibit Mill Point and/or any of its Affiliates from dealing, or otherwise engaging in business, with Persons transacting business with the Company or any of its Subsidiaries, including any client, customer, franchisee, supplier, lender or investor of the Company or any of its Subsidiaries. None of Mill Point or any of its Affiliates shall be liable to the Company or its Subsidiaries or any Member for breach of any duty (contractual or otherwise) by reason of any such business ventures or of such Person's participation therein or by reasons of the fact that Mill Point or such Affiliates directly or indirectly pursues or acquires any such business opportunity or venture for itself, directs such opportunity or venture to another Person or does not communicate, present or offer first such opportunity or venture to the Company or any of its Subsidiaries. Neither the Company (or any of its Subsidiaries) nor any Member shall have any rights or obligations by virtue of this Agreement or the transactions contemplated hereby, in or to any independent venture of Mill Point or any of its Affiliates, or the income or profits or losses or distributions derived therefrom, and such ventures shall not be deemed wrongful or improper even if competitive with the business of the Company or any of its Subsidiaries.

Section 10.15.   Severability  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of

this Agreement is held to be invalid, illegal or unenforceable in any respect under any Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other provision of this Agreement in such jurisdiction or affect the validity, legality or enforceability of any provision in any other jurisdiction, and the invalid, illegal or unenforceable provision shall be interpreted and applied so as to produce as near as may be the economic result intended by the Members.  Upon determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 10.16.  <u>Further Action</u>  Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

Section 10.17.  <u>Nature of Interests</u>  A Member's Membership Interest shall for all purposes of this Agreement be personal property.  No Member has any interest in specific Company property.

Section 10.18.  <u>Representations and Warranties</u>   The parties to this Agreement acknowledge and agree as follows:

(a)     The undersigned Members understand:

(i)     that the Units have not been registered under the Securities Act, the Delaware Securities Act or any other state securities laws (the "<u>Securities Laws</u>") because the Company is issuing the Units in reliance upon the exemptions from the registration requirements of the Securities Laws providing for issuance of securities not involving a public offering;

(ii)     that the Company has relied upon the fact that the Units are to be held by each Member for investment; and

(iii)     that exemption from registration under the Securities Acts may not be available if the Units were acquired by a Member with a view to distribution.

(b)     Accordingly, each Member hereby confirms to the Company that (i) the Member is acquiring the Units for such Member's own account, for investment and not with a view to the resale or distribution thereof, (ii) such Member is an "accredited investor" as that term is defined in Rule 501 of Regulation D under the Securities Act and (iii) such Member is a "qualified purchaser" within the meaning of the Investment Company Act of 1940.

(c)     Before acquiring a Unit, each Member has investigated the Company and its business, and the Company has made available to such Member all information necessary for such Member to make an informed decision to acquire the Units.  Each Member considers itself to be a Person possessing experience and sophistication as an investor adequate for the evaluation of the merits and risks of such Member's investment in the Units.

(d)     Each Member is aware that the legal, financial and other matters contained in this Agreement are complex and that such Member is free to seek advice with respect thereto from independent legal counsel.  Each Member has either sought such advice or determined to waive such right after carefully reviewing this Agreement.

Section 10.19.  <u>Fees and Expenses</u>  Except as otherwise expressly provided herein or in any agreement by which the parties or any of them are bound, the parties hereto shall pay their own fees and expenses (including fees and expenses of attorneys, accountants and other professional advisors) in

connection with the negotiation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated by this Agreement (whether consummated or not).

*    .    *        *

NAI-1516004280v9

IN WITNESS WHEREOF, the Company and the Members have entered into this Agreement as of the day and year first above written.

**COMPANY:**

**STRIKE INVESTMENT, LLC**

By: _____
Name: Stephen V. Pate
Title:   Chief Executive Officer

**MEMBERS:**

**MILL POINT STRIKE SPLITTER, LP**

By: Mill Point Capital Partners UGP II, LLC
Its: General Partner

By: _____
     Name:  Michael Duran
     Title:   Authorized Person

**STRIKE CAPITAL, LLC**

By: _____
Name:  Stephen V. Pate
Title:   Chief Executive Officer

EXHIBIT A

CAPITALIZATION TABLE

| Member's Name | Member's Address | Common Units Contribution Amount ($) | Number of Common Units | % of Common Units (Issued) | Preferred Units Contribution Amount ($) | Number of Preferred Units | % of Preferred Units | Participation Threshold |
|---|---|---|---|---|---|---|---|---|
| Mill Point Strike Splitter, LP | c/o Mill Point Capital LLC 1177 Avenue of the Americas, 45th Floor New York, NY 10036 Attn: Michael C. Duran Facsimile: (212) 416-5800 Email: mduran@millpoint.com | $0.000 | 0.000 | 0.000% | $65,000,000 | 65,000,000 | 100.000% | N/A |
| Strike Capital, LLC | 1800 Hughes Landing Blvd. Suite 500 The Woodlands, TX 77380 Attn: Frank Victor-McCawley; Rhonda Sigman Email: frank.victor-mccawley@strikeusa.com; rhonda.sigman@strikeusa.com | 100% of the issued and outstanding equity interests of Strike, LLC | 32,500,000 Class A Units | 100% | $0.000 | 0.000 | 0.000% | N/A |
| [Management Incentive Plan (Reserved, Unissued)] | N/A | N/A | 10,833,333.33 Class B Units | | N/A | N/A | N/A | $[__] |

EXHIBIT B

DEFINITION OF TERMS

"**Act**" shall mean the Delaware Limited Liability Company Act (currently Chapter 18 of Title 6 of the Delaware Code), as amended from time to time.

"**Additional Capital Contributions**" shall have the meaning set forth in Section 2.2(a).

"**Adjusted Capital Account Deficit**" shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the applicable Fiscal Year after (a) crediting thereto any amounts which such Member is, or is deemed to be, obligated to restore pursuant to Treasury Regulations § 1.704-1(b)(2)(ii)(*c*), 1.704-2(g)(1) and § 1.704-2(i)(5) and (b) debiting such Capital Account by the amount of the items described in Treasury Regulations § 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations § 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

"**Affiliate**" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under direct or indirect common control with, such Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through ownership of voting securities, by agreement or otherwise, provided that no debt investment fund affiliated with Mill Point Partners, L.P., or in which Mill Point Partners, L.P. or any of its controlled portfolio companies or managed private equity funds or its Affiliates holds a non-controlling interest, will be considered to be an Affiliate.

"**Agreement**" shall have the meaning set forth in the Preamble.

"**Applicable Law**" shall mean, with respect to any Person, all provisions of laws, statutes, ordinances, codes, rules, regulations, permits or certificates of any Governmental Authority applicable to such Person or any of its assets or property, and all judgments, injunctions, orders and decrees of any Governmental Authorities in proceedings or actions in which such Person is a party or by which any of its assets or properties are bound.

"**Applicable Percentage**" shall mean the highest marginal effective rate of U.S. federal, state and local income tax applicable to an individual or a corporation resident in New York, New York, Los Angeles, California, or Houston, Texas, whichever is highest, in each case, taking account of any difference in rates applicable to ordinary income, capital gains and dividends and any allowable deductions in respect of state and local taxes in computing the relevant Member's (or its direct or indirect equity owner's) liability for federal income taxes with respect to allocations from the Company.

"**Available Profits**" shall mean, in respect of a Class B Common Unit, the Net Income of the Company realized from and after the date of the issuance of such Unit; provided, that Available Profits shall in no event include any unrealized appreciation inherent in the Company or any of its Subsidiaries' assets at the time of the issuance of such Unit.

"**Beneficial Owner**" shall have the meaning set forth in Section 2.2(b).

"**Blocker**" shall have the meaning set forth in Section 8.11.

"**Blocker Equity**" shall have the meaning set forth in Section 8.11.

"**Board**" shall have the meaning set forth in Section 1.2.

"**Business Day**" shall mean any day, other than a Saturday, a Sunday or a day on which banks located in New York, New York are authorized or required by Applicable Law to close.

"**Capital Account**" shall have the meaning set forth in Section 3.2(a).

"**Capital Contribution**" shall mean an amount of cash and the fair market value (as determined in good faith by the Board) of property contributed to the capital of the Company by a Member, including any Additional Capital Contributions of such Member.

"**Certificate of Formation**" shall mean the Certificate of Formation of the Company, as the same may be amended from time to time.  The initial Certificate of Formation is attached as Exhibit C hereto.

"**Class A Common Units**" shall have the meaning set forth in the Recitals.

"**Class A Common Units Members**" shall mean any Person identified on Exhibit A hereto as a holder of Class A Common Units.

"**Class B Common Units**" shall have the meaning set forth in the Recitals.

"**Class B Common Units Members**" shall mean any Person identified on Exhibit A hereto as a holder of Class B Common Units.

"**Code**" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time, including the corresponding provisions of any successor law.

"**Common Stock**" shall mean the common stock of the Company or any Successor Entity issued upon a Conversion.

"**Common Units**" shall mean the Class A Common Units and Class B Common Units.

"**Common Units Members**" shall mean any Person identified on Exhibit A hereto as a holder of Common Units.

"**Company**" shall have the meaning set forth in the Preamble.

"**Company Indemnification Agreement**" shall have the meaning set forth in Section 6.6(d).

"**Company Minimum Gain**" shall have the meaning attributed to "partnership minimum gain" as set forth in Treasury Regulations §§ 1.704-2(b)(2) and 1.704-2(d).

"**Company Notice**" shall have the meaning set forth Section 8.5(b)(i).

"**Company Representative**" shall have the meaning set forth in Section 7.4(a).

"**Contribution Agreement**" shall have the meaning set forth in the Recitals.

"**Conversion**" shall mean a substitution of the Company or change in the legal status of the Company from a limited liability company for or into a business corporation or such other form of business organization, organized under the laws of the State of Delaware or one of the other states or territories of the United States or the District of Columbia in such form and manner (including by merger, organization, liquidation, transfer of Units or assets of the Company or any Subsidiary of the Company, or by any other shall mean permissible under Applicable Law) and with such classes of stock or other equity securities having such rights, preferences and other terms as may be approved by the Board.

"**Covered Person**" shall mean (a) Company Representative, any "designated individual" as such term is used in Treasury Regulations § 301.6223-1 and any other Member, (b) each officer, director, shareholder, partner, general partner, member, managing member, controlling Affiliate, employee, operating partner, independent contractor, agent or representative of the Members, and each of their controlling Affiliates and (c) each Manager, Officer, employee, agent or any representative of the Company, its Subsidiaries or any Member.

"**Depreciation**" shall mean, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Year or other period, Depreciation will be an amount which bears the same ratio to the beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for the Fiscal Year or other period bears to the beginning adjusted tax basis; provided, that if the federal income tax depreciation, amortization, or other cost recovery deduction for the Fiscal Year or other period is zero, Depreciation will be determined with reference to the beginning Gross Asset Value using any reasonable method selected by the Board.

"**Distributable Cash**" shall mean, as of any date, (a) the excess of the sum of cash receipts of all kinds of the Company over (b) the sum of cash disbursements for the expenses of the Company (or amounts reserved against liabilities (contingent or otherwise) of the Company, or to make distributions of Tax Allowance Amounts or to pay expenses of the Company), in each case between the date on which "Distributable Cash" was last distributed under Section 5.1(a) and such date, all as determined by the Board in its sole discretion.

"**Financing Facilities**" shall mean collectively, that certain (a) Term Loan and LC Loan and Security Agreement dated as of November 30, 2016, by and among Strike Capital, as Holdings, Strike, as the Borrower, the other Obligors party thereto, Wilmington Trust, National Association, as Administrative Agent, and the Lenders party thereto (as amended, modified or supplemented from time to time in accordance with the terms thereof and (b) ABL Loan and Security Agreement dated as of November 30, 2016, by and among Strike, as Borrower Agent, Strike Capital, as Holdings, the other Obligors party thereto, Bank of America, N.A., as Administrative Agent, the Lenders party thereto (as amended, modified or supplemented from time to time in accordance with the terms thereof.

"**First Hurdle**" shall mean, with respect to any Preferred Units Member, an amount equal to (a) the Preferred Capital Amount of such Preferred Units Member *multiplied by* (b) 1.1.

"**First Refusal Holder**" shall have the meaning set forth in Section 8.5(a).

"**First Refusal Units**" shall have the meaning set forth in Section 8.5(a).

"**Fiscal Year**" shall have the meaning set forth in Section 1.7.

"**Flow-Through Entity**" shall mean a disregarded entity, partnership, grantor trust or S Corporation, as such terms are used in the Code or Treasury Regulations.

"**Governmental Authority**" shall mean any instrumentality, subdivision, court, administrative agency, commission, official or other authority of the United States or any other country or any state, province, prefect, municipality, locality or other government or political subdivision thereof, or any quasi-governmental or private body exercising any regulatory, taxing, importing or other governmental or quasi-governmental authority.

"**Gross Asset Value**" shall mean, with respect to any asset, such asset's adjusted basis for federal income tax purposes, except as follows:

(a)    the initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset (as determined in good faith by the Board);

(b)    the Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as of the following times:  (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (ii) the distribution by the Company to a Member of more than a *de minimis* amount of Company assets as consideration for an interest in the Company; (iii) the grant of an interest in the Company (other than a *de minimis* interest) as consideration for the provision of services to or for the benefit of the Company; and (iv) the liquidation of the Company within the meaning of Treasury Regulations § 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (i), (ii) and (iii) of this sentence shall be made only if the Board reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company; and

(c)    the Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution, as determined in good faith by the Board.

The Gross Asset Value of each asset shall be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Loss.

"**Involuntary Transfer**" shall mean any transfer of title or beneficial ownership of Units on default, foreclosure, forfeiture, divorce, court order or other than as a result of a voluntary decision on the part of a holder of Units.

"**Involuntary Transferee**" shall have the meaning set forth in Section 8.6.

"**IPO**" shall mean the initial Public Offering of the Company or any of its Subsidiaries.

"**Management LLC**" means a limited liability company to be formed following the date hereof for the purpose of holding Class B Common Units on behalf of certain individuals providing services to the Company or its Subsidiaries.

"**Managers**" shall have the meaning set forth in Section 1.2.

"**Member**" shall have the meaning set forth in the Preamble.

"**Member Indemnification Agreement**" shall have the meaning set forth in Section 6.6(d).

"**Member Minimum Gain**" shall mean an amount, determined in accordance with Treasury Regulations § 1.704-2(i)(3) with respect to each Member Nonrecourse Debt, equal to the Member Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability.

"**Member Nonrecourse Debt**" shall have the meaning attributed to "partner nonrecourse debt" as set forth in Treasury Regulations § 1.704-2(b)(4).

"**Member Nonrecourse Deductions**" shall have the meaning attributed to "partner nonrecourse deductions" as set forth in Treasury Regulations § 1.704-2(i).

"**Membership Interest**" shall have the meaning set forth in Section 3.1.

"**Mill Point**" shall have the meaning set forth in the Preamble.

"**Mill Point Management Agreement**" shall mean that certain Management Services Agreement, dated as of February 12, 2021, among Mill Point, the Company and Strike, as may be amended or amended and restated from time to time.

"**Mill Point Manager**" shall have the meaning set forth in <u>Section 6.1</u>.

"**Net Income**" and "**Net Loss**" shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (but including in taxable income or loss, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code), with the following adjustments:

(a)    any income of the Company exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition shall be added to such taxable income or loss;

(b)    any expenditures of the Company described in § 705(a)(2)(B) of the Code (or treated as expenditures described in § 705(a)(2)(B) of the Code pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(*i*)) and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition shall be subtracted from such taxable income or loss;

(c)    in the event the Gross Asset Value of any Company asset is adjusted in accordance with paragraph (b) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Net Income or Net Loss;

(d)    gain or loss resulting from any disposition of any Company asset with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the asset disposed of under Treasury Regulations § 1.704-1(b)(2)(iv), notwithstanding that the adjusted tax basis of such asset differs from such book value;

(e)    in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, Depreciation for such Fiscal Year shall be taken into account;

(f)    to the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or 743(b) is required pursuant to Regulations Section 1.704-l(b)(2)(iv)(m) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Units, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Net Income or Net Loss; and

(g)    notwithstanding any other provision of this definition, any items which are allocated under <u>Section 4.3</u> shall not be taken into account in the computation of "Net Income" or "Net Loss."

"**New Units**" shall mean any Common Units, whether authorized now or in the future, including any such rights that may become convertible into or exchangeable or exercisable for any Common Units, and warrants or other rights to purchase or otherwise directly or indirectly acquire Common Units from the Company; <u>provided</u>, that "New Units" shall not include (a) securities issued by the Company on or prior to the date hereof, (b) Units issued upon the direct or indirect conversion, exchange or exercise of

any securities issued by the Company on or prior to the date hereof, (c) securities issued by the Company or any of its Subsidiaries in connection with any subdivision of securities or any combination of securities of the Company or any of its Subsidiaries, (d) Class B Common Unit or any other Units intended to represent profit interests within the meaning of Revenue Procedure 93-27 and Revenue Procedure 2001-43 issued to any employee of the Company or any of its Subsidiaries or associated or affiliated entities, (e) securities issued to any Person in connection with such Person becoming a member of, or providing services to, the Board, manager, or employee of the Company or any of its Subsidiaries, or associated or affiliated entities (f) securities sold upon conversion into Common Stock in a Public Offering, (g) securities issued as consideration in, on in connection with, any Sale of the Company, merger or recapitalization of the Company or issued as consideration in, or in connection with, for the acquisition of another Person or the assets of another Person (whether by merger, recapitalization, business combination or otherwise) or for other strategic reasons, not for the primary purpose of capital raising, (h) any issuance of securities to any Person (other than Mill Point or any of its Affiliates) which is determined by the Board in its sole and absolute discretion to be strategically beneficial to the operations of the Company and (i) securities issued as part of any financing transaction (other than issuances to Mill Point or any of its Affiliates), so long as securities are not the only security component of such financing transaction.

"**New Units Purchase Price**" shall have the meaning set forth in Section 8.7(a).

"**Non-Mill Point Members**" shall have the meaning set forth in Section 8.1(a).

"**Non-Qualified Person**" shall mean any Person who is (a) directly or indirectly engaged in any business which the Board determines to be competing with any business of the Company or any of its Subsidiaries, (b) any customer, franchisee or supplier of the Company or any of its Subsidiaries, (c) an adverse party in any significant (as determined in good faith by the Board in its sole and absolute discretion) legal or arbitration proceeding with the Company or any of its Subsidiaries, (d) designated by the Board from time to time as any Person whose direct or indirect equity ownership in the Company or any of its Subsidiaries would, in the determination of the Board in its sole and absolute discretion, be adverse to the Company, any of its Subsidiaries or any of their respective businesses, or (e) an Affiliate of any Person described in clauses (a) through (d).

"**Nonrecourse Deductions**" shall have the meaning set forth in Treasury Regulations § 1.704-2(b)(1).

"**Nonrecourse Liability**" shall have the meaning set forth in Treasury Regulations § 1.704-2(b)(3).

"**OEP**" shall have the meaning set forth in Section 6.1.

"**OEP Manager**" shall have the meaning set forth in Section 6.1

"**Officer**" shall mean each person holding an office established by or pursuant to Section 6.7.

"**Original Agreement**" shall have the meaning set forth in the Recitals.

"**Participant**" shall have the meaning set forth in Section 8.3(b).

"**Participation Threshold**" shall mean, with respect to any Class B Common Unit, the aggregate of (a) the fair market value of the Company as determined in good faith by the Board immediately prior to the issuance of such Class B Common Unit, plus (b) the aggregate of all Capital Contributions that occur after the issuance of such Class B Common Unit. The Participation Threshold with respect to any such Class B Common Unit shall initially be set forth on the Exhibit A applicable to the relevant Member and shall be adjusted by the Board as it deems appropriate from time to time.

"**Percentage Interest**" shall have the meaning set forth in <u>Section 3.1</u>.

"**Permitted Transfer**" shall have the meaning set forth in <u>Section 8.2(a)</u>.

"**Permitted Transferee**" shall have the meaning set forth in <u>Section 8.2(a)</u>.

"**Person**" shall mean any individual, corporation, limited partnership, general partnership, limited liability partnership, limited liability company, joint stock company, joint venture, corporation, unincorporated organization, association, company, trust, group or any governmental or political subdivision or any agency, department or instrumentality thereof.

"**Preemptive Notice**" shall have the meaning set forth in <u>Section 8.7(a)</u>.

"**Preferred Capital Amount**" shall mean, with respect to each Preferred Units Member, the amount set forth opposite such Preferred Units Member's name on <u>Exhibit A</u>, as the same may be amended from time to time.

"**Preferred Units**" shall mean the Preferred Units of the Company, each of which shall have the rights, powers and preferences set forth in this Agreement.

"**Preferred Units Member**" mean any Person identified on <u>Exhibit A</u> hereto as a holder of Preferred Units.

"**Proposed Transferee**" shall have the meaning set forth in <u>Section 8.5(a)</u>.

"**Public Offering**" shall mean any Underwritten Offering by the Company or Successor Entity of Common Stock (or the common stock of any of Subsidiary of the Company) to the public pursuant to an effective registration statement filed with the SEC under the Securities Act (or the closing of another transaction that results in any Common Stock (or the common stock of any of Subsidiary of the Company) being publicly traded and widely held by the public); <u>provided</u>, <u>however</u>, that a Public Offering shall not include an offering made in connection with a business acquisition or combination or an employee benefit plan.

"**Purchase Agreement**" shall have the meaning set forth in the Recitals.

"**Registration Rights**" shall have the meaning set forth in <u>Section 8.10</u>.

"**Relative Percentage Interest**" shall mean the number of Units of any class held by a Member divided by the total number of Units of the applicable class to be taken into consideration.

"**Sale of the Company**" shall mean any transaction or series of transactions (whether structured as a stock sale, merger, consolidation, reorganization, recapitalization, asset sale or otherwise), which results in the sale or transfer, directly or indirectly, of (a) the Company or Strike with or into any non-Affiliate, as a result of which the equity interests of the Company or Strike, as applicable, represent (after giving to any conversion or exchange pursuant to such transaction) less than 50% of the aggregate voting power of the surviving or resulting entity, (b) direct or indirect acquisition by any non-Affiliate of more than 50% of the equity interests of the Company and its Subsidiaries taken as a whole, (c) a sale of all or substantially all of the Company's or Strike LLC's assets on a consolidated basis (determined based on the fair market value of such assets as determined by the Board in good faith) to any non-Affiliate or (d) an initial public offering that yields a minimum amount of net proceeds to the Company of $100,000,000, or (e) a SPAC Transaction; <u>provided</u>, that in no event shall a Sale of the Company be deemed to include any transaction effected solely for the purpose of changing, directly or indirectly, the form of organization or the organizational structure of the Company or any of its Subsidiaries.

"**Sale Price**" shall have the meaning set forth in <u>Section 8.5(a)</u>.

"**SEC**" shall mean, at any time, the Securities and Exchange Commission or any other federal agency at such time administering the Securities Act.

"**Second Hurdle**" shall mean, with respect to any Preferred Units Member, an amount equal to (a) the Preferred Capital Amount of such Preferred Units Member *multiplied by* (b) 2.1; provided, however, that in the event a Sale of the Company is consummated on or prior to the 12-month anniversary of the date hereof, the Second Hurdle shall be an amount equal to (a) the Preferred Capital Amount of such Preferred Units Member *multiplied by* (b) 1.6.

"**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Securities Laws**" shall have the meaning set forth in Section 10.18(a)(i).

"**Seller's Notice**" shall have the meaning set forth in Section 8.5(a).

"**Selling Holder**" shall have the meaning set forth in Section 8.5(a).

"**SPAC Transaction**" shall mean a transaction or series of transactions involving the Company or its Subsidiaries (whether structured as a stock sale, merger, consolidation, reorganization, recapitalization, redemption, asset sale, other business combination or otherwise), approved by majority of the Managers constituting the Board (or similar governing body of a Successor Entity), as the case may be, to a special purpose acquisition company, regardless of whether such sale results in a change of control of the Company or its Subsidiaries, as the case may be.

"**Strike**" shall have the meaning set forth in the Recitals.

"**Strike Capital**" shall have the meaning set forth in the Preamble.

"**Subsidiary**" shall mean, with respect to any Person, (a) any corporation more than fifty percent (50%) of the stock of any class or classes of which having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is owned by such Person directly or indirectly through one or more subsidiaries of such Person and (b) any partnership, association, joint venture, limited liability company or other entity in which such Person directly or indirectly through one or more subsidiaries of such Person has more than a fifty percent (50%) equity interest.

"**Successor Entity**" shall have the meaning set forth in Section 9.5(a).

"**Tag Members**" shall have the meaning set forth in Section 8.3(a).

"**Tax Allowance Amount**" means, with respect to any Member, for any calendar quarter (i) the Applicable Percentage of the excess of (a) such Member's share of the estimated net taxable income (excluding any taxable income allocable to a Member pursuant to Section 704(c) of the Code) allocable to such Member arising from its ownership of Units in the Company calculated through such calendar quarter over (b) any net losses (for income tax purposes) of the Company for prior Fiscal Years and such Fiscal Year that are allocable to such Member that were not previously utilized in the calculation of the Tax Allowance Amounts in a prior Fiscal Year, plus (ii) (without duplication) any amount payable by such Member to the Internal Revenue Service or other taxing authority as a result of a "push out" election under Section 6226 of the Code made by the Company, minus (iii) all prior distributions (including distributions of Tax Allowance Amounts) for such Fiscal Year, all as reasonably determined by the Board. The amount so determined in accordance with the provisions hereof by the Board shall be the Tax Allowance Amount for such period and shall be final and binding on all Members. The parties acknowledge that the taxable

income of the Tax Allowance Members may differ for various reasons, including but not limited to the fact that the Company has made a Section 754 election under the Code.

"**Third Hurdle**" shall mean, with respect to any Preferred Units Member, an amount equal to (a) the Preferred Capital Amount of such Preferred Units Member *multiplied by* (b) 3.1.

"**Threshold Units**" shall mean, with respect to any Class B Common Unit, all Units outstanding immediately prior to the issuance of such Class B Common Unit.

"**Transfer**" shall have the meaning set forth in Section 8.1(a).

"**Transfer Notice**" shall have the meaning set forth in Section 8.3(a).

"**Treasury Regulations**" shall mean the applicable provisions of the tax regulations promulgated under the Code.

"**Underwritten Offering**" shall mean a sale of securities of the Company to an underwriter or underwriters for reoffering to the public.

"**Unit**" shall have the meaning set forth in Section 2.1(b).

"**Unpaid Indemnity Amounts**" shall have the meaning set forth in Section 6.6(d).

"**UP-C IPO**" shall have the meaning set forth in Section 9.5(c).

"**UP-C IPO Entity**" shall have the meaning set forth in Section 9.5(c).

"**UP-C Entity Stock**" shall have the meaning set forth in Section 9.5(d)(i).

"**Upstream Indemnifying Party**" shall have the meaning set forth in Section 6.6(d).

"**Waived Party**" shall mean any Covered Person other than an Officer.

EXHIBIT C

CERTIFICATE OF FORMATION

[see attached]

EXHIBIT D

FORM OF JOINDER

This JOINDER, dated [_____], by _____ (the "New Member"), relates to that certain Amended and Restated Limited Liability Company Agreement of Strike Investment, LLC, dated as of February 12, 2021 (the "LLC Agreement"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the LLC Agreement.

The New Member hereby acknowledges receipt of the LLC Agreement and agrees to become a party thereto and to be bound thereby. In particular and without limitation, the New Member acknowledges the details of its Membership Interest set forth on Exhibit A to the LLC Agreement and assumes all of the rights and obligations of a Member as set forth in the LLC Agreement.

IN WITNESS WHEREOF, the New Member has executed this Joinder as of the date first set forth above.

By: _____
    Name:

Acknowledged and Agreed:

STRIKE HOLDINGS, LLC

By: _____
    Name:
    Title:

# EXHIBIT H

**EXECUTION VERSION**

<u>**MANAGEMENT SERVICES AGREEMENT**</u>

MANAGEMENT SERVICES AGREEMENT dated as of February 12, 2021 (this "<u>Agreement</u>"), by and between Mill Point Capital LLC, a limited liability company organized under the laws of the State of Delaware (the "<u>Manager</u>"), Strike Investment, LLC, a limited liability company organized under the laws of the State of Delaware (the "<u>Company</u>"), Strike, LLC, a limited liability company organized under the laws of the State of Texas (together with its subsidiaries, "<u>Strike</u>", and collectively with the Company, the "<u>Companies</u>").

WHEREAS, the Companies desire the Manager to provide management advisory services and other services and the Manager desires to render such services to the Companies and their subsidiaries in consideration for a management fee and other compensation as hereinafter specified.

NOW, THEREFORE, in consideration of the mutual agreements set forth herein, the parties agree as follows:

1.    <u>Management Services</u>.  The Companies hereby engage the Manager to provide management advisory services to the Companies and their subsidiaries, as requested by them, which services shall include, without limitation, (a) recommending, structuring and identifying sources of capital, (b) managing, evaluating and making recommendations regarding potential acquisitions and (c) analyzing the Companies' operations, historical performance and future prospects, in connection with financial and strategic corporate planning and other management services as the Companies and the Manager shall mutually agree (collectively, the "<u>Management Services</u>").  In consideration of the Management Services until the Termination Date (as defined below), the Companies agree, jointly and severally, to pay (i) in respect of the period commencing on the date hereof and ending on December 31, 2021, an aggregate fee of $1,000,000, which shall be due and payable on January 1, 2022, and (ii) commencing on January 1, 2022, an aggregate quarterly fee equal to $500,000 (for an aggregate annual amount equal to $2,000,000) paid quarterly in advance on each January 1, April 1, July 1 and October 1 ((i) and (ii), collectively the "<u>Management Fee</u>").  In the event that the Companies are unable to pay the Management Fee when it becomes due and payable pursuant to this Agreement as a result of insufficient available cash at the Companies or the application of restrictions contained in credit agreements or similar contracts pertaining to indebtedness to which the Companies are party (the "<u>Payment Prohibitions</u>"), the parties may elect, by mutual written agreement, to defer all or a portion of any Management Fee for such period of time as mutually agreed by the parties.  The Management Fee and any Transaction Fee (as defined below) shall be paid in cash in immediately available funds to the account of the Manager provided to the Companies in writing by the Manager. In the event that (A) the Management Fee is not paid when due hereunder and (B) such failure to make such payment is attributable to a Payment Prohibition, then, in addition to any other remedies available under law or equity available to the Manager, such Management Fee shall accrue interest at a rate equal to the lesser of (1) 1% per month (or fraction thereof) or (2) the maximum interest rate allowed by applicable law.

In addition to the payment of the Management Fee provided for herein, at the Manager's option, the Companies agree to pay to the Manager, from time to time, a transaction fee in an amount to be determined by the Company's board of managers or as otherwise agreed to by the

parties hereto (a "Transaction Fee") in connection with the acquisition of all or a material portion of the voting stock or equity securities of (whether through stock purchase or merger), or all or a material portion of the assets of, a company not affiliated with the Company that is arranged by the Manager (any such transaction, an "Acquisition"); provided, however, that (i) in no event will the Manager be entitled to a Transaction Fee in respect of an Acquisition if the Companies (or any of them) are required to pay a fee or other consideration to any investment banking firm, broker, finder or other financial advisor as a result of or otherwise in connection with such Acquisition and (ii) any Transaction Fee payable pursuant to this Agreement will be in an amount that is customary for an independent investment banking firm in a transaction of similar size and nature.

If payment of the Management Fee or a Transaction Fee, or any portion thereof, is prohibited under the terms and conditions of any credit agreement, note purchase agreement or other instrument of indebtedness to which the Companies are a party or otherwise subject to any subordination agreement executed in connection therewith (a "Priority Debt Document"), the payment of such amount shall be deferred until the first business day on which the payment of such deferred amount shall not be prohibited under any such Priority Debt Document (in which case the payment of such deferred amount shall become due and payable on such date, without any interest thereon).

2.      Expenses.  In addition to the Management Fee and a Transaction Fee, the Companies shall pay directly or reimburse the Manager for its Out-of-Pocket Expenses (as defined below).  Promptly following the Company's request, the Manager shall provide written back-up relating to any Out-of-Pocket Expenses to be paid or reimbursed by the Companies pursuant to this Agreement.  For the purposes of this Agreement, the term "Out-of-Pocket Expenses" shall mean the reasonable out-of-pocket costs and expenses actually incurred by the Manager in connection with providing the Management Services, including, without limitation, (a) reasonable fees and disbursements of any independent professionals and organizations, including independent accountants, outside legal counsel or consultants, (b) costs of any outside services or independent contractors such as financial printers, couriers, business publications, on-line financial services or similar services, (c) reasonable research and research-related expenses and (d) reasonable transportation, hotel and other per diem costs, or any similar expense not associated with its ordinary operations.  All reimbursements for Out-of-Pocket Expenses shall be made as soon as reasonably practicable after presentation by the Manager to the Company of a written statement thereof.

3.      Other Services; Fees.  Subject to any restrictions provided for in the operating agreement of any of the Companies, to the extent that the Companies request services other than Management Services from the Manager, any of the Companies and the Manager may negotiate from time to time mutually agreed upon fees and expenses to be paid by the Company and Strike for such other services, and such other services shall be deemed to be provided under this Agreement.

4.      Indemnification.  The Companies shall, jointly and severally, indemnify and hold harmless the Manager and its affiliates and each of their respective securityholders and partners (both general and limited), controlling persons, members (both managing and otherwise), managers, officers, directors, employees, agents, advisors, attorneys, and representatives (or any

of their successors or assigns) (each such person being an "Indemnified Party") from and against any and all direct or indirect losses, claims, damages and liabilities (including, without limitation, losses, claims, damages and liabilities arising from or in connection with legal actions brought by or on behalf of the holders or future holders of the outstanding capital stock or securities of the Company, Strike or any of their respective subsidiaries or creditors or future creditors of the Company, Strike or any of their respective subsidiaries, or whether in contract, tort, or otherwise), whether joint, several or otherwise, expenses of any nature (including attorneys' fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits, investigations or proceedings, whether civil, criminal, administrative, arbitral or investigative, in which an Indemnified Party was involved or may be involved, or threatened to be involved, as a party or otherwise (the "Liabilities"), related to, arising out of or in connection with the services contemplated by this Agreement or the engagement of the Manager pursuant to, and the performance by the Manager of the services contemplated by (including the failure to pay the Manager the Management Fee or a Transaction Fee as contemplated in this Agreement), this Agreement (and any other action taken by an Indemnified Party on behalf of the Companies), whether or not pending or threatened, and any other action taken by an Indemnified Party on behalf of the Companies, whether or not resulting in any liability and whether or not such claim, demand, action, suit, investigation or proceeding is initiated or brought by the Companies. The Companies shall, jointly and severally, reimburse any Indemnified Party for all costs and expenses (including attorneys' fees and expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any claim, demand, action, suit, investigation or proceeding for which the Indemnified Party would be entitled to indemnification under the terms of the previous sentence, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The Companies shall not be liable under the foregoing indemnification provision with respect to any Indemnified Party to the extent that any Liability for which an Indemnified Party is seeking indemnification hereunder is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the gross negligence, willful misconduct or fraud of such Indemnified Party or any of its affiliates.

5.    Contribution.  The Companies agree that if any indemnification sought by any Indemnified Party pursuant to Section 4 is unavailable for any reason or is insufficient to hold the Indemnified Party harmless against any Liabilities, then the Company and Strike shall contribute to the Liabilities for which such indemnification is held unavailable or insufficient in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Companies, on the one hand, and the Manager, on the other hand, in connection with the transactions which gave rise to such Liabilities or, if such allocation is not permitted by applicable law, not only such relative benefits but also the relative faults of the Companies, on the one hand, and the Manager, on the other hand, as well as any other equitable considerations, subject to the limitation that in any event the aggregate contribution by the Indemnified Parties to all Liabilities with respect to which contribution is available hereunder shall not exceed the fees actually received by the Manager in connection with the transaction which gave rise to such Liabilities (excluding any amounts paid as reimbursement of expenses).  The indemnity, contribution and expense reimbursement obligations the Companies have under Section 4 and this Section 5 shall be in addition to any other liability the Companies may have and, notwithstanding any other provision of this Agreement, shall survive the termination of this Agreement.  The Companies shall not be liable under the foregoing contribution provision with

-3-

respect to any Indemnified Party, to the extent that any Liability for which an Indemnified Party is seeking indemnification hereunder is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the gross negligence, willful misconduct or fraud of such Indemnified Party or any of its affiliates.

6.     Binding Agreement.  All of the terms and provisions of this Agreement shall be binding upon, shall inure to the benefit of, and shall be enforceable by the parties hereto.

7.     Amendments.  This Agreement may be amended only by a written instrument duly executed by each of the parties hereto.

8.     Term; Termination.   This Agreement shall terminate on the tenth (10th) anniversary of the date of this Agreement, unless renewed prior to such date for a further three (3) year term at the election of the Manager (the "Termination Date").  This Agreement may be earlier terminated at any time by the Manager.   This Agreement shall be terminated automatically upon the sooner to occur of: (a) the consummation of an initial public offering of securities of any of the Companies, (b) the date on which the Manager and/or any of its affiliates either directly or through one or more entities controlled by such parties no longer has the right to appoint a majority of the board of managers or similar governing body of the Company, or (c) upon a sale of all or substantially all of the direct and indirect assets of the Company.

9.     Governing Law; Attorneys' Fees.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such State, without regard to conflict of laws principles of such State. In any action or proceeding brought to enforce any provision of this Agreement, or where any provision hereof is validly asserted as a defense of the prevailing party, as determined by the court in which such action or proceeding is brought, the prevailing party shall be entitled to recover reasonable attorneys' fees in addition to any other available remedy.

10.     Consent to Jurisdiction.  Each party hereto irrevocably submits to the exclusive jurisdiction of (a) the Supreme Court of the State of New York and (b) the United States District Court for the Southern District of New York for purposes of any suit, action or other proceeding arising out of this Agreement. Each party agrees to commence any such action, suit or proceeding either in the Supreme Court of the State of New York or the United States District Court for the Southern District of New York.  Each party hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding with respect to this Agreement, any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to serve process in accordance with this Section 10, that its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise), and to the fullest extent permitted by applicable law, that the suit, action or proceeding in any such court is brought in an inconvenient forum, or that this Agreement, or the subject matter hereof, may not be enforced in or by such courts and further irrevocably waives, to the fullest extent permitted by applicable law, the benefit of any defense that would hinder, fetter or delay the levy, execution or collection of any amount to which the party is

-4-

entitled pursuant to the final judgment of any court having jurisdiction. Each party irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered airmail, postage prepaid, to such party at its address set forth in the signature page to this Agreement, such service of process to be effective upon acknowledgement of receipt of such registered mail. Each party hereby waives any right to a jury trial. Nothing herein shall affect the right of any party to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the other party in any other jurisdiction in which the other party may be subject to suit.

11.    _Confidentiality_.  Except as otherwise required by law or judicial order or decree or by any governmental agency or authority, the Manager agrees that any information obtained by the Manager with respect to Strike, the Company and their subsidiaries shall be treated with at least a reasonable standard of care to protect such confidential information; _provided_ that the Manager may disclose such information as necessary to perform its duties, as well as to legal counsel, consultants, financial advisors, professionals advising he, she or it on matters relating to this Agreement, lenders and investment bankers where such Manager informs the person to which he, she or it is making such disclosure that the disclosed information is confidential, instructs such person to keep such information confidential and not to disclose it to any third party.  In addition, confidential information shall not include information that (a) is or becomes generally available to the public other than as a result of any disclosure or other action or inaction by the Manager in breach of this Agreement, (b) is or becomes known or available to the Manager on a non-confidential basis from a source (other than Strike or the Company), (c) was independently developed by the Manager, or (d) is required to be disclosed by operation of law or necessary to comply with applicable regulatory requirements, provided in each case no more information that is reasonably required is so disclosed.

12.    _Independent Contractor_.  The Manager is an independent contractor and nothing in this Agreement shall be construed or inferred to imply that the Manager or any affiliate of the Manager is a partner or joint venturer with, or an agent, fiduciary or employee of, the Company. All employees, agents or representatives employed by or used by the Manager in its performance of this Agreement shall be the employees, agents and representatives of the Manager and not of the Company, except if the Company expressly hires such persons as its employees, agents or representatives.

13.    _Limited Liability_.  The Companies agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort, or otherwise) to the Companies, holders of its securities or its creditors related to or arising out of the engagement of the Manager pursuant to, or the performance by any Indemnified Party of the services contemplated by, this Agreement, except to the extent that any loss, claim, damage, liability, cost or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from the Manager's willful misconduct, and in no event shall the Manager's total liability in connection with this Agreement be greater than the aggregate amount of fees actually paid by the Companies and received by the Manager.

14.    _Right to Engage in Other Activities_. The Management Services provided herein are not to be deemed exclusive. Nothing contained herein shall restrict the Manager or any of its affiliates or their respective securityholders and partners (both general and limited), controlling

persons, members (both managing and otherwise), managers, officers, directors, employees, agents, advisors, attorneys, and representatives (or any of their successors or assigns) from engaging in any other business or devoting time and attention to the management, investment, involvement or other aspects of any other business, including becoming an officer or director thereof, or rendering services of any kind to any other company, firm, individual or association, including without limitation, any company, firm, individual or association that competes with the Companies.

15. <u>Severability</u>. If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, (a) the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain valid and binding and shall in no way be affected, impaired or invalidated, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable term, provision, covenant or restriction or any portion thereof had never been contained herein and (b) the parties shall negotiate in good faith to reduce the scope, duration or area of such term, provision, covenant or restriction, to delete specific words or phrases, or to replace any invalid or unenforceable term, provision, covenant or restriction with a term, provision, covenant or restriction that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term, provision, covenant or restriction and this Agreement shall be enforceable as modified.

16. <u>Assignment</u>. No party to this Agreement may assign this Agreement or any of their respective rights or obligations hereunder, except that each party may assign or transfer this Agreement to any other person who or which acquires all or substantially all of their respective property, business and assets; provided, however, that in the case of the Manager, this Agreement may be assigned or transferred, in whole or in part, to any affiliate of the Manager, as applicable, and thereafter references in this Agreement to the "Manager" shall include such affiliate.

17. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties. Delivery of an executed counterpart of a signature page by facsimile or other electronic transmission shall be effective as delivery of an original executed counterpart of this Agreement.

18. <u>Entire Agreement</u>. This Agreement contains the entire understanding of the parties hereto with respect to the subject matter contained herein and supersedes all prior agreements and understandings, oral and written, with respect thereto.

IN WITNESS WHEREOF, the parties hereto have caused this Management Services Agreement to be executed by their representatives thereunto duly authorized as of the date first above written.

**Mill Point Capital LLC**

By: _____

Name:  Michael Duran
Title:   Authorized Person
Address:  555 Madison Avenue, 16th Floor
            New York, NY 10022

*Signature Page to Management Services Agreement (Strike)*

**Strike Investment, LLC**

By: _____
Name:      Stephen V. Pate
Title:       Chief Executive Officer and Chairman
Address:  1800 Hughes Landing Blvd., Suite 500
               The Woodlands, TX 77380

**Strike, LLC**

By: _____

Name:    Stephen V. Pate
Title:     Chief Executive Officer and Chairman
Address: 1800 Hughes Landing Blvd., Suite 500
           The Woodlands, TX 77380

# EXHIBIT I

## EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement"), dated as of June 30, 2014 (the "Execution Date"), is between Strike, LLC, a Texas limited liability company (the "Company"), and Billy Cleveland (the "Executive") (collectively, the "Parties" and each, a "Party"). In addition to the terms defined elsewhere herein, initial capitalized terms have the meanings given to them in Section 35.

## RECITALS

A.     The Company has previously entered into that certain Contribution and Purchase Agreement by and among Delta Directional Drilling, LLC, a Texas limited liability company ("Buyer"), the Company, Delta Directional, LLC, a Mississippi limited liability company (the "Seller") and Billy and Tammy Cleveland (the "Purchase Agreement"), pursuant to which Buyer intends to acquire substantially all of the assets of the Seller, effective as of the closing of the transactions contemplated by the Purchase Agreement (the "Closing").

B.     In connection with the Closing, the Company desires to employ the Executive, and the Executive desires to be employed by the Company, on the terms and conditions set forth herein.

C.     The Company will provide trade secrets and confidential information to the Executive, and the Executive agrees to abide by the terms and conditions of this Agreement with respect thereto.

D.     A material inducement for the Company to enter into the Purchase Agreement with the Seller is the Executive's agreement and acknowledgment to comply with the provisions of Sections 9 through 18.

NOW, THEREFORE, the Parties agree as follows:

1.     Effectiveness.  This Agreement and all of the provisions, obligations and terms herein are conditioned upon the occurrence of the Closing, to be effective only upon the occurrence of the Closing.  If the Closing does not take place, this Agreement and any obligations created by this Agreement are null and void, *ab initio*.

2.     Employment.  (a) During the Employment Term, the Executive will serve as the Chief Executive Office of Delta Directional Drilling, LLC, a wholly owned subsidiary of the Company.  The Executive will also serve as an officer or employee of any other member of the Company Group, as may be requested from time to time by the Supervisor (as defined below) on the terms and conditions set forth herein, and without any additional compensation.

(b)     The employment relationship between the Company and the Executive will be governed by the applicable general employment policies and practices of the Company Group, including those relating to ethics and business conduct,

confidential information, expense reimbursement and avoidance of conflicts (together, the "Company Policies"), except that when any express term of this Agreement is in conflict with the Company Policies, such term of this Agreement will control.

      3.    Term. Subject to Section 8, the Executive's employment will be for an initial term of five (5) years commencing upon the Closing (the "Initial Employment Term"), and shall be automatically extended for one year on the date following the end of the Initial Employment Term and on each anniversary date of such date thereafter (each, a "Renewal Term"); provided that the Employment Term shall terminate in the event the Company has given the Executive written notice at least sixty (60) days prior to the end of the Employment Term that the Executive's employment will terminate upon the expiration of the Employment Term.

      4.    Position and Duties of the Executive. (a) The Executive will report to the Chief Executive Officer of the Company or any applicable designee thereof (the "Supervisor"), and have duties, responsibilities and authorities commensurate with the Executive's title and position, and such duties, responsibilities and authority as may be assigned to the Executive from time to time by the Supervisor.

      (b)    During the Employment Term, the Executive will devote the Executive's best efforts, attention and energies during normal working time to the business(es) of the Company Group and the performance of the Executive's duties as set forth herein.

      (c)    So long as such activities do not involve a breach of this Agreement and do not materially interfere with the performance of the Executive's duties hereunder, the Executive may participate in any governmental, educational, charitable or other community affairs during the Employment Term and serve as a member of the governing board of any such organization. The Executive may retain all fees and other compensation from any such service, and the Company will not reduce the Executive's compensation by the amount of such fees. Notwithstanding anything herein to the contrary, the Executive may not accept any position during the Employment Term with a for-profit enterprise without the prior written approval of the Supervisor in the Supervisor's discretion, such approval not to be unreasonably withheld.

      5.    Compensation. (a) Base Salary. During the Employment Term, the Company will pay to the Executive a base salary per annum equal to $350,000, which will be reviewed annually, but may not be decreased (as in effect from time to time, the "Base Salary"). The Base Salary will be pro-rated on an annualized basis (i) during the period beginning on the date of the Closing and ending on December 31, 2014, and (ii) with respect to the last calendar year of the Employment Term if the Executive's employment is terminated prior to the end of such calendar year. The Base Salary will be payable at the times and in the manner consistent with the Company's policies regarding compensation of

the Company's executives generally, but in no event less frequently than monthly. The Company will provide the Executive with a Company vehicle (a truck similar to a GMC 3500 pickup truck in safe working order in accordance with Company Policies) for use in the performance of the Executive's duties and including incidental personal use by the Executive.

(b)      Annual Bonus.  With respect to each calendar year during the Employment Term, the Executive will be eligible to receive an annual incentive bonus in accordance with, and subject to, the terms and conditions of the Company's applicable annual incentive bonus program (the "Annual Bonus").

6.      Benefits.  (a) Employee Plans.  During the Employment Term, subject to the terms and conditions of the applicable plans, the Executive will be eligible to participate in the Company-sponsored group health, major medical, dental, vision, life insurance, 401(k) and other employee welfare benefit plans (the "Employee Plans").  The Company will, at its own expense, provide coverage for the Executive and the Executive's beneficiaries under such group health, major medical, dental and vision Employee Plans during the Employment Term.  With respect to all such Employee Plans, the Executive shall receive full credit for the Executive's employment service with the Seller prior to the Closing to the extent that credit was given for such service with respect to similar plans prior to the Closing and except (i) with respect to any defined benefit pension plan and (ii) as would result in a duplication of benefits. The Executive acknowledges that the Company reserves the right to amend or terminate any Employee Plan(s) at any time in its discretion, subject to the terms of such Employee Plan(s) and applicable law.

(b)      Vacation.  During the Employment Term, the Executive will be eligible to participate in the Company's vacation, holiday and sick, personal and other leave policies as are provided under the Company's policies applicable to executives generally.  The Executive will be eligible for three weeks of paid vacation during each full fiscal year during the Employment Term.

7.      Expenses.  From and after the Closing, the Company will pay or reimburse the Executive for reasonable and necessary business expenses incurred by the Executive during the Employment Term in connection with the Executive's duties on behalf of the Company Group in accordance with the Company's travel and expense policy, as it may be amended from time to time, or any successor policy applicable to executives of the Company, following submission by the Executive of reimbursement expense forms in a form consistent with such expense policies.

8.      Termination.

(a)      Termination by the Company for Cause or Resignation by the Executive Without Good Reason.  Notwithstanding anything to the contrary in this Agreement, if, during the Employment Term, the Executive's employment is terminated

by the Company for Cause or the Executive resigns without Good Reason, the Executive will not be eligible to receive Base Salary, to receive an Annual Bonus or to participate in any Employee Plans with respect to future periods after the date of such termination or resignation, except for the right to receive the following: (A) accrued but unpaid Base Salary through the date of termination of employment, to be paid in accordance with the Company's normal payroll practice; (B) any accrued unused vacation time, to be paid in accordance with the Company's normal payroll practice; (C) any unreimbursed business expenses incurred by the Executive prior to the date of termination, to be paid in accordance with the provisions of Section 7; and (D) all compensation and benefits payable to the Executive under the terms of the Employee Plans in which the Executive participated prior to the date of termination of employment, in accordance with the terms of such Employee Plans (together, the "Accrued Compensation and Benefits").

(b)      Termination by the Company Without Cause or Resignation by the Executive for Good Reason.  If, during the Employment Term, the Executive's employment is terminated by the Company without Cause or the Executive terminates employment for Good Reason (in each case other than due to the Executive's death or Disability), or in the event the Employment Term expires pursuant to the proviso of Section 3 as a result of the Company providing notice of non-renewal and requiring the Executive to be subject to the provisions of Section 18, the Executive will be entitled to receive from the Company, in full satisfaction of the Executive's rights and any benefits the Executive is entitled to under this Agreement, any other employment arrangement with the Company Group or otherwise, the following:

(i)      The Accrued Compensation and Benefits; and

(ii)      Subject to Section 8(e), the Executive's Base Salary, payable in monthly installments, during the Restricted Period (each, a "Severance Payment").

(c)      Termination by Death.  If the Executive dies during the Employment Term, the Executive's employment will terminate and the Executive's beneficiary or, if none, the Executive's estate, will be entitled to receive from the Company the Accrued Compensation and Benefits.

(d)      Termination by Disability.  If the Executive becomes Disabled during the Employment Term, the Executive's employment will terminate and the Executive will be entitled to receive from the Company the Accrued Compensation and Benefits.

(e)      Payment Timing & Release Requirement.  Any obligation of the Company to make any Severance Payment is conditioned upon the Executive first executing and delivering to the Company an effective release, substantially in the form attached hereto as Exhibit A (the "Release"), within 52 days after the date of termination of employment, with all periods for revocation therein having expired.  Subject to the Executive's compliance with the preceding sentence, the Severance Payments will

commence on the 60th day following the date of termination of employment; provided that the first Severance Payment will include the two monthly installments of Base Salary accrued during such 60-day period.

(f)     Forfeiture.  Notwithstanding the foregoing, any right of the Executive to receive any unpaid Severance Payments will be forfeited if the Executive breaches Sections 9 through 18; provided that, before invoking this paragraph, the Company will provide the Executive a reasonable time (not to exceed 30 days) to respond to such assertion and, to the extent curable, a right to cure such breach within such time.  Notwithstanding the foregoing, nothing in this Section 8(f) is intended to limit the rights of the Company under Section 20.

9.     Acknowledgments.

(a)     The Executive acknowledges and agrees that the Company's business is highly competitive and that the Company possesses information that is a valuable, special and unique asset used by the Company in its business.  The Executive acknowledges that such information is constantly evolving and changing.  The Executive further acknowledges that, contemporaneous with the execution of this Agreement by the parties, and prior to the Executive's termination, the Company promises to give the Executive Confidential Information and Trade Secrets and the opportunity to develop goodwill and rapport with the Company's employees and/or customers in a greater quantity and/or expanded nature than previously provided to the Executive by the Company.  The Executive agrees that protection of the Company's Confidential Information and Trade Secrets against unauthorized disclosure and use is of critical importance to the Company and that unauthorized or improper use or disclosure by the Executive of such Confidential Information or Trade Secrets will cause serious and irreparable harm to the Company.

(b)     The Executive acknowledges and agrees that an important part of the Executive's duties will be to advance the business of the Company by directly or through the supervision of others, developing and maintaining substantial relationships with prospective or existing customers, vendors or customers of the Company, and developing and maintaining the goodwill of the Company.

(c)     The Executive acknowledges and agrees that during the term of the Executive's employment with the Company, the Executive will, by reason of the Company's investment of time, training, money, trust, exposure to the public, or exposure to customers, vendors, or other business relationships, (1) gain a high level of notoriety, fame, reputation, or public persona as one of the Company's representatives or spokespersons, or (2) gain a high level of influence or credibility with the Company's customers, vendors, or other business relationships.

(d)     The Executive acknowledges and agrees that the Executive's obligations under this Agreement are reasonable and necessary to protect the legitimate business interests of the Company and that any claim or cause of action by the Executive against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of the covenants and promises in this paragraph.

(e)     The Executive acknowledges and agrees that (i) the Executive has read this Agreement carefully and in its entirety, (ii) the Executive understands the terms and conditions contained herein, (iii) the Executive has had the opportunity to review this Agreement with legal counsel of the Executive's own choosing and has not relied on any statements made by the Company or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement, and (iv) the Executive is entering into this Agreement knowingly and voluntarily.  The Executive acknowledges and agrees that each member of the Company Group is an intended third party beneficiary of this Agreement and, as such, will be entitled to all of the benefits, and will be permitted to enforce its rights, under this Agreement as if such third party were an original party hereto.  As an inducement to enter into this Agreement, the Executive represents and warrants as follows:  (A) the Executive is not a party to any other agreement or obligation for personal services; (B) there exist no impediments or restraints, contractual or otherwise on the Executive's power, right or ability to enter into this Agreement and to perform the Executive's duties and obligations hereunder; and (C) the performance of the Executive's obligations under this Agreement do not and will not violate or conflict with any agreement relating to confidentiality, non-competition or exclusive employment to which the Executive is or was subject.

10.     <u>Non-Disclosure of Confidential Information and Trade Secrets</u>.

(a)     Other than in connection with the Executive's obligations in connection with this Agreement, the Executive agrees to and shall hold in confidence all Trade Secrets and all Confidential Information and will not, either directly or indirectly, use, sell, lend, lease, distribute, license, give, transfer, assign, show, disclose, disseminate, reproduce, copy, appropriate, or otherwise communicate any Trade Secrets or Confidential Information to any person or entity, without the prior written consent of the Company. The Executive's obligation of non-disclosure as set forth herein shall continue for so long as such item continues to constitute a Trade Secret or Confidential Information.

(b)     "Confidential Information" means confidential or proprietary information (other than Trade Secrets) regarding the Company Group that has been or will be developed or used and that cannot be obtained readily by third parties from outside sources.  Confidential Information includes, but is not limited to, the following: information regarding the Company Group's

customers, contractors and the industry not generally known to the public; strategies, methods, books, records and documents; technical information concerning products, equipment, services and processes; procurement procedures, pricing and pricing techniques; information concerning past, current and prospective customers, investors and business affiliates (such as contact name, service provided, pricing, type and amount of services used, financial data and/or other such information); pricing strategies and price curves; positions; plans or strategies for expansion or acquisitions; budgets; research; financial and sales data; trading methodologies and terms; communications information; evaluations, opinions and interpretations of information and data; marketing and merchandising techniques; electronic databases; models; specifications; computer programs; contracts; bids or proposals; technologies and methods; training methods and processes; organizational structure; personnel information; payments or rates paid to consultants or other service providers; and other such confidential or proprietary information. Confidential Information, as defined in this Agreement, includes any such information regarding the Company Group that the Executive may originate, learn, have access to or obtain, whether in tangible form or memorized. Confidential Information shall not include any data or information that has been voluntarily disclosed to the public by the Company (except where such public disclosure has been made by the Executive without authorization) or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful means.

(c)     "Trade Secrets" means the Company Group's information protectable as a trade secret under applicable law, including, without limitation, and without regard to form: technical or non-technical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information (1) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. For purposes of this Agreement, the term Trade Secret shall not include data or information of the Company Group that has been voluntarily disclosed to the public by the Company (except where such public disclosure has been made by the Executive without authorization) or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful means.

(d)     The Executive agrees to promptly notify the Company in writing if the Executive is requested or required pursuant to any legal, governmental or investigatory proceeding or process, in connection with any court proceedings, or otherwise, to disclose any Trade Secret or Confidential

Information, so that the Company may, at its expense, seek a protective order or other appropriate remedy. Notwithstanding anything to the contrary provided herein, to the extent the Executive discloses any Trade Secret or Confidential Information pursuant to any legal, governmental or investigatory proceeding or process, or in connection with any court proceedings, the Executive will not have violated Section 10(a).

(e)     The parties agree that the restrictions stated in this Section 10 are in addition to and not in lieu of protections afforded to trade secrets and confidential information under applicable state and federal law or under any other contract or agreement between the Executive and the Company. Nothing in this Agreement is intended to or shall be interpreted as diminishing or otherwise limiting the Company's rights under applicable state or federal law to protect its trade secrets and confidential information.

11.     Ownership of Work Product.

(a)     The Company shall own all Work Product (as defined below). All Work Product shall be considered work made for hire by the Executive and owned by the Company, and the Executive agrees to promptly disclose all Work Product developed or created by the Executive as described herein. If any of the Work Product may not, by operation of law, be considered work made for hire by the Executive for the Company (or if ownership of all right, title and interest of the intellectual property rights therein shall not otherwise vest exclusively in the Company), the Executive agrees to assign, and upon creation thereof automatically assign, without further consideration, the ownership of all Confidential Information or Trade Secrets, U.S. and international copyrights, patentable inventions, and other intellectual property rights therein to the Company, its successors and assigns. The Company and its successors and assigns shall have the right to obtain and hold in its or their own name copyrights, registrations, patents, and any other protection available in the foregoing. The Executive agrees to perform, upon the reasonable request of the Company, during or after the Executive's termination of employment with the Company, such further acts as may be necessary or desirable to transfer, perfect and defend the Company's ownership of the Work Product. When requested, the Executive shall: (i) Execute, acknowledge and deliver any requested affidavits and documents of assignment and conveyance; (ii) obtain and aid in the enforcement of copyrights (and, if applicable, patents) with respect to the Work Product in any countries; (iii) provide testimony in connection with any proceeding affecting the right, title or interest of the Company in any Work Product; and (iv) perform any other acts deemed necessary or desirable to carry out the purposes of this Agreement.

(b)     The Company shall reimburse all reasonable out-of-pocket expenses incurred by the Executive at the Company's request in connection with the foregoing. The request by the Company for information, an oath, or

for the execution of any document shall not be construed as a waiver of any of the Company's rights under this Agreement.

(c)     For purposes hereof, "Work Product" means all intellectual property rights, including all U.S. and international copyrights, patentable inventions, Trade Secrets, discoveries and improvements, and other intellectual property rights, in any programming, documentation, technology, strategic plans, information, ideas, concepts or other work product that relates to the business and interests of the Company and that the Executive creates, invents, conceives or develops at any time during the term of the Executive's employment (whether or not during normal working hours), and for a period of 90 days thereafter, that relate to the Company's business, actual or demonstrably anticipated research or development of the Company, or which results from any work performed by the Executive (alone or in conjunction with others) for the Company. "Work Product" also includes all intellectual property rights, including all U.S. and international copyrights, patentable inventions, Trade Secrets, discoveries and improvements, and other intellectual property rights, in any programming, documentation, technology, information, ideas, concepts or other work product that is now contained in any of the technologies, products or systems of the Seller to the extent the Executive invented, created, conceived, developed or delivered such Work Product to the Seller prior to the date of this Agreement while the Executive was engaged as an the Executive of the Seller or its predecessors in interest. The Executive hereby irrevocably relinquishes and waives for the benefit of the Company and its assigns any moral rights and any other nonassignable rights or claims in the Work Product recognized by applicable law. To the extent any of the Executive's rights in the Work Product are not assignable or waiveable, the Executive hereby grants the Company a perpetual, irrevocable, exclusive license to use and exercise such rights in any manner whatsoever.

12.    Return of Materials. The Executive agrees that the Executive will deliver to the Company at the conclusion of the Executive's employment, and at any other time at the Company's request, all property of the Company, including all access cards, keys, memoranda, notes, records, computers, computer programs, computer files, computer disks, drawings, blueprints, operating procedure manuals or other documentation, and all copies thereof, in the Executive's possession or control, whether made or compiled by the Executive alone or with others or made available to the Executive while employed by the Company, including any Trade Secrets, Confidential Information, or Work Product.

13.    No Claims/No Conflicts. The Executive agrees that the Executive does not and will not assert any rights to any Confidential Information, Trade Secrets, or Work Product (including any inventions, discoveries, concepts or ideas, or improvements thereof or know-how related thereto), as having been made or acquired by the Executive before the Executive's employment with the

Company, or since the commencement of the Executive's employment with the Company, and expressly warrant that any such rights or potential rights are subject to and governed by this Agreement.  The Executive further represents that the Executive's performance of all the terms of this Agreement, and the performance of the Executive's duties as an the Executive of the Company, do not and will not breach any agreement with any other entity or business.  The Executive represents and warrants that the Executive has not entered into, and will not enter into, any agreement that would conflict with this Agreement, including any employment, non-competition, non-solicitation, or confidentiality agreement.  The Executive agrees that the Executive will, if requested by the Company, deliver to the Company a complete copy of any employment, non-competition, non-solicitation or confidentiality agreement, or related agreement, to which the Executive is or were a party and that remains or may remain in effect.

14.     Non-Disparagement.  The Executive acknowledges and agrees that the Executive shall not make any statement, written or verbal, to any person or entity, including in any forum or media, or take any action, in disparagement of the Company, including, but not limited to, negative references to the Company's services, policies, partners, directors, officers, managers, members, or employees, or take any other action that may disparage the Company to the general public and/or the Company's employees, clients, suppliers, and/or business partners.  The Company acknowledges and agrees that none of its officers or directors shall make any statement in their official capacity, written or verbal, to any person or entity, including in any forum or media, or take any action in disparagement of the Executive.  Notwithstanding the foregoing, statements made in the course of sworn testimony in administrative, judicial or arbitral proceedings (including depositions in connection with such proceedings) will not be subject to this Section 14.

15.     Cooperation.  Following termination of the Executive's employment, the Executive agrees to cooperate with all reasonable requests by the Company (or any Affiliate of the Company) for assistance, including in connection with any investigations or legal proceedings involving the Company (or any Affiliate of the Company), including by providing truthful testimony in person in any such legal proceedings without having to be subpoenaed.  The Company shall reimburse the Executive for expenses reasonably incurred in connection therewith and, during any period in which the Executive is not receiving any Severance Payments (other than as a result of the forfeiture of any Severance Payments pursuant to Section 8(f)), shall provide a reasonable hourly fee for time spent relating to such cooperation, and further provided that any such cooperation occurring after the termination of the Executive's employment shall be scheduled to the extent reasonably practicable so as not to unreasonably interfere with the Executive's business or personal affairs.

16.     Non-Solicitation of Customers.

(a)    The Executive agrees and covenants that during the Employment Term and for a period of two (2) years following the termination of the Executive's employment, the Executive shall not solicit or attempt to solicit, directly or by assisting others, any business from any of the Company's customer contacts with which the Executive had material contact during the term of employment with the Company, including actively sought prospective customers with whom the Executive had material contact during the Executive's employment, for purposes of providing products or services that are competitive with those provided by the Company.

(b)    For purposes of this Agreement, the term "material contact" shall mean contact between the Executive and each customer or potential customer (1) with whom the Executive dealt on behalf of the Company, (2) whose dealings with the Company were coordinated or supervised by the Executive, (3) about whom the Executive obtained Confidential Information in the ordinary course of business as a result of the Executive's association with the Company, or (4) who receives products or services authorized by the Company, the sale or possession of which results or resulted in compensation, commissions, bonuses, or earnings for the Executive within one (1) year prior to the termination of the Executive's employment.

17.    <u>Non-Solicitation of Employees</u>.  The Executive agrees and covenants that during the Employment Term and for a period of two (2) years following the termination of the Executive's employment, the Executive shall not hire, solicit or attempt to solicit, directly or by assisting others, any person who was an employee of the Company Group on, or within three (3) months before, the date of such hire, solicitation or attempted solicitation and with whom the Executive had regular contact while employed by the Company Group to leave the employment of the Company Group.  Notwithstanding the foregoing, the restrictions contained in this <u>Section 17</u> shall not apply to the placement of general advertisements or the use of general search firm services with respect to a particular geographic area, but which are not targeted directly or indirectly towards employees of the Company Group.

18.    <u>Non-Competition</u>.

(a)    The Executive acknowledges that (A) the Executive's services are of special, unique and extraordinary value to the Company Group and (B) the Company Group's ability to accomplish its purposes and to successfully compete in the marketplace depends substantially on the skills and expertise of the Executive.  The Executive acknowledges and agrees that the Company Group would be irreparably damaged if the Executive were to not devote all of the Executive's business time and efforts to the business and affairs of the Company Group during the Employment Term, or were to provide services to any business (whether a corporation or a division of a corporation or similar business unit) which competes with any member of the Company Group.

(b)     The Executive agrees that, during the Employment Term and during the Restricted Period, the Executive will not within the United States, directly or indirectly, own, manage, operate, join, or have a financial interest in, control or participate in the ownership, management, operation or control of, or be employed as an employee, agent or consultant, or in any other individual or representative capacity whatsoever, or use or permit such Executive's name to be used in connection with, or be otherwise connected in any manner with any business or enterprise engaged in any opportunity or business of any type that is competitive with the Company or any business the Executive is aware that the Company intends to engage in within six (6) months following the Executive's termination of employment, including the business of providing directional drilling services of any kind or services related to the construction, maintenance, testing operation and integrity inspection of pipelines for the transport of crude oil or natural gas.

(c)     Notwithstanding the foregoing, the provisions of this Section 18 shall not prohibit the Executive from making investments in entities the equity of which is traded on an established exchange and only to the extent the Executive owns no more than two percent of the outstanding stock thereof.

(d)     Notwithstanding anything to the contrary provided herein, the Executive shall not be bound by the covenants contained in this Section 18 on or after the date the Company provides notice to the Executive that it will no longer require the Executive to be subject to such covenants.

(e)     Notwithstanding anything to the contrary provided herein (except for Section 18(f)), to the extent the Company ceases to provide the Executive with eligible Severance Payments (except in the case of forfeiture of any Severance Payments pursuant to Section 8(f)), the Company Group will release the Executive from any and all covenants contained in this Section 18.

(f)     Notwithstanding anything to the contrary provided herein (including Section 18(e)), during all periods in which the Executive is serving as a member of any entity in the Company Group's Board of Directors, or has the right to appoint any member or members to any entity in the Company Group's Board of Directors, the Executive will be subject to the provisions of Sections 16, 17 and 18 regardless of the lapse of any time period provided therein.

19.     Release.     Other than this Agreement and the Transaction Documents (as such term is defined in the Purchase Agreement), the Executive hereby irrevocably waives, releases and discharges the Company of and from any and all claims, obligations or liabilities of any kind or nature whatsoever arising on or prior to the date of this Agreement, whether arising under any contract or otherwise at law or in equity, and whether known or unknown and liquidated or unliquidated, and the

Executive agrees that it will not seek to recover any amounts from the Company or its Affiliates or representatives.

20.     Remedies.  The Executive and the Company acknowledge that the covenants contained in Sections 9 through 18 are reasonable under the circumstances. Accordingly, if, in the opinion of any court of competent jurisdiction, any such covenant is not reasonable in any respect, such court will have the right, power and authority to sever or modify any provision or provisions of such covenants as to the court will appear not reasonable and to enforce the remainder of the covenants as so amended.  The Executive further acknowledges that the remedy at law available to the Company Group for breach of any of the Executive's obligations under Sections 9 through 18 would be inadequate and that damages flowing from such a breach may not readily be susceptible to being measured in monetary terms.  Accordingly, in addition to any other rights or remedies that the Company Group may have at law, in equity or under this Agreement, including any forfeiture under Section 8(f), upon proof of the Executive's violation of any such provision of this Agreement, the Company Group will be entitled to seek immediate injunctive relief and may obtain a temporary order restraining any threatened or further breach, without the necessity of proof of actual damage or the posting of any bond.

21.     Dispute Resolution.

(a)     In the event that the Parties are unable to resolve any controversy or claim arising out of or in connection with this Agreement or breach thereof, any Party may refer the dispute to binding arbitration, which, except as expressly provided hereafter, will be the exclusive forum for resolving such claims. Such arbitration will be administered by the American Arbitration Association (the "AAA") and governed by Texas law.  The arbitration will be conducted by a single arbitrator selected by the Executive and the Company according to the rules of the AAA. In the event that the Parties fail to agree on the selection of the arbitrator within 30 days after either the Executive's or the Company's request for arbitration, the arbitrator will be chosen by the AAA.  The arbitration proceeding will commence on a mutually agreeable date within 90 days after the request for arbitration.  The forum for arbitration will be agreed on by the Parties or, in the absence of any agreement, will be in a venue located in Houston, Texas.

(b)     The arbitrator will have authority to award attorneys' fees or costs to any Party.

(c)     The arbitrator will have no power or authority to make awards or orders granting relief that would not be available to a Party in a court of law.  The arbitrator's award is limited by and must comply with this Agreement and applicable federal, state and local laws.  The decision of the arbitrator will be final and binding on the Parties.

(d)     Notwithstanding the foregoing, no claim or controversy for injunctive or equitable relief contemplated by or allowed under applicable law pursuant

to <u>Sections 9</u> through <u>18</u> will be subject to arbitration under this <u>Section 21</u>, but will instead be subject to determination as provided in <u>Section 26</u>.

      22.    <u>Other Agreements, Entire Agreement, Etc.</u>  No agreements or representations or warranties, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by any Party which are not expressly set forth in this Agreement or, as applicable, in the Purchase Agreement.  Except with respect to applicable provisions of the Purchase Agreement, this Agreement contains the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to the subject matter hereof, including any employment or confidentiality and non-solicitation agreement entered into between the Executive and the Company prior to the date of this Agreement.  Nothing herein will be deemed to provide the Executive a right to remain an officer or employee of any member of the Company Group.

      23.    <u>Withholding of Taxes</u>.  The Company will have the right to withhold from any amount payable hereunder any federal, state, city, local or other taxes in order for the Company Group to satisfy any withholding tax obligation it may have under any applicable law, regulation or ruling.

      24.    <u>Successors and Binding Agreement</u>.  (a) The Company will require any successor (whether direct or indirect, by purchase, merger, consolidation, reorganization or otherwise) to all or substantially all of the business or assets of the Company expressly to assume and agree to perform this Agreement in the same manner and to the same extent the Company would be required to perform if no such succession had taken place.  This Agreement will be binding upon and inure to the benefit of the Company and any successor to the Company, including any Person acquiring directly or indirectly all or substantially all of the business or assets of the Company whether by purchase, merger, consolidation, reorganization or otherwise (and such successor will thereafter be deemed "the Company" for purposes of this Agreement), but will not otherwise be assignable or delegable by the Company, except that the Company may assign this Agreement, or may assign its rights and delegate its duties hereunder, to any Person who acquires all of the voting stock of the Company (or to any parent entity thereof).

      (b)    This Agreement will inure to the benefit of and be enforceable by the Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees and legatees.  If the Executive dies while any amount would still be payable to the Executive hereunder (other than amounts which, by their terms, terminate upon the death of the Executive) if the Executive had continued to live, all such amounts, unless otherwise provided herein, will be paid in accordance with the terms of this Agreement to the executors, personal representatives or administrators of the Executive's estate.

(c)      This Agreement is personal in nature and neither the Company nor the Executive may, without the consent of the other, assign or delegate this Agreement or any rights or obligations hereunder, except as expressly provided in Sections 24(a) and 24(b).  Without limiting the generality or effect of the foregoing, the Executive's right to receive payments hereunder will not be assignable, transferable or delegable, whether by pledge, creation of a security interest, or otherwise, other than by a transfer by the Executive's will or by the laws of descent and distribution and, in the event of any attempted assignment or transfer contrary to this paragraph, the Company will have no liability to pay any amount so attempted to be assigned, transferred or delegated.

25.      Notices.  Any notice, demand, claim or other communication under this Agreement will be in writing and will be deemed to have been given (a) on delivery if delivered personally; (b) on the date on which delivery thereof is guaranteed by the carrier if delivered by a national courier guaranteeing delivery within a fixed number of days of sending; or (c) on the date of transmission thereof if delivery is confirmed, but, in each case, only if addressed to the Parties in the following manner at the following addresses (or at the other address as a Party may specify by notice to the other) to the Company, to the attention of the General Counsel at its principal executive offices, and to the Executive, at the Executive's principal residence as set forth in the employment records of the Company.

If to Company:

Strike, LLC
1800 Hughes Landing Blvd.
The Woodlands, TX 77380
Attn: Frank Victor-McCawley

If to Executive:

Billy Cleveland
1032 Hurst Road
Hickory, MS  39332

26.      Governing Law and Choice of Forum.  (a) This Agreement shall be deemed to be made in, and in all respects shall be interpreted, construed, and governed by and in accordance with, the laws of the State of Texas.  No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority or by any board of arbitrators by reason of such party or its counsel having or being deemed to have structured or drafted such provision.  Except as provided in Section 21 all disputes arising out of or relating to this Agreement shall be resolved in the state or federal courts in Houston, Texas.  The Executive and the Company hereby consent to the jurisdiction and venue of such courts and irrevocably waive the necessity of personal service of process

40703215.2                                        15

and consent to service of process by First Class mail (return receipt requested), UPS next day delivery or a comparable delivery service.

27.    Validity/Severability.  The Parties agree that (a) the provisions of this Agreement will be severable in the event that for any reason whatsoever any of the provisions hereof are invalid, void or otherwise unenforceable, (b) any such invalid, void or otherwise unenforceable provisions will be replaced by other provisions which are as similar as possible in terms to such invalid, void or otherwise unenforceable provisions but are valid and enforceable, and (c) the remaining provisions will remain valid and enforceable to the fullest extent permitted by applicable law.

28.    Survival.  The obligations of the Company and the Executive under this Agreement which by their nature may require either partial or total performance after the expiration or termination of the Employment Term or this Agreement (including those under Sections 9 through 18) will survive any termination or expiration of this Agreement.

29.    Subsequent Employment.  During the Restricted Period, if the Executive is offered employment or the opportunity to enter into any business activity, whether as owner, investor, executive, manager, employee, independent consultant, contractor, advisor or otherwise, the Executive will inform the offeror of the existence of Sections 9 through 18 of this Agreement and provide the offeror a copy thereof.  The Executive authorizes the Company to provide a copy of the relevant provisions of this Agreement to any of the Persons described in this paragraph and to make such Persons aware of the Executive's obligations under this Agreement.

30.    Exculpation and Indemnification.  The Executive shall be treated as an "Indemnitee" for purposes of Article VII of the Fourth Amended and Restated Regulations of the Company dated as of the date hereof (as amended, the "Operating Agreement"), and no amendment to the Operating Agreement after the date of this Agreement shall be effective against the Executive to the extent such amendment narrows or restricts the rights of Indemnitees under such Article VII, unless (a) the Executive consents thereto or (b) such amendment is required by applicable law.

31.    Section 409A.  (a) The Parties intend that any amounts payable under this Agreement be exempt from or otherwise comply with the provisions of Section 409A of the Code, along with the rules, regulations and guidance promulgated thereunder by the Department of the Treasury or the Internal Revenue Service (collectively, "Section 409A") so as not to subject the Executive to the payment of the additional tax, interest or penalty which may be imposed under Section 409A.  In furtherance thereof, to the extent that any provision of this Agreement would result in the Executive being subject to payment of additional tax, interest or penalty under Section 409A, the Parties agree to amend this Agreement if permitted under Section 409A in a manner

which does not impose any additional taxes, interest or penalties on Executive in order to bring this Agreement into compliance with Section 409A, without materially changing the economic value of the arrangements under this Agreement to any Party, and thereafter the Parties will interpret its provisions in a manner that complies with Section 409A.  Notwithstanding the foregoing, no particular tax result for the Executive with respect to any income recognized by the Executive in connection with this Agreement is guaranteed.

(b)	Notwithstanding any provisions of this Agreement to the contrary, if the Executive is a "specified employee" (within the meaning of Section 409A and determined pursuant to any policies adopted by the Company consistent with Section 409A), at the time of the Executive's "Separation From Service" (within the meaning of Section 409A) and if any portion of the payments or benefits to be received by the Executive upon Separation From Service would be considered deferred compensation under Section 409A and cannot be paid or provided to the Executive without the Executive incurring taxes, interest or penalties under Section 409A, amounts that would otherwise be payable pursuant to this Agreement and benefits that would otherwise be provided pursuant to this Agreement, in each case, during the six-month period immediately following the Executive's Separation From Service will instead be paid or made available on the earlier of (i) the first business day of the seventh month following the date of Executive's Separation From Service or (ii) the Executive's death.

(c)	With respect to any amount of expenses eligible for reimbursement or the provision of any in-kind benefits under this Agreement, to the extent such payment or benefit would be considered deferred compensation under Section 409A or is required to be included in the Executive's gross income for federal income tax purposes, such expenses (including expenses associated with in-kind benefits) will be reimbursed by the Executive no later than December 31st of the year following the year in which the Executive incurs the related expenses.  In no event will the reimbursements or in-kind benefits to be provided by the Company in one taxable year affect the amount of reimbursements or in-kind benefits to be provided in any other taxable year, nor will the Executive's right to reimbursement or in-kind benefits be subject to liquidation or exchange for another benefit.

(d)	Each payment under this Agreement is intended to be a "separate payment" and not one of a series of payments for purposes of Section 409A.

(e)	A termination of employment will not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits subject to Section 409A upon or following a termination of employment unless such termination is also a Separation From Service, and notwithstanding anything contained herein to

the contrary, the date on which such Separation From Service takes place will be the termination date.

32.    Amendment; Waiver.  (a) This Agreement may be amended and any provision of this Agreement may be waived, provided that any such amendment or waiver will be binding upon a Party only if such amendment or waiver is set forth in a writing executed by such Party.  No course of dealing between the Parties will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Party under or by reason of this Agreement.

(b)    No delay or failure in exercising any right, power or remedy hereunder will affect or operate as a waiver thereof; nor will any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, power or remedy preclude any further exercise thereof or of any other right, power or remedy.

33.    Counterparts.  This Agreement may be executed in multiple counterparts (any one of which need not contain the signatures of more than one Party), each of which will be deemed to be an original but all of which taken together will constitute one and the same agreement.  This Agreement, and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, will be treated in all manner and respects as an original agreement and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  At the request of any Party, the Parties will re-execute original forms thereof and deliver them to the requesting Party.  No Party will raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or other electronic means as a defense to the formation of a contract and each Party forever waives any such defense.

34.    Headings; Interpretation.  (a) The descriptive headings herein are inserted for convenience of reference only and are not intended to be a substantive part of or to affect the meaning or interpretation of this Agreement.

(b)    Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and if applicable hereof.  Unless otherwise indicated, any reference to a "Section" means a Section of this Agreement.

(c)    In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

40703215.2

(d)     The word "including" (in its various forms) means including without limitation.  All references in this Agreement to "days" refer to "calendar days" unless otherwise specified.

35.     <u>Defined Terms</u>.  In addition to the terms defined elsewhere herein, the following terms will have the following meanings when used herein with initial capital letters:

(a)     "<u>Affiliate</u>" means, as to any Person, any other Person that directly or indirectly controls, or is controlled by, or is under common control with, such Person.  For this purpose, "control" (including, with its correlative meanings, "controlled by" and "under common control with") will mean the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of a Person, whether through ownership of securities or partnership or other ownership interests, by contract or otherwise.  Unless otherwise indicated, an Affiliate refers to an Affiliate of the Company.

(b)     "<u>Cause</u>" means:

(i)     Any act or omission constituting a material breach by the Executive of any provisions of this Agreement, after demand for restraint or performance is delivered by the Company that identifies in reasonable detail the manner in which the Company believes the Executive has materially breached this Agreement, if, within 30 days of such demand, the Executive fails to cure any such material breach that is capable of being cured;

(ii)     The willful failure by the Executive to perform the Executive's duties hereunder (other than any such failure resulting from the Executive's Disability), after written demand for performance is delivered by the Company that identifies in reasonable detail the manner in which the Company believes the Executive has not performed the Executive's duties, if, within 30 days of such demand, the Executive fails to cure any such failure that is capable of being cured;

(iii)     Any misconduct by the Executive that consists of moral turpitude that is materially injurious to any member of the Company Group, financial or otherwise, or any act of misappropriation or fraud including with respect to any member of the Company Group's accounting and financial statements, embezzlement or conversion by the Executive of the property of any member of the Company Group;

(iv)     The conviction (or plea of no contest) of the Executive for any felony involving moral turpitude or the indictment of the Executive for any such felony;

(v)     The Executive's gross negligence, gross neglect of duties or gross insubordination, after demand for remedy of such gross negligence,

gross neglect or gross insubordination is delivered by the Company that identifies in reasonable detail the extent of such gross negligence, gross neglect or gross insubordination, if, within 30 days of such demand, the Executive fails to cure any such gross negligence, gross neglect or gross insubordination that is capable of being cured;

(vi)    The Executive's alcohol or prescription or other drug abuse substantially affecting work performance;

(vii)    The Executive's violation of the Company's published written policies regarding harassment or discrimination; or

(viii)    The Executive's material violation of the Company Policies after demand for restraint or performance is delivered by the Company that identifies in reasonable detail the manner in which the Company believes the Executive has materially breached this Agreement, if, within 30 days of such demand, the Executive fails to cure any such material breach that is capable of being cured.

(c)    "Code" means the Internal Revenue Code of 1986, as amended.

(d)    "Company Group" means the Company and its subsidiaries.

(e)    "Disability" or "Disabled" means:

(i)    The Executive's incapacity due to physical or mental illness to substantially perform the Executive's duties and the essential functions of the Executive's position, with or without reasonable accommodation, on a full-time basis for 12 months; or

(ii)    The Executive becomes eligible to receive benefits under the Company's applicable long-term disability plan;

except that, if the Executive does not agree with a determination to terminate the Executive's employment because of Disability, the question of the Executive's Disability will be subject to the certification of a qualified medical doctor reasonably agreed upon by the Company and the Executive.  The costs of such qualified medical doctor will be paid by the Company.

(f)    "Employment Term" means the Initial Employment Term and any Renewal Term(s).

(g)    "Good Reason" means, without the Executive's consent:

(i)    A material diminution in the Executive's Base Salary;

(ii)     A material diminution in the Executive's authority, duties, or responsibilities (other than temporarily while the Executive is physically or mentally incapacitated or as required by applicable law);

(iii)     A relocation of the Executive's principal place of employment by more than 50 miles from the Executive's principal place of employment as of the Closing; or

(iv)     Any material breach by the Company of this Agreement;

provided, however, that the foregoing conditions will constitute Good Reason only if (A) the Executive provides written notice to the Company within 30 days of the initial existence of the condition(s) constituting Good Reason and (2) the Company fails to cure such condition(s) within 30 days after receipt from the Executive of such notice; and provided further, that Good Reason will cease to exist with respect to a condition three months following the initial existence of such condition.

(h)     "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture or an unincorporated organization.

(i)     "Restricted Period" means a period beginning on the date of the Executive's termination of employment and ending on the second anniversary of the termination of the Executive's employment for any reason (other than the death of the Executive). Notwithstanding the foregoing, in the event that the Executive's employment is terminated pursuant to Section 8(b) and the Executive would be entitled to Severance Payments, and the Company, in its sole discretion, chooses to cease providing any Severance Payments (other than under conditions that would result in forfeiture of such Severance Payments under Section 8(f)), then the Restricted Period shall end on the date that the Company ceases providing the Executive with eligible Severance Payments (such date in any event, other than as contemplated by Section 18(f), not to extend beyond the second anniversary of the termination of the Executive's employment).

36.     Certain Costs.  Each Party will pay and be fully responsible for its own costs and expenses (including costs of professional advisors) in connection with the negotiation, execution, interpretation and, except as otherwise provided herein, enforcement of this Agreement.

37.     Clawback Provisions.  Notwithstanding any other provisions in this Agreement to the contrary, any incentive-based compensation, or any other compensation, paid to the Executive pursuant to this Agreement or any other agreement or arrangement with any member of the Company Group, which is subject to recovery under any applicable law, government regulation or stock exchange listing requirement, will be subject to such deductions and clawback as may be required to be made pursuant to such law, government regulation or stock exchange listing requirement (or any policy adopted by any member of the

Company Group pursuant to any such law, government regulation or stock exchange listing requirement).

38.     Resignations.  Contemporaneously with the termination of the Executive's employment for any reason, the Executive shall be deemed to have resigned from the Company's Board of Directors, all fiduciary positions (including as trustee) and all other offices and positions the Executive holds with the Company Group.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Agreement is duly executed as of the Execution Date.

Company:

Strike, LLC

By: _____

Name: Steve Pate

Title: Chief Executive Officer

The Executive

_____

Billy Cleveland

[Signature Page to Employment Agreement]

IN WITNESS WHEREOF, this Agreement is duly executed as of the Execution Date.

Company:

Strike, LLC

By: _____

Name: _____
Title: _____

The Executive

Billy Cleveland

[Signature Page to Employment Agreement]

**EXHIBIT A**

**WAIVER AND RELEASE OF CLAIMS AGREEMENT**

_____ ("Employee") hereby acknowledges that Strike, LLC ("Employer") is offering Employee certain payments in connection with Employee's termination of employment pursuant to the employment agreement entered into between Employer and Employee, as amended (the "Employment Agreement"), in exchange for Employee's promises in this Waiver and Release of Claims Agreement (this "Agreement").

**Severance Payments**

1.      Employee agrees that Employee will be entitled to receive the applicable severance payments under the Employment Agreement (the "Severance Payments") only if Employee accepts and does not revoke this Agreement, which requires Employee to release both known and unknown claims.

2.      Employee agrees that the Severance Payments tendered under the Employment Agreement constitute fair and adequate consideration for the execution of this Agreement. Employee further agrees that Employee has been fully compensated for all wages and fringe benefits, including, but not limited to, paid and unpaid leave, due and owing, and that the Severance Payments are in addition to payments and benefits to which Employee is otherwise entitled.

**Claims That Are Being Released**

3.      Employee agrees that this Agreement constitutes a full and final release by Employee and Employee's descendants, dependents, heirs, executors, administrators, assigns, and successors, of any and all claims, charges, and complaints, whether known or unknown, that Employee has or may have to date against Employer and any of its parents, subsidiaries, or affiliated entities and their respective officers, directors, shareholders, partners, joint venturers, employees, consultants, insurers, agents, predecessors, successors, and assigns, arising out of or related to Employee's employment or the termination thereof, or otherwise based upon acts or events that occurred on or before the date on which Employee signs this Agreement. To the fullest extent allowed by law, Employee hereby waives and releases any and all such claims, charges, and complaints in return for the Severance Payments. This release of claims is intended to be as broad as the law allows, and includes, but is not limited to, rights arising out of alleged violations of any contracts, express or implied, any covenant of good faith or fair dealing, express or implied, any tort or common law claims, any legal restrictions on Employer's right to terminate employees, and any claims under any federal, state, municipal, local, or other governmental statute, regulation, or ordinance, including, without limitation:

(a) claims of discrimination, harassment, or retaliation under equal employment laws such as Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Older Workers

40703215.2

Benefit Protection Act, the Rehabilitation Act of 1973, and any and all other federal, state, municipal, local, or foreign equal opportunity laws;

(b) if applicable, claims of wrongful termination of employment; statutory, regulatory, and common law "whistleblower" claims, and claims for wrongful termination in violation of public policy;

(c) claims arising under the Employee Retirement Income Security Act of 1974, except for any claims relating to vested benefits under Employer's employee benefit plans;

(d) claims of violation of wage and hour laws, including, but not limited to, claims for overtime pay, meal and rest period violations, and recordkeeping violations; and

(e) claims of violation of federal, state, municipal, local, or foreign laws concerning leaves of absence, such as the Family and Medical Leave Act. **[Other applicable provisions to be included based upon Employee's place of employment.]**

4.      If Employee has worked or is working in California, Employee expressly agrees to waive the protection of Section 1542 of the California Civil Code, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR

**Claims That Are Not Being Released**

5.      This release does not include any claims that may not be released as a matter of law or any applicable rights pursuant to the Fourth Amended and Restated Regulations of the Company dated [_____], 2013, as amended from time to time or pursuant to that certain Contribution and Purchase Agreement by and among Delta Directional Drilling, LLC, a Texas limited liability company, the Company, Delta Directional, LLC and Billy and Tammy Cleveland and this release does not waive claims or rights that arise after Employee signs this Agreement.  Further, this release will not prevent Employee from doing any of the following:

(a) obtaining unemployment compensation, state disability insurance, or workers' compensation benefits from the appropriate agency of the state in which Employee lives and works, provided Employee satisfies the legal requirements for such benefits (nothing in this Agreement, however, guarantees or otherwise constitutes a representation of any kind that Employee is entitled to such benefits);

[Signature Page to Employment Agreement]

(b) asserting any right that is created or preserved by this Agreement or the Employment Agreement, such as Employee's right to receive the Severance Benefits;

(c) filing a charge, giving testimony or participating in any investigation conducted by the Equal Employment Opportunity Commission (the "EEOC") or any duly authorized agency of the United States or any state (however, Employee is hereby waiving the right to any personal monetary recovery or other personal relief should the EEOC (or any similarly authorized agency) pursue any class or individual charges in part or entirely on Employee's behalf); or

(d) challenging or seeking determination in good faith of the validity of this waiver under the Age Discrimination in Employment Act (nor does this release impose any condition precedent, penalties, or costs for doing so, unless specifically authorized by federal law).

**Additional Employee Covenants**

6.     To the extent applicable, Employee confirms and agrees to Employee's continuing obligations under the Employment Agreement, including, without limitation, following termination of Employee's employment with Employer.  This includes, without limitation, Employee's continuing obligations under Sections 9 through 18 of the Employment Agreement.

**Voluntary Agreement And Effective Date**

7.     Employee understands and acknowledges that, by signing this Agreement, Employee is agreeing to all of the provisions stated in this Agreement, and has read and understood each provision.

8.     The parties understand and agree that:

(a)  Employee will have a period of 21 calendar days in which to decide whether or not to sign this Agreement, and an additional period of seven calendar days after signing in which to revoke this Agreement.  If Employee signs this Agreement before the end of such 21-day period, Employee certifies and agrees that the decision is knowing and voluntary and is not induced by Employer through (i) fraud, misrepresentation, or a threat to withdraw or alter the offer before the end of such 21-day period or (ii) an offer to provide different terms in exchange for signing this Agreement before the end of such 21-day period.

(b) In order to exercise this revocation right, Employee must deliver written notice of revocation to **[INSERT COMPANY CONTACT]** on or before the seventh calendar day after Employee executes this Agreement.  Employee understands that, upon delivery of such notice, this Agreement will terminate and become null and void.

40703215                    [Signature Page to Employment Agreement]

(c) The terms of this Agreement will not take effect or become binding, and Employee will not become entitled to receive the Severance Payments, until that seven-day period has lapsed without revocation by Employee. If Employee elects not to sign this Agreement or revokes it within seven calendar days of signing, Employee will not receive the Severance Payments.

(d) All amounts payable hereunder will be paid in accordance with the applicable terms of the Employment Agreement.

**Governing Law**

9.     This Agreement will be governed by the substantive laws of the State of Texas, without regard to conflicts of law, and by federal law where applicable.

10.     If any part of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement will not be affected in any way.

**Consultation With Attorney**

11.     Employee is hereby encouraged and advised to confer with an attorney regarding this Agreement. By signing this Agreement, Employee acknowledges that Employee has consulted, or had an opportunity to consult with, an attorney or a representative of Employee's choosing, if any, and that Employee is not relying on any advice from Employer or its agents or attorneys in executing this Agreement.

12.     This Agreement was provided to Employee for consideration on **[INSERT DATE THIS AGREEMENT PROVIDED TO EMPLOYEE]**.

**PLEASE READ THIS AGREEMENT CAREFULLY; IT CONTAINS A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

Employee certifies that Employee has read this Agreement and fully and completely understands and comprehends its meaning, purpose, and effect. Employee further states and confirms that Employee has signed this Agreement knowingly and voluntarily and of Employee's own free will, and not as a result of any threat, intimidation or coercion on the part of Employer or its representatives or agents.

EMPLOYEE

Date: _____      _____

[_____]